# EXHIBIT E

```
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                      JACKSONVILLE DIVISION

 3                  Case 3:24-cv-00044-MMH-MCR

 4   WILLIAM LEE LAWSHE, an individual,

 5           Plaintiff,

 6   -vs-

 7   ROBERT HARDWICK, in his official capacity as Sheriff of
     St. Johns County, MIKAYLA PRESTON, in her individual
 8   capacity as a Detective for St. Johns County Sheriff's
     Office, and KATHLEEN DULLY, in her individual capacity
 9   as medical director of the UF Child Protection Team,

10           Defendants.

11   _____/

12           REMOTE DEPOSITION OF EUGINE TOLBERT

13           Taken on Behalf of the Plaintiff

14           DATE TAKEN:  Tuesday, December 17, 2024
             TIME:        1:01 p.m. - 2:47 p.m.
15           PLACE:       Remotely via Zoom

16

17

18       Deposition of the witness taken before:

19              Maureen Hall, RPR, FPR

20

21

22

23

24

25
```

Page 9

```
 1      A.   So instead of just drowning the detectives in
 2   tips that don't go anywhere, at the supervisor level,
 3   we tend to try to triage those to a certain extent for
 4   tips that are actionable.
 5      Q.   Okay.  And what makes a tip actionable?  Is
 6   it like an identifiable suspect that you can -- you can
 7   locate?
 8      A.   Those are great tips, sure.  Yeah, if -- if
 9   we know who the bad guy is when the tip comes in,
10   that's -- that's a great start.
11      Q.   Okay.  Do you evaluate whether or not the
12   particular image is or is not of a minor at the time
13   that you're assigning these tips?
14      A.   Yes.
15      Q.   And tell me, how do you do that?
16      A.   Just based on kind of a common sense
17   approach.  If it looks like a duck and walks like a
18   duck, then we call it a duck.
19      Q.   So we were talking to Detective Greene, and
20   he described something called age-difficult as a
21   category.  Are you familiar with that?
22      A.   I don't know that it's a category, more of a
23   description, but, yes, I understand what you're
24   referring to.
25      Q.   What do you understand that term to mean?
```

Page 10

```
 1      A.   So for instance, in -- in -- and I don't want
 2   to get ahead of you, but I think I'm answering your
 3   question.  But in Mr. Lawshe's case, we received two
 4   separate tips on Mr. Lawshe.  One of those images I did
 5   not assign out because I deemed it to be age-difficult.
 6   The second image that we received, I did assign out
 7   because I deemed it to be decent.
 8      Q.   Okay.  Is it sometimes that investigators in
 9   your office disagree about what is age-difficult or
10   what is CSAM?
11      A.   I wouldn't say we have a deliberate
12   conversation about it.  I can't really remember a time
13   that there was a delineated disagreement.  I suppose
14   it's possible that there would be a disagreement, but I
15   just don't remember a time when someone said, No, I
16   don't agree with you.
17      Q.   Okay.  Would you -- if something was
18   age-difficult, I mean, do you ever investigate
19   age-difficult images?
20      A.   We do, yes.
21      Q.   Yeah.  So do you recall whether or not the
22   images involved in Mr. Lawshe's case were
23   age-difficult?
24      A.   So the initial tip that did not get assigned
25   out, I did deem that to be age-difficult.  The second
```

1   tip that we received in Mr. Lawshe's case, we felt like
2   it was CSAM, but we inquired about a second opinion.
3       Q.   And the reason I ask is, I asked
4   Detective Greene, and in his opinion, all of the images
5   on Mr. Lawshe's phone were age-difficult.  Is that just
6   you guys disagree about that, or some people have a
7   different definition of what age-difficult means?
8       A.   No.  So I think it's really based on the
9   personal experience in kind of -- so I have two
10  daughters, obviously, you know, there is a point of
11  reference there.  Everybody might not have that point
12  of reference when, you know, reviewing these things.  I
13  don't know what Detective Greene's point of reference
14  is, so I can't speak to that.  But from my point of
15  reference, I felt that it was an actionable tip.  But
16  as I said, we did seek a second opinion through
17  Dr. Dully at the Child Protection Team.
18      Q.   Did you communicate to Detective Preston at
19  the time that you communicated the tip that you felt
20  like the image -- image constituted child sexual abuse
21  material?
22      A.   Yes.
23      Q.   Did you ask her to investigate that?
24      A.   Yes.
25      Q.   And -- all right.  Were you a part of the

1  you look at a duck, you can usually tell a duck is a
2  duck.  I don't mean to be facetious, but this is the
3  best way I can explain it.  So if you have a question
4  as to, you know, any further detail, then you might
5  need to dig deeper.  And that's what we did in this
6  scenario when we reached out to Dr. Dully and the CPT
7  team.  So obviously Dr. Dully has a medical background.
8  She has specialized training and things like that.  She
9  has references she can refer to as far as literature to
10 give us a better estimate of age.  But it's really just
11 kind of a, you know, this one looks like this and this
12 one looks like that initial assessment of the case.
13      Q.   Okay.  So does the fact that you took the
14 image to Dr. Duly mean that there was some question
15 about the -- the model's age?
16      A.   No.  So if we didn't feel like it could be
17 CSAM, we wouldn't have taken it to Dr. Dully to begin
18 with.  So as I said, in -- in Mr. Lawshe's case, we got
19 two tips.  The first tip we deemed not -- to not be
20 actionable right off the bat.  We did not take that to
21 Dr. Dully.  I just closed that tip out.  The second tip
22 I felt like was actionable.  We took that tip to
23 Dr. Dully.  Dr. Dully agreed that it appeared to be a
24 child, and then we went forward with the investigation
25 from there.

Page 16

```
 1      Q.   Yeah, and I -- and I -- so I'm just -- I'm
 2   trying to understand.  So sometimes you don't take
 3   images to Dr. Dully, correct?
 4      A.   That's correct.
 5      Q.   If something is obviously a child, you -- you
 6   don't take it to -- to Dr. Dully, correct?
 7      A.   Correct.
 8      Q.   And that's what I'm trying to understand is,
 9   in this case, doesn't it say that this was not
10   obviously a minor because you took it to Dr. Dully?
11      A.   I mean, I don't know how to better answer
12   your question.  I felt it was a minor when I reviewed
13   the tip.  And, you know, to be fair, if we had taken it
14   to Dr. Dully and Dr. Dully said, No, this is not a
15   minor, then we would have went with what Dr. Dully
16   said.  You know what I mean?  But on face value when I
17   reviewed the tip, when I received the tip, I believed
18   the image to be of a minor.  I assigned it to Detective
19   Preston.
20      Q.   Right.
21      A.   And we took the image to Dr. Dully for a
22   second opinion.
23      Q.   For a second opinion.  Okay.
24      A.   So I don't have a better answer than that.
25      Q.   Well, really, and you just keep answering the
```

Page 17

1  best you can.  Okay?

2      A.   Sure.

3      Q.   But -- but when you say you believed that

4  this was a child, it -- it wasn't obviously a child,

5  though, was it?

6      A.   So I can tell you this.  And I will give you

7  a scenario.  If I --

8      Q.   I really just want you to answer the

9  question, really.  I mean, it wasn't obviously a child.

10  You wouldn't have taken it to Dr. Dully if it was

11  obviously a child, would you?

12     A.   Well, it obviously wasn't a two year old, so

13  I believed it to be an early teen child.

14     Q.   And if someone would have told you, no,

15  this -- this is an 18 year old, you would have believed

16  that too?

17     A.   If someone who had the expertise to give that

18  opinion, then, yeah.

19     Q.   What if someone had a copy of her ID and said

20  here's her ID, she's 18, would you have believed that?

21     A.   Oh, absolutely.  Yes.

22     Q.   Okay.  All right.  Okay.

23          But I guess what I'm saying is, is the type

24  and quality of imaging that we're -- that the model is,

25  it's not something that you would look at and say

```
 1   of the lead detective and the chain of command kind of
 2   supporting the decision.  We were in a little bit of a
 3   transition during that timeframe, so we had two layers
 4   of chain of command.  So that's why I don't know whose
 5   decision it was.
 6        Q.   As we sit here today, do you have an
 7   independent recollection of a conversation that you had
 8   with anyone regarding the decision to make an arrest of
 9   Mr. Lawshe?
10        A.   I don't.  I was just informed that it
11   happened.
12        Q.   Okay.  All right.  Who informed you?
13        A.   I don't remember.  I -- it was -- at that
14   point, there were a lot of moving parts.  I just -- I
15   don't remember who actually told me that he was going
16   to be arrested.  It might have been Captain Werle.  It
17   might have been my lieutenant.  I don't remember.
18        Q.   At that time, it sounds like you were
19   responsible for receiving and disseminating the NCMEC
20   cyber reports.  Did I understand that correctly?
21        A.   Correct, yes.
22        Q.   How many reports do you think you would get
23   back first quarter of -- of 2023?  And you can estimate
24   by week or month, if you can.
25        A.   It's kind of hard to estimate because some
```

```
 1    weeks were busier than others.
 2        Q.   Uh-huh.
 3        A.   So some weeks we would get upward of 50.
 4    Some weeks we would get two.  So really it -- there was
 5    really no rhyme or reason to it.  It's just kind of,
 6    you know, however we received them.
 7        Q.   And is there a way for you to estimate how
 8    many of those you -- we used the word culled, but did
 9    not assign because you felt like they weren't
10    actionable just by looking at the image?
11        A.   I tried to weed out as many as possible just
12    to keep the detectives' case loads manageable.  If I
13    had to put an estimate on it, I would say probably
14    somewhere around 50 percent.  But, you know, there's
15    wiggle room on both sides there, so...
16        Q.   Was it a relatively common thing that you
17    would get a NCMEC report and it would not be
18    actionable?
19        A.   Correct, yes.
20        Q.   All right.  Whether it was 60 or 40, I
21    understand you can't testify to that?
22        A.   Correct.
23        Q.   Are you familiar with the NCMEC term
24    "Unconfirmed child pornography"?
25        A.   I am, yes.
```