# EXHIBIT G

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
Civil Action No. 3:24-cv-00137-WWB-LLL


WILLIAM LEE LAWSHE,
an individual,

                    Plaintiff,


V.


VERIZON COMMUNICATIONS, INC., a
Delaware Corporation, and SYNCHRONOSS
TECHNOLOGIES, INC., a Delaware
Corporation,

                    Defendants.





                    Deposition of Cara Blaszka,
            The remote videoconference was taken by
                    Michael K. Roberts, Esquire
                    Before Lourdes Valdes,
                Certified Professional Reporter,

                    On June 13, 2025,
        Beginning at 9:00 a.m. & ending at 2:00 p.m.

                          - - -

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

**Page 20**

quote, near matches.

So if there is a direct match, an exact match or a near match, the image itself gets put into a quarantine server. It never makes it to the subscriber's account.

Hold on, let me take a little drink.

Once it's in the quarantine file, the server, Verizon has contracted with a third-party called WebPurify, who conducts human review of every single image. So a person from WebPurify will access our server -- doesn't have possession, just has ability to view the image. They will put their human eyes on the image and determine whether it's apparent CSAM or not.

If they do determine it is, or potentially could be apparent CSAM, looks like CSAM, then it is classified in a certain way. The classifications -- I don't recall if they're statutory, but they're A1, B1, A2, B2, with A and B being -- which I always get mixed up, prepubescent, postpubescent. And then -- and I always get this word wrong -- one being lascivious, I think I said it, lascivious.

Q.   It's a tough word.  It's a tough word.

A.   And one being -- I say it all the time that's the irony.  And the other being exhibitions.  So after there is a determination that, yes, there is, it is apparent CSAM and it's classified as part of our automated process, a data feed is then created in our system and automatically sent to NCMEC.

I always say that human review is almost like clicking

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025

Page 21

a button just to decide which path it goes on.  It is or it is not.

Q.    So let me back up here and thank you for that.  I mean, I think that was fairly comprehensive, but -- so who has a contract with WebPurify?

A.    Verizon.

Q.    Does Synchronoss have any visibility into the terms of that agreement?

A.    No.

Q.    All right.  You say at the beginning of when the -- either the image is an exact match with an MD5 Hash value or if it's not, then it's PhotoDNA -- a PhotoDNA Signature is generated for that particular image and then that is also queried.  If there is a match, then the image is quarantined.

Did I understand that correctly?

A.    A match or a near match.

Q.    Or a near match, yeah.

A.    I always get confused with MD5 and SHA, so I cannot speak to which one we use because now I'm all spun up in my head.  But yes, we do use the Hash value and if there's a direct match, meaning it's exact, to the NCMEC list, or if PhotoDNA comes up and says there's a near match.  A near match does not exactly match the list, it's meant to be very, very close.

In those two circumstances, you are correct, the image is then intercepted before it gets to the subscriber's account

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

and it is put into the quarentine.

Q.   Okay.  And at that point, when it's intercepted, put into quarantine, the user or the customer would not be able to access that from the cloud?

A.   From the cloud, correct.  It does not hit the cloud account.

Q.   Okay.  And then the human reviewer.  Okay.  So once it's quarantined, how do you communicate with WebPurify, how does that happen?

A.   They are part of the process.  So when the images go into quarantine, they're either notified somehow -- I don't know the specifics of it.  But I do know that they have access and they have 48 hours to view and make a determination on the image.

Q.   And then after the human review, what is the determinant -- who determines whether or not a report is sent or not?

A.   Well, WebPurify.  If -- WebPurify doesn't make a determination on the report, but WebPurify makes a determination on the image.  If they say apparent CSAM, essentially click the button, then the data is automatically generated into a data feed and sent to NCMEC.

So, for example, we do not issue cyber tips themselves.  We only provide the data feed from which NCMEC creates the cyber tips.

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025

Page 42

human review team?

A.   Yes.

Q.   Other than the human review response and the fact that there was a match or a near match with an image in this NCMEC NGO Hash List, are there any other facts and circumstances that support Synchronoss's action to initiate a NCMEC report?

MR. REISS:  Object to the form of the question.  But you can go ahead and answer it.

THE WITNESS:  Okay.  Thanks.  We rely on our scanning process.  Our scanning process predominantly is the -- in fact, yes, the scanning process involves checking the NGO list and the human review by WebPurify.

So, yes, your answer is yes.

BY MR. ROBERTS: (Resuming)

Q.   Now, there was a time historically where, I think there was not a human review process?

A.   Yes.  And that Northern District of Ohio case keeps coming back to bite me.  Yes, that is true.

Q.   Well, I mean, you know.

A.   That's from 2019, before I took over.

Q.   Well, when did that change?

A.   Verizon implemented the human review the end -- I always get it mixed up, whether it's the end of '22 or the beginning of '23, or the end of '21 beginning of '22.  It was sometime in 2022, I believe, the end of 2022.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 52

and "reviewed" meaning "viewed by an individual during the scanning process for the image relating to this cyber tip." Yes.

Q.   Okay.  I think we just established, and you got offended that I tried to make the distinction.  But would you agree now that you cannot truthfully answer that it was reviewed by a human being?

A.   I do not agree with that at all.  Contractually, WebPurify is required to review it.  There is no reason for me to say they violated their contract, so I will stand behind. This image was human reviewed.

Q.   And that's based on the contractual obligation between Verizon and WebPurify?

A.   Correct.

Q.   Have you ever viewed that contract?

A.   Nope.

Q.   Do you know if there's any disclaimers about relying on the results of human review?

A.   I have a contract -- I cannot speak to the contract I have not reviewed it.

Q.   All right.  So what's your understanding of -- I asked you, we got a little sidetracked, about -- you said there was an agreement with NCMEC to view the NGO list.

Did I understand that correctly?

A.   Yes, there is what's called the Hash Sharing Agreement.  It's in our document production when the

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 101

BY MR. ROBERTS: (Resuming)

Q.   Okay.  So just for the record, the incident -- I mean, sorry, the report time is 21:28:58 on October 29th?

A.   UTC, yes.

Q.   UTC.  And the incident information and the incident time, this is provided -- this is information that is provided by Synchronoss, correct?

A.   I would think it comes from our data feed, correct.

Q.   Yeah.  It's the exact same time as the report time, would you agree?

A.   Yes.

Q.   Will you agree that this time is in no way -- this incident time is in no way connected to any conduct of Mr. Lawshe?

A.   I would not say that at all, no.  That's a -- that's a very broad extrapolation.

Q.   Okay.

A.   And I would say the other way, but yes, this does have -- from the direct actions of Mr. Lawshe.

Q.   Okay.  So let me just ask:  Is it -- this is the same time as the report time.  Is that the policy of Synchronoss is that, the incident time match the report time?

A.   No.  No.  I think there's a little bit of a confusion here.  So the incident time is when we report it to NCMEC.

So as I described our whole process for and how it

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 102

takes 24 hours, you know.  About how WebPurify has 24 hours to view and make a determination of the image.  The image is not considered actual -- or, I mean, sorry.  Suspected or apparent CSAM until it's human reviewed.  So technically, the WebPurify determination is our incident time.  And it's the first time Synchronoss has determined its apparent CSAM and it gets sent off to NCMEC.

Now, that is for purposes of reporting to NCMEC.  There's other data that we maintain that shows other timing.

Q.    There's actually -- and I confirmed this with NCMEC, there's actually other fields that you can clarify incident time information in a Cyber Tip Report, are you aware of that?

A.    No.

Q.    You didn't provide any of that additional information to NCMEC at the time of the report, did you?

A.    I would say no, but I'd have to see our data feed to see what from the data feed NCMEC took from.  But I would think no.

Q.    I asked if this is a policy, and then you answered my question, and then it seems like it is the policy that at the point in which Synchronoss or WebPurify makes the decision, this is reportable content.  That is the definition of the incident time as far as Synchronoss is concerned?

A.    No, that's not.  No, it's not the incident time as far as Synchronoss is concerned.  It's the incident time as far as

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 111

Q.   Okay?

A.   And that's my understanding, too.  I mean, I think there's that -- above incident information, there's, I think, canned language that they put in relating to us and Verizon that goes into every cyber tip.

So that's not specific to this one, but yes, the other information would be from our data feed.

Q.   Okay.  And so there's a file name here that would have been information provided by Synchronoss?

A.   Yes.

Q.   There's an MD5 Hash value?

A.   Yes.

Q.   Was that provided by Synchronoss?

A.   Yes.

Q.   Does that give you any information that this image was flagged as an MD5 Hash match?

A.   Yes, that does.  Thank you.  That refreshes my spin around on which kind of Hash it was.

Q.   Okay.  We've talked a little bit about, did the reporting ESP view the entire content of the uploaded file?  The answer is yes.  You testified that that is based on input from WebPurify?

A.   Yes, that is correct.

Q.   Were entire contents of uploaded file publicly available?  The input here is no.  What does that mean?

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 112

A.    I don't know.  That is always no on the cyber tips I have seen.  It's not applicable to our business.  It might be more for like a social media posting type provider.

Q.    So you think that it's always no on your reports?

A.    I don't recall.  But from what I've seen -- again, I only see a handful of reports.  I'm pretty sure it's no, I don't know in what circumstance any of that would be yes.

Let's put it that way.

Q.    Do you really know what this field is seeking, the information that it's seeking?

A.    Yes, it says what it's seeking.  Are they publicly available and no.  Because we're talking about a personal cloud.  This is not -- that's why it's a little bit different than other providers.

Q.    So, I mean, I can tell you that both of these, the entire contents of both of these files were available publicly on the public internet?

A.    They were.  I mean, this document -- are we only talking about the image or the data feed?  Because I thought we were talking about both.

Q.    Well, I --

A.    Because our package is the whole thing.

Q.    Hold on one second.  I want to get your understanding of what this question means and what Synchronoss meant by the answer, no.  And I thought I understood you to say, you're not

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 113

really sure what this field is trying to elicit.

But then I got a little bit different answer.  So I'm going to ask you again, what is your position that this field indicates or is intended to communicate to NCMEC?

A.   You'll have to ask NCMEC, it's their field.  I don't know.

Q.   Okay.  All right.  Do you understand, though, that the contents, the contents which were transmitted, the content that was flagged in both instances, those files, they were downloaded from the public internet?

A.   I have no knowledge of that.

Q.   Okay.  Do you know -- one of the images, I think both of the images had a www.com website listed on the image?

A.   Is that a question or a statement.

Q.   Yeah, it's a question?

A.   I have no knowledge.

Q.   You've reviewed these images.  Do you remember seeing a website listed on them?

A.   I don't recall seeing the website on them.

Q.   Okay.  All right?

A.   It doesn't mean it wasn't there, I just don't recall. I wasn't focusing on the website.

Q.   I understand.  This image categorization, do you know -- and I'm asking for your knowledge, and this may be a technical question.  Is this categorization derived from the

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 119

as well.  Only people with the need to know to view them can view them.  There are limitations, and I recommend you check the statute on that, because they're in there.

Q.    No, I have, and I certainly get the tone.  But WebPurify looks at the images, right?

A.    Yeah.

Q.    And that's not a violation of the law?

A.    No, because it's part of the process.

Q.    Right.  And you're part of the process, too.  So there's nothing that would prevent Synchronoss from reviewing the images themselves inhouse if Verizon directed you to do that?

A.    If Verizon directed us to do that, we could look into that, that is correct.

Q.    Sure.  Okay.  Yeah.  I mean, you keep talking about statutes and prohibitions, but --

A.    And you keep trying -- you keep trying to corner me into what -- excuse me.  You keep trying again to corner me into something that's not accurate.

So I'm just being extra cautious based on your demeanor earlier in this deposition.

Q.    Are you talking about when you -- when you -- when you --

A.    When you told me a liar on the record, yes.

Q.    No, and I'm not --

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 129

of upload.  That's all I can say.  I can't speak as for what legal requirements they need to make in order to make their probable cause.

But I can say that is not the time of uploading.

Q.   Okay.  I'm not going to re ask these same questions because I think they're fairly -- you know, are the questions I asked about the earlier exhibits -- I'll just do it, I guess.  File name, this is -- this is information that you guys provided to NCMEC?

A.   Yes.

Q.   The MD5 Hash value that indicates that this was a Hash match, an MD5 Hash match, not a PhotoDNA Signature match?

A.   I wouldn't say that.  I don't know.  I think we have a Hash value, I believe for all of them.  I don't know for sure, but that does not sound right to me.

Q.   So it could have been a PhotoDNA or an MD5 Hash match?

A.   Yes.  A direct match or near match.

Q.   Okay.  The information regarding -- did the reporting ESP view the entire contents of the uploaded file?  Again, that input is by WebPurify?

A.   I shouldn't say it's by WebPurify or it's by us because we use WebPurify.  I know you asked me that earlier and I want to clarify that.  All of our images are viewed, so that's always yes.  I don't know if we just automatically have it hard coded as yes or it's from WebPurify.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 133

Q.    -- or a near match, PhotoDNA match.  And it is placed in quarantine and is placed for human review.

At that point in the process, there's been no decision or determination about whether or not a report will be sent regarding that particular content?

A.    Right, the process is still pending.

Q.    From that point forward, the determining -- whether a report will be sent is determined on WebPurify's response to the human review?

A.    Yes.

Q.    Okay.  There's no mechanism where, if WebPurify says B1, there's no process for Synchronoss reviewing or auditing that decision?

A.    Well, no.  Also because there's two factors there, but the main factor is that, we don't have a contract with WebPurify.  So their review is governed by Verizon.  But that is correct, we don't audit, essentially, is what you're asking.

Q.    Yeah.  Once they -- and I know this is a euphemism, but like, once they hit the button and say, this is B1, then the report is going to be sent and there's really nothing that can be done at that point?

A.    It is an automated generated report.  So just to be clear, WebPurify doesn't see everything else about the report. They have access to the image and their involvement is extremely limited to seeing the image, classifying, and moving on.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 138

A.    Which model are we talking about, the second --

Q.    Yeah.

A.    Do you want my personal opinion?  I looked at the image and I think she looks under 18.

Q.    Okay.

A.    That's all.

Q.    That's okay.  Let me ask you this:  Do you think that sometimes it can be difficult for -- and I did note your comment, your quip that we are the same age.  I may be a year or two older than you, but I don't know.

The older we get, the harder it is to tell people's age?

A.    No.  I have children.  I can tell you what their friends ages are.  I don't agree with that at all.

Q.    How old -- how old are you -- how old are your kids?

A.    10 and almost 13, he'll be 13 in August.

Q.    So I have a 13 year old, and I have a 7 year old, and I have a 5 year old.

So your testimony is you don't find that sometimes it's difficult to tell how old, like if you're on a college campus or something, how old the kids are?

A.    Generally it depends on the age of the children we're talking about.  It's a very odd question.  I mean, I'd like to think that --

Q.    Well --

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 146

your database and say, this is every time that we've reported this particular MD5 Hash?

A.    That's what I'm told, yes.

Q.    Yes.  Okay.  All right.  Now I will tell you that NCMEC does keep an internal Hash List of all reported files. They have -- I think the October image that has been reported over 100 times and the -- not by Verizon or Synchronoss, I'm not saying about you.  They just have -- and the January image has been reported over 200 times.

Again, not saying Synchronoss, right?

A.    Right.

Q.    But other than obtaining those reports through NCMEC, do you know of any other way where I could determine whether or not Synchronoss has sent any other reports regarding these specific Hash or this content?

A.    No.  I mean, I understood that's what you were trying to get at in the request, and I did ask my team about it, and they tell me that's not something that our system is set up to do.  I don't know.

We could also -- I could speak with someone from my technical team who can give more color of why, but not that I'm aware of that we have that ability, no.

Q.    And so you -- it sounds like, have -- how often do you communicate with NCMEC or their personnel?

A.    Infrequently.  It's usually only the, like, quarterly.