# Exhibit F

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

```
 1                UNITED STATES DISTRICT COURT

 2                  MIDDLE DISTRICT OF FLORIDA

 3                     JACKSONVILLE DIVISION

 4              CASE NO. 3:24-cv-00044-MMH-MCR

 5

 6    WILLIAM LAWSHE,

 7              Plaintiff,

 8    vs.

 9    MIKAYLA PRESTON, in her individual
      capacity as a detective for St. Johns
10    County Sheriff's Office, and
      KATHLEEN DULLY, in her individual capacity
11    as medical director of the UF Child Protection
      Team,
12
                Defendants.
13    _____

14                            VIDEO RECORDED

15    DEPOSITION OF:      WILLIAM LEE LAWSHE

16    DATE TAKEN:         Friday, March 14, 2025

17    PLACE TAKEN:        1260 North Ponce de Leon Boulevard
                          Suite E
18                        St. Augustine, Florida 32084

19    TIME:               9:16 a.m. - 12:16 p.m

20    BEFORE:             LAURA DWYER PIERLE, RPR
                          STENOGRAPHIC COURT REPORTER
21                        AND NOTARY PUBLIC - STATE
                          OF FLORIDA AT LARGE
22    ****************************************************

23              ST. AUGUSTINE COURT REPORTERS
         1260 NORTH PONCE DE LEON BOULEVARD, SUITE E
24              ST. AUGUSTINE, FLORIDA  32084
                        904-825-0570
25
```

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 3 of 17 PageID 790

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 2

```
 1   APPEARANCES:
 2
          On behalf of the Plaintiff:
 3            NOONEY AND ROBERTS, P.A.
              1680 EMERSON STREET
 4            JACKSONVILLE, FLORIDA  32207
              By:  MICHAEL KEITH ROBERTS, II, ESQUIRE
 5
 6        On behalf of the Defendant Mikayla Preston:
              SNIFFEN & SPELLMAN, P.A.
 7            123 NORTH MONROE STREET
              TALLAHASSEE, FLORIDA  32301
 8            By:  MATTHEW J. CARSON, ESQUIRE
                      AND
 9               CHRISTEN PETRUZZELLI, ESQUIRE
                  (Present via videoconference)
10
          On behalf of the Defendant Dr. Dully:
11            BANKER, LOPEZ, GASSLER, PA
              1900 SOUTHEAST 18th AVENUE
12            SUITE 300
              OCALA, FLORIDA 34471-8237
13            By:  AMY SHEVLIN, ESQUIRE
                  (Present via videoconference)
14
     ALSO PRESENT:
15
              DAN BISHOP, VIDEOGRAPHER
16
17
18
19
20
21
22
23
24
25
```

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 4 of 17 PageID 791

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                             Page 3

```
 1

 2                              - - -
                               I N D E X
 3                              - - -
     WITNESS:                                                    PAGE
 4   WILLIAM LEE LAWSHE

 5   DIRECT EXAMINATION BY MR. CARSON                              5
     CROSS EXAMINATION BY MS. SHEVLIN                              88
 6   REDIRECT EXAMINATION BY MR. CARSON                            121

 7
     CERTIFICATE OF OATH                                          127
 8   CERTIFICATE OF REPORTER                                      128

 9                              - - -
                             E X H I B I T S
10                              - - -
     NUMBER                    DESCRIPTION                        PAGE
11
     DEFENDANT'S EX. 10   PLAINTIFF'S ANSWERS TO DEFENDANT   40
12                        MIKAYLA PRESTON'S INTERROGATORIES
     DEFENDANT'S EX. 11   PLAINTIFF'S ANSWERS TO DEFENDANT   40
13                        DR. DULLY'S INTERROGATORIES

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 5 of 17 PageID 792

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                        Page 44

1    A    Yes, sir.
2    Q    Okay.  And how would you access these
3  websites?
4    A    Just via the internet.
5    Q    What kind of phone did you have?
6    A    I don't recall.  I mean, it was -- not Iphone.
7  It was an android.
8    Q    Do you know the name of the web browser that
9  you used?
10   A    If I said, I wouldn't -- I'd be lying if I was
11 truthful I knew that's what it was.  I really don't.
12   Q    Okay.  Is it one that came on the phone?
13   A    I would -- I would think so.
14   Q    Did you ever download onto your phone the one
15 that you had in April 2023 any browser other than the
16 one that came on the phone?
17   A    I think it had -- I think the phone had
18 several browsers on it, but I don't recall what they
19 were.
20   Q    Did you download any additional browsers?
21   A    I don't recall.
22   Q    Did you download any other program that would
23 allow you to access, view or download photographs?
24   A    I honestly don't recall.
25   Q    Did you download anything that would conceal

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 6 of 17 PageID 793

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                      Page 45

1   your identity as you browse the internet?
2        A    I don't believe so, no, sir.
3        Q    Did you ever download a VPN?
4        A    No, sir.
5        Q    Did you ever download an anonymizer?
6        A    Not that I am aware of, no, sir.
7        Q    When you searched did you search in regular
8   mode?
9        A    I'm not sure regular mode.
10       Q    So a lot of web browsers will have what they
11  call an incognito mode?
12       A    Okay.  Um.  I don't recall.  I -- whatever the
13  settings were if I downloaded something or whatever was
14  there I just used what was there.
15       Q    Okay.  Did you ever delete your search
16  history?
17       A    Not that I recall.
18       Q    Did you ever use a search engine or a browser
19  that does not save your search history?
20       A    Didn't know that was possible.  I'm not aware
21  that I did.
22       Q    You're assuming that that picture was found on
23  your phone because I'm representing to you that it was
24  found on your phone.  But as we sit here today you have
25  no recollection of that photograph ever being on your

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 7 of 17 PageID 794

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 46

```
 1   phone; is that correct?
 2        A    No, sir.  Correct.
 3        Q    Do you have any reason to dispute the
 4   assertion that that photograph was found on your phone?
 5        A    No, sir.
 6        Q    All right.  Do you know what your -- you had
 7   Verizon at the time, correct?
 8        A    The provider that was provided Verizon.
 9        Q    Okay.  Did Verizon as part of your
10   subscription, as part of your plan with Verizon was
11   there any sort of cloud storage that accompanied
12   your cellphone?
13        A    I think they all come with it.
14        Q    Are you familiar with what Verizon uses for
15   its cloud storage?
16        A    No, sir.
17        Q    Are you aware, do you know if the photos that
18   you downloaded to your phone were also simultaneously or
19   later uploaded to a cloud storage site?
20        A    No, sir.
21        Q    Let me take that one back.
22        A    Although I can say it was alleged it did go to
23   a cloud.  I think that's what they said at some point
24   during the lawsuit.
25        Q    And I'll just tell you this for whatever it's
```

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 8 of 17 PageID 795

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 47

1  worth, there are a lot of questions that I might ask you
2  that other people are better suited to answer and that's
3  fine.  My point today is to find out what your
4  understanding and what your knowledge is.
5       A    Okay.
6       Q    And I believe this is 8B, which if you skip
7  ahead a couple of pages, sir -- I am going to help you
8  find it.  This is the next image that we're going to
9  talk about.  It's the one that ends in f6a487.
10      A    Okay.
11      Q    And we have marked that as Exhibit B -- 8B.
12 Excuse me.  Do you recall ever seeing that image?
13      A    I recognize the face, but that's all I can say
14 that I recognize.
15      Q    Okay.  What do you recognize the face as?
16      A    Just one of the models that was on a site that
17 I guess I saw.  I can't tell you the site.
18      Q    Do you remember downloading that photograph?
19      A    No, sir.
20      Q    Do you remember having that phone on your
21 phone -- I'm sorry -- that image on your phone?
22      A    No, sir.
23      Q    Do you remember -- if I represent to you that
24 that image was at some point on your phone, would you
25 have any reason to dispute that?

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 9 of 17 PageID 796
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 52

1  no. I mean, I just would -- I went to one or two sites
2  usually and that was it, because I wanted to be careful.
3       Q    Of what?
4       A    Well, there is a lot of shit on the internet.
5  And I'm a police officer and I know I uphold and
6  represent and I don't want to go to some website that is
7  shady or have something that's not legal.
8       Q    **What do you mean there is lots of shit on the**
9  **internet?**
10      A    Just that. I mean, you turn on anything on
11 the internet. I mean, I've made -- what was this thing
12 I did the other night. On Snapchat people were just
13 putting stuff that is not appropriate. And on Snapchat
14 there was a picture that obviously somebody had like
15 monochrome to make it monochrome. So I guess to get
16 past their AI stuff so kids could still see it and it
17 was obviously two people having sex. And it's like so I
18 reported that as an inappropriate image to them and so
19 they could take it off. That's just something that
20 shouldn't be on a site like that.
21      Q    **Was there something inappropriate about the**
22 **two people having sex?**
23      A    Well, yeah, because kids have access --
24      Q    **To Snapchat?**
25      A    -- to Snapchat.

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 10 of 17 PageID 797

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 53

1  Q   Okay.
2  A   That's only an adult should be able to see
3  that stuff.  I mean, I would be -- go out of my mind if
4  my five year brought something to me or 10 year old,
5  hey, Dad, what is this?  Can you explain this?
6  Q   I guess my point is, you know, we're dealing
7  with allegations of minors.
8  A   Okay.
9  Q   And I just wanted to make sure your objection
10 to it was that it was on Snapchat, not that the video or
11 the image itself was illegal?
12 A   Right.  No.  No.  No.  It was -- well, it
13 should be illegal to have -- if somebody put something
14 like that for a kid to see that should be illegal.
15 Q   Sure.
16 A   But, no, there was no -- this was an adult
17 site for all intents and purposes.  It had all the USC's
18 down at the bottom of the website.  It was all models
19 were legal under the United States law.  I can't
20 remember the verbiage.  But so I had nothing to assume
21 anything in that website was legal --
22 Q   Was illegal?
23 A   Legal.
24 Q   You believed it was legal?
25 A   Correct.

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 11 of 17 PageID 798

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 54

```
 1        Q     Because of the disclaimers?
 2        A     Because of the disclaimers and, I mean, it was
 3   a paid site.
 4        Q     You -- and I'm going to ask you again because
 5   you said it is a paid site.  Do you recall -- do you
 6   have any recollection if you paid?
 7        A     I don't.  Most of those sites offer like three
 8   day trial free offers and stuff that you get like two or
 9   three days to watch it, to view the site, to see if you
10   want to pay.  And I'm sure that's what I did, because I
11   was cheap.
12        Q     Okay.  And during that two to three day trial
13   period would you download photographs?
14        A     Safe to say, yes.
15        Q     I want to make sure I understand this.  Before
16   you looked at any of the photographs on Med-Art.com you
17   went to the bottom of the web page and checked that
18   there were --
19        A     I didn't specifically go there for it.  But it
20   was -- it's put on the site.  I mean, you could go to
21   the site and look at it yourself.  It's there in a
22   manner that you can see that it complies with all U.S.,
23   I think it even says Canadian laws.
24        Q     My question to you is this though, before you
25   looked at any of the images did you look to see if it
```

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 12 of 17 PageID 799

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                           Page 55

1  had those disclaimers?
2       A    I believe so.  But I'm not 100 percent
3  certain.  But I'm pretty sure I did, because, again,
4  like I told you, I wanted to make sure it was a valid
5  site, you know.  That there was -- because I was a
6  police officer.
7       Q    If it didn't have the USC sites at the bottom,
8  would you have still looked at the photographs?
9       A    Probably not.  I mean, I just know.  I mean,
10 you have things that pop up on the phones sometimes, and
11 I would just go away from that site.  I mean, I tried to
12 stay with what I considered to be legitimate sites.
13      Q    Okay.  What would you be concerned about
14 seeing, viewing on a nonvalid site or non-legitimate
15 site?
16      A    I mean, I'm concerned, I guess, what some
17 people might construe as being extreme or whatever.  I
18 mean, I just wanted stuff like Playboy or Penthouse, I
19 mean, that's what I grew up.  When I was in the Army I
20 looked at Playboy and Penthouse.  And this site and the
21 Hegre Art site was familiar with and looked just like
22 Playboy and Penthouse.  It was what I called tasteful.
23      Q    But you said a couple of times you were
24 concerned as a police officer about --
25      A    Right.

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 13 of 17 PageID 800

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 56

1    Q    What were you concerned about viewing?

2    A    I mean anything that potentially could be
3    offensive or brought to be illegal I guess.

4    Q    Okay.  Was part of your concern about viewing
5    photographs on a website that didn't have a disclaimer,
6    didn't have the USC sites that it might contain child
7    pornography?

8    A    No, because I don't think that's available on
9    the regular internet.

10   Q    Okay.  So, I mean, this disclaimer USC sites
11   or not, you can go to any website and you shouldn't be
12   afraid as a law enforcement officer that you're going to
13   see something illegal, correct?

14   A    Well, illegal and the society we live in, what
15   might -- somebody might find offense may not be illegal
16   but they would find offensive.  And me as a police
17   officer I always try to draw the line on I need to be
18   better than the average person.  I'm also a Christian.
19   And I didn't want to look at anything that potentially
20   would get into that realm to where, you know, I'm kind
21   of breaking my upbringing with Christ and things like
22   that.  I just look for tasteful pictures.  And if you go
23   to either one of those sites these are tasteful pictures
24   in my opinion.  They don't demoralize women or anything
25   like that.

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 14 of 17 PageID 801

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                        Page 57

```
 1        Q    Do you know if Med-Art is marketed towards --
 2   marketed as having images of young girls and teenagers?
 3        A    No.
 4        Q    You mentioned that, and I think you answered
 5   this question in a roundabout way, you said you've only
 6   gone to one or two sites, you've mentioned the Hegre Art
 7   site, you've mentioned Med-Art.  Any other sites that
 8   you've gone to?
 9        A    Not that I can recall.  Best of my memory
10   those were pretty much my -- where I went.
11        Q    Okay.  Is it your testimony today that there
12   is no image of child pornography available on the
13   internet on a public website today?
14        A    I would say yes.  I mean, I've never come
15   across it or never heard of another officer telling me
16   they've come across it.  I've always heard the dark web.
17   You know, the dark web, dark web type stuff.
18        Q    Do you know where you were when -- you don't
19   remember specifically viewing the picture that's 8B,
20   correct?
21        A    Correct.  But I do recognize her face.
22        Q    Okay.
23        A    And that just comes from being a law
24   enforcement officer.
25        Q    What does that mean?
```

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 15 of 17 PageID 802

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 67

1           MR. ROBERTS:  Objection.
2           THE WITNESS:  Neither way, no, sir.
3    BY MR. CARSON:
4       Q    Did you have a practice of at some time during
5    the months between and including October 2022 and April
6    2023 would you deplete photos from your phone from time
7    to time?
8       A    I mean, I'm sure I did because memory would
9    run out and stuff.  I think there were programs on my
10   phone that would clean up memory and do stuff, I mean,
11   yeah.
12      Q    Okay.  Do you remember ever going through and
13   saying -- whether to clear up memory space or for any
14   other reason, do you remember ever going through your
15   phone and deleting photographs that you had downloaded
16   from the internet?
17      A    Not specifically, no.
18      Q    Other than visiting websites and downloading
19   photos, did you receive any photographs of naked woman
20   or otherwise sexually explicit photographs in any other
21   manner?
22      A    No.
23      Q    Did anyone ever text you a photograph?
24      A    Some officers.
25      Q    Okay.  Did you ever save any of those

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 16 of 17 PageID 803

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 72

```
 1   photograph on your phone?
 2        A    No, sir.
 3        Q    The last photograph I'm going to show you is
 4   -- I think skip ahead a couple of pages and I will show
 5   you where it appears.
 6             MR. ROBERTS:  The DuckDuckGo.
 7   BY MR. CARSON:
 8        Q    Yeah, we're going to call that the DuckDuckGo?
 9        A    Yes, sir.
10        Q    And it has been marked as Exhibit 8E.  Do you
11   recognize that photograph?
12        A    I don't.  But I do remember the name of that
13   site.
14        Q    What site is that, sir?
15        A    Amour Angels.
16        Q    Okay.  Is that a site that you would go to?
17        A    I think it was a sister site that I remember
18   to -- I forget the name of the other one.  The Med-Art
19   that we were talking about.  I think they are all sister
20   sites with the Petter Hegre one.
21        Q    If you were subscribed to Petter Hegre your
22   understanding is that you also would have access to
23   Med-Art and Amour Angels?
24        A    As best I remember I think that was the way it
25   worked.  It was a trial, free trial thing.
```

Case 3:24-cv-00137-MMH-LLL   Document 77-7   Filed 10/06/25   Page 17 of 17 PageID 804

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                        Page 79

1   a web page that had a federal age verification law
2   certificate at the bottom, correct?
3        A    I've never experienced that.
4        Q    Okay.  Is it your experience then if you find
5   a photograph online of a woman being demoralized, again
6   your word, that they are not going to have federal age
7   verification law compliance certificate at the bottom?
8        A    They may or may not.  It just depends on, like
9   I said, when you look at the website you can see, again
10  my opinion, you can tell if a website looks like a
11  professional website or not just by looking at it, you
12  know.  It's either going to be one that's presented
13  professional -- presented professionally or not.  And I
14  tried to just go to the ones that looked professional.
15  And all of the ones that looked professional have that
16  age verification on it.  Because, again, they are in the
17  business to make money.  They don't make money by not
18  being professional and treating -- treating their models
19  respectfully and so forth.
20       Q    Is it your testimony that web pages that show
21  what you would consider demoralizing photographs of
22  adult women will not have federal age verification law
23  compliance?
24       A    Can you repeat that one more time.
25       Q    Sure.