UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
CASE NO.: 3:24-cv-00137-MMH-LLL

WILLIAM LEE LAWSHE,
an individual,
Plaintiff,
-vs-
VERIZON COMMUNICATIONS, INC.,
a Delaware Corporation, and
SYNCHRONOSS TECHNOLOGIES, INC.,
a Delaware Corporation
Defendants.

---

REMOTE VIDEOTAPED DEPOSITION OF DAVID RUNYON
IN HIS CAPACITY AS CORPORATE REPRESENTATIVE
VIA ZOOM PLATFORM
Thursday, October 22, 2025
1:07 - 6:23 p.m.

Reported By:
Wendy Beath Anderson, RDR, CRR, CRC
Notary Public, State of Florida
Esquire Deposition Services
West Palm Beach Office Job #J13610228



APPEARANCES:

On behalf of the Plaintiff:
MICHAEL K. ROBERTS, ESQUIRE
JEFFERY S. NOONEY JR., ESQUIRE
LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI
1680 Emerson Street
Jacksonville, Florida 32207

On behalf of Verizon Communications, Inc.:
NURY SIEKKINEN, ESQUIRE
SUDHIR RAO, ESQUIRE
ZWILLGEN PLLC
1900 M Street NW, Suite 250
Washington, DC 20036

On behalf of Synchronoss Technologies, Inc:
ANDREW H. REISS, ESQUIRE
BOND, SCHOENECK & KING, PLLC
4001 Tamiami Trail North, Suite 105
Naples, Florida 34103

ALSO PRESENT:
PATRICIA SUNAR, ESQUIRE
ASSOCIATE GENERAL COUNSEL, VERIZON

MICHAEL ACKER, REMOTE VIDEOGRAPHER



\- - -
I N D E X
\- - -


| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID RUNYON | | | | |
| BY MR. ROBERTS: | 6 | | | |
| BY MS. SIEKKINEN: | | 158 | | |
| BY MR. ROBERTS: | | | 162 | |




\- - -
E X H I B I T S
\- - -


| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | VERIZON'S MOTION TO DISMISS PLAINTIFF'S AMENDMENT COMPLAINT | 35 |
| EXHIBIT 2 | DOCUMENT ENTITLED "VERIZON'S EFFORTS TO COMBAT ONLINE CHILD EXPLOITATION FREQUENTLY ASKED QUESTIONS" | 43 |
| EXHIBIT 3 | NON-PROFIT HASH SHARING DATABASE AGREEMENT | 53 |
| EXHIBIT 4 | CHANGE REQUEST TO SCOPE OF WORK NO. 1 DATED JANUARY 27, 2022 | 61 |
| EXHIBIT 5 | SCOPE OF WORK FOR WEBPURIFY | 86 |
| EXHIBIT 6 | ANSWERS TO INTERROGATORIES | 104 |
| EXHIBIT 7 | TRAINING MATERIAL | 112 |
| EXHIBIT 8 | CYBERTIP REPORT | 126 |
| EXHIBIT 9 | DEPOSITION TRANSCRIPT OF CARA BLASZKA | 173 |


** ALL EXHIBITS RETAINED BY PLAINTIFF'S COUNSEL AND MAY BE SUPPLIED AT A LATER DATE

P R O C E E D I N G S

\- - -

Remote deposition taken before Wendy Beath Anderson, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

\- - -

THE VIDEOGRAPHER: We are now on the record. The time is 1:07 p.m. eastern standard on October 22, 2025. This begins the videoconference deposition of David Runyon taken in the matter of William Lee Lawshe, an individual, vs. Verizon Communications, Incorporated, a Delaware corporation, et al. filed in the United States District Court, Middle District of Florida, Jacksonville Division. Case number is 24-CV-00137-MMH-LLL.

My name is Michael Acker. I am your remote videographer for today. The court reporter is Wendy Anderson. We are represent Esquire Deposition Solutions.

As a courtesy, will everyone who is not speaking, please mute your audio and please remember to unmute your audio when you are ready to speak.



Will everyone present please identify themselves and state whom you represent, after which the witness will be sworn in.

MR. ROBERTS: Michael Roberts and I represent Mr. Lawshe.

MS. SIEKKINEN: I'm Nury Siekkinen. I represent Verizon Communications, Inc.

MR. RAO: Good afternoon. Sudhir Rao. I also represent defendant Verizon Communications, Inc.

MR. REISS: Andrews Reiss. I represent Synchronoss.

MS. SUNAR: Patricia Sunar, Verizon.

Thereupon,

(DAVID RUNYON)

having been first duly sworn or affirmed, was examined and testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q. Good afternoon, Mr. Runyon. Could you just state your name for the record, please.

A. Yes, David Runyon.

Q. Mr. Runyon, I think I introduced myself a little bit earlier. My name's Michael Roberts. I'm an attorney and I represent a gentleman named William Lee



Lawshe in a case that he's brought against Verizon. I'm here to take a deposition today of Verizon's corporate representative with the most knowledge of policies, procedures and practices regarding the scanning and reporting of child sexual abuse material.

Are you that corporate representative?

A. I am.

Q. All right. Well, tell me a little bit about yourself when you're not being a corporate representative. What do you do?

A. I -- sorry.

Q. Bless you.

A. That may happen quite often, so I apologize up front.

I deal with our hacking, phishing, spam, harassment and child sexual abuse material that is reported on the Verizon consumer IP space.

Q. Okay. What's your job title?

A. Network securities specialist.

Q. And you are a W-2 employee of Verizon?

A. Yes.

Q. And how long have you been doing that?

A. I've been doing this exact work since August of 2008.

Q. I hear you're in New Jersey today; is that



correct?

A. Correct.

Q. I noticed your driver's license was a Texas driver's license. Did I see that correctly?

A. Yes.

Q. Do you live in Texas?

A. I do.

Q. And do you work at a Verizon facility there or do you work remotely?

A. I work at our Hidden Ridge facility.

Q. All right. And where is that? Is that close to a major metropolitan area?

A. It's Las Colinas, technically. Las Colinas or Irving, Texas.

Q. That outside of Dallas?

A. Right up against it.

Q. Yeah, okay. So tell me in your Dade job, not related to being a corporate representative, how is it that you deal with child sexual abuse material for Verizon?

A. Sure. We receive notifications from third parties or sometimes from NCMEC or even law enforcement regarding images that may potentially be on our network. We also take in reports of child predation issues that may occur and reported by third parties involving our

Page 9

customers.
Q. You said child -- didn't understand that word predation?
A. Right, yes.
Q. What does that mean?
A. Basically --
Q. I just don't know what that word means, I'm sorry.
A. Child predation is somebody trying to take advantage of a child.
Q. Okay. All right. Now, you said Verizon receives notification. These are from third parties?
A. They can be from third parties or they can be from law enforcement. They can be from NCMEC directly.
Q. Okay. So tell me, we're today, we're going to talk about it all a little bit, but have you familiarized yourself with the facts of this case or the allegations of Mr. Lawshe's case?
A. I'm aware of the case.
Q. Yeah. He was reported to NCMEC by an entity called Synchronoss after scanning a hash database, generally.
Do you understand that to be the case?
MS. SIEKKINEN: Objection to the extent it's inconsistent with the allegations in the case here.

Page 10

Go ahead.
THE WITNESS: The process is that --
BY MR. ROBERTS:
Q. I'm not asking you about the process. I'm just trying to -- I'm honestly not. I'm just trying to establish, do you work in any way with the scanning of images against a hash database?
A. No, I do not directly work with that.
Q. Okay. All right. I'm trying to understand the universe of CSAM detection and reporting at Verizon. And so one of those methods is scanning of hash values against -- and we'll talk about this -- against a database.
You work in a different department, correct?
A. Correct.
Q. Okay. Tell me, you know, like -- let's just start with, what did you do today -- or not today, but leading up to today, to prepare for this deposition?
A. Reviewed some documentation and went over some information that our legal team wanted me to know, to be aware of.
Q. Okay.
A. So...
Q. All right. So you reviewed some documents.
Do I understand that correctly?

Page 11

A. Yes.
Q. All right. Did you -- in trying to prepare or to be Verizon's corporate representative, did you interview anyone or talk to any other Verizon employees about policies and procedures and practice of the detection and reporting of child sexual abuse material?
A. Outside of our legal department, no.
Q. When you say your legal department, are you talking about the internal legal department at Verizon?
A. Yes.
Q. Let me ask you more specific. There's a gentleman named Ethan Arenson. Did you speak with him?
A. Yes.
MS. SIEKKINEN: Objection. Only to the extent you're going to start -- you're looking for privileged information. He can speak about --
MR. ROBERTS: I'm not asking --
MS. SIEKKINEN: Okay, go ahead. I'm just laying that out there.
BY MR. ROBERTS:
Q. I'm not asking the contents of any conversation. I'm just asking did you speak with him?
MS. SIEKKINEN: Thanks for the clarification, yes.
THE WITNESS: Yes. He's the head of our

Page 12

digital safety programs; yes.
BY MR. ROBERTS:
Q. What is his title?
A. Truthfully, I don't know exactly what his specific title is.
Q. Okay. You said he's the head of the digital safety program.
Did I understand that correctly?
A. Correct.
Q. I've seen something like trust and safety. Is that -- does that phrase sound familiar to you?
A. I've heard it, yes.
Q. I mean, is that the name of his org?
MS. SIEKKINEN: Objection. Asked and answered. He said he didn't know.
BY MR. ROBERTS:
Q. Okay. All right. So you -- okay. You're Verizon's corporate representative today. Do you not know the organization's name within Verizon that which you work for?
MS. SIEKKINEN: Objection. That's not what he testified. Misstates his testimony.
MR. ROBERTS: Okay. Nury, Nury --
MS. SIEKKINEN: You did --
MR. ROBERTS: -- you can object to the form of

Page 13

the question. Please, please refrain from the speaking objections, okay?
MS. SIEKKINEN: It's not speaking.
MR. ROBERTS: You can say --
MS. SIEKKINEN: Michael, I'm giving you an opportunity to cure, that's all.
MR. ROBERTS: Okay.
BY MR. ROBERTS:
Q. I'm just asking for the name of the organization within Verizon that you work for. Do you know the name of the organization that you work for within Verizon?
A. Yes, I do.
Q. Okay. What is the name of the organization that you work for within Verizon?
A. Network security.
Q. Okay. Who is the head of network security?
A. That would be Marc Krause.
Q. And who is Marc? Crawlsee? Can you spell that last name?
A. Krause, K-R-A-U-S-E.
Q. Okay. And who is Mr. Krause?
A. He's the vice president of network security.
Q. Okay. And we had talked about Ethan Arenson. Does Ethan Arenson -- does he report to Marc Krause?

Page 14

A. No.
Q. Okay. Does -- I'm trying to understand the organizational structure, okay, of the organization you work for. You had said earlier that Ethan Arenson is the head of something. Can you just give me the organizational structure, like who do you report to, who do they report to all the way up to who is ultimately in charge of network security?
A. Yes, I could give you that.
Q. Please do.
A. Okay. My direct manager is Marty McGhee and Marty reports up to Ryan Stonehausen and Ryan reports up to Marc Krause.
Q. Where does Ethan Arenson fit into the organizational structure?
A. He represents -- he's the legal person that's responsible for the digital safety program for which we operate under.
Q. Okay. Who is the person who is ultimately responsible for establishing the policies, procedures and practices for child sexual abuse material detection and reporting?
A. The process is outlined from Ethan's efforts.
Q. Okay. Does Ethan -- is Ethan the individual that makes the ultimate decisions on what Verizon's

Page 15

policies or procedure are?
A. As far as I know, yes.
Q. Well, and I mean, I'm not trying to put you on the spot, but you --
A. No, the answer's yes.
Q. Yeah. And I'm asking, you are not -- and just so we understand, this is sometimes a little bit of an awkward situation. I'm not asking you personally this question, right? This is -- you are Verizon's corporate representative of policies and procedures.
A. Right.
Q. And I'm just asking from Verizon's perspective, who is the person responsible for establishing the policies and procedures of reporting and scanning or detecting child sexual abuse material?
MS. SIEKKINEN: Objection. That's outside the scope of the notice, but you can go ahead and answer.
THE WITNESS: That would be Ethan.
BY MR. ROBERTS:
Q. Okay. All right. Now, you indicated that you reviewed some documentation. What documents did you review?
A. I reviewed the statements of work that we have for our vendors and I also --

Page 16

Q. What --
A. Sorry. Go ahead.
Q. What else?
A. Just went over our digital safety program information that we have that's posted online and what -- I think that's what I can recall at the moment.
Q. Okay. So the first thing that you indicated was statement of work from your vendors. What vendors are you referring to?
A. That would be Synchronoss and WebPurify.
Q. Okay. So you reviewed those statement of work documents; is that correct?
A. Correct.
Q. All right. Digital program and safety information, I think you referred to as online. Did I understand that correctly?
A. I'm sorry, could you rephrase that or repeat that?
Q. Yeah, what was the other -- I'm just asking you directly, I mean, can you give me a little more information about what the other -- you said some digital program safety information online, and I'm trying to get a little bit more information about what document or documents you're referring to?
A. Oh, well, our FAQ that's posted on the Verizon

Page 17

web, on Verizon.com.
Q. Yeah, I think I have that document. I can pull it up for you in a little bit when we talk about it, okay?
Did you review anything else you can recall as we sit here today in preparation for today's deposition?
A. I think I did actually take a look at something regarding the National Center for Missing and Exploited Children as well, some of the statements that we have or work with that, yeah, that process.
Q. Can you be a little bit more specific? Is it material that was provided by NCMEC to Verizon?
A. No. I just think it was -- I think we have -- I don't know exactly what that document was. I just remember going over it.
Q. Okay. What types of information did it have on it?
A. Oh, it had information related to the processes, some of the, I think -- I would have to look at it again. I apologize, I don't remember verbatim.
Q. I have some documents from NCMEC we may look at in a little bit. It may refresh your recollection.
Did you review any documents from Synchronoss? Meaning --
A. Yes.

Page 18

Q. I'm sorry?
A. Sorry.
Q. The scope of work you reviewed that, correct?
A. Correct.
Q. Okay. There's been a document that is entitled "Legal Service of Process" or "Process of Service."
Did you review that document?
A. I don't recall.
Q. All right. So as I indicated earlier, I'm here to ask you questions about, you know, Verizon's policies, procedures and practices regarding child sexual abuse material. So have you identified the -- documents that you reviewed, are those all of the documents that memorialize Verizon's policies or procedures regarding the detection and reporting of child sexual abuse material?
A. Can you rephrase it? I'm not exactly sure what you mean by "memorialize."
Q. Yeah. So by memorialize I mean to reduce to writing. And so are those documents that you reviewed, the statements of work and the digital program safety information, the frequently asked questions, are those the only documents within Verizon that reduced to writing Verizon's policies, practices and procedures

Page 19

regarding the detection and reporting of child sexual abuse material?
A. As far as I know that would be the case.
Q. One of the purposes of a corporate representative deposition is for me to ensure that I'm not missing something. And so what I -- I'm going to ask it in a different way, is as far as Verizon is concerned, these documents that you've identified are the only documents that have reduced to writing Verizon's policies and procedures regarding the detection and reporting of child sexual abuse material?
MS. SIEKKINEN: Objection to the extent that he said that he didn't recall something. Just misstates his testimony a little bit. Go ahead.
THE WITNESS: Yeah, again, so far as I know, that's what I've seen.
BY MR. ROBERTS:
Q. Okay. All right. So what steps does Verizon take to detect child sexual abuse material on its network?
MS. SIEKKINEN: Objection. Calls for a narrative, but you can go.
THE WITNESS: On our network?
BY MR. ROBERTS:
Q. Yeah. I'm asking for the entirety of

Page 20

Verizon's universe. What steps does Verizon take to detect child sexual abuse material?
A. Well, there's -- forgive me, but there's multiple parts of our network. So sorry, trying to get some clarification as to what specific segment are we talking about.
Q. I'm asking -- so you're Verizon's corporate representative for policies, procedures and practices regarding the detection of child sexual abuse material. I'm asking you what steps, what programs does Verizon have to detect child sexual abuse material?
A. Okay. Well, for our -- for the cloud storage, we have two vendors that assist us that basically take the images and they scan them and then when they flag an apparent image that could potentially be CSAM. They then -- Synchronoss basically does that scanning. They then market.
They then have WebPurify or in conjunction with investors, they have WebPurify go through -- has a human that goes through and inspects it, and if they watch -- they believe that it also is a candidate or basically has an apparent -- is apparently CSAM, then that gets reported back to Synchronoss and Synchronoss then reports that to the National Center for Missing and Exploited Children.

Q. Okay. I'm going to get into much more detail about that in a minute. But -- so there's the scanning of the cloud storage. What else?
MS. SIEKKINEN: Objection. Detection was not part of the 30(b)(6) notice. Go ahead.
MR. ROBERTS: Can you read what the notice was?
MS. SIEKKINEN: Just one moment.
MR. ROBERTS: I don't have it in front of me.
MS. SIEKKINEN: Yeah, I do, though. The most knowledge of policies, procedure and practices of scanning and reporting CSAM.
BY MR. ROBERTS:
Q. So reporting, is there other practices that you report -- policies and practices in which you report CSAM other than the scanning process that you've just described?
A. Yes, we do -- for our consumer IP space, whenever there's a report of child sexual abuse material that could potentially be on one of our customers' or networks, we report that as well.
Q. What's consumer IP space? What does that mean?
A. That is the IP space that our customers lease from Verizon to have internet service at their homes or businesses.



Q. So that reporting on the consumer IP space, is that based on scanning or just third-party reporting?
A. It's third-party reporting.
Q. Why doesn't Verizon scan its consumer IP space in the same way it does cloud storage?
A. That would be -- sorry.
Q. Bless you, sorry.
A. Yeah, sorry. Like I said, that may happen again.
No, our online environment, that's our customers' networks. We don't scan our customers' networks.
Q. Why not?
MS. SIEKKINEN: Objection. Outside the scope.
BY MR. ROBERTS:
Q. You still have to answer, but why does Verizon scan cloud storage but not the consumer -- your customer's IP space?
A. Because cloud storage is something that the end user is putting on to our network.
Q. I mean, so are you -- okay. I understand that the end user is your customer, though, correct, that you're referring to?
A. Yes.



Q. And when you say your network, you're talking about the cloud storage, correct?
A. Correct.
Q. All right. But your consumers could use the IP space that they're leasing or using to transmit and distribute child sexual abuse material, correct?
A. I'm sorry, could you rephrase that or repeat that?
Q. Your customer, Verizon's customers, could use the IP space that you provide to transmit or distribute child sexual abuse material, correct?
MS. SIEKKINEN: Objection. Calls for speculation and outside the scope.
BY MR. ROBERTS:
Q. You can answer.
A. No. We don't manage their networks.
Q. Okay. But you -- if there's a third party complaint of child sexual abuse material in the consumer IP space, you would report that, correct?
A. Yes. If we received a report, we would pass that on to the National Center for Missing and Exploited Children for their review.
Q. Okay. Explain to me that process.
A. Okay. If someone has happened to be at somebody's house and saw something on their computer that they didn't feel comfortable with and they reported that to Verizon, we are obligated to report that to the National Center for Missing and Exploited Children as a potential CSAM.



Q. Okay. So I want to bear in a little bit on that. You said somebody -- if somebody sees something that they're uncomfortable with, Verizon would report that to NCMEC and that's the National Center for Missing and Exploited Children?
A. Correct.
Q. Well, I'm -- what's Verizon's policy? Does it have to be -- it has to be something more than they're just uncomfortable with it, right?
A. No, if it's apparent or a report to us, we call through and report that to the National Center for Missing and Exploited Children.
Q. So if an individual was to, let's say, just see something and just said, hey, I think this is child sexual abuse material, Verizon doesn't do any sort of -- they don't review that? They don't do anything about like the veracity of that? They just immediately pass it on to the National Center for Missing and Exploited Children?
MS. SIEKKINEN: Objection. Outside the scope and calls for speculation.

Page 25

THE WITNESS: I report -- if we receive a report --
BY MR. ROBERTS:
Q. Right.
A. -- it is our responsibility to forward that to the National Center for Missing and Exploited Children. We don't analyze it. We just pass it along.
Q. Okay. So it doesn't have to be apparent child sexual abuse material? It's just -- if it's a report, you pass it along?
A. For -- yes, for our -- on that --
Q. The consumer IP space?
A. For internet services, yes.
Q. All right. How often does that occur?
A. Very infrequent.
Q. Right.
A. We might see -- in a given year, we might see eight reports.
Q. I was looking at some of the published numbers that NCMEC and Verizon have published in the past, and it's funny you say that, because I think I saw in 2023 there were 30-something-thousand reports from Synchronoss and maybe only like -- literally maybe seven or eight or nine reports from Verizon.
Do I take it from my understanding, that's

Page 26

what you're talking about, those handful of reports that I see on NCMEC's reported list, published list, those five or six or nine, that's what you're talking about is the consumer IP space reports?
MS. SIEKKINEN: Objection. Foundation. Counsel's kind of testifying here for him.
BY MR. ROBERTS:
Q. Let me re-ask that question. Are you familiar, have you ever looked at any of the published numbers by NCMEC on how many reports Verizon makes annually?
A. I think I did look at that a little bit, yes, I have.
Q. Yeah. And so I think what you're testifying to, this is really all I'm asking, you're confirming that if I see Verizon has reported five or six or ten or eight or whatever reports outside of Synchronoss, outside of Synchronoss, that is the consumer IP space reports?
MS. SIEKKINEN: Objection.
THE WITNESS: Correct.
MS. SIEKKINEN: Outside the scope. Go ahead.
BY MR. ROBERTS:
Q. Correct, okay. Is there any other reporting that Verizon does of child sexual abuse material other

Page 27

than what you've described with the consumer IP space and the cloud storage?
A. Not that I'm aware of.
Q. Okay. And I'm just going to ask this just to make sure. You are not aware of why Verizon does not scan the consumer IP space?
MS. SIEKKINEN: Asked and answered. Objection.
BY MR. ROBERTS:
Q. I'll ask it again. You can answer it.
A. Okay. It's just not a practical -- you just -- it's too intrusive.
Q. How is it too intrusive?
A. Well, it's a violation of -- I mean, you can't just go in there and start scanning customer networks.
Q. I mean, you scan customers' photographs. Why can't you scan customers' networks?
A. It's their private network. We don't manage it. Whereas the cloud is something that the customers are openly putting onto our network and our interpretation of service addresses that if they're going to put that on our network, that Verizon will scan the content and that's in our terms of service.
Q. Couldn't Verizon put in its terms of service that you can't use our consumer IP space to transmit

Page 28

child sexual abuse material?
MS. SIEKKINEN: Objection. Way outside the scope here.
BY MR. ROBERTS:
Q. You have to answer the question.
A. Can you repeat that, please?
Q. Yeah, I mean, couldn't Verizon just put in its terms of service that you -- that you're going to scan for child sexual abuse material if you use Verizon's consumer IP space?
MS. SIEKKINEN: Objection. Same objection. Go ahead.
THE WITNESS: We have many different things that are in place in our terms of service and acceptable-use policy, but I don't know. I don't know how to answer that.
BY MR. ROBERTS:
Q. Okay. All right. So does Verizon itself employ any content moderators to review potential images of child sexual abuse material?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: We have our two vendors.
BY MR. ROBERTS:
Q. I'm saying outside the vendors. So I'm

Page 29

talking about now in your world, in the consumer IP space, do you have anyone on your team or in your organization that has the ability to do content moderation?
A. No, we do not do that.
Q. Okay. So just while we're on that topic, if WebPurify escalates content to Verizon, how do they resolve the escalation with WebPurify?
MS. SIEKKINEN: Objection. Lack of foundation.
BY MR. ROBERTS:
Q. Do you understand my question?
A. I don't, actually.
Q. Okay. Well, we'll get there in a minute.
All right. So you -- when we were talking about -- let's move back to the cloud storage scanning. You -- does Verizon agree that the scanning that they do on their customers' cloud storage is entirely voluntary?
A. I'm sorry, could you repeat that, please?
Q. Does Verizon agree that the scanning that you've briefly described performed on customers' cloud storage is entirely voluntary?
A. I'd have to defer to legal on that. I don't -- I guess I don't totally understand how that, how that question's phrased, so I apologize.

Page 30

Q. Okay. Do you understand -- do you believe that Verizon is required to scan their customers' private photographs?
A. We do it to be good corporate citizens and protect children.
Q. Okay. You're not aware of any law that requires you to do that?
A. If we are made aware of CSAM or apparent CSAM, we do have to report that by law.
Q. And my question is, are you aware of any law that requires you to scan your customers' photographs?
A. I would have to defer that to legal because I'm not a lawyer. I don't know.
Q. Okay. In any event, Verizon has chosen to scan its customers' private photographs, correct?
MS. SIEKKINEN: Objection to the characterization. Go ahead.
THE WITNESS: We do scan, yes.
BY MR. ROBERTS:
Q. Okay. All right. Tell me, when was this process of scanning, when was that begun?
A. Do you know what? I don't remember when the actual date is, when that began.
Q. Who does the scanning for Verizon?
A. Synchronoss does.

Page 31

Q. All right. Verizon understands that Synchronoss is acting as its agent to perform the scanning task?
MS. SIEKKINEN: Objection. Calls for a legal conclusion. Go ahead.
BY MR. ROBERTS:
Q. Well, let me ask you this. Does Verizon set all the policies and procedures that Synchronoss is required to follow when scanning Verizon customers' cloud service?
A. It -- whatever's in the statement of work is what they're supposed to be doing. That's what I know.
Q. And does Verizon control that? Does Verizon control what is in the statement of work?
MS. SIEKKINEN: Objection.
THE COURT REPORTER: I'm sorry, Nury. Can you please repeat that objection?
MS. SIEKKINEN: Objection. The contract speaks for itself, but go ahead.
THE WITNESS: I was just saying that that's an agreement between Verizon and Synchronoss. I didn't write it, so I don't know. You would have to ask legal on that.
BY MR. ROBERTS:
Q. Well, I'm sorry, but you're Verizon's

Page 32

corporate representative about policies and procedures, okay? So I'm going to ask you, does Verizon have the right to tell Synchronoss how to scan, what to scan, what procedures to do to scan?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I believe if -- yes.
BY MR. ROBERTS:
Q. Okay.
A. Sorry, Michael, could we take a break for a second?
MR. ROBERTS: Sure. Yeah, let's take a quick break.
THE WITNESS: I appreciate it.
MR. ROBERTS: Yeah.
THE VIDEOGRAPHER: This marks the end of media number one. The time is 1:46 p.m. We are now off the record.
(Off the record.)
THE VIDEOGRAPHER: This marks the beginning of media number two. The time is 1:59 p.m. We are now on the record.
BY MR. ROBERTS:
Q. Okay. We took a quick break, and so we're back here. We were talking about -- we're going to

Page 33

start talking about Verizon's relationship with Synchronoss, and I understand, Mr. Runyon, that at some point Verizon decided that they would ask Synchronoss to scan Verizon's customers' cloud storage; is that correct?
A. Yes.
Q. All right. And you've reviewed the scope of work in which Verizon engaged Synchronoss to do that service, correct?
MS. SIEKKINEN: Objection. Vague on scope of -- sorry.
BY MR. ROBERTS:
Q. So let me just re-ask it. You testified earlier that you had reviewed a scope of work between Verizon and Synchronoss, correct?
A. Correct.
Q. Was that scope of work related to scanning Verizon cloud content or Verizon customers' cloud content for child sexual abuse material?
A. That is inclusive of it, yes.
Q. All right. All right. So tell me, what -- what is Verizon's policy regarding reporting child sexual abuse material through their scanning process?
MS. SIEKKINEN: Objection. Vague. Go ahead.
THE WITNESS: Sorry, the process is that

Page 34

Synchronoss scans and marks anything that appears to be apparent CSAM.
BY MR. ROBERTS:
Q. Okay. How do they determine what -- first of all, what is apparent CSAM?
A. I believe the definition is in the statement of work or in one of the documents, I think, somewhere.
Q. Well, I'm asking you. If you need to refer to something, tell me. What is Verizon's definition of apparent child sexual abuse material?
A. And I think that's in the -- in one of the documents that defines that.
Q. Do you know what Verizon's definition of apparent child sexual abuse material is?
MS. SIEKKINEN: Objection. Asked and answered.
THE WITNESS: I'll refer to the document.
BY MR. ROBERTS:
Q. Where in the document does it define child sexual abuse material?
A. I'll have to look at that.
Q. I don't see a definition section. I could be missing it, but I'm here to ask you questions. You're the corporate representative with the most knowledge and I'm not really asking what's in that agreement. I'm

Page 35

asking what is Verizon's policy regarding the definition of apparent child sexual abuse material?
A. I would have to defer that to legal.
Q. Okay. Hold on one second. I'm going to share -- I'm not just staring at you, Mr. Runyon. I was looking for a document on my computer. I'm going to share what we'll mark as Plaintiff's Exhibit 1.
(Plaintiff's Exhibit No. 1 was marked for ID.)
BY MR. ROBERTS:
Q. This is Verizon's motion to dismiss plaintiff's amended complaint, page 12. I'm going to read you the sentence, okay, Mr. Runyon? It says --
MS. SIEKKINEN: Objection. He's not had a chance to review the document. You've just flashed a page of it.
MR. ROBERTS: I'm not asking him to review it.
MS. SIEKKINEN: He has time to review a document. Thank you.
MR. ROBERTS: Please stop, Nury. You can object once I've asked the question, okay?
BY MR. ROBERTS:
Q. I'm going to read a sentence to you, Mr. Runyon, okay? And I'm going to ask you about Verizon's policy. The sentence says, "An image may appear to be CSAM, child sexual abuse material, but not

Page 36

actually be CSAM in fact, such as when the image involves an 18-year-old who may appear to be 17 years old or younger."
Is that Verizon's policy regarding -- does that reflect Verizon's policy regarding what apparent child sexual abuse material is?
MS. SIEKKINEN: Objection. You flashed one page of a document on the screen. You've not given him a chance --
MR. ROBERTS: Okay, Nury, I mean, I'm serious. I'm serious, okay? The speaking objections have to stop, have to stop, okay? You can object to my questions. I have no problem with you objecting to my questions, but the speaking objections have to top. They're inappropriate.
MS. SIEKKINEN: Michael, it's customary to give your opposing counsel an opportunity to cure.
MR. ROBERTS: I will ask -- I will ask you for clarification of your objection if I choose to, okay? I will, I promise, okay?
BY MR. ROBERTS:
Q. So Mr. Runyon, I've read the sentence -- have you had an opportunity to read the sentence I've highlighted?
A. I am reading it, yes.

Page 37

MS. SIEKKINEN: Objection.
THE WITNESS: Sorry.
MS. SIEKKINEN: Again, he's not had a chance to review the whole document, which is customary.
BY MR. ROBERTS:
Q. Before you read it, Mr. Runyon, you knew -- when did you find out that you were going to be produced as Verizon's corporate representative in this case?
MS. SIEKKINEN: Objection. Outside the scope.
BY MR. ROBERTS:
Q. Well, let me ask you a different way. You were disclosed as a corporate representative for Verizon when they answered their interrogatories back in, I think June of this year; is that correct?
MS. SIEKKINEN: Objection. Lack of foundation. Go ahead.
BY MR. ROBERTS:
Q. Do you recall signing interrogatory answers, Mr. Runyon, back in June? Yes?
A. Yes, I did.
Q. And were you identified as at least a corporate representative regarding those answers back then?
A. Yes.
Q. Yes. And do you feel like you had an ample

Page 38

opportunity to prepare for today's deposition?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: Yes.
BY MR. ROBERTS:
Q. Okay. I'm not going to show you the entire document. You had the opportunity to read whatever documents you wanted to in preparation for today, correct?
MS. SIEKKINEN: Objection. You've marked it as an exhibit. The whole document can be reviewed.
MR. ROBERTS: Okay. Please --
BY MR. ROBERTS:
Q. All right. So I'm going to ask you a question and we're going to try to get an answer. We're going to try to get through this. "An image may -- an image may appear to be child sexual abuse material but not actually be CSAM in fact, such as when the image involves an 18-year-old who may appear to be 17 years old or younger."
My question is, is it Verizon's policy to report images that involve 18-year-olds that may appear to be seven-year-olds -- 17-year-olds?
MS. SIEKKINEN: Objection. Lack of completeness. The footnote isn't shown on the

Page 39

screen. There's -- it's very easy to cure.
BY MR. ROBERTS:
Q. Do you want to read the footnote before answering that, Mr. Runyon?
A. Verizon's -- gosh, sorry, guys. This is going to keep happening.
Verizon's policy is to report apparent CSAM. We do not make the final determination as to whether or not it is. We report it and that is the process.
Q. And I'm asking you what is Verizon's definition of apparent CSAM?
A. I would have to defer to legal on that.
Q. Okay. You can't defer to legal on that. You are the corporate representative for their policies and procedures, okay?
Do you agree that what is apparent -- what constitutes apparent child pornography is an important part of the policies and procedures regarding reporting child sexual abuse material?
MS. SIEKKINEN: Objection to harassing the witness. Go ahead.
THE WITNESS: Again, our policy is to report apparent. We don't make the final determination.
BY MR. ROBERTS:
Q. But as we sit here today, you cannot define

Page 40

what apparent child pornography is, according to Verizon's policies and procedures?
A. I am referring this to our legal department.
Q. Well, does the legal department make the decision about what to report or not report in a particular case?
MS. SIEKKINEN: Objection. Outside the scope and lack of foundation there. Go ahead.
THE WITNESS: The process that we have in place is we scan for apparent -- Synchronoss scans for apparent CSAM. It is then -- then goes to WebPurify where a human who is trained to look at this, looks at it and if they agree it meets the condition of the apparent, it is then sent back to Synchronoss and Synchronoss sends that notice -- sends it off to the National Center for Missing and Exploited Children, who then reports that to law enforcement, and law enforcement makes a final determination as to whether or not it actually is or isn't CSAM.
BY MR. ROBERTS:
Q. But as we sit here today, you cannot give me a definition of what apparent CSAM means?
MS. SIEKKINEN: Objection. Asked and answered.

Page 41

BY MR. ROBERTS:

Q. You can answer it. If you want to refer me to legal again, that's okay. I'm just -- I'm trying to make sure that you do not have an answer to that question.

A. Michael, I'm going to refer that to legal, yes.

Q. Okay. All right. Do you believe that this statement is consistent with Verizon's policy, that an image of an 18-year-old that may appear to be 17 years old is apparent child pornography?

A. If it has the appearance of it, it gets reported through the process.

Q. Does Verizon -- is it Verizon's position that an individual can look at a digital photograph and determine by solely looking at the photograph whether an individual is 18 or 17?

MS. SIEKKINEN: Objection. Lack of foundation. Assumes facts not in evidence. Go ahead.

THE WITNESS: Again, the way the process is, is it is scanned by Synchronoss. If it has the appearance, it is then passed on to WebPurify. WebPurify then has a human using their training and best judgment to -- and life experiences, they

Page 42

pass -- they will then say yes, this meets the criteria of apparent CSAM. They then take that, report it by Synchronoss. Synchronoss reports it to law enforcement -- or to NCMEC and NCMEC refers that to law enforcement. It is then at that point in the hands of law enforcement to make the final determination.

BY MR. ROBERTS:

Q. So I guess we're not going to define apparent today, but is it Verizon's policy that they report apparent child sexual abuse material to NCMEC?

A. Synchronoss does on the -- in this particular instance, if the Synchronoss marks it as apparent and it is confirmed by a person with WebPurify that it meets the criteria of apparent, it will then be referred to the National Center for Missing and Exploited Children who then refers it to law enforcement. That's our process and our policies.

Q. Okay. The policy is to report apparent child sexual abuse material?

MS. SIEKKINEN: Objection. Asked and answered.

BY MR. ROBERTS:

Q. You can answer again.

A. Yes.

Page 43

Q. All right. I'm going to share what's Exhibit 2.

(Plaintiff's Exhibit No. 2 was marked for ID.)

BY MR. ROBERTS:

Q. I believe that this is a document that you have already reviewed. This is Verizon's Efforts to Combat Online Child Exploitation Frequently Asked Questions.

Was this the document that you were referring to that you had reviewed?

MS. SIEKKINEN: Objection. You need a moment to review to make sure it's complete.

THE WITNESS: Yes, that does appear to be so.

BY MR. ROBERTS:

Q. Okay. So this document is available on Verizon's public-facing website?

A. Yes, it should be.

Q. So if a customer had questions, frequently asked questions, about what Verizon does to detect or combat online child exploitation, this is Verizon's statement to customers regarding their efforts, correct?

MS. SIEKKINEN: Objection. Lack of foundation. Go ahead.

BY MR. ROBERTS:

Q. Well, hold on. You had time to review this

Page 44

document in preparation for today's deposition, correct?

MS. SIEKKINEN: Objection. It's not clear that it's the same document. There's no Bates stamp there. I'm helping you, Michael.

MR. ROBERTS: No, you're not, Nury. I thought that Mr. Runyon just testified that this appears to be the same document that he reviewed.

BY MR. ROBERTS:

Q. Is this the document that you reviewed or not?

A. It appears to be, but I don't -- I don't know it verbatim to the point I could match every word to it.

Q. Okay. Well, let's read it. "Verizon uses PhotoDNA technology, which is capable of matching the digital signature of an uploaded image to large databases of known CSAM maintained by the National Center for Missing and Exploited Children."

Did I read that correctly?

A. Yes.

Q. All right. It says, "We also make extensive use of human reviewers, who evaluate the images detected through automated scanning and ensure that all confirmed CSAM is reported to NCMEC."

Did I read that correctly?

A. Yes.

Q. Does that refresh your recollection? Is that

the language that you reviewed on the document that you reviewed in preparation for today's deposition?
A. It may be, but as I stated, I don't remember word-for-word what the document had in it.
Q. Okay. This document does not -- the word "apparent" does not appear in the two sentences that we just read, does it?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I'm sorry, was that a question? I didn't --
BY MR. ROBERTS:
Q. Yeah. The word "apparent" does not appear in this statement, does it?
A. Not in this statement, no.
Q. Right. Does this reflect Verizon's policy -- is this Verizon's policy of scanning and reporting child sexual abuse material?
MS. SIEKKINEN: Objection. Compound.
BY MR. ROBERTS:
Q. Okay. Let's just break it down. The first sentence, "Verizon uses PhotoDNA technology, which is capable of matching the digital signature of an uploaded image to large databases of known CSAM maintained by the National Center for Missing and Exploited Children," is



that an accurate statement of Verizon's policy regarding the scanning for child sexual abuse material?
A. Yes.
Q. Okay. "We also make extensive use of human reviewers who evaluate the images detected through automated scanning and ensure that all confirmed CSAM is reported to NCMEC," is that an accurate statement of Verizon's policies regarding reporting of child sexual abuse material?
A. Yes.
Q. Okay. All right. Why does Verizon believe -- first of all, can you tell me the name of the databases that Verizon was using to scan for the detection of child sexual abuse material?
MS. SIEKKINEN: Object to the form.
THE WITNESS: I'm sorry, could you repeat that, the name of the databases?
BY MR. ROBERTS:
Q. Yeah, yeah. This says it uses PhotoDNA technology, which is capable of matching the digital signature of an uploaded image to large databases of known CSAM maintained by the National Center for Missing and Exploited Children.
Can you tell me in the fall of 2022 and the winter of 2023, what databases was Verizon utilizing to



scan for child sexual abuse material?
MS. SIEKKINEN: Object to the form.
THE WITNESS: I believe the primary was the National Center for Missing and Exploited Children's hash database.
BY MR. ROBERTS:
Q. Can you be more specific than that?
A. What do you -- like what type of -- what's the actual physical name of the database?
Q. There are multiple -- there are multiple databases, I can represent to you, that are, I guess, supported by the National Center for Missing and Exploited Children. I'm asking you which database was Verizon utilizing?
MS. SIEKKINEN: Objection. Lack of foundation.
THE WITNESS: Well, okay. You mean other than the National Center for Missing and Exploited Children?
BY MR. ROBERTS:
Q. Were they using a database -- what do you mean by the National Center for Missing and Exploited Children database? I can represent to you that that doesn't exist. So what are you referring to? Yeah, what are you referring to?



MS. SIEKKINEN: Objection. Lack of foundation.
THE WITNESS: Well, I'm referring to the hash, if that's what you're referring to.
BY MR. ROBERTS:
Q. Has Verizon ever actually is -- you've never reviewed the agreement, the access agreement for the hash database that Verizon was using to scan for child sexual abuse material?
MS. SIEKKINEN: Objection. Assumes facts not in evidence.
BY MR. ROBERTS:
Q. Have you ever reviewed the agreement that was being used -- the agreement to gain access to the database which was being used to scan Verizon's customers' cloud storage for child sexual abuse material?
MS. SIEKKINEN: Objection. Vague.
THE WITNESS: I'm sorry, my voice is starting to cut out too.
BY MR. ROBERTS:
Q. It's okay.
A. Yeah. Believe me, it's not fun right now.
Q. It's really a yes or no question. Have you reviewed an access agreement to any hashtag database?

Page 49

MS. SIEKKINEN: Objection. You're referring to a document. Can we show it?
MR. ROBERTS: No. I'm asking what he has done to prepare for today.
MS. SIEKKINEN: No, you're asking specifics about.
MR. ROBERTS: Nury, please stop arguing with me. I will stop this deposition.
MS. SIEKKINEN: This is easy to cure.
MR. ROBERTS: Please do not make me be this way. You can object to my questions. I have no problem with that, okay? Please stop talking and arguing.
BY MR. ROBERTS:
Q. Mr. Runyon, have you reviewed any access agreement to a database of hashes or hash database for child sexual abuse material in preparation for today?
A. Okay. That -- yes.
Q. Does that refresh your recollection? I asked you earlier about the documents that you reviewed.
A. Yes. It was the phrasing, sorry.
Q. Okay. Tell me, what have you reviewed.
MS. SIEKKINEN: Objection. Asked and answered.

Page 50

BY MR. ROBERTS:
Q. Well, obviously, this has refreshed your recollection. So tell me what additional document other than you -- previously did you review to prepare for today?
A. There was an agreement between NCMEC and Verizon, I believe, or NCMEC and Synchronoss. I'm not sure which.
Q. Okay. And what was that agreement about?
A. I believe access to the hash, to the NCMEC hash.
Q. Was that the non-profit hash database? Is that the document that you're referring to?
A. Yes.
Q. All right. Was Verizon in possession of that document prior to the bringing of this lawsuit?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't -- I don't know when we had possession of it. You would have to ask legal about that. That's --
BY MR. ROBERTS:
Q. Okay. All right. So in Verizon's policy, they indicate that this large database and it says, quote, Of known CSAM.
What makes Verizon believe that that database

Page 51

is only composed of known child sexual abuse material?
MS. SIEKKINEN: Objection. Vague.
THE WITNESS: We put trust in NCMEC and that they've gone through and vetted the information that's in there.
BY MR. ROBERTS:
Q. Verizon believes that NCMEC has vetted the information in the non-profit CSAM hash database?
MS. SIEKKINEN: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. ROBERTS:
Q. Why do you think that they have vetted the information in the non-profit CSAM database?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: They're considered to be a leading industry resource for that.
BY MR. ROBERTS:
Q. Okay. Do you recall there being any disclaimers of no warranty about the accuracy of the information contained in the non-profit database in the agreement that you reviewed?
MS. SIEKKINEN: Objection. This document speaks for itself. Go ahead.
THE WITNESS: There may have been. I don't --

Page 52

I don't know that I looked at it that closely. It could have existed.
BY MR. ROBERTS:
Q. At the time that this statement that we're looking at was written, did Verizon believe that that database was composed of known and only known child sexual abuse material?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: Could you rephrase that or -- I'm sorry.
BY MR. ROBERTS:
Q. At the time that Verizon composed this policy that we've been looking at, did they believe that the database that they were using was only composed of known child sexual abuse material?
MS. SIEKKINEN: Object to the form. Misstates the facts.
THE WITNESS: I would have to defer that to legal. I don't know when this -- what we're looking at right now, when that was actually created versus -- and I really am not sure when the NCMEC agreement was put in place. So I'm not familiar with either one of those timings.
BY MR. ROBERTS:
Q. I'll show you what we have marked -- I think

Page 53

we'll mark it as Plaintiff's Exhibit 3.
MR. ROBERTS: Madam Court Reporter, are we at Exhibit No. 3?
THE COURT REPORTER: Yes, sir.
(Plaintiff's Exhibit No. 3 was marked for ID.)
BY MR. ROBERTS:
Q. This is the non-profit hash-sharing database agreement.
Does this appear to be at least the front page of the document that you reviewed?
A. I believe so, yes.
Q. Okay. I know I'm scrolling pretty quickly here, but does this appear to be the document that you looked at, that you reviewed?
A. It looks -- it very well could be.
Q. It says it was signed in 2018?
A. Okay.
Q. This here at the end, "The registrant," which would be Synchronoss, "on behalf of Verizon accepts all information contained in the non-profit database including but not limited to PhotoDNA signatures, hashes and categorizations as-is without warranty of any kind and assumes all risk and liability associated with using the information contained in the non-profit database."
Did I read that first sentence correctly?

Page 54

MS. SIEKKINEN: Objection. The document speaks for itself. Go ahead.
BY MR. ROBERTS:
Q. Okay. "If the registrant has questions or concerns regarding information contained in the non-profit database, it shall address those issues with the participating non-profit identified as having submitted the information to the non-profit database, including but not limited to circumstances in which the participating non-profit is informed that the information they have submitted may be corrupt, incorrectly categorized or otherwise mistakenly submitted."
So my first question is, why would Verizon characterize to its customers that this database only contained known child sexual abuse material, given this clause in the agreement?
MS. SIEKKINEN: Objection. Misstates the record and assumes facts not in evidence and outside the scope.
BY MR. ROBERTS:
Q. You can answer the question.
A. I'd have to defer you to legal on that.
Q. Okay. Have you reviewed the deposition of Fallon McNulty, the corporate representative for NCMEC?

Page 55

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I'm not sure if I have or haven't.
BY MR. ROBERTS:
Q. Okay. She testifies that in, I think, the non-profit -- well, let me just ask you this. You'll agree you've reviewed the non-profit organization hash-database sharing agreement. That is a database that is composed of multiple lists from multiple non-profit entities, correct?
MS. SIEKKINEN: Objection. Misstates the document. Go ahead.
THE WITNESS: I don't remember what -- if it said it was coming from multiple sources or not.
BY MR. ROBERTS:
Q. Okay. In fact, is Verizon aware that NCMEC has no control over the submissions of other organizations to the non-profit organization hash-sharing list?
MS. SIEKKINEN: Objection. Assumes facts.
BY MR. ROBERTS:
Q. Well, were you aware of that?
MS. SIEKKINEN: Objection. Assumes facts not in evidence.

Page 56

BY MR. ROBERTS:
Q. You can answer.
A. I would have to defer that to legal. I don't know what the -- what that states.
Q. And you didn't realize that NCMEC has no control over the submissions to the non-profit database that are made by other international organizations? You didn't know that?
MS. SIEKKINEN: Objection. Misstates.
THE WITNESS: I would have to defer that to legal. I don't really -- yeah, I don't have an answer for you on that.
BY MR. ROBERTS:
Q. Okay. Well, do you believe that Verizon knew -- well, first of all, let's back up.
The individual hashes that are involved in this case, do you believe that they came from NCMEC's external hash-sharing list?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: Can you please --
BY MR. ROBERTS:
Q. Yeah.
A. Sorry.
Q. Yeah, yeah, it's hard. It sounds like you have no clue like about this, and you correct me if I'm

wrong.
Do you understand that the NCMEC -- that the NPO hash-sharing list is a conglomeration of multiple lists from multiple different organizations, not just NCMEC?
Did you understand that?
MS. SIEKKINEN: Objection. That was not in evidence. Misstates, and argumentative with the witness.
BY MR. ROBERTS:
Q. Did you understand that, Mr. Runyon?
A. I don't know what the list totally comprises.
Q. Okay. You don't know what criteria were used by other organizations to make submissions to the NPO hash list?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I'm not privy to what NCMEC does with that hash list or how they create it.
BY MR. ROBERTS:
Q. Okay. NCMEC doesn't actually control anything that other organizations put on that list. Did you know that?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't have any awareness of how they create that list.



BY MR. ROBERTS:
Q. Okay. But you testified earlier that Verizon relies on that list because you trust NCMEC.
Did I understand that correctly?
MS. SIEKKINEN: Objection. Misstates. Go ahead.
THE WITNESS: Sorry. Yes, that is what I stated, that they are considered to be an industry expert resource.
BY MR. ROBERTS:
Q. But if they don't control the information on that list, why would Verizon trust the information on that list?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: They're considered an industry expert and that's -- we have to rely on them to do their job.
Can we take another break? I apologize. I've got to get something in my throat. My throat's just going nuts.
MR. ROBERTS: Okay. All right. That's fine.
THE VIDEOGRAPHER: This marks the end of media number two. The time is 2:36 p.m. We are now off the record.
(Off the record.)



THE VIDEOGRAPHER: This marks the beginning of media number three. The time is 2:49 p.m. We are now on the record.
BY MR. ROBERTS:
Q. All right, Mr. Runyon, I still have Exhibit 3 up here and I just -- this is the first page of the non-profit hash-sharing database access agreement and the third paragraph down says, "Various non-profit organizations worldwide provide services to help prevent child sexual exploitation and assist child victims of all exploitation. As part of these efforts, these non-profits may possess PhotoDNA signatures and/or hashes of images that they believe constitute apparent child pornography or their jurisdiction's equivalent legal definition for child pornography."
My question for you is, are you aware as we sit here today who these various non-profit organizations are?
A. I know of a few.
Q. Okay. Who?
A. Well, aside from National -- the National Center for Missing and Exploited Children, there's also the Internet Watch Foundation and there's also CyberTip.CA, I think.
Q. Okay. And when did Verizon discover that



those organizations were contributing to the non-profit hash-sharing database?
MS. SIEKKINEN: Objection. Lack of foundation.
THE WITNESS: I don't know when that date was.
BY MR. ROBERTS:
Q. Okay. Do you know any of the other organizations that are -- or have contributed to the non-profit hash-sharing database?
MS. SIEKKINEN: Objection. Lack of foundation.
THE WITNESS: No, I'm not aware of any.
BY MR. ROBERTS:
Q. Okay. Where did you get that information that IWF and CyberTip Canada -- who told you that they were contributors, or what document did you review that told you that?
A. Well, you asked me the question if I was aware of any. I've run into those two different companies through my work receiving child sexual abuse material reports for our consumer IP space, but --
Q. Right.
A. Yeah, but as far as --
Q. But I'm asking you.
A. Right.

Page 61

Q. But I'm asking you why do you think they were part of the non-profit hash-sharing database?
A. Oh, I believe there was a document that stated that Synchronoss was only going to continue to use just the NCMEC base report, I think, or something like that.
Q. Can you tell me, what did that document look like? What document are you referring to?
A. I just remember coming across it. I don't remember what it actually looked like.
Q. Was it an e-mail?
A. It may have been.
Q. Do you know who the author of the e-mail was?
A. No, I do not.
Q. All right. So I think you indicated that you had reviewed some scope of work documents. One of those was between Synchronoss and Verizon, correct?
A. Yes.
Q. Let me show you what we'll mark as 4.
(Plaintiff's Exhibit No. 4 was marked for ID.)
BY MR. ROBERTS:
Q. This document, it's a change request to scope of work No. 1 and this is dated January 27th of 2022. Is this one of the scope-of-work documents that you were referring to?
A. It may have been.

Page 62

Q. Okay. Is this the scope of work that was in place at the time of the events which are the subject of this lawsuit?
MS. SIEKKINEN: Objection. To the extent he hasn't had time to look at that.
BY MR. ROBERTS:
Q. Okay. Have you had time to look at this?
A. I'm looking at it, but the -- I don't know exactly when this was in place, and I'm not familiar exactly when --
Q. So --
A. Yeah.
Q. Okay. So October of 2022 and January of 2023.
A. Okay.
Q. I'm showing you a document that was signed -- a scope of work that was signed January 27th of 2022. This is between Synchronoss and Verizon and it has a scope of work regarding illicit content screening.
So my question is, is this the document that set the policies and procedures between Verizon and Synchronoss that was in place in 2022 and 2023, the time of this subject incident?
A. It appears to be.
Q. Okay. All right. So here it says on -- under Subsection B, and I guess we can identify this by

Page 63

Synchronoss and there's a Bates Stamp 826, "Illicit Content Screening."
Do you see that?
A. Yes.
Q. All right. It says, "Screening content of supported data classes by platform using a commercially available database or bases supported by supplier, such as AOL databases of MD5 child pornography hash signatures."
What is the AOL database?
MS. SIEKKINEN: Objection. Outside of the scope.
THE WITNESS: I don't know what that is.
BY MR. ROBERTS:
Q. Well, this is the -- you tell me if I'm wrong, but this was the scope of work that was signed January of 2022 between Verizon and Synchronoss. You don't know what the AOL database is?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: No, I personally don't have any familiarity with what that is.
BY MR. ROBERTS:
Q. Okay. Do you know why Verizon included it in their policies and procedures regarding scanning of CSAM?

Page 64

MS. SIEKKINEN: Outside the scope. Objection.
THE WITNESS: I do not.
BY MR. ROBERTS:
Q. You are -- you are being produced as the corporate representative or Verizon on scanning child sexual abuse material, correct?
A. Yes.
Q. All right. These are the policies regarding scanning of child sexual abuse material, correct?
MS. SIEKKINEN: Objection. Misstates the evidence.
BY MR. ROBERTS:
Q. I'm asking you a question. Is this the policy -- is this a policy relevant to the scanning of child sexual abuse material between Verizon and Synchronoss?
MS. SIEKKINEN: Objection. Vague what you're referring to.
BY MR. ROBERTS:
Q. I'm sorry, I didn't get your answer, Mr. Runyon.
A. It appears to be.
Q. Okay. So this is the policy. You're the corporate representative. You don't know what the AOL database is?

MS. SIEKKINEN: Objection. Outside the scope.
MR. ROBERTS: Okay. I'm going to indulge you, Nury. How is that question outside the scope of his corporate representative status?
MS. SIEKKINEN: I've lodged my objection for the record. This is not -- that's outside the scope of what you put forth in your 30(b)(6) notice, which is --
MR. ROBERTS: And I'm asking you how asking him a question directly quoted from the policies, how is that outside of the scope, or are you just being obstructive at this point?
MS. SIEKKINEN: No, no, I'm certainly not being obstructionist. I mean, it's very clear --
MR. ROBERTS: Okay. Can you explain how that is the outside the scope of this deposition to ask him what a particular term in the policy means?
MS. SIEKKINEN: First of all, that's not a policy. This is an agreement and this is a change order. So that's no longer part of the agreement. It's being replaced with another part of the agreement. That's why it's outside the scope. It's not part of the policies, practices and procedures for scanning and reporting CSAM.
MR. ROBERTS: Okay.



BY MR. ROBERTS:
Q. So you don't know what the AOL database is?
MS. SIEKKINEN: Objection. Outside the scope.
Go ahead.
THE WITNESS: I am -- no, I do not.
BY MR. ROBERTS:
Q. Okay. So we go to the integration of PhotoDNA signature screening content. What does the NCMEC database hashes, what does that refer to?
A. The list of known CSAM that they provide.
Q. Who's "they"?
A. NCMEC.
Q. Okay. So NCMEC provides or makes -- grants access to multiple lists. Which one does this refer to?
A. Let's see. I don't know. I don't think it -- yeah, I don't know.
Q. Okay. Okay. I want to go to this false positive support. What is a false positive?
A. What is a false positive for a report of CSAM?
Q. What is a false positive as it means here in this agreement?
A. Let me see. I can only make a -- honestly, I don't know how to explain that.
Q. Okay. It says, "Where a given NCMEC database hash generates more than any threshold amount Verizon deems appropriate of false positive identifications with zero true matches to known CSAM, upon written request from Verizon, supplier shall remove such hash from its hash database such that scans do not match against such hash, such functionality, quote, the hash supression functionality."



Okay. So you don't know what false positive is. What is the threshold amount? What does that mean?
A. That would be something I would have to defer to legal on. I don't know the answer to that.
Q. Okay. What is the hash suppression functionality?
A. That I do not know.
Q. All right. This says, "Supplier shall remove such hash from its hash database."
Does Synchronoss maintain a hash database?
MS. SIEKKINEN: Objection. Vague.
BY MR. ROBERTS:
Q. Well, let me ask it a different way. What does its hash database refer to in this agreement?
A. I believe it's referring to the database that's provided from -- or from the National Center for Missing and Exploited Children.
Q. You believe that the supplier has the ability to remove hashes from the database?



MS. SIEKKINEN: Objection.
BY MR. ROBERTS:
Q. Like Synchronoss has ability to remove dashes -- remove hashes from the database?
MS. SIEKKINEN: Objection. Misstates --
BY MR. ROBERTS:
Q. From the NPO database.
MS. SIEKKINEN: Objection. Misstates evidence.
THE WITNESS: I'm sorry, could you --
BY MR. ROBERTS:
Q. Yeah. So this says supplier and I think you said -- you understand the supplier is Synchronoss, correct?
A. Yes.
Q. All right. "Shall remove such hash from its hash database."
My question is, does Verizon believe that Synchronoss has the ability to remove hashes from the NPO database?
A. I don't know.
MS. SIEKKINEN: Objection. Misstates. Go ahead. Yeah, he answered.
BY MR. ROBERTS:
Q. Do you know what its hash database refers to?

Page 69

A. I'm making -- I don't know.
Q. Okay. And that's okay. If you don't know, just say you don't know.
At least as evidenced by this agreement, Verizon anticipated some level of false positives, whatever that meant, when they entered into this agreement; is that true?
MS. SIEKKINEN: Objection. Calls for speculation.
THE WITNESS: There is a portion in that contract there or in that document that says so, I believe, yes.
BY MR. ROBERTS:
Q. Now, does Verizon have any idea what the false positive rate is? In other words, how often does false positives occur?
MS. SIEKKINEN: Objection. Vague. Unclear.
BY MR. ROBERTS:
Q. Well, I guess you don't know what a false positive is, do you?
A. I can speculate what I think it is, but that's not what --
Q. I don't want you to speculate. You're actually speaking on behalf of Verizon, which is a very large corporation. I'm sure --

Page 70

A. Right.
Q. -- they wouldn't want you to speculate. I guess what I'm asking you is, you really don't know what false positive means in this context?
MS. SIEKKINEN: Objection. Asked and answered.
MR. ROBERTS: That's correct. We can move on. You don't have to answer that.
BY MR. ROBERTS:
Q. Do you have any familiarity with reported false positives by either Synchronoss or WebPurify?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: Can you -- when you say "familiarity," can you --
BY MR. ROBERTS:
Q. I guess -- I guess -- I mean, I guess I can't really ask any -- if you don't know what false positive means, I guess -- I mean, it's probably a bad question.
So this is in a section under "Human Review of Suspected CSAM." And it says, "Verizon shall engage the services of a third party to conduct human review of the content that has been flagged as a match or near-match to a NCMEC database hash using the PhotoDNA solution."
First question, what is a near match?

Page 71

A. It contains components that would be -- that match with what's in known CSAM.
Q. And when you say "known CSAM," what are you referring to?
A. The NCMEC list.
Q. And again, why do you think the NCMEC list only contains known CSAM?
MS. SIEKKINEN: Objection. Asked and answered.
THE WITNESS: They are considered to be an industry expert.
BY MR. ROBERTS:
Q. Okay. You mean NCMEC an industry expert?
A. Correct.
Q. Okay. "Human reviews subcontractors shall manually review each such flagged image to determine if such image reasonably qualifies as child pornography under the applicable federal law and any other CSAM definitions/guidelines that may be provided by Verizon to such human review subcontractor. Within 48 hours of identifying content as a match or near-match to a NCMEC database hash, supplier shall provide the human review subcontractor with secure access to the content through a review tool that is mutually agreed upon by the parties, provided supplier shall be responsible for

Page 72

ensuring the human review subcontractor shall not have access to any subscriber data in a form enabling it or containing any subscriber identification or the ability to download the content from the solution. Supplier shall reasonably assist Verizon as necessary for purposes of performing a quality control audit of such human review subcontractor and agrees to provide Verizon with reporting and analysis on a weekly basis and allocated by data centers regarding the total number of images scanned that were identified as a hash match or near match to a NCMEC database hash through the PhotoDNA solution and verified as a true positive or false positive by the human review subcontractor."
Did you understand what I just read?
A. Yes.
Q. Okay. Does Verizon have possession of weekly reporting from Synchronoss on the number of matches, the number of true positives and the number of false positives?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: You would have to defer that to legal.
BY MR. ROBERTS:
Q. Okay. To your knowledge, has Verizon ever

Page 73

conducted a quality control audit of the human review subcontractor?
A. Yes.
Q. Okay. When?
A. I'll have to defer that to legal. It's not something I know.
Q. Well, you say you know that they have. So tell me about what knowledge you have.
A. I'm aware that there's a process in place and I understand that they're -- that that's underneath legal review. I believe that's their process.
Q. I mean, I know that there is a process. We see the process here and it's described elsewhere. But my question to you is, are you aware of it having been done?
MS. SIEKKINEN: Objection.
BY MR. ROBERTS:
Q. An audit being done?
MS. SIEKKINEN: Asked and answered.
BY MR. ROBERTS:
Q. You can answer it. I didn't understand your answer.
A. Yes, I've been advised that it's been done.
Q. Okay. Who -- when? I mean, who told you that it's been done?

Page 74

A. Our legal -- my legal department.
Q. Like as a result of this case it's been done, or like in the past on a regular basis? What?
A. I don't have knowledge of that, so I don't know.
Q. Are there weekly meetings with Synchronoss or WebPurify regarding quality control?
MS. SIEKKINEN: Objection.
THE WITNESS: I don't know.
MS. SIEKKINEN: Outside the scope. Go ahead. Go ahead.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. You don't know. Well, tell me about this. Like what kind of quality control audits have been done?
A. I don't manage that, so I don't know.
Q. I'm asking you as the corporate representative, not your personal knowledge and what you do in your job. And you can tell me you're not prepared to answer that question if that's the truth. Are you not prepared to answer that question?
MS. SIEKKINEN: Objection. Outside the scope and argumentative to the witness. Go ahead.
THE WITNESS: Well, as I stated, I don't know the information.

Page 75

BY MR. ROBERTS:
Q. Okay. This was a document that you reviewed in preparation for today's deposition, correct?
A. It appears to be.
Q. Did you not anticipate that I might ask you questions about quality control or false positives?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: Sure, it's possible.
BY MR. ROBERTS:
Q. Okay. Do you know if any of the procedures for quality control or audit have been done as a result of these two CyberTip reports?
MS. SIEKKINEN: Objection to the extent it calls for privileged information. Go ahead. Not things that are privileged, but you may answer.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. I understand that you're not clear on what false positive is, but let me just ask you this. Do you believe that Verizon considers either the October CyberTip report or the January CyberTip report to be a false positive under the policies and procedures of Verizon?
MS. SIEKKINEN: Objection. Outside the scope. But you can answer.

Page 76

THE WITNESS: Sorry, could you repeat that again?
BY MR. ROBERTS:
Q. Yeah. I understand that you're not clear on what false positive means specifically in this agreement, but I am asking you do you know -- is Verizon's position that either the October CyberTip report that's the subject of this case or the January CyberTip report, which is the subject of this case, are false positives under their policies and procedures?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I'm struggling with the answer -- not the answer, but the question and the interpretation of it. I apologize. I just...
BY MR. ROBERTS:
Q. Okay. You don't understand -- if you don't understand my question, that's okay. I can re-ask it a different way.
A. Yeah, please, if you don't mind.
Q. Yeah, so without getting into what false positive means, okay, I'm just asking you, has Verizon treated the October CyberTip report like a false positive?
MS. SIEKKINEN: Objection. Outside the scope.

Page 77

Go ahead.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Okay. The same question as to the January CyberTip report. Under Verizon's policies and procedures, have they treated that as a false positive?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. So again, and this is just, you don't know, like, currently if one or both of these images were flagged by Verizon again, you don't know whether or not they would be reported to NCMEC again in the future --
MS. SIEKKINEN: Objection.
BY MR. ROBERTS:
Q. -- under Verizon's policies and procedures and practices?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead. And calls for speculation. Go ahead.
THE WITNESS: Yes, our process is if it shows to be apparent CSAM, it would get reported again.
BY MR. ROBERTS:
Q. It is -- is it Verizon's position that under its policies and procedures that the October image is

Page 78

apparent child sexual abuse material?
A. If it shows to be apparent through the process, it will get referred to National Center for Missing and Exploited Children. It will then go to law enforcement and law enforcement makes a determination whether or not it is or isn't.
Q. Right. But my question is, under Verizon's policies and procedures, do they consider the October image, the image that was attached to the October CyberTip report to be apparent child pornography, under their policies?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I feel like I've addressed this, but I'm not quite sure what you're looking -- what answer you're looking for from me.
BY MR. ROBERTS:
Q. Well, let me explain. Does Verizon care about the safety and well-being of its customers?
MS. SIEKKINEN: Objection. Outside the scope.
BY MR. ROBERTS:
Q. Well, you're the corporate representative here to testify about the policies and procedures of the scanning and reporting child sexual abuse material, correct?
A. Yes.

Page 79

Q. And you understand that reporting a customer for possession or manufacture or distribution of child sexual material may have a negative impact on that customer's life, correct?
MS. SIEKKINEN: Objection. Compound and outside the scope.
THE WITNESS: We follow the --
BY MR. ROBERTS:
Q. You understand that, right?
A. We follow the process of reporting.
Q. And that's not my question. But for example, I mean, you understand that you're disclosing potentially private information of a customer when you disclose it to NCMEC, correct?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: If it is apparent CSAM, we report it to NCMEC.
BY MR. ROBERTS:
Q. Right. So let me get back to -- because you asked what answer I want. What I want to hear is that Verizon cares about the accuracy of their reports. And apparently, you're saying they don't really care about the accuracy of their reports.
Is that true?

Page 80

MS. SIEKKINEN: Objection. Misstates the testimony and is argumentative and harassing.
THE WITNESS: No, it's not true.
BY MR. ROBERTS:
Q. So Verizon does care about whether or not their reports to NCMEC are accurate, correct?
MS. SIEKKINEN: Objection. Outside the scope. But go ahead.
THE WITNESS: Our reporting process reports apparent CSAM. We don't make the determination.
BY MR. ROBERTS:
Q. Right.
A. We don't make the determination.
Q. Right, but --
A. The final --
Q. But now, but Mr. Runyon, now --
MS. SIEKKINEN: Objection. You're interrupting his response.
MR. ROBERTS: Yeah, yeah.
BY MR. ROBERTS:
Q. Mr. Runyon, now Verizon knows that the October image does not display a child, okay? What I'm asking you is, don't they care about not reporting that again in the future?
MS. SIEKKINEN: Objection. Lack of

foundation. Assumes facts not in evidence.
Outside the scope.
BY MR. ROBERTS:
Q. You can answer the question.
A. We follow our process. That's --
Q. Right, but your process has, in writing anyway, some mechanism for correcting errors, correct?
A. I believe there's some language in that; yes.
Q. Yeah. And I'm asking you, has Verizon done that in this case? Have they taken any mitigating or corrective errors to address the content that was reported in this case either in the October or the January image?
MS. SIEKKINEN: Objection. Vague, ambiguous and outside the scope.
THE WITNESS: I think I would have to defer that to legal in that regard.
BY MR. ROBERTS:
Q. Well, as their corporate representative, do you believe if Verizon is given information that one of their reports was false, do you believe that Verizon should investigate that and make some independent determination about whether or not that was a correct -- or I think this thing says a false positive?
MS. SIEKKINEN: Objection. Assumes facts not



in evidence and calls for speculation hypothetically.
THE WITNESS: If that falls within the process.
BY MR. ROBERTS:
Q. But does it fall within the process?
MS. SIEKKINEN: Objection. Same objection as before.
BY MR. ROBERTS:
Q. If Verizon is made aware that they have potentially reported an image as child pornography and, in fact, it's not child pornography, do you believe that Verizon's processes and policies are designed to address and correct that issue?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I believe, yes.
BY MR. ROBERTS:
Q. Has any of those policies or processes occurred in this case with the images that Mr. Lawshe was reported for?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: That I don't know.
BY MR. ROBERTS:
Q. As Verizon's corporate representative, you are



unaware of any effort to determine as we sit here today whether or not the October or the January images were false positives that should be subject to Verizon's policies and procedures in that regard?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: Sorry, could you repeat that again?
BY MR. ROBERTS:
Q. Yeah. As Verizon's corporate representative, as we sit here today, you are unaware that there has been any action taken by Verizon on the October or January images in this case to implement the policies and procedures regarding false positives?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Okay. So I want to go back to Exhibit 2, which was the frequently asked questions. We've been talking about the database and the scanning. I want to move to extensive use of human reviewers that we talked about earlier.
This policy states that "The human reviewers evaluate the images and" -- and this is a quote -- "ensure that all confirmed CSAM is reported to NCMEC."
Tell me, what does Verizon mean by "confirmed



CSAM"?
MS. SIEKKINEN: Objection. Mischaracterization.
BY MR. ROBERTS:
Q. Am I mischaracterizing that that says "ensure that all confirmed CSAM is reported to NCMEC"? Is that a mischaracterization, Mr. Runyon?
MS. SIEKKINEN: Objection. Mischaracterizing the document. It's not a policy. Go ahead.
BY MR. ROBERTS:
Q. Okay. Hold on. Your attorney, Mr. Runyon, has just said that this is not -- does not reflect the policy of Verizon. Earlier you testified --
MS. SIEKKINEN: Michael, that's not what I said. That's not at all what I said. The record will reflect what my objection was. That's the mischaracterization. Enough.
BY MR. ROBERTS:
Q. Okay. Is -- Mr. Runyon, is this frequently asked questions, is this an accurate representation of Verizon's policies and procedures regarding their efforts to combat child sexual abuse material?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: It is apparent -- sorry. Yeah,

Page 85

it's a document that's what was I think at one point in time, or still is, on our website. I'm not sure.
BY MR. ROBERTS:
Q. Okay. And it says that "The human reviewers ensure that all confirmed CSAM is reported to NCMEC."
Is that a misrepresentation of what it says?
A. No.
Q. All right. What does "confirmed CSAM" mean? What does Verizon mean by confirmed CSAM?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I would take that to be that it's -- I'm not sure how we're defining confirmed there.
BY MR. ROBERTS:
Q. Okay. But it doesn't say, you'll agree, ensure that all apparent CSAM or images that appear to be CSAM are reported to NCMEC? It does not say that, does it?
A. The word "apparent" is not in that sentence, no.
Q. Yeah, okay.
THE WITNESS: Can we take another break? I apologize.
MR. ROBERTS: Sure.

Page 86

THE WITNESS: I've got to go do something about this.
MR. ROBERTS: All right.
THE COURT REPORTER: Michael, can you take us off the record, Mr. Acker?
THE VIDEOGRAPHER: I'm so sorry. This marks the end of media number three. The time is 3:28 p.m. We are now off the record.
(Off the record.)
THE VIDEOGRAPHER: This marks the beginning of media number four. The time is 3:44 p.m. We are now on the record.
BY MR. ROBERTS:
Q. Okay. Mr. Runyon, we just took a break. I'm going to show you what we'll mark as Exhibit 5.
(Plaintiff's Exhibit No. 5 was marked for ID.)
BY MR. ROBERTS:
Q. It's the -- I think it's the scope of work for WebPurify.
Okay. I'm going to show you this document here. It says, "Scope, Responsibilities and Pricing. Human-based review of suspected CSAM in Verizon cloud project."
Is this the document, or does this appear to be the document that you reviewed? And this is a

Page 87

document -- I'll say Verizon produced this document. The Bates stamp begins at -- the scope of work is at 33.
Does this appear to be the document that you reviewed?
A. It does.
Q. Okay. All right. So in the scope here, again, there's a couple of terms that I want to ask you about. The name of this is human-based review of suspected CSAM in Verizon cloud.
What does Verizon mean when they say "suspected CSAM"?
A. Oh, sorry, I'm looking crosswise.
Q. Do you see it right here? Is it highlighted if I do that? Can you see that?
A. No, I'm sorry, I was looking down below that, I apologize.
Q. Correct.
A. So you're --
Q. So my question is, what does Verizon mean when they say "suspected child sexual abuse material"?
A. It's apparent, appears to be.
Q. Okay. Later under the scope it goes into a little bit more detail. It says, "A third party designated by Verizon provides Verizon with the technical solution for the Verizon cloud personal

Page 88

storage services and uses software to screen images stored in Verizon cloud for matches against databases of known CSAM hashes." I'm going to stop there.
Known CSAM hashes seems to different than suspected CSAM hashes. Does Verizon mean that to be something different than suspected CSAM hashes?
MS. SIEKKINEN: Objection. Calls for a legal conclusion. Go ahead.
THE WITNESS: I don't know. I would have to defer that to legal.
BY MR. ROBERTS:
Q. Well, to me -- and this is just not a legal question. It's just -- known sounds like well, if I know something, it is what it purports to be versus if I suspect something, it may or may not be that thing. Is that the way that you normally use those two terms in your everyday life?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: It could be.
BY MR. ROBERTS:
Q. Right. I mean, if I say I know something, that suggests that I have actual knowledge and that is a fact, correct?
A. That's one interpretation. A lot of people

say they know something when they don't.

Q. We could all be wrong. That's certainly true. But why did Verizon ask WebPurify to do human review of images that Verizon knew -- already knew were child sexual abuse material?

MS. SIEKKINEN: Objection. Mischaracterizes the text.

THE WITNESS: I'm sorry, could you repeat the question?

BY MR. ROBERTS:

Q. Well, let me ask -- let me -- she objected. Let me re-ask.

If a match to a known child sexual abuse image is detected, such human image is flagged for human review and verification prior to reporting it to NCMEC. And so my question is, if it's known child sexual abuse material, why would you have someone review it?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: It would still need to be reported. So you would still go through the same process regardless.

BY MR. ROBERTS:

Q. Well, what I'm saying is, why have the process at all if it's known child sexual abuse material? Is



there any scenario where Verizon is going to intentionally not report known child sexual abuse material?

A. Not that I'm aware.

Q. Right. So Verizon, their policy, if they have knowledge of a match with known child sexual abuse material, human review or not, their policy is going to be to report that to NCMEC, correct?

MS. SIEKKINEN: Objection. Mischaracterization of previous testimony. Go ahead.

THE WITNESS: Sorry, could you repeat the question?

BY MR. ROBERTS:

Q. Yeah. It's a question. I'm not telling you anything. I'm not telling you anything. I'm asking you a question.

A. That's what I asked --

Q. Isn't it true, isn't it true that Verizon, their policy, if they know that an image is a match to known child sexual abuse material, their policy is always going to be report that, whether there's human review or not, correct?

MS. SIEKKINEN: Objection. Assumes facts not in evidence. Go ahead.



THE WITNESS: We follow the same process that we utilize. It's -- basically it goes -- Synchronoss marks it as CSAM and then it goes underneath human review, and then if it's considered still to be CSAM upon the human review, it goes back to Synchronoss to be reported to NCMEC.

BY MR. ROBERTS:

Q. Right, but what I'm -- I think maybe we're ships passing in the night. If Verizon already knows that it's child sexual abuse material, why do they have anybody look at it?

MS. SIEKKINEN: Objection. Assumes facts not in evidence.

THE WITNESS: We follow the process regardless of that. So it just continues -- the same process should be in place regardless.

BY MR. ROBERTS:

Q. And so you're the corporate representative for the policies and procedures. I'm asking you why Verizon's policy is to have a known image of child sexual abuse material reviewed by a human --

MS. SIEKKINEN: Objection.

BY MR. ROBERTS:

Q. -- if you know that it's child sexual abuse



material?

MS. SIEKKINEN: Objection. Assumes facts not in evidence.

THE WITNESS: It's still part of the process.

BY MR. ROBERTS:

Q. Right. Isn't it true, though, that they're not known images of child sexual abuse material? It's really what you said earlier, it's suspected child sexual abuse material?

MS. SIEKKINEN: Objection. Mischaracterization. Go ahead.

THE WITNESS: Right. We don't make the determination whether that's actually CSAM. Law enforcement does.

BY MR. ROBERTS:

Q. Right, but I guess my question, again, following up on this, why are you telling WebPurify in this agreement that it's a known child sexual abuse material? Why do you tell them before they review it that it's known to be child sexual abuse material?

MS. SIEKKINEN: Objection. Outside the scope and mischaracterizes.

THE WITNESS: I would have to refer that language to legal, then. I don't know how to address that.

Page 93

BY MR. ROBERTS:
Q. Let me put it from WebPurify's perspective. If I'm the vendor and I read this agreement and Verizon has told me that a particular image is a match to a known image of child sexual abuse material, do you believe that that might affect their willingness to report or not report an image?
MS. SIEKKINEN: Objection. Outside the scope and calls for a hypothetical.
THE WITNESS: They should be following the process just as we do.
BY MR. ROBERTS:
Q. Yeah, and I -- yeah, but this is the process, right? I mean, you're telling them part of the process is Verizon has told WebPurify that the images that they are reviewing have matched known child sexual abuse material. That's the policy, correct?
MS. SIEKKINEN: Objection. Outside the scope and assumes facts not in evidence. Go ahead.
THE WITNESS: Could you rephrase that?
BY MR. ROBERTS:
Q. Yeah. And I'm literally -- and you correct me if I'm wrong. I'm reading from -- this is -- is the policies and procedures for human review of child sexual abuse material at Verizon, correct? That's what we're

Page 94

looking at?
A. Correct.
Q. You are the corporate representative that's been produced with the most knowledge of those policies and procedures, correct?
A. Correct.
Q. Okay. This paragraph of scope, this is part of Verizon's policies and procedures, correct?
A. Correct.
Q. All right. Is it not true that Verizon has communicated in this document to WebPurify that it is sending images which have matched to known CSAM images?
A. That we're sending them?
Q. Correct?
A. I mean, the language reads that that statement's in there.
Q. Right. So that is part of the policy? I mean, part of the policy is Verizon is telling WebPurify that the images that they are reviewing have matched to known child sexual abuse images, correct?
MS. SIEKKINEN: Objection. Mischaracterization. Go ahead.
THE WITNESS: What the language states.
BY MR. ROBERTS:
Q. Right. Isn't it true, though, that that might

Page 95

bias WebPurify in their evaluation of an image if they've already been told that it's a match to known child sexual abuse material?
MS. SIEKKINEN: Objection. Outside the scope and calls for speculation.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. Do you agree that that's a possibility?
A. I don't know that either.
Q. Okay. This says, "Child sexual abuse material means child sexual abuse material which means any image that reasonably qualifies as child pornography under applicable U.S. federal law and any other child sexual abuse material definitions and guidelines that may be provided by Verizon."
Did I read that correctly?
A. Yes.
Q. Okay. This doesn't have the word apparent in either the definition for child sexual abuse material or the scope of work, does it?
A. It does not.
Q. Okay. What is Montage?
A. My belief is that is a proprietary software.
Q. And Verizon required WebPurify to utilize that in the review of documents?

Page 96

MS. SIEKKINEN: Objection. Assumes facts not in evidence.
MR. ROBERTS: Well, Nury, he is the evidence. He's the corporate rep. I'm asking him a question.
BY MR. ROBERTS:
Q. Is that the policy? Is it the policy of Verizon that they required WebPurify to use Montage?
A. I would have to defer that to legal.
Q. Okay. Do you understand that Montage blurs an image?
A. I've never actually seen that product, or that software, so I can't speak to that.
Q. So you don't know what Montage really is other than it's a proprietary tool?
A. Correct.
MS. SIEKKINEN: Mr. Runyon is having difficulty with coughing right now.
THE WITNESS: Sorry.
MS. SIEKKINEN: It's okay. It's okay, David.
BY MR. ROBERTS:
Q. Does -- other than -- you've identified the process of reporting child sexual abuse material. One is a match to a database of purported or suspected, however you want to call it, images of -- or hash values of child sexual abuse material, and the second is human

Page 97

review.

Are there any other processes involved in the reporting of child sexual abuse material?

A. I don't believe so.

Q. Is there any mechanism where there's an image that is age-difficult or age-indeterminate? Do you know what that means? Do you know what that term means?

A. Somewhat.

Q. Yeah, you look at an image and the person could be 17 or they could be 19. They could be 16 or they could be 20. Do you understand that's what age-difficult or age-indeterminate means?

A. Okay.

Q. Do you understand that that's what it means? I don't want to tell you something. I want you to testify.

A. Yes.

MS. SIEKKINEN: Objection. You are telling him.

MR. ROBERTS: I'm asking him to confirm that's his understanding of the words age-difficult or age-indeterminate.

BY MR. ROBERTS:

Q. So what is Verizon's policy on reporting age-difficult or age-indeterminate images?

Page 98

MS. SIEKKINEN: Objection. Outside the scope.

BY MR. ROBERTS:

Q. Okay. Let me lay the predicate. You are the corporate representative for policy, procedures and practices regarding the reporting of apparent CSAM to NCMEC, correct?

A. Correct.

Q. And do you agree that that involves the reporting, at least potentially, of images which are age-difficult or age-indeterminate?

A. Yes.

Q. What is the policy regarding the reporting of images which are age-difficult or age-indeterminate?

A. I'm sorry, you kind of broke up.

Q. Yeah, let me ask it again. Does Verizon -- or what is Verizon's policy regarding the reporting of age-indeterminate or age-difficult images?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: If it is apparent CSAM, it is marked by Synchronoss. Synchronoss then refers that to WebPurify to be -- have manual verification or to look at it, review. And if they determine that it meets the qualification of apparent CSAM, then that is sent back to Synchronoss and

Page 99

Synchronoss files a report to NCMEC and that's the process we have.

BY MR. ROBERTS:

Q. Right. So my question is, you've already testified that you don't know what apparent child sexual abuse material is. What I'm asking is, what is web -- what is Verizon's policy regarding reporting images that could be interpreted to be 18 or 17, or 19 or 16? What's their policy? Do they report those types of images as child sexual abuse material --

MS. SIEKKINEN: Objection.

BY MR. ROBERTS:

Q. -- as apparent?

MS. SIEKKINEN: Objection. Misstates testimony. But go ahead, answer that.

THE WITNESS: Yeah, if it's apparent, it gets reported through the same process that we've spoken before, and that is it goes to -- Synchronoss marks it. It is then reviewed manually by WebPurify. WebPurify validates that it meets the criteria of apparent and sends it back to Synchronoss. Synchronoss then sends a notification -- or the report over to the National Center for Missing and Exploited Children, and they then forward it on to law enforcement who makes the final determination.

Page 100

BY MR. ROBERTS:

Q. So, but my question is, if there's an image that's been flagged in human review and the human reviewer looks it and says this person, they could be 18 or they could be 16, is that apparent child pornography or reportable under Verizon policies and procedures?

MS. SIEKKINEN: Objection. Compound. Go ahead.

THE WITNESS: Yes, it would get reported.

BY MR. ROBERTS:

Q. Okay. So Verizon includes in apparent child pornography images that they know could be adult images, correct?

MS. SIEKKINEN: Objection. Mischaracterizes. Go ahead.

THE WITNESS: Well, that's the whole point. We don't know. That's why we report it.

BY MR. ROBERTS:

Q. You don't know because they could be adults or they could be minors, correct?

A. It gets -- we don't make that determination.

Q. Is that correct, you report it if they could be a minor, even though they could be an adult?

MS. SIEKKINEN: Objection. Asked and answered.

Page 101

THE WITNESS: If it meets the condition of apparent, then yes.

BY MR. ROBERTS:

Q. And does that meet the condition of apparent?

MS. SIEKKINEN: Objection.

BY MR. ROBERTS:

Q. Someone that could be 18 but they could be 16?

A. Yes, it would get reported.

Q. Okay. So when Verizon reports an image to the National Center for Missing and Exploited Children as apparent child pornography, they are not actually saying that it is a minor; is that correct?

A. Right. We're not making -- yes.

Q. It could be an adult or it could be a minor, correct?

MS. SIEKKINEN: Objection. Mischaracterizes. Go ahead.

THE WITNESS: Yes.

BY MR. ROBERTS:

Q. Okay. Why wouldn't Verizon, when faced with this type of it could be an adult or it could be a minor, why wouldn't they do some level of investigation into the image and the circumstances of the download and try to make some determination about whether or not it really is a minor rather than somebody that just might

Page 102

be a minor?

MS. SIEKKINEN: Objection. Compound and outside the scope. Go ahead.

THE WITNESS: We don't make that determination. We follow our process.

BY MR. ROBERTS:

Q. But I'm asking, why doesn't your process include some level of investigation beyond just looking at the image?

MS. SIEKKINEN: Objection. Outside the scope.

THE WITNESS: The volume of notices would be prohibitive of that.

BY MR. ROBERTS:

Q. Okay. Why do you say that it would be prohibitive?

MS. SIEKKINEN: Bless you.

THE WITNESS: Sorry. Thank you. Could you repeat the question? I'm sorry.

BY MR. ROBERTS:

Q. Yeah, why would it be prohibitive? You mean cost-prohibitive?

A. That could factor in. I don't know.

Q. Okay. Well, you said it would be prohibitive. I'm just asking you, why would it be prohibitive to include some sort of investigation into these images

Page 103

that are age-indeterminate?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: Well, that -- again, that would actually go down to law enforcement at that point. I mean, they would do that final determination. We -- again, we're not making the determination. We are just producing this as apparent CSAM report. They do that type of work.

BY MR. ROBERTS:

Q. And other than it being prohibitive, do you have any explanation as to why Verizon doesn't do some level of investigation other than eyeballing the image prior to reporting your customer to the National Center for Missing and Exploited Children?

MS. SIEKKINEN: Objection. Asked and answered.

THE WITNESS: We have multi steps that we go through. We have two different vendors that are doing that work.

BY MR. ROBERTS:

Q. So this contract, this scope of work -- and actually, you answered some interrogatories. I'm going to stop. I'm going to show you --

MR. ROBERTS: I guess are we at 6, Madam Court

Page 104

Reporter?

THE COURT REPORTER: Yes, we are.

(Plaintiff's Exhibit No. 6 was marked for ID.)

BY MR. ROBERTS:

Q. These are answers to interrogatories. I'll show you -- we'll mark this as 6 -- June 2025. I'm scrolling down for your verification. This is your electronic signature June 6th, 2025.

Do you recall verifying answers to interrogatories or two forms, something like that?

A. Yes.

Q. You recall that, okay. You state here to the Question No. 2, to this particular CyberTip, was it reviewed by a human and your answer was yes. In your answer you say that "Verizon states that the image described in the CyberTip report," this number, "was reviewed by a human being before it was reported to NCMEC. The individual was employed by WebPurify, a company contracted by Verizon. The review occurred on or about August -- October 29th, 2022. Verizon's investigation is in progress and does not yet have direct knowledge of the name or location of the individual who reviewed this image at this time."

Do you understand that WebPurify has destroyed the information that would tell us the name of the

Page 105

individual that you were referring to?
MS. SIEKKINEN: Objection. Mischaracterizes. Go ahead.
THE WITNESS: No, I don't have any knowledge of that.
BY MR. ROBERTS:
Q. Okay. Why do you say that this image was reviewed by a human?
A. Because that's the process that's outlined in the statement of work, and we have to trust our vendors to do their job.
Q. So you're trusting -- you're basically saying that's the process, that's why you answered it that way?
A. We have to have a good-faith belief that our vendors are doing the work that they're employed to do.
Q. You agree with me, though, sometimes people don't do the work that they're supposed to do?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. And how long have you had a job?
A. Since I was 16.
Q. And in that time, nobody has ever not done something that they were supposed to do?
MS. SIEKKINEN: Objection. Outside the scope.

Page 106

THE WITNESS: Of course they have.
BY MR. ROBERTS:
Q. It's a ridiculous question, isn't it? Of course people sometimes don't do the things that they're supposed to do. And I'm not asking you to comment on what WebPurify, an unknown person at WebPurify did or didn't do. I'm just trying to verify that the only reason that you have said that a human being actually looked at this image is because of the process and procedures outlined in the scope of work?
MS. SIEKKINEN: Objection.
BY MR. ROBERTS:
Q. Do I understand that correctly?
MS. SIEKKINEN: Mischaracterizes his testimony. Go ahead.
THE WITNESS: In order for them to be able to submit that back to Synchronoss, they have to check off that they manually reviewed it. So somebody has to acknowledge that that's the steps they took.
BY MR. ROBERTS:
Q. Okay. Other than that, do you have any information that they actually looked at the image?
A. I do not.
Q. Okay. Why do you not know where it occurred?
A. Sorry?

Page 107

Q. Yeah, part of the question was tell me the location. You see this, where did this review occur. And you answered, verified answer, that you do not have direct knowledge of the location of the individual who reviewed this image.
Why do you not know that?
A. My understanding, that's not been provided by WebPurify.
Q. The same contract that you've relied on to testify under oath that this image was looked at says that it has to be done in Hyderabad, India, doesn't it?
MS. SIEKKINEN: Objection. You've taken the document away. He can't see what it says.
BY MR. ROBERTS:
Q. You've reviewed the document, correct?
A. Yes.
Q. Mr. Runyon, you've reviewed it. You understand that Web -- it's actually -- this person was not employed by WebPurify, Inc., were they? It was WebFurther India Ltd. Does that name sound familiar, WebFurther India?
MS. SIEKKINEN: Objection. If you're going to ask about the terms of the contract, please put it back up. You know, that's normal.

Page 108

BY MR. ROBERTS:
Q. You're the corporate representative, Mr. Runyon. You didn't understand that this human review was occurring in Hyderabad, India?
A. Yes.
MS. SIEKKINEN: Objection.
THE WITNESS: I'm aware.
MS. SIEKKINEN: Go ahead.
BY MR. ROBERTS:
Q. You're aware that the review is occurring in Hyderabad, India, correct?
A. Yes.
Q. All right. Why did you not answer this and say that it was done in Hyderabad?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't know. I'll have to defer that to legal. I don't know.
BY MR. ROBERTS:
Q. Well, are these your answers or are these legal's answers?
A. They're mine.
Q. Right. So you relied on the contract to say that it was reviewed, but you wouldn't rely on the contract to say that it was done in Hyderabad, India?
Do I understand that correctly?

Page 109

MS. SIEKKINEN: Objection. Mischaracterizes his testimony. Go ahead.
THE WITNESS: Can you rephrase that or ask that again? I'm sorry.
BY MR. ROBERTS:
Q. Yeah. Why didn't you say that the review occurred in Hyderabad, India?
A. I don't know.
Q. Why does Verizon hire people in Hyderabad, India to do the content review for them?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I have to defer that to legal.
BY MR. ROBERTS:
Q. Is it because it's cheaper?
A. Oh, I don't know.
MS. SIEKKINEN: Objection. Speculation. Go ahead.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. How much -- what are the speculation? You reviewed the exhibit, I think -- let me see, five, the scope of work. What are these unredacted numbers? How much does this cost per month?
MS. SIEKKINEN: Objection. Outside the scope.

Page 110

THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. How much is it an image that WebPurify gets paid?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Did you not see an unredacted copy of this agreement?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I don't recall.
BY MR. ROBERTS:
Q. You don't recall whether or not you saw an unredacted copy of this scope of work for WebPurify?
A. Correct. I don't recall if I did or did not.
Q. Okay. I didn't mean to -- this scope of work references Ethan Arenson. I think you've already identified him. It says, under responsibilities, "Key Responsibilities: Conducts weekly meetings with supplier for quality assurance and other topics related to services covered under this SOW."
Did Ethan Arenson conduct weekly quality assurance meetings with WebPurify from the date this contract was signed until present?

Page 111

A. Don't know.
Q. Okay. This contract speaks about escalations. Do you recall seeing that?
A. I may have glanced over it. I don't remember if I actually read into that to that level, but...
Q. To your knowledge, has WebPurify ever had to escalate content to Verizon under the terms of this policy and procedure to help them evaluate a particular image?
A. I don't know.
Q. If they did have to escalate content to Verizon, isn't it true that Verizon wouldn't have any content moderators that would be qualified to help them?
MS. SIEKKINEN: Objection. Vague.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. You testified earlier that Verizon doesn't employ any content moderators, trained content moderators in-house. Was that true?
A. To the best of my knowledge, yes.
Q. Yeah. So I mean, if WebPurify had to escalate content to Verizon, who at Verizon would help them make a determination?
A. I believe that would be legal and most likely Ethan.

Page 112

Q. Okay. Do you think Ethan has training in identifying child sexual abuse material?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Okay. What were the consequences for this supplier, here WebPurify, if they failed to provide moderation within the 24 hours of receipt?
A. I believe it's in the document there somewhere, but I'm not sure what that is.
Q. Okay. I was provided with some training material. I guess we'll mark the training material as 7.
(Plaintiff's Exhibit No. 7 was marked for ID.)
BY MR. ROBERTS:
Q. Have you reviewed this document?
A. I believe I have.
Q. This was a document produced by Verizon. It starts at Bates Stamp 51. I want to -- "Which image and videos are reportable CSAM? Verizon must report to the National Center for Missing and Exploited Children whenever it encounters child pornography, a term defined in U.S. law to mean an individual under the age of 18 engaged in sexually explicit conduct."

Did I read that correctly?
A. Yes.
Q. That definition doesn't have anything -- does not refer to the word apparent, does it?
A. That word is not in the sentence, no.
Q. Okay. Do you know what the Dost factors are?
A. Not verbatim. I've read a little bit of it, but that's about it. I don't really.
Q. Okay. There's a section here saying, "Making age determinations." It says, "Determining the age of an individual who appears in a photo or video can be difficult and is not an exact science."
Do you agree with that statement?
A. That's what the -- that's what that line says, yes.
Q. Well, I'm not asking you if that's -- I'm sorry. As Verizon's corporate representative on policies and procedures, do you agree that that is a true statement, that it is difficult to determine the age and it is not an exact science?
A. Yes.
Q. Okay. Tell me, as Verizon's corporate representative, what is the Tanner Scale?
A. I believe it's a guideline.
Q. Okay. Do you believe as Verizon's corporate



representative that application of the Tanner Scale is a reliable scientific way of determining whether someone is above or below the age of 18?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. All right. As Verizon's corporate representative, though, you are aware that that is what information was provided by Verizon to WebPurify to make that determination, correct?
MS. SIEKKINEN: Objection. Mischaracterizes the document. Go ahead.
THE WITNESS: Yes.
BY MR. ROBERTS:
Q. Yeah, and they -- just so we're not misrepresenting, it says, "Moderators should use their best judgment with assistance from the Tanner Scale discussed in the next two slides."
Is that what it says?
A. That is what that line states.
Q. Yeah. There's no other methodology in this document to help a moderator make that decision, correct?
MS. SIEKKINEN: Objection. Mischaracterizes.



Go ahead.
BY MR. ROBERTS:
Q. Is there another methodology in this document which would help a moderator to determine whether or not the individual is 18 or not 18 or below 18?
A. Not that I see at the present.
Q. Okay. And you reviewed it. Do you recall anything from your review?
A. I do not.
Q. Okay. Do you believe, as Verizon's corporate representative, that this is an accurate representation of the Tanner Scale?
MS. SIEKKINEN: Objection. Lack of foundation. Go ahead.
THE WITNESS: Best I know, yes.
BY MR. ROBERTS:
Q. What do you -- well, I mean, this is Verizon -- it's not your personal knowledge I'm asking you, but what I'm asking you as Verizon's corporate representative, Verizon believes this is an accurate representation of the Tanner Scale?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: Yes.



BY MR. ROBERTS:
Q. Okay. As the corporate representative of Verizon, you understand Verizon has the resources to hire medical professionals and experts to help them understand the Tanner Scale and limitations of the Tanner Scale?
MS. SIEKKINEN: Objection. Assumes a lot of facts not in evidence.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. Okay. So do you have any idea as Verizon's corporate representative what a Stage 5, let's say, on the Tanner Scale means?
A. Other than what's being shown right there.
Q. Other than what's being shown right here, you'd have no idea?
A. No.
Q. Right. So according to this, a Tanner Scale 5, okay, is the age range of 12 and a half to 16 and a half.
A. Okay. Yes, I see that.
Q. Yes, that's what this scale states, right?
A. I see that, yes.
Q. You're Verizon's corporate representative. This is the document that you gave to WebPurify to help

them determine the age of individuals, correct?
A. Yes.
Q. Okay. I'm going to represent to you that Tanner Scale Stage 5 is fully sexually mature. There is no rating beyond that, okay? Your mother, if she's still alive, is a Tanner Stage 5.
Did you know that?
MS. SIEKKINEN: Objection. Way outside the scope. Go ahead.
THE WITNESS: Yes. I mean, that would make sense.
BY MR. ROBERTS:
Q. Right. So you know just as a human being that Tanner Stage 5, fully sexually mature does not represent an age range of 12 and a half to 16, correct?
A. I don't know that.
Q. Okay. Does that seem like a reasonable thing to you, if someone is fully sexually mature from the pubic hair standpoint that you could estimate their age range to be between 12 and a half and 16 and a half years old?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: Well, this is a guideline and it's not scientific.



BY MR. ROBERTS:
Q. Yeah, it is not scientific, is it? No. This isn't accurate, though, right? That's not accurate?
A. I don't know that.
Q. Okay. Down here it says age and it goes up to 15. What does this mean down here, these ages down here at the bottom, infantile to 15?
A. You mean other than what it represents as an age scale?
Q. Right. You agree that that age scale doesn't go above the age of 15?
A. On this chart.
Q. On this document, yeah. No?
A. Yes.
Q. Do you agree that there is no diagram -- on this diagram, there is no image with an age range that does not include a minor?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: Based upon the document, yes.
BY MR. ROBERTS:
Q. So if I were to use this purported version of the Tanner Scale, every image in this, I would have to conclude that their age range includes being a minor, correct?



MS. SIEKKINEN: Objection. Outside the scope and misrepresents the document. Go ahead.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. Okay. Well, this age range is eight to thirteen. That includes being a minor, correct?
A. Yes, sorry.
MS. SIEKKINEN: Sorry.
BY MR. ROBERTS:
Q. Twelve and a half to 18 and a half, that includes being a minor, correct? Twelve and a half to 18 and a half years old, that age range includes minors, correct?
A. Yes.
Q. Okay. Eighteen (sic) to fourteen years old, that includes minors, correct?
A. Yes.
Q. Twelve and a half to 16 and a half years old, that includes minors, correct?
A. Yes.
Q. There's no age range on this Tanner Scale that would allow me to conclude someone is not a minor, correct?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.



THE WITNESS: Yes.
BY MR. ROBERTS:
Q. All right. But Verizon's policy is let's use this age range of 12 and a half to 18 and a half. If a moderator thought this individual could be from 12 and a half to 18 and a half years old, that would qualify under Verizon's policy as being reportable child sexual abuse material?
MS. SIEKKINEN: Objection. Compound and vague. Go ahead.
THE WITNESS: I'm sorry, could you repeat that?
BY MR. ROBERTS:
Q. Yeah. If there was a pornographic image of an individual, a female individual and the moderator determined that she fit within this 12 and a half to 18 and a half age range, under Verizon' policies and procedures that would be reportable child sexual abuse material?
MS. SIEKKINEN: Objection. Hypothetical.
THE WITNESS: It could potentially.
BY MR. ROBERTS:
Q. Okay. What would it depend on?
MS. SIEKKINEN: Objection. Hypothetical. Same objection.



Page 121

THE WITNESS: Well, they're using their best judgment. Again, it's not scientific.
BY MR. ROBERTS:
Q. Okay. "Under these policies and procedures Tanner Stage 2 marks the beginning of physical signs of puberty and the dividing line between pre- and postpubescent."
Did I read that correctly?
A. Yes.
Q. And that is Verizon's policy?
MS. SIEKKINEN: Objection. Mischaracterizes. Go ahead -- object to the form. Go ahead.
BY MR. ROBERTS:
Q. Is that Verizon's policy?
A. That's what's written on this paper.
Q. Yeah, I'm not asking what's written on the paper. I'm asking you as corporate representative, is that Verizon's policy when they're training the content moderators? Is that their policy?
MS. SIEKKINEN: Object to the form. Go ahead.
THE WITNESS: It's a guideline.
BY MR. ROBERTS:
Q. Under Verizon's guidelines if a model has pubic hair, are they prepubescent or postpubescent or pubescent?

Page 122

MS. SIEKKINEN: Object to the form. Compound. Go ahead.
BY MR. ROBERTS:
Q. Let me ask it again, because I think I changed it near the end.
If a female model has visible signs of pubic hair, under Verizon's policies, is that individual prepubescent or pubescent?
MS. SIEKKINEN: Object to the form. Go ahead. Hypothetical.
THE WITNESS: Now, we're actually -- I'm sorry, we're --
BY MR. ROBERTS:
Q. I know you're looking at this right now. Are you trying to figure out the answer by looking at this --
A. Yes.
Q. -- document?
Okay. I'm asking as Verizon's -- I'm not asking you right now to interpret this, okay? I'm asking you as the corporate representative what their policies and procedures are, okay?
Is it Verizon's policy that if an individual has visible signs of pubic hair, that they would be defined as pubescent as opposed to prepubescent?

Page 123

MS. SIEKKINEN: Objection. Calls for speculation and hypothetical. Go ahead.
THE WITNESS: They could be.
BY MR. ROBERTS:
Q. Could be what?
A. It could be reported.
Q. As -- no, no, no. No, no, no.
A. I'm sorry.
Q. I'm asking you would it be reported as prepubescent or pubescent?
A. We don't --
MS. SIEKKINEN: Objection. Same objection. Go ahead.
THE WITNESS: Again, we don't make the age determination.
BY MR. ROBERTS:
Q. Okay. Actually, do you -- you're aware -- are you not aware that Verizon does -- their policy is to ask WebPurify to make the determination of prepubescent versus pubescent? Are you aware of that?
A. No, I'm not.
Q. Okay.
MS. SIEKKINEN: Can we have -- can we take a break? It's been a little bit and I know David's had some issues with his allergies.

Page 124

MR. ROBERTS: Yeah, yeah, and we'll try to finish it up here. Can we make it like a five-minute break?
MS. SIEKKINEN: Yeah, we'll do it as quick as we can.
THE VIDEOGRAPHER: This marks the end of media number four. The time is 4:38 p.m. We are now off the record.
(Off the record.)
THE VIDEOGRAPHER: This marks the beginning of media number five. The time is 4:47 p.m. We are now on the record.
BY MR. ROBERTS:
Q. Okay. I am -- have you ever spoken with anybody from WebPurify about the services or procedures that they do in preparation for being a corporate representative for Verizon?
A. I have not.
Q. Okay. Do you have any insight into their data retention policies?
A. I do not.
Q. All right. Do you -- as corporate representative for Verizon, do you know why -- you did not know that they had permanently deleted information from their computers regarding the human review of this

Page 125

incident?

MS. SIEKKINEN: Objection. Vague.

THE WITNESS: I'm unaware of that.

BY MR. ROBERTS:

Q. Okay. When you were answering interrogatories, did you speak with anybody from WebPurify to help get information for those interrogatory answers?

A. No.

Q. All right. Did you know why you could not identify the name of the person who allegedly looked at the image in question?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: I do not.

BY MR. ROBERTS:

Q. All right. So let's -- have you ever seen the CyberTip reports in this case?

A. Yes, I have.

Q. Are you familiar with -- what's that?

A. You're fine.

Q. Sorry. Are you familiar with CyberTip reports?

A. I am.

Q. Okay. Do you view them as a part of your

Page 126

daily responsibilities or your job responsibilities, whether it's daily or not?

A. Daily, no. Definitely not daily. But yes, whenever we file one, we do get a confirmation report back.

Q. So how do you -- when you're filing a -- and what I'm showing --

MR. ROBERTS: Madam Court Reporter, is that 7?

THE COURT REPORTER: No, you are up to 8 now.

MR. ROBERTS: Okay, 8.

(Plaintiff's Exhibit No. 8 was marked for ID.)

BY MR. ROBERTS:

Q. How do you send a CyberTip report? Have you ever sent a CyberTip report?

A. Yes.

Q. How do you do that?

A. Go to web interface with the National Center for Missing and Exploited Children, log into the secure database, sort of a secure web page and send the information and file the report there.

Q. And are there like questions and you fill out the answers or you submit different information in there?

A. Yes, yeah. There's a certain amount that are required, but yes.

Page 127

Q. Do you attach the content that is the subject of that CyberTip to that?

A. We put -- if we have an image, but we don't -- in my case I've never had one that I had to attach, but that would be -- if there was one that was provided, that would have to be done.

Q. Okay. So you never had to report child sexual abuse material, or you reported something else?

A. I have had to report child sexual abuse material.

Q. And how did you identify that material without the image itself?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: Our process is designed that we don't actually view the image for my side of the business for what I deal with. So we validate that the URL exists, that it's the reported material, and then we let NCMEC file that to law enforcement.

BY MR. ROBERTS:

Q. What is a URL?

A. Universal request locator.

Q. Is it like a website or a web page?

A. That would be correct.

Q. And how would you get that type of

Page 128

information?

A. It would either be reported to us by a third party, law enforcement or by the National Center for Missing and Exploited Children itself.

Q. Okay. And do you -- it's just like a random person? If someone called up and said, hey, David Runyon's got child pornography on his website, would you just report that to NCMEC without looking at it or doing anything?

MS. SIEKKINEN: Objection. Hypothetical.

THE WITNESS: In that instance, if all they did was just say that there was something there but they didn't provide us with any material evidence, and what I mean by that is they didn't give us the URL for that particular image or for that --

BY MR. ROBERTS:

Q. Right.

A. -- then we would basically at that point inform them that they would have to give us more information, or they themselves can report it to NCMEC or law enforcement.

Q. But if they gave you a URL, like, wouldn't somebody have to, like, follow that to be, like, oh, okay, this is real, it's not just like a fake thing?

A. Right. We validate that the URL exists, but

Page 129

we don't go to actually view the image. We're not designed to do that.

Q. Okay. So do you know how many -- how many -- at WebPurify, how many content moderators are dedicated to the Synchronoss/Verizon project?

A. I don't know.

Q. How often do they get the training that we were talking about, that we just showed?

A. I don't know that. I don't know the answer to that.

Q. Okay. Who administered that training? Is it a Verizon person or is it a WebPurify person?

A. I believe that's in the contract or in the statement of work somewhere would outline that.

Q. Okay. But you don't know as we sit here without going through the contract who does that?

A. No, I do not.

Q. So can you see this? I'm going to make it a little bit bigger for us. I had a milestone in my life the other day. I got bifocals. So that was a big step for me. But my contacts are still just normal. So we'll blow this up.

A. Yeah, same thing, so I understand.

Q. All right. So incident type, this information, are you familiar enough with a CyberTip

Page 130

report that the information provided in Section A is information that's provided by Synchronoss on behalf of Verizon?

A. Yes, in this instance, yes.

Q. Yes, okay. Incident type: Child pornography, possession, manufacture and distribution, let me ask you that. Did Verizon -- and this is you as corporate representative of Verizon.

Did Verizon have any evidence or facts or circumstances that Mr. Lawshe was manufacturing child pornography?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: I don't know that.

BY MR. ROBERTS:

Q. Same question. Did Verizon have any information that Mr. Lawshe was distributing child pornography?

MS. SIEKKINEN: Objection. Outside the scope.

THE WITNESS: I don't know that.

BY MR. ROBERTS:

Q. Let me ask you this. Does every single CyberTip report produced by Synchronoss on behalf of Verizon have the same incident type?

MS. SIEKKINEN: Objection. Outside the scope.

Page 131

Go ahead.

THE WITNESS: I can't speak to the reports that Synchronoss says, but I can tell you that NCMEC, from our standpoint, when we manually enter this into the systems from my side, that's the whole choice we're provided, is one line. It says possession, manufacture, distribution is all together.

BY MR. ROBERTS:

Q. Okay.

A. They don't deviate.

Q. Incident time, what does this mean, the incident time?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: I don't know how it relates to -- how Synchronoss submissions go.

BY MR. ROBERTS:

Q. Okay. But Verizon is submitting these reports on behalf -- I'm sorry, Synchronoss is submitting these reports on behalf of Verizon, correct?

A. Yes.

Q. Okay. They are acting at the direction of Verizon when they scan and report child sexual abuse material, correct?

Page 132

A. Yes.

Q. All right. I can tell you that this incident time at 1:25:23, this number here, is the same as the report time. It's the exact same time as the report time. Do you know why?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: Sorry, I do not.

BY MR. ROBERTS:

Q. Well, does Verizon have a policy of reporting the incident report time in place of the actual incident time?

A. I don't know that.

Q. Is Verizon aware that these incident times are not reflective of the actual time of upload?

MS. SIEKKINEN: Objection. Assumes facts not in evidence. Mischaracterizes. Go ahead.

THE WITNESS: I don't know.

BY MR. ROBERTS:

Q. Well, let me back up. Let me ask you this. As Verizon's corporate representative on policies and procedures of reporting child sexual abuse material, do you know what this incident time represents?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

Page 133

THE WITNESS: I do not.
BY MR. ROBERTS:
Q. So Verizon -- does Verizon know anything about why the incident time is what it is?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I'm sorry, could you repeat the question?
BY MR. ROBERTS:
Q. Yeah. This is -- this is Verizon's, right? Let's go up here. It says, "Synchronoss Technologies is the cloud-based storage provider for content stored on the Verizon cloud"; is that correct?
A. Correct.
Q. Right. This is a report of your customer, Verizon's customer, to the National Center for Missing and Exploited Children, correct?
MS. SIEKKINEN: Objection. Mischaracterizes. Go ahead.
THE WITNESS: It appears to be, yes.
BY MR. ROBERTS:
Q. Well, I mean, Mr. Lawshe was not a customer of Synchronoss, was he?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

Page 134

THE WITNESS: He's a Verizon customer, as I understand it.
BY MR. ROBERTS:
Q. Correct. Does Verizon have a policy of reporting the report time in place of the incident time?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Do you know why this isn't the incident time?
MS. SIEKKINEN: Objection. Assumes facts not in evidence and outside the scope.
THE WITNESS: No, I do not.
BY MR. ROBERTS:
Q. Do you believe -- as Verizon's corporate representative, do you believe that is the time of the upload?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. Okay. "Were the entire contents of the uploaded file publicly available? No."
Why did -- does Verizon always say no on these reports?
A. I don't know.

Page 135

Q. Do you know why this says no? I can represent to you that this image was downloaded from a public www.com website. Do you know why it says that it was not available publicly?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Okay. Do you believe that Verizon should know why its suppliers are answering questions a certain way on a NCMEC CyberTip report?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: Could you rephrase that or repeat it, please?
BY MR. ROBERTS:
Q. Yeah. I mean, do you believe that Verizon should know why its suppliers are answering questions a certain way on a NCMEC CyberTip report?
MS. SIEKKINEN: Same objection.
THE WITNESS: No.
BY MR. ROBERTS:
Q. Do you believe that Verizon should -- if they hire people to make CyberTip reports, do you believe those CyberTip reports should be accurate?
MS. SIEKKINEN: Objection. Outside the scope.

Page 136

Go ahead, and calls for hypothetical.
THE WITNESS: Yes.
BY MR. ROBERTS:
Q. Okay. To the extent -- do you know if this is an accurate answer? Were the entire contents of the uploaded file publicly available? Do you know if that's accurate or not?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I do not.
BY MR. ROBERTS:
Q. Does Verizon -- is that an ambiguous question to you as Verizon's corporate representative?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I'm not exactly sure what ambiguous fully means.
BY MR. ROBERTS:
Q. Okay. Let me say. So the question is, "Were entire contents of uploaded file publicly available?"
Did I read that correctly?
A. Okay, yes.
Q. Would you agree that if this file, if the contents of this file were downloaded from a public website, that the answer to that question should be yes?
MS. SIEKKINEN: Objection. Outside the scope.

THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. Well, why not?
MS. SIEKKINEN: Objection. Same objection.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Well, I mean, just as a human being, you work in the security, you know, division there at Verizon. If I ask you the question were entire contents of the uploaded file publicly available, and you knew that the contents of file had been downloaded from a public website, would you say they are publicly available or would you say they're not publicly available?
MS. SIEKKINEN: Objection. Calls for speculation, outside the scope and vague.
THE WITNESS: Underneath that circumstance, yes.
BY MR. ROBERTS:
Q. Yeah, they would be publicly available, right? I mean, if you do just download them from a public website, they would be publicly available, correct?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: If that's where I downloaded them from, yes.



BY MR. ROBERTS:
Q. Okay. As Verizon's corporate representative, you don't have any other way of interpreting that question that I'm unaware of, do you?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: No.
BY MR. ROBERTS:
Q. Okay. "Did reviewing ESP view entire contents of uploaded file?" This says yes. Do you know why this report would say yes?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I do not.
BY MR. ROBERTS:
Q. Okay. Do you believe that WebPurify -- that it's the policy of Verizon that WebPurify viewed the entire contents of the uploaded file?
MS. SIEKKINEN: Objection. Vague. Go ahead.
They should be viewing it, yes.
BY MR. ROBERTS:
Q. The entire contents of the uploaded file?
A. That I don't know.
MS. SIEKKINEN: Same objection.
BY MR. ROBERTS:
Q. Okay. You don't know if they view the entire



contents of the uploaded file, but they should be looking at it to a certain degree; is that your testimony?
MS. SIEKKINEN: Objection. Mischaracterizes. Go ahead.
THE WITNESS: Sorry, could you rephrase that?
BY MR. ROBERTS:
Q. Yeah. I asked you if you knew -- first of all, let me ask you this way. The reporting electronic service provider, I mean, I guess that's Synchronoss. Let's just say Synchronoss did not view the entire contents of the uploaded file pursuant to Verizon's policies, did they?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. You don't know if Synchronoss looks at the images or not in Verizon's policy?
A. I'm aware that they use the PhotoDNA analysis process.
Q. Okay. I know, but I mean, like, did they view the entire contents of the file? Do you know if Synchronoss looks at the images at all?
A. I don't.



Q. Okay. You know that no one from Verizon looked at the image, correct?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: Don't know.
BY MR. ROBERTS:
Q. You don't know? I mean, hold on now. As the corporate representative, you testified about the policies. There's nobody at Verizon, you've testified, that does content moderation. So nobody at Verizon would have monitored this content, like looked at this picture prior to it being reported, would they?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead. And hypothetical.
THE WITNESS: No.
BY MR. ROBERTS:
Q. Yeah, so I think -- I thought that what you were saying was that Verizon has hired a third party to visually do the content moderation.
Did I understand that correctly?
A. Right. We have Synchronoss that scans for it. They mark it as a candidate. It then goes to WebPurify, who has a human review process.
Q. Right.
A. A person looks at it, yes.



Page 141

Q. Right. And when I ask you that question -- where we got off on this tangent was I asked you did they view the entire contents of the uploaded file, and I think you said you're not sure about that?

MS. SIEKKINEN: Objection.

BY MR. ROBERTS:

Q. What I was trying to clarify is you know they look at it to a certain extent, but are you sure that they viewed the entire contents of the file?

MS. SIEKKINEN: Objection. Vague. Go ahead and outside the scope.

THE WITNESS: I don't know.

BY MR. ROBERTS:

Q. Right. And I don't know if they use this tool called Montage, which potentially can alter the appearance of the image if and when they look at the image, correct?

MS. SIEKKINEN: Objection. Outside the scope and assumes facts not in evidence.

THE WITNESS: I don't have firsthand knowledge of that, no.

BY MR. ROBERTS:

Q. Well, and as Verizon's corporate representative you don't have any knowledge of what the Montage program does?

Page 142

MS. SIEKKINEN: Objection. Same objection as before.

THE WITNESS: It's -- I'll just state that it's proprietary software, so that's...

BY MR. ROBERTS:

Q. But you're not refusing to answer my question because of proprietary software, are you?

A. No. I thought I was just elaborating on it.

Q. Yeah, no. I'm just asking you a very practical question. As Verizon's corporate representative, you don't understand what the Montage program physically does to an image?

A. Correct.

Q. That's all I'm trying to understand.

A. Okay.

Q. Yeah. In your filling out of reports for NCMEC, you are aware that there is a -- the ability to make notes, like physical notes, on a CyberTip report, correct?

A. Yes.

Q. Additional comments that can provide context and additional information that could be helpful for NCMEC?

A. On the ones that I submit, yes.

Q. Right. Do you know why there's no additional

Page 143

information provided on Synchronoss reports?

A. I do not.

Q. All right. There's also the ability to clarify incident time. You know, what do you mean by the incident -- let me ask you this. When you fill out a report for, you know, your job, do you attempt to put an accurate incident time into that report?

A. Yes.

Q. All right. And by incident time, do you mean like trying to give them the -- NCMEC, the best information you have available to you about when the specific event which is the subject of the report occurred?

A. No. And actually, we report when we received it.

Q. Okay. Well, and in those situations -- go ahead. In those situations you may not know when the incident occurred?

MS. SIEKKINEN: Objection.

THE WITNESS: Correct.

MS. SIEKKINEN: Outside the scope. Go ahead.

BY MR. ROBERTS:

Q. Right.

A. Yes.

Q. Are you aware that there is a space on the

Page 144

forms for electronic service providers to clarify what they mean by incident time?

A. No, I'm not.

Q. All right. Are you aware of feedback that NCMEC has provided to Verizon regarding the accuracy of its reports?

MS. SIEKKINEN: Objection. Outside the scope.

THE WITNESS: No.

BY MR. ROBERTS:

Q. Okay. You agree with me that the accuracy of cyber -- NCMEC/CyberTip reports falls within the policies, practices and procedures of detecting and reporting child sexual abuse material, correct?

MS. SIEKKINEN: Objection. Vague.

THE WITNESS: Sorry, could you rephrase that?

BY MR. ROBERTS:

Q. Yeah. So I asked for you to be produced as a corporate representative on partly reporting of child sexual abuse material.

Do you understand that?

A. Partly reporting?

Q. No.

A. Sorry.

Q. Yeah. Part of the reason -- part of the subject matter of which I have asked for a corporate

Page 145

representative to be designated is the reporting of child sexual abuse material.
A. Okay.
Q. Did you understand that?
A. Yes.
Q. All right. Will you agree with me that the CyberTip report is the main, if not the exclusive way, in which Verizon reports child sexual abuse material?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: Yes. That is the reporting mechanism that we employ.
BY MR. ROBERTS:
Q. Okay. And so when Miz -- when your counsel objects to the scope of my question, I just want to make sure you and I understand, you believe that questions about a CyberTip report are included within the scope of reporting child sexual abuse material?
MS. SIEKKINEN: Objection. Outside the scope.
BY MR. ROBERTS:
Q. Correct?
MS. SIEKKINEN: The scope is Verizon's policies.
BY MR. ROBERTS:
Q. Well, listen, Verizon doesn't set the policies of how Synchronoss reports this stuff?

Page 146

MS. SIEKKINEN: Objection. Outside the scope. Go ahead. Go ahead.
THE WITNESS: I was just going to say, it's -- the statement of work specifies that, how the information should be exchanged.
BY MR. ROBERTS:
Q. Yeah, but you agree -- I mean, you agree with me as Verizon's corporate representative that it's Verizon's responsibility of how sexual abuse material is reported on its customers, correct?
A. Could you -- I'm sorry, can you --
Q. Yeah, I mean, you're not suggesting here today that it's not your responsibility how Synchronoss does it because Synchronoss is their own company and that doesn't have anything to do with Verizon, are you?
MS. SIEKKINEN: Objection. Compound. Go ahead.
THE WITNESS: No, I'm not saying that.
BY MR. ROBERTS:
Q. Right. Synchronoss is reporting -- they're doing Verizon's work in submitting these CyberTip reports, correct?
MS. SIEKKINEN: Objection. Vague.
THE WITNESS: They are who we are contracted for this work, yes.

Page 147

BY MR. ROBERTS:
Q. Your -- Verizon is paying them to scan and report child sexual abuse material, correct?
MS. SIEKKINEN: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. ROBERTS:
Q. Okay. What I'm saying, though, what I'm hearing is that Verizon has abdicated the responsibility to Synchronoss to make the CyberTip reports in whatever way they feel is reasonable?
MS. SIEKKINEN: Objection. Mischaracterizes his testimony and argumentative.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. Okay. Well, I'm just trying to figure out, right -- okay. So we've talked about the incident time and what you've told me is Verizon -- as corporate representative, I don't know why the incident time is the way it is, okay?
So I'm trying to figure out who's responsible for making sure that that incident time is accurate. That's my question to you. Who's responsible for making sure that the information in the CyberTip report is accurate?

Page 148

MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Okay. Do you know anything about the content that was the subject of these reports?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: No.
BY MR. ROBERTS:
Q. Have you viewed the images?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I have not. Sorry, I have not.
BY MR. ROBERTS:
Q. All right. Okay. Going back to the frequently asked questions and the statements of Verizon on this, would you agree with me that the human reviewers at WebPurify are not confirming that the information -- that the images that they are reporting are child sexual abuse material?
MS. SIEKKINEN: Objection. Vague. Go ahead.
THE WITNESS: I'm sorry, could you rephrase it or repeat it? I'm sorry.
BY MR. ROBERTS:
Q. Yeah. You stated previously that it was law enforcement's job to figure out whether or not the

Page 149

assertion that this was child sexual abuse material or not -- let me ask that question again. Sorry.

Earlier you testified that it was law enforcement's job to determine whether or not the assertion that this particular image, any particular image, was child sexual abuse material or not was law enforcement's responsibility.

Did I understand that correctly?

A. Yes.

Q. All right. And so your testimony is that it's law enforcement's job to confirm whether or not it's child sexual abuse material or there's been a crime, et cetera, correct?

A. Yes.

Q. All right. WebPurify is not confirming that material is child sexual abuse material before they report it to law enforcement, are they?

A. They are confirming that it's apparent CSAM.

Q. Yeah, okay. And that's different than confirming that it is child sexual abuse material, correct?

A. Yes.

Q. You don't -- you're not here -- you're not prepared to testify on behalf of Verizon as to what Verizon means by "apparent," correct?

Page 150

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.

THE WITNESS: I would leave that definition to our legal department.

BY MR. ROBERTS:

Q. If you can't -- as Verizon's corporate representative, if you can't answer the question of what apparent child pornography means, how could WebPurify know what Verizon means by apparent child sexual abuse material?

MS. SIEKKINEN: Objection. Argumentative with the witness and outside the scope.

THE WITNESS: Again, it's all a process. It goes from the scanner to Synchronoss. It then gets human-reviewed through WebPurify, and these are all just suspected apparent CSAM. It's -- no one in that process makes the final -- makes that determination that is actually truly is until it gets down to law enforcement.

BY MR. ROBERTS:

Q. Okay. And although you can't give me a definition of what apparent is on behalf of Verizon, I think you did indicate that that definition does include images that appear to be adults?

MS. SIEKKINEN: Objection. Mischaracterizes

Page 151

his testimony and outside the scope.

THE WITNESS: No.

BY MR. ROBERTS:

Q. No?

A. No.

Q. Okay. I thought earlier you testified that if you looked at an image that was age-difficult or age-indeterminate and that model could appear to be 18 or 19, but could also appear to be 17 or 16, that that would fall under the definition of reportable, whatever that is, reportable child sexual abuse material?

MS. SIEKKINEN: Objection. Misstates the testimony. Go ahead.

THE WITNESS: Yes, I did state that. I did say that it -- again, it goes down to apparent.

BY MR. ROBERTS:

Q. Yeah. So if I looked at an image on -- and this is a hypothetical. If I looked at an image on a public website, if I was a Verizon customer and I downloaded an image of a young female adult that was 19 years old and someone in Hyderabad thought that they looked 17, Verizon would report me to the National Center for Missing and Exploited Children for possession of child pornography?

MS. SIEKKINEN: Objection.

Page 152

BY MR. ROBERTS:

Q. Is that accurate?

MS. SIEKKINEN: Outside the scope. Outside the scope. Mischaracterizes testimony and hypothetical by your own admission.

THE WITNESS: Again, as I've stated, the process would be that if it was flagged to be in review and it was determined that it was apparent, then that would move on to the next step of going -- being reported to the National Center for Missing and Exploited Children and then on to law enforcement if -- for their --

BY MR. ROBERTS:

Q. I guess the problem is we just don't know what apparent is, though, right?

MS. SIEKKINEN: Objection. Outside the scope.

MR. ROBERTS: Nury, are you saying that the definition of what apparent child pornography is, is outside of the scope of a corporate representative?

MS. SIEKKINEN: No. Your continued going at him in his testimony is outside the scope, harassing the witness. Enough. It's asked and answered.

MR. ROBERTS: Okay.

Page 153

THE WITNESS: Sorry, not that it's relevant, but this is working.
MR. ROBERTS: Oh, good. It is relevant.
MS. SIEKKINEN: That was your Flonase that you held up that has helped you a little bit?
THE WITNESS: Yes, it has definitely made a difference.
MS. SIEKKINEN: I know you were having some trouble with the coughing and stuff earlier.
THE WITNESS: Yeah.
BY MR. ROBERTS:
Q. Let me ask you, and this can be -- you know, I'll talk about the deposition in a second, but does Verizon, in the context of their policies and procedures regarding child sexual abuse -- you understand that as a result of a CyberTip report, one of the foreseeable consequences of that is legal process, a search warrant or subpoena being served on Verizon?
MS. SIEKKINEN: Objection. Outside the scope, but go ahead.
THE WITNESS: Ultimately, that's law enforcement's decision to pursue.
BY MR. ROBERTS:
Q. No, I understand that. I'm just saying Verizon foresees -- let me ask you this. Do you have

Page 154

employees who are dedicated to dealing with search warrants?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: There is a legal team that deals with -- that takes, you know, law enforcement requests, yes.
BY MR. ROBERTS:
Q. And those law enforcement requests often originate from the reporting of child sexual abuse material, correct?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: It may.
BY MR. ROBERTS:
Q. Sure. Does Verizon have any policies or procedure regarding child sexual abuse reports, about the retention of evidence?
MS. SIEKKINEN: Objection. That's outside the scope.
THE WITNESS: I'd have to refer to legal about that.
BY MR. ROBERTS:
Q. Okay. Real quickly back to the CyberTip report, and I'm fixing, I promise, I'm fixing to finish

Page 155

up here.
A. Maybe I spoke too soon. I just started coughing again.
Q. Okay. Do you know whether or not these answers -- "Were the entire contents of the uploaded file publicly available?" It says no. Do you know if that is a hard-coded answer, that it's always that way?
A. I do not know.
Q. All right. Do you know if the reporting -- this question here, "Did the reporting ESP view the entire contents of the uploaded file," do you know if that's hard-coded in these reports?
A. I do not.
Q. And by hard-coded I mean, do you understand that this report is electronically generated?
A. Yes.
Q. Yeah. And that's different when you do your CyberTip report. You physically go in and you answer the questions, correct?
A. Correct.
Q. In the scanning process it's different. This is a computer-generated. No human being types in this information, correct?
MS. SIEKKINEN: Objection. Assumes facts not in evidence. Go ahead.

Page 156

THE WITNESS: I don't know.
BY MR. ROBERTS:
Q. Oh, okay. All right. You don't know if this is a computer-generated report?
A. Correct.
MR. ROBERTS: Okay. Okay. Just give me five minutes, okay? Take a break and I think we might be wrapped up.
MS. SIEKKINEN: Okay.
THE VIDEOGRAPHER: This marks the end of media number five. The time is 5:29 p.m. We are now off the record.
(Off the record.)
THE VIDEOGRAPHER: This marks the beginning of media number six. The time is 5:38 p.m. We are now on the record.
MR. ROBERTS: Okay. Mr. Runyon, I don't have any more questions for you right now, but I am going to continue this deposition and I'm going to continue it for two reasons. One is, I'm not sure that I've been given all of the documents that were responsive to a request to produce. And the other reason is that my impression -- and this is not a personal criticism of you -- was that you were not prepared to answer relevant questions regarding

Page 157

policies and procedures of the detection and reporting of child sexual abuse material.

And so I'm going to reserve my right to come back and ask you further questions. That doesn't mean that I'm going to do that, but I am continuing the deposition and I'm reserving the right to do that.

MS. SIEKKINEN: That's not a question, but for the record, we're objecting to the continuance. You know, to this -- and to all your characterizations, but it's not fruitful to do it here on the record. We will continue our conversation off line, okay, Michael?

MR. ROBERTS: Absolutely. Okay. With that --

MS. SIEKKINEN: I'm sorry, can we -- we're going to take a break and have a -- have redirect because you're concluding your questions for the day.

MR. ROBERTS: Correct, but I'm continuing the deposition. So if you want to ask redirect of your own witness, that's fine.

MS. SIEKKINEN: Yeah, you just said that you were going to be -- maybe not even ask him back, so we wanted to do the redirect now. We'll take a break and we'll come back and do redirect.

Page 158

MR. ROBERTS: Okay.

MS. SIEKKINEN: Thank you, everyone. We'll take a break.

THE VIDEOGRAPHER: This marks the end of media number six. The time is 5:40 p.m. We are now off the record.

(A break was had.)

THE VIDEOGRAPHER: This marks the beginning of media number seven. The time is 5:55 p.m. We are now on the record.

CROSS EXAMINATION

BY MS. SIEKKINEN:

Q. Hi, David. Near the -- close to the beginning of this whole start time, you were asked about the term apparent CSAM, and in your answer you referenced a definition that was in a document.

Do you recall that?

A. Yes.

MS. SIEKKINEN: Okay. Sudhir, would you mind putting up -- I forget -- I forgot Mr. Roberts' numbering. Yeah, go up to the very top. We'll show what that is, yeah. This is a document that Mr. Roberts did put up, but didn't scroll through the full document, didn't show the full document. So scroll down to the bottom of this page. There we go.

Page 159

BY MS. SIEKKINEN:

Q. I'll just draw your attention to 1A. Does that refresh your recollection on a document that had a definition of a child CSAM or a child -- or sorry, apparent child pornography?

A. Yes.

Q. Okay. Can you tell me what apparent CSAM -- apparent child pornography means?

A. That it has the appearance of being something that qualifies as child sexual abuse material.

Q. Would you mind reading 1A of this document, please?

A. Sure, yeah. "Apparent child pornography means images of suspected child sexual exploitation which using good-faith judgment appear to meet the federal definition of child pornography pursuant to 18 U.S. Code 2556(8)."

Q. Okay. Thank you. That's enough for that document.

David, I know we referred to it a couple of times, but mostly off the record, but the record might reflect some coughs and sneezes here and there. Can you tell us what's -- you know, why -- what's causing that?

A. Yeah, fall. A lot of allergies.

Page 160

Q. You suffer from seasonal allergies?

A. Every spring and fall.

Q. And you just arrived in New Jersey within the last day or so; is that right?

A. Yeah, yes.

Q. Okay. And you -- you told us earlier you reside in Texas?

A. Yeah. I have --

Q. Yeah.

A. This type of fall hasn't hit there yet, so I haven't had the displeasure of dealing with it.

Q. And at a certain point you referenced something -- a medication that you had taken. Can you say what that was?

A. Yes, Flonase.

Q. You take that in an effort to clear up your allergies for this testimony?

A. Yes.

Q. Thanks. Okay. Just a clarifying question. Who can access images on a Verizon customer's cloud?

A. Just the customer.

Q. Just the customer. So can the general public access a particular image on a Verizon customer's cloud?

A. No.

Q. Like a regular internet user can't navigate to

a site that has this like -- that's the Verizon customer's cloud account?
A. No.
Q. Okay.
MS. SIEKKINEN: Sudhir, would you mind putting up the training materials, please? Great.
BY MS. SIEKKINEN:
Q. This is a document that Mr. Roberts spent some time with you on earlier; isn't that right?
A. Yes.
Q. Okay. We can scroll down to -- I'll tell you where. Right -- we've spent a fair bit of time on this page, right?
A. Yes.
Q. I'd like you to take a second to look at that first bullet point under "Making Age Determinations." I'll give you a minute.
A. Okay.
Q. Verizon is asking moderators to use what to make determinations?
A. To use their best judgment with the assistance from the Tanner Scale.
Q. Right. So you're -- they're not confined to the Tanner Scale?
A. No. It's just a guide.



MS. SIEKKINEN: All right. Thank you. That is all.
MR. ROBERTS: Andrew, do you have questions?
MR. REISS: I do not.
MR. ROBERTS: I have a couple of follow-up there just right on point with that on the redirect.

REDIRECT EXAMINATION

BY MR. ROBERTS:
Q. Mr. Runyon, you were asked some questions about a definition of apparent child pornography. Do you recall your attorney asking you that question?
A. Yes.
Q. Do you know when Verizon obtained that document?
MS. SIEKKINEN: Objection. Outside the scope. Go ahead.
THE WITNESS: I'm not aware.
BY MR. ROBERTS:
Q. You're not sure that they actually had that document prior to the litigation in this case, are you?
MS. SIEKKINEN: Same objection.
THE WITNESS: I am not.
BY MR. ROBERTS:
Q. Okay. I asked you what Verizon's definition



of apparent child pornography was. That document was a contract between Synchronoss and NCMEC, correct?
A. Yes.
MS. SIEKKINEN: Objection. Compound. Sorry, there were two questions, sorry.
BY MR. ROBERTS:
Q. So the document that you looked at, that -- Verizon was not a party to, that document that your counsel asked you questions about in regards to apparent child pornography, correct?
A. I don't know.
Q. Okay. In any of the documents that you reviewed that Verizon produced, did you see any definitions of apparent child pornography?
A. I don't know.
Q. I asked you early on were there any other documents other than the ones that you had reviewed that memorialized or reduced to writing Verizon's policies and procedures regarding the scanning and reporting of child sexual abuse material.
Do you recall me asking you that question?
A. I do.
Q. And I think you testified that you did not know of any other documents other than the ones you reviewed that memorialized those policies and



procedures; is that true and accurate?
A. Yes, that is what I stated.
Q. Okay. And so the scope of work between Verizon and WebPurify would be the only documentary evidence of policies and procedures as it pertains to the relationship between Verizon and WebPurify; is that correct?
MS. SIEKKINEN: Objection. Outside the scope.
THE WITNESS: I don't know that.
BY MR. ROBERTS:
Q. Do you know of any other document that would establish the policies and procedures regarding content moderation between Verizon and WebPurify other than the scope of work that we went over in your direct testimony?
MS. SIEKKINEN: Objection. Outside the scope and mischaracterizes. Go ahead.
THE WITNESS: No, I am not.
BY MR. ROBERTS:
Q. Yeah, and just for the record, I'm not characterizing your testimony. I'm asking you, am I correct?
A. Correct.
Q. Right. Okay. So when we look at this document, which was marked as an exhibit -- I wrote them

Page 165

down, but maybe it was five, but it is the scope of work.

THE COURT REPORTER: You're correct.

BY MR. ROBERTS:

Q. In fact, it is not the policy of Verizon that only apparent child pornography is reported to NCMEC, correct?

MS. SIEKKINEN: Objection. Misstates testimony and documents. Go ahead.

THE WITNESS: I'm sorry, could you repeat that?

BY MR. ROBERTS:

Q. Yeah. Did someone tell you that it was Verizon's policy to report apparent child sexual abuse material?

MS. SIEKKINEN: Object to the form. And objection, it's outside of the scope.

THE WITNESS: As part of my training for what -- the job I do.

BY MR. ROBERTS:

Q. Who told you that in regards to the scanning and reporting of child sexual abuse material that Verizon's policy and procedure was to report apparent child pornography?

MS. SIEKKINEN: Objection to the scope and --

Page 166

yeah, object to the form.

THE WITNESS: It's something --

BY MR. ROBERTS:

Q. Who told you that?

A. Well, I had forgotten that it was actually in the one document that we looked at, but that's been...

Q. Yeah, but in the document -- and we'll go back to you -- that document doesn't have anything to do with Verizon's policies and procedures regarding reporting CSAM, does it?

MS. SIEKKINEN: Objection. Mischaracterizes testimony.

BY MR. ROBERTS:

Q. We'll go back to it in a minute and we'll figure out what that document actually does, but I'll represent to you that does not set Verizon's policy on what they report or don't report.

My question to you is, who told you that Verizon's policy is to report apparent child pornography in regards to scanning of child sexual abuse material?

MS. SIEKKINEN: Objection. Asked and answered and object to the form.

BY MR. ROBERTS:

Q. You can answer.

A. I mean, it's been --

Page 167

MS. SIEKKINEN: Objection. To the extent it calls for privileged material, I'm objecting on that basis.

BY MR. ROBERTS:

Q. Well, I'll state here, if it was an attorney that told you that it is not privileged because you're corporate representative and you're speaking on behalf of the corporation. But did anybody tell you -- here's what I'm getting at, Mr. Runyon. Nowhere in the documents that I have reviewed or you've reviewed does it say that Verizon's policy is to report apparent child pornography or child sexual abuse material. It doesn't say that in any of the documents.

So I'm asking you, who's told you that?

MS. SIEKKINEN: Objection. Mischaracterizes the documents and mischaracterizes the evidence. Go ahead.

BY MR. ROBERTS:

Q. Go ahead and answer for me, Mr. Runyon.

MS. SIEKKINEN: But I'm raising my same objection as before. Go ahead.

THE WITNESS: I don't remember exactly where I learned that, at what point. It's something that has been verbalized or, you know, that I've been aware of for a long time.

Page 168

BY MR. ROBERTS:

Q. I mean, why wasn't WebPurify made aware of that?

MS. SIEKKINEN: Objection. Outside the scope.

THE WITNESS: I don't know.

BY MR. ROBERTS:

Q. Right, because this just says that the purpose of determining whether the content is child sexual abuse material, correct? That's what this document says?

MS. SIEKKINEN: Objection. Mischaracterizes.

BY MR. ROBERTS:

Q. Okay. I'm going to read it to you, Mr. Runyon, just so nobody thinks I'm mischaracterizing anything. It says, "Supplier shall provide personnel to do the human review for the purpose of determining whether the content is child sexual abuse material and therefore should be reported to NCMEC."

Did I misrepresent what the words are on the page?

A. No.

Q. Okay. Do you agree that that does not tell, or reflect, Verizon a policy that's only apparent or apparent CSAM is what is being either determined or reported?

MS. SIEKKINEN: Objection. Incomplete. Go

ahead.

THE WITNESS: Yes, I agree that that word "apparent" is not in there.

BY MR. ROBERTS:

Q. Right. So what I'm asking you -- because I'm trying to determine where this policy comes from that Verizon reports apparent child sexual abuse material. Because on your website frequently asked questions, it says that confirmed CSAM is reported. In this document, it says determining whether the content, quote, is CSAM and therefore should be reported. I am looking for something that would direct me to understand how or where this policy comes from.

So my question to you is, what document -- is there a document that memorializes the policy that you've articulated that apparent CSAM is what is reported to NCMEC?

MS. SIEKKINEN: Objection. Asked and answered.

THE WITNESS: I don't know.

BY MR. ROBERTS:

Q. And you can't remember any person that told you that that was the policy?

MS. SIEKKINEN: Objection. Asked and answered.



THE WITNESS: No, I can't.

BY MR. ROBERTS:

Q. This is the document that you were shown, the hash-sharing -- the NPO, the non-profit hash-sharing database agreement. And this has a definition of apparent child pornography, correct?

A. Yes.

Q. But this document -- and if you need to take your time and read it, this document does not lay out what Verizon's policies or procedure are for reporting CSAM to NCMEC, does it?

MS. SIEKKINEN: Objection. Vague. But go ahead.

THE WITNESS: I'm sorry, could you repeat the question?

BY MR. ROBERTS:

Q. Yeah. This document does not describe what Verizon's policies are regarding reporting child sexual abuse material to NCMEC, does it?

MS. SIEKKINEN: Object to the form.

THE WITNESS: No.

BY MR. ROBERTS:

Q. Right. You were asked some questions about whether or not the public had access to customers' images that were stored on the cloud.



Do you recall that?

A. Yes.

Q. Tell me, what is your understanding about what happens to an image that's uploaded and is flagged by Synchronoss using this PhotoDNA or hash-matching technology?

MS. SIEKKINEN: Objection. Compound. Go ahead.

THE WITNESS: It is analyzed using PhotoDNA, as I understand it, and it looks for exact and near matches. And it takes those as -- it takes those images and forwards them to WebPurify for them to be visually looked at and to see if they confirm that they do meet the standards for apparent CSAM. And from there, it is forwarded back to Synchronoss. Synchronoss then files the report with National Center for Missing and Exploited Children and they pass it on to law enforcement.

BY MR. ROBERTS:

Q. So particularly, though, you were asked questions about do the public have access to images in the cloud. What's your understanding about what happens when an image is flagged? Does it go to the cloud?

MS. SIEKKINEN: Objection. Outside the scope. Go ahead.



MR. ROBERTS: No, hold on.

MS. SIEKKINEN: I'm sorry.

MR. ROBERTS: No, no, sorry.

BY MR. ROBERTS:

Q. Your counsel asked you questions about public access to the cloud, correct?

A. Yes.

Q. On redirect, you recall her asking you questions on that topic --

A. Yes.

Q. -- correct? All right. I'm going to follow up on one of the questions that she asked, okay?

Is it your understanding that when an image is flagged using PhotoDNA, MD5 hashing, by Synchronoss, it never makes it to the cloud? Do you understand that?

A. I understand the question.

Q. Do you understand the answer?

MS. SIEKKINEN: Objection to the form and argumentative.

MR. ROBERTS: I'm not arguing with you, Mr. Runyon.

BY MR. ROBERTS:

Q. I'm not arguing. I'm just telling you, I'm asking you a question. What does the cloud have to do with anything on these images and it being publicly

Page 173

available?

A. Files where the image is stored.

Q. No, incorrect. Incorrect. You don't understand this basic, basic stuff here, okay? You're the corporate representative for Verizon. Have you not reviewed Synchronoss' attorney's deposition of Cara Blaszka in this case?

MS. SIEKKINEN: Objection. Argumentative and harassing of the witness.

BY MR. ROBERTS:

Q. Have you reviewed --

MS. SIEKKINEN: Ask your questions and be done.

BY MR. ROBERTS:

Q. Have you reviewed that deposition?

A. I don't know.

Q. Okay. Your attorneys actually filed this portion of the deposition in court records. We'll call this maybe 9.

(Plaintiff's Exhibit No. 9 was marked for ID.)

BY MR. ROBERTS:

Q. This is the deposition of Cara Blaszka. This page was actually singled out and filed and they've highlighted it, not me. It says, "So if there is a direct match, an exact match or a near match, the image

Page 174

itself gets put into a quarantine server. It never makes it to the subscriber's account."

Did you not know that?

A. No, I didn't.

Q. Okay. So assuming that she's telling the truth, these images are not stored in the cloud, correct?

MS. SIEKKINEN: Objection. Mischaracterizes, but go ahead.

THE WITNESS: Based upon that document, that would be fair to say.

BY MR. ROBERTS:

Q. Do you have any reason to disagree with the testimony of Cara Blaszka?

A. No, I do not.

MS. SIEKKINEN: Objection. Outside the scope. But go ahead.

THE WITNESS: I do not.

BY MR. ROBERTS:

Q. Okay. Let me ask you this. Are you aware that Verizon tracks and records all website activity of their customers?

MS. SIEKKINEN: Objection. Outside the scope.

THE WITNESS: I am not.

Page 175

BY MR. ROBERTS:

Q. Okay. For marketing purposes, you've never heard -- I mean, you never heard of a program called Custom Experience at Verizon?

MS. SIEKKINEN: Objection. We're outside the scope both of the 30(b)(6) and of recross.

THE WITNESS: No, that's not something I'm familiar with.

BY MR. ROBERTS:

Q. Okay. All right. So in any of the policies or processes that we have discussed, is searching a client's web history in any way part of the policies and procedures to make a determination about whether or not a particular content should be reported?

MS. SIEKKINEN: Objection. Outside the scope of the 30(b)(6) and of recross.

BY MR. ROBERTS:

Q. I just asked you a question. I just want to make sure you understand it. Do the policies and procedures of Verizon and the detection of reporting of child sexual abuse material include searching the web history or search history of the customer?

A. I don't know.

MR. ROBERTS: All right. I don't have any other questions. Okay. So I think, if we're

Page 176

done -- any more questions from anybody? Going once.

MR. REISS: No.

MR. ROBERTS: Going twice.

MS. SIEKKINEN: We're done.

THE VIDEOGRAPHER: Counsel, before we go off the record, I would just like to confirm any video and transcript orders, starting with Mr. Roberts.

MR. ROBERTS: Yes, please. We'll have a transcript. We don't -- we'll take a video. That's fine, yeah.

THE VIDEOGRAPHER: Would you like the video synced with the transcript?

MR. ROBERTS: I don't know if we're that fancy. I don't know if we need that yet. But is that something I can order later if I need it?

THE VIDEOGRAPHER: Yes.

MR. ROBERTS: Okay. Thank you.

MS. SIEKKINEN: We're also ordering the transcript and video, please.

THE VIDEOGRAPHER: And would you like that synced?

MS. SIEKKINEN: Yes, please.

MR. REISS: And we just need the transcript.

MR. ROBERTS: And just for the record -- and I

Page 177

know that opposing counsel is objecting. But I just want to restate that we're continuing the deposition for previous-stated reasons. And I'm assuming that you'll continue to object to that for the stated reasons, and we can have that conversation off line.

MS. SIEKKINEN: Yeah, I agree with that, that we're going to be continuing to object and then we'll continue the meeting to confer off line.

MR. ROBERTS: Sure. All right. Thanks guys. David, I hope you feel better.

THE WITNESS: I'm getting there.

MR. ROBERTS: Sorry you got the short straw to be the corporate rep, you know, but I appreciate your time. Thank you.

THE VIDEOGRAPHER: One moment, Mr. Roberts. I still need to take us off the record.

MR. ROBERTS: Oh, okay. Sorry.

THE VIDEOGRAPHER: All right. We are off the record at 6:23 p.m. This concludes today's testimony given by David Runyon. The total number of media used was seven and will be retained by Esquire Deposition Solutions. Thank you all.

(Witness excused.)

(Deposition was adjourned at 6:23 p.m.)

Page 178

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF PALM BEACH

I, the undersigned authority, certify that DAVID RUNYON personally appeared before me and was duly sworn on the 22nd day of October, 2025.

Witness my hand and official seal this 24th day of October, 2025.

[signature]

______________________________

Wendy Beath Anderson, RDR, CRR, CRC
Notary Public State of Florida
My Commission Expires: 9/23/2029
My Commission No.: HH-687547
Job #J13610228

Page 179

C E R T I F I C A T E

STATE OF FLORIDA
COUNTY OF PALM BEACH

I, Wendy Beath Anderson, Certified Realtime Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report said remote deposition of DAVID RUNYON; that a review of the transcript was not requested; and that the foregoing transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

Dated this 24th day of October, 2025.

[signature]
______________________________
Wendy Beath Anderson, RDR, CRR, CRC
Job #J13610228

Page 180

Reference No.: 13610228

Case: LAWSHE vs VERIZON COMMUNICATIONS

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

______________________________
David Runyon

NOTARIZATION OF CHANGES
(If Required)

Subscribed and sworn to on the ______ day of

__________________________, 20____ before me,

(Notary Sign)________________________________

(Print Name) Notary Public,

in and for the State of ____________________

Reference No.: 13610228
Case: LAWSHE vs VERIZON COMMUNICATIONS

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
David Runyon



Reference No.: 13610228
Case: LAWSHE vs VERIZON COMMUNICATIONS

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
David Runyon

