1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE, an
individual,

                        CASE NO.:
      Plaintiff,     3:24-cv-44-MMH-MCR

    vs.

MIKAYLA PRESTON, in her
individual capacity as a
detective for St. Johns County
Sheriff's Office, and KATHLEEN
DULLY, in her individual
capacity as medical director
of the UF Child Protection
Team,

      Defendants.
_____

VIDEO-RECORDED DEPOSITION OF

**MIKAYLA PRESTON**

Taken on behalf of Plaintiff

DATE TAKEN:  Thursday, March 13, 2025

TIME:       1:01 p.m. - 6:38 p.m.

PLACE:     St. Augustine Court Reporters
           1260 North Ponce De Leon Boulevard
           Suite E
           St. Augustine, Florida 32084

Examination of the witness taken before:

Nicole Medlock
Registered Professional Reporter and FPR-C

---

2

**A P P E A R A N C E S**

MICHAEL KEITH ROBERTS, II, Esquire

Nooney, Roberts, Hewett, & Nowicki
1680 Emerson Street
Jacksonville, Florida 32207-6104
904-398-1992
mroberts@nrhnlaw.com

appearing on behalf of Plaintiff.

MATTHEW JOSEPH CARSON, Esquire
CHRISTEN ANN PETRUZZELLI, Esquire (via Zoom)

Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
850-205-1996
mcarson@sniffenlaw.com
cpetruzzelli@sniffenlaw.com

appearing on behalf of Defendant Mikayla
Preston.

AMY R. SHEVLIN, Esquire (via Zoom)

Buchanan & Buchanan, P.A.
1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471-8237
352-629-4099
ashevlin@rbtrial.com

appearing on behalf of Defendant Kathleen
Dully.

ALSO PRESENT:

ANDREW CUSIMANO, Videographer
AUTUMN ZEPF, Paralegal for Plaintiff

---

3

I N D E X

Witness                              Page
MIKAYLA PRESTON
  Direct Examination By Mr. Roberts............ 5
  Cross Examination By Ms. Shevlin............. 263
  Redirect Examination By Mr. Roberts.......... 287
  Certificate of Oath.......................... 308
  Certificate of Reporter...................... 309
  Errata Sheet................................. 310

PLAINTIFF'S EXHIBITS

Number  Description                          Page

1      Cyber tip line report          14

2      Affidavit for search warrant   38

3      Deposition of Mikayla Preston on   43
       November 21, 2023

4      met-art.com Google search results  45

5      2018 Florida Statute 817.071     85

6      Letters to Mikayla Preston from   107
       Kathleen Dully, M.D.

7      Photograph                  161

8      Photographs                223

9      Photograph                  241


DEFENDANTS' EXHIBITS

(None marked.)

---

4

THE VIDEOGRAPHER:  This begins Media Unit

Number 1 to the video-recorded deposition of

Mikayla Preston in the matter of William Lee Lawshe

versus Mikayla Preston, et al., being heard before

the United States District Court, Middle District

of Florida, Jacksonville Division, Case

Number 3:24-cv-00044-MMH-MCR.  This deposition is

being held at 1260 North Ponce De Leon Boulevard,

Suite E, in St. Augustine, Florida.  Today's date

is March 13th, 2025, and the time is 1:01 p.m.

    My name is Andrew Cusimano, and I am the

videographer.

    The court reporter is Nicole Medlock.

    Counsel, will you please introduce yourselves,

your affiliations, and the witness will then be

sworn in.

    MR. ROBERTS:  Michael Roberts.  I represent

the plaintiff, Mr. Lawshe.

    MR. CARSON:  Matthew Carson, representing

Detective Mikayla Preston.

    MS. SHEVLIN:  Amy Shevlin, representing

Dr. Dully.

5

1          MIKAYLA PRESTON,
2    having been produced and first duly sworn as a witness
3    on behalf of Plaintiff, and after responding "Yes,
4    ma'am" to the oath, testified as follows:
5          THE VIDEOGRAPHER:  Before we start, I forgot
6    to ask you --
7          THE WITNESS:  Yes.
8              DIRECT EXAMINATION
9    BY MR. ROBERTS:
10   Q    All right.  Good afternoon.  Can you just
11   state your name for the record, please?
12   A    Yes, Mikayla Preston.
13   Q    And, Ms. Preston, we're here today to take
14   your deposition.  I introduced myself earlier.  As you
15   know, I represent a gentleman named William Lawshe in a
16   case that he's brought against you and another
17   individual.
18          Are you currently employed?
19   A    Yes, sir, I am.
20   Q    And what's your current employment?
21   A    I'm an ICAC detective -- excuse me -- ICAC
22   detective.  I don't know (unintelligible).
23   Q    With St. Johns County?
24   A    Yes, sir.
25   Q    All right.  And how long have you been an ICAC

6

1    detective?
2    A    Since 2022, if I'm not mistaken, yeah.
3    Q    Now, for the court reporter, let's say what
4    ICAC -- can you -- that's an acronym, I understand.
5    What is that an acronym for?
6    A    Yes.  It's for Internet crimes against
7    children.
8    Q    And you've been deposed in this case before,
9    not in this case but in the case of Mr. Lawshe, the
10   State versus Mr. Lawshe; correct?
11   A    Yes, sir.
12   Q    And have you had an opportunity to review that
13   deposition?
14   A    Yes, sir.
15   Q    All right.  I'm not going to go through the
16   rules of a deposition because I know you've had your
17   deposition taken multiple times.  But from time to time,
18   I may remind you if we start, you know, talking over one
19   another or something like that.  Okay?
20   A    Yes, sir.
21   Q    All right.  Now, we sit here today.  It's
22   March 13th, 2025.  What day did you effectuate this
23   arrest on Mr. Lawshe?
24   A    I do not recall the specific date.
25   Q    Okay.  April of 2023 sound correct?

7

1    A    Yes.  It does sound around that time.
2    Q    All right.  So as we sit here today, have you
3    had an opportunity to review some of the documents in
4    this case?
5    A    Yes, sir.
6    Q    Can you tell me what you've reviewed in
7    preparation for today's deposition?
8    A    So I reviewed the images, the NCMEC images --
9    Q    Uh-huh.
10   A    -- and then the images that were charged.
11   Q    Anything else?
12   A    Also my report.
13   Q    When you say your report, can you be a little
14   bit more specific?
15   A    Yes, sir.  It was my initial -- what we call a
16   narrative.
17   Q    All right.  Did you review any other
18   documents?
19   A    Not that I recall.
20   Q    All right.  I know that you -- you completed
21   and executed several affidavits in this case for search
22   warrants.  Did you review any of that in preparation for
23   today?
24   A    The only search warrant would have been the
25   one I provided my attorney, which would have been the

8

1    Synchronoss.
2    Q    Okay.  That was the first search warrant that
3    you sought in this matter?
4    A    Yes, sir.
5    Q    Okay.  Now, do you understand that the charges
6    against Mr. Lawshe were dropped?
7    A    Yes, sir, I do.
8    Q    Okay.  As we sit here in today in March of
9    2025, do you agree that the models that were the subject
10   of this case were, in fact, adults at the time these
11   photographs were taken?
12   A    Do I agree --
13          MS. SHEVLIN:  Form.
14   BY MR. ROBERTS:
15   Q    From time to time, somebody may object.  You
16   still have to answer the question but --
17   A    Okay.  Do I agree that they were adults?
18   Q    Yes.
19   A    In my opinion, no, I don't.
20   Q    Okay.  So as we sit here today, you believe
21   that the models depicted in the charged images -- there
22   were three charged images; correct?
23   A    Yes, sir.
24   Q    -- were minors at the time that these
25   photographs were taken?

9

1    A    In my personal opinion?  Is that --
2    Q    Well, I'm asking just your opinion, I mean --
3    A    Yes.  In my --
4    Q    -- what your belief it is.
5    A    Yes.  In my personal opinion, I do believe
6  that they are minors.
7    Q    Okay.  And are you under -- do you know why
8  the charges were dropped against Mr. Lawshe?
9    A    The specific reason, no, sir.
10    Q    Were you given any reason?
11    A    Not that I recall.
12    Q    All right.
13        MR. CARSON:  Can we take a real quick break?
14  Is that all right?
15        MR. ROBERTS:  Sure.
16        MR. CARSON:  We don't have to go off the
17  record.  Can we just admit my partner?
18        MR. ROBERTS:  Oh, great.  Yeah.
19        MR. CARSON:  Sorry about that.  Thank you.
20        (Ms. Petruzzelli enters the deposition.)
21        MR. ROBERTS:  Are we back -- still on the
22  record.  Okay.
23  BY MR. ROBERTS:
24    Q    So we're going to get into that a little bit,
25  but I wanted -- that kind of helps me on the road of how

10

1  we're going to address all of this.  Okay?
2        So what's the last investigative thing that
3  you did on this case?
4    A    Sorry if it takes me a while to think back,
5  just because it was, like, two years ago.
6    Q    So it's been two years since you've done
7  anything on the case?
8    A    Yes, sir.  Because that was in 2023, and we're
9  now in 2025.  So it was about two years ago.
10        Offhand, I do not remember, and I don't want
11  to guess on anything.
12    Q    Well, let's just -- I don't want you to guess
13  either.
14        Have you done anything since the charges were
15  dropped in December of 2023?
16    A    Not that I recall.
17    Q    Okay.  At the time that -- and we're going to
18  get into this in more detail -- the charges were
19  dropped, were you shown photographs of the -- the
20  subject models with photographic ID?
21    A    You're talking about, like --
22        MS. SHEVLIN:  Form.
23        THE WITNESS:  -- the passport?
24  BY MR. ROBERTS:
25    Q    With passports, yes.

11

1    A    Yes.  I was shown a redacted version.
2    Q    Right.
3        And what was your reaction to seeing those?
4    A    I didn't really have a reaction just because I
5  didn't have a lot of information to go off of.
6    Q    Did you ask for any other information?
7    A    Ask who?
8    Q    I'm just asking, did you ask anybody for more
9  information?
10    A    I do not remember.  And you're saying it was
11  December of 2023?
12    Q    Yeah.
13    A    Yeah.  I don't recall.  I don't remember.
14    Q    Safe to say that you did not take any other
15  investigative action after seeing those photographs
16  with --
17        MR. CARSON:  Object to form.
18  BY MR. ROBERTS:
19    Q    -- with the -- when I say photographs, you
20  understand I'm talking about the photographs --
21        MS. SHEVLIN:  Join.
22  BY MR. ROBERTS:
23    Q    -- with the passports in them?
24    A    That I don't recall.
25    Q    You don't recall doing anything?

12

1    A    No, sir.
2    Q    Okay.  When the charges were dropped, did you
3  close your investigative file?
4    A    Yes, sir.
5    Q    Did you disagree with the decision to drop the
6  charges?
7    A    I wouldn't say that I disagreed.
8    Q    Did you agree that the charges should be
9  dropped?
10    A    To be honest, I didn't really have a concrete
11  opinion on it.
12    Q    At that time, did you believe that there was
13  probable cause to continue to charge Mr. Lawshe with a
14  crime of possession of child sexual abuse material?
15    A    And at what time are you referring to, at --
16    Q    The time the charges were dropped.
17    A    Do I believe that we had probable cause?
18    Q    At the time the charges were dropped.
19    A    I believe that we had probable cause to charge
20  for what we charged him for, if that makes sense.  I
21  hope I'm not rewording it.
22    Q    It's okay.
23    A    Okay.
24    Q    But you're not answering the question.  So the
25  question is at the time the charges were dropped, do you

13

1  believe that probable cause still existed?
2      A    Yes, sir, I do.
3      Q    At that time?
4      A    Yes, sir, I do.
5      Q    With images of the models holding passports,
6  you believed that there was still probable cause to
7  believe that there was possession of child pornography?
8      A    Yes, sir, I do.
9      Q    Okay.  Do you feel strongly about that?
10     A    Yes, sir, I do.
11     Q    Okay.  We're going to pick back up there in a
12  minute.
13     A    Okay.
14     Q    So what began your investigation into this
15  case?
16     A    We received a NCMEC cyber tip.
17     Q    Okay.  What is a NCMEC cyber tip?  Explain
18  what NCMEC stands for.
19     A    Sorry for using the acronym.  It's the
20  National Center for Missing & Exploited Children.
21     Q    I'm going to show you what we'll mark as
22  Plaintiff's Exhibit 1 and a copy for your counsel.
23         MR. ROBERTS:  And I -- Amy, I did not print
24         out a copy for you.
25         THE WITNESS:  Thank you.

14

1         MS. SHEVLIN:  Can you tell me what document
2         we're looking at?  Because I've got a bunch of
3         stuff in front of me.
4         MR. ROBERTS:  Yeah.  It's the cyber tip line
5         report, Number 1537.
6         MS. SHEVLIN:  Got it.  Thank you.
7         MR. ROBERTS:  Yep.  Okay.  All right.
8         (Plaintiff's Exhibit 1 was marked for
9         identification.)
10  BY MR. ROBERTS:
11     Q    Okay.  What have -- what have I shown you?
12     A    You've shown me a NCMEC cyber tip.
13     Q    And is this the cyber tip that began your
14  investigation?
15     A    Yes, sir.
16     Q    Okay.  And does this report indicate -- tell
17  me, as a detective, what did this report tell you?
18     A    So this report told us who the ESP, which is
19  just an electronic service provider, was that reported
20  the CSAM as well as some suspect identifiers, which
21  would have been the phone number and then the file that
22  was reported.
23     Q    Okay.  And do you -- do you get -- you say the
24  file.  Is that a photograph?
25     A    Yes, sir.

15

1      Q    And did you --
2      A    In this case.
3      Q    And did you receive and review that
4  photograph?
5      A    Yes, sir.
6      Q    I see that the incident type is described as
7  child pornography on Page 2 of the cyber tip line
8  report?
9      A    Yes, sir.
10     Q    And there's an incident time.  What is that?
11     A    That is the date and time that the ESP
12  documented as when the crime would have occurred.
13     Q    Okay.  What's important about the incident
14  date and time for you?
15     A    It gives us, I guess in laymen's terms, kind
16  of like a starting point of when we think that the crime
17  would have occurred.
18     Q    So you see the incident date and time as the
19  date that he uploaded the file or when the crime
20  occurred.
21     A    Yes, sir.  That's what it goes off.
22     Q    And so when you went to seek for a subpoena, I
23  think you asked for seven days before and after that
24  date.
25     A    If I'm not mistaken.

16

1      Q    We'll get to it in a minute.
2         But you would have used that date as the date
3  to communicate with Synchronoss in this case about
4  getting documents and photographs; correct?
5      A    If I don't -- I don't recall the specific date
6  that I put in my search warrant.
7      Q    We'll get to that in a minute.  But that's
8  what you understand that to mean is, like, that's the
9  date that he downloaded the image?  That's the date that
10  the crime occurred?
11     A    Yes, sir.
12     Q    Okay.  All right.  Do you review the entire
13  NCMEC report as part of your investigation?
14     A    And you're referring to, like, all the pages
15  in it?
16     Q    All the pages in it.
17     A    Yes, sir.
18     Q    Okay.  Let's continue down on Page 2.  There's
19  a file name.
20     A    Okay.
21     Q    I see a couple of things.  MD5, what is MD5?
22     A    So in laymen's terms, the MD5 is just pretty
23  much, like, the photo ID of a photograph or, like, a
24  video.
25     Q    We refer -- sometimes I hear hash matching and

**17**

1  stuff like that.  Is --
2      A    Yeah, like, the hash value of it.
3      Q    Okay.  Did the service provider communicate to
4  you how they identified this image, this -- this
5  suspected image?
6      A    No, sir.
7      Q    All right.  Was it by hash match?
8      A    That I don't know because I didn't communicate
9  with them.
10     Q    Does it have in the report as to whether or
11 not it was a hash match or not?  And I'm not trying to
12 trick you.  I -- but I think it indicates that it was a
13 hash match.
14     A    But you're saying a hash match for what,
15 like --
16     Q    For the image.
17     A    So you're -- I guess I'm confused by your
18 question.
19     Q    Okay.
20     A    I'm sorry.
21     Q    Do you have any information -- did the service
22 provider communicate to you in this report how they
23 identified this particular image as potential or
24 suspected child pornography?
25     A    No, sir, not that I recall.

**18**

1      Q    Okay.  I see image categorization by ESP, A2.
2  Was does that mean?
3      A    So that's based off the electronic service
4  provider, how they would classify an image.
5      Q    And what does that mean, A2?
6      A    So if you flip to -- I guess this would be
7  Page 3 -- it will say -- it's kind of halfway down
8  Page 3.  And it's -- A is for prepubescent minor.  And
9  then A1 is sex act.  A2 is just the lascivious
10 exhibition.  Sorry.
11     Q    Okay.  All right.
12          MS. SHEVLIN:  I don't mean to interrupt.  But
13     a Christie Petruzzelli just signed on.  I just want
14     to make sure that that person is supposed to be in
15     this deposition.
16          MR. CARSON:  She is.  That's -- that's my law
17     partner, Amy.
18          MS. SHEVLIN:  Okay.  I just wanted to make
19     sure.  Someone popped up, and I didn't recognize
20     the name.  All right.  Go ahead.  Sorry.
21 BY MR. ROBERTS:
22     Q    All right.  So at the outset of the
23 investigation, I think you said that you identified --
24 in any investigations, not this investigation, when you
25 begin an investigation, do you -- you identify

**19**

1  potential -- a target of the investigation?
2      A    I'm sorry.  What?
3      Q    A suspect or a target of the investigation if
4  a crime occurred?
5      A    So -- but what is your question, I guess?  I'm
6  sorry.
7      Q    Is that something that you do?
8      A    Yes, sir.
9      Q    That's part of your investigation, is to
10 identify --
11     A    Yes, sir.
12     Q    -- a suspect?
13     A    Yes, sir.
14     Q    All right.  And did you do that in this case?
15     A    Yes, sir.
16     Q    Okay.  What did your initial investigation
17 reveal as potential suspect or suspects?
18     A    It was based off of the phone number.
19     Q    Okay.  All right.  And in your initial
20 investigation, did you identify that as William Lee
21 Lawshe?
22     A    Yes, sir.
23     Q    How did you do that?
24     A    We -- if I'm not -- excuse me.  We sent off
25 legal compliance to the suspect identifier, which in

**20**

1  this case was a phone number.  And that came back.
2      Q    Have you reviewed the deposition of any of
3  your colleagues in this case?
4      A    No, sir.
5      Q    Detective Tolbert, Detective Greene?
6      A    No, sir.
7      Q    Detective Camden?
8      A    No, sir, not that I recall.
9      Q    Okay.  If Detective Tolbert told you that --
10 when he gave you this cyber tip, he also told you that
11 the suspect was Lee Lawshe and a Florida Fish and
12 Wildlife officer, would that ring a bell?
13     A    Yes, sir.
14     Q    Okay.  So you knew the suspect.  You were
15 given the suspect before you even got the cyber tip?
16     A    So no, sir.  I didn't personally know him.  I
17 had never heard of him before.
18     Q    No.  But --
19          MS. SHEVLIN:  Form.
20 BY MR. ROBERTS:
21     Q    But Detective Tolbert gave you the information
22 at the time of giving you the tip?
23     A    He stated that that's who he believed the
24 suspect was, but I still had to send off for that
25 compliance --

21

1   Q    Okay.

2   A    -- to confirm it.

3   Q    Okay.  What other suspects or targets of your

4   investigation did -- did you identify?

5   A    Just that, just William Lawshe, sir.

6   Q    So the image that -- that you described has a

7   website across the -- the image; correct?

8   A    Yes, sir.

9   Q    What was the name of the website?

10  A    The MetArt.

11  Q    met-art --

12  A    I believe it's just --

13  Q    -- .com?

14  A    met-art.com.  Sorry.

15  Q    Okay.  You did not identify them as a

16  potential suspect?

17  A    At that time, no, sir.

18  Q    Have you ever identified them as a target of

19  your investigation?

20  A    No, sir.

21  Q    So it's March 13th, 2025.  You believe that

22  met-art.com currently has child pornography on their

23  website, and you have not done anything about it?

24       MR. CARSON:  Object to form.

25       You can answer, if you can.  You can answer.

22

1   Yes, ma'am.

2        THE WITNESS:  Have I done anything further in

3   the investigation?  No, sir, due to it being

4   closed.

5   BY MR. ROBERTS:

6   Q    Why don't you open an investigation into this

7   publisher of child pornography?

8        MR. CARSON:  Object to form.

9        THE WITNESS:  Am I --

10       MR. CARSON:  Yeah, yeah.  Unless I -- unless I

11  tell you don't answer --

12       THE WITNESS:  Okay.  Sorry.

13       MR. CARSON:  -- you'll be allowed to answer.

14  No worries.  No worries.

15       THE WITNESS:  Well, I wouldn't personally have

16  the resources.  I would have to forward that to

17  another government agency, whether it be, like, FBI

18  or HSI.

19  BY MR. ROBERTS:

20  Q    Okay.  Or -- or the state where the company

21  that owns this website is located?

22  A    Yes.  But that would still have to be

23  forwarded to, like, the FBI or HSI --

24  Q    But you have --

25  A    -- as, like, a connection.

23

1   Q    But you have not done that?

2   A    No, sir.

3   Q    Why not?

4   A    I do not have an answer.

5   Q    Do you care about the proliferation of child

6   sexual abuse material?

7   A    Yes, sir, I do.

8   Q    And you say you don't have an answer.  But

9   that's your job; right?

10  A    Yes, sir.

11  Q    Any explanation as to why you're not doing

12  your job?

13  A    I am still doing my job but --

14  Q    But you're allowing a website to

15  disseminate -- continuing to disseminate -- disseminate

16  an image that you, as we sit here today, believe is

17  child sexual exploitation material.  Why?

18       MR. CARSON:  Object to -- object to form.

19       THE WITNESS:  I don't have --

20  BY MR. ROBERTS:

21  Q    It doesn't make any sense to you, the

22  question?

23  A    I didn't say that it didn't make any sense.  I

24  just don't have an answer.

25  Q    Well, explain to me.  Why don't you have an

24

1   answer?

2   A    If I had an answer, I would be --

3   Q    Do you really --

4   A    -- able to explain it.

5   Q    Do you really believe that these are minors?

6   A    Yes, sir, I do.

7   Q    So there's a child victim out there.  Have you

8   made any attempt to identify who that is?

9   A    We have attempted, but I have been

10  unsuccessful.

11  Q    You have a copy of her passport, both of them.

12  A    I have a redacted form.

13  Q    And you also have a name of the record

14  custodian who has a presumably non-redacted copy of

15  that?

16       MR. CARSON:  Object to form.

17  BY MR. ROBERTS:

18  Q    Correct?

19       MR. CARSON:  Object to form.

20       THE WITNESS:  Well, I can't say correct

21  because I can't assume that he would have an

22  un-redacted.

23  BY MR. ROBERTS:

24  Q    But you're an investigator.  It's your job to

25  find out if he has an un-redacted copy; right?

25

1          MR. CARSON:  Object to form.
2    BY MR. ROBERTS:
3      Q    Correct?
4      A    Yes, if I'm able to.
5      Q    Well, Mr. Pierce -- you know Mr. Pierce,
6    Crawford Pierce, the attorney?
7      A    Yes.
8      Q    You -- you know that he simply e-mailed the
9    records custodian of met-art.com and that records
10   custodian, who is a licensed attorney in California,
11   responded to his e-mail.  You know that; correct?
12     A    Yes, sir.
13     Q    You know that's how Mr. Crawford Pierce got
14   the images of the passports; correct?
15     A    Yes, sir.
16     Q    There's nothing preventing you as we sit here
17   today from contacting the records custodian, is there?
18     A    No, sir.
19     Q    But you haven't done that?
20     A    No, sir.
21     Q    But you believe that he's a criminal; correct?
22     A    Believe who is a criminal?
23     Q    That anyone who has any sort of publishing
24   interest or ownership interest in met-art.com is a
25   criminal in your mind; correct?

26

1          MR. CARSON:  Object to form.
2          THE WITNESS:  Yeah.  That's a very broad
3      statement that I --
4    BY MR. ROBERTS:
5      Q    There is --
6      A    -- don't feel comfortable.
7      Q    Okay.  Well, let's back up a little bit.  Are
8    you aware that publishing images child -- of child
9    sexual abuse online is a crime?
10     A    Yes, sir.
11     Q    And you currently here believe that
12   met-art.com is publishing child sexual abuse material;
13   correct?
14         MR. CARSON:  Object to form.
15         THE WITNESS:  Do I believe that MetArt is
16     currently publishing CSAM --
17   BY MR. ROBERTS:
18     Q    Yes.
19     A    -- which is -- sorry -- child porn --
20     Q    Yes.
21     A    -- if I use the term CSAM.
22     Q    Yeah.
23     A    I don't know if I know how to answer that
24   actually.
25     Q    Well, why don't you know how to answer that?

27

1      A    And sorry if it takes me a minute to think --
2      A    It's okay.
3      A    -- just because --
4      Q    It's okay.
5      A    -- I'm processing your question.  So I do
6    apologize if I take a while.
7          I don't know.
8      Q    Do you have any reason to believe that they've
9    taken images of this model down from their website?
10         MR. CARSON:  Object to form.
11         THE WITNESS:  That I do not know.
12   BY MR. ROBERTS:
13     Q    Do you have any idea how long this image has
14   been on the website?
15         MR. CARSON:  Object to form.
16         THE WITNESS:  That I do not know.
17   BY MR. ROBERTS:
18     Q    So let's just go through this.  Do you have
19   any idea why this specific image was flagged?
20     A    Unfortunately, I don't work for Synchronoss,
21   so I don't know.
22     Q    What does the characterization, from NCMEC,
23   unconfirmed child pornography mean?
24     A    So for NCMEC, unconfirmed means that they have
25   not had a confirmed -- like, this is, like, a reported

28

1    child victim, I guess in laymen's terms.
2      Q    They through their review or information that
3    they have cannot confirm that the person in the image is
4    a minor?
5      A    No.  Based off the unconfirmed, it just means
6    that the person has not been identified as a minor,
7    which is why it's unconfirmed.
8      Q    So that -- when you say that person, you're
9    talking about the model depicted in the subject
10   photograph?
11     A    The female, yes.
12     Q    Right.
13         So you understand unconfirmed means that NCMEC
14   has not been able to confirm that this model was a
15   minor; correct?
16     A    No.  It's not that she's not a minor.  It's
17   that they cannot confirm that this is an identified,
18   like, in a sense, child victim.
19     Q    So you believe -- I'm sorry.  I didn't mean to
20   cut you off.
21     A    You're good.
22     Q    You believe that NCMEC has tried to identify
23   who this model is?
24     A    No.  I cannot say that because I don't know.
25     Q    Where are you getting NCMEC's definition of

29

1   unconfirmed from?

2       A    So it all -- it should be in here, but I don't

3   want to speak out of turn.  So --

4       Q    I can represent to you I do not see any

5   definition of the term unconfirmed in there, but you can

6   sit and look if you want.

7       A    No, sir.  I don't see it.

8       Q    Okay.  Do you actually know what NCMEC means

9   by unconfirmed?

10      A    Yes, sir.  Because they have spoken to it --

11  about it in our training.

12      Q    So when you received this photograph and you

13  looked at the photograph, you immediately identified

14  met-art.com as having some association with this image?

15      A    Did I immediately identify it?  No, sir.

16      Q    Tell me, how did met-art.com appear on the

17  image?

18      A    Like, where is it listed on the image?

19      Q    Yeah.

20      A    It should be at the bottom right-hand -- the

21  photograph.

22      Q    You describe it as watermark.

23      A    Yes.

24      Q    What do you mean by the word watermark?

25      A    Just, like, a -- I guess a text that's pretty

30

1   much inputted in the photograph.

2       Q    Right.

3            So that, like, other people can't reproduce it

4   without that being on there?

5            MR. CARSON:  Object to form.

6            THE WITNESS:  That's sometimes one of the

7       functions of watermarks, not always.

8   BY MR. ROBERTS:

9       Q    What are some of the other functions?  Other

10  than copyright, what are -- what are some of the other

11  functions of a -- of a watermark?

12      A    One function could be for further contact,

13  like if somebody wants to input their own information

14  for another person, let's say, to reach out to them

15  further, if that's not too confusing.

16      Q    Yeah.  I don't understand that.  Yeah.

17      A    Sorry.  So, like, another function of a

18  watermark could be where -- let's say I could input your

19  e-mail address on the photo so somebody could use that

20  as a form of contact for you.

21      Q    In relation to the subject matter of the

22  image?

23      A    It could be that, or it could be a multitude

24  of things.

25      Q    What -- what other kinds of things?

31

1       A    One could be, like, payment.  It could be

2   pretty much anything.

3       Q    At what point did you connect this image and

4   the source of this image as met-art.com?

5       A    After further reviewing it.

6       Q    But before you did anything else, just while

7   you were looking at the image.

8       A    What do you mean, before I did anything else?

9       Q    Did you make that determination upon your

10  initial evaluation of the image, that this -- most

11  likely, this image was related to met-art.com?

12      A    No.  That wasn't my initial.

13      Q    Okay.  What I'm asking is when.  After your

14  initial, when did you come to that conclusion?

15      A    Ooh, that was -- I would say probably after

16  sending off the legal compliance.

17      Q    When you say legal compliance, are you talking

18  about a subpoena, the -- the subpoena?

19      A    And the search warrants.

20      Q    And the search warrants.

21           So you, in your mind, did not make any

22  connection between met-art.com and this image prior to

23  getting the return on the subpoena?

24      A    No.  I did.  It was during that time.  Sorry.

25  I don't want to misstate.

32

1       Q    Okay.  So I -- that's what I'm asking.

2   Like --

3       A    Yes, sir.

4       Q    -- was it before you sought the subpoena?

5       A    I don't recall if it was before or after.

6       Q    What made you connect this particular image

7   with the website met-art.com?

8       A    Just looking at the watermark.

9       Q    Okay.  But you saw that initially when you

10  first looked at it.  You saw the watermark when you

11  first looked at the photograph; correct?

12      A    I don't recall if I noticed it right off --

13      Q    Okay.

14      A    -- immediately.

15      Q    Okay.  But it was nothing other than the

16  watermark that led you to believe that that website had

17  some sort of connection with this image.

18      A    Oh, you're saying -- let me make sure I'm

19  answering this correctly.  Are you saying that the

20  watermark is the connection to -- that I had with the

21  website?

22      Q    Yeah.

23      A    Yes.

24      Q    There was no other research or investigation

25  that you did that revealed some other fact that led you

---

**33**

1  to believe that this photograph was connected with
2  met-art.com?
3      A    Not that I recall.
4      Q    Okay.  Now, you -- at this time in -- you
5  received this tip, it looks like, in February of 2023.
6  How long had you been an -- an ICAC investigator at that
7  time?
8      A    For about a couple months.
9      Q    All right.  You were aware at the time that
10 not all cyber tips contained child pornography?
11     A    Yes, sir.
12     Q    And that regularly, you would get a NCMEC
13 cyber tip report, and someone would look at that image
14 and determine that that was not a minor in that image?
15     A    It wouldn't be regularly, but it can occur.
16     Q    Can you quantify for me how -- how often that
17 occurred?
18     A    Honestly, I couldn't.
19     Q    Occurs today.  How often does it occur today?
20     A    Like, you're talking 2025?
21     Q    Yeah.  Like, currently, how often does it
22 happen that you get a cyber tip and you look at it and
23 you go, hmm, I just don't know?
24     A    Honestly, this year, we haven't had a lot.
25 There haven't been actual CSAM and child pornography

---

**34**

1  starting.
2      Q    And to be fair, you think this is CSAM, these
3  images.  You think these images are CSAM?
4      A    Yes, sir.
5      Q    Okay.  So you wouldn't categorize these
6  images, these -- this one image, anyway, that was the
7  cyber tip report image with the met-art.com.  You would
8  not characterize that as a false report of child
9  pornography?
10     A    No, sir, I wouldn't.
11     Q    But there was another cyber tip that -- that
12 was associated with this.  It was a prior cyber tip;
13 correct?
14     A    Yes, sir.
15     Q    And you looked at that image, and you did
16 determine that that appeared to be an adult?
17     A    Yes, sir.
18     Q    Okay.  So from an investigative standpoint,
19 you would agree with me that as an investigator, you --
20 you do have to exercise caution when getting a NCMEC
21 report to make some determination that this is actually
22 child pornography and not a mistaken report?
23     A    Yes, sir.
24     Q    All right.
25          You immediately -- or I -- let me say, between

---

**35**

1  the time that you looked at the image that was the
2  subject of the cyber tip report that we're talking about
3  and the time that you applied for the search warrant,
4  you determined that the characterization of the image as
5  A2 was incorrect; correct?
6      A    I'm just referring back to the A2.  The
7  prepubescent minor?
8      Q    Yes.
9      A    Yes.  Because she looked like she hit puberty.
10 So yes.
11     Q    Right.  So that was a false statement in the
12 NCMEC report; correct?
13          MR. CARSON:  Object to form.
14          THE WITNESS:  Based off their categorization.
15 BY MR. ROBERTS:
16     Q    It was a false statement to categorize this
17 model as prepubescent; correct?
18     A    That -- I don't want to say it's a false
19 statement because we don't go based off of that.  We go
20 based off of our own.
21     Q    I understand what you're saying.  But what I
22 am saying is this report -- the information in this
23 report, not your opinion but the characterization in
24 this report as A2 was incorrect according to your
25 assessment?

---

**36**

1      A    In my opinion, yes.
2      Q    And your opinion is based on the presence of
3  pubic hair?
4      A    Not solely the presence of pubic hair.
5      Q    There were other factors that led you to
6  believe that this was a -- a pubertal --
7      A    I know what --
8      Q    -- female; correct?
9      A    Yes, sir.
10     Q    All right.  And so the characterization of
11 prepubescent was incorrect in your opinion?
12     A    In my opinion, yes, sir.
13     Q    Yeah.  Okay.
14          Now, prior to seeking a search warrant, you
15 determined that the likely source of this image was
16 met-art.com; correct?
17          MR. CARSON:  Object to form.
18          THE WITNESS:  I'm sorry.  Can you repeat the
19 question?
20 BY MR. ROBERTS:
21     Q    You made a determination, an investigative
22 determination that the likely source of this image, the
23 subject image, was met-art.com?
24     A    No, sir.  I can't say that.
25     Q    How would you characterize that?

---

37

1    A    You're asking me based off the photo that I
2  think the likely source was MetArt?
3    Q    Yeah.  You did not think that the likely
4  source was MetArt.
5    A    Oh, I'm sorry.  That I did not think that it
6  was the likely source.  Okay.  Sorry.  I got confused.
7    Q    All right.  Let's start over.  I asked you the
8  question, between the time that you initially viewed the
9  image and when you applied for the search warrant, you
10  had determined that the likely source of the image was
11  met-art.com.
12    A    No.
13    Q    So the converse is at the time you applied for
14  a search warrant, you did not believe that the likely
15  source of the image was met-art.com.
16    A    It's not that I did not believe.  It's just I
17  don't know what -- the likely source of that CSAM image
18  because it could be from anywhere.
19    Q    So at the time you applied for the search
20  warrant, it was your -- what you believed was that this
21  image could be from anywhere?
22    A    Yes, sir.
23    Q    Okay.
24        Now, earlier, you said that you did make some
25  connection between the image and met-art.com.  What

38

1  connection did you -- did you place on that?  What did
2  you understand that connection -- or what did you
3  believe that connection was?
4    A    It was just solely based off of the watermark.
5    Q    But, I mean, did you, as an investigator,
6  think that there was a connection between MetArt and
7  this -- this image?
8    A    No, sir.
9    Q    You didn't think that?
10    A    (Shakes head.)
11    Q    Okay.  We're going to come back to this, but
12  I'm just going to just skip forward a little bit.  I'm
13  going to give you what we'll mark as Exhibit 2, just
14  because we're on this thought.
15        MR. ROBERTS:  Exhibit 2 is the affidavit for
16    the search warrant to Synchronoss and -- Amy.
17        (Plaintiff's Exhibit 2 was marked for
18    identification.)
19  BY MR. ROBERTS:
20    Q    So I just want you to take a second.  Flip
21  over to -- first of all, can you identify this?
22    A    Yes, sir.
23    Q    All right.  What is it?
24    A    It's the search warrant.
25    Q    Right.  Okay.

39

1    Q    So you just testified that you did not believe
2  that there was a connection between the image and
3  met-art.com; correct?
4    A    Yes, sir.
5    Q    Why did you swear under oath to a court that
6  there was a connection between this image and
7  met-art.com?
8    A    Because like --
9        MR. CARSON:  Object to form.
10        You can answer if you can.
11        THE WITNESS:  Like I stated, based off the
12    watermark.
13  BY MR. ROBERTS:
14    Q    Well, you just testified unequivocally that
15  you did not believe that the likely source of this image
16  was met-art.com; correct?
17    A    Yes.  Sorry.
18    Q    Okay.  You understand when you fill out an
19  affidavit and present that to a court, you have to be
20  truthful?
21    A    Yes, sir.
22    Q    You understand it's a third-degree felony to
23  make false statements to a court?
24    A    Yes, sir.
25    Q    And false statements include statements that

40

1  you don't believe to be true; correct?
2    A    Yes.  Yes, sir.
3    Q    Now you've just testified that you did not
4  believe that this image came from met-art.com; correct?
5    A    No.  I said that it can come from a likely
6  source, but I don't know the actual source for MetArt.
7  It could be from anywhere.
8    Q    No.  I asked you, did you believe that
9  met-art.com was the likely source of the image, and you
10  testified no.  Do you recall that?
11    A    Yes.  But I should say that I don't know.  I'm
12  sorry for misspeaking, but it's I don't know.
13    Q    But you agree that you gave a statement to a
14  court under oath that would lead the court to believe
15  that it was the likely source of the image; correct?
16        MR. CARSON:  Object to form.
17        THE WITNESS:  I would have to review what --
18  BY MR. ROBERTS:
19    Q    Let me read it.  To note, there is a watermark
20  of www.met-art.com on the offending image.  This site
21  has a known history of displaying CSAM images of teenage
22  girls and CSAM content from this site has been
23  encountered by other ICAC investigators in past
24  investigations.
25        Correct?

43

1     A     Yes.
2     Q     Well, if it didn't come from that website and
3     has no connection to that website, why would you tell
4     the judge about a history of CSAM on that website?
5     A     Because when describing the photo, I'm
6     describing what is listed on the photo.  Just like I
7     have a description for the photograph, like, hey, it
8     depicts a female at X, Y, and Z, I'm also going to
9     notate the watermark on the photo.
10    Q     You're not actually notating the watermark,
11    though.  You're -- you're telling the court much more
12    than there's just a watermark on there, aren't you?
13          MR. CARSON:  Object to form.
14          THE WITNESS:  But I --
15    BY MR. ROBERTS:
16    Q     You say this --
17    A     -- did note there is a watermark.
18    Q     Yeah.  This site has a known history of
19    displaying CSAM images of teenage girls; correct?
20    A     Yes, sir.
21    Q     But you didn't believe that this image came
22    from met-art.com.
23    A     I don't know where it came from.
24    Q     Okay.  But you've reviewed your deposition;
25    right?

42

1     A     Yes, sir.
2     Q     Okay.  I think your testimony -- your prior
3     testimony is that you Googled met-art.com?
4     A     No, sir.  So I did an open source search of
5     MetArt, but I also consulted with other ICAC
6     investigators.
7     Q     What's open source?  What do you mean?
8     A     It's not using, like, the Google search
9     engine, but it's just pretty much what we call, like,
10    open source and phrase -- you're just researching, I
11    guess, in simple terms, not really using law
12    important -- law enforcement -- excuse me -- databases.
13    But you're utilizing stuff to, I guess, search whatever
14    term, if that makes sense.  I feel like that was kind of
15    confusing, the way I described it.
16    Q     Well, it's confusing because under oath in
17    your prior deposition, you said you Googled it.
18    A     I don't recall using Google, but I could have.
19    Q     Well, if you testified back in 2023, November
20    of 2023, that you Googled met-art.com, you think that
21    would be the most accurate answer?
22    A     It could potentially.  I just don't recall.
23    Q     You don't recall what you did, or you don't
24    recall your testimony?
25    A     No.  I don't recall what actual, I guess,

44

1     database I utilized to query MetArt.
2     Q     I'm going to hand you a deposition.
3     A     Okay.
4     Q     This will be Exhibit 3.
5          (Plaintiff's Exhibit 3 was marked for
6     identification.)
7          MR. ROBERTS:  Got a copy for you.
8          MS. SHEVLIN:  What's the date on the depo,
9     Michael?
10         MR. ROBERTS:  November 21st, 2023.
11         MS. SHEVLIN:  Thank you.
12         And are you marking this as an exhibit, or are
13    you just refreshing her recollection?
14         MR. ROBERTS:  No.  It's Exhibit 3.
15         MS. SHEVLIN:  Gotcha.
16    BY MR. ROBERTS:
17    Q     So just -- if you will, just turn to Page 30.
18    A     30?  Okay.  I'm there.
19    Q     Yeah.
20    A     Yes.
21    Q     And I'll just read your answer on Line 10.  It
22    says:  I actually searched it on Google.  And it was
23    showing -- because he's heard it before in the past.
24    Obviously -- excuse me -- MetArt -- I don't know why I
25    keep saying MetaArt.  But MetArt using underage females

1     in the past on their sites.  And I've been -- and I've
2     seen different links on Google.  Obviously, you can't --
3     can't believe everything you see on Google stating that
4     underage females were used on the site, but I couldn't
5     obviously locate that specific image on met-art.com or
6     MetArt.
7          Did I read that close enough?
8     A     Yes, sir.
9     Q     Okay.  So fair to say -- I mean, is it your
10    testimony that you did Google?
11    A     I don't recall using Google, but if I stated
12    that I used Google back in 2023, then I could have used
13    Google.
14    Q     And I'm assuming if you Googled, you would,
15    like, Google met-art.com, child porn, something like
16    that?
17    A     I would have just probably done MetArt.  I
18    wouldn't type in child porn on Google just because of
19    the job I do.
20    Q     Uh-huh.  Okay.  Well, I've done that.  I'm
21    going to -- I'm going to -- I'm going to mark something
22    as --
23    A     Okay.
24    Q     -- Plaintiff's Exhibit 4.
25

45

1     (Plaintiff's Exhibit 4 was marked for
2     identification.)
3     BY MR. ROBERTS:
4     Q    I've actually Googled it.  And I'm going to
5     represent to you there are no such links on Google
6     talking about met-art.com publishing child pornography.
7     The only thing that actually comes up are our case and
8     a -- and a -- like, an intellectual property case.  Did
9     you actually --
10     MR. CARSON:  Hold on.  So Exhibit 4 to
11     Detective Preston's deposition --
12     MR. ROBERTS:  Yeah.
13     MR. CARSON:  -- is a printout of what you
14     purport to be your Google search?
15     MR. ROBERTS:  That's correct.
16     MS. SHEVLIN:  Were we provided with this ahead
17     of time?
18     MR. ROBERTS:  I just did it.
19     MS. SHEVLIN:  Did you Google (unintelligible)?
20     MR. ROBERTS:  Here.  I can -- we can Google it
21     right now.  I've got my computer.
22     BY MR. ROBERTS:
23     Q    Are you sure there's a link on Google that
24     says met-art.com?
25     MR. CARSON:  Hold on.  Hold on.  We're still

46

1     talking about this exhibit that's been dropped on
2     our lap for the first time.  So --
3     MR. ROBERTS:  Okay.  Well, we won't attach it.
4     If you have a problem with it, we won't attach it.
5     MR. CARSON:  No.  We're going to attach it.
6     MR. ROBERTS:  Okay.
7     MR. CARSON:  Because -- because here's the
8     problem.  Yours shows three hits.  Mine shows
9     considerably more than that.
10     MR. ROBERTS:  Uh-huh.
11     MR. CARSON:  So --
12     MR. ROBERTS:  Probably different search terms.
13     MR. CARSON:  No.  met-art.com, in parens,
14     child pornography case.
15     MR. ROBERTS:  Okay.
16     MR. CARSON:  Oh, I'm sorry.  That's what shows
17     up at the top, but in the header, it's child
18     pornography case, accused criminal.
19     So okay.  We're going to attach this as
20     Exhibit 4 to --
21     MR. ROBERTS:  Yeah.
22     MR. CARSON:  -- Detective Preston's
23     deposition.
24     MR. ROBERTS:  Yeah.
25

47

1     BY MR. ROBERTS:
2     Q    Detective, are you sure that there was a link
3     on Google that described this website as a source of
4     child pornography?
5     A    Yes, sir.
6     Q    You're sure, under oath?
7     A    Yes, sir, under oath.
8     Q    I've got my laptop right here.  Do you want to
9     use my laptop?
10     A    For?
11     Q    Finding it.
12     MR. CARSON:  I'm going to advise my client not
13     to engage in this exercise of searching on Google
14     right now.  That's highly irregular.  It's highly
15     inappropriate to put her on the spot and say, while
16     you're being video-recorded and while the court
17     reporter's taking down everything you say, perform
18     this little stunt for us.  I'm going to advise her
19     not to do it.
20     MR. ROBERTS:  Okay.  Stunt.
21     MR. CARSON:  And I'll say -- let me just say
22     this too, Michael:  I've given you a fair amount of
23     leeway, but it's -- it's taken a decidedly unsavory
24     turn.  There's no reason to treat Detective Preston
25     with this level of disrespect.  I'm going to ask

48

1     you respectfully to rein it in.
2     MR. ROBERTS:  Could you articulate how I've
3     been disrespectful?
4     MR. CARSON:  If -- if you don't understand how
5     you've been disrespectful, then I'm not sure I can
6     explain it to you in a way that you'll understand.
7     But there's a way to speak to her without calling
8     her professionalism into question, without calling
9     her intelligence into question, without calling her
10     competence into question.  There's a way to try
11     this case and to litigate this case without making
12     it personal, and I was hoping we could get there.
13     MR. ROBERTS:  I -- I appreciate that.  I'm
14     going to move to strike your commentary but --
15     MR. CARSON:  Well, it's a deposition
16     transcript.  It doesn't need to be stricken.  I
17     just wanted you to know --
18     MR. ROBERTS:  So --
19     MR. CARSON:  -- I'm getting close to the point
20     where it's starting to seem like you're badgering,
21     harassing the witness.
22     MR. ROBERTS:  Well, it's hard for me to
23     respond, Matt, because you haven't objected to any
24     questions, so I don't know which questions you find
25     to be badgering or offensive.  I think that I'm

49

1   asking fair questions.  Based on the evidence, I'm
2   showing her exhibits and asking why she has or has
3   not done anything.
4        So please object to my questions, and I will
5   respond to the objection.  But I can't, in
6   hindsight, change a question because you find it to
7   be offensive.  Frankly, I believe you don't like
8   the answers, and you don't like the questions.  But
9   that's all commentary, and we don't need to be
10  doing that.
11  BY MR. ROBERTS:
12       Q    So you agree that you put this statement under
13  oath in the search warrant to Synchronoss; correct?
14       A    Yes, sir.
15       Q    And you understand that you have to make
16  truthful statements to the court?
17       A    Yes, sir.
18       Q    All right.  And your testimony today is that
19  your Google search did reveal some -- was it an article?
20       MR. CARSON:  Object to form.
21  BY MR. ROBERTS:
22       Q    What was it?
23       A    I don't recall a specific -- what it pulled
24  up, but it was in reference to MetArt having CSAM.
25       Q    Okay.  Was it a news article?

50

1       A    Like I said, I don't recall specifically what
2   it was.
3       Q    Can you give me any description of what it
4   was?
5       A    I don't recall.  That was over two years ago,
6   unfortunately.
7       Q    Is there any way that I could use different
8   search terms or any way to identify what you're talking
9   about?
10      A    If I remembered the specific search terms,
11  then I would be happy to disclose.  I just don't recall.
12      Q    So I read your testimony in your deposition,
13  and you said, quote:  You can't believe everything you
14  read on Google.
15           Is that correct?
16      A    Yes, sir.
17      Q    Do you believe that?
18      A    Yes.  That's with everything.
19      Q    But a court should be able to believe what you
20  tell them; correct?
21      A    Yes, sir.
22      Q    So you didn't actually believe -- or you knew
23  that you really couldn't believe what you saw on Google
24  on the search results; correct?
25      A    I was using it.  So you're saying -- okay.

51

1   Hold on.  I'm sorry.  I'm confused.  Are you saying that
2   I can't believe what I saw on Google?
3       Q    You testified that you can't believe
4   everything you see on Google.
5       A    Yes.
6       Q    Correct?
7            And so when you read that on Google, you knew
8   that it may or may not be a credible thing that you saw?
9       A    Yes.
10      Q    And what I'm asking you is why would you swear
11  under oath that it was credible?
12      A    Based off the other investigators and their
13  dealings with MetArt.  I guess that's the right term,
14  not really dealings but I guess prior cases that they've
15  had and stuff like that.
16      Q    What investigator told you that they had a
17  prior case with MetArt?
18      A    I believe it was Corporal Greene.
19      Q    We've taken Corporal Greene's deposition.
20  He's testified that he's never had a case with MetArt.
21      A    Well, he told me differently, unfortunately.
22      Q    He told you that he had investigated a case
23  involving an image from met-art.com?
24      A    Yes, when we originally had this case.
25      Q    You haven't reviewed his testimony?

52

1       A    No, sir.
2       Q    So if he testified to me that he had heard of
3   met-art.com through some -- he could not remember where
4   or if it was credible or not credible but that was his
5   only relation to met-art.com, that would have been a
6   false statement that he made to me?
7       A    I can't say that.
8            MR. CARSON:  Object to form.
9   BY MR. ROBERTS:
10      Q    That's not what he told you?
11      A    I can't say what he stated to you was a false
12  statement, and I can't say that what he stated to me was
13  a false statement.  I'm just going solely based off what
14  he told me.
15      Q    Okay.  So what he told you was there was a
16  known history of displaying CSAM images on teenage -- of
17  teenage girls on met-art.com?
18      A    Yes, sir.
19      Q    Do you know what the source of his information
20  was?
21      A    No, sir, I do not.
22      Q    And then you Googled it.  And your testimony
23  today is that you found some unknown source that you
24  cannot identify or had some information
25  that met-art.com was connected with CSAM?

53

1    A    Yes, sir.

2    Q    And on that basis, you felt comfortable
3 swearing under oath that this site has a known history
4 of displaying CSAM images?

5    A    Yes, sir.

6    Q    Can you describe to me what you feel like your
7 obligation to -- let me ask it a different way.  Strike
8 that.

9         Do you believe that you have an obligation to
10 present reliable information to a court?

11   A    Yes, sir.

12   Q    And do you believe that these Google searches
13 that you reference, is that a reliable source?

14   A    I believe that it can be.

15   Q    Was it in this case?

16   A    I don't really know the answer to that, if it
17 was in this case.  I don't really know how to answer.

18   Q    So are you saying that the only source -- did
19 you use it as a source to make this statement to the
20 court?

21   A    You're talking about the Google search?

22   Q    Yeah.

23   A    Is that what is put in my search warrant?
24 Because I'm pretty positive my search warrant states
25 based off obviously the other detectives and their

54

1 history with it.

2    Q    You said:  This site has a known history of
3 displaying CSAM images of teenage girls.

4    A    Yes, and has been encountered by other ICAC
5 investigators in past investigations.

6    Q    And the only investigator that you can
7 identify is Detective Greene?

8    A    Yes, sir.

9    Q    And you don't know if what he was telling you
10 was reliable or not?

11   A    That I don't know because it was before I was
12 even in law enforcement, if I'm not mistaken.

13   Q    Did he know that you put this statement in
14 your affidavit?

15   A    I don't recall.  I don't know if we've ever
16 discussed that.

17   Q    Tell me about this conversation with Detective
18 Greene.  I mean, how did this come about?

19   A    When I was asking him about MetArt and if he's
20 ever heard of it and anything he knows about it.

21   Q    Why were you asking him about MetArt?

22   A    Because I had never heard of it.

23   Q    Did you believe there was a connection between
24 this image and met-art.com?

25   A    That -- like I stated before, I don't know.

55

1    Q    Okay.  How would you find that out?

2        How would I find what out?

3    Q    How would you find out if there was a
4 connection between this image and met-art.com?  As an
5 investigator, just what are some of the ways you could
6 have done that?

7    A    Oh, I'm sorry.  I was confused about where
8 your question was going.

9        You can try to search the site.  That's
10 probably the -- the main way that I would think.

11   Q    Did you do that?

12   A    No, sir.

13   Q    Have you ever been to met-art.com?

14   A    No, sir.

15   Q    Why -- why did you not go to the website?

16   A    At that point in my investigation, I was
17 focused on confirming that obviously this is a child and
18 speaking with Dr. Dully.

19   Q    Detective Greene, in his deposition, described
20 the models as being age-difficult.  Would you agree or
21 disagree with that?

22   A    I would disagree.

23   Q    Okay.  Do sometimes you guys disagree about
24 what age-difficult is and what underage is?

25   A    Yes, sir.

56

1    Q    Was this a case of where there was a
2 disagreement?

3    A    Yes, if I'm not mistaken.

4    Q    So there was a disagreement?

5    A    Honestly, I cannot remember.  I don't want to
6 say yes because clearly, I don't remember.  So I'm sorry
7 for saying not mistaken but honestly don't remember.

8    Q    If someone did characterize all of these
9 images containing age-difficult individuals, that would
10 be a reasonable position for that person to take?

11   A    What are you -- like, what is your question?
12 If you're saying if they -- both of these images, if
13 they did it as age-difficult?

14   Q    Well, let's just start with the image that
15 we're currently talking about.

16   A    Okay.

17   Q    It's easy to get off track.  But the image
18 that was attached to the NCMEC report, you understand
19 the image I'm talking about.

20   A    Yes, sir.

21   Q    All right.  Could a reasonable person look at
22 that model and believe that that was age-difficult?

23   A    That would be an opinion that I can't speak on
24 because I can only speak on my personal opinion.

25   Q    Okay.  But your recollection may be that other

57

1  people looked at this image and thought that person --
2  it could be an age-difficult image?
3      A    In my office, not that I can recall.
4      Q    Okay.  When you say not in your office, are
5  you talking, like, Detective Greene?
6      A    I'm talking about, like, my office, like, the
7  ICAC investigators.
8      Q    Okay.
9      A    Yes.
10     Q    Detective Greene's not an ICAC investigator?
11     A    No, sir.
12     Q    He's a former ICAC investigator?
13     A    Yes, sir.
14     Q    You're not saying that he did not disagree
15 about whether or not it was obviously a child or an
16 age-difficult image?
17     A    I don't recall what his opinion of it was.
18     Q    Okay.  Well, and let's just talk about
19 age-difficult because that's a term of art in your
20 industry; correct?
21     A    It's a term that people can use, but it's not
22 a category, I guess --
23     Q    Right.
24     A    -- of an image, if that makes sense.
25     Q    What does age-difficult mean to you?

58

1      A    For me personally, it just means that a person
2  could easily be underage, or they could be, like, 18,
3  19, that range.
4      Q    So is it fair to say that all 18- or
5  19-year-olds could fairly be categorized as
6  age-difficult?
7      A    No.  Because everybody's body is different.
8      Q    No.  But, I mean, like, there's no such thing
9  as an 18-year-old that's not age-difficult?
10     A    I'm confused by your question.
11     Q    Well, and maybe this is a little basic.
12     A    Okay.
13     Q    But you could be 17 -- right? -- and 11 months
14 old.  And if there was a nude image of me, it was --
15 that would be child sexual abuse material; correct?
16     A    You're 17, so you're under the age of 18, yes.
17     Q    Right.
18         That person doesn't look any different when
19 they turn 18 and they're 18 and a month old; right?
20     A    That I can't speak on because everybody's body
21 develops differently.
22     Q    Yeah.  But when you -- I mean, there's a joke.
23 Like, when you go to sleep on the night before your
24 bed -- your birthday and you wake up, you know, you
25 don't look different -- right? -- from one day to the

59

1  next.
2      A    Like I said, I can't speak on it because
3  everybody is different.  Like, every case is different,
4  so I can't say, yeah, that's going to be the same across
5  the board.
6      Q    You -- you're not comfortable saying that any
7  18-year-old that you look at, someone might think that
8  they look like a 17-year-old?
9      A    Every person is different so --
10     Q    Well, I certainly appreciate that, that
11 everybody is different, I mean.  But I -- I guess what
12 I'm saying is if someone is 18, you think -- do you have
13 the ability to look at some people who are 18 and go,
14 definitely, they're 18 and not 17?
15     A    No.  Because everybody is different.
16     Q    So you can't do that; right?  You don't have
17 the ability to do that, do you?
18     A    No.
19     Q    Right.
20         So I guess what I'm saying -- that's what my
21 point is, is, like, every 18-year-old is age-difficult
22 because you really can't look at somebody and tell if
23 they're 17 or 19.  You really can't just look at
24 somebody and tell that, can you?
25     A    I wouldn't say that every person is

60

1  age-difficult because like I said, everybody is
2  different.
3      Q    Okay.
4      A    So trying to classify just because a person is
5  18 is age-difficult, that doesn't seem correct.
6      Q    But like most 18-year-olds, if you looked at
7  them, you'd be like, they could be age-difficult; right?
8      A    No.
9      Q    Most 18-year-olds?
10     A    I can't say that.
11     Q    Okay.  But, I mean, you do this for a living,
12 though; right?
13     A    (Nods head.)
14     Q    Fair to say you're not an expert in
15 determining who is under 18 or who is over 18?
16     A    No.  I'm not a doctor.
17     Q    You're not.  Well, we'll get into that.
18         But, I mean, you don't have any ICAC training
19 or any specialized training in, like, what is -- what
20 does an 18-year-old look like versus what does a
21 17-year-old look like?
22     A    No.  Because every person is different.
23     Q    Every person is different; right?
24     A    Yes.
25     Q    Every human individual is different, and every

**61**

1  observer has a different set of perspectives; correct?
2  A   Yes.
3  Q   Right.
4      And you don't have the ability to know what
5  other people perceive as looking young or not young, do
6  you?
7  A   No, I do not.
8  Q   Okay.  Now, this image that we are discussing,
9  which was the cyber tip image, this was a professionally
10 produced photograph; correct?
11 A   That I do not know if it was professionally
12 produced.
13 Q   Did it appear to be professionally produced?
14 A   It appeared to be of higher -- higher quality.
15 Like, it didn't seem like a phone took it.
16 Q   Right, yeah.  It looked like a photo shoot,
17 like, a part of a photo shoot; is that correct?
18 A   That I don't know.
19 Q   It was in a studio setting?
20 A   That -- I honestly don't know where that photo
21 was taken.
22 Q   Okay.
23 A   So I can't say that it was in a studio.
24 Q   All right.  But it wasn't, like, a cell phone
25 picture?

**62**

1  A   It didn't appear to be a cell phone to me.
2  Q   It had a website on it, like, listed on it as
3  a watermark?
4  A   Uh-huh.
5  Q   All right.  It was a female; correct?
6  A   Yes.
7  Q   All right.  There was nothing -- no -- no
8  props or other sort of nonverbal descriptions of the
9  image that would have signalled that this is a minor?
10 A   What do you mean?
11 Q   So -- and I've read your testimony.
12 Sometimes, like, there will be, like, pictures in the
13 bathroom or, like, child's underwear in a child's
14 bedroom.  Are you familiar with images like that?
15 A   Uh-huh.
16 Q   Yes?
17 A   We do have -- we have some images -- excuse
18 me -- like that.
19 Q   Yeah.  Or it's, like, you know, seventh grade,
20 after class or something like that that would indicate
21 or tell the viewer that this is a minor.  You -- so you
22 know what I'm saying?
23 A   Yes.
24 Q   There was nothing like that in the image?
25 A   Not that I recall.

**63**

1  Q   Okay.  I've characterized it as like a
2  centerfold-type image.  Do you know what a centerfold
3  is?
4  A   No.
5  Q   Have you ever looked at, like, a Playboy or --
6  A   No.
7  Q   -- Penthouse?
8  A   Sorry.  No.
9  Q   Have you ever looked at pornography?
10 A   What do you mean, just, like, in a magazine?
11 Q   Magazine, on your phone?
12 A   I've never viewed pornography on my cellular
13 phone.
14 Q   Okay.  I mean, it's not -- I'm not -- like,
15 have you ever seen the Pornhub statistics on, like, how
16 many adult Americans look at pornography?
17 A   No, I have not.
18 Q   It's, like, way over half.
19 A   I know Florida --
20 Q   It's, like, the majority --
21 A   -- they said is off the --
22 Q   It's, like, the majority of people.
23 A   But no.  I --
24 Q   So I'm not trying to be mean or ugly.  Like, I
25 just --

**64**

1  A   No.  I know.
2  Q   What I'm trying to do is, like, get a sense
3  of, like, how much do you know about the world of
4  pornography?  It sounds like not a lot.
5  A   I don't view, like I said, like, magazine, if
6  that's what you're talking -- like, Playboy.  Like, I
7  haven't bought Playboy magazines.  That's what I'm
8  referring to.
9  Q   Do you have, like, a brother?
10 A   Yes.  But --
11 Q   Did he ever have a Playboy or anything?
12 A   That I don't know.
13 Q   Okay.  All right.
14 A   I didn't go in his room.
15 Q   So you don't really -- so you don't really
16 know what I mean when I say centerfold?
17 A   No.
18 Q   So, like, a centerfold in a Playboy, when it
19 would come every month or so, like, it would just have,
20 like, a spread.  It would just be, like, still
21 photographs of, like, a model pose.  And it might be
22 partial nudity.  It might be full nudity.  But it was,
23 like, a still photograph that was, like, taken by a
24 photographer, and it's just, like, on the page.  That's
25 what a centerfold is.

65

1     A     Okay.
2     Q     All right.  Does this appear to be, like, a
3  centerfold-type picture?
4     A     It appeared to be just, like, a regular photo
5  taken.
6     Q     Right.  And it was partial nudity?
7     A     Yes.
8     Q     Okay.  I want to -- I do want to -- I mean,
9  I'm not -- and I'm seriously not -- I mean, I'm not
10 trying to pry into your personal life.  I -- if -- do
11 you really not know that much about the world of, like,
12 what is on pornographic websites?
13    A     No.  What I'm saying is I don't know about
14 Playboy.  Like, you're saying, have I ever viewed
15 Playboy --
16    Q     Yeah.
17    A     -- if I had a Playboy -- like, I don't.  So I
18 can't speak on Playboy.  I can't speak on, you know,
19 searching through Pornhub.
20    Q     Okay.  I mean, but, like -- that's what I'm
21 trying to get a sense of is, like, do you understand,
22 like, the way Pornhub is set up or, like, how -- how
23 pornography is portrayed in the world?
24    A     Yes.  I understand that.  What I'm saying is I
25 personally don't go on those sites.

66

1     Q     Sure.
2     MR. CARSON:  And -- and if I could, maybe --
3     MR. ROBERTS:  Yeah.
4     MR. CARSON:  -- maybe that's where we draw the
5     line.  Instead of asking Detective Preston whether
6     she or any members of her family have looked at
7     this stuff, maybe speak more generally to her
8     understanding of how it operates.
9  BY MR. ROBERTS:
10    Q     Well, I mean, I -- I -- you only look at
11 pornographic images at work that have been the subject
12 of, like, a NCMEC report or some other -- right?
13    A     Yes.
14    Q     So your -- your view through work is very
15 myopic, like, short-sided, on images that might be
16 characterized by somebody as child pornography; correct?
17    A     Yes.
18    Q     So, I mean, you're not really an expert on,
19 like, what pornography looks like in general, legal
20 pornography?
21    A     Legal pornography, yes, I am.
22    Q     Okay.  How do you get that expertise?
23    A     Because obviously basing it off of, yes, we
24 view child pornography, and we have to go to these
25 sites.  But sometimes there can be, within those sites,

67

1  illegal pornography, which would be child pornography.
2     Q     Now, you just said you have to go to those
3  sites.
4     A     I'm sorry.  Not have to go to those sites, but
5  we do sometimes go to those sites.
6     Q     Why didn't you go to this site in this case?
7     A     I don't know.
8     Q     No -- no explanation?
9     A     No.
10    Q     I mean, do you wish that you would have?
11    A     I think at that point in my investigation, I
12 was focused on the victim in the photograph, not going
13 to the site.
14    Q     You had reason to believe that this image was
15 published on a public website, though; correct?
16    A     Yes.
17    Q     Yes.
18          And you've been to those websites?
19    A     Some of them.
20    Q     Do you know that most public websites make
21 disclosures and disclaimers about the age of the models?
22    A     Yes, sir.
23    Q     So you're aware that virtually all of the
24 pornography that is published on a public website, the
25 website is at least telling the public that these images

68

1  contain images of adults?
2     A     That the website is telling them that these
3  should be adults?  Yes.
4     Q     Yeah.  So when you got this tip, you knew that
5  Mr. Lawshe, when he viewed this image, most likely was
6  being told that this was an adult?
7     A     That I can't speak on because I don't know
8  where he viewed it.
9     Q     It was easy enough for you find out where he
10 viewed it, though; right?
11    A     No, sir.
12    Q     Did you attempt to find out where he viewed
13 it?
14    A     That would be a digital forensic examiner
15 because they're the ones, like, going through the search
16 terms and all of that, not me.
17    Q     So you don't -- you don't -- you don't ever go
18 to the websites?
19    A     I don't say that I don't ever go, but I have
20 in the past.
21    Q     So you had the ability to go the website in
22 this case?
23    A     Yes, sir.
24    Q     Yeah.  You could have verified that this model
25 was a model on -- on the website very easily?

69

1    A    Yes, sir.

2    Q    Okay.  Do you agree if you would have done

3  that, you would have known for sure that the model was

4  being portrayed as a verified adult?

5    A    No, sir.

6    Q    Why do you say that?

7    A    Because I can't go based off just what the

8  site is telling me on their public forum.  Like, hey,

9  this should be an adult, that that is confirmed an

10  adult.

11    Q    I'm not asking that question.  My question is

12  about what Mr. Lawshe would have been told about this

13  model when he viewed it.  Do you understand the

14  perspective that I'm talking about now?

15    A    Yes.

16    Q    So here's the question.  If you would have

17  gone to the website, you would have been able to confirm

18  that Mr. Lawshe was being told by the website that this

19  model was a verified adult?

20        MR. CARSON:  Object to form.

21        THE WITNESS:  No, I wouldn't have been able to

22  because I don't know if that's how he got the

23  photograph.  So I can't speak on saying, yes, that

24  is a verified minor, and that's what he saw before

25  he viewed the photograph because I don't know how

70

1  he viewed it.

2  BY MR. ROBERTS:

3    Q    But do -- did you have reason to believe that

4  he viewed it on the Internet?

5    A    No.  I can't speak on how he -- because I

6  didn't have his device.  I wasn't there with him.

7    Q    Now, you're a -- you're an expert in

8  investigating Internet crimes against children; correct?

9    A    Yes, sir.

10    Q    You didn't look at this image and take from

11  this image reasonable suspicion that he got this image

12  off of the Internet?

13        MR. CARSON:  Object to form.

14        THE WITNESS:  That would be me speculating,

15  and I cannot speculate that he got it from that

16  site, that he went on to that site and pulled that

17  image.

18  BY MR. ROBERTS:

19    Q    Did you determine -- seek to determine where

20  he got it from?

21    A    That I do not recall.

22    Q    You don't recall whether or not you -- you

23  made an attempt to do that?

24    A    I don't recall.  I don't remember.

25    Q    Okay.  So you agree that -- that there's at

71

1  least a probability that he got it from a website

2  connected with met-art.com?

3    A    That he could have.  He could have not.  I

4  can't speak on how he did it.

5    Q    Right.  But, I mean, there was evidence on the

6  photograph of a website; right?

7    A    Uh-huh.  Yes, sir.

8    Q    And so the only evidence was that this was

9  connected to met-art.com; right?

10    A    What do you mean?

11    Q    That the image was connected with met-art.com.

12  That was the only evidence that you had.

13    A    You're talking about the watermark is the only

14  evidence --

15    Q    That you had of where it might have come from.

16    A    It's a possibility, where it could have come

17  from, yes, based off that watermark.

18    Q    But such that you -- you included it in

19  your -- in your search warrant; correct?

20    A    Yes, sir.

21    Q    All right.  So did you -- do you believe, as

22  we sit here today, that that website portrayed the model

23  as a verified adult?

24    A    That I do not know.

25    Q    Does that concern you?

72

1    A    What do you mean?

2    Q    You've testified that you believe this is a

3  minor; correct?

4    A    Yes, uh-huh.

5    Q    Does it concern you as a law enforcement

6  officer that there's a website that is publishing images

7  telling the public that they're adults but they're

8  really not adults?

9        MR. CARSON:  Object to form.

10  BY MR. ROBERTS:

11    Q    Does that concern you as a law enforcement

12  officer?

13        MR. CARSON:  Object to form.

14        THE WITNESS:  I don't know how to answer that.

15  BY MR. ROBERTS:

16    Q    Would that be a crime?

17    A    You're talking about if they are illegally

18  posting minors?

19    Q    And calling them adults.

20    A    Yes.  That could --

21    Q    That would be a crime?

22    A    Yes.  It could be a crime.

23    Q    What has to happen in St. Johns County in

24  order for you to take that and investigate it?

25    A    What do you -- what do you mean, for --

73

```
1    Q    Do you have the freedom to investigate crimes
2  as you see fit?
3    A    I don't understand your question.  Like, can I
4  pick and choose?  Is that what you're --
5    Q    Well, do you have to get permission?  If -- if
6  we leave here today and you say, you know what; he's
7  right, you know; this is a child on this website and
8  they're most likely telling people that it's an adult,
9  we should do something about that.  I mean, how would
10 you make that happen?
11   A    I would contact one of our federal agencies,
12 whether it be the FBI or, like, HSI.
13   Q    Okay.  But you haven't done that?
14   A    No, sir.
15   Q    All right.  You don't have a reason why?
16   A    No, sir.
17   Q    All right.  So the sole basis of you believing
18 that this was a minor was just your personal opinion
19 about this model looked young?
20        MR. CARSON:  Object to form.
21        THE WITNESS:  No, sir.
22 BY MR. ROBERTS:
23   Q    What was the basis of your opinion when you
24 looked at this image to determine that this was a minor
25 or not?
```

74

```
1    A    Based off my personal experience and obviously
2  me being a female, that, and then also going the extra
3  step and getting it certified by Dr. Dully.
4    Q    What do you mean by that?
5    A    By which part?
6    Q    You -- let -- let's just go to -- if I can
7  direct your --
8    A    Yeah.
9    Q    -- attention to your -- your deposition.  And
10 I'm just going to have you read your testimony on
11 Page 38.
12   A    Okay.  Just one second.  Sorry.
13        MR. ROBERTS:  And, Matt, I'm not trying to be
14   rude.  I'm having her read her testimony from a
15   deposition.  It is awkward.  But I did not make
16   this to be awkward.
17 BY MR. ROBERTS:
18   Q    I'd like you to read Line 14 --
19   A    14?
20   Q    Yep, on 38.  Can you -- can you read your
21 answer?
22   A    Yes.  Yes, sir.  And obviously, the main
23 difference with me is, which is also super weird to say,
24 if you were to get me naked and I was to be photographed
25 naked, you would be able to tell.  Okay.  Even though
```

75

```
1  the face looks young, her body is way more mature than a
2  child, which is what we go based off -- excuse me -- go
3  based off.  We don't go based off the edited photos, if
4  it's just their -- of their face edited.  We go based
5  off of the totality and their body.
6    Q    What do you mean by that?
7    A    That statement was in reference to a previous
8  question for me using certain photos, like, edited
9  photos of my face.
10   Q    It was about determining who looks to be a
11 minor and who is not a minor; correct?
12   A    Uh-huh.
13   Q    Because you -- you have posed in sting
14 operations as a -- as a minor; correct?
15   A    Yes, sir.
16   Q    As a 13-year-old?
17   A    Yes.
18   Q    And pictures of your face unedited?
19   A    No.  They're edited because I don't look 13.
20   Q    How are they edited?
21   A    They're edited through an app that we utilize.
22   Q    I mean, I can tell you I've seen a picture.
23 It looks just like you.
24   A    Like I said, (unintelligible), but I do not
25 look like --
```

76

```
1    Q    You put a hat on.  You slick your hair back.
2  You wear a sweatshirt.
3    A    No.
4    Q    You -- you never had a hat on?
5    A    Not --
6    Q    Luring people in to tell them you're 13?
7    A    No.  We edit our face.  But with, like, hats
8  and stuff, if I'm not mistaken, it's hard for it to pick
9  up, like, your facial features to edit it.
10   Q    Okay.  All right.  I'm not trying to give you
11 a compliment.
12   A    No.
13   Q    But, I mean --
14   A    I'm like --
15   Q    -- your -- your image, you -- you're
16 portraying yourself as a 13-year-old.
17   A    Yes.
18   Q    Okay.  And we'll get into the editing here in
19 a minute.  But I think what you were trying to -- to
20 articulate in your testimony was that it's not just the
21 way someone's face looks as how you determine whether or
22 not someone's a minor or not.
23   A    Yes.
24   Q    And my question to you is what are you talking
25 about there?  And I'm not trying to make you feel
```

77

1  awkward or weird.  But I'm just trying to say, like,
2  what do you mean?
3      A    The totality of it, like, saying that.
4  Because I guess in laymen's terms, with my edited
5  photos, it's just my face.  I am fully clothed.  So
6  obviously, when we get a CSAM image, we're not getting
7  an image of a fully clothed person, and we're not just
8  looking at a face, which could easily be edited to
9  appear younger.  We're looking at the totality of
10  everything in that photograph.
11      Q    So you acknowledge that the photograph in
12  this -- in this case, it -- the face could have been
13  edited in some way?
14      A    That I don't know.
15      Q    But it could have been?
16      A    It could, yes.
17      Q    And -- and you know that images are easily
18  digitally altered?
19      A    Yes.
20      Q    And even with genital or pubic region, I mean,
21  hair is one of the most easy things to remove from a --
22  from a digital image, isn't it?
23      A    It could be, yes.
24      Q    I mean, that happens all the time in -- in the
25  world.

78

1      A    But it could be.  I can't speak for it because
2  I don't know.
3      Q    Okay.  But, like --
4      A    But it could.
5      Q    Yeah.  You -- you understand that's a fairly
6  easy thing to do?
7      A    Yes.
8      Q    All right.  Do you know whether or not this
9  image was altered in any way?
10      A    No, sir, I don't.
11      Q    Okay.  Did you do anything to try to determine
12  whether it had been altered or not?
13      A    Like, anything like what, like, I guess?
14      Q    Talk to the forensic guys about it.
15      A    They reviewed the image, but they didn't tell
16  me that it appeared altered from my recollection.
17      Q    Did you ask them that question?
18      A    I don't recall verbatim if that was one of my
19  questions.
20      Q    Okay.  But as we sit here today, you don't
21  know whether it was altered or not?
22      A    No, sir, I do not.
23      Q    And that's not just for the face, but that's
24  also for the appearance of pubic hair.
25      A    Yes.  That's for everything.  I don't know.

79

1      Q    Right.
2          So, I mean, I -- and I'm not trying to be
3  crude.  But what was it about this image that you looked
4  at, and you're like, no, that's definitely someone who's
5  under 18?
6      A    The totality of it, everything involved in
7  that photograph, the entire person, like, from top to
8  bottom.
9      Q    You have to be a little bit more specific than
10  that.
11      A    So face, her body, everything down to --
12      Q    So she's squatting.  So you don't see her
13  breasts.  Knees to chest.
14      A    Yes.
15      Q    Correct?
16      A    Uh-huh.
17      Q    So you can't see her breasts.  I think maybe
18  she's partially clothed?
19      A    If I remember -- I'd have to refer back to the
20  image.
21      Q    Okay.  So really, all you can see is her face
22  and, I think, her genitals?
23      A    Yes.
24      Q    All right.  Not -- this is not -- let me --
25  what about her genitals looked under 18?

80

1      A    So I'm not a doctor.  So I can't --
2      Q    Right.
3      A    -- you know, speak like, hey, it was this part
4  of her genitals that looked young.
5      Q    You did not have an opinion that her genitals
6  look anything different than anyone else's genitals?
7      A    What do you mean?
8      Q    I'm asking you, did you look at this image and
9  go, oh, no, there's definitely something young-looking
10  about her genitals?
11      A    Yes.
12      Q    What is it?
13      A    That I don't remember specifically, just
14  because I'm not a doctor, so I don't know specific
15  doctor terms.
16      Q    I mean, can you use layperson's terms?
17      A    Personally, everything but -- about her
18  vaginal region.  And I know that's not super specific
19  for you, but that's just my opinion of it based off
20  looking at that photo.
21      Q    I mean, do you have any sort of expertise
22  to -- to make that opinion?
23      A    No.  Because I'm not a doctor.
24      Q    Okay.  So let me -- let me just ask you this:
25  I mean, what in your opinion does your evidentiary --

81

1  like, your opinion, what weight does that have for a
2  court?
3      A    That I do not know.
4      Q    I mean, is your opinion better or worse than
5  anyone else sitting in this room?
6      A    That I can't speak on, I guess.
7      Q    You don't know?
8      A    Yeah.  I don't know.
9      Q    I don't have any training in determining if
10 someone is 18 or 16 or 19 or -- do you have specific
11 training on that?
12     A    On determining the specific age, no, sir, I do
13 not.
14     Q    Okay.  So I don't -- there's nothing special
15 about your opinion that this model looked below the age
16 of 18?
17     A    I wouldn't call my opinion special.
18     Q    There -- there's no weight -- there's no extra
19 weight that we should give that opinion because you're a
20 detective?
21     A    That I don't know.
22          MS. SHEVLIN:  Form.
23 BY MR. ROBERTS:
24     Q    Okay.  All right.  Well, you don't know.  And
25 I guess what that means is as we sit here today, you do

82

1  not see your own opinion as being expert in any way?
2      A    What do you mean?
3          MS. SHEVLIN:  Form.
4          THE WITNESS:  In a body, in classifying a
5  specific age?  No.  Because I'm not an expert in
6  that.  So no, I cannot say --
7  BY MR. ROBERTS:
8      Q    Okay.
9      A    -- my opinion --
10     Q    Okay.
11     A    -- in reference to that.
12          MR. ROBERTS:  All right.  Do you guys want to
13 take a break?  We've been going, like, an hour.
14          MR. CARSON:  I was just going to ask.
15          MR. ROBERTS:  Yeah, yeah, yeah.  That's fine.
16 Yeah, perfect.
17          MS. SHEVLIN:  Yeah, sounds great.
18          MR. ROBERTS:  Yeah.
19          THE VIDEOGRAPHER:  This is the end of Media
20 Unit Number 1.  We are going off the record at
21 2:22 p.m.
22          (Recess from 2:22 p.m. to 2:32 p.m.)
23          THE VIDEOGRAPHER:  This is the beginning of
24 Media Unit Number 2.  We are back on the record at
25 2:32 p.m.

83

1  BY MR. ROBERTS:
2      Q    Okay.  So just going over some notes, kind of
3  pick up where we are, your -- your testimony is that
4  you've never been to met-art.com?
5      A    Yes, sir.
6      Q    Even after sort of the revelations from
7  Mr. Pierce in the criminal case, you never went back and
8  checked on anything?
9      A    No, sir.
10     Q    All right.  I want to just -- you to pull to
11 Page 37 on your -- your deposition.  And Mr. Pierce
12 asked a question.  Aside from any of -- this is Line 6.
13 Aside from any of those conclusions about sexual
14 maturity, is there anything about the image in
15 particular that says this is definitely a minor?  I
16 mean, is it in a child's bedroom?  Does --
17          Then you say:  So no.
18          Question:  Look like a selfie in a bathroom by
19 a teen?
20          Can you read your answer at Line 13?
21     A    Especially on MetArt because it's that
22 overseas.  They're all posed.  And it's done, I'm
23 assuming, by a professional photographer.  So they're
24 usually in, like, staged studios, which is what it
25 appeared to be.

84

1      Q    Okay.  So especially on MetArt, how -- where
2  did you get this information about what models are
3  usually like on met-art.com?
4      A    That was from Detective Greene.
5      Q    So Detective Greene told you that he had been
6  on met-art.com?
7      A    Yes, sir.
8      Q    And told you that these were professional
9  photographers?
10     A    Yes, sir.
11     Q    Told you they were in staged studios?
12     A    Yes, sir.
13     Q    All right.  You never verified that
14 information?
15     A    Not that I can recall.
16     Q    All right.  Is it true that -- and I think I
17 may have asked this.  But is it true, as an investigator
18 of Internet crimes against children, that most public
19 websites describe the models as adults and verified
20 adults?
21     A    What do you mean?  I'm sorry.
22     Q    Most public pornographic websites describe the
23 models on those websites as adults?
24     A    Yes, sir.
25     Q    Okay.  All right.  I think I already went

85

1   through that. Now that reminds me.

2       A    Okay.

3       Q    All right. What was the -- what was the

4   charge that you -- actually, let's -- let's continue.

5   Do you have your -- your search -- your affidavit for

6   the search report there?

7       A    You're talking about which one?

8       Q    Search warrant. This is the search warrant

9   and affidavit for Synchronoss.

10      A    Yes. I think we're at the same one, the

11  (unintelligible). This one?

12      Q    Yes. That's correct, yes.

13      A    Okay.

14      Q    And so in this -- in this affidavit, you cite

15  a -- statute, 827.015. What is that statute?

16      A    So this one is 827 -- you mean .071? You said

17  .1.

18      Q    .071(5).

19      A    Yes, sir, the possession of child sexual abuse

20  imagery.

21      Q    Okay. And I've got a copy of that. We can

22  just attach it for the record.

23           (Plaintiff's Exhibit 5 was marked for

24           identification.)

25

86

1   BY MR. ROBERTS:

2       Q    You're familiar with that statute?

3       A    Yes, sir.

4       Q    All right. And --

5       A    Thank you.

6       Q    -- (5), can you read (5)(a), the first

7   sentence?

8           MR. CARSON: Can you give me -- can you give

9       me just one second?

10          MR. ROBERTS: Yeah.

11          MR. CARSON: I'm going to object to form.

12      You can answer.

13          THE WITNESS: And you said just the first

14      sentence?

15  BY MR. ROBERTS:

16      Q    Yes.

17      A    It is unlawful for any person to knowingly

18  possess, control, or intentionally view a photograph,

19  motion picture, exhibition, show, representation, image,

20  data, computer depiction, or other presentation which in

21  whole or in part he or she knows includes any sexual

22  conduct by a child.

23      Q    And is that the statute that you are

24  referencing in your affidavit for a search warrant?

25      A    Yes, sir.

87

1       Q    All right. And you requested, from Verizon --

2   I see that here. We're looking at the search warrant

3   exhibit, which I think is Exhibit 2.

4       A    Yes. It should be because your NCMEC tip was

5   1.

6       Q    Yeah.

7           And we talked about this earlier. I'm just

8   confirming that -- the dates that you sought for the

9   subpoena, 1/22/23 through 1/28/23. Did I read that

10  correctly?

11      A    Yes, sir.

12      Q    And were those dates based on three days

13  before the incident date and three days after the

14  incident date?

15      A    Yes, sir.

16      Q    So including the incident date, that would be

17  seven days total?

18      A    If my math is correct, yes.

19      Q    I think it is. I think that's at least what

20  you put in your --

21      A    Yes.

22      Q    -- in your search warrant.

23          You go through your background. And you say

24  that you have over five years of law -- law enforcement

25  experience and that your affiant is currently assigned

88

1   to the special victims unit.

2           How long had you been assigned to the special

3   victims unit at the time of this affidavit?

4       A    So it's technically just ICAC, but we were

5   under special victims, if that makes sense.

6       Q    Okay. How long had you been ICAC?

7       A    Just a couple months.

8       Q    All right. Had you been the lead detective on

9   cases prior to this one?

10      A    Yes, sir.

11      Q    All right. Can you estimate how many?

12      A    Oh. I don't know an exact number -- sorry --

13  just because that was back from 2023 and '22. I

14  can't -- I do not remember an exact number.

15      Q    Fair to say that you were pretty new?

16      A    Yes, sir.

17      Q    All right. Had you completed all of your

18  training by that time?

19      A    No, sir.

20      Q    All right. Had you started your training at

21  that time?

22      A    Yes, sir.

23      Q    Can you tell me how -- how far along you were

24  in your training?

25      A    Just being a couple months in, it was pretty

89

1    much right at the beginning stages.

2    Q    Okay.

3    A    Yes, sir.

4    Q    All right.  I want to go to the facts which

5    establish probable cause, that section.

6    A    Okay.

7    Q    All right.  And you reference the -- the cyber

8    tip in the same number that we've previously marked as

9    Exhibit 1; correct?

10   A    Yes, sir.

11   Q    All right.  You quote, looks like word for

12   word, from portions of that cyber tip, file name through

13   the image categorization by ESP.  Is that a sort of copy

14   and paste from the NCMEC report?

15   A    Yes, sir.

16   Q    All right.  Now, at the time you did this

17   affidavit, you knew that A2 was incorrect?

18   A    That it was their description.  And so what

19   I'm copying and pasting is the ESP's description and

20   their information.  So what I put was just the

21   information provided by the ESP.

22   Q    But you knew that the model was not

23   prepubescent?

24   A    In my opinion.  But in their opinion, she was.

25   Q    Let's talk just a little about what you

90

1    understand to be pubescent or prepubescent.  We're

2    obviously talking about puberty; correct?

3    A    Yes, sir.

4    Q    What is your definition of prepubescent versus

5    pubescent?

6    A    I guess the easiest way to describe it is

7    obviously, the prepubescent is you haven't hit puberty,

8    so you have usually no kind of development to you.

9    Q    Pubic hair?

10   A    Not just pubic hair.

11   Q    But pubic hair is one of those things?

12   A    It can be, yes, one of those things, yes, sir.

13   Q    The presence of pubic hair would alert you

14   that someone has begun to experience puberty?

15   A    Yes, sir.

16   Q    Okay.  And this model had pubic hair?

17   A    Yes, sir.

18   Q    Did you make any -- any opinions about the

19   appearance of her pubic hair in relation to her age?

20   A    That I don't recall.  I would have to refer

21   back to this to see if I did, but I don't recall.

22   Q    Refer back to what?

23   A    If it was in the description.

24   Q    Okay.  Yeah.

25   A    Yeah.  I just don't recall.

91

1    Q    We'll go through this.

2    Q    Okay.

3    Q    So we can -- yeah.

4         It says you have viewed the image attached to

5    the cyber tip.  And then additionally, on February 22nd,

6    2023, your affiant consulted with Dr. K. Dully of the

7    First Coast Child Protection Team --

8    A    Yes, sir.

9    Q    -- who also reviewed the offending image.

10        Did I read that sentence correctly?

11   A    Who also reviewed the -- yes, sir.

12   Q    Yeah.

13        You actually did not express -- and you can

14   take a minute if you would like -- your opinion in this

15   affidavit that this was a minor or an adult.

16   A    No.  So usually, we put what the image

17   depicts.  But in this one, I did not put my opinion of

18   what the image depicts.  I just put Dr. Dully's

19   statement.

20   Q    When the -- and unfortunately -- right? -- I

21   mean, unfortunately, sometimes you see images of what is

22   obviously a child; correct?

23   A    Yes, sir.

24   Q    And when it is obviously a child, you don't

25   consult with Dr. Dully usually, do you?

92

1    A    That would be correct.

2    Q    And so --

3         MS. SHEVLIN:  Form.

4    BY MR. ROBERTS:

5    Q    -- in those cases where it's obviously a

6    child, you would express your opinion in the affidavit

7    that this is obviously a child of, you know, a certain,

8    I guess, age range?

9    A    We describe the --

10        MS. SHEVLIN:  Form.

11        THE WITNESS:  Sorry.

12   BY MR. ROBERTS:

13   Q    Yeah.

14   A    We describe the photograph and what it depicts

15   and I say, like, for example, it appears to depict CSAM,

16   which is just the child sexual abuse material.

17   Q    And in those cases, it's just obvious?

18   A    Yes, sir.

19   Q    Right?

20   A    Uh-huh.

21   Q    You'll agree that this case, it was not just

22   obvious that this was a minor?

23   A    In my opinion, it was.

24   Q    But you didn't treat it like other cases where

25   it is obvious, and you would have not consulted with

93

1  Dr. Dully; correct?
2      A    Yes.
3      Q    All right.
4           MS. SHEVLIN:  Form.
5  BY MR. ROBERTS:
6      Q    So it is a little different than those
7  circumstances where it's obviously a child.  You treated
8  it differently anyway.
9      A    Yes.  In my opinion, yes.
10     Q    Right.
11          Do you agree that some people could have
12 looked at this model and said, oh, she's 18?
13     A    That could be.
14     Q    Some people could say that; right?
15     A    Yeah.
16     Q    Detective Greene could come to that
17 conclusion?
18     A    Yes.
19     Q    You -- you wouldn't testify under oath that
20 Dr. Greene -- I mean that Detective Greene is wrong in
21 his opinion that this person could have been 18 years
22 old?
23     A    No.
24     Q    All right.
25          All right.  Let's -- this is a good point for

94

1  us to -- kind of break out of this.
2      A    Okay.
3      Q    And I'm going to show you what we'll mark
4  as --
5           MR. ROBERTS:  Where are we?  4, 5?
6           MR. CARSON:  6.
7           MR. ROBERTS:  6?  Okay.
8  BY MR. ROBERTS:
9      Q    I'm going to mark, as Exhibit 6 -- and what
10 I'll do is I'll -- I'll make this a composite of three
11 different things.
12     A    Okay.
13     Q    But we're just going to talk about one right
14 now.
15     A    All right.
16     Q    This is the three --
17          MR. ROBERTS:  Here you go, Matt.
18 BY MR. ROBERTS:
19     Q    This is the report from Detective -- I mean --
20 sorry -- Dr. Dully.
21     A    Yes.
22     Q    There's three separate reports.  I just want
23 to talk about -- let's start with the February 22nd
24 report.
25     A    Okay.

95

1      Q    How many times prior to this had you met with
2  Dr. Dully in the two months that you had been working?
3      A    Personally, this was my first time.
4      Q    This was your first time.  Okay.
5           How is it that you came to know about
6  Dr. Dully?
7      A    So I was referred to her by Sergeant Tolbert.
8      Q    Okay.  And what did Sergeant Tolbert say?
9      A    That she had previously reviewed other ICAC
10 detectives', like, images and that I would have to go to
11 her.
12     Q    Now, you had had other -- let's just --
13 Detective -- I'm sorry.  Sergeant?
14     A    Tolbert.
15     Q    Tolbert.  And I've called him Detective.  I
16 guess it's Detective Sergeant?
17     A    Yes.
18     Q    Yeah.  Sounds like a British crime show.
19          So Sergeant Tolbert, this was the first time
20 that he had referred you to Dr. Dully; correct?
21     A    Yes, sir.
22     Q    But this was not the first investigation that
23 you had worked on where there was an allegation of
24 possession of child pornography?
25     A    Yes, sir.  That would be correct.

96

1      Q    You had done other investigations?
2      A    Yes, sir.
3      Q    And those other investigations included
4  obvious child pornography that you did not need to go to
5  a doctor; correct?
6      A    Yes, sir, correct.
7      Q    All right.  And so was -- tell me about that
8  conversation.  Did Dr. -- why did it come up that
9  Dr. Dully should or could be involved in this case?
10     A    So with this one, I reviewed it.
11          MS. SHEVLIN:  Form.
12          THE WITNESS:  I -- oh, sorry.  The background
13     is making me -- I viewed it as being CSAM.  I don't
14     remember for certain who it was.  I know it wasn't
15     Sergeant Tolbert because he also reviewed the image
16     before he assigned it to me, and he also viewed it
17     as CSAM.  But I believe that there was somebody
18     else in the office who thought that it could be
19     age-difficult.  So that's when we decided, just to
20     make sure we covered our bases, to have it
21     verified.
22 BY MR. ROBERTS:
23     Q    And when you say age-difficult, what you mean
24 is this could -- somebody believed that it could
25 potentially be an adult?

97

```
1    A    Yes, uh-huh.
2    Q    All right.  So -- and this is in some of the
3    other testimony, that when there's a disagreement about
4    the -- whether the model is an adult or a minor that the
5    kind of policy of the department is to go to a Child
6    Protection Team doctor.  In this case, it was Dr. Dully?
7              MR. ROBERTS:  Object to form.
8              THE WITNESS:  I wouldn't say it's in policy.
9              MS. SHEVLIN:  Join.
10   BY MR. ROBERTS:
11   Q    It wasn't in policy.
12         So sometimes you would, and sometimes you
13   wouldn't?
14   A    This is the first case, so I can only speak on
15   this that I've had.
16   Q    You've -- you've done subsequent cases;
17   correct?
18   A    Uh-huh.
19   Q    Where you've gone to Dr. Dully?
20   A    Not that I recall.  Yeah.
21             MS. SHEVLIN:  Join.
22   BY MR. ROBERTS:
23   Q    Okay.  So this is --
24             MS. SHEVLIN:  Excuse me.  Form.
25             MR. ROBERTS:  I'm sorry.  Yep.
```

98

```
1    BY MR. ROBERTS:
2    Q    This is the only case that you have consulted
3    with Dr. Dully on?
4    A    Yes, sir.
5    Q    Okay.  Other cases, you've chosen not to
6    pursue because you thought this person could very well
7    be an adult?
8    A    No.  It was just other cases have not either
9    been CSAM, or they have been CSAM.
10   Q    Right.  So I guess there was a second part to
11   my --
12   A    Oh, sorry.
13   Q    Sometimes when you don't go to Dr. Dully, it's
14   because you've looked at the image, and you've said this
15   is not CSAM or it's age-difficult -- correct? --
16   sometimes.  Sometimes you don't go to her because it's
17   obvious --
18             MS. SHEVLIN:  Form.
19   BY MR. ROBERTS:
20   Q    -- that it's a child?
21             MR. CARSON:  Object to form.
22             THE WITNESS:  No.
23   BY MR. ROBERTS:
24   Q    Okay.  Yeah.
25         So -- so have you taken every cyber tip that
```

99

```
1    you've gotten since this and ultimately, that led to
2    charges?
3    A    If I haven't, like, investigated -- or excuse
4    me.  I guess I should say every cyber tip that I've had
5    post this, you're referring to?
6    Q    Let me just back up because I think we're
7    ships passing in the night.  Earlier in the deposition,
8    you testified that you have looked at other images that
9    you, yourself, determined were not CSAM.
10   A    Yes.
11   Q    Another way of saying that is you looked at an
12   image, and it was age-difficult to the point where you
13   just did not think it was a valid case to pursue.
14             MR. CARSON:  Object to form.
15   BY MR. ROBERTS:
16   Q    Is that true?
17   A    No, not necessarily.  Because --
18   Q    So -- okay.  So explain that to me.  Would you
19   pursue age-difficult cases?
20   A    No.  If I feel like it is age-difficult, then
21   I would not pursue it.
22   Q    Okay.
23   A    Yes.
24   Q    And if you felt that it was age-difficult, you
25   wouldn't go to Dr. Dully?
```

100

```
1    A    No.  I -- depending on the circumstances.  If
2    it was one that I felt, hey, this is a child and I had
3    somebody like in this case that had a difference of
4    opinion, just to cover our bases, I would go to
5    Dr. Dully.
6    Q    But in those cases, you -- you thought that it
7    was a child?
8    A    Yes, like in this case.
9    Q    Right.
10         What I'm saying is in cases where you felt
11   like that it was not a child; right?  So image -- a tip
12   comes in.  You look at it.  You go, I don't think that's
13   a child.  You would not take that to Dr. Dully.
14             MS. SHEVLIN:  Form.
15             THE WITNESS:  It's hard for me to say because
16        I haven't had a case where I've been on the border,
17        where it's like, ooh, could this be a child; could
18        this not be a child?  Like, I've had cases where
19        it's clear, like, that is not a child or cases that
20        don't even have CSAM at all.
21   BY MR. ROBERTS:
22   Q    Okay.  Okay.  All right.  So what is -- you've
23   never had an opportunity to go to Dr. Dully since this
24   incident?
25   A    Yes.
```

101

1    Q    Okay. All right. So do you know -- I think
2  you said it was Sergeant Tolbert that suggested that you
3  go see Dr. Dully?
4    A    Yes.
5    Q    And your recollection is that because there
6  was some disagreement about whether or not this was a
7  child or an adult?
8    A    I believe it was a disagreement --
9        MS. SHEVLIN:  Form.
10        THE WITNESS:  -- on somebody thinking it could
11    be potentially age-difficult and then us thinking,
12    like, no, this is for sure a child.
13  BY MR. ROBERTS:
14    Q    Okay. So there was some disagreement about
15  how to interpret the photograph?
16    A    Yes.
17    Q    All right. What was explained to you by
18  anyone at St. Johns County, Dr. Dully's qualifications
19  to determine whether some -- a model was an adult or a
20  child?
21    A    What do you mean? Like, her qualifications?
22  Like?
23        MS. SHEVLIN:  Form.
24  BY MR. ROBERTS:
25    Q    However you take that qualifications. I mean,

102

1  did -- let me ask it this way:  Did Detective -- or
2  Sergeant Tolbert tell you that she was qualified to tell
3  you or to render an opinion about whether or not a
4  particular model was an adult or a minor?
5    A    Oh, like, why we should be going to her at
6  all?
7    Q    Right.
8    A    Is that what you're referring to?
9    Q    Right.
10    A    I don't recall the specific conversation. I
11  believe -- honestly, I don't remember verbatim, and I
12  don't want to guess. So I just don't recall the
13  specific conversation we had about, like, I guess her
14  background in medical.
15    Q    So you don't recall, before you first met her,
16  what her -- being told what her specific qualifications
17  were?
18    A    No, sir, I don't.
19    Q    Okay. When you met with Detective -- with
20  Dr. Dully, did she tell you what her qualifications
21  were?
22    A    Honestly, I don't recall because it was so
23  long ago.
24    Q    All right. What makes you think that
25  Dr. Dully has a scientific ability to determine whether

103

1  an image of a model on the Internet is or is not an
2  adult?
3        MS. SHEVLIN:  Form.
4        THE WITNESS:  I don't know how to answer that,
5    like, because I don't want to speak for Dr. Dully
6    but to, like, say that, hey, she has a scientific,
7    you know, I guess, method.
8  BY MR. ROBERTS:
9    Q    Do you know if she has a scientific method?
10    A    And by scientific method, like, what are you
11  referring to?
12    Q    A reproducible method of accurately estimating
13  the chronological age of a particular model in a
14  particular digital photograph.
15        MR. CARSON:  Object to form.
16        You can answer.
17        THE WITNESS:  I don't recall specifically what
18    she did.
19        MS. SHEVLIN:  Join.
20        THE WITNESS:  But I don't want to say, you
21    know, accurately or inaccurately because obviously,
22    that's a difference of opinion.
23  BY MR. ROBERTS:
24    Q    Well, as we sit here today, do you believe
25  Dr. Dully has the ability to estimate within some degree

104

1  of scientific reliability the age of an individual by
2  looking at a digital photograph?
3    A    Yes.
4    Q    Okay.
5        MS. SHEVLIN:  Form.
6  BY MR. ROBERTS:
7    Q    What is that based on?
8    A    The specific? I don't know what it's based
9  on, but that's why we went to her.
10    Q    Why do you believe she has the ability to
11  simply look at a digital photograph and estimate the age
12  of that person?
13        MS. SHEVLIN:  Form.
14        THE WITNESS:  This would be just me going
15    based off my personal opinion --
16  BY MR. ROBERTS:
17    Q    Uh-huh.
18    A    -- which I don't know.
19    Q    Uh-huh.
20        Well, I mean, tell me. You have a personal
21  opinion that -- that -- that doctors have a
22  scientifically reliable way of looking at someone and
23  telling their age?
24        MR. CARSON:  Object to form.
25        MS. SHEVLIN:  Join.

105

1    THE WITNESS:  You're saying scientifically?
2    That's the thing.  I don't know, I guess, how to
3    answer it based off, like, that term being used.
4    BY MR. ROBERTS:
5    Q    So --
6    A    I don't want to misspeak.
7    Q    -- you -- you were the -- ultimately
8    responsible for this investigation; correct?
9    A    Yes, sir.
10    Q    And you understand that when you apply for a
11    search warrant, you have the obligation of only
12    presenting reliable information to the court; correct?
13    A    Yes, sir.
14    Q    All right.  So we've talked about, you know,
15    whether or not it was reliable that this website
16    actually has a history of -- of child pornography.
17    We've talked about that; correct?
18    A    Yes, sir.
19    Q    All right.  What I'm asking you is how did you
20    satisfy yourself, being in charge of the investigation,
21    that Dr. Dully's opinion about the age was reliable such
22    that you could present it to a court?
23    MS. SHEVLIN:  Form.
24    MR. CARSON:  I'll join.
25    You can answer.

106

1    THE WITNESS:  And I'm sorry.  I'm thinking
2    back to obviously when I went to her office, just
3    because I don't recall specifically what she used
4    to determine the age.  But her being a doctor in
5    the medical field working with children, I think
6    that also played into why I felt comfortable
7    utilizing her.
8    BY MR. ROBERTS:
9    Q    So you met with her twice?
10    A    Yes, for this case.
11    Q    Okay.  The first time you met with her on
12    February 22nd, did -- did she tell you that she could --
13    yeah, I can accurately, reliably estimate the age of the
14    individual in this digital photograph?
15    A    I don't remember verbatim what she said.
16    Q    Do you remember getting that sense from her,
17    that she was going to give you reliable information
18    about the age?
19    A    Yes.
20    Q    Okay.
21    MS. SHEVLIN:  Form.
22    BY MR. ROBERTS:
23    Q    All right.  Now, prior to showing her the
24    image, you told her that this image came from a cyber
25    tip; correct?

107

1    A    I don't recall what I stated exactly.
2    Q    Well, if you will, just look at the Exhibit 6.
3    (Plaintiff's Exhibit 6 was marked for
4    identification.)
5    BY MR. ROBERTS:
6    Q    And I -- February --
7    A    This one?
8    Q    Yeah, yeah, February 22nd.
9    A    Okay.
10    Q    This is a letter that Dr. Dully wrote to you;
11    correct?
12    A    Yes, uh-huh.
13    Q    All right.  And she writes that she -- single
14    color photograph displayed on law enforcement laptop.
15    And she has the file number --
16    A    Uh-huh.
17    Q    -- provided to me by yourself following a
18    cyber tip from NCMEC.
19    Correct?
20    A    Yes.
21    Q    She would have had no way to know whether or
22    not this was a cyber tip image without you telling her,
23    would she?
24    A    No.
25    Q    All right.  So fair to say you -- you probably

108

1    told her that this was a NCMEC cyber tip report?
2    A    Yes.
3    Q    Did you tell her that it was unconfirmed?
4    A    I don't think I remember what, verbatim, we
5    talked about.
6    Q    In your deposition with Mr. Pierce, you talk
7    about understanding what confirmation bias is.
8    A    Uh-huh, yes.
9    Q    And what is confirmation bias to you?
10    A    To me, in laymen's terms, it's -- like, I'll
11    use for an example if I tell you, hey, the guy across
12    the street just stole something from McDonald's and he's
13    wearing a blue baseball cap and you see a guy matching
14    that description, you're already going to have bias.
15    Like, okay, he's a thief, based off what I just told
16    you.
17    Q    Do you believe that there's a risk, applying
18    that same thing, when you told Dr. Dully at the time
19    that she reviewed it that NCMEC, the National Center for
20    Missing & Exploited Children, had already flagged this
21    in a cyber tip?  Do you think that that created the
22    potential for confirmation bias?
23    A    No.  Because I can't speak for Dr. Dully and
24    say, like, yeah, she had confirmation bias.
25    Q    But that's exactly the scenario you just

109

1  described about someone robbing something; correct?
2      A    Uh-huh.
3      Q    Correct?
4      A    Yeah.
5      Q    Yeah.
6          You told her -- you gave her information that
7  there was already a suspicion that this was a child at
8  the time or prior to her opinion being formed; correct?
9      A    No.  I don't recall specifically what I stated
10  or if, hey, this is a child; can you confirm.  So I
11  don't recall what was said.
12      Q    But -- but clearly, you did tell her that it
13  was from a cyber tip?
14      A    Yeah, from the National Center for Missing &
15  Exploited Children.
16      Q    Did she -- did she act like she knew what that
17  was?
18      A    I don't recall if she did or didn't.
19      Q    Okay.
20      A    Sorry.
21      Q    Do you agree that there might have been a
22  different outcome if you would have told Dr. Dully that
23  this was an 18-year-old?
24      A    No.  Because I can't speak for her, if she
25  would have changed her opinion on it.

110

1      Q    Okay.  But when you brought the image to her,
2  you realized or you at least acknowledged the
3  possibility that someone had represented this individual
4  as an adult?
5          MR. CARSON:  Object to form.
6          THE WITNESS:  What do you mean, that somebody
7      represented her as an adult?
8  BY MR. ROBERTS:
9      Q    This -- the image that's the subject of the
10  NCMEC report, cyber tip report.
11      A    Yeah.
12      Q    The website that it was on most likely
13  represented this as an adult?
14          MR. CARSON:  Object to form.
15          THE WITNESS:  But like I stated, I can't say
16      that that came specifically from that website.
17  BY MR. ROBERTS:
18      Q    But you knew that it came from the Internet;
19  right?
20          MR. CARSON:  Object to form.
21          THE WITNESS:  That I can't say.
22  BY MR. ROBERTS:
23      Q    Well, where else would it have come from?
24      A    I don't know.
25      Q    Well, you're a detective, Internet crimes

111

1  against children.  I mean, what are the possible sources
2  that this digital photograph with a website stamped on
3  it -- what are the other potential sources that this
4  came from?
5      A    There could be a multitude of different
6  sources that it could come from.
7      Q    Like what?
8      A    Like, honestly, anywhere.
9      Q    Could it have come from the moon?  I mean,
10  that's silly.  But you're saying anywhere.  I mean,
11  like --
12      A    Yeah.
13      Q    -- don't you agree that, like -- I mean,
14  you've heard it's like -- it walks like a duck, talks
15  like a duck.  I mean, doesn't this appear to be an image
16  from the Internet?
17      A    Yes.  It appears to be one that's a digital
18  image, if that's what you're referring to, yes.
19      Q    Right.  It appears to be a pornographic
20  picture from the Internet; right?
21          MR. CARSON:  Object to form.
22          THE WITNESS:  It appears to me to be a digital
23      image.  That's what I see.
24  BY MR. ROBERTS:
25      Q    Right.

112

1      A    I don't automatically constitute it as, okay,
2  this person got it off an Internet-based site.
3      Q    Even though --
4      A    (Unintelligible).
5      Q    Even though it has, like, the website on the
6  image?
7      A    Yes.  But that does not mean that it came from
8  the website is only what I'm saying.
9      Q    Okay.  Where else would this image -- how
10  else -- and you're an expert -- right? -- in crimes
11  Internet crime against children.  Where else would a
12  digital, what we've said, professionally produced
13  photograph --
14      A    Like I said, I don't know -- I can't say for
15  certain that it's professionally produced, so I don't
16  want to say, yes, this was professionally produced.
17      Q    It appears -- you said it appears to be taken
18  by a photographer.
19      A    Yes.
20      Q    Right?
21      A    Uh-huh.
22      Q    Where else would someone, on their phone, get
23  a picture like that?
24          MR. CARSON:  Object to form.
25          THE WITNESS:  Honestly, anywhere.  Like, our

113

1  phones can do so much.
2  BY MR. ROBERTS:
3      Q    They can't get things, though, that are not
4  from the Internet.
5          MR. CARSON:  Object to form.
6  BY MR. ROBERTS:
7      Q    Can they?
8      A    What I'm saying is that I agree that it's a
9  digital photograph, but to say that it came from a
10 specific site solely based off a watermark, I can't say
11 that.
12     Q    And I'm not saying a specific site.  I'm just
13 saying the Internet, like, a -- a website.
14     A    Yes.  Like, any website, yes, it can come from
15 any website.  It can come from any type of social media
16 site.  It could come from a -- a text message.  It can
17 come from anywhere.  That's all I'm saying, yes.
18     Q    Okay.  You made no effort to determine where
19 it came from?
20     A    I don't recall.
21     Q    Okay.  So you -- you meet with Dr. Dully.
22 Tell me about that meeting.
23     A    So I met at her office in Jacksonville.  And I
24 brought in my agency laptop, showed her the image, and
25 then that's when she reviewed it.

114

1      Q    Did she make any comments when she reviewed
2  it?
3      A    I don't recall specifically what she said.
4      Q    How long did you guys meet this first time,
5  February 22nd?
6      A    Yeah.  I don't know because I just wasn't
7  keeping track of time.  So --
8      Q    I mean, do you -- do you think you did have a
9  meeting with her, or was it just -- you just showed her
10 the image and left?
11     A    No.  I had a meeting with her.
12     Q    Exchanged words, like, had a conversation of
13 some sort?
14     A    That I don't remember specifically.  Like,
15 if -- our conversation, like, what we stated, you know,
16 or talked about, I honestly can't recall.
17     Q    Do you remember if she gave you her opinion
18 while you were there?
19         MS. SHEVLIN:  Form.
20         THE WITNESS:  I don't recall, no.
21 BY MR. ROBERTS:
22     Q    Did she make reference to any book or handbook
23 or anything like that?
24     A    Not that I recall.  I can't remember.
25     Q    What did she do?  Did she just look at the

115

1  photograph?
2      A    No.  I remember her reviewing the photograph,
3  but the specifics, just because it's honestly been so
4  long, I don't remember.
5      Q    So you really don't remember anything about
6  the meeting other than you brought a laptop.  She looked
7  at the laptop, and then you left?
8      A    Yeah.
9      Q    Anybody else there with you?
10     A    No.  It was in her office.  I do remember
11 that, yeah.  It was just me and her in her office.
12     Q    Sergeant Tolbert didn't go with you?
13     A    No, sir.
14     Q    Okay.  You can't tell me anything else about
15 that meeting?
16     A    Not that I remember.  And I'm sorry.  It's
17 just been so long.
18     Q    You get the report on February 22nd.  Is that
19 the same day that you -- you met with her, or did you
20 meet with her before that?
21     A    The date on this report would have been the
22 date I met with her.
23     Q    How do you remember that?
24     A    Because I remember getting a printed-out copy
25 of it, of the report.

116

1      Q    While you were still at the office?
2      A    Yes.
3      Q    Okay.  So sounds like you're there.  She forms
4  all of her opinions while you're there, and she prints
5  out a letter for you.
6      A    Yes, sir.
7      Q    Is that correct?
8          MS. SHEVLIN:  Form.
9  BY MR. ROBERTS:
10     Q    All right.  Did you read this?
11     A    Yes, sir.
12     Q    All right.  What is SMR?
13     A    Offhand, I don't remember specifically what
14 the acronym stands for.
15     Q    Do you know what it means?  You don't know
16 what the acronym stands for.  Do you know what it is?
17     A    Offhand, I'm -- I can't recall.
18     Q    Do you think you knew at the time and you've
19 forgotten, or, like, maybe you never knew?
20     A    No.  I would assume at the time, she would
21 have explained to me what SMR stood for and what it is.
22     Q    Do you know what SMR 4 -- what that means?
23     A    No, sir, not offhand.
24     Q    Okay.  The last sentence of the main
25 paragraph, it says:  She does not appear to be shaved,

117

1  as her anterior pubic hair is still present.

2        What does that mean to you?

3    A   What do you mean?  Like --

4    Q   She says:  She does not appear to be shaved,

5  as her anterior pubic hair is still present.

6        What do you take that sentence to mean?

7    A   Like, what do I think Dr. Dully meant by it?

8    Q   Yeah.  Or what did you take it to mean?

9    A   That she doesn't, like, shave, like, her pubic

10 region.

11   Q   Because she has anterior -- still has anterior

12 pubic hair.  Does that make sense to you, that sentence,

13 the way it's written?

14       MR. CARSON:  Object to form.

15       MS. SHEVLIN:  Form.

16 BY MR. ROBERTS:

17   Q   It's okay if it does.  I'm just -- to me, if

18 you said, I still have hair -- right? -- it almost

19 denotes that I have shaved some.  But I'm just trying to

20 understand if I'm misunderstanding it.  It says:  She

21 does not appear to be shaved, as her anterior pubic hair

22 is still present.

23       MR. CARSON:  Object to form.

24       MS. SHEVLIN:  Join.

25

118

1  BY MR. ROBERTS:

2    Q   Do you know what she meant by that?

3    A   Not the way you're breaking it down.  It has

4  me confused.  I'm not even going to lie to you.

5    Q   Right.  It is a little confusing -- right? --

6  the way it's written.

7        MR. CARSON:  Object to form.

8        MS. SHEVLIN:  Join.

9        THE WITNESS:  Not the way it's written.  I

10 guess the way, like, you broke it down, like, you

11 explain, like, I guess I get confused, kind of --

12 BY MR. ROBERTS:

13   Q   All right.

14   A   -- confused me in the process.

15   Q   Okay.  I'm not trying to confuse you.  I'm

16 trying --

17   A   (Unintelligible).

18   Q   -- to understand what it means.

19   A   It's just the way, like, you, I guess, kind of

20 explained it as you were breaking it down kind of made

21 me --

22   Q   Right.

23   A   -- like, what?

24   Q   Right.

25   A   So sorry.

119

1    Q   Right.

2        Do you -- do you believe that Dr. Dully is an

3  expert in what grooming techniques are available for

4  women?

5    A   That I don't know.

6        MS. SHEVLIN:  Form.

7  BY MR. ROBERTS:

8    Q   You have no idea; right?

9    A   No.

10   Q   You -- you know --

11   A   I don't know how I would know.

12   Q   Yeah.

13       You -- you know that there are lots of

14 different grooming methods.

15   A   Uh-huh.

16   Q   Right?

17   A   Yes.

18   Q   Shaving's just one of them?

19   A   Yes.

20   Q   You know that -- waxing?

21   A   Uh-huh.

22   Q   You've heard of that?

23   A   Yes.

24   Q   There -- there are chemicals; right?  Nair?

25   A   Oh, yeah.

120

1    Q   People used to use things like that, you know.

2    A   Yes, yeah.

3    Q   And there's electrolysis.  You've heard of

4  that?  Like, use electro -- like, laser hair removal?

5    A   Yes, laser, uh-huh.

6    Q   Right.

7        And you would agree with me that each -- those

8  all have maybe different appearances afterwards.  Like,

9  electrolysis may appear differently after you've done

10 that than shaving?

11   A   I mean, I think it could appear differently.

12   Q   Right.  I mean, sometimes you can get, like, a

13 razor burn or, like, a rash from shaving; right?

14   A   Yes, uh-huh.

15   Q   You can have a different type of skin

16 irritation, I think, from, like, waxing?

17   A   Yes.

18   Q   But they might appear differently; is that

19 right?

20   A   Yes, on the person.  Yeah.

21   Q   Okay.  Yeah.

22       So you don't know whether or not Dr. Dully is

23 an expert on determining whether a digital photograph

24 accurately depicts whether someone has been shaved or

25 not shaved?

121

```
1    A    No.  Because I don't know her experience --
2    Q    Right.
3    A    -- in that aspect of grooming.  I don't think
4    that was --
5    Q    Right.
6    A    -- ever discussed.
7    Q    Right.
8    A    Yeah.
9    Q    And that's not something traditionally -- I
10   mean, you're a detective, but you're also a female in
11   the world.  Like, you don't go to a doctor to be
12   groomed?
13   A    No.
14   Q    Right.  I mean, you don't expect even a
15   pediatrics to be an expert in, like, being able to look
16   at a -- a digital photograph and say, is that person
17   groomed or not?
18   A    That I couldn't speak on.
19   Q    Yeah.
20        You -- you acknowledge that, like, a lot of
21   young women do groom their pubic regions?
22   A    Uh-huh, yes.
23   Q    Yes?
24        I mean, you, like -- I know you have very
25   limited experience on pornographic websites.  But, I
```

123

```
1    Q    Right?  I mean -- okay.
2         So -- but you -- you're aware that, like, a
3    lot of women choose to groom themselves so that they
4    don't have any pubic hair?
5         MR. CARSON:  Object to form.
6         THE WITNESS:  Some women can.
7    BY MR. ROBERTS:
8    Q    Some of them can.
9         And that's not an indication to you as a
10   detective that they are under the age of 18, is it?
11   A    Just them being groomed?  Is that what you're
12   saying?
13   Q    Right.  Just the lack of pubic hair, that's
14   not a reason for you to say, oh, no, that's -- that
15   person's under the age of 18?
16        MS. SHEVLIN:  Form.
17        THE WITNESS:  I don't think that would be the
18   only determination, if that's what you're -- like,
19   if that's the question that you're asking.  Is that
20   the only determination that I would use?
21   BY MR. ROBERTS:
22   Q    What I'm --
23   A    Sorry.
24   Q    What I'm saying is the fact that a model does
25   not have visibly apparent pubic hair does not by itself
```

122

```
1    mean, is it your understanding that, like, a lot of the
2    women on pornographic websites do not have any pubic
3    hair?
4         MR. CARSON:  Object to form.
5         THE WITNESS:  No.
6         MS. SHEVLIN:  Join.
7         THE WITNESS:  So that is completely different
8         just because some men or let's say women, depending
9         on what you're looking at, may be into people who
10        have pubic hair.  So it just depends.
11   BY MR. ROBERTS:
12   Q    That's right.  I mean, like, it's actually
13   just called a fetish; right?
14   A    Yes, exactly.
15   Q    You're -- you're --
16   A    So it all depends.
17   Q    Right.  So it's, like, a fetish if you're not
18   groomed.
19   A    Yes.
20   Q    Right?
21   A    It could be, yes.
22   Q    It could be; right?  Yeah, yeah, yeah.  This
23   is weird stuff to talk about, but, I mean, this is your
24   job; right?
25   A    Yes.
```

124

```
1    tell you whether or not they are an adult or a minor.
2    A    No.  I don't think that would be the only
3    thing that I would go based off.
4    Q    Right.  I mean, that -- that would be
5    dangerous; right?  Because there's lot of adults that
6    don't have any visible pubic hair on a digital
7    photograph; correct?
8    A    There could be, yeah.
9         MS. SHEVLIN:  Form.
10   BY MR. ROBERTS:
11   Q    Yeah.  All right.
12        So did you get a sense from Dr. Dully that,
13   like, the appearance of the pubic hair was a -- was a
14   contributing factor or a major factor in her opinion
15   about the age?
16   A    No, sir.
17        MS. SHEVLIN:  Form.
18   BY MR. ROBERTS:
19   Q    Did she -- did she tell you why she came to
20   the opinion that she came to?
21   A    I can't remember verbatim what she stated
22   specifically about how she formulated her opinion.
23   Q    Okay.  All right.  So did -- did you -- at the
24   time, February 22nd, did you consider Dr. Dully to be an
25   expert in determining age?
```

125

```
1        MS. SHEVLIN:  Form.
2        THE WITNESS:  Yes, sir.
3    BY MR. ROBERTS:
4    Q    You did?
5    A    Uh-huh.
6    Q    You believed that she had more qualifications
7    than you to determine who's -- what the age of an
8    individual is on a digital photograph?
9    A    Yes, sir.
10        MS. SHEVLIN:  Form.
11   BY MR. ROBERTS:
12   Q    And was it true that, I mean, that
13   expertise -- did you get the understanding that that
14   expertise was sort of the reason why, when there was
15   disagreement, that you guys would kind of go and defer
16   to Dr. Dully?
17   A    What do you mean?
18        MS. SHEVLIN:  Form.
19        THE WITNESS:  Like, her, I guess, opinion was
20        kind of like our -- I guess are you saying, like,
21        the reason that pushed us further into continuing
22        with the case?
23   BY MR. ROBERTS:
24   Q    Yes.
25   A    Yes, uh-huh.
```

126

```
1    Q    You guys might have disagreed, but you've said
2    that you're not really an expert on determining if
3    someone is an adult or a minor; correct?
4    A    Yes, sir.
5    Q    But if this doctor, who has specialized
6    knowledge, can say whether it was an adult or a minor,
7    then -- then you would rely on that?
8    A    Yes, sir.
9    Q    Okay.
10        MS. SHEVLIN:  Form.
11   BY MR. ROBERTS:
12   Q    And that's what you did in this case?
13   A    Yes, sir.
14   Q    All right.  Now, are you aware that at some
15   point, Detective Greene met with a guy named Aaron Weiss
16   and Crawford Pierce down at St. Johns County Sheriff's
17   Office about this case?
18   A    The name Aaron doesn't sound familiar, but
19   obviously, Crawford Pierce does.
20   Q    Yeah.
21        Do you recall -- and I don't know that you --
22   you may have been present or not.  It was in
23   October/November time frame of 2023, where Detective
24   Greene was asked to search and locate this image and --
25   and the other images on the Internet.  Do -- are you
```

127

```
1    familiar with that meeting?
2    A    No, sir.  I don't think I was there.
3    Q    Did he tell you that he was able to locate
4    these images on the Internet?
5    A    That who?
6    Q    Detective Greene.  Did Detective Greene tell
7    you that he was able to locate both of the models that
8    are involved in this case on the Internet on multiple
9    websites?
10   A    Not that I recall.
11   Q    You don't recall him telling you that?
12   A    No, sir.
13   Q    Okay.
14   A    That would have been during their meeting, you
15   said?
16   Q    Yeah.  And I don't know if you were there or
17   not.  You don't recall being in that meeting?
18   A    No, sir.
19   Q    All right.  At some point later, you did
20   learn, though, that these models had been located on a
21   website?
22        MR. CARSON:  Object to form.
23   BY MR. ROBERTS:
24   Q    Let me ask you a question.
25   A    Okay.
```

128

```
1    Q    You saw the photographs with them holding
2    their passports?
3        MR. CARSON:  Object to form.
4    BY MR. ROBERTS:
5    Q    Correct?
6    A    Yes.
7    Q    You were shown those.  Who showed those to
8    you?
9    A    I believe it was Pierce, but I can't be for
10   certain.  So I don't know offhand.
11   Q    Okay.  Was it maybe Kaitlyn Payne, the
12   assistant state attorney?
13   A    I don't recall her ever showing me.
14   Q    Okay.
15   A    No.
16   Q    Do you think you got them in an e-mail or --
17   A    If I viewed them, I believe it was Crawford
18   Pierce who showed me them.  But I don't remember how
19   specifically I viewed them, but I think he provided
20   them.
21   Q    Okay.  All right.  So -- and I'm going to have
22   to circle back around when we talk about the other
23   images but --
24   A    Okay.
25   Q    All right.  So you get this letter from
```

129

1  Dr. Dully, and then you go back to -- what do you do
2  after you get this opinion from Dr. Dully?
3      A    Sorry.  I'm thinking back to -- after I got
4  this opinion, I should have went back to the office, and
5  I can't remember verbatim the next step in it.  I don't
6  want to misspeak.
7      Q    Well, I've got this search warrant.
8  February 28th is the date that it looks to be signed,
9  February 28th, 2023.  That's what's been previously
10  marked as Exhibit 2.
11     A    The Verizon?
12     Q    Yeah.  Do you think that would have been the
13  next thing you did in your investigation?
14     A    Yes, sir.
15         MS. SHEVLIN:  Form.
16  BY MR. ROBERTS:
17     Q    After getting Dr. Dully's letter, did you do
18  anything else in your investigation between obtaining
19  this letter from Dr. Dully and seeking the search
20  warrant?
21         MS. SHEVLIN:  Form.
22         THE WITNESS:  Other than probably waiting on
23      the search warrant to return from Synchronoss.
24  BY MR. ROBERTS:
25     Q    Well, no, no.  I believe that you got

130

1  Dr. Dully's opinion before you sought the search
2  warrant.
3      A    Yeah.  But I'm saying, like, after I got
4  Dr. Dully's, it would have been on waiting on the
5  Synchronoss return.
6      Q    But you -- you didn't send the subpoena until
7  after you did the -- got the warrant; correct?
8      A    The subpoena to -- you're talking about
9  Synchronoss?
10     Q    Yeah.
11     A    I don't recall sending a subpoena to
12  Synchronoss.
13     Q    I mean -- I'm sorry -- to Verizon.  I'm just
14  trying to get the time line.
15     A    Yes, sir.
16     Q    You -- you get Dr. Dully's report.
17     A    Uh-huh.
18     Q    And then is the next thing you do is you fill
19  out and create the affidavit for a search warrant that's
20  dated --
21     A    On the 28th.
22     Q    On the 28th.  That's the next thing you did?
23     A    Yes, sir.
24     Q    You didn't do any investigation between
25  Dully's report and the affidavit?

131

1      A    Not that I recall.
2         MS. SHEVLIN:  Form.
3  BY MR. ROBERTS:
4      Q    Okay.  That's okay.  I don't --
5      A    Yeah.
6      Q    -- have any record that you did.  I'm just
7  trying to verify that I'm not missing anything.
8      A    No.  Sorry.  I'm just -- that's why my face
9  kind of scrunched up.  I was thinking back to it.
10     Q    Sure.
11         All right.  And so you -- in this affidavit,
12  you quote directly from Dr. Dully's letter; correct?
13     A    Yes, sir.
14     Q    And so you -- we've already asked you
15  questions about the reliability of Dr. Dully's opinion.
16  But at that point, did you believe that Dr. Dully was a
17  reliable source of information in estimating the age?
18     A    Yes, sir.
19     Q    Okay.  All right.  So is there anything other
20  than Dr. Dully's report and the NCMEC tip that you
21  submitted to the court -- well, strike that.
22         It looks like you submitted the information
23  from the NCMEC report.  You submitted your -- your
24  statement that met-art.com was a known -- has a known
25  history of displaying CSAM.  And then the third thing

132

1  that you did was you quoted for Dr. Dully.  Is there
2  anything else that you submitted to the court to
3  establish probable cause at the time that you applied
4  for this search warrant on February 28th, 2023?
5         MR. CARSON:  Object to form.
6         THE WITNESS:  I don't recall.
7         MS. SHEVLIN:  Join.
8  BY MR. ROBERTS:
9      Q    Was there anything else in the -- in -- I
10  mean, I'm asking what you submitted to the court.  Did
11  you submit anything to the court other than those three
12  pieces of -- or the information that's contained in this
13  subpoena?
14         MR. CARSON:  Object to form.
15         THE WITNESS:  That I don't recall.  I don't
16      remember if there was anything else.
17  BY MR. ROBERTS:
18     Q    You don't remember if you submitted anything
19  other than the affidavit for the search warrant?
20     A    Yes, I don't remember.
21     Q    Did you submit the image?
22     A    The NCMEC image?
23     Q    Yes.
24     A    We don't, like, submit images into, like, a
25  court forum.

133

1    Q    Okay. But did you -- did you -- that's what
2   I'm asking you.
3    A    Yes.
4    Q    Did you do any -- did you submit anything
5   other than the affidavit for the search warrant in
6   support of probable cause to seek the search warrant?
7    A    Not that I recall, anything other than this.
8    Q    Okay.
9    A    I just know that we don't submit, obviously,
10  NCMEC images.
11   Q    Well, you could show the -- I mean, do you --
12  do you believe that it would be improper for you to show
13  a judge the image?
14   A    So all of our, like -- excuse me. All of our
15  search warrant stuff is electronic-based. So I wouldn't
16  be able to submit that electronically, that image.
17   Q    You don't have the ability to go to chambers
18  to a judge to obtain a search warrant in person?
19   A    I mean, we can go in person. It's just the
20  judges prefer to do it electronically based.
21   Q    Okay. But you have the ability to bring your
22  laptop there --
23   A    Yes.
24   Q    -- if you wanted to show the image?
25   A    Yes.

134

1    Q    All right.
2         And did -- did you get a return on -- on
3   this -- was the -- was the search warrant issued?
4    A    Yes, sir.
5    Q    Okay. And was there -- was it served, and was
6   there a response?
7    A    Yes, sir.
8    Q    Okay. What happened next?
9    A    We received the Synchronoss download.
10   Q    Okay. And what did that download contain?
11   A    It contained numerous files linked to that
12  phone number.
13   Q    All right. And you got all the customer
14  subscriber information?
15   A    I don't recall if they provided the customer
16  subscriber information. Usually, they have you reach
17  out to Verizon.
18   Q    Okay. I'm just looking down the list --
19   A    Yes, sir.
20   Q    -- of things that you requested for it.
21   A    Uh-huh.
22   Q    You requested device purchase information?
23   A    Yes. Sorry. Let me go back to that page.
24   Q    E-mail address -- yeah. E-mail addresses
25  associated with the account.

135

1    A    The call detail records?
2    Q    Call detail records.
3         Cell site information, what's the importance
4   of that?
5    A    That will -- usually with cell site, if you
6   request it fast enough, you should be able to kind of
7   pinpoint, you know, where the phone was utilized during
8   a specific time.
9    Q    And why is that important?
10   A    Because that can tell you, like, hey, were
11  they in our county, or, hey, was it somewhere else, or,
12  you know, like, where were they at specifically. But
13  usually, you have to do that fast, fast.
14   Q    Specifically at the time of the incident?
15   A    Yes.
16   Q    Okay. All right.
17        All right. And so you got the -- the
18  download. What happened next?
19   A    Then the next step is just to go through the
20  download, review it, and see what all is contained in
21  it.
22   Q    And what -- what was contained in it from your
23  perspective?
24   A    That's when we located three other CSAM
25  images, and then -- excuse me -- there was numerous

136

1   other kind of files that contained other pornographic
2   images as well.
3    Q    Those were adult pornographic images?
4    A    To be honest, I do not know their specific
5   age.
6    Q    That's true of any -- any -- any pornographic
7   image; right?
8    A    Uh-huh.
9    Q    Correct, just for the court reporter?
10   A    Oh, sorry. Yes.
11   Q    Yes.
12   A    Sorry. I forget that. I was -- uh-huh.
13   Q    So you found how many images that you thought
14  were child pornography?
15   A    Total of three.
16   Q    Okay. Total of three?
17   A    Yes.
18   Q    Was that unusual?
19   A    No.
20   Q    You write in your affidavit that often people
21  hoard. Is that true?
22   A    Yes.
23   Q    Was -- did you find any evidence of hoarding?
24   A    I can't recall specifically because there was
25  a lot of files, like, a lot.

137

```
 1     Q    Uh-huh.
 2     A    But as it pertains to, like, the CSAM, I can't
 3  recall if there was, like, hoarding of images.
 4     Q    Right.
 5          You say in the affidavit that normally, people
 6  in possession of child pornography will try to hide or
 7  secret them away.
 8     A    Uh-huh.
 9     Q    Is that a yes?
10     A    Oh, yes.  Sorry.  I need to stop doing that.
11  I'm sorry.
12     Q    There was no evidence that Mr. Lawshe was
13  hiding or secreting away these -- these images; correct?
14     A    I don't recall offhand because I do know he
15  was married, but I don't recall if he had them in, like,
16  different folders specifically.
17     Q    But he -- but he didn't have them segregated
18  from the other pornographic images on his phone?
19     A    That I don't recall.
20     Q    So you said there were three total images on
21  his phone of child pornography?
22     A    No, three total that we, like, charged for.
23     Q    Were there other images of child pornography?
24     A    That I don't recall.  No.
25     Q    Okay.  So was one of those images the NCMEC
```

138

```
 1  report image?
 2     A    That we charged, one of the images, no, sir.
 3     Q    Did you guys find that image on his phone?
 4     A    I do not believe we located that image.
 5     Q    I think you located an image of the same
 6  model, though?
 7     A    Yes, sir.
 8     Q    All right.  Actually, at least two images of
 9  the same model?
10     A    Yes.
11     Q    All right.  So I asked you earlier if this
12  appeared to be part of a photo shoot.  Do you recall
13  that?  Did the NCMEC image appear to be part of a photo
14  shoot?
15     A    Sorry.  I'm just thinking back to the other
16  two images, just trying to make sure that they were of
17  the same model.  I know one, for sure, was of the same
18  model, but two, I'm not certain.  I would have to review
19  that image.
20     Q    And we have these images.
21     A    Yes.
22     Q    We're probably going to get to those a little
23  bit later.
24     A    Uh-huh.
25     Q    But my question to you is there was a
```

139

```
 1  different picture of the same model that was in the
 2  NCMEC image; correct?
 3     A    Of the same female, yes.
 4     Q    Same female?
 5     A    Uh-huh.
 6     Q    So I asked you if it was a photo shoot.  I
 7  mean, when you got that other image back, it confirmed
 8  that this was part of a photo shoot; correct?
 9     A    No.  Because I don't know if it was a part of
10  a photo shoot.
11     Q    It didn't appear to be part of the same photo
12  shoot?
13     A    Not based off my personal opinion.
14     Q    Did it -- did it have website information on
15  that image?
16     A    I don't recall.  I would have to look at it
17  again.
18     Q    Okay.  Detective Greene has testified that he
19  located the models on all of the images based on the
20  information that was contained within the images
21  themselves.  Do you have any reason to disagree with
22  that?
23     A    That I don't know just because I wasn't there
24  when we located them, so I can't speak on it.
25     Q    No.  But I'm not asking you --
```

140

```
 1     A    Yeah.
 2     Q    -- if that was a true statement or not.  What
 3  I'm asking you is he has testified --
 4     A    Uh-huh.
 5     Q    -- okay? -- that he was able to locate the two
 6  models in question using solely the information on the
 7  images themselves.  My question to you is do you have
 8  any reason to believe that that testimony is not
 9  accurate?
10     A    No.  I don't think I have any reason to
11  believe that.  Yeah.
12     Q    You take -- you take Detective Greene for his
13  word?
14     A    Yes, uh-huh.
15     Q    All right.  All right.  So he also testified
16  that he located these models on websites within 20 to
17  30 minutes.  Do you have any reason to disagree with
18  that testimony?
19     A    No, sir.
20     Q    All right.  He said when he located these
21  models on the Internet that they were all portrayed as
22  verified adults.  Do you have any reason to disagree
23  with that?
24     A    That?  No, based off what he's saying.
25     Q    Okay.  And that wouldn't be unusual --
```

141

1  right? -- I mean, on a public website for a model to be
2  described as a verified adult.  Like, that's the way it
3  is; right?
4          MR. CARSON:  Object to form.
5          THE WITNESS:  It should be.
6  BY MR. CARSON:
7      Q    Should be; correct?  Right?
8      A    Yes.
9      Q    You're familiar with the federal age
10 verification laws?
11     A    Not super familiar but --
12     Q    But you're an investigator with, you know,
13 Internet crimes against children; correct?
14     A    Yes.
15     Q    You know that there are federal laws which
16 require publishers to -- and producers to maintain age
17 documentation; correct?
18     A    Yes.
19     Q    And you know that websites are supposed to
20 have a records custodian to maintain that information?
21     A    Yes.
22     Q    All right.  And so you know that prior to you
23 making the decision to arrest, you had all of the
24 information that you needed to locate these models on a
25 public website; correct?

142

1          MR. CARSON:  Object -- object to form.
2          THE WITNESS:  Did I have all of the
3      information needed?  I wouldn't say that I did.
4  BY MR. ROBERTS:
5      Q    Well, Detective Greene had all of the
6  information that he needed to do it; correct?
7          MR. CARSON:  Object to form.
8          THE WITNESS:  That I don't know.
9  BY MR. ROBERTS:
10     Q    Well, I mean, he did.
11         MR. CARSON:  Object to form.
12 BY MR. ROBERTS:
13     Q    You're not -- you're not disagreeing.  You're
14 not saying that Detective Greene is lying, are you?
15     A    No, no.
16     Q    Okay.  What other information would you need
17 to locate these models on a website that you didn't have
18 prior to making the decision to arrest Mr. Lawshe?
19     A    So when we made the decision to arrest him,
20 obviously based off the probable cause, we had the
21 information that was available to us.  After -- well,
22 I'm assuming it was months.  Don't quote me on that.  I
23 don't -- I'm assuming it was.  So months later, that's
24 when we were presented with, like, the passport,
25 redacted form and stuff like that.

143

1      Q    But prior to making the arrest, you had all of
2  the information necessary to go to the websites and
3  locate these models; correct?
4          MR. CARSON:  Object to form.
5  BY MR. ROBERTS:
6      Q    I understand you didn't do that, but you had
7  information to do that if you chose to do that?
8          MR. CARSON:  Object to form.
9  BY MR. ROBERTS:
10     Q    Correct?
11     A    I don't think that I could have said for
12 certain, like, yes, that specific image that I have on
13 my NCMEC tip was the exact same image that was on the
14 site.
15     Q    Do you believe that you had all the necessary
16 information prior to arresting Mr. Lawshe in order to
17 locate these models on the Internet?
18         MR. CARSON:  Object to form.
19         THE WITNESS:  No.  I wouldn't say that I had
20     all the --
21 BY MR. ROBERTS:
22     Q    What did you not have?
23         MR. CARSON:  Object to form.
24         THE WITNESS:  What I just stated.
25

144

1  BY MR. ROBERTS:
2      Q    Well, I mean, Detective Greene -- and I think
3  the images are going to speak for themselves.  All of
4  the images had a website on them, listed on them in some
5  way.
6      A    I don't recall all the images having a website
7  listed on them.
8      Q    Okay.  Some of the images had websites on
9  them; correct?
10     A    Yes.
11     Q    You -- you had the names of these -- and I
12 think it was multiple websites; correct?
13     A    That I do not recall, if it was multiple.
14     Q    Okay.  You -- so you at least had met-art.com?
15     A    Yes.
16     Q    Right?
17     A    Uh-huh.
18     Q    So you -- you agree that you had all the
19 information you needed to go to met-art.com; correct?
20     A    Could I have went to MetArt?  Yes.
21     Q    You had all the information that you needed
22 prior to making the arrest to go to met-art.com;
23 correct?  That's something that you do in the past;
24 right?
25     A    What do you mean, do in the past?

145

1    Q    You have been to websites to follow up and
2  investigate NCMEC tips.
3    A    Yes, previously.
4    Q    Yes.  You've done that before; right?
5    A    Uh-huh, yes.
6    Q    So you knew that you had the ability.
7    A    Yes.
8    Q    And you knew you had all of the information to
9  go to met-art.com; correct?
10   A    To go to -- yes.
11   Q    Prior to arresting Mr. Lawshe; correct?
12   A    Yes.
13   Q    And you've never been to met-art.com.  But if
14 that website identified a records custodian, you could
15 have e-mailed that records custodian to request
16 information about these images; correct?
17   A    Yes, uh-huh.
18   Q    All right.  Do you have any reason to believe
19 that you as a law enforcement officer, if you would have
20 e-mailed the record custodian, that he would not have
21 responded to you?
22   A    That I can't speak on because it would be
23 hypothetical, so I don't know.
24   Q    You -- you know that he responded to
25 Mr. Pierce.

146

1    A    Another attorney, yes.
2    Q    Another attorney.
3    A    Yeah.
4    Q    Right?
5         You knew that you had the ability, even if you
6  had to go the state attorney or somebody, you could get
7  the information --
8    A    Yes.
9    Q    -- from the website; right?
10   A    I could have attempted, yes.
11   Q    Right.
12        So you had all of the information that you
13 needed to actually get the passport information and
14 photo session information from met-art.com prior to
15 making the arrest of Mr. Lawshe, didn't you?
16        MR. CARSON:  Object to form.
17        THE WITNESS:  No.  I still would say no.
18 BY MR. ROBERTS:
19   Q    What -- what were you lacking?
20   A    Because what was provided to me, like I
21 stated, which was well after the fact, was just redacted
22 forms.
23   Q    Well, no.  But I'm just saying, you could --
24 you had everything you needed to get the images of the
25 redacted passports prior to making the arrest of

147

1  Mr. Lawshe; correct?
2        MR. CARSON:  Object to form.
3        THE WITNESS:  Yes.  But I guess I'm just
4    confused by your question because the redacted form
5    wouldn't prove.
6  BY MR. ROBERTS:
7    Q    That's not my question.  I'm not -- I'll -- I
8  will ask you -- and I promise I will ask you what you
9  would have maybe hypothetically done with that
10 information.
11   A    Okay.
12   Q    But what I am asking you is you had all of the
13 information that you needed readily available in order
14 to reach out to met-art.com's record custodian to
15 request age verification information; correct?
16   A    Yes, to request it.
17   Q    And you had that information prior to making
18 the arrest of Mr. Lawshe?
19   A    I had MetArt.  That's all I had, was the
20 watermark, yes.
21   Q    And -- and you -- that's all you needed to go
22 to that website and request, from the record custodian,
23 age verification information; correct?
24   A    I would need to know that that photograph was
25 housed on that server.

148

1    Q    And wouldn't -- as an investigator --
2  right? -- a way to find that out would be to e-mail that
3  image to them.
4    A    No, sir.  I wouldn't feel comfortable
5  e-mailing something that I viewed as child pornography
6  because now I'm transmitting child pornography via my
7  agency e-mail.
8    Q    So you believe it would have been illegal for
9  you to transmit that image in your investigation?
10   A    Yes.
11   Q    Okay.
12   A    Very much so.
13   Q    So when you -- you could have gone on the
14 website; right?
15   A    Uh-huh.
16   Q    You could have located.  You could identify
17 the model by name; correct?
18   A    (Nods head.)
19   Q    And then requested all the age verification by
20 the name of the model; right?
21        MR. CARSON:  Object to form.
22        THE WITNESS:  By her name, possibly.  I can't
23    say for certain if that's how they would locate
24    them.  I don't know how they do that.
25

149

BY MR. ROBERTS:

1  BY MR. ROBERTS:
2      Q    You don't know because you didn't do it.
3      A    Yes.
4      Q    All right.  Okay.  So let's talk about what
5  you would have done differently had you gotten the
6  information from the records custodian.  Do you recall
7  seeing an e-mail from the records custodian, attaching
8  the documents?
9      A    I recall getting an e-mail from Crawford
10  Pierce.
11     Q    Right.
12     A    And I don't know if he reached out to that
13  person.
14     Q    Do you --
15     A    But I remember seeing --
16     Q    Do you remember seeing several attachments,
17  and some of them were photographs of the -- of the
18  passports?
19     A    Yes, sir.
20     Q    There's also an affidavit from the records
21  custodian.  Do you recall seeing that?
22     A    There may have been.  I -- I don't know
23  offhand.
24     Q    Okay.
25     A    Yeah.  But I do remember the passport.

150

1      Q    Okay.  Had you gotten that information, would
2  it have affected the way you handled the investigation?
3      A    No.  Because I still felt that we had probable
4  cause to do the arrest.  I would have attempted to see
5  if they could provide the un-redacted, just so we could
6  verify, just because with redacted, there's no way for
7  me as a law enforcement officer to verify what they're
8  providing me.
9      Q    So you -- but you wouldn't have just arrested
10  Mr. Lawshe if you were in possession of an e-mail from a
11  records custodian or an affidavit from a record
12  custodian along with passport images which purported to
13  prove that the models were adults?  You wouldn't have
14  just arrested Mr. Lawshe after receiving that, would
15  you?
16          MR. CARSON:  Object to form.
17          THE WITNESS:  There would have been no way to
18      prove that what they gave me was authentic and
19      valid based off of what they provided you guys.
20  BY MR. ROBERTS:
21     Q    You're law enforcement.  You could have gotten
22  a subpoena.  You could have done lots of things to get
23  un-redacted copies; correct?
24          MR. CARSON:  Object to form.
25          THE WITNESS:  That with it being entirely

151

1  another state, I don't know if me as a St. Johns
2  County law enforcement officer would have been able
3  to force them to provide those records.  So that I
4  can't speak on.
5  BY MR. ROBERTS:
6      Q    And you don't know because you didn't try.
7      A    Exactly.
8      Q    All right.  You wouldn't have arrested
9  Mr. Lawshe if, in fact, the girls were 18 or 19, would
10  you?
11          MR. CARSON:  Object to form.
12          THE WITNESS:  If they were adults, then we
13      wouldn't have viewed it as CSAM.  Then no.
14  BY MR. ROBERTS:
15     Q    It's kind of a ridiculous question; right?
16     A    Yeah, if they were adults.
17     Q    Do you see how it might be -- sound, like,
18  outrageous that if a records custodian, a licensed
19  attorney, in the state of California swore an affidavit
20  and provided images of passports to -- that proved that
21  these models were 18 that was enough to
22  satisfy law enforcement that Mr. Lawshe was not in
23  knowing possession of child pornography?
24          MR. CARSON:  Object to form.
25          THE WITNESS:  Do -- are you saying that do I

152

1      think that the redacted versions of that is enough?
2      Is that your question?
3  BY MR. ROBERTS:
4      Q    Well, don't you think that that creates a
5  serious doubt as to whether or not these models are, in
6  fact, minors?
7          MR. CARSON:  Object to form.
8          THE WITNESS:  No.
9  BY MR. ROBERTS:
10     Q    A sworn affidavit from an attorney licensed in
11  California, that doesn't create any doubt in your mind
12  that these are actually adults?
13          MR. CARSON:  Object to form.
14          THE WITNESS:  Honestly --
15  BY MR. ROBERTS:
16     Q    What would?  What would?  What would
17  constitute reasonable evidence to you that these models
18  were adults?
19          MR. CARSON:  Object to form.
20          THE WITNESS:  What would constitute evidence
21      to me?
22  BY MR. ROBERTS:
23     Q    Right.
24     A    Is if they provided the un-redacted version,
25  something that would allow us as law enforcement

153

1  officers or even any other agency to verify the records
2  that they have.
3      Q    Well, let's say that they were actual real
4  records and nobody tampered with the -- I mean, is
5  that -- is that your theory right now, that the records
6  custodian has manipulated or somebody has manipulated
7  these passport documents?
8          MR. CARSON:  Object to form.
9          THE WITNESS:  I would hope that they wouldn't.
10 BY MR. ROBERTS:
11     Q    Well, if they didn't, then these -- then these
12 models are -- are adults.
13         MR. CARSON:  Object to form.
14         THE WITNESS:  But like I said, I can't say
15     that based off what I was given.
16 BY MR. ROBERTS:
17     Q    So the only way, in your mind, that Mr. Lawshe
18 could not have been arrested is if somebody proved to
19 you beyond a shadow of a doubt that these models were
20 adults?
21         MR. CARSON:  Object to form.
22         THE WITNESS:  No, sir.  I'm not saying that's
23     the only way that he wouldn't have been arrested.
24 BY MR. ROBERTS:
25     Q    But it's not enough to have passport IDs along

154

1  with the dates of the photo shoots from the records
2  custodian.  That's not enough?
3          MR. CARSON:  Object to form.
4          THE WITNESS:  I'm saying that that didn't
5      change probable cause that I was going off of.
6  BY MR. ROBERTS:
7      Q    You said that would not -- you still would
8  have arrested him?
9      A    I'm saying what I had during that time that he
10 was arrested was enough probable cause for me to
11 initiate the arrest.
12     Q    What I'm asking, though, is a different
13 question, is if you would have had the passports, the
14 affidavit, and the e-mail from the record custodian, you
15 still would have arrested him?
16         MR. CARSON:  Object to form.
17         THE WITNESS:  That I don't know.  Like, I
18     can't say because it obviously would have changed
19     the entirety of the investigation, so I can't speak
20     on just one aspect of the investigation.
21 BY MR. ROBERTS:
22     Q    Every one of your colleagues that have been
23 deposed have said, absolutely, no, we would not have
24 arrested him, if we'd had these images of the passports.
25 Are you disagreeing with them?

155

1          MR. CARSON:  Object to form.
2          THE WITNESS:  I'm saying that that's their
3      opinion.  But what I'm saying is I'm going to take
4      everything in an investigation and look at it
5      completely.  So I'm not going to go based off one
6      piece of evidence and formulate an opinion.
7  BY MR. ROBERTS:
8      Q    But -- but you -- but you didn't do -- you
9  didn't investigate these models' identity at all, did
10 you?
11         MR. CARSON:  Object to form.
12         THE WITNESS:  You're talking about during the
13     investigation?
14 BY MR. ROBERTS:
15     Q    During the investigation, you made no attempt
16 to identify these, who you believe are child victims?
17     A    Uh-huh.
18     Q    Isn't it the stated goal of ICAC, is to
19 protect and prevent the sexual abuse of minors?
20     A    Yes, sir.
21     A    I mean, that's the --
22     A    That's one of the goals.
23     Q    But that's the number one priority --
24 right? -- for you is to, like, protect children.
25     A    Yes.

156

1      Q    And yet you took no effort to protect these
2  children.  Why?
3      A    My effort was during my investigation because
4  you're in an investigation is when obviously we work and
5  do pretty much everything.
6      Q    But -- but you didn't make any effort to
7  protect these models, did you?
8      A    Because at that point in my investigation, I
9  had not gotten there.
10     Q    And -- and you still haven't gotten there.
11 It's March of 2025; correct?
12     A    Yes, it is March.
13     Q    All right.  So you find three other images --
14 or three total images of what you believe was child
15 pornography on Mr. Lawshe's phone on the return from --
16 from Synchronoss; correct?
17     A    Yes, sir.
18     Q    How did you choose those images?
19     A    What do you mean, like, choose them?
20     Q    How did you pick them out of all of these
21 photographs?  How did you choose these three?
22     A    Based off reviewing them.  I don't really
23 know, like, what your question is.  Like --
24     Q    I mean, they just looked young to you?
25     A    No.  It was more than just looking young.

157

1  Looking young doesn't constitute CSAM.
2      Q    But, I mean, what about these -- because
3  you're the one that chose the images; correct?
4      A    Yes, sir.
5      Q    You picked these three images out of a lot of
6  different images.
7      A    Yes.
8      Q    Why did you pick these three images?
9      A    For the totality of the image.  So obviously,
10 reviewing the entire image in its -- excuse me -- the
11 image in its entirety.  That's how I formulated my
12 opinion that it was CSAM.
13     Q    And when you say in the entirety, what do you
14 mean?
15     A    Like, everything in the image, including the
16 female.
17     Q    Like, breasts, face?
18     A    Everything, yep.
19     Q    Genitals?
20     A    Everything, yep.
21     Q    Okay.  Explain to me why the third image only
22 has genitals.  And it's got no face.  It's got no
23 breasts.  Why did you choose that image?
24     A    That is the -- you're talking about the Big
25 Heart, right, that film?

158

1      Q    Right, yeah.  You charged that image; correct?
2      A    Yes.
3      Q    The only thing depicted in that image is a
4  vagina.
5      A    Uh-huh.
6      Q    What made you drawn to this particular vagina?
7          MR. CARSON:  Object to form.
8          MR. ROBERTS:  What's the -- what's the
9      objection?
10         MR. CARSON:  Did you ask what drew you to this
11     vagina?
12 BY MR. ROBERTS:
13     Q    Well, it's a picture of a vagina, isn't it?
14 Am I mischaracterizing it?
15     A    It's the way in which, I guess, you worded the
16 question because it's --
17         MR. ROBERTS:  I mean, it's a picture of a
18     vagina, and I'm asking her what drew her to this
19     particular vagina.
20         THE WITNESS:  I wouldn't say anything drew me
21     to that specific vagina the way you worded it.  But
22     that image does depict what I view to be CSAM.
23 BY MR. ROBERTS:
24     Q    I mean, it's not funny; right?  I mean, this
25 ruined my client's life, and I want to know what

159

1  specifically about this image of this vagina led you to
2  believe that the owner of the vagina was a minor.
3      A    And like I'm telling you, the image in its
4  entirety, including that zoomed-in image of her vagina,
5  is what made me believe that it was CSAM.
6      Q    What about the vagina made you believe that it
7  was CSAM?
8      A    I don't know specific medical terminology if
9  that's what you're looking for to describe it.  But I
10 can only describe it the best way that I can.
11     Q    Describe it the best you can.
12     A    That's what I'm saying.  The vagina in and of
13 itself is what made me believe that it was CSAM.
14     Q    But you can't point to anything in particular
15 about it that made you believe that it was a minor?
16     A    Not that I recall.  I can't specify a specific
17 terminology if that's what you're saying.
18     Q    You took that image to Dr. Dully, did you not?
19     A    Uh-huh.
20     Q    And what did she have to say about it?
21     A    Do you want me to read it?
22     Q    Yeah, please.
23     A    Okay.  The second image is imprinted with
24 script saying Big Heart and the file name, screenshot --
25 and then it has a list of numbers -- _duckduckgo.jpg.

160

1  This image shows a female child with her black top
2  parted and underwear down around her parted thighs,
3  exposing her genital area clearly.  She appears to have
4  no pubic hair development.  She does not appear to be
5  shaved.  This developmental appearance is also less than
6  or greater than 9 to 13.5 years of age.
7      Q    So the only anatomical description is -- is
8  that she says she appears to have no public hair
9  development.  Do you agree with that?
10     A    Do I agree that that's what she wrote?  Yes.
11 But --
12     Q    Okay.
13     A    -- her opinion, I can't speak for her opinion.
14     Q    Right.
15          And she does not appear to be shaved; correct?
16     A    That's what is written, yes.
17     Q    So, I mean, other than that, the only thing
18 that Dr. Dully highlights in this to suggest that she's
19 less than 9 to 13 years old is that she appears to have
20 no public hair development?
21     A    That I don't know.  I just know that that's
22 what is written in here.
23     Q    So I think -- and we'll mark this as
24 Exhibit 7.  This is the -- this is the model, I think,
25 in question.

161

```
1       MR. CARSON:  Object to form.
2       MS. SHEVLIN:  Michael, what's being marked as
3   Exhibit 7?
4       MR. ROBERTS:  It's the picture of the model.
5       MS. SHEVLIN:  With the passport, with the
6   Latvian passport?
7       MR. ROBERTS:  With the Latvian passport.
8       MS. SHEVLIN:  Thank you.
9       (Plaintiff's Exhibit 7 was marked for
10      identification.)
11  BY MR. ROBERTS:
12      Q    Now, you never actually saw the face or
13  breasts of this model; correct?
14      A    Nope.
15      Q    You just saw the -- is there a better word to
16  use, genitals?  I guess we can use genitals.
17      A    That's fine.
18      Q    I'm sorry if vagina is -- is offensive.  I'm
19  not trying to be.
20           Would you look at that person and say that
21  they're less than 9 to 13 years old?
22      MR. CARSON:  Object to form.
23      THE WITNESS:  Just based off this photo, I
24  wouldn't be able to give an age.
25
```

162

```
1   BY MR. ROBERTS:
2       Q    Right.
3       A    All I can see is just a face.
4       Q    She doesn't look nine, though; right?
5       A    I can't give a specific age just because I
6   don't have much to go off of.
7       Q    I'm not asking for a specific age, I guess.
8   I'm just saying, like --
9       A    Does she look less than 9?
10      Q    Does she look less than 9 to 13 and a half
11  years old to you?
12      MS. SHEVLIN:  Form.
13      MR. CARSON:  Join.
14      THE WITNESS:  I don't know.
15  BY MR. ROBERTS:
16      Q    You don't know.  Okay.
17           Why didn't -- why didn't you -- I mean, you
18  didn't try to find another image that -- I guess you
19  felt comfortable charging someone with possession of
20  child pornography based on an image that only showed,
21  like, belly button to genitals?
22      A    Yes, sir.
23      Q    This is a weird question.  But does that seem
24  fair to you?
25      MR. CARSON:  Object to form.
```

163

```
1       THE WITNESS:  Fair in what?
2   BY MR. ROBERTS:
3       Q    Like, if -- if Mr. Lawshe wasn't able to
4   locate these images on the Internet, like, he would have
5   never been able to, like, show the face of that
6   individual.  Like, does it seem like you're hiding the
7   ball at all by -- by charging an image that's clearly on
8   a website -- right? -- but you choose an image that
9   doesn't show any breasts and doesn't show a face?
10      MR. CARSON:  Object to form.
11      THE WITNESS:  I don't understand, like, your
12      question.  You're saying that it's not fair that we
13      choose an image based off the focal point of the
14      image?
15  BY MR. ROBERTS:
16      Q    Yeah.  Like, how would you ever defend
17  yourself?  How would Mr. Lawshe ever defend himself?
18  It's just a picture of genitals, and there's no context
19  to it.  How could he ever prove that that was an adult?
20      A    I'm not --
21      MR. CARSON:  Object to form.
22      THE WITNESS:  I'm not him, so I can't say how
23      he would defend his reasoning for that image.
24  BY MR. ROBERTS:
25      Q    It makes it a lot harder, though -- right? --
```

164

```
1   if you don't include breasts or -- or a face --
2   right? -- to defend it?
3       A    I wouldn't say that it would make it harder or
4   easier to defend.
5       Q    Do you think it's a reasonable position that
6   the -- that the model depicted in Photograph 7 is less
7   than 9 to 13 years old?
8       MR. CARSON:  Object to form.
9       THE WITNESS:  That I don't know --
10      MS. SHEVLIN:  Join.
11      THE WITNESS:  -- because all I can go off is
12      based off of face.  Like, that's the thing.  You
13      want me to say --
14  BY MR. ROBERTS:
15      Q    So you can't say that?
16      A    That I don't know, based solely off her face.
17      MR. CARSON:  We've been going about another
18      hour and a half.
19      MR. ROBERTS:  Let me just ask this question.
20      Then we'll take a break.
21      MR. CARSON:  Thanks.
22  BY MR. ROBERTS:
23      Q    If you can't say that, then how can you sit
24  here and say that you believe that she's a minor?
25      MR. CARSON:  Object to form.
```

165

1    THE WITNESS:  Because I wasn't looking at her
2  face in the --
3  BY MR. ROBERTS:
4    Q    No, no, no.  No, no, no, no, no, no,
5  Detective.  I asked you when you sat down.  I said
6  you've seen the pictures --
7    A    Yes.
8    Q    -- of them holding their passports.
9    A    Uh-huh.
10    Q    And you said you still, after seeing the
11  picture in the passport, believe that they are minors.
12  Do you recall that testimony?
13    MR. CARSON:  Object to form.
14    THE WITNESS:  Yes.
15  BY MR. ROBERTS:
16    Q    And now you've just testified that you have
17  no -- you can't look at that and tell at all what age
18  she is; correct?
19    A    Because your question was to, I think, that
20  she is less than 9 years of age or 9 to 13.  What I'm
21  saying is I can't say for certain if she's between that
22  specific age range that you gave me.
23    Q    But you can say --
24    A    So I don't want to misspeak.
25    Q    But you can say that she is, in your opinion,

166

1  less than 18 years old?
2    A    I'm saying that she could be.
3    Q    She could be?
4    A    Yes, sir.
5    Q    She could also be 20; right?
6    A    Yes.
7    Q    Is that the real reason that you -- you
8  haven't sought out these alleged victims of -- of child
9  pornography because you really don't know that they're
10  minors?
11    MR. CARSON:  Object to form.
12    THE WITNESS:  No.  That's not the reason that
13  I wouldn't do my job.
14  BY MR. ROBERTS:
15    Q    You don't know why you haven't sought them
16  out?
17    A    Why I haven't sought out?
18    Q    I mean, this individual right here, you -- you
19  said earlier that you believed that she was a minor.
20    A    Yes.
21    Q    Do you still -- okay.  Now, a lot's happened
22  in this testimony right now.  Do you still believe,
23  after what we've just been through, that she is a minor?
24    MR. CARSON:  Object to form.
25    THE WITNESS:  That she could have been a minor

167

1  at the time the photos were taken, yes.  I don't
2  know, obviously, her age now.
3  BY MR. ROBERTS:
4    Q    She also could have been an adult at the time
5  the pictures were taken; correct?
6    MR. CARSON:  Object to form.
7    THE WITNESS:  That she could have been.  I
8  don't know.
9    MS. SHEVLIN:  Form.
10    THE WITNESS:  Just like she could have been a
11  minor.  She could have been -- I don't know.
12  BY MR. ROBERTS:
13    Q    But the only evidence is that they were an
14  adult; correct?
15    MR. CARSON:  Object to form.
16  BY MR. ROBERTS:
17    Q    Currently, the only evidence -- actually,
18  there's -- there's a passport and there's a statement
19  from the records custodian.  That is the only evidence
20  of what their actual age is; correct?
21    MR. CARSON:  Object to form.
22    THE WITNESS:  I don't know based off that
23  redacted passport what her age is.
24  BY MR. ROBERTS:
25    Q    Okay.  But as we sit here today, isn't it true

168

1  that the reason you're not pursuing these cases is
2  because you believe that both of these models very well
3  may have been adults at the time the photographs were
4  taken?
5    MR. CARSON:  Object to form.
6    THE WITNESS:  No.
7  BY MR. ROBERTS:
8    Q    They could have been adults.
9    MR. CARSON:  Object to form.
10    THE WITNESS:  In my opinion, no.
11  BY MR. ROBERTS:
12    Q    They could not have been adults?
13    A    In my opinion, I don't think that they are
14  adults.
15    Q    You do not believe that this person could have
16  been an adult on the day that this picture was taken.
17    MR. CARSON:  Object to form.
18    THE WITNESS:  That I don't know.
19    MR. ROBERTS:  Okay.  We'll take a break.
20    THE VIDEOGRAPHER:  We are going off the record
21  at 3:56 p.m.
22    (Recess from 3:56 p.m. to 4:06 p.m.)
23    THE VIDEOGRAPHER:  This is the beginning of
24  Media Unit Number 3.  We are back on the record at
25  4:06 p.m.

169

1   BY MR. ROBERTS:
2       Q    Okay.  I want to circle back to -- now that
3   we've talked about all three images, I want to circle
4   back to the -- the idea that there was some disagreement
5   between -- or at least a question in the St. Johns
6   County office by -- I think you maybe recalled Detective
7   Greene questioning whether or not this was clearly a
8   minor or age-difficult?
9       A    I don't recall, like, who specifically.
10      Q    But someone.  Someone questioned that this may
11  be age-difficult or -- or an adult is another way to say
12  that?
13      A    Just age-difficult but yes.
14      Q    Right.  But age-difficult means that it might
15  be an adult?
16      A    It could be, yes.
17      Q    Right.
18           So I want to go back to the exhibit, and I've
19  done a terrible job of writing them down.  But the
20  statute, Florida Statute 27.071 [sic]?
21      A    Yes.  This?
22      Q    Correct.  And part of that --
23           MS. SHEVLIN:  Michael, I'm sorry.  What
24  exhibit number was this?
25           MR. CARSON:  I have it as 5, but --

170

1           MR. ROBERTS:  I think that's right.
2           MR. CARSON:  I'm not sure.
3           MR. ROBERTS:  I think that's right.
4           MS. SHEVLIN:  Thank you.
5   BY MR. ROBERTS:
6       Q    This is the Florida statute that we've
7   referenced.
8           So you're familiar with the idea that crimes
9   have elements?
10      A    Yes, sir.
11      Q    And there are, would you agree with me, two
12  requirements in this statute that, one, the possession
13  of the image must be knowing?
14      A    Uh-huh.
15      Q    Do you agree with that?
16      A    Yes, sir.
17      Q    And that the -- the individual who has
18  possession of it must know that it includes sexual
19  conduct by a child?
20           MR. CARSON:  Object to form.
21  BY MR. ROBERTS:
22      Q    Well, let's just read it because I'm just --
23  you know, let's just do this.
24           MR. CARSON:  Object to form.
25           MR. ROBERTS:  For me reading the statute?

171

1           MR. CARSON:  Yeah.  You can.  Go ahead.
2           MR. ROBERTS:  Okay.
3   BY MR. ROBERTS:
4       Q    You -- you -- this is the statute that you --
5   you charged Mr. -- that you sought the search warrant
6   for; correct?
7       A    Yes.
8           MR. CARSON:  Object to form.
9   BY MR. ROBERTS:
10      Q    You cited this statute?
11      A    The 827.071(5)?
12      Q    Yes.
13      A    Yes.
14      Q    And so you -- you were familiar with the
15  statute at the time that you sought the search warrant?
16      A    Yes, sir.
17      Q    And you didn't put a statute in there without
18  knowing what it was?
19      A    Yes, sir.
20      Q    Right?
21           And so at the time, you were familiar with
22  what was required to prove that someone was in
23  possession of child sexual abuse material?
24      A    Yes, sir.
25      Q    All right.  And I'll just read it real quick.

172

1   It is unlawful for any person to knowingly possess,
2   control, or intentionally view a photograph, motion
3   picture, exhibition, show, representation, image, data,
4   computer depiction, or other presentation which in whole
5   or part he or she knows to include any sexual conduct by
6   a child.
7           Did I read that correctly?
8       A    Yes.
9       Q    All right.  What evidence did you have that
10  Mr. Lawshe knew that this was a minor?
11      A    So that would be just based off of my opinion,
12  just like you're saying based off somebody else's
13  opinion, they can view that as age-difficult.
14      Q    So -- okay.  You've already testified that it
15  was your opinion that it looked to be a minor; correct?
16      A    Yes, uh-huh.
17      Q    You didn't know what age, but it looked to be
18  a minor to you?
19      A    Yes, sir.
20      Q    But you agree that someone else in the
21  sheriff's department expressed concern that it might
22  look like an adult; correct?
23           MR. CARSON:  Object to form.
24           THE WITNESS:  Age-difficult but yes.
25

173

BY MR. ROBERTS:

Q    Age-difficult but that means that it may be an adult; correct?

MR. CARSON:  Object to form.

THE WITNESS:  And it may be a child.  So age-difficult, like we said, it's -- it could be a child, or it could potentially be an adult.  That's why it's age-difficult.  We don't know what age range it is.

BY MR. ROBERTS:

Q    Correct.

So what evidence did you have that made you believe that Mr. Lawshe did not think that this was an adult?

A    So he could have gone off the same opinion as me, that that looked like a child.

Q    Right.  But we've already said that, like, you know, everybody's different, a point that you made earlier; correct?

A    Uh-huh, yes.

Q    And that's not only physically, but we also made the point that people's perception of age and aging other people is different; correct?

A    Yes.

Q    All right.  What I'm saying is what evidence

174

did you have that led you to believe that Mr. Lawshe thought that this was a minor?

A    So I can't speak on his opinion because I'm not him.  So I can't say that yes, he for sure thought that that was an adult or he for sure thought that that was something else.  Like, I can't speak on somebody else's opinion because I'm not them.

Q    Right.

A    So I don't want to speculate.

Q    But at the time, you knew that it was at least a possibility that he had obtained this off of a website?

A    That?  I don't know where he obtained it.

Q    You have to acknowledge that it was possible that he got this off of a website.

A    He could have gotten it off of anywhere.  So that -- I can't say, like, yes, he got it off that site or yes, he could have -- he could have gotten it off anywhere.  Yes, I will agree to that.

Q    But he could have gotten that off met-art.com?

A    Could have.

Q    Right.

And -- and if he had, he would have been told that this was an adult; correct?

A    That I can't say because I don't know if

175

that's what pops up when you first go on that site.  I can't speak on that.

Q    But if you'd have gone to the site -- I mean, Detective Greene -- we went through this -- has been to the site in this investigation.  And he's testified that it -- it does disclaim that the models are verified adults.  Do you have any reason to disagree with that?

MR. CARSON:  Object to form.

THE WITNESS:  What I'm saying is I don't know if that's same across the board.  I can't say what Mr. Lawshe saw when he went to that site, just like I can't say what Detective Greene -- I can only speak on what I know.

BY MR. ROBERTS:

Q    But if Mr. Lawshe got that image from that website, do you agree that it would be very difficult for you to establish that he knew that this was a minor?

A    That I don't know because when I review a case, it doesn't tell me where a person is getting an image from.

Q    Well, you have the ability to do that; right?  You have the forensic guy that can help you understand where each image is coming from; correct?

A    That's not --

MR. CARSON:  Object to form.

176

THE WITNESS:  That's not always the case.

BY MR. ROBERTS:

Q    It's the case in this -- in Mr. Lawshe's case, though.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    That I do not recall.

Q    I mean, you -- you had the availability -- Detective Greene testified to ability to access search terms, websites.  He could see the websites that he went to.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Do you have any reason to disagree that Detective Greene had the ability to see what websites Mr. Lawshe went to?

MR. CARSON:  Object to form.

THE WITNESS:  What I'm saying is just because you see what site somebody visited -- visits doesn't mean that that's the site that the image came off of or that's how they got it.  That's all I'm saying.  So I don't know how he got it.

BY MR. ROBERTS:

Q    That's correct.  But -- but what I'm saying to

177

1  you, what I'm asking you is -- and let's just frame it
2  as a hypothetical.  All right?  If Mr. Lawshe viewed
3  this on a website and was told that it was a verified
4  adult, wouldn't you agree that it would be very
5  difficult for you to show or believe that he thought
6  that it was a minor?
7      A    That I don't know because I can't speak on a
8  hypothetical what if because there are so many other
9  variables that can be hypothetically brought into it.
10 So I can't answer that.  Like, I don't know.
11     Q    Was there any evidence that you -- you had of
12 what he believed about this image?
13     A    What do you mean?
14     Q    Like, so you agree, like, in order for him to
15 be guilty of this crime, he would have to have no -- he
16 would have to know that the person is a minor?
17          MR. CARSON:  Object to form.
18          THE WITNESS:  Like, knowingly and
19     intentionally possessing it.  Like, that person in
20     his mind is a minor.
21 BY MR. ROBERTS:
22     Q    That's your understanding?
23     A    That's -- yes.
24     Q    And so the only basis, if I'm understanding
25 you correctly, is your personal belief that this was a

178

1  minor.  That's the only reason that you have to think
2  that he might have thought that it was a minor?
3      A    No, sir.
4      Q    What's the other basis?
5      A    I'm going based off the totality of it.
6  Obviously, my viewpoint and viewing as CSAM, having a
7  doctor certify that as CSAM, having multiple other
8  people in the office have the same viewpoint that yes,
9  this is CSAM.  Obviously, it's opinions.
10     Q    Okay.  So that's a great point.  You don't --
11 you had no idea -- I mean, you don't believe -- or did
12 you believe at the time that Mr. Lawshe was an expert in
13 aging individuals?
14          MR. CARSON:  Object to form.
15          THE WITNESS:  I don't know anything about him,
16     so I couldn't tell you.
17 BY MR. ROBERTS:
18     Q    Well, you know that he was a Florida Fish and
19 Wildlife officer; correct?
20     A    That was learned after I started this
21 investigation.  I didn't know prior to this
22 investigation who he was or what his job class was.
23     Q    But at the beginning of the investigation, you
24 were told that he was a Florida Fish and Wildlife
25 officer.

179

1      A    I don't remember verbatim if they told me
2  where exactly he worked.
3      Q    Okay.  I think it's -- if it's included in
4  your -- your papers, will you agree that you knew that
5  he was a --
6      A    During the course of the investigation, yes.
7      Q    You learned that he was a --
8      A    Yes, of course.
9      Q    Right.  Prior to his arrest, you knew that.
10     A    Yes, uh-huh.
11     Q    All right.  I'm trying to understand how --
12 and this is a little bit of a hard concept, but I -- I'm
13 trying to articulate it.  If you have a specific
14 illness, would you ever -- you'd go to a doctor to
15 diagnose that illness; right?
16     A    Are --
17     Q    It's just a general question.
18     A    Okay.  Like, are you saying if I had, like,
19 let's say, cancer, I would go to a cancer doctor?
20     Q    You'd go to a cancer doctor; right?
21     A    Yes.
22     Q    And that cancer doctor could give you a
23 diagnosis of what your problem was; right?  Correct?
24     A    Yes.
25     Q    Because he's an expert on cancer; right?

180

1      A    Yes.
2      Q    But you wouldn't go to somebody who is not a
3  cancer doctor to diagnose your cancer, would you?
4      A    I can't say I -- I wouldn't.  That probably --
5  if I'm sick, I would go to a doctor.
6      Q    A doctor; right?
7      A    Yeah.
8      Q    But not a -- but not someone who's not a
9  doctor?
10     A    Not a doctor, yes.
11     Q    Right?
12     A    Not someone who's not a doctor, yes.
13     Q    Right.
14          Here's what I'm getting at, is if it takes a
15 doctor to determine the age of someone, how can you
16 expect just an ordinary guy to be able to know what
17 their age is?
18     A    So I guess the easiest way to answer that is
19 it didn't take a doctor for me to be like, hey, this
20 person looks like a child, appears to be a child.  But I
21 did refer to a doctor as just an extra step to further
22 and kind of beef up the investigation, so to speak, so
23 there couldn't be, like, hey, did you take your extra
24 steps that you could have done, especially if there is
25 something that you're questioning.

181

1    Q    And so -- but officer -- officer or officers
2    in your department took the -- the opposite approach and
3    said, ah, I don't know.  This could be age-difficult.
4    It could be an adult.  Right?
5        MR. CARSON:  Object to form.
6        THE WITNESS:  That, what they specifically
7        stated I can't say because I don't know verbatim.
8    BY MR. ROBERTS:
9    Q    But -- but you remember something -- right? --
10   that they disagreed with the assessment that this was
11   clearly a child?
12   A    I do recall one person, yes, disagreeing, but
13   I just don't remember who specifically it was.
14   Q    Right.
15       And there's probably, like -- we're only
16   talking about, like, four people that would have been
17   involved in this?
18   A    No.  Because I -- oh, gosh.  I don't know at
19   the time because there was some movement in the office
20   of people going to different divisions, so I don't
21   remember offhand, like, how many people were still in
22   the unit.
23   Q    So if -- whoever this person was that
24   disagreed, if they were in possession of that, they --
25   they would not have been in knowing possession of child

182

1    pornography, would they?
2    A    What are you talking -- like, what are you
3    referring --
4    Q    This officer that -- your colleague who looked
5    at this and said, ah, this -- this is -- this could be
6    age-difficult or an adult, however they characterize it,
7    if they possessed this particular image, it would not be
8    a crime; right?
9    A    That I can't say.
10   Q    Well, they don't believe that it's a minor, do
11   they?
12   A    Yes.  But if somebody else was to -- let's
13   say, had that investigation and investigated that
14   officer and they felt the same way that I felt, it would
15   be a crime.
16   Q    So you -- you're -- you're the determiner of
17   what's a crime and not a crime?
18   A    No.  But I'm saying that they could have felt,
19   hey, I have probable cause for this specific crime.
20   Q    But -- but this is what I'm struggling with,
21   is you've acknowledged you've got no expertise as
22   anybody else in this room, yet you get to determine what
23   is and is not CSAM and what is or is not potentially a
24   crime.  And that doesn't seem right to me.  But is that
25   what you're saying; that's what it is?

183

1        MR. CARSON:  Object to form.
2        THE WITNESS:  That's not what I'm saying.  I'm
3        not saming -- excuse me -- saying that I'm the
4        judge and executioner of what is a crime.  What I'm
5        saying is that I felt that this depicted a child,
6        and I had that probable cause.  I had it reviewed
7        by another doctor.  I had it reviewed by a state
8        attorney, and that is why we proceeded with the
9        investigation.  But I'm not saying that I am the
10       end all/be all, no, sir.
11   BY MR. ROBERTS:
12   Q    Do you think that you conducted a reasonable
13   investigation prior to arresting my client?
14   A    Yes, sir, I do.
15   Q    And why -- explain to me why that
16   investigation did not include going to the website
17   met-art.com.
18   A    Because at that point in my investigation,
19   when I am trying to obtain probable cause for an arrest,
20   going to MetArt was not during that point in my
21   investigation.
22   Q    You knew that med-art.com potentially had
23   exculpatory information.
24       MR. CARSON:  Object to form.
25       THE WITNESS:  No, I did not.

184

1    BY MR. ROBERTS:
2    Q    You didn't know that websites like met-art.com
3    purport to have age verification documentation?
4    A    I did not know that that image would be on
5    MetArt, so I can't say for certain that yes, that image
6    would be on MetArt or that's where he got that image, is
7    what I'm saying.
8    Q    But the only reason you don't know that is
9    because you didn't conduct an investigation.
10   A    I did conduct.  Sorry.
11   Q    I think your answer was you did conduct an
12   investigation?
13   A    Yes, sir.
14   Q    No.  But your -- and forgive me, but your
15   argument is -- is, I think, circular.  You're saying you
16   didn't investigate because there was no connection
17   between the image and the website.
18       MR. CARSON:  Object to form.
19   BY MR. ROBERTS:
20   Q    And then you're saying what is -- I'm sorry.
21   So you're -- why didn't you investigate the website?
22   Why didn't you go to the website?
23   A    Because I'm saying at that point in time when
24   I was establishing my probable cause, at that point in
25   time in my investigation, the website in, I guess,

185

1  itself was not at the forefront of my investigation.  My
2  investigation was establishing probable cause.  That
3  image alone, based off the watermark, doesn't mean that
4  that's where the suspect could have gotten it from, is
5  all I'm saying.
6      Q    But you would only know that unless you, like,
7  went to the website or did an investigation into the
8  website and a little bit deeper into where the image
9  came from; right?
10         MR. CARSON:  Object to form.
11         THE WITNESS:  But what I'm saying is even
12     if -- going to that website doesn't automatically
13     mean that that image is going to be on it or that
14     is the same image that he viewed that I am viewing.
15  BY MR. ROBERTS:
16     Q    But you wouldn't know unless you -- unless you
17  went; right?
18     A    Yes.  But what I'm saying is --
19     Q    Right.
20     A    -- it's not a determining factor.
21     Q    Do you see how that's circular, though?  Like,
22  you're saying I didn't know because I didn't go, but I
23  didn't go because I didn't know.
24     A    No.  That's not what I'm trying to say.
25     Q    So sometimes you've said in your

186

1  investigations, you do go to websites like this; right?
2      A    Yes, sir.
3      Q    What's the difference in those cases and this
4  case?
5      A    Nothing that I can recall.
6      Q    Do you think it's reasonable to go to the
7  websites in those cases?
8      A    I wouldn't say that it's unreasonable, and I
9  wouldn't say that it's reasonable.
10     Q    But you can't articulate for me why you would
11  go to a website in one investigation but not in another.
12     A    Have a specific reason?  Not that I can
13  recall.
14     Q    You -- you've said several times now that
15  your -- that you were building probable cause.  Did I
16  understand you correctly?
17     A    No.  What I mean is in the course of my
18  investigation, establishing, obviously, probable cause
19  during that investigation.
20     Q    Is that your goal, is to establish probable
21  cause?
22     A    No.  It's to investigate the crime in its
23  entirety.
24     Q    That did not happen in this case, though, did
25  it?  You did not investigate the crime in its entirety

187

1  in this case, did you?
2      A    I feel like I investigated the crime.
3      Q    You -- you didn't investigate the known
4  potential source of the image, did you?
5      A    No.
6      Q    You didn't contact the website that you had
7  reason to believe was publishing this image, did you?
8      A    No.  Because at the time, there was nothing
9  telling me that, hey, this website for a fact published
10  this image.
11     Q    And the only way you know you would have known
12  that, though, would be to investigate it, which you
13  didn't do, did you?
14     A    No, sir.
15     Q    The victims in this case, you made no attempt
16  to locate or identify the victims in this case, did you?
17     A    I don't recall offhand.  I would have to go
18  back.
19     Q    Okay.  So you said you did a complete
20  investigation, but you didn't do a complete
21  investigation into the circumstances of these images on
22  this NCMEC report, did you?
23         MR. CARSON:  Object to form.
24         THE WITNESS:  I felt as though I did.
25

188

1  BY MR. ROBERTS:
2      Q    But, I mean, as we sit here today, there are
3  major gaps in your investigation, aren't there?
4          MR. CARSON:  Object to form.
5          THE WITNESS:  I don't think so, but it's
6      solely my opinion.
7  BY MR. ROBERTS:
8      Q    Do you think -- do you think that Mr. Lawshe
9  deserved to be arrested like this and for these things
10  to happen to him?
11     A    I felt that I had probable cause to arrest
12  him, yes, sir.
13     Q    But now, knowing everything that you had, now
14  that we've done the investigation -- Mr. -- Mr. Pierce
15  did the investigation and contacted the website.  With
16  all of that information, you don't have any regrets
17  about effectuating this arrest on Mr. Lawshe?
18         MR. CARSON:  Object to form.
19         THE WITNESS:  I think based off what I had and
20     the probable cause that I still had probable cause
21     to arrest him.
22  BY MR. ROBERTS:
23     Q    That's not my question.
24     Q    What is your question?
25     Q    My question is just, like, as a human being,

**189**

1 knowing what you know now, you don't regret ruining this
2 guy's life?
3          MR. CARSON:  Object to form.
4 BY MR. ROBERTS:
5     Q    You -- you understand that this ruined his
6 career in law enforcement; right?
7     A    Like I said, I don't personally know him, and
8 I did not personally follow up with him afterwards.  So
9 I don't know what occurred.  So I can't speak on
10 something that I don't know.
11     Q    FWC was actually in the room next to him when
12 you were interrogating him; correct?
13     A    That -- if I'm in a different room, I don't
14 know who's in the room next to me.  So --
15     Q    No one told you that his supervisors had been
16 called and brought down to the station at the time that
17 you were interrogating him?  No one told you that?
18     A    That I don't recall.  That would have been a
19 command staff level.  I'm not command staff.
20     Q    Okay.  Well, I'm representing to you that he
21 was fired.  Okay?  And I'm representing to you that this
22 has been a catastrophic thing that's happened in his
23 life.  Knowing what you know now, you don't -- you don't
24 feel any regret about -- about what's happened?
25          MR. CARSON:  Object to form.

**190**

1          THE WITNESS:  I don't know what answer you're
2     looking for.
3 BY MR. ROBERTS:
4     Q    You can say no.
5     A    Like --
6     Q    You can say no, I don't have any regrets about
7 this.
8     A    Well, what I'm -- my answer is do I think I
9 had probable cause?  Do I still feel, knowing everything
10 that I know now that I had probable cause to do the
11 arrest, yes.  And that's my answer.
12     Q    And nothing here has told you, man, I -- I
13 kind of wish I went to that website?
14     A    (Shakes head.)
15     Q    Nothing?
16          MR. CARSON:  Object to form.
17          THE WITNESS:  (Shakes head.)
18 BY MR. ROBERTS:
19     Q    Nothing that you've learned has told you, I
20 should have -- I should have reached out to this record
21 custodian?
22     A    Do I think that things could have been
23 different?  That is with every investigation that I
24 have.  You -- hindsight is 20/20.  When I look back at
25 investigations, like, hey, I could have done this

**191**

1 differently or, hey, I could have done X, Y, and Z.
2 That's with every investigation.  That's the only way
3 you learn.
4     Q    You were still learning when you were doing
5 this investigation?
6     A    Yes, sir.
7     Q    Did, at any point, you feel like -- I mean,
8 this is the only time that you've ever used Dr. Dully;
9 correct?
10     A    Yes, sir, uh-huh.
11     Q    I mean, at any point in time, did you feel
12 like maybe -- maybe someone else with more experience
13 should have handled this investigation?
14     A    That --
15          MS. SHEVLIN:  Form.
16          THE WITNESS:  -- I don't know, solely because
17     I can't speak for my sergeant because he was the
18     one that assigns out the investigations and picks
19     who they go to.  So that would have to have been a
20     question for him.  I just can't speak for him.
21 BY MR. ROBERTS:
22     Q    He personally knew Mr. Lawshe.  Did you know
23 that?
24     A    That I don't know, just because he's been in
25 law enforcement way longer than I have.

**192**

1     Q    Right.
2          So tell me, when did you make the decision to
3 arrest Mr. Lawshe?
4     A    This was after everything was reviewed by both
5 my sergeant, lieutenant, and then the state attorney.
6     Q    Okay.  If Dr. Dully would have told you that
7 she could not help you, would you have pursued charges
8 against Mr. Lawshe?
9     A    The case --
10          MS. SHEVLIN:  Form.
11          THE WITNESS:  -- wouldn't have stopped there.
12 BY MR. ROBERTS:
13     Q    So in a way, I guess your position is
14 Dr. Dully -- really, her -- her opinion was the deciding
15 factor in whether or not to proceed to -- pursue the
16 charges or not pursue the charges?
17          MR. CARSON:  Object to form.
18          MS. SHEVLIN:  Form.
19          THE WITNESS:  I can't say that.
20          MS. SHEVLIN:  Mischaracterization of prior
21     testimony.
22 BY MR. ROBERTS:
23     Q    Okay.  Well, let's just say -- I guess then,
24 if I'm mischaracterizing it, just to confirm, if
25 Dr. Dully, on February 22nd, would have told you, look,

193

1  I just can't help you for whatever reason, you would not
2  have sought a search warrant in this matter?
3      A    That I can't say because --
4      MS. SHEVLIN:  Form.
5      THE WITNESS:  -- it would have been reviewed
6  by my sergeant.  So I would have went back to the
7  office, informed my sergeant of everything that
8  occurred, and then it would have been his deciding
9  factor.
10  BY MR. ROBERTS:
11     Q    If, on April 5th, you had gone to Dr. Dully
12  and she would have said, I can't help you, would you
13  have made the decision to arrest?
14     A    It would have been the same answer.  I would
15  have gone back to my sergeant.
16     MS. SHEVLIN:  Form.
17  BY MR. ROBERTS:
18     Q    So when you said earlier that the
19  investigation which would have ended, that wasn't true.
20     A    I'm saying that I would have went back to my
21  sergeant, and he would have been the deciding factor.
22  So I'm sorry.  I misspoke on that.
23     Q    Right.
24     MR. CARSON:  If -- if I could, I think you
25  misheard what she said.

194

1      MR. ROBERTS:  Oh.
2      MR. CARSON:  Yeah.
3  BY MR. ROBERTS:
4      Q    I thought you said -- and it's on video, but I
5  thought you said, like, then this investigation would
6  have ended.
7      A    I don't recall, but if I did say that, then I
8  misspoke.  I would have went back to the office and
9  spoke with my sergeant.
10     MR. CARSON:  I don't -- I don't mean to
11  interrupt your questioning.
12     MR. ROBERTS:  No, no, no.  That's what I
13  heard.
14     MR. CARSON:  I think she said it would not
15  have ended.
16     MR. ROBERTS:  Oh.
17     MS. SHEVLIN:  That's why I said
18  mischaracterization (unintelligible).
19  BY MR. ROBERTS:
20     Q    So -- so Kathleen Dully, if -- if she would
21  have said, I can't help, you -- you -- you don't think
22  the investigation would have ended?
23     A    Yes.  I would have still went back to my
24  sergeant.  I would have reviewed everything again with
25  him in its entirety, including Dr. Dully's statement

195

1  that she would have provided.
2      Q    Uh-huh.
3      A    And then we would have decided how to proceed
4  forward.
5      Q    You can't say one or the other whether or not
6  you would have proceeded or not proceeded?
7      A    No, sir, I cannot.
8      Q    All right.
9      MS. SHEVLIN:  Form.
10  BY MR. ROBERTS:
11     Q    On the -- if you would have gone to the
12  website, if you had the photograph of the passport and
13  the information from the record custodian, can you say
14  as we sit here today whether or not you would have
15  proceeded in the investigation or not?
16     A    No.  Because there is more variables that
17  would have been in play with all of that.
18     Q    It definitely would have changed your --
19  the -- the analysis in what to do with the case?
20     A    I don't know if it would have changed what to
21  do with the case.
22     Q    It might have led to more investigations?
23     A    Yes.
24     Q    All right.  But do you agree that if prior to
25  making the arrest, you were presented with the passport

196

1  photographs and the information from the website that
2  you would have, at least, to have paused on a decision
3  to make an arrest at that point?
4      A    I can't say for certain because it all depends
5  on when we got that information, and there would be a
6  lot of factors that would have been in play.  So I can't
7  say if it would have been paused or if it would have
8  been the exact same.
9      Q    Or if it would have been completely different?
10     A    Yeah, or completely different.
11     Q    And so I think this is a really good point.
12  And I'm glad we're kind of going through this.
13  Sometimes it seems pointless.
14         If you would have had this information from
15  the website that Detective Greene got and Mr. Pierce
16  got, the passports, statement from the records custodian
17  and you had that in your investigative file prior to
18  making the decision to effectuate arrest, I think I
19  understand what you would have done is you would have
20  taken that to your supervisors?
21     A    Yes.  Everything goes through my supervisors.
22  So they see every part of that investigation because
23  they have to approve the reports.
24     Q    So, I mean, really -- I mean, I've asked this
25  question of Detective Tolbert.  He was your supervisor

197

1   at the time; correct?

2       A     Yes, sir.

3       Q     I mean, he said unequivocally, if I had these

4   passport photographs and this information, I would not

5   have arrested him.  You've got no way -- you didn't have

6   the power to disagree with him at that time, did you?

7           MR. CARSON:  Object to form.

8           THE WITNESS:  That wasn't there.  So --

9   BY MR. ROBERTS:

10      Q     Right.  I mean, that didn't happen.  I get

11  that.  No.  But I'm just saying, like, if you would have

12  brought the passport information and the record

13  custodian information, you would have brought that to

14  your supervisor; correct?

15      A     Yes, as with all this other information.

16      Q     As with all the other information?

17      A     Uh-huh.

18      Q     And you would have allowed them to make the

19  call?

20      A     It would have been a group discussion.  I

21  don't know if it would have been just one person because

22  I can't say, yeah, one person is solely making the call.

23  It would have been something that we would have talked

24  about with him, the attorneys, everybody involved in the

25  investigation.

198

1       Q     Who -- who was responsible for making the

2   decision to effectuate the arrest in this case?

3       A     That was something, like I said, that it was a

4   group discussion, where it passed multiple points.  It

5   passed not only the sergeant, the lieutenant as well as

6   the state attorney.  It wasn't solely just one person.

7       Q     You were involved in that decision?

8       A     Yes, because it passed multiple points.

9       Q     And was Sergeant Tolbert part of that

10  decision?

11      A     Yes, sir.

12      Q     Who was the -- who was the person in St. Johns

13  County Sheriff's Office that was responsible for that

14  decision?

15      A     I don't understand your question because --

16      Q     Where does the buck stop for that decision in

17  ICAC at the time that this arrest was made?

18      A     I guess I'm a little confused.  And please

19  correct me if I'm not going down the right path.

20      Q     Don't want you to.

21      A     But what I'm saying is it's not just one

22  person.  Like, it doesn't just stop at one buck.  Like,

23  it's multiple different people, including the state

24  attorney, that it has to go through before we even get

25  to that point.  So I can't just say, yeah, it's one

199

1   person because it's not, if that makes sense.

2       Q     But it wasn't you?  Was it you that made the

3   decision to make this arrest?

4       A     What I'm saying is it's multiple people.  I

5   agreed, if that's what you're saying, with the arrest as

6   well as everybody else that was reviewing it, if that

7   answers your question.  I don't know.

8       Q     Okay.  Did you make a recommendation to your

9   supervisors?  How did you present that to your

10  supervisors?

11      A     By doing the probable cause.  So I --

12      Q     So you did your probable cause affidavit for

13  the search warrant.

14      A     Yes, uh-huh.

15      Q     You stated there was probable cause, and then

16  you asked them to sort of sign off on that?

17      A     So they review it, yes.  But we also do have

18  to have somebody sign off on it.  But they review it as

19  well as the state attorney is reviewing the

20  investigation and obviously Dr. Dully's statements,

21  everything in its entirety.

22      Q     Okay.  So really, if there were this

23  information that we're talking about, the passports and

24  the website record custodian, Detective Tolbert's

25  opinion or testimony about that would be relevant on

200

1   what ultimately happened with the case?

2           MR. CARSON:  Object to form.

3           THE WITNESS:  I don't understand the question.

4   BY MR. ROBERTS:

5       Q     If -- if Detective -- if -- if Sergeant

6   Tolbert told you, we're not proceeding with this case;

7   we're not effectuating an arrest on Mr. Lawshe, that

8   would be the end of the story?

9       A     No.  I can't say that because it would still

10  go to multiple people.  Like, we would all --

11      Q     Who?

12      A     -- review it.

13      Q     Who?

14      A     The people I just listed, me, the state

15  attorney, my sergeant.  In that case, when we brought it

16  in, it was the lieutenant.

17      Q     Who's the lieutenant?

18      A     Because it switched.  I cannot remember if it

19  was -- oh.  I would have to refer back to that time

20  because we -- we now have our third lieutenant.  So

21  we've had different lieutenants during that time, so I

22  would have to refer back to who was working during that

23  time.

24      Q     Okay.  But you were responsible for presenting

25  the information to your superior and the state attorney?

201

1    A    Yes.

2    Q    Not every case that you have do you present to

3    the state attorney, do you?

4    A    If it's one that we're going to try to do a

5    physical arrest day of, yes.

6    Q    But if you make the decision that we're not

7    going to arrest, you don't -- do you have to get the

8    state attorney's involvement in that?

9    A    They do.  Especially if we're going to be

10   eventually forwarding charges, they're going to involved

11   in it.

12   Q    I'm sorry.  I'm asking actually a different

13   question.

14   A    Okay.  Sorry.

15   Q    If you make the decision that you're not going

16   to -- there was another image that was the subject of

17   the NCMEC report in this.  You're familiar?

18   A    Yes, uh-huh.

19   Q    You looked at it, and you discarded it.  You

20   said, no, this is not CSAM; correct?

21   A    Uh-huh, yes.

22   Q    Was that your decision?

23   A    Yes.

24   Q    Did you run that by Sergeant Tolbert?

25   A    Yes.  He reviewed the image as well.

202

1    Q    And he agreed with you?

2    A    Yes.

3    Q    Did you run it by a state attorney?

4    A    I don't recall.  I can't remember if we did or

5    didn't.

6    Q    Okay.  All right.

7         All right.  So I just want to encapsulate --

8    A    Okay.

9    Q    -- what -- what we've got here.  You've got

10   the NCMEC report from Detective Tolbert; correct?

11   A    Yes, sir.

12   Q    At the time that he gave it to you, you do not

13   recall whether or not he identified Mr. Lawshe as the

14   subject of the investigation or not?

15   A    I don't recall offhand.

16   Q    Okay.  But by the time that you applied for a

17   search warrant, you did understand that Mr. Lawshe was a

18   law enforcement officer with FWC?

19   A    Yes.

20   Q    All right.  After viewing the image and

21   reviewing the NCMEC report, you spoke with other

22   detectives in the unit about their opinions about what

23   this NCMEC -- initial NCMEC image showed?

24   A    Yes.

25        MR. CARSON:  Object to form.

203

1    BY MR. ROBERTS:

2    Q    And there was agreement between some people

3    that it -- that it depicted a -- a child -- and there

4    was some dissent from someone -- and you cannot remember

5    that person's name -- that it may not be a child and it

6    may be age-difficult?

7    A    Yes, if I'm recalling correctly.

8    Q    After that, the decision was made, and you

9    were introduced to Dr. Dully by Sergeant Tolbert?

10   A    Yes, sir.

11   Q    You took the image, on February 22nd, to

12   Dr. Dully?

13   A    Yes.

14   Q    You've already described the meeting that

15   you've had with her.  You went back to the office, and

16   sometime between then and February 28th, you executed an

17   affidavit in support of a search warrant; correct?

18   A    Yes, sir.

19   Q    All right.  Search warrant was issued;

20   correct?

21   A    Yes, sir.

22   Q    That was served on Verizon?

23   A    Synchronoss.

24   Q    Synchronoss?

25   A    Yes, sir.

204

1    Q    And they returned the data that you requested.

2    A    Yes, sir.

3    Q    You downloaded that data with Detective

4    Greene, his assistance?

5    A    I don't recall.  He may have assisted.  I just

6    don't recall for certain if he did or didn't.

7    Q    Okay.  You reviewed some of the pornographic

8    images on the phone once the download was complete?

9    A    Yes.

10   Q    You chose three images that were not -- one of

11   the -- those three images were not the original NCMEC

12   tip report; correct?

13   A    That is correct.

14   Q    You -- you -- you made the determination that

15   these appeared to be minors, in your opinion?

16   A    Yes, after reviewing them with Dr. Dully.

17   Q    Well, you made that determination, and then

18   you took them to Dr. Dully.

19   A    Yes, sir.

20   Q    Right?

21   A    Uh-huh, yes.

22   Q    Now, there are images in Dr. Dully's report,

23   and I'm glad we're talking about this.  Let's go to the

24   second report.

25   A    Okay.

205

1    **Q**   It appears that some of the images that you
2  had her review were not ultimately charged.  There's
3  more than three images reviewed in these two -- in these
4  reports.
5    **A**   Which one?
6    **Q**   So we've got the -- the February 22nd;
7  correct?  That image was never charged; right?
8    **A**   No, sir.
9    **Q**   Right?
10         So there's an April 5th, which it deals
11  with -- it sounds like you brought her additional images
12  of the same female child.  This is what this is saying,
13  from the NCMEC report.
14    **A**   And it's the one entitled D26?
15    **Q**   I previously examined a single color
16  photograph on a laptop entitled, yes, D26; right?
17    **A**   Yeah.  That was the NCMEC image, yes, sir.
18    **Q**   Right?
19    **A**   Uh-huh, yes.
20    **Q**   Today -- so -- so basically, she -- she goes
21  over her original opinion in the February 22nd.
22    **A**   Yes.
23    **Q**   Right?
24    **A**   Yes, sir.
25    **Q**   And then there's a -- a paragraph.  It says:

206

1  Today, you've shown me two additional images of the same
2  female child.  And they confirm my previous
3  determination that she is at most SMR 3 or 4 and,
4  therefore, again, less than 12 to 15 years of age.
5  Correct?
6    **A**   Yes, sir.
7    **Q**   You don't know what SMR 3 or 4 means?
8    **A**   Not that I can recall, no, sir.
9    **Q**   All right.  You don't know that SMR 4 could be
10  actually an adult?
11    **A**   Not that I can recall.  I don't know.
12    **Q**   Have you -- have you ever Googled that?
13    **A**   Not that I can recall.  I don't know.
14    **Q**   Have you ever looked into any just, like,
15  online literature about the controversial nature of
16  sexual maturity rating?
17    **A**   No, sir, not that I can recall.
18         MS. SHEVLIN:  Form.
19  BY MR. ROBERTS:
20    **Q**   Okay.  Those two images at the bottom of this
21  letter dealing with the original NCMEC and the two
22  additional images, those two images were charged.  Do I
23  understand that?
24    **A**   Yes.
25    **Q**   All right.  On the second April 5th letter --

207

1  and there's really no way to delineate them other than
2  this -- this deals with the Big Heart?
3    **A**   Yes.
4    **Q**   Right?
5    **A**   Uh-huh.
6    **Q**   The Big Heart is the only image here that was
7  charged?
8    **A**   Yes, sir.
9    **Q**   That was the third image; correct?
10    **A**   Uh-huh.
11    **Q**   Why didn't you charge on the -- the image on
12  the first paragraph, the YCBLVVFQ_0.jpg?
13         MS. SHEVLIN:  Form.
14         THE WITNESS:  I don't recall offhand why that
15    one wasn't charged.
16  BY MR. ROBERTS:
17    **Q**   Was it because this model had adult breasts
18  and --
19         MS. SHEVLIN:  Form.
20  BY MR. ROBERTS:
21    **Q**   -- because she did not have pubic hair?
22  Dr. Dully said she was SMR 1, which is prepubescent.
23    **A**   That wouldn't be a reason not to charge.
24    **Q**   Have you ever met a child that has adult
25  breasts and no pubic hair development?

208

1    **A**   That I can't recall off -- I can't remember
2  each child that I've met.
3    **Q**   But, I mean, like, does it seem really weird
4  to you that, like, a prepubescent child would have,
5  like, adult breasts?
6         MS. SHEVLIN:  Form.
7         THE WITNESS:  No.  That doesn't seem weird.
8  BY MR. CARSON:
9    **Q**   Doesn't seem weird to you at all?
10    **A**   No, sir.
11    **Q**   No pubic hair development because I'm pre --
12  prepuberty, but I have fully developed breasts.  That
13  doesn't seem odd to you?
14    **A**   Because I don't know if I'm --
15         MS. SHEVLIN:  Form, asked and answered.
16         THE WITNESS:  -- like you stated earlier,
17    looking at a child who's shaved or not.  So I
18    don't -- I can't say that just because I don't
19    personally see it with my naked eye.
20  BY MR. CARSON:
21    **Q**   Oh, no, no, no, no.  Excuse me.  I'm not
22  saying shaved.  I'm just saying this -- this child was
23  not shaved.
24    **A**   Yes.  But what I'm saying is I can't --
25    **Q**   Appears -- appears to be not -- not shaved;

209

1  right?  So have you -- have you -- does that not -- does
2  that strike you as normal or -- or odd that a 9- to
3  13-year-old child who is prepubescent and developed no
4  pubic hair would have adult breasts?
5      A    No, that does not seem odd to me as a female.
6      MS. SHEVLIN:  Form, asked and answered.
7  BY MR. ROBERTS:
8      Q    Okay.  If it doesn't sound weird to you, it's
9  fine.  That's okay.
10         All right.  Okay.  But in any event, you did
11  not charge him with possession of this?
12     A    I can't recall specifically why that one
13  didn't get charged.
14     Q    But it wasn't because it made no sense?
15     A    No.  We don't not charge --
16     MS. SHEVLIN:  Form.
17     THE WITNESS:  -- just because they have breast
18  development.  That's not a reason not to charge.
19  BY MR. ROBERTS:
20     Q    Not breast development.  It's Grade 4,
21  Grade 5.  Grade 5 is -- is -- that's an adult?
22     MR. CARSON:  Form.
23  BY MR. ROBERTS:
24     Q    That's as high as it gets?
25     MS. SHEVLIN:  Join, form.

210

1      THE WITNESS:  What I'm saying is I don't know
2   what that terminology means, so that's not a reason
3   for me not to charge for an image.
4  BY MR. ROBERTS:
5      Q    So -- but it's your lack of understanding in
6  what these terms mean that would lead you to, I mean,
7  make a filing decision?
8      MR. CARSON:  Object to form.
9      THE WITNESS:  No, sir.
10     MS. SHEVLIN:  Join.
11  BY MR. ROBERTS:
12     Q    How do you rely on these opinions if you don't
13  have really any understanding of what they mean?
14     MR. CARSON:  Object to form.
15     THE WITNESS:  What I saying is I'm relying
16  on a doctor --
17     MS. SHEVLIN:  Join.
18     THE WITNESS:  -- who has to attest to that.
19  BY MR. ROBERTS:
20     Q    So you're just --
21     A    I am not a doctor.
22     Q    You're just trusting that -- that Dr. Dully is
23  providing you with medical opinions within a reasonable
24  degree of medical probability?
25     MR. CARSON:  Form.

211

1      MS. SHEVLIN:  Form.
2      THE WITNESS:  Am I trusting her that she is
3   accurately describing these females?  I would say
4   yes, if that's --
5  BY MR. ROBERTS:
6      Q    Why?  Why do you trust her?
7      A    Why do I trust her?  Based off her experience.
8      MS. SHEVLIN:  Form.
9  BY MR. ROBERTS:
10     Q    Okay.  Do you know what her experience is?
11     A    I can't recall verbatim what her experience is
12  offhand.
13     Q    Okay.  All right.  So what -- and I'm just
14  going to ask you.  What would these images -- and the
15  images are what they are, and we're going to look at
16  them just here in a second.
17     A    Okay.
18     Q    What evidence would satisfy you that they are
19  an adult?
20     MR. CARSON:  Object to form.
21     THE WITNESS:  What do you mean?
22  BY MR. ROBERTS:
23     Q    What evidence would satisfy you that the
24  models depicted in these images --
25     A    Uh-huh.

212

1      Q    -- are, in fact, adults?  You say today that
2  you don't believe that they are; correct?
3      MR. CARSON:  Object to form.
4      THE WITNESS:  Yes.
5  BY MR. ROBERTS:
6      Q    What evidence would satisfy you that they are,
7  in fact, or were, in fact, adults at the time that the
8  photographs were taken?
9      MR. CARSON:  Object to form.
10     THE WITNESS:  I think that's a hypothetical
11  question.  I can't provide a hypothetical answer
12  and say, like, yeah, that's for sure my reasoning
13  because it would be hypothetically.  So I can't --
14  BY MR. ROBERTS:
15     Q    Well, it's your -- it was part of your job, at
16  least, to determine whether they were adults or minors;
17  right?
18     MR. CARSON:  Object to form.
19     THE WITNESS:  Not -- I don't -- I guess the
20  way you're describing it, that would be hard for me
21  to be, like, yeah, my job is to sit here and judge
22  this person's age, like, because it's not my job.
23  Because I can't determine, like, hey, that's for
24  sure somebody that's 18 or 19.
25

213

BY MR. ROBERTS:

1  Q    You -- you've testified that you, currently,
as we sit here with everything that you know, still
believe that these are -- these two models were minors
at the time the images were taken.

6  A    Yes, sir.

7  Q    My question to you is you've -- you've seen
passport -- government-issued IDs and an affidavit from
a record custodian.  That has not satisfied you that
they were adults at the time of the -- of the photo
shoot; correct?

12 A    I would say no, that it has not satisfied me.

13 Q    So what would?

14 A    Like I said, I can't speak on a hypothetical
because you're saying I've seen passports,
government-issued.  I don't know that they're
government-issued.  All I've seen is a redacted copy.  I
don't know.  So I can't speak on something that --

19 Q    What's -- what's redacted?

20 A    All of their personal information.

21 Q    Like, their name but not their birthday?

22 A    And the rest of the personal information.

23 Q    As we sit here today --

24 A    Yes.

25 Q    -- you believe someone has manipulated or

214

faked the IDs?

2  A    No, that's not what I'm saying.

3  Q    Well, enlighten me.  Is there a difference
between you -- you don't believe the date -- the birth
dates on the IDs but it's not fabricated?

6  A    No.  What I'm saying is I cannot formulate a
concrete opinion based off the limited information that
I have from that photograph.  That is what I'm saying.

9  Q    Which is you have the models' birthday, and
you -- and you have the date of the photographs;
correct?

12     MR. CARSON:  Object to form.

13 BY MR. ROBERTS:

14 Q    What more information would you need?

15     MR. CARSON:  Object to form.

16     THE WITNESS:  What I'm saying is I do not feel
comfortable formulating an opinion based off the
limited information that I had been provided.

19 BY MR. ROBERTS:

20 Q    And I'm just -- it's limited in -- in the name
because I think there's some privacy laws that protect
adults and -- and, you know, their choices that they
make about, you know, what they do for a living.  But, I
mean, you're a detective; right?  That's your job --

25 A    Uh-huh.

215

1  Q    -- is to determine and investigate what facts
are and are not; right?

3  A    Yes.

4  Q    But you can't sit here today and tell me
what -- what would satisfy you that these are or were
adults at the time?

7  A    Because it's a hypothetical question, and I
can't give you a hypothetical answer.

9  Q    Well, it's not a hypothetical question.  I
mean, my client was arrested and lost his career because
you did not verify their age.  And I'm asking you, what
would have verified their age for you?

13     MR. CARSON:  Object to form.

14 BY MR. ROBERTS:

15 Q    It's not a hypothetical.

16 A    And what I'm saying is the limited information
that I was provided I can't go based off of.

18 Q    Would you request a physical copy of their
passport?  Would a physical copy of their passport
satisfy you?

21     MR. CARSON:  Object to form.

22     THE WITNESS:  That I don't know.

23 BY MR. ROBERTS:

24 Q    Would a birth certificate?  Would that satisfy
you?

216

1      MR. CARSON:  Object to form.

2      THE WITNESS:  That I don't know because that
would have been another variable added to the
investigation that I would have reviewed.

5  BY MR. ROBERTS:

6  Q    How do you ever come to any sort of
conclusions?  I mean, you literally -- I mean, you were
a beat cop; right?  You worked as a patrol officer?

9  A    Yes, uh-huh.

10 Q    You just would pull people over and refuse to
believe their age on their ID?  Did you do that?

12 A    Did I pull people over and refuse to believe
their age?

14 Q    They produced an ID and maybe -- maybe -- did
you ever stop anyone for underage drinking?

16 A    Probably in the past, yes.

17 Q    And did they produce a -- a driver's license?

18 A    I've had people produce fictitious driver's
license.

20 Q    Okay.  Have you -- and real ones?

21 A    And real ones.

22 Q    And when they produced, did you believe the
information on -- on the ID, or were you satisfied that
that ID, like, accurately described their birthday?

25 A    That I can't speak on because that is a

217

1  completely different circumstance. You're talking about
2  a driver's license, and then you're talking about a
3  passport. And completely different. So I can't say
4  that yes, during that incident, as a road patrol
5  officer, doing, let's say, a traffic stop --
6      Q    Right.
7      A    -- that that sufficed. And this, doing an
8  investigation that is occurring over the -- like, it's
9  completely different. So I can't speak on that.
10     Q    What's -- what's completely different as a law
11 enforcement officer about verifying someone's age with a
12 passport or a driver's license?
13         MR. CARSON: Object to form.
14 BY MR. ROBERTS:
15     Q    What's different?
16     A    I just explained that. It is completely
17 different when I'm having something in hand, running it,
18 doing X, Y, and Z or --
19     Q    Okay.
20     A    -- whatever the case may be.
21     Q    All right. So --
22     A    It is a different circumstance --
23     Q    So --
24     A    -- as being on patrol.
25         MR. CARSON: Don't interrupt her. Let her

218

1  finish.
2  BY MR. ROBERTS:
3      Q    So if you had a physical copy or if you had,
4  like, an un-redacted copy, you could do all of the
5  things that you do with any other ID?
6          MR. CARSON: Object to form.
7          THE WITNESS: No.
8  BY MR. ROBERTS:
9      Q    You don't have access to Interpol/FBI
10 resources?
11     A    I work for a local agency, so no, I do not.
12     Q    You do not believe that your ICAC membership
13 gives you access to greater law enforcement resources
14 than just St. Johns County?
15     A    I did not say that. What I'm saying is I
16 personally do not have access to Interpol and everything
17 else that you just listed.
18     Q    But you -- you do. You could call the FBI.
19 You could call another law enforcement agency and say,
20 hey, I've got these passports; I need to verify that
21 they're real. You can do that; right?
22         MR. CARSON: Object to form.
23         THE WITNESS: I could attempt to do that.
24 BY MR. ROBERTS:
25     Q    And if you did that, would that satisfy you

219

1  that these were adults at the time that the images were
2  taken?
3      A    Like I said, I do not know.
4      Q    Okay. Let's -- let's -- did you bring some
5  documents with you today?
6      A    Yes. There's thumb drives and the redacted
7  images.
8      Q    And so for the record, I believe, based on
9  government-issued ID and the affidavit of an attorney
10 licensed in the state of California, that these images
11 were taken of adults at the time that the image was
12 taken. That's based on all of the information and
13 belief that I have.
14         You believe that you're holding child sexual
15 abuse material; correct?
16     A    Which is why it's redacted, yes.
17     Q    Okay. So I've made my statement on the
18 record. I believe this is legal based on all of the
19 information. Okay? Thank you.
20         So is this the NCMEC image?
21     A    Yes.
22     Q    Who -- wait. I didn't ask for redacted
23 images.
24     A    The un-redacted are on this thumb drive.
25     Q    Okay. Okay. All right. Okay.

220

1      A    I just don't feel comfortable printing out
2  un-redacted --
3      Q    Okay.
4      A    -- due to me feeling that they are CSAM.
5      Q    You think this is an adult?
6      A    Yes.
7      Q    All right. So no reason to -- do that,
8  redact anything, like --
9      A    I just redacted it because I don't know if you
10 want to see --
11     Q    Okay. You don't think that this -- you've
12 testified that this is not a photo shoot; correct?
13     A    I said that I cannot confirm that is a photo
14 shoot or not.
15     Q    She's wearing the same clothes.
16     A    Yes, she's wearing the same clothes.
17     Q    Same earrings?
18     A    Uh-huh.
19     Q    Background's the same. Curtains are the same.
20     A    Yes.
21     Q    Correct?
22     A    But that doesn't constitute that it is a photo
23 shoot.
24     Q    What do you mean by photo shoot?
25     A    You said that this is a photo shoot. Just

221

1  that alone in my opinion doesn't mean that it's
2  automatically a photo shoot.
3      Q    What -- what do you think a photo shoot is?
4      A    It could be a multitude of things to different
5  people.  What I'm saying, just because somebody's in the
6  same outfit does not mean it is automatically a photo
7  shoot.
8      Q    This top image is the image you charged him
9  with?
10     A    Uh-huh.
11         MR. CARSON:  Object to form.
12         THE WITNESS:  Yes, sir.
13 BY MR. ROBERTS:
14     Q    Let's write these down because we'll obviously
15 have to attach these as exhibits but --
16         MR. CARSON:  For what it's worth, you can ask
17 the witness, but I think there's identifying marks
18 on the back.
19         THE WITNESS:  Yes.  You might not be able --
20 because my handwriting is really bad, but I tried
21 to put the file name on it.
22 BY MR. ROBERTS:
23     Q    Sorry.  I can't read that.
24     A    Yeah.  It's -- it might be bad.
25         MS. SHEVLIN:  Is this the jump drive that --

222

1  there was one going to be delivered to our office
2  and one that was going to be delivered to Michael's
3  office?
4          MR. CARSON:  No, Amy, this is Matt Carson.
5  There's -- there's -- you're going to get a --
6  you're going to get a full hard drive of the
7  investigative file that we provided to plaintiff's
8  counsel.  I also have a thumb drive that has these
9  photographs, both redacted and un-redacted, that we
10 will get to you --
11         MS. SHEVLIN:  Okay.
12         MR. CARSON:  -- as soon as we can.  And maybe
13 you and I can just touch base offline --
14         MS. SHEVLIN:  Okay.
15         MR. CARSON:  -- and figure out the best way to
16 do that.
17         MS. SHEVLIN:  Sure.  Thank you.  Appreciate
18 it.
19 BY MR. ROBERTS:
20     Q    So I've just -- just put, like, A through F
21 here.
22     A    Okay.
23     Q    Okay?
24     A    Okay.
25     Q    So this is E.

223

1      A    Yes.
2      Q    Okay.  There's three images on that; correct?
3      A    Yes, sir.
4      Q    And you -- you charged him with the top image?
5      A    Yes, sir.
6      Q    All right.  Now, we'll attach this as -- it's
7  a composite exhibit -- 8?
8          MS. ZEPF:  I have, like, six pages of that.
9          MR. ROBERTS:  Yeah.  It's --
10         MS. SHEVLIN:  That sounds right.
11         MR. ROBERTS:  It's 8.  It's 8, I think.
12         All right.  So this --
13         MS. SHEVLIN:  Is it -- is it a composite of
14 all the images, Michael?
15         MR. ROBERTS:  Yeah.  So the exhibit will have,
16 like, a bunch of pictures on it.  Like -- yeah.  So
17 8 has A through F.
18         MS. SHEVLIN:  It's a composite of all the
19 images.
20         MR. ROBERTS:  That's correct.  It's A through
21 F, so it will be 8A through F.  Okay?
22         MS. SHEVLIN:  Gotcha.
23         (Plaintiff's Exhibit 8 was marked for
24 identification.)
25

224

1  BY MR. ROBERTS:
2      Q    All right.  So the top -- right?
3      A    Uh-huh.
4      Q    So this photograph identifies the model by
5  name, Sanija?
6      A    That I don't know because I don't know if it's
7  referring to obviously her, her, or another one.
8      Q    That's not true.  It says Big Heart right next
9  to it, and you identified -- you -- you understood that
10 Sanija was part of the Big Heart.
11     A    No.  What I understood was that it listed Big
12 Heart, but I don't know if that's the model obviously
13 presented as what they listed.  I don't know if that's
14 Sanija.
15     Q    Well, who do you think Sanija is?
16     A    That I don't know.
17     Q    I mean, take a guess.
18     A    Like I stated, I don't know.
19     Q    You can't make an educated guess about -- it
20 says AmourAngels Sanija/Big Heart, and then there's a
21 picture that says Big Heart on it.  You don't know --
22 you had no idea who Sanija is?
23     A    What I'm saying is I can't say for certain
24 that this person listed is what they view as Sanija.
25 No, I do not.

225

1   Q    But you can say for certain that it's a minor?
2   A    Yes.
3   Q    But you can't say that that's Sanija?
4   A    Because I don't know who Sanija is.
5   Q    Well, one way would be to go to the website
6   and search Sanija; right?
7   A    If that populates.
8   Q    Yeah.
9        You didn't do that?
10  A    No, sir.
11  Q    All right.  Detective Greene did that?
12  A    That I don't know.
13  Q    Okay.  This AmourAngels Karry chic, you don't
14  think she's a minor, do you?
15  A    That, I would have to review the image, like,
16  full on just because I can't tell based off this small
17  snippet of it.
18  Q    Who do you think Karry is?
19  A    That I don't know.
20  Q    You don't know.  Okay.
21  A    No.
22  Q    All right.
23       All right.  Now, this AmourAngels here, this
24  appears to be the cover of a print magazine.  Do you see
25  that?

226

1   A    Yes.  I'm looking.
2   Q    Does it appear to be a cover of a print
3   magazine?
4   A    I don't know if it's a magazine just because
5   it's only one image.
6   Q    Down here, we have AmourAngels, heaven of
7   sensuality.  That looks like the top of a -- of a
8   magazine or a header, banner, I guess, maybe for a
9   website.  What do you interpret that to be?
10  A    That, honestly, it could be anything because
11  it's a watermark so --
12  Q    So how would you, like, figure out what that
13  is?  If you wanted to figure out, like, what an
14  AmourAngels is, like, what would you do?
15  A    I could try to do, like, an open source query
16  on it.
17  Q    Okay.  Like, a Google search?
18  A    I don't know if I would do Google just because
19  I don't know if I feel comfortable doing Google, but I
20  could try to find another way to search it.
21  Q    I mean, you say you're not comfortable, but, I
22  mean, you have to be comfortable searching pornography,
23  and you are an ICAC investigator; right?
24  A    Yes.  But it's not just adult pornography.  If
25  I think this is child pornography, I don't want to just

227

1   go on Google and type it in.
2   Q    But the statute explicitly excludes your
3   possession of child pornography from the definition of
4   criminal possession, doesn't it?
5   A    That, I would have to review the statute in
6   its entirety.
7   Q    You know that -- I mean, you have the ability
8   to take that laptop with these images, and sometimes you
9   do have images of -- of actual child pornography;
10  correct?
11  A    On what?
12  Q    Your computer.
13  A    No.
14  Q    Or some digital format?  You have possession
15  of the images that you get through these various tips;
16  correct?
17  A    We have it housed in a database, which is the
18  IDS database.
19  Q    And you -- in this case, you put it on your
20  laptop?
21  A    On a thumb drive.
22  Q    Right.  So, I mean, you were in possession of
23  these images as you took them to Dr. Dully; right?
24  A    Yes.
25  Q    You did not think that you were committing a

228

1   crime, did you?
2   A    No.
3   Q    I mean, you understand that you have the
4   ability to research these things.  You have to have that
5   ability, or you couldn't research them; right?
6   A    Yes.
7   Q    So are you testifying that you hesitate to go
8   on the Internet to research whether or not these images
9   are actual CSAM or -- or they're adults?
10  A    No.  I wouldn't say hesitate.  I'd just be
11  more cautious on what platform and what I'm utilizing to
12  research this.  I just don't want to blindly go
13  searching for something and it pop up with more CSAM, or
14  it could potentially pop up with a virus.  You just --
15  you never know.
16  Q    Why would you want to avoid more CSAM popping
17  up?
18  A    I wouldn't say it as in, like, me avoiding
19  more CSAM.  It's me being cautious in what I'm doing.
20  Q    Aren't you looking for CSAM?  I mean, if you
21  did this and you found this treasure trove of child
22  pornography on a website, wouldn't you be like, oh, my
23  God, we've got to call the FBI; we've got to get --
24  we've got to shut this website down?  Right?
25  A    So I wouldn't say that I'm looking for CSAM

229

1  because that would make me, like, a suspect. I don't go
2  out intentionally searching for CSAM, if that makes
3  sense.
4       Q    It doesn't make sense. You're an
5  investigator. Your job is to investigate the
6  proliferation of child sexual abuse material; correct?
7       A    That is one part of our job, yes.
8       Q    And if you -- if you knew that AmourAngels not
9  only had Sanija but other minors on it -- right? --
10 don't you feel compelled as a -- as a law enforcement
11 officer to go and protect these victims of child sexual
12 abuse and get their images taken down off the Internet?
13      A    Yes.
14      Q    But you didn't do that in this case?
15      A    Did I go searching for that site? No, sir, I
16 didn't.
17      Q    Right.
18           But if you wanted to know what AmourAngels was
19 or what Sanija was, you could just Google or whatever
20 open source you're talking about. You could use the
21 Internet to discover what that was.
22      A    I could have attempted, yes, to see if that
23 populates.
24      Q    Most -- yeah. Most likely, you could have
25 just written out that line, September 27th, 2019. You

230

1  could probably have just gotten the exact match; right?
2  Big Heart, AmourAngels Sanija, September 27th, 2019?
3       A    I don't know if it would have been the exact
4  match.
5       Q    But, I mean, there's a good chance that it
6  would be; right?
7       A    That --
8            MR. CARSON:  Object to form.
9            THE WITNESS:  -- I can't say.
10 BY MR. ROBERTS:
11      Q    Okay. The only way you would know is if you
12 actually did the investigation; right?
13           MR. CARSON:  Object to form.
14 BY MR. ROBERTS:
15      Q    The only way that you'd know is if you
16 actually tried to discover it?
17      A    If I went searching for that site.
18      Q    Or this model, the name?
19      A    Yes.
20      Q    Right?
21           Okay.
22           Now, I don't see -- I mean, forgive me, but I
23 don't see the watermark. You have to open it up, and it
24 says met-art.com down there?
25      A    No. So when you look at the image, you'll be

231

1  able to see it. It's just the way this prints out, it
2  only does, unfortunately, that small snippet. I
3  don't --
4       Q    Okay.
5       A    -- know why it doesn't try to take up the
6  entire page but --
7       Q    So on the image, it's -- it's across the whole
8  page?
9       A    No, sir.
10      Q    Okay. How is it?
11      A    It's just like that, down at the bottom.
12      Q    Well, why does it not -- why are you saying
13 it's different on the printout than in real life?
14      A    No. What I'm saying is you see how you have
15 the white?
16           THE WITNESS:  Sorry.
17           MR. CARSON:  Go ahead.
18 BY MR. ROBERTS:
19      Q    But you're saying that -- all right. You're
20 shaking your head. I think she's trying to describe
21 when you print it out, it prints out differently than
22 what it looks on the thumb drive.
23      A    I'm just saying that it's not, like, a
24 zoomed-in version. When you print it out, it's only
25 printing out that big.

232

1       Q    Right.
2       A    So you see how you still have white around the
3  paper?
4       Q    Sure.
5           MS. ZEPF:  Would it be helpful to plug in the
6  thumb drive?
7           MR. ROBERTS:  Well, no.
8  BY MR. ROBERTS:
9       Q    It's just -- what you're saying is it's more
10 visible when you open it up on the thumb drive?
11      A    If you were to open it up, it would be, like,
12 this full page. The picture would be from top to
13 bottom --
14      Q    Okay.
15      A    -- rather than just this small.
16      Q    I mean, my eyes are getting bad in my old age,
17 but I can't read anything there. But you could read
18 that that was met-art.com?
19      A    When I looked at -- yeah. I didn't print it
20 out. So yes, when you look at the digital.
21      Q    When you look at the digital image, it's --
22 it's clearly present that it says met-art.com?
23      A    Yes, sir.
24      Q    That was my question; right?
25      A    Yes, sir.

233

1    Q    And it's not that way when you print it out.
2  It's not so obvious?
3    A    I don't know why it's not.  Yeah.
4    Q    Right.
5    A    I don't know why it didn't print out the
6  full --
7    Q    Right, right.
8         So did you ever have any suspicion that
9  Mr. Lawshe took these photographs?
10   A    That I can't say.  Yeah.  I don't know if that
11 ever crossed my mind.
12   Q    Okay.  You never believed that there was an
13 actual child that he was exploiting?  Like -- like --
14   A    That I don't know.
15   Q    You know what I'm saying?  But you didn't feel
16 like there was a child in eminent harm that he was
17 currently abusing?
18   A    Oh, like, in his home or something like that?
19   Q    Like, in his home or, like, a neighbor or
20 something like that.
21   A    No.  I don't think so.
22   Q    Right.
23        Because all of these images seem to be digital
24 images obtained from, I mean, most likely, the Internet;
25 right?  I mean, they have websites on them.

234

1    A    Yes.  They all appear to be digital images.
2    Q    Right.  And they -- and they all have a
3  website, like, literally written on the image?
4    A    Not all of them, I don't think.  So --
5    Q    So this one does.  I -- it's so
6  hard for me to see.  This one is the same --
7    A    That one I don't think.
8    Q    This is the same model, I think.
9    A    Yes.
10   Q    Yeah.  These do.  These all have; right?
11 So -- so let me just go through.
12   A    Okay.
13   Q    I think you're saying A does not have?
14   A    Yes.  I didn't see a watermark or anything
15 listed on that photo.
16   Q    On A.
17        When you saw this image, did you recognize
18 that it was the same image -- from the same model as in
19 the NCMEC?
20   A    They appear to look the same.
21   Q    When you -- when you first picked it out, you
22 said, like, oh, that looks like the same model as on the
23 NCMEC image?
24   A    I don't know if that's the first thing I
25 thought, but she does appear to be the same female.

235

1    Q    And it appears to be a different photo shoot
2  than the NCMEC image?
3    A    A different photograph, yes.  I don't know if
4  it's a photo shoot, so I can't say a different photo
5  shoot.  But a different photograph, yes.
6    Q    Her hairstyle is different.
7    A    Yes, uh-huh.
8    Q    She is in a different room.
9    A    I --
10   Q    So there's red walls in this, wooden floor.
11 So in B, we've got a wooden floor; correct?
12   A    Uh-huh.
13   Q    B is the NCMEC image; correct?
14   A    Yes.
15   Q    All right.
16   A    Yes, sir.
17   Q    And what I've got listed as A, that's a tile
18 floor; correct?
19   A    It appears to be tile.
20   Q    All right.  And there -- there's some sort of,
21 like, white columns in the background.  Can you see
22 that, like --
23   A    It almost looked like a window to me, but it
24 could be columns.
25   Q    Maybe.

236

1    A    I don't know.
2    Q    It looks completely different in the
3  background and the curtains --
4    A    Yes, different background.
5    Q    -- in this room; right?
6    A    Uh-huh.
7    Q    So fair to say -- I mean, you're an
8  investigator -- probably taken at different times?
9    A    That I don't know, if it would be taken at
10 different times.
11   Q    I mean, her makeup's different; correct?
12   A    Yes.  But I'm saying I don't know if it's
13 taken the same day and just -- you know, they switch
14 out.  I don't know.
15   Q    Right.
16   A    So I can't say.
17   Q    But, I mean, even if it's later, I mean, like,
18 she's changed her hair; correct?
19   A    Yes.  Different hairstyle, yes, sir.
20   Q    Different hairstyle.  Different jewelry.
21   A    Oh, yes, sir.
22   Q    Different makeup.
23   A    I don't know if they're wearing makeup but
24 yes.
25   Q    Okay.  All right.  So did -- I mean, I'm not

237

1  trying to be -- but, like, do you ever try to make
2  deductions from the evidence, like, deduce?
3      A    In what aspect?
4      Q    Like, that -- that this model, which is the
5  subject of the -- cyber tip, has been in multiple
6  photo shoots.
7      A    But like I said, I don't know if it's photo
8  shoots.
9      Q    Well, is she --
10     A    Are they in multiple photographs?  Yes.
11     Q    Yeah.  And there's three photographs where
12 she's wearing the same outfit, same makeup in the same
13 room; right?
14     A    Yes.  Yes, sir.
15     Q    Right?
16     A    Sorry.  Yes.
17     Q    B, C, and D; correct?
18     A    Uh-huh.
19     Q    And so, I mean, I don't know what you mean by
20 photo shoot.  But this is -- it appears that she's
21 posing; correct?
22     A    Yes.
23     Q    Right?
24     A    Uh-huh.
25     Q    It appears that there's a photographer taking

238

1  the picture?  They're not selfies?
2      A    I mean, she's not using --
3      Q    So there's a photographer in the room?
4          MR. CARSON:  Object to form.
5  BY MR. ROBERTS:
6      Q    Right?
7      A    That -- I don't know if it's one in the room
8  because I'm not there.
9      Q    But you're a detective.  Like, that's what I'm
10 talking about, like, a deduction.  Like, you're deducing
11 that someone is taking this photograph.
12         MR. CARSON:  Object to form.
13         THE WITNESS:  But what I'm saying is I can't
14     speak on that because I'm not there.  So I can't
15     say, yes, somebody's taking the photograph or, hey,
16     is that a still video.  Like, I don't know because
17     I'm not there.
18 BY MR. ROBERTS:
19     Q    Oh.  You mean, like, another person could be
20 taking a video?
21     A    What I'm saying is I don't know.  There could
22 be a multitude of things going on.
23     Q    Okay.  Does this have all the appearances of a
24 photo shoot?
25     A    Honestly, I can't really say for certain.

239

1      Q    Have you ever -- has anyone ever taken your
2  picture, like, professionally, like a headshot or --
3      A    Not offhand.
4      Q    -- school pictures?
5      A    School photos.
6      Q    Yeah.  They take, like, three or four
7  pictures, and maybe you, like, do something differently;
8  right?
9      A    Uh-huh, uh-huh.
10     Q    Would you consider that a photo shoot?  Maybe,
11 maybe not?
12         I mean, we don't need to belabor the point.
13 This -- this was a session where multiple photographs
14 were taken presumably -- and maybe you're not
15 comfortable presuming but presumably by a photographer
16 in different poses?
17     A    That -- yeah.  I just --
18     Q    Correct?
19     A    I just don't know if it was a photographer or
20 not.
21     Q    You're not comfortable presuming that there
22 was a photographer involved?
23     A    No, sir, I'm not.
24     Q    Okay.  All right.  So I understand your
25 position that -- I -- I guess what you're -- what you're

240

1  saying is is whoever presented these passports and the
2  affidavit from the records custodian is somehow
3  attempting to fool the ultimate consumer of this
4  content?
5      A    No, sir.
6          MR. CARSON:  Object to form.
7          THE WITNESS:  That's not what I'm saying.
8  BY MR. ROBERTS:
9      Q    So -- and I'm not playing word games with you.
10 Okay?
11     A    Yes, sir.
12     Q    You have seen pictures of the model depicted
13 in Picture A.
14     A    Yes.
15     Q    You have seen a picture of her holding a
16 passport; correct?
17     A    Yes, uh-huh.
18     Q    All right.  And there were representations
19 made about the date of the photo shoot.  Do you know
20 that?
21     A    What do you mean?
22     Q    So the record custodian says her birth date is
23 X, as -- as shown on the passport.
24     A    Okay.
25     Q    And the photo shoot was on this date.  So you

241

1  can do the math. She was an adult at the time of the
2  photo shoot. You're aware that that evidence exists?
3      MR. CARSON: Object to form.
4      THE WITNESS: That I cannot recall because I
5  do not recall.
6  BY MR. ROBERTS:
7      Q  Okay. All right. If it did say that, would
8  you accept that they're -- they were 18 at the time of
9  the photo -- photographs?
10     A  Like I stated previously, there's more
11 variables that would still be into play. Given if they
12 provided, let's say, that documentation, I would still
13 go about my case the same, and I would present all of
14 this information to obviously the state attorney --
15     Q  Right.
16     A  -- to my sergeant.
17     Q  So actually -- and I don't know -- we'll mark
18 this as 9.
19        (Plaintiff's Exhibit 9 was marked for
20 identification.)
21 BY MR. ROBERTS:
22     Q  What I think is -- of course, it's not what I
23 think.
24        Do you remember seeing this photograph?
25     A  Yes.

242

1      Q  Okay. Why -- and I want you to make a
2  deduction. You're an -- you're an investigator.
3      A  Uh-huh.
4      Q  Why does she have two passports?
5      A  That I don't know. Because it appears to be
6  from another country, so I don't know if that's how that
7  country does it. I don't know.
8      Q  Have you -- you've run into people with fake
9  IDs?
10     A  Fake driver's license, yes.
11     Q  Fake -- fake ID; right?
12     A  Uh-huh.
13     Q  Okay. Do they usually present two fake IDs to
14 you at the same time?
15     A  I can't recall.
16     Q  That ever happening, can you?
17     A  That I don't know. It could have happened.
18     Q  Right.
19     A  I just can't recall --
20     Q  Right.
21     A  -- because that was years ago.
22     Q  If I -- don't you agree, like, if -- if she
23 was trying to deceive, this model was trying to deceive
24 someone about her age, using manipulated passports,
25 there would be no reason for her to show two passports?

243

1      MR. CARSON: Object to form.
2      THE WITNESS: That I don't know because I
3  don't know how that country operates or if that's
4  the norm. So I don't know. I can't speak on that.
5  BY MR. ROBERTS:
6      Q  Did you notice that in the two -- did you ever
7  look at the passport photographs?
8      A  Yes.
9      Q  Does she look appreciably younger to you in
10 one of the passport photos?
11     A  In both of them, she looks pretty young.
12     Q  No, no, no. Does she look younger in one of
13 the passport photos than she does in the other passport
14 photo?
15     A  Based off this, it's kind of hard to tell
16 because it's in the black and white, so I -- I don't
17 know.
18     Q  You can't -- you can't look at these and say,
19 oh, she looks younger in one of the pictures than she
20 does in the other picture?
21     MR. CARSON: Object to form.
22     THE WITNESS: Based off that photograph, no.
23 Because they're -- it's in black and white, and
24 it's kind of hard to see.
25

244

1  BY MR. ROBERTS:
2      Q  You -- you saw a digital copy of this
3  photograph originally; right?
4      A  Yes, yes.
5      Q  Okay. Did you take the chance to look at the
6  photographs at that point in time?
7      A  Yes. I do believe so.
8      Q  Do you recall looking at the images of the
9  passports?
10     A  Yes.
11     Q  Did you see anything untoward about them?
12     A  Not that I recall.
13     Q  Anything on the passports that led you to
14 believe that they had been faked?
15     A  That I don't know because I don't know how
16 that country's passports are supposed to look.
17     Q  Okay. All right. And did you ever -- this
18 was the only image that you ever saw on -- on
19 Exhibit 8E, the top -- the Big Heart. This was the only
20 image of this particular model that you ever saw?
21     A  That I don't recall.
22     Q  There's a QR code on that image as well. Do
23 you see that?
24     A  Yes, I see it.
25     Q  Do you know what a -- a QR code is?

245

1    A    Yes.
2    Q    What is a QR code?
3    A    How to describe it in laymen's terms, it's --
4  I guess the easiest way is you can scan it, let's say,
5  on your phone or on an iPad, and it will usually take
6  you to another link.
7    Q    Did you ever try to use that QR code --
8    A    No.
9    Q    -- to see what link it took you to?
10   A    No, sir.
11   Q    Do you believe or do you have -- do you think
12 that there's a possibility that if you use that QR code,
13 it might take you to something that's related to that
14 image?
15   A    That I do not know.
16   Q    Do you think if I asked you to guess, like,
17 would you say that it could?
18   A    That I don't know because it would be a
19 hypothetical answer.
20   Q    You -- you would have to actually do that
21 investigation to know what that went to.
22        MR. CARSON:  Object to form.
23 BY MR. ROBERTS:
24   Q    You'd have to scan it to know what it went to;
25 right?

246

1    A    You mean scan that QR code --
2    Q    Scan that QR code.
3    A    -- to know for certain?
4    Q    Yeah.
5    A    Yes, sir.
6    Q    All right.  Did you attempt to scan that QR
7  code?
8    A    I just said no.
9    Q    Okay.
10        MR. ROBERTS:  Let's just take five, and I
11 think we're -- I think we're done.  But let's take
12 five minutes.
13        THE WITNESS:  Okay.
14        THE VIDEOGRAPHER:  We are going off the record
15 art 5:23 p.m.
16        (Recess from 5:23 p.m. to 5:32 p.m.)
17        THE VIDEOGRAPHER:  We are back on the record
18 at 5:32 p.m.
19 BY MR. ROBERTS:
20   Q    I'm going to show you Exhibit 8, Subsection E,
21 and just take a look at that again.
22   A    Yes, sir.
23   Q    All right.  And the top image here is the one
24 that was charged; correct?
25   A    Yes, sir.

247

1    Q    Now, this appears to be a screenshot from his
2  phone?
3    A    I don't know if it's from his phone, but it
4  does appear to be a screenshot.
5    Q    Right.
6        And are you comfortable acknowledging that
7  this is most likely from the Internet?
8    A    This?
9    Q    These images were obtained most likely from
10 the Internet?
11   A    That I don't know.
12   Q    So we've got a screenshot.  What other way do
13 you think that a person could get an image like this on
14 their phone, like, this particular array of images, if
15 it wasn't a screenshot of, like, a website or something
16 on the internet, social media, some Internet platform?
17   A    Because it could have been a screenshot sent
18 from somebody else to them, so I don't know obviously
19 where specifically this screenshot image came from.
20   Q    Fair enough.
21        Someone could have sent him a screenshot;
22 correct?
23   A    Could have sent, yes, this image.
24   Q    But whoever -- whoever took the screenshot
25 most likely got the images off of the Internet; right?

248

1    A    That I don't know.  I could speculate and say.
2    Q    Yeah.  Speculate for me.
3    A    Possibly but I don't know.
4    Q    How would you find out?
5    A    Based off this image?
6    Q    Right.  How would you find out?
7    A    With it being a screenshot, I would probably
8  refer to one of our digital guys because they work in
9  this realm a lot more than I do.
10   Q    You -- you wouldn't just go to an open source
11 and just, like, Google that to see if it popped up on
12 the Internet?
13   A    I don't know offhand.
14   Q    Okay.  All right.  Okay.  So there was a rumor
15 that -- that Detective Tolbert repeated in his
16 deposition that there was some evidence that Mr. Lawshe
17 had scrubbed his phone.  Did you ever hear anything like
18 that?
19   A    That I don't recall.
20   Q    He didn't recall who told him either.
21   A    Yeah.  I don't --
22   Q    Do you recall hearing something like that?
23   A    Honestly, I don't recall that information.
24   Q    Did you tell Sergeant Tolbert something like
25 that?

249

1    A    That I do not recall, saying that he scrubbed
2    his phone.
3    Q    Do you have any -- is there -- was there ever
4    any suspicion that he scrubbed his phone of -- of
5    illicit images?
6    A    That I do not know.
7    Q    But you're -- you're the investigator.  You're
8    the detective in charge of this case; correct?
9    A    Yes, sir.
10   Q    And you don't know?  Who would I ask?  Who
11   would I ask to know if there was a suspicion that he had
12   scrubbed illegal images off of his phone?
13          MR. CARSON:  Object to form.
14          THE WITNESS:  I don't know specifically who
15          stated that, so I don't know who you would ask
16          to be able --
17   BY MR. ROBERTS:
18   Q    I'm asking you as the lead investigator in
19   this case, did you ever have any concern that my client
20   had deleted or scrubbed any files or images off of his
21   phone?
22   A    What I'm saying is I don't know, and I don't
23   recall hearing that.  So I can't speak on it.
24   Q    I'm not asking --
25   A    Yes.

250

1    Q    I'm going to ask the question until you answer
2    it.  Okay?  Did you have any concerns or information
3    that Mr. Lawshe scrubbed his phone or deleted any images
4    from his phone that were illegal?
5    A    And what I'm saying is I don't recall hearing
6    that or having information that that occurred, so I
7    don't know.
8    Q    Okay.  So you say you don't know.  I'm asking
9    if you had a concern.  Okay?  I'm not asking if you
10   heard somebody else.  So the answer is I either had a
11   concern or I didn't have a concern.  I mean, I guess you
12   might say that I don't remember if I had a concern or
13   not.
14          But my question is did you ever have a concern
15   that he scrubbed or deleted any illegal images off of
16   his phone or any electronic device?
17   A    Like I'm saying, I cannot recall that
18   occurring or having that thought.  Like, I can't
19   remember.  So I don't want to speak on something that I
20   don't remember.
21   Q    So I guess your answer is you don't remember
22   if there was any evidence that he had scrubbed illegal
23   images off of his phone or not?
24   A    My answer is I don't recall that occurring, so
25   I don't know.

251

1    Q    So you just don't remember if that was
2    something you were concerned with or not?
3    A    What I'm saying is I don't recall, so I can't
4    tell you if that's something that I was concerned with
5    or something that I wasn't because I do not recall.
6    Q    Okay.  All right.  And you were the lead
7    detective in charge?
8    A    Yes, sir.
9    Q    All right.
10          We -- you did seek another search warrant for
11   his home; correct?
12   A    Yes, sir.
13   Q    And you obtained two additional devices from
14   his home?
15   A    I don't recall.  I would have to review what
16   was taken because I wasn't on scene when that occurred.
17   Q    Well, let me ask you this:  Did -- all of the
18   three images that he was charged with were from his
19   personal cell phone device?
20   A    I don't recall.  I would have to look back at
21   the Cellebrite extraction.
22   Q    Okay.  Why did you not charge -- there's --
23   one, two, three -- four images of -- let's call her the
24   model from the NCMEC.
25   A    Yes, uh-huh.

252

1    Q    Why did you not charge her [sic] with all of
2    the images?
3    A    You're talking about all of the ones that we
4    have on this table?
5    Q    No, all of the images of the model that was
6    the subject of the NCMEC report.
7    A    Because, like, for instance, this image, I
8    would have to go back to the Cellebrite report.  But if
9    it was not on the device at the time that he physically
10   had it, we wouldn't have charged for it.
11   Q    Why not?
12   A    Because he wouldn't have been physically in
13   possession of that image.
14   Q    But Synchronoss had told you that he had
15   downloaded it.
16   A    That, I don't know if they stated downloaded,
17   but at some point in time, that image was viewed.
18   Q    Okay.  So there's three images.  Let's take
19   out B.
20   A    Okay.
21   Q    Okay?  Because you're saying that you don't
22   believe that was on the -- the download.  There's three
23   images, A, D, and C.  You did not charge for those
24   images, all of those images.  Which images did you
25   charge and why not the other?

253

1    A    I would have to look back at the image names
2    to be able to determine which ones were charged --
3    Q    Okay.
4    A    -- on it.
5    Q    Well, why would you have not charged all
6    three?
7    A    All three of these?
8    Q    Correct.
9    A    This image, I do not believe that was one of
10   the ones that was charged, but I would have to refer
11   back.  But I don't recall why it wasn't.
12   Q    You don't recall?
13   A    Why this image was not charged, no.
14   Q    And -- but this top image in E was charged;
15   correct?
16   A    Yes, sir, uh-huh.
17   Q    Can you tell me why that image was charged?
18   A    Because like I said, I viewed it as CSAM, and
19   we also got that confirmed by Dr. Dully.
20   Q    Yeah.  But so -- so are these.
21   A    Uh-huh.
22   Q    And you didn't charge those.
23        MR. CARSON:  Object to form.
24        THE WITNESS:  I would have to review, but --
25   and I don't want to misspeak.  But I would have to

254

1    look back at the PC to see if these images were
2    charged.
3    BY MR. ROBERTS:
4    Q    Well, there were only three images charged.
5    A    Yes.
6    Q    And -- and we're looking at a total of what,
7    five, six images?
8    A    Yes.
9    Q    We know one, you just determined it was an
10   adult.
11   A    Uh-huh.
12   Q    Right?
13        One wasn't on his phone.
14        MR. CARSON:  Object to form.
15        THE WITNESS:  That I don't know.
16   BY MR. ROBERTS:
17   Q    You don't know, but it wasn't charged.
18   A    No, it was not charged.
19   Q    You're not -- you're not sure why it wasn't
20   charged?
21   A    No.  I'm saying I know that one was not
22   charged.  I do not remember why this one was not
23   charged.  But three images within this were charged, is
24   what I'm saying.
25   Q    You didn't charge A?

255

1    A    I do not recall.  I would have to look back at
2    the image name, the file name, on the PC.
3    Q    Isn't that the file name right there?
4    A    Yes.  But what I'm saying is I would have to
5    refer back to my PC that lists the file names that were
6    charged.
7    Q    On your arrest and booking report or on the
8    charging document?
9    A    It should be on both.
10   Q    I mean, is there a reason -- can you --
11   whether you -- you charged that or not, is there a
12   reason why you wouldn't have?
13   A    I think there's some confusion because within
14   these images are the charged image.  So that's where I'm
15   kind of confused by your question.  Because I included
16   the NCMEC image -- the two NCMEC images, the three
17   images that were charged and then another image.  So
18   you're saying that I didn't charge on these images, but
19   included within this pile are the charges.  So that's
20   why I was --
21   Q    That's correct, yeah.  No, no.  And I --
22   A    That's why I'm a little confused by what
23   you're saying.  Because you're saying that I didn't
24   charge on these images, but what I'm saying is included
25   in these images are the three that's charged.  So

256

1    something would have had to have been charged.
2    Q    Yeah.  And I guess you just don't know why you
3    charged two but not three of those images of the NCMEC
4    model?
5    A    What I'm saying is I don't recall why this one
6    was not charged.  Yes, I don't recall.
7    Q    You're saying that the YCBLDV was not charged?
8    A    What I'm saying is that potentially, but I
9    would have to review that to see.
10   Q    But I'm not really asking you which were
11   charged and not.  I'm asking you why all three of these
12   images were not charged.  Why did you just choose two
13   and not three?
14   A    I'm very confused by what you're asking.
15   Q    Okay.  There are three pictures of this model.
16   A    Yes.
17   Q    Okay?
18   A    Yes.
19   Q    A, D, and C.
20   A    Uh-huh.
21   Q    Okay?  And it doesn't really matter which one
22   was charged or not charged; right?  But only two of
23   these images were charged; correct?
24   A    Yes, if these were the images that were
25   charged.

257

1   Q    Well, I've asked you to bring all of the
2   images; right?
3   A    Yes. But what I'm saying is I would have to
4   review the file name because I've looked at these images
5   so much that I don't know what file name is associated
6   with each image. That's all I'm saying, is I would have
7   to review the file name attached to that PC.
8   Q    You're just not understanding my question.
9   Okay? I'm not asking which --
10  A    Probably.
11  Q    -- which images were charged on. Okay? I'm
12  not asking that question.
13  A    Yes.
14  Q    But there are more images than there are
15  charges.
16  A    Yes. I get that.
17  Q    You understand.
18  A    Yes.
19  Q    One of these of the NCMEC model was not
20  charged because you don't think you could find that on
21  the phone.
22  A    Yes.
23  Q    Right?
24       So that leaves us with three images of the
25  same model that was in the NCMEC picture; right?

258

1   A    Yes.
2   Q    And then you have a second model that we've
3   already talked about; right?
4   A    Uh-huh.
5   Q    That's four images of what you consider to be
6   CSAM on his phone. I'm just asking why you would only
7   charge three of those images and not all four of those
8   images.
9   A    Yes. But that's why I stated I don't recall
10  why one of the images was not charged. I would have to
11  go back and review it. I -- maybe that was not heard.
12  Q    Okay. You think if I showed you which image
13  it was that you would remember?
14  A    Why it was not charged? No, just by seeing
15  it. Because I'm looking at them now. Like, I still --
16  even with looking at them, I can't recall why a specific
17  image --
18  Q    So it doesn't really matter if you know which
19  images were charged or not. You're not going to
20  remember why a specific image was not charged?
21  A    Yes. That's what I'm saying. I thought you
22  were saying why were these not charged, and that's why I
23  was like, no, I'm pretty positive these were. But --
24  Q    No. I'm just -- for some unknown -- for some
25  unknown reason, you just decided not to charge

259

1   Mr. Lawshe with possession of one of these images?
2   A    That, I don't know the reason.
3   Q    You just don't know the reason. That's why I
4   said unknown reason.
5   A    Yes.
6   Q    Right. Okay.
7   A    Sorry. I got confused with the way you asked
8   it.
9   Q    That's okay.
10       All right. I think those are for the court.
11       You were in no way part of the decision to
12  drop the charges?
13  A    No, sir. That was the State Attorney's
14  Office.
15  Q    And I just -- I just want to make sure. Your
16  testimony today is that other detectives in -- in your
17  department, that you ran these images by them after your
18  initial review and they weighed in on whether they
19  thought that it was CSAM or not?
20  A    What images are you referring to?
21  Q    The charged images.
22  A    Yes, sir.
23  Q    You -- after you looked at them, you took them
24  to Detective Greene?
25  A    I don't remember verbatim who I took them to,

260

1   just because it was two years ago. So I can't recall
2   who specifically viewed them.
3   Q    In your deposition, you testified that for
4   sure, you ran it by Detective Greene.
5   A    So maybe he viewed it. I just don't recall.
6   Q    Detective Camden?
7   A    I don't recall if he was back from maternity
8   leave at that point.
9   Q    Tolbert?
10  A    Sergeant Tolbert would have reviewed them.
11  Q    After your initial investigation?
12  A    What do you mean, like, after the initial --
13  Q    Like, after -- after you got the NCMEC to --
14  after you did your search warrants, he would have
15  reviewed them --
16  A    Oh, yes.
17  Q    -- and been part of the decision that these
18  are, in fact, CSAM images?
19  A    Yes, sir, uh-huh.
20  Q    Right?
21       Other than Greene and Tolbert, who -- who
22  would have been your colleagues that you ran these by?
23  A    I don't recall who was in the office during
24  that time.
25  Q    So you don't -- you don't know of anybody

261

1 else?

2    A    Offhand, I don't recall who else.

3    Q    Who were the other detectives at that time

4 in -- in ICAC?

5    A    It was in 2023.  So we had, I believe,

6 Detective Jimenero (phonetic), but I don't know if he

7 would have been -- I don't know --

8    Q    Okay.

9    A    -- if they would have been in the office at

10 that time.

11    Q    Camden, maybe, maybe not?

12    A    That I just -- I can't recall specific, who.

13    Q    Okay.  All right.  So you don't know -- you

14 don't have a specific recollection of who you ran this

15 by?

16    A    No, sir.

17    Q    Detective Greene has testified that he did not

18 have any part in saying whether these were CSAM or not

19 CSAM.  Do you disagree with that testimony?

20    A    What I'm saying is that if I stated back in

21 that original depo that he viewed them, then he would

22 have viewed them.  Now, if he doesn't recall it, he

23 doesn't recall it.

24    Q    Okay.  All right.  Have you ever reached out

25 to the FBI?

262

1    A    In reference to?

2    Q    ICAC issue.

3    A    Like, what exactly?

4    Q    In any investigation that you've done as an

5 ICAC or SVU, have you ever reached out to the FBI for

6 help?

7    A    Possibly.  I can't recall.

8    Q    Okay.  So you can't recall?

9    A    Uh-uh, not that I can recall, possibly.

10    Q    You don't have, like, a -- and I'm not being

11 silly.  But, like, you don't have, like, memory issues,

12 do you?

13    A    No.

14    Q    I mean, you've been an investigator since

15 2023, early 2023.  That's, like, two years, and you

16 don't recall in that time ever having talked to an FBI

17 agent?  You just don't have that recollection?

18    A    No, sir.  With the amount of cases that we get

19 and the amount that goes on in that office, I can't

20 recall specific events.

21    Q    Okay.

22         MR. ROBERTS:  All right.  I don't have any

23    other questions.  Thank you.

24         MS. SHEVLIN:  Matt, I've got some questions.

25    I'm assuming you want me to go first?

263

1         MR. CARSON:  Yeah.

2         MS. SHEVLIN:  I do have follow-up.

3         MR. CARSON:  Yeah.  Go for it.

4         MS. SHEVLIN:  Okay.

5              CROSS EXAMINATION

6 BY MS. SHEVLIN:

7    Q    Detective Preston, my name is Amy Shevlin.  I

8 represent Dr. Dully in this case.  There's a little bit

9 of a delay.  I suspect sometimes the audio goes down --

10    A    Okay.

11    Q    -- and then it pops back up.  So if you have

12 any issues hearing me, please do let me know.

13    A    Yes, ma'am.

14    Q    And I'll let you know if I have issues hearing

15 your answer.  Okay?

16    A    Okay.

17    Q    So I -- I have a couple questions for you

18 mostly based on the testimony that (unintelligible) for

19 Mr. Roberts.  So you testified several times that you

20 believe -- as we sit here today, you believe that the

21 images in question show minors and not adults; correct?

22    A    Yes, ma'am.

23    Q    Okay.  Would it be fair to say that you

24 formulated that opinion upon viewing those images?

25    A    Yes, ma'am.

264

1    Q    Okay.  And you viewed those images prior to

2 taking them to Dr. Dully; is that correct?

3    A    Yes, ma'am.

4    Q    All right.  Can you tell me -- you may have

5 said it already in your testimony, and I apologize if

6 I'm rehashing.  But can you tell me how you know

7 Dr. Dully?

8    A    So I don't -- she was referred to me by my

9 sergeant, Sergeant Tolbert.

10    Q    Okay.

11    A    So this --

12    Q    And that was in the context of the underlying

13 case with Mr. Lawshe; correct?

14    A    Yes, ma'am.  This was my first time meeting

15 her, like, during this investigation.

16    Q    Okay.  Okay.  And I believe you also stated

17 you have not worked with her since this case with

18 Mr. Lawshe.  Am I remembering that correctly?

19    A    Yes, ma'am, that's correct.

20    Q    Okay.  What is your understanding of

21 Dr. Dully's employer as we sit here today?

22    A    I don't remember offhand.  I know that she

23 works in Jacksonville in -- possibly at the Child

24 Protection Team.  I just don't remember the specifics

25 offhand.

265

```
1    Q    Sure.
          Do you remember her job or her title?
3    A    No, ma'am, not offhand.  No, I don't.
4    Q    Dr. Dully is not a -- she's not an employee of
5  St. Johns; is that correct?
6    A    Yes, that is correct.
7    Q    Okay.  And when I say St. Johns, I am using
8  shorthand.  I'm referring to your employer.  Do you
9  understand that?
10   A    Yes, ma'am, the sheriff's office.  Yes, ma'am.
11   Q    Okay.  Thank you.  Yes, yes.
12        So how many times total did you meet with
13 Dr. Dully regarding this case?
14   A    I believe it should have only been twice.
15        Sorry.
16        Sorry.
17   Q    Ms. Preston, I'm sorry.  You cut out.
18   A    Oh, yeah.  Sorry.  The Internet connection is
19 saying it was unstable.
20   Q    Yeah.
21   A    I believe it should only have been twice.
22   Q    Twice?
23   A    Yes, ma'am.
24   Q    Okay.  And I believe you said that you met
25 with Dr. Dully alone.  Do you remember anyone
```

266

```
1  accompanying you to either of the meetings that you had
2  with her?
3    A    Not that I recall, no, ma'am.
4    Q    All right.  How did you come to meet with
5  Dr. Dully, meaning who coordinated the meeting?
6    A    Sergeant Tolbert gave me her contact
7  information, and then I reached out to her.
8    Q    And I believe the dates that you're meeting
9  with her, I think you said February 20th and the 22nd.
10 Am I remembering that correctly?
11   A    It should have been February 22nd and April.
12   Q    Okay.  February 22nd.  And then was that
13 April 5th?
14   A    Yes, ma'am.
15   Q    Okay.  All right.  And that would have been
16 2023?
17   A    Yes, ma'am.
18   Q    All right.  And the -- the -- let's talk about
19 the first meeting on February 22nd.
20   A    Okay.
21   Q    Did you show Dr. Dully any of the images in
22 question on that date, on the 22nd of February?
23   A    It would have been the one NCMEC photograph.
24   Q    And that -- the NCMEC photograph is the
25 first one that came in with the cyber tip?
```

267

```
1    A    No.  So it would have been the second one.  So
2  it was the only one that we worked off because there was
3  two photos.
4    Q    Okay.
5    A    Yeah.
6    Q    Okay.  Do you recollect how many photos you
7  showed her in that first meeting on February 22nd?
8    A    It should have been only one.
9    Q    Just the one.  All right.
10   A    Yes, ma'am.
11   Q    How were the -- how was the photo presented to
12 her?
13   A    On my agency-issued laptop.  I had a thumb
14 drive, and I just plugged in the thumb drive and then
15 opened up the image.
16   Q    That was your employer-issued laptop, you
17 said?
18   A    Yes, ma'am.
19   Q    All right.  And when you showed her the images
20 on your laptop, I am assuming when your meeting was
21 over, you took that laptop.  You took that image.  She
22 was not provided a copy.  Am I correct in that
23 assumption?
24   A    That would be correct, yes, ma'am.
25   Q    All right.  Did you at any point on
```

268

```
1  February 22nd tell Dr. Dully the identity of the
2  suspect?
3    A    No, ma'am.
4    Q    Okay.  Did you at any point reveal
5  Mr. Lawshe's career or job or position as a law
6  enforcement officer with -- during your meeting with
7  Dr. Dully?
8    A    No, ma'am.  Because it's an active
9  investigation.
10   Q    Would it be fair to say that Dr. Dully had
11 absolutely no idea who the subject or the suspect of
12 your investigation was?
13   A    That would be correct.
14   Q    Was Dr. Dully paid to review any of these
15 images or render any of these opinions?
16   A    Not by my knowledge, not by us.
17   Q    Okay.  All right.  So St. Johns, through you,
18 requested that Dr. Dully review these images; correct?
19   A    Yes, ma'am.
20   Q    Okay.  And who requested that Dr. Dully author
21 the letters that we have?  We've got one from
22 February 22nd.  There's one from April 5th, and then
23 there's a second one from April 5th.  Who requested that
24 she author those?
25   A    You mean, like, write her opinion on it?
```

269

1    Q    Yes, ma'am.

2    A    I don't know if anybody requested it. I think
3  she just wrote it herself, but I can't recall.

4    Q    You cut out again. It's freezing. I'm so
5  sorry.

6    A    No. You're good.

7         I'm sorry. I don't think anybody specifically
8  requested she, like, write an opinion on it, if that
9  answers your question. I think she just wrote it on her
10 own.

11   Q    Would it be part of St. Johns' expectation
12 that if they're showing these images to Dr. Dully that
13 she would render a written opinion?

14   A    That I don't know, just because this was my
15 first time using her. But I do believe she has written
16 these in the past.

17   Q    You don't have a specific recollection of you
18 specifically asking her for anything in writing
19 regarding these images?

20   A    No, ma'am. Not from me, no.

21   Q    Okay. Do you know if anyone else from
22 St. Johns asked her to author these?

23   A    No, not from my knowledge.

24   Q    Do you know -- I know you said you've only
25 worked with her the one time.

270

1    A    Yes, ma'am.

2    Q    But do you know that if it is her normal
3  practice or course of business to author a report when
4  she is shown images from law enforcement?

5    A    That I don't know, just because this is my
6  only time working with her, so I don't know if it's --

7    Q    Sure.

8         You never provided a copy of the images
9  showing the two models holding their passports to
10 Dr. Dully; is that correct?

11   A    Yes, that is correct.

12   Q    Okay. And Dr. Dully was never provided with
13 the affidavit from -- I think it's Mr. Douglas, who's
14 the attorney in California, who states that these girls
15 are, in fact, over 18 in his opinion?

16   A    No. She was never provided that.

17   Q    Okay.

18        MR. ROBERTS: I'll object to that question.

19 BY MS. SHEVLIN:

20   Q    Is it fair to say that all of the information
21 that Dr. Dully had regarding these images came either
22 from you or from St. Johns in some fashion?

23   A    Yes, ma'am.

24   Q    Do you believe that Dr. Dully acted in good
25 faith in reviewing these records?

271

1    A    Yes, ma'am.

2    Q    Do you believe that Dr. Dully acted in good
3  faith when she authored the February 22nd and the two
4  April 5th, 2023, letters regarding these images?

5    A    Yes, ma'am, I do.

6    Q    After -- well, let me jump a little bit
7  further ahead.

8         Okay. So on April 5th, you met with her a
9  second time; correct?

10   A    Yes, ma'am.

11   Q    All right. And it looks like her -- on her
12 April 5th letter, there's the first paragraph, which is
13 a copy from the paragraph on February 22nd, 2023?

14   A    Yes, uh-huh.

15   Q    Okay. And then there's a second paragraph
16 that says that she was shown two additional images of
17 the same female that was in the first image that she
18 looked at, and you testified that was the second NCMEC
19 cyber tip that came in?

20   A    Are you saying that these two images were the
21 second NCMEC cyber tip?

22   Q    No. The -- you -- you just told me earlier
23 that the first image that you showed to Dr. Dully was
24 the second NCMEC cyber tip that came in. The first one
25 you did not show her; correct?

272

1    A    Yes, that is correct.

2    Q    Okay. And then in addition to that first one,
3  which she had already seen on April 5th, you showed her
4  two additional images depicting the same female --

5    A    Oh.

6    Q    -- that was in the second cyber tip that you
7  showed her on February 22nd; correct?

8    A    Yes, ma'am. I'm sorry. I misunderstood.
9  Yes.

10   Q    Okay. Okay. That's okay. I just want to
11 make sure.

12        And then also, on February 5th, it looks like
13 she was also shown another -- excuse me -- two
14 additional images. The first image is a -- let me see.
15 It was -- the image is -- it looks like YCBLVVFQ_0.jpg
16 is the file name.

17   A    Yes.

18   Q    Is that correct?

19   A    Yes, ma'am.

20   Q    Okay. And then the second image was the image
21 that Mr. Roberts was asking you about earlier that says
22 Big Heart on the bottom?

23   A    Yes.

24   Q    Okay. I'm going to -- I'm notoriously bad at
25 screen sharing, so bear with me a moment.

273

| | |
|---|---|
| 1 | **A** Okay. |
| 2 | **MR. ROBERTS:** Is it an exhibit you think we |
| 3 | have? |
| 4 | **MS. SHEVLIN:** It is. I'm sure you do have it. |
| 5 | I mean, you do. She's looking at them right now. |
| 6 | It's just the three letters. I have the composite |
| 7 | in front of me. |
| 8 | **MR. ROBERTS:** It's just where your computer is |
| 9 | is, like, kind of hard for her to see. But that's |
| 10 | my only -- |
| 11 | **MS. SHEVLIN:** Okay. All right. Hang on a |
| 12 | second. Like I said, I'm not good at this. |
| 13 | You know what? I'm going to come back to this |
| 14 | because this screen share does not appear to want |
| 15 | to work right now. |
| 16 | BY MS. SHEVLIN: |
| 17 | **Q** All right. We're going to come back to those |
| 18 | letters. I have a couple additional questions for you, |
| 19 | but -- |
| 20 | **A** Okay. |
| 21 | **Q** -- we'll come back to that. |
| 22 | After your -- your second meeting with |
| 23 | Dr. Dully on April 5th of 2023, did you ever have any |
| 24 | (unintelligible) you met with her? |
| 25 | **A** You said did I have any -- you broke up. |

274

| | |
|---|---|
| 1 | **Q** After -- after April 5th of 2023, did you have |
| 2 | any other meetings with Dr. Dully? |
| 3 | **A** Not that I recall, no, ma'am. |
| 4 | **Q** Did you have any phone calls with her after |
| 5 | April 5th of 2023? |
| 6 | **A** Not that I recall, no. |
| 7 | **Q** Did -- did you have any correspondence with |
| 8 | her, either e-mail or letters through the mail, text |
| 9 | message, anything like that regarding this case? |
| 10 | **A** Not that I recall. |
| 11 | **Q** Okay. You said multiple times in your |
| 12 | testimony that there were -- there was a variety of |
| 13 | factors that led to the decision to bring charges |
| 14 | against Mr. Lawshe. Can you very briefly just describe |
| 15 | what those multiple factors were that led you to believe |
| 16 | that charges should be brought against him? |
| 17 | **A** Yes, ma'am. So obviously, based off the |
| 18 | image, me viewing it as CSAM, Dr. Dully's statement, and |
| 19 | then the entirety of the digital download that we did, |
| 20 | that's why we felt as though we had probable cause for |
| 21 | the arrest. |
| 22 | **Q** Would it be fair to say, based on what you've |
| 23 | just told me, that you did not base your decision to |
| 24 | bring charges against Mr. Lawshe exclusively on |
| 25 | Dr. Dully's opinion? |

275

| | |
|---|---|
| 1 | **A** That would be correct. |
| 2 | **Q** Now, Mr. -- excuse me. I think I'm going to |
| 3 | call him by the wrong -- by the wrong title. I think it |
| 4 | is Sergeant Tolbert, but please correctly -- correct me |
| 5 | if I'm wrong. |
| 6 | **A** No. You've got it right, Sergeant Tolbert. |
| 7 | **Q** It is sergeant? |
| 8 | **A** Yes, ma'am. |
| 9 | **Q** Okay. Wonderful. |
| 10 | So Sergeant Tolbert was previously deposed in |
| 11 | this case. And in his deposition, he stated that if we, |
| 12 | meaning St. Johns, didn't feel like it was CSAM, we |
| 13 | wouldn't have taken it to Dr. Dully to begin with, |
| 14 | meaning there was already an opinion that the images |
| 15 | were depicting minors before they were brought to |
| 16 | Dr. Dully. |
| 17 | Do you agree with that statement? |
| 18 | **A** Yes, ma'am, I do. |
| 19 | **Q** Okay. Do you also agree with my statement |
| 20 | that Dr. Dully never would have seen any of these images |
| 21 | if St. Johns hadn't already determined that they |
| 22 | depicted minors? |
| 23 | **A** That, I don't know how she would have been |
| 24 | able to see them without us showing them to her. |
| 25 | **Q** Okay. Did Dr. Dully apply for a search |

276

| | |
|---|---|
| 1 | warrant in this case? |
| 2 | **A** No, ma'am, not from my knowledge. |
| 3 | **Q** Did Dr. Dully testify at any hearings in this |
| 4 | case? |
| 5 | **A** Not from my knowledge, no, ma'am. |
| 6 | **Q** Do you recall what you told Dr. Dully about |
| 7 | the images when she was viewing them? |
| 8 | **A** I don't recall our conversation at all. |
| 9 | **Q** You testified that you do not believe that the |
| 10 | models depicted in the images are age-difficult. Do you |
| 11 | remember that testimony? |
| 12 | **A** Yes, ma'am, I do. |
| 13 | **Q** Okay. So you believed at the time of your |
| 14 | investigation that these images were obviously of |
| 15 | minors? |
| 16 | **A** Yes, ma'am. |
| 17 | **Q** Okay. And you still believe that today? |
| 18 | **A** Yes, ma'am, I do. |
| 19 | **Q** You discussed a little bit earlier with |
| 20 | Mr. Roberts your prior deposition testimony that was in |
| 21 | November of 2023. You remember discussing that today? |
| 22 | **A** Yes, ma'am, I do. |
| 23 | **Q** Okay. On Page 22 of your deposition, you |
| 24 | testified -- prior to taking the photos to Dr. Dully on |
| 25 | the time line, you testified: So that, I did know that |

277

1  it was child pornography. I felt that she, referring to
2  the model, was definitely under the age of 18.
3         As we sit here today, do you stand by that
4  testimony? It's on Lines 21 and 23.
5     A    Thank you. Sorry. I was trying to look for
6  it.
7     Q    That's okay.
8     A    Yes, ma'am, I still stand by that.
9     Q    Okay. And on the next page, on Page 23, we've
10 got Lines 1 through 5. And you answered in the
11 affirmative to a question that you concluded that the
12 image was a minor prior to speaking to Dr. Dully; is
13 that true?
14    A    You broke up. You said --
15    Q    Did I break up?
16    A    Yes, ma'am.
17    Q    Okay. All right. Page 23, Lines 1 through 5
18 of your deposition from November 23 --
19    A    Yes, ma'am.
20    Q    -- you answered in the -- in the affirmative
21 to a question regarding that you -- you concluded that
22 the image was a minor prior to speaking to Dr. Dully.
23    A    Yes, ma'am.
24    Q    And then on Page 29 of your deposition -- let
25 me get there. I believe -- it's between Lines 5 and 20.

279

1  Argentina, Asian dream teen, nude hairy teens, petite
2  teens naked, teens in lingerie, teen nipples, teen
3  boobs, teen boobs teen, teens wearing thongs, teens up
4  skirt? Would any of that surprise you based on what
5  you've seen?
6     A    Based on what I've seen just in
7  investigations, like, for ICAC?
8     Q    Based on -- excuse me. Thank you for
9  clarifying. Based on the images that you reviewed in
10 relation to Mr. Lawshe.
11    A    No, that wouldn't surprise me.
12    Q    Okay. Now, Mr. Roberts had asked you earlier
13 if you were of the opinion that someone had potentially
14 altered the identification or the passports of the
15 models in question to make it appear that they were 18.
16 Do you remember that testimony?
17    A    Yes, ma'am, I do.
18    Q    Or that line of questions?
19    A    Yes, ma'am.
20    Q    Okay. And you -- you saw the images of the
21 two models. There's one -- I believe her name is
22 Melina (phonetic) D., and she's the one holding the two
23 Ukrainian passports?
24    A    Yes, uh-huh.
25    Q    Okay. And those images -- on the image with

278

1  I know that's a lot. But I'll break it down. From
2  Lines 5 to 10, you testified: Nine times out of ten,
3  you would always have another detective with you to
4  confirm this is CSAM, just to get a second opinion on
5  any image, especially if we're going to move forward
6  with it.
7         And then at Lines 16 and 17, you stated that
8  Kevin Greene reviewed the images. Detective Scoggins
9  reviewed the images. And just a couple minutes ago, you
10 also testified that Detective Tolbert also reviewed the
11 images. Are all of those people -- excuse me.
12        Were all of these people, at the time,
13 employees of St. Johns?
14    A    Yes, ma'am. They were and are. Sorry.
15    Q    Okay. I know you stated earlier in your
16 testimony that you did not visit met-art.com. So I will
17 represent to you that met-art.com refers to their model
18 as teens and girls. Is that something you were aware
19 of?
20    A    I know Kevin Greene stated something along
21 those lines, but I don't remember verbatim what he
22 stated.
23    Q    Okay. And would it surprise you to learn
24 there are suggested search terms on met-art.com, which
25 include Roy's teen amateurs, teenage beauties, teen from

280

1  Melina D. with the two passports, the passports on there
2  are, in fact, redacted; correct?
3     A    Yes. Based off what I could see, yes.
4     Q    Okay. So IDs can be manipulated or altered,
5  especially in a photo; correct?
6     A    Yes, ma'am, in a photograph especially.
7     Q    And, in fact, we do have an altered photograph
8  on this one because the information that is contained on
9  the passports have -- has been redacted; correct?
10    A    As in them altering it to redact it, yes,
11 ma'am.
12    Q    Yes, ma'am.
13        And same questions with the other model. I
14 cannot recall her name right now, but she's one with
15 darker hair.
16    A    Yes.
17    Q    She's holding a Latvian passport?
18    A    Uh-huh, yes, ma'am.
19    Q    And the passport that she is holding has also
20 been redacted; correct?
21    A    Yes, ma'am, it has.
22    Q    Okay. So, again, that image has been altered
23 in that it has been redacted so that we can't actually
24 see the information on that passport?
25    A    Yes, ma'am.

281

```
1    Q    Seeing the image -- or images, I should say,
2  of these girls holding these passports that purport to
3  show their age do not give you any indication of how old
4  they were at the time that these photos were taken;
5  correct?
6    A    You're saying -- I'm sorry.  Because you broke
7  up.  Just based off them holding the photographs?
8    Q    You froze again.
9    A    Yes.  Sorry.
10        I was saying you're saying just based off the
11  photographs?
12    Q    There would -- there would be no way of
13  knowing --
14    A    Sorry.
15    Q    Yes.  Let me ask it again just so it's clear
16  because you broke up, and I broke up on your end.
17        You would have no way of knowing how old these
18  girls were at the time these images were taken just by
19  looking at a picture of them holding their passports?
20    A    No, ma'am, I wouldn't.
21    Q    Okay.
22        Okay.  I am going to attempt to screen share
23  again.
24    A    Okay.
25    Q    I am going to be looking -- and you have
```

282

```
1  everything in front of you I'm going to screen share,
2  just so we're on the same page.  Going to have a few
3  things highlighted.
4    A    Okay.
5    Q    But I'm going to refer to the February 22nd,
6  2023, letter from Dr. Dully and then the two letters
7  that are authored on April 5th, 2023.
8    A    Okay.
9    Q    And I understand that my screen is a bit far
10  from you.
11    A    Yes.  I have them in front of me.
12    Q    (Unintelligible) digital image.  Okay.
13        All right.  So on the first letter dated
14  February 22nd, 2023.  So I've got some things here
15  highlighted.  I don't know if you can see those.  But
16  I'll just call your attention to the line so you can
17  look at them with me.
18    A    Okay.
19    Q    And the first -- well, the first letter is
20  only one paragraph.  The fourth line down in the
21  paragraph states:  This image depicts what appears to be
22  a naked pubertal female child wearing pink earrings and
23  white lace socks on her feet.
24    A    Yes, ma'am.  I see that.
25    Q    Would you agree with me that that's what
```

283

```
1  says?
2    A    Yes, ma'am.  That does say that.
3    Q    Okay.  And then two lines under that, it says:
4  This female child appears younger than 18 years of age.
5        Would you agree with that assessment, that
6  that is what this letter states?
7    A    Yes, ma'am.
8    Q    And then on the last line, it says:  She does
9  not appear to be shaved.
10        Would you agree with me that that's what that
11  says?
12    A    Yes, ma'am.  That's what it states.
13    Q    Okay.  I'm going to move to the April 5th, the
14  first April 5th, 2020 -- excuse me -- 2023, letter.  And
15  we've already established that first paragraph is the
16  same as the February 22nd letter?
17    A    Yes.
18    Q    Starting on the second line of the second
19  paragraph, she's describing the image or two images and
20  says:  The model in that image is depicted to be, at
21  most, SMR 3 or 4 and, therefore, between the ages of 12
22  and 15.
23        Would you agree with me that that's what that
24  letter says?
25    A    I'm sorry.  What line was that?  I lost --
```

284

```
1    Q    Second paragraph.
2    A    Oh, okay.
3    Q    It starts on the second line and continues on
4  to the third line.
5    A    Okay.
6    Q    Would you agree with me that that's what that
7  letter says?
8    A    Yes, ma'am.
9    Q    Okay.  And then on the second April 5th
10  letter --
11    A    Yes, ma'am.  I'm here.
12        THE WITNESS:  I don't know if she froze.
13  BY MS. SHEVLIN:
14    Q    I'm not sure if you answered because you broke
15  up.  I'm sorry.
16    A    No.  I think you froze.  I couldn't hear --
17  this is freezing.
18        MR. ROBERTS:  We didn't hear the question.
19        MS. SHEVLIN:  I think there's a delay, yeah.
20        All right.
21  BY MS. SHEVLIN:
22    Q    On the first paragraph on the third line down,
23  it states:  The model (unintelligible) visible and could
24  be SMR 4 to 5.
25        Would you agree with me that that is
```

285

1  accurately stated in this letter; I'm -- I'm accurately
2  stating what this letter says?
3      A    You froze.  But did you state her breasts are
4  partially visible and could be SMR?  Is that --
5      Q    And could be SMR 4 or 5.
6      A    Yes, ma'am.  That's what it states on this
7  one, yes.
8      Q    Okay.  And then the next line down says:
9  Developmental appearance is 9 to 13 and a half years of
10  age.
11     A    Yes, ma'am.
12     Q    Is that accurate?  Am I reading that
13  accurately?
14     A    Yes, ma'am.
15     Q    Okay.  In the second paragraph, second line
16  from the bottom, it says:  The model appears to have no
17  pubic hair development.  She does not appear to be
18  shaved.  Developmental appearance is 9 to 13 and a half
19  years of age.
20          Am I reading that accurately?
21     A    Yes, ma'am, you are.
22     Q    Okay.  So earlier in your testimony, I believe
23  you used the word certified, that Dr. Dully's certified
24  that these images were of minors.  Having just looked at
25  these letters, she says:  Appears, depicts between these

286

1  ages.
2          I don't see anything in here that certifies
3  anything.  Do you?
4      A    Not using the term certified, yes, ma'am.  She
5  does not specify that it's certified that this is what
6  it is.  So yes, I would agree.
7      Q    Now, there was also some earlier testimony
8  that Mr. Roberts was asking you about why not all of the
9  images depicting the same model had been charged, and
10  you couldn't remember the specific reason.
11     A    Yes, ma'am.
12     Q    So would it be fair to say that the ultimate
13  decision on which images to charge, regardless of what
14  Dr. Dully reviewed or rendered an opinion on,
15  ultimately, that decision was St. Johns?  Correct?
16     A    Yes, ma'am.
17     Q    Okay.  And St. Johns was the one that made the
18  decision to bring the chargers forward against
19  Mr. Lawshe; is that correct?
20     A    Yes, ma'am.
21          MS. SHEVLIN:  Okay.  I believe that's all I
22  have for you.  There's probably going to be some
23  follow-up, so I'll turn it over to everybody else.
24  But I appreciate your time, ma'am.  Thank you.
25          THE WITNESS:  Yes, ma'am.

287

1          MR. CARSON:  Do you have any more, Michael?
2          MR. ROBERTS:  I do.
3          MR. CARSON:  Go ahead.
4                 REDIRECT EXAMINATION
5  BY MR. ROBERTS:
6      Q    So I want to show you, in Exhibit 8, A and C.
7      A    Okay.
8      Q    We previously looked at these photographs.
9  Can you read the file number of A?  Well, first of all,
10  you agree that these are the same models?
11     A    They appear to be the same.
12     Q    Right?
13     A    They appear to be, yes.
14     Q    And I think you said you actually -- when
15  you -- when you picked out A, you recognized that as the
16  NCMEC image model?
17     A    As appearing to be, yes.
18     Q    Right?
19          Okay.  So can you read the file number of
20  that?
21     A    It should be YCBLVVFQ_ -- either an O or a 0.
22     Q    Okay.  Now, I want you to go to April 5th, the
23  one that deals with -- it repeats the findings from
24  February 22nd.
25     A    Where it repeats, you said, the find -- this

288

1  one?
2      Q    Yeah.  The one where it repeats it.
3      A    Okay.
4      Q    And then you show her the additional images?
5      A    Okay.
6      Q    You got me?
7      A    Yes.  I think I'm on -- on this page.
8      Q    I wish there was, like, a number.  We could
9  probably call it something but --
10     A    This one?
11     Q    Yes.
12     A    Okay.
13     Q    It's the one that begins I previously
14  examined.
15     A    Yes.  Yes, sir.  I'm there, yes.
16     Q    Okay.  Now, this is describing -- and I think
17  her name is Melania D., so let's just call her
18  Melania D.  Okay?
19     A    Okay.
20     Q    All right.  This is describing the original
21  NCMEC image of Melania D., correct, in the first
22  paragraph?
23     A    Yes, sir.
24     Q    All right.  In the second paragraph, you show
25  her two additional images of that model; correct?

289

1    A    Yes.

2    Q    And I think you have -- that's one of the

3  additional -- one of the additional files; correct?

4    A    The 0059?

5    Q    05 -- 0059. That's 8C; correct?

6    A    Yes, uh-huh.

7    Q    Okay. Both of these are Melania D.; correct?

8    A    I don't know if they are both. They appear to

9  be the same, but I don't know if it's confirmed if they

10  are the same person.

11   Q    That was your impression?

12   A    That it appears to be the same person, yes,

13  sir.

14   Q    Right.

15        And so she estimated that this model was an

16  SMM -- SMR 4 -- correct? -- originally and then SMR 3 or

17  4 at most, therefore, 12 to 15 years of age?

18        MR. CARSON: Object to form.

19  BY MR. ROBERTS:

20   Q    Is that what she --

21        MS. SHEVLIN: Join.

22  BY MR. ROBERTS:

23   Q    Is that what it says in this document that

24  we're looking at?

25        MR. CARSON: Object to form.

290

1        THE WITNESS: By saying --

2        MS. SHEVLIN: Join.

3        THE WITNESS: -- therefore, again, less than

4    equal to 12 to 15. That's what it says in this

5    document.

6  BY MR. ROBERTS:

7    Q    So in this -- in this document that begins I

8  previously examined a single color photograph, Dr. Dully

9  is communicating to you. This letter's directed to you;

10  correct?

11   A    Yes, sir.

12   Q    That Melania D. -- and I understand you didn't

13  know her name at the time. But Melania D. is an SMR 4,

14  maybe a 3, 12 to 15 years of age; correct?

15        MR. CARSON: Object to form.

16        MS. SHEVLIN: Join.

17        THE WITNESS: You said an SMR 4 or what was

18    the other one?

19  BY MR. ROBERTS:

20   Q    3 or 4. I'm just reading her opinion.

21   A    Yes.

22   Q    And I'm trying to get -- when you got this,

23  like, you tried to understand what she was telling you;

24  correct?

25   A    Uh-huh.

291

1    Q    Yes?

2    A    Yes. Sorry.

3    Q    And it says this model, who we now know is

4  Melania D. -- and I'm just reading the last sentence;

5  right?

6    A    Okay. Yes, yes.

7    Q    Right?

8    A    Yes, sir.

9    Q    And it says: She would have achieved this

10  developmental genital appearance of SMR 4 at 12 to 15

11  years of age.

12        Did I read that correctly?

13        MR. CARSON: Object to form.

14  BY MR. ROBERTS:

15   Q    Did I read that correctly?

16        MS. SHEVLIN: Join.

17        THE WITNESS: You read it as it states it on

18    here.

19  BY MR. ROBERTS:

20   Q    Right.

21        And then it says: Today, you showed me two

22  additional images of the same female child, and these

23  confirm my previous determination that she's depicted to

24  be, at most, SMR 3 or 4 and, therefore, again -- I think

25  it says less than 12 to 15 years of age; correct?

292

1    A    Yes, sir.

2    Q    All right. So Melania D., according to this,

3  is an SMR 3 or 4, 12 to 15 years old; correct?

4        MR. CARSON: Object to form.

5        MS. SHEVLIN: Join.

6  BY MR. ROBERTS:

7    Q    Is that what you took from this?

8    A    Based off this model? Yes, based off these

9  photographs of this model.

10   Q    Right.

11        So you went and you also showed her -- I want

12  you to go to the next.

13   A    Uh-huh.

14   Q    Okay. Read that first paragraph for me.

15   A    The entire paragraph?

16   Q    Yeah, the entire paragraph.

17   A    Today, you have provided to me two images for

18  review displayed on a law enforcement laptop. The first

19  is YCBLVVFQ_ -- I'm assuming it's either a O or

20  O -- .jpg and depicts a female child with no pubic hair

21  development. She does not appear to be shaved. Her

22  breasts are partially visible and could be SMR 4 to 5.

23  However, her genitals are plainly visible with her

24  thighs spread widely apart and showing she's SMR 1 --

25  I'm assuming that's going to be 1 -- with respect to

293

1  pubic hair. This developmental appearance is less than
2  or equal to 9 to 13.5 years of age.
3      Q    Okay. So you read this at the time before you
4  sought the -- or the search warrant; correct? Or the --
5  you made the arrest. You read this; right?
6      A    Yes, uh-huh.
7          MS. SHEVLIN: Form.
8          THE WITNESS: I said yes. Sorry. I didn't
9      know if you didn't hear me.
10 BY MR. ROBERTS:
11     Q    That's Melania D.
12         MR. CARSON: Object to form.
13 BY MR. ROBERTS:
14     Q    Correct?
15     A    That I -- like I said, I cannot confirm that
16 it's her.
17         MS. SHEVLIN: Form, assumes facts not in
18     evidence.
19 BY MR. ROBERTS:
20     Q    You testified earlier that you believe that
21 that was Melania D.
22         MR. CARSON: Object to form.
23         THE WITNESS: That it appears to be her.
24         MS. SHEVLIN: Join.
25         THE WITNESS: But I can't confirm that this is

295

1  BY MR. ROBERTS:
2      Q    Okay. Did you recognize that indiscrepancy --
3  or that discrepancy when you first read these reports?
4          MR. CARSON: Object to form.
5          THE WITNESS: What discrepancy?
6          MS. SHEVLIN: Form, assumes facts not in
7      evidence, lack of predicate.
8  BY MR. ROBERTS:
9      Q    That she had a different sexual maturity
10 rating as to Melania D. in the April 5th that begins
11 today, you provided me with two images. Then she did,
12 in the April 5th report -- I previously -- that begins I
13 previously examined. Did you -- did you recognize that
14 discrepancy?
15         MR. CARSON: Object to form.
16         THE WITNESS: I don't --
17         MS. SHEVLIN: Same objections.
18         THE WITNESS: -- understand where the
19     discrepancy -- because she's not saying that this
20     is the same female. So that's what I'm saying. I
21     felt as though this appears to be the same, but
22     Dr. Dully is not saying that this is the same exact
23     female. So I can't say that that's a discrepancy
24     because --
25

294

1  her.
2  BY MR. ROBERTS:
3      Q    Uh-huh. Right. Now you can't confirm that.
4      Do you see the problem?
5      A    No. Because I stated --
6          MS. SHEVLIN: Form.
7          THE WITNESS: -- to begin with, I can't
8      confirm that this is her.
9  BY MR. ROBERTS:
10     Q    Yeah.
11     A    It appears to be her.
12     Q    See, it says no pubic hair development,
13 doesn't it, in that first paragraph?
14     A    No pubic hair development.
15     Q    Right.
16         But -- but the other images of Melania D.
17 shows that she clearly has pubic hair.
18         MR. CARSON: Object to form.
19         THE WITNESS: Yes.
20         MS. SHEVLIN: Join.
21         THE WITNESS: But how do I know when this
22     photo was taken? So I can't confirm that it's her,
23     just like I can't confirm that these photos were
24     taken a month apart, the same day. I can't
25     confirm.

296

1  BY MR. ROBERTS:
2      Q    Okay.
3      A    -- she didn't say that.
4      Q    But at the time --
5      A    Just my opinion.
6      Q    But at the time you read this, it was your
7  opinion that it was the same female?
8      A    That it appears to be the same female. I
9  don't -- like I said, I don't know when this photograph
10 was taken.
11     Q    Okay. And I -- and I appreciate that you
12 don't. But when you saw these images and read this
13 report, did -- did you realize that what Ms. -- that
14 what Dr. Dully was saying, that this was a prepubertal
15 Melania D.?
16         MR. CARSON: Object to form.
17 BY MR. ROBERTS:
18     Q    Did you make that connection in your mind?
19         MS. SHEVLIN: Join.
20         THE WITNESS: No. Because she never said --
21         MR. ROBERTS: Same objection.
22         THE WITNESS: -- that this was the same
23     female.
24 BY MR. ROBERTS:
25     Q    I know she didn't.

297

1    A    Yeah.  So I can't make that connection that
2  this is the same female.  I can say, hey, this appears
3  to be, but I don't know because I don't know when these
4  photographs were taken.  And I also can't confirm that
5  this is the same female.  I'm just going based off this
6  side and it said it appears to be the same person.
7    Q    Right.
8        And I know that she didn't tell you it was the
9  same.  But at the time you read this report, it was your
10 understanding, your belief that it was the same person?
11   A    No.  I said that it appears to be the same
12 person, but I do not know that it is the same person.
13 So I can't say, yes, this is the same person.  It
14 appears to be.
15   Q    So it appears to be, but you didn't believe
16 it?
17   A    What?
18   Q    You're making a distinction between it
19 appeared to be --
20   A    Yes.
21   Q    -- and you believed it to be.  Is that what
22 you're doing?
23   A    No.  What I'm saying is that this appears to
24 be the same person.
25   Q    Right.

298

1    A    But I'm not saying for a fact this is the same
2  person.  That's like if you have somebody that looks
3  like you but it is not you, I'm not going to say, hey,
4  that was, you know, attorney Roberts.  I could say, hey,
5  he appeared to be or he looked similar to that person,
6  but I'm not going to say for a fact that that is that
7  person.
8    Q    Okay.  All right.  So do you -- as we sit here
9  today, do you think that that's the same model?
10   A    Like I previously stated, it appears to be,
11 but I can't say for certain if it is or isn't.
12   Q    If it was, would it be, like, a problem to you
13 that in this April 5th report, there is this discrepancy
14 in the age description by Dr. Dully?
15       MR. CARSON:  Object to form.
16       THE WITNESS:  No, sir.
17       MS. SHEVLIN:  Form, assumes facts not in
18       evidence, mischaracterizes her prior testimony, and
19       lack of predicate.
20 BY MR. ROBERTS:
21   Q    So in -- in the Exhibit C, 8C, you agree that
22 Dr. Dully rendered an opinion that gave an age range of
23 12 to 15?
24   A    Yes.  Based off this photo, yes, sir.
25   Q    Correct?

299

1    A    Uh-huh.
2    Q    And then based on this photograph, which was
3  8A, she said less than 9 to 13 years old.
4    A    Yes, based off that photograph.
5    Q    Okay.  And you think that -- this is your
6  testimony -- it appears that this is the same model.
7    A    Uh-huh.
8    Q    And is it your testimony that --
9    A    Yes.  Sorry.  I said uh-huh.
10   Q    Yes.
11       On the right-hand side, this appears to be a
12 less than 19 -- 9- to 13-year-old version of Melania D.,
13 and on the left, this appears to be a 12- to 15-year-old
14 version of Melania D.?
15       MR. CARSON:  Object to form.
16       MS. SHEVLIN:  Form.
17       THE WITNESS:  Like I said, I don't know if
18       this is the same person, so I can't say that that's
19       a younger version of her because I do not know if
20       that is her.  And I do not want to say for a fact
21       this is a younger version of her because I don't
22       know who it is.
23 BY MR. ROBERTS:
24   Q    Does it appear to be a -- a younger version of
25 her?

300

1    A    I don't know if it would be --
2        MS. SHEVLIN:  Asked and answered.
3        THE WITNESS:  -- a younger version of her.
4  BY MR. ROBERTS:
5    Q    You said it appears to be the same model.
6    A    Yes.
7    Q    I'm asking you, does it appear to be a younger
8  version of the model depicted in 8C?
9        MR. CARSON:  Object to form.
10       THE WITNESS:  And what I'm saying is --
11       MS. SHEVLIN:  Join.
12       THE WITNESS:  -- I can't say that because
13       that's a hypothetical.  I don't know if it appears
14       to be a younger version of her.
15 BY MR. ROBERTS:
16   Q    I'm -- I'm not playing semantics with you,
17 Detective.  You testified that they appear to be the
18 same person.
19   A    Yes, sir.
20   Q    All right.  I'm not asking you if you verified
21 through DNA or physical passport or fingerprints.  I'm
22 not asking you that.  I'm asking you, having testified
23 under oath that these appear to be the same model --
24   A    Uh-huh.
25   Q    -- does the model depicted in 8A appear to be

301

1  a younger version of the model depicted in 8C?
2      A    Like I said --
3          MS. SHEVLIN:  Asked and answered, form.
4          THE WITNESS:  -- I can't say because I don't
5      know if this is a younger version of her.  Like, I
6      can't give you an answer that I don't have,
7      unfortunately.  Like, I don't know how to reword
8      it.
9  BY MR. ROBERTS:
10      Q    Well, I mean, this case is entirely based --
11  not entirely based.  I don't want to be hyperbolic.  It
12  is based, in a large part, on your determination of how
13  old people look; correct?
14      A    Uh-huh.
15      Q    Is your testimony that although these models
16  appear to be the same, you cannot look at them and say
17  one is younger than the other one?
18          MR. CARSON:  Object to form.
19          THE WITNESS:  Like I said, I'm not a doctor.
20          MS. SHEVLIN:  Join.
21          THE WITNESS:  So I can't sit there and say,
22      yes, she looks like she's 9 and she looks like
23      she's 15 because I'm not certified to speak on
24      that.
25

303

1  will not attest to that.
2      Q    I'm just asking your opinion.  That doesn't
3  seem to be younger than this one?
4      A    Like I said, I don't know.
5      Q    When you got this report, did you realize that
6  she was talking about Melania D. or who appeared to be
7  Melania D.?
8          MR. CARSON:  Object to form.
9          THE WITNESS:  What do you mean?
10          MS. SHEVLIN:  Join.
11  BY MR. ROBERTS:
12      Q    Did you realize that the file that she was
13  describing was what you believed to be Melania D.?
14      A    You're saying the file that I gave her --
15      Q    Yeah.
16      A    -- that I said appears to be --
17      Q    Melania D.?
18      A    -- the same female?
19      Q    Yes.
20          When you read this report, did you look at it
21  and say, oh, she's talking about the other picture of
22  Melania D.?
23          MR. CARSON:  Object to form.
24          THE WITNESS:  I'm very confused by this
25      question.  What do you mean?  I'm just very

302

1  BY MR. ROBERTS:
2      Q    But just as a human being, as a person that
3  walks around in the world -- and you're not a doctor,
4  but you make determinations in your job:  This person's
5  a minor; this person's not a minor.  I'm asking you,
6  does the model, which you think appears to be
7  Melania D., depicted in 8A, does she appear to be a
8  younger version of the model, Melania D., that is
9  depicted in 8C?
10          MR. CARSON:  Object to form.
11          THE WITNESS:  And like I stated --
12          MS. SHEVLIN:  Join, asked and answered several
13      times.
14          THE WITNESS:  Like, I don't know how to
15      restate that any further than I already have.
16      Every person is different, so I can't say that this
17      person looks younger than that nine range.  I
18      cannot say that.
19  BY MR. ROBERTS:
20      Q    But you can say with a -- that it's obviously
21  less than 18?
22      A    Yes.
23      Q    But you can't tell whether or not this is a
24  model that's less than 9 to 13 and this is 12 to 15?
25      A    Because I can't say a specific age.  No, I

304

1  confused by the question.
2  BY MR. ROBERTS:
3      Q    Is that the reason you didn't charge this
4  image was because this didn't make any sense?
5      A    No.  That is not the reason.  That's not a
6  reason to not charge for an image.
7      Q    Did it make sense to you that Dr. Dully had
8  aged the model in 8C to be a Grade 3 or 4 and the model
9  in 8A a Grade 1?
10          MR. CARSON:  Object to form.
11  BY MR. ROBERTS:
12      Q    Did that make sense to you?
13          MS. SHEVLIN:  Form.  Form, beyond the scope.
14          THE WITNESS:  She's looking at two totally
15      different photographs, like you said, two totally
16      different photographs, two totally different
17      backgrounds.  I can't speak for her opinion on why
18      she did that, but obviously, it is not the same
19      photograph.
20  BY MR. ROBERTS:
21      Q    But it doesn't appear to be the same model at
22  approximately the same age?
23          MR. CARSON:  Object to form.
24          THE WITNESS:  I can't speak for Dr. Dully.
25

305

1  BY MR. ROBERTS:
2     Q    I'm asking you.
3          MS. SHEVLIN:  Asked and answered, form.
4  BY MR. ROBERTS:
5     Q    I'm asking you.
6     A    Like I said, to me, it appears to be the same
7  person at the same time.  I can't say that.
8     Q    But at -- around the same age; right?
9          MR. CARSON:  Object to form.
10         THE WITNESS:  That I can't say.
11 BY MR. ROBERTS:
12    Q    You can't say?
13         MS. SHEVLIN:  Join.
14 BY MR. ROBERTS:
15    Q    You have no opinion on whether or not these
16 appear to be roughly at the same age?
17    A    No.  Because I do not know when the photograph
18 was taken.
19    Q    I'm not asking you when the photograph was
20 taken.  I'm asking you -- you make determinations on how
21 old people are by looking at them all the time without
22 knowing when the photograph was taken; correct?
23         MR. CARSON:  Object to form.
24         THE WITNESS:  I'm sorry.  What was your
25 question?

306

1  BY MR. ROBERTS:
2     Q    You make determinations on how old, if
3  someone's an adult or a minor, all the time without
4  knowing when the photograph was taken.
5          MR. CARSON:  Object to form.
6  BY MR. ROBERTS:
7     Q    Correct?
8     A    I make the determination that they are under
9  the age of 18.  A specific age, I cannot determine that.
10    Q    And what I'm asking you is do you have the
11 ability -- and you can say no, I guess -- to look at
12 these two images and say -- I'll just ask you the
13 question, rather, this way:  Do these models not appear
14 to be the same model at approximately the same age?
15    A    Like I said, I --
16         MS. SHEVLIN:  Form, asked and answered.
17         THE WITNESS -- cannot say that.
18 BY MR. ROBERTS:
19    Q    You have no opinion as we sit here today?
20    A    I cannot say that these appear to be at the
21 same age or around about the same age.  I can't say that
22 because I don't know.
23    Q    Do -- do they appear to be different ages to
24 you?
25    A    I don't know because I don't know who this is.

307

1  I don't know if this is Melania.  I don't know if this
2  is also Melania.  I don't know.  So I can't sit there
3  and tell you, like, yeah, they appear to be two years
4  apart.  I, unfortunately, cannot say that.
5     Q    You can't say that they appear to be roughly
6  the same age?
7          MS. SHEVLIN:  Asked and answered.
8          THE WITNESS:  No.
9          MR. ROBERTS:  Okay.  All right.  No further
10 questions.
11         MR. CARSON:  Amy, you good?
12         MS. SHEVLIN:  I am good.  Thank you.
13         MR. CARSON:  All right.  I have no questions.
14 She'll read if it's ordered, through me.
15         THE VIDEOGRAPHER:  This concludes the
16 videotaped deposition of Mikayla Preston on
17 March 13th, 2025.  We are going off the record at
18 6:37 p.m.
19         (Witness excused.)
20         (Deposition concluded at 6:38 p.m.)
21                    - - -
22
23
24
25

308

1
2                    CERTIFICATE OF OATH
3  STATE OF FLORIDA    )
4  COUNTY OF ST. JOHNS )
5          I, Nicole Medlock, Registered Professional
6  Reporter, Notary Public, State of Florida, certify that
7  MIKAYLA PRESTON personally appeared before me on
8  March 13, 2025, and was sworn.
9          Signed this 4th day of April, 2025.
10
11
12
13     /s/ Nicole Medlock
       Nicole Medlock, RPR and FPR-C
14     Notary Public, State of Florida
       My Commission No. HH 285922
15     Expires:  July 24, 2026
16
17
18
19
20
21         Personally known _____
22     OR Produced Identification ____X____
       Type of Identification Produced Driver's License
23
24
25

309

1        C E R T I F I C A T E

2   STATE OF FLORIDA    )
3   COUNTY OF ST. JOHNS )
4          I, Nicole Medlock, Registered Professional
5   Reporter, certify that I was authorized and did
6   stenographically report the deposition of MIKAYLA
7   PRESTON; that a review of the transcript was requested;
8   and that the transcript is a true and complete record of
9   my stenographic notes.
10         I further certify that I am not a relative,
11  employee, attorney, or counsel of any of the parties,
12  nor am I a relative or employee of any of the parties'
13  attorney or counsel connected with the action, nor am I
14  financially interested in the action.
15         Signed this 4th day of April, 2025.
16
17
18         /s/ Nicole Medlock
           Nicole Medlock, RPR and FPR-C
19
20

21

22

23

24
25

310

1        E R R A T A  S H E E T

2   WILLIAM LEE LAWSHE, an individual,
            v.
3   MIKAYLA PRESTON, in her individual capacity as a
    detective for St. Johns County Sheriff's Office, and
4   KATHLEEN DULLY, in her individual capacity as medical
    director of the UF Child Protection Team
5   Case No.:  3:24-cv-44-MMH-MCR
    Depo taken:  03/13/2025
6   _____
    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES BELOW
7
    PAGE   LINE  CHANGE        REASON
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  "Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
24  are true."

    _____        _____
25  Date            MIKAYLA PRESTON

**'**

**'22** [1] - 88:13

**/**

**/s** [2] - 308:12, 309:18

**0**

**0** [1] - 287:21
**0059** [2] - 289:4, 289:5
**03/13/2025** [1] - 310:5
**05** [1] - 289:5
**071** [1] - 85:16
**071(5)** [1] - 85:18

**1**

**1** [14] - 3:13, 4:2, 13:22, 14:8, 82:20, 85:17, 87:5, 89:9, 207:22, 277:10, 277:17, 292:24, 292:25, 304:9
**1/22/23** [1] - 87:9
**1/28/23** [1] - 87:9
**10** [2] - 43:21, 278:2
**107** [1] - 3:18
**11** [1] - 58:13
**12** [11] - 206:4, 283:21, 289:17, 290:4, 290:14, 291:10, 291:25, 292:3, 298:23, 299:13, 302:24
**123** [2] - 2:11
**1260** [2] - 1:19, 4:8
**13** [14] - 1:16, 75:19, 76:6, 83:20, 160:19, 161:21, 162:10, 164:7, 165:20, 285:9, 285:18, 299:3, 302:24, 308:8
**13-year-old** [4] - 75:16, 76:16, 209:3, 299:12
**13.5** [2] - 160:6, 293:2
**13th** [4] - 4:10, 6:22, 21:21, 307:17
**14** [3] - 3:13, 74:18, 74:19
**15** [11] - 206:4, 283:22, 289:17, 290:4, 290:14, 291:10, 291:25, 292:3, 298:23, 301:23, 302:24
**15-year-old** [1] - 299:13
**1537** [1] - 14:5
**16** [2] - 81:10, 278:7

**161** [1] - 3:20
**1680** [1] - 2:4
**17** [5] - 58:13, 58:16, 59:14, 59:23, 278:7
**17-year-old** [2] - 59:8, 60:21
**18** [30] - 58:2, 58:4, 58:16, 58:19, 59:12, 59:13, 59:14, 60:5, 60:15, 79:5, 79:25, 81:10, 81:16, 93:12, 93:21, 123:10, 123:15, 151:9, 151:21, 166:1, 212:24, 241:8, 270:15, 277:2, 279:15, 283:4, 302:21, 306:9
**18-year-old** [5] - 58:9, 59:7, 59:21, 60:20, 109:23
**18-year-olds** [2] - 60:6, 60:9
**18th** [1] - 2:17
**19** [6] - 58:3, 59:23, 81:10, 151:9, 212:24, 299:12
**19-year-olds** [1] - 58:5
**1900** [1] - 2:17
**1:01** [2] - 1:17, 4:10

**2**

**2** [9] - 3:14, 15:7, 16:18, 38:13, 38:15, 38:17, 82:24, 87:3, 129:10
**20** [3] - 140:16, 166:5, 277:25
**20/20** [1] - 190:24
**2018** [1] - 3:17
**2019** [2] - 229:25, 230:2
**2020** [1] - 283:14
**2022** [1] - 6:2
**2023** [29] - 3:15, 6:25, 10:8, 10:15, 11:11, 33:5, 42:19, 42:20, 43:10, 44:12, 88:13, 91:6, 126:23, 129:9, 132:4, 261:5, 262:15, 266:16, 271:4, 271:13, 273:23, 274:1, 274:5, 276:21, 282:6, 282:7, 282:14, 283:14
**2025** [12] - 1:16, 4:10, 6:22, 8:9, 10:9, 21:21, 33:20, 156:11, 307:17,

308:8, 308:9, 309:15
**2026** [1] - 308:14
**20th** [1] - 266:9
**21** [2] - 3:15, 277:4
**21st** [1] - 43:10
**22** [1] - 276:23
**223** [1] - 3:21
**22nd** [26] - 91:5, 94:23, 106:12, 107:8, 114:5, 115:18, 124:24, 192:25, 203:11, 205:6, 205:21, 266:9, 266:11, 266:12, 266:19, 266:22, 267:7, 268:1, 268:22, 271:3, 271:13, 272:7, 282:5, 282:14, 283:16, 287:24
**23** [4] - 277:4, 277:9, 277:17, 277:18
**24** [1] - 308:14
**241** [1] - 3:22
**263** [1] - 3:5
**27.071** [1] - 169:20
**27th** [2] - 229:25, 230:2
**285922** [1] - 308:14
**287** [1] - 3:6
**28th** [6] - 129:8, 129:9, 130:21, 130:22, 132:4, 203:16
**29** [1] - 277:24
**2:22** [2] - 82:21, 82:22
**2:32** [2] - 82:22, 82:25

**3**

**3** [16] - 3:15, 18:7, 18:8, 43:4, 43:5, 43:14, 168:24, 206:3, 206:7, 283:21, 289:16, 290:14, 290:20, 291:24, 292:3, 304:8
**30** [3] - 43:17, 43:18, 140:17
**300** [1] - 2:17
**308** [1] - 3:7
**309** [1] - 3:9
**310** [1] - 3:9
**32084** [1] - 1:20
**32207-6104** [1] - 2:5
**32301-1509** [1] - 2:11
**34471-8237** [1] - 2:18
**352-629-4099** [1] - 2:18
**37** [1] - 83:11

**38** [3] - 3:14, 74:11, 74:20
**3:24-cv-00044-MMH-MCR** [1] - 4:7
**3:24-cv-44-MMH-MCR** [2] - 1:5, 310:5
**3:56** [2] - 168:21, 168:22

**4**

**4** [24] - 3:16, 44:24, 45:1, 45:10, 46:20, 94:5, 116:22, 206:3, 206:7, 206:9, 209:20, 283:21, 284:24, 285:5, 289:16, 289:17, 290:13, 290:17, 290:20, 291:10, 291:24, 292:3, 292:22, 304:8
**43** [1] - 3:15
**45** [1] - 3:16
**4:06** [2] - 168:22, 168:25
**4th** [2] - 308:9, 309:15

**5**

**5** [15] - 3:4, 3:17, 85:23, 86:6, 94:5, 169:25, 209:21, 277:10, 277:17, 277:25, 278:2, 284:24, 285:5, 292:22
**5)(a** [1] - 86:6
**5:23** [2] - 246:15, 246:16
**5:32** [2] - 246:16, 246:18
**5th** [22] - 193:11, 205:10, 206:25, 266:13, 268:22, 268:23, 271:4, 271:8, 271:12, 272:3, 272:12, 273:23, 274:1, 274:5, 282:7, 283:13, 283:14, 284:9, 287:22, 295:10, 295:12, 298:13

**6**

**6** [7] - 3:18, 83:12, 94:6, 94:7, 94:9, 107:2, 107:3
**6:37** [1] - 307:18
**6:38** [2] - 1:17, 307:20

**7**

**7** [5] - 3:20, 160:24, 161:3, 161:9, 164:6

**8**

**8** [8] - 3:21, 223:7, 223:11, 223:17, 223:23, 246:20, 287:6
**817.071** [1] - 3:17
**827** [1] - 85:16
**827.015** [1] - 85:15
**827.071(5** [1] - 171:11
**85** [1] - 3:17
**850-205-1996** [1] - 2:12
**8A** [5] - 223:21, 299:3, 300:25, 302:7, 304:9
**8C** [6] - 289:5, 298:21, 300:8, 301:1, 302:9, 304:8
**8E** [1] - 244:19

**9**

**9** [19] - 3:22, 160:6, 160:19, 161:21, 162:9, 162:10, 164:7, 165:20, 209:2, 241:18, 241:19, 285:9, 285:18, 293:2, 299:3, 299:12, 301:22, 302:24
**904-398-1992** [1] - 2:5

**A**

**A1** [1] - 18:9
**A2** [7] - 18:1, 18:5, 18:9, 35:5, 35:6, 35:24, 89:17
**Aaron** [2] - 126:15, 126:18
**ability** [18] - 59:13, 59:17, 61:4, 68:21, 102:25, 103:25, 104:10, 133:17, 133:21, 145:6, 146:5, 175:21, 176:10, 176:16, 227:7, 228:4, 228:5, 306:11
**able** [23] - 24:4, 25:4, 28:14, 50:19, 69:17, 69:21, 74:25, 121:15, 127:3, 127:7, 133:16, 135:6, 140:5, 151:2, 161:24, 163:3,

163:5, 180:16,
221:19, 231:1,
249:16, 253:2,
275:24
**absolutely** [2] -
154:23, 268:11
**abuse** [12] - 12:14,
23:6, 26:9, 26:12,
58:15, 85:19, 92:16,
155:19, 171:23,
219:15, 229:6,
229:12
**abusing** [1] - 233:17
**accept** [1] - 241:8
**access** [4] - 176:10,
218:9, 218:13,
218:16
**accompanying** [1] -
266:1
**according** [2] - 35:24,
292:2
**account** [1] - 134:25
**accurate** [3] - 42:21,
140:9, 285:12
**accurately** [10] -
103:12, 103:21,
106:13, 120:24,
211:3, 216:24,
285:1, 285:13,
285:20
**accused** [1] - 46:18
**achieved** [1] - 291:9
**acknowledge** [3] -
77:11, 121:20,
174:14
**acknowledged** [2] -
110:2, 182:21
**acknowledging** [1] -
247:6
**acronym** [5] - 6:4, 6:5,
13:19, 116:14,
116:16
**act** [2] - 18:9, 109:16
**acted** [2] - 270:24,
271:2
**action** [3] - 11:15,
309:13, 309:14
**active** [1] - 268:8
**actual** [8] - 33:25,
40:6, 42:25, 153:3,
167:20, 227:9,
228:9, 233:13
**added** [1] - 216:3
**addition** [1] - 272:2
**additional** [13] -
205:11, 206:1,
206:22, 251:13,
271:16, 272:4,
272:14, 273:18,
288:4, 288:25,

289:3, 291:22
**additionally** [1] - 91:5
**address** [3] - 10:1,
30:19, 134:24
**addresses** [1] -
134:24
**admit** [1] - 9:17
**adult** [52] - 34:16,
63:16, 68:6, 69:4,
69:9, 69:10, 69:19,
71:23, 73:8, 91:15,
96:25, 97:4, 98:7,
101:7, 101:19,
102:4, 103:2, 110:4,
110:7, 110:13,
124:1, 126:3, 126:6,
136:3, 141:2,
163:19, 167:4,
167:14, 168:16,
169:11, 169:15,
172:22, 173:3,
173:7, 173:14,
174:5, 174:24,
177:4, 181:4, 182:6,
206:10, 207:17,
207:24, 208:5,
209:4, 209:21,
211:19, 220:5,
226:24, 241:1,
254:10, 306:3
**adults** [34] - 8:10,
8:17, 68:1, 68:3,
72:7, 72:8, 72:19,
84:19, 84:20, 84:23,
124:5, 140:22,
150:13, 151:12,
151:16, 152:12,
152:18, 153:12,
153:20, 168:3,
168:8, 168:12,
168:14, 175:7,
212:1, 212:7,
212:16, 213:10,
214:22, 215:6,
219:1, 219:11,
228:9, 263:21
**advise** [2] - 47:12,
47:18
**affected** [1] - 150:2
**affiant** [2] - 87:25,
91:6
**Affidavit** [1] - 3:14
**affidavit** [29] - 38:15,
39:19, 54:14, 85:5,
85:9, 85:14, 86:24,
88:3, 89:17, 91:15,
92:6, 130:19,
130:25, 131:11,
132:19, 133:5,
136:20, 137:5,

149:20, 150:11,
151:19, 152:10,
154:14, 199:12,
203:17, 213:8,
219:9, 240:2, 270:13
**affidavits** [1] - 7:21
**affiliations** [1] - 4:15
**afternoon** [1] - 5:10
**afterwards** [2] - 120:8,
189:8
**age** [110] - 55:20,
55:24, 56:9, 56:13,
56:22, 57:2, 57:16,
57:19, 57:25, 58:6,
58:9, 58:16, 59:21,
60:1, 60:5, 60:7,
67:21, 81:12, 81:15,
82:5, 90:19, 92:8,
96:19, 96:23, 98:15,
99:12, 99:19, 99:20,
99:24, 101:11,
103:13, 104:1,
104:11, 104:23,
105:21, 106:4,
106:13, 106:18,
123:10, 123:15,
124:15, 124:25,
125:7, 131:17,
136:5, 141:9,
141:16, 147:15,
147:23, 148:19,
160:6, 161:24,
162:5, 162:7,
165:17, 165:20,
165:22, 167:2,
167:20, 167:23,
169:8, 169:11,
169:13, 169:14,
172:13, 172:17,
172:24, 173:2,
173:6, 173:8,
173:22, 180:15,
180:17, 181:3,
182:6, 184:3, 203:6,
206:4, 212:22,
215:11, 215:12,
216:11, 216:13,
217:11, 232:16,
242:24, 276:10,
277:2, 281:3, 283:4,
285:10, 285:19,
289:17, 290:14,
291:11, 291:25,
293:2, 298:14,
298:22, 302:25,
304:22, 305:8,
305:16, 306:9,
306:14, 306:21,
307:6
**age-difficult** [36] -

55:20, 55:24, 56:9,
56:13, 56:22, 57:2,
57:16, 57:19, 57:25,
58:6, 58:9, 59:21,
60:1, 60:5, 60:7,
96:19, 96:23, 98:15,
99:12, 99:19, 99:20,
99:24, 101:11,
169:8, 169:11,
169:13, 169:14,
172:13, 172:24,
173:2, 173:6, 173:8,
181:3, 182:6, 203:6,
276:10
**aged** [1] - 304:8
**agencies** [1] - 73:11
**agency** [7] - 22:17,
113:24, 148:7,
153:1, 218:11,
218:19, 267:13
**agency-issued** [1] -
267:13
**agent** [1] - 262:17
**ages** [3] - 283:21,
286:1, 306:23
**aging** [2] - 173:22,
178:13
**ago** [7] - 10:5, 10:9,
50:5, 102:23,
242:21, 260:1, 278:9
**agree** [40] - 8:9, 8:12,
8:17, 12:8, 34:19,
40:13, 49:12, 55:20,
69:2, 70:25, 92:21,
93:11, 109:21,
111:13, 113:8,
120:7, 144:18,
160:9, 160:10,
170:11, 170:15,
172:20, 174:19,
175:16, 177:4,
177:14, 179:4,
195:24, 242:22,
275:17, 275:19,
282:25, 283:5,
283:10, 283:23,
284:6, 284:25,
286:6, 287:10,
298:21
**agreed** [2] - 199:5,
202:1
**agreement** [1] - 203:2
**ahead** [6] - 18:20,
45:16, 171:1,
231:17, 271:7, 287:3
**al** [1] - 4:4
**alert** [1] - 90:13
**all/be** [1] - 183:10
**allegation** [1] - 95:23
**alleged** [1] - 166:8

**allow** [1] - 152:25
**allowed** [2] - 22:13,
197:18
**allowing** [1] - 23:14
**almost** [2] - 117:18,
235:23
**alone** [3] - 185:3,
221:1, 265:25
**ALSO** [1] - 2:22
**altered** [9] - 77:18,
78:9, 78:12, 78:16,
78:21, 279:14,
280:4, 280:7, 280:22
**altering** [1] - 280:10
**amateurs** [1] - 278:25
**Americans** [1] - 63:16
**amount** [3] - 47:22,
262:18, 262:19
**AmourAngels** [8] -
224:20, 225:13,
225:23, 226:6,
226:14, 229:8,
229:18, 230:2
**AMY** [1] - 2:16
**Amy** [7] - 4:21, 13:23,
18:17, 38:16, 222:4,
263:7, 307:11
**analysis** [1] - 195:19
**anatomical** [1] - 160:7
**ANDREW** [1] - 2:23
**Andrew** [1] - 4:11
**ANN** [1] - 2:9
**answer** [41] - 8:16,
21:25, 22:11, 22:13,
23:4, 23:8, 23:24,
24:1, 24:2, 26:23,
26:25, 39:10, 42:21,
43:21, 53:16, 53:17,
72:14, 74:21, 83:20,
86:12, 103:4,
103:16, 105:3,
105:25, 177:10,
180:18, 184:11,
190:1, 190:8,
190:11, 193:14,
212:11, 215:8,
245:19, 250:1,
250:10, 250:21,
250:24, 263:15,
301:6
**answered** [11] -
208:15, 209:6,
277:10, 277:20,
284:14, 300:2,
301:3, 302:12,
305:3, 306:16, 307:7
**answering** [2] - 12:24,
32:19
**answers** [3] - 49:8,
199:7, 269:9

**anterior** [5] - 117:1,
117:5, 117:11,
117:21
**anyway** [2] - 34:6,
93:8
**apart** [3] - 292:24,
294:24, 307:4
**apologize** [2] - 27:6,
264:5
**app** [1] - 75:21
**apparent** [1] - 123:25
**appear** [43] - 29:16,
61:13, 62:1, 65:2,
77:9, 111:15,
116:25, 117:4,
117:21, 120:9,
120:11, 120:18,
138:13, 139:11,
160:4, 160:15,
226:2, 234:1,
234:20, 234:25,
247:4, 273:14,
279:15, 283:9,
285:17, 287:11,
287:13, 289:8,
292:21, 299:24,
300:7, 300:17,
300:23, 300:25,
301:16, 302:7,
304:21, 305:16,
306:13, 306:20,
306:23, 307:3, 307:5
**appearance** [8] -
78:24, 90:19,
124:13, 160:5,
285:9, 285:18,
291:10, 293:1
**appearances** [2] -
120:8, 238:23
**appeared** [11] - 34:16,
61:14, 65:4, 78:16,
83:25, 138:12,
204:15, 297:19,
298:5, 303:6, 308:7
**appearing** [4] - 2:7,
2:14, 2:20, 287:17
**applied** [6] - 35:3,
37:9, 37:13, 37:19,
132:3, 202:16
**apply** [2] - 105:10,
275:25
**applying** [1] - 108:17
**appreciably** [1] -
243:9
**appreciate** [5] - 48:13,
59:10, 222:17,
286:24, 296:11
**approach** [1] - 181:2
**approve** [1] - 196:23
**April** [25] - 6:25,

193:11, 205:10,
206:25, 266:11,
266:13, 268:22,
268:23, 271:4,
271:8, 271:12,
272:3, 273:23,
274:1, 274:5, 282:7,
283:13, 283:14,
284:9, 287:22,
295:10, 295:12,
298:13, 308:9,
309:15
**area** [1] - 160:3
**Argentina** [1] - 279:1
**argument** [1] - 184:15
**array** [1] - 247:14
**arrest** [32] - 6:23,
141:23, 142:18,
142:19, 143:1,
144:22, 146:15,
146:25, 147:18,
150:4, 154:11,
179:9, 183:19,
188:11, 188:17,
188:21, 190:11,
192:3, 193:13,
195:25, 196:3,
196:18, 198:2,
198:17, 199:3,
199:5, 200:7, 201:5,
201:7, 255:7,
274:21, 293:5
**arrested** [12] - 150:9,
150:14, 151:8,
153:18, 153:23,
154:8, 154:10,
154:15, 154:24,
188:9, 197:5, 215:10
**arresting** [3] - 143:16,
145:11, 183:13
**art** [3] - 21:11, 57:19,
246:15
**art.com** [64] - 3:16,
21:14, 21:22, 25:9,
25:24, 26:12, 29:14,
29:16, 31:4, 31:11,
31:22, 32:7, 33:2,
34:7, 36:16, 36:23,
37:11, 37:15, 37:25,
39:3, 39:7, 39:16,
40:4, 40:9, 40:20,
41:22, 42:3, 42:20,
44:5, 44:15, 45:6,
45:24, 46:13, 51:23,
52:3, 52:5, 52:17,
52:25, 54:24, 55:4,
55:13, 71:2, 71:9,
71:11, 83:4, 84:3,
84:6, 131:24,
144:14, 144:19,

144:22, 145:9,
145:13, 146:14,
174:20, 183:17,
183:22, 184:2,
230:24, 232:18,
232:22, 278:16,
278:17, 278:24
**art.com's** [1] - 147:14
**article** [2] - 49:19,
49:25
**articulate** [4] - 48:2,
76:20, 179:13,
186:10
**ashevlin @rbtrial.**
**com** [1] - 2:19
**Asian** [1] - 279:1
**aside** [2] - 83:12,
83:13
**aspect** [3] - 121:3,
154:20, 237:3
**assessment** [3] -
35:25, 181:10, 283:5
**assigned** [3] - 87:25,
88:2, 96:16
**assigns** [1] - 191:18
**assistance** [1] - 204:4
**assistant** [1] - 128:12
**assisted** [1] - 204:5
**associated** [3] -
34:12, 134:25, 257:5
**association** [1] -
29:14
**assume** [2] - 24:21,
116:20
**assumes** [3] - 293:17,
295:6, 298:17
**assuming** [8] - 44:14,
83:23, 142:22,
142:23, 262:25,
267:20, 292:19,
292:25
**assumption** [1] -
267:23
**attach** [7] - 46:3, 46:4,
46:5, 46:19, 85:22,
221:15, 223:6
**attached** [3] - 56:18,
91:4, 257:7
**attaching** [1] - 149:7
**attachments** [1] -
149:16
**attempt** [8] - 24:8,
68:12, 70:23,
155:15, 187:15,
218:23, 246:6,
281:22
**attempted** [4] - 24:9,
146:10, 150:4,
229:22
**attempting** [1] - 240:3

**attention** [2] - 74:9,
282:16
**attest** [2] - 210:18,
303:1
**attorney** [24] - 7:25,
25:6, 25:10, 128:12,
146:1, 146:2, 146:6,
151:19, 152:10,
183:8, 192:5, 198:6,
198:24, 199:19,
200:15, 200:25,
201:3, 202:3, 219:9,
241:14, 270:14,
298:4, 309:11,
309:13
**Attorney's** [1] - 259:13
**attorney's** [1] - 201:8
**attorneys** [1] - 197:24
**audio** [1] - 263:9
**Augustine** [3] - 1:18,
1:20, 4:9
**authentic** [1] - 150:18
**author** [4] - 268:20,
268:24, 269:22,
270:3
**authored** [2] - 271:3,
282:7
**authorized** [1] - 309:5
**automatically** [4] -
112:1, 185:12,
221:2, 221:6
**AUTUMN** [1] - 2:24
**availability** [1] - 176:9
**available** [3] - 119:3,
142:21, 147:13
**Avenue** [1] - 2:17
**avoid** [1] - 228:16
**avoiding** [1] - 228:18
**aware** [7] - 26:8, 33:9,
67:23, 123:2,
126:14, 241:2,
278:18
**awkward** [3] - 74:15,
74:16, 77:1

## B

**background** [6] -
87:23, 96:12,
102:14, 235:21,
236:3, 236:4
**background 's** [1] -
220:19
**backgrounds** [1] -
304:17
**bad** [4] - 221:20,
221:24, 232:16,
272:24
**badgering** [2] - 48:20,
48:25

**ball** [1] - 163:7
**banner** [1] - 226:8
**base** [2] - 222:13,
274:23
**baseball** [1] - 108:13
**based** [82] - 18:3,
19:18, 28:5, 35:14,
35:19, 35:20, 36:2,
37:1, 38:4, 39:11,
49:1, 51:12, 52:13,
53:25, 69:7, 71:17,
74:1, 75:2, 75:3,
75:4, 80:19, 87:12,
104:7, 104:8,
104:15, 105:3,
108:15, 112:2,
113:10, 124:3,
133:15, 133:20,
139:13, 139:19,
140:24, 142:20,
150:19, 153:15,
155:5, 156:22,
161:23, 162:20,
163:13, 164:12,
164:16, 167:22,
172:11, 172:12,
178:5, 185:3,
188:19, 211:7,
214:7, 214:17,
215:17, 219:8,
219:12, 219:18,
225:16, 243:15,
243:22, 248:5,
263:18, 274:17,
274:22, 279:4,
279:6, 279:8, 279:9,
280:3, 281:7,
281:10, 292:8,
297:5, 298:24,
299:2, 299:4,
301:10, 301:11,
301:12
**bases** [2] - 96:20,
100:4
**basic** [1] - 58:11
**basing** [1] - 66:23
**basis** [5] - 53:2, 73:17,
73:23, 177:24, 178:4
**bathroom** [2] - 62:13,
83:18
**bear** [1] - 272:25
**beat** [1] - 216:8
**beauties** [1] - 278:25
**bed** [1] - 58:24
**bedroom** [2] - 62:14,
83:16
**beef** [1] - 180:22
**began** [2] - 13:14,
14:13
**begin** [3] - 18:25,

275:13, 294:7
**beginning** [4] - 82:23, 89:1, 168:23, 178:23
**begins** [5] - 4:1, 288:13, 290:7, 295:10, 295:12
**begun** [1] - 90:14
**behalf** [5] - 1:15, 2:7, 2:14, 2:20, 5:3
**belabor** [1] - 239:12
**belief** [4] - 9:4, 177:25, 219:13, 297:10
**bell** [1] - 20:12
**belly** [1] - 162:21
**below** [1] - 81:15
**BELOW** [1] - 310:6
**best** [3] - 159:10, 159:11, 222:15
**better** [2] - 81:4, 161:15
**between** [21] - 31:22, 34:25, 37:8, 37:25, 38:6, 39:2, 39:6, 54:23, 55:4, 129:18, 130:24, 165:21, 169:5, 184:17, 203:2, 203:16, 214:4, 277:25, 283:21, 285:25, 297:18
**beyond** [2] - 153:19, 304:13
**bias** [5] - 108:7, 108:9, 108:14, 108:22, 108:24
**big** [1] - 231:25
**Big** [11] - 157:24, 159:24, 207:2, 207:6, 224:8, 224:10, 224:11, 224:21, 230:2, 244:19, 272:22
**birth** [3] - 214:4, 215:24, 240:22
**birthday** [4] - 58:24, 213:21, 214:9, 216:24
**bit** [12] - 7:14, 9:24, 26:7, 38:12, 79:9, 138:23, 179:12, 185:8, 263:8, 271:6, 276:19, 282:9
**black** [3] - 160:1, 243:16, 243:23
**blindly** [1] - 228:12
**blue** [1] - 108:13
**board** [2] - 59:5, 175:10
**body** [6] - 58:7, 58:20, 75:1, 75:5, 79:11,

82:4
**boobs** [2] - 279:3
**book** [1] - 114:22
**booking** [1] - 255:7
**border** [1] - 100:16
**bottom** [7] - 29:20, 79:8, 206:20, 231:11, 232:13, 272:22, 285:16
**bought** [1] - 64:7
**Boulevard** [2] - 1:19, 4:8
**break** [7] - 9:13, 82:13, 94:1, 164:20, 168:19, 277:15, 278:1
**breaking** [2] - 118:3, 118:20
**breast** [2] - 209:17, 209:20
**breasts** [14] - 79:13, 79:17, 157:17, 157:23, 161:13, 163:9, 164:1, 207:17, 207:25, 208:5, 208:12, 209:4, 285:3, 292:22
**briefly** [1] - 274:14
**bring** [6] - 133:21, 219:4, 257:1, 274:13, 274:24, 286:18
**British** [1] - 95:18
**broad** [1] - 26:2
**broke** [7] - 118:10, 273:25, 277:14, 281:6, 281:16, 284:14
**brother** [1] - 64:9
**brought** [12] - 5:16, 110:1, 113:24, 115:6, 177:9, 189:16, 197:12, 197:13, 200:15, 205:11, 274:16, 275:15
**Buchanan** [2] - 2:17
**buck** [2] - 198:16, 198:22
**building** [1] - 186:15
**bunch** [2] - 14:2, 223:16
**burn** [1] - 120:13
**business** [1] - 270:3
**button** [1] - 162:21
**BY** [263] - 5:9, 8:14, 9:23, 10:24, 11:18, 11:22, 14:10, 18:21, 20:20, 22:5, 22:19, 23:20, 24:17, 24:23,

25:2, 26:4, 26:17, 27:12, 27:17, 30:8, 35:15, 36:20, 38:19, 39:13, 40:18, 41:15, 43:16, 45:3, 45:22, 47:1, 49:11, 49:21, 52:9, 66:9, 70:2, 70:18, 72:10, 72:15, 73:22, 74:17, 81:23, 82:7, 83:1, 86:1, 86:15, 92:4, 92:12, 93:5, 94:8, 94:18, 96:22, 97:10, 97:22, 98:1, 98:19, 98:23, 99:15, 100:21, 101:13, 101:24, 103:8, 103:23, 104:6, 104:16, 105:4, 106:8, 106:22, 107:5, 110:8, 110:17, 110:22, 111:24, 113:2, 113:6, 114:21, 116:9, 117:16, 118:1, 118:12, 119:7, 122:11, 123:7, 123:21, 124:10, 124:18, 125:3, 125:11, 125:23, 126:11, 127:23, 128:4, 129:16, 129:24, 131:3, 132:8, 132:17, 141:6, 142:4, 142:9, 142:12, 143:5, 143:9, 143:21, 144:1, 146:18, 147:6, 149:1, 150:20, 151:5, 151:14, 152:3, 152:9, 152:15, 152:22, 153:10, 153:16, 153:24, 154:6, 154:21, 155:7, 155:14, 158:12, 158:23, 161:11, 162:1, 162:15, 163:2, 163:15, 163:24, 164:14, 164:22, 165:3, 165:15, 166:14, 167:3, 167:12, 167:16, 167:24, 168:7, 168:11, 169:1, 170:5, 170:21, 171:3, 171:9, 173:1, 173:10, 175:14, 176:2, 176:6, 176:14, 176:24,

177:21, 178:17, 181:8, 183:11, 184:1, 184:19, 185:15, 188:1, 188:7, 188:22, 189:4, 190:3, 190:18, 191:21, 192:12, 192:22, 193:10, 193:17, 194:3, 194:19, 195:10, 197:9, 200:4, 203:1, 206:19, 207:16, 207:20, 208:8, 208:20, 209:7, 209:19, 209:23, 210:4, 210:11, 210:19, 211:5, 211:9, 211:22, 212:5, 212:14, 213:1, 214:13, 214:19, 215:14, 215:23, 216:5, 217:14, 218:2, 218:8, 218:24, 221:13, 221:22, 222:19, 224:1, 230:10, 230:14, 231:18, 232:8, 238:5, 238:18, 240:8, 241:6, 241:21, 243:5, 244:1, 245:23, 246:19, 249:17, 254:3, 254:16, 263:6, 270:19, 273:16, 284:13, 284:21, 287:5, 289:19, 289:22, 290:6, 290:19, 291:14, 291:19, 292:6, 293:10, 293:13, 293:19, 294:2, 294:9, 295:1, 295:8, 296:1, 296:17, 296:24, 298:20, 299:23, 300:4, 300:15, 301:9, 302:1, 302:19, 303:11, 304:2, 304:11, 304:20, 305:1, 305:4, 305:11, 305:14, 306:1, 306:6, 306:18

---

# C

**California** [5] - 25:10, 151:19, 152:11, 219:10, 270:14

**Camden** [3] - 20:7, 260:6, 261:11
**cancer** [7] - 179:19, 179:20, 179:22, 179:25, 180:3
**cannot** [22] - 28:3, 28:17, 28:24, 52:24, 56:5, 70:15, 82:6, 195:7, 200:18, 203:4, 214:6, 220:13, 241:4, 250:17, 280:14, 293:15, 301:16, 302:18, 306:9, 306:17, 306:20, 307:4
**cap** [1] - 108:13
**capacity** [4] - 1:7, 1:9, 310:3, 310:4
**care** [1] - 23:5
**career** [3] - 189:6, 215:10, 268:5
**Carson** [2] - 4:19, 222:4
**CARSON** [219] - 2:9, 4:19, 9:13, 9:16, 9:19, 11:17, 18:16, 21:24, 22:8, 22:10, 22:13, 23:18, 24:16, 24:19, 25:1, 26:1, 26:14, 27:10, 27:15, 30:5, 35:13, 36:17, 39:9, 40:16, 41:13, 45:10, 45:13, 45:25, 46:5, 46:7, 46:11, 46:13, 46:16, 46:22, 47:12, 47:21, 48:4, 48:15, 48:19, 49:20, 52:8, 66:2, 66:4, 69:20, 70:13, 72:9, 72:13, 73:20, 82:14, 86:8, 86:11, 94:6, 98:21, 99:14, 103:15, 104:24, 105:24, 110:5, 110:14, 110:20, 111:21, 112:24, 113:5, 117:14, 117:23, 118:7, 122:4, 123:5, 127:22, 128:3, 132:5, 132:14, 141:4, 141:6, 142:1, 142:7, 142:11, 143:4, 143:8, 143:18, 143:23, 146:16, 147:2, 148:21, 150:16, 150:24, 151:11, 151:24, 152:7,

152:13, 152:19, 153:8, 153:13, 153:21, 154:3, 154:16, 155:1, 155:11, 158:7, 158:10, 161:1, 161:22, 162:13, 162:25, 163:10, 163:21, 164:8, 164:17, 164:21, 164:25, 165:13, 166:11, 166:24, 167:6, 167:15, 167:21, 168:5, 168:9, 168:17, 169:25, 170:2, 170:20, 170:24, 171:1, 171:8, 172:23, 173:4, 175:8, 175:25, 176:5, 176:13, 176:18, 177:17, 178:14, 181:5, 183:1, 183:24, 184:18, 185:10, 187:23, 188:4, 188:18, 189:3, 189:25, 190:16, 192:17, 193:24, 194:2, 194:10, 194:14, 197:7, 200:2, 202:25, 208:8, 208:20, 209:22, 210:8, 210:14, 210:25, 211:20, 212:3, 212:9, 212:18, 214:12, 214:15, 215:13, 215:21, 216:1, 217:13, 217:25, 218:6, 218:22, 221:11, 221:16, 222:4, 222:12, 222:15, 230:8, 230:13, 231:17, 238:4, 238:12, 240:6, 241:3, 243:1, 243:21, 245:22, 249:13, 253:23, 254:14, 263:1, 263:3, 287:1, 287:3, 289:18, 289:25, 290:15, 291:13, 292:4, 293:12, 293:22, 294:18, 295:4, 295:15, 296:16, 298:15, 299:15, 300:9, 301:18, 302:10, 303:8, 303:23,

304:10, 304:23, 305:9, 305:23, 306:5, 307:11, 307:13
**CASE** [1] - 1:4
**case** [79] - 5:16, 6:8, 6:9, 7:4, 7:21, 8:10, 10:3, 10:7, 13:15, 15:2, 16:3, 19:14, 20:1, 20:3, 45:7, 45:8, 46:14, 46:18, 48:11, 51:17, 51:20, 51:22, 51:24, 53:15, 53:17, 56:1, 59:3, 67:6, 68:22, 77:12, 83:7, 92:21, 96:9, 97:6, 97:14, 98:2, 99:13, 100:3, 100:8, 100:16, 106:10, 125:22, 126:12, 126:17, 127:8, 175:19, 176:1, 176:3, 186:4, 186:24, 187:1, 187:15, 187:16, 192:9, 195:19, 195:21, 198:2, 200:1, 200:6, 200:15, 201:2, 217:20, 227:19, 229:14, 241:13, 249:8, 249:19, 263:8, 264:13, 264:17, 265:13, 274:9, 275:11, 276:1, 276:4, 301:10
**Case** [2] - 4:6, 310:5
**cases** [17] - 51:14, 88:9, 92:5, 92:17, 92:24, 97:16, 98:5, 98:8, 99:19, 100:6, 100:10, 100:18, 100:19, 168:1, 186:3, 186:7, 262:18
**catastrophic** [1] - 189:22
**categorization** [3] - 18:1, 35:14, 89:13
**categorize** [2] - 34:5, 35:16
**categorized** [1] - 58:5
**category** [1] - 57:22
**caution** [1] - 34:20
**cautious** [2] - 228:11, 228:19
**cell** [5] - 61:24, 62:1, 135:3, 135:5, 251:19
**Cellebrite** [2] - 251:21, 252:8
**cellular** [1] - 63:12

**Center** [3] - 13:20, 108:19, 109:14
**centerfold** [6] - 63:2, 64:16, 64:18, 64:25, 65:3
**centerfold-type** [2] - 63:2, 65:3
**certain** [17] - 75:8, 92:7, 96:14, 112:15, 128:10, 138:18, 143:12, 148:23, 165:21, 184:5, 196:4, 204:6, 224:23, 225:1, 238:25, 246:3, 298:11
**certainly** [1] - 59:10
**certificate** [1] - 215:24
**CERTIFICATE** [1] - 308:1
**Certificate** [2] - 3:7, 3:8
**certified** [6] - 74:3, 285:23, 286:4, 286:5, 301:23
**certifies** [1] - 286:2
**certify** [4] - 178:7, 308:6, 309:5, 309:10
**chambers** [1] - 133:17
**chance** [2] - 230:5, 244:5
**CHANGE** [1] - 310:7
**change** [2] - 49:6, 154:5
**changed** [5] - 109:25, 154:18, 195:18, 195:20, 236:18
**CHANGES** [1] - 310:6
**characterization** [4] - 27:22, 35:4, 35:23, 36:10
**characterize** [4] - 34:8, 36:25, 56:8, 182:6
**characterized** [2] - 63:1, 66:16
**charge** [25] - 12:13, 12:19, 85:4, 105:20, 207:11, 207:23, 209:11, 209:15, 209:18, 210:3, 249:8, 251:7, 251:22, 252:1, 252:23, 252:25, 253:22, 254:25, 255:18, 255:24, 258:7, 258:25, 286:13, 304:3, 304:6
**charged** [57] - 7:10, 8:21, 8:22, 12:20,

137:22, 138:2, 158:1, 171:5, 205:2, 205:7, 206:22, 207:7, 207:15, 209:13, 221:8, 223:4, 246:24, 251:18, 252:10, 253:2, 253:5, 253:10, 253:13, 253:14, 253:17, 254:2, 254:4, 254:17, 254:18, 254:20, 254:22, 254:23, 255:6, 255:11, 255:14, 255:17, 255:25, 256:1, 256:3, 256:6, 256:7, 256:11, 256:12, 256:22, 256:23, 256:25, 257:11, 257:20, 258:10, 258:14, 258:19, 258:20, 258:22, 259:21, 286:9
**chargers** [1] - 286:18
**charges** [21] - 8:5, 9:8, 10:14, 10:18, 12:2, 12:6, 12:8, 12:16, 12:18, 12:25, 99:2, 192:7, 192:16, 201:10, 255:19, 257:15, 259:12, 274:13, 274:16, 274:24
**charging** [3] - 162:19, 163:7, 255:8
**checked** [1] - 83:8
**chemicals** [1] - 119:24
**chest** [1] - 79:13
**chic** [1] - 225:13
**child** [105] - 12:14, 13:7, 15:7, 17:24, 21:22, 22:7, 23:5, 23:17, 24:7, 26:8, 26:12, 26:19, 27:23, 28:1, 28:18, 33:10, 33:25, 34:8, 34:22, 44:15, 44:18, 45:6, 46:14, 46:17, 47:4, 55:17, 57:15, 58:15, 66:16, 66:24, 67:1, 73:7, 75:2, 85:19, 86:22, 91:22, 91:24, 92:6, 92:7, 92:16, 93:7, 95:24, 96:4, 98:20, 100:2, 100:7, 100:11, 100:13, 100:17, 100:18, 100:19, 101:7,

101:12, 101:20, 105:16, 109:7, 109:10, 136:14, 137:6, 137:21, 137:23, 148:5, 148:6, 151:23, 155:16, 156:14, 160:1, 162:20, 166:8, 170:19, 171:23, 172:6, 173:5, 173:7, 173:16, 180:20, 181:11, 181:25, 183:5, 203:3, 203:5, 205:12, 206:2, 207:24, 208:2, 208:4, 208:17, 208:22, 209:3, 219:14, 226:25, 227:3, 227:9, 228:21, 229:6, 229:11, 233:13, 233:16, 277:1, 282:22, 283:4, 291:22, 292:20
**Child** [5] - 1:10, 91:7, 97:5, 264:23, 310:4
**child's** [3] - 62:13, 83:16
**children** [9] - 6:7, 70:8, 84:18, 106:5, 111:1, 112:11, 141:13, 155:24, 156:2
**Children** [3] - 13:20, 108:20, 109:15
**choices** [1] - 214:22
**choose** [9] - 73:4, 123:3, 156:18, 156:19, 156:21, 157:23, 163:8, 163:13, 256:12
**chose** [3] - 143:7, 157:3, 204:10
**chosen** [1] - 98:5
**CHRISTEN** [1] - 2:9
**Christie** [1] - 18:13
**chronological** [1] - 103:13
**circle** [3] - 128:22, 169:2, 169:3
**circular** [2] - 184:15, 185:21
**circumstance** [2] - 217:1, 217:22
**circumstances** [3] - 93:7, 100:1, 187:21
**cite** [1] - 85:14
**cited** [1] - 171:10
**clarifying** [1] - 279:9

**class** [2] - 62:20, 178:22
**classify** [2] - 18:4, 60:4
**classifying** [1] - 82:4
**clear** [2] - 100:19, 281:15
**clearly** [8] - 56:6, 109:12, 160:3, 163:7, 169:7, 181:11, 232:22, 294:17
**client** [4] - 47:12, 183:13, 215:10, 249:19
**client's** [1] - 158:25
**close** [3] - 12:3, 44:7, 48:19
**closed** [1] - 22:4
**clothed** [3] - 77:5, 77:7, 79:18
**clothes** [2] - 220:15, 220:16
**Coast** [1] - 91:7
**code** [8] - 244:22, 244:25, 245:2, 245:7, 245:12, 246:1, 246:2, 246:7
**colleague** [1] - 182:4
**colleagues** [3] - 20:3, 154:22, 260:22
**color** [3] - 107:14, 205:15, 290:8
**columns** [2] - 235:21, 235:24
**com** [1] - 21:13
**comfortable** [14] - 26:6, 53:2, 59:6, 106:6, 148:4, 162:19, 214:17, 220:1, 226:19, 226:21, 226:22, 239:15, 239:21, 247:6
**coming** [1] - 175:23
**command** [2] - 189:19
**commentary** [2] - 48:14, 49:9
**comments** [1] - 114:1
**Commission** [1] - 308:14
**committing** [1] - 227:25
**communicate** [4] - 16:3, 17:3, 17:8, 17:22
**communicating** [1] - 290:9
**company** [1] - 22:20
**compelled** [1] -

229:10
**competence** [1] - 48:10
**complete** [4] - 187:19, 187:20, 204:8, 309:8
**completed** [2] - 7:20, 88:17
**completely** [10] - 122:7, 155:5, 196:9, 196:10, 217:1, 217:3, 217:9, 217:10, 217:16, 236:2
**compliance** [4] - 19:25, 20:25, 31:16, 31:17
**compliment** [1] - 76:11
**composite** [5] - 94:10, 223:7, 223:13, 223:18, 273:6
**computer** [5] - 45:21, 86:20, 172:4, 227:12, 273:8
**concept** [1] - 179:12
**concern** [10] - 71:25, 72:5, 72:11, 172:21, 249:19, 250:9, 250:11, 250:12, 250:14
**concerned** [2] - 251:2, 251:4
**concerns** [1] - 250:2
**concluded** [3] - 277:11, 277:21, 307:20
**concludes** [1] - 307:15
**conclusion** [2] - 31:14, 93:17
**conclusions** [2] - 83:13, 216:7
**concrete** [2] - 12:10, 214:7
**conduct** [6] - 86:22, 170:19, 172:5, 184:9, 184:10, 184:11
**conducted** [1] - 183:12
**confirm** [19] - 21:2, 28:3, 28:14, 28:17, 69:17, 109:10, 192:24, 206:2, 220:13, 278:4, 291:23, 293:15, 293:25, 294:3, 294:8, 294:22, 294:23, 294:25, 297:4

**confirmation** [4] - 108:7, 108:9, 108:22, 108:24
**confirmed** [6] - 27:25, 52:24, 69:9, 139:7, 253:19, 289:9
**confirming** [2] - 55:17, 87:8
**confuse** [1] - 118:15
**confused** [16] - 17:17, 37:6, 51:1, 55:7, 58:10, 118:4, 118:11, 118:14, 147:4, 198:18, 255:15, 255:22, 256:14, 259:7, 303:24, 304:1
**confusing** [4] - 30:15, 42:15, 42:16, 118:5
**confusion** [2] - 255:13
**connect** [2] - 31:3, 32:6
**connected** [6] - 33:1, 52:25, 71:2, 71:9, 71:11, 309:13
**connection** [18] - 22:25, 31:22, 32:17, 32:20, 37:25, 38:1, 38:2, 38:3, 38:6, 39:2, 39:6, 41:3, 54:23, 55:4, 184:16, 265:18, 296:18, 297:1
**consider** [3] - 124:24, 239:10, 258:5
**considerably** [1] - 46:9
**constitute** [5] - 112:1, 152:17, 152:20, 157:1, 220:22
**consult** [1] - 91:25
**consulted** [4] - 42:5, 91:6, 92:25, 98:2
**consumer** [1] - 240:3
**contact** [5] - 30:12, 30:20, 73:11, 187:6, 266:6
**contacted** [1] - 188:15
**contacting** [1] - 25:17
**contain** [2] - 68:1, 134:10
**contained** [4] - 33:10, 132:12, 134:11, 135:20, 135:22, 136:1, 139:20, 280:8
**containing** [1] - 56:9
**content** [2] - 40:22, 240:4
**context** [2] - 163:18, 264:12

**continue** [3] - 12:13, 16:18, 85:4
**continues** [1] - 284:3
**continuing** [2] - 23:15, 125:21
**contributing** [1] - 124:14
**control** [2] - 86:18, 172:2
**controversial** [1] - 206:15
**conversation** [7] - 54:17, 96:8, 102:10, 102:13, 114:12, 114:15, 276:8
**converse** [1] - 37:13
**coordinated** [1] - 266:5
**cop** [1] - 216:8
**copies** [1] - 150:23
**copy** [18] - 13:22, 13:24, 24:11, 24:14, 24:25, 43:7, 85:21, 89:13, 115:24, 213:17, 215:18, 215:19, 218:3, 218:4, 244:2, 267:22, 270:8, 271:13
**copying** [1] - 89:19
**copyright** [1] - 30:10
**Corporal** [2] - 51:18, 51:19
**correct** [209] - 6:10, 6:25, 8:22, 16:4, 21:7, 24:18, 24:20, 25:3, 25:11, 25:14, 25:21, 25:25, 26:13, 28:15, 32:11, 34:13, 35:5, 35:12, 35:17, 36:8, 36:16, 39:3, 39:16, 40:1, 40:4, 40:15, 40:25, 41:19, 45:15, 49:13, 50:15, 50:20, 50:24, 51:6, 57:20, 58:15, 60:5, 61:1, 61:10, 61:17, 62:5, 66:16, 67:15, 70:8, 71:19, 72:3, 75:11, 75:14, 79:15, 85:12, 87:18, 89:9, 90:2, 91:22, 92:1, 93:1, 95:20, 95:25, 96:5, 96:6, 97:17, 98:15, 105:8, 105:12, 105:17, 106:25, 107:11, 107:19, 109:1, 109:3, 109:8, 116:7, 124:7, 126:3, 128:5,

130:7, 131:12, 136:9, 137:13, 139:2, 139:8, 141:7, 141:13, 141:17, 141:25, 142:6, 143:3, 143:10, 144:9, 144:12, 144:19, 144:23, 145:9, 145:11, 145:16, 147:1, 147:15, 147:23, 148:17, 150:23, 156:11, 156:16, 157:3, 158:1, 160:15, 161:13, 165:18, 167:5, 167:14, 167:20, 169:22, 171:6, 172:15, 172:22, 173:3, 173:11, 173:19, 173:23, 174:24, 175:23, 176:7, 176:25, 178:19, 179:23, 189:12, 191:9, 197:1, 197:14, 198:19, 201:20, 202:10, 203:17, 203:20, 204:12, 204:13, 205:7, 206:5, 207:9, 212:2, 213:11, 214:11, 219:15, 220:12, 220:21, 223:2, 223:20, 227:10, 227:16, 229:6, 235:11, 235:13, 235:18, 236:11, 236:18, 237:17, 237:21, 239:18, 240:16, 246:24, 247:22, 249:8, 251:11, 253:8, 253:15, 255:21, 256:23, 263:21, 264:2, 264:13, 264:19, 265:5, 265:6, 267:22, 267:24, 268:13, 268:18, 270:10, 270:11, 271:9, 271:25, 272:1, 272:7, 272:18, 275:1, 275:4, 280:2, 280:5, 280:9, 280:20, 281:5, 286:15, 286:19, 288:21, 288:25, 289:3, 289:5, 289:7, 289:16, 290:10, 290:14, 290:24,

291:25, 292:3, 293:4, 293:14, 298:25, 301:13, 305:22, 306:7
**correctly** [12] - 32:19, 87:10, 91:10, 172:7, 177:25, 186:16, 203:7, 264:18, 266:10, 275:4, 291:12, 291:15
**correspondence** [1] - 274:7
**counsel** [4] - 13:22, 222:8, 309:11, 309:13
**Counsel** [1] - 4:14
**country** [3] - 242:6, 242:7, 243:3
**country's** [1] - 244:16
**county** [1] - 135:11
**County** [10] - 1:8, 5:23, 72:23, 101:18, 126:16, 151:2, 169:6, 198:13, 218:14, 310:3
**COUNTY** [2] - 308:4, 309:3
**couple** [7] - 16:21, 33:8, 88:7, 88:25, 263:17, 273:18, 278:9
**course** [5] - 179:6, 179:8, 186:17, 241:22, 270:3
**court** [23] - 4:13, 6:3, 39:5, 39:19, 39:23, 40:14, 41:11, 47:16, 49:16, 50:19, 53:10, 53:20, 81:2, 105:12, 105:22, 131:21, 132:2, 132:10, 132:11, 132:25, 136:9, 259:10
**COURT** [1] - 1:1
**Court** [2] - 1:18, 4:5
**cover** [3] - 100:4, 225:24, 226:2
**covered** [1] - 96:20
**cpetruzzelli @ sniffenlaw .com** [1] - 2:13
**Crawford** [6] - 25:6, 25:13, 126:16, 126:19, 128:17, 149:9
**create** [2] - 130:19, 152:11
**created** [1] - 108:21
**creates** [1] - 152:4
**credible** [4] - 51:8,

51:11, 52:4
**crime** [24] - 12:14, 15:12, 15:16, 15:19, 16:10, 19:4, 26:9, 72:16, 72:21, 72:22, 95:18, 112:11, 177:15, 182:8, 182:15, 182:17, 182:19, 182:24, 183:4, 186:22, 186:25, 187:2, 228:1
**crimes** [8] - 6:6, 70:8, 73:1, 84:18, 110:25, 112:10, 141:13, 170:8
**criminal** [6] - 25:21, 25:22, 25:25, 46:18, 83:7, 227:4
**CROSS** [1] - 263:5
**Cross** [1] - 3:5
**crossed** [1] - 233:11
**crude** [1] - 79:3
**CSAM** [57] - 14:20, 26:16, 26:21, 33:25, 34:2, 34:3, 37:17, 40:21, 40:22, 41:4, 41:19, 49:24, 52:16, 52:25, 53:4, 54:3, 77:6, 92:15, 96:13, 96:17, 98:9, 98:15, 99:9, 100:20, 131:25, 135:24, 137:2, 151:13, 157:1, 157:12, 158:22, 159:5, 159:7, 159:13, 178:6, 178:7, 178:9, 182:23, 201:20, 220:4, 228:9, 228:13, 228:16, 228:19, 228:20, 228:25, 229:2, 253:18, 258:6, 259:19, 260:18, 261:18, 261:19, 274:18, 275:12, 278:4
**current** [1] - 5:20
**curtains** [2] - 220:19, 236:3
**CUSIMANO** [1] - 2:23
**Cusimano** [1] - 4:11
**custodian** [28] - 24:14, 25:9, 25:10, 25:17, 141:20, 145:14, 145:15, 145:20, 147:14, 147:22, 149:6, 149:7, 149:21, 150:11, 150:12, 151:18,

153:6, 154:2, 154:14, 167:19, 190:21, 195:13, 196:16, 197:13, 199:24, 213:9, 240:2, 240:22
**customer** [2] - 134:13, 134:15
**cut** [3] - 28:20, 265:17, 269:4
**cyber** [34] - 13:16, 13:17, 14:4, 14:12, 14:13, 15:7, 20:10, 20:15, 33:10, 33:13, 33:22, 34:7, 34:11, 34:12, 35:2, 61:9, 89:7, 89:12, 91:5, 98:25, 99:4, 106:24, 107:18, 107:22, 108:1, 108:21, 109:13, 110:10, 237:5, 266:25, 271:19, 271:21, 271:24, 272:6
**Cyber** [1] - 3:13

## D

**D26** [2] - 205:14, 205:16
**dangerous** [1] - 124:5
**darker** [1] - 280:15
**data** [4] - 86:20, 172:3, 204:1, 204:3
**database** [3] - 43:1, 227:17, 227:18
**databases** [1] - 42:12
**DATE** [1] - 1:16
**Date** [1] - 310:25
**date** [25] - 4:9, 6:24, 15:11, 15:14, 15:18, 15:19, 15:24, 16:2, 16:5, 16:9, 43:8, 87:13, 87:14, 87:16, 115:21, 115:22, 129:8, 214:4, 214:10, 240:19, 240:22, 240:25, 266:22
**dated** [2] - 130:20, 282:13
**dates** [5] - 87:8, 87:12, 154:1, 214:5, 266:8
**days** [4] - 15:23, 87:12, 87:13, 87:17
**De** [2] - 1:19, 4:8
**dealing** [1] - 206:21
**dealings** [2] - 51:13, 51:14
**deals** [3] - 205:10, 207:2, 287:23

**deceive** [2] - 242:23
**December** [2] - 10:15, 11:11
**decided** [3] - 96:19, 195:3, 258:25
**decidedly** [1] - 47:23
**deciding** [3] - 192:14, 193:8, 193:21
**decision** [26] - 12:5, 141:23, 142:18, 142:19, 192:2, 193:13, 196:2, 196:18, 198:2, 198:7, 198:10, 198:14, 198:16, 199:3, 201:6, 201:15, 201:22, 203:8, 210:7, 259:11, 260:17, 274:13, 274:23, 286:13, 286:15, 286:18
**declare** [1] - 310:23
**deduce** [1] - 237:2
**deducing** [1] - 238:10
**deduction** [2] - 238:10, 242:2
**deductions** [1] - 237:2
**deeper** [1] - 185:8
**defend** [5] - 163:16, 163:17, 163:23, 164:2, 164:4
**Defendant** [2] - 2:14, 2:20
**Defendants** [1] - 1:11
**DEFENDANTS '** [1] - 3:24
**defer** [1] - 125:15
**definitely** [6] - 59:14, 79:4, 80:9, 83:15, 195:18, 277:2
**definition** [4] - 28:25, 29:5, 90:4, 227:3
**degree** [3] - 39:22, 103:25, 210:24
**delay** [2] - 263:9, 284:19
**deleted** [3] - 249:20, 250:3, 250:15
**delineate** [1] - 207:1
**delivered** [2] - 222:1, 222:2
**denotes** [1] - 117:19
**department** [4] - 97:5, 172:21, 181:2, 259:17
**depict** [2] - 92:15, 158:22
**depicted** [17] - 8:21, 28:9, 158:3, 164:6,

183:5, 203:3, 211:24, 240:12, 275:22, 276:10, 283:20, 291:23, 300:8, 300:25, 301:1, 302:7, 302:9
**depicting** [3] - 272:4, 275:15, 286:9
**depiction** [2] - 86:20, 172:4
**depicts** [8] - 41:8, 91:17, 91:18, 92:14, 120:24, 282:21, 285:25, 292:20
**Depo** [1] - 310:5
**depo** [2] - 43:8, 261:21
**deposed** [3] - 6:8, 154:23, 275:10
**Deposition** [1] - 3:15
**deposition** [34] - 4:2, 4:7, 5:14, 6:13, 6:16, 6:17, 7:7, 9:20, 18:15, 20:2, 41:24, 42:17, 43:2, 45:11, 46:23, 48:15, 50:12, 51:19, 55:19, 74:9, 74:15, 83:11, 99:7, 108:6, 248:16, 260:3, 275:11, 276:20, 276:23, 277:18, 277:24, 307:16, 307:20, 309:6
**DEPOSITION** [1] - 1:13
**describe** [13] - 29:22, 53:6, 84:19, 84:22, 90:6, 92:9, 92:14, 159:9, 159:10, 159:11, 231:20, 245:3, 274:14
**described** [9] - 15:6, 21:6, 42:15, 47:3, 55:19, 109:1, 141:2, 203:14, 216:24
**describing** [8] - 41:5, 41:6, 211:3, 212:20, 283:19, 288:16, 288:20, 303:13
**Description** [1] - 3:12
**description** [8] - 41:7, 50:3, 89:18, 89:19, 90:23, 108:14, 160:7, 298:14
**descriptions** [1] - 62:8
**deserved** [1] - 188:9
**detail** [3] - 10:18, 135:1, 135:2
**Detective** [58] - 4:20,

20:5, 20:7, 20:9, 20:21, 45:11, 46:22, 47:2, 47:24, 54:7, 54:17, 55:19, 57:5, 57:10, 66:5, 84:4, 84:5, 93:16, 93:20, 94:19, 95:13, 95:15, 95:16, 102:1, 102:19, 126:15, 126:23, 127:6, 139:18, 140:12, 142:5, 142:14, 144:2, 165:5, 169:6, 175:4, 175:12, 176:10, 176:16, 196:15, 196:25, 199:24, 200:5, 202:10, 204:3, 225:11, 248:15, 259:24, 260:4, 260:6, 261:6, 261:17, 263:7, 278:8, 278:10, 300:17

**detective** [16] - 1:8, 5:21, 5:22, 6:1, 14:17, 81:20, 88:8, 110:25, 121:10, 123:10, 214:24, 238:9, 249:8, 251:7, 278:3, 310:3

**detectives** [4] - 53:25, 202:22, 259:16, 261:3

**detectives'** [1] - 95:10

**determination** [12] - 31:9, 34:21, 36:21, 36:22, 123:18, 123:20, 204:14, 204:17, 206:3, 291:23, 301:12, 306:8

**determinations** [3] - 302:4, 305:20, 306:2

**determine** [19] - 33:14, 34:16, 70:19, 73:24, 76:21, 78:11, 101:19, 102:25, 106:4, 113:18, 125:7, 180:15, 182:22, 212:16, 212:23, 215:1, 253:2, 306:9

**determined** [6] - 35:4, 36:15, 37:10, 99:9, 254:9, 275:21

**determiner** [1] - 182:16

**determining** [8] - 60:15, 75:10, 81:9,

81:12, 120:23, 124:25, 126:2, 185:20

**developed** [2] - 208:12, 209:3

**development** [12] - 90:8, 160:4, 160:9, 160:20, 207:25, 208:11, 209:18, 209:20, 285:17, 292:21, 294:12, 294:14

**developmental** [5] - 160:5, 285:9, 285:18, 291:10, 293:1

**develops** [1] - 58:21

**device** [5] - 70:6, 134:22, 250:16, 251:19, 252:9

**devices** [1] - 251:13

**diagnose** [2] - 179:15, 180:3

**diagnosis** [1] - 179:23

**difference** [5] - 74:23, 100:3, 103:22, 186:3, 214:3

**different** [71] - 44:2, 46:12, 50:7, 53:7, 58:7, 58:18, 58:25, 59:3, 59:9, 59:11, 59:15, 60:2, 60:22, 60:23, 60:25, 61:1, 80:6, 93:6, 94:11, 109:22, 111:5, 119:14, 120:8, 120:15, 122:7, 137:16, 139:1, 154:12, 157:6, 173:18, 173:23, 181:20, 189:13, 190:23, 196:9, 196:10, 198:23, 200:21, 201:12, 217:1, 217:3, 217:9, 217:10, 217:15, 217:17, 217:22, 221:4, 231:13, 235:1, 235:3, 235:4, 235:5, 235:6, 235:8, 236:2, 236:4, 236:8, 236:10, 236:11, 236:19, 236:20, 236:22, 239:16, 295:9, 302:16, 304:15, 304:16, 306:23

**differently** [10] - 51:21, 58:21, 93:8, 120:9, 120:11,

120:18, 149:5, 191:1, 231:21, 239:7

**difficult** [38] - 55:20, 55:24, 56:9, 56:13, 56:22, 57:2, 57:16, 57:19, 57:25, 58:6, 58:9, 59:21, 60:1, 60:5, 60:7, 96:19, 96:23, 98:15, 99:12, 99:19, 99:20, 99:24, 101:11, 169:8, 169:11, 169:13, 169:14, 172:13, 172:24, 173:2, 173:6, 173:8, 175:16, 177:5, 181:3, 182:6, 203:6, 276:10

**digital** [24] - 68:14, 77:22, 103:14, 104:2, 104:11, 106:14, 111:2, 111:17, 111:22, 112:12, 113:9, 120:23, 121:16, 124:6, 125:8, 227:14, 232:20, 232:21, 233:23, 234:1, 244:2, 248:8, 274:19, 282:12

**digitally** [1] - 77:18

**DIRECT** [1] - 5:8

**direct** [1] - 74:7

**Direct** [1] - 3:4

**directed** [1] - 290:9

**directly** [1] - 131:12

**director** [2] - 1:9, 310:4

**disagree** [12] - 12:5, 55:21, 55:22, 55:23, 57:14, 139:21, 140:17, 140:22, 175:7, 176:15, 197:6, 261:19

**disagreed** [4] - 12:7, 126:1, 181:10, 181:24

**disagreeing** [3] - 142:13, 154:25, 181:12

**disagreement** [8] - 56:2, 56:4, 97:3, 101:6, 101:8, 101:14, 125:15, 169:4

**discarded** [1] - 201:19

**disclaim** [1] - 175:6

**disclaimers** [1] - 67:21

**disclose** [1] - 50:11

**disclosures** [1] - 67:21

**discover** [2] - 229:21, 230:16

**discrepancy** [6] - 295:3, 295:5, 295:14, 295:19, 295:23, 298:13

**discussed** [3] - 54:16, 121:6, 276:19

**discussing** [2] - 61:8, 276:21

**discussion** [2] - 197:20, 198:4

**displayed** [2] - 107:14, 292:18

**displaying** [6] - 40:21, 41:19, 52:16, 53:4, 54:3, 131:25

**disrespect** [1] - 47:25

**disrespectful** [2] - 48:3, 48:5

**disseminate** [3] - 23:15

**dissent** [1] - 203:4

**distinction** [1] - 297:18

**DISTRICT** [2] - 1:1, 1:1

**District** [2] - 4:5

**DIVISION** [1] - 1:2

**Division** [1] - 4:6

**divisions** [1] - 181:20

**DNA** [1] - 300:21

**DO** [1] - 310:6

**doctor** [29] - 60:16, 80:1, 80:14, 80:15, 80:23, 96:5, 97:6, 106:4, 121:11, 126:5, 178:7, 179:14, 179:19, 179:20, 179:22, 180:3, 180:5, 180:6, 180:9, 180:10, 180:12, 180:15, 180:19, 180:21, 183:7, 210:16, 210:21, 301:19, 302:3

**doctors** [1] - 104:21

**document** [6] - 14:1, 255:8, 289:23, 290:5, 290:7, 310:23

**documentation** [3] - 141:17, 184:3, 241:12

**documented** [1] - 15:12

**documents** [6] - 7:3, 7:18, 16:4, 149:8, 153:7, 219:5

**done** [28] - 10:6, 10:14, 21:23, 22:2, 23:1, 25:19, 44:17, 44:20, 49:3, 55:6, 69:2, 73:13, 83:22, 96:1, 97:16, 120:9, 145:4, 147:9, 149:5, 150:22, 169:19, 180:24, 188:14, 190:25, 191:1, 196:19, 246:11, 262:4

**doubt** [3] - 152:5, 152:11, 153:19

**Douglas** [1] - 270:13

**down** [26] - 16:18, 18:7, 27:9, 47:17, 79:11, 118:3, 118:10, 118:20, 126:16, 134:18, 160:2, 165:5, 169:19, 189:16, 198:19, 221:14, 226:6, 228:24, 229:12, 230:24, 231:11, 263:9, 278:1, 282:20, 284:22, 285:8

**download** [7] - 134:9, 134:10, 135:18, 135:20, 204:8, 252:22, 274:19

**downloaded** [4] - 16:9, 204:3, 252:15, 252:16

**Dr** [115] - 4:22, 55:18, 74:3, 91:6, 91:18, 91:25, 93:1, 93:20, 94:20, 95:2, 95:6, 95:20, 96:8, 96:9, 97:6, 97:19, 98:3, 98:13, 99:25, 100:5, 100:13, 100:23, 101:3, 101:18, 102:20, 102:25, 103:5, 103:25, 105:21, 107:10, 108:18, 108:23, 109:22, 113:21, 117:7, 119:2, 120:22, 124:12, 124:24, 125:16, 129:1, 129:2, 129:17, 129:19, 130:1, 130:4, 130:16, 131:12, 131:15, 131:16, 131:20, 132:1, 159:18, 160:18, 191:8, 192:6,

192:14, 192:25, 193:11, 194:25, 199:20, 203:9, 203:12, 204:16, 204:18, 204:22, 207:22, 210:22, 227:23, 253:19, 263:8, 264:2, 264:7, 264:21, 265:4, 265:13, 265:25, 266:5, 266:21, 268:1, 268:7, 268:10, 268:14, 268:18, 268:20, 269:12, 270:10, 270:12, 270:21, 270:24, 271:2, 271:23, 273:23, 274:2, 274:18, 274:25, 275:13, 275:16, 275:20, 275:25, 276:3, 276:6, 276:24, 277:12, 277:22, 282:6, 285:23, 286:14, 290:8, 295:22, 296:14, 298:14, 298:22, 304:7, 304:24
**draw** [1] - 66:4
**drawn** [1] - 158:6
**dream** [1] - 279:1
**drew** [3] - 158:10, 158:18, 158:20
**drinking** [1] - 216:15
**drive** [10] - 219:24, 221:25, 222:6, 222:8, 227:21, 231:22, 232:6, 232:10, 267:14
**Driver's** [1] - 308:22
**driver's** [5] - 216:17, 216:18, 217:2, 217:12, 242:10
**drives** [1] - 219:6
**drop** [2] - 12:5, 259:12
**dropped** [10] - 8:6, 9:8, 10:15, 10:19, 12:2, 12:9, 12:16, 12:18, 12:25, 46:1
**duck** [2] - 111:14, 111:15
**duckduckgo .jpg** [1] - 159:25
**due** [2] - 22:3, 220:4
**Dully** [99] - 2:20, 3:19, 4:22, 55:18, 74:3, 91:6, 91:25, 93:1, 94:20, 95:2, 95:6, 95:20, 96:9, 97:6,

97:19, 98:3, 98:13, 99:25, 100:5, 100:13, 100:23, 101:3, 102:20, 102:25, 103:5, 103:25, 107:10, 108:18, 108:23, 109:22, 113:21, 117:7, 119:2, 120:22, 124:12, 124:24, 125:16, 129:1, 129:2, 129:19, 131:16, 132:1, 159:18, 160:18, 191:8, 192:6, 192:14, 192:25, 193:11, 194:20, 203:9, 203:12, 204:16, 204:18, 207:22, 210:22, 227:23, 253:19, 263:8, 264:2, 264:7, 265:4, 265:13, 265:25, 266:5, 266:21, 268:1, 268:7, 268:10, 268:14, 268:18, 268:20, 269:12, 270:10, 270:12, 270:21, 270:24, 271:2, 271:23, 273:23, 274:2, 275:13, 275:16, 275:20, 275:25, 276:3, 276:6, 276:24, 277:12, 277:22, 282:6, 286:14, 290:8, 295:22, 296:14, 298:22, 304:7, 304:24
**DULLY** [2] - 1:9, 310:4
**Dully's** [18] - 91:18, 101:18, 105:21, 129:17, 130:1, 130:4, 130:16, 130:25, 131:12, 131:15, 131:20, 194:25, 199:20, 204:22, 264:21, 274:18, 274:25, 285:23
**duly** [1] - 5:2
**during** [16] - 31:24, 127:14, 135:7, 154:9, 155:12, 155:15, 156:3, 179:6, 183:20, 186:19, 200:21, 200:22, 217:4,

260:23, 264:15, 268:6

# E

**e-mail** [12] - 25:11, 30:19, 128:16, 134:24, 148:2, 148:7, 149:7, 149:9, 150:10, 154:14, 274:8
**e-mailed** [3] - 25:8, 145:15, 145:20
**e-mailing** [1] - 148:5
**early** [1] - 262:15
**earrings** [2] - 220:17, 282:22
**easier** [1] - 164:4
**easiest** [3] - 90:6, 180:18, 245:4
**easily** [4] - 58:2, 68:25, 77:8, 77:17
**easy** [4] - 56:17, 68:9, 77:21, 78:6
**edit** [2] - 76:7, 76:9
**edited** [9] - 75:3, 75:4, 75:8, 75:19, 75:20, 75:21, 77:4, 77:8, 77:13
**editing** [1] - 76:18
**educated** [1] - 224:19
**effectuate** [3] - 6:22, 196:18, 198:2
**effectuating** [2] - 188:17, 200:7
**effort** [4] - 113:18, 156:1, 156:3, 156:6
**either** [9] - 10:13, 98:8, 248:20, 250:10, 266:1, 270:21, 274:8, 287:21, 292:19
**electro** [1] - 120:4
**electrolysis** [2] - 120:3, 120:9
**electronic** [4] - 14:19, 18:3, 133:15, 250:16
**electronic-based** [1] - 133:15
**electronically** [2] - 133:16, 133:20
**elements** [1] - 170:9
**Emerson** [2] - 2:4
**eminent** [1] - 233:16
**employed** [1] - 5:18
**employee** [3] - 265:4, 309:11, 309:12
**employees** [1] - 278:13
**employer** [3] - 264:21,

265:8, 267:16
**employer-issued** [1] - 267:16
**employment** [1] - 5:20
**encapsulate** [1] - 202:7
**encountered** [2] - 40:23, 54:4
**end** [4] - 82:19, 183:10, 200:8, 281:16
**ended** [4] - 193:19, 194:6, 194:15, 194:22
**enforcement** [22] - 42:12, 54:12, 72:5, 72:11, 87:24, 107:14, 145:19, 150:7, 150:21, 151:2, 151:22, 152:25, 189:6, 191:25, 202:18, 217:11, 218:13, 218:19, 229:10, 268:6, 270:4, 292:18
**engage** [1] - 47:13
**engine** [1] - 42:9
**enlighten** [1] - 214:3
**ENTER** [1] - 310:6
**enters** [1] - 9:20
**entire** [6] - 16:12, 79:7, 157:10, 231:6, 292:15, 292:16
**entirely** [3] - 150:25, 301:10, 301:11
**entirety** [10] - 154:19, 157:11, 157:13, 159:4, 186:23, 186:25, 194:25, 199:21, 227:6, 274:19
**entitled** [2] - 205:14, 205:16
**equal** [2] - 290:4, 293:2
**Errata** [1] - 3:9
**ESP** [5] - 14:18, 15:11, 18:1, 89:13, 89:21
**ESP's** [1] - 89:19
**especially** [7] - 83:21, 84:1, 180:24, 201:9, 278:5, 280:5, 280:6
**Esquire** [4] - 2:3, 2:9, 2:9, 2:16
**establish** [4] - 89:5, 132:3, 175:17, 186:20
**established** [1] - 283:15
**establishing** [3] -

184:24, 185:2, 186:18
**estimate** [4] - 88:11, 103:25, 104:11, 106:13
**estimated** [1] - 289:15
**estimating** [2] - 103:12, 131:17
**et** [1] - 4:4
**evaluation** [1] - 31:10
**event** [1] - 209:10
**events** [1] - 262:20
**eventually** [1] - 201:10
**evidence** [27] - 49:1, 71:5, 71:8, 71:12, 71:14, 136:23, 137:12, 152:17, 152:20, 155:6, 167:13, 167:17, 167:19, 172:9, 173:12, 173:25, 177:11, 211:18, 211:23, 212:6, 237:2, 241:2, 248:16, 250:22, 293:18, 295:7, 298:18
**evidentiary** [1] - 80:25
**exact** [7] - 88:12, 88:14, 143:13, 196:8, 230:1, 230:3, 295:22
**exactly** [6] - 107:1, 108:25, 122:14, 151:7, 179:2, 262:3
**EXAMINATION** [3] - 5:8, 263:5, 287:4
**Examination** [4] - 1:23, 3:4, 3:5, 3:6
**examined** [4] - 205:15, 288:14, 290:8, 295:13
**examiner** [1] - 68:14
**example** [2] - 92:15, 108:11
**exchanged** [1] - 114:12
**excludes** [1] - 227:2
**exclusively** [1] - 274:24
**exculpatory** [1] - 183:23
**excuse** [18] - 5:21, 19:24, 42:12, 43:24, 62:17, 75:2, 97:24, 99:3, 133:14, 135:25, 157:10, 183:3, 208:21, 272:13, 275:2, 278:11, 279:8,

283:14
**excused** [1] - 307:19
**executed** [2] - 7:21, 203:16
**executioner** [1] - 183:4
**exercise** [2] - 34:20, 47:13
**Exhibit** [28] - 13:22, 14:8, 38:13, 38:15, 38:17, 43:4, 43:5, 43:14, 44:24, 45:1, 45:10, 46:20, 85:23, 87:3, 89:9, 94:9, 107:2, 107:3, 129:10, 160:24, 161:3, 161:9, 223:23, 241:19, 244:19, 246:20, 287:6, 298:21
**exhibit** [8] - 43:12, 46:1, 87:3, 169:18, 169:24, 223:7, 223:15, 273:2
**exhibition** [3] - 18:10, 86:19, 172:3
**exhibits** [2] - 49:2, 221:15
**EXHIBITS** [2] - 3:11, 3:24
**existed** [1] - 13:1
**exists** [1] - 241:2
**expect** [2] - 121:14, 180:16
**expectation** [1] - 269:11
**experience** [9] - 74:1, 87:25, 90:14, 121:1, 121:25, 191:12, 211:7, 211:10, 211:11
**expert** [13] - 60:14, 66:18, 70:7, 82:1, 82:5, 112:10, 119:3, 120:23, 121:15, 124:25, 126:2, 178:12, 179:25
**expertise** [5] - 66:22, 80:21, 125:13, 125:14, 182:21
**Expires** [1] - 308:14
**explain** [8] - 13:17, 23:25, 24:4, 48:6, 99:18, 118:11, 157:21, 183:15
**explained** [4] - 101:17, 116:21, 118:20, 217:16
**explanation** [2] - 23:11, 67:8

**explicitly** [1] - 227:2
**exploitation** [1] - 23:17
**Exploited** [3] - 13:20, 108:20, 109:15
**exploiting** [1] - 233:13
**exposing** [1] - 160:3
**express** [2] - 91:13, 92:6
**expressed** [1] - 172:21
**extra** [4] - 74:2, 81:18, 180:21, 180:23
**extraction** [1] - 251:21
**eye** [1] - 208:19
**eyes** [1] - 232:16

## F

**fabricated** [1] - 214:5
**face** [23] - 75:1, 75:4, 75:9, 75:18, 76:7, 76:21, 77:5, 77:8, 77:12, 78:23, 79:11, 79:21, 131:8, 157:17, 157:22, 161:12, 162:3, 163:5, 163:9, 164:1, 164:12, 164:16, 165:2
**facial** [1] - 76:9
**fact** [17] - 8:10, 32:25, 123:24, 146:21, 151:9, 152:6, 187:9, 212:1, 212:7, 260:18, 270:15, 280:2, 280:7, 298:1, 298:6, 299:20
**factor** [6] - 124:14, 185:20, 192:15, 193:9, 193:21
**factors** [4] - 36:5, 196:6, 274:13, 274:15
**facts** [6] - 89:4, 215:1, 293:17, 295:6, 298:17, 310:23
**fair** [18] - 34:2, 44:9, 47:22, 49:1, 58:4, 60:14, 88:15, 107:25, 162:24, 163:1, 163:12, 236:7, 247:20, 263:23, 268:10, 270:20, 274:22, 286:12
**fairly** [2] - 58:5, 78:5
**faith** [2] - 270:25, 271:3
**fake** [5] - 242:8, 242:10, 242:11,

242:13
**faked** [2] - 214:1, 244:14
**false** [9] - 34:8, 35:11, 35:16, 35:18, 39:23, 39:25, 52:6, 52:11, 52:13
**familiar** [10] - 62:14, 86:2, 126:18, 127:1, 141:9, 141:11, 170:8, 171:14, 171:21, 201:17
**family** [1] - 66:6
**far** [2] - 88:23, 282:9
**fashion** [1] - 270:22
**fast** [2] - 135:6, 135:13
**FBI** [8] - 22:17, 22:23, 73:12, 218:18, 228:23, 261:25, 262:5, 262:16
**features** [1] - 76:9
**February** [33] - 33:5, 91:5, 94:23, 106:12, 107:6, 107:8, 114:5, 115:18, 124:24, 129:8, 129:9, 132:4, 192:25, 203:11, 203:16, 205:6, 205:21, 266:9, 266:11, 266:12, 266:19, 266:22, 267:7, 268:1, 268:22, 271:3, 271:13, 272:7, 272:12, 282:5, 282:14, 283:16, 287:24
**federal** [3] - 73:11, 141:9, 141:15
**feet** [1] - 282:23
**felony** [1] - 39:22
**felt** [16] - 53:2, 99:24, 100:2, 100:10, 106:6, 150:3, 162:19, 182:14, 182:18, 183:5, 187:24, 188:11, 274:20, 277:1, 295:21
**female** [28] - 28:11, 36:8, 41:8, 62:5, 74:2, 121:10, 139:3, 139:4, 157:16, 160:1, 205:12, 206:2, 209:5, 234:25, 271:17, 272:4, 282:22, 283:4, 291:22, 292:20, 295:20, 295:23, 296:7,

296:8, 296:23, 297:2, 297:5, 303:18
**females** [3] - 43:25, 44:4, 211:3
**fetish** [2] - 122:13, 122:17
**few** [1] - 282:2
**fictitious** [1] - 216:18
**field** [1] - 106:5
**figure** [3] - 222:15, 226:12, 226:13
**file** [22] - 12:3, 14:21, 14:24, 15:19, 16:19, 89:12, 107:15, 159:24, 196:17, 221:21, 222:7, 255:2, 253:3, 255:5, 257:4, 257:5, 257:7, 272:16, 287:9, 287:19, 303:12, 303:14
**files** [5] - 134:11, 136:1, 136:25, 249:20, 289:3
**filing** [1] - 210:7
**fill** [2] - 39:18, 130:18
**film** [1] - 157:25
**financially** [1] - 309:14
**findings** [1] - 287:23
**fine** [3] - 82:15, 161:17, 209:9
**fingerprints** [1] - 300:21
**finish** [1] - 218:1
**fired** [1] - 189:21
**First** [1] - 91:7
**first** [44] - 5:2, 8:2, 32:10, 32:11, 38:21, 46:2, 86:6, 86:13, 95:3, 95:4, 95:19, 95:22, 97:14, 102:15, 106:11, 114:4, 175:1, 207:12, 234:21, 234:24, 262:25, 264:14, 266:19, 266:25, 267:7, 269:15, 271:12, 271:17, 271:23, 271:24, 272:2, 272:14, 282:13, 282:19, 283:14, 283:15, 284:22, 287:9, 288:21, 292:14, 292:18, 294:13, 295:3
**Fish** [3] - 20:11, 178:18, 178:24
**fit** [1] - 73:2
**five** [4] - 87:24,

246:10, 246:12, 254:7
**flagged** [2] - 27:19, 108:20
**flip** [2] - 18:6, 38:20
**floor** [3] - 235:10, 235:11, 235:18
**FLORIDA** [3] - 1:1, 308:3, 309:2
**Florida** [15] - 1:20, 2:5, 2:11, 2:18, 3:17, 4:6, 4:9, 20:11, 63:19, 169:20, 170:6, 178:18, 178:24, 308:6, 308:13
**focal** [1] - 163:13
**focused** [2] - 55:17, 67:12
**folders** [1] - 137:16
**follow** [4] - 145:1, 189:8, 263:2, 286:23
**follow-up** [2] - 263:2, 286:23
**following** [1] - 107:17
**follows** [1] - 5:4
**fool** [1] - 240:3
**force** [1] - 151:3
**forefront** [1] - 185:1
**foregoing** [1] - 310:23
**forensic** [3] - 68:14, 78:14, 175:22
**forget** [1] - 136:12
**forgive** [2] - 184:14, 230:22
**forgot** [1] - 5:5
**forgotten** [1] - 116:19
**form** [232] - 8:13, 10:22, 11:17, 20:19, 21:24, 22:8, 23:18, 24:12, 24:16, 24:19, 25:1, 26:1, 26:14, 27:10, 27:15, 30:5, 30:20, 35:13, 36:17, 39:9, 40:16, 41:13, 49:20, 52:8, 69:20, 70:13, 72:9, 72:13, 73:20, 81:22, 82:3, 86:11, 92:3, 92:10, 93:4, 96:11, 97:7, 97:24, 98:18, 98:21, 99:14, 100:14, 101:9, 101:23, 103:3, 103:15, 104:5, 104:13, 104:24, 105:23, 106:21, 110:5, 110:14, 110:20, 111:21, 112:24, 113:5, 114:19,

116:8, 117:14,
117:15, 117:23,
118:7, 119:6, 122:4,
123:5, 123:16,
124:9, 124:17,
125:1, 125:10,
125:18, 126:10,
127:22, 128:3,
129:15, 129:21,
131:2, 132:5,
132:14, 141:4,
142:1, 142:7,
142:11, 142:25,
143:4, 143:8,
143:18, 143:23,
146:16, 147:2,
147:4, 148:21,
150:16, 150:24,
151:11, 151:24,
152:7, 152:13,
152:19, 153:8,
153:13, 153:21,
154:3, 154:16,
155:1, 155:11,
158:7, 161:1,
161:22, 162:12,
162:25, 163:10,
163:21, 164:8,
164:25, 165:13,
166:11, 166:24,
167:6, 167:9,
167:15, 167:21,
168:5, 168:9,
168:17, 170:20,
170:24, 171:8,
172:23, 173:4,
175:8, 175:25,
176:5, 176:13,
176:18, 177:17,
178:14, 181:5,
183:1, 183:24,
184:18, 185:10,
187:23, 188:4,
188:18, 189:3,
189:25, 190:16,
191:15, 192:10,
192:17, 192:18,
193:4, 193:16,
195:9, 197:7, 200:2,
202:25, 206:18,
207:13, 207:19,
208:6, 208:15,
209:6, 209:16,
209:22, 209:25,
210:8, 210:14,
210:25, 211:1,
211:8, 211:20,
212:3, 212:9,
212:18, 214:12,
214:15, 215:13,
215:21, 216:1,

217:13, 218:6,
218:22, 221:11,
230:8, 230:13,
238:4, 238:12,
240:6, 241:3, 243:1,
243:21, 245:22,
249:13, 253:23,
254:14, 289:18,
289:25, 290:15,
291:13, 292:4,
293:7, 293:12,
293:17, 293:22,
294:6, 294:18,
295:4, 295:6,
295:15, 296:16,
298:15, 298:17,
299:15, 299:16,
300:9, 301:3,
301:18, 302:10,
303:8, 303:23,
304:10, 304:13,
304:23, 305:3,
305:9, 305:23,
306:5, 306:16
**format** [1] - 227:14
**formed** [1] - 109:8
**former** - 57:12
**forms** [2] - 116:3,
146:22
**formulate** [2] - 155:6,
214:6
**formulated** [3] -
124:22, 157:11,
263:24
**formulating** [1] -
214:17
**forum** [2] - 69:8,
132:25
**forward** [5] - 22:16,
38:12, 195:4, 278:5,
286:18
**forwarded** [1] - 22:23
**forwarding** [1] -
201:10
**four** [5] - 181:16,
239:6, 251:23,
258:5, 258:7
**fourth** [1] - 282:20
**FPR** [3] - 1:24, 308:13,
309:18
**FPR-C** [3] - 1:24,
308:13, 309:18
**frame** [2] - 126:23,
177:1
**frankly** [1] - 49:7
**freedom** [1] - 73:1
**freezing** [2] - 269:4,
284:17
**front** [4] - 14:3, 273:7,
282:1, 282:11

**froze** [4] - 281:8,
284:12, 284:16,
285:3
**full** [5] - 64:22, 222:6,
225:16, 232:12,
233:6
**fully** [3] - 77:5, 77:7,
208:12
**function** [2] - 30:12,
30:17
**functions** [3] - 30:7,
30:9, 30:11
**funny** [1] - 158:24
**FWC** [2] - 189:11,
202:18

## G

**games** [1] - 240:9
**gaps** [1] - 188:3
**general** [2] - 66:19,
179:17
**generally** [1] - 66:7
**genital** [3] - 77:20,
160:3, 291:10
**genitals** [13] - 79:22,
79:25, 80:4, 80:5,
80:6, 80:10, 157:19,
157:22, 161:16,
162:21, 163:18,
292:23
**gentleman** [1] - 5:15
**girls** [9] - 40:22,
41:19, 52:17, 54:3,
151:9, 270:14,
278:18, 281:2,
281:18
**given** [5] - 9:10, 20:15,
47:22, 153:15,
241:11
**glad** [2] - 196:12,
204:23
**goal** [2] - 155:18,
186:20
**goals** [1] - 155:22
**God** [1] - 228:23
**Google** [33] - 3:16,
42:8, 42:18, 43:22,
44:2, 44:3, 44:10,
44:11, 44:12, 44:13,
44:15, 44:18, 45:5,
45:14, 45:19, 45:20,
45:23, 47:3, 47:13,
49:19, 50:14, 50:23,
51:2, 51:4, 51:7,
53:12, 53:21,
226:17, 226:18,
226:19, 227:1,
229:19, 248:11
**Googled** [7] - 42:3,
42:17, 42:20, 44:14,

45:4, 52:22, 206:12
**gosh** [1] - 181:18
**gotcha** [2] - 43:15,
223:22
**government** [5] -
22:17, 213:8,
213:16, 213:17,
219:9
**government -issued**
[4] - 213:8, 213:16,
213:17, 219:9
**grade** [1] - 62:19
**Grade** [5] - 209:20,
209:21, 304:8, 304:9
**great** [3] - 9:18, 82:17,
178:10
**greater** [2] - 160:6,
218:13
**Greene** [34] - 20:5,
51:18, 54:7, 54:18,
55:19, 57:5, 84:4,
84:5, 93:16, 93:20,
126:15, 126:24,
127:6, 139:18,
140:12, 142:5,
142:14, 144:2,
169:7, 175:4,
175:12, 176:10,
176:16, 196:15,
204:4, 225:11,
259:24, 260:4,
260:21, 261:17,
278:8, 278:20
**Greene's** [2] - 51:19,
57:10
**groom** [2] - 121:21,
123:3
**groomed** [4] - 121:12,
121:17, 122:18,
123:11
**grooming** [3] - 119:3,
119:14, 121:3
**group** [2] - 197:20,
198:4
**guess** [55] - 10:11,
10:12, 15:15, 17:17,
18:6, 19:5, 28:1,
29:25, 42:11, 42:13,
42:25, 51:13, 51:14,
57:22, 59:11, 59:20,
77:4, 78:13, 81:6,
81:25, 90:6, 92:8,
95:16, 98:10, 99:4,
102:12, 102:13,
103:7, 105:2,
118:10, 118:11,
118:19, 125:19,
125:20, 147:3,
158:15, 161:16,
162:7, 162:18,

180:18, 184:25,
192:13, 192:23,
198:18, 212:19,
224:17, 224:19,
226:8, 239:25,
245:4, 245:16,
250:11, 250:21,
256:2, 306:11
**guilty** [1] - 177:15
**guy** [5] - 108:11,
108:13, 126:15,
175:22, 180:16
**guys** [9] - 55:23,
78:14, 82:12, 114:4,
125:15, 126:1,
138:3, 150:19, 248:8

## H

**hair** [39] - 36:3, 36:4,
76:1, 77:21, 78:24,
90:9, 90:10, 90:11,
90:13, 90:16, 90:19,
117:1, 117:5,
117:12, 117:18,
117:21, 120:4,
122:3, 122:10,
123:4, 123:13,
123:25, 124:6,
124:13, 160:4,
160:8, 160:20,
207:21, 207:25,
208:11, 209:4,
236:18, 280:15,
285:17, 292:20,
293:1, 294:12,
294:14, 294:17
**hairstyle** [1] - 235:6,
236:19, 236:20
**hairy** [1] - 279:1
**half** [5] - 63:18,
162:10, 164:18,
285:9, 285:18
**halfway** [1] - 18:7
**hand** [4] - 29:20, 43:2,
217:17, 299:11
**handbook** [1] - 114:22
**handled** [2] - 150:2,
191:13
**handwriting** [1] -
221:20
**hang** [1] - 273:11
**happy** [1] - 50:11
**harassing** [1] - 48:21
**hard** [10] - 48:22, 76:8,
100:15, 179:12,
212:20, 222:6,
234:6, 243:15,
243:24, 273:9
**harder** [2] - 163:25,
164:3

**harm** [1] - 233:16
**hash** [6] - 16:25, 17:2, 17:7, 17:11, 17:13, 17:14
**hat** [2] - 76:1, 76:4
**hats** [1] - 76:7
**head** [6] - 38:10, 60:13, 148:18, 190:14, 190:17, 231:20
**header** [2] - 46:17, 226:8
**headshot** [1] - 239:2
**hear** [5] - 16:25, 248:17, 284:16, 284:18, 293:9
**heard** [12] - 4:4, 20:17, 43:23, 52:2, 54:20, 54:22, 111:14, 119:22, 120:3, 194:13, 250:10, 258:11
**hearing** [5] - 248:22, 249:23, 250:5, 263:12, 263:14
**hearings** [1] - 276:3
**Heart** [12] - 157:25, 159:24, 207:2, 207:6, 224:8, 224:10, 224:12, 224:20, 224:21, 230:2, 244:19, 272:22
**heaven** [1] - 226:6
**held** [1] - 4:8
**help** [6] - 175:22, 192:7, 193:1, 193:12, 194:21, 262:6
**helpful** [1] - 232:5
**helps** [1] - 9:25
**herself** [1] - 269:3
**hesitate** [2] - 228:7, 228:10
**Hewett** [1] - 2:4
**HH** [1] - 308:14
**hide** [1] - 137:6
**hiding** [2] - 137:13, 163:6
**high** [1] - 209:24
**higher** [2] - 61:14
**highlighted** [2] - 282:3, 282:15
**highlights** [1] - 160:18
**highly** [2] - 47:14
**himself** [1] - 163:17
**hindsight** [2] - 49:6, 190:24
**history** [9] - 40:21, 41:4, 41:18, 52:16,

53:3, 54:1, 54:2, 105:16, 131:25
**hit** [2] - 35:9, 90:7
**hits** [1] - 46:8
**hmm** [1] - 33:23
**hoard** [1] - 136:21
**hoarding** [2] - 136:23, 137:3
**hold** [4] - 45:10, 45:25, 51:1
**holding** [12] - 13:5, 128:1, 165:8, 219:14, 240:15, 270:9, 279:22, 280:17, 280:19, 281:2, 281:7, 281:19
**home** [4] - 233:18, 233:19, 251:11, 251:14
**honest** [2] - 12:10, 136:4
**honestly** [15] - 33:18, 33:24, 56:5, 56:7, 61:20, 102:11, 102:22, 111:8, 112:25, 114:16, 115:3, 152:14, 226:10, 238:25, 248:23
**hope** [2] - 12:21, 153:9
**hoping** [1] - 48:12
**hour** [2] - 82:13, 164:18
**housed** [2] - 147:25, 227:17
**HSI** [3] - 22:18, 22:23, 73:12
**human** [3] - 60:25, 188:25, 302:2
**hyperbolic** [1] - 301:11
**hypothetical** [12] - 145:23, 177:2, 177:8, 212:10, 212:11, 213:14, 215:7, 215:8, 215:9, 215:15, 245:19, 300:13
**hypothetically** [3] - 147:9, 177:9, 212:13

# I

**ICAC** [23] - 5:21, 5:25, 6:4, 33:6, 40:23, 42:5, 54:4, 57:7, 57:10, 57:12, 60:18, 88:4, 88:6, 95:9, 155:18, 198:17, 218:12, 226:23,

261:4, 262:2, 262:5, 279:7
**ID** [9] - 10:20, 16:23, 216:11, 216:14, 216:23, 216:24, 218:5, 219:9, 242:11
**idea** [8] - 27:13, 27:19, 119:8, 169:4, 170:8, 178:11, 224:22, 268:11
**Identification** [2] - 308:21, 308:22
**identification** [10] - 14:9, 38:18, 43:6, 45:2, 85:24, 107:4, 161:10, 223:24, 241:20, 279:14
**identified** [10] - 17:4, 17:23, 18:23, 21:18, 28:6, 28:17, 29:13, 145:14, 202:13, 224:9
**identifier** [1] - 19:25
**identifiers** [1] - 14:20
**identifies** [1] - 224:4
**identify** [15] - 18:25, 19:10, 19:20, 21:4, 21:15, 24:8, 28:22, 29:15, 38:21, 50:8, 52:24, 54:7, 148:16, 155:16, 187:16
**identifying** [1] - 221:17
**identity** [2] - 155:9, 268:1
**IDS** [1] - 227:18
**IDs** [7] - 153:25, 213:8, 214:1, 214:5, 242:9, 242:13, 280:4
**II** [1] - 2:3
**illegal** [6] - 67:1, 148:8, 249:12, 250:4, 250:15, 250:22
**illegally** [1] - 72:17
**illicit** [1] - 249:5
**illness** [2] - 179:14, 179:15
**image** [244] - 16:9, 17:4, 17:5, 17:16, 17:23, 18:1, 18:4, 21:6, 21:7, 23:16, 27:13, 27:19, 28:3, 29:14, 29:17, 29:18, 30:22, 31:3, 31:4, 31:7, 31:10, 31:11, 31:22, 32:6, 32:17, 33:13, 33:14, 34:6, 34:7, 34:15, 35:1, 35:4, 36:15, 36:22,

36:23, 37:9, 37:10, 37:15, 37:17, 37:21, 37:25, 38:7, 39:2, 39:6, 39:15, 40:4, 40:9, 40:15, 40:20, 41:21, 44:5, 51:23, 54:24, 55:4, 56:14, 56:17, 56:19, 57:1, 57:2, 57:16, 57:24, 58:14, 61:8, 61:9, 62:9, 62:24, 63:2, 67:14, 68:5, 70:10, 70:11, 70:17, 71:11, 73:24, 76:15, 77:6, 77:7, 77:22, 78:9, 78:15, 79:3, 79:20, 80:8, 83:14, 86:19, 89:13, 91:4, 91:9, 91:16, 91:18, 96:15, 98:14, 99:12, 100:11, 103:1, 106:24, 107:22, 110:1, 110:9, 111:15, 111:18, 111:23, 112:6, 112:9, 113:24, 114:10, 126:24, 132:21, 132:22, 133:13, 133:16, 133:24, 136:7, 138:1, 138:3, 138:4, 138:5, 138:13, 138:19, 139:2, 139:7, 139:15, 143:12, 143:13, 148:3, 148:9, 157:9, 157:10, 157:11, 157:15, 157:21, 157:23, 158:1, 158:3, 158:22, 159:1, 159:3, 159:4, 159:18, 159:23, 160:1, 162:18, 162:20, 163:7, 163:8, 163:13, 163:14, 163:23, 170:13, 172:3, 175:15, 175:20, 175:23, 176:21, 177:12, 182:7, 184:4, 184:5, 184:6, 184:17, 185:3, 185:8, 185:13, 185:14, 187:4, 187:7, 187:10, 201:16, 201:25, 202:20, 202:23, 203:11, 205:7, 205:17, 207:6, 207:9, 207:11, 210:3, 219:11,

219:20, 221:8, 223:4, 225:15, 226:5, 230:25, 231:7, 232:21, 234:3, 234:17, 234:18, 234:23, 235:2, 235:13, 244:18, 244:20, 244:22, 245:14, 246:23, 247:13, 247:19, 247:23, 248:5, 252:7, 252:13, 252:17, 253:1, 253:9, 253:13, 253:14, 253:17, 255:2, 255:14, 255:16, 255:17, 257:6, 258:12, 258:17, 258:20, 267:15, 267:21, 271:17, 271:23, 272:14, 272:15, 272:20, 274:18, 277:12, 277:22, 278:5, 279:25, 280:22, 281:1, 282:12, 282:21, 283:19, 283:20, 287:16, 288:21, 304:4, 304:6
**imagery** [1] - 85:20
**images** [192] - 7:8, 7:10, 8:21, 8:22, 13:5, 25:14, 26:8, 27:9, 34:3, 34:6, 40:21, 41:19, 52:16, 53:4, 54:3, 56:9, 56:12, 62:14, 62:17, 66:11, 66:15, 67:25, 68:1, 72:6, 77:17, 91:21, 95:10, 99:8, 126:25, 127:4, 128:23, 132:24, 133:10, 135:25, 136:2, 136:3, 136:13, 137:3, 137:13, 137:18, 137:20, 137:23, 137:25, 138:2, 138:8, 138:16, 138:20, 139:19, 139:20, 140:7, 144:3, 144:4, 144:6, 144:8, 145:16, 146:24, 150:12, 151:20, 154:24, 156:13, 156:14, 156:18, 157:3, 157:5, 157:6, 157:8, 163:4, 169:3, 187:21, 204:8,

204:10, 204:11,
204:22, 205:1,
205:3, 205:11,
206:1, 206:20,
206:22, 211:14,
211:15, 211:24,
213:5, 219:1, 219:7,
219:10, 219:23,
223:2, 223:14,
223:19, 227:8,
227:9, 227:15,
227:23, 228:8,
229:12, 233:23,
233:24, 234:1,
244:8, 247:9,
247:14, 247:25,
249:5, 249:12,
249:20, 250:3,
250:15, 250:23,
251:18, 251:23,
252:2, 252:5,
252:18, 252:23,
252:24, 254:1,
254:4, 254:7,
254:23, 255:14,
255:16, 255:17,
255:18, 255:24,
255:25, 256:3,
256:12, 256:23,
256:24, 257:2,
257:4, 257:11,
257:14, 257:24,
258:5, 258:7, 258:8,
258:10, 258:19,
259:1, 259:17,
259:20, 259:21,
260:18, 263:21,
263:24, 264:1,
266:21, 267:19,
268:15, 268:18,
269:12, 269:19,
270:4, 270:8,
270:21, 271:4,
271:16, 271:20,
272:4, 272:14,
275:14, 275:20,
276:7, 276:10,
276:14, 278:8,
278:9, 278:11,
279:9, 279:20,
279:25, 281:1,
281:18, 283:19,
285:24, 286:9,
286:13, 288:4,
288:25, 291:22,
292:17, 294:16,
295:11, 296:12,
306:12
**immediately** [4] -
29:13, 29:15, 32:14,
34:25

**importance** [1] - 135:3
**important** [3] - 15:13,
42:12, 135:9
**impression** [1] -
289:11
**imprinted** [1] - 159:23
**improper** [1] - 133:12
**inaccurately** [1] -
103:21
**inappropriate** [1] -
47:15
**incident** [10] - 15:6,
15:10, 15:13, 15:18,
87:13, 87:14, 87:16,
100:24, 135:14,
217:4
**include** [5] - 39:25,
164:1, 172:5,
183:16, 278:25
**included** [6] - 71:18,
96:3, 179:3, 255:15,
255:19, 255:24
**includes** [2] - 86:21,
170:18
**including** [5] - 87:16,
157:15, 159:4,
194:25, 198:23
**incorrect** [4] - 35:5,
35:24, 36:11, 89:17
**indicate** [2] - 14:16,
62:20
**indicates** [1] - 17:12
**indication** [2] - 123:9,
281:3
**indiscrepancy** [1] -
295:2
**individual** [15] - 1:4,
1:7, 1:9, 5:17, 60:25,
104:1, 106:14,
110:3, 125:8, 163:6,
166:18, 170:17,
310:2, 310:3, 310:4
**individuals** [2] - 56:9,
178:13
**industry** [1] - 57:20
**information** [82] -
11:5, 11:6, 11:9,
17:21, 20:21, 28:2,
30:13, 35:22, 52:19,
52:24, 53:10, 84:2,
84:14, 89:20, 89:21,
105:12, 106:17,
109:6, 131:17,
131:22, 132:12,
134:14, 134:16,
134:22, 135:3,
139:14, 139:20,
140:6, 141:20,
141:24, 142:3,
142:6, 142:16,

142:21, 143:2,
143:7, 143:16,
144:19, 144:21,
145:8, 145:16,
146:7, 146:12,
146:13, 146:14,
147:10, 147:13,
147:15, 147:17,
147:23, 149:6,
150:1, 183:23,
188:16, 195:13,
196:1, 196:5,
196:14, 197:4,
197:12, 197:13,
197:15, 197:16,
199:23, 200:25,
213:20, 213:22,
214:7, 214:14,
214:18, 215:16,
216:23, 219:12,
219:19, 241:14,
248:23, 250:2,
250:6, 266:7,
270:20, 280:8,
280:24
**informed** [1] - 193:7
**initial** [10] - 7:15,
19:16, 19:19, 31:10,
31:12, 31:14,
202:23, 259:18,
260:11, 260:12
**initiate** [1] - 154:11
**input** [2] - 30:13,
30:18
**inputted** [1] - 30:1
**instance** [1] - 252:7
**instead** [1] - 66:5
**intellectual** [1] - 45:8
**intelligence** [1] - 48:9
**intentionally** [4] -
86:18, 172:2,
177:19, 229:2
**interest** [2] - 25:24
**interested** [1] - 309:14
**Internet** [31] - 6:6,
70:4, 70:8, 70:12,
84:18, 103:1,
110:18, 110:25,
111:16, 111:20,
112:2, 112:11,
113:4, 113:13,
126:25, 127:4,
127:8, 140:21,
141:13, 143:17,
163:4, 228:8,
229:12, 229:21,
233:24, 247:7,
247:10, 247:16,
247:25, 248:12,
265:18

**internet** [1] - 247:16
**Internet-based** [1] -
112:2
**Interpol** [1] - 218:16
**Interpol/FBI** [1] -
218:9
**interpret** [2] - 101:15,
226:9
**interrogating** [2] -
189:12, 189:17
**interrupt** [3] - 18:12,
194:11, 217:25
**introduce** [1] - 4:14
**introduced** [2] - 5:14,
203:9
**investigate** [12] -
72:24, 73:1, 145:2,
155:9, 184:16,
184:21, 186:22,
186:25, 187:3,
187:12, 215:1, 229:5
**investigated** [4] -
51:22, 99:3, 182:13,
187:2
**investigating** [1] -
70:8
**investigation** [82] -
13:14, 14:14, 16:13,
18:23, 18:24, 18:25,
19:1, 19:3, 19:9,
19:16, 19:20, 21:4,
21:19, 22:3, 22:6,
32:24, 55:16, 67:11,
95:22, 105:8,
105:20, 129:13,
129:18, 130:24,
148:9, 150:2,
154:19, 154:20,
155:4, 155:13,
155:15, 156:3,
156:4, 156:8, 175:5,
178:21, 178:22,
178:23, 179:6,
180:22, 182:13,
183:9, 183:13,
183:16, 183:18,
183:21, 184:9,
184:12, 184:25,
185:1, 185:2, 185:7,
186:11, 186:18,
186:19, 187:20,
187:21, 188:3,
188:14, 188:15,
190:23, 191:2,
191:5, 191:13,
193:19, 194:5,
194:22, 195:15,
196:22, 197:25,
199:20, 202:14,
216:4, 217:8,

230:12, 245:21,
260:11, 262:4,
264:15, 268:9,
268:12, 276:14
**investigations** [10] -
18:24, 40:24, 54:5,
96:1, 96:3, 186:1,
190:25, 191:18,
195:22, 279:7
**investigative** [7] -
10:2, 11:15, 12:3,
34:18, 36:21,
196:17, 222:7
**investigator** [19] -
24:24, 33:6, 34:19,
38:5, 51:16, 54:6,
55:5, 57:10, 57:12,
84:17, 141:12,
148:1, 226:23,
229:5, 236:8, 242:2,
249:7, 249:18,
262:14
**investigators** [5] -
40:23, 42:6, 51:12,
54:5, 57:7
**involved** [8] - 79:6,
96:9, 127:8, 181:17,
197:24, 198:7,
201:10, 239:22
**involvement** [1] -
201:8
**involving** [1] - 51:23
**iPad** [1] - 245:5
**irregular** [1] - 47:14
**irritation** [1] - 120:16
**issue** [1] - 262:2
**issued** [8] - 134:3,
203:19, 213:8,
213:16, 213:17,
219:9, 267:13,
267:16
**issues** [3] - 262:11,
263:12, 263:14
**itself** [3] - 123:25,
159:13, 185:1

## J

**Jacksonville** [4] - 2:5,
4:6, 113:23, 264:23
**JACKSONVILLE** [1] -
1:2
**jewelry** [1] - 236:20
**Jimenero** [1] - 261:6
**job** [18] - 23:9, 23:12,
23:13, 24:24, 44:19,
122:24, 166:13,
169:19, 178:22,
212:15, 212:21,
212:22, 214:24,
229:5, 229:7, 265:2,

268:5, 302:4
**JOHNS** [2] - 308:4,
309:3
**Johns** [20] - 1:8, 5:23,
72:23, 101:18,
126:16, 151:1,
169:5, 198:12,
218:14, 265:5,
265:7, 268:17,
269:22, 270:22,
275:12, 275:21,
278:13, 286:15,
286:17, 310:3
**Johns'** [1] - 269:11
**join** [28] - 11:21, 97:9,
97:21, 103:19,
104:25, 105:24,
117:24, 118:8,
122:6, 132:7,
162:13, 164:10,
209:25, 210:10,
210:17, 289:21,
290:2, 290:16,
291:16, 292:5,
293:24, 294:20,
296:19, 300:11,
301:20, 302:12,
303:10, 305:13
**joke** [1] - 58:22
**JOSEPH** [1] - 2:9
**jpg** [1] - 292:20
**judge** [5] - 41:4,
133:13, 133:18,
183:4, 212:21
**judges** [1] - 133:20
**July** [1] - 308:14
**jump** [2] - 221:25,
271:6

### K

**Kaitlyn** [1] - 128:11
**Karry** [2] - 225:13,
225:18
**KATHLEEN** [2] - 1:8,
310:4
**Kathleen** [3] - 2:20,
3:19, 194:20
**keep** [1] - 43:25
**keeping** [1] - 114:7
**KEITH** [1] - 2:3
**Kevin** [2] - 278:8,
278:20
**kind** [24] - 9:25, 15:15,
18:7, 42:14, 83:2,
90:8, 94:1, 97:5,
118:11, 118:19,
118:20, 125:15,
125:20, 131:9,
135:6, 136:1,
151:15, 180:22,

190:13, 196:12,
243:15, 243:24,
255:15, 273:9
**kinds** [1] - 30:25
**knees** [1] - 79:13
**knowing** [12] - 151:23,
170:13, 171:18,
181:25, 188:13,
189:1, 189:23,
190:9, 281:13,
281:17, 305:22,
306:4
**knowingly** [3] - 86:17,
172:1, 177:18
**knowledge** [5] -
126:6, 268:16,
269:23, 276:2, 276:5
**known** [11] - 40:21,
41:18, 52:16, 53:3,
54:2, 69:3, 131:24,
187:3, 187:11,
308:21
**knows** [3] - 54:20,
86:21, 172:5

### L

**lace** [1] - 282:23
**lack** [4] - 123:13,
210:5, 295:7, 298:19
**lacking** [1] - 146:19
**lap** [1] - 46:2
**laptop** [15] - 47:8,
47:9, 107:14,
113:24, 115:6,
115:7, 133:22,
205:16, 227:8,
227:20, 267:13,
267:16, 267:20,
267:21, 292:18
**large** [1] - 301:12
**lascivious** [1] - 18:9
**laser** [2] - 120:4, 120:5
**last** [4] - 10:2, 116:24,
283:8, 291:4
**Latvian** [3] - 161:6,
161:7, 280:17
**law** [25] - 18:16, 42:11,
42:12, 54:12, 72:5,
72:11, 87:24,
107:14, 145:19,
150:7, 150:21,
151:2, 151:22,
152:25, 189:6,
191:25, 202:18,
217:10, 218:13,
218:19, 229:10,
268:5, 270:4, 292:18
**laws** [3] - 141:10,
141:15, 214:21
**Lawshe** [55] - 4:3,

4:18, 5:15, 6:9, 6:10,
6:23, 8:6, 9:8, 12:13,
19:21, 20:11, 21:5,
68:5, 69:12, 69:18,
137:12, 142:18,
143:16, 145:11,
146:15, 147:1,
147:18, 150:10,
150:14, 151:9,
151:22, 153:17,
163:3, 163:17,
172:10, 173:13,
174:1, 175:11,
175:15, 176:17,
177:2, 178:12,
188:8, 188:17,
191:22, 192:3,
192:8, 200:7,
202:13, 202:17,
233:9, 248:16,
250:3, 259:1,
264:13, 264:18,
274:14, 274:24,
279:10, 286:19
**LAWSHE** [2] - 1:3,
310:2
**Lawshe's** [3] - 156:15,
176:3, 268:5
**laymen's** [6] - 15:15,
16:22, 28:1, 77:4,
108:10, 245:3
**layperson's** [1] -
80:16
**lead** [5] - 40:14, 88:8,
210:6, 249:18, 251:6
**learn** [3] - 127:20,
191:3, 278:23
**learned** [3] - 178:20,
179:7, 190:19
**learning** [1] - 191:4
**least** [10] - 67:25,
71:1, 87:19, 110:2,
138:8, 144:14,
169:5, 174:10,
196:2, 212:16
**leave** [2] - 73:6, 260:8
**leaves** [1] - 257:24
**led** [10] - 32:16, 32:25,
36:5, 99:1, 159:1,
174:1, 195:22,
244:13, 274:13,
274:15
**LEE** [2] - 1:3, 310:2
**Lee** [3] - 4:3, 19:20,
20:11
**leeway** [1] - 47:23
**left** [3] - 114:10, 115:7,
299:13
**legal** [6] - 19:25,
31:16, 31:17, 66:19,

66:21, 219:18
**Leon** [2] - 1:19, 4:8
**less** [16] - 160:5,
160:19, 161:21,
162:9, 162:10,
164:6, 165:20,
166:1, 206:4, 290:3,
291:25, 293:1,
299:3, 299:12,
302:21, 302:24
**LINE** [1] - 310:7
**Lines** [6] - 277:4,
277:10, 277:17,
277:25, 278:2, 278:7
**lines** [2] - 278:21,
283:3
**lingerie** [1] - 279:2
**link** [4] - 45:23, 47:2,
245:6, 245:9
**linked** [1] - 134:11
**links** [2] - 44:2, 45:5
**list** [2] - 134:18,
159:25
**listed** [12] - 29:18,
41:6, 62:2, 144:4,
144:7, 200:14,
218:17, 224:11,
224:13, 224:24,
234:15, 235:17
**lists** [1] - 255:5
**literally** [2] - 216:7,
234:3
**literature** [1] - 206:15
**litigate** [1] - 48:11
**living** [2] - 60:11,
214:23
**local** [1] - 218:11
**locate** [12] - 44:5,
126:24, 127:3,
127:7, 140:5,
141:24, 142:17,
143:3, 143:17,
148:23, 163:4,
187:16
**located** [10] - 22:21,
127:20, 135:24,
138:4, 138:5,
139:19, 139:24,
140:16, 140:20,
148:16
**look** [58] - 29:6, 33:13,
33:22, 56:21, 58:18,
58:25, 59:7, 59:8,
59:13, 59:22, 59:23,
60:20, 60:21, 63:16,
66:10, 70:10, 75:19,
75:25, 80:6, 80:8,
83:18, 100:12,
104:11, 107:2,
114:25, 121:15,
139:16, 155:4,
161:20, 162:4,
162:9, 162:10,
165:17, 172:22,

279:18, 282:16,
282:20, 283:8,
283:18, 283:25,
284:3, 284:4,
284:22, 285:8,
285:15
**LINE** [1] - 310:7
**Lines** [6] - 277:4,
277:10, 277:17,
277:25, 278:2, 278:7
**letter** [20] - 107:10,
116:5, 128:25,
129:17, 129:19,
131:12, 206:21,
206:25, 271:12,
282:6, 282:13,
282:19, 283:6,
283:14, 283:16,
283:24, 284:7,
284:10, 285:1, 285:2
**letter's** [1] - 290:9
**Letters** [1] - 3:18
**letters** [7] - 268:21,
271:4, 273:6,
273:18, 274:8,
282:6, 285:25
**level** [2] - 47:25,
189:19
**license** [5] - 216:17,
216:19, 217:2,
217:12, 242:10
**License** [1] - 308:22
**licensed** [4] - 25:10,
151:18, 152:10,
219:10
**lie** [1] - 118:4
**lieutenant** [2] - 192:5,
198:5, 200:16,
200:17, 200:20
**lieutenants** [1] -
200:21
**life** [5] - 65:10, 158:25,
189:2, 189:23,
231:13
**likely** [21] - 31:11,
36:15, 36:22, 37:2,
37:3, 37:6, 37:10,
37:14, 37:17, 39:15,
40:5, 40:9, 40:15,
68:5, 73:8, 110:12,
229:24, 233:24,
247:7, 247:9, 247:25
**limited** [5] - 121:25,
214:7, 214:18,
214:20, 215:16
**Line** [4] - 43:21, 74:18,
83:12, 83:20
**line** [18] - 3:13, 14:4,
15:7, 66:5, 130:14,
229:25, 276:25,

190:24, 192:25,
211:15, 230:25,
232:20, 232:21,
234:20, 243:7,
243:9, 243:12,
243:18, 244:5,
244:16, 246:21,
251:20, 253:1,
254:1, 255:1, 277:5,
282:17, 301:13,
301:16, 303:20,
306:11
**looked** [38] - 29:13,
32:10, 32:11, 34:15,
35:1, 35:9, 57:1,
60:6, 61:16, 63:5,
63:9, 66:6, 73:19,
73:24, 79:3, 79:25,
80:4, 81:15, 93:12,
98:14, 99:8, 99:11,
115:6, 156:24,
172:15, 172:17,
173:16, 182:4,
201:19, 206:14,
232:19, 235:23,
257:4, 259:23,
271:18, 285:24,
287:8, 298:5
**looking** [32] - 14:2,
31:7, 32:8, 61:5,
77:8, 77:9, 80:9,
80:20, 87:2, 104:2,
104:22, 122:9,
134:18, 156:25,
157:1, 159:9, 165:1,
190:2, 208:17,
226:1, 228:20,
228:25, 244:8,
254:6, 258:15,
258:16, 273:5,
281:19, 281:25,
289:24, 304:14,
305:21
**looks** [23] - 33:5,
66:19, 75:1, 75:10,
75:23, 76:21, 89:11,
129:8, 131:22,
180:20, 226:7,
231:22, 234:22,
236:2, 243:11,
243:19, 271:11,
272:12, 272:15,
298:2, 301:22,
302:17
**lost** [2] - 215:10,
283:25
**lot's** [1] - 166:21
**luring** [1] - 76:6
**lying** [1] - 142:14

**M**

**M.D** [1] - 3:19
**ma'am** [70] - 5:4, 22:1,
263:13, 263:22,
263:25, 264:3,
264:14, 264:19,
265:3, 265:10,
265:23, 266:3,
266:14, 266:17,
267:10, 267:18,
267:24, 268:3,
268:8, 268:19,
269:1, 269:20,
270:1, 270:23,
271:1, 271:5,
271:10, 272:8,
272:19, 274:3,
274:17, 275:8,
275:18, 276:2,
276:5, 276:12,
276:16, 276:18,
276:22, 277:8,
277:16, 277:19,
277:23, 278:14,
279:17, 279:19,
280:6, 280:11,
280:12, 280:18,
280:21, 280:25,
281:20, 282:24,
283:2, 283:7,
283:12, 284:8,
284:11, 285:6,
285:11, 285:14,
285:21, 286:4,
286:11, 286:16,
286:20, 286:24,
286:25
**magazine** [7] - 63:10,
63:11, 64:5, 225:24,
226:3, 226:4, 226:8
**magazines** [1] - 64:7
**mail** [13] - 25:11,
30:19, 128:16,
134:24, 148:2,
148:7, 149:7, 149:9,
150:10, 154:14,
274:8
**mailed** [3] - 25:8,
145:15, 145:20
**mailing** [1] - 148:5
**main** [3] - 55:10,
74:22, 116:24
**maintain** [2] - 141:16,
141:20
**major** [2] - 124:14,
188:3
**majority** [2] - 63:20,
63:22
**makeup** [3] - 236:22,
236:23, 237:12

**makeup 's** [1] - 236:11
**man** [1] - 190:12
**manipulated** [5] -
153:6, 213:25,
242:24, 280:4
**March** [9] - 1:16, 4:10,
6:22, 8:8, 21:21,
156:11, 156:12,
307:17, 308:8
**mark** [7] - 13:21,
38:13, 44:21, 94:3,
94:9, 160:23, 241:17
**marked** [13] - 3:25,
14:8, 38:17, 43:5,
45:1, 85:23, 89:8,
107:3, 129:10,
161:2, 161:9,
223:23, 241:19
**marking** [1] - 43:12
**marks** [1] - 221:17
**married** [1] - 137:15
**match** [6] - 17:7,
17:11, 17:13, 17:14,
230:1, 230:4
**matching** [2] - 16:25,
108:13
**material** [9] - 12:14,
23:6, 23:17, 26:12,
58:15, 92:16,
171:23, 219:15,
229:6
**maternity** [1] - 260:7
**math** [2] - 87:18,
241:1
**Matt** [5] - 48:23, 74:13,
94:17, 222:4, 262:24
**matter** [6] - 4:3, 8:3,
30:21, 193:2,
256:21, 258:18
**MATTHEW** [1] - 2:9
**Matthew** [1] - 4:19
**mature** [1] - 75:1
**maturity** [3] - 83:14,
206:16, 295:9
**mcarson @
sniffenlaw .com** [1] -
2:12
**McDonald 's** [1] -
108:12
**MD5** [3] - 16:21, 16:22
**mean** [165] - 9:2, 16:8,
18:2, 18:5, 18:12,
27:23, 28:19, 29:24,
31:8, 38:5, 42:7,
44:9, 54:18, 57:25,
58:8, 58:22, 59:11,
60:11, 60:18, 62:10,
63:10, 63:14, 63:24,
64:16, 65:8, 65:9,
65:20, 66:10, 66:18,

67:10, 71:5, 71:10,
72:1, 72:25, 73:9,
74:4, 75:6, 75:22,
76:13, 77:2, 77:20,
77:24, 79:2, 80:7,
80:16, 80:21, 80:25,
81:4, 82:2, 83:16,
84:21, 85:16, 91:21,
93:20, 94:19, 96:23,
101:21, 101:25,
104:20, 110:6,
111:1, 111:9,
111:10, 111:13,
111:15, 112:7,
114:8, 117:2, 117:3,
117:6, 117:8,
120:11, 120:12,
121:10, 121:14,
121:24, 122:1,
122:12, 122:23,
123:1, 124:4,
125:12, 125:17,
130:13, 132:10,
133:11, 133:19,
139:7, 141:1,
142:10, 144:2,
144:25, 153:4,
155:21, 156:19,
156:24, 157:2,
157:14, 158:17,
158:24, 160:17,
162:17, 166:18,
175:3, 176:9,
176:21, 177:13,
178:11, 185:3,
185:13, 186:17,
188:2, 191:7,
191:11, 194:10,
196:24, 197:3,
197:10, 208:3,
210:6, 210:13,
211:21, 214:24,
215:10, 216:7,
220:24, 221:1,
221:6, 224:17,
226:21, 226:22,
227:7, 227:22,
228:3, 228:20,
230:5, 230:22,
232:16, 233:24,
233:25, 236:7,
236:11, 236:17,
236:25, 237:19,
238:2, 238:19,
239:12, 240:21,
246:1, 250:11,
255:10, 260:12,
262:14, 268:25,
273:5, 301:10,
303:9, 303:25
**meaning** [3] - 266:5,

275:12, 275:14
**means** [24] - 27:24,
28:5, 28:13, 29:8,
58:1, 81:25, 116:15,
116:22, 118:18,
169:14, 173:2,
206:7, 210:2
**meant** [2] - 117:7,
118:2
**med** [1] - 183:22
**med-art.com** [1] -
183:22
**media** [2] - 113:15,
247:16
**Media** [4] - 4:1, 82:19,
82:24, 168:24
**medical** [7] - 1:9,
102:14, 106:5,
159:8, 210:23,
210:24, 310:4
**Medlock** [8] - 1:24,
4:13, 308:5, 308:12,
308:13, 309:4,
309:18, 309:18
**meet** [5] - 113:21,
114:4, 115:20,
265:12, 266:4
**meeting** [17] - 113:22,
114:9, 114:11,
115:6, 115:15,
127:1, 127:14,
127:17, 203:14,
264:14, 266:5,
266:8, 266:19,
267:7, 267:20,
268:6, 273:22
**meetings** [2] - 266:1,
274:2
**Melania** [23] - 288:17,
288:18, 289:7,
290:12, 290:13,
291:4, 292:2,
293:11, 293:21,
294:16, 295:10,
296:15, 299:12,
299:14, 302:7,
302:8, 303:6, 303:7,
303:13, 303:17,
303:22, 307:1, 307:2
**Melanie** [1] - 288:21
**Melina** [2] - 279:22,
280:1
**members** [1] - 66:6
**membership** [1] -
218:12
**memory** [1] - 262:11
**men** [1] - 122:8
**message** [2] - 113:16,
274:9
**met** [78] - 3:16, 21:11,

21:14, 21:22, 25:9,
25:24, 26:12, 29:14,
29:16, 31:4, 31:11,
31:22, 32:7, 33:2,
34:7, 36:16, 36:23,
37:11, 37:15, 37:25,
39:3, 39:7, 39:16,
40:4, 40:9, 41:22,
42:3, 42:20, 44:5,
44:15, 45:6, 45:24,
46:13, 51:23, 52:3,
52:5, 52:17, 52:25,
54:24, 55:4, 55:13,
71:2, 71:9, 71:11,
83:4, 84:3, 84:6,
95:1, 102:15,
102:19, 106:9,
106:11, 113:23,
115:19, 115:22,
126:15, 131:24,
144:14, 144:19,
144:22, 145:9,
145:13, 146:14,
147:14, 174:20,
183:17, 184:2,
207:24, 208:2,
230:24, 232:18,
232:22, 265:24,
271:8, 273:24,
278:16, 278:17,
278:24
**met-art** [1] - 21:11
**met-art.com** [62] -
3:16, 21:14, 21:22,
25:9, 25:24, 26:12,
29:14, 29:16, 31:4,
31:11, 31:22, 32:7,
33:2, 34:7, 36:16,
36:23, 37:11, 37:15,
37:25, 39:3, 39:7,
39:16, 40:4, 40:9,
41:22, 42:3, 42:20,
44:5, 44:15, 45:6,
45:24, 46:13, 51:23,
52:3, 52:5, 52:17,
52:25, 54:24, 55:4,
55:13, 71:2, 71:9,
71:11, 83:4, 84:3,
84:6, 131:24,
144:14, 144:19,
144:22, 145:9,
145:13, 146:14,
174:20, 183:17,
184:2, 230:24,
232:18, 232:22,
278:16, 278:17,
278:24
**met-art.com's** [1] -
147:14
**MetaArt** [1] - 43:25

**MetArt** [25] - 21:10,
26:15, 37:2, 37:4,
38:6, 40:6, 42:5,
43:1, 43:24, 43:25,
44:6, 44:17, 49:24,
51:13, 51:17, 51:20,
54:19, 54:21, 83:21,
84:1, 144:20,
147:19, 183:20,
184:5, 184:6
**method** [4] - 103:7,
103:9, 103:10,
103:12
**methods** [1] - 119:14
**MICHAEL** [1] - 2:3
**Michael** [7] - 4:17,
43:9, 47:22, 161:2,
169:23, 223:14,
287:1
**Michael's** [1] - 222:2
**Middle** [1] - 4:5
**MIDDLE** [1] - 1:1
**might** [17] - 59:7,
64:21, 64:22, 66:15,
71:15, 109:21,
120:18, 126:1,
151:17, 169:14,
172:21, 178:2,
195:22, 221:19,
221:24, 245:13,
250:12
**Mikayla** [8] - 2:14,
3:15, 3:18, 4:3, 4:4,
4:20, 5:12, 307:16
**MIKAYLA** [8] - 1:7,
1:14, 3:3, 5:1, 308:7,
309:6, 310:3, 310:25
**mind** [7] - 25:25,
31:21, 152:11,
153:17, 177:20,
233:11, 296:18
**mine** [1] - 46:8
**minor** [51] - 18:8, 28:4,
28:6, 28:15, 28:16,
33:14, 35:7, 62:9,
62:21, 69:24, 72:3,
73:18, 73:24, 75:11,
75:14, 76:22, 83:15,
91:15, 92:22, 97:4,
102:4, 124:1, 126:3,
126:6, 159:2,
159:15, 164:24,
166:19, 166:23,
166:25, 167:11,
169:8, 172:10,
172:15, 172:18,
174:2, 175:17,
177:6, 177:16,
177:20, 178:1,
178:2, 182:10,

225:1, 225:14,
277:12, 277:22,
302:5, 306:3
**minors** [17] - 8:24, 9:6,
24:5, 72:18, 152:6,
155:19, 165:11,
166:10, 204:15,
212:16, 213:4,
229:9, 263:21,
275:15, 275:22,
276:15, 285:24
**minute** [6] - 13:12,
16:1, 16:7, 27:1,
76:19, 91:14
**minutes** [3] - 140:17,
246:12, 278:9
**mischaracterization**
[2] - 192:20, 194:18
**mischaracterizes** [1] -
298:18
**mischaracterizing** [2]
- 158:14, 192:24
**misheard** [1] - 193:25
**missing** [1] - 131:7
**Missing** [3] - 13:20,
108:20, 109:14
**misspeak** [4] - 105:6,
129:6, 165:24,
253:25
**misspeaking** [1] -
40:12
**misspoke** [2] -
193:22, 194:8
**misstate** [1] - 31:25
**mistaken** [7] - 6:2,
15:25, 34:22, 54:12,
56:3, 56:7, 76:8
**misunderstanding** [1]
- 117:20
**misunderstood** [1] -
272:8
**model** [81] - 27:9,
28:9, 28:14, 28:23,
35:17, 56:22, 64:21,
68:24, 68:25, 69:3,
69:13, 69:19, 71:22,
73:19, 81:15, 89:22,
90:16, 93:12, 97:4,
101:19, 102:4,
103:1, 103:13,
123:24, 138:6,
138:9, 138:17,
138:18, 139:1,
141:1, 148:17,
148:20, 160:24,
161:4, 161:13,
164:6, 207:17,
224:4, 224:12,
230:18, 234:8,
234:18, 234:22,

237:4, 240:12,
242:23, 244:20,
251:24, 252:5,
256:4, 256:15,
257:19, 257:25,
258:2, 277:2,
278:17, 280:13,
283:20, 284:23,
285:16, 286:9,
287:16, 288:25,
289:15, 291:3,
292:8, 292:9, 298:9,
299:6, 300:5, 300:8,
300:23, 300:25,
301:1, 302:6, 302:8,
302:24, 304:8,
304:21, 306:14
**models** [37] - 8:9,
8:21, 10:20, 13:5,
55:20, 67:21, 84:2,
84:19, 84:23, 127:7,
127:20, 139:19,
140:6, 140:16,
140:21, 141:24,
142:17, 143:3,
143:17, 150:13,
151:21, 152:5,
152:17, 153:12,
153:19, 156:7,
168:2, 175:6,
211:24, 213:4,
270:9, 276:10,
279:15, 279:21,
287:10, 301:15,
306:13
**models'** [2] - 155:9,
214:9
**moment** [1] - 272:25
**Monroe** [1] - 2:11
**month** [3] - 58:19,
64:19, 294:24
**months** [7] - 33:8,
58:13, 88:7, 88:25,
95:2, 142:22, 142:23
**moon** [1] - 111:9
**most** [21] - 31:10,
42:21, 60:6, 60:9,
67:20, 68:5, 73:8,
77:21, 84:18, 84:22,
110:12, 206:3,
229:24, 233:24,
247:7, 247:9,
247:25, 283:21,
289:17, 291:24
**mostly** [1] - 263:18
**motion** [2] - 86:19,
172:2
**move** [3] - 48:14,
278:5, 283:13
**movement** [1] -

181:19
**MR** [538] - 4:17, 4:19,
5:9, 8:14, 9:13, 9:15,
9:16, 9:18, 9:19,
9:21, 9:23, 10:24,
11:17, 11:18, 11:22,
13:23, 14:4, 14:7,
14:10, 18:16, 18:21,
20:20, 21:24, 22:5,
22:8, 22:10, 22:13,
22:19, 23:18, 23:20,
24:16, 24:17, 24:19,
24:23, 25:1, 25:2,
26:1, 26:4, 26:14,
26:17, 27:10, 27:12,
27:15, 27:17, 30:5,
30:8, 35:13, 35:15,
36:17, 36:20, 38:15,
38:19, 39:9, 39:13,
40:16, 40:18, 41:13,
41:15, 43:7, 43:10,
43:14, 43:16, 45:3,
45:10, 45:12, 45:13,
45:15, 45:18, 45:20,
45:22, 45:25, 46:3,
46:5, 46:6, 46:7,
46:10, 46:11, 46:12,
46:13, 46:15, 46:16,
46:21, 46:22, 46:24,
47:1, 47:12, 47:20,
47:21, 48:2, 48:4,
48:13, 48:15, 48:18,
48:19, 48:22, 49:11,
49:20, 49:21, 52:8,
52:9, 66:2, 66:3,
66:4, 66:9, 69:20,
70:2, 70:13, 70:18,
72:9, 72:10, 72:13,
72:15, 73:20, 73:22,
74:13, 74:17, 81:23,
82:7, 82:12, 82:14,
82:15, 82:18, 83:1,
86:1, 86:8, 86:10,
86:11, 86:15, 92:4,
92:12, 93:5, 94:5,
94:6, 94:7, 94:8,
94:17, 94:18, 96:22,
97:7, 97:10, 97:22,
97:25, 98:1, 98:19,
98:21, 98:23, 99:14,
99:15, 100:21,
101:13, 101:24,
103:8, 103:15,
103:23, 104:6,
104:16, 104:24,
105:4, 105:24,
106:8, 106:22,
107:5, 110:5, 110:8,
110:14, 110:17,
110:20, 110:22,
111:21, 111:24,

112:24, 113:2, 113:5, 113:6, 114:21, 116:9, 117:14, 117:16, 117:23, 118:1, 118:7, 118:12, 119:7, 122:4, 122:11, 123:5, 123:7, 123:21, 124:10, 124:18, 125:3, 125:11, 125:23, 126:11, 127:22, 127:23, 128:3, 128:4, 129:16, 129:24, 131:3, 132:5, 132:8, 132:14, 132:17, 141:4, 141:6, 142:1, 142:4, 142:7, 142:9, 142:11, 142:12, 143:4, 143:5, 143:8, 143:9, 143:18, 143:21, 143:23, 144:1, 146:16, 146:18, 147:2, 147:6, 148:21, 149:1, 150:16, 150:20, 150:24, 151:5, 151:11, 151:14, 151:24, 152:3, 152:7, 152:9, 152:13, 152:15, 152:19, 152:22, 153:8, 153:10, 153:13, 153:16, 153:21, 153:24, 154:3, 154:6, 154:16, 154:21, 155:1, 155:7, 155:11, 155:14, 158:7, 158:8, 158:10, 158:12, 158:17, 158:23, 161:1, 161:4, 161:7, 161:11, 161:22, 162:1, 162:13, 162:15, 162:25, 163:2, 163:10, 163:15, 163:21, 163:24, 164:8, 164:14, 164:17, 164:19, 164:21, 164:22, 164:25, 165:3, 165:13, 165:15, 166:11, 166:14, 166:24, 167:3, 167:6, 167:12, 167:15, 167:16, 167:21, 167:24, 168:5, 168:7, 168:9,

168:11, 168:17, 168:19, 169:1, 169:25, 170:1, 170:2, 170:3, 170:5, 170:20, 170:21, 170:24, 170:25, 171:1, 171:2, 171:3, 171:8, 171:9, 172:23, 173:1, 173:4, 173:10, 175:8, 175:14, 175:25, 176:2, 176:5, 176:6, 176:13, 176:14, 176:18, 176:24, 177:17, 177:21, 178:14, 178:17, 181:5, 181:8, 183:1, 183:11, 183:24, 184:1, 184:18, 184:19, 185:10, 185:15, 187:23, 188:1, 188:4, 188:7, 188:18, 188:22, 189:3, 189:4, 189:25, 190:3, 190:16, 190:18, 191:21, 192:12, 192:17, 192:22, 193:10, 193:17, 193:24, 194:1, 194:2, 194:3, 194:10, 194:12, 194:14, 194:16, 194:19, 195:10, 197:7, 197:9, 200:2, 200:4, 202:25, 203:1, 206:19, 207:16, 207:20, 208:8, 208:20, 209:7, 209:19, 209:22, 209:23, 210:4, 210:8, 210:11, 210:14, 210:19, 210:25, 211:5, 211:9, 211:20, 211:22, 212:3, 212:5, 212:9, 212:14, 212:18, 213:1, 214:12, 214:13, 214:15, 214:19, 215:13, 215:14, 215:21, 215:23, 216:1, 216:5, 217:13, 217:14, 217:25, 218:2, 218:6, 218:8, 218:22, 218:24, 221:11, 221:13, 221:16, 221:22, 222:4, 222:12,

222:15, 222:19, 223:9, 223:11, 223:15, 223:20, 224:1, 230:8, 230:10, 230:13, 230:14, 231:17, 231:18, 232:7, 232:8, 238:4, 238:5, 238:12, 238:18, 240:6, 240:8, 241:3, 241:6, 241:21, 243:1, 243:5, 243:21, 244:1, 245:22, 245:23, 246:10, 246:19, 249:13, 249:17, 253:23, 254:3, 254:14, 254:16, 262:22, 263:1, 263:3, 270:18, 273:2, 273:8, 284:18, 287:1, 287:2, 287:3, 287:5, 289:18, 289:19, 289:22, 289:25, 290:6, 290:15, 290:19, 291:13, 291:14, 291:19, 292:4, 292:6, 293:10, 293:12, 293:13, 293:19, 293:22, 294:2, 294:9, 294:18, 295:1, 295:4, 295:8, 295:15, 296:1, 296:16, 296:17, 296:21, 296:24, 298:15, 298:20, 299:15, 299:23, 300:4, 300:9, 300:15, 301:9, 301:18, 302:1, 302:10, 302:19, 303:8, 303:11, 303:23, 304:2, 304:10, 304:11, 304:20, 304:23, 305:1, 305:4, 305:9, 305:11, 305:14, 305:23, 306:1, 306:5, 306:6, 306:18, 307:9, 307:11, 307:13

**mroberts @nrhnlaw.**
**com** [1] - 2:6
**MS** [130] - 4:21, 8:13, 10:22, 11:21, 14:1, 14:6, 18:12, 18:18, 20:19, 43:8, 43:11, 43:15, 45:16, 45:19, 81:22, 82:3, 82:17,

92:3, 92:10, 93:4, 96:11, 97:9, 97:21, 97:24, 98:18, 100:14, 101:9, 101:23, 103:3, 103:19, 104:5, 104:13, 104:25, 105:23, 106:21, 114:19, 116:8, 117:15, 117:24, 118:8, 119:6, 122:6, 123:16, 124:9, 124:17, 125:1, 125:10, 125:18, 126:10, 129:15, 129:21, 131:2, 132:7, 161:2, 161:5, 161:8, 162:12, 164:10, 167:9, 169:23, 170:4, 191:15, 192:10, 192:18, 192:20, 193:4, 193:16, 194:17, 195:9, 206:18, 207:13, 207:19, 208:6, 208:15, 209:6, 209:16, 209:25, 210:10, 210:17, 211:1, 211:8, 221:25, 222:11, 222:14, 222:17, 223:8, 223:10, 223:13, 223:18, 223:22, 232:5, 262:24, 263:2, 263:4, 263:6, 270:19, 273:4, 273:11, 273:16, 284:13, 284:19, 284:21, 286:21, 289:21, 290:2, 290:16, 291:16, 292:5, 293:7, 293:17, 293:24, 294:6, 294:20, 295:6, 295:17, 296:19, 298:17, 299:16, 300:2, 300:11, 301:3, 301:20, 302:12, 303:10, 304:13, 305:3, 305:13, 306:16, 307:7, 307:12

**multiple** [15] - 6:17, 127:8, 144:12, 144:13, 178:7, 198:4, 198:8, 198:23, 199:4, 200:10, 237:5,

237:10, 239:13, 274:11, 274:15
**multitude** [4] - 30:23, 111:5, 221:4, 238:22
**must** [2] - 170:13, 170:18
**myopic** [1] - 66:15

## N

**Nair** [1] - 119:24
**naked** [5] - 74:24, 74:25, 208:19, 279:2, 282:22
**name** [30] - 4:11, 5:11, 16:19, 18:20, 21:9, 24:13, 89:12, 126:18, 148:17, 148:20, 148:22, 159:24, 203:5, 213:21, 214:20, 221:21, 224:5, 230:18, 255:2, 255:3, 257:4, 257:5, 257:7, 263:7, 272:16, 279:21, 280:14, 288:17, 290:13
**named** [2] - 5:15, 126:15
**names** [3] - 144:11, 253:1, 255:5
**narrative** [1] - 7:16
**National** [3] - 13:20, 108:19, 109:14
**nature** [1] - 206:15
**NCMEC** [61] - 7:8, 13:16, 13:17, 13:18, 14:12, 16:13, 27:22, 27:24, 28:13, 28:22, 29:8, 33:12, 34:20, 35:12, 56:18, 66:12, 87:4, 89:14, 107:18, 108:1, 108:19, 110:10, 131:20, 131:23, 132:22, 133:10, 137:25, 138:13, 139:2, 143:13, 145:2, 187:22, 201:17, 202:10, 202:21, 202:23, 204:11, 205:13, 205:17, 206:21, 219:20, 234:19, 234:23, 235:2, 235:13, 251:24, 252:6, 255:16, 256:3, 257:19, 257:25, 260:13, 266:23, 266:24, 271:18,

271:21, 271:24,
287:16, 288:21
**NCMEC's** [1] - 28:25
**necessarily** [1] - 99:17
**necessary** [2] - 143:2,
143:15
**need** [9] - 48:16, 49:9,
96:4, 137:10,
142:16, 147:24,
214:14, 218:20,
239:12
**needed** [9] - 141:24,
142:3, 142:6,
144:19, 144:21,
146:13, 146:24,
147:13, 147:21
**neighbor** [1] - 233:19
**never** [21] - 20:17,
51:20, 54:22, 63:12,
76:4, 83:4, 83:7,
84:13, 100:23,
116:19, 145:13,
161:12, 163:5,
205:7, 228:15,
233:12, 270:8,
270:12, 270:16,
275:20, 296:20
**new** [1] - 88:15
**news** [1] - 49:25
**next** [14] - 59:1, 129:5,
129:13, 130:18,
130:22, 134:8,
135:18, 135:19,
189:11, 189:14,
224:8, 277:9, 285:8,
292:12
**Nicole** [8] - 1:24, 4:13,
308:5, 308:12,
308:13, 309:4,
309:18, 309:18
**night** [2] - 58:23, 99:7
**nine** [3] - 162:4, 278:2,
302:17
**nipples** [1] - 279:2
**NO** [1] - 1:4
**nobody** [1] - 153:4
**non** [1] - 24:14
**non-redacted** [1] -
24:14
**none** [1] - 3:25
**nonverbal** [1] - 62:8
**Nooney** [1] - 2:4
**norm** [1] - 243:4
**normal** [2] - 209:2,
270:2
**normally** [1] - 137:5
**North** [3] - 1:19, 2:11,
4:8
**NOT** [1] - 310:6
**Notary** [2] - 308:6,

308:13
**notate** [1] - 41:9
**notating** [1] - 41:10
**note** [2] - 40:19, 41:17
**notes** [2] - 83:2, 309:9
**nothing** [10] - 25:16,
32:15, 62:7, 62:24,
81:14, 186:5, 187:8,
190:12, 190:15,
190:19
**notice** [1] - 243:6
**noticed** [1] - 32:12
**notoriously** [1] -
272:24
**November** [5] - 3:15,
42:19, 43:10,
276:21, 277:18
**Nowicki** [1] - 2:4
**nude** [2] - 58:14,
279:1
**nudity** [3] - 64:22,
65:6
**number** [13] - 14:21,
19:18, 20:1, 88:12,
88:14, 89:8, 107:15,
134:12, 155:23,
169:24, 287:9,
287:19, 288:8
**Number** [7] - 3:12,
4:2, 4:7, 14:5, 82:20,
82:24, 168:24
**numbers** [1] - 159:25
**numerous** [2] -
134:11, 135:25

## O

**oath** [11] - 5:4, 39:5,
40:14, 42:16, 47:6,
47:7, 49:13, 51:11,
53:3, 93:19, 300:23
**OATH** [1] - 308:1
Oath ...........................
[1] - 3:7
**object** [169] - 8:15,
11:17, 21:24, 22:8,
23:18, 24:16, 24:19,
25:1, 26:1, 26:14,
27:10, 27:15, 30:5,
35:13, 36:17, 39:9,
40:16, 41:13, 49:4,
49:20, 52:8, 69:20,
70:13, 72:9, 72:13,
73:20, 86:11, 97:7,
98:21, 99:14,
103:15, 104:24,
110:5, 110:14,
110:20, 111:21,
112:24, 113:5,
117:14, 117:23,
118:7, 122:4, 123:5,

127:22, 128:3,
132:5, 132:14,
141:4, 142:1, 142:7,
142:11, 143:4,
143:8, 143:18,
143:23, 146:16,
147:2, 148:21,
150:16, 150:24,
151:11, 151:24,
152:7, 152:13,
152:19, 153:8,
153:13, 153:21,
154:3, 154:16,
155:1, 155:11,
158:7, 161:1,
161:22, 162:25,
163:10, 163:21,
164:8, 164:25,
165:13, 166:11,
166:24, 167:6,
167:15, 167:21,
168:5, 168:9,
168:17, 170:20,
170:24, 171:8,
172:23, 173:4,
175:8, 175:25,
176:5, 176:13,
176:18, 177:17,
178:14, 181:5,
183:1, 183:24,
184:18, 185:10,
187:23, 188:4,
188:18, 189:3,
189:25, 190:16,
192:17, 197:7,
200:2, 202:25,
210:8, 210:14,
211:20, 212:3,
212:9, 212:18,
214:12, 214:15,
215:13, 215:21,
216:1, 217:13,
218:6, 218:22,
221:11, 230:8,
230:13, 238:4,
238:12, 240:6,
241:3, 243:1,
243:21, 245:22,
249:13, 253:23,
254:14, 270:18,
289:18, 289:25,
290:15, 291:13,
292:4, 293:12,
293:22, 294:18,
295:4, 295:15,
296:16, 298:15,
299:15, 300:9,
301:18, 302:10,
303:8, 303:23,
304:10, 304:23,
305:9, 305:23, 306:5

**objected** [1] - 48:23
**objection** [3] - 49:5,
158:9, 296:21
**objections** [1] -
295:17
**obligation** [3] - 53:7,
53:9, 105:11
**observer** [1] - 61:1
**obtain** [2] - 133:18,
183:19
**obtained** [5] - 174:11,
174:13, 233:24,
247:9, 251:13
**obtaining** [1] - 129:18
**obvious** [6] - 92:17,
92:22, 92:25, 96:4,
98:17, 233:2
**obviously** [39] - 43:24,
44:2, 44:5, 53:25,
55:17, 57:15, 66:23,
74:1, 74:22, 77:6,
90:2, 90:7, 91:22,
91:24, 92:5, 92:7,
93:7, 103:21, 106:2,
126:19, 133:9,
142:20, 154:18,
156:4, 157:9, 167:2,
178:6, 178:9,
186:18, 199:20,
221:14, 224:7,
224:12, 241:14,
247:18, 274:17,
276:14, 302:20,
304:18
**Ocala** [1] - 2:18
**occur** [2] - 33:15,
33:19
**occurred** [10] - 15:12,
15:17, 15:20, 16:10,
19:4, 33:17, 189:9,
193:8, 250:6, 251:16
**occurring** [3] - 217:8,
250:18, 250:24
**occurs** [1] - 33:19
**October/November**
[1] - 126:23
**odd** [3] - 208:13,
209:2, 209:5
**OF** [7] - 1:1, 1:13,
308:1, 308:3, 308:4,
309:2, 309:3
**offending** [2] - 40:20,
91:9
**offensive** [3] - 48:25,
49:7, 161:18
**offhand** [18] - 10:10,
116:13, 116:17,
116:23, 128:10,
137:14, 149:23,
181:21, 187:17,

202:15, 207:14,
211:12, 239:3,
248:13, 261:2,
264:22, 264:25,
265:3
**office** [22] - 57:3, 57:4,
57:6, 96:18, 106:2,
113:23, 115:10,
115:11, 116:1,
129:4, 169:6, 178:8,
181:19, 193:7,
194:8, 203:15,
222:1, 222:3,
260:23, 261:9,
262:19, 265:10
**Office** [5] - 1:8,
126:17, 198:13,
259:14, 310:3
**officer** [18] - 20:12,
72:6, 72:12, 145:19,
150:7, 151:2,
178:19, 178:25,
181:1, 182:4,
182:14, 202:18,
216:8, 217:5,
217:11, 229:11,
268:6
**officers** [2] - 153:1,
181:1
**offline** [1] - 222:13
**often** [4] - 33:16,
33:19, 33:21, 136:20
**old** [16] - 58:14, 58:19,
93:22, 160:19,
161:21, 162:11,
164:7, 166:1,
232:16, 281:3,
281:17, 292:3,
299:3, 301:13,
305:21, 306:2
**ON** [1] - 310:6
**once** [1] - 204:8
**one** [110] - 6:18, 7:25,
30:6, 30:12, 31:1,
34:6, 58:25, 73:11,
74:12, 77:21, 78:18,
85:7, 85:10, 85:11,
85:16, 86:9, 88:9,
90:11, 90:12, 91:17,
94:13, 96:10, 100:2,
107:7, 111:17,
119:18, 137:25,
138:2, 138:17,
154:20, 154:22,
155:5, 155:22,
155:23, 157:3,
170:12, 181:12,
186:11, 189:15,
189:17, 191:18,
195:5, 197:21,

197:22, 198:6,
198:21, 198:22,
198:25, 201:4,
204:10, 205:5,
205:14, 207:15,
209:12, 222:1,
222:2, 224:7, 225:5,
226:5, 229:7, 234:5,
234:6, 234:7, 238:7,
243:10, 243:12,
243:19, 246:23,
248:8, 251:23,
253:9, 254:9,
254:13, 254:21,
254:22, 256:5,
256:21, 257:19,
258:10, 259:1,
266:23, 266:25,
267:1, 267:2, 267:8,
267:9, 268:21,
268:22, 268:23,
269:25, 271:24,
272:2, 279:21,
279:22, 280:8,
280:14, 282:20,
285:7, 286:17,
287:23, 288:1,
288:2, 288:10,
288:13, 289:2,
289:3, 290:18,
301:17, 303:3
**ones** [6] - 68:15,
216:20, 216:21,
252:3, 253:2, 253:10
**online** [2] - 26:9,
206:15
**ooh** [2] - 31:15,
100:17
**open** [10] - 22:6, 42:4,
42:7, 42:10, 226:15,
229:20, 230:23,
232:10, 232:11,
248:10
**opened** [1] - 267:15
**operates** [2] - 66:8,
243:3
**operations** [1] - 75:14
**opinion** [92] - 8:19,
9:1, 9:2, 9:5, 12:11,
35:23, 36:1, 36:2,
36:11, 36:12, 56:23,
56:24, 57:17, 73:18,
73:23, 80:5, 80:19,
80:22, 80:25, 81:1,
81:4, 81:15, 81:17,
81:19, 82:1, 82:9,
89:24, 91:14, 91:17,
92:6, 92:23, 93:9,
93:21, 100:4, 102:3,
103:22, 104:15,

104:21, 105:21,
109:8, 109:25,
114:17, 124:14,
124:20, 124:22,
125:19, 129:2,
129:4, 130:1,
131:15, 139:13,
155:3, 155:6,
157:12, 160:13,
165:25, 168:10,
168:13, 172:11,
172:13, 172:15,
173:15, 174:3,
174:7, 188:6,
192:14, 199:25,
204:15, 205:21,
214:7, 214:17,
221:1, 263:24,
268:25, 269:8,
269:13, 270:15,
274:25, 275:14,
278:4, 279:13,
286:14, 290:20,
296:5, 296:7,
298:22, 303:2,
304:17, 305:15,
306:19
**opinions** [7] - 90:18,
116:4, 178:9,
202:22, 210:12,
210:23, 268:15
**opportunity** [3] - 6:12,
7:3, 100:23
**opposite** [1] - 181:2
**order** [4] - 72:24,
143:16, 147:13,
177:14
**ordered** [1] - 307:14
**ordinary** [1] - 180:16
**original** [5] - 204:11,
205:21, 206:21,
261:21, 288:20
**originally** [3] - 51:24,
244:3, 289:16
**outcome** [1] - 109:22
**outfit** [2] - 221:6,
237:12
**outrageous** [1] -
151:18
**outset** [1] - 18:22
**overseas** [1] - 83:22
**own** [4] - 30:13, 35:20,
82:1, 269:10
**owner** [1] - 159:2
**ownership** [1] - 25:24
**owns** [1] - 22:21

---

## P

**P.A** [2] - 2:10, 2:17
**p.m** [17] - 1:17, 4:10,

82:21, 82:22, 82:25,
168:21, 168:22,
168:25, 246:15,
246:16, 246:18,
307:18, 307:20
**page** [8] - 64:24,
134:23, 231:6,
231:8, 232:12,
277:9, 282:2, 288:7
**PAGE** [1] - 310:7
**Page** [13] - 3:2, 3:12,
15:7, 16:18, 18:7,
18:8, 43:17, 74:11,
83:11, 276:23,
277:9, 277:17,
277:24
**pages** [3] - 16:14,
16:16, 223:8
**paid** [1] - 268:14
**paper** [1] - 232:3
**papers** [1] - 179:4
**paragraph** [19] -
116:25, 205:25,
207:12, 271:12,
271:13, 271:15,
282:20, 282:21,
283:15, 283:19,
284:1, 284:22,
285:15, 288:22,
288:24, 292:14,
292:15, 292:16,
294:13
**Paralegal** [1] - 2:24
**parens** [1] - 46:13
**part** [24] - 16:13, 19:9,
61:17, 74:5, 80:3,
86:21, 98:10,
138:12, 138:13,
139:8, 139:9,
139:11, 169:22,
172:5, 196:22,
198:9, 212:15,
224:10, 229:7,
259:11, 260:17,
261:18, 269:11,
301:12
**parted** [2] - 160:2
**partial** [2] - 64:22,
65:6
**partially** [3] - 79:18,
285:4, 292:22
**particular** [12] - 17:23,
32:6, 83:15, 102:4,
103:13, 103:14,
158:6, 158:19,
159:14, 182:7,
244:20, 247:14
**parties** [1] - 309:11
**parties'** [1] - 309:12
**partner** [2] - 9:17,

18:17
**passed** [3] - 198:4,
198:5, 198:8
**passing** [1] - 99:7
**passport** [33] - 10:23,
24:11, 142:24,
146:13, 149:25,
150:12, 153:7,
153:25, 161:5,
161:6, 161:7,
165:11, 167:18,
167:23, 195:12,
195:25, 197:4,
197:12, 213:8,
215:19, 217:3,
217:12, 240:16,
240:23, 243:7,
243:10, 243:13,
280:17, 280:19,
280:24, 300:21
**passports** [30] -
10:25, 11:23, 13:5,
25:14, 128:2,
146:25, 149:18,
151:20, 154:13,
154:24, 165:8,
196:16, 199:23,
213:15, 218:20,
240:1, 242:4,
242:24, 242:25,
244:9, 244:13,
244:16, 270:9,
279:14, 279:23,
280:1, 280:9, 281:2,
281:19
**past** [9] - 40:23, 43:23,
44:1, 54:5, 68:20,
144:23, 144:25,
216:16, 269:16
**paste** [1] - 89:14
**pasting** [1] - 89:19
**path** [1] - 198:19
**patrol** [3] - 216:8,
217:4, 217:24
**paused** [2] - 196:2,
196:7
**payment** [1] - 31:1
**Payne** [1] - 128:11
**PC** [4] - 254:1, 255:2,
255:5, 257:7
**pediatrics** [1] - 121:15
**penalties** [1] - 310:23
**Penthouse** [1] - 63:7
**people** [33] - 30:3,
57:1, 57:21, 59:13,
61:5, 63:22, 73:8,
76:6, 93:11, 93:14,
120:1, 122:9,
136:20, 137:5,
173:23, 178:8,

181:16, 181:20,
181:21, 198:23,
199:4, 200:10,
200:14, 203:2,
216:10, 216:12,
216:18, 221:5,
242:8, 278:11,
278:12, 301:13,
305:21
**people's** [1] - 173:22
**perceive** [1] - 61:5
**perception** [1] -
173:22
**perfect** [1] - 82:16
**perform** [1] - 47:17
**perjury** [1] - 310:23
**permission** [1] - 73:5
**person** [62] - 18:14,
28:3, 28:6, 28:8,
30:14, 56:10, 56:21,
57:1, 58:1, 58:18,
59:9, 59:25, 60:4,
60:22, 60:23, 77:7,
79:7, 86:17, 93:21,
98:6, 104:12, 112:2,
120:20, 121:16,
133:18, 133:19,
149:13, 161:20,
168:15, 172:1,
175:19, 177:16,
177:19, 180:20,
181:12, 181:23,
197:21, 197:22,
198:6, 198:12,
198:22, 199:1,
224:24, 238:19,
247:13, 289:10,
289:12, 297:6,
297:10, 297:12,
297:13, 297:24,
298:2, 298:5, 298:7,
299:18, 300:18,
302:2, 302:16,
302:17, 305:7
**person's** [5] - 123:15,
203:5, 212:22,
302:4, 302:5
**personal** [14] - 9:1,
9:5, 48:12, 56:24,
65:10, 73:18, 74:1,
104:15, 104:20,
139:13, 177:25,
213:20, 213:22,
251:19
**personally** [13] -
20:16, 22:15, 58:1,
65:25, 80:17, 95:3,
189:7, 189:8,
191:22, 208:19,
218:16, 308:7,

308:21
perspective [2] - 69:14, 135:23
perspectives [1] - 61:1
pertains [1] - 137:2
petite [1] - 279:1
PETRUZZELLI [1] - 2:9
Petruzzelli [2] - 9:20, 18:13
phone [34] - 14:21, 19:18, 20:1, 61:15, 61:24, 62:1, 63:11, 63:13, 112:22, 134:12, 135:7, 137:18, 137:21, 138:3, 156:15, 204:8, 245:5, 247:2, 247:3, 247:14, 248:17, 249:2, 249:4, 249:12, 249:21, 250:3, 250:4, 250:16, 250:23, 251:19, 254:13, 257:21, 258:6, 274:4
phones [1] - 113:1
phonetic [2] - 261:6, 279:22
photo [47] - 16:23, 30:19, 37:1, 41:5, 41:6, 41:9, 61:16, 61:17, 61:20, 65:4, 80:20, 138:12, 138:13, 139:6, 139:8, 139:10, 139:11, 146:14, 154:1, 161:23, 213:10, 220:12, 220:13, 220:22, 220:24, 220:25, 221:2, 221:3, 221:6, 234:15, 235:1, 235:4, 237:6, 237:7, 237:20, 238:24, 239:10, 240:19, 240:25, 241:2, 241:9, 243:14, 267:11, 280:5, 294:22, 298:24
photograph [63] - 14:24, 15:4, 16:23, 28:10, 29:12, 29:13, 29:21, 30:1, 32:11, 33:1, 41:7, 61:10, 64:23, 67:12, 69:23, 69:25, 71:6, 77:10, 77:11, 79:7, 86:18, 92:14, 101:15,

103:14, 104:2, 104:11, 106:14, 107:14, 111:2, 112:13, 113:9, 115:1, 115:2, 120:23, 121:16, 124:7, 125:8, 147:24, 172:2, 195:12, 205:16, 214:8, 224:4, 235:3, 235:5, 238:11, 238:15, 241:24, 243:22, 244:3, 266:23, 266:24, 280:6, 280:7, 290:8, 296:9, 299:2, 299:4, 304:19, 305:17, 305:19, 305:22, 306:4
Photograph [3] - 3:20, 3:22, 164:6
photographed [1] - 74:24
photographer [8] - 64:24, 83:23, 112:18, 237:25, 238:3, 239:15, 239:19, 239:22
photographers [1] - 84:9
photographic [1] - 10:20
Photographs [1] - 3:21
photographs [31] - 8:11, 8:25, 10:19, 11:15, 11:19, 11:20, 16:4, 64:21, 128:1, 149:17, 156:21, 168:3, 196:1, 197:4, 212:8, 214:10, 222:9, 233:9, 237:10, 237:11, 239:13, 241:9, 243:7, 244:6, 281:7, 281:11, 287:8, 292:9, 297:4, 304:15, 304:16
photos [13] - 75:3, 75:8, 75:9, 77:5, 167:1, 239:5, 243:10, 243:13, 267:3, 267:6, 276:24, 281:4, 294:23
phrase [1] - 42:10
physical [5] - 201:5, 215:18, 215:19, 218:3, 300:21
physically [3] -

173:21, 252:9, 252:12
pick [6] - 13:11, 73:4, 76:8, 83:3, 156:20, 157:8
picked [3] - 157:5, 234:21, 287:15
picks [1] - 191:18
Picture [1] - 240:13
picture [23] - 61:25, 65:3, 75:22, 86:19, 111:20, 112:23, 139:1, 158:13, 158:17, 161:4, 163:18, 165:11, 168:16, 172:3, 224:21, 232:12, 238:1, 239:2, 240:15, 243:20, 257:25, 281:19, 303:21
pictures [10] - 62:12, 75:18, 165:6, 167:5, 223:16, 239:4, 239:7, 240:12, 243:19, 256:15
piece [1] - 155:6
pieces [1] - 132:12
Pierce [15] - 25:5, 25:6, 25:13, 83:7, 83:11, 108:6, 126:16, 126:19, 128:9, 128:18, 145:25, 149:10, 188:14, 196:15
pile [1] - 255:19
pink [1] - 282:22
pinpoint [1] - 135:7
PLACE [1] - 1:18
place [1] - 38:1
plainly [1] - 292:23
plaintiff [2] - 1:5, 4:18
Plaintiff [4] - 1:15, 2:7, 2:24, 5:3
Plaintiff's [11] - 13:22, 14:8, 38:17, 43:5, 44:24, 45:1, 85:23, 107:3, 161:9, 223:23, 241:19
PLAINTIFF'S [1] - 3:11
plaintiff's [1] - 222:7
platform [2] - 228:11, 247:16
play [3] - 195:17, 196:6, 241:11
Playboy [9] - 63:5, 64:6, 64:7, 64:11, 64:18, 65:14, 65:15, 65:17, 65:18

played [1] - 106:6
playing [2] - 240:9, 300:16
plug [1] - 232:5
plugged [1] - 267:14
point [32] - 15:16, 31:3, 48:19, 55:16, 59:21, 67:11, 93:25, 99:12, 126:15, 127:19, 131:16, 156:8, 159:14, 163:13, 173:18, 173:22, 178:10, 183:18, 183:20, 184:23, 184:24, 191:7, 191:11, 196:3, 196:11, 198:25, 239:12, 244:6, 252:17, 260:8, 267:25, 268:4
pointless [1] - 196:13
points [2] - 198:4, 198:8
policy [3] - 97:5, 97:8, 97:11
Ponce [2] - 1:19, 4:8
pop [2] - 228:13, 228:14
popped [2] - 18:19, 248:11
popping [1] - 228:16
pops [2] - 175:1, 263:11
populates [2] - 225:7, 229:23
porn [2] - 26:19, 44:15, 44:18
Pornhub [3] - 63:15, 65:19, 65:22
pornographic [11] - 65:12, 66:11, 84:22, 111:19, 121:25, 122:2, 136:1, 136:3, 136:6, 137:18, 204:7
pornography [48] - 13:7, 15:7, 17:24, 21:22, 22:7, 27:23, 33:10, 33:25, 34:9, 34:22, 45:6, 46:14, 46:18, 47:4, 63:9, 63:12, 63:16, 64:4, 65:23, 66:16, 66:19, 66:20, 66:21, 66:24, 67:1, 67:24, 95:24, 96:4, 105:16, 136:14, 137:6, 137:21, 137:23, 148:5, 148:6, 151:23, 156:15, 162:20, 166:9,

182:1, 226:22, 226:24, 226:25, 227:3, 227:9, 228:22, 277:1
portions [1] - 89:12
portrayed [4] - 65:23, 69:4, 71:22, 140:21
portraying [1] - 76:16
pose [1] - 64:21
posed [2] - 75:13, 83:22
poses [1] - 239:16
posing [1] - 237:21
position [5] - 56:10, 164:5, 192:13, 239:25, 268:5
positive [2] - 53:24, 258:23
possess [2] - 86:18, 172:1
possessed [1] - 182:7
possessing [1] - 177:19
possession [20] - 12:14, 13:7, 85:19, 95:24, 137:6, 150:10, 151:23, 162:19, 170:12, 170:18, 171:23, 181:24, 181:25, 209:11, 227:3, 227:4, 227:14, 227:22, 252:13, 259:1
possibility [4] - 71:16, 110:3, 174:11, 245:12
possible [2] - 111:1, 174:14
possibly [5] - 148:22, 248:3, 262:7, 262:9, 264:23
post [1] - 99:5
posting [1] - 72:18
potential [7] - 17:23, 19:1, 19:17, 21:16, 108:22, 111:3, 187:4
potentially [9] - 42:22, 96:25, 101:11, 173:7, 182:23, 183:22, 228:14, 256:8, 279:13
power [1] - 197:6
practice [1] - 270:3
pre [1] - 208:11
predicate [2] - 295:7, 298:19
prefer [1] - 133:20
preparation [2] - 7:7, 7:22

prepubertal [1] - 296:14
prepuberty [1] - 208:12
prepubescent [11] - 18:8, 35:7, 35:17, 36:11, 89:23, 90:1, 90:4, 90:7, 207:22, 208:4, 209:3
presence [3] - 36:2, 36:4, 90:13
PRESENT [1] - 2:22
present [12] - 39:19, 53:10, 105:22, 117:1, 117:5, 117:22, 126:22, 199:9, 201:2, 232:22, 241:13, 242:13
presentation [2] - 86:20, 172:4
presented [5] - 142:24, 195:25, 224:13, 240:1, 267:11
presenting [2] - 105:12, 200:24
PRESTON [8] - 1:7, 1:14, 3:3, 5:1, 308:7, 309:7, 310:3, 310:25
Preston [13] - 2:14, 3:15, 3:18, 4:3, 4:4, 4:20, 5:12, 5:13, 47:24, 66:5, 263:7, 265:17, 307:16
Preston's [2] - 45:11, 46:22
presumably [3] - 24:14, 239:14, 239:15
presuming [2] - 239:15, 239:21
pretty [10] - 16:22, 29:25, 31:2, 42:9, 53:24, 88:15, 88:25, 156:5, 243:11, 258:23
prevent [1] - 155:19
preventing [1] - 25:16
previous [3] - 75:7, 206:2, 291:23
previously [13] - 89:8, 95:9, 129:9, 145:3, 205:15, 241:10, 275:10, 287:8, 288:13, 290:8, 295:12, 295:13, 298:10
print [8] - 13:23, 225:24, 226:2,

231:21, 231:24, 232:19, 233:1, 233:5
printed [1] - 115:24
printed-out [1] - 115:24
printing [2] - 220:1, 231:25
printout [2] - 45:13, 231:13
prints [3] - 116:4, 231:1, 231:21
priority [1] - 155:23
privacy [1] - 214:21
probability [2] - 71:1, 210:24
probable [29] - 12:13, 12:17, 12:19, 13:1, 13:6, 89:5, 132:3, 133:6, 142:20, 150:3, 154:5, 154:10, 182:19, 183:6, 183:19, 184:24, 185:2, 186:15, 186:18, 186:20, 188:11, 188:20, 190:9, 190:10, 199:11, 199:12, 199:15, 274:20
problem [5] - 46:4, 46:8, 179:23, 294:4, 298:12
proceed [2] - 192:15, 195:3
proceeded [4] - 183:8, 195:6, 195:15
proceeding [1] - 200:6
process [1] - 118:14
processing [1] - 27:5
produce [2] - 216:17, 216:18
Produced [2] - 308:21, 308:22
produced [9] - 5:2, 61:10, 61:12, 61:13, 112:12, 112:15, 112:16, 216:14, 216:22
producers [1] - 141:16
professional [2] - 83:23, 84:8
Professional [3] - 1:24, 308:5, 309:4
professionalism [1] - 48:8
professionally [7] - 61:9, 61:11, 61:13, 112:12, 112:15, 112:16, 239:2
proliferation [2] -

23:5, 229:6
promise [1] - 147:8
property [1] - 45:8
props [1] - 62:8
protect [6] - 155:19, 155:24, 156:1, 156:7, 214:21, 229:11
Protection [5] - 1:10, 91:7, 97:6, 264:24, 310:4
prove [5] - 147:5, 150:13, 150:18, 163:19, 171:22
proved [2] - 151:20, 153:18
provide [3] - 150:5, 151:3, 212:11
provided [21] - 7:25, 45:16, 89:21, 107:17, 128:19, 134:15, 146:20, 150:19, 151:20, 152:24, 195:1, 214:18, 215:17, 222:7, 241:12, 267:22, 270:8, 270:12, 270:16, 292:17, 295:11
provider [4] - 14:19, 17:3, 17:22, 18:4
providing [2] - 150:8, 210:23
pry [1] - 65:10
pubertal [2] - 36:6, 282:22
puberty [4] - 35:9, 90:2, 90:7, 90:14
pubescent [2] - 90:1, 90:5
pubic [34] - 36:3, 36:4, 77:20, 78:24, 90:9, 90:10, 90:11, 90:13, 90:16, 90:19, 117:1, 117:5, 117:9, 117:12, 117:21, 121:21, 122:2, 122:10, 123:4, 123:13, 123:25, 124:6, 124:13, 160:4, 207:21, 207:25, 208:11, 209:4, 285:17, 292:20, 293:1, 294:12, 294:14, 294:17
public [12] - 67:15, 67:20, 67:24, 67:25, 69:8, 72:7, 84:18, 84:22, 141:1,

141:25, 160:8, 160:20
Public [2] - 308:6, 308:13
published [3] - 67:15, 67:24, 187:9
publisher [1] - 22:7
publishers [1] - 141:16
publishing [7] - 25:23, 26:8, 26:12, 26:16, 45:6, 72:6, 187:7
pull [3] - 83:10, 216:10, 216:12
pulled [2] - 49:23, 70:16
purchase [1] - 134:22
purport [3] - 45:14, 184:3, 281:2
purported [1] - 150:12
pursue [6] - 98:6, 99:13, 99:19, 99:21, 192:15, 192:16
pursued [1] - 192:7
pursuing [1] - 168:1
pushed [1] - 125:21
put [15] - 16:6, 47:15, 49:12, 52:3, 54:13, 76:1, 87:20, 89:20, 91:16, 91:17, 91:18, 171:17, 221:21, 222:20, 227:19

Q

QR [8] - 244:22, 244:25, 245:2, 245:7, 245:12, 246:1, 246:2, 246:6
qualifications [6] - 101:18, 101:21, 101:25, 102:16, 102:20, 125:6
qualified [1] - 102:2
quality [1] - 61:14
quantify [1] - 33:16
query [2] - 43:1, 226:15
questioned [1] - 169:10
questioning [3] - 169:7, 180:25, 194:11
questions [15] - 48:24, 49:1, 49:4, 49:8, 78:19, 131:15, 262:23, 262:24, 263:17, 273:18, 279:18, 280:13, 307:10, 307:13

quick [2] - 9:13, 171:25
quote [4] - 50:13, 89:11, 131:12, 142:22
quoted [1] - 132:1

R

ran [4] - 259:17, 260:4, 260:22, 261:14
range [6] - 58:3, 92:8, 165:22, 173:9, 298:22, 302:17
rash [1] - 120:13
rather [2] - 232:15, 306:13
rating [2] - 206:16, 295:10
razor [1] - 120:13
reach [3] - 30:14, 134:16, 147:14
reached [5] - 149:12, 190:20, 261:24, 262:5, 266:7
reaction [2] - 11:3, 11:4
read [38] - 40:19, 43:21, 44:7, 50:12, 50:14, 51:7, 62:11, 74:10, 74:14, 74:18, 74:20, 83:20, 86:6, 87:9, 91:10, 116:10, 159:21, 170:22, 171:25, 172:7, 221:23, 232:17, 287:9, 287:19, 291:12, 291:15, 291:17, 292:14, 293:3, 293:5, 295:3, 296:6, 296:12, 297:9, 303:20, 307:14, 310:23
readily [1] - 147:13
reading [5] - 170:25, 285:12, 285:20, 290:20, 291:4
real [8] - 9:13, 153:3, 166:7, 171:25, 216:20, 216:21, 218:21, 231:13
realize [3] - 296:13, 303:5, 303:12
realized [1] - 110:2
really [33] - 11:4, 12:10, 24:3, 24:5, 42:11, 50:23, 51:14, 53:16, 53:19, 59:22, 59:23, 64:15, 65:11, 66:18, 72:8, 79:21,

115:5, 126:2, 156:22, 166:9, 192:14, 196:11, 196:24, 199:22, 207:1, 208:3, 210:13, 221:20, 238:25, 256:10, 256:21, 258:18

**realm** [1] - 248:9

**REASON** [1] - 310:7

**reason** [41] - 9:9, 9:10, 27:8, 47:24, 67:14, 70:3, 73:15, 123:14, 125:14, 125:21, 139:21, 140:8, 140:10, 140:17, 140:22, 145:18, 166:7, 166:12, 168:1, 175:7, 176:15, 178:1, 184:8, 186:12, 187:7, 193:1, 207:23, 209:18, 210:2, 220:7, 242:25, 255:10, 255:12, 258:25, 259:2, 259:3, 259:4, 286:10, 304:3, 304:5, 304:6

**reasonable** [9] - 56:10, 56:21, 70:11, 152:17, 164:5, 183:12, 186:6, 186:9, 210:23

**reasoning** [2] - 163:23, 212:12

**recalled** [1] - 169:6

**recalling** [1] - 203:7

**receive** [1] - 15:3

**received** [4] - 13:16, 29:12, 33:5, 134:9

**receiving** [1] - 150:14

**recess** [3] - 82:22, 168:22, 246:16

**recognize** [4] - 18:19, 234:17, 295:2, 295:13

**recognized** [1] - 287:15

**recollect** [1] - 267:6

**recollection** [7] - 43:13, 56:25, 78:16, 101:5, 261:14, 262:17, 269:17

**recommendation** [1] - 199:8

**record** [27] - 5:11, 9:17, 9:22, 24:13, 82:20, 82:24, 85:22, 131:6, 145:20,

147:14, 147:22, 150:11, 154:14, 168:20, 168:24, 190:20, 195:13, 197:12, 199:24, 213:9, 219:8, 219:18, 240:22, 246:14, 246:17, 307:17, 309:8

**recorded** [2] - 4:2, 47:16

**RECORDED** [1] - 1:13

**records** [22] - 25:9, 25:17, 135:1, 135:2, 141:20, 145:14, 145:15, 149:6, 149:7, 149:20, 150:11, 151:3, 151:18, 153:1, 153:4, 153:5, 154:1, 167:19, 196:16, 240:2, 270:25

**red** [1] - 235:10

**redact** [2] - 220:8, 280:10

**redacted** [30] - 11:1, 24:12, 24:14, 24:22, 24:25, 142:25, 146:21, 146:25, 147:4, 150:5, 150:6, 150:23, 152:1, 152:24, 167:23, 213:17, 213:19, 218:4, 219:6, 219:16, 219:22, 219:24, 220:2, 220:9, 222:9, 280:2, 280:9, 280:20, 280:23

**REDIRECT** [1] - 287:4

**Redirect** [1] - 3:6

**refer** [11] - 16:25, 79:19, 90:20, 90:22, 180:21, 200:19, 200:22, 248:8, 253:10, 255:5, 282:5

**reference** [7] - 49:24, 53:13, 75:7, 82:11, 89:7, 114:22, 262:1

**referenced** [1] - 170:7

**referencing** [1] - 86:24

**referred** [3] - 95:7, 95:20, 264:8

**referring** [13] - 12:15, 16:14, 35:6, 64:8, 99:5, 102:8, 103:11, 111:18, 182:3, 224:7, 259:20, 265:8, 277:1

**refers** [1] - 278:17

**refreshing** [1] - 43:13

**refuse** [2] - 216:10, 216:12

**regarding** [6] - 265:13, 269:19, 270:21, 271:4, 274:9, 277:21

**regardless** [1] - 286:13

**region** [3] - 77:20, 80:18, 117:10

**regions** [1] - 121:21

**Registered** [3] - 1:24, 308:5, 309:4

**regret** [2] - 189:1, 189:24

**regrets** [2] - 188:16, 190:6

**regular** [1] - 65:4

**regularly** [2] - 33:12, 33:15

**rehashing** [1] - 264:6

**rein** [1] - 48:1

**related** [2] - 31:11, 245:13

**relation** [4] - 30:21, 52:5, 90:19, 279:10

**relative** [2] - 309:10, 309:12

**relevant** [1] - 199:25

**reliability** [2] - 104:1, 131:15

**reliable** [9] - 53:10, 53:13, 54:10, 104:22, 105:12, 105:15, 105:21, 106:17, 131:17

**reliably** [1] - 106:13

**rely** [2] - 126:7, 210:12

**relying** [1] - 210:15

**remember** [63] - 10:10, 11:10, 11:13, 52:3, 56:5, 56:6, 56:7, 70:24, 79:19, 80:13, 88:14, 96:14, 102:11, 106:15, 106:16, 108:4, 114:14, 114:17, 114:24, 115:2, 115:4, 115:5, 115:10, 115:16, 115:23, 115:24, 116:13, 124:21, 128:18, 129:5, 132:16, 132:18, 132:20, 149:15, 149:16, 149:25, 179:1, 181:9, 181:13, 181:21, 200:18, 202:4,

203:4, 208:1, 241:24, 250:12, 250:19, 250:20, 250:21, 251:1, 254:22, 258:13, 258:20, 259:25, 264:22, 264:24, 265:2, 265:25, 276:11, 276:21, 278:21, 279:16, 286:10

**remembered** [1] - 50:10

**remembering** [2] - 264:18, 266:10

**remind** [1] - 6:18

**reminds** [1] - 85:1

**removal** [1] - 120:4

**remove** [1] - 77:21

**render** [3] - 102:3, 268:15, 269:13

**rendered** [2] - 286:14, 298:22

**repeat** [1] - 36:18

**repeated** [1] - 248:15

**repeats** [3] - 287:23, 287:25, 288:2

**report** [57] - 3:13, 7:12, 7:13, 14:5, 14:16, 14:17, 14:18, 15:8, 16:13, 17:10, 17:22, 33:13, 34:7, 34:8, 34:21, 34:22, 35:2, 35:12, 35:22, 35:23, 35:24, 56:18, 66:12, 85:6, 89:14, 94:19, 94:24, 108:1, 110:10, 115:18, 115:21, 115:25, 130:16, 130:25, 131:20, 131:23, 138:1, 187:22, 201:17, 202:10, 202:21, 204:12, 204:22, 204:24, 205:13, 252:6, 252:8, 255:7, 270:3, 295:12, 296:13, 297:9, 298:13, 303:5, 303:20, 309:6

**reported** [3] - 14:19, 14:22, 27:25

**Reporter** [3] - 1:24, 308:6, 309:5

**reporter** [3] - 4:13, 6:3, 136:9

**reporter's** [1] - 47:17

**Reporter ..................... ..** [1] - 3:8

**Reporters** [1] - 1:18

**reports** [4] - 94:22, 196:23, 205:4, 295:3

**represent** [6] - 4:17, 5:15, 29:4, 45:5, 263:8, 278:17

**representation** [2] - 86:19, 172:3

**representations** [1] - 240:18

**represented** [3] - 110:3, 110:7, 110:13

**representing** [4] - 4:19, 4:21, 189:20, 189:21

**reproduce** [1] - 30:3

**reproducible** [1] - 103:12

**request** [6] - 135:6, 145:15, 147:15, 147:16, 147:22, 215:18

**requested** [11] - 87:1, 134:20, 134:22, 148:19, 204:1, 268:18, 268:20, 268:23, 269:2, 269:8, 309:7

**require** [1] - 141:16

**required** [1] - 171:22

**requirements** [1] - 170:12

**research** [5] - 32:24, 228:4, 228:5, 228:8, 228:12

**researching** [1] - 42:10

**resources** [3] - 22:16, 218:10, 218:13

**respect** [1] - 292:25

**respectfully** [1] - 48:1

**respond** [2] - 48:23, 49:5

**responded** [3] - 25:11, 145:21, 145:24

**responding** [1] - 5:3

**response** [1] - 134:6

**responsible** [4] - 105:8, 198:1, 198:13, 200:24

**rest** [1] - 213:22

**restate** [1] - 302:15

**results** [2] - 3:16, 50:24

**return** [5] - 31:23, 129:23, 130:5, 134:2, 156:15

**returned** [1] - 204:1

**reveal** [3] - 19:17, 49:19, 268:4

**revealed** [1] - 32:25

**revelations** [1] - 83:6
**review** [28] - 6:12, 7:3, 7:17, 7:22, 15:3, 16:12, 28:2, 40:17, 135:20, 138:18, 175:18, 199:17, 199:18, 200:12, 205:2, 225:15, 227:5, 251:15, 253:24, 256:9, 257:4, 257:7, 258:11, 259:18, 268:14, 268:18, 292:18, 309:7
**reviewed** [30] - 7:6, 7:8, 20:2, 41:24, 51:25, 78:15, 91:9, 91:11, 95:9, 96:10, 96:15, 108:19, 113:25, 114:1, 183:6, 183:7, 192:4, 193:5, 194:24, 201:25, 204:7, 205:3, 216:4, 260:10, 260:15, 278:8, 278:9, 278:10, 279:9, 286:14
**reviewing** [9] - 31:5, 115:2, 156:22, 157:10, 199:6, 199:19, 202:21, 204:16, 270:25
**reword** [1] - 301:7
**rewording** [1] - 12:21
**ridiculous** [1] - 151:15
**right-hand** [2] - 29:20, 299:11
**ring** [1] - 20:12
**risk** [1] - 108:17
**road** [2] - 9:25, 217:4
**robbing** [1] - 109:1
**ROBERTS** [321] - 2:3, 4:17, 5:9, 8:14, 9:15, 9:18, 9:21, 9:23, 10:24, 11:18, 11:22, 12:23, 14:4, 14:7, 14:10, 18:21, 20:20, 22:5, 22:19, 23:20, 24:17, 24:23, 25:2, 26:4, 26:17, 27:12, 27:17, 30:8, 35:15, 36:20, 38:15, 38:19, 39:13, 40:18, 41:15, 43:7, 43:10, 43:14, 43:16, 45:3, 45:12, 45:15, 45:18, 45:20, 45:22, 46:3, 46:6, 46:10, 46:12, 46:15, 46:21, 46:24, 47:1,

47:20, 48:2, 48:13, 48:18, 48:22, 49:11, 49:21, 52:9, 66:3, 66:9, 70:2, 70:18, 72:10, 72:15, 73:22, 74:13, 74:17, 81:23, 82:7, 82:12, 82:15, 82:18, 83:1, 86:1, 86:10, 86:15, 92:4, 92:12, 93:5, 94:5, 94:7, 94:8, 94:17, 94:18, 96:22, 97:7, 97:10, 97:22, 97:25, 98:1, 98:19, 98:23, 99:15, 100:21, 101:13, 101:24, 103:8, 103:23, 104:6, 104:16, 105:4, 106:8, 106:22, 107:5, 110:8, 110:17, 110:22, 111:24, 113:2, 113:6, 114:21, 116:9, 117:16, 118:1, 118:12, 119:7, 122:11, 123:7, 123:21, 124:10, 124:18, 125:3, 125:11, 125:23, 126:11, 127:23, 128:4, 129:16, 129:24, 131:3, 132:8, 132:17, 142:4, 142:9, 142:12, 143:5, 143:9, 143:21, 144:1, 146:18, 147:6, 149:1, 150:20, 151:5, 151:14, 152:3, 152:9, 152:15, 152:22, 153:10, 153:16, 153:24, 154:6, 154:21, 155:7, 155:14, 158:8, 158:12, 158:17, 158:23, 161:4, 161:7, 161:11, 162:1, 162:15, 163:2, 163:15, 163:24, 164:14, 164:19, 164:22, 165:3, 165:15, 166:14, 167:3, 167:12, 167:16, 167:24, 168:7, 168:11, 168:19, 169:1, 170:1, 170:3, 170:5, 170:21, 170:25,

171:2, 171:3, 171:9, 173:1, 173:10, 175:14, 176:2, 176:6, 176:14, 176:24, 177:21, 178:17, 181:8, 183:11, 184:1, 184:19, 185:15, 188:1, 188:7, 188:22, 189:4, 190:3, 190:18, 191:21, 192:12, 192:22, 193:10, 193:17, 194:1, 194:3, 194:12, 194:16, 194:19, 195:10, 197:9, 200:4, 203:1, 206:19, 207:16, 207:20, 209:7, 209:19, 209:23, 210:4, 210:11, 210:19, 211:5, 211:9, 211:22, 212:5, 212:14, 213:1, 214:13, 214:19, 215:14, 215:23, 216:5, 217:14, 218:2, 218:8, 218:24, 221:13, 221:22, 222:19, 223:9, 223:11, 223:15, 223:20, 224:1, 230:10, 230:14, 231:18, 232:7, 232:8, 238:5, 238:18, 240:8, 241:6, 241:21, 243:5, 244:1, 245:23, 246:10, 246:19, 249:17, 254:3, 254:16, 262:22, 270:18, 273:2, 273:8, 284:18, 287:2, 287:5, 289:19, 289:22, 290:6, 290:19, 291:14, 291:19, 292:6, 293:10, 293:13, 293:19, 294:2, 294:9, 295:1, 295:8, 296:1, 296:17, 296:21, 296:24, 298:20, 299:23, 300:4, 300:15, 301:9, 302:1, 302:19, 303:11, 304:2, 304:11, 304:20, 305:1,

305:4, 305:11, 305:14, 306:1, 306:6, 306:18, 307:9
**Roberts** [8] - 2:4, 4:17, 263:19, 272:21, 276:20, 279:12, 286:8, 298:4
**Roberts ..........** [1] - 3:6
**Roberts ............** [1] - 3:4
**room** [11] - 64:14, 81:5, 182:22, 189:11, 189:13, 189:14, 235:8, 236:5, 237:13, 238:3, 238:7
**roughly** [2] - 305:16, 307:5
**Roy's** [1] - 278:25
**RPR** [2] - 308:13, 309:18
**rude** [1] - 74:14
**ruined** [2] - 158:25, 189:5
**ruining** [1] - 189:1
**rules** [1] - 6:16
**rumor** [1] - 248:14
**run** [3] - 201:24, 202:3, 242:8
**running** [1] - 217:17

# S

**safe** [1] - 11:14
**saming** [1] - 183:3
**Sanija** [12] - 224:5, 224:10, 224:14, 224:15, 224:22, 224:24, 225:3, 225:4, 225:6, 229:9, 229:19, 230:2
**Sanija/Big** [1] - 224:20
**sat** [1] - 165:5
**satisfied** [3] - 213:9, 213:12, 216:23
**satisfy** [6] - 105:20, 151:22, 211:18, 211:23, 212:6, 215:5, 215:20, 215:24, 218:25
**saw** [16] - 32:9, 32:10, 50:23, 51:2, 51:8, 69:24, 128:1, 161:12, 161:15, 175:11, 234:17, 244:2, 244:18, 244:20, 279:20, 296:12
**scan** [5] - 245:4,

245:24, 246:1, 246:2, 246:6
**scenario** [1] - 108:25
**scene** [1] - 251:16
**school** [2] - 239:4, 239:5
**scientific** [5] - 102:25, 103:6, 103:9, 103:10, 104:1
**scientifically** [2] - 104:22, 105:1
**Scoggins** [1] - 278:8
**scope** [1] - 304:13
**screen** [5] - 272:25, 273:14, 281:22, 282:1, 282:9
**screenshot** [10] - 159:24, 247:1, 247:4, 247:12, 247:15, 247:17, 247:19, 247:21, 247:24, 248:7
**script** [1] - 159:24
**scrubbed** [8] - 248:17, 249:1, 249:4, 249:12, 249:20, 250:3, 250:15, 250:22
**scrunched** [1] - 131:9
**SE** [1] - 2:17
**search** [68] - 3:14, 3:16, 7:21, 7:24, 8:2, 16:6, 31:19, 31:20, 35:3, 36:14, 37:9, 37:14, 37:19, 38:16, 38:24, 42:4, 42:8, 42:13, 45:14, 46:12, 49:13, 49:19, 50:8, 50:10, 50:24, 53:21, 53:23, 53:24, 55:9, 68:15, 71:19, 85:5, 85:6, 85:8, 86:24, 87:2, 87:22, 105:11, 126:24, 129:7, 129:19, 129:23, 130:1, 130:19, 132:4, 132:19, 133:5, 133:6, 133:15, 133:18, 134:3, 171:5, 171:15, 176:10, 193:2, 199:13, 202:17, 203:17, 203:19, 225:6, 226:17, 226:20, 251:10, 260:14, 275:25, 278:24, 293:4
**searched** [1] - 43:22
**searches** [1] - 53:12

**searching** [7] - 47:13, 65:19, 226:22, 228:13, 229:2, 229:15, 230:17

**second** [29] - 38:20, 74:12, 86:9, 98:10, 159:23, 204:24, 206:25, 211:16, 258:2, 267:1, 268:23, 271:9, 271:15, 271:18, 271:21, 271:24, 272:6, 272:20, 273:12, 273:22, 278:4, 283:18, 284:1, 284:3, 284:9, 285:15, 288:24

**secret** [1] - 137:7

**secreting** [1] - 137:13

**section** [1] - 89:5

**see** [58] - 15:6, 15:18, 16:21, 18:1, 29:4, 29:7, 44:3, 51:4, 73:2, 79:12, 79:17, 79:21, 82:1, 87:2, 90:21, 91:21, 101:3, 108:13, 111:23, 135:20, 150:4, 151:17, 162:3, 176:11, 176:16, 176:20, 185:21, 196:22, 208:19, 220:10, 225:24, 229:22, 230:22, 230:23, 231:1, 231:14, 232:2, 234:6, 234:14, 235:21, 243:24, 244:11, 244:23, 244:24, 245:9, 248:11, 254:1, 256:9, 272:14, 273:9, 275:24, 280:3, 280:24, 282:15, 282:24, 286:2, 294:4, 294:12

**seeing** [10] - 11:3, 11:15, 149:7, 149:15, 149:16, 149:21, 165:10, 241:24, 258:14, 281:1

**seek** [4] - 15:22, 70:19, 133:6, 251:10

**seeking** [2] - 36:14, 129:19

**seem** [13] - 48:20, 60:5, 61:15, 162:23, 163:6, 182:24, 208:3, 208:7, 208:9,

208:13, 209:5, 233:23, 303:3

**segregated** [1] - 137:17

**selfie** [1] - 83:18

**selfies** [1] - 238:1

**semantics** [1] - 300:16

**send** [2] - 20:24, 130:6

**sending** [2] - 31:16, 130:11

**sense** [19] - 12:20, 23:21, 23:23, 28:18, 42:14, 57:24, 64:2, 65:21, 88:5, 106:16, 117:12, 124:12, 199:1, 209:14, 229:3, 229:4, 304:4, 304:7, 304:12

**sensuality** [1] - 226:7

**sent** [4] - 19:24, 247:17, 247:21, 247:23

**sentence** [7] - 86:7, 86:14, 91:10, 116:24, 117:6, 117:12, 291:4

**separate** [1] - 94:22

**September** [2] - 229:25, 230:2

**Sergeant** [19] - 95:7, 95:8, 95:16, 95:19, 96:15, 101:2, 102:2, 115:12, 198:9, 200:5, 201:24, 203:9, 248:24, 260:10, 264:9, 266:6, 275:4, 275:6, 275:10

**sergeant** [14] - 95:13, 191:17, 192:5, 193:6, 193:7, 193:15, 193:21, 194:9, 194:24, 198:5, 200:15, 241:16, 264:9, 275:7

**serious** [1] - 152:5

**seriously** [1] - 65:9

**served** [2] - 134:5, 203:22

**server** [1] - 147:25

**service** [4] - 14:19, 17:3, 17:21, 18:3

**session** [2] - 146:14, 239:13

**set** [2] - 61:1, 65:22

**setting** [1] - 61:19

**seven** [2] - 15:23, 87:17

**seventh** [1] - 62:19

**several** [5] - 7:21,

149:16, 186:14, 263:19, 302:12

**sex** [1] - 18:9

**sexual** [19] - 12:14, 23:6, 23:17, 26:9, 26:12, 58:15, 83:13, 85:19, 86:21, 92:16, 155:19, 170:18, 171:23, 172:5, 206:16, 219:14, 229:6, 229:11, 295:9

**shadow** [1] - 153:19

**shakes** [3] - 38:10, 190:14, 190:17

**shaking** [1] - 231:20

**share** [3] - 273:14, 281:22, 282:1

**sharing** [1] - 272:25

**shave** [1] - 117:9

**shaved** [15] - 116:25, 117:4, 117:19, 117:21, 120:24, 120:25, 160:5, 160:15, 208:17, 208:22, 208:23, 208:25, 283:9, 285:18, 292:21

**shaving** [2] - 120:10, 120:13

**shaving's** [1] - 119:18

**Sheet** .......................... ........ [1] - 3:9

**Sheriff's** [4] - 1:8, 126:16, 198:13, 310:3

**sheriff's** [2] - 172:21, 265:10

**SHEVLIN** [129] - 2:16, 4:21, 8:13, 10:22, 11:21, 14:1, 14:6, 18:12, 18:18, 20:19, 43:8, 43:11, 43:15, 45:16, 45:19, 81:22, 82:3, 82:17, 92:3, 92:10, 93:4, 96:11, 97:9, 97:21, 97:24, 98:18, 100:14, 101:9, 101:23, 103:3, 103:19, 104:5, 104:13, 104:25, 105:23, 106:21, 114:19, 116:8, 117:15, 117:24, 118:8, 119:6, 122:6, 123:16, 124:9, 124:17, 125:1, 125:10, 125:18, 126:10, 129:15, 129:21, 131:2,

132:7, 161:2, 161:5, 161:8, 162:12, 164:10, 167:9, 169:23, 170:4, 191:15, 192:10, 192:18, 192:20, 193:4, 193:16, 194:17, 195:9, 206:18, 207:13, 207:19, 208:6, 208:15, 209:6, 209:16, 209:25, 210:10, 210:17, 211:1, 211:8, 221:25, 222:11, 222:14, 222:17, 223:10, 223:13, 223:18, 223:22, 262:24, 263:2, 263:4, 263:6, 270:19, 273:4, 273:11, 273:16, 284:13, 284:19, 284:21, 286:21, 289:21, 290:2, 290:16, 291:16, 292:5, 293:7, 293:17, 293:24, 294:6, 294:20, 295:6, 295:17, 296:19, 298:17, 299:16, 300:2, 300:11, 301:3, 301:20, 302:12, 303:10, 304:13, 305:3, 305:13, 306:16, 307:7, 307:12

**Shevlin** [2] - 4:21, 263:7

**Shevlin** ............. [1] - 3:5

**ships** [1] - 99:7

**shoot** [26] - 61:16, 61:17, 138:12, 138:14, 139:6, 139:8, 139:10, 139:12, 213:11, 220:12, 220:14, 220:23, 220:24, 220:25, 221:2, 221:3, 221:7, 235:1, 235:4, 235:5, 237:20, 238:24, 239:10, 240:19, 240:25, 241:2

**shoots** [3] - 154:1, 237:6, 237:8

**short** [1] - 66:15

**short-sided** [1] -

66:15

**shorthand** [1] - 265:8

**show** [21] - 13:21, 86:19, 94:3, 95:18, 133:11, 133:12, 133:24, 163:5, 163:9, 172:3, 177:5, 242:25, 246:20, 263:21, 266:21, 271:25, 281:3, 287:6, 288:4, 288:24

**showed** [14] - 113:24, 114:9, 128:7, 128:18, 162:20, 202:23, 258:12, 267:7, 267:19, 271:23, 272:3, 272:7, 291:21, 292:11

**showing** [8] - 43:23, 49:2, 106:23, 128:13, 269:12, 270:9, 275:24, 292:24

**shown** [10] - 10:19, 11:1, 14:11, 14:12, 128:7, 206:1, 240:23, 270:4, 271:16, 272:13

**shows** [5] - 46:8, 46:16, 160:1, 294:17

**shut** [1] - 228:24

**sic** [2] - 169:20, 252:1

**sick** [1] - 180:5

**side** [2] - 297:6, 299:11

**sided** [1] - 66:15

**sign** [2] - 199:16, 199:18

**signalled** [1] - 62:9

**Signed** [2] - 308:9, 309:15

**signed** [2] - 18:13, 129:8

**silly** [2] - 111:10, 262:11

**similar** [1] - 298:5

**simple** [1] - 42:11

**simply** [2] - 25:8, 104:11

**single** [3] - 107:13, 205:15, 290:8

**sit** [26] - 6:21, 7:2, 8:8, 8:20, 23:16, 25:16, 29:6, 71:22, 78:20, 81:25, 103:24, 164:23, 167:25, 188:2, 195:14, 212:21, 213:3, 213:23, 215:4,

263:20, 264:21, 277:3, 298:8, 301:21, 306:19, 307:2

**site** [28] - 40:20, 40:22, 41:18, 44:4, 53:3, 54:2, 55:9, 67:6, 67:13, 69:8, 70:16, 112:2, 113:10, 113:12, 113:16, 135:3, 135:5, 143:14, 174:17, 175:1, 175:3, 175:5, 175:11, 176:20, 176:21, 229:15, 230:17

**sites** [7] - 44:1, 65:25, 66:25, 67:3, 67:4, 67:5

**sitting** [1] - 81:5

**six** [2] - 223:8, 254:7

**skin** [1] - 120:15

**skip** [1] - 38:12

**skirt** [1] - 279:4

**sleep** [1] - 58:23

**slick** [1] - 76:1

**small** [3] - 225:16, 231:2, 232:15

**SMM** [1] - 289:16

**SMR** [20] - 116:12, 116:21, 116:22, 206:3, 206:7, 206:9, 207:22, 283:21, 284:24, 285:4, 285:5, 289:16, 290:13, 290:17, 291:10, 291:24, 292:3, 292:22, 292:24

**Sniffen** [1] - 2:10

**snippet** [2] - 225:17, 231:2

**social** [2] - 113:15, 247:16

**socks** [1] - 282:23

**sole** [1] - 73:17

**solely** [10] - 36:4, 38:4, 52:13, 113:10, 140:6, 164:16, 188:6, 191:16, 197:22, 198:6

**someone** [29] - 18:19, 33:13, 56:8, 59:7, 59:12, 79:4, 81:10, 90:14, 104:22, 109:1, 110:3, 112:22, 120:24, 126:3, 162:19, 169:10, 171:22,

172:20, 180:8, 180:12, 180:15, 191:12, 203:4, 213:25, 238:11, 242:24, 247:21, 279:13

**sometime** [1] - 203:16

**sometimes** [17] - 16:25, 30:6, 55:23, 62:12, 66:25, 67:5, 91:21, 97:12, 98:13, 98:16, 120:12, 185:25, 196:13, 227:8, 263:9

**somewhere** [1] - 135:11

**soon** [1] - 222:12

**sorry** [78] - 9:19, 10:4, 13:19, 17:20, 18:10, 18:20, 19:2, 19:6, 21:14, 22:12, 26:19, 27:1, 28:19, 30:17, 31:24, 36:18, 37:5, 37:6, 39:17, 40:12, 46:16, 51:1, 55:7, 56:6, 63:8, 67:4, 74:12, 84:21, 88:12, 92:11, 94:20, 95:13, 96:12, 97:25, 98:12, 106:1, 109:20, 115:16, 118:25, 123:23, 129:3, 130:13, 131:8, 134:23, 136:10, 136:12, 137:10, 137:11, 138:15, 161:18, 169:23, 184:10, 184:20, 193:22, 201:12, 201:14, 221:23, 231:16, 237:16, 259:7, 265:15, 265:16, 265:17, 265:18, 269:5, 269:7, 272:8, 277:5, 278:14, 281:6, 281:9, 281:14, 283:25, 284:15, 291:2, 293:8, 299:9, 305:24

**sort** [11] - 25:23, 32:17, 62:8, 80:21, 83:6, 89:13, 114:13, 125:14, 199:16, 216:6, 235:20

**sought** [11] - 8:3, 32:4, 87:8, 130:1, 166:8, 166:15, 166:17, 171:5, 171:15, 193:2, 293:4

**sound** [5] - 6:25, 7:1, 126:18, 151:17, 209:8

**sounds** [6] - 64:4, 82:17, 95:18, 116:3, 205:11, 223:10

**source** [28] - 31:4, 36:15, 36:22, 37:2, 37:4, 37:6, 37:10, 37:15, 37:17, 39:15, 40:6, 40:9, 40:15, 42:4, 42:7, 42:10, 47:3, 52:19, 52:23, 53:13, 53:18, 53:19, 131:17, 187:4, 226:15, 229:20, 248:10

**sources** [3] - 111:1, 111:3, 111:6

**speaking** [3] - 55:18, 277:12, 277:22

**special** [5] - 81:14, 81:17, 88:1, 88:2, 88:5

**specialized** [2] - 60:19, 126:5

**specific** [41] - 6:24, 7:14, 9:9, 16:5, 27:19, 44:5, 49:23, 50:10, 79:9, 80:14, 80:18, 81:10, 81:12, 82:5, 102:10, 102:13, 102:16, 104:8, 113:10, 113:12, 135:8, 143:12, 158:21, 159:8, 159:16, 162:5, 162:7, 165:22, 179:13, 182:19, 186:12, 258:16, 258:20, 261:12, 261:14, 262:20, 269:17, 286:10, 302:25, 306:9

**specifically** [25] - 50:1, 80:13, 103:17, 106:3, 109:9, 110:16, 114:3, 114:14, 116:13, 124:22, 128:19, 135:12, 135:14, 136:24, 137:16, 159:1, 169:9, 181:6, 181:13, 209:12, 247:19, 249:14, 260:2, 269:7, 269:18

**specifics** [2] - 115:3, 264:24

**specify** [2] - 159:16,

286:5

**speculate** [4] - 70:15, 174:9, 248:1, 248:2

**speculating** [1] - 70:14

**Spellman** [1] - 2:10

**spoken** [1] - 29:10

**spot** [1] - 47:15

**spread** [2] - 64:20, 292:24

**squatting** [1] - 79:12

**ST** [2] - 308:4, 309:3

**St** [24] - 1:8, 1:18, 1:20, 4:9, 5:23, 72:23, 101:18, 126:16, 151:1, 169:5, 198:12, 218:14, 265:5, 265:7, 268:17, 269:11, 269:22, 270:22, 275:12, 275:21, 278:13, 286:15, 286:17, 310:3

**staff** [2] - 189:19

**staged** [2] - 83:24, 84:11

**stages** [1] - 89:1

**stamped** [1] - 111:2

**stand** [2] - 277:3, 277:8

**standpoint** [1] - 34:18

**stands** [3] - 13:18, 116:14, 116:16

**start** [5] - 5:5, 6:18, 37:7, 56:14, 94:23

**started** [2] - 88:20, 178:20

**starting** [4] - 15:16, 34:1, 48:20, 283:18

**starts** [1] - 284:3

**state** [19] - 5:11, 22:20, 128:12, 146:6, 151:1, 151:19, 183:7, 192:5, 198:6, 198:23, 199:19, 200:14, 200:25, 201:3, 201:8, 202:3, 219:10, 241:14, 285:3

**STATE** [2] - 308:3, 309:2

**State** [4] - 6:10, 259:13, 308:6, 308:13

**statement** [22] - 26:3, 35:11, 35:16, 35:19, 40:13, 49:12, 52:6, 52:12, 52:13, 53:19,

54:13, 75:7, 91:19, 131:24, 140:2, 167:18, 194:25, 196:16, 219:17, 274:18, 275:17, 275:19

**statements** [5] - 39:23, 39:25, 49:16, 199:20

**States** [1] - 4:5

**STATES** [1] - 1:1

**states** [8] - 53:24, 270:14, 282:21, 283:6, 283:12, 284:23, 285:6, 291:17

**stating** [2] - 44:3, 285:2

**station** [1] - 189:16

**statistics** [1] - 63:15

**Statute** [2] - 3:17, 169:20

**statute** [14] - 85:15, 86:2, 86:23, 169:20, 170:6, 170:12, 170:25, 171:4, 171:10, 171:15, 171:17, 227:2, 227:5

**stenographic** [1] - 309:9

**stenographically** [1] - 309:6

**step** [4] - 74:3, 129:5, 135:19, 180:21

**steps** [1] - 180:24

**still** [38] - 8:16, 9:21, 13:1, 13:6, 20:24, 22:22, 23:13, 45:25, 64:20, 64:23, 116:1, 117:1, 117:5, 117:11, 117:18, 117:22, 146:17, 150:3, 154:7, 154:15, 156:10, 165:10, 166:21, 166:22, 181:21, 188:20, 190:9, 191:4, 194:23, 200:9, 213:3, 232:2, 238:16, 241:11, 241:12, 258:15, 276:17, 277:8

**sting** [1] - 75:13

**stole** [1] - 108:12

**stood** [1] - 116:21

**stop** [5] - 137:10, 198:16, 198:22, 216:15, 217:5

**stopped** [1] - 192:11

**story** [1] - 200:8

**Street** [2] - 2:4, 2:11
**street** [1] - 108:12
**stricken** [1] - 48:16
**strike** [4] - 48:14, 53:7, 131:21, 209:2
**strongly** [1] - 13:9
**struggling** [1] - 182:20
**studio** [2] - 61:19, 61:23
**studios** [2] - 83:24, 84:11
**stuff** [9] - 14:3, 17:1, 42:13, 51:15, 66:7, 76:8, 122:23, 133:15, 142:25
**stunt** [2] - 47:18, 47:20
**subject** [13] - 8:9, 10:20, 28:9, 30:21, 35:2, 36:23, 66:11, 110:9, 201:16, 202:14, 237:5, 252:6, 268:11
**submit** [6] - 132:11, 132:21, 132:24, 133:4, 133:9, 133:16
**submitted** [6] - 131:21, 131:22, 131:23, 132:2, 132:10, 132:18
**subpoena** [11] - 15:22, 31:18, 31:23, 32:4, 87:9, 130:6, 130:8, 130:11, 132:13, 150:22
**subscriber** [2] - 134:14, 134:16
**Subsection** [1] - 246:20
**subsequent** [1] - 97:16
**sufficed** [1] - 217:7
**suggest** [1] - 160:18
**suggested** [2] - 101:2, 278:24
**Suite** [3] - 1:19, 2:17, 4:9
**super** [3] - 74:23, 80:18, 141:11
**superior** [1] - 200:25
**supervisor** [2] - 196:25, 197:14
**supervisors** [5] - 189:15, 196:20, 196:21, 199:9, 199:10
**support** [2] - 133:6, 203:17
**supposed** [3] - 18:14,

141:19, 244:16
**surprise** [3] - 278:23, 279:4, 279:11
**suspect** [15] - 14:20, 19:3, 19:12, 19:17, 19:25, 20:11, 20:14, 20:15, 20:24, 21:16, 185:4, 229:1, 263:9, 268:2, 268:11
**suspected** [2] - 17:5, 17:24
**suspects** [2] - 19:17, 21:3
**suspicion** [5] - 70:11, 109:7, 233:8, 249:4, 249:11
**SVU** [1] - 262:5
**swear** [2] - 39:5, 51:10
**swearing** [1] - 53:3
**sweatshirt** [1] - 76:2
**switch** [1] - 236:13
**switched** [1] - 200:18
**swore** [1] - 151:19
**sworn** [4] - 4:16, 5:2, 152:10, 308:8
**Synchronoss** [15] - 8:1, 16:3, 27:20, 38:16, 49:13, 85:9, 129:23, 130:5, 130:9, 130:12, 134:9, 156:16, 203:23, 203:24, 252:14

## T

**table** [1] - 252:4
**TAKEN** [1] - 1:16
**talks** [1] - 111:14
**Tallahassee** [1] - 2:11
**tampered** [1] - 153:4
**target** [3] - 19:1, 19:3, 21:18
**targets** [1] - 21:3
**Team** [5] - 1:10, 91:7, 97:6, 264:24, 310:4
**technically** [1] - 88:4
**techniques** [1] - 119:3
**teen** [8] - 83:19, 278:25, 279:1, 279:2, 279:3
**teenage** [6] - 40:21, 41:19, 52:16, 52:17, 54:3, 278:25
**teens** [6] - 278:18, 279:1, 279:2, 279:3
**ten** [1] - 278:2
**term** [8] - 26:21, 29:5, 42:14, 51:13, 57:19, 57:21, 105:3, 286:4

**terminology** [3] - 159:8, 159:17, 210:2
**terms** [16] - 15:15, 16:22, 28:1, 42:11, 46:12, 50:8, 50:10, 68:16, 77:4, 80:15, 80:16, 108:10, 176:11, 210:6, 245:3, 278:24
**terrible** [1] - 169:19
**testified** [32] - 5:4, 39:1, 39:14, 40:3, 40:10, 42:19, 51:3, 51:20, 52:2, 72:2, 99:8, 139:18, 140:3, 140:15, 165:16, 172:14, 175:5, 176:10, 213:2, 220:12, 260:3, 261:17, 263:19, 271:18, 276:9, 276:24, 276:25, 278:2, 278:10, 293:20, 300:17, 300:22
**testify** [2] - 93:19, 276:3
**testifying** [1] - 228:7
**testimony** [36] - 42:2, 42:3, 42:24, 44:10, 49:18, 50:12, 51:25, 52:22, 62:11, 74:10, 74:14, 76:20, 83:3, 97:3, 140:8, 140:18, 165:12, 166:22, 192:21, 199:25, 259:16, 261:19, 263:18, 264:5, 274:12, 276:11, 276:20, 277:4, 278:16, 279:16, 285:22, 286:7, 298:18, 299:6, 299:8, 301:15
**text** [3] - 29:25, 113:16, 274:8
**THE** [190] - 4:1, 5:5, 5:7, 10:23, 13:25, 22:2, 22:9, 22:12, 22:15, 23:19, 24:20, 26:2, 26:15, 27:11, 27:16, 30:6, 35:14, 36:18, 39:11, 40:17, 41:14, 69:21, 70:14, 72:14, 73:21, 82:4, 82:19, 82:23, 86:13, 92:11, 96:12, 97:8, 98:22, 100:15, 101:10, 103:4, 103:17, 103:20,

104:14, 105:1, 106:1, 110:6, 110:15, 110:21, 111:22, 112:25, 114:20, 118:9, 122:5, 122:7, 123:6, 123:17, 125:2, 125:19, 129:22, 132:6, 132:15, 141:5, 142:2, 142:8, 143:19, 143:24, 146:17, 147:3, 148:22, 150:17, 150:25, 151:12, 151:25, 152:8, 152:14, 152:20, 153:9, 153:14, 153:22, 154:4, 154:17, 155:2, 155:12, 158:20, 161:23, 162:14, 163:1, 163:11, 163:22, 164:9, 164:11, 165:1, 165:14, 166:12, 166:25, 167:7, 167:10, 167:22, 168:6, 168:10, 168:18, 168:20, 168:23, 172:24, 173:5, 175:9, 176:1, 176:19, 177:18, 178:15, 181:6, 183:2, 183:25, 185:11, 187:24, 188:5, 188:19, 190:1, 190:17, 191:16, 192:11, 192:19, 193:5, 197:8, 200:3, 207:14, 208:7, 208:16, 209:17, 210:1, 210:9, 210:15, 210:18, 211:2, 211:21, 212:4, 212:10, 212:19, 214:16, 215:22, 216:2, 218:7, 218:23, 221:12, 221:19, 230:9, 231:16, 238:13, 240:7, 241:4, 243:2, 243:22, 246:13, 246:14, 246:17, 249:14, 253:24, 254:15, 284:12, 286:25, 290:1, 290:3, 290:17, 291:17, 293:8, 293:23, 293:25,

294:7, 294:19, 294:21, 295:5, 295:16, 295:18, 296:20, 296:22, 296:16, 299:17, 300:3, 300:10, 300:12, 301:4, 301:19, 301:21, 302:11, 302:14, 303:9, 303:24, 304:14, 304:24, 305:10, 305:24, 306:17, 307:8, 307:15
**themselves** [4] - 123:3, 139:21, 140:7, 144:3
**theory** [1] - 153:5
**therefore** [5] - 206:4, 283:21, 289:17, 290:3, 291:24
**they've** [2] - 27:8, 51:14
**thief** [1] - 108:15
**thighs** [2] - 160:2, 292:24
**thinking** [6] - 101:10, 101:11, 106:1, 129:3, 131:9, 138:15
**third** [7] - 39:22, 131:25, 157:21, 200:20, 207:9, 284:4, 284:22
**third-degree** [1] - 39:22
**thongs** [1] - 279:3
**three** [42] - 8:22, 46:8, 87:12, 87:13, 94:10, 94:16, 94:22, 132:11, 135:24, 136:15, 136:16, 137:20, 137:22, 156:13, 156:14, 156:21, 157:5, 157:8, 169:3, 204:10, 204:11, 205:3, 223:2, 237:11, 239:6, 251:18, 251:23, 252:18, 252:22, 253:6, 253:7, 254:4, 254:23, 255:16, 255:25, 256:3, 256:11, 256:13, 256:15, 257:24, 258:7, 273:6
**thumb** [9] - 219:6, 219:24, 222:8, 227:21, 231:22, 232:6, 232:10,

267:13, 267:14
**Thursday** [1] - 1:16
**tile** [2] - 235:17,
235:19
**TIME** [1] - 1:17
**tip** [42] - 3:13, 13:16,
13:17, 14:4, 14:12,
14:13, 15:7, 20:10,
20:15, 20:22, 33:5,
33:13, 33:22, 34:7,
34:11, 34:12, 35:2,
61:9, 68:4, 87:4,
89:8, 89:12, 91:5,
98:25, 99:4, 100:11,
106:25, 107:18,
107:22, 108:1,
108:21, 109:13,
110:10, 131:20,
143:13, 204:12,
237:5, 266:25,
271:19, 271:21,
271:24, 272:6
**tips** [3] - 33:10, 145:2,
227:15
**title** [2] - 265:2, 275:3
**today** [37] - 5:13, 6:21,
7:2, 7:23, 8:8, 8:20,
23:16, 25:17, 33:19,
49:18, 52:23, 71:22,
73:6, 78:20, 81:25,
103:24, 167:25,
188:2, 195:14,
205:20, 206:1,
212:1, 213:23,
215:4, 219:5,
259:16, 263:20,
264:21, 276:17,
276:21, 277:3,
291:21, 292:17,
295:11, 298:9,
306:19
**today's** [2] - 4:9, 7:7
**Tolbert** [29] - 20:5,
20:9, 20:21, 95:7,
95:8, 95:14, 95:15,
95:19, 96:15, 101:2,
102:2, 115:12,
196:25, 198:9,
200:6, 201:24,
202:10, 203:9,
248:15, 248:24,
260:9, 260:10,
260:21, 264:9,
266:6, 275:4, 275:6,
275:10, 278:10
**Tolbert's** [1] - 199:24
**took** [15] - 61:15,
156:1, 159:18,
181:2, 203:11,
204:18, 227:23,

233:9, 245:9,
247:24, 259:23,
259:25, 267:21,
292:7
**top** [11] - 46:17, 79:7,
160:1, 221:8, 223:4,
224:2, 226:7,
232:12, 244:19,
246:23, 253:14
**total** [8] - 87:17,
136:15, 136:16,
137:20, 137:22,
156:14, 254:6,
265:12
**totality** [6] - 75:5,
77:3, 77:9, 79:6,
157:9, 178:5
**totally** [3] - 304:14,
304:15, 304:16
**touch** [1] - 222:13
**track** [2] - 56:17, 114:7
**traditionally** [1] -
121:9
**traffic** [1] - 217:5
**training** [8] - 29:11,
60:18, 60:19, 81:9,
81:11, 88:18, 88:20,
88:24
**transcript** [3] - 48:16,
309:7, 309:8
**TRANSCRIPT** [1] -
310:6
**transmit** [1] - 148:9
**transmitting** [1] -
148:6
**treasure** [1] - 228:21
**treat** [2] - 47:24, 92:24
**treated** [1] - 93:7
**trick** [1] - 17:12
**tried** [4] - 28:22,
221:20, 230:16,
290:23
**trove** [1] - 228:21
**true** [14] - 40:1, 84:16,
84:17, 99:16,
125:12, 136:6,
136:21, 140:2,
167:25, 193:19,
224:8, 277:13,
309:8, 310:24
**trust** [2] - 211:6, 211:7
**trusting** [2] - 210:22,
211:2
**truthful** [2] - 39:20,
49:16
**try** [12] - 48:10, 55:9,
78:11, 137:6, 151:6,
162:18, 201:4,
226:15, 226:20,
231:5, 237:1, 245:7

**trying** [29] - 17:11,
60:4, 63:24, 64:2,
65:10, 65:21, 74:13,
76:10, 76:19, 76:25,
77:1, 79:2, 117:19,
118:15, 118:16,
130:14, 131:7,
138:16, 161:19,
179:11, 179:13,
183:19, 185:24,
231:20, 237:1,
242:23, 277:5,
290:22
**turn** [5] - 29:3, 43:17,
47:24, 58:19, 286:23
**twice** [4] - 106:9,
265:14, 265:21,
265:22
**two** [50] - 10:5, 10:6,
10:9, 50:5, 95:2,
138:8, 138:16,
138:18, 140:5,
170:11, 205:3,
206:1, 206:20,
206:21, 206:22,
213:4, 242:4,
242:13, 242:25,
243:6, 251:13,
251:23, 255:16,
256:3, 256:12,
256:22, 260:1,
262:15, 267:3,
270:9, 271:3,
271:16, 271:20,
272:4, 272:13,
279:21, 279:22,
280:1, 282:6, 283:3,
283:19, 288:25,
291:21, 292:17,
295:11, 304:14,
304:15, 304:16,
306:12, 307:3
**Type** [1] - 308:22
**type** [7] - 15:6, 44:18,
63:2, 65:3, 113:15,
120:15, 227:1

**U**

**UF** [2] - 1:10, 310:4
**ugly** [1] - 63:24
**Ukrainian** [1] - 279:23
**ultimate** [2] - 240:3,
286:12
**ultimately** [5] - 99:1,
105:7, 200:1, 205:2,
286:15
**un-redacted** [9] -
24:22, 24:25, 150:5,
150:23, 152:24,
218:4, 219:24,

220:2, 222:9
**unconfirmed** [9] -
27:23, 27:24, 28:5,
28:7, 28:13, 29:1,
29:5, 29:9, 108:3
**under** [21] - 9:7, 39:5,
40:14, 42:16, 47:6,
47:7, 49:12, 51:11,
53:3, 58:16, 60:15,
79:5, 79:25, 88:5,
93:19, 123:10,
123:15, 277:2,
283:3, 300:23, 306:8
**Under** [1] - 310:23
**underage** [5] - 43:25,
44:4, 55:24, 58:2,
216:15
**underlying** [1] -
264:12
**understood** [2] -
224:9, 224:11
**underwear** [2] - 62:13,
160:2
**unedited** [1] - 75:18
**unequivocally** [2] -
39:14, 197:3
**unfortunately** [8] -
27:20, 50:6, 51:21,
91:20, 91:21, 231:2,
301:7, 307:4
**unintelligible** [6] -
45:19, 75:24,
263:18, 273:24,
282:12, 284:23
**unintelligible )** [5] -
5:22, 85:11, 112:4,
118:17, 194:18
**unit** [4] - 88:1, 88:3,
181:22, 202:22
**Unit** [4] - 4:1, 82:20,
82:24, 168:24
**UNITED** [1] - 1:1
**United** [1] - 4:5
**unknown** [4] - 52:23,
258:24, 258:25,
259:4
**unlawful** [2] - 86:17,
172:1
**unless** [5] - 22:10,
185:6, 185:16
**unreasonable** [1] -
186:8
**unsavory** [1] - 47:23
**unstable** [1] - 265:19
**unsuccessful** [1] -
24:10
**untoward** [1] - 244:11
**unusual** [2] - 136:18,
140:25
**up** [37] - 13:11, 18:19,

26:7, 45:7, 46:17,
49:24, 58:24, 65:22,
76:9, 83:3, 96:8,
99:6, 131:9, 145:1,
175:1, 180:22,
189:8, 228:13,
228:14, 228:17,
230:23, 231:5,
232:10, 232:11,
248:11, 263:2,
263:11, 267:15,
273:25, 277:14,
277:15, 279:3,
281:7, 281:16,
284:15, 286:23
**uploaded** [1] - 15:19
**utilize** [1] - 75:21
**utilized** [2] - 43:1,
135:7
**utilizing** [3] - 42:13,
106:7, 228:11

**V**

**vagina** [13] - 158:4,
158:6, 158:11,
158:13, 158:18,
158:19, 158:21,
159:1, 159:2, 159:4,
159:6, 159:12,
161:18
**vaginal** [1] - 80:18
**valid** [2] - 99:13,
150:19
**value** [1] - 17:2
**variable** [1] - 216:3
**variables** [3] - 177:9,
195:16, 241:11
**variety** [1] - 274:12
**various** [1] - 227:15
**verbatim** [11] - 78:18,
102:11, 106:15,
108:4, 124:21,
129:5, 179:1, 181:7,
211:11, 259:25,
278:21
**verification** [5] -
141:10, 147:15,
147:23, 148:19,
184:3
**verified** [14] - 68:24,
69:4, 69:19, 69:24,
71:23, 84:13, 84:19,
96:21, 140:22,
141:2, 175:6, 177:3,
215:12, 300:20
**verify** [6] - 131:7,
150:6, 150:7, 153:1,
215:11, 218:20
**verifying** [1] - 217:11
**Verizon** [5] - 87:1,

129:11, 130:13, 134:17, 203:22
**version** [14] - 11:1, 152:24, 231:24, 299:12, 299:14, 299:19, 299:21, 299:24, 300:3, 300:8, 300:14, 301:1, 301:5, 302:8
**versions** [1] - 152:1
**versus** [4] - 4:4, 6:10, 60:20, 90:4
**via** [3] - 2:9, 2:16, 148:6
**victim** [4] - 24:7, 28:1, 28:18, 67:12
**victims** [8] - 88:1, 88:3, 88:5, 155:16, 166:8, 187:15, 187:16, 229:11
**video** [6] - 4:2, 16:24, 47:16, 194:4, 238:16, 238:20
**VIDEO** [1] - 1:13
**video-recorded** [2] - 4:2, 47:16
**VIDEO-RECORDED** [1] - 1:13
**Videographer** [1] - 2:23
**VIDEOGRAPHER** [9] - 4:1, 5:5, 82:19, 82:23, 168:20, 168:23, 246:14, 246:17, 307:15
**videographer** [1] - 4:12
**videotaped** [1] - 307:16
**view** [8] - 64:5, 66:14, 66:24, 86:18, 158:22, 172:2, 172:13, 224:24
**viewed** [7] - 37:8, 63:12, 65:14, 68:5, 68:8, 68:10, 68:12, 69:13, 69:25, 70:1, 70:4, 91:4, 96:13, 96:16, 128:17, 128:19, 148:5, 151:13, 177:2, 185:14, 252:17, 253:18, 260:2, 260:5, 261:21, 261:22, 264:1
**viewer** [1] - 62:21
**viewing** [6] - 178:6, 185:14, 202:20, 263:24, 274:18, 276:7

**viewpoint** [2] - 178:6, 178:8
**virtually** [1] - 67:23
**virus** [1] - 228:14
**visible** [6] - 124:6, 232:10, 284:23, 285:4, 292:22, 292:23
**visibly** [1] - 123:25
**visit** [1] - 278:16
**visited** [1] - 176:20
**visits** [1] - 176:20
**vs** [1] - 1:6

## W

**wait** [1] - 219:22
**waiting** [2] - 129:22, 130:4
**wake** [1] - 58:24
**walks** [2] - 111:14, 302:3
**walls** [1] - 235:10
**wants** [1] - 30:13
**warrant** [44] - 3:14, 7:24, 8:2, 16:6, 35:3, 36:14, 37:9, 37:14, 37:20, 38:16, 38:24, 49:13, 53:23, 53:24, 71:19, 85:8, 86:24, 87:2, 87:22, 105:11, 129:7, 129:20, 129:23, 130:2, 130:7, 130:19, 132:4, 132:19, 133:5, 133:6, 133:15, 133:18, 134:3, 171:5, 171:15, 193:2, 199:13, 202:17, 203:17, 203:19, 251:10, 276:1, 293:4
**warrants** [4] - 7:22, 31:19, 31:20, 260:14
**watermark** [24] - 29:22, 29:24, 30:11, 30:18, 32:8, 32:10, 32:16, 32:20, 38:4, 39:12, 40:19, 41:9, 41:10, 41:12, 41:17, 62:3, 71:13, 71:17, 113:10, 147:20, 185:3, 226:11, 230:23, 234:14
**watermarks** [1] - 30:7
**waxing** [2] - 119:20, 120:16
**ways** [1] - 55:5
**wear** [1] - 76:2
**wearing** [7] - 108:13,

220:15, 220:16, 236:23, 237:12, 279:3, 282:22
**website** [77] - 21:7, 21:9, 21:23, 22:21, 23:14, 27:9, 27:14, 32:7, 32:16, 32:21, 41:2, 41:3, 41:4, 47:3, 55:15, 62:2, 67:15, 67:24, 67:25, 68:2, 68:21, 68:25, 69:17, 69:18, 71:1, 71:6, 71:22, 72:6, 73:7, 105:15, 110:12, 110:16, 111:2, 112:5, 112:8, 113:13, 113:14, 113:15, 127:21, 139:14, 141:1, 141:25, 142:17, 144:4, 144:6, 145:14, 146:9, 147:22, 148:14, 163:8, 174:12, 174:15, 175:16, 177:3, 183:16, 184:17, 184:21, 184:22, 184:25, 185:7, 185:8, 185:12, 186:11, 187:6, 187:9, 188:15, 190:13, 195:12, 196:1, 196:15, 199:24, 225:5, 226:9, 228:22, 228:24, 234:3, 247:15
**websites** [23] - 65:12, 67:18, 67:20, 68:18, 84:19, 84:22, 84:23, 121:25, 122:2, 127:9, 140:16, 141:19, 143:2, 144:8, 144:12, 145:1, 176:11, 176:16, 184:2, 186:1, 186:7, 233:25
**weighed** [1] - 259:18
**weight** [3] - 81:1, 81:18, 81:19
**weird** [8] - 74:23, 77:1, 122:23, 162:23, 208:3, 208:7, 208:9, 209:8
**Weiss** [1] - 126:15
**white** [6] - 231:15, 232:2, 235:21, 243:16, 243:23, 282:23
**whole** [3] - 86:21,

172:4, 231:7
**widely** [1] - 292:24
**Wildlife** [3] - 20:12, 178:19, 178:24
**WILLIAM** [2] - 1:3, 310:2
**William** [4] - 4:3, 5:15, 19:20, 21:5
**window** [1] - 235:23
**wish** [3] - 67:10, 190:13, 288:8
**Witness** [1] - 3:2
**WITNESS** [181] - 5:7, 10:23, 13:25, 22:2, 22:9, 22:12, 22:15, 23:19, 24:20, 26:2, 26:15, 27:11, 27:16, 30:6, 35:14, 36:18, 39:11, 40:17, 41:14, 69:21, 70:14, 72:14, 73:21, 82:4, 86:13, 92:11, 96:12, 97:8, 98:22, 100:15, 101:10, 103:4, 103:17, 103:20, 104:14, 105:1, 106:1, 110:6, 110:15, 110:21, 111:22, 112:25, 114:20, 118:9, 122:5, 122:7, 123:6, 123:17, 125:2, 125:19, 129:22, 132:6, 132:15, 141:5, 142:2, 142:8, 143:19, 143:24, 146:17, 147:3, 148:22, 150:17, 150:25, 151:12, 151:25, 152:8, 152:14, 152:20, 153:9, 153:14, 153:22, 154:4, 154:17, 155:2, 155:12, 158:20, 161:23, 162:14, 163:1, 163:11, 163:22, 164:9, 164:11, 165:1, 165:14, 166:12, 166:25, 167:7, 167:10, 167:22, 168:6, 168:10, 168:18, 172:24, 173:5, 175:9, 176:1, 176:19, 177:18, 178:15, 181:6, 183:2, 183:25, 185:11, 187:24, 188:5, 188:19,

190:1, 190:17, 191:16, 192:11, 192:19, 193:5, 197:8, 200:3, 207:14, 208:7, 208:16, 209:17, 210:1, 210:9, 210:15, 210:18, 211:2, 211:21, 212:4, 212:10, 212:19, 214:16, 215:22, 216:2, 218:7, 218:23, 221:12, 221:19, 230:9, 231:16, 238:13, 240:7, 241:4, 243:2, 243:22, 246:13, 249:14, 253:24, 254:15, 284:12, 286:25, 290:1, 290:3, 290:17, 291:17, 293:8, 293:23, 293:25, 294:7, 294:19, 294:21, 295:5, 295:16, 295:18, 296:20, 296:22, 298:16, 299:17, 300:3, 300:10, 300:12, 301:4, 301:19, 301:21, 302:11, 302:14, 303:9, 303:24, 304:14, 304:24, 305:10, 305:24, 306:17, 307:8
**witness** [6] - 1:23, 4:15, 5:2, 48:21, 221:17, 307:19
**women** [6] - 19:4, 121:21, 122:2, 122:8, 123:3, 123:6
**wonderful** [1] - 275:9
**wooden** [2] - 235:10, 235:11
**word** [7] - 29:24, 89:11, 89:12, 140:13, 161:15, 240:9, 285:23
**worded** [2] - 158:15, 158:21
**words** [1] - 114:12
**works** [1] - 264:23
**world** [6] - 64:3, 65:11, 65:23, 77:25, 121:11, 302:3
**worries** [1] - 22:14
**worse** [1] - 81:4
**worth** [1] - 221:16

**WRITE** [1] - 310:6
**write** [4] - 136:20,
221:14, 268:25,
269:8
**writes** [1] - 107:13
**writing** [2] - 169:19,
269:18
**written** [9] - 117:13,
118:6, 118:9,
160:16, 160:22,
229:25, 234:3,
269:13, 269:15
**wrote** [4] - 107:10,
160:10, 269:3, 269:9
**www.met** [1] - 40:20
**www.met-art.com** [1]
- 40:20

# Y

**YCBLDV** [1] - 256:7
**YCBLVVFQ** [2] -
287:21, 292:19
**YCBLVVFQ _0.jpg** [2]
- 207:12, 272:15
**year** [1] - 33:24
**years** [28] - 10:5, 10:6,
10:9, 50:5, 87:24,
93:21, 160:6,
160:19, 161:21,
162:11, 164:7,
165:20, 166:1,
206:4, 242:21,
260:1, 262:15,
283:4, 285:9,
285:19, 289:17,
290:14, 291:11,
291:25, 292:3,
293:2, 299:3, 307:3
**young** [11] - 61:5,
73:19, 75:1, 80:4,
80:9, 121:21,
156:24, 156:25,
157:1, 243:11
**young-looking** [1] -
80:9
**younger** [17] - 77:9,
243:9, 243:12,
243:19, 283:4,
299:19, 299:21,
299:24, 300:3,
300:7, 300:14,
301:1, 301:5,
301:17, 302:8,
302:17, 303:3
**yourself** [5] - 76:16,
99:9, 105:20,
107:17, 163:17
**yourselves** [1] - 4:14

# Z

**ZEPF** [3] - 2:24, 223:8,
232:5
**Zoom** [2] - 2:9, 2:16
**zoomed** [2] - 159:4,
231:24
**zoomed-in** [2] - 159:4,
231:24