```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                JACKSONVILLE DIVISION

 3              Case 3:24-cv-00044-MMH-MCR

 4   WILLIAM LEE LAWSHE, an individual,

 5              Plaintiff,

 6   -vs-

 7   ROBERT HARDWICK, in his official capacity as Sheriff of
     St. Johns County, MIKAYLA PRESTON, in her individual
 8   capacity as a Detective for St. Johns County Sheriff's
     Office, and KATHLEEN DULLY, in her individual capacity
 9   as medical director of the UF Child Protection Team,

10              Defendants.

11   _____/

12              REMOTE DEPOSITION OF KEVIN GREENE

13              Taken on Behalf of the Plaintiff

14   DATE TAKEN:   Tuesday, December 17, 2024
     TIME:         10:02 a.m. - 12:12 p.m.
15   PLACE:        Remotely via Zoom

16

17

18        Deposition of the witness taken before:

19              Maureen Hall, RPR, FPR

20

21

22

23

24

25
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 2

```
1    APPEARANCES:
2    Counsel for Plaintiff:
3
             MICHAEL K. ROBERTS, ESQUIRE
4    LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND
     NOWICKI
5            1680 Emerson Street
             Jacksonville, Florida 32207
6            mroberts@nrhnlaw.com
7    Counsel for Defendants, Robert Hardwick and Mikayla
     Preston:
8
             MATTHEW JOSEPH CARSON, ESQUIRE
9    SNIFFEN & SPELLMAN, P.A.
             123 Monroe Street
10           Tallahassee, Florida 32301-1509
             mcarson@sniffenlaw.com
11
12   Counsel for Defendant, Kathleen Dully:
13           AMY K. SHEVLIN, ESQUIRE
             BUCHANAN & BUCHANAN, P.A.
14           1900 Southeast 18th Avenue, Suite 300
             Ocala, Florida 34471-8237
15           ashevlin@rbtrial.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                  I N D E X
2    REMOTE ZOOM DEPOSITION OF KEVIN GREENE
3    DIRECT EXAMINATION BY MR. ROBERTS:                  4
4    CROSS EXAMINATION BY MS. SHEVLIN:                  80
5    REDIRECT EXAMINATION BY MR. ROBERTS:              87
6                E X H I B I T S
7    Plaintiff's Ex. No. 1  Statute                    39
8    Plaintiff's Ex. No. 2  CyberTipline Report        62
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                   PROCEEDINGS
2    Whereupon,
3            KEVIN GREENE, called as a witness by the
4    Plaintiff, having been first duly sworn, testified as
5    follows:
6            THE WITNESS:  I do.
7                   DIRECT EXAMINATION
8    BY MR. ROBERTS:
9        Q.  Can you state your name for the record.
10       A.  Kevin Greene.
11       Q.  And I understand you're employed with
12   St. Johns County Sheriff's Office?
13       A.  Yes.
14       Q.  And you're a corporal or detective corporal
15   at --
16       A.  Yes.
17       Q.  Yeah.  What's your -- your job title today as
18   we sit here?
19       A.  I'm a digital forensics detective.  I'm kind
20   of like assistant supervisor of the digital forensics
21   lab.
22       Q.  How many people are in that lab?
23       A.  Currently there are four of us.  And we have
24   a lieutenant who oversees us.
25       Q.  And how long have you been doing that for
```

Page 5

```
1    St. Johns County?
2        A.  Full-time just -- well, almost five years.
3    Next month it will be five years.
4        Q.  I understand before that you were -- did you
5    work for -- were you an ICAC detective?
6        A.  From 2015, like late 2015 until I think
7    mid-2017.  It's internet crimes against children,
8    I-C-A-C.
9        Q.  And I was just going to ask you, what -- what
10   is that?
11       A.  It's investigating like online enticement of
12   children.
13       Q.  Okay.  Well, as -- I think we're here today
14   about an investigation that involved the alleged
15   possession of child pornography.  Would that be under
16   the -- the purview of -- of ICAC investigators?
17       A.  Yes.
18       Q.  And in your -- in the past, while you were an
19   ICAC investigator or detective, was that with St. Johns
20   County Sheriff's Office?
21       A.  Yes.
22       Q.  Sometimes I see the -- a special victims unit
23   or SVU; did you work in that department?
24       A.  Yes.  I went from ICAC to special victims.
25       Q.  Okay.
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 6

```
 1        A.   And at the time that I was in ICAC, ICAC was
 2   part of special victims unit.
 3        Q.   And when you say part of ICAC, is that a
 4   certification or a membership?  What is that?
 5        A.   It's not really a certification; it's more of
 6   a specialty.
 7        Q.   Do they provide training?
 8        A.   Yeah, they do.  There's a task force at the
 9   state and national level that will give you -- or a
10   part of that task force is really more of like a
11   funding.  The Federal Government or agencies out there
12   will provide funding for training for special -- or, I
13   guess, specialized training for law enforcement agents
14   that do that kind of work.
15        Q.   All right.  Now I understand that you were
16   involved in the investigation of Mr. Lawshe's case; is
17   that correct?
18        A.   Yes, sir.
19        Q.   And you performed your forensics function in
20   that investigation; is that -- do I understand that
21   correct?
22        A.   Yes.
23        Q.   And that you generated a report as a result
24   of your work; is that correct?
25        A.   Yes.
```

Page 7

```
 1        Q.   All right.  I know that you've had your
 2   deposition taken before.  Did you review anything in
 3   preparation for today's deposition?
 4        A.   Yes.
 5        Q.   What did you review?
 6        A.   That report and the cellphones.  Downloads,
 7   the forensics reports that -- that I did.
 8        Q.   So did you look at the actual cellphones, or
 9   did you just look at the reports that you did?
10        A.   The reports that I did.
11        Q.   Okay.  How many reports did you do?
12        A.   Well, actually, I only reviewed one of the
13   reports.  The -- his -- he had two phones.  He had his
14   work phone and his personal phone.  The work phone had
15   nothing of evidentiary value, so there was no point in
16   really reviewing that.
17        Q.   Did you review anything else?
18        A.   I think I scanned through the -- the Verizon
19   download, just to kind of confirm something that I read
20   in my report.
21        Q.   So when you say "The Verizon download," are
22   you referring to the -- NCMEC cyber tip report?
23             MR. ROBERTS:  And Madam Court Reporter,
24        that's National Center for Missing & Exploited
25        Children.
```

Page 8

```
 1   BY MR. ROBERTS:
 2        Q.   Before we get into that, what is National
 3   Center for Missing & Exploited Children, Mr. Greene --
 4   or Detective Green?
 5        A.   It is -- it's a clearinghouse for -- the way
 6   we are referring to it, it's a clearinghouse for
 7   information on -- on -- I'm trying to think of the
 8   easiest way to explain it.  They share with us
 9   information related to children that are being
10   exploited, whether it's over the internet or in person
11   and being exploited over the internet or in person with
12   information that they get online, whether it's through
13   electronic service providers such as Google or, you
14   know, Comcast or whoever.  They'll get information via
15   cyber tips.  They share that with law enforcement, and
16   that gets passed down through whatever chain and
17   eventually comes to us and we investigate those.
18             They also get information via hotlines and
19   that cyber tip from people, and that gets also passed
20   down to us to be investigated.  And that goes to the
21   ICAC unit, and they do their investigations that way.
22        Q.   Sometimes that's referred to as NCMEC; do I
23   understand that correctly?
24        A.   Yes.
25             MR. ROBERTS:  And that acronym, for the court
```

Page 9

```
 1        reporter, is N-C-M-E-C.
 2   BY MR. ROBERTS:
 3        Q.   Is that correct, Detective Greene?
 4        A.   Yes.
 5        Q.   All right.  And so if I say "NCMEC," you will
 6   know that I'm referring to the National Center for
 7   Missing & Exploited Children?
 8        A.   Yes.
 9        Q.   Now, you -- where we were going, I kind of
10   got on a tangent there, you -- you reviewed a -- you
11   called it a Verizon report or something like that.
12   Were you referring to the NCMEC cyber tip that
13   St. Johns County received regarding Mr. Lawshe?
14        A.   Yes.  I reviewed that, yes.
15        Q.   Okay.  All right.  And we'll talk about that
16   in a little bit about anything else that you reviewed
17   in preparation for today's deposition.
18        A.   I also reviewed the -- the Verizon download,
19   the search warrant return.
20        Q.   And when you say you reviewed it, are you
21   talking about a document that you reviewed?
22        A.   No, the -- the return that Detective Preston
23   requested from Verizon after she got the NCMEC tip.
24        Q.   What I'm asking, though, is, are you
25   referring to a document, or did you look at all -- did
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 10

1  you review all of the images that were -- were provided
2  in that subpoena return?
3      A.  I didn't look at all the images, but the
4  images were present, yes.
5      Q.  Did you -- did you look at any images in
6  preparation for today's deposition?
7      A.  Yes.
8      Q.  Okay.  Do you believe that you have in your
9  possession the three images that Mr. Lawshe was charged
10  with in this case?
11      A.  Yes.
12      Q.  Okay.  And did you review those three images
13  today?
14      A.  Yes.
15      Q.  All right.
16      A.  Well, not today, but yes.
17      Q.  But in preparation for today?
18      A.  Yes, in preparation, yes.
19      Q.  Anything else that you reviewed?
20      A.  No.
21      Q.  Did you have time to speak with your lawyer
22  and have any questions answered that you may have about
23  this process today?
24      A.  Not really.
25      Q.  Okay.  Okay.  So let me ask you this.  When

Page 11

1  you came into this investigation, did you know
2  Mr. Lawshe or who he was?
3          You have to say yes or no for the court
4  reporter.
5      A.  No, no.  I did.  There's a printer going on
6  in the background.  I'm sorry.
7      Q.  It's okay.  And you know -- you know, you
8  have done this before, I'm not trying to be a jerk
9  about it, I just --
10      A.  Right, right.
11      Q.  The court reporter has to write something
12  down.  When did you first realize -- when did you first
13  learn that he was a law enforcement officer?
14      A.  It -- it had to be a while after everything
15  was going on.  I don't honestly know how long the case
16  was being investigated for.
17      Q.  Uh-huh.
18      A.  It was probably several hours after, I guess,
19  he was maybe brought in for an interview.  I don't
20  know.
21      Q.  Okay.
22      A.  Our office is across the hall from the ICAC
23  office, but they don't really -- I mean, they don't
24  discuss everything with us until they need assistance
25  with a download of a phone, so...

Page 12

1      Q.  Sure.  So let me just start by asking -- I
2  mean, you know, you've reviewed, it seems like, quite a
3  bit of material, but have you reviewed everything that
4  you want to review before today's deposition?
5      A.  I believe so, yeah.
6      Q.  Okay.  And I know your deposition was taken
7  in this case previously, in the criminal case.  Do you
8  recall that?
9      A.  I don't recall it, no.  I -- believe me, I
10  have -- I have -- I do a lot of cases, so it's very
11  possible.  I just don't remember it.
12      Q.  Do you remember Crawford Pierce, that name
13  Crawford Pierce?
14      A.  Yes, I do, but whether it was from this case
15  or others, I -- I know -- I know him.  I just don't
16  remember if it was for this case or not.
17      Q.  You're not saying that you weren't deposed.
18  You just don't have a recollection?
19      A.  Right, I don't remember it, yeah.
20      Q.  All right.  So let me just ask you this.  I
21  mean, as we get started, is there anything after
22  reviewing the documents that you would like to say to
23  me or Mr. Lawshe?
24      A.  No, no, I don't.
25      Q.  Is there anything, in looking back at the

Page 13

1  investigation, that you wish or think should have
2  happened differently from St. Johns County's
3  perspective?
4          MR. CARSON:  Object to form.
5          You can answer, if you can, Corporal Greene.
6          MS. SHEVLIN:  Join.
7          THE WITNESS:  Say that again.  Sorry.
8          MR. CARSON:  Are you asking me what I said,
9  sir?
10          THE WITNESS:  Yeah.  Yeah, yeah.
11          MR. CARSON:  Yeah, from time to time, myself
12  or Ms. Shevlin may object to the form of the
13  question.  That's just so that the record notes
14  that we -- we have an objection to the form, but
15  you still answer the question, if you can.
16          THE WITNESS:  Okay.  And so can you repeat
17  the question?
18  BY MR. ROBERTS:
19      Q.  Sure.
20      A.  The original question.
21      Q.  Right.
22          MR. ROBERTS:  And I will -- Matt, I will
23  understand that you will object to the question.
24  I'll just try to ask -- I don't have it verbatim,
25  but I'll try to ask it again.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 14

1  BY MR. ROBERTS:
2      Q.   Having reviewed the documents that you
3  reviewed, is there anything that you wish or believe
4  that St. Johns County Sheriff's Office should have done
5  differently in the investigation of the allegations
6  against Mr. Lawshe?
7           MR. CARSON:  Object to form.
8           MS. SHEVLIN:  Join.
9           THE WITNESS:  I mean, I think they should
10     have taken more time.  Honestly, I think they have
11     probably rushed a little bit and, you know, taken
12     more time and -- and gone through things a little
13     longer.
14  BY MR. ROBERTS:
15     Q.   Okay.  I appreciate that.  Well, can you be a
16  little bit more specific about what you wish they would
17  have taken more time with?
18     A.   Not really.  It just -- you know, I know in a
19  lot of cases, especially when it comes to dealing
20  with -- with certain individuals that you worry about,
21  especially, you know, people that are known to have
22  firearms, you worry about issues of -- of safety and
23  how things are going to turn out.  So it becomes an
24  officer safety issue, how things are going to come
25  together getting -- getting somebody to a place where

Page 15

1  you can conduct an interview safely becomes an issue.
2  And things tend to maybe get rushed as opposed to
3  slowing the process down, which you have that
4  opportunity with other potential suspects, if you want
5  to call it that.  And I kind of wish things would have
6  slowed down.  But, you know, in this case, that had
7  nothing to do with, you know, me or my unit.  We had no
8  idea what was going on with any of this.
9      Q.   Right.
10     A.   Hindsight's 20/20 with all things.
11     Q.   Right.  So, yeah, I -- I appreciate that.
12  But just to be clear, you're -- you are saying that
13  there's a known concern of -- that Mr. Lawshe may have
14  shot himself, killed himself, had he learned about --
15     A.   No, no --
16     Q.   Let me just ask a different question.  You
17  kind of answered that, I think, but you -- you said
18  that with an officer who owns a gun, there may be sort
19  of a desire to rush because of safety.  Whose safety
20  are you talking about?
21     A.   His safety, our safety, anybody's.  And it's
22  not necessarily a law enforcement officer.  It could be
23  anybody who is known to have firearms.  You know, it
24  would be the same thing as if we were going against,
25  you know, a known gangster who is -- to drive around

Page 16

1  with firearms, we're going to be a little extra careful
2  or on a drug warrant --
3      Q.   Right.
4      A.   -- you know, if we're sending a SWAT team to
5  go in to do, you know, something.  And then in this
6  case, especially when it comes to, you know, evidence
7  that's easy to -- to get rid of, you know, it's -- in a
8  lot of cases, easy just to throw in a toilet and, you
9  know, you don't even need to flush it, it's -- you
10  know, you get a phone wet and it's gone.
11     Q.   So -- so you -- you -- you believe or you
12  wish that they would have slowed this investigation
13  down and taken a little bit more time before making the
14  decision to arrest Mr. Lawshe?
15     A.   I mean, in my opinion, yeah.
16     Q.   Yeah.  And that's all I'm here to do, is to
17  get your opinion, your facts and -- and you made a
18  comment, I want to kind of go to that, which is, you --
19  you downloaded -- let's just talk about the Samsung
20  phone.  Would that be okay?
21     A.   Yeah.
22     Q.   And the reason I like to do that is because
23  he had a work phone, I believe it was an Apple device;
24  is that correct?
25     A.   Yes.

Page 17

1      Q.   I think you just testified to this, and I
2  want to make sure.  There was no nude or pornographic
3  images on that phone?
4      A.   Correct.
5      Q.   So the -- and you actually had possession of
6  a work laptop; did I understand that correctly?
7      A.   Yes.
8      Q.   And you didn't find any, you know, content of
9  interest or anything relevant to possession of
10  pornography or child pornography on that device?
11     A.   Correct.
12     Q.   Right.  So let's talk about the Samsung
13  device.  You -- you had the device in your possession
14  at the time that you were asked to do a forensic
15  download.  Do I understand that correctly?
16     A.   Well, we knew that we were going to have to
17  do it.  They didn't have it when he came in for the
18  interview.  Initially, I was asked to go with them to
19  his house to pick it up to identify it.
20     Q.   Okay.
21     A.   So I went with -- I don't remember everybody
22  that was there.  It wasn't a whole lot of people.
23  There was several of us, though, I think three or four.
24  We went to Mr. Lawshe's house, located the phone,
25  identified it by the IMEI number on the back.  I took a

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 18

1  few pictures of it.  I think somebody was there -- I
2  don't remember who it was, somebody was there with a
3  camera, took some pictures of the house to show that we
4  didn't damage anything.  I took the phone with me and
5  went back to the lab and started my process with it.
6      Q.   Now, prior to bringing Mr. Lawshe in, you
7  just referred to, it was your understanding that
8  St. Johns County already had the subpoena return
9  from -- from Verizon or Synchronoss at that point?
10     A.   Yes.  Yes.
11     Q.   And so they knew what was in his cloud on
12  that Samsung device from the return of the subpoena.
13  Do I understand that correctly?
14     A.   Yes.  And I don't remember a hundred percent,
15  I -- I believe so.  I don't -- I don't recall exactly
16  the timeline of events.
17     Q.   Right.
18     A.   But generally that would be how it would
19  work.  You would get the subpoena or the -- the tip
20  from NCMEC.  You would do your -- your legal process,
21  which in this case would be the Synchronoss, whether
22  it's a subpoena or a search warrant, requesting all the
23  information, then you would review it.  And I -- I
24  think in this case Detective Preston had problems
25  getting the downloads, and she asked me to help her get

Page 19

1  the search warrant return from Synchronoss.  And
2  because they, at the time, were running off of small
3  laptops, she was having a lot of trouble with it, and I
4  think our computers are way, way more advanced.  I
5  think I downloaded it for her and gave it to her.  I
6  didn't review it or anything.  I just gave it to her.
7      Q.   And let me --
8      A.   They probably would have gone from there.
9      Q.   Yeah, so -- and let me just kind of make a
10  sort of -- make sure I understand one thing is, your
11  involvement in this case was the forensic download --
12     A.   Yes.
13     Q.   -- of the phone and perhaps you helped her
14  download the subpoena return; is that correct?
15     A.   Yes.
16     Q.   You never reviewed any images to make, inform
17  an opinion prior to the arrest about whether or not an
18  image constituted probable cause for possession of
19  child sexual abuse material?
20     A.   No.
21     Q.   You were strictly just sort of the tech
22  facilitator of getting any images to Detective Preston
23  for her to do the investigation; is that correct?
24     A.   Yes.
25     Q.   You were not responsible for making any

Page 20

1  probable cause determinations about any of the images,
2  whether charged or not charged, in this case?
3      A.   No.
4      Q.   And no one on your team was; is that correct?
5      A.   Correct.
6      Q.   All right.  You have done that before,
7  though, when you were an ICAC and SVU detective or
8  investigator, you -- it was at one point in the past
9  your job to make probable cause determinations about
10  what is or does not constitute probable cause for
11  possession of -- of child pornography?
12     A.   Yes.
13     Q.   All right.  You indicated that Detective
14  Preston, you -- you have a recollection that she may
15  have asked you to help download the subpoena return.
16  Did I understand that correctly?
17     A.   The search warrant, yes.
18     Q.   The search warrant subpoena return.  Okay.
19          Did she ever ask you specifically to look at
20  the images, the charged images, for you to confirm that
21  you -- in your opinion, they were depictions of a
22  minor?
23     A.   Not that I recall, no.
24     Q.   As a forensic investigator or detective with
25  St. Johns County, do you have the ability to look at an

Page 21

1  image and determine whether or not it has been edited
2  or altered digitally?
3      A.   Sometimes.  It -- it depends on the way it's
4  been done and the -- the type of tool that was used.
5  There are some -- some ways that we can -- or some
6  tools that we can use that will let us know if
7  something has been altered.  And a lot of the forensic
8  tools we use are becoming way more advanced in that
9  field that are looking for artificial intelligence
10  manipulation in -- in images and videos, but there are
11  ways to kind of tinker with an image and play with like
12  the lighting in different filters and you can see the
13  manipulations in it, but it's -- it's kind of hit or
14  miss.  You know, if somebody is really good at the job,
15  then it's -- it's hard to tell.
16     Q.   You are an expert, though, in -- in tinkering
17  with it and trying to tell whether an image has been
18  digitally altered?
19     A.   I wouldn't say an expert, no, but I have a
20  little experience with it, yeah.
21     Q.   Is there anybody else at St. Johns County who
22  has more experience than you or more knowledge than you
23  in trying to determine whether or not an image has been
24  digitally altered in some way?
25     A.   I don't know, maybe.  Not that I know of, but

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 22

1  maybe.
2      Q.    In your forensics --
3      A.    Maybe one of my coworkers, maybe.
4      Q.    Yeah.
5      A.    But...
6      Q.    Let me ask you a question.  Did Detective
7  Preston or anybody else at St. Johns County Sheriff's
8  Office ask you to review any images related to
9  Mr. Lawshe's case to determine whether or not they had
10  been digitally altered or not?
11     A.    Not that I can recall.
12     Q.    If you did something like that, would you
13  have generated a report of your work?
14     A.    I don't think so.  I mean, it would -- it
15  would depend on -- no, I -- I don't think so, because
16  it would depend on what I did it for and if it had a
17  result in the case.  You know what I mean?  If it was
18  just like, Hey, do you think somebody has done
19  something with this, and I looked at it and nobody did
20  anything with it, then, not really.  But if I looked at
21  it, and I said, Wow, yeah, this has been really
22  tinkered with or somebody has done something with this
23  and that affected the investigation, then absolutely I
24  would.
25     Q.    You have no recollection today of Detective

Page 23

1  Preston or another detective coming to you with those
2  images related to Mr. Lawshe's case and asking you to
3  evaluate them as to whether or not they had been
4  digitally altered or not?
5      A.    Not that I remember, no.
6      Q.    Do you have a way of determining whether or
7  not an image is artificial intelligence generated?
8      A.    Other than some of the forensic tools, they
9  sometimes will show us that stuff, but not really.
10     Q.    A similar answer to the digitally altered
11  question?
12     A.    Yes.
13     Q.    Okay.  Do you recall anyone coming to ask you
14  whether or not any of the images related to
15  Mr. Lawshe's case were the product of AI generation?
16     A.    No.
17     Q.    So we're going through kind of your
18  involvement in the case.  I think -- was it fair to say
19  the first time -- let me ask.  When was the first time
20  that you were made aware of this investigation?
21     A.    I think it was around the time that
22  Mr. Lawshe was brought in to the interview room.
23  Either -- it was either -- I think it was after he was
24  brought into the interview room.
25     Q.    And that would have been the time where you

Page 24

1  were asked to help assist with the Synchronoss
2  download, or had that happened before he was brought
3  in?
4      A.    Well, it -- well, no, the Synchronoss
5  download, I might -- I mean, I guess that would have
6  been a couple days before.  I probably just didn't even
7  realize it was the same case.
8      Q.    Fair enough.
9      A.    Yeah.
10     Q.    You were just asked the technical, Hey, can
11  you help with this?
12     A.    Right.  And that happens a lot.  And not --
13  not just from ICAC.  That happens from every unit all
14  over the place.
15     Q.    Where they're dealing -- where they're
16  dealing with a large amount of information or data
17  that's being downloaded or dealt with?
18     A.    Yes.  I'm kind of like the investigations IT
19  person.
20     Q.    Okay.
21     A.    So a lot of people come to me for a lot of
22  different things, and I just end up going to help them
23  out.
24     Q.    Yeah.  So you were made aware when they
25  brought him in.  And I think you already testified you

Page 25

1  were asked to -- to go to the home, Mr. Lawshe's home.
2  Did I understand that correctly?
3      A.    Yes, sir.
4      Q.    You, along with several other officers, not a
5  lot, but a few officers, went to his home.  You
6  recall going to his home?
7      A.    Yes.
8      Q.    At the time that you went to his home, did
9  you understand that this investigation was about the
10  allegation of possession of child pornography?
11     A.    Yes.
12     Q.    All right.  I think you testified that you
13  located the device in the home, took some pictures.
14  Did you bring back -- that back to your office?
15     A.    Yes.
16     Q.    And did you download, or did you do
17  everything that you were asked to do with all three
18  devices?
19     A.    Yes.
20     Q.    Talking about the Samsung device, you were
21  able to image or download that phone successfully?
22     A.    Yes.
23     Q.    And I think you ran the data through several
24  programs that you guys have to detect images of nudity
25  or -- or pornography or things like that?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 26

1      A.   Right.
2      Q.   Right.  I have had a chance to look at your
3  report.  It says that a download revealed several items
4  of interest.  I think that's the way you phrased it in
5  your report.  Did I recall that correctly?
6      A.   Files of interest is usually how I write it.
7      Q.   "Files of interest."  And by that, you --
8  you -- do I understand correctly, you simply meant that
9  these files may contain pornographic or nude images of
10  individuals?
11     A.   Correct.
12     Q.   You did not make any determination that these
13  files contained minors during your -- your work as a
14  forensic download specialist?
15     A.   Correct.  It's -- unless it's overly obvious,
16  as in it's a -- you know, like a toddler or something
17  like that, and still, it's -- it's not my job to make
18  that determination.  I'm am not charging anybody.
19  Unless I find a crime of some other type that's not
20  related to the case with ICAC investigations, I'm
21  sending it to the ICAC detectives to let them do their
22  job.  So I just note that I saw something that seemed
23  like it should be of interest, and I send it to the
24  detective to let them...
25     Q.   But I'm just trying to clarify.  When you say

Page 27

1  "of interest," it's just because there is a picture of
2  a -- of a nude individual or -- or potentially
3  pornographic image.  You're not making a value judgment
4  upon the age of the person depicted in those images?
5      A.   In this case, I think there were a lot of
6  what we would categorize as age-difficult, but, yes,
7  for the most part, it was a lot of nudity.
8      Q.   Okay.
9      A.   Yes.
10     Q.   And you didn't see anything that you, in your
11  experience, would categorize as -- as obvious, I think
12  you used the term obvious child pornography?
13     A.   Correct, I did not.
14     Q.   You also made a notation, I think I under --
15  or I saw it somewhere, there were no file-sharing apps,
16  things like BitTorrent.  I'm not even sure what that
17  is.  What is BitTorrent?
18     A.   BitTorrent is -- it's a type of peer-to-peer
19  sharing.  Do you remember like Napster back in the 90s?
20     Q.   I do.
21     A.   It's similar to that, where people will
22  share -- like say if I want to share a movie, I can --
23     Q.   Right.
24     A.   -- upload it into a BitTorrent file and then
25  put it onto a platform where 20 different people can

Page 28

1  share from, you know, multiple files, and then they
2  share with a hundred different people.  And it's just a
3  quicker way to share files.
4      Q.   You didn't find anything like that on -- on
5  any of the devices that you imaged of Mr. Lawshe's,
6  correct?
7      A.   No, sir.
8      Q.   I have heard the term "dark web."  Is it --
9  8chan or 4chan or things like that, is that different
10  than file sharing or...
11     A.   Yeah, that's more of a forum-based service.
12     Q.   Did you -- did you find any evidence like
13  that -- that -- that -- I don't even know, some sort of
14  a platform device or something on any of these devices
15  that would have shown that there was -- he had been
16  accessing things from these sort of dark web places?
17     A.   I -- not really dark web.  I did see some
18  like forum-based websites.  I wouldn't categorize them
19  necessarily as illegal.  They were definitely related
20  to pornographic like sharing --
21     Q.   Sure.
22     A.   -- and stuff like that, but I wouldn't say
23  not illegal.  It's -- per se, you know.
24     Q.   You saw, I think, a lot of information
25  that -- you're just saying a public website that deals

Page 29

1  in pornography.  That's what you're talking about,
2  right?
3      A.   But it was like a forum-based, you know,
4  people can get on there and just talk to each other.
5  Not like a -- like a chat site where -- you know, where
6  you would get on like Yahoo Messenger or something like
7  that, but it's -- when you say "4chan," 4chan is really
8  a forum similar to Reddit where you post something and
9  people respond back and forth to what the original post
10  is.  And that's -- if I remember correctly, 4chan or
11  8chan is like that, and you can post pictures, you can
12  post videos in response to an original post, and there
13  was at least one thing that was similar to that.  But I
14  think it was more along the lines of somebody posts
15  something and people would send nudes to that post or
16  nude pictures to that post.  And I -- not that I really
17  dug a lot into it, but I think that's what that website
18  was for.  But it was -- as far as I can tell, it wasn't
19  anything really illegal about it.  I didn't dig a whole
20  lot into it because --
21     Q.   Okay.
22     A.   -- it didn't seem --
23     Q.   All right.
24     A.   -- nefarious.
25     Q.   You were not involved at all in the decision

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 30

1  to bring Mr. Lawshe in or effectuate arrest on him,
2  were you?
3      A.  No.
4      Q.  All right.  After you imaged the phone -- the
5  devices and you turned over that data to Detective
6  Preston, what was the next involvement that you had
7  with this case?
8      A.  I don't think there was really much more
9  involvement.  I know there was a search of his car, and
10 I stood by in case they needed me to identify anything,
11 but I didn't really search.  And I was only there for a
12 couple minutes, and I tried to -- I tried to image his
13 computer, which didn't work out well.  His work
14 computer.
15     Q.  Okay.  But I --
16     A.  I -- like not really a whole lot of anything.
17     Q.  Okay.  I have -- I have a record that you met
18 twice about this case separately.  And I'm not trying
19 to -- I know you meet with a lot of people a lot of
20 times, right, so I know you're not intentionally trying
21 to, you know, whatever, but I understand that you met
22 with an Aaron Weiss.  Do you know who Aaron Weiss is?
23     A.  Yes.  Yeah.
24     Q.  Okay.  And then -- and then I think maybe he
25 has a colleague named Santiago.  I'm not sure what his

Page 31

1  last name is or if that is his last name.  Do you know
2  Mr. Santiago?
3      A.  Yes.
4      Q.  All right.  And then I -- I understand that
5  you met a second time with Mr. Weiss, and this time
6  Mr. Pierce was present, and I believe some St. Johns
7  County and the Assistant State Attorney were present
8  for that second meeting.
9      A.  Yeah, yeah, yeah.
10     Q.  Do you recall that?
11     A.  Uh-huh.
12     Q.  Okay.  I want to go to the second meeting, if
13 I could.  And I believe that happened in late October
14 2023.  Do you have any reason to disagree with the
15 timeframe of that?
16     A.  No.
17     Q.  Okay.  Do you recall who was present for that
18 meeting?
19     A.  I think it was just -- I don't remember Aaron
20 being there, but maybe he was.  I remember Mr. Pierce,
21 and if it's the meeting I'm thinking of, it would be
22 Kaitlyn Payne and the State Attorney and Crawford
23 Pierce and, yes, Aaron Weiss was there, and me, yes,
24 and I don't -- well, no, I think it was just us four.
25     Q.  You think the -- that Detective Preston was

Page 32

1  there?
2      A.  I don't think so.
3      Q.  Okay.
4      A.  I don't remember, but I don't think so.  I do
5  remember that, yeah.
6      Q.  Okay.
7      A.  I didn't know that was the involvement you
8  were you talking about.  I thought you meant like as
9  far as in -- like --
10     Q.  You meet with people almost every day,
11 probably, about your forensic downloads, correct?
12     A.  Yeah.
13     Q.  Okay.  So, you know, most people remember
14 their deposition taken, but, you know, it happens so
15 often with you, you don't recall that, and I understand
16 totally.
17     A.  Absolutely.
18     Q.  Don't apologize.
19         What do you recall about that second meeting?
20     A.  We were reviewing the images that Mr. Lawshe
21 was charged with, and Mr. Pierce was asking -- or him
22 and Ms. Payne were arguing over the content, and there
23 was a watermark on the bottom of the images, and
24 Mr. Pierce wanted to go to the websites, and so we went
25 to the websites, and on one of the images in

Page 33

1  particular, there's a -- you only see a portion of the
2  female's body, which just shows from like the bottom of
3  her hips to the top of her thighs, and we were able to
4  find the image and then find her entire body in that
5  image, and, I mean, you can see her whole body from
6  that as opposed to just her vagina.
7      Q.  Is it unusual in your experience for an image
8  like that, that just shows like hips to vagina, to be
9  charged as possession of an image of a minor, a
10 pornographic image of a minor?
11     A.  I wouldn't say unusual.
12     Q.  Well, let me ask you this.  How long did it
13 take for you to -- I understand that you were asked to
14 actually drive the computer in this, so you were like
15 typing in the websites and all that kind of stuff.  Is
16 that your recollection?
17     A.  Yes.
18     Q.  And I also have information that all of the
19 images had information on them related to a website; is
20 that correct?
21     A.  Yes.  Well -- oh, those three images, yes.
22     Q.  Those three images that he was charged with
23 all had some type of reference to a website on them,
24 correct?
25     A.  Yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 34

1    Q.   How long did it take you to locate that image
2  on the website, the image that you're talking about,
3  with the hips to the vaginal area?
4    A.   I don't remember.  Twenty minutes, maybe,
5  30 minutes.
6    Q.   Okay.  I understand that you guys actually
7  went to multiple websites that day?
8    A.   I wouldn't think multiple, maybe two.  Two,
9  three.  Yeah.
10   Q.   Two or three websites.  And you were able to
11 locate both of the models on those websites?
12   A.   Correct.
13   Q.   Just for the record, so we understand, there
14 were three images that Mr. Lawshe was charged with,
15 correct?
16   A.   Yes.
17   Q.   There were two images of one model and one
18 image of another model; is that right?
19   A.   Correct.
20   Q.   All right.  Both of the websites or the
21 websites that you went to represented that the models
22 in question were adults, correct?
23   A.   Correct.
24        MR. CARSON:  Object to form.
25        MS. SHEVLIN:  Join.

Page 35

1        MR. ROBERTS:  I want to make sure that the
2    court reporter got that answer.  You said
3    "correct."  Those websites did represent that the
4    models were adults; is that correct?
5        THE WITNESS:  Yeah, they represented every
6    model on their websites were adults.
7  BY MR. ROBERTS:
8    Q.   Okay.  They -- these websites also contain a
9  disclaimer that the websites were complying with
10 federal age verification laws; is that correct?
11   A.   If I remember correctly, yes.
12   Q.   Now, Mr. Pierce actually asked you to print
13 out that disclaimer, did he not?
14   A.   I don't remember.
15   Q.   Do you remember the Assistant State Attorney
16 instructing you not to print it out?
17   A.   I don't remember that either, no.
18   Q.   Okay.  You said they were arguing.  Do you
19 recall that that might have been one of the things they
20 were arguing about?
21   A.   It's possible.  They argued a lot that day.
22   Q.   Okay.  When you saw the full image of the
23 model who is the subject of the picture of just
24 bellybutton to her vagina --
25   A.   Uh-huh.

Page 36

1    Q.   -- you recall the image that I'm talking
2  about?
3    A.   Yes.
4    Q.   And you recall seeing the image of her, of
5  her face.  Yes?
6    A.   I don't remember what her face looks like,
7  but I do remember -- I remember what you're talking
8  about, yes.
9    Q.   You actually just reviewed these images just
10 within the last couple of days?
11   A.   Not the one of her whole face, yes.
12   Q.   Right.  Were there any images that were
13 charged that showed her face?
14   A.   I don't remember what she looked like.  Oh,
15 you mean of the charged one?  No.
16   Q.   Okay.  So Mr. Lawshe was charged with
17 possession of child pornography on three images,
18 correct?
19   A.   Correct.
20   Q.   Two of them didn't show the face of the
21 model; is that correct?
22   A.   Two of them showed the face of --
23   Q.   The one model?
24   A.   -- of the one model.
25   Q.   Okay.  Okay.  All right.

Page 37

1    A.   And one didn't show.  One just had -- well,
2  one had the one clip, or it had three different females
3  in it, and I guess the section that was actually being
4  charged was the one that just showed the girl's vagina,
5  and there was the two other girls in the picture, I
6  believe.
7    Q.   Yeah, the two other girls appear to be adults
8  or at least arguably adults?
9    A.   I believe so.  I'm not sure about it.  Yeah.
10   Q.   All right.  Now, you are a -- you at least
11 were an IPAC investigator, correct?
12   A.   Uh-huh, yes.
13   Q.   You are familiar with the statute that -- the
14 crime that Mr. Lawshe was charged with?
15   A.   Yes.  It's been a long time since I've read
16 it, but yes.
17   Q.   In Section 827.071, Subsection 5, Possession
18 of child sexual abuse material, I'm going to ask you a
19 couple of questions about it, and I'm not -- you can
20 say you don't remember or you don't know, like I'm not
21 trying to trick you here.
22        But you were trained in investigating cases
23 of possession of child pornography, correct?
24   A.   Yes.  A long time ago, yes.
25   Q.   Right.  You understand because of your

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 38

1  training that the law requires -- in order to be guilty
2  of this crime -- knowing possession of the -- of the
3  image; is that correct?
4       A.   Knowingly being in possession?
5       Q.   Yes.
6       A.   I would believe so, if that's in the statute,
7  yes.
8       Q.   And look, why don't I just -- I'm not trying
9  to -- let me -- rather than fumbling around with this,
10  I'm just going to share, and I can -- we can make this
11  an exhibit, I guess.  It's the Florida Statute on --
12  okay.  This is Subsection 5 of 827.01, sexual
13  performance by a child.  Did I read that correctly?
14       A.   Uh-huh.
15       Q.   And then Subsection 5-A, I'm just going to
16  read it so you don't have to squint and look at your
17  computer.  It says, "It is unlawful for any person to
18  knowingly possess, control, or intentionally view a
19  photograph, motion picture, exhibition, show,
20  representation image, data, computer depiction or other
21  presentation which in whole or in part he or she knows
22  to include any sexual conduct by a child."  Did I read
23  that correctly?
24       A.   Yes.
25            (Plaintiff's Exhibit No. 1 was marked for

Page 39

1  Identification.)
2  BY MR. ROBERTS:
3       Q.   Does that refresh your recollection from your
4  training about what the law is regarding possession of
5  child pornography?
6            MR. CARSON:  Object to form.
7            MS. SHEVLIN:  Join.
8  BY MR. ROBERTS:
9       Q.   Does it refresh your recollection?
10       A.   Yes.
11       Q.   All right.  So you would agree in order for
12  there -- in order for a person to have committed this
13  crime, they would have to know that the models were
14  minors.  Is that your understanding, from your
15  training?
16            MR. CARSON:  Object to form.
17            MS. SHEVLIN:  Join.
18            THE WITNESS:  Yeah and no.  I would think
19       if -- if you're looking for -- if you're looking
20       for young teens, then I don't know.  It just --
21       it -- at some point you're going to end up down a
22       rabbit hole, and you're going to get hurt.  And
23       it's just -- it's bad.  Technically knowingly in
24       possession, yes.  But it's just as bad.
25

Page 40

1  BY MR. ROBERTS:
2       Q.   You agree that it's legal to possess
3  pornographic images of an adult in the United States?
4       A.   Yes.
5       Q.   And you -- you understand that that means
6  anyone 18 years or older, correct?
7       A.   Right.
8       Q.   You understand that in order to be a minor,
9  the individual has to be below 18, correct?
10       A.   Yes.
11       Q.   Now, you said it's bad.  Are you saying like
12  it's morally wrong to look at an 18 or a 19 year old;
13  is that what you mean?
14       A.   No, no, no, no, no, no.  I'm just saying that
15  if he's -- I don't know.  I just -- I think -- he's
16  digging himself further.  And I'm just saying,
17  theoretically, I'm not saying your client, I'm just
18  saying a person that keeps doing this kind of stuff is
19  going to end up getting themself in a -- in a -- a
20  hole, in a -- you know, I've seen it time and time
21  again, that people just keep digging themself into a
22  hole, and they just go down in this pit, and they end
23  up in bad spots with this stuff, so I don't know,
24  I'm --
25       Q.   Do you think it's a bad spot to be on a

Page 41

1  public website that has a disclaimer that all of the
2  models are verified under federal law to be adults?  Do
3  you think that's a bad spot?
4       A.   No.  No.  No.  It's -- it's legal to be on a
5  legal website.
6       Q.   So do you believe that the information which
7  you saw that represented the models that Mr. Lawshe was
8  charged with was readily available to any investigator
9  who chose to investigate that?
10       A.   It could have been, yes.  Those websites can
11  sometimes be very sketchy or can be very --
12       Q.   Sure.
13       A.   It's a lot of times probably why people are
14  nervous about going to them, especially if they end
15  with like dot RU or dot TO or something like that, you
16  know, those are -- people worry about getting viruses
17  and stuff like that, and that's...
18       Q.   All of these websites ended with a dot com,
19  correct?
20       A.   As far as I recall, yes.  But -- or at least
21  those two, yes.
22       Q.   As an ICAT trained investigator, are you
23  familiar, at least nominally, with federal age
24  verification requirements?
25       A.   Honestly, no.  I wasn't, no.  But I

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 42

1  understand it.  I understand that.
2      Q.   Right.  Right.  And as an ICAT investigator,
3  you certainly have access to understand what those laws
4  are and what that means, correct?
5      A.   Yes.
6      Q.   The websites that you viewed with Mr. Pierce
7  and the Assistant State Attorney, they actually cited
8  the federal statute, didn't they?
9      A.   I don't recall.  But I'm sure they did, yeah.
10     Q.   Okay.  All right.  So were you aware that
11 that law requires their website to have a records
12 custodian?
13     A.   No, that wasn't --
14     Q.   All right.  Well, let me ask you this.  That
15 type of -- of work that you did there with Mr. Crawford
16 and the Assistant State Attorney, is that the type of
17 thing when you said when we began is that you wish they
18 would have taken a little bit more time with this
19 investigation, is that the kind of thing that you wish
20 would have happened before Mr. Lawshe was arrested?
21     A.   Yeah.  Yeah, among other things, you know.
22 But yes.  Yeah.
23     Q.   What other things?
24     A.   I mean, nothing specific.
25     Q.   Okay.

Page 43

1      A.   Just, you know, yeah.
2      Q.   So viewing those websites that you did with
3  Mr. Pierce and the Assistant State Attorney, in your
4  opinion -- and I understand it was not your
5  investigation -- but in your opinion, raised serious
6  doubts about what probable cause existed that
7  Mr. Lawshe had committed a crime in this matter,
8  correct?
9          MR. CARSON:  Object to form.
10         MS. SHEVLIN:  Join.
11         THE WITNESS:  Not -- well, so there's more to
12     the development of probable cause than just the
13     image itself when you're dealing with the issue of
14     an age-difficult image, so you come across an
15     image of what you believe to be a potential, like
16     an older teenage, in this case, female, or a -- an
17     older male, you know, with pubic hair, you know,
18     chest tissue or whatever, pectoral muscles, you
19     still -- you know, you're looking at a face that
20     still looks like a child or something like that,
21     or in this case you're seeing a female is starting
22     to develop breasts or pubic hair or hip
23     development, but in the face you still look like a
24     child, they have -- the investigators are supposed
25     to take it to a doctor, and in this case they

Page 44

1      didn't, and the doctor agreed that it looked like
2      a child, and that was enough to develop probable
3      cause, so, you know, technically probable cause
4      was there.
5          MR. ROBERTS:  We're going to get back to that
6      in a second.
7          THE WITNESS:  Okay.
8  BY MR. ROBERTS:
9      Q.   But let me ask you this.  Had you had that
10 information that the -- the websites were telling --
11 well, let me ask you this.  Do you agree that -- let's
12 say hypothetically one of these models was 17 years
13 old.  Okay?  Do you understand my hypothetical?  Let's
14 just say -- we know they weren't, but let's just say
15 they were 17.
16         MS. SHEVLIN:  Objection.  Not established.
17         MR. CARSON:  Join.
18 BY MR. ROBERTS:
19     Q.   We'll establish it in a second.  Have you
20 seen the images of the models with their passports?
21 Have you seen that?
22     A.   Uh-huh.
23     Q.   Is that a yes?
24     A.   Yes.
25     Q.   You've seen this.  Okay.

Page 45

1          Let's just hypothetical that they were 17.
2  If the evidence was, as an investigator, that
3  Mr. Lawshe had reason to believe that they were 18,
4  that's not a crime to possess those images under
5  Florida law, is it?
6      A.   No.
7          MR. CARSON:  Object to form.
8          MS. SHEVLIN:  Join.
9  BY MR. ROBERTS:
10     Q.   Your answer was no?
11     A.   No.
12     Q.   Right.  So really, whether an expert
13 physician comes to an expert opinion about the age of
14 an individual doesn't really bear on Mr. Lawshe if he
15 committed a crime or not, does it?
16         MR. CARSON:  Object to form.
17 BY MR. ROBERTS:
18     Q.   Does it?
19     A.   I don't know what you want me to say here.
20     Q.   It doesn't, does it?
21     A.   I --
22     Q.   Yes or no?
23         MS. SHEVLIN:  Form.
24         THE WITNESS:  Okay.  Okay.
25

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 46

BY MR. ROBERTS:

Q.   Okay.  All right.  If you would have been the
investigator in charge and you had seen the full images
in the context of the website, with the representations
made on the website, you would not have charged
Mr. Lawshe with possession of child pornography, would
you?

A.   I can't say.  I might have made different
decisions.  I -- I don't know.

Q.   Okay.

A.   I mean, it wasn't my investigation.  I don't
want to second-guess somebody else one way or another.

Q.   Do you believe that any reasonable
investigation of these images should include visiting
the websites that are referenced on the images
themselves?

A.   If possible.  I would -- I would like to --
if -- if -- if circumstances -- if the circumstances
allow, yes.  I think we should be able to.

Q.   And in this case, the circumstances did
allow?

A.   I don't know the entire circumstances.  You
know, I wasn't -- I wasn't here for it, for the
beginning of that.  I don't know what happened at the
beginning of what was going on.

Page 47

Q.   Well --

A.   It wasn't included in the part.

Q.   When you were in a room with nothing but the
images themselves, you were able to locate both of
these models on --

A.   Correct.

Q.   -- looking on the internet, correct?

A.   Correct.  I mean, from before I became
involved.  I don't know what happened up to the time.

Q.   Correct.  But you do know that
Detective Preston had the three images that you were
looking at, at the end of October, 2023.  You know that
she had possession of those images prior to making the
decision to arrest Mr. Lawshe, correct?

A.   Yes.

Q.   So with those images and with those images
alone, she had the ability to easily access those
models on the internet, correct?

A.   Well, I don't know that she knew that she
could, though.  Honestly it's --

Q.   Okay.  You don't know --

A.   Up to that point.  Up to that point they did
not have the same internet access that we do in the
lab.  We had just moved the forensic lab across the
hall.  It opened up on -- I think within a couple of

Page 48

months -- across from their hall.  We have an
undercover internet line in our lab.  They have one
now.  They didn't have it at that time, I don't think.

Q.   She could have walked across the hallway and
asked you to help her, correct?

A.   She could have, but I don't think she knew
that.  Now, I'm not making excuses for her.  She could
have been able to do that.  But I'm just saying there's
a possibility that she didn't know that.

Q.   Well, she came and asked you to help download
the images from the subpoena return, correct?

A.   Yeah.  I'm just saying.  Yeah.

Q.   She's testified actually that she regularly
would go to you for help --

A.   She did.

Q.   -- for difficult matters, correct?

A.   Yes.

Q.   Detective Preston regularly came to you for
technical internet data assistance prior to making the
decision to arrest Mr. Lawshe, correct?

A.   Yes.

Q.   But she did not come to you asking you to
help her access these websites that were available
through looking at the images in Mr. Lawshe's case, did
she?

Page 49

A.   No, she didn't.

Q.   So after this -- after this meeting where you
viewed these -- you identified these models on -- on
the internet, did you have any further conversations
with anyone about this case?

And let me say this.  Up until the point --
let me just ask it -- that's a bad question because I
know you have, right?  We're sitting here talking about
it now.

Did you ever go to Detective Preston and
express concerns about the investigation and the
evidence in this case, given your meeting -- I think it
was October 29th, 2023 -- with Mr. Pierce and the
Assistant State Attorney?

A.   I don't remember.  I probably told her about
finding that full picture on the internet, but I don't
remember.

Q.   Okay.

A.   When did you say the -- the meeting with
Crawford Pierce was?  Was it October?

Q.   I think it was like October 29th, I think is
what I have.

A.   Of last year?

Q.   Of 2023.  Not last -- so, I mean, is that
last year?  Yeah, I guess it's 2024.  The years run

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

Page 50

1  together now.
2      A.  I know.  Believe me, a lot has happened since
3  then, so...
4      Q.  If you don't remember, that's okay.
5      A.  Yeah, I don't.  I don't remember.
6      Q.  But fair to say you did have concerns about
7  the evidence against Mr. Lawshe at that point?
8      A.  Well, just the simple fact that we found
9  that, I probably told her about that, I would just
10  guess.  I just don't remember any of it.
11      Q.  Right.  So at some point you actually saw the
12  images with the models, the two models with pictures of
13  their -- of their passports?
14      A.  Yes.
15      Q.  Tell me, how did that happen?  How did that
16  come to pass?
17      A.  Whenever I -- I guess Mr. Pierce contacted
18  after that meeting, I think he contacted whatever
19  company it was, metart.com., and they sent him the
20  pictures, and either he sent them to the State Attorney
21  in -- I think he sent them to the State Attorney, and
22  either she sent them to Detective Preston and me, or
23  somehow they got to me.  And they showed them to me,
24  so...
25      Q.  Do you remember the context?  I mean, did you

Page 51

1  have a conversation with somebody about them or...
2      A.  I don't know.  I don't remember.
3      Q.  The --
4      A.  The picture doesn't -- it doesn't -- like,
5  when you first look at it, it doesn't look like the
6  girl in the photos because she doesn't have makeup on.
7  But, you know, once you look at her, you can tell it's
8  definitely the same girl.  It's just...
9      Q.  Both of the models, I just want to confirm,
10  you saw an I.D. and photographs of the two models that
11  were depicted in the images that Mr. Lawshe was charged
12  with, correct?
13      A.  I have seen both of the photo ID's.  Like I
14  said, I don't remember what the other one's face looks
15  like, so I, you know, couldn't tell you.  I just --
16  the -- the one girl who has the Ukrainian passport,
17  there's the two photos or the two images that have her
18  face, so I can compare to her.  But the other one, I --
19  I don't have the original picture of her face.
20      Q.  Because -- because her face wasn't charged?
21      A.  Right.  Correct.
22          And we didn't screenshot the -- the website
23  for her face, that I remember.
24      Q.  So let me ask you, do you know anything about
25  metart.com?

Page 52

1      A.  A little bit, not much.
2      Q.  What do you know?  Let me ask you this.
3  Before I ask you this, I want to ask a better question.
4  When did you know prior to Mr. Lawshe's case?
5      A.  I had read -- I know -- I mean, I know what
6  you're getting at.  I had read somewhere back when I
7  was doing ICAC investigations that they used 17 year
8  old models from the Ukraine back years ago.
9      Q.  What was the source of that?
10      A.  Something when I was doing investigations
11  when I was -- I read it on the internet somewhere.
12      Q.  You read it on the internet somewhere?
13      A.  I can't remember.  I mean, I don't have it in
14  a book or anything.
15      Q.  No, but, I mean, like, was it a -- a Google
16  review or...
17      A.  I don't recall.  That was almost ten years
18  ago, you know.
19      Q.  So you have no idea if that was a credible
20  accusation?
21      A.  I don't recall.  It could have been at the
22  time.  I just -- I mean, I don't have it.
23      Q.  It could have been credible, but it also
24  could have not been credible, correct?
25      A.  I mean, it very well -- I mean --

Page 53

1      Q.  I mean --
2      A.  It was -- it was from 2015 or 2016.  I
3  don't -- I don't have -- it's something I remembered
4  from when I was in ICAC.
5      Q.  Okay.  All right.  Actually not what I was
6  going to, but I appreciate it.  I was going to go
7  there.
8          Have you ever visited -- have you ever --
9  have you ever Googled metart.com in response to this
10  case?
11      A.  Yes.  This morning.  Yeah.
12      Q.  Okay.  Okay.  Okay.  Did you and Ms. -- did
13  you and Detective Preston Google metart.com together at
14  any point in time?
15      A.  Not that I recall.
16      Q.  Did you tell her that metart.com was
17  publishing illegal content?
18      A.  I don't think so.
19      Q.  All right.
20      A.  Did I?  Did she say I did?  Because I don't
21  remember telling her that I did.
22      Q.  Okay.  You made a comment about -- well, I'm
23  going to go through something else first.  You said you
24  reviewed the NCMEC report?
25      A.  Yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 54

1    Q.   Would you agree with me that there are
2  factual discrepancies or false statements contained
3  within that NCMEC property?
4    A.   In what regard?  I don't -- I don't remember
5  the entire NCMEC report.
6    Q.   Sure.  So you recall -- you have reviewed the
7  image that was the subject of the NCMEC report,
8  correct?
9    A.   Yes.
10   Q.   All right.  Let me just -- are you familiar
11 that a NCMEC report categorizes the content contained
12 within the -- the image, the subject image?
13   A.   How so?
14   Q.   A-1, A-2, B-1, B-2.
15   A.   Yeah, I -- I know that they do that but...
16   Q.   Okay.  Let me -- do you recall what that
17 means?
18   A.   Not really, no.
19   Q.   Okay.  I'm showing you the NCMEC report, and
20 it's dated January 25th, 2023; is that correct?
21   A.   Yes, sir.
22   Q.   You reviewed this report within the last
23 several days or some time in preparation for today's
24 deposition?
25   A.   Very quickly.

Page 55

1    Q.   Okay.  So the number right here under further
2  information on uploaded files, I'll just read it.  In
3  each category it says, "A-2," and then it has a "1."
4  Do you see that?
5    A.   Yes.
6    Q.   Did I read that correctly?
7    A.   Yes.
8    Q.   Right.  A stands for prepubescent minor,
9  correct?
10   A.   Yes.
11   Q.   All right.  2 is lascivious exhibition,--
12 that's a hard word to say -- correct?
13   A.   Yes.
14   Q.   All right.  The model in the image was not
15 prepubescent, correct?
16   A.   This is the one where the -- the girl is
17 facing away from the camera.
18   Q.   Knee -- chest to knees, there's pubic hair
19 present?
20   A.   Yes.  Yeah.
21   Q.   She's not prepubescent, correct?
22   A.   Correct.  Right.
23   Q.   And it also says that this image was not
24 available to the public.  That was not correct either,
25 was it?

Page 56

1    A.   And I think what it's saying as far as not
2  available to the public, it's not available to the
3  public from him.  Like, it's -- it's coming from his --
4  his cloud system.  Like, he's not making it publicly
5  available.  And I don't know.  You'd have to get with
6  NCMEC about that.  I'm not positive.  I don't --
7    Q.   Well --
8    A.   I don't read their reports on a constant
9  basis.  It's just on a -- like a need-to-know like as
10 far as the only -- realistically, the only reason I
11 review their reports is so when we have an
12 investigation or we're doing downloads from an ICAC
13 case is so I know what images or videos I'm looking
14 for.  It helps us to kind of narrow the scope of our
15 investigation to help them to get stuff done a little
16 quicker.
17   Q.   Well, when you were an ICAC investigator, you
18 regularly looked at them, correct?
19   A.   Yeah.  But again, that was eight, nine years
20 ago.
21   Q.   Okay.  You made a comment, and I think it's a
22 term of art, it's called "age-difficult."  What does
23 that mean?
24   A.   It means it's a -- where it's beginning to --
25 or it's where a person, a human being, is developing

Page 57

1  physically because of puberty it's hard to tell an
2  approximate age.  It's obvious they're no longer a -- a
3  small child or an infant or a toddler because of
4  puberty developing where they are getting pubic hair.
5  In females it's breast development, hip dysplasia.  In
6  males it's pubic hair, pectoral muscles, testicles are
7  starting to drop, stuff like that.  So for us, it --
8  it -- it's a -- it's a level of categorization where
9  it's -- we call it age-difficult.  It's kind of a --
10 for -- for categorization purposes as far as child
11 sexual abuse material, we have, you know, absolute
12 CSAM, then age-difficult or child erotica and then
13 nonchargeable and then there's a few other
14 categorizations but...
15   Q.   And we've used the word "CSAM."  Let's tell
16 the court reporter what CSAM is.
17   A.   CSAM is child sexual abuse material.
18   Q.   All right.  Age-difficult kind of means what
19 it sounds like.  It's difficult to tell how old this
20 individual is?
21   A.   Correct.
22   Q.   And are you familiar with a NCMEC
23 categorization of unconfirmed child pornography?
24   A.   Yes.
25   Q.   And isn't it the case that this report from

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 58

1  NCMEC was a report of unconfirmed child pornography?
2      A.   I believe that's what they would consider it,
3  that it's -- I think what they're saying, and you'd
4  have to check with them again, is that somebody is
5  reporting this, and in this case it would be -- I
6  believe it would be Synchronoss is reporting to NCMEC
7  that they think that this is child pornography.  NCMEC
8  is reporting to us is unconfirmed because the hash
9  values on the picture do not match something that is
10  known to them as child pornography.  NCMEC doesn't make
11  that determination.  They only report what they have
12  known in their data base as confirmed child pornography
13  because of the hash values.
14      Q.   You understand, though, that when you get
15  a -- a NCMEC report of unconfirmed child pornography,
16  NCMEC is not communicating to St. Johns County
17  Sheriff's Office or any ICAC investigator that they
18  have confirmed that this is child pornography?
19      A.   They -- they will confirm that it is child
20  pornography, if they have the hash values to confirm
21  that it is.  They'll -- well, they won't confirm that
22  it's child porn.  They'll say these -- these are known,
23  you need to confirm with us that these are known images
24  or known videos.
25      Q.   And in this case, they were not able to

Page 59

1  confirm that it was child pornography?
2      A.   Correct.  Correct.
3      Q.   And so you understand that by getting this
4  NCMEC report that is unconfirmed, St. Johns County
5  Sheriff's Office has to do some investigation to
6  determine whether it is child pornography or not child
7  pornography.  They cannot just rely on this NCMEC
8  report?
9      A.   Correct.
10      Q.   Also, I mean, as you pointed out, I mean,
11  would you consider the fact that the report says that
12  this a prepubescent individual and that's just not
13  true, is that -- does that affect -- as an
14  investigator, would that affect your -- your viewing or
15  the credibility of this tip?
16      A.   Well, I mean, again, I'm not the investigator
17  on this, so, you know, I -- it would but...
18      Q.   Right.  If you were the investigator -- if
19  you were the investigator, it would raise a question
20  about the credibility of the tip, in your mind?
21      A.   Yeah.  Yes.  Correct.
22      Q.   Okay.  And I have no idea.  This is an
23  open-ended question.  How many NCMEC reports -- and
24  let's just use the timeframe of, you know, first
25  quarter of 2023, how many NCMEC reports, cyber tip

Page 60

1  reports, does St. Johns County Sheriff's Office
2  receive, however you would like to estimate it, daily,
3  weekly, monthly?  Can you estimate?
4      A.   I -- I don't know off the top of my head, but
5  just as a guesstimation, when I was doing it in 2015 to
6  2017, we got about, I think, seven a month, and now
7  they're getting easily like a hundred a month.  If not,
8  maybe a little less, maybe a little more.  I -- I know
9  that they had, I think, 300 in the first three months
10  or something like that.  It's -- it's crazy considering
11  there's only a handful of people in there, so they have
12  a lot.
13      Q.   How many of those images are just not
14  chargeable, it's just -- it's just not child
15  pornography that they're getting in these cyber tips?
16      A.   I don't know.  We -- I don't -- I don't -- I
17  just can't answer.  I don't know.  Yeah.
18      Q.   But are you aware it happens on a fairly
19  regular basis that a NCMEC report will contain an image
20  that does not constitute a chargeable possession of
21  child pornography material?
22      MS. SHEVLIN:  Form.
23      THE WITNESS:  I can't answer.  I don't know.
24      I don't -- I don't look at cyber tips unless they
25      are specifically related to a case.

Page 61

1  BY MR. ROBERTS:
2      Q.   Back when you were doing it, were there times
3  where you got a NCMEC report and you're like you looked
4  at it and go, No, this is not something that we can
5  charge?
6      A.   I think so.  I -- yeah.  Well, you know, we
7  only got them, like I said, like seven -- maybe seven a
8  month.
9      Q.   Okay.
10      A.   So...
11      Q.   All right.
12      A.   And most of them were like weird guys from up
13  north was chatting with a kid from here or something
14  like that.  They weren't really so much image-related.
15      Q.   I think we talked about, you know, the need,
16  and you thought, Well, we should go to a website, if
17  that's available.  I want to ask you a question,
18  though.  I mean, if -- if you have an image, and let's
19  just say hypothetically the detective believes that
20  it's a minor being depicted and published, would you
21  agree that the detective should make every effort
22  possible to identify the -- the model or the individual
23  being depicted in that image?
24      A.   Uh-huh, I do.
25      Q.   Yes?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 62

1    A.   Yes, I do.
2    Q.   I mean, the point of ICAC investigations is
3    to protect children from sexual exploitation, correct?
4    A.   Yes.
5        MR. ROBERTS:  You know, we've been going for
6    an hour.  Does anybody need a break?
7        MS. SHEVLIN:  A bathroom break sounds great,
8    actually.
9        MR. ROBERTS:  I'll get some coffee.  I
10   appreciate everybody's time.  Thank you.
11       MS. SHEVLIN:  All right.  See you all in
12   five.
13       (Off record)
14       MR. ROBERTS:  If we go back on the record, I
15   was talking to the court reporter -- I will, just
16   because I think maybe it was ambiguous, just make
17   the NCMEC report Exhibit 2.  I think Exhibit 1 was
18   the statute 82.071.  So am I right, there have
19   been only two things that I have shared?
20       MR. CARSON:  Can you e-mail those to the
21   court reporter?
22       MR. ROBERTS:  She put her e-mail in the chat,
23   so yeah, yeah, yeah.
24       (Plaintiff's Exhibit No. 2 was marked for
25   Identification.)

Page 63

1    BY MR. ROBERTS:
2    Q.   All right.  So Mr. Greene, I always do this.
3    We just had a break.  Did you discuss this case with
4    anyone during the break?
5    A.   No.  And I apologize, somebody put a lock on
6    this door and didn't give anybody the keys.
7    Q.   Okay.  All right.
8    A.   Gave us a nice office to do this stuff in
9    and...
10   Q.   I always say too, it's not inappropriate that
11   you did talk to someone.  It's not against the rules.
12   It's just I -- you know, we want to know.  So -- but
13   you didn't.  So...
14       MR. ROBERTS:  So Madam Court Reporter, I
15   think the last, were we asking like -- did I ask
16   something about it would be -- an officer should
17   make best efforts to try to identify any minor
18   depicted in a -- can you just ask the last
19   question, Madam Court Reporter, because I think I
20   already got an answer to that one.
21       THE COURT REPORTER:  Sure.
22       (Thereupon, the requested portion of the
23   record was read.)
24       MR. ROBERTS:  Okay.  Very good.
25

Page 64

1    BY MR. ROBERTS:
2    Q.   All right.  You were able to view the models
3    in question with their ID's, correct?
4    A.   Yes.
5    Q.   Are you satisfied, as we sit here today, that
6    at the time of these photo shoots that the models were
7    at least over the age of 18?
8    A.   No.
9    Q.   All right.  What evidence makes you think
10   that they were not?
11   A.   If I can see the -- the meta data from the
12   images, the original images, I would be satisfied.
13   Q.   Let me ask you this.  Does it at least raise
14   a question in your mind that needs to be investigated
15   before anyone got arrested for possession of these
16   images?
17   A.   Yes.
18       MR. CARSON:  Object to the form.
19       MS. SHEVLIN:  Join.
20   BY MR. ROBERTS:
21   Q.   Did anybody ask you to do any analysis on the
22   photographs depicting the -- the ID's?
23   A.   No.
24   Q.   Just so I know, you're -- you're not taking
25   the position that these models are under the age of 18,

Page 65

1    are you?
2        MR. CARSON:  Object to form.
3        MS. SHEVLIN:  Join.
4        THE WITNESS:  I'm not taking any position on
5    anything.
6    BY MR. ROBERTS:
7    Q.   Let me ask you this.  Could a -- in your
8    opinion, as an investigator, and you have looked at
9    these images and, you know, could a reasonable person
10   believe that these models were 18 at the time they were
11   depicted in these photographs?
12   A.   Yes.  And a reasonable person could also
13   believe that they are under 18.
14   Q.   And isn't that why the federal government has
15   given investigators the tools to use the federal age --
16   age verification statute?
17       MR. CARSON:  Object to form.
18       MS. SHEVLIN:  Join.
19       THE WITNESS:  The federal age verification
20   statute?
21   BY MR. ROBERTS:
22   Q.   The statute that was disclaimed and -- and
23   posted on the websites that you viewed with these
24   images.
25       MR. CARSON:  Object to form.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 66

1    MS. SHEVLIN: Join.
2    THE WITNESS: Sure.
3    BY MR. ROBERTS:
4    Q. Yeah, I mean, look, I think -- and look, I'm
5    just saying, like, it can be -- and I'm not talking
6    about specifically about Mr. Lawshe, okay, but you
7    agree it sometimes can be very difficult to tell the
8    difference between a 17 year old and a 19 year old?
9    You would agree with that, correct?
10    A. Yeah, absolutely.
11    Q. Right. And so if there was some law that
12    required publishers to keep and maintain age, you know,
13    IDs, that would be very helpful to law enforcement to
14    make those calls, correct?
15    A. Yes.
16    MR. CARSON: Object to the form.
17    MS. SHEVLIN: Join.
18    BY MR. ROBERTS:
19    Q. And in your understanding metart.com did
20    keep, at least what they purport to be, government
21    issued ID's of the models in question, correct?
22    A. From -- from what I have seen, which is only
23    this, the two pictures that I saw, yes.
24    Q. Did you ever -- were you provided the
25    affidavit from the record custodian?

Page 67

1    A. Not that I recall.
2    Q. Okay. But at least that -- I mean, you agree
3    that that is a tool that would help an investigator to
4    make that difficult decision, right?
5    A. Yes.
6    Q. And that way, you don't -- you don't have to
7    make this sort of like difficult choice, correct?
8    A. Correct.
9    Q. You made a reference earlier in your -- your
10    testimony like if you're searching for -- and I can't
11    remember the terms you used, I think you said like
12    young teens. You don't have any evidence of any search
13    terms that Mr. Lawshe was using on any of his devices,
14    do you?
15    A. As far as stuff like that?
16    Q. Yeah.
17    A. Correct, no.
18    Q. So when you said, "If you search for really
19    young teens," that was just a hypothetical that you
20    were using?
21    A. Right.
22    Q. You're not saying that Mr. Lawshe was
23    searching for, quote, young teens?
24    A. There -- there was some -- I think some
25    search history for like pornographic sites but nothing

Page 68

1    that would lead us to believe that there was any search
2    history for anything illegal, correct.
3    Q. Right. On the images in question, there was
4    nothing that stated that the individuals were minors,
5    was there?
6    A. On the three images, no.
7    Q. They weren't pretending to be minors?
8    MR. CARSON: Form.
9    BY MR. ROBERTS:
10    Q. You did not interpret them as pretending to
11    be minors?
12    MR. CARSON: Object to form.
13    MS. SHEVLIN: Join.
14    THE WITNESS: No.
15    BY MR. ROBERTS:
16    Q. You know what I mean, though, when I say like
17    people pretending to be minors?
18    A. Yes.
19    Q. Detective Preston sometimes pretends to be a
20    minor, doesn't she?
21    A. In -- in her job, yes.
22    Q. You're aware, I think, in 2022, 2023, she's
23    about 28, 29 years old?
24    A. I believe so, something like that. She was
25    parts of investigations where she was putting

Page 69

1    photographs of herself out and claiming to be 15 as
2    part of a -- a UC or an undercover operation but, yeah,
3    I believe so.
4    Q. So I mean, you know, as you are aware that
5    St. Johns County as a -- as a unit has attempted and
6    believes that they can credibly pass off a 28, 29 year
7    old as a 15 year old on the internet?
8    A. It's -- it's part of, you know, being an ICAC
9    investigator.
10    Q. Right. But these models weren't doing
11    anything like that, right? Like, they were saying,
12    Hey, I'm 15, or I just got out of my seventh grade
13    class or something like that, were they?
14    A. Not that I can tell --
15    MR. CARSON: Form.
16    THE WITNESS: -- with the two pictures, no.
17    BY MR. ROBERTS:
18    Q. Right. Would you agree with me that the fact
19    that a 28 or 29 year old female can success -- let me
20    ask you this. Has she successfully baited and fooled
21    somebody into believing that she was 15?
22    A. I wouldn't use the terms "baited" and
23    "fooled," no.
24    Q. Has she -- has St. Johns County convinced
25    another person, an individual that images of Detective

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 70

1    Preston were images of a 15 year old?
2        MR. CARSON:  Object form.
3        THE WITNESS:  Yeah, I'm not going to answer
4    that.  That's...
5    BY MR. ROBERTS:
6        Q.  Well, let me ask you this.  Have you -- has
7    St. Johns County Sheriff's Office arrested somebody for
8    attempting to meet up with Detective Preston who had
9    pretended to be a 15 year old?
10       A.  I -- I don't honestly know.  I --
11       Q.  Okay.  That's okay.
12       A.  -- don't keep track -- yeah, I don't have...
13       Q.  You can say "I don't know" at any time.  You
14   can say I don't know.  That's fair enough.
15           You would agree that photographs are highly
16   manipulatable especially terms of like the age of the
17   individual depicted?
18       A.  How so?
19       Q.  Well, a 29 year old could be made to look
20   like a 15 year old?
21       A.  What -- what does this have to do with --
22   with what I did in this case?  Because you're asking me
23   a whole bunch of stuff that's hypothetical that has
24   nothing to do with anything I did in this
25   investigation.  And it's been going on for at least

Page 71

1    like 45 minutes now.
2            I did nothing with any kind of manipulation.
3    I'm sure it's possible, but I don't know anything about
4    it.
5        Q.  Anytime you don't know the answer to a
6    question, you can say "I don't know."
7        A.  I don't know.
8        Q.  You understand why Mr. Lawshe is suing
9    Detective Preston, though, correct?
10       A.  I do, yes.  Yeah.
11       Q.  You understand that this -- this arrest
12   ruined his career?
13       A.  I absolutely do.
14       Q.  And ruined his personal reputation?
15       A.  I do.
16       Q.  Do you know who in St. Johns County Sheriff's
17   Office called the media after they made the arrest?
18       A.  No.
19       Q.  Do you understand that it was somebody from
20   St. Johns County Sheriff's Office that called the
21   media?
22       A.  No.  I -- I didn't even know the media got
23   called, honestly.
24       Q.  You never saw any news, TV, articles about
25   this case?

Page 72

1        A.  No.
2        Q.  Who called his supervisor at FWC before the
3    arrest?
4        A.  I don't know.
5        Q.  Are you aware that FWC was called and
6    notified of this investigation prior to the arrest?
7        A.  Well, I know that there was a supervisor that
8    was here because when I went into the office, into the
9    ICAC office, to -- they were talking to me about going
10   to the house to pick up the phone.  I think it was his
11   supervisor was in there, so -- and that was the only
12   kind of contact I had with anybody with FWC or with
13   fish and wildlife.
14       Q.  We talked about Dr. Dully for a moment, you
15   referenced her.  Have you -- did you, while you were an
16   ICAC investigator, use Dr. Dully in the investigation
17   of possession of child pornography cases?
18       A.  No, sir.
19       Q.  What is your understanding of her expertise?
20       A.  I -- I don't -- I believe, a pediatrician.  I
21   don't know.
22       Q.  You made a comment earlier, this is the
23   reason I'm asking, that if somebody was age-difficult
24   and people disagreed, that the policy was to call
25   Dr. Dully.  Did I understand that correctly?

Page 73

1        A.  Yes.  Well, a -- a doctor.
2        Q.  A doctor.
3            Do you believe -- go ahead.
4        A.  I never -- I never had to do that when I was
5    an investigator, but that would be the step to have to
6    go to.
7        Q.  Why not?
8        A.  I was lucky.
9        Q.  I mean, are you saying that all of the images
10   you charged were obviously child pornography?
11       A.  Correct.  Obviously young children.
12       Q.  You never made the decision to file charges
13   on an age-difficult person?
14       A.  Correct.
15       Q.  All right.  And again, I'm -- I'm -- I'm
16   just -- I don't know what you know, right, and so like
17   sometimes there are things that -- you know, if you
18   don't know the answer to the question, you can say "I
19   don't know."  Do you believe that Dr. Dully has the
20   ability to tell the chronological age of an individual
21   by looking at a digital picture?
22           MS. SHEVLIN:  Form.
23           THE WITNESS:  I don't know.
24   BY MR. ROBERTS:
25       Q.  Unfortunately, I guess, you have had to look

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 74

1 at a lot of pornographic images over your career; is
2 that correct?
3      A.    Yes.
4      Q.    And many of those are legal images of
5 pornography?
6      A.    Yes.
7      Q.    Correct?
8      A.    Yes.
9      Q.    You are aware that female models, adult
10 female models do practice on a regular basis grooming
11 of some type of their pubic hair?
12     A.    Yes.
13           MS. SHEVLIN:  Form.
14 BY MR. ROBERTS:
15     Q.    You're aware that there are multiple types of
16 grooming?
17     A.    Yes.
18     Q.    And you are aware that digital images can be
19 touched up to improve the esthetic appearance of things
20 like skin and hair?
21     A.    Yes.
22     Q.    It happens on like a regular basis in our
23 society that -- that photographs are touched up,
24 correct?
25     A.    Yeah.

Page 75

1      Q.    All right.  When you were an ICAC
2 investigator, did you ever take solely the absence of
3 pubic hair as evidence that a model was prepubescent?
4           MS. SHEVLIN:  Form.
5           THE WITNESS:  Not that I recall, no.
6 BY MR. ROBERTS:
7      Q.    Okay.  Would you agree with me that just
8 because a female model does not have pubic hair does
9 not mean that she is prepubescent?
10     A.    No.  Say that question again.
11     Q.    Yeah.  You would agree that not all -- I'm
12 going to ask it a better way, I think a better way.
13 Not all models who do not have visible signs of pubic
14 hair are prepubescent?
15     A.    Right.
16     Q.    I talked to you a little bit earlier about as
17 a forensics specialist your ability to tell whether an
18 image has been touched up or altered in any way.  Do
19 you recall that question?
20     A.    Yes.
21     Q.    Sometimes it's difficult for even you to tell
22 whether or not an image has been altered in some way,
23 for example, to remove evidence of pubic hair?
24     A.    Correct.
25     Q.    Did you ever look at Dr. Dully's reports in

Page 76

1 this case?
2      A.    No.
3      Q.    Do you have any idea what they are based on?
4      A.    Not really.  I'm guessing the Tanner scale, I
5 think is what it's called.
6      Q.    Sexual maturity rating, Tanner scale, that --
7 that sort thing.  Are you familiar with that Tanner
8 scale?
9      A.    Not -- not really.  I had another case
10 recently where I had to meet with a pediatrician,
11 similar to this, not this case but something kind of
12 similar to this, and I took some pictures to a
13 pediatrician, and she explained it just a little,
14 little tiny bit to me, but, yeah.
15     Q.    Was it Dr. Dully that you took it to?
16     A.    No.
17     Q.    Was a member -- sorry.
18     A.    No.  It was a doctor in Gainesville.  I
19 don't -- I don't remember her name.  But...
20     Q.    Was it a doctor who is a member of the
21 Florida -- UF Child Protection Team?
22     A.    I don't know.
23     Q.    Okay.
24     A.    She was referred to by a -- a State Attorney
25 in Putnam County.

Page 77

1      Q.    Were -- in that case, were you investigating
2 possession of child pornography?
3      A.    Yes.  Yes.
4      Q.    Why were you investigating possession of
5 child pornography?
6      A.    A completely different kind of case.  It was
7 one of our people.  It wasn't me investigating.  It was
8 one of our detectives who was in the ICAC unit who is
9 no longer in the ICAC unit.  I was doing the digital
10 forensics on it, and I had dealt with this State
11 Attorney on another case that I worked or did the
12 digital forensics on for a different county and was
13 helping her on this other case and was taking some
14 stuff to her and just, you know, kill two birds with
15 one stone, so I figured I would take this stuff over
16 and let her take it to the doctor, so...
17     Q.    And this doctor kind of gave you a little bit
18 of insight into Tanner staging?
19     A.    Correct.  Correct.
20     Q.    Did that doctor explain to you that Tanner
21 staging is not designed to estimate chronological age?
22     A.    No.  No.
23     Q.    Did she tell you that that test was actually
24 designed to measure an individual's development through
25 the stages of puberty?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 78

1   A.   No.
2       MS. SHEVLIN:  Form.
3   BY MR. ROBERTS:
4   Q.   But you're not a doctor, so you don't really
5   know what --
6   A.   Right.
7   Q.   -- the Tanner stages are?  Okay.
8   A.   Right.
9   Q.   I'm just trying to get what she would have
10  told you.
11  A.   Right.
12  Q.   Did that doctor tell you that she could
13  estimate the chronological age of an individual from
14  looking at a photograph?
15  A.   No.
16  Q.   Okay.  Did she explain that there were
17  limitations to chronological age estimation using the
18  Tanner scale?
19  A.   No.
20  Q.   We're almost getting through this.
21       You talked earlier -- I'm just kind of going
22  to skip around -- a little bit about grants and funding
23  related to ICAC.
24  A.   Okay.
25  Q.   Do you recall that?

Page 79

1   A.   About funding, yes.
2   Q.   Yeah.  Does St. Johns County Sheriff's Office
3   receive funding based on the number of arrests for
4   child pornography, child sexual exploitation?
5   A.   No, not that I know of, no.
6   Q.   Do they write grants to organizations to
7   receive funding for investigations and arrests of child
8   sexual exploitation?
9   A.   Based on the amount of arrests?  No.
10       We might -- we might write -- and this is way
11  above my paygrade, but we might write grants for
12  funding to assist for equipment to -- I know we do for
13  digital forensics and things like that, but it's not
14  based on the amount of arrests, or it would be like,
15  you know, wanting to get more equipment, so we would
16  write more tickets and, you know, have a quota or
17  something like that.  We don't -- we don't do any kind
18  of quota work.
19  Q.   Is there a certain prestige that comes from
20  within the law enforcement community from arresting
21  another law enforcement officer?
22  A.   No.  We -- at least for me personally, I
23  think it's disgraceful.  I don't like doing it.
24  Q.   Do you treat law enforcement differently than
25  you would treat anybody else?

Page 80

1   A.   No.  No.  And that's -- you have to be very
2   particular about that.  You can't treat somebody
3   differently, because if you do, if you treat them
4   better or you treat them worse, you get looked down
5   upon by the members of the community.
6   Q.   All right.  Just give me -- just give me one
7   second.  I'm going to take a quick break, and that may
8   be all I have.  I'm just going to look at my notes.
9       (Recess taken)
10      MR. ROBERTS:  Thank you, Detective Greene.  I
11  don't have any other questions.
12      THE WITNESS:  All right.
13      MR. ROBERTS:  This lady and gentleman, these
14  other attorneys, may have some other questions, I
15  don't know.
16      THE WITNESS:  Okay.
17      MS. SHEVLIN:  I have a couple of questions
18  for you, Detective.  Thank you.
19      THE WITNESS:  Uh-huh.
20      MS. SHEVLIN:  Let me just go through my notes
21  here.
22           CROSS-EXAMINATION
23  BY MS. SHEVLIN:
24  Q.   Prior to the investigation involving
25  Mr. Lawshe, were you familiar with the website

Page 81

1   metart.com?
2   A.   I have heard of it, and I think -- I can't
3   say I have ever had an investigation on it, but I'm
4   familiar with it, yes.
5   Q.   Okay.  And when you say you're familiar with
6   it, what did you know about it prior to the
7   investigation involving Mr. Lawshe?
8   A.   I'm sure I had seen pictures from it.  I
9   couldn't tell you from where.  I -- probably from
10  whether it was from ICAC downloads or working in ICAC
11  or from digital forensics, I have seen pictures or
12  videos or something from it, but I -- I at least knew
13  the name from one place or another.  I can't recall.
14  Q.   And do you know what the -- the M-E-T, the
15  met part, stands for?
16  A.   No, ma'am.
17  Q.   Were you familiar with the term "most erotic
18  teens" in relation to metart.com?
19  A.   No.
20  Q.   Okay.  Are you familiar with the fact that
21  metart refers to its models as teens and girls?
22  A.   No.  No, I wasn't.  No.
23  Q.   Would that surprise you?
24  A.   No.  Actually, I did see that this morning
25  when I was Googling.  I just didn't put two and two

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 82

1  together.
2      Q.    You were asked earlier by Mr. Roberts about
3  an image that was -- it sounded like it was bellybutton
4  to thighs, and it showed vagina of the individual on
5  the -- in the photo.  Was that photo that we're talking
6  about cropped, or was that the full image was from
7  bellybutton to thighs?
8      A.    It was a screenshot from a web page, and it
9  was -- there's a word for that type of image, but it --
10  I can't remember the word.  It was kind of cropped in
11  between two other images.  It would be like if -- if
12  you were looking at a website, and it was just a --
13  like a very large thumbnail in between two other
14  images.  It was basically wanting you to click on it to
15  see the full image.
16      Q.    Okay.
17      A.    So I think if you'd have clicked on that,
18  then you were on the website, it would go to the -- the
19  full image.  And I can't remember the -- the name of
20  the -- the photo, but it was like screenshot, a bunch
21  of numbers, dot DuckDuckGo, or something like that.
22      Q.    Mr. Roberts also asked about a disclaimer
23  that was on metart.com, essentially saying all of our
24  models are -- are 18, and we do age verification.  You
25  would have no way of knowing whether or not that

Page 83

1  statement was accurate and true, correct?
2      A.    Correct.
3      Q.    Okay.  And in fact, there is false
4  information published across the internet every day,
5  all the time, correct?
6      A.    Correct.
7      Q.    He also asked you about whether or not you
8  had seen the models' passports or IDs.  And I was not
9  clear.  Did each -- there were two models, correct?
10      A.    Correct.
11      Q.    Did you view an image -- an image of a
12  passport for each of those models?
13      A.    I -- I only remember -- I -- I have some type
14  of image of ID.  I don't recall the one where you only
15  see the girl's vagina.  I don't recall if it's her
16  passport or an ID for the one girl.  But the other one
17  where you have the -- the two pictures where you can
18  see, you know, who the girl is, her, definitely have an
19  ID and passport for her, because I always go back and
20  look to verify.  I just don't remember off the top my
21  head.  I know there's some form of ID for the other
22  girl, too.  I just -- but I also don't remember what
23  her face looked like from when we went on the internet.
24      Q.    And the identification and the passports that
25  you viewed, what country were those from?

Page 84

1      A.    The Ukraine.
2      Q.    Both of them?
3      A.    The only one I remember, yeah, yeah.  I don't
4  remember the other one.
5      Q.    Are you familiar with passports or government
6  issued IDs from the Ukraine?
7      A.    No.
8      Q.    Have you seen government issued IDs or
9  passports from Ukraine before?
10      A.    No.
11      Q.    Regardless of the age identification on the
12  passports and the IDs which are purported to belong to
13  these models, you would have no way of verifying when
14  the photographs in question were taken, correct?
15      A.    No.
16      Q.    Okay.  So the fact that the passports and the
17  identifications which purport to belong to these girls
18  show that they were over the age of 18 does not
19  necessarily equate to those images being taken when
20  those girls were over 18, correct?
21      A.    Correct.
22      Q.    I'm just looking through my notes.  Thank you
23  for your patience.
24          Mr. Roberts had asked you a question about
25  your -- I think it was phrased that you never made the

Page 85

1  decision to file charges on an age-difficult person.
2  Do you remember that question?
3      A.    Correct.
4      Q.    I want to clarify, because you said you --
5  you got lucky and -- and the images that you brought
6  charges forth on were obvious child pornography images.
7      A.    Uh-huh.
8      Q.    So in relation to that question, were you
9  saying that you never had occasion to bring charges
10  forth on an age-difficult person, or were you saying
11  you did see age-difficult people, and you made a
12  decision not to bring charges forward?
13      A.    I think that I didn't have the occasion.
14      Q.    Okay.
15      A.    I don't recall having to make that decision.
16  And I know I never had to go to a doctor for any kind
17  of verification or anything like that.  I know there
18  were occasions when I had females that were
19  age-difficult, but they were known victims or I was
20  able to -- they were identified victims, something like
21  that.  And that's a whole different ballgame, so that's
22  not something that we would be dealing with like this.
23      Q.    There was also some brief discussion of the
24  Tanner scale.  Are you familiar with the Tanner scale
25  being a commonly used or accepted practice among

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 86

1  doctors who opine on age ranges of -- of people in
2  photographs such as the ones we are talking about
3  today?
4      A.  That's about the limit of my knowledge of it,
5  is that it's commonly used.
6      Q.  Okay.  And in fact, the -- the doctor that
7  you were just talking about that you consulted with
8  recently, she discussed the Tanner scale with you
9  within that context, correct?
10     A.  Right.  I -- I was really trying to see if
11 there was a way to get some kind of -- if there was
12 some type of training that might be available to law
13 enforcement for these kinds of situations and what --
14 what do y'all do?  And, Oh, we used a Tanner scale.
15 Oh, okay, maybe I'll look into something like this
16 later on that might be beneficial to people that do
17 ICAC cases, but that just wasn't the time or place so,
18 yeah.
19     Q.  And is it your understanding that the Tanner
20 scale does in fact use indicators such as breast
21 development and pubic hair to establish possible age
22 range for children or teenagers?
23     A.  I believe so.  I'm not a hundred percent
24 sure, but I -- I think that's where everything I was
25 taught coming into ICAC and -- and later learned is

Page 87

1  where that came from.
2      Q.  Have you ever had occasion to speak with
3  Dr. Dully regarding either this case or any other
4  similar case?
5      A.  No, no.  I have never met or talked to
6  Dr. Dully.
7          MS. SHEVLIN:  Okay.  I believe that's all I
8      have for you.  I very much appreciate your time.
9      Thank you.
10         THE WITNESS:  You're welcome.
11         MR. ROBERTS:  Matt, do you have any
12     questions.
13         MR. CARSON:  Give me one second.
14         MR. ROBERTS:  I've got a couple follow-up.
15     Do you want me to ask those before you go or...
16         MR. CARSON:  You're doing redirect based on
17     what Ms. Shevlin asked?
18         MR. ROBERTS:  Yeah.
19         MR. CARSON:  Go ahead.
20             REDIRECT EXAMINATION
21 BY MR. ROBERTS:
22     Q.  So Mr. Greene, you were asked by Ms. Shevlin
23 about your knowledge of the Metart website before your
24 involvement in the Lawshe case.  Do you recall that?
25     A.  Uh-huh.

Page 88

1      Q.  I think I recall you, I think you testified
2  earlier, you don't recall the source or exactly what
3  was said about Metart, correct?
4      A.  Right.  Right.
5      Q.  Okay.  My question to you is, based on your
6  knowledge, would you be comfortable stating under oath
7  that metart.com has a known history of displaying child
8  sexual abuse material?
9      A.  No.  I wouldn't -- I wouldn't say that it's
10 child sexual abuse material, no.  Because even -- yeah,
11 no, I wouldn't.  No.
12     Q.  Okay.  You were asked about did you have any
13 way of knowing -- Ms. Shevlin was asking you questions
14 about the -- the disclaimers on the websites that you
15 viewed that the models were 18 or older and that there
16 was age verification.  Do you recall those questions?
17     A.  Yes.
18     Q.  I think she asked was there any way that you
19 could verify if that was true or not.  Do you recall
20 that question?
21     A.  Uh-huh.  Yes.
22     Q.  Well, isn't it -- isn't it true that you --
23 you could have -- not you, I'm just saying an
24 investigator could have investigated those claims by
25 e-mailing the records custodian of the website,

Page 89

1  correct?
2          MS. SHEVLIN:  Form.
3          MR. CARSON:  Join.
4          THE WITNESS:  Sure, you could e-mail them.
5  BY MR. ROBERTS:
6      Q.  And in fact, you understand that's what
7  happened in this case, that Mr. Lawshe's investigative
8  team e-mailed the record custodian, and they returned
9  the photo ID's, correct?
10     A.  Correct.
11     Q.  And I -- you're not aware of any affidavit
12 where the dates of the photographs, the records
13 custodian said what dates the photographs were taken,
14 you just don't know that because it wasn't provided to
15 you?
16     A.  Right.  I never saw any of that.
17     Q.  But had you been provided that, you would
18 have been able to compare the -- the date of birth to
19 the date of the photo shoot, correct?
20     A.  Correct.
21         MR. ROBERTS:  No further questions.
22         MR. CARSON:  Ms. Shevlin, are you good?
23         MS. SHEVLIN:  I'm good.  Thank you.
24         MR. CARSON:  Corporal Greene, my name is Matt
25     Carson.  I represent Detective Preston in this

**Page 90**

1    action.  I don't have any questions for you.
2       Mr. Roberts, is it all right if I suggest
3    that he'll read, and he can go through me?
4       MR. ROBERTS:  Absolutely.
5       MR. CARSON:  All right.
6       MR. ROBERTS:  And honestly, Matt, I mean,
7    I -- I kind of assume you represented him anyway
8    because he's an employee of St. Johns, so I -- you
9    know --
10      MR. CARSON:  Yeah, we're -- we're in this --
11   we're in this weird spot where I'm -- I'm still
12   considering the Sheriff's Office employees to be
13   my client inasmuch as --
14      MR. ROBERTS:  Yeah.
15      MR. CARSON:  -- as of very recently, the
16   sheriff's office was a defendant.  So, yeah, he'll
17   read and that can go through me.
18      MR. ROBERTS:  Perfect.  Yeah, no objection to
19   that.  Yeah.
20      THE COURT REPORTER:  Mr. Roberts, do you want
21   to order the 0 and 1 and then Mr. Carson and
22   Ms. Shevlin want a copy?
23      MR. ROBERTS:  Yes, I -- I will order.
24      MR. CARSON:  I will take a copy, ma'am.  I
25   need the simplest possible PDF that you can send

**Page 91**

1    me, please.  And thank you.
2       THE COURT REPORTER:  Okay.
3       MR. ROBERTS:  Although it is nice, Matt, to
4    get the kind that you can word search.  You know,
5    sometimes I get these PDFs, and it won't do the
6    control F, find, then I'm like...
7       MR. CARSON:  Yeah, what I hate --
8       THE COURT REPORTER:  Do you want this on or
9    off?  I'll just go off now.
10      MR. CARSON:  Yeah, we can go off.
11      THE COURT REPORTER:  Would you like a copy,
12   Ms. Shevlin?
13      MS. SHEVLIN:  Yeah, I'll take a copy.  Thank
14   you.  Just PDF.
15      (Off record)
16      (Thereupon, the remote deposition was
17   concluded at 12:12 and the signature and formalities
18   were not waived.)
19
20
21
22
23
24
25

**Page 92**

1                 CERTIFICATE OF OATH
2    STATE OF FLORIDA
3    COUNTY OF JACKSONVILLE
4
5       I, the undersigned authority, certify that
6    the aforementioned witness Kevin Greene, personally
7    appeared before me via remote teleconference and was
8    duly sworn on Tuesday, December 17, 2024.
9       Dated this 27th day of December, 2024
10
11
12
13        _maureen Uebel Jackson Hall_
14
       MAUREEN HALL, RPR, FPR
15     Notary Public - State of Florida
       My Commission Expires:  3/17/25
16     My Commission No.:  HH065896
17     Identification presented by Deponent:
       License
18
19
20
21
22
23
24
25

**Page 93**

1                 C E R T I F I C A T E
2    STATE OF FLORIDA
3    COUNTY OF JACKSONVILLE
4
5       I, MAUREEN HALL, Registered Professional
     Reporter and Notary Public duly commissioned and
6    qualified in and for the State of Florida at Large, do
     hereby certify that I was authorized to and did
7    stenographically report the foregoing remote
     deposition; and that the transcript is a true record of
8    the testimony given by the witness.
9       I FURTHER CERTIFY that I am not a relative,
     employee, attorney, or counsel of any of the parties,
10   parties' attorney, or counsel connected with the
     action, nor am I financially interested in this action.
11
12      Dated this 27th day of December, 2024.
13
14
15        _maureen Uebel Jackson Hall_
16     MAUREEN HALL, RPR, FPR
       Notary Public - State of Florida
17
18
19
20
21
22
23
24
25

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 94

```
1    KEVIN GREENE
     C/O MATTHEW JOSEPH CARSON, ESQUIRE
2    SNIFFEN & SPELLMAN, P A.
     123 North Monroe Street
3    Tallahassee, Florida 32301-1509
     mcarson@sniffenlaw.com
4
           IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK,
5    MIKAYLA PRESTON AND KATHLEEN DULLY,
6          CASE NO.:  3:24-cv-00044-MMH-MCR
7    Dear Mr. Carson,
8        The deposition of Kevin Greene, taken in
     the above-styled cause on December 17, 2024 is now ready
9    for signature of the witness.  Please contact our office
     to make arrangements for the witness to sign the same;
10   or, if you wish to waive the signature of the deposition,
     please so advise.
11       If this deposition has not been signed by January
     27th, 2025, or the signature thereto waived, we shall
12   consider such delay a refusal to sign under Rule 1.310(e)
     of the Florida Rules of Civil Procedure.
13       If you have any reason which you would like for me
     to place on the deposition as to the witness' failure to
14   sign the same, please advise.
15       Very truly yours,
         HUSEBY COURT REPORTING, COURT REPORTER
16
17   By:
18          Maureen Hall, RPR, FPR
19   Dated:  December 27, 2024
20   cc:  Counsel of Record
21
22
23
24
25
```

Page 95

```
1              E R R A T A   S H E E T
2    IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA
     PRESTON AND KATHLEEN DULLY
3
4    DEPO OF:  KEVIN GREENE
5    DATE TAKEN:  12/17/24
6        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
7        Page No._____Line No._____Change to:_____
8        _____
9        Reason for change:_____
10       Page No._____Line No._____Change to:_____
11       _____
12       Reason for change:_____
13       Page No._____Line No._____Change to:_____
14       _____
15       Reason for change:_____
16       Page No._____Line No._____Change to:_____
17       _____
18       Reason for change:_____
19
20       Please forward the original signed errata sheet to
21   this office so that copies may be distributed to all
22   parties.
23       DATE:_____
24
25       SIGNATURE OF DEPONENT:_____
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                    Index: 1..agree

---
**1**
---

**1**  38:25 55:3 62:17 90:21

**12:12**  91:17

**15**  69:1,7,12, 21 70:1,9,20

**17**  44:12,15 45:1 52:7 66:8

**18**  40:6,9,12 45:3 64:7,25 65:10,13 82:24 84:18, 20 88:15

**19**  40:12 66:8

---
**2**
---

**2**  55:11 62:17,24

**20**  27:25

**20/20**  15:10

**2015**  5:6 53:2 60:5

**2016**  53:2

**2017**  60:6

**2022**  68:22

**2023**  31:14 47:12 49:13, 24 54:20 59:25 68:22

**2024**  49:25

**25th**  54:20

**28**  68:23 69:6,19

**29**  68:23 69:6,19 70:19

**29th**  49:13,21

---
**3**
---

**30**  34:5

**300**  60:9

---
**4**
---

**45**  71:1

**4chan**  28:9 29:7,10

---
**5**
---

**5**  37:17 38:12

**5-A**  38:15

---
**8**
---

**82.071**  62:18

**827.01**  38:12

**827.071**  37:17

**8chan**  28:9 29:11

---
**9**
---

**90s**  27:19

---
**A**
---

**A-1**  54:14

**A-2**  54:14 55:3

**Aaron**  30:22 31:19,23

**ability**  20:25 47:17 73:20 75:17

**absence**  75:2

**absolute**  57:11

**absolutely** 22:23 32:17 66:10 71:13 90:4

**abuse**  19:19 37:18 57:11, 17 88:8,10

**accepted**  85:25

**access**  42:3 47:17,23 48:23

**accessing** 28:16

**accurate**  83:1

**accusation** 52:20

**acronym**  8:25

**action**  90:1

**actual**  7:8

**adult**  40:3 74:9

**adults**  34:22 35:4,6 37:7, 8 41:2

**advanced**  19:4 21:8

**affect**  59:13, 14

**affected**  22:23

**affidavit** 66:25 89:11

**age**  27:4 35:10 41:23 45:13 57:2 64:7,25 65:15,16,19 66:12 70:16 73:20 77:21 78:13,17 82:24 84:11, 18 86:1,21 88:16

**age-difficult** 27:6 43:14 56:22 57:9, 12,18 72:23 73:13 85:1, 10,11,19

**agencies**  6:11

**agents**  6:13

**agree**  39:11 40:2 44:11 54:1 61:21

66:7,9 67:2
69:18 70:15
75:7,11

agreed  44:1

ahead  73:3
87:19

AI  23:15

allegation
25:10

allegations
14:5

alleged  5:14

altered  21:2,
7,18,24
22:10 23:4,
10 75:18,22

ambiguous
62:16

amount  24:16
79:9,14

analysis  64:21

anybody's
15:21

Anytime  71:5

apologize
32:18 63:5

appearance
74:19

Apple  16:23

approximate
57:2

apps  27:15

area  34:3

arguably  37:8

argued  35:21

arguing  32:22
35:18,20

arrest  16:14
19:17 30:1
47:14 48:20
71:11,17
72:3,6

arrested  42:20
64:15 70:7

arresting
79:20

arrests  79:3,
7,9,14

art  56:22

articles  71:24

artificial
21:9 23:7

assist  24:1
79:12

assistance
11:24 48:19

assistant  4:20
31:7 35:15
42:7,16 43:3
49:14

assume  90:7

attempted  69:5

attempting
70:8

Attorney  31:7,
22 35:15
42:7,16 43:3
49:14 50:20,
21 76:24
77:11

attorneys
80:14

aware  23:20
24:24 42:10
60:18 68:22
69:4 72:5
74:9,15,18
89:11

---

**B**

---

B-1  54:14

B-2  54:14

back  12:25
17:25 18:5
25:14 27:19
29:9 44:5
52:6,8 61:2
62:14 83:19

background
11:6

bad  39:23,24
40:11,23,25
41:3 49:7

baited  69:20,
22

ballgame  85:21

base  58:12

based  76:3
79:3,9,14
87:16 88:5

basically
82:14

basis  56:9
60:19 74:10,
22

bathroom  62:7

bear  45:14

began  42:17

beginning
46:24,25
56:24

believes  61:19
69:6

believing
69:21

bellybutton
35:24 82:3,7

belong  84:12,
17

beneficial
86:16

birds  77:14

birth  89:18

bit  9:16 12:3
14:11,16
16:13 42:18
52:1 75:16
76:14 77:17
78:22

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024          Index: Bittorrent..children

Bittorrent
  27:16,17,18,
  24

body  33:2,4,5

book  52:14

bottom  32:23
  33:2

break  62:6,7
  63:3,4 80:7

breast  57:5
  86:20

breasts  43:22

bring  25:14
  30:1 85:9,12

bringing  18:6

brought  11:19
  23:22,24
  24:2,25 85:5

bunch  70:23
  82:20

———————

C

call  15:5
  57:9 72:24

called  4:3
  9:11 56:22
  71:17,20,23
  72:2,5 76:5

calls  66:14

camera  18:3
  55:17

car  30:9

career  71:12
  74:1

careful  16:1

Carson  13:4,8,
  11 14:7
  34:24 39:6,
  16 43:9
  44:17 45:7,
  16 62:20
  64:18 65:2,
  17,25 66:16
  68:8,12
  69:15 70:2
  87:13,16,19
  89:3,22,24,
  25 90:5,10,
  15,21,24
  91:7,10

case  6:16
  10:10 11:15
  12:7,14,16
  15:6 16:6
  18:21,24
  19:11 20:2
  22:9,17
  23:2,15,18
  24:7 26:20
  27:5 30:7,
  10,18 43:16,
  21,25 46:20
  48:24 49:5,
  12 52:4
  53:10 56:13
  57:25 58:5,
  25 60:25
  63:3 70:22
  71:25 76:1,

9,11 77:1,6,
  11,13 87:3,
  4,24 89:7

cases  12:10
  14:19 16:8
  37:22 72:17
  86:17

categorization
  57:8,10,23

categorizations
  57:14

categorize
  27:6,11
  28:18

categorizes
  54:11

category  55:3

cellphones
  7:6,8

Center  7:24
  8:3 9:6

certification
  6:4,5

chain  8:16

chance  26:2

charge  46:3
  61:5

chargeable
  60:14,20

charged  10:9
  20:2,20
  32:21 33:9,
  22 34:14

36:13,15,16
  37:4,14 41:8
  46:5 51:11,
  20 73:10

charges  73:12
  85:1,6,9,12

charging  26:18

chat  29:5
  62:22

chatting  61:13

check  58:4

chest  43:18
  55:18

child  5:15
  17:10 19:19
  20:11 25:10
  27:12 36:17
  37:18,23
  38:13,22
  39:5 43:20,
  24 44:2 46:6
  57:3,10,12,
  17,23 58:1,
  7,10,12,15,
  18,19,22
  59:1,6
  60:14,21
  72:17 73:10
  76:21 77:2,5
  79:4,7 85:6
  88:7,10

children  5:7,
  12 7:25 8:3,
  9 9:7 62:3
  73:11 86:22

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                              Index: choice..correctly

choice  67:7

chose  41:9

chronological
 73:20  77:21
 78:13,17

circumstances
 46:18,20,22

cited  42:7

claiming  69:1

claims  88:24

clarify  26:25
 85:4

class  69:13

clear  15:12
 83:9

clearinghouse
 8:5,6

click  82:14

clicked  82:17

client  40:17
 90:13

clip  37:2

cloud  18:11
 56:4

coffee  62:9

colleague
 30:25

Comcast  8:14

comfortable
 88:6

comment  16:18

53:22 56:21
 72:22

committed
 39:12 43:7
 45:15

commonly  85:25
 86:5

communicating
 58:16

community
 79:20 80:5

company  50:19

compare  51:18
 89:18

completely
 77:6

complying  35:9

computer
 30:13,14
 33:14 38:17,
 20

computers  19:4

concern  15:13

concerns  49:11
 50:6

concluded
 91:17

conduct  15:1
 38:22

confirm  7:19
 20:20 51:9
 58:19,20,21,
 23 59:1

confirmed
 58:12,18

constant  56:8

constitute
 20:10 60:20

constituted
 19:18

consulted  86:7

contact  72:12

contacted
 50:17,18

contained
 26:13 54:2,
 11

content  17:8
 32:22 53:17
 54:11

context  46:4
 50:25 86:9

control  38:18
 91:6

conversation
 51:1

conversations
 49:4

convinced
 69:24

copy  90:22,24
 91:11,13

corporal  4:14
 13:5 89:24

correct  6:17,

21,24 9:3
 16:24 17:4,
 11 19:14,23
 20:4,5
 26:11,15
 27:13 28:6
 32:11 33:20,
 24 34:12,15,
 19,22,23
 35:3,4,10
 36:18,19,21
 37:11,23
 38:3 40:6,9
 41:19 42:4
 43:8 47:6,7,
 8,10,14,18
 48:5,11,16,
 20 51:12,21
 52:24 54:8,
 20 55:9,12,
 15,21,22,24
 56:18 57:21
 59:2,9,21
 62:3 64:3
 66:9,14,21
 67:7,8,17
 68:2 71:9
 73:11,14
 74:2,7,24
 75:24 77:19
 83:1,2,5,6,
 9,10 84:14,
 20,21 85:3
 86:9 88:3
 89:1,9,10,
 19,20

correctly  8:23
 17:6,15

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: country..detectives

18:13 20:16
25:2 26:5,8
29:10 35:11
38:13,23
55:6 72:25

country  83:25

county  4:12
5:1,20 9:13
14:4 18:8
20:25 21:21
22:7 31:7
58:16 59:4
60:1 69:5,24
70:7 71:16,
20 76:25
77:12 79:2

County's  13:2

couple  24:6
30:12 36:10
37:19 47:25
80:17 87:14

court  7:23
8:25 11:3,11
35:2 57:16
62:15,21
63:14,19,21
90:20 91:2,
8,11

coworkers  22:3

Crawford
12:12,13
31:22 42:15
49:20

crazy  60:10

credibility

59:15,20

credible
52:19,23,24

credibly  69:6

crime  26:19
37:14 38:2
39:13 43:7
45:4,15

crimes  5:7

criminal  12:7

cropped  82:6,
10

CROSS-
EXAMINATION
80:22

CSAM  57:12,
15,16,17

custodian
42:12 66:25
88:25 89:8,
13

cyber  7:22
8:15,19 9:12
59:25 60:15,
24

—————————
D
—————————

daily  60:2

damage  18:4

dark  28:8,16,
17

data  24:16
25:23 30:5

38:20 48:19
58:12 64:11

date  89:18,19

dated  54:20

dates  89:12,
13

day  32:10
34:7 35:21
83:4

days  24:6
36:10 54:23

dealing  14:19
24:15,16
43:13 85:22

deals  28:25

dealt  24:17
77:10

decision  16:14
29:25 47:14
48:20 67:4
73:12 85:1,
12,15

decisions  46:9

defendant
90:16

department
5:23

depend  22:15,
16

depends  21:3

depicted  27:4
51:11 61:20,
23 63:18

65:11 70:17

depicting
64:22

depiction
38:20

depictions
20:21

deposed  12:17

deposition
7:2,3 9:17
10:6 12:4,6
32:14 54:24
91:16

designed
77:21,24

desire  15:19

detect  25:24

detective
4:14,19 5:5,
19 8:4 9:3,
22 18:24
19:22 20:7,
13,24 22:6,
25 23:1
26:24 30:5
31:25 47:11
48:18 49:10
50:22 53:13
61:19,21
68:19 69:25
70:8 71:9
80:10,18
89:25

detectives

26:21 77:8

**determination**
26:12,18
58:11

**determinations**
20:1,9

**determine**
21:1,23 22:9
59:6

**determining**
23:6

**develop** 43:22
44:2

**developing**
56:25 57:4

**development**
43:12,23
57:5 77:24
86:21

**device** 16:23
17:10,13
18:12 25:13,
20 28:14

**devices** 25:18
28:5,14 30:5
67:13

**difference**
66:8

**differently**
13:2 14:5
79:24 80:3

**difficult**
48:16 57:19
66:7 67:4,7

75:21

**dig** 29:19

**digging** 40:16,
21

**digital** 4:19,
20 73:21
74:18 77:9,
12 79:13
81:11

**digitally**
21:2,18,24
22:10 23:4,
10

**DIRECT** 4:7

**disagree** 31:14

**disagreed**
72:24

**disclaimed**
65:22

**disclaimer**
35:9,13 41:1
82:22

**disclaimers**
88:14

**discrepancies**
54:2

**discuss** 11:24
63:3

**discussed** 86:8

**discussion**
85:23

**disgraceful**
79:23

**displaying**
88:7

**doctor** 43:25
44:1 73:1,2
76:18,20
77:16,17,20
78:4,12
85:16 86:6

**doctors** 86:1

**document** 9:21,
25

**documents**
12:22 14:2

**door** 63:6

**dot** 41:15,18
82:21

**doubts** 43:6

**download** 7:19,
21 9:18
11:25 17:15
19:11,14
20:15 24:2,5
25:16,21
26:3,14
48:10

**downloaded**
16:19 19:5
24:17

**downloads** 7:6
18:25 32:11
56:12 81:10

**drive** 15:25
33:14

**drop** 57:7

**drug** 16:2

**Duckduckgo**
82:21

**dug** 29:17

**Dully** 72:14,
16,25 73:19
76:15 87:3,6

**Dully's** 75:25

**duly** 4:4

**dysplasia** 57:5

---

**E**

**e-mail** 62:20,
22 89:4

**e-mailed** 89:8

**e-mailing**
88:25

**earlier** 67:9
72:22 75:16
78:21 82:2
88:2

**easiest** 8:8

**easily** 47:17
60:7

**easy** 16:7,8

**edited** 21:1

**effectuate**
30:1

**effort** 61:21

**efforts** 63:17

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: electronic..find

electronic
 8:13

employed  4:11

employee  90:8

employees
 90:12

end  24:22
 39:21 40:19,
 22 41:14
 47:12

ended  41:18

enforcement
 6:13 8:15
 11:13 15:22
 66:13 79:20,
 21,24 86:13

enticement
 5:11

entire  33:4
 46:22 54:5

equate  84:19

equipment
 79:12,15

erotic  81:17

erotica  57:12

essentially
 82:23

establish
 44:19 86:21

established
 44:16

esthetic  74:19

estimate  60:2,
 3 77:21
 78:13

estimation
 78:17

evaluate  23:3

events  18:16

eventually
 8:17

everybody's
 62:10

evidence  16:6
 28:12 45:2
 49:12 50:7
 64:9 67:12
 75:3,23

evidentiary
 7:15

EXAMINATION
 4:7 87:20

excuses  48:7

exhibit  38:11,
 25 62:17,24

exhibition
 38:19

exhibition,--
 55:11

existed  43:6

experience
 21:20,22
 27:11 33:7

expert  21:16,
 19 45:12,13

expertise
 72:19

explain  8:8
 77:20 78:16

explained
 76:13

exploitation
 62:3 79:4,8

exploited  7:24
 8:3,10,11
 9:7

express  49:11

extra  16:1

---

**F**

face  36:5,6,
 11,13,20,22
 43:19,23
 51:14,18,19,
 20,23 83:23

facilitator
 19:22

facing  55:17

fact  50:8
 59:11 69:18
 81:20 83:3
 84:16 86:6,
 20 89:6

facts  16:17

factual  54:2

fair  23:18
 24:8 50:6
 70:14

fairly  60:18

false  54:2
 83:3

familiar  37:13
 41:23 54:10
 57:22 76:7
 80:25 81:4,
 5,17,20 84:5
 85:24

federal  6:11
 35:10 41:2,
 23 42:8
 65:14,15,19

female  43:16,
 21 69:19
 74:9,10 75:8

female's  33:2

females  37:2
 57:5 85:18

field  21:9

figured  77:15

file  27:24
 28:10 73:12
 85:1

file-sharing
 27:15

files  26:6,7,
 9,13 28:1,3
 55:2

filters  21:12

find  17:8
 26:19 28:4,
 12 33:4 91:6

finding   49:16

firearms   14:22
  15:23 16:1

fish   72:13

Florida   38:11
  45:5 76:21

flush   16:9

follow-up
  87:14

fooled   69:20,
  23

force   6:8,10

forensic   17:14
  19:11 20:24
  21:7 23:8
  26:14 32:11
  47:24

forensics
  4:19,20 6:19
  7:7 22:2
  75:17 77:10,
  12 79:13
  81:11

form   13:4,12,
  14 14:7
  34:24 39:6,
  16 43:9
  45:7,16,23
  60:22 64:18
  65:2,17,25
  66:16 68:8,
  12 69:15
  70:2 73:22
  74:13 75:4

78:2 83:21
89:2

formalities
  91:17

forum   29:8

forum-based
  28:11,18
  29:3

forward   85:12

found   50:8

full   35:22
  46:3 49:16
  82:6,15,19

Full-time   5:2

fumbling   38:9

function   6:19

funding   6:11,
  12 78:22
  79:1,3,7,12

FWC   72:2,5,12

G

Gainesville
  76:18

gangster   15:25

gave   19:5,6
  63:8 77:17

generally
  18:18

generated   6:23
  22:13 23:7

generation
  23:15

gentleman
  80:13

girl   51:6,8,
  16 55:16
  83:16,18,22

girl's   37:4
  83:15

girls   37:5,7
  81:21 84:17,
  20

give   6:9 63:6
  80:6 87:13

good   21:14
  63:24 89:22,
  23

Google   8:13
  52:15 53:13

Googled   53:9

Googling   81:25

government
  6:11 65:14
  66:20 84:5,8

grade   69:12

grants   78:22
  79:6,11

great   62:7

Green   8:4

Greene   4:3,10
  8:3 9:3 13:5
  63:2 80:10
  87:22 89:24

grooming
  74:10,16

guess   6:13
  11:18 24:5
  37:3 38:11
  49:25 50:10,
  17 73:25

guessing   76:4

guesstimation
  60:5

guilty   38:1

gun   15:18

guys   25:24
  34:6 61:12

H

hair   43:17,22
  55:18 57:4,6
  74:11,20
  75:3,8,14,23
  86:21

hall   11:22
  47:25 48:1

hallway   48:4

handful   60:11

happen   50:15

happened   13:2
  24:2 31:13
  42:20 46:24
  47:9 50:2
  89:7

hard   21:15
  55:12 57:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                      Index: hash..images

**hash** 58:8,13, 20

**hate** 91:7

**he'll** 90:3,16

**head** 60:4 83:21

**heard** 28:8 81:2

**helped** 19:13

**helpful** 66:13

**helping** 77:13

**helps** 56:14

**Hey** 22:18 24:10 69:12

**highly** 70:15

**Hindsight's** 15:10

**hip** 43:22 57:5

**hips** 33:3,8 34:3

**history** 67:25 68:2 88:7

**hit** 21:13

**hole** 39:22 40:20,22

**home** 25:1,5, 6,8,13

**honestly** 11:15 14:10 41:25 47:20 70:10 71:23 90:6

**hotlines** 8:18

**hour** 62:6

**hours** 11:18

**house** 17:19, 24 18:3 72:10

**human** 56:25

**hundred** 18:14 28:2 60:7 86:23

**hurt** 39:22

**hypothetical** 44:13 45:1 67:19 70:23

**hypothetically** 44:12 61:19

---

**I**

---

**I-C-A-C** 5:8

**I.D.** 51:10

**ICAC** 5:5,16, 19,24 6:1,3 8:21 11:22 20:7 24:13 26:20,21 52:7 53:4 56:12,17 58:17 62:2 69:8 72:9,16 75:1 77:8,9 78:23 81:10 86:17,25

**ICAT** 41:22

42:2

**ID** 83:14,16, 19,21

**ID's** 51:13 64:3,22 66:21 89:9

**idea** 15:8 52:19 59:22 76:3

**identification** 39:1 62:25 83:24 84:11

**identifications** 84:17

**identified** 17:25 49:3 85:20

**identify** 17:19 30:10 61:22 63:17

**IDS** 66:13 83:8 84:6,8, 12

**illegal** 28:19, 23 29:19 53:17 68:2

**image** 19:18 21:1,11,17, 23 23:7 25:21 27:3 30:12 33:4, 5,7,9,10 34:1,2,18 35:22 36:1,4

38:3,20 43:13,14,15 54:7,12 55:14,23 60:19 61:18, 23 75:18,22 82:3,6,9,15, 19 83:11,14

**image-related** 61:14

**imaged** 28:5 30:4

**images** 10:1,3, 4,5,9,12 17:3 19:16, 22 20:1,20 21:10 22:8 23:2,14 25:24 26:9 27:4 32:20, 23,25 33:19, 21,22 34:14, 17 36:9,12, 17 40:3 44:20 45:4 46:3,14,15 47:4,11,13, 16 48:11,24 50:12 51:11, 17 56:13 58:23 60:13 64:12,16 65:9,24 68:3,6 69:25 70:1 73:9 74:1,4,18 82:11,14

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: IMEI..Join

84:19 85:5,6

IMEI   17:25

improve   74:19

inappropriate
  63:10

include   38:22
  46:14

included   47:2

indicators
  86:20

individual
  27:2 40:9
  45:14 57:20
  59:12 61:22
  69:25 70:17
  73:20 78:13
  82:4

individual's
  77:24

individuals
  14:20 26:10
  68:4

infant   57:3

inform   19:16

information
  8:7,9,12,14,
  18 18:23
  24:16 28:24
  33:18,19
  41:6 44:10
  55:2 83:4

Initially
  17:18

insight   77:18

instructing
  35:16

intelligence
  21:9 23:7

intentionally
  30:20 38:18

interest   17:9
  26:4,6,7,23
  27:1

internet   5:7
  8:10,11
  47:7,18,23
  48:2,19
  49:4,16
  52:11,12
  69:7 83:4,23

interpret
  68:10

interview
  11:19 15:1
  17:18 23:22,
  24

investigate
  8:17 41:9

investigated
  8:20 11:16
  64:14 88:24

investigating
  5:11 37:22
  77:1,4,7

investigation
  5:14 6:16,20
  11:1 13:1

14:5 16:12
  19:23 22:23
  23:20 25:9
  42:19 43:5
  46:11,14
  49:11 56:12,
  15 59:5
  70:25 72:6,
  16 80:24
  81:3,7

investigations
  8:21 24:18
  26:20 52:7,
  10 62:2
  68:25 79:7

investigative
  89:7

investigator
  5:19 20:8,24
  37:11 41:8,
  22 42:2 45:2
  46:3 56:17
  58:17 59:14,
  16,18,19
  65:8 67:3
  69:9 72:16
  73:5 75:2
  88:24

investigators
  5:16 43:24
  65:15

involved   5:14
  6:16 29:25
  47:9

involvement
  19:11 23:18

30:6,9 32:7
  87:24

involving
  80:24 81:7

IPAC   37:11

issue   14:24
  15:1 43:13

issued   66:21
  84:6,8

issues   14:22

items   26:3

_____

          J

January   54:20

jerk   11:8

job   4:17 20:9
  21:14 26:17,
  22 68:21

Johns   4:12
  5:1,19 9:13
  13:2 14:4
  18:8 20:25
  21:21 22:7
  31:6 58:16
  59:4 60:1
  69:5,24 70:7
  71:16,20
  79:2 90:8

Join   13:6
  14:8 34:25
  39:7,17
  43:10 44:17
  45:8 64:19
  65:3,18

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: judgment..Madam

66:1,17
68:13 89:3

**judgment**   27:3

---

### K

**Kaitlyan**  31:22

**Kevin**   4:3,10

**keys**   63:6

**kid**   61:13

**kill**   77:14

**killed**   15:14

**kind**   4:19
6:14 7:19
9:9 15:5,17
16:18 19:9
21:11,13
23:17 24:18
33:15 40:18
42:19 56:14
57:9,18 71:2
72:12 76:11
77:6,17
78:21 79:17
82:10 85:16
86:11 90:7
91:4

**kinds**   86:13

**Knee**   55:18

**knees**   55:18

**knew**   17:16
18:11 47:19
48:6 81:12

**knowing**   38:2

82:25 88:13

**knowingly**
38:4,18
39:23

**knowledge**
21:22 86:4
87:23 88:6

---

### L

**lab**   4:21,22
18:5 47:24
48:2

**lady**   80:13

**laptop**   17:6

**laptops**   19:3

**large**   24:16
82:13

**lascivious**
55:11

**late**   5:6
31:13

**law**   6:13 8:15
11:13 15:22
38:1 39:4
41:2 42:11
45:5 66:11,
13 79:20,21,
24 86:12

**laws**   35:10
42:3

**Lawshe**   9:13
10:9 11:2
12:23 14:6

15:13 16:14
18:6 23:22
30:1 32:20
34:14 36:16
37:14 41:7
42:20 43:7
45:3,14 46:6
47:14 48:20
50:7 51:11
66:6 67:13,
22 71:8
80:25 81:7
87:24

**Lawshe's**   6:16
17:24 22:9
23:2,15 25:1
28:5 48:24
52:4 89:7

**lawyer**   10:21

**lead**   68:1

**learn**   11:13

**learned**   15:14
86:25

**legal**   18:20
40:2 41:4,5
74:4

**level**   6:9
57:8

**lieutenant**
4:24

**lighting**   21:12

**limit**   86:4

**limitations**
78:17

**lines**   29:14

**locate**   34:1,11
47:4

**located**   17:24
25:13

**lock**   63:5

**long**   4:25
11:15 33:12
34:1 37:15,
24

**longer**   14:13
57:2 77:9

**looked**   22:19,
20 36:14
44:1 56:18
61:3 65:8
80:4 83:23

**lot**   12:10
14:19 16:8
17:22 19:3
21:7 24:12,
21 25:5
27:5,7 28:24
29:17,20
30:16,19
35:21 41:13
50:2 60:12
74:1

**lucky**   73:8
85:5

---

### M

**M-E-T**   81:14

**Madam**   7:23

Case 3:24-cv-00137-MMH-LLL    Document 84-13    Filed 11/06/25    Page 37 of 46 PageID
1367
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                    Index: made..N-C-M-E-C

63:14,19

made 16:17
23:20 24:24
27:14 46:5,8
53:22 56:21
67:9 70:19
71:17 72:22
73:12 84:25
85:11

maintain 66:12

make 17:2
19:9,10,16
20:9 26:12,
17 35:1
38:10 58:10
61:21 62:16
63:17 66:14
67:4,7 85:15

makes 64:9

makeup 51:6

making 16:13
19:25 27:3
47:13 48:7,
19 56:4

male 43:17

males 57:6

manipulatable
70:16

manipulation
21:10 71:2

manipulations
21:13

marked 38:25
62:24

match 58:9

material 12:3
19:19 37:18
57:11,17
60:21 88:8,
10

Matt 13:22
87:11 89:24
90:6 91:3

matter 43:7

matters 48:16

maturity 76:6

means 40:5
42:4 54:17
56:24 57:18

meant 26:8
32:8

measure 77:24

media 71:17,
21,22

meet 30:19
32:10 70:8
76:10

meeting 31:8,
12,18,21
32:19 49:2,
12,19 50:18

member 76:17,
20

members 80:5

membership 6:4

Messenger 29:6

met 30:17,21
31:5 81:15
87:5

meta 64:11

metart 81:21
87:23 88:3

metart.com
51:25 53:9,
13,16 66:19
81:1,18
82:23 88:7

metart.com.
50:19

mid-2017 5:7

mind 59:20
64:14

minor 20:22
33:9,10 40:8
55:8 61:20
63:17 68:20

minors 26:13
39:14 68:4,
7,11,17

minutes 30:12
34:4,5 71:1

Missing 7:24
8:3 9:7

model 34:17,
18 35:6,23
36:21,23,24
55:14 61:22
75:3,8

models 34:11,
21 35:4

39:13 41:2,7
44:12,20
47:5,18 49:3
50:12 51:9,
10 52:8
64:2,6,25
65:10 66:21
69:10 74:9,
10 75:13
81:21 82:24
83:9,12
84:13 88:15

models' 83:8

moment 72:14

month 5:3
60:6,7 61:8

monthly 60:3

months 48:1
60:9

morally 40:12

morning 53:11
81:24

motion 38:19

moved 47:24

movie 27:22

multiple 28:1
34:7,8 74:15

muscles 43:18
57:6

---

**N**

N-C-M-E-C 9:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                      Index: named..passports

named    30:25

Napster    27:19

narrow    56:14

national    6:9
 7:24 8:2 9:6

NCMEC    7:22
 8:22 9:5,12,
 23 18:20
 53:24 54:3,
 5,7,11,19
 56:6 57:22
 58:1,6,7,10,
 15,16 59:4,
 7,23,25
 60:19 61:3
 62:17

necessarily
 15:22 28:19
 84:19

need-to-know
 56:9

needed    30:10

nefarious
 29:24

nervous    41:14

news    71:24

nice    63:8
 91:3

nominally
 41:23

nonchargeable
 57:13

north    61:13

notation    27:14

note    26:22

notes    13:13
 80:8,20
 84:22

notified    72:6

nude    17:2
 26:9 27:2
 29:16

nudes    29:15

nudity    25:24
 27:7

number    17:25
 55:1 79:3

numbers    82:21

─────────────
            O
─────────────

oath    88:6

object    13:4,
 12,23 14:7
 34:24 39:6,
 16 43:9
 45:7,16
 64:18 65:2,
 17,25 66:16
 68:12 70:2

objection
 13:14 44:16
 90:18

obvious    26:15
 27:11,12
 57:2 85:6

occasion    85:9,

13 87:2

occasions
 85:18

October    31:13
 47:12 49:13,
 20,21

office    4:12
 5:20 11:22,
 23 14:4 22:8
 25:14 58:17
 59:5 60:1
 63:8 70:7
 71:17,20
 72:8,9 79:2
 90:12,16

officer    11:13
 14:24 15:18,
 22 63:16
 79:21

officers    25:4,
 5

older    40:6
 43:16,17
 88:15

one's    51:14

online    5:11
 8:12

open-ended
 59:23

opened    47:25

operation    69:2

opine    86:1

opinion    16:15,

17 19:17
 20:21 43:4,5
 45:13 65:8

opportunity
 15:4

opposed    15:2
 33:6

order    38:1
 39:11,12
 40:8 90:21,
 23

organizations
 79:6

original    13:20
 29:9,12
 51:19 64:12

overly    26:15

oversees    4:24

owns    15:18

─────────────
            P
─────────────

part    6:2,3,10
 27:7 38:21
 47:2 69:2,8
 81:15

parts    68:25

pass    50:16
 69:6

passed    8:16,19

passport    51:16
 83:12,16,19

passports

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                    Index: past..portion

44:20 50:13
83:8,24
84:5,9,12,16

past  5:18
20:8

patience  84:23

paygrade  79:11

Payne  31:22
32:22

PDF  90:25
91:14

PDFS  91:5

pectoral  43:18
57:6

pediatrician
72:20 76:10,
13

peer-to-peer
27:18

people  4:22
8:19 14:21
17:22 24:21
27:21,25
28:2 29:4,9,
15 30:19
32:10,13
40:21 41:13,
16 60:11
68:17 72:24
77:7 85:11
86:1,16

percent  18:14
86:23

Perfect  90:18

performance
38:13

performed  6:19

person  8:10,11
24:19 27:4
38:17 39:12
40:18 56:25
65:9,12
69:25 73:13
85:1,10

personal  7:14
71:14

personally
79:22

perspective
13:3

phone  7:14
11:25 16:10,
20,23 17:3,
24 18:4
19:13 25:21
30:4 72:10

phones  7:13

photo  51:13
64:6 82:5,20
89:9,19

photograph
38:19 78:14

photographs
51:10 64:22
65:11 69:1
70:15 74:23
84:14 86:2

89:12,13

photos  51:6,17

phrased  26:4
84:25

physically
57:1

physician
45:13

pick  17:19
72:10

picture  27:1
35:23 37:5
38:19 49:16
51:4,19 58:9
73:21

pictures  18:1,
3 25:13
29:11,16
50:12,20
66:23 69:16
76:12 81:8,
11 83:17

Pierce  12:12,
13 31:6,20,
23 32:21,24
35:12 42:6
43:3 49:13,
20 50:17

pit  40:22

place  14:25
24:14 81:13
86:17

places  28:16

Plaintiff  4:4

plaintiff's
38:25 62:24

platform  27:25
28:14

play  21:11

point  7:15
18:9 20:8
39:21 47:22
49:6 50:7,11
53:14 62:2

pointed  59:10

policy  72:24

porn  58:22

pornographic
17:2 26:9
27:3 28:20
33:10 40:3
67:25 74:1

pornography
5:15 17:10
20:11 25:10,
25 27:12
29:1 36:17
37:23 39:5
46:6 57:23
58:1,7,10,
12,15,18,20
59:1,6,7
60:15,21
72:17 73:10
74:5 77:2,5
79:4 85:6

portion  33:1

63:22

**position** 64:25
65:4

**positive** 56:6

**possess** 38:18
40:2 45:4

**possession**
5:15 10:9
17:5,9,13
19:18 20:11
25:10 33:9
36:17 37:17,
23 38:2,4
39:4,24 46:6
47:13 60:20
64:15 72:17
77:2,4

**possibility**
48:9

**post** 29:8,9,
11,12,15,16

**posted** 65:23

**posts** 29:14

**potential** 15:4
43:15

**potentially**
27:2

**practice** 74:10
85:25

**preparation**
7:3 9:17
10:6,17,18
54:23

**prepubescent**
55:8,15,21
59:12 75:3,
9,14

**present** 10:4
31:6,7,17
55:19

**presentation**
38:21

**prestige** 79:19

**Preston** 9:22
18:24 19:22
20:14 22:7
23:1 30:6
31:25 47:11
48:18 49:10
50:22 53:13
68:19 70:1,8
71:9 89:25

**pretended** 70:9

**pretending**
68:7,10,17

**pretends** 68:19

**previously**
12:7

**print** 35:12,
16

**printer** 11:5

**prior** 18:6
19:17 47:13
48:19 52:4
72:6 80:24
81:6

**probable** 19:18
20:1,9,10
43:6,12
44:2,3

**problems** 18:24

**PROCEEDINGS**
4:1

**process** 10:23
15:3 18:5,20

**product** 23:15

**programs** 25:24

**property** 54:3

**protect** 62:3

**Protection**
76:21

**provide** 6:7,12

**provided** 10:1
66:24 89:14,
17

**providers** 8:13

**puberty** 57:1,4
77:25

**pubic** 43:17,
22 55:18
57:4,6 74:11
75:3,8,13,23
86:21

**public** 28:25
41:1 55:24
56:2,3

**publicly** 56:4

**published**

61:20 83:4

**publishers**
66:12

**publishing**
53:17

**purport** 66:20
84:17

**purported**
84:12

**purposes** 57:10

**purview** 5:16

**put** 27:25
62:22 63:5
81:25

**Putnam** 76:25

**putting** 68:25

---

**Q**

**quarter** 59:25

**question**
13:13,15,17,
20,23 15:16
22:6 23:11
34:22 49:7
52:3 59:19,
23 61:17
63:19 64:3,
14 66:21
68:3 71:6
73:18 75:10,
19 84:14,24
85:2,8 88:5,
20

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: questions..report

**questions**
10:22 37:19
80:11,14,17
87:12 88:13,
16 89:21
90:1

**quick** 80:7

**quicker** 28:3
56:16

**quickly** 54:25

**quota** 79:16,
18

**quote** 67:23

———————

**R**

**rabbit** 39:22

**raise** 59:19
64:13

**raised** 43:5

**ran** 25:23

**range** 86:22

**ranges** 86:1

**rating** 76:6

**read** 7:19
37:15 38:13,
16,22 52:5,
6,11,12
55:2,6 56:8
63:23 90:3,
17

**readily** 41:8

**realistically**

56:10

**realize** 11:12
24:7

**reason** 16:22
31:14 45:3
56:10 72:23

**reasonable**
46:13 65:9,
12

**recall** 12:8,9
18:15 20:23
22:11 23:13
25:6 26:5
31:10,17
32:15,19
35:19 36:1,4
41:20 42:9
52:17,21
53:15 54:6,
16 67:1
75:5,19
78:25 81:13
83:14,15
85:15 87:24
88:1,2,16,19

**receive** 60:2
79:3,7

**received** 9:13

**recently** 76:10
86:8 90:15

**recess** 80:9

**recollection**
12:18 20:14
22:25 33:16
39:3,9

**record** 4:9
13:13 30:17
34:13 62:13,
14 63:23
66:25 89:8
91:15

**records** 42:11
88:25 89:12

**Reddit** 29:8

**redirect**
87:16,20

**reference**
33:23 67:9

**referenced**
46:15 72:15

**referred** 8:22
18:7 76:24

**referring** 7:22
8:6 9:6,12,
25

**refers** 81:21

**refresh** 39:3,9

**regard** 54:4

**regular** 60:19
74:10,22

**regularly**
48:13,18
56:18

**related** 8:9
22:8 23:2,14
26:20 28:19
33:19 60:25
78:23

**relation** 81:18
85:8

**relevant** 17:9

**rely** 59:7

**remember**
12:11,12,16,
19 17:21
18:2,14 23:5
27:19 29:10
31:19,20
32:4,5,13
34:4 35:11,
14,15,17
36:6,7,14
37:20 49:15,
17 50:4,5,
10,25 51:2,
14,23 52:13
53:21 54:4
67:11 76:19
82:10,19
83:13,20,22
84:3,4 85:2

**remembered**
53:3

**remote** 91:16

**remove** 75:23

**repeat** 13:16

**report** 6:23
7:6,20,22
9:11 22:13
26:3,5 53:24
54:5,7,11,
19,22 57:25
58:1,11,15

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: reporter..section

59:4,8,11
60:19 61:3
62:17

reporter   7:23
9:1 11:4,11
35:2 57:16
62:15,21
63:14,19,21
90:20 91:2,
8,11

reporting
58:5,6,8

reports   7:7,9,
10,11,13
56:8,11
59:23,25
60:1 75:25

represent   35:3
89:25

representation
38:20

representations
46:4

represented
34:21 35:5
41:7 90:7

reputation
71:14

requested   9:23
63:22

requesting
18:22

required   66:12

requirements
41:24

requires   38:1
42:11

respond   29:9

response   29:12
53:9

responsible
19:25

result   6:23
22:17

return   9:19,22
10:2 18:8,12
19:1,14
20:15,18
48:11

returned   89:8

revealed   26:3

review   7:2,5,
17 10:1,12
12:4 18:23
19:6 22:8
52:16 56:11

reviewed   7:12
9:10,14,16,
18,20,21
10:19 12:2,3
14:2,3 19:16
36:9 53:24
54:6,22

reviewing   7:16
12:22 32:20

rid   16:7

Roberts   4:8
7:23 8:1,25
9:2 13:18,22
14:1,14
35:1,7 39:2,
8 40:1 44:5,
8,18 45:9,17
46:1 61:1
62:5,9,14,22
63:1,14,24
64:1,20
65:6,21
66:3,18
68:9,15
69:17 70:5
73:24 74:14
75:6 78:3
80:10,13
82:2,22
84:24 87:11,
14,18,21
89:5,21
90:2,4,6,14,
18,20,23
91:3

room   23:22,24
47:3

RU   41:15

ruined   71:12,
14

rules   63:11

run   49:25

running   19:2

rush   15:19

rushed   14:11

15:2

S

safely   15:1

safety   14:22,
24 15:19,21

Samsung   16:19
17:12 18:12
25:20

Santiago   30:25
31:2

satisfied
64:5,12

scale   76:4,6,
8 78:18
85:24 86:8,
14,20

scanned   7:18

scope   56:14

screenshot
51:22 82:8,
20

search   9:19
18:22 19:1
20:17,18
30:9,11
67:12,18,25
68:1 91:4

searching
67:10,23

second-guess
46:12

section   37:3,

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: send..start

17

**send** 26:23
29:15 90:25

**sending** 16:4
26:21

**separately**
30:18

**service** 8:13
28:11

**seventh** 69:12

**sexual** 19:19
37:18 38:12,
22 57:11,17
62:3 76:6
79:4,8 88:8,
10

**share** 8:8,15
27:22 28:1,
2,3 38:10

**shared** 62:19

**sharing** 27:19
28:10,20

**sheriff's** 4:12
5:20 14:4
22:7 58:17
59:5 60:1
70:7 71:16,
20 79:2
90:12,16

**Shevlin** 13:6,
12 14:8
34:25 39:7,
17 43:10
44:16 45:8,

23 60:22
62:7,11
64:19 65:3,
18 66:1,17
68:13 73:22
74:13 75:4
78:2 80:17,
20,23 87:7,
17,22 88:13
89:2,22,23
90:22 91:12,
13

**shoot** 89:19

**shoots** 64:6

**shot** 15:14

**show** 18:3
23:9 36:20
37:1 38:19
84:18

**showed** 36:13,
22 37:4
50:23 82:4

**showing** 54:19

**shown** 28:15

**shows** 33:2,8

**signature**
91:17

**signs** 75:13

**similar** 23:10
27:21 29:8,
13 76:11,12
87:4

**simple** 50:8

**simplest** 90:25

**simply** 26:8

**sir** 6:18 13:9
25:3 28:7
54:21 72:18

**sit** 4:18 64:5

**site** 29:5

**sites** 67:25

**sitting** 49:8

**situations**
86:13

**sketchy** 41:11

**skin** 74:20

**skip** 78:22

**slowed** 15:6
16:12

**slowing** 15:3

**small** 19:2
57:3

**society** 74:23

**solely** 75:2

**sort** 15:18
19:10,21
28:13,16
67:7 76:7

**sounded** 82:3

**sounds** 57:19
62:7

**source** 52:9
88:2

**speak** 10:21

87:2

**special** 5:22,
24 6:2,12

**specialist**
26:14 75:17

**specialized**
6:13

**specialty** 6:6

**specific** 14:16
42:24

**specifically**
20:19 60:25
66:6

**spot** 40:25
41:3 90:11

**spots** 40:23

**squint** 38:16

**St** 4:12 5:1,
19 9:13 13:2
14:4 18:8
20:25 21:21
22:7 31:6
58:16 59:4
60:1 69:5,24
70:7 71:16,
20 79:2 90:8

**stages** 77:25
78:7

**staging** 77:18,
21

**stands** 55:8
81:15

**start** 12:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: started..things

started  12:21
  18:5

starting  43:21
  57:7

state  4:9 6:9
  31:7,22
  35:15 42:7,
  16 43:3
  49:14 50:20,
  21 76:24
  77:10

stated  68:4

statement  83:1

statements
  54:2

States  40:3

stating  88:6

statute  37:13
  38:6,11 42:8
  62:18 65:16,
  20,22

step  73:5

stone  77:15

stood  30:10

strictly  19:21

stuff  23:9
  28:22 33:15
  40:18,23
  41:17 56:15
  57:7 63:8
  67:15 70:23
  77:14,15

subject  35:23

54:7,12

subpoena  10:2
  18:8,12,19,
  22 19:14
  20:15,18
  48:11

Subsection
  37:17 38:12,
  15

success  69:19

successfully
  25:21 69:20

suggest  90:2

suing  71:8

supervisor
  4:20 72:2,7,
  11

supposed  43:24

surprise  81:23

suspects  15:4

SVU  5:23 20:7

SWAT  16:4

sworn  4:4

Synchronoss
  18:9,21 19:1
  24:1,4 58:6

system  56:4

— T —

taking  64:24
  65:4 77:13

talk  9:15
  16:19 17:12
  29:4 63:11

talked  61:15
  72:14 75:16
  78:21 87:5

talking  9:21
  15:20 25:20
  29:1 32:8
  34:2 36:1,7
  49:8 62:15
  66:5 72:9
  82:5 86:2,7

tangent  9:10

Tanner  76:4,6,
  7 77:18,20
  78:7,18
  85:24 86:8,
  14,19

task  6:8,10

taught  86:25

team  16:4
  20:4 76:21
  89:8

tech  19:21

technical
  24:10 48:19

technically
  39:23 44:3

teenage  43:16

teenagers
  86:22

teens  39:20

67:12,19,23
  81:18,21

telling  44:10
  53:21

ten  52:17

tend  15:2

term  27:12
  28:8 56:22
  81:17

terms  67:11,
  13 69:22
  70:16

test  77:23

testicles  57:6

testified  4:4
  17:1 24:25
  25:12 48:13
  88:1

testimony
  67:10

themself
  40:19,21

theoretically
  40:17

thighs  33:3
  82:4,7

thing  15:24
  19:10 29:13
  42:17,19
  76:7

things  14:12,
  23,24 15:2,
  5,10 24:22

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024          Index: thinking..understanding

25:25 27:16
28:9,16
35:19 42:21,
23 62:19
73:17 74:19
79:13

**thinking**  31:21

**thought**  32:8
61:16

**throw**  16:8

**thumbnail**
82:13

**tickets**  79:16

**time**  6:1
10:21 13:11
14:10,12,17
16:13 17:14
19:2 23:19,
21,25 25:8
31:5 37:15,
24 40:20
42:18 47:9
48:3 52:22
53:14 54:23
62:10 64:6
65:10 70:13
83:5 86:17
87:8

**timeframe**
31:15 59:24

**timeline**  18:16

**times**  30:20
41:13 61:2

**tinker**  21:11

**tinkered**  22:22

**tinkering**
21:16

**tiny**  76:14

**tip**  7:22 8:19
9:12,23
18:19 59:15,
20,25

**tips**  8:15
60:15,24

**tissue**  43:18

**title**  4:17

**today**  4:17
5:13 10:13,
16,17,23
22:25 64:5
86:3

**today's**  7:3
9:17 10:6
12:4 54:23

**toddler**  26:16
57:3

**toilet**  16:8

**told**  49:15
50:9 78:10

**tool**  21:4
67:3

**tools**  21:6,8
23:8 65:15

**top**  33:3 60:4
83:20

**totally**  32:16

**touched**  74:19,
23 75:18

**track**  70:12

**trained**  37:22
41:22

**training**  6:7,
12,13 38:1
39:4,15
86:12

**treat**  79:24,
25 80:2,3,4

**trick**  37:21

**trouble**  19:3

**true**  59:13
83:1 88:19,
22

**turn**  14:23

**turned**  30:5

**TV**  71:24

**Twenty**  34:4

**type**  21:4
26:19 27:18
33:23 42:15,
16 74:11
82:9 83:13
86:12

**types**  74:15

**typing**  33:15

———————

**U**

———————

**UC**  69:2

**UF**  76:21

**Uh-huh**  11:17
31:11 35:25
37:12 38:14
44:22 61:24
80:19 85:7
87:25 88:21

**Ukraine**  52:8
84:1,6,9

**Ukrainian**
51:16

**unconfirmed**
57:23 58:1,
8,15 59:4

**undercover**
48:2 69:2

**understand**
4:11 5:4
6:15,20 8:23
13:23 17:6,
15 18:13
19:10 20:16
25:2,9 26:8
30:21 31:4
32:15 33:13
34:6,13
37:25 40:5,8
42:1,3 43:4
44:13 58:14
59:3 71:8,
11,19 72:25
89:6

**understanding**
18:7 39:14
66:19 72:19

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**                                    Index: unit..young

86:19

unit   5:22  6:2
  8:21  15:7
  24:13  69:5
  77:8,9

United   40:3

unlawful   38:17

unusual   33:7,
  11

upload   27:24

uploaded   55:2

_____

V

_____

vagina   33:6,8
  35:24  37:4
  82:4  83:15

vaginal   34:3

values   58:9,
  13,20

verbatim   13:24

verification
  35:10  41:24
  65:16,19
  82:24  85:17
  88:16

verified   41:2

verify   83:20
  88:19

verifying
  84:13

Verizon   7:18,
  21  9:11,18,

23  18:9

victims   5:22,
  24  6:2
  85:19,20

videos   21:10
  29:12  56:13
  58:24  81:12

view   38:18
  64:2  83:11

viewed   42:6
  49:3  65:23
  83:25  88:15

viewing   43:2
  59:14

viruses   41:16

visible   75:13

visited   53:8

visiting   46:14

_____

W

_____

waived   91:18

walked   48:4

wanted   32:24

wanting   79:15
  82:14

warrant   9:19
  16:2  18:22
  19:1  20:17,
  18

watermark
  32:23

ways   21:5,11

web   28:8,16,
  17  82:8

website   28:25
  29:17  33:19,
  23  34:2
  41:1,5  42:11
  46:4,5  51:22
  61:16  80:25
  82:12,18
  87:23  88:25

websites   28:18
  32:24,25
  33:15  34:7,
  10,11,20,21
  35:3,6,8,9
  41:10,18
  42:6  43:2
  44:10  46:15
  48:23  65:23
  88:14

weekly   60:3

weird   61:12
  90:11

Weiss   30:22
  31:5,23

wet   16:10

wildlife   72:13

word   55:12
  57:15  82:9,
  10  91:4

work   5:5,23
  6:14,24  7:14
  16:23  17:6

18:19  22:13
  26:13  30:13
  42:15  79:18

worked   77:11

working   81:10

worry   14:20,
  22  41:16

worse   80:4

Wow   22:21

write   11:11
  26:6  79:6,
  10,11,16

wrong   40:12

_____

Y

_____

y'all   86:14

Yahoo   29:6

year   40:12
  49:23,25
  52:7  66:8
  69:6,7,19
  70:1,9,19,20

years   5:2,3
  40:6  44:12
  49:25  52:8,
  17  56:19
  68:23

young   39:20
  67:12,19,23
  73:11