```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                JACKSONVILLE DIVISION

 3              Case 3:24-cv-00044-MMH-MCR

 4   WILLIAM LEE LAWSHE, an individual,

 5             Plaintiff,

 6   -vs-

 7   ROBERT HARDWICK, in his official capacity as Sheriff of
     St. Johns County, MIKAYLA PRESTON, in her individual
 8   capacity as a Detective for St. Johns County Sheriff's
     Office, and KATHLEEN DULLY, in her individual capacity
 9   as medical director of the UF Child Protection Team,

10             Defendants.

11   _____/

12            REMOTE DEPOSITION OF EUGINE TOLBERT

13            Taken on Behalf of the Plaintiff

14            DATE TAKEN:  Tuesday, December 17, 2024
              TIME:        1:01 p.m. - 2:47 p.m.
15            PLACE:       Remotely via Zoom

16

17

18            Deposition of the witness taken before:

19                  Maureen Hall, RPR, FPR

20

21

22

23

24

25
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 2

```
1   APPEARANCES:
2   Counsel for Plaintiff:
3
4           MICHAEL K. ROBERTS, ESQUIRE
            LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND
            NOWICKI
5           1680 Emerson Street
            Jacksonville, Florida 32207
6           mroberts@nrhnlaw.com
7   Counsel for Defendants, Robert Hardwick and Mikayla
    Preston:
8
            MATTHEW JOSEPH CARSON, ESQUIRE
9           SNIFFEN & SPELLMAN, P.A.
            123 Monroe Street
10          Tallahassee, Florida 32301-1509
            mcarson@sniffenlaw.com
11
12  Counsel for Defendant, Kathleen Dully:
13          AMY K. SHEVLIN, ESQUIRE
            BUCHANAN & BUCHANAN, P.A.
14          1900 Southeast 18th Avenue, Suite 300
            Ocala, Florida 34471-8237
15          ashevlin@rbtrial.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            I N D E X
2   REMOTE ZOOM DEPOSITION OF EUGINE TOLBERT
3   DIRECT EXAMINATION BY MR. ROBERTS:                    4
4   CROSS EXAMINATION BY MS. SHEVLIN:                    72
5   REDIRECT EXAMINATION BY MR. ROBERTS:                82
6          E X H I B I T S
7   Plaintiff's Ex. No. 1  CyberTipline Report           49
8   Plaintiff's Ex. No. 2  4-5-23 Letter                 59
9   Plaintiff's Ex. No. 3  Photo ID                      65
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                PROCEEDINGS
2   Whereupon,
3            EUGINE TOLBERT, called as a witness by the
4   Plaintiff, having been first duly sworn, testified as
5   follows:
6            THE WITNESS:  I do.
7                DIRECT EXAMINATION
8   BY MR. ROBERTS:
9        Q.  Good afternoon, Detective.  Is it detective?
10  I saw -- are you sergeant detective or detective?
11       A.  Yeah, detective sergeant.  Call me anything,
12  just don't call me late for dinner.
13       Q.  It won't be the worst thing you've been
14  called, right?
15            Okay.  So Detective, I introduced myself just
16  before we got on to the record.  My name is Michael
17  Roberts.  I'm here to take your deposition today.  I
18  understand that you have had your deposition taken
19  before, so I won't go through the -- the kind of ground
20  rules and procedure stuff with you.
21            We're here about a case, it's a -- my client
22  is a guy named William Lee Lawshe.  Are you familiar
23  with the investigation or the prosecution of Mr. Lawshe
24  for allegations of possession of child pornography?
25       A.  Can you hear me?
```

Page 5

```
1            I am.
2        Q.  You are.  Okay.
3        A.  Yes, sir.
4        Q.  Yeah, sorry.
5            So first of all, tell me, what -- what's
6   your -- your title, your job title, as we sit here
7   today?
8        A.  So currently I'm of two sergeants assigned to
9   supervise the major crimes unit at the St. Johns County
10  Sheriff's Office.
11       Q.  And what was your -- your job back in the
12  beginning of 2023?
13       A.  When this case was going?  Are you referring
14  to when this case --
15       Q.  Yeah.
16       A.  -- was going on?
17       Q.  Yes.
18       A.  I was in -- I was in transition at that
19  point.  I was transitioning as the supervisor of the
20  Internet Crimes Against Children Unit, ICAC,
21  transitioning back to major crimes unit.
22       Q.  So how long were you -- I think you -- were
23  you the supervisor of the ICAC unit --
24       A.  Yeah.
25       Q.  -- back at that time?
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 6

1    A.    Yes.
2    Q.    And how long had you done that?  And just
3  give me kind of the timeframe of when you were the
4  supervisor of the ICAC unit.
5    A.    About two years.
6    Q.    And prior to that two years, so I'm guessing
7  '21 to '23 timeframe, you were the ICAC supervisor?
8    A.    Correct.
9    Q.    Prior to that, it sounds like you were in the
10  major crimes unit at that time, too?
11    A.    Correct, prior to.  So I was -- I was a
12  patrol deputy from 2001 to 2009, if this makes it easy.
13    Q.    Yeah.
14    A.    2009 I came to investigations in what was
15  then referred to as robbery/homicide is now referred to
16  as major crimes, so it's changed its name.  I was there
17  for ten and-a-half years as a homicide detective.
18  While I was there, I got promoted to sergeant in 2018
19  and supervised that unit for two additional years.  And
20  then in 2020, I rotated back to patrol.  I did just a
21  little over a year in patrol.  In '21 I transitioned to
22  ICAC as a supervisor of ICAC.  I was there for about
23  two years, and then I transitioned back to the
24  supervisor of major crimes because the other sergeant
25  retired.

Page 7

1    Q.    So can you just describe for me what your
2  involvement in the investigation of Mr. Lawshe's case
3  was?
4    A.    Yeah.  So as the ICAC supervisor, I
5  reviewed -- received and reviewed the cyber tips that
6  were sent to our agency through the North Florida ICAC
7  task force.  And I assigned tips out to detectives for
8  follow-up investigation and then general supervision of
9  the investigation.
10    Q.    In this case, did -- were you the lead
11  investigator investigating Mr. Lawshe's case?
12    A.    I was not, no.  I assigned it to a detective.
13    Q.    Now, I understand you assigned it to
14  Detective Preston; is that correct?
15    A.    Yes, correct.
16    Q.    And she was the detective in the ICAC unit at
17  St. Johns County Sheriff's Office?
18    A.    She was, yes.  She still is.
19    Q.    Is there any particular reason that you
20  assigned this case to Detective Preston?
21    A.    It was her turn in the barrel.
22    Q.    So let me ask you this.  I just want to
23  understand your -- your process of dealing with the --
24  the -- the cyber tips.  That's what we're talking
25  about, correct?

Page 8

1    A.    Yes.
2    Q.    We just had a deposition with Mr. Greene or
3  Detective Greene, and we talked about National Centers
4  for Missing & Exploited Children.  That's what we're --
5  you understand that's what I'm referring to when I say
6  "NCMEC"?
7    A.    Yes.
8    Q.    All right.  And do you, when you get the
9  cyber tip -- and we're talking about in the timeframe,
10  let's just say first quarter of 2023, do you refer
11  every cyber tip to an investigator or detective for
12  what you say, further follow-up investigation?
13    A.    No.
14    Q.    Did you cull out any cyber tips prior to
15  assigning them to the detectives?
16    A.    When you say "call out," I'm not quite sure
17  what you mean by that.
18    Q.    Yeah.  So cull, my grandmother used to cull
19  things, but --
20    A.    Oh, I'm sorry, cull.  I thought you said
21  "call."  I apologize.
22    Q.    No, no, cull.
23    A.    Yeah.  So not all tips are -- have enough
24  information for a follow-up investigation.
25    Q.    Uh-huh.

Page 9

1    A.    So instead of just drowning the detectives in
2  tips that don't go anywhere, at the supervisor level,
3  we tend to try to triage those to a certain extent for
4  tips that are actionable.
5    Q.    Okay.  And what makes a tip actionable?  Is
6  it like an identifiable suspect that you can -- you can
7  locate?
8    A.    Those are great tips, sure.  Yeah, if -- if
9  we know who the bad guy is when the tip comes in,
10  that's -- that's a great start.
11    Q.    Okay.  Do you evaluate whether or not the
12  particular image is or is not of a minor at the time
13  that you're assigning these tips?
14    A.    Yes.
15    Q.    And tell me, how do you do that?
16    A.    Just based on kind of a common sense
17  approach.  If it looks like a duck and walks like a
18  duck, then we call it a duck.
19    Q.    So we were talking to Detective Greene, and
20  he described something called age-difficult as a
21  category.  Are you familiar with that?
22    A.    I don't know that it's a category, more of a
23  description, but, yes, I understand what you're
24  referring to.
25    Q.    What do you understand that term to mean?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 10

1    A.   So for instance, in -- in -- and I don't want
2  to get ahead of you, but I think I'm answering your
3  question.  But in Mr. Lawshe's case, we received two
4  separate tips on Mr. Lawshe.  One of those images I did
5  not assign out because I deemed it to be age-difficult.
6  The second image that we received, I did assign out
7  because I deemed it to be decent.
8    Q.   Okay.  Is it sometimes that investigators in
9  your office disagree about what is age-difficult or
10 what is CSAM?
11   A.   I wouldn't say we have a deliberate
12 conversation about it.  I can't really remember a time
13 that there was a delineated disagreement.  I suppose
14 it's possible that there would be a disagreement, but I
15 just don't remember a time when someone said, No, I
16 don't agree with you.
17   Q.   Okay.  Would you -- if something was
18 age-difficult, I mean, do you ever investigate
19 age-difficult images?
20   A.   We do, yes.
21   Q.   Yeah.  So do you recall whether or not the
22 images involved in Mr. Lawshe's case were
23 age-difficult?
24   A.   So the initial tip that did not get assigned
25 out, I did deem that to be age-difficult.  The second

Page 11

1  tip that we received in Mr. Lawshe's case, we felt like
2  it was CSAM, but we inquired about a second opinion.
3    Q.   And the reason I ask is, I asked
4  Detective Greene, and in his opinion, all of the images
5  on Mr. Lawshe's phone were age-difficult.  Is that just
6  you guys disagree about that, or some people have a
7  different definition of what age-difficult means?
8    A.   No.  So I think it's really based on the
9  personal experience in kind of -- so I have two
10 daughters, obviously, you know, there is a point of
11 reference there.  Everybody might not have that point
12 of reference when, you know, reviewing these things.  I
13 don't know what Detective Greene's point of reference
14 is, so I can't speak to that.  But from my point of
15 reference, I felt that it was an actionable tip.  But
16 as I said, we did seek a second opinion through
17 Dr. Dully at the Child Protection Team.
18   Q.   Did you communicate to Detective Preston at
19 the time that you communicated the tip that you felt
20 like the image -- image constituted child sexual abuse
21 material?
22   A.   Yes.
23   Q.   Did you ask her to investigate that?
24   A.   Yes.
25   Q.   And -- all right.  Were you a part of the

Page 12

1  investigation?
2    A.   So as far as the -- I went with Detective
3  Preston to see Dr. Dully when we presented the images
4  to the doctor.
5    Q.   Okay.
6    A.   It was more of a -- kind of a let's just get
7  it done and take care of this kind of deal as opposed
8  to kind of holding her hand, so to speak.  But that's
9  just kind of how it worked out.  It wasn't really that,
10 you know, I had any skin in the game.  I just kind of
11 tagged along.
12   Q.   So you went with Detective Preston to the
13 meeting with Dr. Dully?
14   A.   Correct.
15   Q.   All right.  I want to -- I'll ask you some
16 more detailed questions about that in a minute.
17        So other than, you know, the fact that you
18 have two daughters, what training do you have in
19 determining if a particular individual displayed on
20 a -- a photograph is, let's say, the difference between
21 17 and 18 years old?
22   A.   I don't know that we would get into those
23 leads in an investigation.  By that point, you're --
24 you're kind of past puberty, and those are going to be
25 very difficult images to kind of hash out, between a 17

Page 13

1  and 18 year old, unless we have some kind of specific
2  information to the identity of the child.  So that's
3  probably not a scenario that we would be involved with.
4    Q.   So you say "puberty."  What do you mean by
5  that?
6    A.   So I mean, everybody hits puberty a little
7  differently, but it's generally the development of --
8  like for females it's generally the development of
9  breast buds, you know, body hair, things like that.
10   Q.   And so generally it was y'all's practice if
11 someone had developed pubic hair that you would not get
12 into those weeds as to whether or not this was a 17 or
13 18 year old?
14   A.   Not -- not in so many words.  That might be
15 something that we took the CPT if we -- if we felt a
16 certain way about it, and we felt like that, you know,
17 it presented as CSAM, we might get a second opinion
18 from CPT, and that's what we did in this case.
19   Q.   Yeah, I'm not trying to put words in your --
20 in your mouth.  You said, you know, if someone is
21 experiencing puberty -- I'm trying to understand what
22 training.  The original question I asked was, What
23 training do you have to distinguish whether someone is
24 16, 17, 18, 19, what training do you have to make that
25 determination, other than you have two daughters?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 14

1    A.   Just me being on this earth for 48 years.  So
2  there's -- there's not a class that I have taken.
3  There's not a seminar that I have attended that says
4  that this person is 16 versus this person is 17, so...
5    **Q.   So you have no specialized training or**
6  **knowledge in understanding -- in -- in estimating**
7  **someone's age other than what we all have, just living**
8  **on the earth?**
9    A.   Yeah, I mean, generally speaking, you know,
10  as a layperson, if you're out in public, you can
11  generally look at a person, even an adult, and
12  approximate their age.  And that's just based on, you
13  know, your interaction with society, things that you
14  have experienced in your lifetime, you're drawing on
15  all those things, you know, as it is generally termed
16  law enforcement training experience, you know, that
17  personal experience in life weighs heavily in that as
18  well. So...
19    **Q.   Right.  And -- but I'm just a lawyer, and I'm**
20  **trying to be, you know -- you have all of that life**
21  **experience, but you don't have any specialized**
22  **training; you haven't taken classes or been educated on**
23  **estimating someone's age in this regard?**
24    A.   So, no.  But like I said before, I don't know
25  how to better answer your question, so, you know, if

Page 15

1  you look at a duck, you can usually tell a duck is a
2  duck.  I don't mean to be facetious, but this is the
3  best way I can explain it.  So if you have a question
4  as to, you know, any further detail, then you might
5  need to dig deeper.  And that's what we did in this
6  scenario when we reached out to Dr. Dully and the CPT
7  team.  So obviously Dr. Dully has a medical background.
8  She has specialized training and things like that.  She
9  has references she can refer to as far as literature to
10  give us a better estimate of age.  But it's really just
11  kind of a, you know, this one looks like this and this
12  one looks like that initial assessment of the case.
13    **Q.   Okay.  So does the fact that you took the**
14  **image to Dr. Duly mean that there was some question**
15  **about the -- the model's age?**
16    A.   No.  So if we didn't feel like it could be
17  CSAM, we wouldn't have taken it to Dr. Dully to begin
18  with.  So as I said, in -- in Mr. Lawshe's case, we got
19  two tips.  The first tip we deemed not -- to not be
20  actionable right off the bat.  We did not take that to
21  Dr. Dully.  I just closed that tip out.  The second tip
22  I felt like was actionable.  We took that tip to
23  Dr. Dully.  Dr. Dully agreed that it appeared to be a
24  child, and then we went forward with the investigation
25  from there.

Page 16

1    A.   Yeah, and I -- and I -- so I'm just -- I'm
2  trying to understand.  So sometimes you don't take
3  images to Dr. Dully, correct?
4    A.   That's correct.
5    Q.   If something is obviously a child, you -- you
6  don't take it to -- to Dr. Dully, correct?
7    A.   Correct.
8    Q.   And that's what I'm trying to understand is,
9  in this case, doesn't it say that this was not
10  obviously a minor because you took it to Dr. Dully?
11    A.   I mean, I don't know how to better answer
12  your question.  I felt it was a minor when I reviewed
13  the tip.  And, you know, to be fair, if we had taken it
14  to Dr. Dully and Dr. Dully said, No, this is not a
15  minor, then we would have went with what Dr. Dully
16  said.  You know what I mean?  But on face value when I
17  reviewed the tip, when I received the tip, I believed
18  the image to be of a minor.  I assigned it to Detective
19  Preston.
20    Q.   Right.
21    A.   And we took the image to Dr. Dully for a
22  second opinion.
23    Q.   For a second opinion.  Okay.
24    A.   So I don't have a better answer than that.
25    **Q.   Well, really, and you just keep answering the**

Page 17

1  **best you can.  Okay?**
2    A.   Sure.
3    **Q.   But -- but when you say you believed that**
4  **this was a child, it -- it wasn't obviously a child,**
5  **though, was it?**
6    A.   So I can tell you this.  And I will give you
7  a scenario.  If I --
8    **Q.   I really just want you to answer the**
9  **question, really.  I mean, it wasn't obviously a child.**
10  **You wouldn't have taken it to Dr. Dully if it was**
11  **obviously a child, would you?**
12    A.   Well, it obviously wasn't a two year old, so
13  I believed it to be an early teen child.
14    **Q.   And if someone would have told you, no,**
15  **this -- this is an 18 year old, you would have believed**
16  **that too?**
17    A.   If someone who had the expertise to give that
18  opinion, then, yeah.
19    **Q.   What if someone had a copy of her ID and said**
20  **here's her ID, she's 18, would you have believed that?**
21    A.   Oh, absolutely.  Yes.
22    **Q.   Okay.  All right.  Okay.**
23    **But I guess what I'm saying is, is the type**
24  **and quality of imaging that we're -- that the model is,**
25  **it's not something that you would look at and say**

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 18

1  there's no way this person is 18 years old, correct?
2      A.   Well, I don't know that there is -- I kind of
3  learned my lesson about absolutes in law enforcement.
4      Q.   Sure.
5      A.   So I -- I -- I don't know that there's really
6  a scenario that I would want to submit to an absolute
7  like that.
8      Q.   Right.  But you would accept either
9  Dr. Dully's opinion that this particular model was 18,
10 and you would accept that the model was 18 if she had
11 said that it was 18?
12     A.   Absolutely, yes.
13     Q.   And if someone produced a photograph of an ID
14 and said, Hey, she was 18 at the time of the
15 photograph, you would have also accepted that as being
16 she was 18?
17         MS. SHEVLIN:  Form.
18         THE WITNESS:  Considering the source, but,
19     yes.
20 BY MR. ROBERTS:
21     Q.   Yeah, generally speaking, yes, right?
22     A.   Correct.
23         MS. SHEVLIN:  Form.
24 BY MR. ROBERTS:
25     Q.   So would you just agree with me, because, I

Page 19

1  mean, I have the same life experience that you do, is,
2  sometimes it is difficult to tell whether or not
3  somebody is 16 or 19 years old?
4      A.   I agree.
5      Q.   Yeah.  Kind of seems like the older I get the
6  harder it is to look at someone and say, Oh, no, that
7  person's in college or that person -- is that your
8  experience?
9          MS. SHEVLIN:  Form.
10         THE WITNESS:  Do I hear something in the
11     background?  I'm not sure if it's --
12         MR. ROBERTS:  Someone is objecting.  Someone
13     is just objecting for the record.
14         MS. SHEVLIN:  You may hear objections from
15     time to time.
16         THE WITNESS:  I'm only hearing a blip, and I
17     can't quit make out what it is.  I apologize.
18         MS. SHEVLIN:  It's just me objecting to form.
19     You can ignore me.  It's just for the record.
20         THE WITNESS:  No problem.  No problem.
21         MR. CARSON:  If we could, for just -- if we
22     could, for just a second, I -- I objected to the
23     form of a question a few minutes ago, and I wasn't
24     sure, I didn't see the green border of my Zoom
25     window light up, so, Madam Court Reporter, could

Page 20

1  you confirm that you can -- you can hear me object
2  to the form previously?
3          THE COURT REPORTER:  I did not hear anything
4      from you previously, and the green light didn't
5      show up on my end.  So maybe if they pause a
6      little bit, it will get it.
7          MR. CARSON:  Yeah, Sergeant Tolbert, if you
8      don't mind making sure you just give us one second
9      between the end of Mr. Roberts' question and you
10     starting your answer, and that will allow
11     Ms. Shevlin and myself to object to the form, if
12     we deem it appropriate.  And you can still answer,
13     if you can.  All right?
14         THE WITNESS:  Absolutely.
15         MR. CARSON:  Thank you, sir.
16 BY MR. ROBERTS:
17     Q.   So, I want to just kind of go through some --
18 some basic -- and I -- I'm not trying to -- I know
19 you're a professional, and you do this for a living or
20 you have done the ICAC investigation for a living, but
21 I just want to just kind of confirm some things.  I'm a
22 lawyer, that's my job.  Do you understand?
23     A.   No problem.
24     Q.   The private possession of adult pornography
25 images is legal and protected by the Constitution of

Page 21

1  the United States.  Do you agree with that statement?
2      A.   Yes.
3      Q.   And at the time of this investigation, that
4  right was well-established, and you were aware of it?
5      A.   Yes.
6      Q.   You understand what probable cause means?
7      A.   I do.
8      Q.   What do you understand the term "probable
9  cause" to mean?
10     A.   The facts and circumstances that would lead
11 one to believe that a circumstance probably occurred.
12     Q.   Okay.  And in terms of probable cause that a
13 crime was committed, can you tell me what that means?
14     A.   Facts and circumstances that would lead you
15 to believe that circumstances or crimes probably
16 occurred.
17     Q.   And you understood at the time of this
18 investigation that the Constitution of the United
19 States required a finding of probable cause prior to
20 issuing a search warrant in this case?
21     A.   Correct.
22     Q.   And you also understood that the Constitution
23 of the United States required a finding of probable
24 cause prior to effectuating an arrest?
25     A.   Correct.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 22

```
 1       Q.   Those rights and the requirement of probable
 2  cause were long established, and you were aware of them
 3  at the time of this investigation?
 4       A.   Correct.
 5       Q.   Okay.  You are familiar with Florida Statute
 6  Section 827.071, Subsection 5, which is the possession
 7  of child sexual abuse material statute?  Are you
 8  familiar with that statute?
 9       A.   I have read it before.  I couldn't quote it
10  to you.
11       Q.   You have -- you have arrested people based on
12  that statute before?
13       A.   I have been involved in investigations based
14  on that statute before.
15       Q.   I'm just going to read the statute and see if
16  that -- if it purports with your recollection.  Okay?
17            "It is unlawful for any person to knowingly
18  possess, control, or intentionally view a photograph,
19  motion picture, exhibition, show, representation,
20  image, data, computer depiction or other presentation
21  which in whole or in part he or she knows to include
22  any sexual conduct by a child."  Does that sound like
23  the statute that you're familiar with?
24       A.   Yes.
25            MR. CARSON:  I'm going to object to form.
```

Page 23

```
 1            MS. SHEVLIN:  Join.
 2  BY MR. ROBERTS:
 3       Q.   Do you understand and did you understand at
 4  the time of this investigation that Florida law
 5  required Mr. Lawshe to know that the images in his
 6  possession contained images of a child?
 7       A.   Yes.
 8       Q.   So in order to believe that an individual has
 9  committed the crime of possession of child pornography
10  in Florida, the officer would have to believe that the
11  person knew that the image in their possession depicted
12  a child, correct?
13       A.   Correct.
14            MR. CARSON:  Object to form.
15            MS. SHEVLIN:  Join.
16  BY MR. ROBERTS:
17       Q.   The opposite of that is true as well.  If the
18  law enforcement officer had reason to believe that the
19  suspect believed that the image depicted an adult, then
20  there would not be probable cause to believe that the
21  suspect had committed the crime of possession of child
22  sexual abuse material?
23            MS. SHEVLIN:  Form.
24            MR. CARSON:  Object to form.
25            THE WITNESS:  I'm sorry, was that a question?
```

Page 24

```
 1       I thought you were just making a statement.
 2  BY MR. ROBERTS:
 3       Q.   No, it's a question.
 4       A.   I apologize.  I'm sorry, can you repeat it?
 5       Q.   Yeah.  If -- and that usually signifies the
 6  question, "if."  If a law enforcement officer had
 7  reason to believe that the suspect believed the image
 8  depicted an adult, then there would not be probable
 9  cause to believe that the suspect had committed the
10  crime of possession of child sexual abuse material?
11            MR. CARSON:  Object to form.
12            MS. SHEVLIN:  Join.
13            THE WITNESS:  Generally speaking, yes.
14  BY MR. ROBERTS:
15       Q.   You would agree that it is important to
16  understand the context in which an image is published
17  to understand what the suspect may or may not have
18  believed at the time that they possessed the image?
19       A.   I'm not quite sure what you mean by
20  "context."
21       Q.   Do you not understand the word "context"?
22       A.   I do.  I just don't know what you're -- what
23  you're referring to by context.  You mean like by the
24  means, like be it the internet or -- I'm not quite
25  following what you mean by that.
```

Page 25

```
 1       Q.   So like a picture of a naked baby that a mom
 2  has taken of her own child in a bathtub, probably not
 3  possession of child sexual abuse material?
 4       A.   I think it could be innocently possessed, but
 5  I -- I think it could be innocently possessed, but I
 6  think that could also be a criminal situation.  I think
 7  it really depends on what the circumstances are.
 8       Q.   I mean, did -- you have two daughters.  I
 9  mean, I have kids.  I mean, sometimes my wife will take
10  pictures, and my kids are naked in the pictures.  I'm
11  not committing a crime of possession of child sexual
12  abuse material, am I?
13            MS. SHEVLIN:  Form.
14            THE WITNESS:  So in -- in that context, to
15       use your words, no.
16  BY MR. ROBERTS:
17       Q.   Okay.  So the -- but if someone else was
18  trading or selling it on the dark web, that very well
19  may be, that same image very well may constitute a
20  crime of possession of child sexual abuse material,
21  correct?
22       A.   Correct.  And that's kind of what I was
23  getting at, is just because the image itself being
24  innocent doesn't necessarily mean that it is innocent.
25  So the context is important in that scenario.
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 26

1    Q.   Right.  You also agree that if an image such
2  as the one that Mr. Lawshe was viewing was available on
3  a public website with a disclaimer that the model was
4  verified to be an adult, that would be an important
5  context to consider before making a probable cause
6  determination?
7         MR. CARSON:  Object to form.
8         MS. SHEVLIN:  Join.
9         THE WITNESS:  Well, I -- I think generally,
10        yes, but I don't know what website that image was
11        posted to, so there is -- I just don't have that
12        information listed here, so...
13  BY MR. ROBERTS:
14    Q.   Okay.  And I understand you were not
15  intimately involved with the investigation of this
16  image, correct?
17    A.   Correct.
18    Q.   Right.  You, as we sit here today, don't
19  recall having the information of what website it was
20  published on?
21    A.   I do believe there was a watermark on the
22  photo for Metart, if memory serves me correctly.  I
23  don't want to get my wires crossed, but I don't know
24  what website that that image was received from.
25    Q.   Okay.  Did you ever investigate -- did you

Page 27

1  personally ever go to that website to see the context
2  and the disclaimers in which that image was published?
3    A.   No.
4    Q.   Did you go to any website where any of the
5  images that Mr. Lawshe was charged with were published
6  on the internet?
7    A.   No.
8    Q.   Are you aware today that -- that all three of
9  the images were published on the public internet?
10    A.   No, I'm not.
11    Q.   Have you ever seen photographs of these two
12  models with their IDs, pictures of holding their IDs?
13    A.   I have not.
14    Q.   You have not.  Okay.  All right.  Are you
15  aware of whether or not Detective Preston ever visited
16  metart.com or any other website to investigate the
17  context in which these images were published?
18         I didn't hear your answer.  I'm sorry.
19         THE COURT REPORTER:  I didn't either.
20         THE WITNESS:  I almost wonder if we need to
21        take just two minutes and let me swap this
22        microphone, if you're having a really hard time.
23        I'm leaning into the microphone, and if you still
24        can't hear me, I don't know what else I can do.
25        Can we just hit pause for like a minute, and I'll

Page 28

1        just --
2         MR. ROBERTS:  Absolutely.
3         THE WITNESS:  I'll pop out and go on my
4        laptop.
5         MR. ROBERTS:  Absolutely.
6         (Off record)
7         THE WITNESS:  I'm not aware of that, no.
8  BY MR. ROBERTS:
9    Q.   So you indicated that you went with Detective
10  Dully to -- I'm sorry, Detective Preston to Dr. Dully's
11  office, and you participated in that meeting.  Other
12  than that, what else, if anything, did you do in this
13  investigation?
14    A.   I reviewed a search warrant for the -- I
15  think it was Synchronoss.  Hang on a second.  I've got
16  the case file right here.  Is Synchronoss correct?
17    Q.   Yeah, that's right, Verizon --
18    A.   Yeah.
19    Q.   -- Synchronoss, or something like that.
20    A.   Yeah.  So I reviewed the search warrant for
21  Synchronoss, and I participated in the ruse when Lee
22  came into the sheriff's office and was interviewed.
23    Q.   Did you -- did you reach out to Mr. Lawshe to
24  get him to come in to the office?
25    A.   I did, yes.

Page 29

1    Q.   Did you know Mr. Lawshe?
2    A.   Professionally because of a prior
3  investigation, yes.
4    Q.   Tell me about what you knew of Mr. Lawshe
5  before this.
6    A.   So back in 2013 I was working a homicide
7  case, and Mr. Lawshe was working for FWC at the time,
8  and he participated in a search out in the Flagler
9  Estates area in the southwest corner of our county, and
10  he actually located the remains of our homicide victim.
11    Q.   Did you form any impressions about him as a
12  law enforcement officer during that interaction?
13    A.   No, not really.  So I mean, we didn't know
14  each other intimately, like we didn't hang out on the
15  weekends, drink beer together or anything like that.  I
16  didn't know anything about him.  That was really my
17  only interaction with him.
18    Q.   When did you first learn that this
19  investigation that we're here talking about involved
20  Mr. Lawshe?
21    A.   When I opened the cyber tip.
22    Q.   You knew that that cyber tip involved a law
23  enforcement officer, local law enforcement officer at
24  that moment?
25    A.   I did.  I recognized his name.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 30

1    Q.   Did you communicate that information to
2  Detective Preston?
3    A.   I did.
4    Q.   So the entire time she investigated this
5  case, she was aware that Mr. Lawshe was a law
6  enforcement officer?
7    A.   Yes.
8    Q.   Okay.  So you participated in the interview.
9  I understand that his supervisor at FWC had been
10 informed about this investigation prior to him being
11 brought in or the arrest.  First of all, do you know
12 who informed his supervisor at FWC of this
13 investigation?
14   A.   Captain Bill Werle.
15   Q.   And that's -- that's the St. Johns County
16 Sheriff's officer?  And you said Werle; is that
17 correct?
18   A.   Yeah.  It's W-E-R-L-E.  His first name is
19 William.  He goes by Bill.
20   Q.   And how did Mr. Werle find out about this
21 investigation?
22   A.   He's the captain of criminal investigations
23 at the Sheriff's office.
24   Q.   I mean, does he know about every criminal
25 investigation, or did someone bring this to him saying

Page 31

1  that this was a law enforcement officer?
2    A.   Both.  So he is the chain of command for
3  criminal investigations.  So any large scale
4  investigation or any sensitive investigation, like in
5  this situation involving a law enforcement officer, he
6  would be briefed on.
7    Q.   This was a -- you considered this a sensitive
8  investigation?
9    A.   Yes.
10   Q.   Is the only reason that he was a law
11 enforcement officer --
12   A.   I --
13   Q.   I'm just trying to say, are all -- are all
14 investigations of CSAM sensitive, or is it just the
15 fact that he was a law enforcement officer that made
16 this particular investigation sensitive?
17   A.   No.  All investigations are sensitive, but
18 this one, like, it adds a little bit more to it by the
19 fact that he's a law enforcement officer.
20   Q.   Was this investigation treated any
21 differently because Mr. Lawshe was a law enforcement
22 officer?
23   A.   Other than who had access to the information
24 being limited, no.
25   Q.   Nothing was done or not done in the

Page 32

1  investigation because he was a law enforcement officer?
2    A.   Well, I would say that the contact with his
3  agency was done because he was a law enforcement
4  officer, but I -- I wasn't party to that.  I just know
5  it happened.
6    Q.   I understand that media was contacted upon
7  his arrest.  Do you know how they were contacted?
8    A.   I'm not positive that the sheriff's office
9  contacted the media.  If I remember correctly, and I
10 could be mistaken because we're going back in time a
11 little bit, I believe that media contacted us because
12 someone had saw his name and recognized his name on the
13 booking log, and then a release was made after that.
14   Q.   Were you involved with that at all?
15   A.   No.
16   Q.   Okay.  So you were part of the interview and
17 were you the one that communicated to Captain Werle
18 about this case involving a law enforcement officer?
19   A.   I communicated to my lieutenant, who is Jose
20 Jimenez, and then the chain of command kind of goes
21 from there.  I did have conversations with Captain
22 Werle, but I'm not the person who told him about it.
23   Q.   Tell me about those conversations.  What did
24 you guys talk about?
25   A.   They just wanted to be kept abreast of the

Page 33

1  investigation as it went forward.  And then when Lee
2  came in during the ruse, we actually met in Bill's
3  office.
4    Q.   Okay.  All right.  So other than assigning
5  the tip, going with Detective Preston to Dr. Dully's
6  office, participating in the interview, are there any
7  other tasks that you performed on this investigation?
8    A.   I never said I participated in the interview.
9  I'm not sure where you got that from, but I did not --
10 I did not --
11   Q.   I thought you said you were there.  Yeah, I'm
12 sorry.
13   A.   No, I was involved in the ruse when he was --
14   Q.   Okay.
15   A.   -- taken into custody.  I didn't participate
16 in the interview, no, sir.
17   Q.   My bad.  So you did not participate in the
18 interview?
19   A.   No, sir.
20   Q.   All right.  Whose decision was it to make an
21 arrest?
22   A.   I got to be honest with you, I don't know.
23   Q.   That's okay.  Would that usually be the lead
24 detective's decision?
25   A.   It's generally a kind of a -- a combination

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 34

1  of the lead detective and the chain of command kind of
2  supporting the decision.  We were in a little bit of a
3  transition during that timeframe, so we had two layers
4  of chain of command.  So that's why I don't know whose
5  decision it was.
6      Q.   As we sit here today, do you have an
7  independent recollection of a conversation that you had
8  with anyone regarding the decision to make an arrest of
9  Mr. Lawshe?
10     A.   I don't.  I was just informed that it
11  happened.
12     Q.   Okay.  All right.  Who informed you?
13     A.   I don't remember.  I -- it was -- at that
14  point, there were a lot of moving parts.  I just -- I
15  don't remember who actually told me that he was going
16  to be arrested.  It might have been Captain Werle.  It
17  might have been my lieutenant.  I don't remember.
18     Q.   At that time, it sounds like you were
19  responsible for receiving and disseminating the NCMEC
20  cyber reports.  Did I understand that correctly?
21     A.   Correct, yes.
22     Q.   How many reports do you think you would get
23  back first quarter of -- 2023?  And you can estimate
24  by week or month, if you can.
25     A.   It's kind of hard to estimate because some

Page 35

1  weeks were busier than others.
2      Q.   Uh-huh.
3      A.   So some weeks we would get upward of 50.
4  Some weeks we would get two.  So really it -- there was
5  really no rhyme or reason to it.  It's just kind of,
6  you know, however we received them.
7      Q.   And is there a way for you to estimate how
8  many of those you -- we used the word culled, but did
9  not assign because you felt like they weren't
10  actionable just by looking at the image?
11     A.   I tried to weed out as many as possible just
12  to keep the detectives' case loads manageable.  If I
13  had to put an estimate on it, I would say probably
14  somewhere around 50 percent.  But, you know, there's
15  wiggle room on both sides there, so...
16     Q.   Was it a relatively common thing that you
17  would get a NCMEC report and it would not be
18  actionable?
19     A.   Correct, yes.
20     Q.   All right.  Whether it was 60 or 40, I
21  understand you can't testify to that?
22     A.   Correct.
23     Q.   Are you familiar with the NCMEC term
24  "Unconfirmed child pornography"?
25     A.   I am, yes.

Page 36

1      Q.   What do you understand that term to mean?
2      A.   Just -- so, to me it can be a couple of
3  different things, but generally speaking, it hasn't
4  been viewed independently by someone from the center,
5  meaning the national center, or some other review
6  process.
7      Q.   So is it your understanding or your position,
8  I guess, that if you received a NCMEC report of
9  unconfirmed child pornography, that report in and of
10  itself would not constitute probable cause that the
11  image was child sexual abuse material?
12     A.   I agree with that.
13     Q.   Okay.  That would require some level of
14  investigation by either you or your subordinates?
15     A.   That's correct.
16     Q.   So I know that you have talked about
17  assigning this to Detective Preston, and I know that
18  you've talked about going to Dr. Dully's office with
19  her.  Are you aware of any steps that she took to
20  investigate this image other than going to Dr. Dully?
21     A.   Off the top of my head -- I can read a report
22  but I know she went to Dr. Dully, and I know -- can you
23  hear me okay?
24     Q.   I can.
25     A.   Okay.  I know she went to Dr. Dully and I

Page 37

1  know that she did the search warrant for Synchronoss
2  and got some data back there.  I'm not sure if
3  there's -- she might have did a cell cite search
4  warrant.  I'm vaguely remembering something about that.
5  I'm trying to skim over the report right now.
6      Q.   Other than what's contained in the report,
7  are you aware of any steps that she took to complete
8  her investigation into whether or not these images
9  constituted child sexual abuse material?
10     A.   No, I'm not aware of anything outside of what
11  is documented in her report.
12     Q.   Okay.  Do you agree that any reasonable
13  investigation of -- that a purported depiction of CSAM
14  would include visiting the website where that image was
15  published, if that information was available?
16         MR. CARSON:  Object, form.
17         THE WITNESS:  No, I don't --
18         MS. SHEVLIN:  Join.
19         THE WITNESS:  -- I don't agree with that.
20  BY MR. ROBERTS:
21     Q.   You don't agree with that?
22     A.   No, I don't.
23     Q.   Okay.  So do you agree that ICAC's purpose is
24  to prevent the proliferation and spread of child sexual
25  abuse material?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 38

1    A.  I think that's one of their goals, yes.
2    Q.  I mean, is that St. Johns County, is that
3  your goal, the sheriff's office, is to prevent the
4  exploitation of children?
5    A.  Correct, yes.
6    Q.  All right.  So I mean, would you agree that
7  an investigator should have taken reasonable steps to
8  obtain the identity of someone that they believed was
9  being sexually exploited?
10    A.  I do, yes.
11    Q.  Wouldn't that information potentially be
12  found on the website where the image was published?
13    A.  Well, it's -- so the reason why I said not
14  necessarily that I don't agree with that is, it's
15  not -- it's not really a hard no.  It's more of a
16  situation context type scenario.  Generally speaking,
17  the -- the -- the download of the device when the
18  search warrant is down on the device would give us
19  clues as to the origin or the -- kind of the path that
20  that image took.
21    Q.  Right.
22    A.  And that might lead to additional information
23  as far as being able to investigate that, but if we
24  can't identify where the image originated from, in some
25  circumstances, then that might be something that would

Page 39

1  be prohibitive to pursue that, so...
2    Q.  Detective Greene has testified that he
3  located, along with counsel for Mr. Lawshe, both of the
4  models that are in question here within about 20 to 30
5  minutes based solely on the information that was
6  contained in the images.  He found those images and
7  models on the internet.  Do you have any reason to
8  disagree with that?
9    MS. SHEVLIN:  Form.
10    THE WITNESS:  If that's what Detective Greene
11    said, that's fine.  I'm not aware of that.
12  BY MR. ROBERTS:
13    Q.  Okay.  But if that's true, don't you believe
14  that a reasonable investigation would include going to
15  that website to investigate the context or potential
16  identity of the victim?
17    MR. CARSON:  Object to form.
18    THE WITNESS:  Again, not in every scenario,
19    so...
20  BY MR. ROBERTS:
21    Q.  But in this scenario where you had
22  information that told you where they were being
23  published, don't you think that should be a
24  reasonable part of the investigation?
25    A.  So I remember having a conversation with

Page 40

1  Detective Greene about this case and him making a
2  reference -- he's been doing ICAC investigations for
3  quite a bit longer than I have -- and him telling me
4  that Metart that had the watermark on the image or one
5  of the images, I'm not sure if it was on all of them or
6  not, but I remember at least one of them having that
7  watermark, that that website that had had -- previously had
8  issues with displaying images of underage females.
9  Now, beyond that, whether or not someone should have
10  gone to Metart to investigate that, I don't know if
11  that occurred.  I certainly don't think it would have
12  been a bad idea, but, again, context-wise, you know,
13  not in every scenario.
14    Q.  Okay.  And I appreciate your answer.  And I
15  appreciate that you do not know exactly what was done,
16  but my question to you is, do you agree that given the
17  context that you know or have information that leads
18  you to believe that it was published on particular
19  websites, that it would be reasonable to go to those
20  websites to investigate the publication or identity of
21  the victims contained in those images?
22    MR. CARSON:  Object to form.
23    THE WITNESS:  I don't think it's
24    unreasonable.  Again, like I said, it's
25    situational based upon, you know --

Page 41

1  BY MR. ROBERTS:
2    Q.  Well, I mean, if your goal is to end or to
3  stop the proliferation of online sexual abuse material,
4  wouldn't the publisher of that website be committing a
5  crime but publishing this image?
6    A.  Oh, agreeable.  But not all websites are
7  housed within the borders of the United States.  We
8  frequently in an ICAC investigation more often than not
9  run into companies that are overseas where, you know,
10  unfortunately, it's -- it kind of just comes to a dead
11  end.  So again, like I said, I don't think it's
12  unreasonable at all, but it might not be feasible in
13  every scenario, so...
14    Q.  But you would have to go to the website to
15  determine whether it was an offshore website or housed
16  in the United States, wouldn't you?
17    A.  Not necessarily.  There may be a legal
18  process that you could do to the company.  You know,
19  there's a couple of different avenues that you can
20  pursue, so...
21    Q.  But going to the internet would probably be
22  the -- the website itself would probably be the first
23  step in that investigation, wouldn't you agree?
24    A.  Well, I mean, you know, typically speaking,
25  we don't want to go to, you know, an illicit website on

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 42

1   a, you know, county computer that's on a sheriff's
2   office network that can be infected by mal-ware or
3   something along those lines to kind of, you know, just
4   willy-nilly go fishing around.  So there are ways to do
5   that.  It might not be on our, you know, network
6   computers.  It might be on a -- on a -- on a different
7   interface, but -- but, yes, that is one way to do it,
8   is to go to the website, so...
9        Q.   And do you have any information -- I can
10  represent to you Metart's record custodian is a barred
11  attorney in the State of California.  Have you ever
12  heard that?
13       A.   No, I haven't heard that.
14       Q.   Okay.  Are you familiar -- and let me just
15  ask this.  Did Detective Greene do anything wrong by
16  using a St. John's County Sheriff's Office computer to
17  search these websites to find these models on the
18  internet?
19       A.   No, he has forensic machines that are on a
20  protected network that are not on the Sheriff's Office
21  network, so he has the ability to do that.
22       Q.   And Detective Greene has access -- I mean,
23  I'm sorry -- Detective Preston has access to ask
24  Detective Greene for assistance in her investigation
25  anytime she feels free to, correct?

Page 43

1        A.   She does, yes.
2        Q.   Right.  So has St. John County Sheriff's
3   office ever pursued or referred publication of child
4   sexual abuse material to another law enforcement agency
5   in another jurisdiction to prosecute the publisher of
6   that image?
7        A.   Well, you used the word "ever."  I don't
8   know.  I'm not familiar with a scenario where that has
9   happened.  But I can't answer the "ever" part of your
10  question.
11       Q.   Do you know why not, why it hasn't happened
12  under when you were the supervisor?
13       A.   I don't know that the scenario has presented
14  itself.
15       Q.   Well, this scenario presented itself, right?
16  I mean, there is a website that purports to own this
17  image.  And it's a ww.com.  I mean, that's the scenario
18  that we're talking about, right?
19       A.   Again, I can't tell you.  The only thing I
20  can tell you is, I'm not familiar with that ever
21  occurring.
22       Q.   Okay.
23       A.   Now, whether or not it has ever occurred, I
24  don't know.
25       Q.   All right.  So getting your ICAC training,

Page 44

1   investigative experience, you are familiar with federal
2   age verification laws?
3        A.   Yes.
4        Q.   That federal government has laws that
5   publishers of pornography under certain circumstances
6   are required to keep age-verification documents of the
7   models; you're aware of that, correct?
8        A.   Yes.
9        Q.   All right.  Have you ever utilized that
10  statute to obtain identification or age confirming
11  information from a website?
12       A.   I have not.
13            MR. CARSON:  Object to form.
14  BY MR. ROBERTS:
15       Q.   Do you know --
16            MR. CARSON:  Hold on a second.  Madam Court
17       Reporter, did you get my objection?
18            THE COURT REPORTER:  Yes.  Yes.
19            MR. CARSON:  Thank you, ma'am.  I'm sorry to
20       interrupt.  Go ahead.
21            MR. ROBERTS:  That's okay.
22  BY MR. ROBERTS:
23       Q.   Do you know how this case was ultimately
24  disposed of?
25       A.   I don't know the details.  Again, like right

Page 45

1   as this case was coming to a culmination, I transferred
2   out of ICAC and moved back to major crimes, so I don't
3   know the details, the kind of behind the scenes, if you
4   will.  But I know the charges got dropped, so...
5        Q.   You know the charges got dropped?
6        A.   Correct.
7        Q.   You don't know why the charges got dropped?
8        A.   I don't know all the details.
9        Q.   Do you know any of the details?
10       A.   Not enough to say that it's reliable
11  information, so...
12       Q.   You made a comment about what you heard from
13  Detective Greene regarding metart.com.  Do you recall
14  that testimony?
15       A.   I do, yes.
16       Q.   Do you have -- or at the time, right, when
17  you got -- at the moment that you got the cyber tip,
18  did you have any information or opinions about
19  metart.com?
20       A.   I never heard of it before this
21  investigation.
22       Q.   Okay.  And I think I know the answer to this,
23  but I'm just going to make sure.  You never
24  investigated metart.com as part of your work in this
25  investigation?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 46

1    A.   Correct.
2    Q.   ICAC provides training to investigators,
3  correct?
4    A.   They do.
5    Q.   One of the things that they are trained to do
6  is to attempt to identify victims of child sexual
7  abuse?
8    A.   Yes.
9    Q.   All right.  I mean, to the extent that
10 Detective Preston never attempted to identify these
11 individuals, would you agree that that would be a
12 violation of her duty as a law enforcement officer at
13 St. John's County Sheriff's Office?
14        MR. CARSON:  Object to form.
15        THE WITNESS:  I think it's sloppy police
16   work.
17 BY MR. ROBERTS:
18   Q.   You're aware of federal age verification
19 statutes.  You've testified to that.  Would you agree
20 if that information was available to a detective such
21 as Detective Preston, she should inquire with the
22 records custodian of the website to see if they have
23 age verification documentation of the models in
24 question?
25   A.   Well, again, you're kind of talking in

Page 47

1  absolute terms, and I would say it's situational.  So
2  when you say should she have, I don't know that she
3  should have.  Could she have, yes, she could have.
4  So...
5    Q.   Right.  If she had the ability to be able to
6  go to the website, and that website said, Hey, we -- we
7  complied with federal age verification statutes, she
8  could have asked for that documentation, correct?
9    A.   She could have, yes.
10   Q.   I mean, do you think it's sloppy police work
11 to not do that, in this case?
12   A.   So I can tell you that I'm not aware in the
13 year and-a-half, just under two years that I was in
14 ICAC, of us in -- I could just not be remembering a
15 scenario, but I'm not aware of us ever pursuing that
16 information in an investigation.  So is it one of those
17 things that you could do, yes, but when you say -- you
18 know, when you use the word "should," well, we have
19 quite a few cases that we've investigated successfully
20 prosecuted, closed out, that that was never done in.
21 So is it a necessity for an investigation, no, not
22 necessarily.
23   Q.   It's not necessary to obtain a conviction,
24 but is it necessary to at least get all of the
25 information that's available?

Page 48

1    A.   Well, again, I think it's a circumstantial
2  scenario, you know, based on the circumstances, the
3  contact of the investigation.  And like I said, I'm not
4  familiar with a case where we have pursued that
5  information in the past from a website.
6    Q.   But you agree, if someone, as you say, was
7  successfully prosecuted and convicted of possession of
8  child pornography, and it turned out that that
9  individual was an adult, that would be a travesty, a
10 miscarriage of justice, correct?
11   A.   Oh, I agree with that.  Yes.
12   Q.   It is not just your goal as a detective just
13 to convict people.  It's to seek justice, correct?
14   A.   Correct.
15   Q.   All right.  You would agree that sometimes --
16 and I think we have already said that this -- it is
17 difficult to look at an image and determined with any
18 sort of certainty the age of the model depicted,
19 correct?
20   A.   The best you can probably get is an
21 estimation, an age range, correct.
22   Q.   The federal age verification laws, would you
23 agree, are a powerful tool at your disposal in order to
24 attempt to verify someone's age through government
25 issued ID?

Page 49

1         MR. CARSON:  Object to form.
2         MS. SHEVLIN:  Join.
3         THE WITNESS:  I would agree, yes.
4  BY MR. ROBERTS:
5    Q.   You would agree, correct?
6    A.   Yes.
7    Q.   All right.  You are getting these cyber tip
8  reports, and I think you would agree, that as a
9  detective, it's your job prior to making any probable
10 cause decisions to determine the credibility of that
11 tip before taking any actionable steps?
12   A.   Yes.
13   Q.   In this cyber tip report, and I -- I don't --
14 and I know you looked at it probably multiple times,
15 isn't it true that this cyber tip report describes the
16 image as prepubescent?
17   A.   I have it right here.  I can verify that.
18   Q.   Yeah, please do.
19   A.   Can you point to me to where you're referring
20 to?
21   Q.   Yeah, and actually, you know, rather than
22 making you do that, I can -- what I can do is, I can
23 share my screen, and we can attach this as Exhibit 1.
24        (Plaintiff's Exhibit No. 1 was marked for
25   Identification.)

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 50

1     THE WITNESS:  If it's further information on
2   uploaded files, I see where it says, Prepubescent
3   minor is a -- Is that what you're referring to?
4   BY MR. ROBERTS:
5     Q.   Yeah.  You see where it says A-2?
6     A.   Yeah.
7     Q.   A-2.
8     A.   I just want to make sure that's what we were
9   talking about, yeah.
10    Q.   Right.  And the A stands for prepubescent,
11  correct?
12    A.   I'm assuming.
13    Q.   What does it say right under there?
14    A.   Yes.
15    MS. SHEVLIN:  I don't -- I don't want to
16  interrupt you, but can you screen share anyway so
17  we can --
18    MR. ROBERTS:  Sure.
19    MS. SHEVLIN:  -- make sure we know exactly
20  what he's referring to?
21    MR. ROBERTS:  Absolutely.
22    MS. SHEVLIN:  Thank you.  And you're marking
23  this as Exhibit 1, you said?
24    MR. ROBERTS:  Yes.
25    MS. SHEVLIN:  Okay.

Page 51

1   BY MR. ROBERTS:
2     Q.   Detective Tolbert, were you looking at this
3   document that I just shared on the screen?
4     A.   Yes.
5     Q.   All right.  And you agree that when you
6   received this tip, the tip to you was that the -- that
7   the final contained one image of a prepubescent minor
8   in a lascivious expedition -- exhibition.  I don't know
9   why I can't say that word.  I'm sorry.
10    A.   Lascivious, yes, sir.
11    Q.   Lascivious exhibition.  That was what you
12  were told?
13    A.   That's what the tip says, yes.
14    Q.   Right.  As we sit here today, though, do you
15  recall that the image actually was of a pubescent
16  individual?
17    A.   No, I don't.  I don't have the image in front
18  of me, though.  There's two different cyber tips, but
19  can we verify we're talking about the one in 9160?
20    Q.   Yeah, that was the one I was just showing
21  you.
22    A.   Okay.  All right.
23    Q.   Would it -- would it -- would it be important
24  if that was incorrect and this was actually a pubescent
25  image, an image of a pubescent individual?

Page 52

1     A.   No, it's not important.  We don't rely on
2   that information.
3     Q.   Well, do you attempt to verify the
4   credibility of a tip, especially when it's been an
5   unconfirmed tip?
6     A.   So I -- when I was reviewing tips, I didn't
7   look at that information at all, that category.
8     Q.   Okay.
9     A.   That meant very little to me.  The thing that
10  I wanted to look at was kind of like a -- you know,
11  kind of firsthand scenario is the image itself.  And
12  then the suspect information as far as assigning out
13  tips.
14    Q.   Okay.
15    A.   In theory, if that was a -- and I'm not
16  suggesting this never happens, but in theory, if that
17  was a pubescent minor or adult pornography, we
18  shouldn't have received a tip to begin with.  So in my
19  experience, most, if not all of the tips that we
20  received, I'm trying to think of a scenario where it
21  would be different, I'll say that.  So does that make
22  sense?
23    Q.   Yeah, I mean, some of them say pubescent.  I
24  mean, it's A or B, right?
25    A.   Sure.

Page 53

1     Q.   Yeah, yeah.  But I think you said 50 percent
2   or somewhere around 50 percent you call out as being
3   either age-difficult or not actionable?
4     A.   The non-actionable could be as simple as it's
5   very clear CSAM, but there is no information or
6   follow-up on as far as pursuing a suspect.
7     Q.   But you also call out that some age-difficult
8   images as well?
9     A.   You're correct, yes.
10    Q.   So you know that -- I mean, just because you
11  get a cyber tip doesn't mean that it's actually CSAM?
12    A.   Correct.
13    Q.   And did you hear through the grapevine or any
14  other way that one of the reasons or at least the
15  defendant or Mr. Lawshe's attorney presented
16  government-issue ID, photographs, something like that,
17  to the State Attorney?
18    A.   So I remember having a conversation -- I
19  never saw the documents about, I want to say it was
20  passports, but I don't know the details as far as how
21  that flushed out.
22    Q.   Let me ask you a question.  This is a
23  hypothetical question.  If prior to making a decision
24  to let's start with seek a search warrant, if you would
25  have had an image of government-issued ID and

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 54

1  information that the model was 18 or older at the time
2  of the photo shoot, would you have sought a search
3  warrant, and would you have claimed to have had
4  probable cause to search Mr. Lawshe's data?
5       A.   No.
6       Q.   Same question.  If you had images of the
7  models in question with a government issued ID and an
8  affidavit stating their age or information from a
9  records custodian stating their age at the time of the
10 photographs, would you have supported an affidavit, or
11 would you have supported the decision for probable
12 cause to make an arrest of Mr. Lawshe?
13      A.   No.
14      Q.   Do you have any reason to believe in this
15 case that documents were not easily assessable to
16 Detective Preston?
17      A.   I mean, in hindsight, so...
18      Q.   In hindsight.  I mean, look, we're talking
19 about things that happened in the past.
20      A.   Sure.
21      Q.   That information was readily available to
22 Detective Preston at the time she made the decision or
23 at the time the arrest was made?
24      A.   In hindsight, correct.
25      Q.   Correct.  One of the images that Mr. Lawshe

Page 55

1  was charged with -- first of all, did you ever see all
2  of the images -- there were three images that we were
3  charged with.  Did you see all three of those?
4       A.   No.
5       Q.   Okay.  Did you only see the numbering NCMEC
6  tip image?
7       A.   Correct.
8       Q.   Okay.  It's my understanding he actually
9  wasn't charged with that.  Do you have any knowledge
10 about that?
11      A.   I do not.
12      Q.   Okay.  Well, I can relate to you that one of
13 the images only showed the vantage point of bellybutton
14 to genital area, vaginal area of the model, there was
15 no face, no breast, it was just that cross-section.  Is
16 that -- is that ordinarily the type of image that would
17 be picked out to charge someone with possession of
18 CSAM?
19      A.   If that image alone was the only image you
20 had, probably not.
21      Q.   Okay.  So if that was the only image of that
22 model, would you agree that that should not have been
23 charged in this case against Mr. Lawshe?
24           MR. CARSON:  Object to form.
25           THE WITNESS:  It's kind of difficult to say

Page 56

1  without having the advantage of seeing the image,
2  you know.
3  BY MR. ROBERTS:
4       Q.   But it at least raises a question in your
5  mind about the charge of a -- of a picture that doesn't
6  show the face or breast of the model?
7       A.   I mean, it certainly makes it more
8  challenging.  So I don't know the circumstances in
9  which that decision was made, so I don't know if
10 there's more information available that I'm not aware
11 of.
12      Q.   Okay.
13      A.   Like I said, based on not having seen the
14 image, I couldn't really say one way or another.
15      Q.   Okay.  Doctor Dully, do you know Dr. Dully?
16      A.   I mean, we don't hang out on the weekends,
17 but I have met her probably a half a dozen times or so
18 when I was in iTech.
19      Q.   And was it all under similar circumstances
20 where you were investigating possession of child
21 pornography?
22      A.   Yes, correct.
23      Q.   I heard that sort of the office policy or
24 custom was that if an image was age-difficult and there
25 was a disagreement about the age of the individual,

Page 57

1  that the procedure was to take it to Dr. Dully and let
2  her be the tiebreaker.  Is that true?
3           MR. CARSON:  Object to form.
4           MS. SHEVLIN:  Join.
5           THE WITNESS:  I don't know that that's a fair
6       characterization of it.
7  BY MR. ROBERTS:
8       Q.   Just tell me what -- what circumstances would
9  Dr. Dully be brought in on a case?
10      A.   Sure.  So if it's one of those things where
11 you're just looking for, I guess, an extra layer of
12 confirmation, you know, I think we all can kind of look
13 at something and say, Oh, that appears to be this to
14 me, but maybe I want a second opinion.  You know,
15 there's plenty of things in life that you can refer to
16 in that, so in those scenarios, we would reach out to
17 Dr. Dully or someone from CPT.  I only ever dealt with
18 Dr. Dully, but I'm sure CPT has someone else that you
19 could also, you know, speak to, so...
20      Q.   Did you ever review her reports in this case?
21      A.   So she didn't do a report.  She did like a
22 memo.  I'm not familiar with an actual report, but it
23 was like a kind of a letter memo kind of deal.  I'm not
24 sure if you're calling that a report.
25      Q.   Yeah, I -- I -- I don't -- yeah, yeah -- no,

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 58

1  all I have are three separate, I guess you could call
2  them even a letter.  It's all on letterhead, with her
3  opinions in them.
4       A.  Correct, yes, I am -- I guess it's semantics.
5  I guess you could call it a report.  I wouldn't refer
6  to it as a report, but I remember looking at them.  I
7  don't remember them in any great detail at this point.
8  I might have copies of them.  I printed everything out
9  from this case and kind of held onto it.  I do have
10  copies of them.
11      Q.  So I just want to ask you a couple of
12  questions.  Are you generally familiar with the sexual
13  maturity rating that it goes from 1 to 5?
14      A.  I don't know the details behind that.  I've
15  had very little exposure to it as far as the medical
16  side of it.
17      Q.  Okay.
18      A.  I mean, I -- I -- I put a great deal of
19  weight in the fact that a medical professional is
20  telling us their opinion on something, so I don't know
21  the signs behind that, so...
22      Q.  Okay.  Well, I just want to look right here.
23  I mean, other than -- let me just ask you this.  Other
24  than the fact that she has a medical license, do you
25  have any reason to trust Dr. Dully?

Page 59

1       MS. SHEVLIN:  Form.
2       MR. CARSON:  Join.
3  BY MR. ROBERTS:
4       Q.  I mean, is there something -- do you
5  understand what I'm saying?  I mean, is she just a
6  resource, and you say you don't hang out with her.  I
7  mean, you just implicitly -- you trust her, that she's
8  telling you the truth?
9       MR. CARSON:  Form.
10      THE WITNESS:  Well, I trust the process in
11      that she has consulted on cases before.  She works
12      for the child protective team with the University
13      of Florida.  You know, she obviously is a medical
14      professional, would obviously be able to give her
15      expert opinion in situations, where we as lay
16      people can't, and I trust that a court would give
17      her latitude with that, and from my understanding,
18      has in the past.  So I'm not aware of any issues,
19      you know, with any -- any kind of -- you know, for
20      me to doubt that process or for me to doubt her
21      reliability.
22      (Plaintiff's Exhibit No. 2 was marked for
23  identification.)
24  BY MR. ROBERTS:
25      Q.  Right.  Okay.  So I just want to show you,

Page 60

1  this is a letter from April 5th, 2023.  I'm sharing it
2  from the screen, and we'll make all three of her
3  letters Exhibit 2.  It's a composite exhibit to this
4  deposition, okay?  Can you see it?
5       A.  I can.  And I'm looking at it in my case file
6  as well.
7       Q.  Right.  So I'm showing you the first
8  paragraph.  Today you've provided me with two images
9  for review displayed on a law enforcement laptop.  The
10  first is -- and then there's a file number and depicts
11  a female child with no pubic hair development.  She
12  does not appear to be shaved.  Her breasts are
13  partially visible and could be SMR 4 to 5; however, her
14  genitals are plainly visible, with her thighs displayed
15  widely apart and showing she is an SMR 1 with respect
16  to pubic hair.  This developmental appearance is nine
17  to 13 years -- 13 and-a-half -- less than nine to
18  13 years of age.  Did I read that correctly?
19      A.  Yes, you did.
20      Q.  And you were there for this meeting?
21      A.  No, I wasn't, not for the April one.  I was
22  there in February.  There's a letter dated February.
23  That's the one that I -- that was the initial meeting
24  when we met with Dr. Dully.
25      Q.  Thank you for that clarification.  I

Page 61

1  appreciate it.
2       So you were not there --
3       A.  I apologize for the misunderstanding.
4       Q.  No, no, it's my fault.  I knew that there
5  were two meetings, or I should have known there was two
6  meetings.  So you know that this was a digital image,
7  correct?
8       A.  I do.  Well, I mean, I'm assuming it was.
9  My -- on the April one, the one from February that I
10  can speak to personally was a digital image.
11      Q.  Right.  So you understand -- and I'm sure
12  you're not a doctor, but you understand what Dr. Dully
13  was saying is that it does not appear -- there is no
14  pubic hair development on the model, you understand
15  what that means, right?
16      A.  Yes.
17      Q.  Okay.  I'm sure in your -- your experience as
18  an investigator, you see a lot of images of
19  pornography, adult pornography, age-difficult
20  pornography, you see a lot of that, don't you, or you
21  did back when you were doing the ICAC investigations?
22      A.  Yes, correct.
23      Q.  You agree that it is common for adult models
24  to have groomed themselves so that there is no
25  appearance of a pubic hair?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 62

1    A.   I vote yes, but okay.  Yeah.
2    Q.   Okay, yeah.
3         You're familiar with that; you know that,
4    right?
5    A.   Yes.
6    Q.   And as a -- I mean, as an investigator of
7    pornographic images, that would be something that you
8    really have to be familiar with, correct?
9    A.   Yes.
10   Q.   So you, as an ICAC trained investigator and a
11   major crimes investigator, you understand that apart
12   from grooming, images can be digitally altered or
13   touched up to improve the esthetics of that -- of that
14   image, correct?
15   A.   Correct.
16   Q.   You have no belief that Dr. Dully is an
17   expert in determining if an image has been touched up
18   or digitally altered, do you?
19        MS. SHEVLIN:  Form.
20        THE WITNESS:  No, but there's not a
21        requirement in the Florida Statute for that
22        delineation to be made.  For instance, if the
23        image is intentionally altered for the purposes of
24        trying to put a particular person's face on a
25        particular body, and that still represents a

Page 63

1         child, it doesn't matter that that image has been
2         altered.  It still depicts child sexual abuse
3         material, so I mean, the --
4    BY MR. ROBERTS:
5    Q.   But it is relevant -- you agree it is
6    relevant given her opinion about whether or not this
7    model is grooming or altering the photograph to have no
8    pubic hair, or if she has not developed pubic hair
9    because she's prepubescent, you agreed that that's like
10   the heart of the matter from an investigative
11   standpoint, correct?
12        MS. SHEVLIN:  Form.
13        MR. CARSON:  Join.
14        THE WITNESS:  I mean, I don't know that that
15        is solely what she relies on.  I have to assume
16        that she takes other factors into consideration.
17   BY MR. ROBERTS:
18   Q.   Did she put any other factors in her letter?
19   A.   No, I've read the letter, and --
20   Q.   No.  Do you know -- do you know what --
21        MS. SHEVLIN:  The witness is still trying to
22        answer the question.
23        THE WITNESS:  I said, I've read the letter,
24        and you just read it out loud, is what I said.
25

Page 64

1    BY MR. ROBERTS:
2    Q.   Do you know -- do you understand that an SMR
3    4 to 5, a 5 is an adult breast; are you aware of that?
4    A.   No, I don't think I've ever known that
5    before, no.
6    Q.   Do you think that an ICAC investigator
7    prosecuting crimes, investigating crimes of child
8    pornography, should know the basics of the SMR rating?
9    A.   I do think there's some value in
10   understanding that language, yes.
11   Q.   Would it give you concern to know that this
12   model had potentially adult breasts, but because she
13   did not have pubic hair, according to Dr. Dully, she
14   was less than nine to 13 and-a-half years old.  Does
15   that give you concern as an investigator?
16        MS. SHEVLIN:  Form.
17        THE WITNESS:  Well, to kind of correct what
18        counsel said, I don't think it says less than
19        nine.  I think it's a range between nine and 13
20        and-a-half.
21   BY MR. ROBERTS:
22   Q.   Does your copy have that -- that angle
23   that -- that -- with a line under it?
24   A.   Yeah, yeah, so it's greater than or --
25   Q.   That's less than or equal to.  Yeah.

Page 65

1    A.   It does, yes.  Yes.  Greater than or equal
2    to.
3    Q.   Well, I think it's -- the way I interpret
4    that is her appearance is less than or equal to nine to
5    13 and-a-half years old?
6    A.   Oh, I'm sorry.  You're correct.  Yes, I stand
7    corrected.  Yes.
8    Q.   Okay.  Does that give you concern as an
9    investigator, that this model has what may be
10   interpreted as adult breasts, but this doctor, because
11   of the lack of appearance of pubic hair, is saying that
12   she is prepubescent, does that give you concern, as an
13   investigator?
14   A.   As we sit here --
15        MS. SHEVLIN:  Object to form.
16        MR. CARSON:  I join.
17        MS. SHEVLIN:  I objected to form, and I --
18        MR. CARSON:  I joined.
19        MS. SHEVLIN:  Yes, counsel joined.
20        THE WITNESS:  So it's certainly a
21        conversation I would want to have with her, to try
22        to get that hashed out.  I came across my --
23        (Plaintiff's Exhibit No. 3 was marked for
24   identification.)
25

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 66

BY MR. ROBERTS:

Q.  I'm going to share -- I'm going to share the photograph of the ID.  I don't think you've seen this before.  We'll mark this as Exhibit 3.

In any world or interpretation, would you interpret the model that's depicted in Exhibit 3 as being less than nine to 13 years old?

A.  No.

Q.  Would you look at this model and say that it is entirely possible that she is 18 or older?

A.  I do believe it's a possible -- it's possible she's 18 or older.

Q.  Okay.

MS. SHEVLIN:  Are you attaching that as an exhibit, Michael?

MR. ROBERTS:  Exhibit 3.

BY MR. ROBERTS:

Q.  During this deposition, Detective Greene testifies that he wished that the investigators had spent a little bit more time on this case prior to making a decision for arrest.  Would you agree with that comment?

A.  I do agree with that comment.

MR. CARSON:  Object to form.

Page 67

BY MR. ROBERTS:

Q.  You do agree with that comment?

A.  I don't know what just happened, but I just got a lot of feedback.  Can you say that again?

Q.  Did you agree with that comment?

A.  I do agree with that comment, yes.

Q.  Okay.  One of the things that you -- I want to understand -- one of the things in taking more time is Detective Preston could have gone to the website and requested the age documentation information, correct?

A.  Yes, she could have.

Q.  And had she done that, at least in your opinion, there would not have been probable cause to believe that these two images constituted probable cause for an arrest for possession of child sexual abuse material?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  Correct.

BY MR. ROBERTS:

Q.  You agree with that statement?

A.  Yes, correct.

Q.  I want to use -- you understand the implications of an allegation like this against Mr. Lawshe, don't you?

Page 68

A.  Of course.

Q.  He was -- you understood that he was like a decorated law enforcement officer?

A.  I know he's a law enforcement officer.  I don't know, you know, what his background is, so...

Q.  Okay.  All right.  You knew the moment that you saw this cyber tip, that if he was charged or arrested with this crime, it would end his law enforcement career?

A.  Yes.

Q.  You knew that it would devastate his reputation in the community?

A.  Yes.

Q.  You know that the allegation alone, whether or not he was guilty or not, would be enough to irreparably damage his reputation?

A.  Yes.

Q.  I mean, I can tell you, I mean, I don't know if you care, but Mr. Lawshe, I mean, this has -- this has changed his life.  Do you have any reason to believe that it hasn't?

A.  No, I don't have a reason to believe it hasn't, no.

Q.  I mean, do you think that St. John's County owes him an apology or something for what it's done to

Page 69

him?

MR. CARSON:  Object to the form.

THE WITNESS:  No, I do not.

BY MR. ROBERTS:

Q.  You just think -- what do you think in that regard?  This is the way it should happen, it should have happened to him?

A.  No.  I think that the case happened the way it happened.  I think that there are aspects of the case that give me a great deal of concern as far as I wasn't involved in the investigation in the aftermath, but it was my understanding that there was some evidence that his phone had been wiped.

Q.  Yeah.  Who said that?  Who said that?

A.  Who told me that?

Q.  Yeah, who told you that?

A.  I don't know who told me that.

Q.  And you didn't remember who told you that?

A.  I don't know who told me that.

Q.  Because it's a defamatory statement that somebody is perpetuating in law enforcement or at the State Attorney's Office.  Are you aware of any evidence that he wiped his phone?

A.  Do I?  No, that's just -- that's just something that I was told.  I just don't remember

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 70

1  specifically who told me that, so...
2      Q.   Did they say they had evidence of that, or
3  was it just an allegation?
4      A.   I -- I got to be honest with you, I don't
5  remember the details of it.
6      Q.   But this individual was publishing this
7  statement to whoever would listen?
8      A.   Well, I mean, I was told it, so --
9      Q.   And was it told you -- did you interpret it
10  as meaning, well, he really is a pedophile; we just
11  couldn't prove it?  Is that the way you took it?
12      A.   So like I said, it causes some concerns as
13  far as like, you know, there's that kind of wonderance
14  as far as what did we miss, so to speak.
15      Q.   Yeah.  Makes you think maybe he was guilty,
16  doesn't it?
17      A.   Well, I don't know.  So, I mean --
18      Q.   That's a very damaging statement --
19      A.   Yes.
20      Q.   -- and it makes you think -- makes you
21  think --
22           It's a very damaging statement, isn't it?
23      A.   Well, I guess in the grand scheme of things I
24  don't know enough about the case, the aftermath of the
25  case, to even know if that was true or not.  I just

Page 71

1  know that that's what I was told.  I don't remember the
2  circumstances in which I was told that.
3      Q.   Do you know Kevin Greene?
4      A.   I do know Kevin Greene.
5      Q.   Is he a competent forensic investigator?
6      A.   Based on my interaction with him, yeah, he's
7  worked plenty of cases for me in the past.
8      Q.   Have you reviewed his report?
9      A.   I have not.
10      Q.   If somebody had wiped a device, don't you
11  think that would be something that would be included in
12  his forensic report?
13      A.   I have to assume, but I don't know if it's
14  there or not.  So I'm assuming --
15      Q.   You're not --
16      A.   I'm sorry.
17      Q.   You're not telling anybody that Mr. Lawshe
18  has wiped a phone or anything like that, are you?
19      A.   I'm sorry.  Repeat that.
20      Q.   You're not telling people that Mr. Lawshe has
21  wiped a phone or destroyed evidence, are you?
22      A.   No, beyond the conversation that I've had
23  with you guys about the deposition, I haven't talked
24  about this case since it happened.
25      Q.   But you haven't repeated that comment that

Page 72

1  you were told, Oh, he -- there's evidence that he wiped
2  a device, you haven't repeated that to anybody?
3      A.   No.  I don't remember telling anybody that.
4      Q.   Has there been any sort of after action
5  report or investigation into Detective Preston's
6  conduct in this investigation?
7      A.   I don't know the answer to that.
8      Q.   Is she still a special victims unit
9  investigator?
10      A.   ICAC, yes.
11      Q.   ICAC.  Okay.
12           Let me just go through my notes.  I think I'm
13  done, but just give me one second.  Okay?
14      A.   Sure.  Sure.  No problem.
15           MR. ROBERTS:  Thanks, Detective.  I don't
16      have any other questions.  I appreciate your time.
17           THE WITNESS:  All right.
18                     CROSS-EXAMINATION
19  BY MS. SHEVLIN:
20      Q.   I have a couple of questions for you, sir.
21  My name is Amy.  I represent Dr. Dully in this case,
22  and I have a couple of follow-up questions for you
23  based on your prior testimony.
24           I want to make sure I understood you.  I
25  believe you said you were at only one of the meetings

Page 73

1  that took place with Dr. Dully.  Did I hear you
2  correctly?
3      A.   Yeah, the first one is the one I remember
4  going to.
5      Q.   Okay.  And when was that?
6      A.   Her letter is dated February 22nd.  I have to
7  assume that's reliable.  I know she would generally
8  type the letter right there and give it to us before we
9  would leave in the past.  I just don't remember if she
10  did that in this particular case.
11      Q.   Okay.  But safe to say it was a meeting that
12  took place in February of 2023?
13      A.   Correct.
14      Q.   Okay.  At that meeting, the February 2023
15  meeting, how many images were presented to Dr. Dully?
16      A.   I believe one.
17      Q.   And how were they presented to her or shown
18  to her?
19      A.   On a laptop.
20      Q.   And whose laptop was that?
21      A.   Detective Preston.
22      Q.   And who physically showed her the image on
23  the laptop?  Was that you or Detective Preston?
24      A.   Detective Preston.
25      Q.   Do you remember what that image looks like?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 74

1    A.   Vaguely.

2    Q.   Can you describe it for me?

3    A.   If I remember correctly, it's a little girl,
4  kind of seated with her legs spread.  I think that's
5  the one where she's wearing white socks or like little
6  lacy socks, is the only thing that she has on.

7    Q.   And can you see the -- you said "little
8  girl," but can you see the little girl's face in the
9  image?

10   A.   Yes, yes, you could.

11   Q.   And when Dr. Dully was shown this image, was
12 she given a copy, or was she shown the image on the
13 computer, and then the computer left with you and
14 Detective Preston, and Dr. Dully does not have access
15 to that?

16   A.   No, she doesn't have access to it.  We --
17 we -- it was only on the computer, and we took the
18 computer with us.

19   Q.   Okay.  At the time of this meeting, was
20 Dr. Dully informed of the identity of Mr. Lawshe?

21   A.   I don't remember.

22   Q.   Would it be typical that Dr. Dully be
23 informed of who the subject of investigation is?

24   A.   No.

25   Q.   More likely than not she was not informed

Page 75

1  regarding the name or identity of the subject of the
2  investigation, meaning Mr. Lawshe?

3    A.   Yeah, she wouldn't really have a reason to
4  know that, so...

5    Q.   Would she have been informed of Mr. Lawshe's
6  status as a law enforcement officer during this
7  meeting?

8    A.   No, again, she really wouldn't have a reason
9  to know that.

10   Q.   And Dr. Dully was not paid for this service,
11 correct?

12   A.   No, she's part of the CPT, so they offer this
13 service to law enforcement.

14   Q.   And can you define "CPT" for the record?

15   A.   Child protection team at the University of
16 Florida.  They have an office in Jacksonville, and they
17 handle abuse cases.  They have doctors that are
18 forensically trained to provide law enforcement support
19 for abuse investigations.

20   Q.   And you testified earlier you had some prior
21 interactions with Dr. Dully.  I think you said you've
22 met her approximately six times.  Am I remembering that
23 testimony correctly?

24   A.   Five or six, yes.  I don't remember the exact
25 number.  But that's a fair estimate.

Page 76

1    Q.   And on those five or six occasions that you
2  had previously met Dr. Dully, were they all within the
3  context of investigations regarding probable CSAM?

4    A.   Yes.

5    Q.   Give me moment.  I'm just looking through
6  my notes here.

7         I misunderstood your testimony earlier.  I
8  want to ask you again to make sure the record is clear,
9  prior to the investigation regarding Mr. Lawshe, were
10 you familiar with the website metart.com?

11   A.   No.

12   Q.   Okay.  Do you know what the MET in Metart
13 stands for?

14   A.   I do not.

15   Q.   If I told you it stood for most erotic teens,
16 would that surprise you, based on the content that you
17 saw?

18   A.   No, there's often, like in ICAC
19 investigations, there's often hidden meanings in
20 different terms.

21   Q.   And were you aware that metart.com refers to
22 their models as teens and girls?

23   A.   I'm not aware of that, no.

24   Q.   Would it surprise you?

25   A.   No, it doesn't surprise me.

Page 77

1    Q.   Now, I know you said you stated you never saw
2  the passports that Mr. Roberts had referred to earlier
3  on his questioning of you.  Do you know what country
4  those passports were issued from?

5    A.   I don't.

6    Q.   Do you know if they were issued in the United
7  States?

8    A.   I don't.

9    Q.   If those passports -- passports were not
10 issued in the United States, would that cause you some
11 concern regarding verification of the ages of the
12 models?

13   A.   I don't know that them being issued in the
14 United States or outside the United States really
15 matters.  Any ID can really be manipulated, so I guess
16 to answer your question is -- I guess the simple answer
17 is yes.

18   Q.   The purported ages of the models using the
19 passports for identification that was issued for them
20 would not prove to you that the images in question were
21 taken at a time that the models were 18 or older; is
22 that correct?

23   A.   That's correct.

24   Q.   I want to refer you back to Exhibit 2, which
25 was the April 5th, 2023 report of Dr. Dully.  I know

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 78

1  you said you were not present at that meeting, but we
2  did discuss that.
3          And Michael, just for ease of use, could you
4  throw Exhibit 2 back up there, the April 5th report.
5  Much appreciated. Okay.
6          In the letter that we're looking at, the same
7  one that you discussed with Mr. Roberts earlier, there
8  are descriptions of the images that Dr. Dully reviewed,
9  correct?
10     A.  If you are referring to paragraph 2, the
11  second image is imprinted with the word "script" saying
12  "big heart." Is that what you're referring to?
13     Q.  Correct.
14     A.  Yes, correct.
15     Q.  Okay. And it also -- it describes the images
16  in terms of it shows, you know, a female child with a
17  black top, underwear down. It describes what she's
18  seeing in the images, correct?
19     A.  Correct.
20     Q.  Okay. And you just noted that there is an
21  indication that there is white script on the image,
22  saying, "big heart," correct?
23     A.  Correct.
24     Q.  And it also indicates what the file names are
25  for these two images, correct?

Page 79

1      A.  Correct.
2      Q.  Okay. Nowhere in this letter does it
3  indicate that there is any type of watermark on any of
4  these images, correct?
5      A.  Not on this one.
6      Q.  Okay. And nowhere in this letter does it
7  indicate that there's any other text on these images
8  other than what she's noted with the quote/unquote, big
9  heart in the second image, correct?
10     A.  That is correct.
11     Q.  And Dr. Dully was not asked to provide an
12  opinion as to whether any of these images appeared
13  altered, correct?
14     A.  That's correct.
15     Q.  And Dr. Dully was not asked to provide an
16  opinion regarding the potential grooming habits of any
17  of these models, correct?
18     A.  That's correct.
19     Q.  Now, Mr. Roberts asked you about the sexual
20  maturity rating scale, the SMR, and he made a
21  representation to you that Stage 5 was an adult. Do
22  you remember that earlier in your testimony?
23     A.  I do.
24     Q.  Okay. Now, Stage 5, which is fully
25  developed, does not necessarily mean that a fully

Page 80

1  developed sexually mature person is in fact over the
2  age of 18, correct?
3      A.  I'm not familiar with the SMR scale, like I
4  told Mr. Roberts, so I took for granted what he said
5  was true. I don't -- I don't know the answer to that.
6      Q.  Okay. Let me ask it a different way. In
7  your experience with these investigations, would it be
8  possible for an image of a breast to appear to be fully
9  developed and that breast belonged to a person who is
10  still under the age of 18? So, for example, a 16 or 17
11  year old may have a fully developed looking breast?
12     A.  Yes.
13         MS. SHEVLIN: Michael, could you put
14     Exhibit 3 back up, please. It was the image of
15     the model holding the passport.
16  BY MS. SHEVLIN:
17     Q.  Thank you. Mr. Roberts asked you earlier
18  while were you looking at this picture if you could
19  believe that she was 18 or older, and you answered in
20  the affirmative. Do you remember that?
21     A.  Yes.
22     Q.  Looking at this image, could you also believe
23  that she was under the age of 18?
24     A.  I think she could be.
25     Q.  I'm looking through my notes here.

Page 81

1      A.  Not that it matters, but where is that
2  passport from?
3      Q.  My understanding is it is from the Ukraine.
4  Have you seen this before?
5      A.  No, I've never seen it before, and I didn't
6  recognize the wording.
7          MR. ROBERTS: It's actually Lat --
8          MS. SHEVLIN: It says Latvia. Excuse me. It
9      says Latvia.
10         Have you seen a Latvian passport before?
11         THE WITNESS: I have not. I'm not worldly
12     traveled, so...
13  BY MS. SHEVLIN:
14     Q.  And in fact, this passport in this image is
15  redacted in several spots, correct?
16     A.  Yes, that's correct.
17     Q.  And we're looking at this image again, and I
18  think you answered me already, but the passport in
19  question in this image is redacted in several places,
20  correct?
21     A.  Correct.
22     Q.  Okay. So we do see some alteration in this
23  photograph, which is apparent, correct?
24     A.  Correct.
25     Q.  Okay.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

---

Page 82

```
1        MS. SHEVLIN:  Michael, you can take it down.
2   Thank you.
3        I believe that is all I have for you, sir.  I
4   appreciate your time.  Some of the other counsels
5   may have questions for you.
6        MR. ROBERTS:  I just have a little bit of
7   redirect on that, but...
8        MR. CARSON:  Go ahead.
9              REDIRECT EXAMINATION
10  BY MR. ROBERTS:
11       Q.  Detective Tolbert, you understand that
12  probable cause for possession of child pornography
13  cannot be based on the mere possibility that the model
14  is underage, correct?
15       A.  Correct.
16       Q.  Unless the evidence satisfies a reasonable
17  person that a crime has likely occurred, correct?
18       A.  Correct.
19       Q.  When I asked you about the way that model
20  looked, I asked you if that model, if a reasonable
21  person can believe that that model was 18 and you
22  testified yes, that had nothing to do with her
23  passport, did it?
24       A.  No, it was just visually looking at the photo
25  that was displayed on the screen.
```

Page 83

```
1        Q.  Well, actually, you understand that it's not
2   Mr. Lawshe's burden to prove his innocence to St. Johns
3   County for the State of Florida, correct?  It's the
4   state's burden to prove that he committed a crime?
5        MR. CARSON:  Object to form.
6        THE WITNESS:  Yes.
7        MR. ROBERTS:  Okay.  No further questions.
8        MR. CARSON:  Sergeant Tolbert, I'm Matt
9   Carson.  I'm an attorney representing
10  Detective Preston in this action.  I have no
11  questions for you today.  Mr. Roberts, are you
12  ordering?
13       MR. ROBERTS:  I will order.
14       MR. CARSON:  Yeah, he'll read through me.
15       THE COURT REPORTER:  And do you want a copy?
16       MS. SHEVLIN:  Yes.
17       MR. CARSON:  Same order.  Thank you.
18       (Thereupon, the deposition was concluded at
19  2:47 p.m. and the signature and formalities were
20  not waived.)
```

Page 84

```
1              CERTIFICATE OF OATH
2   STATE OF FLORIDA
3   COUNTY OF JACKSONVILLE
4
5        I, the undersigned authority, certify that
6   the aforementioned witness Eugine Tolbert, personally
7   appeared before me via remote teleconference and was
8   duly sworn on Tuesday, December 17, 2024.
9        Dated this 27th day of December, 2024
10
11
12
13
14
       MAUREEN HALL, RPR, FPR
15     Notary Public - State of Florida
       My Commission Expires:  3/17/25
16     My Commission No.:  HH065896
17     Identification presented by Deponent:
       License
```

Page 85

```
1              C E R T I F I C A T E
2   STATE OF FLORIDA
3   COUNTY OF JACKSONVILLE
4
5        I, MAUREEN HALL, Registered Professional
    Reporter and Notary Public duly commissioned and
6   qualified in and for the State of Florida at Large, do
    hereby certify that I am authorized to and did
7   stenographically report the foregoing remote
    deposition; and that the transcript is a true record of
8   the testimony given by the witness.
9        I FURTHER CERTIFY that I am not a relative,
    employee, attorney, or counsel of any of the parties,
10  parties' attorney, or counsel connected with the
    action, nor am I financially interested in this action.
11
12       Dated this 27th day of December, 2024.
13
14
15
16     MAUREEN HALL, RPR, FPR
17     Notary Public - State of Florida
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 86

```
1    EUGINE TOLBERT
     C/O MATTHEW JOSEPH CARSON, ESQUIRE
2    SNIFFEN & SPELLMAN, P A.
     123 North Monroe Street
3    Tallahassee, Florida 32301-1509
     mcarson@sniffenlaw.com
4
             IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK,
5    MIKAYLA PRESTON AND KATHLEEN DULLY,
6            CASE NO.:  3:24-cv-00044-MMH-MCR
7    Dear Mr. Carson,
8        The deposition of Eugine Tolbert, taken in
     the above-styled cause on December 17, 2024 is now ready
9    for signature of the witness.  Please contact our office
     to make arrangements for the witness to sign the same;
10   or, if you wish to waive the signature of the deposition,
     please so advise.
11       If this deposition has not been signed by January
     27th, 2025, or the signature thereto waived, we shall
12   consider such delay a refusal to sign under Rule 1.310(e)
     of the Florida Rules of Civil Procedure.
13       If you have any reason which you would like for me
     to place on the deposition as to the witness' failure to
14   sign the same, please advise.
15       Very truly yours,
         HUSEBY COURT REPORTING, COURT REPORTER
16
17       By:
18           Maureen Hall, RPR, FPR
19   Dated:  December 27, 2024
20   cc:  Counsel of Record
21
22
23
24
25
```

Page 87

```
1            E R R A T A   S H E E T
2    IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA
     PRESTON AND KATHLEEN DULLY
3
4    DEPO OF:  EUGINE TOLBERT
5    DATE TAKEN:  12/17/24
6        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
7        Page No._____Line No._____Change to:_____
8        _____
9        Reason for change:_____
10       Page No._____Line No._____Change to:_____
11       _____
12       Reason for change:_____
13       Page No._____Line No._____Change to:_____
14       _____
15       Reason for change:_____
16       Page No._____Line No._____Change to:_____
17       _____
18       Reason for change:_____
19
20       Please forward the original signed errata sheet to
21   this office so that copies may be distributed to all
22   parties.
23       DATE:_____
24
25       SIGNATURE OF DEPONENT:_____
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                                    Index: 1..age

---

**1**

**1** 49:23,24
  50:23 58:13
  60:15

**13** 60:17,18
  64:14,19
  65:5 66:7

**16** 13:24 14:4
  19:3 80:10

**17** 12:21,25
  13:12,24
  14:4 80:10

**18** 12:21
  13:1,13,24
  17:15,20
  18:1,9,10,
  11,14,16
  54:1 66:10,
  12 77:21
  80:2,10,19,
  23 82:21

**19** 13:24 19:3

---

**2**

**2** 59:22 60:3
  77:24 78:4,
  10

**20** 39:4

**2001** 6:12

**2009** 6:12,14

**2013** 29:6

**2018** 6:18

**2020** 6:20

**2023** 5:12
  8:10 34:23
  60:1 73:12,
  14 77:25

**21** 6:7,21

**22nd** 73:6

**23** 6:7

**2:47** 83:19

---

**3**

**3** 65:23 66:4,
  6,16 80:14

**30** 39:4

---

**4**

**4** 60:13 64:3

**40** 35:20

**48** 14:1

---

**5**

**5** 22:6 58:13
  60:13 64:3
  79:21,24

**50** 35:3,14
  53:1,2

**5th** 60:1
  77:25 78:4

---

**6**

**60** 35:20

---

**8**

**827.071** 22:6

---

**9**

**9160** 51:19

---

**A**

**A-2** 50:5,7

**ability** 42:21
  47:5

**abreast** 32:25

**absolute** 18:6
  47:1

**absolutely**
  17:21 18:12
  20:14 28:2,5
  50:21

**absolutes** 18:3

**abuse** 11:20
  22:7 23:22
  24:10 25:3,
  12,20 36:11
  37:9,25 41:3
  43:4 46:7
  63:2 67:16
  75:17,19

**accept** 18:8,10

**accepted** 18:15

**access** 31:23
  42:22,23
  74:14,16

**action** 72:4
  83:10

**actionable**
  9:4,5 11:15
  15:20,22
  35:10,18
  49:11 53:3

**actual** 57:22

**additional**
  6:19 38:22

**adds** 31:18

**adult** 14:11
  20:24 23:19
  24:8 26:4
  48:9 52:17
  61:19,23
  64:3,12
  65:10 79:21

**advantage** 56:1

**affidavit**
  54:8,10

**affirmative**
  80:20

**aftermath**
  69:11 70:24

**afternoon** 4:9

**age** 14:7,12,
  23 15:10,15
  44:2,10
  46:18,23
  47:7 48:18,
  21,22,24
  54:8,9 56:25
  60:18 67:10

Case 3:24-cv-00137-MMH-LLL    Document 84-17    Filed 11/06/25    Page 25 of 45 PageID
1466
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                    Index: age-difficult..back

80:2,10,23

**age-difficult**
9:20 10:5,9,
18,19,23,25
11:5,7 53:3,
7 56:24
61:19

**age-verification**
44:6

**agency** 7:6
32:3 43:4

**ages** 77:11,18

**agree** 10:16
18:25 19:4
21:1 24:15
26:1 36:12
37:12,19,21,
23 38:6,14
40:16 41:23
46:11,19
48:6,11,15,
23 49:3,5,8
51:5 55:22
61:23 63:5
66:21,23
67:2,5,6,21

**agreeable** 41:6

**agreed** 15:23
63:9

**ahead** 10:2
44:20 82:8

**allegation**
67:24 68:14
70:3

**allegations**
4:24

**alteration**
81:22

**altered** 62:12,
18,23 63:2
79:13

**altering** 63:7

**Amy** 72:21

**and-a-half**
6:17 47:13
60:17 64:14,
20 65:5

**angle** 64:22

**answering** 10:2
16:25

**anytime** 42:25

**apologize** 8:21
19:17 24:4
61:3

**apology** 68:25

**apparent** 81:23

**appearance**
60:16 61:25
65:4,11

**appeared** 15:23
79:12

**appears** 57:13

**appreciated**
78:5

**approach** 9:17

**approximate**

14:12

**approximately**
75:22

**April** 60:1,21
61:9 77:25
78:4

**area** 29:9
55:14

**arrest** 21:24
30:11 32:7
33:21 34:8
54:12,23
66:21 67:15

**arrested** 22:11
34:16 68:8

**aspects** 69:9

**assessable**
54:15

**assessment**
15:12

**assign** 10:5,6
35:9

**assigned** 5:8
7:7,12,13,20
10:24 16:18

**assigning** 8:15
9:13 33:4
36:17 52:12

**assistance**
42:24

**assume** 63:15
71:13 73:7

**assuming** 50:12

61:8 71:14

**attach** 49:23

**attaching**
66:14

**attempt** 46:6
48:24 52:3

**attempted**
46:10

**attended** 14:3

**attorney** 42:11
53:15,17
83:9

**Attorney's**
69:22

**avenues** 41:19

**aware** 21:4
22:2 27:8,15
28:7 30:5
36:19 37:7,
10 39:11
44:7 46:18
47:12,15
56:10 59:18
64:3 69:22
76:21,23

---

**B**

**baby** 25:1

**back** 5:11,21,
25 6:20,23
29:6 32:10
34:23 37:2
45:2 61:21
77:24 78:4

Case 3:24-cv-00137-MMH-LLL    Document 84-17    Filed 11/06/25    Page 26 of 45 PageID
1467
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                    Index: background..charged

80:14

**background**
15:7  19:11
68:5

**bad**  9:9  33:17
40:12

**barred**  42:10

**barrel**  7:21

**based**  9:16
11:8  14:12
22:11,13
39:5  40:25
48:2  56:13
71:6  72:23
76:16  82:13

**basic**  20:18

**basics**  64:8

**bat**  15:20

**bathtub**  25:2

**beer**  29:15

**begin**  15:17
52:18

**beginning**  5:12

**belief**  62:16

**believed**  16:17
17:3,13,15,
20  23:19
24:7,18  38:8

**bellybutton**
55:13

**belonged**  80:9

**big**  78:12,22

79:8

**Bill**  30:14,19

**Bill's**  33:2

**bit**  20:6
31:18  32:11
34:2  40:3
66:20  82:6

**black**  78:17

**blip**  19:16

**body**  13:9
62:25

**booking**  32:13

**border**  19:24

**borders**  41:7

**breast**  13:9
55:15  56:6
64:3  80:8,9,
11

**breasts**  60:12
64:12  65:10

**briefed**  31:6

**bring**  30:25

**brought**  30:11
57:9

**buds**  13:9

**burden**  83:2,4

**busier**  35:1

---
**C**
---

**California**
42:11

**call**  4:11,12
8:16,21  9:18
53:2,7  58:1,
5

**called**  4:3,14
9:20

**calling**  57:24

**captain**  30:14,
22  32:17,21
34:16

**care**  12:7
68:19

**career**  68:9

**Carson**  19:21
20:7,15
22:25  23:14,
24  24:11
26:7  37:16
39:17  40:22
44:13,16,19
46:14  49:1
55:24  57:3
59:2,9  63:13
65:16,18
66:24  67:17
69:2  82:8
83:5,8,9,14,
17

**case**  4:21
5:13,14  7:2,
10,11,20
10:3,22  11:1
13:18  15:12,
18  16:9
21:20  28:16
29:7  30:5

32:18  35:12
40:1  44:23
45:1  47:11
48:4  54:15
55:23  57:9,
20  58:9  60:5
66:20  69:8,
10  70:24,25
71:24  72:21
73:10

**cases**  47:19
59:11  71:7
75:17

**category**  9:21,
22  52:7

**cell**  37:3

**center**  36:4,5

**Centers**  8:3

**certainty**
48:18

**chain**  31:2
32:20  34:1,4

**challenging**
56:8

**changed**  6:16
68:20

**characterization**
57:6

**charge**  55:17
56:5

**charged**  27:5
55:1,3,9,23
68:7

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: charges..copies

charges   45:4,
  5,7

child   4:24
  11:17,20
  13:2 15:24
  16:5 17:4,9,
  11,13 22:7,
  22 23:6,9,
  12,21 24:10
  25:2,3,11,20
  35:24 36:9,
  11 37:9,24
  43:3 46:6
  48:8 56:20
  59:12 60:11
  63:1,2 64:7
  67:15 75:15
  78:16 82:12

children   5:20
  8:4 38:4

circumstance
  21:11

circumstances
  21:10,14,15
  25:7 38:25
  44:5 48:2
  56:8,19 57:8
  71:2

circumstantial
  48:1

cite   37:3

claimed   54:3

clarification
  60:25

class   14:2

classes   14:22

clear   53:5
  76:8

client   4:21

closed   15:21
  47:20

clues   38:19

college   19:7

combination
  33:25

command   31:2
  32:20 34:1,4

comment   45:12
  66:22,23
  67:2,5,6
  71:25

committed
  21:13 23:9,
  21 24:9 83:4

committing
  25:11 41:4

common   9:16
  35:16 61:23

communicate
  11:18 30:1

communicated
  11:19 32:17,
  19

community
  68:12

companies   41:9

company   41:18

competent   71:5

complete   37:7

complied   47:7

composite   60:3

computer   22:20
  42:1,16
  74:13,17,18

computers   42:6

concern   64:11,
  15 65:8,12
  69:10 77:11

concerns   70:12

concluded
  83:18

conduct   22:22
  72:6

confirm   20:1,
  21

confirmation
  57:12

confirming
  44:10

consideration
  63:16

considered
  31:7

constitute
  25:19 36:10

constituted
  11:20 37:9
  67:14

Constitution

20:25 21:18,
  22

consulted
  59:11

contact   32:2
  48:3

contacted
  32:6,7,9,11

contained   23:6
  37:6 39:6
  40:21 51:7

content   76:16

context   24:16,
  20,21,23
  25:14,25
  26:5 27:1,17
  38:16 39:15
  40:17 76:3

context-wise
  40:12

control   22:18

conversation
  10:12 34:7
  39:25 53:18
  65:21 71:22

conversations
  32:21,23

convict   48:13

convicted   48:7

conviction
  47:23

copies   58:8,10

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                    Index: copy..decorated

copy   17:19
  64:22 74:12
  83:15

corner   29:9

correct   6:8,11
  7:14,15,25
  12:14 16:3,
  4,6,7 18:1,
  22 21:21,25
  22:4 23:12,
  13 25:21,22
  26:16,17
  28:16 30:17
  34:21 35:19,
  22 36:15
  38:5 42:25
  44:7 45:6
  46:1,3 47:8
  48:10,13,14,
  19,21 49:5
  50:11 53:9,
  12 54:24,25
  55:7 56:22
  58:4 61:7,22
  62:8,14,15
  63:11 64:17
  65:6 67:10,
  19,22 73:13
  75:11 77:22,
  23 78:9,13,
  14,18,19,22,
  23,25 79:1,
  4,9,10,13,
  14,17,18
  80:2 81:15,
  16,20,21,23,
  24 82:14,15,

17,18 83:3

corrected   65:7

correctly
  26:22 32:9
  34:20 60:18
  73:2 74:3
  75:23

counsel   39:3
  64:18 65:19

counsels   82:4

country   77:3

county   5:9
  7:17 29:9
  30:15 38:2
  42:1,16 43:2
  46:13 68:24
  83:3

couple   36:2
  41:19 58:11
  72:20,22

court   19:25
  20:3 27:19
  44:16,18
  59:16 83:15

CPT   13:15,18
  15:6 57:17,
  18 75:12,14

credibility
  49:10 52:4

crime   21:13
  23:9,21
  24:10 25:11,
  20 41:5 68:8
  82:17 83:4

crimes   5:9,20,
  21 6:10,16,
  24 21:15
  45:2 62:11
  64:7

criminal   25:6
  30:22,24
  31:3

CROSS-
EXAMINATION
  72:18

cross-section
  55:15

crossed   26:23

CSAM   10:10
  11:2 13:17
  15:17 31:14
  37:13 53:5,
  11 55:18
  76:3

cull   8:14,18,
  20,22

culled   35:8

culmination
  45:1

custodian
  42:10 46:22
  54:9

custody   33:15

custom   56:24

cyber   7:5,24
  8:9,11,14
  29:21,22
  34:20 45:17

49:7,13,15
  51:18 53:11
  68:7

─────────
          D
─────────

damage   68:16

damaging
  70:18,22

dark   25:18

data   22:20
  37:2 54:4

dated   60:22
  73:6

daughters
  11:10 12:18
  13:25 25:8

dead   41:10

deal   12:7
  57:23 58:18
  69:10

dealing   7:23

dealt   57:17

decent   10:7

decision
  33:20,24
  34:2,5,8
  53:23 54:11,
  22 56:9
  66:21

decisions
  49:10

decorated   68:3

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                     Index: deem..disposed

deem  10:25
  20:12

deemed  10:5,7
  15:19

deeper  15:5

defamatory
  69:20

defendant
  53:15

define  75:14

definition
  11:7

deliberate
  10:11

delineated
  10:13

delineation
  62:22

depends  25:7

depicted
  23:11,19
  24:8 48:18
  66:6

depiction
  22:20 37:13

depicts  60:10
  63:2

deposition
  4:17,18 8:2
  60:4 66:18
  71:23 83:18

deputy  6:12

describe  7:1
  74:2

describes
  49:15 78:15,
  17

description
  9:23

descriptions
  78:8

destroyed
  71:21

detail  15:4
  58:7

detailed  12:16

details  44:25
  45:3,8,9
  53:20 58:14
  70:5

detective  4:9,
  10,11,15
  6:17 7:12,
  14,16,20
  8:3,11 9:19
  11:4,13,18
  12:2,12
  16:18 27:15
  28:9,10 30:2
  33:5 34:1
  36:17 39:2,
  10 40:1
  42:15,22,23,
  24 45:13
  46:10,20,21
  48:12 49:9
  51:2 54:16,

22 66:18
  67:9 72:5,15
  73:21,23,24
  74:14 82:11
  83:10

detective's
  33:24

detectives  7:7
  8:15 9:1

detectives'
  35:12

determination
  13:25 26:6

determine
  41:15 49:10

determined
  48:17

determining
  12:19 62:17

devastate
  68:11

developed
  13:11 63:8
  79:25 80:1,
  9,11

development
  13:7,8 60:11
  61:14

developmental
  60:16

device  38:17,
  18 71:10
  72:2

difference
  12:20

differently
  13:7 31:21

difficult
  12:25 19:2
  48:17 55:25

dig  15:5

digital  61:6,
  10

digitally
  62:12,18

dinner  4:12

DIRECT  4:7

disagree  10:9
  11:6 39:8

disagreement
  10:13,14
  56:25

disclaimer
  26:3

disclaimers
  27:2

discuss  78:2

discussed  78:7

displayed
  12:19 60:9,
  14 82:25

displaying
  40:8

disposal  48:23

disposed  44:24

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024          Index: disseminating..exploitation

disseminating
  34:19

distinguish
  13:23

doctor   12:4
  56:15 61:12
  65:10

doctors   75:17

document   51:3

documentation
  46:23 47:8
  67:10

documented
  37:11

documents   44:6
  53:19 54:15

doubt   59:20

download  38:17

dozen   56:17

drawing   14:14

drink   29:15

dropped   45:4,
  5,7

drowning   9:1

duck   9:17,18
  15:1,2

Dully   11:17
  12:3,13
  15:6,7,17,
  21,23 16:3,
  6,10,14,15,
  21 17:10

28:10 36:20,
22,25 56:15
57:1,9,17,18
58:25 60:24
61:12 62:16
64:13 72:21
73:1,15
74:11,14,20,
22 75:10,21
76:2 77:25
78:8 79:11,
15

Dully's   18:9
  28:10 33:5
  36:18

duly   4:4
  15:14

duty   46:12

─────────────

E

─────────────

earlier   75:20
  76:7 77:2
  78:7 79:22
  80:17

early   17:13

earth   14:1,8

ease   78:3

easily   54:15

easy   6:12

educated   14:22

effectuating
  21:24

end   20:5,9

41:2,11 68:8

enforcement
  14:16 18:3
  23:18 24:6
  29:12,23
  30:6 31:1,5,
  11,15,19,21
  32:1,3,18
  43:4 46:12
  60:9 68:3,4,
  9 69:21
  75:6,13,18

entire   30:4

equal   64:25
  65:1,4

erotic   76:15

established
  22:2

Estates   29:9

esthetics
  62:13

estimate   15:10
  34:23,25
  35:7,13
  75:25

estimating
  14:6,23

estimation
  48:21

EUGINE   4:3

evaluate   9:11

evidence
  69:13,22

70:2 71:21
72:1 82:16

exact   75:24

EXAMINATION
  4:7 82:9

Excuse   81:8

exhibit   49:23,
  24 50:23
  59:22 60:3
  65:23 66:4,
  6,15,16
  77:24 78:4
  80:14

exhibition
  22:19 51:8,
  11

expedition
  51:8

experience
  11:9 14:16,
  17,21 19:1,8
  44:1 52:19
  61:17 80:7

experienced
  14:14

experiencing
  13:21

expert   59:15
  62:17

expertise
  17:17

explain   15:3

exploitation

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: exploited..give

38:4

**exploited** 8:4
38:9

**exposure** 58:15

**extent** 9:3
46:9

**extra** 57:11

———————————

F

**face** 16:16
55:15 56:6
62:24 74:8

**facetious** 15:2

**fact** 12:17
15:13 31:15,
19 58:19,24
80:1 81:14

**factors** 63:16,
18

**facts** 21:10,
14

**fair** 16:13
57:5 75:25

**familiar** 4:22
9:21 22:5,8,
23 35:23
42:14 43:8,
20 44:1 48:4
57:22 58:12
62:3,8 76:10
80:3

**fault** 61:4

**feasible** 41:12

**February** 60:22
61:9 73:6,
12,14

**federal** 44:1,4
46:18 47:7
48:22

**feedback** 67:4

**feel** 15:16

**feels** 42:25

**felt** 11:1,15,
19 13:15,16
15:22 16:12
35:9

**female** 60:11
78:16

**females** 13:8
40:8

**file** 28:16
60:5,10
78:24

**files** 50:2

**final** 51:7

**find** 30:20
42:17

**finding** 21:19,
23

**fine** 39:11

**firsthand**
52:11

**fishing** 42:4

**Flagler** 29:8

**Florida** 7:6

22:5 23:4,10
59:13 62:21
75:16 83:3

**flushed** 53:21

**follow-up** 7:8
8:12,24 53:6
72:22

**force** 7:7

**forensic** 42:19
71:5,12

**forensically**
75:18

**form** 18:17,23
19:9,18,23
20:2,11
22:25 23:14,
23,24 24:11
25:13 26:7
29:11 37:16
39:9,17
40:22 44:13
46:14 49:1
55:24 57:3
59:1,9 62:19
63:12 64:16
65:15,17
66:24 67:17
69:2 83:5

**formalities**
83:19

**forward** 15:24
33:1

**found** 38:12
39:6

**free** 42:25

**frequently**
41:8

**front** 51:17

**fully** 79:24,
25 80:8,11

**FWC** 29:7
30:9,12

———————————

G

**game** 12:10

**general** 7:8

**generally**
13:7,8,10
14:9,11,15
18:21 24:13
26:9 33:25
36:3 38:16
58:12 73:7

**genital** 55:14

**genitals** 60:14

**get all** 47:24

**girl** 74:3,8

**girl's** 74:8

**girls** 76:22

**give** 6:3
15:10 17:6,
17 20:8
38:18 59:14,
16 64:11,15
65:8,12
69:10 72:13

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: goal..identification

73:8 76:5

goal 38:3
  41:2 48:12

goals 38:1

Good 4:9

government
  44:4 48:24
  54:7

government-issue
  53:16

government-
issued 53:25

grand 70:23

grandmother
  8:18

granted 80:4

grapevine
  53:13

great 9:8,10
  58:7,18
  69:10

greater 64:24
  65:1

green 19:24
  20:4

Greene 8:2,3
  9:19 11:4
  39:2,10 40:1
  42:15,22,24
  45:13 66:18
  71:3,4

Greene's 11:13

groomed 61:24

grooming 62:12
  63:7 79:16

ground 4:19

guess 17:23
  36:8 57:11
  58:1,4,5
  70:23 77:15,
  16

guessing 6:6

guilty 68:15
  70:15

guy 4:22 9:9

guys 11:6
  32:24 71:23

---

**H**

habits 79:16

hair 13:9,11
  60:11,16
  61:14,25
  63:8 64:13
  65:11

half 56:17

hand 12:8

handle 75:17

hang 28:15
  29:14 56:16
  59:6

happen 69:6

happened 32:5
  34:11 43:9,

11 54:19
  67:3 69:7,8,
9 71:24

hard 27:22
  34:25 38:15

harder 19:6

hash 12:25

hashed 65:22

he'll 83:14

head 36:21

hear 4:25
  19:10,14
  20:1,3
  27:18,24
  36:23 53:13
  73:1

heard 42:12,
13 45:12,20
  56:23

hearing 19:16

heart 63:10
  78:12,22
  79:9

heavily 14:17

held 58:9

Hey 18:14
  47:6

hidden 76:19

hindsight
  54:17,18,24

hit 27:25

hits 13:6

Hold 44:16

holding 12:8
  27:12 80:15

homicide 6:17
  29:6,10

honest 33:22
  70:4

housed 41:7,15

hypothetical
  53:23

---

**I**

ICAC 5:20,23
  6:4,7,22
  7:4,6,16
  20:20 40:2
  41:8 43:25
  45:2 46:2
  47:14 61:21
  62:10 64:6
  72:10,11
  76:18

ICAC's 37:23

ID 17:19,20
  18:13 48:25
  53:16,25
  54:7 66:3
  77:15

idea 40:12

identifiable
  9:6

identification
  44:10 49:25
  59:23 65:24

Case 3:24-cv-00137-MMH-LLL    Document 84-17    Filed 11/06/25    Page 33 of 45 PageID
1474
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                    Index: identify..interview

77:19

**identify** 38:24
46:6,10

**identity** 13:2
38:8 39:16
40:20 74:20
75:1

**IDS** 27:12

**ignore** 19:19

**illicit** 41:25

**image** 9:12
10:6 11:20
15:14 16:18,
21 22:20
23:11,19
24:7,16,18
25:19,23
26:1,10,16,
24 27:2
35:10 36:11,
20 37:14
38:12,20,24
40:4 41:5
43:6,17
48:17 49:16
51:7,15,17,
25 52:11
53:25 55:6,
16,19,21
56:1,14,24
61:6,10
62:14,17,23
63:1 73:22,
25 74:9,11,
12 78:11,21
79:9 80:8,

14,22 81:14,
17,19

**images** 10:4,
19,22 11:4
12:3,25 16:3
20:25 23:5,6
27:5,9,17
37:8 39:6
40:5,8,21
53:8 54:6,25
55:2,13 60:8
61:18 62:7,
12 67:14
73:15 77:20
78:8,15,18,
25 79:4,7,12

**imaging** 17:24

**implications**
67:24

**implicitly**
59:7

**important**
24:15 25:25
26:4 51:23
52:1

**impressions**
29:11

**imprinted**
78:11

**improve** 62:13

**include** 22:21
37:14 39:14

**included** 71:11

**incorrect**

51:24

**independent**
34:7

**independently**
36:4

**indication**
78:21

**individual**
12:19 23:8
48:9 51:16,
25 56:25
70:6

**individuals**
46:11

**infected** 42:2

**information**
8:24 13:2
26:12,19
30:1 31:23
37:15 38:11,
22 39:5,22
40:17 42:9
44:11 45:11,
18 46:20
47:16,25
48:5 50:1
52:2,7,12
53:5 54:1,8,
21 56:10
67:10

**informed**
30:10,12
34:10,12
74:20,23,25
75:5

**initial** 10:24
15:12 60:23

**innocence** 83:2

**innocent** 25:24

**innocently**
25:4,5

**inquire** 46:21

**inquired** 11:2

**instance** 10:1
62:22

**intentionally**
22:18 62:23

**interaction**
14:13 29:12,
17 71:6

**interactions**
75:21

**interface** 42:7

**internet** 5:20
24:24 27:6,9
39:7 41:21
42:18

**interpret** 65:3
66:6 70:9

**interpretation**
66:5

**interpreted**
65:10

**interrupt**
44:20 50:16

**interview** 30:8
32:16 33:6,

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024          Index: interviewed..language

8,16,18

**interviewed**
  28:22

**intimately**
  26:15 29:14

**introduced**
  4:15

**investigate**
  10:18 11:23
  26:25 27:16
  36:20 38:23
  39:15 40:10,
  20

**investigated**
  30:4 45:24
  47:19

**investigating**
  7:11 56:20
  64:7

**investigation**
  4:23 7:2,8,9
  8:12,24
  12:1,23
  15:24 20:20
  21:3,18 22:3
  23:4 26:15
  28:13 29:3,
  19 30:10,13,
  21,25 31:4,
  8,16,20 32:1
  33:1,7 36:14
  37:8,13
  39:14,24
  41:8,23
  42:24 45:21,

25 47:16,21
48:3 69:11
72:5,6 74:23
75:2 76:9

**investigations**
  6:14 22:13
  30:22 31:3,
  14,17 40:2
  61:21 75:19
  76:3,19 80:7

**investigative**
  44:1 63:10

**investigator**
  7:11 8:11
  38:7 61:18
  62:6,10,11
  64:6,15
  65:9,13 71:5
  72:9

**investigators**
  10:8 46:2
  66:19

**involved**  10:22
  13:3 22:13
  26:15 29:19,
  22 32:14
  33:13 69:11

**involvement**
  7:2

**involving**  31:5
  32:18

**irreparably**
  68:16

**issued**  48:25
  54:7 77:4,6,

10,13,19

**issues**  40:8
  59:18

**issuing**  21:20

**itech**  56:18

___

**J**

___

**Jacksonville**
  75:16

**Jimenez**  32:20

**job**  5:6,11
  20:22 49:9

**John**  43:2

**John's**  42:16
  46:13 68:24

**Johns**  5:9
  7:17 30:15
  38:2 83:2

**join**  23:1,15
  24:12 26:8
  37:18 49:2
  57:4 59:2
  63:13 65:16
  67:18

**joined**  65:18,
  19

**Jose**  32:19

**jurisdiction**
  43:5

**justice**  48:10,
  13

___

**K**

___

**Kevin**  71:3,4

**kids**  25:9,10

**kind**  4:19 6:3
  9:16 11:9
  12:6,7,8,9,
  10,24,25
  13:1 15:11
  18:2 19:5
  20:17,21
  25:22 32:20
  33:25 34:1,
  25 35:5
  38:19 41:10
  42:3 45:3
  46:25 52:10,
  11 55:25
  57:12,23
  58:9 59:19
  64:17 70:13
  74:4

**knew**  23:11
  29:4,22 61:4
  68:6,11

**knowingly**
  22:17

**knowledge**  14:6
  55:9

___

**L**

___

**lack**  65:11

**lacy**  74:6

**language**  64:10

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: laptop..makes

laptop   28:4
  60:9  73:19,
  20,23

large   31:3

lascivious
  51:8,10,11

Lat   81:7

late   4:12

latitude   59:17

Latvia   81:8,9

Latvian   81:10

law   14:16
  18:3  23:4,18
  24:6  29:12,
  22,23  30:5
  31:1,5,10,
  15,19,21
  32:1,3,18
  43:4  46:12
  60:9  68:3,4,
  8  69:21
  75:6,13,18

laws   44:2,4
  48:22

Lawshe   4:22,23
  10:4  23:5
  26:2  27:5
  28:23  29:1,
  4,7,20  30:5
  31:21  34:9
  39:3  54:12,
  25  55:23
  67:25  68:19
  71:17,20

74:20  75:2
  76:9

Lawshe's   7:2,
  11  10:3,22
  11:1,5  15:18
  53:15  54:4
  75:5  83:2

lawyer   14:19
  20:22

lay   59:15

layer   57:11

layers   34:3

layperson
  14:10

lead   7:10
  21:10,14
  33:23  34:1
  38:22

leads   12:23
  40:17

leaning   27:23

learn   29:18

learned   18:3

leave   73:9

Lee   4:22
  28:21  33:1

left   74:13

legal   20:25
  41:17

legs   74:4

lesson   18:3

letter   57:23
  58:2  60:1,22
  63:18,19,23
  73:6,8  78:6
  79:2,6

letterhead
  58:2

letters   60:3

level   9:2
  36:13

license   58:24

lieutenant
  32:19  34:17

life   14:17,20
  19:1  57:15
  68:20

lifetime   14:14

light   19:25
  20:4

limited   31:24

lines   42:3

listed   26:12

listen   70:7

literature
  15:9

living   14:7
  20:19,20

loads   35:12

local   29:23

locate   9:7

located   29:10
  39:3

log   32:13

long   5:22  6:2
  22:2

longer   40:3

looked   49:14
  82:20

lot   34:14
  61:18,20
  67:4

loud   63:24


M

machines   42:19

Madam   19:25
  44:16

made   31:15
  32:13  45:12
  54:22,23
  56:9  62:22
  79:20

major   5:9,21
  6:10,16,24
  45:2  62:11

make   13:24
  19:17  33:20
  34:8  45:23
  50:8,19
  52:21  54:12
  60:2  72:24
  76:8

makes   6:12
  9:5  56:7
  70:15,20

making   20:8
  24:1 26:5
  40:1 49:9,22
  53:23 66:21

mal-ware   42:2

manageable
  35:12

manipulated
  77:15

mark   66:4

marked   49:24
  59:22 65:23

marking   50:22

material   11:21
  22:7 23:22
  24:10 25:3,
  12,20 36:11
  37:9,25 41:3
  43:4 63:3
  67:16

Matt   83:8

matter   63:1,10

matters   77:15
  81:1

mature   80:1

maturity   58:13
  79:20

meaning   36:5
  70:10 75:2

meanings   76:19

means   11:7
  21:6,13
  24:24 61:15

meant   52:9

media   32:6,9,
  11

medical   15:7
  58:15,19,24
  59:13

meeting   12:13
  28:11 60:20,
  23 73:11,14,
  15 74:19
  75:7 78:1

meetings   61:5,
  6 72:25

memo   57:22,23

memory   26:22

mere   82:13

met   33:2
  56:17 60:24
  75:22 76:2,
  12

Metart   26:22
  40:4,10
  76:12

Metart's   42:10

metart.com
  27:16 45:19,
  24 76:10,21

metart.com.
  45:13

Michael   4:16
  66:15 78:3
  80:13 82:1

microphone

27:22,23

mind   20:8
  56:5

minor   9:12
  16:10,12,15,
  18 50:3 51:7
  52:17

minute   12:16
  27:25

minutes   19:23
  27:21 39:5

miscarriage
  48:10

Missing   8:4

mistaken   32:10

misunderstanding
  61:3

misunderstood
  76:7

model   17:24
  18:9,10 26:3
  48:18 54:1
  55:14,22
  56:6 61:14
  63:7 64:12
  65:9 66:6,9
  80:15 82:13,
  19,20,21

model's   15:15

models   27:12
  39:4,7 42:17
  44:7 46:23
  54:7 61:23
  76:22 77:12,

18,21 79:17

mom   25:1

moment   29:24
  45:17 68:6
  76:5

month   34:24

motion   22:19

mouth   13:20

moved   45:2

moving   34:14

multiple   49:14

─────────────

N

naked   25:1,10

named   4:22

names   78:24

national   8:3
  36:5

NCMEC   8:6
  34:19 35:17,
  23 36:8 55:5

necessarily
  25:24 38:14
  41:17 47:22
  79:25

necessity
  47:21

network   42:2,
  5,20,21

non-actionable
  53:4

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                                    Index: North..performed

North  7:6

noted  78:20
  79:8

notes  72:12
  76:6 80:25

number  60:10
  75:25

numbering  55:5

---

O

object  20:1,11
  22:25 23:14,
  24 24:11
  26:7 37:16
  39:17 40:22
  44:13 46:14
  49:1 55:24
  57:3 65:15
  66:24 67:17
  69:2 83:5

objected  19:22
  65:17

objecting
  19:12,13,18

objection
  44:17

objections
  19:14

obtain  38:8
  44:10 47:23

occasions  76:1

occurred
  21:11,16

40:11 43:23
  82:17

occurring
  43:21

offer  75:12

office  5:10
  7:17 10:9
  28:11,22,24
  30:23 32:8
  33:3,6 36:18
  38:3 42:2,
  16,20 43:3
  46:13 56:23
  69:22 75:16

officer  23:10,
  18 24:6
  29:12,23
  30:6,16
  31:1,5,11,
  15,19,22
  32:1,4,18
  46:12 68:3,4
  75:6

offshore  41:15

older  19:5
  54:1 66:10,
  12 77:21
  80:19

online  41:3

opened  29:21

opinion  11:2,
  4,16 13:17
  16:22,23
  17:18 18:9
  57:14 58:20

59:15 63:6
  67:13 79:12,
  16

opinions  45:18
  58:3

opposed  12:7

opposite  23:17

order  23:8
  48:23 83:13,
  17

ordering  83:12

ordinarily
  55:16

origin  38:19

original  13:22

originated
  38:24

overseas  41:9

owes  68:25

---

P

p.m.  83:19

paid  75:10

paragraph  60:8
  78:10

part  11:25
  22:21 32:16
  39:24 43:9
  45:24 75:12

partially
  60:13

participate
  33:15,17

participated
  28:11,21
  29:8 30:8
  33:8

participating
  33:6

parts  34:14

party  32:4

passport  80:15
  81:2,10,14,
  18 82:23

passports
  53:20 77:2,
  4,9,19

past  12:24
  48:5 54:19
  59:18 71:7
  73:9

path  38:19

patrol  6:12,
  20,21

pause  20:5
  27:25

pedophile
  70:10

people  11:6
  22:11 48:13
  59:16 71:20

percent  35:14
  53:1,2

performed  33:7

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024    Index: perpetuating..PROCEEDINGS

perpetuating
  69:21

person  14:4,11
  18:1 19:7
  22:17 23:11
  32:22 80:1,9
  82:17,21

person's  19:7
  62:24

personal  11:9
  14:17

personally
  27:1 61:10

phone  11:5
  69:13,23
  71:18,21

photo  26:22
  54:2 82:24

photograph
  12:20 18:13,
  15 22:18
  63:7 66:3
  81:23

photographs
  27:11 53:16
  54:10

physically
  73:22

picked  55:17

picture  22:19
  25:1 56:5
  80:18

pictures  25:10
  27:12

place  73:1,12

places  81:19

plainly  60:14

Plaintiff  4:4

plaintiff's
  49:24 59:22
  65:23

plenty  57:15
  71:7

point  5:19
  11:10,11,13,
  14 12:23
  34:14 49:19
  55:13 58:7

police  46:15
  47:10

policy  56:23

pop  28:3

pornographic
  62:7

pornography
  4:24 20:24
  23:9 35:24
  36:9 44:5
  48:8 52:17
  56:21 61:19,
  20 64:8
  82:12

position  36:7

positive  32:8

possess  22:18

possessed
  24:18 25:4,5

possession
  4:24 20:24
  22:6 23:6,9,
  11,21 24:10
  25:3,11,20
  48:7 55:17
  56:20 67:15
  82:12

possibility
  82:13

posted  26:11

potential
  39:15 79:16

potentially
  38:11 64:12

powerful  48:23

practice  13:10

prepubescent
  49:16 50:2,
  10 51:7 63:9
  65:12

present  78:1

presentation
  22:20

presented  12:3
  13:17 43:13,
  15 53:15
  73:15,17

Preston  7:14,
  20 11:18
  12:3,12
  16:19 27:15
  28:10 30:2
  33:5 36:17

42:23 46:10,
  21 54:16,22
  67:9 73:21,
  23,24 74:14
  83:10

Preston's  72:5

prevent  37:24
  38:3

previously
  20:2,4 40:7
  76:2

printed  58:8

prior  6:6,9,
  11 8:14
  21:19,24
  29:2 30:10
  49:9 53:23
  66:20 72:23
  75:20 76:9

private  20:24

probable  21:6,
  8,12,19,23
  22:1 23:20
  24:8 26:5
  36:10 49:9
  54:4,11
  67:13,14
  76:3 82:12

problem  19:20
  20:23 72:14

procedure  4:20
  57:1

PROCEEDINGS
  4:1

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                                    Index: process..received

process   7:23
  36:6 41:18
  59:10,20

produced   18:13

professional
  20:19 58:19
  59:14

Professionally
  29:2

prohibitive
  39:1

proliferation
  37:24 41:3

promoted   6:18

prosecute   43:5

prosecuted
  47:20 48:7

prosecuting
  64:7

prosecution
  4:23

protected
  20:25 42:20

protection
  11:17 75:15

protective
  59:12

prove   70:11
  77:20 83:2,4

provide   75:18
  79:11,15

provided   60:8

puberty   12:24
  13:4,6,21

pubescent
  51:15,24,25
  52:17,23

pubic   13:11
  60:11,16
  61:14,25
  63:8 64:13
  65:11

public   14:10
  26:3 27:9

publication
  40:20 43:3

published
  24:16 26:20
  27:2,5,9,17
  37:15 38:12
  39:23 40:18

publisher   41:4
  43:5

publishers
  44:5

publishing
  41:5 70:6

purported
  37:13 77:18

purports   22:16
  43:16

purpose   37:23

purposes   62:23

pursue   39:1
  41:20

pursued   43:3
  48:4

pursuing   47:15
  53:6

put   13:19
  35:13 58:18
  62:24 63:18
  80:13

Q

quality   17:24

quarter   8:10
  34:23

question   10:3
  13:22 14:25
  15:3,14
  16:12 17:9
  19:23 20:9
  23:25 24:3,6
  39:4 40:16
  43:10 46:24
  53:22,23
  54:6,7 56:4
  63:22 77:16,
  20 81:19

questioning
  77:3

questions
  12:16 58:12
  72:16,20,22
  82:5 83:7,11

quit   19:17

quote   22:9

quote/unquote

79:8

R

raises   56:4

range   48:21
  64:19

rating   58:13
  64:8 79:20

reach   28:23
  57:16

reached   15:6

read   22:9,15
  36:21 60:18
  63:19,23,24
  83:14

readily   54:21

reason   7:19
  11:3 23:18
  24:7 31:10
  35:5 38:13
  39:7 54:14
  58:25 68:20,
  22 75:3,8

reasonable
  37:12 38:7
  39:14,24
  40:19 82:16,
  20

reasons   53:14

recall   10:21
  26:19 45:13
  51:15

received   7:5

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                Index: receiving..Roberts

10:3,6 11:1
16:17 26:24
35:6 36:8
51:6 52:18,
20

**receiving**
34:19

**recognize** 81:6

**recognized**
29:25 32:12

**recollection**
22:16 34:7

**record** 4:16
19:13,19
28:6 42:10
75:14 76:8

**records** 46:22
54:9

**redacted**
81:15,19

**redirect** 82:7,
9

**refer** 8:10
15:9 57:15
58:5 77:24

**reference**
11:11,12,13,
15 40:2

**references**
15:9

**referred** 6:15
43:3 77:2

**referring** 5:13

8:5 9:24
24:23 49:19
50:3,20
78:10,12

**refers** 76:21

**regard** 14:23
69:6

**relate** 55:12

**release** 32:13

**relevant** 63:5,
6

**reliability**
59:21

**reliable** 45:10
73:7

**relies** 63:15

**rely** 52:1

**remains** 29:10

**remember**
10:12,15
32:9 34:13,
15,17 39:25
40:6 53:18
58:6,7
69:18,25
70:5 71:1
72:3 73:3,9,
25 74:3,21
75:24 79:22
80:20

**remembering**
37:4 47:14
75:22

**repeat** 24:4
71:19

**repeated** 71:25
72:2

**report** 35:17
36:8,9,21
37:5,6,11
49:13,15
57:21,22,24
58:5,6 71:8,
12 72:5
77:25 78:4

**Reporter** 19:25
20:3 27:19
44:17,18
83:15

**reports** 34:20,
22 49:8
57:20

**represent**
42:10 72:21

**representation**
22:19 79:21

**representing**
83:9

**represents**
62:25

**reputation**
68:12,16

**requested**
67:10

**require** 36:13

**required**
21:19,23

23:5 44:6

**requirement**
22:1 62:21

**resource** 59:6

**respect** 60:15

**responsible**
34:19

**retired** 6:25

**review** 36:5
57:20 60:9

**reviewed** 7:5
16:12,17
28:14,20
71:8 78:8

**reviewing**
11:12 52:6

**rhyme** 35:5

**rights** 22:1

**robbery/homicide**
6:15

**Roberts** 4:8,17
18:20,24
19:12 20:16
23:2,16
24:2,14
25:16 26:13
28:2,5,8
37:20 39:12,
20 41:1
44:14,21,22
46:17 49:4
50:4,18,21,
24 51:1 56:3
57:7 59:3,24

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                              Index: Roberts'..situation

63:4,17
64:1,21
66:1,16,17
67:1,20 69:4
72:15 77:2
78:7 79:19
80:4,17 81:7
82:6,10
83:7,11,13

Roberts'  20:9

room  35:15

rotated  6:20

rules  4:20

run  41:9

ruse  28:21
33:2,13

───── S ─────

safe  73:11

satisfies
82:16

scale  31:3
79:20 80:3

scenario  13:3
15:6 17:7
18:6 25:25
38:16 39:18,
21 40:13
41:13 43:8,
13,15,17
47:15 48:2
52:11,20

scenarios
57:16

scenes  45:3

scheme  70:23

screen  49:23
50:16 51:3
60:2 82:25

script  78:11,
21

search  21:20
28:14,20
29:8 37:1,3
38:18 42:17
53:24 54:2,4

seated  74:4

Section  22:6

seek  11:16
48:13 53:24

selling  25:18

semantics  58:4

seminar  14:3

sense  9:16
52:22

sensitive
31:4,7,14,
16,17

separate  10:4
58:1

sergeant  4:10,
11 6:18,24
20:7 83:8

sergeants  5:8

serves  26:22

service  75:10,

13

sexual  11:20
22:7,22
23:22 24:10
25:3,11,20
36:11 37:9,
24 41:3 43:4
46:6 58:12
63:2 67:15
79:19

sexually  38:9
80:1

share  49:23
50:16 66:2

shared  51:3

sharing  60:1

shaved  60:12

sheriff's  5:10
7:17 28:22
30:16,23
32:8 38:3
42:1,16,20
43:2 46:13

Shevlin  18:17,
23 19:9,14,
18 20:11
23:1,15,23
24:12 25:13
26:8 37:18
39:9 49:2
50:15,19,22,
25 57:4 59:1
62:19 63:12,
21 64:16
65:15,17,19

66:14 67:18
72:19 80:13,
16 81:8,13
82:1 83:16

shoot  54:2

show  20:5
22:19 56:6
59:25

showed  55:13
73:22

showing  51:20
60:7,15

shown  73:17
74:11,12

shows  78:16

side  58:16

sides  35:15

signature
83:19

signifies  24:5

signs  58:21

similar  56:19

simple  53:4
77:16

sir  5:3 20:15
33:16,19
51:10 72:20
82:3

sit  5:6 26:18
34:6 51:14
65:14

situation  25:6

31:5 38:16

**situational**
40:25 47:1

**situations**
59:15

**skim** 37:5

**skin** 12:10

**sloppy** 46:15
47:10

**SMR** 60:13,15
64:2,8 79:20
80:3

**society** 14:13

**socks** 74:5,6

**solely** 39:5
63:15

**someone's**
14:7,23
48:24

**sort** 48:18
56:23 72:4

**sought** 54:2

**sound** 22:22

**sounds** 6:9
34:18

**source** 18:18

**southwest** 29:9

**speak** 11:14
12:8 57:19
61:10 70:14

**speaking** 14:9
18:21 24:13

36:3 38:16
41:24

**special** 72:8

**specialized**
14:5,21 15:8

**specific** 13:1

**specifically**
70:1

**spent** 66:20

**spots** 81:15

**spread** 37:24
74:4

**St** 5:9 7:17
30:15 38:2
42:16 43:2
46:13 68:24
83:2

**Stage** 79:21,
24

**stand** 65:6

**standpoint**
63:11

**stands** 50:10
76:13

**start** 9:10
53:24

**starting** 20:10

**State** 42:11
53:17 69:22
83:3

**state's** 83:4

**stated** 77:1

**statement** 21:1
24:1 67:21
69:20 70:7,
18,22

**States** 21:1,
19,23 41:7,
16 77:7,10,
14

**stating** 54:8,9

**status** 75:6

**statute** 22:5,
7,8,12,14,
15,23 44:10
62:21

**statutes** 46:19
47:7

**step** 41:23

**steps** 36:19
37:7 38:7
49:11

**stood** 76:15

**stop** 41:3

**stuff** 4:20

**subject** 74:23
75:1

**submit** 18:6

**subordinates**
36:14

**Subsection**
22:6

**successfully**
47:19 48:7

**suggesting**
52:16

**supervise** 5:9

**supervised**
6:19

**supervision**
7:8

**supervisor**
5:19,23 6:4,
7,22,24 7:4
9:2 30:9,12
43:12

**support** 75:18

**supported**
54:10,11

**supporting**
34:2

**suppose** 10:13

**surprise**
76:16,24,25

**suspect** 9:6
23:19,21
24:7,9,17
52:12 53:6

**swap** 27:21

**sworn** 4:4

**Synchronoss**
28:15,16,19,
21 37:1

---
**T**
---

**tagged** 12:11

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: takes..transitioning

takes  63:16

taking  49:11
  67:8

talk  32:24

talked  8:3
  36:16,18
  71:23

talking  7:24
  8:9 9:19
  29:19 43:18
  46:25 50:9
  51:19 54:18

task  7:7

tasks  33:7

team  11:17
  15:7 59:12
  75:15

teen  17:13

teens  76:15,
  22

telling  40:3
  58:20 59:8
  71:17,20
  72:3

ten  6:17

tend  9:3

term  9:25
  21:8 35:23
  36:1

termed  14:15

terms  21:12
  47:1 76:20
  78:16

testified  4:4
  39:2 46:19
  75:20 82:22

testifies
  66:19

testify  35:21

testimony
  45:14 72:23
  75:23 76:7
  79:22

text  79:7

theory  52:15,
  16

thighs  60:14

thing  4:13
  35:16 43:19
  52:9 74:6

things  8:19
  11:12 13:9
  14:13,15
  15:8 20:21
  36:3 46:5
  47:17 54:19
  57:10,15
  67:7,8 70:23

thought  8:20
  24:1 33:11

throw  78:4

tiebreaker
  57:2

time  5:25
  6:10 9:12
  10:12,15
  11:19 18:14

19:15 21:3,
  17 22:3 23:4
  24:18 27:22
  29:7 30:4
  32:10 34:18
  45:16 54:1,
  9,22,23
  66:20 67:8
  72:16 74:19
  77:21 82:4

timeframe  6:3,
  7 8:9 34:3

times  49:14
  56:17 75:22

tip  8:9,11
  9:5,9 10:24
  11:1,15,19
  15:19,21,22
  16:13,17
  29:21,22
  33:5 45:17
  49:7,11,13,
  15 51:6,13
  52:4,5,18
  53:11 55:6
  68:7

tips  7:5,7,24
  8:14,23 9:2,
  4,8,13 10:4
  15:19 51:18
  52:6,13,19

title  5:6

today  4:17
  5:7 26:18
  27:8 34:6
  51:14 60:8

83:11

Tolbert  4:3
  20:7 51:2
  82:11 83:8

told  17:14
  32:22 34:15
  39:22 51:12
  69:15,16,17,
  18,19,25
  70:1,8,9
  71:1,2 72:1
  76:15 80:4

tool  48:23

top  36:21
  78:17

touched  62:13,
  17

trading  25:18

trained  46:5
  62:10 75:18

training  12:18
  13:22,23,24
  14:5,16,22
  15:8 43:25
  46:2

transferred
  45:1

transition
  5:18 34:3

transitioned
  6:21,23

transitioning
  5:19,21

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                                    Index: traveled..website

traveled  81:12

travesty  48:9

treated  31:20

triage  9:3

true  23:17
  39:13 49:15
  57:2 70:25
  80:5

trust  58:25
  59:7,10,16

truth  59:8

turn  7:21

turned  48:8

type  17:23
  38:16 55:16
  73:8 79:3

typical  74:22

typically
  41:24

**U**

Uh-huh  8:25
  35:2

Ukraine  81:3

ultimately
  44:23

unconfirmed
  35:24 36:9
  52:5

underage  40:8
  82:14

understand
  4:18 7:13,23
  8:5 9:23,25
  13:21 16:2,8
  20:22 21:6,8
  23:3 24:16,
  17,21 26:14
  30:9 32:6
  34:20 35:21
  36:1 59:5
  61:11,12,14
  62:11 64:2
  67:8,23
  82:11 83:1

understanding
  14:6 36:7
  55:8 59:17
  64:10 69:12
  81:3

understood
  21:17,22
  68:2 72:24

underwear
  78:17

unit  5:9,20,
  21,23 6:4,
  10,19 7:16
  72:8

United  21:1,
  18,23 41:7,
  16 77:6,10,
  14

University
  59:12 75:15

unlawful  22:17

unreasonable
  40:24 41:12

uploaded  50:2

upward  35:3

utilized  44:9

**V**

vaginal  55:14

vaguely  37:4
  74:1

vantage  55:13

verification
  44:2 46:18,
  23 47:7
  48:22 77:11

verified  26:4

verify  48:24
  49:17 51:19
  52:3

Verizon  28:17

versus  14:4

victim  29:10
  39:16

victims  40:21
  46:6 72:8

view  22:18

viewed  36:4

viewing  26:2

violation
  46:12

visible  60:13,

14

visited  27:15

visiting  37:14

visually  82:24

vote  62:1

**W**

W-E-R-L-E
  30:18

waived  83:20

walks  9:17

wanted  32:25
  52:10

warrant  21:20
  28:14,20
  37:1,4 38:18
  53:24 54:3

watermark
  26:21 40:4,7
  79:3

ways  42:4

wearing  74:5

web  25:18

website  26:3,
  10,19,24
  27:1,4,16
  37:14 38:12
  39:15 40:7
  41:4,14,15,
  22,25 42:8
  43:16 44:11
  46:22 47:6

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: websites..Zoom

48:5 67:9
76:10

**websites**
  40:19,20
  41:6 42:17

**weed**  35:11

**weeds**  13:12

**week**  34:24

**weekends**  29:15
  56:16

**weeks**  35:1,3,
  4

**weighs**  14:17

**weight**  58:19

**well-established**
  21:4

**Werle**  30:14,
  16,20 32:17,
  22 34:16

**white**  74:5
  78:21

**widely**  60:15

**wife**  25:9

**wiggle**  35:15

**William**  4:22
  30:19

**willy-nilly**
  42:4

**window**  19:25

**wiped**  69:13,
  23 71:10,18,
  21 72:1

**wires**  26:23

**wished**  66:19

**wonderance**
  70:13

**word**  24:21
  35:8 43:7
  47:18 51:9
  78:11

**wording**  81:6

**words**  13:14,
  19 25:15

**work**  45:24
  46:16 47:10

**worked**  12:9
  71:7

**working**  29:6,7

**works**  59:11

**world**  66:5

**worldly**  81:11

**worst**  4:13

**wrong**  42:15

**ww.com.**  43:17

---
**Y**
---

**y'all's**  13:10

**year**  6:21
  13:1,13
  17:12,15
  47:13 80:11

**years**  6:5,6,
  17,19,23

12:21 14:1
18:1 19:3
47:13 60:17,
18 64:14
65:5 66:7

---
**Z**
---

**Zoom**  19:24