## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,
an individual,

      Plaintiff,

v.                                       Case No. 3:24-cv-00137-MMH-LLL

VERIZON COMMUNICATIONS, INC.,
a Delaware Corporation, and
SYNCHRONOSS TECHNOLOGIES, INC.,
a Delaware Corporation

      Defendants.

_____/

## <u>SECOND AMENDED COMPLAINT</u>

    Plaintiff, WILLIAM LEE LAWSHE ("Plaintiff"), sues the Defendant, VERIZON COMMUNICATIONS, INC ("Verizon"), and SYNCHRONOSS TECHNOLOGIES INC. ("Synchronoss"), and alleges:

## <u>COMMON ALLEGATIONS</u>

1. This is an action for damages in excess of $75,000.00.

2. Plaintiff, is a resident of St. Augustine, St. Johns County, FL.

3. Plaintiff is a veteran and former Florida statewide law enforcement officer.

4. Defendant, Verizon, is a corporation engaged in the business of providing cell phone and internet services to the public.

5. Defendant Synchronoss Technologies, Inc is a corporation engaged in the business of cloud-based data storage.

6.    At all times material, Defendant Verizon contracted with Defendant Synchronoss Technologies to provide cloud-based data storge for its customers.

7.    At all times material, Plaintiff, as a customer, contracted with Verizon for internet and/or cellular phone service.

8.    This contract and service plan was entered into in the State of Florida.

9.    As a part of this service contract, Verizon provided data storage services to Plaintiff through Synchronoss Technologies, Inc.

10.    Defendant Verizon and/or Synchronoss Technologies, pursuant to the terms of their agreement, stored content downloaded and/or otherwise possessed by Plaintiff.

11.    This content was private and protected by law from disclosure to third parties.

12.    The private possession of adult or pornographic material is protected by the First Amendment of the Constitution of the United States.

13.    Content, which is not otherwise illegal, is private and dissemination of such content by a service provider is prohibited by 18 U.S. Code § 2702.

14.    Defendants Verizon and Synchronoss each had a non-delegable statutory duty of reasonable care to protect Plaintiff's legally protected content from disclosure to third parties.

15.    Child sexual abuse material (CSAM) is not protected by the First Amendment.

16.    Where a service provider, such Defendants, have "actual knowledge" of facts or circumstances which constitute "apparent" possession of CSAM, they have a statutory duty to report such information to the National Center for Missing and Exploited Children (NCMEC), pursuant to 18 U.S. Code Sec. 2258A.

17.  Apparent "is that which is obvious, evident, or manifest."[1]

18.  18 U.S. Code 2258A is the only statutory provision that creates an affirmative duty on the part of providers to report "apparent" possession of CSAM.

19.  NCMEC has a published policy, which was known to Defendants, that all reports of possession of CSAM would be sent to applicable law enforcement agencies.

20.  As a "Protection of Privacy," Congress, in enacting 18 U.S. Code Sec. 2258A, explicitly intended that "nothing in this section shall be construed to require a provider to –

     a.  Monitor any user, subscriber, or customer of that provider

     b.  Monitor the content of any communication of any person or subscriber

     c.  Affirmatively search, screen, or scan for facts or circumstances of apparent possession of CSAM.

21.  Despite no legal or statutory obligation to do so, Defendants voluntarily implemented a plan to monitor, screen and affirmatively search all subscribers' uploaded content for CSAM using a database of "hash" values.

22.  A "hash" is a digital marker for a particular image and any image can be hashed.

23.  Various entities, including the Defendants, collect and disseminate hash values of images which are, or have been, categorized as containing alleged CSAM.

---

[1] Blacks Law Dictionary

24. Defendants used a database of previously categorized (CSAM) hash values to compare with all customer data uploaded to the cloud. When an uploaded image's "hash" value matched one of the hash values in the existing database of alleged CSAM, a "hash match" was generated.

25. This database was known as the Non-Profit Hash Database (sometimes referred to as the "NPO" or "NGO" list by industry professionals)

26. This database is comprised of multiple lists contributed by multiple world-wide Non-Profit Organizations.

27. NCMEC is only one of the organizations who make a CSAM hash list available through the NPO hash database.

28. When a participating Non-Profit organization contributed hashes to their lists in the NPO Hash Database, they were required to include information along with the hash submission which would be available to subscribers of the database, such as the Defendants.

29. This information included the name of the organization making the contribution, the method of categorization and categorization of the content.

30. Defendants knew or should have known that NCMEC did not categorize, solicit, remove, review, approve, create, vet or make any recommendations regarding any PhotoDNA Signatures and/or hashes submitted to the Non-Profit Database by participating Non-Profit organizations.

31. Defendants had the ability to create their own unique program to query information from the database. At the time of the conduct which is the subject of this complaint, the automated scanning system designed and maintained by the Defendants did not record or recognize the identifying information contained in the database connected with individual hash values.

32. Although Defendants knew or should have known that multiple world-wide organizations were contributing to the NPO database, at the time of the

conduct which is the subject of this complaint, Defendants did not know the identity of the other worldwide Non-Profit organizations contributing hash lists to the NPO database.

33. In agreeing to gain access to the NPO Database, Defendants were notified about the potential for errors in the database, including incorrect classification and inclusion on the various lists.

34. Defendants accepted the information and data contained in the database "as is" with no warranties of any kind and assumed all risk and liability associated with using the NPO Database.

35. Because Defendants accepted use of the information included in the database "as is," without warranty as to its veracity or accuracy, reliance on the information in the database to constitute "actual knowledge of facts and circumstances," of apparent child pornography was unreasonable and would have given Defendants reason to question any content flagged in the NPO database.

36. The submission of hash values to hash sharing lists, in the context of CSAM, is largely unregulated.

37. For example, some hash values originate from subjective customer or user complaints, while others may come from law enforcement.

38. Some of the entities contributing to the NPO Hash Database are located in foreign countries with different definitions of child pornography, different free speech protections and different privacy laws.

39. Many of the images contained on other contributing NPO lists did not meet the accuracy standards of NCMEC for inclusion in the NCMEC hash sharing list.

40. A "hash match" is highly accurate at flagging the same image within a large database.

41. However, a "hash match" contained no information regarding the content of that image, other than someone, at some point, categorized (correctly or incorrectly) the image as possible CSAM.

42. A hash match is not confirmation that the particular content is in fact apparent CSAM.

43. In addition to scanning for hash matches, Defendant's employed a technology known as PhotoDNA.

44. Different from hash matching, PhotoDNA searches a hash database for "near matches."

45. PhotoDNA can flag content that is similar to content within a hash list, but is not the same. In fact, as illustrated later in this complaint, it has the potential to flag materially different content.

46. Providers can voluntarily use these various hashing technologies to aid in the detection of CSAM.

47. However, providers are not required to use hashing technology to detect or report apparent possession of CSAM.

48. The only permissible manner of disclosing content which constitutes apparent possession of CSAM, pursuant to 18 U.S Code § 2702, is through Sec. 2258A, where the provider has "actual knowledge" of facts and circumstances of an apparent violation of laws regarding CSAM.

49. This systematic monitoring and scanning of substantially all subscribers' content, including that of the Plaintiff, was entirely voluntarily and specifically excluded from the statutory scheme created and regulated by 18 U.S. Code Sec. 2258A or Sec 2258C.

50. As such, the actions described in this Amended Complaint constituted a private search, not carried out under color of law or as an agent of the government.

51.    By voluntarily undertaking the monitoring and screening of Plaintiff's data, Defendants assumed a legal duty to do so with reasonable care, including but not limited to the duty to protect the privacy rights of Plaintiff and all those similarly situated.

52.    In practice and/or in policy, all or substantially all of the content flagged by a "hash match" or PhotoDNA was disclosed to NCMEC by the Defendants.

53.    This practice and/or policy produced errors which incorrectly identified private constitutionally protected content as containing CSAM.

54.    Specifically, some "hash matches" or "near matches" flagged images which depicted consenting professional adult models.

55.    As a result of Defendant's practice or policy, images containing consenting adult models were reported to NCMEC as child pornography.

56.    Defendants Verizon and Synchronoss knew or should have known that the use of this technology carried the substantial risk of misidentification of content as CSAM.

57.    In fact, Defendants created and maintained a list of hashes (a "block list") which had been confirmed as adult images, age indeterminate images or otherwise not reportable, after receiving law enforcement feedback on content previously reported by Defendants.

58.    Electronic Service Provider hash-based reporting represents 99% of total NCMEC CyberTip reports to law enforcement.

59.    According to NCMEC, a large percentage of those reports are characterized as "unconfirmed" by NCMEC after receiving the particular CyberTip report. However, NCMEC is required to forward all reports to law enforcement.

60.    As much as half of all NCMEC CyberTips are not actionable by law enforcement by simple visual inspection of the reported content.

61.    NCMEC receives hundreds of thousands of reports annually from law enforcement, communicating that ESP reporters have submitted CyberTips which depict adults, age-difficult models or not enough information to discern if the content is pornographic.

62.    If Defendants did not know that the monitoring and screening program falsely identified CSAM, then it was due to a willful indifference to the veracity of the screening program's results.

63.    As for example, the images involved in this case were easily identifiable as adults by the barest of review and/or investigation.

64.    At the time of the conduct described in this complaint, Defendants provided law enforcement officers with written guidelines for legal process when investigating CyberTip reports they generated.

65.    This document, entitled "Legal Process of Service," was designed to be read in conjunction with its CyberTip reports.

66.    These guidelines made representations about the veracity of Snynchronoss and Verizon's CSAM reporting.

67.    This document was also designed to aid in law enforcement's application for search warrants in criminal investigations where Synchronoss and Verizon had originated the particular CyberTip.

68.    This document was made available to all Internet Crimes Against Children (ICAC) agencies, including the investigating law enforcement agency in this case. Information contained in this document was later used by law enforcement to serve search warrants in the criminal investigation.

69.    These guidelines told law enforcement officers that Synchronoss and Verizon (1) only matched content against "known" images of CSAM and (2) sent CyberTips only "after a photo is confirmed as child pornography."

70.    These representations were false.

71.   At the time these guidelines were sent to law enforcement agencies nationwide, Synchronoss and Verizon knew that these representations were false.

72.   Defendants knew that they were scanning content against a database that included age indeterminate, adult or otherwise unconfirmed material that was not CSAM.

73.   Defendants also knew that sometimes they flagged "near matches" and not identical matches.

74.    At no time did Defendants have in place a process or procedure for "confirming" a particular image was CSAM.

75.   Synchronoss's senior legal counsel has admitted that Defendants were not "confirming" content was CSAM prior to submitting NCMEC Cybertip Reports.

76.    These false statements presented a serious and substantial risk that law enforcement would be misled about the veracity of Defendant's allegations of criminal conduct. These statements also raise complex and widespread Fourth Amendment concerns.

77.   Moreover, these statements reflect a willful misrepresentation of material facts related to the reporting of alleged criminal conduct and, therefore, constitute intentional misconduct and actual malice.

78.   On January 25, 2023, this monitoring and screening plan, implemented by the Defendants, incorrectly flagged, through the use of hashing technology, content (a single still image) possessed by Plaintiff as containing CSAM.

79.    The hash match or, PhotoDNA near match, was not flagged against the NCMEC CSAM has list.

80.   In other words, this content was not, and has never been, included on NCMEC's CSAM hash list.

81.  Therefore, any match would not have included information regarding NCMEC's classification of the content.

82.  What would have been immediately knowable to the Defendant was that the content had never been classified as CSAM by NCMEC for inclusion on their CSAM hash sharing list, because the databased contained the source information for the particular content. However, as stated above, the system utilized by Defendants did not query or record this information from the database.

83.  In fact, NCMEC had previously viewed the content in question and refused to place the image on its CSAM hash sharing list because it could not be confirmed as CSAM.

84.  NCMEC only includes images of confirmed CSAM on its external hash sharing list contributed to the NPO Hash Database.

85.  However, NCMEC maintains an internal hash list of all images ever reported. Within this list, all content is categorized using an extensive list of various categories.

86.  The subject content was classified as "unconfirmed" on NCMEC's internal hash list.  "Unconfirmed," in this context, meant that NCMEC could not determine the age of the individual depicted to be a minor or an adult.

87.  With the assistance of NCMEC staff, Defendants, as participants or members of the NPO Hash Database, have the ability to investigate particular hash values and content against the internal list, in order to obtain information about given content.

88.  Therefore, if questions arose, or there was the need for additional information about a particular hash match, Defendants had the ability to query the content with NCMEC in order to obtain additional information about the particular content.

89.    At no time, did Defendants communicate or liaison with NCMEC regarding
any of the subject content to further any investigation into the nature of the
content.

90.    NCMEC does not know, or have the ability to know where or if the subject
image was on another CSAM hash sharing list. They do not control, monitor
or maintain the content contained in the NPO Hash Database beyond their
own submissions.

91.    At the time of this CyberTip report, Defendants did not know the source of
the hash match or near hash match which flagged the subject image.

92.    At the time of this CyberTip report, Defendants did not know if this was a
near match or an exact match to an image contained in a CSAM hash list.

93.    If the exact content was on a list, Defendants did not know who (or what
entity) had placed the image on the list or what criteria or definitions were
used to determine that the image should be placed on the list.

94.    However, this image was the subject of a prior law enforcement
investigation into a missing underage person.  Investigators with the Federal
Bureau of Investigation (FBI) ultimately confirmed, with the records
custodian of the publishing website, that the image did not depict the
missing person.

95.    The FBI viewed this image and allowed it to remain on the public website
over a decade prior to the events described in this complaint.

96.    To the extent that the subject image was on a list within the NPO Database,
on information and belief, the image was placed on the list erroneously due
to this missing person investigation.

97.    Despite confirmation by the FBI, multiple people have been charged with
possession of this image based on its erroneous inclusion in some unknown

CSAM list, which evidences the brokenness of a reporting system predicated on blindly reporting content from unknown and unvetted lists.

98.   In fact, the image did not contain CSAM.

99.   Furthermore, there was nothing contained within the image which suggested that it was CSAM.

100.  The model was, in fact, an adult.

101.  The adult model was not portrayed or described as a minor in the image itself.

102.  The adult model was not acting or pretending to be a minor.

103.  To the contrary, all of the facts, then available to the Defendants, showed that the image was not CSAM:

    a.  The image was watered-marked by a public domain website, denoting a copyrighted image.

    b.  The website, from which the image came, explicitly identifies the model as an adult.

    c.  The website, from which the image came, explicitly claims compliance with Federal Law regarding age verification of models.

    d.  The website, from which the image came, provides a link to a legal representative who can provide age verification compliance information.

    e.  The verification information kept by the website, proves the model was over the age of 18 at the time of the professionally produced photo shoot.

104.  At all times material, this file was protected and private content, which could not be disclosed to third parties.

105. At all times material, the Defendants did not have "actual knowledge" of an apparent violation of the law regarding CSAM.

106. At all times material the Defendants conducted no investigation into the veracity of the flagged content for the purpose of gathering "facts or circumstances" which would constitute "actual knowledge" of apparent possession of CSAM.

107. All Defendants knew was that an image had been flagged. They did not know what list the image was flagged against, what jurisdiction that list had originated from, who had created the list or why the image was placed on the list.

108. On January 25, 2023, the Defendant Synchronoss disclosed the subject content in an automated "Cyber Tipline" report to NCMEC alleging an incident of "possession, manufacture and distribution" of child pornography by Plaintiff.

109. No human employed or acting on behalf of Defendants actually reviews the entire contents of any CyberTip reports generated by scanning prior to it being sent to NCMEC.

110. No human employed or acting on behalf of Defendants consciously decides to send any CyberTip reports generated by scanning, rather it is automatically generated and sent by the computer program itself.

111. The disclosure included the subject image.

112. The disclosure of the subject image to NCMEC, was entirely voluntary and was made outside of the requirements of 18 U.S. Code Sec. 2258A.

113. Defendants never had any information to support the allegation that Plaintiff was in anyway connected to the manufacture or distribution of the subject uploaded file.

114.  Defendants knew the allegation of manufacturing and distributing the content in question was false at the time they communicated the report to NCMEC.

115.  In fact, the accusations of manufacturing and distribution were hard-coded allegations made against all customers who were the subject to NCMEC reporting – irrespective of the truth or circumstances surrounding the particular report.

116.   Furthermore, Defendants reported an incident date and time of "1-25-2023 21:18:12 UTC."

117.  This "incident time" was false and in no way connected to the incident described in the report.

118.  In fact, the reported incident time was merely the time the computer generated the automated report.

119.  Although Synchronoss knew and recorded the exact time of the upload, their practice was to report an arbitrary time which was inaccurate by as much as 24 hours.

120.  Later, after law enforcement subsequently received this report from NCMEC, they erroneously relied on the false incident time to seek a search warrant (including information regarding cell cite locations by time) and establish "domain and control" of the device for purposes of probable cause.

121.  Prior to the events described in this complaint, NCMEC had cautioned Defendants, Verizon and Synchronoss, about the accuracy of information contained in their CyberTip reports, including incident descriptions and incident times. NCMEC went as far as adding additional fields to the CyberTip forms, which they hoped would prompt clarifying information.

122.  Defendants did not take the opportunity to clarify the information being incorrectly reported.

123. Recognizing the dangers of incorrect incident times in digital down/upload criminal investigations, NCMEC began including warnings to law enforcement that they should not rely on incident times provided in CyberTip reports.

124. In making the disclosure, Defendants made multiple additional false statements to NCMEC.

125. The subject disclosure stated that:

   a) The service provider had viewed the entire contents of the uploaded file.

   b) That the entire content of the uploaded file was not available publicly.

   c) That the image contained the lascivious exhibition of a "pre-pubescent" minor.

126. All three of these statements were false at the time they were made:

   a) No officer, director, manager, or employee of either Defendant actually viewed the image in question prior to its disclosure as CSAM.

   b) The entire content of the subject file was available publicly.

   c) The adult model in the image was unequivocally pubescent.

127. The monitoring system, then in place, was designed or functioned to electronically generate and automatically send NCMEC reports.

128. No human being, acting on behalf of Verizon, actually viewed the image in question.

129. Currently, Verizon has no direct knowledge of who purportedly reviewed the image or where any purported review occurred.

130. In the alternative, if some unknown person did view the image, they were entirely unqualified to make any determination of age of the individual depicted in the subject image and they did not view the "entire contents" of the file.

131. At the time of the disclosure, neither Defendant had "actual knowledge" that the content contained apparent CSAM.

132. At the time of the disclosure neither Defendant had "actual knowledge" that the Plaintiff had committed an "apparent" violation of law regarding the possession of CSAM.

133. At no time did the Defendants attempt to investigate or obtain "actual knowledge" of facts or circumstances that the content was, in fact, CSAM.

134. In fact, Defendant Verizon and/or Synchronoss did not have a subjective belief that the content was CSAM.

135. Under the totality of the circumstances, the Defendants knew and/or had ample and obvious reason to believe that the allegations and material representations in the report were false.

136. Under 18 U.S. Code Sec. 2258A and 18 U.S. Code § 2702, Defendants Verizon and Synchronoss are responsible for making the determination, based on "actual knowledge," of "facts and circumstances" that there has been an apparent violation of law regarding CSAM.

137. The extra-statutory scanning system, as planned and/or implement by Defendant, does not attempt to obtain "actual knowledge" of the violation of laws regarding CSAM but rather abdicates that responsibility to the individual or organization that created the original hash value, NCMEC or law enforcement.

138. These other individuals or organizations do not have any obligation to protect the Defendant's customers' privacy.

139. Based on the false allegations contained within the January 25, 2023 disclosure, law enforcement obtained a subpoena to search virtually all of Plaintiff's personal digital information and content.

140. Defendants knew that the allegation of possession of CSAM carried a substantial risk of search and seizure by the State, arrest, loss of employment, devastating social stigma, and ostracization from friends and family.

141. The misidentification of Plaintiff as possessing, manufacturing and distributing CSAM was not an accident. Rather, it was the predictable and expected outcome of the system put in place and executed by the Defendants.

142. The monitoring and screening system put in place by the Defendants, or programs which are substantially similar, have falsely reported this same content (hash value) to either NCMEC, or some other organization, in the past as CSAM.

143. The system, unless it has been modified by Defendants since the origination of the present case, will falsely report this content in the future. It is just a matter of time, as the content is publicly available and completely legal.

144. A simple "Google Images" search of the model's name, who has now been a professional model for over 14 years, will return the subject image.

145. There are other images which have been reported, in the past, and will be falsely reported by the Defendants as CSAM, in the future.

146. Unknown to Plaintiff until his arrest, Defendant had falsely flagged and disclosed content of the Plaintiff in the past as "unconfirmed" CSAM.

147. On October 29, 2022, Defendant Synchronoss disclosed private content that was flagged by its scanning program.

148. The image flagged on October 29, 2022 was never included in any CSAM
hash list or database and no NPO had ever previously categorized the image
as CSAM of any kind.

149. At the time of this CyberTip report, Defendants did not know the source of
the near hash match which flagged the subject image.

150. The image was flagged using PhotoDNA technology, which produced a
"near match" to another version of the image, which had been digitally
altered.

151. Specifically, the image possessed and uploaded by Plaintiff contained a
clearly adult model. However, someone had modified this image at some
point in time by superimposing a minor's face over the face of the adult.

152. Plaintiff only possessed the adult version of this image and had no
knowledge of the altered version.

153. Neither version of the image was included in the NCMEC CSAM hash list
made available to the NPO Database.

154. In the alternative, if the October image was included in a hash list, that
organization purposefully place adult images on its CSAM list.

155. On October 29, 2022, the Defendant Synchronoss disclosed the subject
content in a "Cyber Tipline" report to NCMEC alleging an incident of
possession, manufacture and distribution of child pornography by Plaintiff. .

156. Synchronoss never had any information to support the allegation that
Plaintiff was in anyway connected to the manufacture or distribution of the
subject uploaded file.

157. Defendants knew the allegation of manufacturing and distributing the
content in question was false at the time they communicated the report to
NCMEC.

158.   Defendant Synchronoss reported an incident time of "10-29-2022  21:28:58 UTC."

159.  This "incident time" was false and in no way connected to the incident described in the CyberTip.

160.  The reported incident time was merely the time the computer generated the automated report.

161.  Although Synchronoss knew and recorded the exact time of the upload, their practice is to report an arbitrary time which could be incorrect by as much as 24 hours.

162.  The subject disclosure stated that:

   d) The service provider had viewed the entire contents of the uploaded file.

   e) That the entire content of the uploaded file was not available publicly.

   f) That the image contained sexual conduct of a "pubescent" minor.

163.  All three of these statements were false at the time they were made:

   a) No officer, director, manager, or employee of either Defendant actually viewed the image in question prior to its disclosure as CSAM.

   b) The entire content of the subject file was available publicly.

   c) The adult model in the image was unequivocally an adult.

164.  No human being, acting on behalf of Verizon, actually viewed the image in question.

165. Currently, Verizon has no direct knowledge of who purportedly reviewed the image or where any purported review occurred.

166. In the alternative, if some unknown person did view the image, they were entirely unqualified to make any determination of age of the individual depicted in the subject image and they did not view the "entire contents" of the file.

167. The image was watered-marked by a public domain website, denoting a copyrighted, publicly available image.

168. The website, from which the image came, explicitly identifies the model as an adult.

169. The website, from which the image came, explicitly claims compliance with Federal Law regarding age verification of models.

170. The monitoring system, then in place, was designed or functioned to electronically generate and automatically send NCMEC reports.

171. The subject content was not CSAM.

172. In making this disclosure, Defendant Synchronoss made the false factual allegation that Plaintiff was in possession of CSAM.

173. In fact, Defendant Verizon and/or Synchronoss did not have a subjective belief that the content was CSAM.

174. Under the totality of the circumstances, the Defendants knew and/or had ample and obvious reason to believe that the allegations and material representations in the report were false.

175. Despite the fact that it was not CSAM, the disclosure and false allegations were communicated to law enforcement by NCMEC.

176. Law enforcement determined that it was not apparent, obvious or manifest CSAM and refused to take further action on the report from Defendants and NCMEC.

177. NCMEC has subsequently categorized the content as "adult."

178. Even so, the defamatory statement resulted in damage to Plaintiff's reputation.

179. In the year 2022, Defendant Synchronoss made 30, 901 separate reports to NCMEC. All of these reports included false "incident times" and most, if not all, included false allegations in the "incident type."

180. In 2023, Law enforcement officials in Georgia were forced to drop charges of possession of CSAM based on a hash match from another service provider. That particular content was published by verified models on Pornhub.com. The content had been viewed millions of times. The models had verified adult profiles on that website, and yet, somehow, the content had been "hashed" as CSAM.

181. In essence, the Defendants have created a monitoring and screening system that plays a game of Russian Roulette with the privacy and liberty of their customers: although many of the reports to NCMEC may be justified, when the game is played long enough, a customer will be subjected to a false allegation, catastrophic and irreparable injury to their reputation, illegal search and seizure, arrest and destruction of the society they enjoyed.

182. Such conduct is malicious, reckless and demonstrates a wonton disregard for the rights and liberty of their own customers.

183. However, Defendants had a subjective belief that they were immune from civil liability for this conduct.

184. Defendants had and continue to have a subjective belief that they are immune from civil liability for any conduct relating to the disclosure of pornographic content, whether it is apparent CSAM or not, to NCMEC.

185. They believe that this immunity extends to acts and omissions which are not required and explicitly beyond the scope of Sec 2258A or C, including the voluntary monitoring and screening of customers' private content.

186. This subjective belief has fueled the impunity with which the Defendants expose their customer's private content to third party disclosure, unreasonable government search and seizure and false defamatory allegations.

187. This belief has led to the complete abdication of responsibility, indifference to the truth of their accusations and material representations about alleged criminal conduct and disregard for the consequence of their actions.

188. As further evidence of this total indifference to the truth or the rights of their customer, as of June 2025, Defendants have not placed the subject images on their "block list." Meaning that if a current customer were to be flagged again, they too would be reported to NCMEC and law enforcement.

189. In making these disclosures, the Defendants published and communicated false, factual, defamatory statements identifying the Plaintiff as violating laws regarding the manufacture, possession and distribution of of child pornography.

190. Specifically, On January 25, 2023, Defendant communicated and published the statement that Plaintiff possessed, manufactured and distributed an image which depicted the "lascivious exposition" of a "prepubescent minor" to NCMEC.

191. This statement was false.

192. The knowing possession, manufacture and distribution of such an image would constitute a felony in the State of Florida.

193. Ultimately, this defamatory statement was communicated to law enforcement in the State of Florida.

194.   The false factual defamatory statement resulted in the arrest of Plaintiff.

## **COUNT I- VERIZON COMMUNICATIONS, INC – DEFAMATION**

195.   Plaintiff re-incorporates and realleges paragraphs 1-194.

196.   At all times material Defendant Synchronoss was an agent of Defendant, Verizon.

197.   At all times material Defendant Synchronoss was acting within the course and scope of its agency with Defendant Verizon.

198.   At the time of the publication, the Defendant knew or should have known, by the exercise of reasonable diligence, the defamatory statement published by Synchronoss on January 25, 2023 was false.

199.   At the time of the publication, Verizon was completely indifferent to the veracity of the false defamatory statement made on January 25, 2023.

200.   The publication of the defamatory statement was made with actual malice and/or a reckless indifference to the truth of the accusation and a wanton disregard for the rights and reputation of the Plaintiff.

201.   Defendants knew or should have known that Defendant Synchronoss was making serious and defamatory allegations against its customers, on a regular basis.

202.   Defendant Verizon had a duty of reasonable care to ensure that Synchronoss had verified, or at the very least investigated, the veracity of these defamatory statements.

203.   Defendant Verizon knew or should have known that the defamatory allegations would be disseminated to additional parties, including but not limited to law enforcement.

204. Defendant Verizon created, directed and/or was responsible for all policies and procedures implemented by Synchronoss for the detection and reporting of CSAM.

205. As a result of the acts and/or omissions described herein, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages against Defendant, VERIZON COMMUNICATIONS, INC., and demands a jury trial.

## **COUNT II- VERIZON COMMUNICATIONS, INC – DEFAMATION**

206. Plaintiff re-incorporates and realleges paragraphs 1-194.

207. At all times material Defendant Synchronoss was an agent of Defendant, Verizon.

208. At all times material Defendant Synchronoss was acting within the course and scope of their agency with Defendant Verizon.

209. At the time of the publication, the Defendant knew or should have known, by the exercise of reasonable diligence, the defamatory statement published by Synchronoss on October 29, 2022 was false.

210. At the time of the publication, Verizon was completely indifferent to the veracity of the false defamatory statement made on October 29, 2022.

211.  The publication of the defamatory statement was made with actual malice and/or a reckless indifference to the truth of the accusation and a wanton disregard for the rights and reputation of the Plaintiff.

212.  Defendants knew or should have known that Defendant Synchronoss was making serious and defamatory allegations against its customers, on a regular basis.

213.  Defendant Verizon had a duty of reasonable care to ensure that Synchronoss had verified, or at the very least investigated, the veracity of these defamatory statements.

214.  Defendant Verizon knew or should have known that the defamatory allegations would be disseminated to additional parties, including but not limited to law enforcement.

215.  Defendant Verizon created, directed and/or was responsible for all policies and procedures implemented by Synchronoss for the detection and reporting of CSAM.

216.  As a result of the acts and/or omissions described herein, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages against Defendant, VERIZON COMMUNICATIONS, INC., and demands a jury trial.

## COUNT III- SYNCHRONOSS TECHNOLOGIES, INC-DEFAMATION

217. Plaintiff re-incorporates and realleges paragraphs 1-194.

218. At the time of the publication on January 25, 2023, the Defendant Synchronoss knew or should have known, by the exercise of reasonable diligence, the defamatory statement was false.

219. The publication of the defamatory statement was made with actual malice and/or a reckless indifference to the truth of the accusation and a wanton disregard for the rights of the Plaintiff.

220. Defendant Synchronoss knew or should have known that the publication would be disseminated to additional parties, including but not limited to law enforcement.

221. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages against Defendant, SYNCHRONOSS TECHNOLOGIES, INC, and demands a jury trial.

## COUNT IV- SYNCHRONOSS TECHNOLOGIES, INC-DEFAMATION

222. Plaintiff re-incorporates and realleges paragraphs 1-194.

223. At the time of the publication on October 29, 2022, the Defendant Synchronoss knew or should have known, by the exercise of reasonable diligence, the defamatory statement was false.

224. The publication of the defamatory statement was made with actual malice and/or a reckless indifference to the truth of the accusation and a wanton disregard for the rights of the Plaintiff.

225. Defendant Synchronoss knew or should have known that the publication would be disseminated to additional parties, including but not limited to law enforcement.

226. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages against Defendant, SYNCHRONOSS TECHNOLOGIES, INC, and demands a jury trial.

## COUNT V- VERIZON COMMUNICATIONS, INC –VIOLATION OF 18 U.S. CODE § 2702 - VOLUNTARY DISCLOSURE OF CUSTOMER COMMUNICATIONS OR RECORDS

227. Plaintiff re-incorporates and realleges paragraphs 1-194.

228. At all times material, Defendant Verizon was subject to the requirements of 18 U.S. Code § 2702.

229. Specifically, that Verizon shall not knowingly divulge to any person or entity the contents of a communication or record while in electronic storage by that service.

230. Pursuant to 18 U.S Code § 2702, Verizon had a non-delegable duty to maintain the privacy of Plaintiff's private content as described by that statute.

231. On or about January 25, 2023, Verizon knowingly divulged Plaintiff's private content to a third party, in violation of 18 U.S. Code § 2702.

232. On or about January 25, 2023, Defendant Synchronoss knowingly divulged Plaintiff's private content to a third party, in violation of 18 U.S. Code § 2702.

233. At all times material Defendant Synchronoss was an agent of Defendant Verizon.

234. At all times material Defendant Synchronoss was acting within the course and scope of their agency with Defendant Verizon.

235. Defendant Verizon created, directed and/or was responsible for all policies and procedures implemented by Synchronoss for the detection and reporting of CSAM.

236. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages, including reasonable attorney's fees pursuant

to 18 U.S. Code § 2702 against Defendant, VERIZON COMMUNICATIONS, INC, and demands a jury trial.

## COUNT VI- VERIZON COMMUNICATIONS, INC –VIOLATION OF 18 U.S. CODE § 2702 - VOLUNTARY DISCLOSURE OF CUSTOMER COMMUNICATIONS OR RECORDS

237. Plaintiff re-incorporates and realleges paragraphs 1-194.

238. At all times material, Defendant Verizon was subject to the requirements of 18 U.S. Code § 2702.

239. Specifically, that Verizon shall not knowingly divulge to any person or entity the contents of a communication or record while in electronic storage by that service.

240. Pursuant to 18 U.S Code § 2702, Verizon had a non-delegable duty to maintain the privacy of Plaintiff's private content as described by that statute.

241. On or about October 29, 2022, Verizon knowingly divulged Plaintiff's private content to a third party, in violation of 18 U.S. Code § 2702.

242. On or about October 29, 2022, Defendant Synchronoss knowingly divulged Plaintiff's private content to a third party, in violation of 18 U.S. Code § 2702.

243. At all times material Defendant Synchronoss was an agent of Defendant, Verizon.

244. At all times material Defendant Synchronoss was acting within the course and scope of their agency with Defendant Verizon.

245. Defendant Verizon created, directed and/or was responsible for all policies and procedures implemented by Synchronoss for the detection and reporting of CSAM.

246.    As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages, including reasonable attorney's fees pursuant to 18 U.S. Code § 2702 against Defendant, VERIZON COMMUNICATIONS, INC, and demands a jury trial.

## COUNT VII- SYNCHRONOSS TECHNOLOGIES, INC – VIOLATION OF 18 U.S. CODE § 2702 - VOLUNTARY DISCLOSURE OF CUSTOMER COMMUNICATIONS OR RECORDS

247.    Plaintiff re-incorporates and realleges paragraphs 1-194.

248.    At all times material, Defendant Synchronoss Technologies was subject to the requirements of 18 U.S. Code § 2702.

249.    Specifically, that Synchronoss Technologies shall not knowingly divulge to any person or entity the contents of a communication or record while in electronic storage by that service.

250.    On or about January 25, 2023, Synchronoss Technologies knowingly divulged Plaintiff's private content to a third party, in violation of 18 U.S. Code § 2702.

251. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages, including reasonable attorney's fees pursuant to 18 U.S. Code § 2702, against Defendant, SYNCHRONOSS TECHNOLOGIES, INC, and demands a jury trial.

## COUNT VIII- SYNCHRONOSS TECHNOLOGIES, INC – VIOLATION OF 18 U.S. CODE § 2702 - VOLUNTARY DISCLOSURE OF CUSTOMER COMMUNICATIONS OR RECORDS

252. Plaintiff re-incorporates and realleges paragraphs 1-194.

253. At all times material, Defendant Synchronoss Technologies was subject to the requirements of 18 U.S. Code § 2702.

254. Specifically, that Synchronoss Technologies shall not knowingly divulge to any person or entity the contents of a communication or record while in electronic storage by that service.

255. On or about October 29, 2022, Synchronoss Technologies knowingly divulged Plaintiff's private content to a third party, in violation of 18 U.S. Code § 2702.

256. As a result, the Plaintiff suffered actual damages, including a violation of privacy, the public disclosure of private facts, arrest, the deprivation of liberty, the loss of wages, the loss of the ability to earn money, monetary

damages in the form of attorney's fees, the loss of ability to enjoy life, emotional distress, mental anguish and irreparable damage to his reputation.

WHEREFORE, Plaintiff, WILLIAM LEE LAWSHE demands judgment for compensatory and punitive damages, including reasonable attorney's fees pursuant to 18 U.S. Code § 2702, against Defendant, SYNCHRONOSS TECHNOLOGIES, INC, and demands a jury trial.

Based on information and belief, the undersigned verifies that the facts and allegations of the above Second Amended Complaint are true and accurate

Dated on this 18th day of November 2025.

**LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND NOWICKI**

*/s/ Michael K Roberts*

_____
**Michael K. Roberts, Esquire**
Florida Bar No. 00779741
**Jeffery S. Nooney, Esquire**
Florida Bar No. 1011565
1680 Emerson Street
Jacksonville, FL 32207
(904) 398-1992
(904) 858-9943 facsimile
mroberts@nrhnlaw.com
jnooney@nrhnlaw.com
Attorney for Plaintiff