**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

```
 1                   UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF FLORIDA
 2                      JACKSONVILLE DIVISION
                 Civil Action No. 3:24-cv-00137-WWB-LLL
 3

 4    WILLIAM LEE LAWSHE,
      an individual,
 5
                          Plaintiff,
 6

 7    V.

 8
      VERIZON COMMUNICATIONS, INC., a
 9    Delaware Corporation, and SYNCHRONOSS
      TECHNOLOGIES, INC., a Delaware
10    Corporation,

11                        Defendants.

12

13

14
                      Deposition of Cara Blaszka,
15          The remote videoconference was taken by
                   Michael K. Roberts, Esquire
16                  Before Lourdes Valdes,
              Certified Professional Reporter,
17
                      On June 13, 2025,
18        Beginning at 9:00 a.m. & ending at 2:00 p.m.

19                              -  -  -

20

21

22

23

24

25
```

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

**Page 2**

1    APPEARANCES OF COUNSEL
2
3    For the Plaintiff:
4    Michael K. Roberts, Esquire
     Law Offices of Nooney, Roberts, Hewett and Nowicki
5    1680 Emerson Street
     Jacksonville, Florida 32207
6    (904)398-1992
     Mroberts@nrhnlaw.com
7
8    For the Defendants:
9    Andrew H. Reiss, Esquire
     BOND, SCHOENECK & KING, PLLC
10   4001 Tamiami Trail North
     Naples, Florida 34103
11   (239)659-3848
     Areiss@bsk.com
12
13   Nury Siekkinen, Esquire
     ZwillGen, PLLC
14   1900 M. Street NW
     Suite 250
15   Washington, D.C. 20036
     (202)706-5229
16   Nury@zwillgen.com
17
18   Also Present:
19   Mike Stingo - The Videographer
20   Autumn Zepf - Paralegal for Mr. Roberts
21
22
23
24
25

**Page 3**

1            INDEX TO PROCEEDING
2            EXAMINATION INDEX
3
4    Cara Blaszka                          Page
5    Exhibit Page                          4
6    Direct Examination by Mr. Roberts     5 - 151
7    Cross Examination by Ms. Siekkinen    151 - 153
8    Certificate Page                      - 156
9    Errata Page                           - 157
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1            EXHIBIT PAGE
2    Exhibit                Description                  Page
3    Plaintiff's Exhibit A  Synchronoss Legal Guide      15
4    Plaintiff's Exhibit B  CyberTipline Report October   25
5    Plaintiff's Exhibit C  Motion for Reconsideration    29
6    Plaintiff's Exhibit D  Synchronoss Contract          67
7    Plaintiff's Exhibit E  Verizon's Efforts to Combat   71
8                           Child Exploitation FAQs
9    Plaintiff's Exhibit F  E-mails                       72
10   Plaintiff's Exhibit G  Answers to Interrogatories   108
11   Plaintiff's Exhibit H  CyberTipline Report January  123
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1            June 13, 2025
2            9:00 a.m.
3        THE VIDEOGRAPHER:  We're on the record for the video
4    deposition of Cara Blaszka taken in the matter of William
5    Lee Lawshe vs Verizon Communications, Inc.  and Synchronoss
6    Technologies, Inc.
7        Today is June 13, 2025, and the time is 9:05 a.m.
8        The court reporter is Lourdes Valdes and the
9    videographer is Michael Stingo.  We are here with Huseby
10   Global Litigation.
11       Will council please introduce themselves, after which
12   the court reporter will swear in the witness.
13       MR. ROBERTS:  Michael Roberts for the plaintiff.
14       MR. REISS:  Andrew Reese on behalf of Synchronoss.
15       MS. SIEKKINEN:  Nury Siekkinen on behalf of defendant,
16   Verizon.
17            CARA BLASZKA,
18       Being first duly sworn, was examined and testified as
19   follows:
20       THE COURT REPORTER:  The witness is sworn, we're
21   officially on the record, it's 9:06 a.m.
22            DIRECT EXAMINATION
23   BY MR. ROBERTS:
24    Q.  Good Morning.  I'll introduce myself, my name is
25   Michael Roberts, I'm an attorney down in Jacksonville, Florida.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 6

1  I represent a gentleman named William Lawshe in a claim that
2  he's brought against Synchronoss, and I'm here to take your
3  deposition.
4        Can you just briefly introduce yourself?
5  A.  Sure.  My name is Caralyn Blaszka, I go by Cara, and I
6  am senior legal counsel at Synchronoss Technologies.
7  Q.  And how long have you been in that role?
8  A.  I have been at Synchronoss for six years.  I have been
9  senior legal counsel for a number of those, I don't recall.  But
10 I've always been in the legal department, the title changes
11 sometimes.
12 Q.  I take it by that that you are a lawyer by training?
13 A.  I am.
14 Q.  And can you just give me a brief rundown of your
15 education and previous work history prior to working for
16 Synchronoss?
17 A.  Yeah, sure.  I -- undergraduate, I graduated from
18 Rutgers University here in New Jersey, I then went to Seton Hall
19 Law and graduated in 2005.  I was licensed in 2005 in New Jersey
20 in the District Court of New Jersey.  Thereafter, I -- I don't
21 want to talk too fast, I apologize.  I clerked for one year with
22 a judge in Union County, New Jersey, the Superior Court.
23        I then moved to private practice at a firm called
24 Spector & Ehrenworth, I was there for nearly 10 years.  And
25 there we focused on -- we were a small boutique business firm,

Page 7

1  so we focused on both litigation and transactions.  I did a lot
2  of litigation work towards the end -- I started there in 2006,
3  and when the economy tanked in 2008, litigation took off.  So I
4  became a litigation attorney for quite a while, did some
5  transactions still.
6        Then I left, I was given the opportunity to go inhouse
7  with a construction firm, which I did for a short period.  The
8  construction firm laid off my division.  I then worked at a
9  small firm for a short period.  I went and worked at ADP, the
10 payroll company in the procurement department in like a hybrid
11 legal contracts role.
12        And then Synchronoss recruited me, and I have been
13 there since February of 2019.
14 Q.  Okay.  Very good.  Thank you for that?
15        Are you a Big East Basketball fan?
16 A.  I actually am not.
17 Q.  Oh, my gosh?
18 A.  Well, and also, my husband went to Villanova.
19 Q.  Well, I went to Villanova.  So that's what I was going
20 to say, so you got to be a Villanova fan.  Yeah?
21 A.  Sorry to say, just to get under his skin I do root
22 against them.
23 Q.  Very good.  Okay.  So give me an idea of what your
24 current job role encompasses?
25 A.  Okay.  That's a very broad question.  So we are a

Page 8

1  publicly traded company and we have three lawyers.  As a result
2  of that, we all do a little bit of everything.  So I have a lot
3  of hats around here.  I handle all procurement, I do a lot of
4  contract work, procurement and sales.  I handle -- so many
5  things.  Patent monitoring, I do SEC filings, Form 4s.  Just
6  general corporate stuff.
7        And also, I am the legal person assigned to the
8  illicit content screening from Verizon that Verizon does on
9  their cloud.
10 Q.  Now, you said Verizon, is that the only customer that
11 you perform -- well, let me ask you this:  Verizon is not
12 Synchronoss's only customer?
13        Did I understand that right?
14 A.  Yeah.
15 Q.  Okay.  But is Verizon the only customer that -- that
16 you do content screening for, or are there other customers?
17 A.  I don't know if I'm permitted to speak about our
18 contracts with other customers, but --
19 Q.  No --
20 A.  -- let me finish.  Verizon scanning is proprietary to
21 the Verizon cloud.
22 Q.  Okay.  Well, and you don't have to tell me the names
23 of the other companies.  I just -- are there other companies
24 that you do scanning for?
25 A.  Currently, no.

Page 9

1  Q.  Okay.  And so what's -- just so we use the same
2  terminology, you know, I think you said illicit content.
3  Illicit content, is that the department that you call it,
4  illicit content scanning?
5        Just tell me how to refer to it?
6  A.  I would refer to it for purposes of this, for CSAM
7  scanning, we internally call it illicit content.  I may use
8  those terms interchangeably, but it is specific to CSAM.
9  Q.  Okay.  So are you the senior executive in charge of
10 CSAM screening?
11 A.  Yes and no.  So there's really two different
12 components internally.  There's the technical team that actually
13 does the technical work behind the scenes, and then there's the
14 team that responds to the warrants, obtains the -- you know,
15 communicates with law enforcement, those kind of things.
16        I oversee the -- the group that handles the law
17 enforcement component of it and I work kind of like a dotted
18 line with the technical team.
19 Q.  Who would be in charge of the technical team?
20 A.  We've had a couple shifts around, so I'm trying to
21 think of who it might be.  I would -- I don't think it's him
22 anymore, but I would put down Josh Starr, S-T-A-R-R.  He was, he
23 may still be, but if not, he can point us in the right
24 direction.
25 Q.  Now it seems like you're -- you're at your home today?

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 10

1      Do I understand that right?
2      A.    Yes, I work from home.
3      Q.    Do you -- are you remote -- are you a remote employee,
4   I guess, you'd say?
5      A.    I am -- yes.
6      Q.    Yeah.  Okay.  That's fine.  I just -- Yeah?
7      A.    On paper, no.  But I have an ADA accommodation so I
8   stay home.
9      Q.    Okay.  All right.  So kind of give me an idea, you
10  talked about sort of the broad responsibilities that you have.
11  Give me an idea of what are your specific responsibilities
12  regarding the CSAM scanning and reporting program at
13  Synchronoss?
14     A.    Sure.  See where to start.  So I oversee a group of a
15  handful of individuals that handle all of the law enforcement
16  requests that come in, preservation requests.  Sometimes it's
17  just merely questions about where to send things, where to send
18  service of process, things like that.  I am the go to for that
19  team.
20          All the warrants and preservation requests come into a
21  group e-mail, that group e-mail I am on and then it is assigned
22  to a specific individual and then they handle it, they handle
23  the processing.  If there's any issues with a warrant, we have
24  a -- I've trained the team so they know what to look for in a
25  warrant.  If there's any questions, any concerns, they reach out

Page 11

1   to me.
2          I also have oversight over everything.  So I'll go in
3   and I'll look at things just to make sure everything is running
4   smoothly.  And that's really usually it.  Usually the team will
5   provide the data as required by the warrant.
6          And then if there's follow up questions, if they're
7   legal of nature, they direct the law enforcement officer to me.
8   If they're more technical, then the technical team handles it,
9   such as how to read blogs and things like that.
10     Q.    You said oversight over everything and I just want to,
11  is that oversight over like --
12     A.    The law enforcement.
13     Q.    Just the law enforcement side?
14     A.    Yes.  But I'm also the attorney who the technical team
15  consults with for the scanning as well.  So I am not a decision
16  maker on the technical side, obviously, but I am the legal
17  support that provides the advice and the guidance of what they
18  can and should do.
19          If they have a question of changing any code -- we
20  haven't changed much in a long time.
21     Q.    I understand that you guys utilize an API to conduct
22  your scanning; is that right?
23     A.    We use an API to call back to the NCMEC Hash List,
24  yes.
25     Q.    And just briefly, just for the record, what is an API?

Page 12

1      A.    I am not equipped to tell you what an API is.  In
2   layman's terms --
3      Q.    Yeah?
4      A.    -- from my understanding, it is a connection to an
5   outside source.
6          For example, we always say, call back, in quotes to a
7   source.  In this case, it would be the NGO Hash List from NCMEC.
8   But it is not something you have on your server.
9      Q.    You kind of, I guess, answered my question in a
10  roundabout way.  It's a very technical thing, correct.  Like if
11  you have to write code and you basically generate through
12  technical computing ability, an API that communicates with this
13  external server?
14     A.    That I don't know.  I can't speak to that, but I can
15  say that, I don't know if it's create -- I don't know if you're
16  implying it was created by us.  But it's my understanding that
17  we license APIs, so I don't think we create them.
18          I think they're provided from the outside source.  But
19  again, we'd have to verify that with my technical team.
20     Q.    But that's very technical, that's not what you do?
21     A.    No.
22     Q.    Yeah.  So but who sets the policies and procedures
23  about what's scanned, how it's scanned, what rises to the level
24  of content that necessitates a report to NCMEC, who's -- who
25  sets that type of policy?

Page 13

1      A.    Well, part of that is statutory and part of that is
2   Verizon.  We are the data processor for Verizon, so our actions
3   are at their direction.
4      Q.    So from your perspective -- I guess maybe we should
5   just back up a little bit.  What is Verizon -- what's
6   Synchronoss relationship with Verizon, as you understand it?
7      A.    Synchronoss is a supplier of Verizon.  We are the
8   provider of the Verizon Cloud.  It is our product that they
9   license from us.  That's it in a nutshell.
10     Q.    And so are the people who -- the individuals who
11  utilize Synchronoss Cloud through Verizon, are those Verizon
12  customers or those Synchronoss customers?
13     A.    Yeah.  Yes.  Let me clarify, and this is one of those
14  confusing parts of our business is that we're a B2B, not a B2C.
15  So we go -- our customer is Verizon, Verizon's customers are
16  their subscribers.  We have no direct contract or direct
17  relationship or communication with any of the subscribers.
18          In fact, we only maintain cloud accounts by what we
19  call the MDN, which is the phone number -- actually, strike
20  that, it's not the MDN.  It's what we call an LCID, L-C-I-D,
21  it's a local identifier that is specific to each account.  That
22  is the only information we maintain about a subscriber.
23          Verizon does not pass any subscriber information to
24  us.
25     Q.    Okay.  And so a little bit earlier, you know, you were

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 14

1  saying Verizon, you kind of act at their direction in terms of
2  setting policies and procedures regarding the scanning and
3  reporting for CSAM --
4      A.   No, they --
5      Q.   -- along with the statutory stuff?
6      A.   They would set policies and procedures that we would
7  follow.
8      Q.   That's what I'm saying?
9      A.   Yeah.
10     Q.   I'm sorry if I missed that.  Verizon sets the policies
11  and procedures that Synchronoss follows?
12     A.   They set the procedures contractually, I'm not --
13  policies is throwing me off because I'm not really certain what
14  exactly you're referring to.
15         But, yes, any direction we take in connection with
16  CSAM would come from Verizon.
17     Q.   So on Synchronoss's website, there's a publish, and I
18  think you're -- and I can show it to you in a minute so I'm not
19  trying to hide the ball?
20     A.   Yeah.
21     Q.   But there's like a, hey, this is how we detect CSAM.
22  I think your name is on it.  And it has, like, kind of a process
23  for law enforcement?
24     A.   Can you show me that?
25     Q.   Yeah, yeah, yeah.  I will.  I will.  And we can mark

Page 15

1  this as Plaintiff's Exhibit A.
2         (Whereupon Plaintiff Exhibit Number A was marked for
3  identification.)
4         I'll just share my screen here?
5      A.   Oh, wait a minute.  Hold on.  Is this on the website
6  or was this provided by --
7      Q.   No documents have been provided to me by Synchronoss
8  or Verizon.  So do you recognize this exhibit?
9      A.   No, I do not at all.
10     Q.   I mean, it has your e-mail on the bottom of it to
11  contact you if you have any questions?
12     A.   Yes, it does.
13     Q.   So this doesn't look familiar?
14     A.   No, and I'm not happy about it and I'm writing that
15  down.  Yeah.
16     Q.   Okay.  So there -- there's a section here called
17  Illicit Content Scanning and Reporting, and it has, like, a
18  certain procedure there.
19         I guess my question right now is, is that procedure --
20  is that given to you by Verizon or is that something that you
21  create?
22     A.   Oh, this step process, which is --
23     Q.   Yeah?
24     A.   -- might not be entirely accurate because I haven't
25  read this yet.  But I wouldn't use this as gospel.  This process

Page 16

1  is set by Verizon.  It is done with the technical teams working
2  together to create the scanning process.  And it was -- let me
3  just clarify; this -- we've been scanning for years, I've been
4  overseeing it for five years.
5         We've been scanning for a few years before that,
6  there's been some modifications along the way.  So I can't speak
7  to the initial startup because that was years and years ago, but
8  I can speak to the more recent within the last five years.
9      Q.   Okay.  And we'll get into more of that.  Right now I
10  don't want to get sidetracked on that because I just want to
11  kind of stay focused here.
12         I got a little outline, and if I start going down
13  rabbit holes, we'll get off track.
14     A.   Oh, I remember my litigation days and I outlined.  So
15  I get it, don't worry.
16     Q.   Yeah, yeah.  So do you have a contact person that you
17  liaise with, that you communicate with, at Verizon regarding the
18  scanning?
19     A.   Yes.
20     Q.   Who is that?
21     A.   His name is Ethan Aronson, A-R-O-N-S -- either O-N or
22  E-N, I don't recall right now.  He is an attorney at Verizon.
23     Q.   So is that your main point of contact?
24     A.   Yes.
25     Q.   How often -- and this is a really difficult question,

Page 17

1  but like, do you guys have a regular meeting scheduled where you
2  meet, or is it just you communicate on an as needed basis?
3      A.   No, we communicate on an as needed basis.  For
4  example, I reached out to him yesterday because I had an inquiry
5  specific to Verizon.  So I reached out to him, but I hadn't
6  spoken to him in quite a while.
7         So sometimes it's often depending on what's going on
8  at that moment, and it can be months in between.
9      Q.   And when you communicate, are you like most of us and
10  do that via e-mail, at least initially, or --
11     A.   Yeah.
12     Q.   Yeah.  Okay.  And so, like, when you communicated with
13  him yesterday, that was regarding the -- the CSAM scanning?
14     A.   Yeah, it was regarding the prosecution of one of them,
15  it was a prosecutor with questions specific for Verizon.
16     Q.   Okay.  All right.  Have you -- have you had any
17  conversations or meetings with Mr. Aronson at Verizon regarding
18  this litigation?
19     A.   No.  If so, it would have only been in the beginning,
20  when we were first served, just to liaise to say that this
21  litigation was active.
22     Q.   But other than that, no meetings or communications
23  with him?
24     A.   No.
25     Q.   Has he reached out to you to ask you questions about

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 18

1  the process or information involved in this case?

2      A.   No.

3      Q.   Has anyone from Verizon reached out to you to gather

4  information of any nature regarding the allegations in this

5  case?

6      A.   Only very early in the case when -- I think before we

7  even retained counsel.  I did have a few discussions with

8  Verizon's counsel, but really more just coordinating.

9      Q.   Okay.  Since that sort of initial conversation, like

10  pre retaining lawyers, you haven't -- to your knowledge, has

11  anyone from Verizon reached out to anyone from Synchronoss to

12  gather information regarding the allegations in this case?

13      A.   Not to me, no.  Not that I'm aware of.

14      Q.   And not to you that you're aware of, but not to any

15  members of your team that you're aware of?

16      A.   That I'm aware of, correct.

17      Q.   Okay.  All right.  So I guess I'll just ask you the

18  direct question.  Can you -- you were listed on -- I'm sure

19  you're familiar with what a Rule 26 initial disclosure is.

20      A.   Yes.

21      Q.   And, I mean, you were listed as someone who -- let me

22  see here.  Discoverable information concerning Synchronoss's

23  data review and analyst processes and the processes for

24  reporting apparent CSAM material to NCMEC.

25           You think that was a fair characterization of your

Page 19

1  information that you have just as your job duty?

2      A.   Yes.  Those aren't my words, but, yes, I think it's

3  relatively fair.

4      Q.   Right.

5      A.   You're asking a lawyer about specific words, so.

6      Q.   Yeah, yeah, yeah, yeah.  So can you tell me what is

7  the process that Synchronoss employs to scan for CSAM on the

8  Verizon Cloud?

9      A.   Okay.  This is a bit of a narrative, so bear with me.

10      Q.   Sure.

11      A.   And please interrupt, and I may trip over myself.

12  Interrupt if I, you know, make say something that doesn't make

13  sense.

14           So, as a provider of a cloud service, we are a backup

15  service.  So when a user has a -- for example, an image, in this

16  case on his device, his or her device, when the image is

17  uploaded to the cloud itself, there is a scanning process that

18  is done before it hits the user's repository.  The scanning

19  process is as follows:

20           First, there's, as you mentioned before, there's an

21  API, of course, to the NGO Hash List maintained by NCMEC.  If

22  there's a direct match, then that's considered a hit.  But also

23  there's another option, if it's not a direct match, then it runs

24  through Microsoft's product PhotoDNA, which is a product that is

25  designed to, at least it advertises, it's designed to detect,

Page 20

1  quote, near matches.

2           So if there is a direct match, an exact match or a

3  near match, the image itself gets put into a quarantine server.

4  It never makes it to the subscriber's account.

5           Hold on, let me take a little drink.

6           Once it's in the quarantine file, the server, Verizon

7  has contracted with a third-party called WebPurify, who conducts

8  human review of every single image.  So a person from WebPurify

9  will access our server -- doesn't have possession, just has

10  ability to view the image.  They will put their human eyes on

11  the image and determine whether it's apparent CSAM or not.

12           If they do determine it is, or potentially could be

13  apparent CSAM, looks like CSAM, then it is classified in a

14  certain way.  The classifications -- I don't recall if they're

15  statutory, but they're A1, A2, B2, with A and B being --

16  which I always get mixed up, prepubescent, postpubescent.  And

17  then -- and I always get this word wrong -- one being

18  lascivious, I think I said it, lascivious.

19      Q.   It's a tough word.  It's a tough word.

20      A.   And one being -- I say it all the time that's the

21  irony.  And the other being exhibitions.  So after there is a

22  determination that, yes, there is, it is apparent CSAM and it's

23  classified as part of our automated process, a data feed is then

24  created in our system and automatically sent to NCMEC.

25           I always say that human review is almost like clicking

Page 21

1  a button just to decide which path it goes on.  It is or it is

2  not.

3      Q.   So let me back up here and thank you for that.  I

4  mean, I think that was fairly comprehensive, but -- so who has a

5  contract with WebPurify?

6      A.   Verizon.

7      Q.   Does Synchronoss have any visibility into the terms of

8  that agreement?

9      A.   No.

10      Q.   All right.  You say at the beginning of when the --

11  either the image is an exact match with an MD5 Hash value or if

12  it's not, then it's PhotoDNA -- a PhotoDNA Signature is

13  generated for that particular image and then that is also

14  queried.  If there is a match, then the image is quarantined.

15           Did I understand that correctly?

16      A.   A match or a near match.

17      Q.   Or a near match, yeah.

18      A.   I always get confused with MD5 and SHA, so I cannot

19  speak to which one we use because now I'm all spun up in my

20  head.  But yes, we do use the Hash value and if there's a direct

21  match, meaning it's exact, to the NCMEC list, or if PhotoDNA

22  comes up and says there's a near match.  A near match does not

23  exactly match the list, it's meant to be very, very close.

24           In those two circumstances, you are correct, the image

25  is then intercepted before it gets to the subscriber's account

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 22

1  and it is put into the quarantine.
2       Q.   Okay.  And at that point, when it's intercepted, put
3  into quarantine, the user or the customer would not be able to
4  access that from the cloud?
5       A.   From the cloud, correct.  It does not hit the cloud
6  account.
7       Q.   Okay.  And then the human reviewer.  Okay.  So once
8  it's quarantined, how do you communicate with WebPurify, how
9  does that happen?
10      A.   They are part of the process.  So when the images go
11 into quarantine, they're either notified somehow -- I don't know
12 the specifics of it.  But I do know that they have access and
13 they have 48 hours to view and make a determination on the
14 image.
15      Q.   And then after the human review, what is the
16 determinant -- who determines whether or not a report is sent or
17 not?
18      A.   Well, WebPurify.  If -- WebPurify doesn't make a
19 determination on the report, but WebPurify makes a determination
20 on the image.  If they say apparent CSAM, essentially click the
21 button, then the data is automatically generated into a data
22 feed and sent to NCMEC.
23      So, for example, we do not issue cyber tips
24 themselves.  We only provide the data feed from which NCMEC
25 creates the cyber tips.

Page 23

1       Q.   Well, we'll get into the technical -- the technical
2  piece of this.
3       But -- so the way that Synchronoss's system is set up,
4  if a human reviewer at WebPurify, as you put it, clicks the
5  button, this meets the definition or whatever -- and we'll talk
6  about that in a second of CSAM.  Then when they hit that button,
7  then a report is more or less instantaneously generated?
8       A.   A data feed is generated and sent to NCMEC -- a report
9  is generated by NCMEC.
10      Q.   You guys send information which is designed to fit
11 into a Cyber Tip Report, but you guys don't actually send a
12 report.  You just send the information and then at the NCMEC
13 level, every report is generated?
14      A.   That's my understanding, yes.
15      Q.   Okay.  Do you understand that Synchronoss has control
16 over the information that they send to NCMEC?
17      A.   Now you're getting into some data log that's a little
18 bit sketchy.  Do we have control, I cannot speak to that.  As a
19 data processor, there's all sorts of data privacy laws that
20 govern that.
21      Q.   I'll probably ask you some more specific questions,
22 but we can get into that in a little bit.  So I understand -- I
23 did get your answers to interrogatories yesterday, and I
24 appreciate that.
25      So I do take it that you have been involved in the

Page 24

1  gathering or investigating of this case in terms of discovery
2  questions set by the plaintiff?
3       A.   Oh, yeah.
4       Q.   Okay.  And so you -- you have done some inquiry into
5  the facts of this case, particularly?
6       A.   Inquiry to whom?
7       Q.   Well, you've done --
8       A.   Yes.
9       Q.   Yeah, yeah.  You're internal.  You've done
10 investigation into the facts or allegations of this complaint?
11      A.   Yes, I've looked into our records for this particular.
12      Q.   So -- and let me -- and obviously you're an attorney,
13 I didn't go through the rules here.  But you know, because you
14 know the rules about a deposition.  But if any time I ask a
15 question that you don't know the answer to, you can say, I don't
16 know, right.  I don't know what you know or don't know.  And
17 that's part of the purpose today?
18      So do you know in -- and we're going to break this
19 down because -- are you aware there were two Cyber Tip Reports
20 that were sent regarding Mr. Lawshe's account?
21      A.   Yes I am aware of two.
22      A.   There was one in October and there was one in January.
23      A.   January.
24      Q.   Yes, that's correct.  Okay.  So let's just start by
25 talking about the October.  The October --

Page 25

1       A.   I get those two mixed up.  Yes, okay.
2       Q.   So the October one first.  Okay?  And I can just pull
3  up, so we're not just talking from memory.  Why don't I just
4  pull up that Cyber Tip Report.
5       A.   Which -- just refresh my recollection, which one is
6  still pending after the motion to dismissed?  Was it the October
7  or the January, just so I can get my head around.
8       Q.   The January is the one that's the pending.
9       A.   Okay.  That helps.  Thank you.
10      Q.   Currently.  Yes.  Let me -- I'm looking at my
11 computer, trying to find this stuff.  I'm not --
12      A.   Oh.  Take your time.
13      Q.   -- just staring at you.  Let's see here.  Okay.
14      There we go.  Zoom in here so we can read.  So this is
15 Cyber Tip Report, we'll mark this as Plaintiff's Exhibit B?
16      (Whereupon Plaintiff Exhibit Number B was marked for
17 identification.)
18      The number of the Cyber Tip Report is 137877848?
19      Have you reviewed this document prior to today's
20 deposition?
21      A.   Yes, I have.  Have I gotten this one, let me just
22 remind myself if I have.  I don't see many actual cyber tips,
23 so.
24      Q.   Right.
25      A.   I believe I have seen this one, but I have to just

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 26

1  double check this is the one.
2      MS. SIEKKINEN:  Pardon me, counsel, Would you mind
3  sharing the exhibits that you're using in this deposition?
4  They are sometimes difficult to see on the shared screen.
5  Thank you.
6      MR. ROBERTS:  I'm sorry, can you see him on the shared
7  screen now?  I don't -- how do you --
8      MS. SIEKKINEN:  I'm able to see them, but we're not
9  able to kind of like properly review them as you're --
10  you're presenting.  Customary to e-mail them or share them
11  some other way as well.  You included something that -- you
12  know, you put them --
13      THE WITNESS:  I would request that as well.
14      MS. SIEKKINEN:  Thank you.
15      THE WITNESS:  So my counsel may review the entire
16  document while I'm being asked about.
17      MS. SIEKKINEN:  Certainly that's very customary.
18      MR. REISS:  Maybe you can just put them in the chat.
19      MS. SIEKKINEN:  Or send an e-mail.
20      MR. REISS:  That's how I normally see them shared.
21      MR. ROBERTS:  Let me just get through this and then
22  maybe we'll take a quick break and I can try to figure out
23  how to do that.
24      I don't know how to share it in the chat.
25  BY MR. ROBERTS:  (Resuming)

Page 27

1      Q.   I'm not really going to ask you a lot of questions
2  about this document right now.  I'm just going to ask you about
3  what your investigation is.  Okay?
4      A.   Yeah, that's fine.  I believe I have seen this one.  I
5  believe I've seen both of the cyber tip documents in this case,
6  but I can't say for sure unless I cross reference.
7      Q.   Right.  And so we'll go a little bit and then I'll
8  take a break and then we can start, you know, when we get into
9  the exhibits, I'll put them in the chat.
10      So -- and just to be sure, your -- your client has not
11  you -- not your client, but you -- you, Synchronoss, has not
12  disclosed any documentation pursuant to the request to produce,
13  have you?
14      A.   I -- that would have to defer to my attorney.  I have
15  provided information to my attorney, but I don't know what's
16  been produced because I know there was a pending confidentiality
17  order.
18      Q.   Okay.  So do you know whether or not the content which
19  was the subject of the October 29, 2022 Cyber Tip Report that
20  Synchronoss initiated, do you know that if that was an exact MD5
21  Hash match, or do you know if it was a PhotoDNA Signature match?
22      A.   Oh, goodness.  I don't know because I get these two
23  mixed up.  I believe it was in the motion to dismiss, I don't
24  recall it.  But one was a match and one was in PhotoDNA is my
25  recollection.

Page 28

1      Q.   Okay.
2      A.   But again, I'm now spinning myself around, so I'm
3  hedging my bets.  But that's what I recall.
4      Q.   Okay.  But you -- and it's okay, right, if you don't
5  remember, you say I don't remember.  So do you remember what --
6  you don't remember which one was -- was which, the photo?
7      A.   I don't remember the -- let's put it this way, there
8  was a ruling on it and I don't recall which was which, no.
9      But let me clarify that, I don't recall which is which
10  by cyber tip number because these are adult images, I have seen
11  the images, so I know them by image.
12      Q.   So, okay.  The one with -- it's with the SNM image?
13      A.   Yes, yes, yes, I'm very familiar.
14      Q.   Was that a PhotoDNA match or?
15      A.   That I don't recall.  The PhotoDNA match I thought was
16  the other, but I am not certain.
17      Q.   Okay.
18      A.   Again, I don't know.  One is, one isn't.
19      Q.   Okay.  So one of the things that I just -- I'll share
20  this, I don't think I need to put this in the chat.  It's --
21  it's Verizon's motion for reconsideration.
22      Have you read the Verizon's motion for reconsideration
23  of the motion to order on the motion to dismiss?
24      A.   I did, but it was a while ago.
25      Q.   Yeah, I'll just -- part of the deposition, as you

Page 29

1  know, is for me just to kind of understand, you know, what your
2  position is.  You know, as a team leader, as a -- you know, what
3  are your positions.  And I just want to kind of understand a
4  little bit.  And the motion for reconsideration is kind of
5  helpful, I think, maybe.
6      So we'll mark this as Plaintiff's C.  So this
7  statement here on Page 6 and 7, "Providers like Verizon?
8      (Whereupon Plaintiff Exhibit Number C was marked for
9      identification.)
10      Receive only the Hash values when they access the Hash
11  database from NCMEC that is intended to be used by providers to
12  identify apparent CSAM and to report it (as Verizon did here)?"
13      Now, I think Verizon is using their name synonymously
14  with Synchronoss.
15      Do I understand that correctly?
16      A.   Yes and no.  Verizon is technically the data
17  controller, so Verizon is the actor.  We act in their -- so they
18  may be speaking in that regard, I can't speak for Verizon, but
19  there is a distinction there.
20      Q.   But let me just ask you, is your understanding that
21  the only information -- and this is one of the positions that
22  Verizon has taken.
23      The only information that is included in this Hash
24  database is just the Hash, and so when there's a match, all you
25  know is that there's just a match?

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 30

1    A.    Yes, that's my understanding.

2    Q.    Yes.  Okay.  All right.  No other information is

3  included, it's just a list or database of Hashes that you -- you

4  are using an API to scan against and you get a hit or no hit?

5    A.    Yes, that's my understanding.

6         Again, the technicalities would have to be addressed

7  to the technical team.

8    Q.    In the motion for reconsideration, I think, you know,

9  I -- one of the positions that -- and I just want to see if you

10  guys are aligned on this.  Is that, these images -- and I'm just

11  going to lump them together, the October and the January image

12  were included in the NCMEC CSAM database?

13    A.    The NCMEC NGO database, yes.  That's my understanding.

14  I'm assuming that's what they mean by CSAM database, yes.

15    Q.    Okay.  And then it says, "At best, Verizon reported an

16  image mistakenly categorized as CSAM in the NCMEC database."

17         So what is the NCMEC NGO database?

18    A.    It's a list of Hashes maintained by NCMEC that -- and

19  theoretically the list is known child pornography.  For example,

20  images that have been previously prosecuted, things like that.

21  But that's maintained by NCMEC.

22         So the specifics of it, I don't know exactly.

23    Q.    What do you mean by is it maintained by NCMEC?

24    A.    It's NCMEC's list, they maintain a NGO database or NGO

25  list.

Page 31

1    Q.    Like they create the list?

2    A.    Yes.  Yes, they maintain a list.

3    Q.    Okay.

4    A.    I don't know if -- I'm assuming they create it.  It is

5  maintained and it is connected to us by API.

6    Q.    There's -- there's a thing -- a statement here that

7  the NCMEC Hash database by their own statement contains 3.6

8  million Hash values.  And then it goes on and says, "When a

9  triple vetted image or video is identified as containing CSAM,

10  NCMEC adds the Hash value to a list that is shared with

11  technology companies."

12         Is that your understanding?

13    A.    I don't know.  I don't know about how many times it's

14  vetted, but I do know that they add to the list and do share it

15  with ISP.

16    Q.    Okay.  And is it Synchronoss's position that these two

17  images were matched against the NCMEC Hash List?

18    A.    These two images followed our process which

19  connects -- which compares against the NCMEC Hash List.  And

20  that's all I know.

21    Q.    And when you say, NGO, do you mean the NCMEC NGO Hash

22  List?

23    A.    Yes.  Yes.  They're specific to identify it, I don't

24  know if there's another one, but the one I am familiar with is

25  called the NGO.

Page 32

1    Q.    So -- all right.  Does Synchronoss have access to any

2  list or other lists that are created by organizations other than

3  NCMEC?

4    A.    No, not currently.  I mean we have for other customers

5  in Europe, had an agreement with the IWF, but that is not in

6  scope here.

7    Q.    Well, let me just add -- let me give you the next.  At

8  the time of these reports, did Synchronoss only have access

9  to --

10    A.    Yes.

11    Q.    -- the NCMEC list?

12    A.    The list that was accessible through the NCMEC API,

13  yes, that is correct.

14    Q.    Did they have any agreement with IW -- did Synchronoss

15  have any agreement with IWF or anyone else at the time of

16  this --

17    A.    If we did -- if we did, it was unrelated to Verizon.

18  I don't believe we did, I believe it terminated before this

19  because it was in connection with another customer.

20    Q.    Right.

21    A.    But for purposes of this litigation, it has only ever

22  been and will only ever be NCMEC.

23    Q.    And that's something that you've looked into and

24  you're fairly confident about that?

25    A.    We only have one API, so yes, I'm confident.

Page 33

1    Q.    Okay.  There's no question that these two reports were

2  initiated by the actions of Synchronoss?

3    A.    I don't know if I understand that question.  That

4  seems very, very leading.

5    Q.    Well, I can ask leading questions.

6    A.    Yeah, that's what I thought.  Not going to answer

7  them.

8    Q.    Yeah, I can ask leading questions, but I think it's a

9  fairly basic question.

10    A.    It's --

11    Q.    I wouldn't want to get down the road and you say, oh,

12  no, no, this is a mistake, Synchronoss actually didn't -- this

13  wasn't us.  We didn't actually initiate the information that

14  generated these reports.

15    A.    Let's see if I can cut to the chase a little bit.  And

16  I've been trying to -- anything Synchronoss does is at Verizon's

17  direction because of the nature of our relationship with

18  Verizon.

19         So our scanning process did initiate this cyber tip,

20  our cyber -- our scanning process is governed by Verizon, and we

21  do what Verizon tells us.  So was it initiated by Synchronoss, I

22  don't know, but it was and it was not.

23    Q.    You've reviewed the Synchronoss -- you've reviewed the

24  two Cyber Tip Reports that are involved in this case?

25    A.    I have.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 34

1    Q.   And they both have Synchronoss and it says, I think
2 something like CO Verizon or on behalf of Verizon --
3    A.   Yes.
4    Q.   -- were the reporting ESPs?
5    A.   Yes, I believe it says Synchronize, and it might have
6 Verizon right under it or something like that, correct.
7    Q.   Is that information correct?
8    A.   Yes.
9    Q.   Okay.  All right.  You've talked about, you know,
10 statutory, all this kind of -- you know, regulations and stuff.
11 Are you aware that once a report is sent to NCMEC that NCMEC is
12 bound to forward that to law enforcement?
13    A.   I am aware of the statute that requires us to report
14 to NCMEC, and I do know there's obligations of NCMEC in the
15 statute, but I'm not familiar with them specifically.
16    Q.   Okay.  So you're aware of Synchronoss -- well, first
17 of all, let me ask you this:  I mean, I guess you agree that
18 you're acting as an agent of Verizon in terms of the scanning
19 and reporting of CSAM?
20    A.   We're acting as a data processor.
21    Q.   Okay.  But you're acting on their behalf?
22    A.   Correct.  At their direction.
23    Q.   At their direction.  Is there a written agreement
24 between Verizon and Synchronoss regarding this CSAM scanning and
25 reporting?

Page 35

1    A.   Yes.
2    Q.   Have you reviewed that prior to today's deposition?
3    A.   I helped draft it.
4    Q.   Okay.  What does it say?
5    A.   It says proprietary things between Verizon and
6 Synchronoss.  It will be produced in our document production, I
7 believe after the confidentiality order is entered.
8    Q.   Okay.
9         MR. REISS:  Michael, let me just address that real
10    quick so we are clear on how to proceed today.  So -- yeah,
11    so the order hasn't been entered to my knowledge and I
12    think there's a provision in there about marking portions
13    of depositions that are confidential.  In anticipation
14    of that order being entered, let me just note for the
15    record that, you know, we will be marking any portion of
16    the deposition that talks about the -- that agreement as
17    confidential.
18         MR. ROBERTS:  Okay.
19         MR. REISS:  And we may have to do that even before the
20    order is entered, I'm not sure.  But I just want to let you
21    know our intention.
22         MR. ROBERTS:  No, it's okay.
23 BY MR. ROBERTS:  (Resuming)
24    Q.   So are you aware -- does Synchronoss have any
25 agreement with NCMEC?

Page 36

1    A.   Yes.
2    Q.   And have you reviewed that document?
3    A.   Yes.
4    Q.   Okay.  All right.  So we're talking about regulations.
5 Describe to me -- or the law.  What is it, your perception of
6 your company, their obligation to report CSAM to NCMEC?
7    A.   Well, it's statutory.  So under the statute, if a
8 service provider decides to look and decides to scan and find
9 CSAM, they are obligated to report.  Verizon has taken the
10 position that they would like to scan.  So if we find anything
11 that is covered under the statute, then we are obligated to
12 report.
13         Otherwise, we are subject to very steep fines.
14    Q.   I think it says something like, you know, when the
15 provider has actual knowledge of facts and circumstances, is
16 that your recollection?
17    A.   Of apparent -- yes.  There's more -- there's more, you
18 know, qualifying words in there, but yes.
19    Q.   Yeah.  Is the inclusion of this image on a CSAM Hash
20 List, is that part of the facts and circumstances that
21 Synchronoss relies on in making the determination to make a
22 report?
23    A.   Yeah.  You were asking the Hash value, is that what
24 you mean?
25    Q.   Yeah, yeah.  I mean, is the fact that it matched

Page 37

1 against a Hash List part of the facts and circumstances that
2 Synchronoss relies on prior to making a NCMEC report?
3    A.   Yes.
4    Q.   Do you know what NCMEC criteria are for inclusion of
5 an image or content in their NCMEC external Hash Sharing List?
6    A.   No.
7    Q.   Do you know if it includes images of adults?
8    A.   I don't.  But I do know that we do have a process
9 for -- what's the word, not missed.  Shoot.  Wrong Hashes.  It's
10 not the word I'm thinking of.
11    Q.   Collision.
12    A.   Incorrect Hashes.  So we have a process where if we
13 have -- I'm just trying to find the term, it's driving me crazy.
14 False positives.  Excuse me.  We do track false positives.  So
15 as part of our scanning, if NCMEC reports back, which again,
16 would have to be described by the technical team, I don't know
17 how technically it's done.
18         If it reports back that it is not -- that it is a
19 false positive, then we do -- we track our false positives.  And
20 if we hit a certain number of false positives, even if that Hash
21 is on the NCMEC list, we exclude it from our reporting.
22    Q.   How do you define that false positive?
23    A.   It comes back from NCMEC, as either -- sometimes it
24 will say it's an adult image, I've seen reports.  Sometimes
25 it'll just say it's not CSAM, doesn't really have an explanation

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 38

1  of why.
2       But I don't know how that's determined or who makes
3  that determination.
4    Q.   You said from NCMEC?
5    A.   Correct.
6    Q.   NCMEC gives you feedback?
7    A.   Yes.  Yes.
8    Q.   Currently?
9    A.   Well --
10   Q.   Or -- let me ask you:  At the time --
11   A.   Not immediate, I just want to be clear.  Not immediate
12 feedback for that.  It's reporting -- I get -- for example, I
13 get an e-mail summary from NCMEC every -- I think it's every
14 quarter.
15       So I can't say it's immediate to the actual
16 transaction of that image, but it is reported back to us when we
17 have false positives.  I don't know the turnaround time.
18   Q.   Does the list that you get from NCMEC, does that
19 contain a description of the false positives?
20   A.   No.  I get a very -- what I get from a legal
21 perspective is merely a chart of the reports that have been
22 issued, whether they were referred to law enforcement.  And then
23 sometimes it'll come back, you know, not prosecuted because
24 adult image.  That's all I know from my perspective.  I do know
25 that my technical team, I actually spoke with them yesterday to

Page 39

1  get my head around it.  They do get notifications back of false
2  positives.
3       Again, they'd have to speak to how that comes to us
4  and we track them and if we have a certain number of false
5  positives for the specific Hash, then it goes on our block list.
6  Meaning, we don't report on that image because -- even though
7  it's still on the NGO list.
8    Q.   Have you placed either of these Hash values or images
9  in your block list?
10   A.   I cannot speak to that, I don't know.  My
11 understanding is that, our block list is if we have 50 false
12 positives.  I don't have access to the block list, but I can
13 find out.
14   Q.   You do have access to the quarterly summary from --
15   A.   Yeah, but those aren't comprehensive.  Those are only
16 ones that I see that are kicked back after going to law
17 enforcement.  I believe there is also a group of Hashes that get
18 kicked back -- and again, I can't say for sure, but this is my
19 understanding from the technical team, they get kicked back
20 before being produced to law enforcement.  So there's two
21 different things.
22       So the ones I have are very, very few.  The ones that
23 my technical team have, I'm not sure.  The list, I don't even
24 know how long it is.  It may be very short, it may be very long.
25 I'm not certain.

Page 40

1    Q.   So you rely in the sort of to establish the actual
2  knowledge of facts and circumstances.  You testified that you
3  rely on the match with the NCMEC NGO Hash List, correct?
4    A.   No.  We use the --
5    A.   That's one of the things -- one of the things?
6    A.   Yeah.  Well, wait, we use the NGO Hash List for either
7  a match or a near match.
8    Q.   Right.
9    A.   That then is then later confirmed.  That's when it is
10 suspected CSAM.  It then goes to human review and that's when it
11 is determined whether it's reportable or not.
12   Q.   So what do you mean by -- so I guess the second piece
13 of information is that Synchronoss relies on would be the human
14 review?
15   A.   Correct.  Yes.
16   Q.   What do you mean when you say, confirmed?
17   A.   Confirmed apparent CSAM is when a human reviewer,
18 based on whatever -- determining whatever criteria they have.  I
19 can't say specifically what they are, but I do know that some of
20 them are development and hair growth, things like that.  Based
21 on whatever criteria they have, that then they make a
22 determination in good faith whether it's apparent CSAM or not,
23 and then it gets reported.
24   Q.   Do you know what that criteria that they use is or
25 are?

Page 41

1    A.   Again, the only parts of it that I know are certain
2  development and certain hair growth, and things like that.  I do
3  know there's more, I do not know what they are.
4    Q.   Okay.  Have you ever interacted with a human reviewer
5  or WebPurify?
6    A.   No.  Their relationship is directly with Verizon.
7    Q.   Okay.  And so you really don't know what a content
8  moderator at WebPurify, what their qualifications are, what
9  their criteria are?
10   A.   I have no knowledge of WebPurify.
11   Q.   Do you know if the content -- do you know if the
12 content moderators actually work for WebPurify or is it some
13 other third-party?
14   A.   I don't know if they're employees or contractors, I
15 wouldn't know that.
16   Q.   Okay.  Do you know where this review takes place?
17   A.   No.
18   Q.   Have you attempted to figure that out?  That was one
19 of the questions in the interrogatory answers.
20   A.   I'm aware, yes.  And no, because I don't have a
21 relationship with WebPurify.  The relationship with WebPurify is
22 Verizon, so I would expect that information to come from
23 Verizon.
24   Q.   Okay.  But in any event, to the extent that
25 Synchronoss makes the report, you do rely on the results of the

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 42

1   human review team?

2       A.   Yes.

3       Q.   Other than the human review response and the fact that

4   there was a match or a near match with an image in this NCMEC

5   NGO Hash List, are there any other facts and circumstances that

6   support Synchronoss's action to initiate a NCMEC report?

7           MR. REISS:  Object to the form of the question.  But

8   you can go ahead and answer it.

9           THE WITNESS:  Okay.  Thanks.  We rely on our scanning

10  process.  Our scanning process predominantly is the -- in

11  fact, yes, the scanning process involves checking the NGO

12  list and the human review by WebPurify.

13          So, yes, your answer is yes.

14  BY MR. ROBERTS: (Resuming)

15      Q.   Now, there was a time historically where, I think

16  there was not a human review process?

17      A.   Yes.  And that Northern District of Ohio case keeps

18  coming back to bite me.  Yes, that is true.

19      Q.   Well, I mean, you know.

20      A.   That's from 2019, before I took over.

21      Q.   Well, when did that change?

22      A.   Verizon implemented the human review the end -- I

23  always get it mixed up, whether it's the end of '22 or the

24  beginning of '23, or the end of '21 beginning of '22.  It was

25  sometime in 2022, I believe, the end of 2022.

Page 43

1       Q.   Well, I mean, this was October of 2022.  I mean, do

2   you believe that human review had anything to do with this case?

3       A.   Oh, yeah.  This -- this case was absolutely human

4   review.  So that helped me say it was before that.

5       Q.   How do you know that there was a -- how do you know

6   that there was a human review here?

7       A.   Isn't it on the cyber tip you just showed me?

8       Q.   Yeah, I'm just asking.  Other than -- you never saw

9   the Cyber Tip Report initially though, right?

10          Like, that's not a document -- you said that's not a

11  document that Synchronoss actually creates, is it?

12      A.   Correct, but we create the data feed only after human

13  review is completed.  So the fact that I saw the data feed means

14  human review was completed and is marked on the cyber tip.

15      Q.   So someone clicked a button that said that they

16  reviewed it?

17      A.   They clicked a button that said it was apparent child,

18  apparent CSAM.

19      Q.   Right.

20      A.   I'm not going to say what they did or didn't do, I

21  can't speak to someone else.

22      Q.   Right.  I mean, you know, you're a lawyer.  I mean,

23  I -- you know --

24      A.   I'm aware.

25      Q.   You don't know if they looked at it or not, you just

Page 44

1   know if they clicked the button, so to speak?

2       A.   I can't say either way.  And you're a lawyer, too, and

3   you know, I can't say either way.

4       Q.   Yeah.

5       A.   Actually, I find this line of questioning a little

6   offensive because, you know, I can't answer what someone else

7   did.  And I expect a little bit more, you know, candor and

8   respect than that.  You keep pushing me on it, and I don't

9   appreciate it.

10      Q.   Just one second.  I'm going to share my screen.  These

11  are your answers to interrogatories.

12          MS. SIEKKINEN:  Counsel, again, I ask that you share

13  these exhibits.

14          MR. ROBERTS:  I will.

15          THE WITNESS:  Can we take a break so that counsel can

16  have them?  I'm not comfortable proceeding until counsel

17  has the documents that we're reviewing.

18          MS. SIEKKINEN:  Certainly.  And the ones that have

19  previously been used in this deposition.  It's highly

20  unusual.

21          THE WITNESS:  I agree.

22  BY MR. ROBERTS: (Resuming)

23      Q.   This is a document you signed, correct?

24      A.   Has -- has -- has Verizon's counsel seen this?

25          MS. SIEKKINEN:  I can't find it.  She -- she has not

Page 45

1   been able to even see the full document.  It's -- it --

2   these should be produced, should be shared in the context

3   of a deposition.  If we were all in person, you'd be

4   sharing us paper copies, this is how this is done.

5           THE WITNESS:  Ms. Gabrys signed it, and I notarized

6   it.

7   BY MR. ROBERTS: (Resuming)

8       Q.   Did you sign this document?

9       A.   As a notary, correct.  Yes.

10      Q.   Who is the answering person?

11      A.   Well, if you look at the notary acknowledgement that

12  you just rolled past that other people can't look at, it was

13  Christina Gabrys, who is our chief legal officer.  She has

14  authority to sign these things on behalf of the company.

15          I'm the one that provided the information to answer

16  them.

17      Q.   Okay.  And we'll take a break in a second.  I -- this

18  is a document that your counsel provided to me yesterday.

19      A.   Okay.

20      Q.   Okay.

21      A.   And I'm not disputing that.  What I'm disputing is

22  that -- is that, Verizon counsel has not yet had the opportunity

23  to look at it and not comfortable answering questions until they

24  have the documents.  I think we should just take a break now and

25  send them off.  It really shouldn't be --

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 46

1      MS. SIEKKINEN:  And as per your own counsel, that's
2  just customary.
3      THE WITNESS:  Of course.  Of course.  Yes.  I only
4  refer to you, ma' am, because.
5      MS. SIEKKINEN:  Thank you.
6      THE WITNESS:  Mr. Reiss sent it out yesterday, so I
7  know has them.
8      MS. SIEKKINEN:  Understood.  Thank you.
9      MR. ROBERTS:  So why don't we just do this, there's
10  absolutely no legal basis for me to do this.  But why don't
11  I -- why don't somebody just tell me how to drop this
12  document in a chat.
13      THE WITNESS:  It might be easier to e-mail, I don't
14  know if there's a way to do that.
15      MR. ROBERTS:  I'm not going to send by e-mail.
16      THE WITNESS:  Okay.  Well, then I'm not going to
17  answer questions until somehow we figure out if --
18      MS. SIEKKINEN:  Your paralegal is on the line,
19  Mr. Roberts, I think she can certainly e-mail them out as
20  you're presenting them.  Certainly that would be the same
21  as if we were all in the same room and you were handing
22  out.
23      This is -- I'm marking this as Exhibit A, I'm marking
24  this as Exhibit B.  It would be absolutely -- I've seen it
25  done that way as well.

Page 47

1      THE WITNESS:  And for the record, I would not refuse
2  to answer questions.  I would refuse to answer questions
3  without being properly represented by my counsel who
4  doesn't have copies of these exhibits.
5      MR. ROBERTS:  Your counsel does have copies.  He gave
6  it to you yesterday.
7      MR. REISS:  Well, this one, yes.  But I think she's
8  referring to some others that I don't have.
9      THE WITNESS:  That is correct.
10      MR. REISS:  Yeah.
11      MR. ROBERTS:  And just for the record, there's been no
12  discovery request in this case by your counsel or anyone
13  else, so.
14      MS. SIEKKINEN:  You have Rule 26A1 disclosure
15  requirements to produce them if you're using them in your
16  case.
17      MR. ROBERTS:  I think I know how to do that through
18  the chat, but --
19      MS. SIEKKINEN:  I've never done it through the chat.
20  I do it through, like, a shared drive.
21      THE VIDEOGRAPHER:  Counsel, we're still on the record,
22  just so you know.
23      MS. SIEKKINEN:  Okay.
24      MR. ROBERTS:  Okay.
25      THE WITNESS:  That's okay.

Page 48

1      MS. SIEKKINEN:  I'm happy to share how many ways that
2  this can be done via e-mail, as it goes in a shared file.
3  If you want to do it piece by piece, you can share them one
4  at a time, drop them in a shared file one at a time.  I've
5  seen all of these done.
6      What I've never seen done is withholding exhibits from
7  counsel.  I've never, ever seen that done.
8      MR. ROBERTS:  And no one's withholding any exhibits.
9  I just don't know how to drop them in the chat.  And I
10  don't know what you guys are talking about.  I do this
11  every day, I've done it for 20 years.  Most of the time,
12  people screen share, and then they e-mail the parties and
13  the court reporter after the deposition with the exhibits.
14  That's normally the way it is.
15      I'm guessing I do way more depositions than anybody
16  else in this room.
17      THE WITNESS:  That's not my experience, and I've done
18  a lot.
19      MR. ROBERTS:  Well, I mean, you know --
20      THE WITNESS:  Being on the other side, Mr. Roberts,
21  I've been -- we've all been practicing a very long time.  I
22  think it's only fair and can't -- and --
23      MR. ROBERTS:  Well, you're acting as though I'm not --
24  I mean, I'm sharing the--
25      THE WITNESS:  No, no, no.

Page 49

1      MR. ROBERTS:  -- document on the screen.  You can see
2  it.  There is nothing different that you are going to
3  experience when you get an e-mail with this document that
4  you are not going to experience with me sharing in the
5  screen.
6      THE WITNESS:  That is not true.  In fact, my attorney
7  and Miss --  I'm sorry, I don't know how to say your name
8  now.
9      MS. SIEKKINEN:  Siekkinen.
10      THE WITNESS:  Siekkinen.  And Ms. Siekkinen didn't
11  have the opportunity, like most attorneys do during
12  depositions, to take the document, to flip through it, to
13  look at it themselves while you're only focusing on one
14  small portion of it asking me a question.  It is very
15  common and very standard.
16      In fact, it is proper practice to provide copies to my
17  counsel.  And I am not refusing to answer questions --
18      MR. ROBERTS:  I'm not saying that I'm not going to get
19  a copy to your counsel.
20      THE WITNESS:  No.
21      MR. ROBERTS:  I'm just saying --
22      THE WITNESS:  While I'm being asked questions about
23  it.  I also don't have the ability to look at the whole
24  thing, so how can I speak to it?
25      MR. ROBERTS:  You don't have a copy of this document?

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 50

1 THE WITNESS: I'm not talking about this one in
2 particular. You showed me a cyber tip before. I'm talking
3 generally on exhibits in a case.
4 MR. ROBERTS: Yeah, all of this --
5 THE WITNESS: I'm not trying -- I'm not trying to be
6 difficult.
7 MR. ROBERTS: Okay. Can I please --
8 THE WITNESS: I would just like my counsel to have
9 copies of the doc.
10 MR. ROBERTS: Okay. It looks like she's working on it
11 and she's attached already some of it in the chat. So I
12 think we're going to solve the problem. We don't have to
13 argue about it.
14 MS. SIEKKINEN: This depth appears to be in the chat,
15 for the record, because this is not visible, probably she
16 included what appears to be Exhibit C. I asked about
17 Exhibits A and B. She says, working on it.
18 I said, thank you very much, Ms. Zepf.
19 MR. ROBERTS: Yeah.
20 THE WITNESS: Thank you very much for that. I did not
21 see it because it didn't pop up on mine.
22 MR. ROBERTS: And just for the record, I mean, I think
23 we did disclose documents in, you know, with our Rule 26.
24 MS. SIEKKINEN: That is -- I believe that's incorrect.
25 MR. ROBERTS: Okay. I've -- I don't know. Well, I

Page 51

1 think I indicated that they were available or I disclosed
2 them, identified them. There's been no request for
3 anything from me, so I -- you know, I --
4 Okay. So let's get back to it.
5 MS. SIEKKINEN: Okay.
6 BY MR. ROBERTS: (Resuming)
7 Q. All right. So I just want to -- well, we can go -- I
8 can give you time, if that's what you like to see if you
9 recognize this.
10 Do you recognize this document?
11 A. I do, yes.
12 Q. And are you the individual that answered these
13 questions?
14 A. Yes. Well, my counsel -- through my counsel. But
15 yes, I provided the information to answer the question.
16 Q. Okay. The first question was on -- was the image
17 described in Cyber Tip Report reviewed by a human being?
18 Can you read the answer?
19 A. Yes, I can. Oh, you mean out loud?
20 Q. Yes.
21 A. Oh, yes. " Objection. The term "reviewed" is vague
22 and undefined. Synchronoss further objects because there is no
23 timeframe identified in the request. Subject to and without
24 waiving these objections, Synchronoss responds to this
25 Interrogatory and all subparts with the terms "human reviewed"

Page 52

1 and "reviewed" meaning "viewed by an individual during the
2 scanning process for the image relating to this cyber tip." Yes.
3 Q. Okay. I think we just established, and you got
4 offended that I tried to make the distinction. But would you
5 agree now that you cannot truthfully answer that it was reviewed
6 by a human being?
7 A. I do not agree with that at all. Contractually,
8 WebPurify is required to review it. There is no reason for me
9 to say they violated their contract, so I will stand behind.
10 This image was human reviewed.
11 Q. And that's based on the contractual obligation between
12 Verizon and WebPurify?
13 A. Correct.
14 Q. Have you ever viewed that contract?
15 A. Nope.
16 Q. Do you know if there's any disclaimers about relying
17 on the results of human review?
18 A. I have a contract -- I cannot speak to the contract I
19 have not reviewed it.
20 Q. All right. So what's your understanding of -- I asked
21 you, we got a little sidetracked, about -- you said there was an
22 agreement with NCMEC to view the NGO list.
23 Did I understand that correctly?
24 A. Yes, there is what's called the Hash Sharing
25 Agreement. It's in our document production when the

Page 53

1 confidentiality order goes through.
2 I think -- oh, the Hash database -- Hash Value
3 Database Sharing Agreement or something to that effect. I can't
4 get the exact name.
5 Q. Right.
6 A. And I believe it's from years ago.
7 Q. Your prior testimony indicated that you believe that
8 NCMEC creates -- I'm sorry, who creates that list?
9 A. I don't know. All I know is that NCMEC, maintains it.
10 It's my understanding they create it, but I can't say for sure.
11 Q. But it's your understanding that they're the ones that
12 put the Hash values into the NGO list?
13 A. That's my understanding.
14 Q. Okay. Do you have any more understanding than that?
15 A. No. No. And I do have the exact name now, hold on.
16 It is called Nonprofit Hash Sharing Database Access Agreement.
17 And it is dated -- one more time, it is dated August of 2018.
18 Q. All right. And you reviewed that before today's
19 deposition?
20 A. Yes. Yes, I did.
21 Q. You learned about -- when did you first learn about
22 this lawsuit?
23 A. I don't know why February of '24 comes to my mind, but
24 shortly after it was filed. And I believe after we were served.
25 It may have been after Verizon was served and they contacted us,

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 54

1 but very early in the case.
2      Q.   Did you begin your investigation into these facts and
3 circumstances at that time?
4      A.   Yes, I did.
5      Q.   Okay.  So you've been looking into this now for well
6 over a year?
7      A.   Yes.  Intermittently, yes.
8      Q.   All right.  So were you aware that there was a
9 deposition of a NCMEC corporate representative yesterday?
10     A.   No.
11     Q.   I tended to coordinate that with your -- with your
12 lawyers.
13          MR. REISS:  You're talking about in a different case,
14 right?
15          MR. ROBERTS:  In the related case and I --
16          THE WITNESS:  Oh, no.  Then certainly not.  I know
17 nothing about --
18          MR. REISS:  A case that Synchronoss is not a party to,
19 correct?
20          MR. ROBERTS:  Correct.  And I -- and I e-mailed -- and
21 you --
22 BY MR. ROBERTS: (Resuming)
23     Q.   So you weren't aware -- I mean, I e-mailed your --
24 your attorney indicating that the deposition was going to
25 happen, offering to schedule it with them and provided them with

Page 55

1 a copy of a subpoena Duces Tecum.
2          Were you aware of that, to the extent you have --
3     A.   No.
4          MR. REISS:  And hold on a second.  To the extent
5 you're asking her about communications that I've had with
6 her, I would object and instruct her not to answer.
7          THE WITNESS:  Okay.
8 BY MR. ROBERTS: (Resuming)
9     Q.   So I learned a lot yesterday and what I'm going to
10 first tell you is that, the images and the content in this case
11 were not included on NCMEC external Hash Sharing List.
12          Did you know that?
13     A.   I still don't know that, that's hearsay.
14     Q.   Okay.
15     A.   Was my name mentioned?
16     Q.   No.
17     A.   Hmm.
18     Q.   You find that hard to believe?
19     A.   Is that a pending question?
20     Q.   Yeah, I mean your facial expressions express disbelief
21 or concern.
22     A.   My personal opinion is irrelevant.
23     Q.   Okay.
24     A.   I know what our process is and the facts will find.
25     Q.   Okay.  Okay.  So also -- also learned that there are

Page 56

1 other organizations that contribute significantly to the NCMEC
2 NGO Hash List.
3          Were you aware of that?
4     A.   No.  Actually yes, I shouldn't say that.  I do know
5 that are some contributors to the list, I don't know who they
6 are or the extent of it.
7     Q.   Okay.
8     A.   And I do believe that there is a recent -- the Report
9 Act that recently enacted actually extends that.  I don't
10 know if it's an obligation but that permission to report back to
11 NCMEC.
12     Q.   Okay.  So -- so maybe you know -- do you know that
13 there are other organizations, or you've heard that, or you
14 don't know who they are?
15     A.   Well, I mean for example, I know that there are
16 publications from NCMEC.  They did a publication of how many
17 cyber tips there are and they do publish things like that.  I
18 don't know who they are.  I do know that they are provided, but
19 I don't know who they are.  I don't know if it's law enforcement
20 or organization, but I do know there is a right.
21          And again, I don't know if it's an obligation or an
22 ability to report back to NCMEC.
23     Q.   No, I'm talking about that NGO Hash List.  Who
24 provides the Hashes to the list?
25     A.   Oh, I don't know.

Page 57

1     Q.   Well, do you -- do you believe it was NCMEC, other
2 organizations?
3     A.   Again, I don't know.  As I said before, I know it's
4 maintained by NCMEC.  You pushed me on whether it was created by
5 NCMEC, knowing it wasn't created by NCMEC.  So I found that a
6 little misleading.  But it is maintained by NCMEC.
7          That's all I know, as I testified earlier.
8     Q.   So, I mean, I can tell you that there was a subpoena
9 Duces Tecum for the -- for the deposition.  I was provided a
10 copy of the contract between Synchronoss and NCMEC.  In fact,
11 that agreement that you just referred tells you that there
12 are other organizations that are contributing to the NCMEC NGO
13 Hash List, does it not?
14     A.   I am not going -- I would defer to my counsel whether
15 I should speak about a confidential agreement prior to the entry
16 of the confidentiality order.  I'm happy to do it, but I just
17 want to make sure.
18     Q.   Well --
19          MR. REISS:  You can.  And we'll mark it as
20 confidential when the transcript is produced.  They may
21 produce it, so, I mean, I guess --
22          THE WITNESS:  In this case?
23          MR. ROBERTS:  In this case, yeah.
24          THE WITNESS:  Okay.
25          MR. REISS:  Wait, wait, wait.  No, in this case.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 58

1    THE WITNESS:  Thank you.
2  BY MR. ROBERTS: (Resuming)
3    Q.    So I have a copy of it.  Doesn't it inform Synchronoss
4  in clear language that other NGO's are contributing to Hash
5  Lists?
6    A.    It speaks for itself.  You're welcome to show me a
7  provision of it that says that and I'll agree to it, but it says
8  what it says.
9    Q.    Well, I'm just asking you a question.
10   A.    I'm not going to touch on it, it says what it says.
11   Q.    You've reviewed it?
12   A.    I have.
13   Q.    After reviewing it, do you understand that the NGO
14  Hash List is made up of lists from other organizations, not just
15  NCMEC?
16   A.    I understand that in 2018, that's what that document
17  said.  I have no reason to think it's any different.  But again,
18  I will not testify as my understanding of a document that speaks
19  for itself.
20   Q.    And that document has clear disclaimers telling NCMEC
21  that they cannot rely on the veracity of the Hash information
22  included in the list?
23   A.    Speaks for itself.
24   Q.    But is there language in there that you interpret to
25  be something like that?

Page 59

1    A.    That's what's on the page, it speaks for itself.  I'm
2  not testifying --
3    Q.    What does it say?
4    A.    Would you like to show me what it says and I will
5  confirm --
6    Q.    Well --
7    A.    -- that it speaks for itself.  I am not going to
8  testify on a document that is not in front of me about what it
9  says.  If you'd like to show it to me, I am more than happy to
10  confirm what you're telling me.
11   But without you presenting it to me, I will not
12  comment on a document.
13   Q.    I'm just asking about your recollection.
14   A.    I know, and I'm saying I will not testify onto it.
15   Q.    So you're --
16   A.    No, I'm not going to testify as to my interpretation
17  of a document that speaks for itself.  I am not refusing to
18  testify, I am merely relying on the page -- the words on the
19  page of the document.
20   Q.    Okay.  I'll show it to you in a minute.  The -- so you
21  testified that so, I mean, is it your understanding, as we
22  sit here today, do you know what are the organizations that --
23  or any of the organizations that contribute to the NCMEC NGO
24  Hash List?
25   A.    I'm sorry, do I know any of them?  What was the

Page 60

1  question, I didn't quite catch.
2    Q.    Do you know the names of any of the organizations that
3  contribute to the NGO Hash List?
4    A.    Definitively, no.
5    Q.    Let me ask another question, that in 2022 and 2023
6  contributed to the NGO Hash List?
7    A.    I don't -- I don't -- I wouldn't know, no.
8    Q.    You wouldn't have any --
9    MR. REISS:  Counsel, I'm sorry.  Your answer didn't
10  come through.  I don't know if it's your mic or you're just
11  getting soft spoken on some of them, but we couldn't hear
12  you.
13   THE WITNESS:  Okay.  Me or Mr. Roberts?
14   MR. REISS:  No, you ma'am.
15   THE WITNESS:  Okay.  Sorry, I'm a witness, that's why
16  I'm confused.  Shoot.  What was the question, can you
17  please refresh me and then I'll --
18  BY MR. ROBERTS: (Resuming)
19   Q.    Yeah.  You don't have any way of knowing who the
20  different organizations were that contributed to the NCMEC NGO
21  Hash List at the time that these reports were made?
22   A.    I don't know.  I don't know if I have a way of
23  knowing.  I could search perhaps, but I do not know right now,
24  correct.
25   Q.    And in the agreement -- I mean, did you -- when you

Page 61

1  review the agreement involving the NGO Hash List, do you recall
2  there being a provision where the contributors to the Hash List
3  have to identify their name, certain categorizations of the
4  content that is included in the database with a match?
5    A.    Are you talking about the providers when they report
6  to NCMEC with the images?
7    Q.    No, I'm talking about the different organizations that
8  contribute to the NGO Hash List.  They're required to include
9  certain information like the name of the organization that
10  contributed the Hash, and categorizations such as A1, B1, A2.
11   Is that information actually included in the NGO
12  Hash data?
13   A.    I'm not aware.  If that's what you're asking, I'm not
14  familiar with that.
15   Q.    Well, then I want to ask you.  It says that in the
16  agreement between Synchronoss and NCMEC.
17   A.    Okay.
18   Q.    Do you recall that?
19   A.    The words on the page speak for themselves.
20   Q.    Okay.  Hold on one second.
21   So another thing that I discussed with NCMEC and that
22  they actually produced along with a subpoena, is an e-mail chain
23  that you're -- you're on.  And it's between Synchronoss and
24  NCMEC from June, July, timeframe of 2024?
25   A.    Okay.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 62

1    Q.   Do you recall communicating with them?
2    A.   No.  I mean, I'm sure I did.  I'm not disputing I did,
3  but I sent hundreds of e-mail's a day.  I can't remember just
4  one.
5    Q.   Do you remember investigating a significant drop in
6  the Hash match count?
7    A.   Yes.  And it appears that our NCMEC data feed had --
8  somehow there was a -- I do recall that, yes.  And I do recall
9  getting to the bottom of it, yes.
10   Q.   You were told that you had lost access to IWF's and
11 Cyber Tip Canada's Hash Lists, were you not?
12   A.   Can you show me the e-mail?
13   Q.   I'm just asking your recollection?
14   A.   My recollection -- I think my attorney might want to
15 speak.
16        MR. REISS:  I just don't understand what we're doing
17 here.  If you have the document and you want to ask her
18 about it, why do you refuse to show it to her?  It's
19 almost -- I'm getting the feeling that you're trying to
20 spring a trap here.  That you're -- you're asking her to
21 comment on it and then you're going to show it to her and
22 say, ah-ha, you were wrong.
23        THE WITNESS:  Let me also supplement the record that
24 that did happen earlier when you asked me about Hash Lists.
25 And now I'm understanding where you're going.  It was

Page 63

1  deceptive and I don't appreciate it.  I'm actually getting
2  quite angry, I think we need to take a break.
3  BY MR. ROBERTS:  (Resuming)
4    Q.   Did you -- did you lie to me when you said you didn't
5  know the name --
6        MS. SIEKKINEN:  The witness asked to take a break when
7  there was no pending questions.  I think that we should
8  respect her.
9        MR. ROBERTS:  Why?
10       THE WITNESS:  Thank you.
11       MR. ROBERTS:  I -- I want to ask the question.
12 BY MR. ROBERTS:  (Resuming)
13   Q.   Did you lie to me --
14       MS. SIEKKINEN:  There was no pending question, she
15 asked to take a break.
16       THE WITNESS:  Did I lie to you, no.  Did you mislead
17 me, yes.  I am taking a break.  This can go to the court if
18 you want to continue.  I am appalled at your behavior.
19 Appalled.  I am taking a break and will confer with my
20 attorney.  Goodbye.  I am hanging up.  Uncalled for.
21       THE VIDEOGRAPHER:  Off the record, 10:35 a.m.
22       THE VIDEOGRAPHER:  On the record, 10:50 a.m.
23       MR. ROBERTS:  All right.
24       THE WITNESS:  Before we continue, I would like to say
25 one thing for the record.  I do know, Mr. Roberts, that

Page 64

1  when I hung up you did call me a liar.  I would appreciate
2  more professionalism and candor from a fellow member of the
3  bar.  I do not lie.
4        I actually find it incredibly offensive that you would
5  say such things.  And I have been practicing as long as you
6  have, perhaps 45 days longer.  And I truly believe that
7  candor and professionalism are really what matters.  And I
8  expect the same from someone who's member of the bar.
9        MR. ROBERTS:  Okay.  Thank you for that.
10 BY MR. ROBERTS:  (Resuming)
11   Q.   So at the time you answered my questions, did you know
12 that IWF and Canada CyberTipline contributed to the NGO Hash
13 List?
14   A.   I did not.  So wait, when time, which time, at the
15 time of the cyber tip or now?
16   Q.   No, at the time you answered my questions earlier in
17 this deposition.  I specifically asked you, did you know the
18 names of any of the other organizations which contributed to
19 the -- first I asked you, if you knew if other organizations
20 contributed to the NGO Hash List, and you said that you did not
21 know.
22        Do you recall that testimony?
23   A.   That is correct.  And I can clarify my answer if you'd
24 like me to clarify.
25   Q.   No.

Page 65

1    A.   No, no.  I would like to answer the question that you
2  asked me.  The question that you asked me was, did I know.  No.
3  After you subsequently asked me questions about cyber tip Canada
4  and IWF, which is where you were going in June of 2024.
5        We were completely unaware that the NGO list that we
6  applied to included those Hashes.  Our contract and our process
7  has only ever been one API to one list.  So it is our
8  understanding, our understanding has always been, that what we
9  get from NCMEC is the NGO list.  It turns out in the middle of
10 2024, there was some confusion.
11       But when you asked me the questions earlier in the
12 deposition, I would have appreciated you bring up this 2024
13 issue because it refreshed my recollection on what actually
14 could have happened for the first time in this case.
15       So, again, professionalism and candor really would
16 streamline things and be a little bit more appropriate.
17   Q.   So is your clarification that you did not remember
18 that there were other organizations contributing to the NGO Hash
19 List?
20   A.   No, that is not my testimony.  My testimony is that,
21 our understanding was that the NGO Hash List, the IWF list, and
22 the Cyber Tip Canada list were all different things that somehow
23 got wrapped up in our data feed from NCMEC.
24       As far as we're concerned, there was no change on our
25 end.  It was a NCMEC issue that was dealt with on their end.  So

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 66

1  our knowledge -- our process has always been the same. This
2  change was NCMEC, that was something internal with them. We
3  have never, ever had contracts for the Verizon scanning with
4  Cyber Tip Canada or with IWF.
5      Q.    But you knew that other organizations were
6  contributing to the NCMEC NGO Hash List?
7      A.    Well, I testified before I knew other organizations,
8  but I thought you meant law enforcement and entities. I was not
9  aware you were referring to other nonprofit organizations
10  outside of the United States, which is IWF and Cyber Tip Canada.
11      Q.    So I'm confused now. So when I asked you the
12  question, did you have any ideas the names of the organizations
13  that were contributing to the NGO Hash List, you said you did
14  not know the names. Are you testifying now that you do know the
15  names?
16      A.    No. No. My understanding was never that these
17  organizations contributed to the NGO Hash List. My
18  understanding is that these organizations had separate lists
19  that somehow accidentally we got roped in with our API with
20  NCMEC.
21          But never, never did I know and I still don't know to
22  this day if they contribute to the NGO list or if it's a
23  separate list. I always thought it was a separate list.
24      Q.    And the e-mail's between you and NCMEC didn't make
25  that clear?

Page 67

1      A.    No. I thought it was an improper API where we were
2  accessing different lists. I did not know it was the same list.
3  So, no, it did not make that clear at all.
4      Q.    Okay. I'm going to share the Synchronoss contract.
5          (Whereupon Plaintiff Exhibit Number D was marked for
6  identification.)
7          MR. ROBERTS: And Autumn, if you're listening, can you
8  just try drop this in the chat? I don't know why there's a
9  blue line on that.
10  BY MR. ROBERTS: (Resuming)
11      Q.    Do you recognize this document?
12      A.    Yeah, let me just pull up the whole one, please.
13      Q.    You have it there in front of you?
14      A.    I see it. I'm just trying to get the whole thing.
15  Yes, this is the one I was looking at. Yes, signed by
16  Mr. Prague (Phonetic).
17      Q.    This is the one that you had reviewed before today's
18  deposition?
19      A.    I mean, yes, I've seen it before. I did review it. I
20  didn't read it word for word, but I reviewed it.
21      Q.    Right. But this says that, "Various nonprofit
22  organizations worldwide providers services to help prevent child
23  sexual exploitation and assist child victims of sexual
24  exploitation.
25          As part of these efforts, these nonprofits may possess

Page 68

1  PhotoDNA signatures and/or Hash of images that they believe
2  constitute Apparent Child Pornography or their jurisdiction's
3  equivalent of legal definition for child pornography and/or
4  child sexual exploitation.
5          Certain of these nonprofit organizations have decided
6  to contribute to global efforts to reduce the online
7  transmission of Child Sexual Abuse images by sharing their
8  PhotoDNA Signatures and/or Hashes of Child Sexual Abuse images
9  through the Nonprofit Database with entities delivering
10  Electronic Communication Services or Remote Computing Services?"
11          So your testimony is that you did not understand that
12  the nonprofit has sharing database access, included
13  contributions from worldwide nonprofit NGO's?
14      A.    No. My testimony is that, I did not know that the IWF
15  list and the Cyber Tip Canada list -- in fact, I still don't
16  know if they were contributed and included in the NGO list or
17  were separate lists. It was my understanding there were
18  separate lists. If it was provided to me that they were
19  incorporated into the NGO list, I don't -- I would still
20  question that because we had a license to the whole NGO list, so
21  that wouldn't make much sense.
22          But my testimony is no, I did not, I thought they were
23  separate lists. And I did know that there were contributors, as
24  I testified before, I just didn't know who those contributors
25  were.

Page 69

1      Q.    But you learned that after July of 2024. You learned
2  that those contributors were IWF and Cyber Tip Canada?
3      A.    Mr. Roberts, I can't be any clearer to you that I
4  still don't know that. I think they are separate lists. I am
5  not -- I still don't have anything to know that they were part
6  of the NGO list or it was just an incorrect API. I can't
7  testify to that.
8          Again, I don't know. It's my understanding that they
9  were separate lists, not that they contributed to the NGO list.
10      Q.    Why was it that Synchronoss reached out to NCMEC in --
11  before I get off of this. I think this is Exhibit C; is that
12  correct?
13      A.    No, I think this is D.
14          THE COURT REPORTER: This would be D. D, sir.
15          MR. ROBERTS: All right. All right.
16  BY MR. ROBERTS: (Resuming)
17      Q.    Why it that you guys reached out to NCMEC in July
18  of 2024?
19      A.    Can you show me the e-mail? I know there was an
20  e-mail and that would refresh my recollection. You referenced
21  it earlier, it would have why.
22      Q.    Yeah. Maybe I can refresh your recollection, there's
23  a dramatic drop in the number of Hash matches.
24          Does that ring a bell?
25          MS. SIEKKINEN: Yeah, sorry. The witness has asked

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 70

1    for the -- the e-mail to refresh her recollection.  I --
2         MR. ROBERTS:  This is my deposition, guys.  You
3    can't -- you cannot.
4         THE WITNESS:  Okay.
5         MR. ROBERTS: -- control what I do.
6    BY MR. ROBERTS: (Resuming)
7         Q.  I'm asking if you cannot -- if you cannot recall,
8    that's a perfectly acceptable answer.
9         MR. REISS:  As long as you understand that she's going
10   to say, I don't have any knowledge of a document that
11   you're not willing to show to me.
12        MR. ROBERTS:  We can show it to you.
13        MR. REISS:  I just don't understand why you won't.  It
14   makes me suspicious of why you're doing it this way.
15        MR. ROBERTS:  Okay.
16   BY MR. ROBERTS: (Resuming)
17        Q.  Well, let me ask you this.  Did you review these
18   e-mail's in preparation for the deposition today?
19        A.  You have to show me the e-mail's, I don't know what
20   e-mail's you're referring to, sir.
21        Q.  All right.  Well, before -- before I do that -- before
22   I do that, and I will.  I'm not really not trying to hide the
23   e-mail's from you.  I'm the one that brought them up and I just
24   recently learned about them.  But let me -- I was looking online
25   at the reporting numbers for Verizon in NCMEC.

Page 71

1         Are you familiar with the -- like the numbers, like
2    the total reports that Synchronoss makes on behalf of Verizon on
3    an annual basis?
4         A.  I do know that we report them, I do know that -- I
5    don't know them off the top of my head.  But yes, we do report
6    them every year or Verizon reports them.
7         Q.  Yeah.  So just one second here.  I'll show you a
8    document that's just like -- it's been referred to in pleadings,
9    it's a -- basically a screen grab from Verizon's website.  It
10   has numbers.
11        (Whereupon Plaintiff Exhibit Number E was marked for
12        identification.)
13        Q.  Autumn, can you drop this in the chat?
14   BY MR. ROBERTS: (Resuming)
15        Q.  This is Verizon's efforts to combat online child
16   exploitation Frequently Asked Questions.
17        Do you see this document?
18        A.  I do.  I see the top of it, yes.
19        Q.  Yeah, yeah.  So it has some frequently asked answers
20   to frequently asked questions.  And then it has how many CSAM
21   reports has Verizon filed with NCMEC.  And it goes from 2022, to
22   2023, to 2024.
23        Do you see those numbers?
24        A.  Yes.
25        Q.  There seems to be a dramatic drop from 37,000 in 2023

Page 72

1    to 18,000 in 2024.
2         Do you see that?
3         A.  I do see the drop, yes.
4         Q.  Okay.  What is the explanation for the drop in
5    reports?
6         A.  I believe that NCMEC is the one that provided that
7    information in the e-mail's that you've referred to.  So I would
8    really like for you to present the e-mail, please.
9         Q.  Yeah, sure.  Hold on.
10        MR. ROBERTS:  Autumn, can you drop -- there's a lot of
11   duplicative, like duplicative e-mail's that they -- that
12   they sent.  So it's like I don't know how many e-mail's,
13   but it's a lot more pages than e-mail's.
14        Autumn, can you drop that in the chat?
15        (Whereupon Plaintiff Exhibit Number F was marked for
16        identification.)
17   BY MR. ROBERTS: (Resuming)
18        Q.  So I mean, this is kind of a random e-mail, but they
19   just really repeat over and over again.  But the question, who
20   is Bip Smedley?
21        A.  Bip is on our technical team, I forget his title.
22   He's either an architect or an engineer.
23        Q.  And so there's this statement here in the e-mail from
24   July 15th, "We're seeing a considerable decrease in the number
25   of Hashes, which in turn has decreased our match rate."

Page 73

1         Do you recall that issue coming up?
2         A.  I do recall us investigating the drop in cyber tips in
3    the beginning of 2024.
4         Q.  And this is an e-mail from you on July 25, 2024.  It
5    says, "Hannah, just to clarify, this is not a historical issue.
6    There was something that happened very specifically on
7    June 1, 2024 that we need to address.
8         That is the date we begin seeing far less matches than
9    previously.  Were there any updates or changes made effective?"
10        A.  Oh, I may have missed -- I thought it was January, but
11   it could have been June.
12        But that's just a side note.
13        Q.  Okay.  Well, you're writing this e-mail in July.
14   Would it be a fair assumption or statement that you wouldn't
15   have waited from January to July to bring this issue up?
16        A.  I don't -- I can't answer that question.
17        Q.  Okay.
18        A.  If you're asking me how -- why we started
19   investigating this, I can answer that question.
20        Q.  Why did you start investigating this?
21        A.  Because Verizon asked us to.
22        Q.  Okay.  And who specifically at Verizon asked you to?
23        A.  Oh, I would like to say it was Ethan, but I can't be
24   100 percent sure.  I believe it came through Ethan, but it may
25   have also come through a technical team, I'm not certain.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 74

1    Ethan Aronson, who I mentioned earlier. Apologies.
2    Q.    Right.  And I'm just scrolling through here.  As you
3    can see, a lot of these are -- there's some technical
4    information.  They're trying to query a specific API, but there
5    is an explanation that is given.  And I mean, I can just tell
6    you why I'm scrolling.
7    That NCMEC informed you and your team that you guys
8    had lost access to the IWF and Cyber Tip Canada Hash List
9    through the NGO -- through the NGO?
10    A.    That I don't recall.  I don't recall it through the
11    NGO.  And if it is, then I -- I never quite grasped that.
12    Q.    Okay.
13    A.    It's never been my understanding that it was through
14    the NGO.  Again, I don't handle the technical side of it.
15    Q.    So you knew that there were other organizations that
16    were contributing to the NCMEC NGO list, but you didn't know who
17    they were?
18    A.    Correct.
19    Q.    Were you --
20    A.    And when you say, organizations, again, my frame --
21    when you said organizations was law enforcement and private
22    corporate entities.  I had no even -- this wasn't even on my
23    radar that other providers were contributing to the list.
24    So I just wanted to make that clarification.
25    Q.    Do you believe law enforcement has the ability to

Page 75

1    contribute Hashes to the NGO list?
2    A.    I do know that the Report Act has extended and
3    expanded the ability for certain individuals and entities to
4    report to the NGO list.  I don't know the extent of them.
5    Q.    Do you believe that there's this statute deals
6    specifically with the NGO list?
7    A.    No.
8    Q.    Yeah.  So how many --
9    A.    NCMEC, yes.  The NGO list, no.
10    Q.    How many NCMEC lists do you understand -- CSAM Hash
11    sharing lists do you understand that there are?
12    A.    I don't -- I don't know.  I know there's multiple ones
13    and multiple jurisdictions.  Like there's -- in my -- I don't
14    know, but my understanding is there's essentially one in each
15    jurisdiction.  IWF, meaning Europe.  Not just an individual
16    country.
17    Q.    Right.  No, NCMEC -- I can represent to you that NCMEC
18    has four US based Hash Sharing List, are you unaware of that?
19    A.    No, I'm aware that -- I'm sorry.  I'm sorry if I
20    misspoke, I thought we were talking specifically about the NGO
21    list and contributions to the NGO list.
22    Q.    Okay.  So I will ask you about that again.  But, how
23    many lists does NCMEC make available to US members?
24    A.    I don't know.
25    Q.    All right.

Page 76

1    A.    And I don't know if there's different places, for
2    example, service providers, law enforcement, things like that.
3    Q.    So there's something called like the Take It Down
4    List, are you familiar with that?
5    A.    No.  I mean, I've heard of Take It Down, but not in
6    the context of a list.
7    Q.    So there's actually a corporate electronic service
8    provider list that is separate than the NGO list, were you aware
9    of that?
10    A.    No.
11    Q.    All right.  Do you know why Synchronoss doesn't
12    subscribe to all of the CSAM Hash Lists supported by NCMEC?
13    A.    We asked at Verizon's direction.  We have not been
14    directed to do so, that's why we have not.
15    Q.    Okay.  So I've actually pulled up here the e-mail that
16    says Friday, July 19, 2024.  Can you just read this e-mail, it's
17    from Hannah I. Wilk and I believe that this was directed to you,
18    Cara?
19    A.    Oh, yes, but it refers to an NPO list that I'm not
20    familiar with.  But yes, I can certainly read it.
21    Q.    Yeah.  Okay.
22    A.    "Hi Rohan, I hope you're doing well.  I received the
23    following message from our technical team."  This is from Hannah
24    Wilk from NCMEC, who I've dealt with before.  "Besides NCMEC
25    there are two other contributing members to the NPO Hash Sharing

Page 77

1    List, (IWF and CyberTip Canada) who have removed Synchronoss's
2    access to their Hash contributions and therefore the number of
3    Hashes they have access to would be lower.
4    There aren't any receipts captured by the API when
5    this happens," I'm sorry, it's kind of small, so I'm leaning
6    forward.  "When this happens in terms of retracted messages,
7    therefore causing confusion."  Oh, thank you.  "Depending on
8    what information they keep locally, is there a concern around
9    accessing NCMEC contributed Hashes or Hashes contributed to NPO
10    in general?  If the latter, the above would conclude why there
11    is the illusion of missing Hashes.  If there are concerns around
12    missing NCMEC contributions, we are happy to assist further to
13    determine the disconnect.  Thanks, Hannah I. Wilk."
14    Q.    What did you understand that to mean?
15    A.    I -- well, this is directed -- I'm copied, this is
16    really directed to my technical team.  But my understanding was
17    that, we had access to two lists that we shouldn't have and
18    they -- they pulled those access.  The NPO, again, I don't know
19    what that is.
20    Q.    Nonprofit organization --
21    A.    Yes, but we use the NGO list, not the NPO list.
22    Q.    So did you clarify that with anybody that you didn't
23    understand what they were talking about when they said NPO?
24    A.    But I did understand what they talked about.  They
25    spoke that we were removed from two lists that we shouldn't have

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 78

1  had access to.  So, no, I did not question that further.  That
2  was being handled by Rohan and Bip.
3      Q.   You understood that she was referring to the Hash
4  List, the single Hash List that you guys have participated in?
5      A.   No, I don't understand that.
6      Q.   Well --
7      A.   All I understood was that we were removed from two
8  lists.  To be honest, I moved so quickly and I'm so busy that I
9  didn't even look at the NPO Hash Sharing List part.  I saw that
10  we were removed from two lists we weren't entitled to and I
11  moved on from there.
12     Q.   Do you know why you were dropped from those lists?
13     A.   No, I don't know why we were on those lists, so no.
14     Q.   Well, I can represent to you, they're just part of the
15  NGO -- the NGO Hash Sharing List?
16     A.   I know, you keep telling me that, but if we have a
17  license to the NPO Hash Sharing List, then we would have a
18  license to anything that's on that list.  So again, there's a
19  disconnect.
20          I'm not quite grasping how that could happen.  Now,
21  perhaps they were on the NPO list and we had the wrong access,
22  but the NGO list is what we always have access.
23     Q.   So did anybody ever reach out to IWF and CyberTip
24  Canada to clarify?
25     A.   I reached out to Verizon to discuss whether they

Page 79

1  wanted me to do that.
2      Q.   And what did Verizon say?
3          THE WITNESS:  Ms. Siekkinen, am I permitted to say?
4          MS. SIEKKINEN:  We -- I have the understanding that
5  Mr. Roberts has represented to me and my counsel that he is
6  abiding by the proposed confidentiality order until it gets
7  entered.  And we will mark confidential, we think should be
8  confidential, just as your counsel will.
9          But thank you for verifying, Ms. Blaszka.
10          THE WITNESS:  Thank you.  Can you repeat the question
11  again?
12  BY MR. ROBERTS:  (Resuming)
13     Q.   Yes.  So you testified that you reached out to Verizon
14  to ask them whether or not Synchronoss should reach out to IWF
15  and CyberTip Canada.  And I asked for, what was Verizon's
16  response?
17     A.   Yes, I spoke with Ethan, Ethan Aronson, and Ethan
18  advised to not pursue those two lists.  That Verizon did not
19  want us to pursue being reinstated to those two lists.  I don't
20  recall if we discussed how we were even included in those lists,
21  but he did specifically say not to proceed, so we did not.
22     Q.   So Synchronoss only has one agreement with NCMEC,
23  correct?
24     A.   That I'm familiar with, yes.
25     Q.   And you searched for -- I mean, I requested for you to

Page 80

1  search or Synchronoss to search for agreements with NCMEC.  And
2  did you only discover the one?
3      A.   Yeah, I've searched our database, which isn't always
4  the best, but yes, I've searched everything and that is the only
5  one I have found.
6      Q.   And that agreement says that worldwide non
7  governmental organizations will contribute to this non
8  governmental organization or NGO Hash Sharing List, correct?
9      A.   If you'd like to show me where on the document does
10  that, I don't know.
11     Q.   Okay.  If you don't know --
12     A.   I need to say yes, but I need to see it.
13     Q.   You never put it together, though, in your mind that
14  IWF and CyberTip Canada were two of the organizations that were
15  contributing to the NGO Hash Sharing List?
16     A.   No, I still don't know that.
17     Q.   Okay.  But do you understand that losing access to --
18  let me ask it a different way.
19          NCMEC provided you an explanation of why your Hash
20  matches were dramatically dropping, correct?
21     A.   Why they had dropped, yes.
22     Q.   Okay.  And so can you help me understand how
23  dramatically that dropped?
24     A.   Well, you showed the numbers yourself.  You'd like to
25  show the numbers again, we can show them.  I believe it was

Page 81

1  around 31,000 the year before and then 18,000 the next year.
2  But the data will show.
3      Q.   One second.  So I think this is back to Exhibit D?
4      A.   Yes.  It's 37 -- excuse me.  37,106 in 2023.  And
5  18,064 in 2024.
6      Q.   Well -- and I want to assume that this problem
7  occurred and your e-mail was correct, that there was a dramatic
8  change June 1, 2024?
9      A.   I don't believe that was accurate.  I believe that
10  there was a drop that started in February.  Again, my
11  recollection is that it started in February, maybe not quite as
12  much, and then we had a bigger drop later, and that's what
13  prompted Ethan to reach out to me.  But my recollection is that
14  it was not just a light switch in June.
15          We may have thought that at the time, but upon further
16  investigation, I believe it began in February of '24.
17     Q.   So you -- you investigated this issue.  Sounds like
18  trying to figure out what was going on back in July of 2024.
19  So, I mean, last July?
20     A.   Yes.
21     Q.   All right.  And so you understood -- and did you
22  satisfy yourself that NCMEC's explanation to Synchronoss was an
23  accurate explanation of what was going on?
24     A.   Yes.  We did a thorough investigation.
25     Q.   So you understood after your investigation that the

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 82

1  data list that you were querying included the IWF and CyberTip
2  Canada Hash Lists?
3      A.   I understood that the API we were using did include
4  Hashes from those lists.  I learned that in or around July after
5  hearing back from NCMEC, July '24, excuse me.
6      Q.   Right.  So by July of '24, you understood that the API
7  that you were using to access the NGO Hash List included IWF and
8  CyberTip Canada contributions?
9      A.   That was my -- my understanding was, we only got one
10  API.  So my understanding was that it came through the API.  I
11  don't know how, but yes.
12      Q.   Well -- and in looking at the agreement of the NGO
13  sharing agreement, I mean, does that make sense to you now that
14  it says, you know, other worldwide organizations are to
15  contribute to this Hash List.
16          Does that kind of put one and one together?
17      A.   Mr. Roberts, we can beat the dead horse as much as
18  you'd like, but again, I'm still not -- I still don't know that
19  those were incorporated in the NGO list.
20      Q.   Okay.
21      A.   My testimony is not going to change.
22      Q.   Well, I keep hearing --
23      A.   You keep asking you the same question and I keep
24  giving you the same answer, it's not going to change, sir.
25      Q.   Did your API change at all?

Page 83

1      A.   No.
2      Q.   Prior to the change in the dramatic drop in results?
3      A.   Our API?  I mean, not that I'm aware of.  And I don't
4  mean by -- what you mean by change the API, you mean a different
5  API?
6      Q.   You guys were querying the same database when the
7  dramatic drop in Hashes began.  It was nothing that you guys did
8  that caused a dramatic drop, correct?
9      A.   Correct.  We -- our processes did not change, and
10  that's why we had to investigate.  And we looked -- we asked
11  NCMEC, because it was not something that had -- we had done on
12  our system.
13      Q.   So do you know what IWF or CyberTip Canada, what their
14  standards or protocol for inclusion of Hash values or content in
15  their lists?
16      A.   No, I don't.  I'm not aware of their criteria.
17      Q.   So in -- so let me -- let me -- let me just come out
18  and say; so the drop from 37 to 18, I'm not using round numbers.
19  That was explained by just losing those two Hash Lists; is that
20  your understanding?
21      A.   Yes.  The amount of the drop, correct.  The large
22  amount of the drop.  I mean, there may have also been other
23  contributing factors that were smaller, but yes, that was the
24  contributing factor to the massive -- I shouldn't say massive,
25  the large drop.

Page 84

1      Q.   Correct.  Okay.  So did anybody ever do any
2  investigation as to why the IWF or CyberTip Canada included so
3  many other Hash values or content then was not included in the
4  NCMEC CSAM list?
5      A.   No.
6      Q.   Okay.  And so at the time of the October and January
7  cyber tips, your testimony is Synchronoss, or you, as the head
8  of Synchronoss, really did not know where the Hash values that
9  you were matching against came from?
10      A.   I wouldn't say that.  I would say that contractually,
11  we only had access to the NGO list.
12          So our position is that contractually and with our
13  API, we were accessing the NGO list.  If there were other lists
14  included, we were unaware.  And frankly, we only contracted for
15  one.
16      Q.   Well, you contracted for the NGO list which included
17  contributions of worldwide non governmental organizations,
18  correct?
19      A.   Again, I don't know that.
20      Q.   Well, that's what the contract says.
21      A.   Okay.
22      Q.   All right.  So before today you didn't realize that
23  this content was not included on a NCMEC CSAM Hash Sharing List.
24          Do I understand that correctly?
25      A.   No.  Now you're conflating issues.  Now I'm getting a

Page 85

1  little bit confused.
2      Q.   Okay.  Let me clarify.
3      A.   Well, wait, if you're saying that there's -- I'm
4  seeing two arguments.  Let me just clarify so I can understand.
5          So you're saying that they were -- that CyberTip
6  Canada and IWF were included on the NGO list.  That's the
7  representation you're making to me.  But then you're saying that
8  we accessed a different list, even though you're saying it was
9  part of the NGO list?  I'm not -- I'm not quite getting it.  So
10  what's the process?
11      Q.   You really don't understand how the NCMEC NGO Hash
12  Sharing List works, do you?
13      A.   Oh, no, I understand.  I don't understand the
14  questions you're asking me.  And I --
15      Q.   Okay.  So do you understand that NCMEC has a Hash
16  Sharing List, CSAM Hash Sharing List, that they contribute to
17  the NGO platform?
18      A.   Who contributes, NCMEC?
19      Q.   NCMEC has a Hash List.  This is the triple verified,
20  this is the vaunted NCMEC gold standard Hash List that they
21  contribute to, the NGO Hash sharing platform.
22          Do you understand that?  They contribute a Hash List
23  to the NGO platform.
24      A.   They maintain the NGO platform.
25      Q.   So you don't understand that they actually create a

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 86

1  list and they contribute triple verified content to that
2  platform?
3      A.  Sir, it's not that I don't understand, it's that I
4  don't have knowledge.
5      Q.  Okay.  All right.  Do you have any knowledge as to
6  whether or not other NGO's do the same thing?  Like they do
7  whatever process they have, and then they have the ability to
8  share their list with the NGO platform?
9      A.  I have no knowledge of that.
10     Q.  Okay.  So I want to go back to the Synchronoss
11 contract with NCMEC.  And I've blown it up here.  Just want to
12 show you.  For some reason, it's not -- let me stop sharing.
13 Okay.
14          This is the Nonprofit Hash Sharing Database Access
15 Agreement that you reviewed prior to the deposition today,
16 correct?
17     A.  Yeah, I think it's D.  Is it Exhibit D?
18     Q.  Probably, right.  So just so we have this, I guess, on
19 the record, this agreement under registrant -- now you
20 understand that Synchronoss is the registrant?
21     A.  I believe so.  You'd have to scroll up for me to
22 confirm that, but yes, I believe so.
23     Q.  "Registrant accepts all information contained in the
24 Nonprofit Database, including, but not limited to PhotoDNA
25 Signatures, Hashes, and categorizations, "AS IS" without

Page 87

1  warranty of any kind and assumes all risk and liability
2  associated with using the information contained in the Nonprofit
3  Database.
4          If Registrant has questions or concerns regarding
5  information contained in the Nonprofit Database, it shall
6  address those issues with the Participating Nonprofit identified
7  as having submitted the information to the Nonprofit Database,
8  including but not limited to circumstances in which the
9  Participating Nonprofit is informed that information they have
10 submitted may be corrupt, incorrectly categorized or otherwise
11 mistakenly submitted?"
12          Did I read that correctly?
13     A.  Yes.
14     Q.  All right.  At the time of this -- of Mr. Lawshe's,
15 the two Cyber Tip Reports, this was the agreement that was in
16 full force and effect between Synchronoss and NCMEC, correct?
17     A.  Correct.
18     Q.  All right.  Did you ever reach out to any of the
19 participating nonprofits -- first of all, your testimony today
20 is, you did not know who the participating nonprofits to the
21 NCMEC Nonprofit Database was?
22     A.  I feel like we've gone over this a million times.
23 Correct.
24     Q.  Okay.  So there's an exhibit attached to this, did you
25 review the exhibit as well?

Page 88

1      A.  Yeah, I've seen the exhibit.
2          Again, when I say review, I looked at it very quickly,
3  but yes.
4      Q.  Right.
5      A.  I have seen this before as well.
6      Q.  Right.  So it says here that, "Participating
7  Nonprofits are required to submit information to the Nonprofit
8  Database in the field indicated below.  Participating Nonprofits
9  are required to use the Industry Standard Child Pornography
10 Categorization when submitting PhotoDNA Signatures and/or Hashes
11 unless they have implemented an alternate image categorization.
12         If a Participating Nonprofit uses an alternate image
13 categorization, it will populate the "Nonprofit Categorization"
14 field rather than the "Industry Standard Child Pornography
15 Categorization" but is then required to provide a key or map to
16 its categorization system under its full corporate name in the
17 "Company Name" field."
18         Did I read that correctly?
19     A.  Yeah.  Yes, you did.
20     Q.  Okay.  So then there is a chart.
21         Do you see that?
22     A.  Yes.
23     Q.  All right.  And then it defines below there the
24 information that should be included in the chart, correct?
25     A.  Yes, it looks like it.

Page 89

1      Q.  Right.  So all of this information is in fact made
2  available in the database, correct?
3      A.  I don't know.  I have not seen the specific database,
4  I would have to ask my technical team.
5      Q.  Okay.  So you don't know whether or not you have the
6  ability to know the name of the company that submitted a
7  particular PhotoDNA Signature or MD5 Hash value?
8      A.  I'm sorry, what was the question?  The first part of
9  the question I missed.
10     Q.  You don't know if Synchronoss has the ability to gain
11 information about a particular PhotoDNA Signature or MD5 Hash
12 value, such as an Industry Standard Child Pornography
13 Categorization or the name of the company that submitted the
14 Hash value to the list?
15     A.  I personally don't know.  Someone from my technical
16 team may, I could always inquire.  But I personally do not have
17 knowledge.
18     Q.  In investigating this case, did you ever make an
19 attempt to discover where the MD -- the PhotoDNA or the MD5 Hash
20 value originated from on this list?
21     A.  No.
22     Q.  Do you know whether or not your API populates the
23 predetermined Industry Standard Child Pornography Categorization
24 that is included in the database?
25     A.  No, that would have to be answered by our -- I would

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 90

1  almost said Biff -- Bip or someone from our technical team.
2      Q.   Okay.  I mean, based on these questions and this
3  information, would you agree with me that it would not be
4  reasonable to rely on a simple match in the NGO or Nonprofit
5  Hash Sharing List to support facts and circumstances of apparent
6  child pornography?
7      A.   No, I wouldn't.  I don't think that was an accurate
8  representation of what I would say, no.
9      Q.   What would you say?  Would you say that you feel
10  comfortable relying on a Hash match, MD, nonprofit, or NGO list
11  as a fact and circumstances -- as a fact and circumstance which
12  would support actual knowledge of an apparent violation of child
13  pornography laws?
14      A.   Our actual knowledge is based on our entire screening.
15  So if you're asking me about a portion of the screening, I won't
16  comment to that.
17           But I think that our entire process does meet the
18  requisite standard standards.  It's not done piecemeal for that
19  reason.
20      Q.   Well, so we learned a little bit about the content
21  from the October 29 Cyber Tip Report yesterday.  And that is,
22  you know, the S and M or the, you know, the ball gag image.
23           Do you recall that?
24      A.   Oh, yeah, I recall that.
25      Q.   So what we learned was, that is actually an image of

Page 91

1  an adult.
2      A.   Yes, which is why I've seen it.  I do not view any
3  child images, I only view ones that are adult.  So, yes, I'm
4  aware it's an adult.
5      Q.   And you looked at that image and immediately
6  understood that it was an adult?
7      A.   No.  No.  That I don't appreciate.
8      Q.   So what --
9      A.   What did I think when I saw the image?  Number one, I
10  thought -- initially I thought it could have been CSAM.  There's
11  no hair and she's laying flat, so her breasts are very, very
12  flat.
13           Looking closer, I could see that it was an adult, but
14  it was still questionable as to age.
15      Q.   Your initial impression was that it was like, maybe
16  age difficult or could be a minor, maybe not a minor?
17      A.   For the October one?  And that's the --
18      Q.   Correct?
19      A.   Correct.
20      Q.   I can tell you that the reason -- I believe the reason
21  that that image was actually on a list was because another
22  version of it had been altered and a child's face had been put
23  over that adult's face.
24           Do you have any knowledge of that?
25      A.   I have no knowledge of that at all.

Page 92

1      A.   Actually, NCMEC now categorizes that as an adult
2  image.  They don't believe that there's any, like, age difficult
3  nature of it.  Did you -- have you ever heard that, that NCMEC
4  has categorized it as an adult?
5      A.   No.
6      Q.   No?
7      A.   You're telling -- I'm taking your word for it.
8      Q.   Yeah, okay.
9      A.   But I mean, I'm happy because I've seen the image, I
10  don't look at child pornography.  So that confirms that I've
11  done the right thing.
12      Q.   Right.  But are you happy that you're forwarding
13  images of adults to NCMEC and then on to law enforcement
14  accusing at least Verizon's providers of possession of child
15  pornography?
16      A.   Mr. Roberts, have you seen the other image?
17           MR. REISS:  Object to the form of the question.
18  BY MR. ROBERTS:  (Resuming)
19      Q.   Let's not talk about the other image.  I want to talk
20  about -- we'll talk about that in a second.
21      A.   But you're asking me a generalization, so I --
22      Q.   Does it bother you?  Does it bother you that there are
23  adult images that your company has characterized as child
24  pornography?
25           MR. REISS:  Object to the form of the question.

Page 93

1           THE WITNESS:  Does it bother me?
2  BY MR. ROBERTS:  (Resuming)
3      Q.   Yeah.
4      A.   No.
5      Q.   No, it does not bother you?
6      A.   No.  I mean, I think it's unfortunate and nothing is
7  perfect and it's a consequence.  But no, it does not bother me.
8  People who do nothing wrong have nothing to hide.
9      Q.   So what -- as a consequence to what?
10      A.   What do you mean?
11      Q.   You said it's a consequence.  And I'm just asking --
12      A.   Oh, a consequence of nothing.  What I mean is, nothing
13  is perfect.  There will always be, you know, a flaw or an
14  exception to the rule.  We're all flawed.  So it's an
15  unfortunate consequence of scanning.
16      Q.   So there's just certain collateral damage that you are
17  willing to accept in this process?
18      A.   No, it's a risk benefit analysis, like much legal
19  decisions.  I wouldn't say it's collateral damage.
20      Q.   Okay.  All right.  Were you aware that some databases
21  include adult images, even though they don't include any CSAM?
22  Simply because of the fact that that image has been altered in
23  other ways, in other images?
24      A.   Okay.  You lost me on the last part.
25      Q.   Yeah.  So were you aware that images like this existed

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 94

1  in the database where they were just an adult, but the image was
2  there because in some circumstances that image had been
3  modified?
4      A.  I'm taking your word for it.  This is the first time
5  learning of it.
6      Q.  Okay.
7      A.  No.  It wouldn't surprise me, but no.
8      Q.  Okay.  Has there been any discussion or feedback on
9  the human review of this image, the October image?
10     A.  Between whom?
11     Q.  Synchronoss and Verizon or Synchronoss and WebPurify.
12     A.  We've had no discussions with WebPurify.  And I don't
13  think we've any specific discussions with Verizon about it,
14  except perhaps in connection with this litigation that it's
15  pending.
16     Q.  Well, let's talk a little bit about the human review
17  of the document, of this particular one.  In -- I think this is
18  Exhibit A, that this is a Synchronoss --
19     A.  Might be B.  Oh, shoot.  Usually I'm really good.
20  Thank you.
21     Q.  You indicated that this is a Synchronoss Technologies,
22  Inc.  legal process of service document.  But you did not
23  recognize this document?
24     A.  I did not know it was published on our website.  This
25  particular one I don't recognize.  I do know that we have a

Page 95

1  copyright 2001 -- 2021, I mean.  We do have a law enforcement
2  guide that gets sent to law enforcement officers when they
3  request information.  It's just, I don't believe --
4      Q.  And honestly, I don't know.  I mean, I -- it could
5  have been through the Internet.
6          Like, I don't -- you know, I mean, I'm not saying I
7  pulled it off of your website.  I just Googled, you know?
8      A.  Okay.  I don't know if this is the most recent.  We do
9  have one that we do produce to law enforcement.  That's a fair
10  assessment.  I don't think it's on our website, it could have
11  been found.  If it is, it is.
12          But I do not know if this is the most recent.  I'd
13  have to check with my technical team.
14     Q.  Is this, the -- does this accurately describe
15  Synchronoss's process?
16     A.  Give me a minute to read it.
17     Q.  Yeah, yeah, yeah.
18     A.  Take a look at it.
19     Q.  Yeah, yeah.
20     A.  It's an oversimplified version of it, but it is high
21  level accurate, yes.
22     Q.  Okay.  Yeah --
23     A.  I mean, there's things in here that are wrong.  Like a
24  Cyber Tip Report is not generated, cyber tip data feed is
25  generated.

Page 96

1          But general overview, it is correct.
2      Q.  Okay.  And so it says here, "All hits are placed in a
3  quarantine to the human review tool."  I think we've talked
4  about that?
5      A.  Yeah, that's quarantine.  That really should say, the
6  quarantine folder, but yes.
7      Q.  Okay.  "The images identified during Step 1 are put
8  through human review for confirmation that such image is
9  illicit."
10     A.  Okay.
11     Q.  Okay?
12     A.  I wouldn't have written that.  So let's not focus on
13  the words.
14     Q.  If it says, "If you have any questions, you may
15  contact Cara Blaszka."  So that's what we're doing right now.
16     A.  Well, yeah, and I'm telling you it's wrong.  Feel free
17  to ask.
18     Q.  That's an inaccurate description.  Tell me what --
19  make that accurate for me.
20     A.  It's not sent for confirmation, it's sent for review
21  for a determination of whether it is in fact a report of --
22  well, apparent -- I keep saying the term, but apparent CSAM.
23     Q.  And what is the definition of apparent CSAM?
24     A.  Or whom?  I think you asked me if I knew what
25  PhotoDNA's guidelines were before, I don't.

Page 97

1      Q.  No, no, no, no.  So I -- what I was going to ask you
2  is, what does confirmation that such an image is illicit mean?
3      A.  Yeah, I don't like that.  I would never write that.
4      Q.  So if you provided alternate language, which is review
5  to determine whether or not it is apparent CSAM.  And so I'm
6  asking you, what is your definition of apparent CSAM?
7      A.  It would be an image that could be categorized into
8  one of the four categories by NCMEC, prepubescent,
9  postpubescent, so it would be a minor.  And it depends on the
10  type of image.
11          If it's exhibition or if it's sexual in nature.  So
12  there has to be two factors.
13     Q.  And so how is that -- how is the age of the individual
14  confirmed through human review?
15     A.  Well, that's -- again, that's how -- that would be
16  PhotoDNA -- I'm sorry, strike that.
17          That would be WebPurify's guidelines.  But as I
18  testified before, I do know that some of the criteria includes
19  development.  And I mean development like sexual development,
20  maturity, things like that, breasts.
21     Q.  Yeah, and it has something like that, some sort of
22  that definition in the -- in the -- the agreement between
23  Synchronoss and NCMEC, I read?
24     A.  Right.
25     Q.  It has kind of like in general, puberty.  That

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 98

1   means -- do you recall that language?
2       A.   I recall their description of it, I don't recall
3   exactly.
4       Q.   Yeah, yeah.  But -- and I just want to be -- real
5   quick, you have no idea what WebPurify's definition of, apparent
6   child pornography is, do you?
7       A.   I don't -- their definition?  I think a definition
8   is -- is one thing.  What their criteria is, I do not.  I don't
9   know if they have a -- I don't know if they even define it or if
10  they just have criteria, and if it meets criteria, they click a
11  button.  They might not make an actual determination, just if
12  it's one, two, three, it moves on.  I don't know.  And I'm
13  speculating.
14          But I can't speak for that.
15      Q.   Okay.  I don't want you to speculate.  I just want you
16  to say the truth.  It sounds like you don't know what WebPurify
17  does.  Other than, it is put into the human review tool and that
18  they put in input after they do what they do?
19      A.   Yes.  Contractually, they have 48 hours to do what
20  they do and provide a response.  Yes, that is correct.
21      Q.   So I think you touched on this; it's WebPurify or
22  whoever -- have you ever heard of Web Further India, Web Further
23  Private Limited?
24      A.   The name may have come across my eyes.  It does sound
25  vaguely familiar, but I've never done business or anything with

Page 99

1   them.
2       Q.   Hyderabad, India?
3       A.   No, no, I recognize that as a name of a street, but I
4   don't recall.
5       Q.   Hyderabad, India is the name of a town.  I think it's
6   where WebPurify --
7       A.   No.
8       Q.   Yeah, I think it's where WebPurify subsidiaries do
9   their content review.  I don't -- I don't know that.  You don't
10  know that, do you, you don't know where they do it?
11      A.   I do not.
12      Q.   You don't know who's doing it?
13      A.   I know that WebPurify is doing it.
14      Q.   Well, I mean --
15      A.   I don't know if it's their employees or contractors,
16  but I know WebPurify is contracted to do it, yes.
17      Q.   Right.  Yeah.  All right.  So I want to go back to --
18  and then why don't we just drop -- did we ever put the Exhibit
19  B, which was, I think, the first Cyber Tip Report in the chat?
20          MR. REISS:  I think you did.
21          THE WITNESS:  I think so.
22  BY MR. ROBERTS:  (Resuming)
23      Q.   Okay.
24      A.   I think it was one of the first ones.  Like A and B
25  were put in at the same time.

Page 100

1       Q.   Right.  Okay.  So I'll share what's Exhibit B.
2       A.   Okay.
3       Q.   This is CyberTipline Report, 137877848.  I want to
4   talk about a couple of the pieces of information in here.
5          Do you see the received by NCMEC on 10/29/22?
6       A.   Yes.
7       Q.   Okay.  So I have confirmed, and I'm going to ask you,
8   do you have any reason to disagree with the statement that that
9   time is a timestamp provided by NCMEC when this information hits
10  their system?
11      A.   That's my understanding.  I have nothing to say
12  otherwise.
13      Q.   Okay.  Now, the incident time -- let's just go back up
14  here real quick.
15          MR. REISS:  This is not the same document that you
16  marked as B.  I think it is, isn't it?
17          MR. ROBERTS:  The CyberTipline Report, was it C or B?
18          MR. REISS:  I think it was B, but -- but this is B?
19          MR. ROBERTS:  Yeah, I mean, I think this is the
20  October -- the October.
21          MR. REISS:  I thought I heard you referred to it by a
22  different letter.
23          MR. ROBERTS:  No, I think this is B.  I think this is
24  CyberTipline D.
25          MR. REISS:  Okay.

Page 101

1   BY MR. ROBERTS:  (Resuming)
2       Q.   Okay.  So just for the record, the incident -- I mean,
3   sorry, the report time is 21:28:58 on October 29th?
4       A.   UTC, yes.
5       Q.   UTC.  And the incident information and the incident
6   time, this is provided -- this is information that is provided
7   by Synchronoss, correct?
8       A.   I would think it comes from our data feed, correct.
9       Q.   Yeah.  It's the exact same time as the report time,
10  would you agree?
11      A.   Yes.
12      Q.   Will you agree that this time is in no way -- this
13  incident time is in no way connected to any conduct of Mr.
14  Lawshe?
15      A.   I would not say that at all, no.  That's a -- that's a
16  very broad extrapolation.
17      Q.   Okay.
18      A.   And I would say the other way, but yes, this does
19  have -- from the direct actions of Mr. Lawshe.
20      Q.   Okay.  So let me just ask:  Is it -- this is the same
21  time as the report time.  Is that the policy of Synchronoss is
22  that, the incident time match the report time?
23      A.   No.  No.  I think there's a little bit of a confusion
24  here.  So the incident time is when we report it to NCMEC.
25          So as I described our whole process for and how it

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 102

1  takes 24 hours, you know.  About how WebPurify has 24 hours to
2  view and make a determination of the image.  The image is not
3  considered actual -- or, I mean, sorry.  Suspected or apparent
4  CSAM until it's human reviewed.  So technically, the WebPurify
5  determination is our incident time.  And it's the first time
6  Synchronoss has determined its apparent CSAM and it gets sent
7  off to NCMEC.
8       Now, that is for purposes of reporting to NCMEC.
9  There's other data that we maintain that shows other timing.
10       Q.   There's actually -- and I confirmed this with NCMEC,
11  there's actually other fields that you can clarify incident time
12  information in a Cyber Tip Report, are you aware of that?
13       A.   No.
14       Q.   You didn't provide any of that additional information
15  to NCMEC at the time of the report, did you?
16       A.   I would say no, but I'd have to see our data feed to
17  see what from the data feed NCMEC took from.  But I would think
18  no.
19       Q.   I asked if this is a policy, and then you answered my
20  question, and then it seems like it is the policy that at the
21  point in which Synchronoss or WebPurify makes the decision, this
22  is reportable content.  That is the definition of the incident
23  time as far as Synchronoss is concerned?
24       A.   No, that's not.  No, it's not the incident time as far
25  as Synchronoss is concerned.  It's the incident time as far as

Page 103

1  NCMEC is concerned and reporting.  On the back end we have other
2  information that we can pull that doesn't get sent directly to
3  NCMEC.
4       This is only the, you know, the result of the
5  scanning.  I believe there was a first part to your question
6  that I don't recall, but maybe there wasn't.  I feel like I
7  missed something.
8       Q.   Let me ask you in this way:  Are all reports, do they
9  have an identical incident time as to the report time?
10       A.   I don't see reports, but I would think yes.  And I do
11  know what I was going to say.  You keep referring to a policy, I
12  think it's more practice.  A policy implies that it's
13  documented, written down.  I think it's more of a practice.
14       Q.   Well --
15       A.   Policy means a lot in the corporate world.
16       Q.   And I hear what you're saying, but someone has created
17  a program, and in that code, they have made a conscious decision
18  to fill this information block with a particular time, correct?
19       A.   I would think, yes.  I don't know actually.  I don't
20  know.
21       Q.   Well, it's not an accident that the time is the exact
22  same as the report time, is it?
23       A.   I don't know how NCMEC generates that.  I would have
24  to see our data feed to see if we have a specific incident time
25  or if NCMEC takes the incident time as the report time.  I don't

Page 104

1  know which comes first, the chicken or the egg.
2       Q.   Well, earlier in your testimony, you said that
3  Synchronoss defines the incident time as the time in which they
4  determine that a report should be sent.
5       A.   Our process stuff, that's how our process works.  And
6  our process is guided by Verizon.
7       Q.   Right.  And so your process or your practice is to
8  report the incident time as the time in which you made the
9  decision -- Synchronoss made the decision to report the content?
10       A.   I don't know.  I would have to see our data feed to
11  see what our data feed said.
12       Our data feed is different than the -- the synthesized
13  information from NCMEC.  I don't know whether we made that or
14  they just put an incident time, the time they received it.  I
15  can't answer that.
16       Q.   So you don't know if this is the information that you
17  provided or that NCMEC provided?
18       A.   No, but the data feed that I will produce in discovery
19  has all the information that we provided.  Some of it -- most --
20  a lot of this is not provided by -- I shouldn't say a lot.  But
21  there are portions of this not provided by Synchronoss.
22       Q.   Sure.
23       A.   And I don't know if that field was completed by us or
24  completed by NCMEC.  I don't know.  I'd have to see our field --
25  our feed.

Page 105

1       Q.   Yesterday, NCMEC's corporate representative testified
2  that they were aware of incorrect incident times being reported
3  by electronic service providers and had provided feedback to
4  electronic service providers regarding accurate incident times.
5       Do you ever recall receiving feedback from NCMEC
6  regarding accurate information and specifically with incident
7  times?
8       A.   No.  No.  Never came through me.  And I don't -- I
9  don't know if it came to my team.
10       THE COURT REPORTER:  May the court reporter interrupt.
11  Mr. Roberts, can we go off the record real quick
12  please?
13       MR. ROBERTS:  Sure.
14       THE COURT REPORTER:  Thank you.
15       MR. ROBERTS:  We could probably take a break too.
16  We've been going for a while.
17       THE COURT REPORTER:  Okay.
18       MR. ROBERTS:  Do you want to take a -- does everyone
19  want to take 10 or 15 or longer?
20       MR. REISS:  That'd be fine with me.  And I'm certainly
21  not going to hold you to this, Michael, but do you have any
22  idea of what our schedule is today?
23       MR. ROBERTS:  I think I said it for four hours, but I
24  mean, you know, I don't think I have too terribly much
25  longer.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

1    MR. REISS: Okay. That's fine. No, I'm -- I'm just
2  trying to get some idea.
3        MS. SIEKKINEN: Yeah, I'm trying to see if we can be
4  done before three when my son gets home, that'd be
5  fantastic.
6        MR. ROBERTS: Oh yeah.
7        MS. SIEKKINEN: Then all hell breaks loose.
8        MR. ROBERTS: Absolutely.
9        THE VIDEOGRAPHER: Is it okay for me to get us off?
10        MR. ROBERTS: Yes.
11        THE WITNESS: How long are we taking a break for?
12        MS. SIEKKINEN: Can we go to 12:10?
13        MR. ROBERTS: Okay. That's fine. Yeah, yeah, yeah.
14  Or we could go to -- yeah.
15        THE VIDEOGRAPHER: Please, everyone, one moment
16  please. Off the record, 11:56 a.m.
17        THE VIDEOGRAPHER: On the record at 12:24 p.m.
18  BY MR. ROBERTS: (Resuming)
19    Q.   Okay. So we were talking earlier and you said that
20  Synchronoss has other information regarding incident times or
21  timing of certain events.
22        What information does Synchronoss have?
23    A.   We can produce logs. They're spreadsheets of when the
24  image was -- how do you put it? Not really ingested, when it
25  was sent to upload to the Verizon cloud.

1    Q.   Right.
2    A.   So that's not actually uploaded because it gets
3  intercepted, but we do have the time it was set to upload.
4    Q.   Okay. What other information?
5    A.   Oh, goodness.
6    Q.   Let me ask you this: Do you have the information on,
7  like, when it was put into the human review tool?
8    A.   I know I produce documents to my counsel in response
9  to the document requests. I do know one of those documents has
10  the timing, I don't recall exactly which fields I have, but I
11  do.
12    Q.   Okay?
13    A.   And there are documents responsive in our production.
14    Q.   In your Answers to Interrogatories, you put a very
15  specific time about when you thought the review took place?
16    A.   That would be very helpful to show me. Thank you.
17    Q.   Yeah. I'm not going to ask you about the time. My
18  question is going to be, like, where did you get that from? But
19  I'll show you the -- I don't know that we marked these as an
20  exhibit.
21        Does anyone know whether or not we marked the Answers
22  to Interrogatories as an exhibit? I think I did.
23    A.   I don't think you did. I don't.
24    Q.   Thank you. You don't think I did?
25        MS. SIEKKINEN: I believe one of the documents you

1  presented was missing -- did not get marked. I can't
2  recall if it was this or if it was the reconsideration
3  motion. I can't recall which one. But one of them I don't
4  think was marked.
5        MR. ROBERTS: Let's call this H (Sic), because I think
6  G was the e-mail's; is that right? I think so.
7        THE COURT REPORTER: Yes. Yes. E-mail was E (Sic),
8  yes, sir.
9        (Whereupon Plaintiff Exhibit Number G was marked for
10  identification.)
11        MR. ROBERTS: Okay. All right.
12  BY MR. ROBERTS: (Resuming)
13    Q.   So, here -- October -- so the question is, "When did
14  the review occur? Please state date and time with specificity."
15  The answer, which I appreciate your answer, "Upon information
16  and belief, on or about October 29, 2022, at 2:06 UTC?"
17        I'm assuming that came from some sort of data
18  document?
19    A.   Yes, I -- well, I obtained it from my team who pulled
20  the data from the database. Which could be from the logs. I
21  can find the name of the specific person I asked, I don't recall
22  which one right now.
23        But it was definitely someone on the technical side of
24  things that pulled that data for me.
25    Q.   And do you know whether or not that's when it was the

1  content or the notification was sent to WebPurify, or when you
2  got something back from WebPurify? And again, if you don't
3  know, you can just say, I don't know?
4    A.   I do know. I have a document that tells me to refresh
5  my recollection, and I don't know where I put it. So I don't
6  remember right now, but I don't know if I have permission to
7  look it up.
8        But if I do, I can tell you.
9    Q.   Well, I'm sure that -- will it be evident in the
10  document that you're referring to?
11    A.   It will help refresh my recollection.
12    Q.   Yeah. What document are you referring to?
13    A.   I'm referring to my own internal notes, the work
14  product. It's just for my own recollection.
15    Q.   Oh?
16    A.   I just want to refresh myself so I can actually answer
17  your question, because I can. Not trying to be difficult,
18  just --
19    Q.   I mean, if you need to look at something to refresh
20  your recollection, that's okay with me?
21    A.   All right. Just give me one second to find it, and I
22  will --
23        MR. REISS: Yeah. Just as long as we understand that
24  just by her looking at it doesn't necessarily mean we're
25  gonna -- it's gonna be produced.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

1  THE WITNESS:  I'm not producing it.  I wanna make that
2  very clear, it is work product.
3  MR. REISS:  Otherwise, she'll just have to say she
4  doesn't know and we'll move on.
5  THE WITNESS:  Are we stipulated on that?
6  MR. ROBERTS:  Well, I'm not gonna stipulate
7  anything --
8  THE WITNESS:  I mean, I'm gonna say I don't know then
9  because I'm not producing that document.
10 BY MR. ROBERTS:  (Resuming)
11  Q.  Have you been reviewing -- have you been referring to
12 a document throughout the deposition?
13  A.  No, I've been referring to nothing except what you
14 showed to me.
15  Q.  All right.  Okay.  So you just -- if you don't know
16 the -- if you don't know the answer to my question, then just --
17  A.  I don't remember.
18  Q.  Okay.  All right.  Then go back to our -- okay.  I'm
19 going to share and I -- what we -- the Cyber Tip Report from
20 October has been marked as an exhibit.  And go back to where we
21 were talking about this document.
22  This is in the Section A, and it's entitled, reported
23 information.  My understanding is in Section A is information
24 that was reported by Synchronoss; is that your understanding?
25  A.  Yes, from what I see so far, yes.

1  Q.  Okay?
2  A.  And that's my understanding, too.  I mean, I think
3  there's that -- above incident information, there's, I think,
4  canned language that they put in relating to us and Verizon that
5  goes into every cyber tip.
6  So that's not specific to this one, but yes, the other
7  information would be from our data feed.
8  Q.  Okay.  And so there's a file name here that would have
9  been information provided by Synchronoss?
10  A.  Yes.
11  Q.  There's an MD5 Hash value?
12  A.  Yes.
13  Q.  Was that provided by Synchronoss?
14  A.  Yes.
15  Q.  Does that give you any information that this image was
16 flagged as an MD5 Hash match?
17  A.  Yes, that does.  Thank you.  That refreshes my spin
18 around on which kind of Hash it was.
19  Q.  Okay.  We've talked a little bit about, did the
20 reporting ESP view the entire content of the uploaded file?  The
21 answer is yes.  You testified that that is based on input from
22 WebPurify?
23  A.  Yes, that is correct.
24  Q.  Were entire contents of uploaded file publicly
25 available?  The input here is no.  What does that mean?

1  A.  I don't know.  That is always no on the cyber tips I
2  have seen.  It's not applicable to our business.  It might be
3  more for like a social media posting type provider.
4  Q.  So you think that it's always no on your reports?
5  A.  I don't recall.  But from what I've seen -- again, I
6  only see a handful of reports.  I'm pretty sure it's no, I don't
7  know in what circumstance any of that would be yes.
8  Let's put it that way.
9  Q.  Do you really know what this field is seeking, the
10 information that it's seeking?
11  A.  Yes, it says what it's seeking.  Are they publicly
12 available and no.  Because we're talking about a personal cloud.
13 This is not -- that's why it's a little bit different than other
14 providers.
15  Q.  So, I mean, I can tell you that both of these, the
16 entire contents of both of these files were available publicly
17 on the public internet?
18  A.  They were.  I mean, this document -- are we only
19 talking about the image or the data feed?  Because I thought we
20 were talking about both.
21  Q.  Well, I --
22  A.  Because our package is the whole thing.
23  Q.  Hold on one second.  I want to get your understanding
24 of what this question means and what Synchronoss meant by the
25 answer, no.  And I thought I understood you to say, you're not

1  really sure what this field is trying to elicit.
2  But then I got a little bit different answer.  So I'm
3  going to ask you again, what is your position that this field
4  indicates or is intended to communicate to NCMEC?
5  A.  You'll have to ask NCMEC, it's their field.  I don't
6  know.
7  Q.  Okay.  All right.  Do you understand, though, that the
8  contents, the contents which were transmitted, the content that
9  was flagged in both instances, those files, they were downloaded
10 from the public internet?
11  A.  I have no knowledge of that.
12  Q.  Okay.  Do you know -- one of the images, I think both
13 of the images had a www.com website listed on the image?
14  A.  Is that a question or a statement.
15  Q.  Yeah, it's a question?
16  A.  I have no knowledge.
17  Q.  You've reviewed these images.  Do you remember seeing
18 a website listed on them?
19  A.  I don't recall seeing the website on them.
20  Q.  Okay.  All right?
21  A.  It doesn't mean it wasn't there, I just don't recall.
22 I wasn't focusing on the website.
23  Q.  I understand.  This image categorization, do you
24 know -- and I'm asking for your knowledge, and this may be a
25 technical question.  Is this categorization derived from the

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025

Page 114

1  database information that we previously talked about in Exhibit
2  A to the Synchronoss NCMEC contract, or is this a categorization
3  that is generated by WebPurify?
4      A.   The category -- okay.  The categories are established
5  by NCMEC.  The assignment of what category the particular image
6  is, is -- you know, input by WebPurify.
7      Q.   Okay.  But you understand that at least for some
8  images that categorization is included in the NCMEC NPO or NGO
9  database?
10     A.   You represented that, I do not know that.  I have no
11 knowledge of that.
12     Q.   Well, I didn't represent that.  The contract between
13 Synchronoss and NCMEC recognizes that?
14     A.   But you're asking in reality if it's on there, I do
15 not know.  I have not seen the list, I have to ask my technical.
16     Q.   And that's what I'm asking you.  From a technical
17 standpoint, do you know, is that B1 from WebPurify or is it
18 something that is populated from the match?
19     A.   My --
20     Q.   In other words, is that queried in the API?
21     A.   I do not believe it is, but I would have to check with
22 my technical team.  It is my understanding that WebPurify
23 categorize it.
24     Q.   Okay?
25     A.   I have to verify with my technical team and I could.

Page 115

1      Q.   Okay.  So you indicated that Synchronoss maintained a
2  blocked Hash or image list of images that they've determined
3  that won't be -- won't be reported on?
4           Did I understand that correctly?
5      A.   Yes, we have a Hash List.  We don't know what the
6  images are, we don't see them.  Only WebPurify sees them.  So we
7  have a Hash List that -- again, that I can't speak to how it
8  works, but I do know that we are notified when there are false
9  positives.
10          And we do maintain -- I believe we call it a block
11 list of those that have had a certain number of false positives.
12     Q.   Does Synchronoss have any sort of ability to
13 investigate the content that is reported or is going to report
14 to NCMEC from Verizon customers content?
15     A.   I don't think I'm following the question.
16     Q.   Yeah, so, for example, as you -- in the -- probably in
17 the allegations, understand that at some point after my client
18 was arrested, his team conducted an investigation into this
19 conduct.  And part of that included just contacting the website
20 where the image came from and obtaining age verification law
21 that's maintained by the website pursuant to federal law.
22 Copies of passports and dates of photographs, that sort of
23 information.  We conducted that investigation.  The results show
24 that the model was an adult.  We forwarded that to law
25 enforcement.

Page 116

1      Q.   Were you aware of that -- those allegations?
2      A.   The allegations in the complaint, yes.
3      Q.   Yes.  Yes.  And you're aware that, like that that was
4  part of the allegations, that there was an investigation and we
5  contacted the website?
6      A.   I mean, it was in your complaint.
7      Q.   Yeah?
8      A.   I'll take your word for it.  I do not have knowledge
9  of it.
10     Q.   Does Synchronoss have any sort of personnel or
11 investigative team that does that?  You know, when there's a
12 close call or there's some sort of question where, hey, let's
13 look into it and let's actually try to confirm or like figure
14 out what's going on here?
15     A.   Well, now you're getting into statutory restrictions
16 that we have.  We are only permitted to report to NCMEC and
17 NCMEC takes it from there.  We have no -- we don't go into
18 anyone's account, we don't look at these images.  The only
19 person that looks at the images is through the flow, through
20 WebPurify.
21          So there is nothing outside of our flow that touches
22 any of the illicit content because of the nature of the
23 screening and the way it has to proceed for chain of custody
24 purposes.
25          So, no, we do not have anyone to investigate.

Page 117

1      Q.   But you're not suggesting that Synchronoss couldn't
2  have an actual employee review the content, are you?
3      A.   I am saying that.  A user's content.
4      Q.   Yes?
5      A.   I am saying that, we can't go into a user's account.
6  There's the Stored Communications Act.
7      Q.   Well, you did in this case?
8      A.   Well, no, we ingested it on upload and our Verizon ULA
9  permits the scanning and actually says that we would report to
10 the National Center of Missing and Exploited Children.  Wait,
11 that's on upload, that's not in our user's repository.
12          Those are two very different things.
13     Q.   Well, that's what I'm talking about is, you're not
14 suggesting that Synchronoss cannot view the content that's
15 quarantined?
16     A.   Yes, I am suggesting.  I'm not suggesting it, I am
17 saying it.  In order to view --
18     Q.   Don't --
19     A.   Wait.  In order to view CSAM or potential CSAM, there
20 are very, very stringent limitations around it.
21          First of all, by law and by contract, we are limited
22 to the very strict number of people who could actually view any
23 images.  Synchronoss has no people who view images whether
24 they're questionable or not, because there's also a level of
25 counseling and certain support services for people who view

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 118

1  images like that. We are not equipped for that.
2       Verizon has not asked us to do that, so we do not.
3  Could we, I don't know. We only act at the direction of
4  Verizon.
5       Q.   Yeah.  You started your answer by saying that the
6  statute prohibits you from looking at the content that we're
7  talking about.  And it certainly does not prohibit you acting on
8  behalf of Verizon to review the content flagged in a CSAM Hash
9  List, does it?
10      A.   Okay.  You're conflating two things.  The content of a
11 user's account --
12      Q.   I'm --
13      A.   Let me explain.  The content of a user's account and
14 the quarantine are two different things.
15           Now, Verizon has chosen to contract with WebPurify to
16 view the image.  Without Verizon's direction or approval, no, no
17 one at Synchronoss could do it.  So could we, maybe, but not
18 without further direction from our customer.
19      Q.   Sure.  But that's Verizon's decision, that's not a
20 statutory prohibition?
21      A.   I was just discussing going into the user's
22 repository, which is a statutory prohibition.
23      Q.   Yeah.  And my question was actually, I think, directed
24 towards quarantined images?
25      A.   There is -- there are statutory limitations on those

Page 119

1  as well.  Only people with the need to know to view them can
2  view them.  There are limitations, and I recommend you check the
3  statute on that, because they're in there.
4       Q.   No, I have, and I certainly get the tone.  But
5  WebPurify looks at the images, right?
6       A.   Yeah.
7       Q.   And that's not a violation of the law?
8       A.   No, because it's part of the process.
9       Q.   Right.  And you're part of the process, too.  So
10 there's nothing that would prevent Synchronoss from reviewing
11 the images themselves inhouse if Verizon directed you to do
12 that?
13      A.   If Verizon directed us to do that, we could look into
14 that, that is correct.
15      Q.   Sure.  Okay.  Yeah.  I mean, you keep talking about
16 statutes and prohibitions, but --
17      A.   And you keep trying -- you keep trying to corner me
18 into what -- excuse me.  You keep trying again to corner me into
19 something that's not accurate.
20           So I'm just being extra cautious based on your
21 demeanor earlier in this deposition.
22      Q.   Are you talking about when you -- when you -- when
23 you --
24      A.   When you told me a liar on the record, yes.
25      Q.   No, and I'm not --

Page 120

1       A.   Yeah, that's what I'm talking about, Mr. Roberts.
2       Q.   Did you offer false testimony --
3       A.   No.
4       Q.   -- during this deposition?
5       A.   Mr. Roberts --
6       Q.   Okay?
7       A.   --  you are treading on very thin ground here.  You
8  understand that I --
9       Q.   How am I --
10      A.   Excuse me, you called me a liar on the record after I
11 hung up.  That is going to be reported to the Florida Bar.
12 Thank you very much.  I am a member of the New Jersey Bar, and I
13 am dreadfully offended at your unprofessionalism.
14           I will continue this deposition, but again, I ask that
15 you show professionalism, which seems to be difficult.
16      Q.   I repeatedly ask you --
17      A.   You asked me if I was a liar.  How dare you.
18      Q.   Yeah.  And I repeatedly asked you if you were aware
19 that other NGO's or organizations contributed to the NCMEC Hash
20 sharing --
21      A.   That's been answered, Mr. Roberts.  I'm not
22 entertaining these questions anymore.  You can file a motion.
23 Asked and answered.  Done.
24      Q.   So, are you making objections on behalf of yourself?
25      A.   Yes.  I'm representing myself personally.  Mr. Reiss

Page 121

1  represents my company.  I am now protecting my license and my
2  rights because you are accusing me of unethical behavior as a
3  liar, and I do not appreciate that.
4       Q.   Will you at least acknowledge that you gave me
5  inaccurate answers?
6       A.   No.  I will acknowledge that you had information that
7  you intentionally withheld and did not tell me, and then asked
8  me a question expecting me to answer one way to later get me on
9  it another way.  That is unethical, unprofessional, and will not
10 be tolerated.  I did not know that these images were on the IWF
11 and/or CyberTip Canada -- do not give me that look -- the
12 CyberTip Canada list.
13           You did, and you withheld that information.  That is
14 unethical.  You asked me to testify a certain way about the NGO
15 list, which I did -- do not look confused, Mr. Roberts, you know
16 darn well what you did.
17      Q.   When you originally started this deposition you denied
18 knowing anything about the IWF or Canada --
19      A.   Yeah, because we didn't subscribe to them.  I will tell
20 Mr. Roberts, you are treading on very thin ground.  I will tell
21 you right now.  This deposition transcript will be presented to
22 the Florida Bar.  How dare you.  And I understand you're
23 familiar with the Florida Bar.
24      Q.   I am?
25      A.   Yes.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 122

```
1       Q.   Thank you.  Thank you.  So, will you continue to
2  answer questions in this deposition?
3       A.   If they are fair and professional, yes.
4       Q.   Okay.  The -- let's move on to the next deposition --
5  not the deposition.  Have you been deposed as the corporate
6  representative of Synchronoss before?
7       A.   Oh, yes.  Many, many times.  Deposed and testified.
8       Q.   Have you ever testified about what organizations make
9  up the NGO Hash Sharing List?
10       A.   Asked and answered.  I'm not answering any more
11  questions on the NGO list, Mr. Roberts.  We've established that.
12       Q.   I'm just asking you if you've ever provided testimony
13  in another case?
14       A.   I understand what you're asking, and I'm refusing to
15  answer that question.
16            MR. REISS:  Okay.  Cara.
17            THE WITNESS:  No, I haven't actually never been asked.
18            MR. REISS:  Go ahead and answer the questions.  If
19       there are objections to make, I'll -- I'll be happy to make
20       them.  Okay?
21            THE WITNESS:  Thank you.
22            MR. REISS:  Okay.
23            THE WITNESS:  I have not -- not that topic, no.
24  BY MR. ROBERTS:  (Resuming)
25       Q.   Okay.  Let's go -- it's -- what exhibit are we at?
```

Page 123

```
1       A.   I think we have H, maybe I.
2       Q.   Yeah.  Let's share this.  This is the Cyber Tip
3  Report.
4            (Whereupon Plaintiff Exhibit Number H was marked for
5       identification.)
6       A.   The other.
7       Q.   Yeah.  Just --
8       A.   Can you make it a little larger for the visually
9  impaired.
10       Q.   I will.  Now, I just -- this is the Cyber Tip Report
11  that resulted in my client's arrest and wrongful prosecution.
12  You've gotten upset today because I've suggested that you've
13  been untruthful to me in some of your answers, haven't you?
14       A.   I've gotten upset today because I expected a higher
15  level of professionalism, and I don't -- I have never, in my 20
16  years of practicing, been openly called a liar on the record.
17  That is why I got upset.
18            My testimony is as clear and as truthful as can be.
19  What I'm upset about is the way I've been treated.
20       Q.   Okay?
21       A.   So let's not classify why I'm upset.
22       Q.   Do you -- do you agree that being called a pedophile
23  is a catastrophic accusation in today's world?
24            MR. REISS:  Object to the form of the question.
25            THE WITNESS:  I don't know what you mean by
```

Page 124

```
1  catastrophic.
2  BY MR. ROBERTS:  (Resuming)
3       Q.   Yes.  Irreparable?
4       A.   I wouldn't say that, no.
5       Q.   Have you tried to imagine the emotional distress, the
6  financial difficulty that my client has gone through because of
7  his CyberTipline Report?
8            MR. REISS:  Object to the form of the question.
9            THE WITNESS:  That's not in the nature of my job, no.
10  BY MR. ROBERTS:  (Resuming)
11       Q.   So you haven't given a thought to Synchronoss's
12  actions and their consequences on Mr. Lawshe?
13            MR. REISS:  Same objection.
14            THE WITNESS:  Sir, I do my job.  I -- I don't look at
15       my job from a personal perspective.  If I did, I wouldn't
16       be able to do this kind of work.
17            So I do my job.  I have not thought about that, no.
18  BY MR. ROBERTS:  (Resuming)
19       Q.   I asked you whether or not this content has been
20  placed on your block list?
21            Do you recall those questions?
22       A.   Yes, I don't know.
23       Q.   And you don't know?
24       A.   No.
25       Q.   So do you have any concerns about whether or not a
```

Page 125

```
1  same or similar thing may happen to another person in the
2  future?
3            MR. REISS:  Object to the form of the question.
4            THE WITNESS:  I don't -- again, I don't know if it's
5       on the list, so I don't have a concern either way.
6  BY MR. ROBERTS:  (Resuming)
7       Q.   Well, you're in --
8       A.   If I knew it wasn't on the list -- I'm not in charge
9  of the list.  If I knew it wasn't on the list, then maybe I
10  would be concerned, but I don't -- I don't know.
11       Q.   But I mean, you -- you are the senior legal officer,
12  you are the director of this program, are you not?
13       A.   I'm the overseer of the law enforcement portion of the
14  program, that is correct.
15       Q.   And your testimony today is that, you're unsure
16  whether or not the content that's the subject of this lawsuit is
17  still being reported by Synchronoss to NCMEC?
18       A.   That's not my testimony.  That wasn't the question.
19  The question was whether it was on the block list.  I said I
20  don't know if it's on the block list.
21       Q.   But do you know whether or not if this content matched
22  again in the Synchronoss system, whether or not that would
23  generate a report to NCMEC?
24       A.   I don't know.
25       Q.   And why haven't you -- why haven't you made any
```

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

---

**Page 126**

1  investigation into whether or not that's the case?
2      A.  This is an ongoing litigation.  If there's a judicial
3  determination at the end, we can certainly look into it, but
4  it's not part of our standard practice.
5      Q.  So we'll start here.  This is CyberTipline Report
6  153739160.  Again, it has a incident time of -- date and time of
7  1-25-2023 21:18:12 UTC.  I want to go to again, Section A.
8  Again, Section A is the information that Synchronoss provided to
9  NCMEC, that's your understanding?
10     A.  Yes.  Most of it, yes.  Like I said, the canned
11 language above incident information.  But that's been provided,
12 it's just not cyber tip specific it's not all cyber's.
13     Q.  And so again, we have the incident time, which is the
14 identical time to the report time.  Is that because that is
15 the -- the practice of Synchronoss?
16     A.  Yes, that's the practice -- wait, I shouldn't say
17 that.  That's the practice of NCMEC.
18         Again, I'd have to see what our data feed says, but I
19 would assume the data feed was sent on that exact time.
20     Q.  You don't -- are you saying you're not sure if this
21 was information that was provided by Synchronoss or not?
22     A.  What I'm saying is, I don't know if we call it
23 incident time or is merely just the time that NCMEC received the
24 data feed.  Without looking at the data feed, I couldn't say,
25 what we say that time is, if that's the human review time.  If

---

**Page 127**

1  we say that's just the time that we're reporting.
2          So, yes, we reported that time, but I don't know if we
3  classified it as an incident time or if that was from NCMEC.
4      Q.  But what it is not is the time of the upload?
5      A.  That is correct, it is not.
6      Q.  And Synchronoss has the time of the upload?
7      A.  Yes.  We can pull that information, correct, and we
8  have.
9      Q.  Why wouldn't that be included as the incident time?
10     A.  That I can't discuss, again.  We follow a Verizon
11 process.
12     Q.  So Verizon directs that that's the incident time?
13     A.  I don't know.  I know that our feed -- the data that's
14 in our feed is what Verizon tells us to produce.  So if it says
15 incident time in the data feed, then that came from Verizon.  If
16 it doesn't, and it's nearly the time that the report or the feed
17 was sent.  I don't know.  That's what I'm trying to say.
18         I'm not trying to be difficult, but without seeing
19 that document, I don't know what originated, how we classified
20 that date and time.
21     Q.  Okay.  Do you know or have you -- have you been --
22 have you researched, like, any of the -- have you looked at the
23 arrest and booking report in this case?
24     A.  No.
25     Q.  Have you looked at any news articles in this case?

---

**Page 128**

1      A.  No.  I believe there was one -- only one very early on
2  when the case started.
3      Q.  You mean, like -- I think when we --
4      A.  When we were -- when we were served with this
5  complaint, we -- I probably Googled it.  I do recall seeing it,
6  but not at the time.
7      Q.  Well, I'm referring to news articles regarding the
8  arrest of Mr. Lawshe.
9      A.  I did, but not until after this lawsuit was filed.
10     Q.  Okay.  Did you notice in there that law enforcement
11 utilized the incident time provided by Synchronoss in this
12 report in order to establish probable cause?
13     A.  Oh, I haven't seen the criminal records and anything
14 synthesized by the media, I don't think it had that information.
15 I don't know.  I know nothing about the -- any criminal case
16 except that we produce pursuant to respond.
17     Q.  If -- if an officer would use the incident time on
18 this Cyber Tip Report or any Cyber Tip Report from Synchronoss
19 to establish control and possession of the device at the time of
20 the upload, that would be an incorrect incident time to use.
21         MR. REISS:  I'm going to object to this one.
22 BY MR. ROBERTS:  (Resuming)
23     Q.  You can answer.
24     A.  I'm not sure.  I mean, I see where you're going.  It
25 kind of falls -- I don't know.  I would -- that's not the time

---

**Page 129**

1  of upload.  That's all I can say.  I can't speak as for what
2  legal requirements they need to make in order to make their
3  probable cause.
4          But I can say that is not the time of uploading.
5      Q.  Okay.  I'm not going to re ask these same questions
6  because I think they're fairly -- you know, are the questions I
7  asked about the earlier exhibits -- I'll just do it, I guess.
8  File name, this is -- this is information that you guys provided
9  to NCMEC?
10     A.  Yes.
11     Q.  The MD5 Hash value that indicates that this was a Hash
12 match, an MD5 Hash match, not a PhotoDNA Signature match?
13     A.  I wouldn't say that.  I don't know.  I think we have a
14 Hash value, I believe for all of them.  I don't know for sure,
15 but that does not sound right to me.
16     Q.  So it could have been a PhotoDNA or an MD5 Hash match?
17     A.  Yes.  A direct match or near match.
18     Q.  Okay.  The information regarding -- did the reporting
19 ESP view the entire contents of the uploaded file?  Again, that
20 input is by WebPurify?
21     A.  I shouldn't say it's by WebPurify or it's by us
22 because we use WebPurify.  I know you asked me that earlier and
23 I want to clarify that.  All of our images are viewed, so that's
24 always yes.  I don't know if we just automatically have it hard
25 coded as yes or it's from WebPurify.

---

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025

1     But the classification, my understanding is definitely
2  from WebPurify.
3     Q.  So if we get into the technical data that yes may be
4  just programmed in there to populate yes because of the policy?
5     A.  No, no, no, no, no, no.  We would not make a
6  misrepresentation.  All of our images --
7     Q.  Explain yourself again because I did not understand
8  your answer when you were trying to clarify.
9     A.  So all of our images are viewed.  So if -- there's two
10  ways of doing things.  Either I can say yes every single time I
11  send a data feed, which we may.  In fact, I think it may be on
12  there.  Or we could just have it as part of our company
13  information, much like above, where above where it said infinite
14  time, you know, that cans language.
15     It could just be part of what's routinely put into our
16  reports.  I believe that we have a field that has the click box
17  in our data feed, I'm 90 percent sure of that.  So now that I'm
18  thinking about it, I'm confident that came from us in our
19  data feed in connection with WebPurify.
20     Because don't forget, the feed goes through WebPurify,
21  they hit a button and it gets sent out.
22     Q.  And I guess that's -- my question is, does Synchronoss
23  indicate yes or does WebPurify indicate yes?
24     A.  Synchronoss.
25     Q.  So you think that that is an input from Synchronoss?

1     A.  I think it's in our data sheet.  Again, I wish -- what
2  I'm trying to say is, in the data feed that I'm producing in
3  discovery.
4     So it's difficult for me to testify.  I don't know.  I
5  have to look at it, and you don't have it yet, so we can't
6  really look at it.
7     So I don't know.
8     Q.  Okay.  All right.  The image categorization, you
9  believe that that's not just in the data feed from the Hash --
10  the NGO Hash database.  You believe that that's input by
11  WebPurify?
12     A.  That's my understanding.  That's correct.  But that
13  would have to be verified with the WebPurify contract.  It's
14  with Verizon.
15     Q.  Okay.  So, I mean, is it a fair statement that really
16  the determining factor of whether or not a report gets sent is
17  the input made by WebPurify?
18     A.  No.  No.  I think it's the whole process.  I look at
19  the process as a whole.  I don't look at any piece of it as a --
20  as a deciding factor.  The process as a whole.
21     Q.  Let me just give you a hypothetical.  Let's say an
22  image is flagged and it is quarantined because of a match, let's
23  just say an MD5 Hash value match in the NGO CSAM Hash List, and
24  it's placed into the human review tool.  If WebPurify says no,
25  we're unsure, or whatever their definition is, but they don't

1  categorize it as either A1 or A2, or B1 or B2, what happens?
2     A.  It does not get reported.
3     Q.  Okay.  Do they provide a categorization input?
4     A.  The categories are only CSAM.  So if they're not CSAM,
5  there's no category to set.
6     Q.  So my question is, how do they communicate that to
7  Synchronoss?
8     A.  That's part of the process and part of the data feeds,
9  the technical team would have to -- they would have information
10  you on that.
11     Q.  Okay.  So I understand that in terms of process,
12  nothing goes into the quarantine or human review tool until
13  there is a match of some sort?
14     A.  Match or near match, yes.  Under photos, either match
15  or near match.  And we're only talking images, not videos.  Just
16  because our process is different.  I just want to clarify for
17  the record.
18     So that is correct.
19     Q.  Okay.  And so at that point, Synchronoss has made no
20  determination about whether or not to report the information or
21  not report the information?
22     A.  At which point?
23     Q.  It's just placed in quarantine, there's been a Hash
24  match or a --
25     A.  Near match, yep.

1     Q.  -- or a near match, PhotoDNA match.  And it is placed
2  in quarantine and is placed for human review.
3     At that point in the process, there's been no decision
4  or determination about whether or not a report will be sent
5  regarding that particular content?
6     A.  Right, the process is still pending.
7     Q.  From that point forward, the determining -- whether a
8  report will be sent is determined on WebPurify's response to the
9  human review?
10     A.  Yes.
11     Q.  Okay.  There's no mechanism where, if WebPurify says
12  B1, there's no process for Synchronoss reviewing or auditing
13  that decision?
14     A.  Well, no.  Also because there's two factors there, but
15  the main factor is that, we don't have a contract with
16  WebPurify.  So their review is governed by Verizon.  But that is
17  correct, we don't audit, essentially, is what you're asking.
18     Q.  Yeah.  Once they -- and I know this is a euphemism,
19  but like, once they hit the button and say, this is B1, then the
20  report is going to be sent and there's really nothing that can
21  be done at that point?
22     A.  It is an automated generated report.  So just to be
23  clear, WebPurify doesn't see everything else about the report.
24  They have access to the image and their involvement is extremely
25  limited to seeing the image, classifying, and moving on.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 134

1    When they complete their step, it completes the
2  process and then the automatic data feed is created and pushed
3  out.
4    Q.   It's the trigger, so to speak?
5    A.   It's the final step of the -- yes.  I mean, you
6  wouldn't get there if you didn't have the Hash now.
7    Q.   Right.  It's been cocked and loaded, WebPurify pulls
8  the trigger or doesn't pull the trigger?
9    A.   Very Florida analogy, but yes.
10   Q.   Yeah, we don't hear that in South Philly.
11   A.   We don't like guns in Jersey.
12   Q.   South Philly, actually.
13   A.   Born and raised playground you spend most of your
14  days.
15   Q.   Okay?
16   A.   You'll get to the Prince of Bel Air.
17        MR. REISS:  I like the memes that are like, please
18  don't deport me I'm from Bali.  Like the islands with, you
19  know, with the tiki huts over the water.
20        THE WITNESS:  And for the record, everyone should be
21  very happy.  I did not break into the entire Fresh Prince
22  of Bel Air song.
23        MS. SIEKKINEN:  Admire your self control.
24        THE WITNESS:  I did it in my head.
25        MR. REISS:  I'd like to hear it.

Page 135

1  BY MR. ROBERTS: (Resuming)
2    Q.   Does the information that you have, does it capture --
3  and I'm not asking you to testify to this, but to the actual
4  time, but does it capture how long the content review took?
5    A.   I believe it does.  I believe --
6    Q.   I mean, to be fair --
7    A.   I know I'm not being specific.  I believe that we --
8  we have three different -- I think it's three, we have a number
9  of different, essentially, checkpoints where we can see the
10  image move through.
11        One is on upload, one is -- and I don't remember the
12  other two.  One is to NCMEC.  And then there's the middle one,
13  which I think is when it's put into quarantine, but I'd have to
14  double check.
15   Q.   Okay.
16   A.   And there may be another, but I'm not sure.
17   Q.   So, I mean, I think I -- so we asked some
18  interrogatory questions, and you provided answers.  But in
19  trying to get those answers, you did not reach out to Verizon to
20  help in answering any of those questions?
21   A.   No.  It's my understanding Verizon's a party, so, you
22  know, our assumption at Synchronoss is that Verizon and their
23  attorneys would work with our attorneys.
24        So it really wasn't my decision.
25   Q.   Okay.  Well, I'm not asking whose decision it is.

Page 136

1  That's not my place.  I'm just asking, have you, you know, in
2  part of your investigation -- for example, you know that
3  WebPurify may have information that is responsive to our
4  discovery request.
5        And my question is, have you reached out to WebPurify
6  to try to obtain any of the answers to the questions that we
7  sent to Synchronoss?
8    A.   No.  I respect our -- our contractual relationship
9  with Verizon.  And that Verizon is the contractor with
10  WebPurify.
11        So, no, I wouldn't reach out to them directly and nor
12  did I.  And even if I did, frankly, I don't know if they'd speak
13  to me, because I'm not Verizon.
14   Q.   Have you -- have you reached out to the website that
15  published the image which was the subject of January Cyber Tip
16  Report?
17   A.   I'm not familiar with the website, so no.
18   Q.   Okay.  You're aware of the allegation that the image
19  was post -- was published on a website?
20   A.   Yes, I did see that in the complaint, yes.
21   Q.   And that the website represented that the model was a
22  verified adult.  You familiar with that allegation?
23   A.   Yes, I am.  The allegation, yes.
24   Q.   And are you aware that there are -- let's just call
25  them, age verification documents, the Rutgers custodian produced

Page 137

1  documents pursued to a request regarding the age of that model.
2        Were you aware of those?
3    A.   From the website?
4    Q.   From the website.
5    A.   No, I'm not aware.
6    Q.   The Rutgers custodian is actually a licensed attorney
7  in the state of California.
8        Do you have any reason to believe that they have
9  manipulated or falsified the age verification records of that
10  model?
11   A.   I have no knowledge of any age verification records,
12  so I can't speculate on anything.
13   Q.   If those records and the Rutgers custodian testifies
14  that the model in question was an adult the time of the
15  photographs were taken.
16        And by adult I mean over the age of 18.  Would you
17  disagree with that?
18        MR. REISS:  Object to the form of the question.
19        THE WITNESS:  I can't speak as the documentation I
20        haven't seen.  That's very speculative and I'm not
21        comfortable doing that.
22  BY MR. ROBERTS: (Resuming)
23   Q.   Well, as we sit here today, do you -- I mean, do you
24  have any reason to believe that the model was not 18 at the time
25  of the photographs?

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 138

```
1        A.   Which model are we talking about, the second --
2        Q.   Yeah.
3        A.   Do you want my personal opinion?  I looked at the
4   image and I think she looks under 18.
5        Q.   Okay.
6        A.   That's all.
7        Q.   That's okay.  Let me ask you this:  Do you think that
8   sometimes it can be difficult for -- and I did note your
9   comment, your quip that we are the same age.  I may be a year or
10  two older than you, but I don't know.
11            The older we get, the harder it is to tell people's
12  age?
13       A.   No.  I have children.  I can tell you what their
14  friends ages are.  I don't agree with that at all.
15       Q.   How old -- how old are you -- how old are your kids?
16       A.   10 and almost 13, he'll be 13 in August.
17       Q.   So I have a 13 year old, and I have a 7 year old, and
18  I have a 5 year old.
19            So your testimony is you don't find that sometimes
20  it's difficult to tell how old, like if you're on a college
21  campus or something, how old the kids are?
22       A.   Generally it depends on the age of the children we're
23  talking about.  It's a very odd question.  I mean, I'd like to
24  think that --
25       Q.   Well --
```

Page 139

```
1        A.   I'd like to think -- wait, wait, let me say this.  I'm
2   still speaking.  I'd like to think that I have a good judgment
3   of character.
4            I mean, I'd like to think people think I look 22 so I
5   don't know.
6        Q.   Sure.  It's not an odd question in the context of this
7   case though, is it?
8        A.   Well, you're asking me, but I don't appreciate you
9   asking about specific or you ask me about general?  Specific,
10  the image you're talking about is one thing.  General is
11  another.
12            I mean generally -- now let's put it this way; I don't
13  agree with your assessment actually at all.
14       Q.   I don't know what that means.
15       A.   I don't agree that it's more difficult as me, as a 45
16  year old woman, to tell if someone's a minor or not.  No
17  different than when I was 20.
18       Q.   Okay.  So do you agree that the presence of pubic hair
19  denotes the onset of puberty?
20       A.   Denotes the onset of puberty, yes.
21       Q.   Okay.  And in the exhibit that we were just looking
22  at, and I'll just pull it up.  The image categorization is A --
23  A2, correct?
24       A.   Correct.
25       Q.   And can you just tell me what that means?  Here's
```

Page 140

```
1   the --
2        A.   You'll have to remind me.
3        Q.   Here's the thing right here.
4        A.   A2.  Pre pubescent lascivious exhibition.  Are you
5   talking about this particular image?  Because you have to zoom
6   in to see the hair.  It is not evident from first glance.
7        Q.   But you agree that if you examine the photograph,
8   there's pubic hair?
9        A.   It looks that way, yes.
10       Q.   And you agree that this model is not pre pubescent?
11            MR. REISS:  Object to the form of the question.
12            THE WITNESS:  I don't make that determination.  I
13  mean, if you're asking someone with a 12 year old boy, so
14  there's pubescent -- you're asking me about puberty and
15  pubic hair.
16            Look, you know, the 12 year old -- my son may have
17  some, but he might not be postpubescent.  So it's really --
18  especially a mother, it's a very sketchy area you're asking
19  about here.
20  BY MR. ROBERTS:  (Resuming)
21       Q.   Well you --
22       A.   I can't say either way.
23       Q.   Right.
24       A.   I mean, it shows that you've started puberty, but it
25  doesn't mean you're pre or post, you can be in the middle of it.
```

Page 141

```
1   So which one is it.
2        Q.   You offered your personal opinion, so I'm just asking
3   you.  I mean, do you understand that prepubescent means before
4   you began puberty?
5        A.   I don't.  Prepubescence to me doesn't -- I don't know
6   where the line is.
7        Q.   Okay.  And you can say, like, I don't really know the
8   definition of prepubescent?
9        A.   I don't know.  You know, if I've started to develop am
10  I pre or post?  If I have full breasts, I'm post.  It's an area
11  there that I can't say either way whether that image would be
12  classified pre or post.
13            I don't know.
14       Q.   All right.  And to take it back to -- not your
15  personal, you know, opinions, we'll just go back to the contract
16  between Synchronoss and NCMEC.  And here it says, "As a general
17  guideline prepubescent is appropriate when the subject of the
18  image lacks breast/hip development, has no pubic/facial/underarm
19  hair."
20            I'll stop reading there.
21       A.   No, don't stop reading there because the rest is very
22  relevant, actually.
23       Q.   Okay.  Testicles -- did you see any testicles in these
24  pictures?
25       A.   No, I'm not going for testicles.  Keep going there,
```

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

---

**Page 142**

1  buddy.
2     Q.   Okay.  I'm not your buddy.  "The body development of
3  muscle tone and body curves has not occurred, and, if audio is
4  available, the voice has not deepened."
5     A.   Yeah, that portion about the muscle tone, yes.  Thank
6  you for reading that whole thing.
7     Q.   Oh, okay.  Tell me, what's your training and expertise
8  in muscle tone?
9     A.   I have none.  My husband's a physical therapist,
10  trainer and a licensed --
11     Q.   So why did you make me continue reading it, yeah?
12     A.   Because you were focusing on only one of the multiple
13  guidelines that are listed there.
14     Q.   Right.
15     A.   Pubic hair is one of them, yes.  But there's also
16  others.
17          And I just wanted to make sure the record was clear
18  because you stopped that there's more than just what you read.
19  That's all.  It's merely for the record.
20     Q.   Yeah, but for the record, the reason I brought this up
21  is because, you don't know what prepubescent means, correct?
22     A.   That's not true.
23     Q.   You testified that you didn't know what prepubescent
24  meant.  Was it no pubic hair or the start of pubic hair?  Do you
25  not recall that testimony?

---

**Page 143**

1     A.   Mr. Roberts, I can tell you that I have seen pubic
2  hair on children who are not pubescent.  They do not look like
3  postpubescent.
4          You don't have the issue -- and let me clarify, the
5  issue I'm having is not post and pre, it's in the middle.  So
6  there is -- I'm testifying --
7     Q.   You --
8     A.   Let me finish.  I'm testifying that I do not know
9  where in the middle that line is.
10          That's correct.
11     Q.   And you have no training about what prepubescent or
12  postpubescent means, do you?
13     A.   Training, no.
14     Q.   Exactly.  So you're talking about personal opinions,
15  correct?
16     A.   I asked you if you wanted my personal opinion, you
17  said yes --
18     Q.   Right.
19     A.   I gave it to you.
20     Q.   And then I brought -- and I brought this contract up
21  to -- and explicitly I said, let's take it away from personal
22  opinions and let's talk about the contract.  Okay?
23     A.   Yes.
24     Q.   Do you recall that?  Right?
25     A.   Considering I was sitting here, yes.

---

**Page 144**

1     Q.   In this definition -- okay.  In this definition; "As a
2  general guideline, prepubescent is appropriate when," and I'm
3  going to skip because we're just talking about pubic hair right
4  now.  "Has no pubic/facial/underarm hair?"
5          Did I read that correctly?
6     A.   As a general guideline, yes, you did.
7     Q.   Okay?
8     A.   All right.  Don't know what relevance that has to my
9  testimony, but okay.  We can beat the dead horse as much as
10  you'd like.
11     Q.   Well, it's relevant because the categorization in our
12  last exhibit is prepubescent?
13     A.   But did I categorize it, so what does my knowledge
14  matter?  Thank you.
15          THE WITNESS:  How much longer do you have?  Because my
16     son will be home shortly, I just want to make sure we have
17     enough time.
18          MR. ROBERTS:  Why don't we take a quick break.
19          THE WITNESS:  That'd be great.  Because I have to make
20     sure not missing something.  Okay.  Thank you.  How long?
21          MR. ROBERTS:  Let's take 10 minutes.
22          THE WITNESS:  Okay.
23          THE VIDEOGRAPHER:  Off the record, 1:20 p.m.
24          THE VIDEOGRAPHER:  On the record, 1:33 p.m.
25  BY MR. ROBERTS: (Resuming)

---

**Page 145**

1     Q.   All right.  So you indicated that you looked at both
2  of the images, which are the subject of this case.  How is it
3  that you looked at those images?
4     A.   After it was pleaded and established that they were
5  adult images, it was not easy.  I actually requested my team to
6  provide them to me.
7          They had to provide them through our secure -- we call
8  it a law enforcement portal.
9     Q.   All right?
10     A.   Everything is encrypted.  So I was able to get the
11  images from there.
12     Q.   Okay.  All right.  So I was looking at your Answers to
13  Interrogatories and you indicate -- I can share it because we
14  asked for other reports involving these Hash values.  And
15  somewhere in here -- Ah, hold on?
16          You indicated that you don't keep like, searchable
17  reports.  Like you can't search by an MD5 Hash?
18     A.   And get the specific cyber tips attached to it?  I
19  check with my technical team, and that's my understanding of the
20  way our system works.
21          The only Hashes we really track back are those false
22  positives.
23     Q.   Okay.  And that's -- I just wanted -- so if I sent you
24  a request, and said, maybe, kind of did.
25          But, like, you just don't have the ability to search

---

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

Page 146

1   your database and say, this is every time that we've reported
2   this particular MD5 Hash?
3       A.   That's what I'm told, yes.
4       Q.   Yes.  Okay.  All right.  Now I will tell you that
5   NCMEC does keep an internal Hash List of all reported files.
6   They have -- I think the October image that has been reported
7   over 100 times and the -- not by Verizon or Synchronoss, I'm not
8   saying about you.  They just have -- and the January image has
9   been reported over 200 times.
10      Again, not saying Synchronoss, right?
11      A.   Right.
12      Q.   But other than obtaining those reports through NCMEC,
13  do you know of any other way where I could determine whether or
14  not Synchronoss has sent any other reports regarding these
15  specific Hash or this content?
16      A.   No.  I mean, I understood that's what you were trying
17  to get at in the request, and I did ask my team about it, and
18  they tell me that's not something that our system is set up to
19  do.  I don't know.
20      We could also -- I could speak with someone from my
21  technical team who can give more color of why, but not that I'm
22  aware of that we have that ability, no.
23      Q.   And so you -- it sounds like, have -- how often do you
24  communicate with NCMEC or their personnel?
25      A.   Infrequently.  It's usually only the, like, quarterly.

Page 147

1   Me personally, only the quarterly, like, updates we get from
2   them.
3       I don't often communicate with them directly.  The
4   exception being the last summer.
5       Q.   Yeah.  What about your team, I mean, is there like a
6   regular sort of liaison between them and your -- NCMEC and their
7   team?
8       A.   I do know that Bip and his team work closely with
9   them.  I cannot speak for how often they liaise.
10      Q.   So are you -- I mean, you saw in both of these
11  reports, NCMEC had assigned this unconfirmed categorization to
12  the Hash value?
13      Did you see that when you were --
14      A.   I actually didn't.  I'll take your word for it because
15  I know it's been pleaded, but I do not know.
16      Q.   Don't need to take my word for it.  Hold on.  So here
17  in the executive summary?
18      A.   Oh, there we go.  Yeah.
19      Q.   Is CP unconfirmed?
20      A.   And that's -- which one is that?  Oh, that's the
21  October.
22      Q.   I think this is the October.  And I'll stop sharing
23  here, I'll show you the other one.  So, yeah, so this is
24  unconfirmed.
25      So are you aware that when NCMEC gets an image they

Page 148

1   run that Hash against an internal CSAM Hash List?
2       A.   I'm not familiar.
3       Q.   Okay.  And so -- NCMEC, the corporate representative,
4   said that members or, you know, subscribers or electronic
5   service providers, who've signed up to be a part of this Hash
6   Sharing Agreement have the ability to communicate with NCMEC
7   regarding this internal Hash List?
8       Were you aware of that?
9       A.   No, I did not know there was an internal list.
10      Q.   Okay.  And so if someone from Synchronoss wanted to
11  inquire about a particular Hash value's characterization as
12  unconfirmed or confirmed, Synchronoss actually has the ability
13  to do that?
14      Did you know that?
15      A.   I don't know if that's true.  That would be a question
16  for Bip, I believe.
17      Q.   Okay.  All right.  Do you know what unconfirmed means?
18      A.   I don't.
19      Q.   All right.  Do you know if that information -- well,
20  you don't know what it means.
21      Had you ever seen that term before this case?
22      A.   Not that I can remember specifically, no.
23      Q.   Okay.  At the time in October and January of --
24  October 2022, January 2023, is it your belief that Synchronoss
25  was in compliance with Verizon's instructions and process

Page 149

1   regarding the scanning and reporting of CSAM or child sexual
2   abuse material?
3       A.   Yeah.
4       Q.   Have there been any changes since January of 2025 to
5   that process or practice in scanning of images of suspected
6   CSAM?
7       A.   Do you mean '25 or '23.
8       Q.   Since January of '23.  Yeah.
9       A.   Yeah.  Okay.  If there have been, they are more
10  technical, nothing substantive.  If there are, it would be on
11  the technical end, just improve workflow's and things like that.
12  Nothing that I can recall.
13      Q.   We saw that high level, you know, Synchronoss legal
14  document with that, you know, sort of -- nothing from that has
15  changed other than what you've already testified to today?
16      A.   Correct.  From what I recall on that document, that is
17  correct.  It was a general overview.
18      Q.   Right.  Right?
19      A.   But nothing has not changed, no.
20      Q.   Nothing at that level has changed.  Let me ask you
21  this:  If you, as the chief legal officer in charge of the
22  scanning and detection and reporting of CSAM, if you wanted to
23  change the process or procedures, could you do that or would
24  that be something that would have to be Verizon?
25      You couldn't unilaterally change those processes or

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025

Page 150

1    procedures?
2        A.   That is correct.  And that's because we handle
3    Verizon's customers data.  So we are at the direction of
4    Verizon.
5        Q.   And I know that you guys have not produced any
6    agreements between Verizon and Synchronoss, but are there
7    documents that outline this process and procedure that we're
8    talking about?
9        A.   Yes, it's in our document production.
10       Q.   Okay?
11       A.   And I should clarify, it's the contract between us and
12   Verizon.  It might not get into the granular specifics, but it
13   does lay out the PhotoDNA licensing and all of those things.
14       Q.   Does Verizon have access to your API with the Hash
15   List?
16       A.   Do you mean direct access?  I mean, it's their data,
17   so they're entitled to access it at any time if they have a
18   direct way to access it without contacting us, I'm not certain.
19       Q.   Right.  Do you know whether or not Verizon has any
20   agreements with NCMEC regarding a Hash Sharing List?
21       A.   I'm not familiar with any Verizon agreements.
22           MR. ROBERTS:  All right.  I don't have any other
23   questions.  I know that I have offended you, but I do
24   appreciate your time.
25           These are never easy things to do.  And I know that

Page 151

1    you care about what you're doing and I don't mean to upset
2    you.
3           THE WITNESS:  No, and I appreciate that.  And you
4    know, it's all part of the practice of law, right.  It's
5    the litigation world, and I appreciate the -- your
6    commentary.  Thank you very much for that.
7           And I apologize for getting -- for flying off the
8    handle like I do so well.
9           MR. ROBERTS:  It's okay.  All right.  I don't have any
10   other question, guys.  Andrew?
11          MR. REISS:  I don't have any questions.  And we'll
12   read.
13          MR. ROBERTS:  Yeah.
14          THE COURT REPORTER:  All right.  Mr. Roberts --
15          THE WITNESS:  Hold on, I think Nury's trying to speak,
16   but she's still on mute.
17          MR. REISS:  Yeah.  Nury, you're on mute.
18          MS. SIEKKINEN:  I was afraid my clickety clock was
19   going to disturb everybody.
20          But yes, thank you so much.  I have a very brief
21   couple of clarifications -- questions.
22                      CROSS EXAMINATION
23   BY MS. SIEKKINEN:
24       Q.   Thank you, Ms. Blaszka, for your patience.  So here,
25   let me go to them.  You described, Ms. Blaszka, a quarterly

Page 152

1    e-mail concerning what you called kind of, for lack of a better
2    term, false positives, the things that maybe end up on the block
3    list or might end up on the block list?
4        A.   I was talking about two different things and I can see
5    how that got confused.  So I was speaking to -- I get a
6    quarterly list from NCMEC that lists our cyber tips and whether
7    there's been action taken.
8           For example, an arrest, things like that.  That list,
9    after the images get sent to law enforcement, that's the
10   feedback from law enforcement.  So that list includes some line
11   items that will say, not prosecuted adult image or something
12   like that, or not.  Or sometimes just as basic as not CSAM, we
13   don't know why.
14          So I have that.  That's what I'm referring to.  I
15   don't have access to the -- the block list that our technical
16   team has.
17       Q.   Right.  And in a given -- and I'm going to ask you to
18   make a bit of a generalization and you can give a range, right?
19       A.   Yeah.
20       Q.   But in a given, one of these quarterly e-mail's, how
21   many do you -- how many reports of like you said, not CSAM or
22   non prosecuted adult image, as you said, that would maybe begin
23   triggering the process of going on the block list.
24          How many might you get in one of those quarterly
25   e-mail's?

Page 153

1        A.   I think that you can --
2        Q.   You can ballpark.  Is it like --
3        A.   Yes, the most I've seen --
4        Q.   More than 10, less than 10?
5        A.   Most I've seen is maybe 5, 6.
6        Q.   In a given quarter?
7        A.   In a given quarter.  It's typically a handful a
8    quarter.
9        Q.   That's helpful.  Thank you for that clarification.
10   That gives us an idea of the amount?
11          Now, going back to the October report, briefly,
12   Mr. Roberts represented, without documentation, that NCMEC now
13   classifies that October image as an adult.
14          But at the time of the October image, do you know what
15   the categorization was?  The NCMEC categorization?
16       A.   I only know that it was -- it hit on our screening.  I
17   don't know what the categorization was.
18       Q.   All right.
19          MS. SIEKKINEN:  Okay.  That's all I have.  And I thank
20   you again for your patience and your remarkable restraint
21   not singing the theme song to the Fresh Prince of Bel Air.
22          THE WITNESS:  Thank you.  It's hard.
23          THE COURT REPORTER:  All right.  Mr. Roberts, will you
24   redirect, sir, or your?
25          MR. ROBERTS:  No, no, no.  We're done.

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
**Cara Blaszka on 06/13/2025**

---

Page 154

1    THE COURT REPORTER: All right.
2    MR. ROBERTS: I'll order a copy of the transcript and
3  the video and just standard.
4    THE COURT REPORTER: Okay. Mr. Reiss?
5    MR. REISS: Go Wildcats. Hopefully we can get out of
6  the slump that we are in basketball. I think having a Pope
7  could be a big nil bump.
8    You know, that's a big, big deal to get these donors
9  to pay for these -- these guys to -- get back into the
10  tournament, final score, maybe.
11    THE WITNESS: No -- no hockey.
12    MR. REISS: What?
13    THE WITNESS: No hockey. No Panthers. No -- like,
14  what's going on here?
15    MS. SIEKKINEN: We're a hockey household. I couldn't
16  possibly get on that topic. It'll take --
17    THE WITNESS: Oh, my gosh. My son plays so I -- Yeah.
18    THE COURT REPORTER: Before we conclude, just quickly,
19  Mr. Reiss, will you be taking a copy, sir? I'm sorry to
20  interrupt, counsel.
21    MR. REISS: Please, thank you.
22    THE COURT REPORTER: I just want to make sure. Okay.
23    THE VIDEOGRAPHER: Would you like a copy of the video
24  as well?
25    MR. REISS: No.

---

Page 155

1    MS. SIEKKINEN: I'll take a -- I'll also take a copy
2  of the transcript. Thank you.
3    THE COURT REPORTER: Okay. All right. Sorry, Mike, I
4  think I interrupted you. Sorry.
5    THE VIDEOGRAPHER: That's okay. Just trying to get
6  video orders also.
7    THE COURT REPORTER: Yes, sir.
8    THE VIDEOGRAPHER: Yeah, I'll get us off. We're going
9  off the record, 2:00 p.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 156

1        C E R T I F I C A T E
2
3  STATE OF FLORIDA
4  JACKSONVILLE DIVISION
5        I, Lourdes Valdes, Certified Court Reporter, do hereby
6  certify that proceedings were held in the above-entitled case at
7  the time and place set forth in the caption hereof; that I was
8  authorized to, and did, report the testimony and proceedings had
9  in said proceedings, and that the foregoing pages, inclusive,
10  constitute a true and correct transcript of the proceedings on
11  June 13, 2025.
12        I further certify that I am not a relative or employee
13  or attorney or counsel of any of the parties, nor am I a
14  relative or employee of such attorney or counsel, nor am I
15  financially interested in the action.
16        This, the 13th day of June, 2025.
17
18        *Lourdes Valdes*
        LOURDES VALDES
        Certified Court Reporter
19
20
21
22
23
24
25

---

Page 157

1  ERRATA SHEET
2  DO NOT WRITE ON TRANSCRIPT
3  DATE: June 13, 2025
4
   Page No.        Line No. Change        Reason
5
6  _____
7  _____
8  _____
9  _____
10
11  _____
12  _____
13  _____
14
15  _____
16  _____
17  _____
        Under the penalties of perjury, I declare that I have
18  read the foregoing document and that the facts stated in it are
   true.
19
20  _____
   DATE                        CARA BLASZKA
21
22
23
24
25

---

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: 1..4s

**Exhibits**

**Exhibit A**    4:3
15:1,2  46:23
94:18  114:1,
2

**Exhibit B**    4:4
25:15,16
46:24  99:18,
19  100:1

**Exhibit C**    4:5
29:8  50:16
69:11

**Exhibit D**    4:6
67:5  81:3
86:17

**Exhibit E**    4:7
71:11

**Exhibit F**    4:9
72:15

**Exhibit G**    4:10
108:9

---

**1**

**1**   73:7  81:8
96:7

**1-25-2023**
126:7

**10**   6:24
105:19
138:16
144:21  153:4

**10/29/22**    100:5

**100**   73:24
146:7

**10:35**   63:21

**10:50**   63:22

**11:56**   106:16

**12**   140:13,16

**12:10**   106:12

**12:24**   106:17

**13**   5:1,7
138:16,17

**137877848**
25:18  100:3

**15**   105:19

**153739160**
126:6

**15th**   72:24

**18**   83:18
137:16,24
138:4

**18,000**   72:1
81:1

**18,064**   81:5

**19**   76:16

**1:20**   144:23

**1:33**   144:24

---

**2**

**20**   48:11
123:15
139:17

**200**   146:9

**2001**   95:1

**2005**   6:19

**2006**   7:2

**2008**   7:3

**2018**   53:17
58:16

**2019**   7:13
42:20

**2021**   95:1

**2022**   27:19
42:25  43:1
60:5  71:21
108:16
148:24

**2023**   60:5
71:22,25
81:4  148:24

**2024**   61:24
65:4,10,12
69:1,18
71:22  72:1
73:3,4,7
76:16  81:5,
8,18

**2025**   5:1,7
149:4

**21**   42:24

**21:18:12**   126:7

**21:28:58**   101:3

**22**   42:23,24
139:4

**23**   42:24
149:7,8

**24**   53:23
81:16  82:5,6
102:1

**25**   73:4  149:7

**26**   18:19
50:23

**26A1**   47:14

**29**   27:19
90:21  108:16

**29th**   101:3

**2:00**   155:9

**2:06**   108:16

---

**3**

**3.6**   31:7

**31,000**   81:1

**37**   81:4  83:18

**37,000**   71:25

**37,106**   81:4

---

**4**

**45**   64:6
139:15

**48**   22:13
98:19

**4s**   8:5

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                          Index: 5..adult

**5**

5   138:18
  153:5

50   39:11

**6**

6   29:7 153:5

**7**

7   29:7 138:17

**9**

90   130:17

9:00   5:2

9:05   5:7

9:06   5:21

**A**

A-R-O-N-S
  16:21

a.m.   5:2,7,21
  63:21,22
  106:16

A1   20:15
  61:10 132:1

A2   20:15
  61:10 132:1
  139:23 140:4

abiding   79:6

ability   12:12
  20:10 49:23
  56:22 74:25
  75:3 86:7
  89:6,10
  115:12
  145:25
  146:22
  148:6,12

absolutely
  43:3 46:10,
  24 106:8

abuse   68:7,8
  149:2

accept   93:17

acceptable
  70:8

accepts   86:23

access   20:9
  22:4,12
  29:10 32:1,8
  39:12,14
  53:16 62:10
  68:12 74:8
  77:2,3,17,18
  78:1,21,22
  80:17 82:7
  84:11 86:14
  133:24
  150:14,16,
  17,18 152:15

accessed   85:8

accessible
  32:12

accessing   67:2

77:9 84:13

accident
  103:21

accidentally
  66:19

accommodation
  10:7

account   13:21
  20:4 21:25
  22:6 24:20
  116:18 117:5
  118:11,13

accounts   13:18

accurate   15:24
  81:9,23 90:7
  95:21 96:19
  105:4,6
  119:19

accurately
  95:14

accusation
  123:23

accusing   92:14
  121:2

acknowledge
  121:4,6

acknowledgement
  45:11

act   14:1
  29:17 56:9
  75:2 117:6
  118:3

acting   34:18,

20,21 48:23
  118:7

action   42:6
  152:7

actions   13:2
  33:2 101:19
  124:12

active   17:21

actor   29:17

actual   25:22
  36:15 38:15
  40:1 90:12,
  14 98:11
  102:3 117:2
  135:3

ADA   10:7

add   31:14
  32:7

additional
  102:14

address   35:9
  73:7 87:6

addressed   30:6

adds   31:10

Admire   134:23

ADP   7:9

adult   28:10
  37:24 38:24
  91:1,3,4,6,
  13 92:1,4,23
  93:21 94:1
  115:24
  136:22

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                          Index: adult's..Aronson

137:14,16
145:5
152:11,22
153:13

**adult's**  91:23

**adults**  37:7
92:13

**advertises**
19:25

**advice**  11:17

**advised**  79:18

**afraid**  151:18

**age**  91:14,16
92:2 97:13
115:20
136:25
137:1,9,11,
16 138:9,12,
22

**agent**  34:18

**ages**  138:14

**agree**  34:17
44:21 52:5,7
58:7 90:3
101:10,12
123:22
138:14
139:13,15,18
140:7,10

**agreement**  21:8
32:5,14,15
34:23 35:16,
25 52:22,25
53:3,16

57:11,15
60:25 61:1,
16 79:22
80:6 82:12,
13 86:15,19
87:15 97:22
148:6

**agreements**
80:1 150:6,
20,21

**ah-ha**  62:22

**ahead**  42:8
122:18

**Air**  134:16,22
153:21

**aligned**  30:10

**allegation**
136:18,22,23

**allegations**
18:4,12
24:10 115:17
116:1,2,4

**altered**  91:22
93:22

**alternate**
88:11,12
97:4

**amount**  83:21,
22 153:10

**analogy**  134:9

**analysis**  93:18

**analyst**  18:23

**and/or**  68:1,3,

8 88:10
121:11

**Andrew**  5:14
151:10

**angry**  63:2

**annual**  71:3

**answering**
45:10,23
122:10
135:20

**answers**  23:23
41:19 44:11
71:19
107:14,21
121:5 123:13
135:18,19
136:6 145:12

**anticipation**
35:13

**anymore**  9:22
120:22

**anyone's**
116:18

**API**  11:21,23,
25 12:1,12
19:21 30:4
31:5 32:12,
25 65:7
66:19 67:1
69:6 74:4
77:4 82:3,6,
10,25 83:3,
4,5 84:13
89:22 114:20
150:14

**APIS**  12:17

**Apologies**  74:1

**apologize**  6:21
151:7

**appalled**
63:18,19

**apparent**  18:24
20:11,13,22
22:20 29:12
36:17 40:17,
22 43:17,18
68:2 90:5,12
96:22,23
97:5,6 98:5
102:3,6

**appears**  50:14,
16 62:7

**applicable**
112:2

**applied**  65:6

**appreciated**
65:12

**approval**
118:16

**architect**
72:22

**area**  140:18
141:10

**argue**  50:13

**arguments**  85:4

**Aronson**  16:21
17:17 74:1
79:17

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: arrest..behavior

**arrest**  123:11
127:23 128:8
152:8

**arrested**
115:18

**articles**
127:25 128:7

**assessment**
95:10 139:13

**assigned**  8:7
10:21 147:11

**assignment**
114:5

**assist**  67:23
77:12

**assume**  81:6
126:19

**assumes**  87:1

**assuming**  30:14
31:4 108:17

**assumption**
73:14 135:22

**attached**  50:11
87:24 145:18

**attempt**  89:19

**attempted**
41:18

**attorney**  5:25
7:4 11:14
16:22 24:12
27:14,15
49:6 54:24
62:14 63:20

137:6

**attorneys**
49:11 135:23

**audio**  142:3

**audit**  133:17

**auditing**
133:12

**August**  53:17
138:16

**authority**
45:14

**automated**
20:23 133:22

**automatic**
134:2

**automatically**
20:24 22:21
129:24

**Autumn**  67:7
71:13 72:10,
14

**aware**  18:13,
14,15,16
24:19,21
34:11,13,16
35:24 41:20
43:24 54:8,
23 55:2 56:3
61:13 66:9
75:19 76:8
83:3,16 91:4
93:20,25
102:12 105:2
116:1,3

120:18
136:18,24
137:2,5
146:22
147:25 148:8

───────────

**B**

───────────

**B1**  20:15
61:10 114:17
132:1
133:12,19

**B2**  20:15
132:1

**B2b**  13:14

**B2c**  13:14

**back**  11:23
12:6 13:5
21:3 37:15,
18,23 38:16,
23 39:1,16,
18,19 42:18
51:4 56:10,
22 81:3,18
82:5 86:10
99:17 100:13
103:1 109:2
110:18,20
141:14,15
145:21
153:11 154:9

**backup**  19:14

**Bali**  134:18

**ball**  14:19
90:22

**ballpark**  153:2

**bar**  64:3,8
120:11,12
121:22,23

**based**  40:18,
20 52:11
75:18 90:2,
14 111:21
119:20

**basic**  33:9
152:12

**basically**
12:11 71:9

**basis**  17:2,3
46:10 71:3

**basketball**
7:15 154:6

**bear**  19:9

**beat**  82:17
144:9

**began**  81:16
83:7 141:4

**begin**  54:2
73:8 152:22

**beginning**
17:19 21:10
42:24 73:3

**behalf**  5:14,15
34:2,21
45:14 71:2
118:8 120:24

**behavior**  63:18
121:2

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025                                    Index: Bel..case

**Bel** 134:16,22
153:21

**belief** 108:16
148:24

**bell** 69:24

**benefit** 93:18

**bets** 28:3

**Biff** 90:1

**big** 7:15
154:7,8

**bigger** 81:12

**Bip** 72:20,21
78:2 90:1
147:8 148:16

**bit** 8:2 13:5,
25 19:9
23:18,22
27:7 29:4
33:15 44:7
65:16 85:1
90:20 94:16
101:23
111:19
112:13 113:2
152:18

**bite** 42:18

**Blaszka** 5:4,17
6:5 79:9
96:15
151:24,25

**block** 39:5,9,
11,12 103:18
115:10
124:20

**Bel** 125:19,20
152:2,3,15,
23

**blocked** 115:2

**blogs** 11:9

**blown** 86:11

**blue** 67:9

**body** 142:2,3

**booking** 127:23

**Born** 134:13

**bother** 92:22
93:1,5,7

**bottom** 15:10
62:9

**bound** 34:12

**boutique** 6:25

**box** 130:16

**boy** 140:13

**break** 24:18
26:22 27:8
44:15 45:17,
24 63:2,6,
15,17,19
105:15
106:11
134:21
144:18

**breaks** 106:7

**breast/hip**
141:18

**breasts** 91:11
97:20 141:10

**briefly** 6:4
11:25 153:11

**bring** 65:12
73:15

**broad** 7:25
10:10 101:16

**brought** 6:2
70:23 142:20
143:20

**buddy** 142:1,2

**bump** 154:7

**business** 6:25
13:14 98:25
112:2

**busy** 78:8

**button** 21:1
22:21 23:5,6
43:15,17
44:1 98:11
130:21
133:19

———————————

**C**

———————————

**California**
137:7

**call** 9:3,7
11:23 12:6
13:19,20
64:1 108:5
115:10
116:12
126:22
136:24 145:7

**called** 6:23
15:16 20:7
31:25 52:24
53:16 76:3
120:10
123:16,22
152:1

**campus** 138:21

**Canada** 64:12
65:3,22
66:4,10
68:15 69:2
74:8 77:1
78:24 79:15
80:14 82:2,8
83:13 84:2
85:6 121:11,
12,18

**Canada's** 62:11

**candor** 44:7
64:2,7 65:15

**canned** 111:4
126:10

**cans** 130:14

**capture** 135:2,
4

**captured** 77:4

**Cara** 5:4,17
6:5 76:18
96:15 122:16

**Caralyn** 6:5

**care** 151:1

**case** 12:7
18:1,5,6,12

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025          Index: catastrophic..classified

19:16 24:1,5
27:5 33:24
42:17 43:2,3
47:12,16
50:3 54:1,
13,15,18
55:10 57:22,
23,25 65:14
89:18 117:7
122:13 126:1
127:23,25
128:2,15
139:7 145:2
148:21

**catastrophic**
123:23 124:1

**catch** 60:1

**categories**
97:8 114:4
132:4

**categorization**
88:10,11,13,
15,16 89:13,
23 113:23,25
114:2,8
131:8 132:3
139:22
144:11
147:11
153:15,17

**categorizations**
61:3,10
86:25

**categorize**
114:23 132:1
144:13

**categorized**
30:16 87:10
92:4 97:7

**categorizes**
92:1

**category**
114:4,5
132:5

**caused** 83:8

**causing** 77:7

**cautious**
119:20

**Center** 117:10

**chain** 61:22
116:23

**change** 42:21
65:24 66:2
81:8 82:21,
24,25 83:2,
4,9 149:23,
25

**changed** 11:20
149:15,19,20

**changing** 11:19

**character**
139:3

**characterization**
18:25 148:11

**characterized**
92:23

**charge** 9:9,19
125:8 149:21

**chart** 38:21
88:20,24

**chase** 33:15

**chat** 26:18,24
27:9 28:20
46:12 47:18,
19 48:9
50:11,14
67:8 71:13
72:14 99:19

**check** 26:1
95:13 114:21
119:2 135:14
145:19

**checking** 42:11

**checkpoints**
135:9

**chicken** 104:1

**chief** 45:13
149:21

**child** 30:19
43:17 67:22,
23 68:2,3,4,
7,8 71:15
88:9,14
89:12,23
90:6,12 91:3
92:10,14,23
98:6 149:1

**child's** 91:22

**children**
117:10
138:13,22
143:2

**chosen** 118:15

**Christina**
45:13

**circumstance**
90:11 112:7

**circumstances**
21:24 36:15,
20 37:1 40:2
42:5 54:3
87:8 90:5,11
94:2

**claim** 6:1

**clarification**
65:17 74:24
153:9

**clarifications**
151:21

**clarify** 13:13
16:3 28:9
64:23,24
73:5 77:22
78:24 85:2,4
102:11
129:23 130:8
132:16 143:4
150:11

**classification**
130:1

**classifications**
20:14

**classified**
20:13,23
127:3,19
141:12

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                Index: classifies..confidential

classifies
153:13

classify
123:21

classifying
133:25

clear   35:10
38:11 58:4,
20 66:25
67:3 110:2
123:18
133:23
142:17

clearer   69:3

clerked   6:21

click   22:20
98:10 130:16

clicked   43:15,
17 44:1

clickety
151:18

clicking   20:25

clicks   23:4

client   27:10,
11 115:17
124:6

client's
123:11

clock   151:18

close   21:23
116:12

closely   147:8

closer   91:13

cloud   8:9,21
13:8,11,18
19:8,14,17
22:4,5
106:25
112:12

cocked   134:7

code   11:19
12:11 103:17

coded   129:25

collateral
93:16,19

college   138:20

Collision
37:11

color   146:21

combat   71:15

comfortable
44:16 45:23
90:10 137:21

comment   59:12
62:21 90:16
138:9

commentary
151:6

common   49:15

communicate
16:17 17:2,
3,9 22:8
113:4 132:6
146:24 147:3
148:6

communicated
17:12

communicates
9:15 12:12

communicating
62:1

communication
13:17 68:10

communications
5:5 17:22
55:5 117:6

companies   8:23
31:11

company   7:10
8:1 36:6
45:14 88:17
89:6,13
92:23 121:1
130:12

compares   31:19

complaint
24:10 116:2,
6 128:5
136:20

complete   134:1

completed
43:13,14
104:23,24

completely
65:5

completes
134:1

compliance

148:25

component   9:17

components
9:12

comprehensive
21:4 39:15

computer   25:11

computing
12:12 68:10

concern   55:21
77:8 125:5

concerned
65:24
102:23,25
103:1 125:10

concerns   10:25
77:11 87:4
124:25

conclude   77:10
154:18

conduct   11:21
101:13
115:19

conducted
115:18,23

conducts   20:7

confer   63:19

confident
32:24,25
130:18

confidential
35:13,17
57:15,20

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025        Index: confidentiality..contributing

79:7,8

**confidentiality**
27:16 35:7
53:1 57:16
79:6

**confirm** 59:5,
10 86:22
116:13

**confirmation**
96:8,20 97:2

**confirmed**
40:9,16,17
97:14 100:7
102:10
148:12

**confirms** 92:10

**conflating**
84:25 118:10

**confused** 21:18
60:16 66:11
85:1 121:15
152:5

**confusing**
13:14

**confusion**
65:10 77:7
101:23

**connected** 31:5
101:13

**connection**
12:4 14:15
32:19 94:14
130:19

**connects** 31:19

**conscious**
103:17

**consequence**
93:7,9,11,
12,15

**consequences**
124:12

**considerable**
72:24

**considered**
19:22 102:3

**constitute**
68:2

**construction**
7:7,8

**consults** 11:15

**contact** 15:11
16:16,23
96:15

**contacted**
53:25 116:5

**contacting**
115:19
150:18

**contained**
86:23 87:2,5

**content** 8:8,16
9:2,3,4,7
12:24 15:17
27:18 37:5
41:7,11,12
55:10 61:4

83:14 84:3,
23 86:1
90:20 99:9
102:22 104:9
109:1 111:20
113:8
115:13,14
116:22
117:2,3,14
118:6,8,10,
13 124:19
125:16,21
133:5 135:4
146:15

**contents**
111:24
112:16 113:8
129:19

**context** 45:2
76:6 139:6

**continue**
63:18,24
120:14 122:1
142:11

**contract** 8:4
13:16 21:5
52:9,14,18
57:10 65:6
67:4 84:20
86:11 114:2,
12 117:21
118:15
131:13
133:15
141:15
143:20,22
150:11

**contracted**
20:7 84:14,
16 99:16

**contractor**
136:9

**contractors**
41:14 99:15

**contracts** 7:11
8:18 66:3

**contractual**
52:11 136:8

**contractually**
14:12 52:7
84:10,12
98:19

**contribute**
56:1 59:23
60:3 61:8
66:22 68:6
75:1 80:7
82:15 85:16,
21,22 86:1

**contributed**
60:6,20
61:10 64:12,
18,20 66:17
68:16 69:9
77:9 120:19

**contributes**
85:18

**contributing**
57:12 58:4
65:18 66:6,
13 74:16,23
76:25 80:15

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025          Index: contributions..CSAM

83:23,24

**contributions**
68:13 75:21
77:2,12 82:8
84:17

**contributors**
56:5 61:2
68:23,24
69:2

**control** 23:15,
18 70:5
128:19
134:23

**controller**
29:17

**conversation**
18:9

**conversations**
17:17

**coordinate**
54:11

**coordinating**
18:8

**copied** 77:15

**copies** 45:4
47:4,5 49:16
50:9 115:22

**copy** 49:19,25
55:1 57:10
58:3 154:2,
19,23 155:1

**copyright** 95:1

**corner** 119:17,

18

**corporate** 8:6
54:9 74:22
76:7 88:16
103:15 105:1
122:5 148:3

**correct** 12:10
18:16 21:24
22:5 24:24
32:13 34:6,
7,22 38:5
40:3,15
43:12 44:23
45:9 47:9
52:13 54:19,
20 60:24
64:23 69:12
74:18 79:23
80:8,20 81:7
83:8,9,21
84:1,18
86:16 87:16,
17,23 88:24
89:2 91:18,
19 96:1
98:20 101:7,
8 103:18
111:23
119:14
125:14
127:5,7
131:12
132:18
133:17
139:23,24
142:21
143:10,15

149:16,17
150:2

**correctly**
21:15 29:15
52:23 84:24
87:12 88:18
115:4 144:5

**corrupt** 87:10

**council** 5:11

**counsel** 6:6,9
18:7,8 26:2,
15 44:12,15,
16,24 45:18,
22 46:1
47:3,5,12,21
48:7 49:17,
19 50:8
51:14 57:14
60:9 79:5,8
107:8 154:20

**counseling**
117:25

**count** 62:6

**country** 75:16

**County** 6:22

**couple** 9:20
100:4 151:21

**court** 5:8,12,
20 6:20,22
48:13 63:17
69:14
105:10,14,17
108:7 151:14
153:23

154:1,4,18,
22 155:3,7

**covered** 36:11

**CP** 147:19

**crazy** 37:13

**create** 12:15,
17 15:21
16:2 31:1,4
43:12 53:10
85:25

**created** 12:16
20:24 32:2
57:4,5
103:16 134:2

**creates** 22:25
43:11 53:8

**criminal**
128:13,15

**criteria** 37:4
40:18,21,24
41:9 83:16
97:18 98:8,
10

**cross** 27:6
151:22

**CSAM** 9:6,8,10
10:12 14:3,
16,21 17:13
18:24 19:7
20:11,13,22
22:20 23:6
29:12 30:12,
14,16 31:9
34:19,24

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**

36:6,9,19
37:25 40:10,
17,22 43:18
71:20 75:10
76:12 84:4,
23 85:16
91:10 93:21
96:22,23
97:5,6
102:4,6
117:19 118:8
131:23 132:4
148:1 149:1,
6,22 152:12,
21

**current**   7:24

**curves**   142:3

**custodian**
136:25
137:6,13

**custody**   116:23

**customary**
26:10,17
46:2

**customer**   8:10,
12,15 13:15
22:3 32:19
118:18

**customers**
8:16,18
13:12,15
32:4 115:14
150:3

**cut**   33:15

**cyber**   22:23,

25 23:11
24:19 25:4,
15,18,22
27:5,19
28:10 33:19,
20,24 43:7,
9,14 50:2
51:17 52:2
56:17 62:11
64:15 65:3,
22 66:4,10
68:15 69:2
73:2 74:8
84:7 87:15
90:21 95:24
99:19 102:12
110:19 111:5
112:1 123:2,
10 126:12
128:18
136:15
145:18 152:6

**cyber's**   126:12

**Cybertip**   77:1
78:23 79:15
80:14 82:1,8
83:13 84:2
85:5 121:11,
12

**Cybertipline**
64:12 100:3,
17,24 124:7
126:5

---
**D**
---

**damage**   93:16,

19

**dare**   120:17
121:22

**darn**   121:16

**data**   11:5
13:2 18:23
20:23 22:21,
24 23:8,17,
19 29:16
34:20 43:12,
13 61:12
62:7 65:23
81:2 82:1
95:24 101:8
102:9,16,17
103:24
104:10,11,
12,18
108:17,20,24
111:7 112:19
126:18,19,24
127:13,15
130:3,11,17,
19 131:1,2,9
132:8 134:2
150:3,16

**database**
29:11,24
30:3,12,13,
14,16,17,24
31:7 53:2,3,
16 61:4
68:9,12 80:3
83:6 86:14,
24 87:3,5,7,
21 88:8
89:2,3,24

94:1 108:20
114:1,9
131:10 146:1

**databases**
93:20

**date**   73:8
108:14 126:6
127:20

**dated**   53:17

**dates**   115:22

**day**   48:11
62:3 66:22

**days**   16:14
64:6 134:14

**dead**   82:17
144:9

**deal**   154:8

**deals**   75:5

**dealt**   65:25
76:24

**deceptive**   63:1

**decide**   21:1

**decided**   68:5

**decides**   36:8

**deciding**
131:20

**decision**   11:15
102:21
103:17 104:9
118:19
133:3,13
135:24,25

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                Index: decisions..directs

decisions
  93:19

decrease   72:24

decreased
  72:25

deepened   142:4

defendant   5:15

defer   27:14
  57:14

define   37:22
  98:9

defines   88:23
  104:3

definition
  23:5 68:3
  96:23 97:6,
  22 98:5,7
  102:22
  131:25 141:8
  144:1

Definitively
  60:4

delivering
  68:9

demeanor
  119:21

denied   121:17

denotes
  139:19,20

department
  6:10 7:10
  9:3

depending   17:7
  77:7

depends   97:9
  138:22

deport   134:18

deposed   122:5,
  7

deposition   5:4
  6:3 24:14
  25:20 26:3
  28:25 35:2,
  16 44:19
  45:3 48:13
  53:19 54:9,
  24 57:9
  64:17 65:12
  67:18 70:2,
  18 86:15
  110:12
  119:21
  120:4,14
  121:17,21
  122:2,4,5

depositions
  35:13 48:15
  49:12

depth   50:14

derived   113:25

describe   36:5
  95:14

description
  38:19 96:18
  98:2

designed   19:25

23:10

detect   14:21
  19:25

detection
  149:22

determinant
  22:16

determination
  20:22 22:13,
  19 36:21
  38:3 40:22
  96:21 98:11
  102:2,5
  126:3 132:20
  133:4 140:12

determine
  20:11,12
  77:13 97:5
  104:4 146:13

determined
  38:2 40:11
  102:6 115:2
  133:8

determines
  22:16

determining
  40:18 131:16
  133:7

develop   141:9

development
  40:20 41:2
  97:19 141:18
  142:2

device   19:16

128:19

difficult
  16:25 26:4
  50:6 91:16
  92:2 109:17
  120:15
  127:18 131:4
  138:8,20
  139:15

difficulty
  124:6

direct   5:22
  11:7 13:16
  18:18 19:22,
  23 20:2
  21:20 101:19
  129:17
  150:16,18

directed
  76:14,17
  77:15,16
  118:23
  119:11,13

direction   9:24
  13:3 14:1,15
  33:17 34:22,
  23 76:13
  118:3,16,18
  150:3

directly   41:6
  103:2 136:11
  147:3

director
  125:12

directs   127:12

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                     Index: disagree..e-mailed

disagree    100:8
137:17

disbelief
55:20

disclaimers
52:16  58:20

disclose    50:23

disclosed
27:12  51:1

disclosure
18:19  47:14

disconnect
77:13  78:19

discover    80:2
89:19

Discoverable
18:22

discovery    24:1
47:12  104:18
131:3  136:4

discuss    78:25
127:10

discussed
61:21  79:20

discussing
118:21

discussion
94:8

discussions
18:7  94:12,
13

dismiss    27:23
28:23

dismissed    25:6

disputing
45:21  62:2

distinction
29:19  52:4

distress    124:5

District    6:20
42:17

disturb    151:19

division    7:8

doc    50:9

document    25:19
26:16  27:2
35:6  36:2
43:10,11
44:23  45:1,
8,18  46:12
49:1,3,12,25
51:10  52:25
58:16,18,20
59:8,12,17,
19  62:17
67:11  70:10
71:8,17  80:9
94:17,22,23
100:15  107:9
108:18
109:4,10,12
110:9,12,21
112:18
127:19
149:14,16
150:9

documentation
27:12  137:19

153:12

documented
103:13

documents    15:7
27:5  44:17
45:24  50:23
107:8,9,13,
25  136:25
137:1  150:7

donors    154:8

dotted    9:17

double    26:1
135:14

downloaded
113:9

draft    35:3

dramatic    69:23
71:25  81:7
83:2,7,8

dramatically
80:20,23

dreadfully
120:13

drink    20:5

drive    47:20

driving    37:13

drop    46:11
48:4,9  62:5
67:8  69:23
71:13,25
72:3,4,10,14
73:2  81:10,
12  83:2,7,8,

18,21,22,25
99:18

dropped    78:12
80:21,23

dropping    80:20

Duces    55:1
57:9

duly    5:18

duplicative
72:11

duty    19:1

_____

**E**
_____

e-mail    10:21
15:10  17:10
26:10,19
38:13  46:13,
15,19  48:2,
12  49:3
61:22  62:12
69:19,20
70:1  72:8,
18,23  73:4,
13  76:15,16
81:7  108:7
152:1

e-mail's    62:3
66:24  70:18,
19,20,23
72:7,11,12,
13  108:6
152:20,25

e-mailed
54:20,23

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: E-N..exhibit

**E-N**   16:22

**earlier**   13:25
  57:7 62:24
  64:16 65:11
  69:21 74:1
  104:2 106:19
  119:21
  129:7,22

**early**   18:6
  54:1 128:1

**easier**   46:13

**East**   7:15

**easy**   145:5
  150:25

**economy**   7:3

**education**   6:15

**effect**   53:3
  87:16

**effective**   73:9

**efforts**   67:25
  68:6 71:15

**egg**   104:1

**Ehrenworth**
  6:24

**electronic**
  68:10 76:7
  105:3,4
  148:4

**elicit**   113:1

**emotional**
  124:5

**employee**   10:3

**employees**
  41:14 99:15

**employs**   19:7

**enacted**   56:9

**encompasses**
  7:24

**encrypted**
  145:10

**end**   7:2
  42:22,23,24,
  25 65:25
  103:1 126:3
  149:11
  152:2,3

**enforcement**
  9:15,17
  10:15 11:7,
  12,13 14:23
  34:12 38:22
  39:17,20
  56:19 66:8
  74:21,25
  76:2 92:13
  95:1,2,9
  115:25
  125:13
  128:10 145:8
  152:9,10

**engineer**   72:22

**entered**   35:7,
  11,14,20
  79:7

**entertaining**

117:2

**120:22**

**entire**   26:15
  90:14,17
  111:20,24
  112:16
  129:19
  134:21

**entities**   66:8
  68:9 74:22
  75:3

**entitled**   78:10
  110:22
  150:17

**entry**   57:15

**equipped**   12:1
  118:1

**equivalent**
  68:3

**ESP**   111:20
  129:19

**ESPS**   34:4

**essentially**
  22:20 75:14
  133:17 135:9

**establish**   40:1
  128:12,19

**established**
  52:3 114:4
  122:11 145:4

**Ethan**   16:21
  73:23,24
  74:1 79:17
  81:13

**euphemism**
  133:18

**Europe**   32:5
  75:15

**event**   41:24

**events**   106:21

**evident**   109:9
  140:6

**exact**   20:2
  21:11,21
  27:20 53:4,
  15 101:9
  103:21
  126:19

**EXAMINATION**
  5:22 151:22

**examine**   140:7

**examined**   5:18

**exception**
  93:14 147:4

**exclude**   37:21

**excuse**   37:14
  81:4 82:5
  119:18
  120:10

**executive**   9:9
  147:17

**exhibit**   15:1,
  2,8 25:15,16
  29:8 46:23,
  24 50:16
  67:5 69:11
  71:11 72:15

81:3 86:17
87:24,25
88:1 94:18
99:18 100:1
107:20,22
108:9 110:20
114:1 122:25
123:4 139:21
144:12

**exhibition**
97:11 140:4

**exhibitions**
20:21

**exhibits**  26:3
27:9 44:13
47:4 48:6,8,
13 50:3,17
129:7

**existed**  93:25

**expanded**  75:3

**expect**  41:22
44:7 64:8

**expected**
123:14

**expecting**
121:8

**experience**
48:17 49:3,4

**expertise**
142:7

**explain**  118:13
130:7

**explained**
83:19

**explanation**
37:25 72:4
74:5 80:19
81:22,23

**explicitly**
143:21

**exploitation**
67:23,24
68:4 71:16

**Exploited**
117:10

**express**  55:20

**expressions**
55:20

**extended**  75:2

**extends**  56:9

**extent**  41:24
55:2,4 56:6
75:4

**external**  12:13
37:5 55:11

**extra**  119:20

**extrapolation**
101:16

**extremely**
133:24

**eyes**  20:10
98:24

_____

**F**
_____

**face**  91:22,23

**facial**  55:20

**fact**  13:18
36:25 42:3,
11 43:13
49:6,16
57:10 68:15
89:1 90:11
93:22 96:21
130:11

**factor**  83:24
131:16,20
133:15

**factors**  83:23
97:12 133:14

**facts**  24:5,10
36:15,20
37:1 40:2
42:5 54:2
55:24 90:5

**fair**  18:25
19:3 48:22
73:14 95:9
122:3 131:15
135:6

**fairly**  21:4
32:24 33:9
129:6

**faith**  40:22

**falls**  128:25

**false**  37:14,
19,20,22
38:17,19
39:1,4,11
115:8,11
120:2 145:21
152:2

**falsified**
137:9

**familiar**  15:13
18:19 28:13
31:24 34:15
61:14 71:1
76:4,20
79:24 98:25
121:23
136:17,22
148:2 150:21

**fan**  7:15,20

**fantastic**
106:5

**fast**  6:21

**February**  7:13
53:23 81:10,
11,16

**federal**  115:21

**feed**  20:23
22:22,24
23:8 43:12,
13 62:7
65:23 95:24
101:8
102:16,17
103:24
104:10,11,
12,18,25
111:7 112:19
126:18,19,24
127:13,14,
15,16
130:11,17,
19,20 131:2,

9 134:2

**feedback** 38:6,
12 94:8
105:3,5
152:10

**feeds** 132:8

**feel** 87:22
90:9 96:16
103:6

**feeling** 62:19

**fellow** 64:2

**field** 88:8,
14,17
104:23,24
112:9 113:1,
3,5 130:16

**fields** 102:11
107:10

**figure** 26:22
41:18 46:17
81:18 116:13

**file** 20:6
48:2,4
111:8,20,24
120:22
129:8,19

**filed** 53:24
71:21 128:9

**files** 112:16
113:9 146:5

**filings** 8:5

**fill** 103:18

**final** 134:5

154:10

**financial**
124:6

**find** 25:11
36:8,10
37:13 39:13
44:5,25
55:18,24
64:4 108:21
109:21
138:19

**fine** 10:6
27:4 105:20
106:1,13

**fines** 36:13

**finish** 8:20
143:8

**firm** 6:23,25
7:7,8,9

**fit** 23:10

**flagged** 111:16
113:9 118:8
131:22

**flat** 91:11,12

**flaw** 93:13

**flawed** 93:14

**flip** 49:12

**Florida** 5:25
120:11
121:22,23
134:9

**flow** 116:19,
21

**flying** 151:7

**focus** 96:12

**focused** 6:25
7:1 16:11

**focusing** 49:13
113:22
142:12

**folder** 96:6

**follow** 11:6
14:7 127:10

**force** 87:16

**forget** 72:21
130:20

**form** 8:5 42:7
92:17,25
123:24 124:8
125:3 137:18
140:11

**forward** 34:12
77:6 133:7

**forwarded**
115:24

**forwarding**
92:12

**found** 57:5
80:5 95:11

**frame** 74:20

**frankly** 84:14
136:12

**free** 96:16

**frequently**
71:16,19,20

**Fresh** 134:21
153:21

**Friday** 76:16

**friends** 138:14

**front** 59:8
67:13

**full** 45:1
87:16 88:16
141:10

**future** 125:2

---

### G

**Gabrys** 45:5,13

**gag** 90:22

**gain** 89:10

**gather** 18:3,12

**gathering** 24:1

**gave** 47:5
121:4 143:19

**general** 8:6
77:10 96:1
97:25 139:9,
10 141:16
144:2,6
149:17

**generalization**
92:21 152:18

**generally** 50:3
138:22
139:12

**generate** 12:11
125:23

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: generated..Hash

generated
 21:13 22:21
 23:7,8,9,13
 33:14 95:24,
 25 114:3
 133:22

generates
 103:23

gentleman  6:1

give  6:14
 7:23 10:9,11
 32:7 51:8
 95:16 109:21
 111:15
 121:11
 131:21
 146:21
 152:18

giving  82:24

glance  140:6

global  5:10
 68:6

gold  85:20

good  5:24
 7:14,23
 40:22 94:19
 139:2

Goodbye  63:20

goodness  27:22
 107:5

Googled  95:7
 128:5

gosh  7:17
 154:17

gospel  15:25

govern  23:20

governed  33:20
 133:16

governmental
 80:7,8 84:17

grab  71:9

graduated
 6:17,19

granular
 150:12

grasped  74:11

grasping  78:20

great  144:19

ground  120:7
 121:20

group  9:16
 10:14,21
 39:17

growth  40:20
 41:2

guess  10:4
 12:9 13:4
 15:19 18:17
 34:17 40:12
 57:21 86:18
 129:7 130:22

guessing  48:15

guidance  11:17

guide  95:2

guided  104:6

guideline
 141:17
 144:2,6

guidelines
 96:25 97:17
 142:13

guns  134:11

guys  11:21
 17:1 23:10,
 11 30:10
 48:10 69:17
 70:2 74:7
 78:4 83:6,7
 129:8 150:5
 151:10 154:9

---

**H**

---

hair  40:20
 41:2 91:11
 139:18
 140:6,8,15
 141:19
 142:15,24
 143:2 144:3,
 4

Hall  6:18

handful  10:15
 112:6 153:7

handing  46:21

handle  8:3,4
 10:15,22
 74:14 150:2
 151:8

handled  78:2

handles  9:16
 11:8

hanging  63:20

Hannah  73:5
 76:17,23
 77:13

happen  22:9
 54:25 62:24
 78:20 125:1

happened  65:14
 73:6

happy  15:14
 48:1 57:16
 59:9 77:12
 92:9,12
 122:19
 134:21

hard  55:18
 129:24
 153:22

harder  138:11

Hash  11:23
 12:7 19:21
 21:11,20
 27:21 29:10,
 23,24 31:7,
 8,10,17,19,
 21 36:19,23
 37:1,5,20
 39:5,8 40:3,
 6 42:5 52:24
 53:2,12,16
 55:11 56:2,
 23 57:13
 58:4,14,21

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: Hashes..Hyderabad

59:24 60:3,
6,21 61:1,2,
8,10,12
62:6,11,24
64:12,20
65:18,21
66:6,13,17
68:1 69:23
74:8 75:10,
18 76:12,25
77:2 78:3,4,
9,15,17
80:8,15,19
82:2,7,15
83:14,19
84:3,8,23
85:11,15,16,
19,20,21,22
86:14 89:7,
11,14,19
90:5,10
111:11,16,18
115:2,5,7
118:8 120:19
122:9
129:11,12,
14,16 131:9,
10,23 132:23
134:6
145:14,17
146:2,5,15
147:12
148:1,5,7,11
150:14,20

**Hashes**  30:3,18
37:9,12
39:17 56:24
65:6 68:8

72:25 75:1
77:3,9,11
82:4 83:7
86:25 88:10
145:21

**hats**  8:3

**he'll**  138:16

**head**  21:20
25:7 39:1
71:5 84:7
134:24

**hear**  60:11
103:16
134:10,25

**heard**  56:13
76:5 92:3
98:22 100:21

**hearing**  82:5,
22

**hearsay**  55:13

**hedging**  28:3

**hell**  106:7

**helped**  35:3
43:4

**helpful**  29:5
107:16 153:9

**helps**  25:9

**hey**  14:21
116:12

**hide**  14:19
70:22 93:8

**high**  95:20
149:13

**higher**  123:14

**highly**  44:19

**historical**
73:5

**historically**
42:15

**history**  6:15

**hit**  19:22
22:5 23:6
30:4 37:20
130:21
133:19
153:16

**hits**  19:18
96:2 100:9

**Hmm**  55:17

**hockey**  154:11,
13,15

**hold**  15:5
20:5 53:15
55:4 61:20
72:9 105:21
112:23
145:15
147:16
151:15

**holes**  16:13

**home**  9:25
10:2,8 106:4
144:16

**honest**  78:8

**honestly**  95:4

**hope**  76:22

**horse**  82:17
144:9

**hours**  22:13
98:19 102:1
105:23

**household**
154:15

**human**  20:8,
10,25 22:7,
15 23:4
40:10,13,17
41:4 42:1,3,
12,16,22
43:2,3,6,12,
14 51:17,25
52:6,10,17
94:9,16
96:3,8 97:14
98:17 102:4
107:7 126:25
131:24
132:12
133:2,9

**hundreds**  62:3

**hung**  64:1
120:11

**husband**  7:18

**husband's**
142:9

**Huseby**  5:9

**huts**  134:19

**hybrid**  7:10

**Hyderabad**
99:2,5

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: hypothetical..incorrect

hypothetical
  131:21

_____

**I**

_____

idea   7:23
  10:9,11 98:5
  105:22 106:2
  153:10

ideas   66:12

identical
  103:9 126:14

identification
  15:3 25:17
  29:9 67:6
  71:12 72:16
  108:10 123:5

identified
  31:9 51:2,23
  87:6 96:7

identifier
  13:21

identify   29:12
  31:23 61:3

illicit   8:8
  9:2,3,4,7
  15:17 96:9
  97:2 116:22

illusion   77:11

image   19:15,
  16 20:3,8,
  10,11 21:11,
  13,14,24
  22:14,20
  28:11,12

30:11,16
31:9 36:19
37:5,24
38:16,24
39:6 42:4
51:16 52:2,
10 88:11,12
90:22,25
91:5,9,21
92:2,9,16,19
93:22 94:1,
2,9 96:8
97:2,7,10
102:2 106:24
111:15
112:19
113:13,23
114:5 115:2,
20 118:16
131:8,22
133:24,25
135:10
136:15,18
138:4
139:10,22
140:5
141:11,18
146:6,8
147:25
152:11,22
153:13,14

images   22:10
28:10,11
30:10,20
31:17,18
37:7 39:8
55:10 61:6
68:1,7,8

91:3 92:13,
23 93:21,23,
25 96:7
113:12,13,17
114:8 115:2,
6 116:18,19
117:23
118:1,24
119:5,11
121:10
129:23
130:6,9
132:15
145:2,3,5,11
149:5 152:9

imagine   124:5

immediately
91:5

impaired   123:9

implemented
42:22 88:11

implies   103:12

implying   12:16

impression
91:15

improper   67:1

improve   149:11

inaccurate
96:18 121:5

incident
100:13
101:2,5,13,
22,24 102:5,
11,22,24,25

103:9,24,25
104:3,8,14
105:2,4,6
106:20 111:3
126:6,11,13,
23 127:3,9,
12,15
128:11,17,20

include   61:8
82:3 93:21

included   26:11
29:23 30:3,
12 50:16
55:11 58:22
61:4,11 65:6
68:12,16
79:20 82:1,7
84:2,3,14,
16,23 85:6
88:24 89:24
114:8 115:19
127:9

includes   37:7
97:18 152:10

including
86:24 87:8

inclusion
36:19 37:4
83:14

incorporated
68:19 82:19

incorrect
37:12 50:24
69:6 105:2
128:20

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: incorrectly..introduce

incorrectly
  87:10

incredibly
  64:4

India   98:22
  99:2,5

indicating
  54:24

individual
  10:22 51:12
  52:1 75:15
  97:13

individuals
  10:15 13:10
  75:3

Industry   88:9,
  14 89:12,23

infinite
  130:13

inform   58:3

information
  13:22,23
  18:1,4,12,22
  19:1 23:10,
  12,16 27:15
  29:21,23
  30:2 33:13
  34:7 40:13
  41:22 45:15
  51:15 58:21
  61:9,11 72:7
  74:4 77:8
  86:23 87:2,
  5,7,9 88:7,
  24 89:1,11

90:3 95:3
100:4,9
101:5,6
102:12,14
103:2,18
104:13,16,19
105:6
106:20,22
107:4,6
108:15
110:23
111:3,7,9,15
112:10 114:1
115:23
121:6,13
126:8,11,21
127:7 128:14
129:8,18
130:13
132:9,20,21
135:2 136:3
148:19

informed   74:7
  87:9

Infrequently
  146:25

ingested
  106:24 117:8

inhouse   7:6
  119:11

initial   16:7
  18:9,19
  91:15

initially
  17:10 43:9
  91:10

initiate
  33:13,19
  42:6

initiated
  27:20 33:2,
  21

input   98:18
  111:21,25
  114:6 129:20
  130:25
  131:10,17
  132:3

inquire   89:16
  148:11

inquiry   17:4
  24:4,6

instances
  113:9

instantaneously
  23:7

instruct   55:6

instructions
  148:25

intended   29:11
  113:4

intention
  35:21

intentionally
  121:7

interacted
  41:4

intercepted
  21:25 22:2

107:3

interchangeably
  9:8

Intermittently
  54:7

internal   24:9
  66:2 109:13
  146:5 148:1,
  7,9

internally
  9:7,12

internet   95:5
  112:17
  113:10

interpret
  58:24

interpretation
  59:16

interrogatories
  23:23 44:11
  107:14,22
  145:13

interrogatory
  41:19 51:25
  135:18

interrupt
  19:11,12
  105:10
  154:20

interrupted
  155:4

introduce
  5:11,24 6:4

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: investigate..lacks

investigate
 83:10 115:13
 116:25

investigated
 81:17

investigating
 24:1 62:5
 73:2,19,20
 89:18

investigation
 24:10 27:3
 54:2 81:16,
 24,25 84:2
 115:18,23
 116:4 126:1
 136:2

investigative
 116:11

involved  18:1
 23:25 33:24

involvement
 133:24

involves  42:11

involving  61:1
 145:14

irony  20:21

irrelevant
 55:22

Irreparable
 124:3

islands  134:18

ISP  31:15

issue  22:23

 65:13,25
 73:1,5,15
 81:17 143:4,
 5

issued  38:22

issues  10:23
 84:25 87:6

items  152:11

IW  32:14

IWF  32:5,15
 64:12 65:4,
 21 66:4,10
 68:14 69:2
 74:8 75:15
 77:1 78:23
 79:14 80:14
 82:1,7 83:13
 84:2 85:6
 121:10,18

IWF's  62:10

---

**J**

---

Jacksonville
 5:25

January  24:22,
 23 25:7,8
 30:11 73:10,
 15 84:6
 136:15 146:8
 148:23,24
 149:4,8

Jersey  6:18,
 19,20,22
 120:12

 134:11

job  7:24 19:1
 124:9,14,15,
 17

Josh  9:22

judge  6:22

judgment  139:2

judicial  126:2

July  61:24
 69:1,17
 72:24 73:4,
 13,15 76:16
 81:18,19
 82:4,5,6

June  5:1,7
 61:24 65:4
 73:7,11
 81:8,14

jurisdiction
 75:15

jurisdiction's
 68:2

jurisdictions
 75:13

---

**K**

---

key  88:15

kicked  39:16,
 18,19

kids  138:15,
 21

kind  9:15,17

 10:9 12:9
 14:1,22
 16:11 26:9
 29:1,3,4
 34:10 72:18
 77:5 82:16
 87:1 97:25
 111:18
 124:16
 128:25
 145:24 152:1

knew  64:19
 66:5,7 74:15
 96:24 125:8,
 9

knowing  57:5
 60:19,23
 121:18

knowledge
 18:10 35:11
 36:15 40:2
 41:10 66:1
 70:10 86:4,
 5,9 89:17
 90:12,14
 91:24,25
 113:11,16,24
 114:11 116:8
 137:11
 144:13

---

**L**

---

L-C-I-D  13:20

lack  152:1

lacks  141:18

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: laid..list

laid   7:8

language   58:4,
  24 97:4 98:1
  111:4 126:11
  130:14

large   83:21,
  25

larger   123:8

lascivious
  20:18 140:4

law   6:19
  9:15,16
  10:15 11:7,
  12,13 14:23
  34:12 36:5
  38:22 39:16,
  20 56:19
  66:8 74:21,
  25 76:2
  92:13 95:1,
  2,9 115:20,
  21,24 117:21
  119:7 125:13
  128:10 145:8
  151:4 152:9,
  10

laws   23:19
  90:13

Lawshe   5:5 6:1
  101:14,19
  124:12 128:8

Lawshe's   24:20
  87:14

lawsuit   53:22
  125:16 128:9

lawyer   6:12
  19:5 43:22
  44:2

lawyers   8:1
  18:10 54:12

lay   150:13

laying   91:11

layman's   12:2

LCID   13:20

leader   29:2

leading   33:4,
  5,8

leaning   77:5

learn   53:21

learned   53:21
  55:9,25 69:1
  70:24 82:4
  90:20,25

learning   94:5

Lee   5:5

left   7:6

legal   6:6,9,
  10 7:11 8:7
  11:7,16
  38:20 45:13
  46:10 68:3
  93:18 94:22
  125:11 129:2
  149:13,21

letter   100:22

level   12:23
  23:13 95:21

117:24
  123:15
  149:13,20

liability   87:1

liaise   16:17
  17:20 147:9

liaison   147:6

liar   64:1
  119:24
  120:10,17
  121:3 123:16

license   12:17
  13:9 68:20
  78:17,18
  121:1

licensed   6:19
  137:6 142:10

licensing
  150:13

lie   63:4,13,
  16 64:3

light   81:14

limitations
  117:20
  118:25 119:2

limited   86:24
  87:8 98:23
  117:21
  133:25

list   11:23
  12:7 19:21
  21:21,23
  30:3,18,19,
  24,25 31:1,

2,10,14,17,
  19,22 32:2,
  11,12 36:20
  37:1,5,21
  38:18 39:5,
  7,9,11,12,23
  40:3,6 42:5,
  12 52:22
  53:8,12
  55:11 56:2,
  5,23,24
  57:13 58:14,
  22 59:24
  60:3,6,21
  61:1,2,8
  64:13,20
  65:5,7,9,19,
  21,22 66:6,
  13,17,22,23
  67:2 68:15,
  16,19,20
  69:6,9 74:8,
  16,23 75:1,
  4,6,9,18,21
  76:4,6,8,19
  77:1,21
  78:4,9,15,
  17,18,21,22
  80:8,15
  82:1,7,15,19
  84:4,11,13,
  16,23 85:6,
  8,9,12,16,
  19,20,22
  86:1,8
  89:14,20
  90:5,10
  91:21 114:15

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: listed..match

115:2,5,7,11
118:9
121:12,15
122:9,11
124:20
125:5,8,9,
19,20 131:23
146:5 148:1,
7,9 150:15,
20 152:3,6,
8,10,15,23

**listed** 18:18,
21 113:13,18
142:13

**listening** 67:7

**lists** 32:2
58:5,14
62:11,24
66:18 67:2
68:17,18,23
69:4,9
75:10,11,23
76:12 77:17,
25 78:8,10,
12,13 79:18,
19,20 82:2,4
83:15,19
84:13 152:6

**litigation**
5:10 7:1,2,
3,4 16:14
17:18,21
32:21 94:14
126:2 151:5

**loaded** 134:7

**local** 13:21

**locally** 77:8

**log** 23:17

**logs** 106:23
108:20

**long** 6:7
11:20 39:24
48:21 64:5
70:9 106:11
109:23 135:4
144:20

**longer** 64:6
105:19,25
144:15

**looked** 24:11
32:23 43:25
83:10 88:2
91:5 127:22,
25 138:3
145:1,3

**loose** 106:7

**losing** 80:17
83:19

**lost** 62:10
74:8 93:24

**lot** 7:1 8:2,3
27:1 48:18
55:9 72:10,
13 74:3
103:15
104:20

**loud** 51:19

**Lourdes** 5:8

**lower** 77:3

**lump** 30:11

———————————

**M**

**ma'** 46:4

**made** 58:14
60:21 73:9
89:1 103:17
104:8,9,13
125:25
131:17
132:19

**main** 16:23
133:15

**maintain**
13:18,22
30:24 31:2
85:24 102:9
115:10

**maintained**
19:21 30:18,
21,23 31:5
57:4,6
115:1,21

**maintains** 53:9

**make** 11:3
19:12 22:13,
18 36:21
40:21 52:4
57:17 66:24
67:3 68:21
74:24 75:23
82:13 89:18
96:19 98:11
102:2 110:1
122:8,19

123:8 129:2
130:5 140:12
142:11,17
144:16,19
152:18
154:22

**maker** 11:16

**makes** 20:4
22:19 38:2
41:25 70:14
71:2 102:21

**making** 36:21
37:2 85:7
120:24

**manipulated**
137:9

**map** 88:15

**mark** 14:25
25:15 29:6
57:19 79:7

**marked** 15:2
25:16 29:8
43:14 67:5
71:11 72:15
100:16
107:19,21
108:1,4,9
110:20 123:4

**marking** 35:12,
15 46:23

**massive** 83:24

**match** 19:22,
23 20:2,3
21:11,14,16,

Case 3:24-cv-00137-MMH-LLL    Document 98-2    Filed 12/15/25    Page 63 of 82 PageID
1865
WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025                                    Index: matched..motion

17,21,22,23
27:21,24
28:14,15
29:24,25
40:3,7 42:4
61:4 62:6
72:25 90:4,
10 101:22
111:16
114:18
129:12,16,17
131:22,23
132:13,14,
15,24,25
133:1

**matched** 31:17
36:25 125:21

**matches** 20:1
69:23 73:8
80:20

**matching** 84:9

**material** 18:24
149:2

**matter** 5:4
144:14

**matters** 64:7

**maturity** 97:20

**MD** 89:19
90:10

**MD5** 21:11,18
27:20 89:7,
11,19
111:11,16
129:11,12,16
131:23

145:17 146:2

**MDN** 13:19,20

**meaning** 21:21
39:6 52:1
75:15

**means** 43:13
98:1 103:15
112:24
139:14,25
141:3 142:21
143:12
148:17,20

**meant** 21:23
66:8 112:24
142:24

**mechanism**
133:11

**media** 112:3
128:14

**meet** 17:2
90:17

**meeting** 17:1

**meetings**
17:17,22

**meets** 23:5
98:10

**member** 64:2,8
120:12

**members** 18:15
75:23 76:25
148:4

**memes** 134:17

**memory** 25:3

**mentioned**
19:20 55:15
74:1

**message** 76:23

**messages** 77:6

**mic** 60:10

**Michael** 5:9,
13,25 35:9
105:21

**Microsoft's**
19:24

**middle** 65:9
135:12
140:25
143:5,9

**Mike** 155:3

**million** 31:8
87:22

**mind** 26:2
53:23 80:13

**mine** 50:21

**minor** 91:16
97:9 139:16

**minute** 14:18
15:5 59:20
95:16

**minutes** 144:21

**mislead** 63:16

**misleading**
57:6

**misrepresentatio
n** 130:6

**missed** 14:10
37:9 73:10
89:9 103:7

**missing** 77:11,
12 108:1
117:10
144:20

**misspoke** 75:20

**mistake** 33:12

**mistakenly**
30:16 87:11

**mixed** 20:16
25:1 27:23
42:23

**model** 115:24
136:21
137:1,10,14,
24 138:1
140:10

**moderator** 41:8

**moderators**
41:12

**modifications**
16:6

**modified** 94:3

**moment** 17:8
106:15

**monitoring** 8:5

**months** 17:8

**Morning** 5:24

**mother** 140:18

**motion** 25:6

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: move..nonprofit

27:23 28:21,
22,23 29:4
30:8 108:3
120:22

**move**  110:4
122:4 135:10

**moved**  6:23
78:8,11

**moves**  98:12

**moving**  133:25

**multiple**
75:12,13
142:12

**muscle**  142:3,
5,8

**mute**  151:16,
17

───────────

**N**

───────────

**named**  6:1

**names**  8:22
60:2 64:18
66:12,14,15

**narrative**  19:9

**National**
117:10

**nature**  11:7
18:4 33:17
92:3 97:11
116:22 124:9

**NCMEC**  11:23
12:7,24
18:24 19:21

20:24 21:21
22:22,24
23:8,9,12,16
29:11 30:12,
13,16,17,18,
21,23 31:7,
10,17,19,21
32:3,11,12,
22 34:11,14
35:25 36:6
37:2,4,5,15,
21,23 38:4,
6,13,18 40:3
42:4,6 52:22
53:8,9 54:9
55:11 56:1,
11,16,22
57:1,4,5,6,
10,12 58:15,
20 59:23
60:20 61:6,
16,21,24
62:7 65:9,
23,25 66:2,
6,20,24
69:10,17
70:25 71:21
72:6 74:7,16
75:9,10,17,
23 76:12,24
77:9,12
79:22 80:1,
19 82:5
83:11 84:4,
23 85:11,15,
18,19,20
86:11 87:16,
21 92:1,3,13

97:8,23
100:5,9
101:24
102:7,8,10,
15,17 103:1,
3,23,25
104:13,17,24
105:5 113:4,
5 114:2,5,8,
13 115:14
116:16,17
120:19
125:17,23
126:9,17,23
127:3 129:9
135:12
141:16
146:5,12,24
147:6,11,25
148:3,6
150:20 152:6
153:12,15

**NCMEC's**  30:24
81:22 105:1

**necessarily**
109:24

**necessitates**
12:24

**needed**  17:2,3

**news**  127:25
128:7

**NGO**  12:7
19:21 30:13,
17,24 31:21,
25 39:7
40:3,6 42:5,

11 52:22
53:12 56:2,
23 57:12
58:13 59:23
60:3,6,20
61:1,8,11
64:12,20
65:5,9,18,21
66:6,13,17,
22 68:16,19,
20 69:6,9
74:9,11,14,
16 75:1,4,6,
9,20,21 76:8
77:21 78:15,
22 80:8,15
82:7,12,19
84:11,13,16
85:6,9,11,
17,21,23,24
86:8 90:4,10
114:8 121:14
122:9,11
131:10,23

**NGO's**  58:4
68:13 86:6
120:19

**nil**  154:7

**nonprofit**
53:16 66:9
67:21 68:5,
9,12,13
77:20 86:14,
24 87:2,5,6,
7,9,21 88:7,
12,13 90:4,
10

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: nonprofits..organization

nonprofits
  67:25 87:19,
  20 88:7,8

Northern   42:17

notarized   45:5

notary   45:9,11

note   35:14
  73:12 138:8

notes   109:13

notice   128:10

notification
  109:1

notifications
  39:1

notified   22:11
  115:8

NPO   76:19,25
  77:9,18,21,
  23 78:9,17,
  21 114:8

number   6:9
  13:19 15:2
  25:16,18
  28:10 29:8
  37:20 39:4
  67:5 69:23
  71:11 72:15,
  24 77:2 91:9
  108:9 115:11
  117:22 123:4
  135:8

numbers   70:25
  71:1,10,23
  80:24,25

83:18

Nury   5:15
  151:17

Nury's   151:15

nutshell   13:9

---

**O**

O-N   16:21

object   42:7
  55:6 92:17,
  25 123:24
  124:8 125:3
  128:21
  137:18
  140:11

objection
  51:21 124:13

objections
  51:24 120:24
  122:19

objects   51:22

obligated
  36:9,11

obligation
  36:6 52:11
  56:10,21

obligations
  34:14

obtain   136:6

obtained
  108:19

obtaining

115:20
  146:12

obtains   9:14

occur   108:14

occurred   81:7
  142:3

October   24:22,
  25 25:2,6
  27:19 30:11
  43:1 84:6
  90:21 91:17
  94:9 100:20
  101:3
  108:13,16
  110:20 146:6
  147:21,22
  148:23,24
  153:11,13,14

odd   138:23
  139:6

offended   52:4
  120:13
  150:23

offensive   44:6
  64:4

offer   120:2

offered   141:2

offering   54:25

officer   11:7
  45:13 125:11
  128:17
  149:21

officers   95:2

officially
  5:21

Ohio   42:17

older   138:10,
  11

one's   48:8

ongoing   126:2

online   68:6
  70:24 71:15

onset   139:19,
  20

openly   123:16

opinion   55:22
  138:3 141:2
  143:16

opinions
  141:15
  143:14,22

opportunity
  7:6 45:22
  49:11

option   19:23

order   27:17
  28:23 35:7,
  11,14,20
  53:1 57:16
  79:6 117:17,
  19 128:12
  129:2 154:2

orders   155:6

organization
  56:20 61:9
  77:20 80:8

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                          Index: organizations..Phonetic

**organizations**
  32:2 56:1,13
  57:2,12
  58:14 59:22,
  23 60:2,20
  61:7 64:18,
  19 65:18
  66:5,7,9,12,
  17,18 67:22
  68:5 74:15,
  20,21 80:7,
  14 82:14
  84:17 120:19
  122:8

**originally**
  121:17

**originated**
  89:20 127:19

**outline**  16:12
  150:7

**outlined**  16:14

**oversee**  9:16
  10:14

**overseeing**
  16:4

**overseer**
  125:13

**oversight**
  11:2,10,11

**oversimplified**
  95:20

**overview**  96:1
  149:17

────────────
**P**
────────────

**p.m.**  106:17
  144:23,24
  155:9

**package**  112:22

**pages**  72:13

**Panthers**
  154:13

**paper**  10:7
  45:4

**paralegal**
  46:18

**Pardon**  26:2

**part**  13:1
  20:23 22:10
  24:17 28:25
  36:20 37:1,
  15 67:25
  69:5 78:9,14
  85:9 89:8
  93:24 103:5
  115:19 116:4
  119:8,9
  126:4
  130:12,15
  132:8 136:2
  148:5 151:4

**participated**
  78:4

**participating**
  87:6,9,19,20
  88:6,8,12

**parties**  48:12

**parts**  13:14
  41:1

**party**  54:18
  135:21

**pass**  13:23

**passports**
  115:22

**past**  45:12

**Patent**  8:5

**path**  21:1

**patience**
  151:24
  153:20

**pay**  154:9

**payroll**  7:10

**pedophile**
  123:22

**pending**  25:6,8
  27:16 55:19
  63:7,14
  94:15 133:6

**people**  13:10
  45:12 48:12
  93:8 117:22,
  23,25 119:1
  139:4

**people's**
  138:11

**percent**  73:24
  130:17

**perception**
  36:5

**perfect**  93:7,
  13

**perfectly**  70:8

**perform**  8:11

**period**  7:7,9

**permission**
  56:10 109:6

**permits**  117:9

**permitted**  8:17
  79:3 116:16

**person**  8:7
  16:16 20:8
  45:3,10
  108:21
  116:19 125:1

**personal**  55:22
  112:12
  124:15 138:3
  141:2,15
  143:14,16,21

**personally**
  89:15,16
  120:25 147:1

**personnel**
  116:10
  146:24

**perspective**
  13:4 38:21,
  24 124:15

**Philly**  134:10,
  12

**phone**  13:19

**Phonetic**  67:16

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025              Index: photo..predominantly

photo  28:6

Photodna  19:24
  21:12,21
  27:21,24
  28:14,15
  68:1,8 86:24
  88:10 89:7,
  11,19 97:16
  129:12,16
  133:1 150:13

Photodna's
  96:25

photograph
  140:7

photographs
  115:22
  137:15,25

photos  132:14

physical  142:9

pictures
  141:24

piece  23:2
  40:12 48:3
  131:19

piecemeal
  90:18

pieces  100:4

place  41:16
  107:15 136:1

places  76:1

plaintiff  5:13
  15:2 24:2
  25:16 29:8

67:5 71:11
72:15 108:9
123:4

Plaintiff's
  15:1 25:15
  29:6

platform
  85:17,21,23,
  24 86:2,8

playground
  134:13

plays  154:17

pleaded  145:4
  147:15

pleadings  71:8

point  9:23
  16:23 22:2
  102:21
  115:17
  132:19,22
  133:3,7,21

policies  12:22
  14:2,6,10,13

policy  12:25
  101:21
  102:19,20
  103:11,12,15
  130:4

pop  50:21

Pope  154:6

populate  88:13
  130:4

populated

114:18

populates
  89:22

pornography
  30:19 68:2,3
  88:9,14
  89:12,23
  90:6,13
  92:10,15,24
  98:6

portal  145:8

portion  35:15
  49:14 90:15
  125:13 142:5

portions  35:12
  104:21

position  29:2
  31:16 36:10
  84:12 113:3

positions
  29:3,21 30:9

positive
  37:19,22

positives
  37:14,19,20
  38:17,19
  39:2,5,12
  115:9,11
  145:22 152:2

possess  67:25

possession
  20:9 92:14
  128:19

possibly
  154:16

post  136:19
  140:25
  141:10,12
  143:5

posting  112:3

postpubescent
  20:16 97:9
  140:17
  143:3,12

potential
  117:19

potentially
  20:12

practice  6:23
  49:16
  103:12,13
  104:7 126:4,
  15,16,17
  149:5 151:4

practicing
  48:21 64:5
  123:16

Prague  67:16

pre  18:10
  140:4,10,25
  141:10,12
  143:5

predetermined
  89:23

predominantly
  42:10

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: preparation..prosecutor

preparation
  70:18

Prepubescence
  141:5

prepubescent
  20:16  97:8
  141:3,8,17
  142:21,23
  143:11
  144:2,12

presence
  139:18

present  72:8

presented
  108:1  121:21

presenting
  26:10  46:20
  59:11

preservation
  10:16,20

pretty  112:6

prevent  67:22
  119:10

previous  6:15

previously
  30:20  44:19
  73:9  114:1

Prince  134:16,
  21  153:21

prior  6:15
  25:19  35:2
  37:2  53:7
  57:15  83:2

86:15

privacy  23:19

private  6:23
  74:21  98:23

probable
  128:12  129:3

problem  50:12
  81:6

procedure
  15:18,19
  150:7

procedures
  12:22  14:2,
  6,11,12
  149:23  150:1

proceed  35:10
  79:21  116:23

proceeding
  44:16

process  10:18
  14:22  15:22,
  25  16:2  18:1
  19:7,17,19
  20:23  22:10
  31:18  33:19,
  20  37:8,12
  42:10,11,16
  52:2  55:24
  65:6  66:1
  85:10  86:7
  90:17  93:17
  94:22  95:15
  101:25
  104:5,6,7
  119:8,9

127:11
131:18,19,20
132:8,11,16
133:3,6,12
134:2  148:25
149:5,23
150:7  152:23

processes
  18:23  83:9
  149:25

processing
  10:23

processor  13:2
  23:19  34:20

procurement
  7:10  8:3,4

produce  27:12
  47:15  57:21
  95:9  104:18
  106:23  107:8
  127:14
  128:16

produced  27:16
  35:6  39:20
  45:2  57:20
  61:22  109:25
  136:25  150:5

producing
  110:1,9
  131:2

product  13:8
  19:24  109:14
  110:2

production
  35:6  52:25

107:13  150:9

professional
  122:3

professionalism
  64:2,7  65:15
  120:15
  123:15

program  10:12
  103:17
  125:12,14

programmed
  130:4

prohibit  118:7

prohibition
  118:20,22

prohibitions
  119:16

prohibits
  118:6

prompted  81:13

proper  49:16

properly  26:9
  47:3

proposed  79:6

proprietary
  8:20  35:5

prosecuted
  30:20  38:23
  152:11,22

prosecution
  17:14  123:11

prosecutor

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**

17:15

**protecting**
121:1

**protocol** 83:14

**provide** 11:5
22:24 49:16
88:15 98:20
102:14 132:3
145:6,7

**provided** 12:18
15:6,7 27:15
45:15,18
51:15 54:25
56:18 57:9
68:18 72:6
80:19 97:4
100:9 101:6
104:17,19,
20,21 105:3
111:9,13
122:12
126:8,11,21
128:11 129:8
135:18

**provider** 13:8
19:14 36:8,
15 76:8
112:3

**providers**
29:7,11 61:5
67:22 74:23
76:2 92:14
105:3,4
112:14 148:5

**provision**
35:12 58:7

61:2

**puberty** 97:25
139:19,20
140:14,24
141:4

**pubescent**
140:4,10,14
143:2

**pubic** 139:18
140:8,15
142:15,24
143:1 144:3

**pubic/facial/
underarm**
141:18 144:4

**public** 112:17
113:10

**publication**
56:16

**publications**
56:16

**publicly** 8:1
111:24
112:11,16

**publish** 14:17
56:17

**published**
94:24
136:15,19

**pull** 25:2,4
67:12 103:2
127:7 134:8
139:22

**pulled** 76:15

77:18 95:7
108:19,24

**pulls** 134:7

**purpose** 24:17

**purposes** 9:6
32:21 102:8
116:24

**pursuant** 27:12
115:21
128:16

**pursue** 79:18,
19

**pursued** 137:1

**pushed** 57:4
134:2

**pushing** 44:8

**put** 9:22
20:3,10
22:1,2 23:4
26:12,18
27:9 28:7,20
53:12 80:13
82:16 91:22
96:7 98:17,
18 99:18,25
104:14
106:24
107:7,14
109:5 111:4
112:8 130:15
135:13
139:12

―――――――――――
**Q**
―――――――――――

**qualifications**
41:8

**qualifying**
36:18

**quarantine**
20:3,6 22:3,
11 96:3,5,6
118:14
132:12,23
133:2 135:13

**quarantined**
21:14 22:8
117:15
118:24
131:22

**quarentine**
22:1

**quarter** 38:14
153:6,7,8

**quarterly**
39:14 146:25
147:1 151:25
152:6,20,24

**queried** 21:14
114:20

**query** 74:4

**querying** 82:1
83:6

**question** 7:25
11:19 12:9
15:19 16:25
18:18 24:15

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: questionable..recognize

33:1,3,9
42:7 49:14
51:15,16
55:19 58:9
60:1,5,16
63:11,14
65:1,2 66:12
68:20 72:19
73:16,19
78:1 79:10
82:23 89:8,9
92:17,25
102:20 103:5
107:18
108:13
109:17
110:16
112:24
113:14,15,25
115:15
116:12
118:23 121:8
122:15
123:24 124:8
125:3,18,19
130:22 132:6
136:5
137:14,18
138:23 139:6
140:11
148:15
151:10

**questionable**
91:14 117:24

**questioning**
44:5

**questions**

10:17,25
11:6 15:11
17:15,25
23:21 24:2
27:1 33:5,8
41:19 45:23
46:17 47:2
49:17,22
51:13 63:7
64:11,16
65:3,11
71:16,20
85:14 87:4
90:2 96:14
120:22
122:2,11,18
124:21
129:5,6
135:18,20
136:6 150:23
151:11,21

**quick** 26:22
35:10 98:5
100:14
105:11
144:18

**quickly** 78:8
88:2 154:18

**quip** 138:9

**quote** 20:1

**quotes** 12:6

―――――――――

**R**

―――――――――

**rabbit** 16:13

**radar** 74:23

**raised** 134:13

**random** 72:18

**range** 152:18

**rate** 72:25

**reach** 10:25
78:23 79:14
81:13 87:18
135:19
136:11

**reached** 17:4,
5,25 18:3,11
69:10,17
78:25 79:13
136:5,14

**read** 11:9
15:25 25:14
28:22 51:18
67:20 76:16,
20 87:12
88:18 95:16
97:23 142:18
144:5 151:12

**reading**
141:20,21
142:6,11

**real** 35:9
98:4 100:14
105:11

**reality** 114:14

**realize** 84:22

**reason** 52:8
58:17 86:12
90:19 91:20
100:8 137:8,

24 142:20

**reasonable**
90:4

**recall** 6:9
16:22 20:14
27:24 28:3,
8,9,15 61:1,
18 62:1,8
64:22 70:7
73:1,2 74:10
79:20 90:23,
24 98:1,2
99:4 103:6
105:5 107:10
108:2,3,21
112:5
113:19,21
124:21 128:5
142:25
143:24
149:12,16

**receipts** 77:4

**Receive** 29:10

**received** 76:22
100:5 104:14
126:23

**receiving**
105:5

**recent** 16:8
56:8 95:8,12

**recently** 56:9
70:24

**recognize** 15:8
51:9,10
67:11 94:23,

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025          Index: recognizes..removed

25 99:3

**recognizes**
114:13

**recollection**
25:5 27:25
36:16 59:13
62:13,14
65:13 69:20,
22 70:1
81:11,13
109:5,11,14,
20

**recommend**
119:2

**reconsideration**
28:21,22
29:4 30:8
108:2

**record** 5:3,21
11:25 35:15
47:1,11,21
50:15,22
62:23 63:21,
22,25 86:19
101:2 105:11
106:16,17
119:24
120:10
123:16
132:17
134:20
142:17,19,20
144:23,24
155:9

**records** 24:11
128:13

137:9,11,13

**recruited** 7:12

**redirect**
153:24

**reduce** 68:6

**Reese** 5:14

**refer** 9:5,6
46:4

**reference** 27:6

**referenced**
69:20

**referred** 38:22
57:11 71:8
72:7 100:21

**referring**
14:14 47:8
66:9 70:20
78:3 103:11
109:10,12,13
110:11,13
128:7 152:14

**refers** 76:19

**refresh** 25:5
60:17 69:20,
22 70:1
109:4,11,16,
19

**refreshed**
65:13

**refreshes**
111:17

**refuse** 47:1,2
62:18

**refusing** 49:17
59:17 122:14

**regard** 29:18

**registrant**
86:19,20,23
87:4

**regular** 17:1
147:6

**regulations**
34:10 36:4

**reinstated**
79:19

**Reiss** 5:14
26:18,20
35:9,19 42:7
46:6 47:7,10
54:13,18
55:4 57:19,
25 60:9,14
62:16 70:9,
13 92:17,25
99:20
100:15,18,
21,25 105:20
106:1 109:23
110:3 120:25
122:16,18,22
123:24
124:8,13
125:3 128:21
134:17,25
137:18
140:11
151:11,17
154:4,5,12,
19,21,25

**related** 54:15

**relating** 52:2
111:4

**relationship**
13:6,17
33:17 41:6,
21 136:8

**relevance**
144:8

**relevant**
141:22
144:11

**relies** 36:21
37:2 40:13

**rely** 40:1,3
41:25 42:9
58:21 90:4

**relying** 52:16
59:18 90:10

**remarkable**
153:20

**remember** 16:14
28:5,6,7
62:3,5 65:17
109:6 110:17
113:17
135:11
148:22

**remind** 25:22
140:2

**remote** 10:3
68:10

**removed** 77:1,
25 78:7,10

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: repeat..result

**repeat** 72:19
79:10

**repeatedly**
120:16,18

**report** 12:24
22:16,19
23:7,8,11,
12,13 25:4,
15,18 27:19
29:12 34:11,
13 36:6,9,
12,22 37:2
39:6 41:25
42:6 43:9
51:17 56:8,
10,22 61:5
71:4,5 75:2,
4 90:21
95:24 96:21
99:19 100:3,
17 101:3,9,
21,22,24
102:12,15
103:9,22,25
104:4,8,9
110:19
115:13
116:16 117:9
123:3,10
124:7 125:23
126:5,14
127:16,23
128:12,18
131:16
132:20,21
133:4,8,20,
22,23 136:16

153:11

**reportable**
40:11 102:22

**reported** 30:15
38:16 40:23
105:2
110:22,24
115:3,13
120:11
125:17 127:2
132:2 146:1,
5,6,9

**reporter** 5:8,
12,20 48:13
69:14
105:10,14,17
108:7 151:14
153:23
154:1,4,18,
22 155:3,7

**reporting**
10:12 14:3
15:17 18:24
34:4,19,25
37:21 38:12
70:25 102:8
103:1 111:20
127:1 129:18
149:1,22

**reports** 24:19
32:8 33:1,
14,24 37:15,
18,24 38:21
60:21 71:2,
6,21 72:5
87:15 103:8,

10 112:4,6
130:16
145:14,17
146:12,14
147:11
152:21

**repository**
19:18 117:11
118:22

**represent** 6:1
75:17 78:14
114:12

**representation**
85:7 90:8

**representative**
54:9 105:1
122:6 148:3

**represented**
47:3 79:5
114:10
136:21
153:12

**representing**
120:25

**represents**
121:1

**request** 26:13
27:12 47:12
51:2,23 95:3
136:4 137:1
145:24
146:17

**requested**
79:25 145:5

**requests**
10:16,20
107:9

**required** 11:5
52:8 61:8
88:7,9,15

**requirements**
47:15 129:2

**requires** 34:13

**requisite**
90:18

**researched**
127:22

**respect** 44:8
63:8 136:8

**respond** 128:16

**responds** 9:14
51:24

**response** 42:3
79:16 98:20
107:8 133:8

**responsibilities**
10:10,11

**responsive**
107:13 136:3

**rest** 141:21

**restraint**
153:20

**restrictions**
116:15

**result** 8:1
103:4

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: resulted..ruling

resulted
  123:11

results  41:25
  52:17 83:2
  115:23

Resuming  26:25
  35:23 42:14
  44:22 45:7
  51:6 54:22
  55:8 58:2
  60:18 63:3,
  12 64:10
  67:10 69:16
  70:6,16
  71:14 72:17
  79:12 92:18
  93:2 99:22
  101:1 106:18
  108:12
  110:10
  122:24
  124:2,10,18
  125:6 128:22
  135:1 137:22
  140:20
  144:25

retained  18:7

retaining
  18:10

retracted  77:6

review  18:23
  20:8,25
  22:15 26:9,
  15 40:10,14
  41:16 42:1,
  3,12,16,22

43:2,4,6,13,
14 52:8,17
61:1 67:19
70:17 87:25
88:2 94:9,16
96:3,8,20
97:4,14
98:17 99:9
107:7,15
108:14 117:2
118:8 126:25
131:24
132:12
133:2,9,16
135:4

reviewed  25:19
  33:23 35:2
  36:2 43:16
  51:17,21,25
  52:1,5,10,19
  53:18 58:11
  67:17,20
  86:15 102:4
  113:17

reviewer  22:7
  23:4 40:17
  41:4

reviewing
  44:17 58:13
  110:11
  119:10
  133:12

rights  121:2

ring  69:24

rises  12:23

risk  87:1
  93:18

road  33:11

Roberts  5:13,
  23,25 26:6,
  21,25 35:18,
  22,23 42:14
  44:14,22
  45:7 46:9,
  15,19 47:5,
  11,17,24
  48:8,19,20,
  23 49:1,18,
  21,25 50:4,
  7,10,19,22,
  25 51:6
  54:15,20,22
  55:8 57:23
  58:2 60:13,
  18 63:3,9,
  11,12,23,25
  64:9,10
  67:7,10
  69:3,15,16
  70:2,5,6,12,
  15,16 71:13,
  14 72:10,17
  79:5,12
  82:17 92:16,
  18 93:2
  99:22
  100:17,19,23
  101:1
  105:11,13,
  15,18,23
  106:6,8,10,
  13,18 108:5,

11,12 110:6,
10 120:1,5,
21 121:15,20
122:11,24
124:2,10,18
125:6 128:22
135:1 137:22
140:20 143:1
144:18,21,25
150:22
151:9,13,14
153:12,23,25
154:2

Rohan  76:22
  78:2

role  6:7
  7:11,24

rolled  45:12

room  46:21
  48:16

root  7:21

roped  66:19

round  83:18

roundabout
  12:10

routinely
  130:15

rule  18:19
  47:14 50:23
  93:14

rules  24:13,
  14

ruling  28:8

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                    Index: run..short

run  148:1

rundown  6:14

running  11:3

runs  19:23

Rutgers  6:18
  136:25
  137:6,13

---

### S

S-T-A-R-R  9:22

sales  8:4

satisfy  81:22

scan  19:7
  30:4 36:8,10

scanned  12:23

scanning  8:20,
  24 9:4,7
  10:12 11:15,
  22 14:2
  15:17 16:2,
  3,5,18 17:13
  19:17,18
  33:19,20
  34:18,24
  37:15 42:9,
  10,11 52:2
  66:3 93:15
  103:5 117:9
  149:1,5,22

scenes  9:13

schedule  54:25
  105:22

scheduled  17:1

scope  32:6

score  154:10

screen  15:4
  26:4,7 44:10
  48:12 49:1,5
  71:9

screening  8:8,
  16 9:10
  90:14,15
  116:23
  153:16

scroll  86:21

scrolling
  74:2,6

search  60:23
  80:1 145:17,
  25

searchable
  145:16

searched  79:25
  80:3,4

SEC  8:5

section  15:16
  110:22,23
  126:7,8

secure  145:7

seeking  112:9,
  10,11

sees  115:6

send  10:17
  23:10,11,12,
  16 26:19
  45:25 46:15

130:11

senior  6:6,9
  9:9 125:11

sense  19:13
  68:21 82:13

separate
  66:18,23
  68:17,18,23
  69:4,9 76:8

served  17:20
  53:24,25
  128:4

server  12:8,13
  20:3,6,9

service  10:18
  19:14,15
  36:8 76:2,7
  94:22 105:3,
  4 148:5

services  67:22
  68:10 117:25

set  14:6,12
  16:1 23:3
  24:2 107:3
  132:5 146:18

Seton  6:18

sets  12:22,25
  14:10

setting  14:2

sexual  67:23
  68:4,7,8
  97:11,19
  149:1

SHA  21:18

share  15:4
  26:10,24
  28:19 31:14
  44:10,12
  48:1,3,12
  67:4 86:8
  100:1 110:19
  123:2 145:13

shared  26:4,6,
  20 31:10
  45:2 47:20
  48:2,4

sharing  26:3
  37:5 45:4
  48:24 49:4
  52:24 53:3,
  16 55:11
  68:7,12
  75:11,18
  76:25 78:9,
  15,17 80:8,
  15 82:13
  84:23 85:12,
  16,21 86:12,
  14 90:5
  120:20 122:9
  147:22 148:6
  150:20

she'll  110:3

sheet  131:1

shifts  9:20

shoot  37:9
  60:16 94:19

short  7:7,9

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: shortly..specific

39:24

**shortly**  53:24
 144:16

**show**  14:18,24
 58:6 59:4,9,
 20 62:12,18,
 21 69:19
 70:11,12,19
 71:7 80:9,25
 81:2 86:12
 107:16,19
 115:23
 120:15
 147:23

**showed**  43:7
 50:2 80:24
 110:14

**shows**  102:9
 140:24

**Sic**  108:5,7

**side**  11:13,16
 48:20 73:12
 74:14 108:23

**sidetracked**
 16:10 52:21

**Siekkinen**  5:15
 26:2,8,14,
 17,19 44:12,
 18,25 46:1,
 5,8,18
 47:14,19,23
 48:1 49:9,10
 50:14,24
 51:5 63:6,14
 69:25 79:3,4

106:3,7,12
 107:25
 134:23
 151:18,23
 153:19
 154:15 155:1

**sign**  45:8,14

**Signature**
 21:12 27:21
 89:7,11
 129:12

**signatures**
 68:1,8 86:25
 88:10

**signed**  44:23
 45:5 67:15
 148:5

**significant**
 62:5

**significantly**
 56:1

**similar**  125:1

**simple**  90:4

**Simply**  93:22

**singing**  153:21

**single**  20:8
 78:4 130:10

**sir**  69:14
 70:20 82:24
 86:3 108:8
 124:14
 153:24
 154:19 155:7

**sit**  59:22
 137:23

**sitting**  143:25

**sketchy**  23:18
 140:18

**skin**  7:21

**skip**  144:3

**slump**  154:6

**small**  6:25
 7:9 49:14
 77:5

**smaller**  83:23

**Smedley**  72:20

**smoothly**  11:4

**SNM**  28:12

**social**  112:3

**soft**  60:11

**solve**  50:12

**someone's**
 139:16

**son**  106:4
 140:16
 144:16
 154:17

**song**  134:22
 153:21

**sort**  10:10
 18:9 40:1
 97:21 108:17
 115:12,22
 116:10,12
 132:13 147:6

149:14

**sorts**  23:19

**sound**  98:24
 129:15

**sounds**  81:17
 98:16 146:23

**source**  12:5,7,
 18

**South**  134:10,
 12

**speak**  8:17
 12:14 16:6,8
 21:19 23:18
 29:18 39:3,
 10 43:21
 44:1 49:24
 52:18 57:15
 61:19 62:15
 98:14 115:7
 129:1 134:4
 136:12
 137:19
 146:20 147:9
 151:15

**speaking**  29:18
 139:2 152:5

**speaks**  58:6,
 18,23 59:1,
 7,17

**specific**  9:8
 10:11,22
 13:21 17:5,
 15 19:5
 23:21 31:23
 39:5 74:4

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: specifically..substantive

89:3 94:13
103:24
107:15
108:21 111:6
126:12 135:7
139:9 145:18
146:15

**specifically**
34:15 40:19
64:17 73:6,
22 75:6,20
79:21 105:6
148:22

**specificity**
108:14

**specifics**
22:12 30:22
150:12

**Spector** 6:24

**speculate**
98:15 137:12

**speculating**
98:13

**speculative**
137:20

**spend** 134:13

**spin** 111:17

**spinning** 28:2

**spoke** 38:25
77:25 79:17

**spoken** 17:6
60:11

**spreadsheets**

106:23

**spring** 62:20

**spun** 21:19

**stand** 52:9

**standard** 49:15
85:20 88:9,
14 89:12,23
90:18 126:4
154:3

**standards**
83:14 90:18

**standpoint**
114:17

**staring** 25:13

**Starr** 9:22

**start** 10:14
16:12 24:24
27:8 73:20
126:5 142:24

**started** 7:2
73:18 81:10,
11 118:5
121:17 128:2
140:24 141:9

**startup** 16:7

**state** 108:14
137:7

**statement** 29:7
31:6,7 72:23
73:14 100:8
113:14
131:15

**States** 66:10

**statute** 34:13,
15 36:7,11
75:5 118:6
119:3

**statutes**
119:16

**statutory** 13:1
14:5 20:15
34:10 36:7
116:15
118:20,22,25

**stay** 10:8
16:11

**steep** 36:13

**step** 15:22
96:7 134:1,5

**Stingo** 5:9

**stipulate**
110:6

**stipulated**
110:5

**stop** 86:12
141:20,21
147:22

**stopped** 142:18

**Stored** 117:6

**streamline**
65:16

**street** 99:3

**strict** 117:22

**strike** 13:19
97:16

**stringent**
117:20

**stuff** 8:6
14:5 25:11
34:10 104:5

**subject** 27:19
36:13 51:23
125:16
136:15
141:17 145:2

**submit** 88:7

**submitted**
87:7,10,11
89:6,13

**submitting**
88:10

**subparts** 51:25

**subpoena** 55:1
57:8 61:22

**subscribe**
76:12 121:19

**subscriber**
13:22,23

**subscriber's**
20:4 21:25

**subscribers**
13:16,17
148:4

**subsequently**
65:3

**subsidiaries**
99:8

**substantive**

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**

149:10

**suggested**
123:12

**suggesting**
117:1,14,16

**summary** 38:13
39:14 147:17

**summer** 147:4

**Superior** 6:22

**supplement**
62:23

**supplier** 13:7

**support** 11:17
42:6 90:5,12
117:25

**supported**
76:12

**surprise** 94:7

**suspected**
40:10 102:3
149:5

**suspicious**
70:14

**swear** 5:12

**switch** 81:14

**sworn** 5:18,20

**Synchronize**
34:5

**Synchronoss**
5:5,14 6:2,
6,8,16 7:12
10:13 13:6,

7,11,12
14:11 15:7
18:11 19:7
21:7 23:15
27:11,20
29:14 32:1,
8,14 33:2,
12,16,21,23
34:1,16,24
35:6,24
36:21 37:2
40:13 41:25
43:11 51:22,
24 54:18
57:10 58:3
61:16,23
67:4 69:10
71:2 76:11
79:14,22
80:1 81:22
84:7,8
86:10,20
87:16 89:10
94:11,18,21
97:23 101:7,
21 102:6,21,
23,25 104:3,
9,21 106:20,
22 110:24
111:9,13
112:24
114:2,13
115:1,12
116:10
117:1,14,23
118:17
119:10 122:6
125:17,22

126:8,15,21
127:6
128:11,18
130:22,24,25
132:7,19
133:12
135:22 136:7
141:16
146:7,10,14
148:10,12,24
149:13 150:6

**Synchronoss's**
8:12 14:17
18:22 23:3
31:16 42:6
77:1 95:15
124:11

**synonymously**
29:13

**synthesized**
104:12
128:14

**system** 20:24
23:3 83:12
88:16 100:10
125:22
145:20
146:18

———————

**T**

**takes** 41:16
102:1 103:25
116:17

**taking** 63:17,
19 92:7 94:4

106:11
154:19

**talk** 6:21
23:5 92:19,
20 94:16
100:4 143:22

**talked** 10:10
34:9 77:24
96:3 111:19
114:1

**talking** 24:25
25:3 36:4
48:10 50:1,2
54:13 56:23
61:5,7 75:20
77:23 106:19
110:21
112:12,19,20
117:13 118:7
119:15,22
120:1 132:15
138:1,23
139:10 140:5
143:14 144:3
150:8 152:4

**talks** 35:16

**tanked** 7:3

**team** 9:12,14,
18,19 10:19,
24 11:4,8,14
12:19 18:15
29:2 30:7
37:16 38:25
39:19,23
42:1 72:21
73:25 74:7

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: teams..thought

76:23 77:16
89:4,16 90:1
95:13 105:9
108:19
114:22,25
115:18
116:11 132:9
145:5,19
146:17,21
147:5,7,8
152:16

**teams**  16:1

**technical**
9:12,13,18,
19 11:8,14,
16 12:10,12,
19,20 16:1
23:1 30:7
37:16 38:25
39:19,23
72:21 73:25
74:3,14
76:23 77:16
89:4,15 90:1
95:13 108:23
113:25
114:15,16,
22,25 130:3
132:9 145:19
146:21
149:10,11
152:15

**technicalities**
30:6

**technically**
29:16 37:17
102:4

**Technologies**
5:6 6:6
94:21

**technology**
31:11

**Tecum**  55:1
57:9

**telling**  58:20
59:10 78:16
92:7 96:16

**tells**  33:21
57:11 109:4
127:14

**tended**  54:11

**term**  37:13
51:21 96:22
148:21 152:2

**terminated**
32:18

**terminology**
9:2

**terms**  9:8
12:2 14:1
21:7 24:1
34:18 51:25
77:6 132:11

**terribly**
105:24

**testicles**
141:23,25

**testified**  5:18
40:2 57:7
59:21 66:7
68:24 79:13

97:18 105:1
111:21
122:7,8
142:23
149:15

**testifies**
137:13

**testify**  58:18
59:8,14,16,
18 69:7
121:14 131:4
135:3

**testifying**
59:2 66:14
143:6,8

**testimony**  53:7
64:22 65:20
68:11,14,22
82:21 84:7
87:19 104:2
120:2 122:12
123:18
125:15,18
138:19
142:25 144:9

**that'd**  105:20
106:4 144:19

**the--**  48:24

**theme**  153:21

**theoretically**
30:19

**therapist**
142:9

**thin**  120:7

121:20

**thing**  12:10
31:6 49:24
61:21 63:25
67:14 86:6
92:11 98:8
112:22 125:1
139:10 140:3
142:6

**things**  8:5
9:15 10:17,
18 11:3,9
28:19 30:20
35:5 39:21
40:5,20 41:2
45:14 56:17
64:5 65:16,
22 76:2
95:23 97:20
108:24
117:12
118:10,14
130:10
149:11
150:13,25
152:2,4,8

**thinking**  37:10
130:18

**third-party**
20:7 41:13

**thought**  28:15
33:6 66:8,23
67:1 68:22
73:10 75:20
81:15 91:10
100:21

107:15
112:19,25
124:11,17

**throwing** 14:13

**tiki** 134:19

**time** 5:7
11:20 20:20
24:14 25:12
32:8,15
38:10,17
42:15 48:4,
11,21 51:8
53:17 54:3
60:21 64:11,
14,15,16
65:14 81:15
84:6 87:14
94:4 99:25
100:9,13
101:3,6,9,
12,13,21,22,
24 102:5,11,
15,23,24,25
103:9,18,21,
22,24,25
104:3,8,14
107:3,15,17
108:14
126:6,13,14,
19,23,25
127:1,2,3,4,
6,9,12,15,
16,20 128:6,
11,17,19,20,
25 129:4
130:10,14
135:4

137:14,24
144:17 146:1
148:23
150:17,24
153:14

**timeframe**
51:23 61:24

**times** 31:13
87:22 105:2,
4,7 106:20
122:7 146:7,
9

**timestamp**
100:9

**timing** 102:9
106:21
107:10

**tip** 23:11
24:19 25:4,
15,18 27:5,
19 28:10
33:19,24
43:7,9,14
50:2 51:17
52:2 62:11
64:15 65:3,
22 66:4,10
68:15 69:2
74:8 87:15
90:21 95:24
99:19 102:12
110:19 111:5
123:2,10
126:12
128:18
136:15

**tips** 22:23,25
25:22 56:17
73:2 84:7
112:1 145:18
152:6

**title** 6:10
72:21

**today** 5:7
9:25 24:17
35:10 59:22
70:18 84:22
86:15 87:19
105:22
123:12,14
125:15
137:23
149:15

**today's** 25:19
35:2 53:18
67:17 123:23

**told** 62:10
119:24 146:3

**tolerated**
121:10

**tone** 119:4
142:3,5,8

**tool** 96:3
98:17 107:7
131:24
132:12

**top** 71:5,18

**topic** 122:23
154:16

**total** 71:2

**touch** 58:10

**touched** 98:21

**touches** 116:21

**tough** 20:19

**tournament**
154:10

**town** 99:5

**track** 16:13
37:14,19
39:4 145:21

**traded** 8:1

**trained** 10:24

**trainer** 142:10

**training** 6:12
142:7
143:11,13

**transaction**
38:16

**transactions**
7:1,5

**transcript**
57:20 121:21
154:2 155:2

**transmission**
68:7

**transmitted**
113:8

**trap** 62:20

**treading** 120:7
121:20

**treated** 123:19

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                                Index: trigger..utilized

trigger  134:4,
  8

triggering
  152:23

trip  19:11

triple  31:9
  85:19 86:1

true  42:18
  49:6 142:22
  148:15

truth  98:16

truthful
  123:18

truthfully
  52:5

turn  72:25

turnaround
  38:17

turns  65:9

type  12:25
  97:10 112:3

typically
  153:7

_____

U

ULA  117:8

unaware  65:5
  75:18 84:14

Uncalled  63:20

unconfirmed
  147:11,19,24
  148:12,17

undefined
  51:22

undergraduate
  6:17

understand
  8:13 10:1
  11:21 13:6
  21:15 23:15,
  22 29:1,3,15
  33:3 52:23
  58:13,16
  62:16 68:11
  70:9,13
  75:10,11
  77:14,23,24
  78:5 80:17,
  22 84:24
  85:4,11,13,
  15,22,25
  86:3,20
  109:23
  113:7,23
  114:7 115:4,
  17 120:8
  121:22
  122:14 130:7
  132:11 141:3

understanding
  12:4,16
  23:14 29:20
  30:1,5,13
  31:12 39:11,
  19 52:20
  53:10,11,13,
  14 58:18
  59:21 62:25
  65:8,21

66:16,18
  68:17 69:8
  74:13 75:14
  77:16 79:4
  82:9,10
  83:20 100:11
  110:23,24
  111:2 112:23
  114:22 126:9
  130:1 131:12
  135:21
  145:19

understood
  46:8 78:3,7
  81:21,25
  82:3,6 91:6
  112:25
  146:16

unethical
  121:2,9,14

unfortunate
  93:6,15

unilaterally
  149:25

Union  6:22

United  66:10

University
  6:18

unprofessional
  121:9

unprofessionalis
  m  120:13

unrelated
  32:17

unsure  125:15
  131:25

untruthful
  123:13

unusual  44:20

updates  73:9
  147:1

upload  106:25
  107:3 117:8,
  11 127:4,6
  128:20 129:1
  135:11

uploaded  19:17
  107:2
  111:20,24
  129:19

uploading
  129:4

upset  123:12,
  14,17,19,21
  151:1

user  19:15
  22:3

user's  19:18
  117:3,5,11
  118:11,13,21

UTC  101:4,5
  108:16 126:7

utilize  11:21
  13:11

utilized
  128:11

WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.
Cara Blaszka on 06/13/2025                     Index: vague..Webpurify

—————
**V**
—————

**vague**  51:21

**vaguely**  98:25

**Valdes**  5:8

**value's**  148:11

**values**  29:10
  31:8 39:8
  53:12 83:14
  84:3,8
  145:14

**vaunted**  85:20

**veracity**  58:21

**verification**
  115:20
  136:25
  137:9,11

**verified**  85:19
  86:1 131:13
  136:22

**verify**  12:19
  114:25

**verifying**  79:9

**Verizon**  5:5,16
  8:8,10,11,
  15,20,21
  13:2,5,6,7,
  8,11,15,23
  14:1,10,16
  15:8,20
  16:1,17,22
  17:5,15,17
  18:3,11 19:8
  20:6 21:6

29:7,12,13,
  16,17,18,22
  30:15 32:17
  33:18,20,21
  34:2,6,18,24
  35:5 36:9
  41:6,22,23
  42:22 45:22
  52:12 53:25
  66:3 70:25
  71:2,6,21
  73:21,22
  78:25 79:2,
  13,18 94:11,
  13 104:6
  106:25 111:4
  115:14 117:8
  118:2,4,8,15
  119:11,13
  127:10,12,
  14,15 131:14
  133:16
  135:19,22
  136:9,13
  146:7 149:24
  150:4,6,12,
  14,19,21

**Verizon's**
  13:15 18:8
  28:21,22
  33:16 44:24
  71:9,15
  76:13 79:15
  92:14
  118:16,19
  135:21
  148:25 150:3

**version**  91:22
  95:20

**vetted**  31:9,14

**victims**  67:23

**video**  5:3
  31:9 154:3,
  23 155:6

**videos**  132:15

**view**  20:10
  22:13 52:22
  91:2,3 102:2
  111:20
  117:14,17,
  19,22,23,25
  118:16
  119:1,2
  129:19

**viewed**  52:1,14
  129:23 130:9

**Villanova**
  7:18,19,20

**violated**  52:9

**violation**
  90:12 119:7

**visibility**
  21:7

**visible**  50:15

**visually**  123:8

**voice**  142:4

—————
**W**
—————

**wait**  15:5

**version**  91:22
  95:20

40:6 57:25
  64:14 85:3
  117:10,19
  126:16 139:1

**waited**  73:15

**waiving**  51:24

**wanna**  110:1

**wanted**  74:24
  79:1 142:17
  143:16
  145:23
  148:10
  149:22

**warrant**  10:23,
  25 11:5

**warrants**  9:14
  10:20

**warranty**  87:1

**water**  134:19

**ways**  48:1
  93:23 130:10

**Web**  98:22

**Webpurify**
  20:7,8 21:5
  22:8,18,19
  23:4 41:5,8,
  10,12,21
  42:12 52:8,
  12 94:11,12
  98:16,21
  99:6,8,13,16
  102:1,4,21
  109:1,2
  111:22

**WILLIAM LEE LAWSHE V. VERIZON COMMUNICATIONS, INC., ET AL.**
Cara Blaszka on 06/13/2025                    Index: Webpurify's..zoom

114:3,6,17, 22 115:6 116:20 118:15 119:5 129:20,21, 22,25 130:2, 19,20,23 131:11,13, 17,24 133:11,16,23 134:7 136:3, 5,10

**Webpurify's** 97:17 98:5 133:8

**website** 14:17 15:5 71:9 94:24 95:7, 10 113:13, 18,19,22 115:19,21 116:5 136:14,17, 19,21 137:3, 4

**who've** 148:5

**Wildcats** 154:5

**Wilk** 76:17,24 77:13

**William** 5:4 6:1

**withheld** 121:7,13

**withholding** 48:6,8

**woman** 139:16

**word** 20:17,19 37:9,10 67:20 92:7 94:4 116:8 147:14,16

**words** 19:2,5 36:18 59:18 61:19 96:13 114:20

**work** 6:15 7:2 8:4 9:13,17 10:2 41:12 109:13 110:2 124:16 135:23 147:8

**worked** 7:8,9

**workflow's** 149:11

**working** 6:15 16:1 50:10, 17

**works** 85:12 104:5 115:8 145:20

**world** 103:15 123:23 151:5

**worldwide** 67:22 68:13 80:6 82:14 84:17

**worry** 16:15

**wrapped** 65:23

**write** 12:11 97:3

**writing** 15:14 73:13

**written** 34:23 96:12 103:13

**wrong** 20:17 37:9 62:22 78:21 93:8 95:23 96:16

**wrongful** 123:11

**www.com** 113:13

─────────

**Y**

─────────

**year** 6:21 54:6 71:6 81:1 138:9, 17,18 139:16 140:13,16

**years** 6:8,24 16:3,4,5,7,8 48:11 53:6 123:16

**yesterday** 17:4,13 23:23 38:25 45:18 46:6 47:6 54:9 55:9 90:21 105:1

─────────

**Z**

─────────

**Zepf** 50:18

**zoom** 25:14 140:5