```
                UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
                  JACKSONVILLE DIVISION

             CASE NO.  3:24-cv-00044-MMH-MCR


WILLIAM LEE LAWSHE,
an individual,

                    Plaintiff,
vs.

MIKAYLA PRESTON, in her individual
capacity as a Detective for St. Johns
County Sheriff's Office; and KATHLEEN
DULLY, in her individual capacity as
medical director of the UF Child
Protection Team,

                    Defendants.
_____/




        VIDEOTAPED DEPOSITION OF FALLON MCNULTY

           Taken on Behalf of the Plaintiff



     DATE TAKEN:            June 12, 2025
     TIME:                  10:06 AM - 1:18 PM
     PLACE:                 Via Videoconference




     Examination of the witness taken before:
         Jodi J. Benjamin, Court Reporter
   and Notary Public, State of Florida at Large.

            Huseby Litigation
            14 Suntree Place
              Suite 101
        Viera/Melbourne, FL  32940
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 2

```
 1                    APPEARANCES
               (all appearances via videoconference)
 2
 3
        APPEARANCE ON BEHALF OF THE PLAINTIFF
 4
              MICHAEL K. ROBERTS, ESQUIRE
 5      Law Offices of Nooney, Roberts, Hewett & Nowicki
                  1680 Emerson Street
 6              Jacksonville, FL  32207
 7
        APPEARANCE ON BEHALF OF FALLON MCNULTY
 8
              LOGAN M. RUTHERFORD, ESQUIRE
 9        Bryan Cave Leighton Paisner, LLP
                 One Kansas City Place
10                 1200 Main Street
                     Suite 3800
11              Kansas City, MO  64105
12
        APPEARANCE ON BEHALF OF MIKAYLA PRESTON
13
              MATTHEW J. CARSON, ESQUIRE
14               Sniffen & Spellman P.A.
                123 North Monroe Street
15              Tallahassee, FL  32301
16
        APPEARANCE ON BEHALF OF KATHLEEN DULLY
17
              JAMI M. KIMBRELL
18             Howell, Buchan & Strong
                  2898 Mahan Drive
19                   Suite 6
                Tallahassee, FL  32308
20
21                  ALSO PRESENT
22        MIKE STINGO, VIDEOGRAPHER
    YIOTA SOURAS, ESQUIRE - IN-HOUSE COUNSEL FOR NCMEC
23            ALEXANDRA GROSSO
                  AUTUMN ZEPF
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
            DEPOSITION OF FALLON MCNULTY
 2
 3                                         PAGE NO.
 4  Direct Examination by Mr. Roberts         5
    Cross Examination by Mr. Carson          101
 5
    Certificate of Oath                      117
 6  Certificate of Reporter                  118
    Errata                                   119
 7
 8
 9
10              INDEX OF EXHIBITS
11            PLAINTIFF'S EXHIBITS
12  NO.        DESCRIPTION              PAGE NO.
13   A  CyberTipline Report 153739160    (post-marked)
     B  CyberTipline Report 137877848    (post-marked)
14   C  Stanford Publication             (post-marked)
     D  Agreement                        (post-marked)
15   E  Audit Letter                     (post-marked)
     F  Synchronoss Document             (post-marked)
16   G  Motion                           (post-marked)
17
18
19            DEFENDANT'S EXHIBITS
20  NO.        DESCRIPTION              PAGE NO.
21    ************** NONE **************
22
23
24
25
```

Page 4

```
 1         (Whereupon, the following proceedings were
 2  had:)
 3         VIDEOGRAPHER STINGO:  We are on the record in
 4  the video deposition of Fallon McNulty, as
 5  corporate representative of National Center for
 6  Missing and Endangered Children, taken in the
 7  matter of William Lee Lawshe vs. Mikayla Preston
 8  and Kathleen Dully.
 9         Today is June 12th, 2025, and the time is ten
10  oh six a.m.
11         The court reporter is Jodi Benjamin, and the
12  videographer is Michael Stingo.  We are here with
13  Huseby Global Litigation.
14         Will counsel please introduce themselves;
15  after which, the court reporter will swear in the
16  witness.
17         MR. ROBERTS:  Michael Roberts for the
18  plaintiff.
19         MR. RUTHERFORD:  Logan Rutherford, I'm here on
20  behalf of the witness.
21         MR. CARSON:  Matt Carson with Sniffen and
22  Spellman representing Detective Mikayla Preston.
23         MS. KIMBRELL:  Jami Kimbrell with Howell,
24  Buchan and Strong, representing defendant
25  Dr. Dully.
```

Page 5

```
 1  WHEREUPON:
 2                   FALLON MCNULTY,
 3  a witness herein, having been duly sworn, testified upon
 4  her oath as follows:
 5         THE WITNESS:  I do.
 6              DIRECT EXAMINATION
 7  BY MR. ROBERTS:
 8     Q    Good morning.  My name is Michael Roberts, I
 9  didn't get a chance to introduce myself before we
10  started.
11         But can you introduce yourself for the record?
12     A    Good morning.  My name is Fallon McNulty.
13     Q    And, Ms. McNulty, I understand you've been
14  designated as a corporate representative for the
15  National Center for Missing and Exploited Children?
16     A    Yes, that is correct.
17     Q    All right.  Can you tell me what your, what
18  your, your job is at -- and for the court reporter's
19  benefit, we will, we will be using some acronyms today.
20         But is, is the National Center for Missing and
21  Exploited Children, is that sometimes referred to as
22  NCMEC?
23     A    It is.
24         MR. ROBERTS:  Okay.  And so, Madame Court
25  Reporter, when we say NCMEC, that's an acronym,
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 6

```
1    N-C-M-E-C, and that's probably the way that I will
2    refer to it, just for the record so you have that.
3    BY MR. ROBERTS:
4        Q    Okay.  So back to my question, Ms. McNulty.
5    What is your, what's your current position with,
6    with NCMEC?
7        A    I am the executive director of our
8    CyberTipline.
9        Q    And how long have you been doing that?
10       A    In this current role, I was just recently
11   promoted in April of this year.
12       Q    All right.  And what did you do before, before
13   that?
14       A    Prior to this role I was the director of the
15   CyberTipline.
16       Q    All right.  How long have you been involved
17   with the work for NCMEC, specifically involving the, the
18   CyberTipline?
19       A    I've been employed at the CyberTipline since
20   2016, so nearly a decade.
21       Q    And have you been, has your deposition ever
22   been taken regarding your work for NCMEC?
23       A    I have not been deposed previously.
24       Q    Okay.  And so can you give me an idea of what
25   your current role entails, in terms of like what's your
```

Page 7

```
1    job, what are your job duties?
2        A    As the executive director of the CyberTipline,
3    I help to oversee the day-to-day operations of the
4    CyberTipline.  So specifically how we receive reports,
5    especially from electronic service providers, how we
6    process those reports, and how we make them available to
7    law enforcement.
8        Q    All right.  So I had sent a subpoena for a
9    deposition today.
10       Did you have an opportunity to review that?
11       A    I did.
12       Q    And there, there is a, a schedule that's
13   attached to that, that subpoena as Exhibit A, where we
14   ask for certain documents to be produced.
15       Did you review that?
16       A    I did see a copy with the, the list of
17   documents that were requested.
18       Q    Okay.  And, and I did receive documents that
19   were responsive to, you know, to those requests.
20       My question is were you part of the effort to, to
21   gather that, those documents?
22       A    I was.
23       Q    And have you reviewed the documents that were,
24   that were produced?
25       A    Yes, I have had a chance to review them.
```

Page 8

```
1        Q    Okay.  So we're here today, I represent a man
2    named William Lawshe, William Lee Lawshe, regarding some
3    charges against him.  And there were NCMEC reports
4    involved in, in that case.
5        Have you had an opportunity to review the original
6    NCMEC reports that were sent to the Gainesville Police
7    Department in this case?
8        A    I have had the opportunity to review the two
9    CyberTipline reports, yes.
10       Q    All right.  Okay.  So one of the documents
11   that we requested, or information that we requested, was
12   historical information about the evaluation of the
13   specific content that was included in the CyberTip
14   reports.
15       Do you recall that, those requests?
16       A    Yes, I do.
17       MR. ROBERTS:  All right.  And so let me just,
18   if we, if we can, what I'll do is just so we -- I'm
19   going to share my screen, Madame Court Reporter,
20   with what we will mark as exhibit, Plaintiff's
21   Exhibit A.
22   BY MR. ROBERTS:
23       Q    I want to share the, can you see the shared
24   screen there, Ms. McNulty?
25       A    I can.
```

Page 9

```
1        Q    All right.  And does this appear to be the
2    CyberTip report that you reviewed?
3    And for the record it's 153739160.
4        A    From this first page, yes, it does.
5        Q    From the executive summary?
6        A    Yes.
7        Q    Okay.  I want to scroll down --
8        MS. KIMBRELL:  Hey, Michael.
9        MR. ROBERTS:  Yeah.
10       MS. KIMBRELL:  This is Jami Kimbrell.
11       While you're doing that, I know you had
12   indicated yesterday you were going to send a link
13   to the documents that you had received.
14       Did that get sent, if it did --
15       MR. ROBERTS:  I did.  I did send it, you know.
16   I might have just sent it to John.
17       MS. KIMBRELL:  Okay.  Can you have Autumn send
18   it to me now if that would, if that would --
19       MR. ROBERTS:  Sure.  Autumn, can you send that
20   to her?
21       Yeah, she's doing it now.
22       MS. KIMBRELL:  Thank you.
23       MR. ROBERTS:  Sorry about that, Jami.
24       MS. KIMBRELL:  That's okay.
25       MR. ROBERTS:  I had been emailing with John
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 10

1    about the case, I'm sorry.
2        MS. KIMBRELL:  Yeah.
3    BY MR. ROBERTS:
4        Q    Okay.  So we asked you specific questions
5    about hash values that were involved in this case.  And
6    it's hard to read, but did you attempt to locate this
7    hash -- and I'll represent to you it begins with a B06.
8        Did you attempt to locate that hash in the NCMEC
9    CSAM hash list?
10       A    We did.
11       Q    And were you able to find that hash in the
12   NCMEC hash list?
13       A    Are you referring to the CSAM hash list that
14   NCMEC makes available within industry members or within
15   our just general CyberTipline database?
16       Q    Well, let me ask you this.
17       Were you able to find that hash in any list?
18       A    So that MD5 hash value is present within the
19   CyberTipline, based on this report in question that was
20   received by the CyberTipline.  That MD5 hash value was
21   not located in any hash-sharing list that is made
22   available with parties outside of NCMEC.
23       Q    Okay.  So can you -- okay.  I want to, I want
24   to back up here.
25       So where is that hash value located, where were you

Page 11

1    able to locate it?
2        A    This exact MD5 hash value is located within
3    this particular CyberTipline report itself.  That is the
4    only instance in which we've seen this exact MD5 hash
5    value.
6        Q    All right.  So let's go back a second just for
7    the record.
8        What is an MD5 hash value?
9        A    A hash value is a digital fingerprint
10   essentially of a file, so any file could have one.  In
11   this instance, the MD5 hash value represents the
12   uploaded image that was included within this report.  An
13   MD5 hash value is something that is going to be exact to
14   a file.  So it only is repetitive of that exact file or
15   image.
16       Q    And so when you received this report from
17   Synchronoss in this case, does NCMEC run the specific
18   MD5 hash value against a hash list?
19       A    So we do, with any incoming report, any files
20   that are received by the CyberTipline, we look to see if
21   the file has ever been submitted previously by an
22   industry member.  We do that both with the exact MD5
23   hash value, as well as something called a PhotoDNA
24   signature, which is another type of hashing algorithm.
25   And that is to look for any visually similar, near

Page 12

1    identical versions of an image or a video that's been
2    received by the CyberTipline.
3        Q    Okay.  So what do you run that, what database
4    or list do you run that, either the MD5 value or a
5    PhotoDNA, do they call it a fingerprint?
6        A    Or a PhotoDNA signature.
7        Q    Or a, okay, yeah, or a signature.
8        What database or list do you run that against?
9        A    We run that internally against our own
10   CyberTipline database.
11       Q    Internally -- say that again.
12       A    Against our own CyberTipline information.
13       Q    So what do you refer to that as, is that the
14   NCMEC CSAM hash list?
15       A    It is not.  So when I'm referring to the
16   CyberTipline database, that is going to be any images or
17   videos or other files that have been previously reported
18   to the CyberTipline by an electronic service provider.
19   So think of that as all of the files that have been
20   previously reported to the CyberTipline.  The NGO CSAM
21   hash-sharing list that NCMEC creates is a much smaller
22   list of hashes.
23       Q    Have you run this MD5 through the NCMEC NGO
24   hash list?
25       A    We have compared that, yes.

Page 13

1        Q    And did you find the hash in that list?
2        A    We did not.
3        Q    So I understand that -- let's, let's just go
4    back and take a step.
5        So what is the NCMEC NGO hash list?
6        A    The NCMEC NGO hash list is a hash-sharing
7    platform that NCMEC hosts and makes available to
8    participating industry members.  NCMEC contributes
9    hashes to that list of files that have undergone a
10   multi-human review process and that NCMEC has classified
11   as depicting apparent child sexual abuse material.
12       That list also contains hashes from, from other
13   participating NGOs as well.
14       Q    Do you know the names of the other -- and by
15   NGO, are you referring to non-governmental
16   organizations?
17       A    Yes, I am.
18       Q    And who are the other NGOs that participate in
19   NCMEC's NGO hash-sharing list?
20       A    Those include the Internet Watch Foundation,
21   and the Canadian Center for Child Protection.
22       VIDEOGRAPHER STINGO:  Excuse me, Counsel, it's
23   your videographer.
24       Just a heads-up, for video purposes you might
25   want to make the exhibits a little bit larger so

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 14

1    they're legible on, on the video.
2         Thank you.
3         MR. ROBERTS:  Thank you.
4         Thank you for that suggestion, is that better?
5         THE WITNESS:  (Unintelligible.)
6         VIDEOGRAPHER STINGO:  Yes, sir.
7    BY MR. ROBERTS:
8         Q    Okay.  All right.  So it seems that in regards
9    to the MD hash, MD5 hash value that begins with B06,
10   NCMEC, as we sit here today, has run that against its
11   internal list of hashes that have been ever reported by
12   an electronic service provider; is that correct?
13        A    Yes.
14        Q    And you've run it against the NCMEC NGO
15   hash-sharing list that NCMEC contributes to, along with
16   the International Watch Foundation and the Canadian
17   CyberTipline?
18        A    Yes.
19        Q    And this specific hash that begins with B06
20   was not found in the, in the NCMEC NGO hash list?
21        A    That's correct.
22        Q    All right.  Was it found in the internal NCMEC
23   hash list of all reported hash values?
24        A    This exact MD5 hash value was not.  But we
25   also ran a comparison to see if any images with

Page 15

1    different hash values were through, again, that
2    technology and PhotoDNA, and we have seen this image
3    reported to the CyberTipline previously.
4         Q    Prior to January 25th, 2023?
5         A    Yes, that is correct.
6         Q    All right.  Is there any document that you
7    could refer to, or NCMEC has possession of, that would
8    tell me on what occasions, you know, previous to
9    January 25, 2023, that this image had been reported?
10        A    There's not currently a document that has that
11   information.
12        Q    Can you give me any sort of idea how many
13   times prior to January 25, 2023, this particular image
14   had been reported to NCMEC?
15        A    It had been seen in just over two hundred
16   CyberTipline reports.
17        Q    And let me ask you another question.
18   Did you, did you do the PhotoDNA comparison?
19        A    Yes.
20        Q    With the, with the external list?
21        A    We did.  With the hash-sharing list?
22        Q    Right.
23        A    Yes, that is correct.
24        Q    With the hash -- and that did not return any,
25   any results?

Page 16

1         A    No, this image as filed has not been
2    represented on NCMEC's hash-sharing contributions.
3         Q    Or IWF or, or the Canadian CyberTipline?
4         A    So we're only able to query NCMEC's entries to
5    the, to the external hash-sharing list that's shared
6    with industry members.  We don't have visibility
7    necessarily into the entries that other NGO participants
8    make to the list.
9         Q    Okay.  But you did run the MD5 hash against
10   the NCMEC NGO --
11        A    Yes.
12        Q    -- hash list?
13        A    We did run it against NCMEC's entries to the
14   list.
15        Q    Okay.  But it's just NCMEC's entries, it's
16   just NCMEC's contributions to the list?
17        A    Yes, that's correct.
18        Q    So you don't, is it, do you have any way of
19   knowing whether or not this hash appears on IWF or the
20   Canadian CyberTipline?
21        A    No, we would not be able to speak to the
22   entries made by other participating NGOs.
23        Q    Okay.  And so prior to January 25th, 2023,
24   NCMEC had been, or a CyberTip had contained this, this
25   content, did I understand that correctly, a little more

Page 17

1    than two hundred times?
2         A    Yes, that is correct.
3         Q    Okay.  Can you, could you tell from your
4    review of the records about whether or not the image had
5    been viewed prior to January 25th, 2023, by NCMEC staff?
6         A    Yes, it had.
7         Q    And are there any records that reflect those
8    reviews?
9         A    The prior CyberTipline reports would contain
10   that information.
11        Q    Okay.  And so are you able to answer the
12   question that I asked you, had this hash value beginning
13   with B06, had that ever been included in a NCMEC CSAM
14   hash list?
15        A    The MD5 hash value starting with B06 had not
16   ever been included and it had never been seen by the
17   CyberTipline before, nor had it been included in a
18   hash-sharing list.
19        Q    But the content which this MD5 hash represents
20   had been viewed by NCMEC previously?
21        A    Yes.
22        Q    All right.  Do you know how many, or
23   approximately how many images, individual images are
24   contained within the NCMEC CSAM list that it shares with
25   the, with external electronic service providers?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 18

1      A      We have contributed more than ten million
2  entries to the NCMEC entries to the NGO CSAM sharing
3  list.
4      Q      Are those individual, individual images or are
5  those MD5 hash values?
6      A      Those are going to be hash values.  So they
7  are not necessarily unique, there is duplication within
8  the list.
9      Q      Okay.  I thought I saw, and we're actually
10 going to talk about it a little bit later, that NCMEC
11 had employed a company named Concentrix to do an audit
12 of its list.
13     Do, do you recall all that?
14     A      Yes, I do.
15     Q      That indicated that it was something around,
16 over, between five hundred and six hundred thousand
17 individual images.
18     Would that be -- or images or, you know, content
19 files I guess I should say.
20     Is that, does that represent the complete content
21 that NCMEC has contributed to the NGO hash-sharing list?
22     A      Yes, that was representative of the
23 de-duplicated set of images and videos that are
24 represented on NCMEC CSAM hash-sharing list.
25     Q      And so, and I can imagine like in a video or

Page 19

1  something, one particular file may generate multiple MD5
2  hash values; is that right?
3      A      Yes.
4      Q      Okay.  Do you have a sense of, you know, when
5  we talk about the NCMEC NGO hash list that is shared
6  with participating electronic service providers, do you
7  have a sense of how many images or separate content
8  files are contained within that list?
9      A      It's going to be close to that six hundred
10 thousand number from the Concentrix audit.
11     Q      Well, and I'm sorry, probably a bad question.
12 I'm referring also to like the International Watch
13 Foundation and the Canadian center, do you have a sense
14 of like the combined amount of content?
15     A      So, not the de-duplicated content because
16 NCMEC doesn't have necessarily that visibility into the
17 images or videos that are being represented on the
18 contributions made by the other NGOs.  But it is
19 millions and millions of hashes that are being shared by
20 those entities.
21     Q      So just so I understand, so in this case we're
22 talking about Synchronoss or Verizon as an electronic
23 service provider.
24     They have, if they choose to, they can have access
25 to the, the full list of NCMEC NGO hash-sharing list,

Page 20

1  which would include NCMEC, IWF, and Canadian
2  CyberTipline hash values?
3      A      Yes, that's correct.
4      Q      But NCMEC doesn't have that same access?
5      A      We do not access the, the entries from the
6  other participants.
7      Q      Why is that, I'm just curious?
8      A      Really because we couldn't necessarily have
9  access to the files in which those other entities are
10 creating their, their hash lists from.  And also just
11 with different data sharing agreements.
12     Q      Okay.  And I understand that there's a, that
13 NCMEC, NCMEC takes seriously the inclusion of content
14 into its CSAM hash-sharing list.
15     Is that, did I understand that correctly?
16     A      Yes.
17     Q      And you, you, I have seen it described as a
18 triple-vetting process.
19     Did I, did I read that somewhere?
20     A      Yes, that is correct.
21     Q      Can you, can you describe what, what that
22 means?
23     A      Certainly.  So as files are being reviewed
24 that have come into the CyberTipline, we have a separate
25 process for the categorization of those files, including

Page 21

1  the inclusion of identifying which files would be
2  suitable to be represented on NCMEC's hash-sharing
3  contributions.
4      That includes a three-part human review in which
5  initially a first-pass reviewer is going to be assessing
6  the content of what is depicted within that file, and
7  applying a content categorization.
8      It then goes to a second-review process, so a
9  second individual is reviewing that content and seeing
10 if they agree with that content categorization.
11     If at that point the content has gone through the
12 two-part review process and both reviewers have agreed
13 that it depicts apparent child sexual abuse material,
14 it's going to go through a third-party review by another
15 more senior member of our staff who is looking both to,
16 one, ensure that they agree that the file should be
17 classified as apparent CSAM, and also to review the file
18 to see if it's suitable for hash-sharing.
19     Q      And so is, do, do you know whether or not at
20 some point prior to January 25th, 2023, the content
21 which is the subject of the CyberTip report that we're
22 looking at here in Exhibit A had gone through this
23 triple-vetting process?
24     A      This file had been reviewed and had been
25 previously categorized.  Because it is not represented

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 22

1  on our hash-sharing list, it would not have necessarily
2  gone through the triple-vetting process, but it would
3  have gone through the two-person process for the content
4  categorization.
5       Q    And I, so I understand what you're saying,
6  only, only, I guess, I guess it's, in theory, you could
7  go through the three steps, and then the final step
8  someone make the decision, the more senior, that it's
9  not going to be included in the list; is that correct?
10      A    Yes, that's possible.
11      Q    All right.  So this content was previously
12  categorized how?
13      A    This content was categorized and should be
14  included within this report as well, if you look at
15  Section C or Section D of the PDF, but was classified as
16  unconfirmed child pornography.
17      Q    And what does that mean?
18      A    That unconfirmed designation -- yes, that's
19  the designation there.  That indicates that when this
20  file was being reviewed and categorized, it depicted
21  either a sex act or lewd and/or lascivious exhibition,
22  but that NCMEC was not able to confirm the age of the
23  individual depicted.  So we're indicating that it could
24  be CSAM, but it is unconfirmed.
25      Q    So tell me what, what is the standard for

Page 23

1  inclusion into the NCMEC hash-sharing list?
2       A    In order for a file to be included in the
3  NCMEC hash-sharing list that is going to be shared
4  externally, the file has to have been categorized as
5  apparent child sexual abuse material by NCMEC.  That
6  means that the file depicts either a sex act, or lewd
7  and lascivious exhibition, and that it is clearly either
8  a prepubescent child, or if it's a pubescent child, it's
9  a child that NCMEC knows to have been identified by law
10  enforcement as being an individual under the age of
11  eighteen.
12      Q    So obviously prepubescent or has been
13  identified by law enforcement as an individual under the
14  age of eighteen?
15      A    Yes.
16      Q    Did I understand that correctly?
17      All right.  So I want to talk about the law
18  enforcement confirmation.
19      How, how do you guys get that type of information
20  in regards to content?
21      A    So NCMEC's Exploited Children Division has an
22  additional program of work called Our Child Victim
23  Identification Program, or CVIP.  Our Child Victim
24  Identification Program receives information from law
25  enforcement to indicate when a file has been identified

Page 24

1  as depicting an individual that is under the age of
2  eighteen.  So NCMEC similarly holds that information as
3  a national clearinghouse.
4       Q    And I, I think it's, it's true that NCMEC does
5  not have a law enforcement or exploitation file
6  regarding this content which is the subject of
7  Exhibit A?
8       A    We do not to my knowledge.
9       Q    So the, the other potential reason for not
10  inclusion is, is that it does not obviously predict --
11  it does not show an obviously prepubescent child.
12      Do I take it by that that -- well, first of all,
13  let me ask you, the first-pass review and the second
14  individual, do those individuals receive training
15  regarding making these types of determinations that you,
16  you've described?
17      A    They do.
18      Q    And who provides that training?
19      A    That's provided internally with our Exploited
20  Children Division.
21      Q    Can you just describe what that training
22  entails?
23      A    Certainly.  It is very on-the-job training.
24  But as an analyst is first working within the Exploited
25  Children Division, they would be reviewing content that

Page 25

1  has been submitted either to our CyberTipline or to our
2  Child Victim Identification Program.  And they would be
3  sitting with a more senior team member, member of
4  management, and being taught the content categorizations
5  that we use for incoming files, which could be what the
6  actual content itself depicts, so what do we classify as
7  apparent CSAM, or versus unconfirmed child pornography,
8  versus an unclothed child.  And can also entail
9  different additional labeling that could be applied to
10  files as well, so if a file depicts bondage or sadism,
11  if a file depicts an infant.
12      Those individuals who are in training are going to
13  be reviewing thousands of different types of files that
14  are coming in.  And then they are going to be
15  categorizing those files.  As they are categorizing
16  those files in training, again, their trainer, a member
17  of management, is going to be reviewing those
18  classifications and providing feedback to them until
19  they are, are certified within our team for content
20  classification.
21      Q    And it sounds like the, the third review here
22  is the most senior of reviewers before content is placed
23  on a NCMEC CSAM external hash-sharing list?
24      A    Yes, that's correct.
25      Q    Is there any way to identify, you know, the

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 26

1  individual or probably individuals who categorized this
2  content that is the subject of Exhibit A?
3       A    That information is not typically stored
4  within our CyberTipline system.  It could be possible
5  looking back at different records, but I don't have that
6  information today.
7       Q    So is, is there only one for this CP
8  unconfirmed, you've given me a definition, is that the
9  only definition of the unconfirmed categorization?
10      A    Yes, that, it depicts what could be CSAM, but
11 our team is indicating the designation as unconfirmed,
12 again, because they are unsure of the age of the
13 individual who is being depicted.
14      Q    So, and now let me just, just hone in on that
15 a second.  It seems like a two-part, a two-part
16 definition.
17      One is, is that the image depicts a sex act or
18 something that could be characterized as pornography.
19      Is, is that a fair statement?
20      A    Correct.
21      Q    And then the second is a question of the age
22 of the individual that's depicted in the sex act or
23 pornography?
24      A    Yes.
25      Q    Would you agree though that the age of the

Page 27

1  individual depicted is the determining factor about
2  whether or not something is child pornography or adult
3  pornography?
4       A    That is a critical factor, yes.
5       Q    I saw some case out of Florida, it's
6  Williamson, have you ever, are you familiar with that,
7  that case in the, in Florida where it was a NCMEC
8  employee that testified about the definition of
9  unconfirmed?
10      A    I have heard of this case, yes.
11      Q    Yeah, and I just, I just want, and I don't
12 want to belabor the point, but the determining factor of
13 whether you guys confirm or do not confirm whether
14 something is child pornography is in, in the context of
15 like the age of, or the apparent, or your, your
16 perception of the age of the individual?
17           MR. RUTHERFORD:  I'm going to object and just
18      ask that that question be reasked.  I think it
19      was a little bit confusing the way --
20           MR. ROBERTS:  Probably, probably, probably.
21           MR. RUTHERFORD:  Thank you.
22           MR. ROBERTS:  Probably.
23 BY MR. ROBERTS:
24      Q    I don't know that I need to re-ask it.  I
25 think you, I think you have, I think you've made it

Page 28

1  clear that unconfirmed means that we have a sex act or
2  pornography, but we are unsure of the age of the
3  individual depicted in that content.
4       Is that a fair representation of what unconfirmed
5  means?
6       A    Yes, unconfirmed would indicate we believe it
7  could be child sexual abuse material, but ultimately we
8  do not have that determination of age.
9       Q    I've heard the term age-difficult, is that a
10 term that you guys use at all?
11      A    That is a term that is sometimes used, yes.
12      Q    I've heard it used in law enforcement as
13 describing someone who simply, by looking at them, you
14 cannot determine whether they are under the age of
15 eighteen or over the age of eighteen.
16      Is that the way you use that term?
17      A    Yes, we use it similarly.
18      Q    Okay.  Is that, when getting down to,
19 you know, when you talk about it's we cannot determine
20 the age of the individual depicted, is another way to
21 say that, that the individual is age-difficult?
22      A    It could be, yes.
23      Q    Okay.  I asked about who, do you know when
24 this image was, the image that is the subject of Exhibit
25 A, categorized as unconfirmed CSAM?

Page 29

1       A    I don't know that information off the top of
2  my head of when the categorization was applied.  I can
3  tell you that we have been seeing this file since about
4  2010.
5       Q    All right.  Other than subjective -- the first
6  pass, the second review, and the third review, are
7  those, and I'm not trying to minimize what they're
8  doing, but are those subjective opinions of NCMEC's
9  staff regarding the age or content that is depicted?
10      A    Not necessarily.  So, again, NCMEC does house
11 information about children who have been identified by
12 law enforcement, that certainly could pay a factor into
13 imagery that's being represented on NCMEC's NGO CSAM
14 hash-sharing list, as well as our content
15 categorization.
16      Q    Does NCMEC ever engage in investigating
17 whether or not content is, depicts, depicts a minor or,
18 or not?
19      And let me give you an example of what I'm talking
20 about.  In this case, you know, an image was depicted on
21 a website and, you know, an investigator contacted the
22 website, hey, can we have the age verification
23 information.
24      Does NCMEC ever do anything like that in terms of
25 investigating content?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 30

1      A    NCMEC does not investigate any content or any
2  information reported to the CyberTipline.
3      Q    In the, back up a little bit to the NGO, the
4  NCMEC NGO hash-sharing list.
5      Do participating electronic service providers, do
6  they have the ability to choose the, the specific hash
7  list that they match against or they utilize?
8      A    They do.
9      Q    So let's just use Synchronoss because, you
10  know, they're involved in this case.
11      They get access to the NGO hash-sharing list, they
12  can choose to only utilize NCMEC's list?
13      A    Yes.
14      Q    All right.
15      A    Participating industry members are able to
16  both query based on the entering member of a hash, and
17  they are also, regardless of what hashes they are
18  ingesting, able to see which entity contributed that
19  hash to the hash-sharing list.
20      Q    And that was true back in let's say the
21  calendar year 2022, 2023?
22      A    Yes.
23      Q    Is it an opt-in system?
24      So, so that I, if I, if I sign up for the NCMEC NGO
25  hash list, I opt in to receiving NCMEC list, IWF list,

Page 31

1  or Canadian CyberTip list, or am I automatically
2  enrolled in all?
3      A    It's really up to the industry member. They
4  are accessing the hash list through an API, and then
5  they are able to query the list based on the parameters
6  that they are setting up. And they are able to then
7  ingest those hashes that are returned based on the query
8  parameters that they've utilized.
9      Q    I can go ahead and tell you that I'm not going
10  to go through the API technical documents that you guys
11  sent to me because I'm just not able to do that.
12      But in layman's terms, what is, what is an API?
13      A    It's a web service. So essentially it's, it
14  sets up the ability for the company to access the data
15  that NCMEC is holding and to pull that information down.
16  NCMEC does not push any of the information out.
17      Q    So you say a query, is there an affirmative
18  step that a service provider has to take in order to
19  request a hash scan with, let's say NCMEC list, IWF
20  list, or Canadian CyberTip list, is that, is that an
21  affirmative input that has to be made when setting up
22  the API?
23      A    So certainly the company has to search the
24  hashes and then pull those down. In terms of anything
25  that happens from there, that is, is totally on the

Page 32

1  company. So we don't do any comparisons, and we don't
2  push any information. We simply make the hashes
3  available for the companies to access and ingest.
4      Q    You make NCMEC's CSAM list available through
5  the NGO platform; is that correct?
6      A    Yes.
7      Q    But, and, and I think NCMEC sets up the
8  platform to which other NGOs can contribute; is that
9  also correct?
10      A    Yes.
11      Q    But you're not, you're not making any
12  representations or pushing any IWF content or the
13  Canadian CyberTipline, you're not, you have nothing to
14  do with what they are putting in, or how service
15  providers interact with that?
16      A    Yes, that's correct.
17      Q    I saw something in some materials about some
18  feedback that NCMEC can provide to service providers in
19  terms of like a vote up or a vote down.
20      Does that sound familiar to you?
21      A    Yes, that is a feature within the hash-sharing
22  list.
23      Q    Now is that, was that available in 2023?
24      A    I would need to refer to, I believe there's
25  actually an email thread that references when that was

Page 33

1  first released. Off the top of my head, I can't recall
2  if it was in 2023 or 2024.
3      Q    If you can, briefly describe to me what that
4  is, that thumbs-up, thumbs-down kind of thing?
5      A    So the upvote/downvote feature is a feature
6  that allows any participants of the hash-sharing list to
7  essentially upvote an entry or downvote an entry based
8  on their feedback regarding the particular hash entry.
9      Q    And can you be a little bit more specific in
10  what you mean about the, the substance or content of the
11  entry?
12      A    So the upvote and downvote would be utilized
13  so that essentially other industry members could endorse
14  hashes that had been shared, or they could downvote a
15  hash to indicate that they have previously ingested the
16  hash and for whatever reason didn't feel that it was one
17  that other industry members should use, or perhaps they
18  had some type of issue with it.
19      Q    Okay. Is it something that like if something
20  is unconfirmed, would you give that a downvote, or a no
21  vote, or an upvote, how would that work?
22      A    So NCMEC doesn't add any hashes to the NGO
23  CSAM list that would have an unconfirmed designation.
24  We also do not participate in the, the upvote/downvote.
25      And perhaps just to elaborate a little bit more on

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 34

1  that feature. Aside from the NGO CSAM sharing list,
2  NCMEC has multiple other lists that we host as well,
3  some of which we do not participate in, but we host the
4  platform. And so this is a request that was made by
5  industry participants to be able to provide feedback to
6  one another about some of their different hashes that
7  they might be sharing amongst one another.
8       Q    Is there any mechanism, you know, where -- and
9  I'll, and I'll ask this as a hypothetical because I
10  don't want anybody to have to, you know, accept
11  something as true.
12       But, you know, hypothetically if, if it was proved
13  that the model depicted in the content represented in
14  Exhibit A was an adult at the time of the image, is
15  there any mechanism to communicate with whoever has got
16  this hash value on their list so that, that they can
17  remove it from their list?
18       A    There is a, a mechanism both for providing the
19  feedback as well as to retract hashes.
20       Q    But how in this case, right, so do you know
21  the source of this hash?
22       A    This hash has never been contributed to a
23  hash-sharing list by NCMEC.
24       Q    So you don't know what -- let me ask you this.
25  Can you tell from this, this CyberTip report that

Page 35

1  Synchronoss discovered this image by a hash match?
2       A    I don't believe that there's anything within
3  the report to indicate how Synchronoss became aware of
4  the file.
5       Q    Okay. Let me just ask it different.
6       So you, you, as we sit here today, you don't know
7  if Synchronoss used MD5 hash scanning technology to, to
8  discover or pick out this image out of all the other
9  images?
10       A    No, I, I don't know how Synchronoss became
11  aware of this content.
12       Q    And if it was -- you don't know if this hash
13  was contained in any hash list, whether that was an NGO
14  hash list or some other hash list?
15       A    No, I wouldn't be able to speak to that.
16       Q    So in this particular case, would there be any
17  way, you know, at the conclusion of the case if I said,
18  hey, look, you know, here's the evidence that this model
19  was an adult, there would be no way for you to sort of
20  retrace the steps and figure out where the hash came
21  from in order to correct it?
22       A    We would only have the visibility into NCMEC's
23  entries and contributions.
24       Q    Correct. Okay. Not correct, but I
25  understand, I'm sorry.

Page 36

1       Q    Is there overlapping between the content or the
2  hash values in the NCMEC list and the other NGO hash
3  list within the NGO platform, the hash-sharing platform?
4       A    Again, I wouldn't necessarily be able to speak
5  to that because we are not reviewing the entries that
6  are added by the other NGOs.
7       Q    But in theory, and I know, in theory, just
8  thinking through this, if, if a hash and content, the
9  corresponding content was on an IWF hash list shared in
10  the NGO platform, and that came through a CyberTip
11  report to NCMEC, NCMEC would evaluate that, and if they
12  felt it met the three-step, you know, verification
13  process, that hash value and content would be placed on
14  the NCMEC CSAM list; correct?
15       A    Yes, that's scenario is possible.
16       Q    So to that extent, I mean, in theory at least,
17  there is an overlap of content between NCMEC CSAM list
18  that they share with the NGO platform, and IWF or the
19  Canadian CyberTipline's list that they share with the
20  NGO platform?
21       A    There could be.
22       Q    So I'm going to stop sharing right now and I,
23  I just want to, this is to just confirm a little bit
24  about what we're talking about.
25       We're going to mark as -- well, before I do that, I

Page 37

1  apologize. I'm going to mark as Exhibit B, and I'll
2  share this, we won't go through the same level of detail
3  here.
4       Do you see this CyberTipline report?
5       A    Yes, I do.
6       Q    And this is Report 137877848.
7       Did I read that correctly?
8       A    Yes.
9       Q    Did you do the same research regarding the
10  content and hash that is the subject of Exhibit B as you
11  did with Exhibit A?
12       A    Yes, we did.
13       Q    All right. Had that content, was that content
14  included in the NCMEC CSAM hash list that they share
15  externally?
16       A    No, it was not.
17       Q    Had this hash or the PhotoDNA signature, this
18  content, been reported to NCMEC prior to October of
19  2022?
20       A    The exact MD5 hash value had not been seen
21  before, but there were previous versions of this file
22  seen in the CyberTipline based on photo, PhotoDNA hash
23  matching.
24       Q    Same question, about how many times prior to
25  this had this content been the subject of another NCMEC

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 38

1  report?
2      A    This file had been seen in more than one
3  hundred CyberTipline reports.
4          VIDEOGRAPHER STINGO:  Counsel, you might want
5      to blow it up a little bit.
6          MR. ROBERTS:  Thank you again.
7  BY MR. ROBERTS:
8      Q    This is again, had this previously been
9  categorized as unconfirmed?
10     A    Yes, it had previously.
11     Q    And same question, because of that prior
12 review of this content, and the characterization of it
13 as unconfirmed, it was not placed on the NCMEC
14 hash-sharing list which is the external list?
15     A    Correct.  It was not.
16     Q    I, I have seen, there was a recent article,
17 I've seen -- it must be a little bit odd having your
18 deposition taken and knowing I've done a little bit of
19 research on you.  I've seen you give a video
20 presentation at a, a conference last summer talking
21 about, you know, NCMEC and the process and all the good
22 work that you do there.  I didn't know if you know
23 there's a YouTube video of you online giving your, your
24 presentation.
25          But do you keep up with industry literature

Page 39

1  regarding the detection, scanning, reporting of, of
2  images of suspected CSAM?
3          MR. ROBERTS:  And before you answer that
4      question, Madame Court Reporter, when I say CSAM,
5      that is another acronym for child sexual abuse
6      material.
7  BY MR. ROBERTS:
8      Q    Do you keep up with literature like that,
9  Ms. McNulty?
10     A    To some extent.
11     Q    There is a, there's a group at Stanford
12 University called Internet Observatory, the Cyber Policy
13 Center at Stanford University.
14          Are you familiar with that --
15     A    Yes.
16     Q    -- that group?
17          They, they conducted it seems like a fairly
18 comprehensive study that was published in April of 2024
19 where I think they interview NCMEC staff to, to compile
20 that report.
21          Do you, are you familiar with that?
22     A    I am.
23     Q    Have you read that, that report?
24     A    I have.
25     Q    Okay.  And I know that you guys have done an

Page 40

1  audit using Concentrix of your -- and I, and I remember
2  seeing in the video that I think you made the comment of
3  something like, you know, I trust my people to do a good
4  job, but like why should other people trust my people to
5  do a good job.
6          Do you recall making a statement like that?
7      A    I, I do not.
8      Q    Okay.  I was going to say -- anyway, well, let
9  me ask you this question.
10          Why did you guys do the audit of the NCMEC CSAM
11 external hash-sharing list?
12     A    It's something that had not been done before,
13 to our knowledge, by really any other entity either who
14 shares hashes externally.  And we really wanted to
15 highlight just how curated that list is.
16          And so we had engaged with Concentrix who
17 ultimately ended up being the third party who performed
18 the audit to see if they were in agreement of what is
19 represented on NCMEC's hash-sharing list does indeed
20 depict child sexual abuse material.  And the results of
21 that audit was the ninety-nine point ninety-nine percent
22 agreement.
23     Q    I'm actually, and a little bit later I've got
24 it on my, I'm trying to stay with my, with my notes.
25 I'm going to attach that as an exhibit so that we can

Page 41

1  talk a little bit about those results and your efforts
2  to do that.
3          Why is it important -- or let me ask you this.
4          Is it important to have a curated list as you put
5  it?
6      A    I mean, we certainly think it's important for
7  individuals who are ingesting the list to be able to
8  feel that they can remove that content from their
9  platforms, so the child victims who are depicted in that
10 imagery are not having their images and videos
11 recirculated over and over and over again on the
12 internet.
13     Q    I'm going to share what we'll mark as Exhibit
14 C.  And I can represent to you this and you can see it,
15 I'll blow it up before.  This is the Stanford Internet
16 Observatory Cyber Policy Center report I think that we
17 were referring to.
18          And I've highlighted a line here, it says one
19 officer, and they're talking about law enforcement
20 officer, told us that there are a lot, quote, of
21 CyberTipline reports that are images of adults.
22          Do you recall reading this in this report?
23     A    It, it's been about a year since I've read the
24 report, so not necessarily this particular quote; but in
25 general this is familiar to me.

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 42

1  Q    Have you, have you gotten that feedback from
2  law enforcement or industry people that a lot of
3  CyberTip reports are images of adults?
4  A    We receive very little feedback concerning
5  CyberTipline reports.  When we think about the tens of
6  millions of reports that are made available to law
7  enforcement each year, only a few hundred thousand
8  reports ultimately come back to us with law enforcement
9  feedback.  But anecdotally we have heard feedback about
10  the content that is sometimes included by electronic
11  service providers within reports.
12  Q    And, and the feedback is that some of those
13  electronic service providers are providing reports with
14  adult images in it?
15  A    Could be regarding that, could be regarding
16  imagery that is perhaps age-difficult, it could be
17  regarding reports that are submitted by industry members
18  that might just not have enough information for law
19  enforcement to determine even what is occurring.
20  Q    And when you say it could be, you're
21  describing the different types of feedback that you get,
22  not, it's not hypothetical, you have gotten those types
23  of feedback?
24  A    Yes, we, we do receive that anecdotal
25  feedback.

Page 43

1  Q    And is that part of the motivating factor, in
2  at least part, for auditing your, your list, and the
3  three-step verification process that you guys go
4  through?
5  A    In terms of the three-step verification
6  process, we truly want our NGO CSAM contributions to be
7  the best of the best.  We deserve or we believe that
8  these children and survivors deserve to not have their
9  content being recirculated online, and for that
10  revictimization to be happening over and over again.
11  The audit was seen as a way to also have a third
12  party come in and similarly be able to say that the
13  content depicted within that list are indeed CSAM.
14  Q    And I know you guys have a congressional
15  mandate to be the, the clearinghouse for child sexual
16  abuse material; correct?
17  A    We are authorized to, NCMEC is authorized to
18  operate about sixteen different programs of work,
19  including the CyberTipline.
20  Q    Is there any concern from NCMEC though
21  regarding the rights of, privacy rights of individuals
22  who may be falsely accused of possessing child
23  pornography based on inaccurate or uncurated hash lists?
24  A    So NCMEC doesn't make any determination about
25  the validity of information that's included within a

Page 44

1  report.  Ultimately as a clearinghouse, we're serving
2  two main functions.
3  One is we are constantly triaging the tens of
4  thousands of reports that we're receiving each and every
5  day to prioritize the risk to a child.  So we are
6  constantly looking to surface any reports where a child
7  may be imminently in harm's way.
8  Secondly, we are looking to see and determine where
9  that report resolves to based on the information that's
10  contained within that report so it can be made available
11  to the appropriate law enforcement agency for their
12  independent review.
13  Q    You understand, or do you understand that if,
14  if law enforcement is having to deal with images of
15  adults, that that takes away from the time that they can
16  focus on children?
17  A    It would really depend in what context.  There
18  are certainly reports that come into the CyberTipline
19  which depict adults who are perhaps engaged in sexually
20  abusing a child, adults who are engaged in online
21  enticement or sextortion of a child.  So we do receive
22  information concerning adults.
23  Q    Have you ever gotten complaints from law
24  enforcement, like something to the effect of, hey, you
25  know, we're, we're drowning in the amount of CyberTip

Page 45

1  reports that we get, in the context of complaining about
2  the accuracy of the reports?
3  A    We have heard feedback from law enforcement, I
4  would say pretty universally that there is a very high
5  volume of cases being referred related to online child
6  sexual exploitation.  The reports that NCMEC receives go
7  out globally, so it would not just be here within the
8  United States.
9  And certainly there are a lot of different laws, a
10  lot of different things that law enforcement may find
11  actionable in one area of the world that might not be
12  true in another area of the world.  So, essentially, as
13  we're referring those reports out, we are allowing law
14  enforcement to, to be performing that triage on their
15  end, again, through that independent review as they
16  receive a report.
17  Q    And I'm, I'm not, I'm not suggesting that
18  there should be, but does NCMEC have any policies or
19  procedures or practices that are designed to protect the
20  privacy of the individuals who are described as suspects
21  or targets in CyberTipline reports?
22  A    I'm not sure I understand that question.
23  Q    So CyberTipline reports, not always but, but
24  generally can identify a, a suspect or a target who is
25  in possession of alleged CSAM or child sexual abuse

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 46

```
1   material.
2       Do I understand that right?
3       A   Yes, the report could contain information
4   about a user or an account --
5       Q   Right.
6       A   -- that's been reported.
7       Q   Right.  My question is are there any policies
8   or practices or procedures that are designed to protect
9   the privacy of those individuals who are identified as
10  possessing or, let's just say possessing child sexual
11  abuse material?
12      A   Well, certainly CyberTipline reports can only
13  be shared with law enforcement.  So that information, as
14  it's being received to the CyberTipline, whether it's a
15  report that's being submitted by a member of the public
16  or an electronic service provider, all of that is
17  happening in a secure manner in our system.
18      And then the reports are made available to law
19  enforcement via secure electronic connection.  Law
20  enforcement, who has direct connectivity with the
21  CyberTipline, is then able to come into our system to
22  retrieve those reports.
23      So there, there's no information sharing outside of
24  that pipeline from the CyberTipline except to law
25  enforcement.
```

Page 47

```
1       MR. ROBERTS:  So we've been going about an
2   hour, do people want to take a break or --
3   customarily, Ms. McNulty, we'll take a break every
4   hour for comfort.
5       But I'm just, I just want to throw that out
6   there, does anybody want to take five or anything
7   like that?
8       MR. RUTHERFORD:  I would, I would normally
9   take a break right around now, but I guess I'm
10  just, if you, if you have only thirty minutes left,
11  then we wouldn't take one.  But, but if you have --
12      MR. ROBERTS:  I don't know how much longer,
13  you know, I kind of make it up as I go along.
14      MR. RUTHERFORD:  That's fine.  Then let's,
15  then let's take a break.  That's fine.
16      MR. ROBERTS:  Yeah, we'll take, take
17  five-minute break, guys, okay.
18      MR. RUTHERFORD:  Thank you.
19      MR. ROBERTS:  All right.  Thank you.
20      VIDEOGRAPHER STINGO:  Off the record, eleven
21  sixteen a.m.
22      (Whereupon, a break was had from 11:16 a.m. to
23  11:23 a.m.)
24      VIDEOGRAPHER STINGO:  On the record, eleven
25  twenty-three a.m.
```

Page 48

```
1   BY MR. ROBERTS:
2       Q   Okay.  Thank you, Ms. McNulty, for the quick
3   break there.
4       I just want to kind of follow up on some of the
5   questions and we'll move on.
6       In regards to the source of a particular hash from
7   the NGO hash list, does a service provider have ability
8   to know the source of that hash?
9       A   They have the ability to see the entering
10  member.  So, for example, if a hash was contributed by
11  NCMEC, they would be able to see that within the entry.
12      Q   Or in this case if, if hypothetically the hash
13  was contained within the NGO list, it would have had
14  someone, it would not have said NCMEC, it would have had
15  IWF or the Canadian organization?
16      A   Yes, that's correct.
17      Q   Is there, and we'll talk about it briefly in a
18  little bit, but I, I see email communications between
19  Synchronoss and staff at NCMEC.
20      Does, is there the ability, is there an ability for
21  a service provider to inquire about particular content's
22  categorization or anything like that with NCMEC?
23      A   So certainly any member or any registrant who
24  is accessing the hash list would be able to be in
25  contact with our team at the CyberTipline for any
```

Page 49

```
1   questions that they had about a particular hash that
2   NCMEC contributed, or about accessing the hash list
3   itself.
4       Q   In, in this case, if, if, let's say there was,
5   you know, I'm a service provider and I, I get an image
6   and I don't know, you know, like it's, it's difficult,
7   right, and I'm trying to figure out what to do.
8       In this circumstance, it's not on a NCMEC list
9   but -- well, it is on the internal NCMEC list, could I
10  as a service provider inquire about, you know, how has
11  NCMEC categorized this image if it exists on that list?
12      A   That wouldn't be common, but certainly a
13  company could reach out with, with questions.
14      Q   Sure.
15      A   Similarly, if a company had questions about
16  any hash that they had ingested from the list that was
17  added by a different member, so in this instance a
18  different NGO, they could certainly reach out to NCMEC
19  and we would be able to provide them with the
20  appropriate contact information for that other entity
21  that had added the hash.
22      Q   But essentially NCMEC is there to provide
23  information if there's questions about content, if NCMEC
24  has reviewed it and categorized it, it's certainly not
25  something that you're prohibited from sharing with a,
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 50

1   with a member?

2       A    Certainly if they have any questions about the
3   hashes that we've added to the list.

4       Q    Or, and I, and specifically this question is
5   content that you've reviewed and decided not to add to
6   the list, you have a record of that content as well
7   internally?

8       A    Not, not necessarily.  I'm not sure I really
9   understand the, the question.

10      Q    So you keep an internal, I thought I
11  understood you keep an internal list of all of the
12  content, whether it's MD5, I know MD5 is not content,
13  but of the MD5 hashes or PhotoDNA that you receive in
14  reports even though they are not included in the
15  external NCMEC CSAM list; is that correct?

16      Did I understand that correctly?

17      A    Yes, any file that's been reported to the
18  CyberTipline, we would have record of that file.

19      Q    And in that record, and do you search that
20  list by either a PhotoDNA signature or the MD5 hash
21  value?

22      A    Yes, we can.

23      Q    Okay.  So if I was a member and I had a
24  question about, you know, NCMEC's categorization of
25  content, could you, could you access that list as well,

Page 51

1   not just the external list?

2       A    So if an, if I'm understanding your question
3   correctly, if a, say an industry member had an MD5 hash
4   value or some other hash value and they wanted to know
5   if NCMEC had seen that reported to the CyberTipline
6   before, we certainly could query the CyberTipline to see
7   if it had.  And, you know, of course we could share if
8   we had previously categorized it, what NCMEC categorized
9   it as.  But ultimately it would really be up to that
10  industry member to make any determination about what
11  action they would be taking with that file.

12      Q    You don't give them any advice about what
13  their reporting obligations are or what they should do,
14  I would assume that you don't?

15      A    That's up to, to the industry member.

16      Q    Right.  Right.  NCMEC doesn't provide advice
17  to them about what they should do?

18      A    Correct.

19      Q    Yeah, yeah, yeah, yeah, yeah.

20      Okay.  So I just want to, we requested any and all
21  agreements or memorandums of understanding, and I guess
22  we're at Exhibit, is it D, I want to share what we'll
23  mark as Exhibit D.

24      This is the, can you see the screen there?

25      A    Yes.

Page 52

1       Q    Okay.  This was the only agreement that NCMEC
2   produced in, in a request for both, you know, the
3   agreements for Verizon and Synchronoss that were in
4   effect at the time of these two reports.

5       Was this the only agreement that you were able to
6   locate?

7       A    Yes, it is.

8       Q    And so Verizon does not have a current
9   agreement with NCMEC.

10      Do I understand that correctly?

11      A    They do not.

12      Q    Have they ever to your knowledge?

13      A    Not to my knowledge.

14      Q    Now earlier you, you indicated and you did
15  provide sample agreements of the other, I think there's
16  three different hash lists that you got, or there's four
17  in total but, there's four in total hash lists that you
18  guys provide access to electronic service providers; is
19  that correct?

20      A    Yes, it is.

21      Q    Can you just tell me what those four are?

22      A    Certainly.  So this one which we're looking at
23  right now is our non-profit CSAM hash-sharing list or
24  our NGO CSAM list.  That is the one that NCMEC
25  contributes CSAM hashes to, as well as the other NGOs

Page 53

1   that we discussed.

2       Additionally, we host the NCMEC exploitative
3   hash-sharing list.  That contains entries contributed by
4   NCMEC of sexually exploitative files that do not
5   necessarily rise to the definition of child sexual abuse
6   material, but depicts children either who are unclothed
7   or in sexually exploitative, otherwise being explicit,
8   we make that available to industry as well should they
9   choose to remove that content from their platforms.

10      We also host a take-it-down hash-sharing list.
11  That is a list that marries up with it, with our
12  take-it-down service in which minors or survivors are
13  able to submit hashes of images or videos depicting
14  themselves from when they were under the age of
15  eighteen.  And then in turn we share those hashes with
16  participating industry members.  That list NCMEC does
17  not have any visibility into those files necessarily
18  because we are only receiving the hashes, not the images
19  or the videos themselves.

20      And then finally we host an industry CSAM sharing
21  list.  And that is something where industry members are
22  able to share hashes amongst one another; but, again,
23  NCMEC does not contribute to, or review, or interact
24  with that list in any way.

25      Q    So in response to the subpoena, or the

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 54

```
1   schedule on the deposition subpoena, you guys produced
2   one agreement with Synchronoss.
3         Do I take it that there were no other agreements
4   regarding the other hash-sharing lists that NCMEC
5   supports?
6         A    Yes, we do not have record of any other
7   agreements with Synchronoss.
8         Q    Or Verizon?
9         A    Nor Verizon.
10        Q    And I think you were, this was kind of what
11  you were just touching on, this is specifically the NGO
12  hash-sharing list, this agreement; correct?
13        A    Yes.
14        Q    And under NCMEC responsibilities, it says
15  NCMEC does not submit and is not responsible for
16  information submitted to the non-profit database by
17  participating non-profits.
18        Do I understand that correctly that what you're
19  saying is NCMEC is responsible for the, the hash lists
20  that it provides, but not for the stuff that other NGOs
21  provide?
22        A    Yes.
23        Q    And in the agreement, the registrant, I guess
24  in this case Synchronoss, they accept all information
25  contained in the not, in the non-profit database,
```

Page 55

```
1   including but not limited to PhotoDNA signatures, hashes
2   and categorizations as is without warranty of any kind,
3   and assumes all risks and liability associated with
4   using the information contained in the non-profit
5   database.
6         Was this the agreement that was in force and effect
7   in October of 2022 and January of 2023?
8         A    Yes, that paragraph would have been included
9   in those years as well.
10        Q    And, and so NCMEC makes it clear at the time
11  that registrants agree to use these lists, that the
12  information is provided as is and that there are no
13  warranties about the accuracy of the information
14  contained in the NGO list?
15        A    Yes.
16        Q    I understand that NCMEC does what they believe
17  are best efforts to ensure that their lists are
18  accurate.
19        But do you have any visibility into the
20  International Watch Foundation or Canadian CyberTip as
21  to what their either definition or threshold for entry
22  into their CyberTip hash lists are?
23        A    I'm not familiar with their internal
24  practices.
25        Q    Okay.  And NCMEC makes no representations that
```

Page 56

```
1   the NGO list is triple-verified or accurate in any way
2   other than the things that they have contributed.
3         Do I understand that correctly?
4         A    Yes, we don't make that assertion,
5   observation anywhere within this agreement.
6         Q    I think I understood you say earlier that
7   your, your audit with Concentrix -- and I'll, and I will
8   attach, let me just attach it before I ask you.
9         I've attached what we'll mark as E, Plaintiff's
10  Exhibit E.
11        Do you recognize this document?
12        A    I do.
13        Q    And what is this?
14        A    This is a letter from Concentrix to NCMEC with
15  the results of Concentrix audit of NCMEC's hashes that
16  are represented on our CSAM hash list.
17        Q    I think I heard you say, and I think it maybe
18  is referenced in here, that to your knowledge this is
19  the first industry, industry-wide, this is the first
20  audit of a hash list?
21        A    I'm not aware of, of any others, or at least
22  any others that have been spoken about publicly in this
23  way.
24        Q    I think the, in the conclusion it was
25  fifty-nine, they found fifty-nine exceptions out of five
```

Page 57

```
1   hundred and thirty-eight thousand and change.
2         And you guys removed those, it looks like as soon
3   as practical, as soon as you were in a, notified of
4   those, you removed those from the hash lists?
5         A    Yes.
6         Q    This audit did not cover the content in the
7   NGO, the NGO hash-sharing list contributed by IWF or the
8   Canadian organization?
9         A    No, this only concerned the NCMEC hashes.
10        Q    So going back to Exhibit A, I just want to
11  kind of go through this document.  We've looked at the
12  executive summary.
13        I want to talk about the incident time.  I've read
14  in some of your training materials, warnings to law
15  enforcement, that electronic service providers may be
16  providing inaccurate incident times.
17        Does that sound familiar?
18        A    I wouldn't characterize it as inaccurate so
19  much as that different industry members may utilize this
20  field for different purposes.  We have an additional
21  field which is incident date and time description in
22  which the industry member can choose to clarify exactly
23  what the incident time reflects.
24        But in this instance that information was not
25  provided within this report.
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 58

1    Q   So you don't really know what Synchronoss --
2  from, from this report, it's, you're unable to know what
3  Synchronoss meant by the, the incident time?
4    A   Yes, we don't have that further clarification
5  in this section of the report.
6    Q   Okay.  And let me, let me just go back up
7  because I think just, just for the record the, there's a
8  time stamp on the report of 1/25/2023 at twenty-one
9  eighteen twelve UTC.
10   Does, did I read that correctly?
11   A   Yes.
12   Q   And the incident time, is that the exact same
13  time down to the second?
14   A   It looks to be, yes.
15   Q   How does NCMEC generate the received by NCMEC
16  on, how do you generate that time?
17   A   Our system generates this time at the point in
18  which the, the company submits the report to the
19  CyberTipline.
20   Q   Are you confident that that is an accurate
21  recording of the time that NCMEC received the report?
22   A   Yes, I am.
23   Q   So in this instance, would you agree with me
24  that it appears that the incident time provided by
25  Synchronoss is, is simply the time that they hit the

Page 59

1  button to send the report to Synchronoss -- I mean to
2  NCMEC, I'm sorry?
3    A   Yes, it does appear to be reflective of the
4  time they submitted the report to the CyberTipline.
5    Q   It doesn't appear to be reflective of the time
6  of any conduct of the person that they've identified as
7  either possessing, manufacturing, or distributing child
8  pornography?
9    A   I wouldn't be able to speak to that based on
10  the, the limited information that they included within
11  this report.
12   Q   So the, under the uploaded file information,
13  we have a file name, the MD5 number that we've spoken
14  about.  There's an indication that says, did reporting
15  ESP view the entire contents of the uploaded file.
16   Do you see their answer?
17   A   Yes.
18   Q   What do you take that to mean?
19   A   That Synchronoss indicated that, yes, that
20  the, that Synchronoss viewed the entire contents of the
21  uploaded file included within this report.
22   Q   Does that include, does it have to be
23  Synchronoss or could it be some other entity that they
24  hire?
25   A   That information's not included within the

Page 60

1  report, and I'm not familiar with, with how Synchronoss
2  operates or answers this question.
3    Q   Okay.  It says were the, were entire contents
4  of the uploaded file publicly available.  It says no.
5    What does that mean to you?
6    A   To me that, I take that to mean that this file
7  was not publicly available.
8    Q   And then there's an image categorization by
9  the ESP A2.
10   What does A2 mean?
11   A   If you are to scroll down into Section B, we
12  provide a definition.
13   So this is a industry categorization or
14  classification that was created by industry and is used
15  by industry.  Synchronoss here indicated A2, which
16  indicates that a, the file depicts a prepubescent minor
17  engaged in lascivious exhibition.
18   Q   So NCMEC had previously viewed this content
19  and made the determination that it did not depict
20  someone who was obviously prepubescent; correct?
21   A   Correct.  We indicated that the file was
22  unconfirmed.
23   Q   This categorization of A2, that information is
24  contained or potentially -- let me ask, start with it
25  this way, potentially, is potentially included in the

Page 61

1  information on the NGO hash-sharing list.
2    Do I understand that correctly?
3    A   In this context, this information was provided
4  by Synchronoss at the time of submitting the report.
5    Q   But my question is when you have a hash match
6  in the NGO, if -- and this is hypothetically, right.
7    If you have a hash match in the NGO hash-sharing
8  list, does that match, can it come with the
9  categorization of the image as A1, A2, B1, B2?
10   A   There are a number of different
11  categorizations that contributing members can include
12  within the hashes that they are sharing, whether to the
13  NGO list or other hash lists that NCMEC hosts.
14   Q   Let's just go back here to, because I want
15  to clarify this.
16   So this is our Exhibit, I think D, this is the, the
17  contract with, or the agreement with Synchronoss.
18   And there's an Exhibit 1.  And it says that
19  participating non-profits are required to submit
20  information to the non-profit database in the fields
21  indicated below.
22   So when, do I understand when an NGO places a, a
23  hash in their list that they're sharing externally, they
24  are required to put their name, the PhotoDNA signature,
25  the MD5 hash value, they have to identify that they're

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 62

1  using the industry-standard child pornography
2  categorization, and they have to include their
3  categorization of the image.
4      Do I understand that correctly?
5      A    That is how it's laid out here in this
6  agreement which is a bit older and perhaps had some
7  historical language.  But there is not currently a
8  requirement for that, that industry classification or
9  categorization to be included with a hash-sharing entry.
10     Q    In 2018, when this agreement was signed, was
11  that a requirement?
12     A    I don't recall that off, off --
13     Q    Okay.
14     A    -- the top of my head.
15     Q    In any event in -- let's just ask it this way.
16  It is possible that NGOs have included this
17  categorization information in, within the NGO CSAM list?
18     A    Yes, it's possible.
19     Q    Especially historically possible, content
20  maybe that's been in there for some time may more likely
21  have that type of information?
22     A    It, it's really up to the, the entering
23  member; but, yes, it's possible that, that they're
24  utilizing the industry classification.
25     Q    Okay.  Well, at the very least -- let me ask

Page 63

1  you this.
2      Is it still required that they, that they include
3  their name with the submission of a hash to the list?
4      A    Yes, the, the member name is always going to
5  be included, as well as then the, the fingerprints or
6  hashes that they are including with the entry.
7      Q    And for every entry, do they include both the
8  PhotoDNA and the MD5?
9      A    Not necessarily.  So especially as time has
10  gone on, we have seen different entities, different
11  companies use a, a multitude of different hashing
12  algorithms.  So there are certainly entries within the
13  list that don't necessarily have both an MD5 and a
14  PhotoDNA signature.  It could be some other type of hash
15  fingerprint.
16     Q    One question that I had here, and this may be
17  a little bit out of order.
18     But do you have some idea of the frequency in which
19  NCMEC transmits reports of unconfirmed child pornography
20  to law enforcement?
21     A    That would be on nearly a daily basis.
22     Q    So, and I know that NCMEC, CyberTip reports
23  come from multiple sources; correct?
24     It's not all electronic service providers, they can
25  come from other sources; right?

Page 64

1      A    Yes, we could receive reports from members of
2  the public as well.
3      Q    Is it, I mean, can you venture a guess on like
4  what the percentage is?
5      A    I would imagine it's, the vast majority is from the
6  electronic service provider.
7      A    Yes, about ninety-nine percent of our reports
8  come from industry.
9      Q    What I would like to do is your, is get your
10  best estimate of the percentage of reports which result
11  in unconfirmed, a report of unconfirmed child
12  pornography.
13     A    I don't have a, a figure in mind for, for last
14  year.  It is a large portion of the reports that come
15  into the CyberTipline.  Especially as we have seen an
16  increase in incidents concerning online enticement of
17  children, of content that is being produced by victims
18  and used themselves.  We might not have that information
19  at the onset of receiving a report to indicate or to
20  know that that individual is under the age of eighteen.
21     Q    I mean, is it, can it, more or less than half
22  of, of the reports that go to law enforcement are
23  unconfirmed?
24     A    So actually a, a fairly small percentage of
25  the reports that are being referred out by the

Page 65

1  CyberTipline are being reviewed and receiving that
2  categorization.  We have a fairly small team here, and
3  we receive tens of millions of reports each and every
4  year.  So certainly the focus is reviewing content and
5  information certainly where a child is at risk.
6      Q    Sure.
7      A    Content that's never been seen before, reports
8  that are resolving here within the United States.  But
9  there are, is a multitude of reports that are being
10  auto-referred, especially to international law
11  enforcement, by our system where we wouldn't necessarily
12  have that information to provide the breakdown of that
13  content categorization.
14     Q    Is every service, is every report received by
15  NCMEC from an electronic service provider at least run
16  through the internal NCMEC system?
17     A    We do have a number of internalized alerts in
18  which information is being checked across the
19  CyberTipline application really to help us surface any
20  incidents that are incoming in which a child may be at
21  imminent risk.  So that would include the system
22  reviewing if that file had been seen before through that
23  hash-matching technology.  It could also include
24  information about any kind of chat or text that's,
25  that's included as well.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 66

1    Q    So, I mean, I guess back to my question, then
2    we can back out of it.
3        Do you think that it's, it's more than half of the
4    reports that are sent to law enforcement in the United
5    States are child pornography unconfirmed?
6    A    I, again, and I don't have the, the exact
7    numbers.
8    Q    Right.
9    A    I don't know that I would say more than half,
10   because again unfortunately --
11   Q    Sure.
12   A    -- we see some of the same content depicted
13   and recirculated over and over and over again of
14   identified child victims, known survivors. And much of
15   that content depicts the rape and sexual abuse of
16   prepubescent children.
17   Q    But the consent that you're talking about
18   would be confirmed. If you're talking about
19   recirculation of, you know, things that are obviously,
20   you know, prepubescent or recirculating of things, those
21   would be confirmed reports of child pornography;
22   wouldn't they?
23   A    Yes.
24   Q    So what I'm talking about is, so this image
25   that's the subject of, you know, Exhibit A, has been

Page 67

1    recirculated over two hundred times. The, the content
2    which is the subject of CyberTip from Exhibit B has
3    been, you know, circulated over a hundred times. So
4    just these two images are three hundred, you know, over
5    three hundred CyberTip reports that are unconfirmed.
6        That's what I'm trying to get a sense of is how
7    often are those types of reports getting pushed out to
8    law enforcement in the United States?
9        MR. RUTHERFORD: And, I'm sorry, I'm going to
10   have to object. I, I really don't even know what
11   the question was there.
12       MR. ROBERTS: Yeah, I'll re-ask it.
13   BY MR. ROBERTS:
14   Q    So you receive reports like the one in Exhibit
15   A everyday; correct?
16       Electronic service provider has got a hash match
17   with some list and they're attaching an image and
18   saying, hey, this is possession of child pornography.
19       You get that everyday; right?
20   A    We certainly receive reports everyday from
21   electronic service providers that contain uploaded
22   files.
23   Q    And those files, you have to I think by
24   statute, you have to forward those CyberTip reports to
25   the applicable law enforcement if you are able, if you

Page 68

1    have like, you know, enough information to identify the
2    law enforcement, relevant law enforcement; correct?
3    A    We do make all CyberTipline reports available
4    to law enforcement.
5    Q    Right. So what I'm trying to get at is how
6    many of those, whether it's daily, monthly, yearly, are
7    of uploaded files that have been reviewed by NCMEC and
8    categorized as unconfirmed?
9    A    And that's where I don't have a number to
10   provide off the top of my head.
11   Q    So you guys have a list, you maintain a list
12   of all the content that has been reported on a CyberTip,
13   through the CyberTipline; correct?
14   A    We maintain a record of every file that's been
15   reported to the CyberTipline, yes.
16   Q    Can you query that database by the term
17   unconfirmed?
18   A    Not in that manner; but, yes, we would be able
19   to query our database to see how many files have been
20   categorized as unconfirmed child pornography.
21   Q    And would that like print out some sort of
22   like a log if you, if you, if you queried it and it
23   would come up with like these are the, these are the,
24   this is the content that we've categorized as
25   unconfirmed?

Page 69

1    A    In theory, yes, we could try to do that.
2    Q    But if I asked you to do that, you could try
3    to do that?
4    A    Yes.
5    Q    That's something you have the capability of
6    doing.
7        Okay. So to go back to, I think it was Exhibit A.
8        What was, and so we talked about, do you recall the
9    training material where you were, where we were talking
10   about law enforcement, warning them about the incident
11   time?
12   A    Are you referring to the, our PowerPoint
13   presentation?
14   Q    Yeah, I think that's where I saw it.
15       Rather than like digging through it and pulling it
16   up, can you tell me about that?
17   A    Yes, so as I stated earlier, so one of the
18   things that we highlight here is that the incident time
19   could represent different things to different industry
20   members.
21       We also have a field available for incident time
22   description in which a company can choose to clarify
23   what this time reflects within their reports, but that
24   was not included within this CyberTipline report.
25   Q    So Synchronoss had the ability to clarify what

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 70

1  they meant by an incident time in this case?
2      A   Yes.
3      Q   And they did not do that?
4      A   That information is not included.
5      Q   There's also just a general comment section
6  where they can add context or commentary to a CyberTip
7  report.
8      Do I understand that?
9      A   Yes.
10     Q   And did they do that in this case, in
11 Exhibit A?
12     A   There is not any additional information that's
13 included here.  I believe I did see some texts that they
14 had included above earlier in Section A.  Yes, says
15 company information.
16     Q   Okay.  But not any context about the, the
17 content that they're reporting?
18     A   Yeah, this is the extent of what they included
19 within the report.
20     Q   So we already talked about this, the entire
21 contents of the uploaded file publicly available, no.
22 We talked about what you understood that to mean.
23     Is it, do sometimes people add like a website, like
24 here's the website, here's the URL where this can be
25 found?

Page 71

1      A   For the uploaded file information?
2      Q   Yes.
3      A   Yes, there is a field that's available where
4  the company could choose to include additional
5  information about where that file was first seen or
6  other information about the reported incident.
7      Q   Where it was downloaded or uploaded from?
8      A   They could provide a URL.
9      Q   So when you guys are determining where to,
10 because you get a report and then you disseminate it,
11 correct, to law enforcement?
12     Do you guys ever report websites for publishing
13 CSAM?
14     A   We do have a separate program within the
15 CyberTipline.  So any reports that we receive, whether
16 from members of the public or electronic service
17 providers, if those concern URLs that are reported to
18 still be hosting CSAM, our team does access those URLs.
19 And if we do find CSAM depicted on that platform, we
20 send a notification to that service provider alerting
21 them that CSAM is being hosted on the platform.
22     Q   So this particular image was, I can represent
23 to you, published on a publicly dot com, you know,
24 website for ten years, fifteen, ten years, at least ten
25 years.

Page 72

1      If somebody would have reported that website in
2  conjunction with one of these CyberTip reports, what
3  action would NCMEC have taken?
4      A   It would depend on the, the context included
5  within the report.  If this report was submitted by
6  Synchronoss and it also included the URL, because we
7  have that location information from the phone number, we
8  would still be referring this to law enforcement for
9  their independent review.
10     Q   But would you have taken, how, what do you
11 have, what has to happen for you to get it into that
12 program where you, you would contact the website and
13 say, hey, take this down or, you know, you got child
14 pornography on your website?
15     A   So if we received a report that solely
16 contained a URL, or perhaps contained some additional
17 information indicating that possible CSAM was being
18 hosted somewhere, and we didn't have any other
19 information within that report in order to, to make it
20 available to law enforcement, that is at the time the
21 team would be accessing the URL and assessing what
22 content was hosted there.
23     Q   And this is just perhaps an aside but, I mean,
24 you've spoken today about, you know, the recirculation
25 and victimization of children's images online.  It seems

Page 73

1  that -- or let me ask another question.
2      Wouldn't you agree that efforts should be made, if
3  images of children are being published on public
4  websites, that efforts should be made to remove that?
5      A   Of course.  If child sexual abuse material is
6  being hosted online, that, that content should be
7  removed.
8      Q   Have you guys ever given the industry feed,
9  and when I say industry I mean electronic service
10 provider, industry feedback on the importance of
11 clarifying the incident time, you know, or providing
12 accurate incident time information?
13     A   We frequently provide feedback to industry
14 members about improving the quality of information
15 provided within CyberTipline reports, including things
16 like incident time, description, and that clarification.
17     Q   And has Synchronoss or Verizon been on the
18 receiving end of some of that feedback?
19     A   Thinking back over the years, yes, they have
20 certainly heard from the team about different areas for
21 improvement within their reports.
22     Q   Including the incident time?
23     A   Off the top of my head I would not be able to
24 speak to that field specifically.
25     Q   But that's something that you include in your,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 74

1  or have included in your, your training material and
2  PowerPoints in the past?
3      A    Yes, that information is included in
4  PowerPoints provided by NCMEC.
5      Q    To law enforcement?
6      A    Yes.
7      Q    We've talked about this section and the, the
8  definitions.  I guess if there's any -- let me just, let
9  me just go through this real quickly.
10     It seems that in the -- I'm going to share the
11 Synchronoss agreement with you one more time because I
12 think it has also information regarding the
13 characterization.
14     NCMEC, this is the agreement -- first of all, does
15 NCMEC draft this agreement for the non-profit sharing
16 database access agreement, is this drafted by NCMEC?
17     A    Yes.
18     Q    Okay.  So NCMEC provided Synchronoss, or
19 anyone else who is a member, this guideline.  It says,
20 as a general guideline, prepubescent is appropriate when
21 the subject of the image lacks breast/hip development,
22 has no pubic/facial/underarm hair, testicles have not
23 dropped away from the body, development of muscle tone
24 and body curves has not occurred, and, if audio is
25 available, the voice has not deepened.

Page 75

1      Is that the guidance that Synchronoss, I'm sorry,
2  that NCMEC still provides to companies that sign up for
3  access to the NGO list?
4      A    I would have to refer to one of our more
5  recent agreements.
6      Q    Okay.  Is this definition or general
7  guideline, is that language reflective of how NCMEC
8  attempts to distinguish between content when they're
9  evaluating is this obviously prepubescent or is it
10 age-difficult?
11     A    This general guideline is in line with, with
12 some of the training that the team would be receiving
13 when doing content categorization.
14     Q    Okay.  In particular, in reference to this
15 image which is the subject of Exhibit A, has NCMEC, when
16 did NCMEC, when did you first become aware of this
17 particular lawsuit and the allegations that were in this
18 lawsuit regarding Mr. Lawshe and, and I guess the, the
19 Verizon lawsuit as well?
20     A    I think I first became aware probably in July
21 of last year.
22     Q    And what were the circumstances of that?
23     A    I heard about it at a conference in, out in
24 San Francisco last July.
25     Q    Who, did someone give a presentation about

Page 76

1  that?
2      A    There was a, yes, a representative from
3  Verizon who was speaking about the case.
4      Q    Who was that person?
5      A    Ethan Arenson.
6      Q    How do you spell Arenson, is it like A's or
7  E's?
8      A    I believe it starts with an A.
9      Q    Okay.  Arenson.
10     And was there, was this like a, a formal
11 presentation, like a little, you know, slide slow, or
12 what was it?
13     A    I don't necessarily recall the specifics of
14 the presentation, but it, it would have been, yes,
15 speaking to a group of people at a conference track.
16     Q    And were you part of the group of people?
17     A    Yes, I was present in the audience.
18     Q    And did he have material, like a slide show?
19     A    I don't recall if he had a slide show or not.
20     Q    Okay.  What was the name of the conference?
21     A    TrustCon.
22     Q    You spoke at that.
23     A    I did.
24     Q    Okay.  That's the video that I saw of you was
25 at TrustCon, yeah, your, your presentation.  You had a

Page 77

1  slide show.
2      A    I did.  I had several.
3      Q    Was he on that same stage talking about this
4  case?
5      A    No, this would have been with a much smaller
6  group of people.
7      Q    What did he say, what did he have to say?
8      A    I really don't recall the specifics of the
9  presentation, but it, it would have centered around some
10 different case law concerning industry matters and
11 CyberTipline reporting.
12     Q    Anything more specific than that?
13     A    Not, not that I recall.
14     Q    Was it recorded?
15     A    No, I don't believe so.
16     Q    Was there other, did you know other people who
17 were in attendance at that?
18     A    There would have been about a hundred or so
19 people I believe in attendance.
20     Q    So was it, was it kind of like a, a legal
21 primer on, on the issues of the case, or was it like
22 substantive, like this is what we did or didn't do?
23     A    It was more in an overview of just the, the
24 legal landscape currently as it related to industry
25 reporting in the CyberTipline.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 78

1    Q    Not like factual representations about what
2  they did or didn't do in this case?
3    A    No, more of an overview of multiple different
4  cases that were ongoing.
5    Q    Is Ethan, is he a lawyer?
6    A    I believe so.
7    Q    Okay.  So that was the first time you heard
8  about it and we've discussed that.
9         Any other presentations or conversations within the
10  industry or work that you had about this, this case?
11    A    Not externally.  The next time I heard of the
12  case would have been the spring, maybe in March of 2025,
13  and that was internally here at NCMEC.
14    Q    Tell me about that.
15         MR. RUTHERFORD:  I just want to object to the
16    extent that this is asking for conversations that
17    Fallon has had with lawyers, those would be
18    off-limits in this deposition.
19         MR. ROBERTS:  Oh, sure, yeah, obviously.
20    BY MR. ROBERTS:
21    Q    Is that what you're referring to,
22  conversations with lawyers?
23    A    Yes, it would have been with NCMEC's internal
24  counsel.
25    Q    And was that before or after we requested a

Page 79

1  deposition?
2         MR. RUTHERFORD:  I'm going to, I'm going to
3    instruct the witness not to answer.  She would only
4    know that from conversations she's had with
5    counsel.
6    BY MR. ROBERTS:
7    Q    Okay.  Well, let me, let me just ask it
8  another way.  I'll do this a different way.
9         I'm looking for something, I'm not just staring at
10  you, I'm sorry.
11         All right.  Here we go.
12         So I'll mark as Exhibit F -- well, I thought I was
13  going to.
14         This was a document that was produced that was
15  responsive to our subpoena, and it's almost an identical
16  copy of the CyberTip report in this case.  There's two
17  of them.  The difference is it's a PDF and it has a date
18  that it was generated as March 6th, 2025.  Which I can
19  tell you is, is prior to my office reaching out to
20  request any deposition or anything.  It's right after
21  the order was entered denying Verizon's motion to
22  dismiss the lawsuit.
23         So let me ask you this.
24         Was there any non-lawyer reason why you guys
25  printed out this PDF on March 6th, 2025?

Page 80

1    A    Not that I'm aware of.
2    Q    Were you part of the decision to pull this up
3  and, and review it in March of, March 6th of 2025?
4    A    I, I don't recall who would have generated
5  this PDF.
6    Q    Okay.  The, the difference here, I guess
7  substantively to, other than the PDF date, is that staff
8  reviewed the following uploaded files at the time of the
9  PDF report was generated.
10         So my question to you is did you review the files
11  in March 6th, that timeframe, of this year?
12    A    I don't know if I reviewed the files on
13  March 6th, but I had reviewed the file within this
14  report.
15    Q    Okay.  And the original NCMEC report, it
16  indicated, and I don't want to make you just do it from
17  memory, so we'll, what's Exhibit A, I'm showing you
18  here, it says that NCMEC staff have not viewed the
19  following uploaded files and have no information
20  concerning the, the content of the uploaded files.
21         Do I understand by this, at the time, January 25th,
22  2023, when this report was received and transmitted,
23  NCMEC staff did not view, physically view the content
24  that was the subject of Exhibit A?
25    A    Yes, the, at that time the file within this

Page 81

1  report had not been viewed by NCMEC staff.
2    Q    Historically the file had been viewed by NCMEC
3  staff though; correct?
4    A    Yes.
5    Q    And was that the basis of the unconfirmed
6  categorization?
7    A    Yes, the file had been previously reviewed in
8  other CyberTipline reports and had previously been
9  categorized as unconfirmed.
10    Q    Same question as to the October '22, Exhibit B
11  report.
12         Is that your understanding, it was not viewed at
13  the time that the, that the tip was received and
14  transmitted to law enforcement, but it had been
15  historically viewed and categorized prior to October of
16  2022?
17    A    Do we have that?
18    Q    I can pull it up, yeah, sure, yeah, yeah.  I
19  don't, you never need to do this from memory.
20         Okay.  Oh, shoot, I've shared the same thing, stop
21  sharing.
22         All right.  So this is the October 29th
23  CyberTipline report.  And, wait, this is, I can't
24  remember if, is this the, I'm getting confused here.
25    A    Yeah, so --

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 82

1    Q    No, this is the original one.  So it is
2  different.
3         So this is, the PDF was generated -- what does this
4  mean, date PDF generated?
5    A    So that indicates the date that this copy of
6  the PDF was generated.  And if we scroll down a bit, I
7  believe at this time, as of 2023, it indicated that the
8  files had been viewed by NCMEC staff.
9    Q    Yeah, I think that's right.  So they did view
10 this, in October they viewed the file.
11        What, does that mean that it had been viewed at the
12 time the report was made in October, or does it, does it
13 mean that they reviewed it in February of '23?
14   A    So it means that information is, is accurate
15 as of February 20th, 2023, at the time that the report
16 was generated, this version of the PDF.
17        If you are to scroll up to the executive summary of
18 this report.
19   Q    Sure.
20   A    I don't believe this one indicates it was a
21 hash match.
22        See where it says incident type, apparent child
23 pornography unconfirmed, I believe is a report that
24 the individual analyst, when processing the report,
25 reviewed the files at the time of making that report

Page 83

1  available to law enforcement.
2    Q    So, but this file had been previously viewed
3  and categorized as unconfirmed irrespective of whether
4  or not it was looked at in October or by February?
5    A    As of the time that this PDF was generated in
6  2023, it indicates that, yes, the file had been
7  categorized at a file level as CP, unconfirmed.  And
8  then also at the time of processing, the analyst had
9  applied at the overall report level that incident type
10 of apparent child pornography, unconfirmed.
11   Q    Earlier you indicated that this content had
12 been the subject of a report over a hundred times
13 previous to October of 2022.
14        Did I understand that right?
15   A    It's been seen over a hundred times all time
16 in --
17   Q    Oh, okay.  So you're not sure if that's before
18 or after, but can you -- go ahead, sorry.
19   A    Yeah, I was just going to agree, yes.
20   Q    But can you tell me whether or not this had
21 been categorized previously as, previous to
22 October 29th, unconfirmed child pornography?
23   A    I believe it had been prior to 2022
24 categorized as unconfirmed.  There are several versions
25 of this file that we have seen within the CyberTipline.

Page 84

1  And so when we were querying to see how many times it
2  had been reported previously, we first started seeing it
3  in 2017, or a version of it, submitted by other industry
4  members.
5         In, in that particular version, the, the photo has
6  been either photoshopped or digitally altered to depict
7  a child's face superimposed over the body of the
8  individual.
9    Q    Oh, so I, I was, I was, that's -- okay.
10        So you have looked at the content though that was
11 attached to this file?
12   A    Yes, I have.
13   Q    It, it does not have a child's face?
14   A    It does not.
15   Q    And because, I mean, I'm not trying to be
16 mean, I'm forty-seven years old.
17        The, the woman does not look to be remotely young,
18 I mean, I -- do you agree that she does not appear to be
19 a teen or a young adult at all?
20   A    The file itself is now categorized as appears
21 adult within the CyberTipline system.
22   Q    Okay.
23   A    In reviewing the file, I could understand an
24 analyst making the designation as unconfirmed, really
25 the, the focus of the file itself being on the

Page 85

1  individual's anus and genitalia, and ultimately making
2  that determination to leave it for law enforcement for
3  their review.
4    Q    Are you, are you saying like lack of, lack of
5  pubic hair, is that what you mean when you say the
6  focus?
7    A    Yeah, certainly.  In terms of the, the file in
8  this report, that individual's face, when the, the
9  analyst is going through and doing a review not
10 necessarily being the focus --
11   Q    Mm-hmm.
12   A    -- what they might be looking at.
13   Q    Mm-hmm.
14   A    And, again, keeping in mind is the analyst is
15 processing the report, they are making that fairly snap
16 determination about where that, that report resolves to
17 and who it should be made available to, and then
18 applying that top level incident type that was selected.
19   Q    When was this hash listed as appears adult?
20   A    I believe that that was first categorized in
21 either late 2023 or early 2024.
22   Q    I'm just looking at something.
23        And, you know, just, it's just the way things go
24 when you're viewing hundreds of documents and moving.
25        I, I will reshow I think what is Exhibit F.  This

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 86

1  is the, what I'll refer to as the March, when you guys
2  reviewed it in March of this year, and you produced this
3  report.
4      The executive summary of the CyberTip Report
5  137877848, that now reflects a categorization of adult?
6      A    Yes.
7      Q    And that's what you're referring to?
8      A    Yes.
9      Q    So can you just describe to me how -- and any
10  time I ask a question, if I'm asking something that's
11  too technical.
12      But how is it that the hash of the image with a
13  sort of altered image gets confused with the hash of the
14  adult image?
15      A    So not necessarily that it gets confused, but
16  more so that when we were doing our query to see when
17  the, the image was first seen, when it first began being
18  reported to the CyberTipline, using some of that
19  visually similar hash matching, we're also able to
20  surface those files which depict the digitally altered
21  image to include the child's face.
22      Q    So a hash of, a hash value, MD5 hash value
23  represents a digital DNA or fingerprint of a particular
24  photograph.
25      Do I understand that correctly?

Page 87

1      A    The MD5 hash value I would think of as the
2  exact fingerprint, so it is the exact file itself.
3      Q    And so the hash that you received corresponds
4  with the image which was attached to the October
5  CyberTip report, Exhibit B.
6      And that represents a picture of an adult, or what
7  you're fairly confident is an adult as we sit here
8  today; correct?
9      A    Yes, it is categorized as apparent adult
10  within our system.
11      Q    And so if this image is included in a, another
12  NGO's hash list, it is, it is a hash and an image or
13  content that is of an adult, it is not, it doesn't have
14  any sort of relationship with the altered image other
15  than -- that's a terrible question, just stop.
16      Your attorney is going to object and he should
17  object.  I'm trying to figure this out.  So --
18      MR. RUTHERFORD:  I was getting, I was getting
19  ready.
20      MR. ROBERTS:  Yeah, yeah.  He was getting
21  wound up.  I could, I can't see him, but I can, I
22  can feel it.
23  BY MR. ROBERTS:
24      Q    NCMEC would never include this hash and this
25  image in their, their CSAM hash list, the external CSAM

Page 88

1  hash list; would they?
2      A    No, this file has not been represented on our
3  hash-sharing list.
4      Q    And if, tell me, just explain to me how did
5  you make that connection?
6      Did you do like a PhotoDNA and it, and that's how
7  you kind of connected the two images?
8      A    Yes, doing a hash comparison, our team was
9  able to surface both the images that are representative
10  of the file that's included within the report that we're
11  talking about today, as well as the modified version of
12  the file that has been seen in other CyberTipline
13  reports.  We have seen both instances reported multiple
14  times to the CyberTipline.
15      Q    Do you all include digitally altered images,
16  as the one that you are describing where it's an adult
17  body that has been altered to put a child's face on it,
18  in your external NCMEC CSAM hash list?
19      A    That file, the altered version of this file,
20  has also not been represented on NCMEC's hash sharing
21  contributions.
22      Q    Do you have a policy though regarding
23  inclusion of images like that, where you have an adult
24  body that's been altered to put a child's face on it?
25      A    A policy, not necessarily.

Page 89

1      Think of, again, when we're doing this three-person
2  review, and one of the things that we're thinking about
3  is the suitability for something to be represented on a
4  hash-sharing.
5      So we talked about doing the content
6  categorization.
7      Also thinking about the suitability, that would
8  include things that could create any kind of collisions
9  or confusion when registrants are performing hash
10  matching.  And so whether something is photoshopped or
11  digitally altered in this way, something that might be a
12  grid image for example, a file that has very strong
13  borders, so say if I were to take a screenshot here, and
14  the majority of the, the file was just black borders
15  around the actual image itself, those are the types of
16  things that the reviewers are assessing to determine if
17  something should or should not be represented on
18  hash-sharing.  Because we would like those,
19  representations of those files to ensure that they're,
20  again, going to be suitable for matching.
21      So in a long-winded way to say that, no, this file,
22  similar files would not be added to NCMEC's hash-sharing
23  list.
24      Q    Now the, you don't know what other, other
25  people generating hash lists though, what their policies

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 90

1  and procedures are regarding an image like this; do you?
2      A   No, I wouldn't be able to speak to that.
3      Q   But, I mean, in theory, including the fully
4  adult image could potentially, using PhotoDNA, could
5  catch the altered image in, in an algorithm or a match.
6      Is that what I'm understanding?
7      A   Yes, in, in theory someone could.
8      Q   Have you heard of, there is a, what I've heard
9  from industry, industry people, there's a, I don't know
10  what the technical term is, but it's where like people
11  will transmit child pornography, images of child sexual
12  abuse, packaged with other, like, legal images.
13      Have you heard of this, it's almost like a
14  bundling, have you heard of this being something that
15  people do, criminals do?
16      A   You're asking if I've heard if criminals share
17  CSAM along with other files to one another?
18      Q   Right.  Like, like almost like hidden in other
19  legal files.
20      A   Can you elaborate --
21      Q   Well, yeah, yeah, here's what I'm, here's what
22  I'm getting at is that I've heard that sometimes there
23  would be like a batch of files that include like a
24  clearly abusive, you know, illegal image.  But it's,
25  it's, it's in this larger file that has other legal

Page 91

1  images.
2      And what I have heard is that sometimes those other
3  images are hashed because they're associated with the
4  illegal content, and that they are, that they are
5  transmitted with that content by some, some criminals.
6      Does that make sense?
7      A   I'm following what you're saying, but I'm, I'm
8  still not sure I understand.
9      Are these adult pornography images, some other type
10  of file?
11      Q   Yeah, they may be -- and if you're not
12  familiar with it, I'm not going to ask you to speculate
13  about it.
14      So if it doesn't sound familiar, you can say like,
15  no, it's just not in my wheelhouse.  Like, I don't, I
16  don't know what you're talking about.
17      It sounds like you're not really familiar with this
18  kind of thing.
19      A   It's not a, a trend that we've seen with --
20      Q   Okay.
21      A   (Unintelligible.)
22      Q   Okay.  Okay.  All right.  Have you
23  communicated to any other members of the NGO
24  hash-sharing list, or anyone else, specifically
25  regarding this adult image being included or possibly

Page 92

1  included in a hash list?
2      A   No, NCMEC has no indication.  It, it's not
3  included within NCMEC's entries.  We have not --
4      Q   But --
5      A   -- been in communication with anyone else.
6      Q   I mean, is there a concern, maybe this is
7  something that you're not concerned with, but, I mean,
8  is there a concern that is included in either the
9  International Watch Foundation or the Canadian
10  CyberTipline list?
11      A   We haven't received any indication from any
12  hash-sharing members to indicate that it had.
13      Q   Do you have any sense of, I mean, where it's
14  coming from?
15      I mean, you've seen this image before, this content
16  before.  Do you have any sense of where or what list, if
17  there is a list, that it's being matched with?
18      A   No, we have no visibility into that.  Industry
19  uses a, a number of different mechanisms, whether that's
20  hash-sharing, whether it's lists that they maintain, we,
21  we have no idea why industry members are reporting that
22  piece of content.
23      MR. ROBERTS:  Okay.  So I'm almost at the end
24      here.  I'm not saying that I've got like two or
25      three more questions, I may have a couple

Page 93

1  questions.
2      But should we just take a quick break and
3  then, you know, and then come back and then I'll,
4  I'll kind of wrap it up?
5      MR. RUTHERFORD:  Yeah, I think that's great
6  with me.
7      MR. ROBERTS:  Thanks.
8      MR. RUTHERFORD:  Thanks.
9      MR. ROBERTS:  And if anybody wanted to take a
10  longer break, because I mean there may be other
11  people that have questions, I'm okay with a longer
12  break if somebody wants to, you know, grab a soda
13  or some crackers or something like that, too, but.
14      MR. CARSON:  I'm going to have just a few
15  questions for the witness.  I don't expect it will
16  take more than fifteen minutes.
17      MR. ROBERTS:  Sure.
18      MR. CARSON:  I'll just throw that out there if
19  it's helpful for the witness to figure out if you
20  would like to take a longer break before we
21  continue.
22      MR. RUTHERFORD:  Fallon, what do you think, is
23  ten minutes enough?
24      THE WITNESS:  Yeah, ten minutes is perfect.
25      MR. ROBERTS:  Perfect.  Thank you so much,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 94

1    yeah.
2        MS. KIMBRELL:  And, Madame Court Reporter, I'm
3    going to be logging off, but I'm going to come back
4    on on a different line, so I'll be on here but you
5    may have to let me back in.
6        VIDEOGRAPHER STINGO:  Counsels, I'll just get
7    us off.
8        Off the record at twelve thirty-eight p.m.
9        (Whereupon, a break was had from 12:38 p.m. to
10    12:49 p.m.)
11        VIDEOGRAPHER STINGO:  On the record at twelve
12    forty-nine p.m.
13    BY MR. ROBERTS:
14        Q    Ms. McNulty, you all produced a lot of pages
15    of emails between Synchronoss staff and NCMEC staff.
16        Did you have a chance to review those?
17        A    I did have a chance to look them over briefly.
18        Q    But I don't think you were actually involved
19    in any of that back and forth?
20        A    In reviewing the majority of them, no, I don't
21    believe I was in copy.
22        Q    Just because I don't think we need to go
23    through all of them, but it seems like Synchronoss was
24    inquiring because they had a problem with a reduction in
25    the matches that they were getting against the NGO hash

Page 95

1    list.
2        A    My interpretation of the email is Synchronoss
3    reached out because it seemed they were having some
4    technical difficulty in querying the NGO CSAM list and
5    were not seeing the number of results that they would
6    have expected to see.
7        Q    Now the explanation that I saw from NCMEC was
8    that they had been dropped from the IWF and Canadian
9    organization's list in terms of access.
10        Did I read that correctly?
11        A    Yes, that the IWF and Canada had revoked
12    access to their hashes.
13        Q    And is it, was it NCMEC's, was the, was the
14    determination that that, that was what caused the, the
15    reduction in the number of matches that Synchronoss was
16    observing?
17        A    Yes, that would explain their reduction that
18    they were seeing.
19        Q    They were still getting matches, and I think
20    it was June of 2024 that the emails were, June to July
21    of 2024, that they were going back.
22        Does that timeframe sound right from your review?
23        A    Yes, it does.
24        Q    Okay.  They were still getting matches, it
25    just wasn't to the volume that they expected.

Page 96

1        Q    Is that, was that your interpretation of what they
2    were telling you, or telling NCMEC?
3        A    Yes, the email, the gist of it was that they
4    expected to see more hashes returned based on the query
5    that they were doing against the hash-sharing list and
6    that it was a reduced number.
7        Q    At that time though they still had access to
8    the NCMEC list?
9        A    Yes.
10        Q    It was just that they had lost access to IWF
11    and the Canadian list?
12        A    Yes.
13        Q    Is it your impression that there are a lot
14    like more, or a, or a, or a, a broader scope of, of
15    hashes in those two lists than, than in NCMEC's list?
16        A    Based on feedback that we've heard, there is
17    quite a, a wide breadth of content that's represented on
18    each list.  And so while I'm sure there is some overlap,
19    I don't believe it's at a, an extremely high volume.
20        Q    When you say a, a wider breadth, do you
21    attribute that to some, at least in part to NCMEC's sort
22    of stringent three-part verification process?
23        A    More so what comes to my mind is that both of
24    those entities are hotlines within the UK or Canada
25    respectively receiving different reports than what the

Page 97

1    CyberTipline is receiving here in the U.S.  And so it
2    certainly could be that.  It could be just based on the,
3    the reports that they're receiving in and what content
4    they're reviewing and categorizing.
5        Q    So it could be that, a sort of curation issue
6    is one, but it also could be just their definition of
7    what gets on the, the list or not on the list is
8    different than, than NCMEC's as well?
9        A    Or even just the reports or the work that
10    they're doing within their own, as their own national
11    hotlines.
12        Q    Okay.  All right.  Do you know whether or not
13    they regain, do you know why they lost access to the IWF
14    or Canadian --
15        A    I don't know the, the specifics.  Generally,
16    if an industry member loses access to one of the lists,
17    it could be that they, their agreement with that other
18    entity has expired.  And so I believe the resolution was
19    we provided them with contact information for both of
20    those other entities so that they could be in direct
21    contact with them.
22        Q    Do you know the outcome of, of those
23    conversations?
24        A    I do not.
25        Q    Synchronoss agreed to the NCMEC NGO list

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 98

1  agreement.
2      Is it your understanding that they had separate
3  agreements with International Watch Foundation and the
4  Canadian group, or did that one agreement satisfy access
5  to the entire platform?
6      A    So the one agreement provides access to the
7  platform that each entity is able to allow or restrict
8  access to their individual hash contributions.
9      But in terms of if Synchronoss previously had
10 agreements with IWF or Canada, I, I don't know.  I
11 wouldn't have visibility into that.
12     Q    Okay.  All right.  I just want one last
13 exhibit here.  What are we on, G?
14     And this is, have you, have you looked at any of
15 the pleadings in the case, the Lawshe vs Verizon case?
16     A    No.
17     Q    I just want to just, one statement here, or
18 two statements.  I just want to get your feedback.
19 Share this exhibit.
20     This is a motion, Verizon's motion for
21 reconsideration of the order denying the Rule 12, Rule
22 12(b)(6) motions to dismiss.
23     And it, and I've highlighted here.  It says the
24 fact that the image was included in NCMEC's CSAM
25 database.

Page 99

1      That's, that's an incorrect or, or false statement;
2  correct?
3      This, this image was not included in NCMEC's CSAM
4  database?
5      A    I'm not sure what NCMEC's CSAM database refers
6  to, but this image was not represented on our
7  hash-sharing list.
8      Q    Okay.  And then there's a list here that, at
9  best, Verizon reported an image mistakenly categorized
10 as CSAM in the NCMEC database.
11     NCMEC did not categorize these images as CSAM or
12 apparent CSAM in their database; did they?
13     A    The image represented in the first report was
14 previously categorized as unconfirmed and is now
15 categorized as adult within our system.
16     And the image within the second report is
17 categorized as unconfirmed.
18     Q    But it's not in NCMEC's external hash-sharing
19 database or list?
20     A    No, neither image has been represented on our
21 hash-sharing list.
22     Q    So if Verizon meant the NGO list, then it was
23 another list, not NCMEC's list, that this was contained
24 on, that these images were, were contained in?
25     A    Yes, neither of the, the images, we don't have

Page 100

1  any indication that they have ever been added to the
2  list by NCMEC.
3      Q    And, and so, so let me, let me just do this.
4      If Verizon or Synchronoss wanted to take the
5  position that, hey, NCMEC indicated that these two
6  images were apparent child pornography, that would be an
7  incorrect statement, NCMEC has never externally
8  described either of these images as apparent child
9  pornography?
10     A    Yes, we have no record of ever having shared
11 them externally on the hash-sharing list.
12     Q    Okay.  And certainly, and we went over the
13 contract, but just.
14     When Synchronoss signed up to be a member of the
15 NGO hash list, it is clearly explained to them that
16 the NGO list includes lists from other non-governmental
17 organizations, not just NCMEC?
18     A    Yes.
19     MR. ROBERTS:  Okay.  All right.  I don't have
20 any other questions at this time.
21     Thank you, Ms. McNulty.
22     THE WITNESS:  Thank you.
23     MR. CARSON:  All right.  Jami, you all right
24 if I go next?
25     MS. KIMBRELL:  Go ahead.  I don't have

Page 101

1  anything right now.
2      MR. CARSON:  Okay.  Thank you.
3          CROSS EXAMINATION
4  BY MR. CARSON:
5      Q    Good afternoon, Ms. McNulty.
6      My name is Matt Carson.  I'm with the law firm of
7  Sniffen and Spellman in Tallahassee, Florida.  We
8  represent Detective Mikayla Preston in this action.
9  She's a deputy with the St. Johns County Sheriff's
10 Office, and she was the detective that, in large part,
11 investigated the allegations that Mr. Lawshe possessed
12 CSAM.
13     I appreciate your insight thus far.  I have a
14 couple of clarification questions that hopefully will
15 help me understand your testimony.
16     Verizon or Synchronoss reported to NCMEC -- well,
17 let me, let me specifically refer to Exhibit A, which
18 was the second tip.
19     Synchronoss or Verizon reported to NCMEC that one
20 of its subscribers had in his or her possession this
21 photograph; is that accurate?
22     A    Yes.
23     Q    Okay.  How did Verizon or Synchronoss know to
24 report to NCMEC that this photograph was potentially
25 problematic or otherwise of interest to NCMEC?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 102

1      A    I wouldn't be able to speak to that.
2  Synchronoss would have to answer that question.
3      Q    So, and is it possible that they are just
4  looking at their subscriber's photographs and looking
5  for stuff that they think is problematic?
6      A    It certainly could be.  Industry members use a
7  variety of different means to surface imagery to report
8  to the CyberTipline.
9      Q    Okay.  If they were, in order to, to get an
10  MD5 hash value for a photograph, what, what's the
11  process?
12      A    In regards to how we expose the MD5 related to
13  the CyberTipline?
14      Q    Yes, ma'am.
15      A    So that is with, built within our system.  So
16  inherently as that report is being submitted and as the
17  file is being uploaded to the CyberTipline report, our
18  system reads the MD5 hash value associated with that
19  file and puts it into that field within the reported
20  PDF.
21      Q    So if I sent you a, a photograph of anything
22  right now, could your organization create an MD5 hash
23  value for that photograph?
24      A    If it was coming through the CyberTipline,
25  yes, that MD5 hash value would be read and we would be

Page 103

1  able to provide that.
2      Q    Okay.  If I wanted to find out what an MD5
3  hash value of any given photograph would be, am I able
4  to do that?
5      A    Yes, I believe you would be able to do that.
6      Q    Okay.  And how would I do that?
7      A    You would use a -- well, it depends on what
8  system you're, you're operating.  But there are a
9  variety of different, whether it's hash readers that are
10  available online or whatnot.  Ours is built directly
11  into our CyberTipline application.
12      Q    Thank you.
13      Is it your understanding that the ESPs are
14  converting images of their subscriber's photographs,
15  photographs stored on the cloud, et cetera, and
16  converting them or otherwise obtaining the MD5 hash
17  values for those photographs?
18      A    Could you clarify what you mean by converting?
19      Q    Sure.  So I understand you've got a, a, a
20  database of just a massive amount of hash values;
21  correct?
22      A    We have all of the, the hash information about
23  all the files that have been reported to the
24  CyberTipline.
25      Q    And if I have a subscriber, let's say I'm an

Page 104

1  ESP and I have a subscriber and he's got a hundred
2  photographs and I don't want to look at the photographs,
3  am I able to convert those photographs, and convert is
4  probably not the right word, but am I able to somehow
5  obtain the MD5 hash values associated with those
6  photographs and then compare them to these hash lists
7  that are available?
8      A    So we don't offer a, a comparison.  There's
9  no, no tool that's provided within the CyberTipline for
10  comparison.
11      What we do is publish the list of the, the hashes
12  that we wish to contribute on the CSAM hash-sharing
13  list.  The company is then able to ingest or download
14  those hashes, maintain that list, and then certainly
15  they would be able to do any matching on their end.
16      But the specifics of how they do that would be
17  ultimately up to the industry member.
18      Q    Understand.  And I appreciate that, and that's
19  exactly what I'm going for.  And I, I understand you
20  can't speak specifically to Verizon or Synchronoss or
21  any given industry member.
22      But, in general, how does an ESP after it, it
23  ingests these, these, these hash values from the list,
24  how does it compare those hash values to the photographs
25  that it's storing on the cloud?

Page 105

1      A    So, again, this is going to vary depending on
2  the company and how they might have things set up on
3  their end.  So ultimately the company would be the best
4  to speak to this.
5      But, in general, the company could either be
6  ingesting the exact MD5 hash value and comparing that
7  against content on their platform, they might be using a
8  different hashing algorithm and doing other types of
9  hatch matching.  But that is something that they would
10  have to build and operate on their end.
11      Q    Okay.  I guess my question really is what
12  value is the, the database that you provide to the ESP
13  that is trying to make sure that there is not
14  problematic content being housed on its servers?
15      A    So the, the CSAM hashes that we provide within
16  the hash-sharing list is really meant to be sharing that
17  information back to industries so they can ensure that
18  that content is not being circulated on their platforms,
19  so that that CSAM is not being uploaded or shared and
20  they are able to remove it very swiftly.
21      Q    And I guess I'll have to try to ask it a
22  different way.
23      How?
24      A    So the how is ultimately going to be up to the
25  company.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 106

1    Q   Okay.  But presumably they, they are not
2 looking at millions of pictures, they have somehow
3 automated the process where pictures are converted to
4 hash values and hash values are being able to be
5 compared to known files or files that otherwise have
6 hash values in one or more of the databases you've
7 spoken about.
8       Is that accurate?
9    A   Again, I would say it really varies on the
10 company and their business practices.  There are
11 certainly platforms that we hear from who are relying
12 heavily on human content moderation, some who are using
13 just known CSAM hash values for matching others who
14 might be doing a combination of both of those things or
15 using other tools.
16    Q   Okay.  Looking at the CyberTipline report that
17 is Exhibit A, which is the, the second report, or the
18 second tip, excuse me.
19       The report that we've looked at, that PDF, does it
20 contain any reference to how it was that Verizon or
21 Synchronoss determined that the specific image was
22 potentially problematic?
23    A   Are you asking if it contained any indication
24 of how they became aware of it?
25    Q   Yes.

Page 107

1    A   No, that information was not included within
2 the report.
3    Q   Okay.  You've testified that the, the hash
4 value that we see, I'm sorry, the MD5 begins with
5 B06 for this particular tip, has never appeared in any
6 of the hash lists that NCMEC maintains; is that
7 accurate?
8    A   Yes, that's correct.
9    Q   So presumably when they are looking at this
10 photograph, whether it be a hash value or otherwise --
11 well, let me rephrase that.
12       The MD5 hash value that is referenced on the
13 CyberTipline report, that is what is generated when the
14 photograph is uploaded to NCMEC; is that correct?
15    A   Yes.
16    Q   Okay.  So it's possible that prior to Verizon
17 or Synchronoss uploading the photo to NCMEC, they had no
18 idea what the MD5 hash value for this photograph was; is
19 that accurate?
20    A   I, I would not be able to speak to that.
21    Q   Right.  You don't know one way or the other;
22 correct?
23    A   I don't know what Synchronoss did on their
24 end.
25    Q   Right.  And the report doesn't indicate one

Page 108

1 way or the other?
2    A   It does not.
3    Q   Okay.  You said that it had never been on any,
4 any list that NCMEC has ever maintained, but you're able
5 to run a comparison to look for the image itself that,
6 and had found that it had been seen in over two hundred
7 CyberTipline reports; is that correct?
8    A   Yes.
9    Q   Did you have or do you have MD5 hash values
10 for those other images?
11    A   We do, yes.
12    Q   Okay.  Are they different than the MD5 hash
13 value for this specific image that is the subject of
14 Exhibit A?
15    A   Yes, there are different MD5 hashes.
16    Q   But it's the same photograph, it's the same
17 image; correct?
18    A   Correct.
19    Q   How does that happen?
20    A   How does, do different MD5 hashes get
21 generated?
22    Q   Yeah, if I've got two images that by all
23 accounts appear to be the exact same image, how can they
24 have different MD5 hash values?
25    A   So, again, that MD5 hash value is going to be

Page 109

1 that exact fingerprint of a file.
2       So if I were to take a picture of our computer
3 screen right here and I made an exact copy of that file,
4 that would be the, the same file.  If I were to edit it
5 in any way, by one pixel, if I were to very slightly
6 crop it, that second file would have a different MD5
7 hash value.  But if I were to put them up side-by-side
8 everyone on the call would not be able to see a
9 difference, visually identical.
10       So we utilize different hash-matching technology to
11 identify those visually similar images.  And that is
12 what we utilized to, to cross-reference and see if that
13 had been seen previously by the CyberTipline.
14    Q   Are you able to know what happened to any of
15 those other over two hundred CyberTipline reports that
16 are related to this, the same image?
17    A   Could you elaborate what happened to them?
18    Q   Yeah, are you able to know were those
19 CyberTipline reports made available to local law
20 enforcement, do you know if anything happened as a
21 result of those referrals or otherwise being made
22 available to law enforcement, anything like that?
23    A   That is information that we would be able to
24 access, yes.
25    Q   In your experience, do people that would

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025

Page 110

1  exchange or otherwise collect CSAM, do they ever
2  purposefully attempt to modify the picture in an effort
3  to avoid MD5 hash matching by you or other
4  organizations?
5      A    Yes.
6      Q    Okay.  And based on your prior testimony, that
7  could be as simple as cropping a photograph; correct?
8      A    Correct.
9      Q    Or, or adding text in, in the corner in such a
10  way that it is no longer the exact same image; correct?
11     A    Yes, editing it in any way would change the
12  hash value.
13     Q    You testified earlier that this particular
14  image was likely not triple-vetted when it was submitted
15  in this case pursuant to this specific CyberTipline
16  submission; is that correct?
17     A    The triple-verification, the tertiary review
18  is for inclusion on the hash-sharing list, and this file
19  was not categorized as apparent child sexual abuse
20  material, so it is unlikely that it went for that
21  third-pass review.
22     Q    Okay.  And, but you testified that it had
23  already been vetted with, when it was submitted, when
24  the same image was submitted but in a slightly different
25  format resulting in a different MD5 hash value; is that

Page 111

1  accurate?
2      A    Yes.
3      Q    And the, the document that you provided in
4  response to the subpoena in advance of your deposition
5  today, the PDF was created or generated on March 6th of
6  2025; correct?
7      A    This is still for the, the second report?
8      Q    The second report.
9      A    Yes, I believe so.
10     Q    Okay.  March, March of this year; correct?
11     A    Yes.
12     Q    And it's still listed as, it's still
13  categorized as CP, unconfirmed; correct?
14     A    Yes.
15     Q    Okay.  At the top, and I can show it to you if
16  it's helpful, at the top of the CyberTipline report,
17  right underneath the number it says Priority Level E.
18     What does that mean?
19     A    If you wouldn't mind screen sharing the
20  report.
21     Q    Yeah, no problem, no problem.  Just one
22  second.
23     A    Right underneath it will have the definition
24  of what that priority level entails.
25     Q    Okay.  Are you able to see my screen?

Page 112

1      A    Yes, thank you.
2      So Priority Level E, and right underneath that
3  priority level indicates that it is a report that was
4  submitted by a registered electronic service provider.
5      Q    Awesome.  So, yeah, so what's underneath it
6  is, is the definition.  Understood.
7      That wasn't clear to me from the, from the outset,
8  so I appreciate that.
9      All right.  Well, I don't have any -- well, I have
10  one other question.
11     If you, if NCMEC is, if NCMEC is reviewing a
12  submission and determines upon viewing the document, the
13  image, that it's not CSAM, it's not apparent CSAM, it's
14  not unconfirmed CSAM but it's an adult, they will make
15  the change to the categorization of the, the image, or
16  at least the MD5 hash value associated with that tip;
17  correct?
18     A    Yes, and we would indicate that within the
19  report incident type as well.
20     MR. CARSON:  Awesome.  That's all the
21  questions I have for you.
22     Thank you so much, Ms. McNulty, I appreciate
23  it.
24     THE WITNESS:  Thank you.
25     MS. KIMBRELL:  And this is Jami Kimbrell.  I

Page 113

1  have no additional questions.
2      Thank you.
3      MR. ROBERTS:  I really appreciate you.
4      And, Ms. Souras, I really appreciate your
5  cooperation.  And you guys work very smoothly and
6  courtesy, and I appreciate that, so.
7      I don't, that's -- you guys want to read or
8  waive?
9      Oh, I don't, I doubt that your attorney has
10  any questions.  I don't know why, no dog in this
11  fight.
12     MR. RUTHERFORD:  No.
13     MR. ROBERTS:  I mean --
14     MR. RUTHERFORD:  No, no, I didn't have any.  I
15  didn't have any.
16     MR. ROBERTS:  Yeah, yeah, yeah, yeah.
17     MR. RUTHERFORD:  Yeah, Fallon, would you,
18  would you like to read the transcript just to
19  ensure that it's, that it's accurate?
20     THE WITNESS:  Yes, please.
21     MR. RUTHERFORD:  Okay.  Yeah, we'll, we'll
22  read and sign.
23     VIDEOGRAPHER STINGO:  Okay.  Counsels, before
24  we go off, I just have to ask if you like to order
25  video today?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 114

1    MR. ROBERTS:  I don't --
2    MR. RUTHERFORD:  (Unintelligible.)
3    MR. ROBERTS:  I don't need a copy of the
4 video, but I am going to order the transcript.
5    THE COURT REPORTER:  Wait a minute.  That was
6 two of you at the same time, I didn't get it.
7    So, Mr. Roberts, what did you say?
8    MR. CARSON:  No video, but I do need the
9 transcript.
10    THE COURT REPORTER:  Okay.  How do you like
11 it -- and do you want all this on the record, the
12 video record or do you want to go off?
13    I meant the ordering of the transcript on
14 video.
15    VIDEOGRAPHER STINGO:  Because I need to know
16 if everyone else would like video as well.
17    THE COURT REPORTER:  I know the video part on
18 the record.
19    VIDEOGRAPHER STINGO:  Yep.
20    THE COURT REPORTER:  So anybody want video?
21    MR. ROBERTS:  I don't need video.
22    Thank you, sir.
23    MS. KIMBRELL:  I don't need video.
24    Thank you.
25    MR. RUTHERFORD:  NCMEC would also just like a

Page 115

1 transcript.
2    VIDEOGRAPHER STINGO:  Okay.  I will get us
3 off.
4    Going off the record, one eighteen p.m.
5    THE COURT REPORTER:  Now we'll stay on the
6 record for the ordering of the transcript.
7    Mr. Roberts, how did you want it, etran, PDF?
8    MR. ROBERTS:  Yeah, the PDF is fine, you know,
9 the condensed and standard.
10    THE COURT REPORTER:  Okay.  And let's just go
11 in order.
12    Mr. Rutherford, do you want a copy?
13    MR. RUTHERFORD:  Yes, and when you say just a
14 PDF, would that be a PDF of the transcript and the
15 there would be the exhibits at the end of the
16 transcript when you say it that way?
17    THE COURT REPORTER:  Yes, the PDF with the
18 exhibits attached.
19    MR. RUTHERFORD:  Yeah, that would be fine.
20 That would be fine.
21    THE COURT REPORTER:  And then, Mr. Carson, yes
22 or no?
23    MR. CARSON:  I'm good.  I don't need anything.
24    Thank you, ma'am.
25    THE COURT REPORTER:  Okay.  And, Ms. Kimbrell?

Page 116

1    MS. KIMBRELL:  I don't need anything.
2    Thank you.
3    THE COURT REPORTER:  All right.  Well, that's
4 all I need.  Have a great rest of a day.
5    MR. ROBERTS:  All right.  Thank you.
6    MS. KIMBRELL:  Thank you.
7    MR. ROBERTS:  Bye-bye.
8    (Whereupon, the deposition was concluded at
9    1:18 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 117

1
2              CERTIFICATE OF OATH
3
4    STATE OF FLORIDA   )
5    COUNTY OF INDIAN RIVER  )
6
7
8      I, JODI J. BENJAMIN, Court Reporter, Notary
9 Public, State of Florida, certify that FALLON MCNULTY
10 appeared before me via videoconference on the 12th day
11 of June, 2025, and was duly sworn.
12
13
14
15
16
                          _____
                          Jodi J. Benjamin,
17                        Court Reporter,
                          Notary Public, State of Florida
18                        My Commission No.  HH 346222
                          My Commission Expires:  May 1, 2027
19
20
21
22
23
24
25

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Fallon McNulty on 06/12/2025**

Page 118

1
2                    CERTIFICATE OF REPORTER
3

STATE OF FLORIDA   )

4

COUNTY OF INDIAN RIVER  )

5

6      I, Jodi J. Benjamin, Court Reporter, do hereby
7  certify that I was authorized to and did
8  stenographically report the videoconference deposition
9  of FALLON MCNULTY; and that the foregoing transcript,
10  Pages 1 through 119, is a true and correct record of my
11  stenographic notes.
12      I FURTHER CERTIFY that I am not a relative,
13  employee, or attorney, or counsel of any of the parties,
14  nor am I a relative or employee of any of the parties'
15  attorney or counsel connected with the action, nor am I
16  financially interested in the action.
17      Dated this 19th day of June, 2025, at Sebastian,
18  Indian River County, Florida.
19
20
21
22
23  _____
24      Jodi J. Benjamin, Court Reporter
25

Page 119

1                    ERRATA SHEET
2      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3  IN RE:  Lawshe v. Preston, et al
   CASE NO:  3:24-cv-00044-MMH-MCR
4  DEPOSITION OF:  Fallon McNulty
   TAKEN:  June 12, 2025
5
   Page No.   Line No.      Change            Reason
6  _____
7  _____
   _____
8  _____
   _____
9  _____
   _____
10 _____
   _____
11 _____
   _____
12 _____
   _____
13 _____
   _____
14 _____
   _____
15 _____
   _____
16 _____
   _____
17 _____
   _____
18 _____
   _____
19 _____
   _____
20 _____
   _____
21 Under penalties of perjury, I declare I have read my
   deposition is this matter and that it is true and
22 correct, subject to any changes in form or substance as
   reflected above.
23
24 _____        _____
25 Signature                           Date

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                                            Index: 1..accurate

**Exhibits**

**EXHIBIT A - FM**
  3:13 7:13
  8:21 21:22
  24:7 26:2
  28:24,25
  34:14 37:11
  57:10 66:25
  67:14,15
  69:7 70:11
  75:15 80:17,
  24 101:17
  106:17
  108:14

**EXHIBIT B - FM**
  3:13 37:1,10
  67:2 81:10
  87:5

**EXHIBIT C - FM**
  3:14 41:13,
  14

**EXHIBIT D - FM**
  3:14 51:23

**EXHIBIT E - FM**
  3:15 56:10

**EXHIBIT F - FM**
  3:15 79:12
  85:25

**EXHIBIT G - FM**
  3:16

**1**

**1**  61:18

**1/25/2023**  58:8

**11:16**  47:22

**11:23**  47:23

**12**  98:21

**12(b)(6)**  98:22

**12:38**  94:9

**12:49**  94:10

**12th**  4:9

**137877848**  37:6
  86:5

**153739160**  9:3

**1:18**  116:9

**2**

**2010**  29:4

**2016**  6:20

**2017**  84:3

**2018**  62:10

**2022**  30:21
  37:19 55:7
  81:16 83:13,
  23

**2023**  15:4,9,
  13 16:23
  17:5 21:20
  30:21 32:23
  33:2 55:7
  80:22 82:7,
  15 83:6
  85:21

**2024**  33:2

**39:18 85:21**
  95:20,21

**2025**  4:9
  78:12 79:18,
  25 80:3
  111:6

**20th**  82:15

**22**  81:10

**23**  82:13

**25**  15:9,13

**25th**  15:4
  16:23 17:5
  21:20 80:21

**29th**  81:22
  83:22

**6**

**6th**  79:18,25
  80:3,11,13
  111:5

**A**

**A's**  76:6

**a.m.**  4:10
  47:21,22,23,
  25

**A1**  61:9

**A2**  60:9,10,
  15,23 61:9

**ability**  30:6
  31:14 48:7,
  9,20 69:25

**abuse**  13:11
  21:13 23:5
  28:7 39:5
  40:20 43:16
  45:25 46:11
  53:5 66:15
  73:5 90:12
  110:19

**abusing**  44:20

**abusive**  90:24

**accept**  34:10
  54:24

**access**  19:24
  20:4,5,9
  30:11 31:14
  32:3 50:25
  52:18 71:18
  74:16 75:3
  95:9,12
  96:7,10
  97:13,16
  98:4,6,8
  109:24

**accessing**  31:4
  48:24 49:2
  72:21

**account**  46:4

**accounts**
  108:23

**accuracy**  45:2
  55:13

**accurate**  55:18
  56:1 58:20
  73:12 82:14
  101:21 106:8

107:7,19
111:1 113:19

accused  43:22

acronym  5:25
39:5

acronyms  5:19

act  22:21
23:6 26:17,
22 28:1

action  51:11
72:3 101:8

actionable
45:11

actual  25:6
89:15

add  33:22
50:5 70:6,23

added  36:6
49:17,21
50:3 89:22
100:1

adding  110:9

additional
23:22 25:9
57:20 70:12
71:4 72:16
113:1

Additionally
53:2

adult  27:2
34:14 35:19
42:14 84:19,
21 85:19

86:5,14
87:6,7,9,13
88:16,23
90:4 91:9,25
99:15 112:14

adults  41:21
42:3 44:15,
19,20,22

advance  111:4

advice  51:12,
16

affirmative
31:17,21

afternoon
101:5

age  22:22
23:10,14
24:1 26:12,
21,25 27:15,
16 28:2,8,
14,15,20
29:9,22
53:14 64:20

age-difficult
28:9,21
42:16 75:10

agency  44:11

agree  21:10,
16 26:25
55:11 58:23
73:2 83:19
84:18

agreed  21:12
97:25

agreement
40:18,22
52:1,5,9
54:2,12,23
55:6 56:5
61:17 62:6,
10 74:11,14,
15,16 97:17
98:1,4,6

agreements
20:11 51:21
52:3,15
54:3,7 75:5
98:3,10

ahead  31:9
83:18 100:25

alerting  71:20

alerts  65:17

algorithm
11:24 90:5
105:8

algorithms
63:12

allegations
75:17 101:11

alleged  45:25

allowing  45:13

altered  84:6
86:13,20
87:14 88:15,
17,19,24
89:11 90:5

amount  19:14
44:25 103:20

analyst  24:24
82:24 83:8
84:24 85:9,
14

and/or  22:21

anecdotal
42:24

anecdotally
42:9

answers  60:2

anus  85:1

API  31:4,10,
12,22

apologize  37:1

apparent  13:11
21:13,17
23:5 25:7
27:15 82:22
83:10 87:9
99:12 100:6,
8 110:19
112:13

appeared  107:5

appears  16:19
58:24 84:20
85:19

applicable
67:25

application
65:19 103:11

applied  25:9
29:2 83:9

applying  21:7

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025          Index: approximately..bundling

85:18

**approximately**
17:23

**April** 6:11
39:18

**area** 45:11,12

**areas** 73:20

**Arenson** 76:5,
6,9

**article** 38:16

**assertation**
56:4

**assessing** 21:5
72:21 89:16

**assume** 51:14

**assumes** 55:3

**attach** 40:25
56:8

**attached** 7:13
56:9 84:11
87:4 115:18

**attaching**
67:17

**attempt** 10:6,8
110:2

**attempts** 75:8

**attendance**
77:17,19

**attorney** 87:16
113:9

**attribute**
96:21

**audience** 76:17

**audio** 74:24

**audit** 18:11
19:10 40:1,
10,18,21
43:11 56:7,
15,20 57:6

**auditing** 43:2

**authorized**
43:17

**auto-referred**
65:10

**automated**
106:3

**automatically**
31:1

**Autumn** 9:17,19

**avoid** 110:3

**aware** 35:3,11
56:21 75:16,
20 80:1
106:24

**Awesome** 112:5,
20

———————

———————
**B**
———————

**B06** 10:7
14:9,19
17:13,15
107:5

**B1** 61:9

**B2** 61:9

**back** 6:4
10:24 11:6
13:4 26:5
30:3,20 42:8
57:10 58:6
61:14 66:1,2
69:7 73:19
93:3 94:3,5,
19 95:21
105:17

**bad** 19:11

**based** 10:19
30:16 31:5,7
33:7 37:22
43:23 44:9
59:9 96:4,16
97:2 110:6

**basis** 63:21
81:5

**batch** 90:23

**began** 86:17

**beginning**
17:12

**begins** 10:7
14:9,19
107:4

**behalf** 4:20

**belabor** 27:12

**benefit** 5:19

**Benjamin** 4:11

**bit** 13:25
18:10 27:19
30:3 33:9,25
36:23 38:5,

17,18 40:23
41:1 48:18
62:6 63:17
82:6

**black** 89:14

**blow** 38:5
41:15

**body** 74:23,24
84:7 88:17,
24

**bondage** 25:10

**borders** 89:13,
14

**breadth** 96:17,
20

**break** 47:2,3,
9,15,17,22
48:3 93:2,
10,12,20
94:9

**breakdown**
65:12

**breast/hip**
74:21

**briefly** 33:3
48:17 94:17

**broader** 96:14

**Buchan** 4:24

**build** 105:10

**built** 102:15
103:10

**bundling** 90:14

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                                    Index: business..choose

business
  106:10

button   59:1

Bye-bye   116:7

———————————

          C

calendar   30:21

call   12:5
  109:8

called   11:23
  23:22 39:12

Canada   95:11
  96:24 98:10

Canadian   13:21
  14:16 16:3,
  20 19:13
  20:1 31:1,20
  32:13 36:19
  48:15 55:20
  57:8 92:9
  95:8 96:11
  97:14 98:4

capability
  69:5

Carson   4:21
  93:14,18
  100:23
  101:2,4,6
  112:20 114:8
  115:21,23

case   8:4,7
  10:1,5 11:17
  19:21 27:5,
  7,10 29:20

30:10 34:20
  35:16,17
  48:12 49:4
  54:24 70:1,
  10 76:3
  77:4,10,21
  78:2,10,12
  79:16 98:15
  110:15

cases   45:5
  78:4

catch   90:5

categorization
  20:25 21:7,
  10 22:4 26:9
  29:2,15
  48:22 50:24
  60:8,13,23
  61:9 62:2,3,
  9,17 65:2,13
  75:13 81:6
  86:5 89:6
  112:15

categorizations
  25:4 55:2
  61:11

categorize
  99:11

categorized
  21:25 22:12,
  13,20 23:4
  26:1 28:25
  38:9 49:11,
  24 51:8
  68:8,20,24
  81:9,15

83:3,7,21,24
  84:20 85:20
  87:9 99:9,
  14,15,17
  110:19
  111:13

categorizing
  25:15 97:4

caused   95:14

center   4:5
  5:15,20
  13:21 19:13
  39:13 41:16

centered   77:9

certified
  25:19

cetera   103:15

chance   5:9
  7:25 94:16,
  17

change   57:1
  110:11
  112:15

characterization
  38:12 74:13

characterize
  57:18

characterized
  26:18

charges   8:3

chat   65:24

checked   65:18

child   13:11,
  21 21:13
  22:16 23:5,
  8,9,22,23
  24:11 25:2,
  7,8 27:2,14
  28:7 39:5
  40:20 41:9
  43:15,22
  44:5,6,20,21
  45:5,25
  46:10 53:5
  59:7 62:1
  63:19 64:11
  65:5,20
  66:5,14,21
  67:18 68:20
  72:13 73:5
  82:22 83:10,
  22 90:11
  100:6,8
  110:19

child's   84:7,
  13 86:21
  88:17,24

children   4:6
  5:15,21
  23:21 24:20,
  25 29:11
  43:8 44:16
  53:6 64:17
  66:16 73:3

children's
  72:25

choose   19:24
  30:6,12 53:9
  57:22 69:22

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: circulated..contact

71:4

circulated
67:3 105:18

circumstance
49:8

circumstances
75:22

clarification
58:4 73:16
101:14

clarify 57:22
61:15 69:22,
25 103:18

clarifying
73:11

classification
25:20 60:14
62:8,24

classifications
25:18

classified
13:10 21:17
22:15

classify 25:6

clear 28:1
55:10 112:7

clearinghouse
24:3 43:15
44:1

close 19:9

cloud 103:15
104:25

collect 110:1

collisions
89:8

combination
106:14

combined 19:14

comfort 47:4

comment 40:2
70:5

commentary
70:6

common 49:12

communicate
34:15

communicated
91:23

communication
92:5

communications
48:18

companies 32:3
63:11 75:2

company 18:11
31:14,23
32:1 49:13,
15 58:18
69:22 70:15
71:4 104:13
105:2,3,5,25
106:10

compare 104:6,
24

compared 12:25
106:5

comparing
105:6

comparison
14:25 15:18
88:8 104:8,
10 108:5

comparisons
32:1

compile 39:19

complaining
45:1

complaints
44:23

complete 18:20

comprehensive
39:18

computer 109:2

Concentrix
18:11 19:10
40:1,16
56:7,14,15

concern 43:20
71:17 92:6,8

concerned 57:9
92:7

concluded
116:8

conclusion
35:17 56:24

condensed
115:9

conduct 59:6

conducted
39:17

conference
38:20 75:23
76:15,20

confident
58:20 87:7

confirm 22:22
27:13 36:23

confirmation
23:18

confirmed
66:18,21

confused 81:24
86:13,15

confusing
27:19

confusion 89:9

congressional
43:14

conjunction
72:2

connected 88:7

connection
46:19 88:5

connectivity
46:20

consent 66:17

constantly
44:3,6

contact 48:25

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: contacted..court

49:20 72:12
97:19,21

**contacted**
29:21

**contained**
16:24 17:24
19:8 35:13
44:10 48:13
54:25 55:4,
14 60:24
72:16 99:23,
24 106:23

**content** 8:13
16:25 17:19
18:18,20
19:7,14,15
20:13 21:6,
7,9,10,11,20
22:3,11,13
23:20 24:6,
25 25:4,6,
19,22 26:2
28:3 29:9,
14,17,25
30:1 32:12
33:10 34:13
35:11 36:1,
8,9,13,17
37:10,13,18,
25 38:12
41:8 42:10
43:9,13
49:23 50:5,
6,12,25 53:9
57:6 60:18
62:19 64:17
65:4,7,13

66:12,15
67:1 68:12,
24 70:17
72:22 73:6
75:8,13
80:20,23
83:11 84:10
87:13 89:5
91:4,5
92:15,22
96:17 97:3
105:7,14,18
106:12

**content's**
48:21

**contents**
59:15,20
60:3 70:21

**context** 27:14
44:17 45:1
61:3 70:6,16
72:4

**continue** 93:21

**contract** 61:17
100:13

**contribute**
32:8 53:23
104:12

**contributed**
18:1,21
30:18 34:22
48:10 49:2
53:3 56:2
57:7

**contributes**

13:8 14:15
52:25

**contributing**
61:11

**contributions**
16:2,16
19:18 21:3
35:23 43:6
88:21 98:8

**conversations**
78:9,16,22
79:4 97:23

**convert** 104:3

**converted**
106:3

**converting**
103:14,16,18

**cooperation**
113:5

**copy** 7:16
79:16 82:5
94:21 109:3
114:3 115:12

**corner** 110:9

**corporate** 4:5
5:14

**correct** 5:16
14:12,21
15:5,23
16:17 17:2
20:3,20 22:9
25:24 26:20
32:5,9,16
35:21,24

36:14 38:15
43:16 48:16
50:15 51:18
52:19 54:12
60:20,21
63:23 67:15
68:2,13
71:11 81:3
87:8 99:2
103:21
107:8,14,22
108:7,17,18
110:7,8,10,
16 111:6,10,
13 112:17

**correctly**
16:25 20:15
23:16 37:7
50:16 51:3
52:10 54:18
56:3 58:10
61:2 62:4
86:25 95:10

**corresponds**
87:3

**counsel** 4:14
13:22 38:4
78:24 79:5

**Counsels** 94:6
113:23

**County** 101:9

**couple** 92:25
101:14

**court** 4:11,15
5:18,24 8:19
39:4 94:2

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: courtesy..deal

114:5,10,17,
20 115:5,10,
17,21,25
116:3

**courtesy** 113:6

**cover** 57:6

**CP** 26:7 83:7
111:13

**crackers** 93:13

**create** 89:8
102:22

**created** 60:14
111:5

**creates** 12:21

**creating** 20:10

**criminals**
90:15,16
91:5

**critical** 27:4

**crop** 109:6

**cropping** 110:7

**CROSS** 101:3

**cross-reference**
109:12

**CSAM** 10:9,13
12:14,20
17:13,24
18:2,24
20:14 21:17
22:24 25:7,
23 26:10
28:25 29:13
32:4 33:23

34:1 36:14,
17 37:14
39:2,4 40:10
43:6,13
45:25 50:15
52:23,24,25
53:20 56:16
62:17 71:13,
18,19,21
72:17 87:25
88:18 90:17
95:4 98:24
99:3,5,10,
11,12 101:12
104:12
105:15,19
106:13 110:1
112:13,14

**curated** 40:15
41:4

**curation** 97:5

**curious** 20:7

**current** 6:5,
10,25 52:8

**curves** 74:24

**customarily**
47:3

**CVIP** 23:23

**Cyber** 39:12
41:16

**Cybertip** 8:13
9:2 16:24
21:21 31:1,
20 34:25
36:10 42:3

44:25 55:20,
22 63:22
67:2,5,24
68:12 70:6
72:2 79:16
86:4 87:5

**Cybertipline**
6:8,15,18,19
7:2,4 8:9
10:15,19,20
11:3,20
12:2,10,12,
16,18,20
14:17 15:3,
16 16:3,20
17:9,17
20:2,24 25:1
26:4 30:2
32:13 37:4,
22 38:3
41:21 42:5
43:19 44:18
45:21,23
46:12,14,21,
24 48:25
50:18 51:5,6
58:19 59:4
64:15 65:1,
19 68:3,13,
15 69:24
71:15 73:15
77:11,25
81:8,23
83:25 84:21
86:18 88:12,
14 92:10
97:1 102:8,
13,17,24

103:11,24
104:9 106:16
107:13 108:7
109:13,15,19
110:15
111:16

**Cybertipline's**
36:19

————————

**D**

————————

**daily** 63:21
68:6

**data** 20:11
31:14

**database** 10:15
12:3,8,10,16
54:16,25
55:5 61:20
68:16,19
74:16 98:25
99:4,5,10,
12,19 103:20
105:12

**databases**
106:6

**date** 57:21
79:17 80:7
82:4,5

**day** 44:5
116:4

**day-to-day** 7:3

**de-duplicated**
18:23 19:15

**deal** 44:14

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                          Index: decade..documents

decade  6:20

decided  50:5

decision  22:8
  80:2

deepened  74:25

defendant  4:24

definition
  26:8,9,16
  27:8 53:5
  55:21 60:12
  75:6 97:6
  111:23 112:6

definitions
  74:8

denying  79:21
  98:21

Department  8:7

depend  44:17
  72:4

depending
  105:1

depends  103:7

depict  40:20
  44:19 60:19
  84:6 86:20

depicted  21:6
  22:20,23
  26:13,22
  27:1 28:3,20
  29:9,20
  34:13 41:9
  43:13 66:12
  71:19

depicting
  13:11 24:1
  53:13

depicts  21:13
  23:6 25:6,
  10,11 26:10,
  17 29:17
  53:6 60:16
  66:15

deposed  6:23

deposition  4:4
  6:21 7:9
  38:18 54:1
  78:18 79:1,
  20 111:4
  116:8

deputy  101:9

describe  20:21
  24:21 33:3
  86:9

describing
  28:13 42:21
  88:16

description
  57:21 69:22
  73:16

deserve  43:7,8

designated
  5:14

designation
  22:18,19
  26:11 33:23
  84:24

designed  45:19

46:8

detail  37:2

detection  39:1

detective  4:22
  101:8,10

determination
  28:8 43:24
  51:10 60:19
  85:2,16
  95:14

determinations
  24:15

determine
  28:14,19
  42:19 44:8
  89:16

determined
  106:21

determines
  112:12

determining
  27:1,12 71:9

development
  74:21,23

difference
  79:17 80:6
  109:9

difficult  49:6

difficulty
  95:4

digging  69:15

digital  11:9
  86:23

digitally  84:6
  86:20 88:15
  89:11

direct  5:6
  46:20 97:20

directer  6:7
  7:2

directly
  103:10

director  6:14

discover  35:8

discovered
  35:1

discussed  53:1
  78:8

dismiss  79:22
  98:22

disseminate
  71:10

distinguish
  75:8

distributing
  59:7

Division  23:21
  24:20,25

DNA  86:23

document  15:6,
  10 56:11
  57:11 79:14
  111:3 112:12

documents
  7:14,17,18,
  21,23 8:10

9:13 31:10 85:24

**dog** 113:10

**dot** 71:23

**doubt** 113:9

**download** 104:13

**downloaded** 71:7

**downvote** 33:7, 12,14,20

**draft** 74:15

**drafted** 74:16

**dropped** 74:23 95:8

**drowning** 44:25

**Dully** 4:8,25

**duly** 5:3

**duplication** 18:7

**duties** 7:1

---

**E**

---

**E's** 76:7

**earlier** 52:14 56:6 69:17 70:14 83:11 110:13

**early** 85:21

**edit** 109:4

**editing** 110:11

**effect** 44:24 52:4 55:6

**effort** 7:20 110:2

**efforts** 41:1 55:17 73:2,4

**eighteen** 23:11,14 24:2 28:15 53:15 58:9 64:20 115:4

**elaborate** 33:25 90:20 109:17

**electronic** 7:5 12:18 14:12 17:25 19:6, 22 30:5 42:10,13 46:16,19 52:18 57:15 63:24 64:6 65:15 67:16, 21 71:16 73:9 112:4

**eleven** 47:20, 24

**email** 32:25 48:18 95:2 96:3

**emailing** 9:25

**emails** 94:15 95:20

**employed** 6:19 18:11

**employee** 27:8

**end** 45:15 73:18 92:23 104:15 105:3,10 107:24 115:15

**Endangered** 4:6

**ended** 40:17

**endorse** 33:13

**enforcement** 7:7 23:10, 13,18,25 24:5 28:12 29:12 41:19 42:2,7,8,19 44:11,14,24 45:3,10,14 46:13,19,20, 25 57:15 63:20 64:22 65:11 66:4 67:8,25 68:2,4 69:10 71:11 72:8, 20 74:5 81:14 83:1 85:2 109:20, 22

**engage** 29:16

**engaged** 40:16 44:19,20 60:17

**enrolled** 31:2

**ensure** 21:16 55:17 89:19 105:17 113:19

**entail** 25:8

**entails** 6:25 24:22 111:24

**entered** 79:21

**entering** 30:16 48:9 62:22

**enticement** 44:21 64:16

**entire** 59:15, 20 60:3 70:20 98:5

**entities** 19:20 20:9 63:10 96:24 97:20

**entity** 30:18 40:13 49:20 59:23 97:18 98:7

**entries** 16:4, 7,13,15,22 18:2 20:5 35:23 36:5 53:3 63:12 92:3

**entry** 33:7,8, 11 48:11 55:21 62:9 63:6,7

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: ESP..February

**ESP** 59:15
60:9 104:1,
22 105:12

**ESPS** 103:13

**essentially**
11:10 31:13
33:7,13
45:12 49:22

**estimate** 64:10

**Ethan** 76:5
78:5

**etran** 115:7

**evaluate** 36:11

**evaluating**
75:9

**evaluation**
8:12

**event** 62:15

**everyday**
67:15,19,20

**evidence** 35:18

**exact** 11:2,4,
13,14,22
14:24 37:20
58:12 66:6
87:2 105:6
108:23
109:1,3
110:10

**EXAMINATION**
5:6 101:3

**exceptions**
56:25

**exchange** 110:1

**excuse** 13:22
106:18

**executive** 6:7
7:2 9:5
57:12 82:17
86:4

**exhibit** 7:13
8:20,21
21:22 24:7
26:2 28:24
34:14 37:1,
10,11 40:25
41:13 51:22,
23 56:10
57:10 61:16,
18 66:25
67:2,14 69:7
70:11 75:15
79:12 80:17,
24 81:10
85:25 87:5
98:13,19
101:17
106:17
108:14

**exhibition**
22:21 23:7
60:17

**exhibits** 13:25
115:15,18

**exists** 49:11

**expect** 93:15

**expected** 95:6,
25 96:4

**experience**
109:25

**expired** 97:18

**explain** 88:4
95:17

**explained**
100:15

**explanation**
95:7

**explicit** 53:7

**exploitation**
24:5 45:6

**exploitative**
53:2,4,7

**Exploited**
5:15,21
23:21 24:19,
24

**expose** 102:12

**extent** 36:16
39:10 70:18
78:16

**external** 15:20
16:5 17:25
25:23 38:14
40:11 50:15
51:1 87:25
88:18 99:18

**externally**
23:4 37:15
40:14 61:23
78:11 100:7,
11

**extremely**
96:19

———————

**F**

———————

**face** 84:7,13
85:8 86:21
88:17,24

**fact** 98:24

**factor** 27:1,4,
12 29:12
43:1

**factual** 78:1

**fair** 26:19
28:4

**fairly** 39:17
64:24 65:2
85:15 87:7

**Fallon** 4:4
5:2,12 78:17
93:22 113:17

**false** 99:1

**falsely** 43:22

**familiar** 27:6
32:20 39:14,
21 41:25
55:23 57:17
60:1 91:12,
14,17

**feature** 32:21
33:5 34:1

**February**
82:13,15
83:4

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                        Index: feed..generates

feed    73:8

feedback    25:18
  32:18 33:8
  34:5,19
  42:1,4,9,12,
  21,23,25
  45:3 73:10,
  13,18 96:16
  98:18

feel    33:16
  41:8 87:22

felt    36:12

field    57:20,
  21 69:21
  71:3 73:24
  102:19

fields    61:20

fifteen    71:24
  93:16

fifty-nine
  56:25

fight    113:11

figure    35:20
  49:7 64:13
  87:17 93:19

file    11:10,
  14,21 19:1
  21:6,16,17,
  24 22:20
  23:2,4,6,25
  24:5 25:10,
  11 29:3 35:4
  37:21 38:2
  50:17,18

51:11 59:12,
13,15,21
60:4,6,16,21
65:22 68:14
70:21 71:1,5
80:13,25
81:2,7 82:10
83:2,6,7,25
84:11,20,23,
25 85:7 87:2
88:2,10,12,
19 89:12,14,
21 90:25
91:10
102:17,19
109:1,3,4,6
110:18

filed    16:1

files    11:19
  12:17,19
  13:9 18:19
  19:8 20:9,
  23,25 21:1
  25:5,10,13,
  15,16 53:4,
  17 67:22,23
  68:7,19
  80:8,10,12,
  19,20 82:8,
  25 86:20
  89:19,22
  90:17,19,23
  103:23 106:5

final    22:7

finally    53:20

find    10:11,17

13:1 45:10
71:19 103:2

fine    47:14,15
  115:8,19,20

fingerprint
  11:9 12:5
  63:15 86:23
  87:2 109:1

fingerprints
  63:5

firm    101:6

first-pass
  21:5 24:13

five-minute
  47:17

Florida    27:5,7
  101:7

focus    44:16
  65:4 84:25
  85:6,10

follow    48:4

force    55:6

formal    76:10

format    110:25

forty-nine
  94:12

forty-seven
  84:16

forward    67:24

found    14:20,
  22 56:25
  70:25 108:6

Foundation
  13:20 14:16
  19:13 55:20
  92:9 98:3

Francisco
  75:24

frequency
  63:18

frequently
  73:13

full    19:25

fully    90:3

functions    44:2

---

G

Gainesville
  8:6

gather    7:21

general    10:15
  41:25 70:5
  74:20 75:6,
  11 104:22
  105:5

generally
  45:24 97:15

generate    19:1
  58:15,16

generated
  79:18 80:4,9
  82:3,4,6,16
  83:5 107:13
  108:21 111:5

generates

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: generating..hashes

58:17

**generating**
89:25

**genitalia**  85:1

**gist**  96:3

**give**  6:24
15:12 29:19
33:20 38:19
51:12 75:25

**giving**  38:23

**Global**  4:13

**globally**  45:7

**good**  5:8,12
38:21 40:3,5
101:5 115:23

**grab**  93:12

**great**  93:5
116:4

**grid**  89:12

**group**  39:11,
16 76:15,16
77:6 98:4

**guess**  18:19
22:6 47:9
51:21 54:23
64:3 66:1
74:8 75:18
80:6 105:11,
21

**guidance**  75:1

**guideline**
74:19,20
75:7,11

**guys**  23:19
27:13 28:10
31:10 39:25
40:10 43:3,
14 47:17
52:18 54:1
57:2 68:11
71:9,12 73:8
79:24 86:1
113:5,7

---

**H**

**hair**  74:22
85:5

**half**  64:21
66:3,9

**happen**  72:11
108:19

**happened**
109:14,17,20

**happening**
43:10 46:17

**hard**  10:6

**harm's**  44:7

**hash**  10:5,7,
8,9,11,12,
13,17,18,20,
25 11:2,4,8,
9,11,13,18,
23 12:14,24
13:1,5,6
14:9,19,20,
23,24 15:1,
24 16:9,12,
19 17:12,14,

15,19 18:5,6
19:2,5 20:2,
10 30:6,16,
19,25 31:4,
19 33:8,15,
16 34:16,21,
22 35:1,7,
12,13,14,20
36:2,8,9,13
37:10,14,17,
20,22 43:23
48:6,7,8,10,
12,24 49:1,
2,16,21
50:20 51:3,4
52:16,17
54:19 55:22
56:16,20
57:4 61:5,7,
13,23,25
63:3,14
67:16 82:21
85:19 86:12,
13,19,22
87:1,3,12,
24,25 88:1,
8,18,20
89:9,25 92:1
94:25 98:8
100:15
102:10,18,
22,25 103:3,
9,16,20,22
104:5,6,23,
24 105:6
106:4,6,13
107:3,4,6,
10,12,18

108:9,12,24,
25 109:7
110:3,12,25
112:16

**hash-matching**
65:23 109:10

**hash-sharing**
10:21 12:21
13:6,19
14:15 15:21
16:2,5 17:18
18:21,24
19:25 20:14
21:2,18 22:1
23:1,3 25:23
29:14 30:4,
11,19 32:21
33:6 34:23
36:3 38:14
40:11,19
52:23 53:3,
10 54:4,12
57:7 61:1,7
62:9 88:3
89:4,18,22
91:24 92:12,
20 96:5
99:7,18,21
100:11
104:12
105:16
110:18

**hashed**  91:3

**hashes**  12:22
13:9,12
14:11 19:19
30:17 31:7,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: hashing..images

24 32:2
33:14,22
34:6,19
40:14 50:3,
13 52:25
53:13,15,18,
22 55:1
56:15 57:9
61:12 63:6
95:12 96:4,
15 104:11,14
105:15
108:15,20

**hashing** 11:24
63:11 105:8

**hatch** 105:9

**head** 29:2
33:1 62:14
68:10 73:23

**heads-up** 13:24

**hear** 106:11

**heard** 27:10
28:9,12 42:9
45:3 56:17
73:20 75:23
78:7,11
90:8,13,14,
16,22 91:2
96:16

**heavily** 106:12

**helpful** 93:19
111:16

**hey** 9:8 29:22
35:18 44:24
67:18 72:13

100:5

**hidden** 90:18

**high** 45:4
96:19

**highlight**
40:15 69:18

**highlighted**
41:18 98:23

**hire** 59:24

**historical**
8:12 62:7

**historically**
62:19 81:2,
15

**hit** 58:25

**holding** 31:15

**holds** 24:2

**hone** 26:14

**host** 34:2,3
53:2,10,20

**hosted** 71:21
72:18,22
73:6

**hosting** 71:18

**hosts** 13:7
61:13

**hotlines** 96:24
97:11

**hour** 47:2,4

**house** 29:10

**housed** 105:14

**Howell** 4:23

**human** 21:4
106:12

**hundred** 15:15
17:1 18:16
19:9 38:3
42:7 57:1
67:1,3,4,5
77:18 83:12,
15 104:1
108:6 109:15

**hundreds** 85:24

**Huseby** 4:13

**hypothetical**
34:9 42:22

**hypothetically**
34:12 48:12
61:6

---

**I**

---

**idea** 6:24
15:12 63:18
92:21 107:18

**identical** 12:1
79:15 109:9

**Identification**
23:23,24
25:2

**identified**
23:9,13,25
29:11 46:9
59:6 66:14

**identify** 25:25
45:24 61:25

68:1 109:11

**identifying**
21:1

**illegal** 90:24
91:4

**image** 11:12,
15 12:1
15:2,9,13
16:1 17:4
26:17 28:24
29:20 34:14
35:1,8 49:5,
11 60:8 61:9
62:3 66:24
67:17 71:22
74:21 75:15
86:12,13,14,
17,21 87:4,
11,12,14,25
89:12,15
90:1,4,5,24
91:25 92:15
98:24 99:3,
6,9,13,16,20
106:21
108:5,13,17,
23 109:16
110:10,14,24
112:13,15

**imagery** 29:13
41:10 42:16
102:7

**images** 12:16
14:25 17:23
18:4,17,18,
23 19:7,17

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: imagine..information

35:9 39:2
41:10,21
42:3,14
44:14 53:13,
18 67:4
72:25 73:3
88:7,9,15,23
90:11,12
91:1,3,9
99:11,24,25
100:6,8
103:14
108:10,22
109:11

**imagine**  18:25
64:5

**imminent**  65:21

**imminently**
44:7

**importance**
73:10

**important**
41:3,4,6

**impression**
96:13

**improvement**
73:21

**improving**
73:14

**inaccurate**
43:23 57:16,
18

**incident**
57:13,16,21,

23 58:3,12,
24 69:10,18,
21 70:1 71:6
73:11,12,16,
22 82:22
83:9 85:18
112:19

**incidents**
64:16 65:20

**include**  13:20
20:1 59:22
61:11 62:2
63:2,7
65:21,23
71:4 73:25
86:21 87:24
88:15 89:8
90:23

**included**  8:13
11:12 17:13,
16,17 22:9,
14 23:2
37:14 42:10
43:25 50:14
55:8 59:10,
21,25 60:25
62:9,16 63:5
65:25 69:24
70:4,13,14,
18 72:4,6
74:1,3 87:11
88:10 91:25
92:1,3,8
98:24 99:3
107:1

**includes**  21:4
100:16

**including**
20:25 43:19
55:1 63:6
73:15,22
90:3

**inclusion**
20:13 21:1
23:1 24:10
88:23 110:18

**incoming**  11:19
25:5 65:20

**incorrect**  99:1
100:7

**increase**  64:16

**independent**
44:12 45:15
72:9

**indicating**
22:23 26:11
72:17

**indication**
59:14 92:2,
11 100:1
106:23

**individual**
17:23 18:4,
17 21:9
22:23 23:10,
13 24:1,14
26:1,13,22
27:1,16
28:3,20,21
64:20 82:24
84:8 98:8

**individual's**

85:1,8

**individuals**
24:14 25:12
26:1 41:7
43:21 45:20
46:9

**industries**
105:17

**industry**  10:14
11:22 13:8
16:6 30:15
31:3 33:13,
17 34:5
38:25 42:2,
17 51:3,10,
15 53:8,16,
20,21 56:19
57:19,22
60:13,14,15
62:8,24 64:8
69:19 73:8,
9,10,13
77:10,24
78:10 84:3
90:9 92:18,
21 97:16
102:6
104:17,21

**industry-
standard**  62:1

**industry-wide**
56:19

**infant**  25:11

**information**
8:11,12
12:12 15:11

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025          Index: information's..Kimbrell

17:10 23:19,
24 24:2
26:3,6 29:1,
11,23 30:2
31:15,16
32:2 42:18
43:25 44:9,
22 46:3,13,
23 49:20,23
54:16,24
55:4,12,13
57:24 59:10,
12 60:23
61:1,3,20
62:17,21
64:18 65:5,
12,18,24
68:1 70:4,
12,15 71:1,
5,6 72:7,17,
19 73:12,14
74:3,12
80:19 82:14
97:19 103:22
105:17 107:1
109:23

**information's**
59:25

**ingest** 31:7
32:3 104:13

**ingested** 33:15
49:16

**ingesting**
30:18 41:7
105:6

**ingests** 104:23

**inherently**
102:16

**initially** 21:5

**input** 31:21

**inquire** 48:21
49:10

**inquiring**
94:24

**insight** 101:13

**instance** 11:4,
11 49:17
57:24 58:23

**instances**
88:13

**instruct** 79:3

**interact** 32:15
53:23

**interest**
101:25

**internal**
14:11,22
49:9 50:10,
11 55:23
65:16 78:23

**internalized**
65:17

**internally**
12:9,11
24:19 50:7
78:13

**international**
14:16 19:12
55:20 65:10

92:9 98:3

**internet** 13:20
39:12 41:12,
15

**interpretation**
95:2 96:1

**interview**
39:19

**introduce** 4:14
5:9,11

**investigate**
30:1

**investigated**
101:11

**investigating**
29:16,25

**investigator**
29:21

**involved** 6:16
8:4 10:5
30:10 94:18

**involving** 6:17

**irrespective**
83:3

**issue** 33:18
97:5

**issues** 77:21

**IWF** 16:3,19
20:1 30:25
31:19 32:12
36:9,18
48:15 57:7
95:8,11

96:10 97:13
98:10

___

**J**

**Jami** 4:23
9:10,23
100:23
112:25

**January** 15:4,
9,13 16:23
17:5 21:20
55:7 80:21

**job** 5:18 7:1
40:4,5

**Jodi** 4:11

**John** 9:16,25

**Johns** 101:9

**July** 75:20,24
95:20

**June** 4:9
95:20

___

**K**

**Kathleen** 4:8

**keeping** 85:14

**Kimbrell** 4:23
9:8,10,17,
22,24 10:2
94:2 100:25
112:25
114:23
115:25
116:1,6

**kind**  33:4
  47:13 48:4
  54:10 55:2
  57:11 65:24
  77:20 88:7
  89:8 91:18
  93:4

**knowing**  16:19
  38:18

**knowledge**  24:8
  40:13 52:12,
  13 56:18

---

**L**

**labeling**  25:9

**lack**  85:4

**lacks**  74:21

**laid**  62:5

**landscape**
  77:24

**language**  62:7
  75:7

**large**  64:14
  101:10

**larger**  13:25
  90:25

**lascivious**
  22:21 23:7
  60:17

**late**  85:21

**law**  7:7 23:9,
  13,17,24
  24:5 28:12

29:12 41:19
42:2,6,8,18
44:11,14,23
45:3,10,13
46:13,18,19,
24 57:14
63:20 64:22
65:10 66:4
67:8,25
68:2,4 69:10
71:11 72:8,
20 74:5
77:10 81:14
83:1 85:2
101:6
109:19,22

**laws**  45:9

**Lawshe**  4:7 8:2
  75:18 98:15
  101:11

**lawsuit**  75:17,
  18,19 79:22

**lawyer**  78:5

**lawyers**  78:17,
  22

**layman's**  31:12

**leave**  85:2

**Lee**  4:7 8:2

**left**  47:10

**legal**  77:20,
  24 90:12,19,
  25

**legible**  14:1

**letter**  56:14

**level**  37:2
  83:7,9 85:18
  111:17,24
  112:2,3

**lewd**  22:21
  23:6

**liability**  55:3

**limited**  55:1
  59:10

**link**  9:12

**list**  7:16
  10:9,12,13,
  17,21 11:18
  12:4,8,14,
  21,22,24
  13:1,5,6,9,
  12,19 14:11,
  15,20,23
  15:20,21
  16:5,8,12,
  14,16 17:14,
  18,24 18:3,
  8,12,21,24
  19:5,8,25
  20:14 22:1,9
  23:1,3 25:23
  29:14 30:4,
  7,11,12,19,
  25 31:1,4,5,
  19,20 32:4,
  22 33:6,23
  34:1,16,17,
  23 35:13,14
  36:2,3,9,14,
  17,19 37:14

38:14 40:11,
15,19 41:4,7
43:2,13
48:7,13,24
49:2,8,9,11,
16 50:3,6,
11,15,20,25
51:1 52:23,
24 53:3,10,
11,16,21,24
54:12 55:14
56:1,16,20
57:7 61:1,8,
13,23 62:17
63:3,13
67:17 68:11
75:3 87:12,
25 88:1,3,18
89:23 91:24
92:1,10,16,
17 95:1,4,9
96:5,8,11,
15,18 97:7,
25 99:7,8,
19,21,22,23
100:2,11,15,
16 104:11,
13,14,23
105:16 108:4
110:18

**listed**  85:19
  111:12

**lists**  20:10
  34:2 43:23
  52:16,17
  54:4,19
  55:11,17,22

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                              Index: literature..MD5

57:4 61:13
89:25 92:20
96:15 97:16
100:16 104:6
107:6

**literature**
38:25 39:8

**Litigation**
4:13

**local** 109:19

**locate** 10:6,8
11:1 52:6

**located** 10:21,
25 11:2

**location** 72:7

**log** 68:22

**Logan** 4:19

**logging** 94:3

**long** 6:9,16

**long-winded**
89:21

**longer** 47:12
93:10,11,20
110:10

**looked** 57:11
83:4 84:10
98:14 106:19

**loses** 97:16

**lost** 96:10
97:13

**lot** 41:20
42:2 45:9,10

94:14 96:13

---

**M**

---

**Madame** 5:24
8:19 39:4
94:2

**made** 10:21
16:22 19:18
27:25 31:21
34:4 40:2
42:6 44:10
46:18 60:19
73:2,4 82:12
85:17 109:3,
19,21

**main** 44:2

**maintain**
68:11,14
92:20 104:14

**maintained**
108:4

**maintains**
107:6

**majority** 64:5
89:14 94:20

**make** 7:6
13:25 16:8
22:8 32:2,4
43:24 47:13
51:10 53:8
56:4 68:3
72:19 80:16
88:5 91:6
105:13
112:14

**makes** 10:14
13:7 55:10,
25

**making** 24:15
32:11 40:6
82:25 84:24
85:1,15

**man** 8:1

**management**
25:4,17

**mandate** 43:15

**manner** 46:17
68:18

**manufacturing**
59:7

**March** 78:12
79:18,25
80:3,11,13
86:1,2
111:5,10

**mark** 8:20
36:25 37:1
41:13 51:23
56:9 79:12

**marries** 53:11

**massive** 103:20

**match** 30:7
35:1 61:5,7,
8 67:16
82:21 90:5

**matched** 92:17

**matches** 94:25
95:15,19,24

**matching** 37:23
86:19 89:10,
20 104:15
105:9 106:13
110:3

**material** 13:11
21:13 23:5
28:7 39:6
40:20 43:16
46:1,11 53:6
69:9 73:5
74:1 76:18
110:20

**materials**
32:17 57:14

**Matt** 4:21
101:6

**matter** 4:7

**matters** 77:10

**Mcnulty** 4:4
5:2,12,13
6:4 8:24
39:9 47:3
48:2 94:14
100:21 101:5
112:22

**MD** 14:9

**MD5** 10:18,20
11:2,4,8,11,
13,18,22
12:4,23
14:9,24 16:9
17:15,19
18:5 19:1
35:7 37:20

Case 3:24-cv-00137-MMH-LLL    Document 98-5    Filed 12/15/25    Page 49 of 62 PageID
1939
WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                    Index: means..NCMEC

50:12,13,20
51:3 59:13
61:25 63:8,
13 86:22
87:1 102:10,
12,18,22,25
103:2,16
104:5 105:6
107:4,12,18
108:9,12,15,
20,24,25
109:6 110:3,
25 112:16

**means** 20:22
23:6 28:1,5
82:14 102:7

**meant** 58:3
70:1 99:22
105:16
114:13

**mechanism**
34:8,15,18

**mechanisms**
92:19

**member** 11:22
21:15 25:3,
16 30:16
31:3 46:15
48:10,23
49:17 50:1,
23 51:3,10,
15 57:22
62:23 63:4
74:19 97:16
100:14
104:17,21

**members** 10:14
13:8 16:6
30:15 33:13,
17 42:17
53:16,21
57:19 61:11
64:1 69:20
71:16 73:14
84:4 91:23
92:12,21
102:6

**memorandums**
51:21

**memory** 80:17
81:19

**met** 36:12

**Michael** 4:12,
17 5:8 9:8

**Mikayla** 4:7,22
101:8

**million** 18:1

**millions** 19:19
42:6 65:3
106:2

**mind** 64:13
85:14 96:23
111:19

**minimize** 29:7

**minor** 29:17
60:16

**minors** 53:12

**minute** 114:5

**minutes** 47:10

93:16,23,24

**Missing** 4:6
5:15,20

**mistakenly**
99:9

**Mm-hmm** 85:11,
13

**model** 34:13
35:18

**moderation**
106:12

**modified** 88:11

**modify** 110:2

**monthly** 68:6

**morning** 5:8,12

**motion** 79:21
98:20

**motions** 98:22

**motivating**
43:1

**move** 48:5

**moving** 85:24

**multi-human**
13:10

**multiple** 19:1
34:2 63:23
78:3 88:13

**multitude**
63:11 65:9

**muscle** 74:23

---

### N

**N-C-M-E-C** 6:1

**named** 8:2
18:11

**names** 13:14

**national** 4:5
5:15,20 24:3
97:10

**NCMEC** 5:22,25
6:6,17,22
8:3,6 10:8,
12,14,22
11:17 12:14,
21,23 13:5,
6,7,8,10
14:10,14,15,
20,22 15:7,
14 16:10,24
17:5,13,20,
24 18:2,10,
21,24 19:5,
16,25 20:1,
4,13 22:22
23:1,3,5,9
24:2,4 25:23
27:7 29:10,
16,24 30:1,
4,24,25
31:15,16,19
32:7,18
33:22 34:2,
23 36:2,11,
14,17 37:14,
18,25 38:13,
21 39:19

40:10 43:17,
20,24 45:6,
18 48:11,14,
19,22 49:2,
8,9,11,18,
22,23 50:15
51:5,8,16
52:1,9,24
53:2,4,16,23
54:4,14,15,
19 55:10,16,
25 56:14
57:9 58:15,
21 59:2
60:18 61:13
63:19,22
65:15,16
68:7 72:3
74:4,14,15,
16,18 75:2,
7,15,16
78:13 80:15,
18,23 81:1,2
82:8 87:24
88:18 92:2
94:15 95:7
96:2,8 97:25
99:10,11
100:2,5,7,17
101:16,19,
24,25 107:6,
14,17 108:4
112:11
114:25

**NCMEC's** 13:19
16:2,4,13,
15,16 21:2
23:21 29:8,

13 30:12
32:4 35:22
40:19 50:24
56:15 78:23
88:20 89:22
92:3 95:13
96:15,21
97:8 98:24
99:3,5,18,23

**necessarily**
16:7 18:7
19:16 20:8
22:1 29:10
36:4 41:24
50:8 53:5,17
63:9,13
65:11 76:13
85:10 86:15
88:25

**NGO** 12:20,23
13:5,6,15,19
14:14,20
16:7,10
18:2,21
19:5,25
29:13 30:3,
4,11,24 32:5
33:22 34:1
35:13 36:2,
3,10,18,20
43:6 48:7,13
49:18 52:24
54:11 55:14
56:1 57:7
61:1,6,7,13,
22 62:17
75:3 91:23

94:25 95:4
97:25 99:22
100:15,16

**NGO's** 87:12

**NGOS** 13:13,18
16:22 19:18
32:8 36:6
52:25 54:20
62:16

**ninety-nine**
40:21 64:7

**non-governmental**
13:15 100:16

**non-lawyer**
79:24

**non-profit**
52:23 54:16,
25 55:4
61:20 74:15

**non-profits**
54:17 61:19

**notes** 40:24

**notification**
71:20

**notified** 57:3

**number** 19:10
59:13 61:10
65:17 68:9
72:7 92:19
95:5,15 96:6
111:17

**numbers** 66:7

------

O

------

**oath** 5:4

**object** 27:17
67:10 78:15
87:16,17

**obligations**
51:13

**observation**
56:5

**Observatory**
39:12 41:16

**observing**
95:16

**obtain** 104:5

**obtaining**
103:16

**occasions** 15:8

**occurred** 74:24

**occurring**
42:19

**October** 37:18
55:7 81:10,
15,22 82:10,
12 83:4,13,
22 87:4

**odd** 38:17

**off-limits**
78:18

**offer** 104:8

**office** 79:19
101:10

officer    41:19,
 20

older    62:6

on-the-job
 24:23

ongoing    78:4

online    38:23
 43:9  44:20
 45:5  64:16
 72:25  73:6
 103:10

onset    64:19

operate    43:18
 105:10

operates    60:2

operating
 103:8

operations    7:3

opinions    29:8

opportunity
 7:10  8:5,8

opt    30:25

opt-in    30:23

order    23:2
 31:18  35:21
 63:17  72:19
 79:21  98:21
 102:9  113:24
 114:4  115:11

ordering
 114:13  115:6

organization

48:15  57:8
 102:22

organization's
 95:9

organizations
 13:16  100:17
 110:4

original    8:5
 80:15  82:1

outcome    97:22

outset    112:7

overlap    36:17
 96:18

overlapping
 36:1

oversee    7:3

overview    77:23
 78:3

_____

P
_____

p.m.    94:8,9,
 10,12  115:4
 116:9

packaged    90:12

pages    94:14

paragraph    55:8

parameters
 31:5,8

part    7:20
 43:1,2  76:16
 80:2  96:21
 101:10

114:17

participants
 16:7  20:6
 33:6  34:5

participate
 13:18  33:24
 34:3

participating
 13:8,13
 16:22  19:6
 30:5,15
 53:16  54:17
 61:19

parties    10:22

party    40:17
 43:12

pass    29:6

past    74:2

pay    29:12

PDF    22:15
 79:17,25
 80:5,7,9
 82:3,4,6,16
 83:5  102:20
 106:19  111:5
 115:7,8,14,
 17

people    40:3,4
 42:2  47:2
 70:23  76:15,
 16  77:6,16,
 19  89:25
 90:9,10,15
 93:11  109:25

percent    40:21
 64:7

percentage
 64:4,10,24

perception
 27:16

perfect    93:24,
 25

performed
 40:17

performing
 45:14  89:9

person    59:6
 76:4

phone    72:7

photo    37:22
 84:5  107:17

Photodna    11:23
 12:5,6  15:2,
 18  37:17,22
 50:13,20
 55:1  61:24
 63:8,14  88:6
 90:4

photograph
 86:24
 101:21,24
 102:10,21,23
 103:3
 107:10,14,18
 108:16  110:7

photographs
 102:4
 103:14,15,17

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025         Index: photoshopped..proceedings

104:2,3,6,24

**photoshopped**
84:6 89:10

**physically**
80:23

**pick** 35:8

**picture** 87:6
109:2 110:2

**pictures**
106:2,3

**piece** 92:22

**pipeline** 46:24

**pixel** 109:5

**places** 61:22

**plaintiff** 4:18

**Plaintiff's**
8:20 56:9

**platform** 13:7
32:5,8 34:4
36:3,10,18,
20 71:19,21
98:5,7 105:7

**platforms** 41:9
53:9 105:18
106:11

**pleadings**
98:15

**point** 21:11,
20 27:12
40:21 58:17

**Police** 8:6

**policies** 45:18

46:7 89:25

**policy** 39:12
41:16 88:22,
25

**pornography**
22:16 25:7
26:18,23
27:2,3,14
28:2 43:23
59:8 62:1
63:19 64:12
66:5,21
67:18 68:20
72:14 82:23
83:10,22
90:11 91:9
100:6,9

**portion** 64:14

**position** 6:5
100:5

**possessed**
101:11

**possessing**
43:22 46:10
59:7

**possession**
15:7 45:25
67:18 101:20

**possibly** 91:25

**potential** 24:9

**potentially**
60:24,25
90:4 101:24
106:22

**Powerpoint**
69:12

**Powerpoints**
74:2,4

**practical** 57:3

**practices**
45:19 46:8
55:24 106:10

**predict** 24:10

**prepubescent**
23:8,12
24:11 60:16,
20 66:16,20
74:20 75:9

**present** 10:18
76:17

**presentation**
38:20,24
69:13 75:25
76:11,14,25
77:9

**presentations**
78:9

**Preston** 4:7,22
101:8

**pretty** 45:4

**previous** 15:8
37:21 83:13,
21

**previously**
6:23 11:21
12:17,20
15:3 17:20
21:25 22:11

33:15 38:8,
10 51:8
60:18 81:7,8
83:2,21 84:2
98:9 99:14
109:13

**primer** 77:21

**print** 68:21

**printed** 79:25

**prior** 6:14
15:4,13
16:23 17:5,9
21:20 37:18,
24 38:11
79:19 81:15
83:23 107:16
110:6

**prioritize**
44:5

**priority**
111:17,24
112:2,3

**privacy** 43:21
45:20 46:9

**problem** 94:24
111:21

**problematic**
101:25 102:5
105:14
106:22

**procedures**
45:19 46:8
90:1

**proceedings**

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: process..quote

4:1

**process** 7:6
13:10 20:18,
25 21:8,12,
23 22:2,3
36:13 38:21
43:3,6 96:22
102:11 106:3

**processing**
82:24 83:8
85:15

**produced** 7:14,
24 52:2 54:1
64:17 79:14
86:2 94:14

**program** 23:22,
23,24 25:2
71:14 72:12

**programs** 43:18

**prohibited**
49:25

**promoted** 6:11

**protect** 45:19
46:8

**Protection**
13:21

**proved** 34:12

**provide** 32:18
34:5 49:19,
22 51:16
52:15,18
54:21 60:12
65:12 68:10
71:8 73:13

103:1
105:12,15

**provided** 24:19
55:12 57:25
58:24 61:3
73:15 74:4,
18 97:19
104:9 111:3

**provider** 12:18
14:12 19:23
31:18 46:16
48:7,21
49:5,10 64:6
65:15 67:16
71:20 73:10
112:4

**providers** 7:5
17:25 19:6
30:5 32:15,
18 42:11,13
52:18 57:15
63:24 67:21
71:17

**providing**
25:18 34:18
42:13 57:16
73:11

**pubescent** 23:8

**pubic** 85:5

**pubic/facial/
underarm** 74:22

**public** 46:15
64:2 71:16
73:3

**publicly** 56:22

60:4,7 70:21
71:23

**publish** 104:11

**published**
39:18 71:23
73:3

**publishing**
71:12

**pull** 31:15,24
80:2 81:18

**pulling** 69:15

**purposefully**
110:2

**purposes** 13:24
57:20

**pursuant**
110:15

**push** 31:16
32:2

**pushed** 67:7

**pushing** 32:12

**put** 41:4
61:24 88:17,
24 109:7

**puts** 102:19

**putting** 32:14

───────────

**Q**

───────────

**quality** 73:14

**queried** 68:22

**query** 16:4

30:16 31:5,
7,17 51:6
68:16,19
86:16 96:4

**querying** 84:1
95:4

**question** 6:4
7:20 10:19
15:17 17:12
19:11 26:21
27:18 37:24
38:11 39:4
40:9 45:22
46:7 50:4,9,
24 51:2 60:2
61:5 63:16
66:1 67:11
73:1 80:10
81:10 86:10
87:15 102:2
105:11
112:10

**questions** 10:4
48:5 49:1,
13,15,23
50:2 92:25
93:1,11,15
100:20
101:14
112:21
113:1,10

**quick** 48:2
93:2

**quickly** 74:9

**quote** 41:20,
24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: ran..remove

---

**R**

ran  14:25

rape  66:15

re-ask  27:24
  67:12

reach  49:13,
  18

reached  95:3

reaching  79:19

read  10:6
  20:19 37:7
  39:23 41:23
  57:13 58:10
  95:10 102:25
  113:7,18,22

readers  103:9

reading  41:22

reads  102:18

ready  87:19

real  74:9

reasked  27:18

reason  24:9
  33:16 79:24

recall  8:15
  18:13 33:1
  40:6 41:22
  62:12 69:8
  76:13,19
  77:8,13 80:4

receive  7:4,18
  24:14 42:4,

24 44:21
  45:16 50:13
  64:1 65:3
  67:14,20
  71:15

received  9:13
  10:20 11:16,
  20 12:2
  46:14 58:15,
  21 65:14
  72:15 80:22
  81:13 87:3
  92:11

receives  23:24
  45:6

receiving
  30:25 44:4
  53:18 64:19
  65:1 73:18
  75:12 96:25
  97:1,3

recent  38:16
  75:5

recently  6:10

recirculated
  41:11 43:9
  66:13 67:1

recirculating
  66:20

recirculation
  66:19 72:24

recognize
  56:11

reconsideration

98:21

record  4:3
  5:11 6:2 9:3
  11:7 47:20,
  24 50:6,18,
  19 54:6 58:7
  68:14 94:8,
  11 100:10
  114:11,12,18
  115:4,6

recorded  77:14

recording
  58:21

records  17:4,7
  26:5

reduced  96:6

reduction
  94:24 95:15,
  17

refer  6:2
  12:13 15:7
  32:24 75:4
  86:1 101:17

reference
  75:14 106:20

referenced
  56:18 107:12

references
  32:25

referrals
  109:21

referred  5:21
  45:5 64:25

referring
  10:13 12:15
  13:15 19:12
  41:17 45:13
  69:12 72:8
  78:21 86:7

refers  99:5

reflect  17:7

reflective
  59:3,5 75:7

reflects  57:23
  69:23 86:5

regain  97:13

registered
  112:4

registrant
  48:23 54:23

registrants
  55:11 89:9

related  45:5
  77:24 102:12
  109:16

relationship
  87:14

released  33:1

relevant  68:2

relying  106:11

remember  40:1
  81:24

remotely  84:17

remove  34:17
  41:8 53:9

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025        Index: removed..responsibilities

73:4 105:20

**removed**  57:2,4
  73:7

**repetitive**
  11:14

**rephrase**
  107:11

**report**  9:2
  10:19 11:3,
  12,16,19
  21:21 22:14
  34:25 35:3
  36:11 37:4,6
  38:1 39:20,
  23 41:16,22,
  24 44:1,9,10
  45:16 46:3,
  15 57:25
  58:2,5,8,18,
  21 59:1,4,
  11,21 60:1
  61:4 64:11,
  19 65:14
  69:24 70:7,
  19 71:10,12
  72:5,15,19
  79:16 80:9,
  14,15,22
  81:1,11,23
  82:12,15,18,
  23,24,25
  83:9,12
  85:8,15,16
  86:3,4 87:5
  88:10 99:13,
  16 101:24
  102:7,16,17

106:16,17,19
107:2,13,25
111:7,8,16,
20 112:3,19

**reported**
  12:17,20
  14:11,23
  15:3,9,14
  30:2 37:18
  46:6 50:17
  51:5 68:12,
  15 71:6,17
  72:1 84:2
  86:18 88:13
  99:9 101:16,
  19 102:19
  103:23

**reporter**  4:11,
  15 5:25 8:19
  39:4 94:2
  114:5,10,17,
  20 115:5,10,
  17,21,25
  116:3

**reporter's**
  5:18

**reporting**  39:1
  51:13 59:14
  70:17 77:11,
  25 92:21

**reports**  7:4,6
  8:3,6,9,14
  15:16 17:9
  38:3 41:21
  42:3,5,6,8,
  11,13,17

44:4,6,18
45:1,2,6,13,
21,23 46:12,
18,22 50:14
52:4 63:19,
22 64:1,7,
10,14,22,25
65:3,7,9
66:4,21
67:5,7,14,
20,24 68:3
69:23 71:15
72:2 73:15,
21 81:8
88:13 96:25
97:3,9 108:7
109:15,19

**represent**  8:1
  10:7 18:20
  41:14 69:19
  71:22 101:8

**representation**
  28:4

**representations**
  32:12 55:25
  78:1 89:19

**representative**
  4:5 5:14
  18:22 76:2
  88:9

**represented**
  16:2 18:24
  19:17 21:2,
  25 29:13
  34:13 40:19
  56:16 88:2,

20 89:3,17
96:17 99:6,
13,20

**representing**
  4:22,24

**represents**
  11:11 17:19
  86:23 87:6

**request**  31:19
  34:4 52:2
  79:20

**requested**  7:17
  8:11 51:20
  78:25

**requests**  7:19
  8:15

**required**
  61:19,24
  63:2

**requirement**
  62:8,11

**research**  37:9
  38:19

**reshow**  85:25

**resolution**
  97:18

**resolves**  44:9
  85:16

**resolving**  65:8

**response**  53:25
  111:4

**responsibilities**
  54:14

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025

responsible
  54:15,19

responsive
  7:19 79:15

rest  116:4

restrict  98:7

result  64:10
  109:21

resulting
  110:25

results  15:25
  40:20 41:1
  56:15 95:5

retrace  35:20

retract  34:19

retrieve  46:22

return  15:24

returned  31:7
  96:4

revictimization
  43:10

review  7:10,
  15,25 8:5,8
  13:10 17:4
  21:4,12,14,
  17 24:13
  25:21 29:6
  38:12 44:12
  45:15 53:23
  72:9 80:3,10
  85:3,9 89:2
  94:16 95:22
  110:17,21

reviewed  7:23
  9:2 20:23
  21:24 22:20
  49:24 50:5
  65:1 68:7
  80:8,12,13
  81:7 82:13,
  25 86:2

reviewer  21:5

reviewers
  21:12 25:22
  89:16

reviewing  21:9
  24:25 25:13,
  17 36:5
  65:4,22
  84:23 94:20
  97:4 112:11

reviews  17:8

revoked  95:11

rights  43:21

rise  53:5

risk  44:5
  65:5,21

risks  55:3

Roberts  4:17
  5:7,8,24 6:3
  8:17,22 9:9,
  15,19,23,25
  10:3 14:3,7
  27:20,22,23
  38:6,7 39:3,
  7 47:1,12,
  16,19 48:1

67:12,13
78:19,20
79:6 87:20,
23 92:23
93:7,9,17,25
94:13 100:19
113:3,13,16
114:1,3,7,21
115:7,8
116:5,7

role  6:10,14,
  25

Rule  98:21

run  11:17
  12:3,4,8,9,
  23 14:10,14
  16:9,13
  65:15 108:5

Rutherford
  4:19 27:17,
  21 47:8,14,
  18 67:9
  78:15 79:2
  87:18 93:5,
  8,22 113:12,
  14,17,21
  114:2,25
  115:12,13,19

─────────────

─────────────
          S
─────────────

sadism  25:10

sample  52:15

San  75:24

satisfy  98:4

scan  31:19

scanning  35:7
  39:1

scenario  36:15

schedule  7:12
  54:1

scope  96:14

screen  8:19,24
  51:24 109:3
  111:19,25

screenshot
  89:13

scroll  9:7
  60:11 82:6,
  17

search  31:23
  50:19

second-review
  21:8

section  22:15
  58:5 60:11
  70:5,14 74:7

secure  46:17,
  19

selected  85:18

send  9:12,15,
  17,19 59:1
  71:20

senior  21:15
  22:8 25:3,22

sense  19:4,7,
  13 67:6 91:6
  92:13,16

**separate** 19:7
20:24 71:14
98:2

**servers** 105:14

**service** 7:5
12:18 14:12
17:25 19:6,
23 30:5
31:13,18
32:14,18
42:11,13
46:16 48:7,
21 49:5,10
52:18 53:12
57:15 63:24
64:6 65:14,
15 67:16,21
71:16,20
73:9 112:4

**serving** 44:1

**set** 18:23
105:2

**sets** 31:14
32:7

**setting** 31:6,
21

**sex** 22:21
23:6 26:17,
22 28:1

**sextortion**
44:21

**sexual** 13:11
21:13 23:5
28:7 39:5
40:20 43:15

45:6,25
46:10 53:5
66:15 73:5
90:11 110:19

**sexually** 44:19
53:4,7

**share** 8:19,23
36:18,19
37:2,14
41:13 51:7,
22 53:15,22
74:10 90:16
98:19

**shared** 8:23
16:5 19:5,19
23:3 33:14
36:9 46:13
81:20 100:10
105:19

**shares** 17:24
40:14

**sharing** 18:2
20:11 34:1,7
36:22 46:23
49:25 53:20
61:12,23
74:15 81:21
88:20 105:16
111:19

**Sheriff's**
101:9

**shoot** 81:20

**show** 24:11
76:18,19
77:1 111:15

**showing** 80:17

**side-by-side**
109:7

**sign** 30:24
75:2 113:22

**signature**
11:24 12:6,7
37:17 50:20
61:24 63:14

**signatures**
55:1

**signed** 62:10
100:14

**similar** 11:25
86:19 89:22
109:11

**similarly** 24:2
28:17 43:12
49:15

**simple** 110:7

**simply** 28:13
32:2 58:25

**sir** 14:6
114:22

**sit** 14:10
35:6 87:7

**sitting** 25:3

**sixteen** 43:18
47:21

**slide** 76:11,
18,19 77:1

**slightly** 109:5
110:24

**slow** 76:11

**small** 64:24
65:2

**smaller** 12:21
77:5

**smoothly** 113:5

**snap** 85:15

**Sniffen** 4:21
101:7

**soda** 93:12

**solely** 72:15

**sort** 15:12
35:19 68:21
86:13 87:14
96:21 97:5

**sound** 32:20
57:17 91:14
95:22

**sounds** 25:21
91:17

**Souras** 113:4

**source** 34:21
48:6,8

**sources** 63:23,
25

**speak** 16:21
35:15 36:4
59:9 73:24
90:2 102:1
104:20 105:4
107:20

**speaking** 76:3,
15

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Fallon McNulty on 06/12/2025                    Index: specific..summary

specific  8:13
 10:4 11:17
 14:19 30:6
 33:9 77:12
 106:21
 108:13
 110:15

specifically
 6:17 7:4
 50:4 54:11
 73:24 91:24
 101:17
 104:20

specifics
 76:13 77:8
 97:15 104:16

speculate
 91:12

spell  76:6

Spellman  4:22
 101:7

spoke  76:22

spoken  56:22
 59:13 72:24
 106:7

spring  78:12

St  101:9

staff  17:5
 21:15 29:9
 39:19 48:19
 80:7,18,23
 81:1,3 82:8
 94:15

stage  77:3

stamp  58:8

standard  22:25
 115:9

Stanford
 39:11,13
 41:15

staring  79:9

start  60:24

started  5:10
 84:2

starting  17:15

starts  76:8

stated  69:17

statement
 26:19 40:6
 98:17 99:1
 100:7

statements
 98:18

States  45:8
 65:8 66:5
 67:8

statute  67:24

stay  40:24
 115:5

step  13:4
 22:7 31:18

steps  22:7
 35:20

Stingo  4:3,12
 13:22 14:6
 38:4 47:20,

24 94:6,11
 113:23
 114:15,19
 115:2

stop  36:22
 81:20 87:15

stored  26:3
 103:15

storing  104:25

stringent
 96:22

strong  4:24
 89:12

study  39:18

stuff  54:20
 102:5

subject  21:21
 24:6 26:2
 28:24 37:10,
 25 66:25
 67:2 74:21
 75:15 80:24
 83:12 108:13

subjective
 29:5,8

submission
 63:3 110:16
 112:12

submit  53:13
 54:15 61:19

submits  58:18

submitted
 11:21 25:1

42:17 46:15
 54:16 59:4
 72:5 84:3
 102:16
 110:14,23,24
 112:4

submitting
 61:4

subpoena  7:8,
 13 53:25
 54:1 79:15
 111:4

subscriber
 103:25 104:1

subscriber's
 102:4 103:14

subscribers
 101:20

substance
 33:10

substantive
 77:22

substantively
 80:7

suggesting
 45:17

suggestion
 14:4

suitability
 89:3,7

suitable  21:2,
 18 89:20

summary  9:5

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: summer..thousand

57:12 82:17
86:4

**summer** 38:20

**superimposed**
84:7

**supports** 54:5

**surface** 44:6
65:19 86:20
88:9 102:7

**survivors** 43:8
53:12 66:14

**suspect** 45:24

**suspected** 39:2

**suspects** 45:20

**swear** 4:15

**swiftly** 105:20

**sworn** 5:3

**Synchronoss**
11:17 19:22
30:9 35:1,3,
7,10 48:19
52:3 54:2,7,
24 58:1,3,25
59:1,19,20,
23 60:1,15
61:4,17
69:25 72:6
73:17 74:11,
18 75:1
94:15,23
95:2,15
97:25 98:9
100:4,14
101:16,19,23

102:2 104:20
106:21
107:17,23

**system** 26:4
30:23 46:17,
21 58:17
65:11,16,21
84:21 87:10
99:15
102:15,18
103:8

---

**T**

**take-it-down**
53:10,12

**takes** 20:13
44:15

**taking** 51:11

**talk** 18:10
19:5 23:17
28:19 41:1
48:17 57:13

**talked** 69:8
70:20,22
74:7 89:5

**talking** 19:22
29:19 36:24
38:20 41:19
66:17,18,24
69:9 77:3
88:11 91:16

**Tallahassee**
101:7

**target** 45:24

**targets** 45:21

**taught** 25:4

**team** 25:3,19
26:11 48:25
65:2 71:18
72:21 73:20
75:12 88:8

**technical**
31:10 86:11
90:10 95:4

**technology**
15:2 35:7
65:23 109:10

**teen** 84:19

**telling** 96:2

**ten** 4:9 18:1
71:24 93:23,
24

**tens** 42:5
44:3 65:3

**term** 28:9,10,
11,16 68:16
90:10

**terms** 6:25
29:24 31:12,
24 32:19
43:5 85:7
95:9 98:9

**terrible** 87:15

**tertiary**
110:17

**testicles**
74:22

**testified** 5:3
27:8 107:3
110:13,22

**testimony**
101:15 110:6

**text** 65:24
110:9

**texts** 70:13

**theory** 22:6
36:7,16 69:1
90:3,7

**thing** 33:4
81:20 91:18

**things** 45:10
56:2 66:19,
20 69:18,19
73:15 85:23
89:2,8,16
105:2 106:14

**thinking** 36:8
73:19 89:2,7

**third-party**
21:14

**third-pass**
110:21

**thirty** 47:10

**thirty-eight**
57:1 94:8

**thought** 18:9
50:10 79:12

**thousand** 18:16
19:10 42:7
57:1

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: thousands..unable

**thousands**
  25:13 44:4

**thread**  32:25

**three-part**
  21:4 96:22

**three-person**
  89:1

**three-step**
  36:12 43:3,5

**threshold**
  55:21

**throw**  47:5
  93:18

**thumbs-down**
  33:4

**thumbs-up**  33:4

**time**  4:9
  34:14 44:15
  52:4 55:10
  57:13,21,23
  58:3,8,12,
  13,16,17,21,
  24,25 59:4,5
  61:4 62:20
  63:9 69:11,
  18,21,23
  70:1 72:20
  73:11,12,16,
  22 74:11
  78:7,11
  80:8,21,25
  81:13 82:7,
  12,15,25
  83:5,8,15
  86:10 96:7

  100:20 114:6

**timeframe**
  80:11 95:22

**times**  15:13
  17:1 37:24
  57:16 67:1,3
  83:12,15
  84:1 88:14

**tip**  81:13
  101:18
  106:18 107:5
  112:16

**today**  4:9
  5:19 7:9 8:1
  14:10 26:6
  35:6 72:24
  87:8 88:11
  111:5 113:25

**told**  41:20

**tone**  74:23

**tool**  104:9

**tools**  106:15

**top**  29:1 33:1
  62:14 68:10
  73:23 85:18
  111:15,16

**total**  52:17

**totally**  31:25

**touching**  54:11

**track**  76:15

**trainer**  25:16

**training**
  24:14,18,21,

  23 25:12,16
  57:14 69:9
  74:1 75:12

**transcript**
  113:18
  114:4,9,13
  115:1,6,14,
  16

**transmit**  90:11

**transmits**
  63:19

**transmitted**
  80:22 81:14
  91:5

**trend**  91:19

**triage**  45:14

**triaging**  44:3

**triple-
verification**
  110:17

**triple-verified**
  56:1

**triple-vetted**
  110:14

**triple-vetting**
  20:18 21:23
  22:2

**true**  24:4
  30:20 34:11
  45:12

**trust**  40:3,4

**Trustcon**
  76:21,25

**turn**  53:15

**twelve**  58:9
  94:8,11

**twenty-one**
  58:8

**twenty-three**
  47:25

**two-part**  21:12
  26:15

**two-person**
  22:3

**type**  11:24
  23:19 33:18
  62:21 63:14
  82:22 83:9
  85:18 91:9
  112:19

**types**  24:15
  25:13 42:21,
  22 67:7
  89:15 105:8

**typically**  26:3

─────────
    U
─────────

**U.S.**  97:1

**UK**  96:24

**ultimately**
  28:7 40:17
  42:8 44:1
  51:9 85:1
  104:17
  105:3,24

**unable**  58:2

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                          Index: unclothed..video

**unclothed** 25:8
  53:6

**unconfirmed**
  22:16,18,24
  25:7 26:8,9,
  11 27:9
  28:1,4,6,25
  33:20,23
  38:9,13
  60:22 63:19
  64:11,23
  66:5 67:5
  68:8,17,20,
  25 81:5,9
  82:23 83:3,
  7,10,22,24
  84:24 99:14,
  17 111:13
  112:14

**uncurated**
  43:23

**undergone** 13:9

**underneath**
  111:17,23
  112:2,5

**understand**
  5:13 13:3
  16:25 19:21
  20:12,15
  22:5 23:16
  35:25 44:13
  45:22 46:2
  50:9,16
  52:10 54:18
  55:16 56:3
  61:2,22 62:4

  70:8 80:21
  83:14 84:23
  86:25 91:8
  101:15
  103:19
  104:18,19

**understanding**
  51:2,21
  81:12 90:6
  98:2 103:13

**understood**
  50:11 56:6
  70:22 112:6

**Unintelligible**
  14:5 91:21
  114:2

**unique** 18:7

**United** 45:8
  65:8 66:4
  67:8

**universally**
  45:4

**University**
  39:12,13

**unsure** 26:12
  28:2

**uploaded** 11:12
  59:12,15,21
  60:4 67:21
  68:7 70:21
  71:1,7 80:8,
  19,20 102:17
  105:19
  107:14

**uploading**
  107:17

**upvote** 33:7,
  12,21

**upvote/downvote**
  33:5,24

**URL** 70:24
  71:8 72:6,
  16,21

**URLS** 71:17,18

**user** 46:4

**UTC** 58:9

**utilize** 30:7,
  12 57:19
  109:10

**utilized** 31:8
  33:12 109:12

**utilizing**
  62:24

                      V

**validity** 43:25

**values** 10:5
  14:23 15:1
  18:5,6 19:2
  20:2 36:2
  103:17,20
  104:5,23,24
  106:4,6,13
  108:9,24

**varies** 106:9

**variety** 102:7
  103:9

**vary** 105:1

**vast** 64:5

**venture** 64:3

**verification**
  29:22 36:12
  43:3,5 96:22

**Verizon** 19:22
  52:3,8 54:8,
  9 73:17
  75:19 76:3
  98:15 99:9,
  22 100:4
  101:16,19,23
  104:20
  106:20
  107:16

**Verizon's**
  79:21 98:20

**version** 82:16
  84:3,5
  88:11,19

**versions** 12:1
  37:21 83:24

**versus** 25:7,8

**vetted** 110:23

**Victim** 23:22,
  23 25:2

**victimization**
  72:25

**victims** 41:9
  64:17 66:14

**video** 4:4
  12:1 13:24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Fallon McNulty on 06/12/2025                    Index: videos..Youtube

14:1 18:25
38:19,23
40:2 76:24
113:25
114:4,8,12,
14,16,17,20,
21,23

**videos** 12:17
18:23 19:17
41:10 53:13,
19

**view** 59:15
80:23 82:9

**viewed** 17:5,20
59:20 60:18
80:18 81:1,
2,12,15
82:8,10,11
83:2

**viewing** 85:24
112:12

**visibility**
16:6 19:16
35:22 53:17
55:19 92:18
98:11

**visually** 11:25
86:19 109:9,
11

**voice** 74:25

**volume** 45:5
95:25 96:19

**vote** 32:19
33:21

**W**

**wait** 81:23
114:5

**waive** 113:8

**wanted** 40:14
51:4 93:9
100:4 103:2

**warning** 69:10

**warnings** 57:14

**warranties**
55:13

**warranty** 55:2

**Watch** 13:20
14:16 19:12
55:20 92:9
98:3

**web** 31:13

**website** 29:21,
22 70:23,24
71:24 72:1,
12,14

**websites** 71:12
73:4

**whatnot** 103:10

**wheelhouse**
91:15

**wide** 96:17

**wider** 96:20

**William** 4:7
8:2

**Williamson**
27:6

**woman** 84:17

**word** 104:4

**work** 6:17,22
23:22 33:21
38:22 43:18
78:10 97:9
113:5

**working** 24:24

**world** 45:11,
12

**wound** 87:21

**wrap** 93:4

**Y**

**year** 6:11
30:21 41:23
42:7 64:14
65:4 75:21
80:11 86:2
111:10

**yearly** 68:6

**years** 55:9
71:24,25
73:19 84:16

**yesterday** 9:12

**young** 84:17,
19

**Youtube** 38:23