**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

1              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2              JACKSONVILLE DIVISION

3              Case 3:24-cv-00044-MMH-MCR

4    WILLIAM LEE LAWSHE, an individual,

5              Plaintiff,

6    -vs-

7    ROBERT HARDWICK, in his official capacity as Sheriff of
     St. Johns County, MIKAYLA PRESTON, in her individual
8    capacity as a Detective for St. Johns County Sheriff's
     Office, and KATHLEEN DULLY, in her individual capacity
9    as medical director of the UF Child Protection Team,

10             Defendants.

11   _____/

12             REMOTE DEPOSITION OF KEVIN GREENE

13             Taken on Behalf of the Plaintiff

14             DATE TAKEN:  Tuesday, December 17, 2024
               TIME:        10:02 a.m. - 12:12 p.m.
15             PLACE:       Remotely via Zoom

16

17

18             Deposition of the witness taken before:

19                    Maureen Hall, RPR, FPR

20

21

22

23

24

25

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 2

```
 1   APPEARANCES:
 2   Counsel for Plaintiff:
 3
           MICHAEL K. ROBERTS, ESQUIRE
 4         LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND
           NOWICKI
 5         1680 Emerson Street
           Jacksonville, Florida 32207
 6         mroberts@nrhnlaw.com
 7   Counsel for Defendants, Robert Hardwick and Mikayla
     Preston:
 8
           MATTHEW JOSEPH CARSON, ESQUIRE
 9         SNIFFEN & SPELLMAN, P.A.
           123 Monroe Street
10         Tallahassee, Florida 32301-1509
           mcarson@sniffenlaw.com
11
12   Counsel for Defendant, Kathleen Dully:
13         AMY K. SHEVLIN, ESQUIRE
           BUCHANAN & BUCHANAN, P.A.
14         1900 Southeast 18th Avenue, Suite 300
           Ocala, Florida 34471-8237
15         ashevlin@rbtrial.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   REMOTE ZOOM DEPOSITION OF KEVIN GREENE
 3   DIRECT EXAMINATION BY MR. ROBERTS:                 4
 4   CROSS EXAMINATION BY MS. SHEVLIN:                 80
 5   REDIRECT EXAMINATION BY MR. ROBERTS:             87
 6           E X H I B I T S
 7   Plaintiff's Ex. No. 1  Statute                   39
 8   Plaintiff's Ex. No. 2  CyberTipline Report       62
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              PROCEEDINGS
 2   Whereupon,
 3           KEVIN GREENE, called as a witness by the
 4   Plaintiff, having been first duly sworn, testified as
 5   follows:
 6           THE WITNESS:  I do.
 7              DIRECT EXAMINATION
 8   BY MR. ROBERTS:
 9       Q.   Can you state your name for the record.
10       A.   Kevin Greene.
11       Q.   And I understand you're employed with
12   St. Johns County Sheriff's Office?
13       A.   Yes.
14       Q.   And you're a corporal or detective corporal
15   at --
16       A.   Yes.
17       Q.   Yeah.  What's your -- your job title today as
18   we sit here?
19       A.   I'm a digital forensics detective.  I'm kind
20   of like assistant supervisor of the digital forensics
21   lab.
22       Q.   How many people are in that lab?
23       A.   Currently there are four of us.  And we have
24   a lieutenant who oversees us.
25       Q.   And how long have you been doing that for
```

Page 5

```
 1   St. Johns County?
 2       A.   Full-time just -- well, almost five years.
 3   Next month it will be five years.
 4       Q.   I understand before that you were -- did you
 5   work for -- were you an ICAC detective?
 6       A.   From 2015, like late 2015 until I think
 7   mid-2017.  It's internet crimes against children,
 8   I-C-A-C.
 9       Q.   And I was just going to ask you, what -- what
10   is that?
11       A.   It's investigating like online enticement of
12   children.
13       Q.   Okay.  Well, as -- I think we're here today
14   about an investigation that involved the alleged
15   possession of child pornography.  Would that be under
16   the -- the purview of -- of ICAC investigators?
17       A.   Yes.
18       Q.   And in your -- in the past, while you were an
19   ICAC investigator or detective, was that with St. Johns
20   County Sheriff's Office?
21       A.   Yes.
22       Q.   Sometimes I see the -- a special victims unit
23   or SVU; did you work in that department?
24       A.   Yes.  I went from ICAC to special victims.
25       Q.   Okay.
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 6

1    A.   And at the time that I was in ICAC, ICAC was
2    part of special victims unit.
3        Q.   And when you say part of ICAC, is that a
4    certification or a membership?  What is that?
5        A.   It's not really a certification; it's more of
6    a specialty.
7        Q.   Do they provide training?
8        A.   Yeah, they do.  There's a task force at the
9    state and national level that will give you -- or a
10   part of that task force is really more of like a
11   funding.  The Federal Government or agencies out there
12   will provide funding for training for special -- or, I
13   guess, specialized training for law enforcement agents
14   that do that kind of work.
15       Q.   All right.  Now I understand that you were
16   involved in the investigation of Mr. Lawshe's case; is
17   that correct?
18       A.   Yes, sir.
19       Q.   And you performed your forensics function in
20   that investigation; is that -- do I understand that
21   correct?
22       A.   Yes.
23       Q.   And that you generated a report as a result
24   of your work; is that correct?
25       A.   Yes.

Page 7

1        Q.   All right.  I know that you've had your
2    deposition taken before.  Did you review anything in
3    preparation for today's deposition?
4        A.   Yes.
5        Q.   What did you review?
6        A.   That report and the cellphones.  Downloads,
7    the forensics reports that -- that I did.
8        Q.   So did you look at the actual cellphones, or
9    did you just look at the reports that you did?
10       A.   The reports that I did.
11       Q.   Okay.  How many reports did you do?
12       A.   Well, actually, I only reviewed one of the
13   reports.  The -- his -- he had two phones.  He had his
14   work phone and his personal phone.  The work phone had
15   nothing of evidentiary value, so there was no point in
16   really reviewing that.
17       Q.   Did you review anything else?
18       A.   I think I scanned through the -- the Verizon
19   download, just to kind of confirm something that I read
20   in my report.
21       Q.   So when you say "The Verizon download," are
22   you referring to the -- NCMEC cyber tip report?
23            MR. ROBERTS:  And Madam Court Reporter,
24            that's National Center for Missing & Exploited
25            Children.

Page 8

1    BY MR. ROBERTS:
2        Q.   Before we get into that, what is National
3    Center for Missing & Exploited Children, Mr. Greene --
4    or Detective Green?
5        A.   It is -- it's a clearinghouse for -- the way
6    we are referring to it, it's a clearinghouse for
7    information on -- on -- I'm trying to think of the
8    easiest way to explain it.  They share with us
9    information related to children that are being
10   exploited, whether it's over the internet or in person
11   and being exploited over the internet or in person with
12   information that they get online, whether it's through
13   electronic service providers such as Google or, you
14   know, Comcast or whoever.  They'll get information via
15   cyber tips.  They share that with law enforcement, and
16   that gets passed down through whatever chain and
17   eventually comes to us and we investigate those.
18            They also get information via hotlines and
19   that cyber tip from people, and that gets also passed
20   down to us to be investigated.  And that goes to the
21   ICAC unit, and they do their investigations that way.
22       Q.   Sometimes that's referred to as NCMEC; do I
23   understand that correctly?
24       A.   Yes.
25            MR. ROBERTS:  And that acronym, for the court

Page 9

1    reporter, is N-C-M-E-C.
2    BY MR. ROBERTS:
3        Q.   Is that correct, Detective Greene?
4        A.   Yes.
5        Q.   All right.  And so if I say "NCMEC," you will
6    know that I'm referring to the National Center for
7    Missing & Exploited Children?
8        A.   Yes.
9        Q.   Now, you -- where we were going, I kind of
10   got on a tangent there, you -- you reviewed a -- you
11   called it a Verizon report or something like that.
12   Were you referring to the NCMEC cyber tip that
13   St. Johns County received regarding Mr. Lawshe?
14       A.   Yes.  I reviewed that, yes.
15       Q.   Okay.  All right.  And we'll talk about that
16   in a little bit about anything else that you reviewed
17   in preparation for today's deposition.
18       A.   I also reviewed the -- the Verizon download,
19   the search warrant return.
20       Q.   And when you say you reviewed it, are you
21   talking about a document that you reviewed?
22       A.   No, the -- the return that Detective Preston
23   requested from Verizon after she got the NCMEC tip.
24       Q.   What I'm asking, though, is, are you
25   referring to a document, or did you look at all -- did

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 10

1  you review all of the images that were -- were provided
2  in that subpoena return?
3      A.   I didn't look at all the images, but the
4  images were present, yes.
5      Q.   Did you -- did you look at any images in
6  preparation for today's deposition?
7      A.   Yes.
8      Q.   Okay.  Do you believe that you have in your
9  possession the three images that Mr. Lawshe was charged
10  with in this case?
11      A.   Yes.
12      Q.   Okay.  And did you review those three images
13  today?
14      A.   Yes.
15      Q.   All right.
16      A.   Well, not today, but yes.
17      Q.   But in preparation for today?
18      A.   Yes, in preparation, yes.
19      Q.   Anything else that you reviewed?
20      A.   No.
21      Q.   Did you have time to speak with your lawyer
22  and have any questions answered that you may have about
23  this process today?
24      A.   Not really.
25      Q.   Okay.  Okay.  So let me ask you this.  When

Page 11

1  you came into this investigation, did you know
2  Mr. Lawshe or who he was?
3          You have to say yes or no for the court
4  reporter.
5      A.   No, no.  I did.  There's a printer going on
6  in the background.  I'm sorry.
7      Q.   It's okay.  And you know -- you know, you
8  have done this before, I'm not trying to be a jerk
9  about it, I just --
10      A.   Right, right.
11      Q.   The court reporter has to write something
12  down.  When did you first realize -- when did you first
13  learn that he was a law enforcement officer?
14      A.   It -- it had to be a while after everything
15  was going on.  I don't honestly know how long the case
16  was being investigated for.
17      Q.   Uh-huh.
18      A.   It was probably several hours after, I guess,
19  he was maybe brought in for an interview.  I don't
20  know.
21      Q.   Okay.
22      A.   Our office is across the hall from the ICAC
23  office, but they don't really -- I mean, they don't
24  discuss everything with us until they need assistance
25  with a download of a phone, so...

Page 12

1      Q.   Sure.  So let me just start by asking -- I
2  mean, you know, you've reviewed, it seems like, quite a
3  bit of material, but have you reviewed everything that
4  you want to review before today's deposition?
5      A.   I believe so, yeah.
6      Q.   Okay.  And I know your deposition was taken
7  in this case previously, in the criminal case.  Do you
8  recall that?
9      A.   I don't recall it, no.  I -- believe me, I
10  have -- I have -- I do a lot of cases, so it's very
11  possible.  I just don't remember it.
12      Q.   Do you remember Crawford Pierce, that name
13  Crawford Pierce?
14      A.   Yes, I do, but whether it was from this case
15  or others, I -- I know -- I know him.  I just don't
16  remember if it was for this case or not.
17      Q.   You're not saying that you weren't deposed.
18  You just don't have a recollection?
19      A.   Right, I don't remember it, yeah.
20      Q.   All right.  So let me just ask you this.  I
21  mean, as we get started, is there anything after
22  reviewing the documents that you would like to say to
23  me or Mr. Lawshe?
24      A.   No, no, I don't.
25      Q.   Is there anything, in looking back at the

Page 13

1  investigation, that you wish or think should have
2  happened differently from St. Johns County's
3  perspective?
4          MR. CARSON:  Object to form.
5          You can answer, if you can, Corporal Greene.
6          MS. SHEVLIN:  Join.
7          THE WITNESS:  Say that again.  Sorry.
8          MR. CARSON:  Are you asking me what I said,
9  sir?
10          THE WITNESS:  Yeah.  Yeah, yeah.
11          MR. CARSON:  Yeah, from time to time, myself
12  or Ms. Shevlin may object to the form of the
13  question.  That's just so that the record notes
14  that we -- we have an objection to the form, but
15  you still answer the question, if you can.
16          THE WITNESS:  Okay.  And so can you repeat
17  the question?
18  BY MR. ROBERTS:
19      Q.   Sure.
20      A.   The original question.
21      Q.   Right.
22          MR. ROBERTS:  And I will -- Matt, I will
23  understand that you will object to the question.
24  I'll just try to ask -- I don't have it verbatim,
25  but I'll try to ask it again.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 14

1  BY MR. ROBERTS:
2       Q.   Having reviewed the documents that you
3  reviewed, is there anything that you wish or believe
4  that St. Johns County Sheriff's Office should have done
5  differently in the investigation of the allegations
6  against Mr. Lawshe?
7            MR. CARSON:  Object to form.
8            MS. SHEVLIN:  Join.
9            THE WITNESS:  I mean, I think they should
10       have taken more time.  Honestly, I think they have
11       probably rushed a little bit and, you know, taken
12       more time and -- and gone through things a little
13       longer.
14  BY MR. ROBERTS:
15       Q.   Okay.  I appreciate that.  Well, can you be a
16  little bit more specific about what you wish they would
17  have taken more time with?
18       A.   Not really.  It just -- you know, I know in a
19  lot of cases, especially when it comes to dealing
20  with -- with certain individuals that you worry about,
21  especially, you know, people that are known to have
22  firearms, you worry about issues of -- of safety and
23  how things are going to turn out.  So it becomes an
24  officer safety issue, how things are going to come
25  together getting -- getting somebody to a place where

Page 15

1  you can conduct an interview safely becomes an issue.
2  And things tend to maybe get rushed as opposed to
3  slowing the process down, which you have that
4  opportunity with other potential suspects, if you want
5  to call it that.  And I kind of wish things would have
6  slowed down.  But, you know, in this case, that had
7  nothing to do with, you know, me or my unit.  We had no
8  idea what was going on with any of this.
9       Q.   Right.
10       A.   Hindsight's 20/20 with all things.
11       Q.   Right.  So, yeah, I -- I appreciate that.
12  But just to be clear, you're -- you are saying that
13  there's a known concern of -- that Mr. Lawshe may have
14  shot himself, killed himself, had he learned about --
15       A.   No, no --
16       Q.   Let me just ask a different question.  You
17  kind of answered that, I think, but you -- you said
18  that with an officer who owns a gun, there may be sort
19  of a desire to rush because of safety.  Whose safety
20  are you talking about?
21       A.   His safety, our safety, anybody's.  And it's
22  not necessarily a law enforcement officer.  It could be
23  anybody who is known to have firearms.  You know, it
24  would be the same thing as if we were going against,
25  you know, a known gangster who is -- to drive around

Page 16

1  with firearms, we're going to be a little extra careful
2  or on a drug warrant --
3       Q.   Right.
4       A.   -- you know, if we're sending a SWAT team to
5  go in to do, you know, something.  And then in this
6  case, especially when it comes to, you know, evidence
7  that's easy to -- to get rid of, you know, it's -- in a
8  lot of cases, easy just to throw in a toilet and, you
9  know, you don't even need to flush it, it's -- you
10  know, you get a phone wet and it's gone.
11       Q.   So -- so you -- you -- you believe or you
12  wish that they would have slowed this investigation
13  down and taken a little bit more time before making the
14  decision to arrest Mr. Lawshe?
15       A.   I mean, in my opinion, yeah.
16       Q.   Yeah.  And that's all I'm here to do, is to
17  get your opinion, your facts and -- and you made a
18  comment, I want to kind of go to that, which is, you --
19  you downloaded -- let's just talk about the Samsung
20  phone.  Would that be okay?
21       A.   Yeah.
22       Q.   And the reason I like to do that is because
23  he had a work phone, I believe it was an Apple device;
24  is that correct?
25       A.   Yes.

Page 17

1       Q.   I think you just testified to this, and I
2  want to make sure.  There was no nude or pornographic
3  images on that phone?
4       A.   Correct.
5       Q.   So the -- and you actually had possession of
6  a work laptop; did I understand that correctly?
7       A.   Yes.
8       Q.   And you didn't find any, you know, content of
9  interest or anything relevant to possession of
10  pornography or child pornography on that device?
11       A.   Correct.
12       Q.   Right.  So let's talk about the Samsung
13  device.  You -- you had the device in your possession
14  at the time that you were asked to do a forensic
15  download.  Do I understand that correctly?
16       A.   Well, we knew that we were going to have to
17  do it.  They didn't have it when he came in for the
18  interview.  Initially, I was asked to go with them to
19  his house to pick it up to identify it.
20       Q.   Okay.
21       A.   So I went with -- I don't remember everybody
22  that was there.  It wasn't a whole lot of people.
23  There was several of us, though, I think three or four.
24  We went to Mr. Lawshe's house, located the phone,
25  identified it by the IMEI number on the back.  I took a

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 18

1  few pictures of it.  I think somebody was there -- I
2  don't remember who it was, somebody was there with a
3  camera, took some pictures of the house to show that we
4  didn't damage anything.  I took the phone with me and
5  went back to the lab and started my process with it.
6      Q.   Now, prior to bringing Mr. Lawshe in, you
7  just referred to, it was your understanding that
8  St. Johns County already had the subpoena return
9  from -- from Verizon or Synchronoss at that point?
10     A.   Yes.  Yes.
11     Q.   And so they knew what was in his cloud on
12 that Samsung device from the return of the subpoena.
13 Do I understand that correctly?
14     A.   Yes.  And I don't remember a hundred percent,
15 I -- I believe so.  I don't -- I don't recall exactly
16 the timeline of events.
17     Q.   Right.
18     A.   But generally that would be how it would
19 work.  You would get the subpoena or the -- the tip
20 from NCMEC.  You would do your -- your legal process,
21 which in this case would be the Synchronoss, whether
22 it's a subpoena or a search warrant, requesting all the
23 information, then you would review it.  And I -- I
24 think in this case Detective Preston had problems
25 getting the downloads, and she asked me to help her get

Page 19

1  the search warrant return from Synchronoss.  And
2  because they, at the time, were running off of small
3  laptops, she was having a lot of trouble with it, and I
4  think our computers are way, way more advanced.  I
5  think I downloaded it for her and gave it to her.  I
6  didn't review it or anything.  I just gave it to her.
7      Q.   And let me --
8      A.   They probably would have gone from there.
9      Q.   Yeah, so -- and let me just kind of make a
10 sort of -- make sure I understand one thing is, your
11 involvement in this case was the forensic download --
12     A.   Yes.
13     Q.   -- of the phone and perhaps you helped her
14 download the subpoena return; is that correct?
15     A.   Yes.
16     Q.   You never reviewed any images to make, inform
17 an opinion prior to the arrest about whether or not an
18 image constituted probable cause for possession of
19 child sexual abuse material?
20     A.   No.
21     Q.   You were strictly just sort of the tech
22 facilitator of getting any images to Detective Preston
23 for her to do the investigation; is that correct?
24     A.   Yes.
25     Q.   You were not responsible for making any

Page 20

1  probable cause determinations about any of the images,
2  whether charged or not charged, in this case?
3      A.   No.
4      Q.   And no one on your team was; is that correct?
5      A.   Correct.
6      Q.   All right.  You have done that before,
7  though, when you were an ICAC and SVU detective or
8  investigator, you -- it was at one point in the past
9  your job to make probable cause determinations about
10 what is or does not constitute probable cause for
11 possession of -- of child pornography?
12     A.   Yes.
13     Q.   All right.  You indicated that Detective
14 Preston, you -- you have a recollection that she may
15 have asked you to help download the subpoena return.
16 Did I understand that correctly?
17     A.   The search warrant, yes.
18     Q.   The search warrant subpoena return.  Okay.
19     Did she ever ask you specifically to look at
20 the images, the charged images, for you to confirm that
21 you -- in your opinion, they were depictions of a
22 minor?
23     A.   Not that I recall, no.
24     Q.   As a forensic investigator or detective with
25 St. Johns County, do you have the ability to look at an

Page 21

1  image and determine whether or not it has been edited
2  or altered digitally?
3      A.   Sometimes.  It -- it depends on the way it's
4  been done and the -- the type of tool that was used.
5  There are some -- some ways that we can -- or some
6  tools that we can use that will let us know if
7  something has been altered.  And a lot of the forensic
8  tools we use are becoming way more advanced in that
9  field that are looking for artificial intelligence
10 manipulation in -- images and videos, but there are
11 ways to kind of tinker with an image and play with like
12 the lighting in different filters and you can see the
13 manipulations in it, but it's -- it's kind of hit or
14 miss.  You know, if somebody is really good at the job,
15 then it's -- it's hard to tell.
16     Q.   You are an expert, though, in -- in tinkering
17 with it and trying to tell whether an image has been
18 digitally altered?
19     A.   I wouldn't say an expert, no, but I have a
20 little experience with it, yeah.
21     Q.   Is there anybody else at St. Johns County who
22 has more experience than you or more knowledge than you
23 in trying to determine whether or not an image has been
24 digitally altered in some way?
25     A.   I don't know, maybe.  Not that I know of, but

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 22

1  maybe.
2      Q.    In your forensics --
3      A.    Maybe one of my coworkers, maybe.
4      Q.    Yeah.
5      A.    But...
6      Q.    Let me ask you a question.  Did Detective
7  Preston or anybody else at St. Johns County Sheriff's
8  Office ask you to review any images related to
9  Mr. Lawshe's case to determine whether or not they had
10 been digitally altered or not?
11     A.    Not that I can recall.
12     Q.    If you did something like that, would you
13 have generated a report of your work?
14     A.    I don't think so.  I mean, it would -- it
15 would depend on -- no, I -- I don't think so, because
16 it would depend on what I did it for and if it had a
17 result in the case.  You know what I mean?  If it was
18 just like, Hey, do you think somebody has done
19 something with this, and I looked at it and nobody did
20 anything with it, then, not really.  But if I looked at
21 it, and I said, Wow, yeah, this has been really
22 tinkered with or somebody has done something with this
23 and that affected the investigation, then absolutely I
24 would.
25     Q.    You have no recollection today of Detective

Page 23

1  Preston or another detective coming to you with those
2  images related to Mr. Lawshe's case and asking you to
3  evaluate them as to whether or not they had been
4  digitally altered or not?
5      A.    Not that I remember, no.
6      Q.    Do you have a way of determining whether or
7  not an image is artificial intelligence generated?
8      A.    Other than some of the forensic tools, they
9  sometimes will show us that stuff, but not really.
10     Q.    A similar answer to the digitally altered
11 question?
12     A.    Yes.
13     Q.    Okay.  Do you recall anyone coming to ask you
14 whether or not any of the images related to
15 Mr. Lawshe's case were the product of AI generation?
16     A.    No.
17     Q.    So we're going through kind of your
18 involvement in the case.  I think -- was it fair to say
19 the first time -- let me ask.  When was the first time
20 that you were made aware of this investigation?
21     A.    I think it was around the time that
22 Mr. Lawshe was brought in to the interview room.
23 Either -- it was either -- I think it was after he was
24 brought into the interview room.
25     Q.    And that would have been the time where you

Page 24

1  were asked to help assist with the Synchronoss
2  download, or had that happened before he was brought
3  in?
4      A.    Well, it -- well, no, the Synchronoss
5  download, I might -- I mean, I guess that would have
6  been a couple days before.  I probably just didn't even
7  realize it was the same case.
8      Q.    Fair enough.
9      A.    Yeah.
10     Q.    You were just asked the technical, Hey, can
11 you help with this?
12     A.    Right.  And that happens a lot.  And not --
13 not just from ICAC.  That happens from every unit all
14 over the place.
15     Q.    Where they're dealing -- where they're
16 dealing with a large amount of information or data
17 that's being downloaded or dealt with?
18     A.    Yes.  I'm kind of like the investigations IT
19 person.
20     Q.    Okay.
21     A.    So a lot of people come to me for a lot of
22 different things, and I just end up going to help them
23 out.
24     Q.    Yeah.  So you were made aware when they
25 brought him in.  And I think you already testified you

Page 25

1  were asked to -- to go to the home, Mr. Lawshe's home.
2  Did I understand that correctly?
3      A.    Yes, sir.
4      Q.    You, along with several other officers, not a
5  lot, but a few officers, went to his home.  You
6  recall going to his home?
7      A.    Yes.
8      Q.    At the time that you went to his home, did
9  you understand that this investigation was about the
10 allegation of possession of child pornography?
11     A.    Yes.
12     Q.    All right.  I think you testified that you
13 located the device in the home, took some pictures.
14 Did you bring back -- that back to your office?
15     A.    Yes.
16     Q.    And did you download, or did you do
17 everything that you were asked to do with all three
18 devices?
19     A.    Yes.
20     Q.    Talking about the Samsung device, you were
21 able to image or download that phone successfully?
22     A.    Yes.
23     Q.    And I think you ran the data through several
24 programs that you guys have to detect images of nudity
25 or -- or pornography or things like that?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 26

1    A.   Right.

2    Q.   Right.  I have had a chance to look at your
3  report.  It says that a download revealed several items
4  of interest.  I think that's the way you phrased it in
5  your report.  Did I recall that correctly?

6    A.   Files of interest is usually how I write it.

7    Q.   "Files of interest."  And by that, you --
8  you -- do I understand correctly, you simply meant that
9  these files may contain pornographic or nude images of
10 individuals?

11   A.   Correct.

12   Q.   You did not make any determination that these
13 files contained minors during your -- your work as a
14 forensic download specialist?

15   A.   Correct.  It's -- unless it's overly obvious,
16 as in it's a -- you know, like a toddler or something
17 like that, and still, it's -- it's not my job to make
18 that determination.  I'm am not charging anybody.
19 Unless I find a crime of some other type that's not
20 related to the case with ICAC investigations, I'm
21 sending it to the ICAC detectives to let them do their
22 job.  So I just note that I saw something that seemed
23 like it should be of interest, and I send it to the
24 detective to let them...

25   Q.   But I'm just trying to clarify.  When you say

Page 27

1  "of interest," it's just because there is a picture of
2  a -- of a nude individual or -- or potentially
3  pornographic image.  You're not making a value judgment
4  upon the age of the person depicted in those images?

5    A.   In this case, I think there were a lot of
6  what we would categorize as age-difficult, but, yes,
7  for the most part, it was a lot of nudity.

8    Q.   Okay.

9    A.   Yes.

10   Q.   And you didn't see anything that you, in your
11 experience, would categorize as -- as obvious, I think
12 you used the term obvious child pornography?

13   A.   Correct, I did not.

14   Q.   You also made a notation, I think I under --
15 or I saw it somewhere, there were no file-sharing apps,
16 things like BitTorrent.  I'm not even sure what that
17 is.  What is BitTorrent?

18   A.   BitTorrent is -- it's a type of peer-to-peer
19 sharing.  Do you remember like Napster back in the 90s?

20   Q.   I do.

21   A.   It's similar to that, where people will
22 share -- like say if I want to share a movie, I can --

23   Q.   Right.

24   A.   -- upload it into a BitTorrent file and then
25 put it onto a platform where 20 different people can

Page 28

1  share from, you know, multiple files, and then they
2  share with a hundred different people.  And it's just a
3  quicker way to share files.

4    Q.   You didn't find anything like that on -- on
5  any of the devices that you imaged of Mr. Lawshe's,
6  correct?

7    A.   No, sir.

8    Q.   I have heard the term "dark web."  Is it --
9  8chan or 4chan or things like that, is that different
10 than file sharing or...

11   A.   Yeah, that's more of a forum-based service.

12   Q.   Did you -- did you find any evidence like
13 that -- that -- that -- I don't even know, some sort of
14 a platform device or something on any of these devices
15 that would have shown that there was -- he had been
16 accessing things from these sort of dark web places?

17   A.   I -- not really dark web.  I did see some
18 like forum-based websites.  I wouldn't categorize them
19 necessarily as illegal.  They were definitely related
20 to pornographic like sharing --

21   Q.   Sure.

22   A.   -- and stuff like that, but I wouldn't say
23 not illegal.  It's -- per se, you know.

24   Q.   You saw, I think, a lot of information
25 that -- you're just saying a public website that deals

Page 29

1  in pornography.  That's what you're talking about,
2  right?

3    A.   But it was like a forum-based, you know,
4  people can get on there and just talk to each other.
5  Not like a -- like a chat site where -- you know, where
6  you would get on like Yahoo Messenger or something like
7  that, but it's -- when you say "4chan," 4chan is really
8  a forum similar to Reddit where you post something and
9  people respond back and forth to what the original post
10 is.  And that's -- if I remember correctly, 4chan or
11 8chan is like that, and you can post pictures, you can
12 post videos in response to an original post, and there
13 was at least one thing that was similar to that.  But I
14 think it was more along the lines of somebody posts
15 something and people would send nudes to that post or
16 nude pictures to that post.  And I -- not that I really
17 dug a lot into it, but I think that's what that website
18 was for.  But it was -- as far as I can tell, it wasn't
19 anything really illegal about it.  I didn't dig a whole
20 lot into it because --

21   Q.   Okay.

22   A.   -- it didn't seem --

23   Q.   All right.

24   A.   -- nefarious.

25   Q.   You were not involved at all in the decision

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 30

1  to bring Mr. Lawshe in or effectuate arrest on him,
2  were you?
3      A.  No.
4      Q.  All right.  After you imaged the phone -- the
5  devices and you turned over that data to Detective
6  Preston, what was the next involvement that you had
7  with this case?
8      A.  I don't think there was really much more
9  involvement.  I know there was a search of his car, and
10 I stood by in case they needed me to identify anything,
11 but I didn't really search.  And I was only there for a
12 couple minutes, and I tried to -- I tried to image his
13 computer, which didn't work out well.  His work
14 computer.
15     Q.  Okay.  But I --
16     A.  I -- like not really a whole lot of anything.
17     Q.  Okay.  I have -- I have a record that you met
18 twice about this case separately.  And I'm not trying
19 to -- I know you meet with a lot of people a lot of
20 times, right, so I know you're not intentionally trying
21 to, you know, whatever, but I understand that you met
22 with an Aaron Weiss.  Do you know who Aaron Weiss is?
23     A.  Yes.  Yeah.
24     Q.  Okay.  And then -- and then I think maybe he
25 has a colleague named Santiago.  I'm not sure what his

Page 31

1  last name is or if that is his last name.  Do you know
2  Mr. Santiago?
3      A.  Yes.
4      Q.  All right.  And then I -- I understand that
5  you met a second time with Mr. Weiss, and this time
6  Mr. Pierce was present, and I believe some St. Johns
7  County and the Assistant State Attorney were present
8  for that second meeting.
9      A.  Yeah, yeah, yeah.
10     Q.  Do you recall that?
11     A.  Uh-huh.
12     Q.  Okay.  I want to go to the second meeting, if
13 I could.  And I believe that happened in late October
14 2023.  Do you have any reason to disagree with the
15 timeframe of that?
16     A.  No.
17     Q.  Okay.  Do you recall who was present for that
18 meeting?
19     A.  I think it was just -- I don't remember Aaron
20 being there, but maybe he was.  I remember Mr. Pierce,
21 and if it's the meeting I'm thinking of, it would be
22 Kaitlyn Payne and the State Attorney and Crawford
23 Pierce and, yes, Aaron Weiss was there, and me, yes,
24 and I don't -- well, no, I think it was just us four.
25     Q.  You think the -- that Detective Preston was

Page 32

1  there?
2      A.  I don't think so.
3      Q.  Okay.
4      A.  I don't remember, but I don't think so.  I do
5  remember that, yeah.
6      Q.  Okay.
7      A.  I didn't know that was the involvement you
8  were you talking about.  I thought you meant like as
9  far as in -- like --
10     Q.  You meet with people almost every day,
11 probably, about your forensic downloads, correct?
12     A.  Yeah.
13     Q.  Okay.  So, you know, most people remember
14 their deposition taken, but, you know, it happens so
15 often with you, you don't recall that, and I understand
16 totally.
17     A.  Absolutely.
18     Q.  Don't apologize.
19         What do you recall about that second meeting?
20     A.  We were reviewing the images that Mr. Lawshe
21 was charged with, and Mr. Pierce was asking -- or him
22 and Ms. Payne were arguing over the content, and there
23 was a watermark on the bottom of the images, and
24 Mr. Pierce wanted to go to the websites, and so we went
25 to the websites, and on one of the images in

Page 33

1  particular, there's a -- you only see a portion of the
2  female's body, which just shows from like the bottom of
3  her hips to the top of her thighs, and we were able to
4  find the image and then find her entire body in that
5  image, and, I mean, you can see her whole body from
6  that as opposed to just her vagina.
7      Q.  Is it unusual in your experience for an image
8  like that, that just shows like hips to vagina, to be
9  charged as possession of an image of a minor, a
10 pornographic image of a minor?
11     A.  I wouldn't say unusual.
12     Q.  Well, let me ask you this.  How long did it
13 take for you to -- I understand that you were asked to
14 actually drive the computer in this, so you were like
15 typing in the websites and all that kind of stuff.  Is
16 that your recollection?
17     A.  Yes.
18     Q.  And I also have information that all of the
19 images had information on them related to a website; is
20 that correct?
21     A.  Yes.  Well -- oh, those three images, yes.
22     Q.  Those three images that he was charged with
23 all had some type of reference to a website on them,
24 correct?
25     A.  Yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 34

1    Q.   How long did it take you to locate that image
2  on the website, the image that you're talking about,
3  with the hips to the vaginal area?
4    A.   I don't remember.  Twenty minutes, maybe,
5  30 minutes.
6    Q.   Okay.  I understand that you guys actually
7  went to multiple websites that day?
8    A.   I wouldn't think multiple, maybe two.  Two,
9  three.  Yeah.
10    Q.   Two or three websites.  And you were able to
11  locate both of the models on those websites?
12    A.   Correct.
13    Q.   Just for the record, so we understand, there
14  were three images that Mr. Lawshe was charged with,
15  correct?
16    A.   Yes.
17    Q.   There were two images of one model and one
18  image of another model; is that right?
19    A.   Correct.
20    Q.   All right.  Both of the websites or the
21  websites that you went to represented that the models
22  in question were adults, correct?
23    A.   Correct.
24         MR. CARSON:  Object to form.
25         MS. SHEVLIN:  Join.

Page 35

1         MR. ROBERTS:  I want to make sure that the
2    court reporter got that answer.  You said
3    "correct."  Those websites did represent that the
4    models were adults; is that correct?
5         THE WITNESS:  Yeah, they represented every
6    model on their websites were adults.
7  BY MR. ROBERTS:
8    Q.   Okay.  They -- these websites also contain a
9  disclaimer that the websites were complying with
10  federal age verification laws; is that correct?
11    A.   If I remember correctly, yes.
12    Q.   Now, Mr. Pierce actually asked you to print
13  out that disclaimer, did he not?
14    A.   I don't remember.
15    Q.   Do you remember the Assistant State Attorney
16  instructing you not to print it out?
17    A.   I don't remember that either, no.
18    Q.   Okay.  You said they were arguing.  Do you
19  recall that that might have been one of the things they
20  were arguing about?
21    A.   It's possible.  They argued a lot that day.
22    Q.   Okay.  When you saw the full image of the
23  model who is the subject of the picture of just
24  bellybutton to her vagina --
25    A.   Uh-huh.

Page 36

1    Q.   -- you recall the image that I'm talking
2  about?
3    A.   Yes.
4    Q.   And you recall seeing the image of her, of
5  her face.  Yes?
6    A.   I don't remember what her face looks like,
7  but I do remember -- I remember what you're talking
8  about, yes.
9    Q.   You actually just reviewed these images just
10  within the last couple of days?
11    A.   Not the one of her whole face, yes.
12    Q.   Right.  Were there any images that were
13  charged that showed her face?
14    A.   I don't remember what she looked like.  Oh,
15  you mean of the charged one?  No.
16    Q.   Okay.  So Mr. Lawshe was charged with
17  possession of child pornography on three images,
18  correct?
19    A.   Correct.
20    Q.   Two of them didn't show the face of the
21  model; is that correct?
22    A.   Two of them showed the face of --
23    Q.   The one model?
24    A.   -- of the one model.
25    Q.   Okay.  Okay.  All right.

Page 37

1    A.   And one didn't show.  One just had -- well,
2  one had the one clip, or it had three different females
3  in it, and I guess the section that was actually being
4  charged was the one that just showed the girl's vagina,
5  and there was the two other girls in the picture, I
6  believe.
7    Q.   Yeah, the two other girls appear to be adults
8  or at least arguably adults?
9    A.   I believe so.  I'm not sure about it.  Yeah.
10    Q.   All right.  Now, you are a -- you at least
11  were an IPAC investigator, correct?
12    A.   Uh-huh, yes.
13    Q.   You are familiar with the statute that -- the
14  crime that Mr. Lawshe was charged with?
15    A.   Yes.  It's been a long time since I've read
16  it, but yes.
17    Q.   In Section 827.071, Subsection 5, Possession
18  of child sexual abuse material, I'm going to ask you a
19  couple of questions about it, and I'm not -- you can
20  say you don't remember or you don't know, like I'm not
21  trying to trick you here.
22         But you were trained in investigating cases
23  of possession of child pornography, correct?
24    A.   Yes.  A long time ago, yes.
25    Q.   Right.  You understand because of your

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 38

1  training that the law requires -- in order to be guilty
2  of this crime -- knowing possession of the -- of the
3  image; is that correct?
4      A.   Knowingly being in possession?
5      Q.   Yes.
6      A.   I would believe so, if that's in the statute,
7  yes.
8      Q.   And look, why don't I just -- I'm not trying
9  to -- let me -- rather than fumbling around with this,
10  I'm just going to share, and I can -- we can make this
11  an exhibit, I guess.  It's the Florida Statute on --
12  okay.  This is Subsection 5 of 827.01, sexual
13  performance by a child.  Did I read that correctly?
14      A.   Uh-huh.
15      Q.   And then Subsection 5-A, I'm just going to
16  read it so you don't have to squint and look at your
17  computer.  It says, "It is unlawful for any person to
18  knowingly possess, control, or intentionally view a
19  photograph, motion picture, exhibition, show,
20  representation image, data, computer depiction or other
21  presentation which in whole or in part he or she knows
22  to include any sexual conduct by a child."  Did I read
23  that correctly?
24      A.   Yes.
25          (Plaintiff's Exhibit No. 1 was marked for

Page 39

1  Identification.)
2  BY MR. ROBERTS:
3      Q.   Does that refresh your recollection from your
4  training about what the law is regarding possession of
5  child pornography?
6          MR. CARSON:  Object to form.
7          MS. SHEVLIN:  Join.
8  BY MR. ROBERTS:
9      Q.   Does it refresh your recollection?
10      A.   Yes.
11      Q.   All right.  So you would agree in order for
12  there -- in order for a person to have committed this
13  crime, they would have to know that the models were
14  minors.  Is that your understanding, from your
15  training?
16          MR. CARSON:  Object to form.
17          MS. SHEVLIN:  Join.
18          THE WITNESS:  Yeah and no.  I would think
19      if -- if you're looking for -- if you're looking
20      for young teens, then I don't know.  It just --
21      it -- at some point you're going to end up down a
22      rabbit hole, and you're going to get hurt.  And
23      it's just -- it's bad.  Technically knowingly in
24      possession, yes.  But it's just as bad.
25

Page 40

1  BY MR. ROBERTS:
2      Q.   You agree that it's legal to possess
3  pornographic images of an adult in the United States?
4      A.   Yes.
5      Q.   And you -- you understand that that means
6  anyone 18 years or older, correct?
7      A.   Right.
8      Q.   You understand that in order to be a minor,
9  the individual has to be below 18, correct?
10      A.   Yes.
11      Q.   Now, you said it's bad.  Are you saying like
12  it's morally wrong to look at an 18 or a 19 year old;
13  is that what you mean?
14      A.   No, no, no, no, no, no.  I'm just saying that
15      if he's -- I don't know.  I just -- I think -- he's
16      digging himself further.  And I'm just saying,
17      theoretically, I'm not saying your client, I'm just
18      saying a person that keeps doing this kind of stuff is
19      going to end up getting themself in a -- in a -- a
20      hole, in a -- you know, I've seen it time and time
21      again, that people just keep digging themself into a
22      hole, and they just go down in this pit, and they end
23      up in bad spots with this stuff, so I don't know,
24      I'm --
25      Q.   Do you think it's a bad spot to be on a

Page 41

1  public website that has a disclaimer that all of the
2  models are verified under federal law to be adults?  Do
3  you think that's a bad spot?
4      A.   No.  No.  No.  It's -- it's legal to be on a
5  legal website.
6      Q.   So do you believe that the information which
7  you saw that represented the models that Mr. Lawshe was
8  charged with was readily available to any investigator
9  who chose to investigate that?
10      A.   It could have been, yes.  Those websites can
11  sometimes be very sketchy or can be very --
12      Q.   Sure.
13      A.   It's a lot of times probably why people are
14  nervous about going to them, especially if they end
15  with like dot RU or dot TO or something like that, you
16  know, those are -- people worry about getting viruses
17  and stuff like that, and that's...
18      Q.   All of these websites ended with a dot com,
19  correct?
20      A.   As far as I recall, yes.  But -- or at least
21  those two, yes.
22      Q.   As an ICAT trained investigator, are you
23  familiar, at least nominally, with federal age
24  verification requirements?
25      A.   Honestly, no.  I wasn't, no.  But I

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 42

```
1   understand it.  I understand that.
2        Q.   Right.  Right.  And as an ICAT investigator,
3   you certainly have access to understand what those laws
4   are and what that means, correct?
5        A.   Yes.
6        Q.   The websites that you viewed with Mr. Pierce
7   and the Assistant State Attorney, they actually cited
8   the federal statute, didn't they?
9        A.   I don't recall.  But I'm sure they did, yeah.
10       Q.   Okay.  All right.  So were you aware that
11  that law requires their website to have a records
12  custodian?
13       A.   No, that wasn't --
14       Q.   All right.  Well, let me ask you this.  That
15  type of -- of work that you did there with Mr. Crawford
16  and the Assistant State Attorney, is that the type of
17  thing when you said when we began is that you wish they
18  would have taken a little bit more time with this
19  investigation, is that the kind of thing that you wish
20  would have happened before Mr. Lawshe was arrested?
21       A.   Yeah.  Yeah, among other things, you know.
22  But yes.  Yeah.
23       Q.   What other things?
24       A.   I mean, nothing specific.
25       Q.   Okay.
```

Page 43

```
1        A.   Just, you know, yeah.
2        Q.   So viewing those websites that you did with
3   Mr. Pierce and the Assistant State Attorney, in your
4   opinion -- and I understand it was not your
5   investigation -- but in your opinion, raised serious
6   doubts about what probable cause existed that
7   Mr. Lawshe had committed a crime in this matter,
8   correct?
9             MR. CARSON:  Object to form.
10            MS. SHEVLIN:  Join.
11            THE WITNESS:  Not -- well, so there's more to
12       the development of probable cause than just the
13       image itself when you're dealing with the issue of
14       an age-difficult image, so you come across an
15       image of what you believe to be a potential, like
16       an older teenage, in this case, female, or a -- an
17       older male, you know, with pubic hair, you know,
18       chest tissue or whatever, pectoral muscles, you
19       still -- you know, you're looking at a face that
20       still looks like a child or something like that,
21       or in this case you're seeing a female is starting
22       to develop breasts or pubic hair or hip
23       development, but in the face you still look like a
24       child, they have -- the investigators are supposed
25       to take it to a doctor, and in this case they
```

Page 44

```
1        didn't, and the doctor agreed that it looked like
2        a child, and that was enough to develop probable
3        cause, so, you know, technically probable cause
4        was there.
5             MR. ROBERTS:  We're going to get back to that
6        in a second.
7             THE WITNESS:  Okay.
8   BY MR. ROBERTS:
9        Q.   But let me ask you this.  Had you had that
10  information that the -- the websites were telling --
11  well, let me ask you this.  Do you agree that -- let's
12  say hypothetically one of these models was 17 years
13  old.  Okay?  Do you understand my hypothetical?  Let's
14  just say -- we know they weren't, but let's just say
15  they were 17.
16            MS. SHEVLIN:  Objection.  Not established.
17            MR. CARSON:  Join.
18  BY MR. ROBERTS:
19       Q.   We'll establish it in a second.  Have you
20  seen the images of the models with their passports?
21  Have you seen that?
22       A.   Uh-huh.
23       Q.   Is that a yes?
24       A.   Yes.
25       Q.   You've seen this.  Okay.
```

Page 45

```
1             Let's just hypothetical that they were 17.
2   If the evidence was, as an investigator, that
3   Mr. Lawshe had reason to believe that they were 18,
4   that's not a crime to possess those images under
5   Florida law, is it?
6        A.   No.
7             MR. CARSON:  Object to form.
8             MS. SHEVLIN:  Join.
9   BY MR. ROBERTS:
10       Q.   Your answer was no?
11       A.   No.
12       Q.   Right.  So really, whether an expert
13  physician comes to an expert opinion about the age of
14  an individual doesn't really bear on Mr. Lawshe if he
15  committed a crime or not, does it?
16            MR. CARSON:  Object to form.
17  BY MR. ROBERTS:
18       Q.   Does it?
19       A.   I don't know what you want me to say here.
20       Q.   It doesn't, does it?
21       A.   I --
22       Q.   Yes or no?
23            MS. SHEVLIN:  Form.
24            THE WITNESS:  Okay.  Okay.
25
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 46

BY MR. ROBERTS:

Q.   Okay.  All right.  If you would have been the investigator in charge and you had seen the full images in the context of the website, with the representations made on the website, you would not have charged Mr. Lawshe with possession of child pornography, would you?

A.   I can't say.  I might have made different decisions.  I -- I don't know.

Q.   Okay.

A.   I mean, it wasn't my investigation.  I don't want to second-guess somebody else one way or another.

Q.   Do you believe that any reasonable investigation of these images should include visiting the websites that are referenced on the images themselves?

A.   If possible.  I would -- I would like to -- if -- if -- if circumstances -- if the circumstances allow, yes.  I think we should be able to.

Q.   And in this case, the circumstances did allow?

A.   I don't know the entire circumstances.  You know, I wasn't -- I wasn't here for it, for the beginning of that.  I don't know what happened at the beginning of what was going on.

Page 47

Q.   Well --

A.   It wasn't included in the part.

Q.   When you were in a room with nothing but the images themselves, you were able to locate both of these models on --

A.   Correct.

Q.   -- looking on the internet, correct?

A.   Correct.  I mean, from before I became involved.  I don't know what happened up to the time.

Q.   Correct.  But you do know that Detective Preston had the three images that you were looking at, at the end of October, 2023.  You know that she had possession of those images prior to making the decision to arrest Mr. Lawshe, correct?

A.   Yes.

Q.   So with those images and with those images alone, she had the ability to easily access those models on the internet, correct?

A.   Well, I don't know that she knew that she could, though.  Honestly it's --

Q.   Okay.  You don't know --

A.   Up to that point.  Up to that point they did not have the same internet access that we do in the lab.  We had just moved the forensic lab across the hall.  It opened up on -- I think within a couple of

Page 48

months -- across from their hall.  We have an undercover internet line in our lab.  They have one now.  They didn't have it at that time, I don't think.

Q.   She could have walked across the hallway and asked you to help her, correct?

A.   She could have, but I don't think she knew that.  Now, I'm not making excuses for her.  She could have been able to do that.  But I'm just saying there's a possibility that she didn't know that.

Q.   Well, she came and asked you to help download the images from the subpoena return, correct?

A.   Yeah.  I'm just saying.  Yeah.

Q.   She's testified actually that she regularly would go to you for help --

A.   She did.

Q.   -- for difficult matters, correct?

A.   Yes.

Q.   Detective Preston regularly came to you for technical internet data assistance prior to making the decision to arrest Mr. Lawshe, correct?

A.   Yes.

Q.   But she did not come to you asking you to help her access these websites that were available through looking at the images in Mr. Lawshe's case, did she?

Page 49

A.   No, she didn't.

Q.   So after this -- after this meeting where you viewed these -- you identified these models on -- on the internet, did you have any further conversations with anyone about this case?

And let me say this.  Up until the point -- let me just ask it -- that's a bad question because I know you have, right?  We're sitting here talking about it now.

Did you ever go to Detective Preston and express concerns about the investigation and the evidence in this case, given your meeting -- I think it was October 29th, 2023 -- with Mr. Pierce and the Assistant State Attorney?

A.   I don't remember.  I probably told her about finding that full picture on the internet, but I don't remember.

Q.   Okay.

A.   When did you say the -- the meeting with Crawford Pierce was?  Was it October?

Q.   I think it was like October 29th, I think is what I have.

A.   Of last year?

Q.   Of 2023.  Not last -- so, I mean, is that last year?  Yeah, I guess it's 2024.  The years run

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 50

1  together now.
2      A.   I know.  Believe me, a lot has happened since
3  then, so...
4      Q.   If you don't remember, that's okay.
5      A.   Yeah, I don't.  I don't remember.
6      Q.   But fair to say you did have concerns about
7  the evidence against Mr. Lawshe at that point?
8      A.   Well, just the simple fact that we found
9  that, I probably told her about that, I would just
10 guess.  I just don't remember any of it.
11     Q.   Right.  So at some point you actually saw the
12 images with the models, the two models with pictures of
13 their -- of their passports?
14     A.   Yes.
15     Q.   Tell me, how did that happen?  How did that
16 come to pass?
17     A.   Whenever I -- I guess Mr. Pierce contacted
18 after that meeting, I think he contacted whatever
19 company it was, metart.com., and they sent him the
20 pictures, and either he sent them to the State Attorney
21 in -- I think he sent them to the State Attorney, and
22 either she sent them to Detective Preston and me, or
23 somehow they got to me.  And they showed them to me,
24 so...
25     Q.   Do you remember the context?  I mean, did you

Page 51

1  have a conversation with somebody about them or...
2      A.   I don't know.  I don't remember.
3      Q.   The --
4      A.   The picture doesn't -- it doesn't -- like,
5  when you first look at it, it doesn't look like the
6  girl in the photos because she doesn't have makeup on.
7  But, you know, once you look at her, you can tell it's
8  definitely the same girl.  It's just...
9      Q.   Both of the models, I just want to confirm,
10 you saw an I.D. and photographs of the two models that
11 were depicted in the images that Mr. Lawshe was charged
12 with, correct?
13     A.   I have seen both of the photo ID's.  Like I
14 said, I don't remember what the other one's face looks
15 like, so I, you know, couldn't tell you.  I just --
16 the -- the one girl who has the Ukrainian passport,
17 there's the two photos or the two images that have her
18 face, so I can compare to her.  But the other one, I --
19 I don't have the original picture of her face.
20     Q.   Because -- because her face wasn't charged?
21     A.   Right.  Correct.
22          And we didn't screenshot the -- the website
23 for her face, that I remember.
24     Q.   So let me ask you, do you know anything about
25 metart.com?

Page 52

1      A.   A little bit, not much.
2      Q.   What do you know?  Let me ask you this.
3  Before I ask you this, I want to ask a better question.
4  When did you know prior to Mr. Lawshe's case?
5      A.   I had read -- I know -- I mean, I know what
6  you're getting at.  I had read somewhere back when I
7  was doing ICAC investigations that they used 17 year
8  old models from the Ukraine back years ago.
9      Q.   What was the source of that?
10     A.   Something when I was doing investigations
11 when I was -- I read it on the internet somewhere.
12     Q.   You read it on the internet somewhere?
13     A.   I can't remember.  I mean, I don't have it in
14 a book or anything.
15     Q.   No, but, I mean, like, was it a -- a Google
16 review or...
17     A.   I don't recall.  That was almost ten years
18 ago, you know.
19     Q.   So you have no idea if that was a credible
20 accusation?
21     A.   I don't recall.  It could have been at the
22 time.  I just -- I mean, I don't have it.
23     Q.   It could have been credible, but it also
24 could have not been credible, correct?
25     A.   I mean, it very well -- I mean --

Page 53

1      Q.   I mean --
2      A.   It was -- it was from 2015 or 2016.  I
3  don't -- I don't have -- it's something I remembered
4  from when I was in ICAC.
5      Q.   Okay.  All right.  Actually not what I was
6  going to, but I appreciate it.  I was going to go
7  there.
8          Have you ever visited -- have you ever --
9  have you ever Googled metart.com in response to this
10 case?
11     A.   Yes.  This morning.  Yeah.
12     Q.   Okay.  Okay.  Okay.  Did you and Ms. -- did
13 you and Detective Preston Google metart.com together at
14 any point in time?
15     A.   Not that I recall.
16     Q.   Did you tell her that metart.com was
17 publishing illegal content?
18     A.   I don't think so.
19     Q.   All right.
20     A.   Did I?  Did she say I did?  Because I don't
21 remember telling her that I did.
22     Q.   Okay.  You made a comment about -- well, I'm
23 going to go through something else first.  You said you
24 reviewed the NCMEC report?
25     A.   Yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 54

1    Q.   Would you agree with me that there are
2  factual discrepancies or false statements contained
3  within that NCMEC property?
4    A.   In what regard?  I don't -- I don't remember
5  the entire NCMEC report.
6    Q.   Sure.  So you recall -- you have reviewed the
7  image that was the subject of the NCMEC report,
8  correct?
9    A.   Yes.
10   Q.   All right.  Let me just -- are you familiar
11 that a NCMEC report categorizes the content contained
12 within the -- the image, the subject image?
13   A.   How so?
14   Q.   A-1, A-2, B-1, B-2.
15   A.   Yeah, I -- I know that they do that but...
16   Q.   Okay.  Let me -- do you recall what that
17 means?
18   A.   Not really, no.
19   Q.   Okay.  I'm showing you the NCMEC report, and
20 it's dated January 25th, 2023; is that correct?
21   A.   Yes, sir.
22   Q.   You reviewed this report within the last
23 several days or some time in preparation for today's
24 deposition?
25   A.   Very quickly.

Page 55

1    Q.   Okay.  So the number right here under further
2  information on uploaded files, I'll just read it.  In
3  each category it says, "A-2," and then it has a "1."
4  Do you see that?
5    A.   Yes.
6    Q.   Did I read that correctly?
7    A.   Yes.
8    Q.   Right.  A stands for prepubescent minor,
9  correct?
10   A.   Yes.
11   Q.   All right.  2 is lascivious exhibition,--
12 that's a hard word to say -- correct?
13   A.   Yes.
14   Q.   All right.  The model in the image was not
15 prepubescent, correct?
16   A.   This is the one where the -- the girl is
17 facing away from the camera.
18   Q.   Knee -- chest to knees, there's pubic hair
19 present?
20   A.   Yes.  Yeah.
21   Q.   She's not prepubescent, correct?
22   A.   Correct.  Right.
23   Q.   And it also says that this image was not
24 available to the public.  That was not correct either,
25 was it?

Page 56

1    A.   And I think what it's saying as far as not
2  available to the public, it's not available to the
3  public from him.  Like, it's -- it's coming from his --
4  his cloud system.  Like, he's not making it publicly
5  available.  And I don't know.  You'd have to get with
6  NCMEC about that.  I'm not positive.  I don't --
7    Q.   Well --
8    A.   I don't read their reports on a constant
9  basis.  It's just on a -- like a need-to-know like as
10 far as the only -- realistically, the only reason I
11 review their reports is so when we have an
12 investigation or we're downloads from an ICAC
13 case is so I know what images or videos I'm looking
14 for.  It helps us to kind of narrow the scope of our
15 investigation to help them to get stuff done a little
16 quicker.
17   Q.   Well, when you were an ICAC investigator, you
18 regularly looked at them, correct?
19   A.   Yeah.  But again, that was eight, nine years
20 ago.
21   Q.   Okay.  You made a comment, and I think it's a
22 term of art, it's called "age-difficult."  What does
23 that mean?
24   A.   It means it's a -- where it's beginning to --
25 or it's where a person, a human being, is developing

Page 57

1  physically because of puberty it's hard to tell an
2  approximate age.  It's obvious they're no longer a -- a
3  small child or an infant or a toddler because of
4  puberty developing where they are getting pubic hair.
5  In females it's breast development, hip dysplasia.  In
6  males it's pubic hair, pectoral muscles, testicles are
7  starting to drop, stuff like that.  So for us, it --
8  it -- it's a -- it's a level of categorization where
9  it's -- we call it age-difficult.  It's kind of a --
10 for -- for categorization purposes as far as child
11 sexual abuse material, we have, you know, absolute
12 CSAM, then age-difficult or child erotica and then
13 nonchargeable and then there's a few other
14 categorizations but...
15   Q.   And we've used the word "CSAM."  Let's tell
16 the court reporter what CSAM is.
17   A.   CSAM is child sexual abuse material.
18   Q.   All right.  Age-difficult kind of means what
19 it sounds like.  It's difficult to tell how old this
20 individual is?
21   A.   Correct.
22   Q.   And are you familiar with a NCMEC
23 categorization of unconfirmed child pornography?
24   A.   Yes.
25   Q.   And isn't it the case that this report from

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 58

1  NCMEC was a report of unconfirmed child pornography?
2      A.   I believe that's what they would consider it,
3  that it's -- I think what they're saying, and you'd
4  have to check with them again, is that somebody is
5  reporting this, and in this case it would be -- I
6  believe it would be Synchronoss is reporting to NCMEC
7  that they think that this is child pornography.  NCMEC
8  is reporting to us is unconfirmed because the hash
9  values on the picture do not match something that is
10  known to them as child pornography.  NCMEC doesn't make
11  that determination.  They only report what they have
12  known in their data base as confirmed child pornography
13  because of the hash values.
14      Q.   You understand, though, that when you get
15  a -- a NCMEC report of unconfirmed child pornography,
16  NCMEC is not communicating to St. Johns County
17  Sheriff's Office or any ICAC investigator that they
18  have confirmed that this is child pornography?
19      A.   They -- they will confirm that it is child
20  pornography, if they have the hash values to confirm
21  that it is.  They'll -- well, they won't confirm that
22  it's child porn.  They'll say these -- these are known,
23  you need to confirm with us that these are known images
24  or known videos.
25      Q.   And in this case, they were not able to

Page 59

1  confirm that it was child pornography?
2      A.   Correct.  Correct.
3      Q.   And so you understand that by getting this
4  NCMEC report that is unconfirmed, St. Johns County
5  Sheriff's Office has to do some investigation to
6  determine whether it is child pornography or not child
7  pornography.  They cannot just rely on this NCMEC
8  report?
9      A.   Correct.
10      Q.   Also, I mean, as you pointed out, I mean,
11  would you consider the fact that the report says that
12  this a prepubescent individual and that's just not
13  true, is that -- does that affect -- as an
14  investigator, would that affect your -- your viewing or
15  the credibility of this tip?
16      A.   Well, I mean, again, I'm not the investigator
17  on this, so, you know, I -- it would but...
18      Q.   Right.  If you were the investigator -- if
19  you were the investigator, it would raise a question
20  about the credibility of the tip, in your mind?
21      A.   Yeah.  Yes.  Correct.
22      Q.   Okay.  And I have no idea.  This is an
23  open-ended question.  How many NCMEC reports -- and
24  let's just use the timeframe of, you know, first
25  quarter of 2023, how many NCMEC reports, cyber tip

Page 60

1  reports, does St. Johns County Sheriff's Office
2  receive, however you would like to estimate it, daily,
3  weekly, monthly?  Can you estimate?
4      A.   I -- I don't know off the top of my head, but
5  just as a guesstimation, when I was doing it in 2015 to
6  2017, we got about, I think, seven a month, and now
7  they're getting easily like a hundred a month.  If not,
8  maybe a little less, maybe a little more.  I -- I know
9  that they had, I think, 300 in the first three months
10  or something like that.  It's -- it's crazy considering
11  there's only a handful of people in there, so they have
12  a lot.
13      Q.   How many of those images are just not
14  chargeable, it's just -- it's just not child
15  pornography that they're getting in these cyber tips?
16      A.   I don't know.  We -- I don't -- I don't -- I
17  just can't answer.  I don't know.  Yeah.
18      Q.   But are you aware it happens on a fairly
19  regular basis that a NCMEC report will contain an image
20  that does not constitute a chargeable possession of
21  child pornography material?
22      MS. SHEVLIN:  Form.
23      THE WITNESS:  I can't answer.  I don't know.
24  I don't -- I don't look at cyber tips unless they
25  are specifically related to a case.

Page 61

1  BY MR. ROBERTS:
2      Q.   Back when you were doing it, were there times
3  where you got a NCMEC report and you're like you looked
4  at it and go, No, this is not something that we can
5  charge?
6      A.   I think so.  I -- yeah.  Well, you know, we
7  only got them, like I said, like seven -- maybe seven a
8  month.
9      Q.   Okay.
10      A.   So...
11      Q.   All right.
12      A.   And most of them were like weird guys from up
13  north chatting with a kid from here or something
14  like that.  They weren't really so much image-related.
15      Q.   I think we talked about, you know, the need,
16  and you thought, Well, we should go to a website, if
17  that's available.  I want to ask you a question,
18  though.  I mean, if -- if you have an image, and let's
19  just say hypothetically the detective believes that
20  it's a minor being depicted and published, would you
21  agree that the detective should make every effort
22  possible to identify the -- the model or the individual
23  being depicted in that image?
24      A.   Uh-huh, I do.
25      Q.   Yes?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 62

```
 1      A.   Yes, I do.
 2      Q.   I mean, the point of ICAC investigations is
 3   to protect children from sexual exploitation, correct?
 4      A.   Yes.
 5           MR. ROBERTS:  You know, we've been going for
 6   an hour.  Does anybody need a break?
 7           MS. SHEVLIN:  A bathroom break sounds great,
 8   actually.
 9           MR. ROBERTS:  I'll get some coffee.  I
10   appreciate everybody's time.  Thank you.
11           MS. SHEVLIN:  All right.  See you all in
12   five.
13           (Off record)
14           MR. ROBERTS:  If we go back on the record, I
15   was talking to the court reporter -- I will, just
16   because I think maybe it was ambiguous, just make
17   the NCMEC report Exhibit 2.  I think Exhibit 1 was
18   the statute 82.071.  So am I right, there have
19   been only two things that I have shared?
20           MR. CARSON:  Can you e-mail those to the
21   court reporter?
22           MR. ROBERTS:  She put her e-mail in the chat,
23   so yeah, yeah, yeah.
24           (Plaintiff's Exhibit No. 2 was marked for
25           Identification.)
```

Page 63

```
 1   BY MR. ROBERTS:
 2      Q.   All right.  So Mr. Greene, I always do this.
 3   We just had a break.  Did you discuss this case with
 4   anyone during the break?
 5      A.   No.  And I apologize, somebody put a lock on
 6   this door and didn't give anybody the keys.
 7      Q.   Okay.  All right.
 8      A.   Gave us a nice office to do this stuff in
 9   and...
10      Q.   I always say too, it's not inappropriate that
11   you did talk to someone.  It's not against the rules.
12   It's just I -- you know, we want to know.  So -- but
13   you didn't.  So...
14           MR. ROBERTS:  So Madam Court Reporter, I
15           think the last, were we asking like -- did I ask
16           something about it would be -- an officer should
17           make best efforts to try to identify any minor
18           depicted in a -- can you just ask the last
19           question, Madam Court Reporter, because I think I
20           already got an answer to that one.
21           THE COURT REPORTER:  Sure.
22           (Thereupon, the requested portion of the
23   record was read.)
24           MR. ROBERTS:  Okay.  Very good.
25
```

Page 64

```
 1   BY MR. ROBERTS:
 2      Q.   All right.  You were able to view the models
 3   in question with their ID's, correct?
 4      A.   Yes.
 5      Q.   Are you satisfied, as we sit here today, that
 6   at the time of these photo shoots that the models were
 7   at least over the age of 18?
 8      A.   No.
 9      Q.   All right.  What evidence makes you think
10   that they were not?
11      A.   If I can see the -- the meta data from the
12   images, the original images, I would be satisfied.
13      Q.   Let me ask you this.  Does it at least raise
14   a question in your mind that needs to be investigated
15   before anyone got arrested for possession of these
16   images?
17      A.   Yes.
18           MR. CARSON:  Object to the form.
19           MS. SHEVLIN:  Join.
20   BY MR. ROBERTS:
21      Q.   Did anybody ask you to do any analysis on the
22   photographs depicting the -- the ID's?
23      A.   No.
24      Q.   Just so I know, you're -- you're not taking
25   the position that these models are under the age of 18,
```

Page 65

```
 1   are you?
 2           MR. CARSON:  Object to form.
 3           MS. SHEVLIN:  Join.
 4           THE WITNESS:  I'm not taking any position on
 5           anything.
 6   BY MR. ROBERTS:
 7      Q.   Let me ask you this.  Could a -- in your
 8   opinion, as an investigator, and you have looked at
 9   these images and, you know, could a reasonable person
10   believe that these models were 18 at the time they were
11   depicted in these photographs?
12      A.   Yes.  And a reasonable person could also
13   believe that they are under 18.
14      Q.   And isn't that why the federal government has
15   given investigators the tools to use the federal age --
16   age verification statute?
17           MR. CARSON:  Object to form.
18           MS. SHEVLIN:  Join.
19           THE WITNESS:  The federal age verification
20           statute?
21   BY MR. ROBERTS:
22      Q.   The statute that was disclaimed and -- and
23   posted on the websites that you viewed with these
24   images.
25           MR. CARSON:  Object to form.
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 66

```
1           MS. SHEVLIN:  Join.
2           THE WITNESS:  Sure.
3  BY MR. ROBERTS:
4       Q.  Yeah, I mean, look, I think -- and look, I'm
5  just saying, like, it can be -- and I'm not talking
6  about specifically about Mr. Lawshe, okay, but you
7  agree it sometimes can be very difficult to tell the
8  difference between a 17 year old and a 19 year old?
9  You would agree with that, correct?
10      A.  Yeah, absolutely.
11      Q.  Right.  And so if there was some law that
12 required publishers to keep and maintain age, you know,
13 IDs, that would be very helpful to law enforcement to
14 make those calls, correct?
15      A.  Yes.
16          MR. CARSON:  Object to the form.
17          MS. SHEVLIN:  Join.
18 BY MR. ROBERTS:
19      Q.  And in your understanding metart.com did
20 keep, at least what they purport to be, government
21 issued ID's of the models in question, correct?
22      A.  From -- from what I have seen, which is only
23 this, the two pictures that I saw, yes.
24      Q.  Did you ever -- were you provided the
25 affidavit from the record custodian?
```

Page 67

```
1       A.  Not that I recall.
2       Q.  Okay.  But at least that -- I mean, you agree
3  that that is a tool that would help an investigator to
4  make that difficult decision, right?
5       A.  Yes.
6       Q.  And that way, you don't -- you don't have to
7  make this sort of like difficult choice, correct?
8       A.  Correct.
9       Q.  You made a reference earlier in your -- your
10 testimony like if you're searching for -- and I can't
11 remember the terms you used, I think you said like
12 young teens.  You don't have any evidence of any search
13 terms that Mr. Lawshe was using on any of his devices,
14 do you?
15      A.  As far as stuff like that?
16      Q.  Yeah.
17      A.  Correct, no.
18      Q.  So when you said, "If you search for really
19 young teens," that was just a hypothetical that you
20 were using?
21      A.  Right.
22      Q.  You're not saying that Mr. Lawshe was
23 searching for, quote, young teens?
24      A.  There -- there was some -- I think some
25 search history for like pornographic sites but nothing
```

Page 68

```
1  that would lead us to believe that there was any search
2  history for anything illegal, correct.
3       Q.  Right.  On the images in question, there was
4  nothing that stated that the individuals were minors,
5  was there?
6       A.  On the three images, no.
7       Q.  They weren't pretending to be minors?
8           MR. CARSON:  Form.
9  BY MR. ROBERTS:
10      Q.  You did not interpret them as pretending to
11 be minors?
12          MR. CARSON:  Object to form.
13          MS. SHEVLIN:  Join.
14          THE WITNESS:  No.
15 BY MR. ROBERTS:
16      Q.  You know what I mean, though, when I say like
17 people pretending to be minors?
18      A.  Yes.
19      Q.  Detective Preston sometimes pretends to be a
20 minor, doesn't she?
21      A.  In -- in her job, yes.
22      Q.  You're aware, I think, in, in 2022, 2023, she's
23 about 28, 29 years old?
24      A.  I believe so, something like that.  She was
25 parts of investigations where she was putting
```

Page 69

```
1  photographs of herself out and claiming to be 15 as
2  part of a -- a UC or an undercover operation but, yeah,
3  I believe so.
4       Q.  So I mean, you know, as you are aware that
5  St. Johns County as a -- as a unit has attempted and
6  believes that they can credibly pass off a 28, 29 year
7  old as a 15 year old on the internet?
8       A.  It's -- it's part of, you know, being an ICAC
9  investigator.
10      Q.  Right.  But these models weren't doing
11 anything like that, right?  Like, they were saying,
12 Hey, I'm 15, or I just got out of my seventh grade
13 class or something like that, were they?
14      A.  Not that I can tell --
15          MR. CARSON:  Form.
16          THE WITNESS:  -- with the two pictures, no.
17 BY MR. ROBERTS:
18      Q.  Right.  Would you agree with me that the fact
19 that a 28 or 29 old female can success -- let me
20 ask you this.  Has she successfully baited and fooled
21 somebody into believing that she was 15?
22      A.  I wouldn't use the terms "baited" and
23 "fooled," no.
24      Q.  Has she -- has St. Johns County convinced
25 another person, an individual that images of Detective
```

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 70

1    Preston were images of a 15 year old?
2            MR. CARSON:  Object form.
3            THE WITNESS:  Yeah, I'm not going to answer
4    that.  That's...
5    BY MR. ROBERTS:
6        Q.    Well, let me ask you this.  Have you -- has
7    St. Johns County Sheriff's Office arrested somebody for
8    attempting to meet up with Detective Preston who had
9    pretended to be a 15 year old?
10       A.    I -- I don't honestly know.  I --
11       Q.    Okay.  That's okay.
12       A.    -- don't keep track -- yeah, I don't have...
13       Q.    You can say "I don't know" at any time.  You
14   can say I don't know.  That's fair enough.
15             You would agree that photographs are highly
16   manipulatable especially terms of like the age of the
17   individual depicted?
18       A.    How so?
19       Q.    Well, a 29 year old could be made to look
20   like a 15 year old?
21       A.    What -- what does this have to do with --
22   with what I did in this case?  Because you're asking me
23   a whole bunch of stuff that's hypothetical that has
24   nothing to do with anything I did in this
25   investigation.  And it's been going on for at least

Page 71

1    like 45 minutes now.
2            I did nothing with any kind of manipulation.
3    I'm sure it's possible, but I don't know anything about
4    it.
5        Q.    Anytime you don't know the answer to a
6    question, you can say "I don't know."
7        A.    I don't know.
8        Q.    You understand why Mr. Lawshe is suing
9    Detective Preston, though, correct?
10       A.    I do, yes.  Yeah.
11       Q.    You understand that this -- this arrest
12   ruined his career?
13       A.    I absolutely do.
14       Q.    And ruined his personal reputation?
15       A.    I do.
16       Q.    Do you know who in St. Johns County Sheriff's
17   Office called the media after they made the arrest?
18       A.    No.
19       Q.    Do you understand that it was somebody from
20   St. Johns County Sheriff's Office that called the
21   media?
22       A.    No.  I -- I didn't even know the media got
23   called, honestly.
24       Q.    You never saw any news, TV, articles about
25   this case?

Page 72

1        A.    No.
2        Q.    Who called his supervisor at FWC before the
3    arrest?
4        A.    I don't know.
5        Q.    Are you aware that FWC was called and
6    notified of this investigation prior to the arrest?
7        A.    Well, I know that there was a supervisor that
8    was here because when I went into the office, into the
9    ICAC office, to -- they were talking to me about going
10   to the house to pick up the phone.  I think it was his
11   supervisor was in there, so -- and that was the only
12   kind of contact I had with anybody with FWC or with
13   fish and wildlife.
14       Q.    We talked about Dr. Dully for a moment, you
15   referenced her.  Have you -- did you, while you were an
16   ICAC investigator, use Dr. Dully in the investigation
17   of possession of child pornography cases?
18       A.    No, sir.
19       Q.    What is your understanding of her expertise?
20       A.    I -- I don't -- I believe, a pediatrician.  I
21   don't know.
22       Q.    You made a comment earlier, this is the
23   reason I'm asking, that if somebody was age-difficult
24   and people disagreed, that the policy was to call
25   Dr. Dully.  Did I understand that correctly?

Page 73

1        A.    Yes.  Well, a -- a doctor.
2        Q.    A doctor.
3             Do you believe -- go ahead.
4        A.    I never -- I never had to do that when I was
5    an investigator, but that would be the step to have to
6    go to.
7        Q.    Why not?
8        A.    I was lucky.
9        Q.    I mean, are you saying that all of the images
10   you charged were obviously child pornography?
11       A.    Correct.  Obviously young children.
12       Q.    You never made the decision to file charges
13   on an age-difficult person?
14       A.    Correct.
15       Q.    All right.  And again, I'm -- I'm -- I'm
16   just -- I don't know what you know, right, and so like
17   sometimes there are things that -- you know, if you
18   don't know the answer to the question, you can say "I
19   don't know."  Do you believe that Dr. Dully has the
20   ability to tell the chronological age of an individual
21   by looking at a digital picture?
22             MS. SHEVLIN:  Form.
23             THE WITNESS:  I don't know.
24   BY MR. ROBERTS:
25       Q.    Unfortunately, I guess, you have had to look

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 74

1  at a lot of pornographic images over your career; is
2  that correct?
3       A.   Yes.
4       Q.   And many of those are legal images of
5  pornography?
6       A.   Yes.
7       Q.   Correct?
8       A.   Yes.
9       Q.   You are aware that female models, adult
10  female models do practice on a regular basis grooming
11  of some type of their pubic hair?
12       A.   Yes.
13            MS. SHEVLIN:  Form.
14  BY MR. ROBERTS:
15       Q.   You're aware that there are multiple types of
16  grooming?
17       A.   Yes.
18       Q.   And you are aware that digital images can be
19  touched up to improve the esthetic appearance of things
20  like skin and hair?
21       A.   Yes.
22       Q.   It happens on like a regular basis in our
23  society that -- that photographs are touched up,
24  correct?
25       A.   Yeah.

Page 75

1       Q.   All right.  When you were an ICAC
2  investigator, did you ever take solely the absence of
3  pubic hair as evidence that a model was prepubescent?
4            MS. SHEVLIN:  Form.
5            THE WITNESS:  Not that I recall, no.
6  BY MR. ROBERTS:
7       Q.   Okay.  Would you agree with me that just
8  because a female model does not have pubic hair does
9  not mean that she is prepubescent?
10       A.   No.  Say that question again.
11       Q.   Yeah.  You would agree that not all -- I'm
12  going to ask it a better way, I think a better way.
13  Not all models who do not have visible signs of pubic
14  hair are prepubescent?
15       A.   Right.
16       Q.   I talked to you a little bit earlier about as
17  a forensics specialist your ability to tell whether an
18  image has been touched up or altered in any way.  Do
19  you recall that question?
20       A.   Yes.
21       Q.   Sometimes it's difficult for even you to tell
22  whether or not an image has been altered in some way,
23  for example, to remove evidence of pubic hair?
24       A.   Correct.
25       Q.   Did you ever look at Dr. Dully's reports in

Page 76

1  this case?
2       A.   No.
3       Q.   Do you have any idea what they are based on?
4       A.   Not really.  I'm guessing the Tanner scale, I
5  think is what it's called.
6       Q.   Sexual maturity rating, Tanner scale, that --
7  that sort thing.  Are you familiar with that Tanner
8  scale?
9       A.   Not -- not really.  I had another case
10  recently where I had to meet with a pediatrician,
11  similar to this, not this case but something kind of
12  similar to this, and I took some pictures to a
13  pediatrician, and she explained it just a little,
14  little tiny bit to me, but, yeah.
15       Q.   Was it Dr. Dully that you took it to?
16       A.   No.
17       Q.   Was a member -- sorry.
18       A.   No.  It was a doctor in Gainesville.  I
19  don't -- I don't remember her name.  But...
20       Q.   Was it a doctor who is a member of the
21  Florida -- UF Child Protection Team?
22       A.   I don't know.
23       Q.   Okay.
24       A.   She was referred to by a -- a State Attorney
25  in Putnam County.

Page 77

1       Q.   Were -- in that case, were you investigating
2  possession of child pornography?
3       A.   Yes.  Yes.
4       Q.   Why were you investigating possession of
5  child pornography?
6       A.   A completely different kind of case.  It was
7  one of our people.  It wasn't me investigating.  It was
8  one of our detectives who was in the ICAC unit who is
9  no longer in the ICAC unit.  I was doing the digital
10  forensics on it, and I had dealt with this State
11  Attorney on another case that I worked or did the
12  digital forensics on for a different county and was
13  helping her on this other case and was taking some
14  stuff to her and just, you know, kill two birds with
15  one stone, so I figured I would take this stuff over
16  and let her take it to the doctor, so...
17       Q.   And this doctor kind of gave you a little bit
18  of insight into Tanner staging?
19       A.   Correct.  Correct.
20       Q.   Did that doctor explain to you that Tanner
21  staging is not designed to estimate chronological age?
22       A.   No.  No.
23       Q.   Did she tell you that that test was actually
24  designed to measure an individual's development through
25  the stages of puberty?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 78

1    A.    No.
2         MS. SHEVLIN:  Form.
3    BY MR. ROBERTS:
4         Q.    But you're not a doctor, so you don't really
5    know what --
6         A.    Right.
7         Q.    -- the Tanner stages are?  Okay.
8         A.    Right.
9         Q.    I'm just trying to get what she would have
10   told you.
11        A.    Right.
12        Q.    Did that doctor tell you that she could
13   estimate the chronological age of an individual from
14   looking at a photograph?
15        A.    No.
16        Q.    Okay.  Did she explain that there were
17   limitations to chronological age estimation using the
18   Tanner scale?
19        A.    No.
20        Q.    We're almost getting through this.
21              You talked earlier -- I'm just kind of going
22   to skip around -- a little bit about grants and funding
23   related to ICAC.
24        A.    Okay.
25        Q.    Do you recall that?

Page 79

1         A.    About funding, yes.
2         Q.    Yeah.  Does St. Johns County Sheriff's Office
3    receive funding based on the number of arrests for
4    child pornography, child sexual exploitation?
5         A.    No, not that I know of, no.
6         Q.    Do they write grants to organizations to
7    receive funding for investigations and arrests of child
8    sexual exploitation?
9         A.    Based on the amount of arrests?  No.
10             We might -- we might write -- and this is way
11   above my paygrade, but we might write grants for
12   funding to assist for equipment to -- I know we do for
13   digital forensics and things like that, but it's not
14   based on the amount of arrests, or it would be like,
15   you know, wanting to get more equipment, so we would
16   write more tickets and, you know, have a quota or
17   something like that.  We don't -- we don't do any kind
18   of quota work.
19        Q.    Is there a certain prestige that comes from
20   within the law enforcement community from arresting
21   another law enforcement officer?
22        A.    No.  We -- at least for me personally, I
23   think it's disgraceful.  I don't like doing it.
24        Q.    Do you treat law enforcement differently than
25   you would treat anybody else?

Page 80

1         A.    No.  No.  And that's -- you have to be very
2    particular about that.  You can't treat somebody
3    differently, because if you do, if you treat them
4    better or you treat them worse, you get looked down
5    upon by the members of the community.
6         Q.    All right.  Just give me -- just give me one
7    second.  I'm going to take a quick break, and that may
8    be all I have.  I'm just going to look at my notes.
9              (Recess taken)
10             MR. ROBERTS:  Thank you, Detective Greene.  I
11        don't have any other questions.
12             THE WITNESS:  All right.
13             MR. ROBERTS:  This lady and gentleman, these
14        other attorneys, may have some other questions, I
15        don't know.
16             THE WITNESS:  Okay.
17             MS. SHEVLIN:  I have a couple of questions
18        for you, Detective.  Thank you.
19             THE WITNESS:  Uh-huh.
20             MS. SHEVLIN:  Let me just go through my notes
21        here.
22             CROSS-EXAMINATION
23   BY MS. SHEVLIN:
24        Q.    Prior to the investigation involving
25   Mr. Lawshe, were you familiar with the website

Page 81

1    metart.com?
2         A.    I have heard of it, and I think -- I can't
3    say I have ever had an investigation on it, but I'm
4    familiar with it, yes.
5         Q.    Okay.  And when you say you're familiar with
6    it, what did you know about it prior to the
7    investigation involving Mr. Lawshe?
8         A.    I'm sure I had seen pictures from it.  I
9    couldn't tell you from where.  I -- probably from
10   whether it was from ICAC downloads or working in ICAC
11   or from digital forensics, I have seen pictures or
12   videos or something from it, but I -- I at least knew
13   the name from one place or another.  I can't recall.
14        Q.    And do you know what the -- the M-E-T, the
15   met part, stands for?
16        A.    No, ma'am.
17        Q.    Were you familiar with the term "most erotic
18   teens" in relation to metart.com?
19        A.    No.
20        Q.    Okay.  Are you familiar with the fact that
21   metart refers to its models as teens and girls?
22        A.    No.  No, I wasn't.  No.
23        Q.    Would that surprise you?
24        A.    No.  Actually, I did see that this morning
25   when I was Googling.  I just didn't put two and two

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 82

1  together.
2      Q.    You were asked earlier by Mr. Roberts about
3  an image that was -- it sounded like it was bellybutton
4  to thighs, and it showed vagina of the individual on
5  the -- in the photo.  Was that photo that we're talking
6  about cropped, or was that the full image was from
7  bellybutton to thighs?
8      A.    It was a screenshot from a web page, and it
9  was -- there's a word for that type of image, but it --
10  I can't remember the word.  It was kind of cropped in
11  between two other images.  It would be like if -- if
12  you were looking at a website, and it was just a --
13  like a very large thumbnail in between two other
14  images.  It was basically wanting you to click on it to
15  see the full image.
16      Q.    Okay.
17      A.    So I think if you'd have clicked on that,
18  then you were on the website, it would go to the -- the
19  full image.  And I can't remember the -- the name of
20  the -- the photo, but it was like screenshot, a bunch
21  of numbers, dot DuckDuckGo, or something like that.
22      Q.    Mr. Roberts also asked about a disclaimer
23  that was on metart.com, essentially saying all of our
24  models are -- are 18, and we do age verification.  You
25  would have no way of knowing whether or not that

Page 83

1  statement was accurate and true, correct?
2      A.    Correct.
3      Q.    Okay.  And in fact, there is false
4  information published across the internet every day,
5  all the time, correct?
6      A.    Correct.
7      Q.    He also asked you about whether or not you
8  had seen the models' passports or IDs.  And I was not
9  clear.  Did each -- there were two models, correct?
10      A.    Correct.
11      Q.    Did you view an image -- an image of a
12  passport for each of those models?
13      A.    I -- I only remember -- I -- I have some type
14  of image of ID.  I don't recall the one where you only
15  see the girl's vagina.  I don't recall if it's her
16  passport or an ID for the one girl.  But the other one
17  where you have the -- the two pictures where you can
18  see, you know, who the girl is, her, definitely have an
19  ID and passport for her, because I always go back and
20  look to verify.  I just don't remember off the top my
21  head.  I know there's some form of ID for the other
22  girl, too.  I just -- but I also don't remember what
23  her face looked like from when we went on the internet.
24      Q.    And the identification and the passports that
25  you viewed, what country were those from?

Page 84

1      A.    The Ukraine.
2      Q.    Both of them?
3      A.    The only one I remember, yeah, yeah.  I don't
4  remember the other one.
5      Q.    Are you familiar with passports or government
6  issued IDs from the Ukraine?
7      A.    No.
8      Q.    Have you seen government issued IDs or
9  passports from Ukraine before?
10      A.    No.
11      Q.    Regardless of the age identification on the
12  passports and the IDs which are purported to belong to
13  these models, you would have no way of verifying when
14  the photographs in question were taken, correct?
15      A.    No.
16      Q.    Okay.  So the fact that the passports and the
17  identifications which purport to belong to these girls
18  show that they were over the age of 18 does not
19  necessarily equate to those images being taken when
20  those girls were over 18, correct?
21      A.    Correct.
22      Q.    I'm just looking through my notes.  Thank you
23  for your patience.
24          Mr. Roberts had asked you a question about
25  your -- I think it was phrased that you never made the

Page 85

1  decision to file charges on an age-difficult person.
2  Do you remember that question?
3      A.    Correct.
4      Q.    I want to clarify, because you said you --
5  you got lucky and -- and the images that you brought
6  charges forth on were obvious child pornography images.
7      A.    Uh-huh.
8      Q.    So in relation to that question, were you
9  saying that you never had occasion to bring charges
10  forth on an age-difficult person, or were you saying
11  you did see age-difficult people, and you made a
12  decision not to bring charges forward?
13      A.    I think that I didn't have the occasion.
14      Q.    Okay.
15      A.    I don't recall having to make that decision.
16  And I know I never had to go to a doctor for any kind
17  of verification or anything like that.  I know there
18  were occasions when I had females that were
19  age-difficult, but they were known victims or I was
20  able to -- they were identified victims, something like
21  that.  And that's a whole different ballgame, so that's
22  not something that we would be dealing with like this.
23      Q.    There was also some brief discussion of the
24  Tanner scale.  Are you familiar with the Tanner scale
25  being a commonly used or accepted practice among

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 86

1  doctors who opine on age ranges of -- of people in
2  photographs such as the ones we are talking about
3  today?
4      A.   That's about the limit of my knowledge of it,
5  is that it's commonly used.
6      Q.   Okay.  And in fact, the -- the doctor that
7  you were just talking about that you consulted with
8  recently, she discussed the Tanner scale with you
9  within that context, correct?
10     A.   Right.  I -- I was really trying to see if
11 there was a way to get some kind of -- if there was
12 some type of training that might be available to law
13 enforcement for these kinds of situations and what --
14 what do y'all do?  And, Oh, we used a Tanner scale.
15 Oh, okay, maybe I'll look into something like this
16 later on that might be beneficial to people that do
17 ICAC cases, but that just wasn't the time or place so,
18 yeah.
19     Q.   And is it your understanding that the Tanner
20 scale does in fact use indicators such as breast
21 development and pubic hair to establish possible age
22 range for children or teenagers?
23     A.   I believe so.  I'm not a hundred percent
24 sure, but I -- I think that's where everything I was
25 taught coming into ICAC and -- and later learned is

Page 87

1  where that came from.
2      Q.   Have you ever had occasion to speak with
3  Dr. Dully regarding either this case or any other
4  similar case?
5      A.   No, no.  I have never met or talked to
6  Dr. Dully.
7          MS. SHEVLIN:  Okay.  I believe that's all I
8      have for you.  I very much appreciate your time.
9      Thank you.
10         THE WITNESS:  You're welcome.
11         MR. ROBERTS:  Matt, do you have any
12     questions.
13         MR. CARSON:  Give me one second.
14         MR. ROBERTS:  I've got a couple follow-up.
15     Do you want me to ask those before you go or...
16         MR. CARSON:  You're doing redirect based on
17     what Ms. Shevlin asked?
18         MR. ROBERTS:  Yeah.
19         MR. CARSON:  Go ahead.
20              REDIRECT EXAMINATION
21 BY MR. ROBERTS:
22     Q.   So Mr. Greene, you were asked by Ms. Shevlin
23 about your knowledge of the Metart website before your
24 involvement in the Lawshe case.  Do you recall that?
25     A.   Uh-huh.

Page 88

1      Q.   I think I recall you, I think you testified
2  earlier, you don't recall the source or exactly what
3  was said about Metart, correct?
4      A.   Right.  Right.
5      Q.   Okay.  My question to you is, based on your
6  knowledge, would you be comfortable stating under oath
7  that metart.com has a known history of displaying child
8  sexual abuse material?
9      A.   No.  I wouldn't -- I wouldn't say that it's
10 child sexual abuse material, no.  Because even -- yeah,
11 no, I wouldn't.  No.
12     Q.   Okay.  You were asked about did you have any
13 way of knowing -- Ms. Shevlin was asking you questions
14 about the -- the disclaimers on the websites that you
15 viewed that the models were 18 or older and that there
16 was age verification.  Do you recall those questions?
17     A.   Yes.
18     Q.   I think she asked was there any way that you
19 could verify if that was true or not.  Do you recall
20 that question?
21     A.   Uh-huh.  Yes.
22     Q.   Well, isn't it -- isn't it true that you --
23 you could have -- not you, I'm just saying an
24 investigator could have investigated those claims by
25 e-mailing the records custodian of the website,

Page 89

1  correct?
2          MS. SHEVLIN:  Form.
3          MR. CARSON:  Join.
4          THE WITNESS:  Sure, you could e-mail them.
5  BY MR. ROBERTS:
6      Q.   And in fact, you understand that's what
7  happened in this case, that Mr. Lawshe's investigative
8  team e-mailed the record custodian, and they returned
9  the photo ID's, correct?
10     A.   Correct.
11     Q.   And I -- you're not aware of any affidavit
12 where the dates of the photographs, the records
13 custodian said what dates the photographs were taken,
14 you just don't know that because it wasn't provided to
15 you?
16     A.   Right.  I never saw any of that.
17     Q.   But had you been provided that, you would
18 have been able to compare the -- the date of birth to
19 the date of the photo shoot, correct?
20     A.   Correct.
21         MR. ROBERTS:  No further questions.
22         MR. CARSON:  Ms. Shevlin, are you good?
23         MS. SHEVLIN:  I'm good.  Thank you.
24         MR. CARSON:  Corporal Greene, my name is Matt
25     Carson.  I represent Detective Preston in this

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Page 90

1   action.  I don't have any questions for you.
2        Mr. Roberts, is it all right if I suggest
3   that he'll read, and he can go through me?
4        MR. ROBERTS:  Absolutely.
5        MR. CARSON:  All right.
6        MR. ROBERTS:  And honestly, Matt, I mean,
7   I -- I kind of assume you represented him anyway
8   because he's an employee of St. Johns, so I -- you
9   know --
10       MR. CARSON:  Yeah, we're -- we're in this --
11  we're in this weird spot where I'm -- I'm still
12  considering the Sheriff's Office employees to be
13  my client inasmuch as --
14       MR. ROBERTS:  Yeah.
15       MR. CARSON:  -- as of very recently, the
16  sheriff's office was a defendant.  So, yeah, he'll
17  read and that can go through me.
18       MR. ROBERTS:  Perfect.  Yeah, no objection to
19  that.  Yeah.
20       THE COURT REPORTER:  Mr. Roberts, do you want
21  to order the 0 and 1 and then Mr. Carson and
22  Ms. Shevlin want a copy?
23       MR. ROBERTS:  Yes, I -- I will order.
24       MR. CARSON:  I will take a copy, ma'am.  I
25  need the simplest possible PDF that you can send

Page 91

1        me, please.  And thank you.
2        THE COURT REPORTER:  Okay.
3        MR. ROBERTS:  Although it is nice, Matt, to
4   get the kind that you can word search.  You know,
5   sometimes I get these PDFs, and it won't do the
6   control F, find, then I'm like...
7        MR. CARSON:  Yeah, what I hate --
8        THE COURT REPORTER:  Do you want this on or
9   off?  I'll just go off now.
10       MR. CARSON:  Yeah, we can go off.
11       THE COURT REPORTER:  Would you like a copy,
12  Ms. Shevlin?
13       MS. SHEVLIN:  Yeah, I'll take a copy.  Thank
14  you.  Just PDF.
15       (Off record)
16       (Thereupon, the remote deposition was
17  concluded at 12:12 and the signature and formalities
18  were not waived.)
19
20
21
22
23
24
25

Page 92

1              CERTIFICATE OF OATH
2   STATE OF FLORIDA
3   COUNTY OF JACKSONVILLE
4
5        I, the undersigned authority, certify that
6   the aforementioned witness Kevin Greene, personally
7   appeared before me via remote teleconference and was
8   duly sworn on Tuesday, December 17, 2024.
9        Dated this 27th day of December, 2024
10
11
12
13
14
15        MAUREEN HALL, RPR, FPR
          Notary Public - State of Florida
16        My Commission Expires:  3/17/25
          My Commission No.:  HH065896
17        Identification presented by Deponent:
          License
18
19
20
21
22
23
24
25

Page 93

1            C E R T I F I C A T E
2   STATE OF FLORIDA
3   COUNTY OF JACKSONVILLE
4
5        I, MAUREEN HALL, Registered Professional
    Reporter and Notary Public duly commissioned and
6   qualified in and for the State of Florida at Large, do
    hereby certify that I was authorized to and did
7   stenographically report the foregoing remote
    deposition; and that the transcript is a true record of
8   the testimony given by the witness.
9        I FURTHER CERTIFY that I am not a relative,
    employee, attorney, or counsel of any of the parties,
10  parties' attorney, or counsel connected with the
    action, nor am I financially interested in this action.
11
12       Dated this 27th day of December, 2024.
13
14
15
16        MAUREEN HALL, RPR, FPR
          Notary Public - State of Florida
17
18
19
20
21
22
23
24
25

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

---

**Page 94**

```
1   KEVIN GREENE
    C/O MATTHEW JOSEPH CARSON, ESQUIRE
2   SNIFFEN & SPELLMAN, P A.
    123 North Monroe Street
3   Tallahassee, Florida 32301-1509
    mcarson@sniffenlaw.com
4
            IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK,
5   MIKAYLA PRESTON AND KATHLEEN DULLY,
6           CASE NO.:  3:24-cv-00044-MMH-MCR
7   Dear Mr. Carson,
8       The deposition of Kevin Greene, taken in
    the above-styled cause on December 17, 2024 is now ready
9   for signature of the witness.  Please contact our office
    to make arrangements for the witness to sign the same;
10  or, if you wish to waive the signature of the deposition,
    please so advise.
11      If this deposition has not been signed by January
    27th, 2025, or the signature thereto waived, we shall
12  consider such delay a refusal to sign under Rule 1.310(e)
    of the Florida Rules of Civil Procedure.
13      If you have any reason which you would like for me
    to place on the deposition as to the witness' failure to
14  sign the same, please advise.
15      Very truly yours,
        HUSEBY COURT REPORTING, COURT REPORTER
16
17  By:
18          Maureen Hall, RPR, FPR
19  Dated:  December 27, 2024
20  cc:  Counsel of Record
21
22
23
24
25
```

---

**Page 95**

```
1           E R R A T A  S H E E T
2   IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA
    PRESTON AND KATHLEEN DULLY
3
4   DEPO OF:  KEVIN GREENE
5   DATE TAKEN:  12/17/24
6       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
7       Page No._____Line No._____Change to:_____
8       _____
9       Reason for change:_____
10      Page No._____Line No._____Change to:_____
11      _____
12      Reason for change:_____
13      Page No._____Line No._____Change to:_____
14      _____
15      Reason for change:_____
16      Page No._____Line No._____Change to:_____
17      _____
18      Reason for change:_____
19
20      Please forward the original signed errata sheet to
21  this office so that copies may be distributed to all
22  parties.
23      DATE:_____
24
25      SIGNATURE OF DEPONENT:_____
```

---

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                    Index: 1..agree

---
**1**
---

**1**  38:25 55:3
62:17 90:21

**12:12**  91:17

**15**  69:1,7,12,
21 70:1,9,20

**17**  44:12,15
45:1 52:7
66:8

**18**  40:6,9,12
45:3 64:7,25
65:10,13
82:24 84:18,
20 88:15

**19**  40:12 66:8

---
**2**
---

**2**  55:11
62:17,24

**20**  27:25

**20/20**  15:10

**2015**  5:6 53:2
60:5

**2016**  53:2

**2017**  60:6

**2022**  68:22

**2023**  31:14
47:12 49:13,
24 54:20
59:25 68:22

**2024**  49:25

**25th**  54:20

**28**  68:23
69:6,19

**29**  68:23
69:6,19
70:19

**29th**  49:13,21

---
**3**
---

**30**  34:5

**300**  60:9

---
**4**
---

**45**  71:1

**4chan**  28:9
29:7,10

---
**5**
---

**5**  37:17 38:12

**5-A**  38:15

---
**8**
---

**82.071**  62:18

**827.01**  38:12

**827.071**  37:17

**8chan**  28:9
29:11

---
**9**
---

**90s**  27:19

---
**A**
---

**A-1**  54:14

**A-2**  54:14
55:3

**Aaron**  30:22
31:19,23

**ability**  20:25
47:17 73:20
75:17

**absence**  75:2

**absolute**  57:11

**absolutely**
22:23 32:17
66:10 71:13
90:4

**abuse**  19:19
37:18 57:11,
17 88:8,10

**accepted**  85:25

**access**  42:3
47:17,23
48:23

**accessing**
28:16

**accurate**  83:1

**accusation**
52:20

**acronym**  8:25

**action**  90:1

**actual**  7:8

**adult**  40:3
74:9

**adults**  34:22
35:4,6 37:7,
8 41:2

**advanced**  19:4
21:8

**affect**  59:13,
14

**affected**  22:23

**affidavit**
66:25 89:11

**age**  27:4
35:10 41:23
45:13 57:2
64:7,25
65:15,16,19
66:12 70:16
73:20 77:21
78:13,17
82:24 84:11,
18 86:1,21
88:16

**age-difficult**
27:6 43:14
56:22 57:9,
12,18 72:23
73:13 85:1,
10,11,19

**agencies**  6:11

**agents**  6:13

**agree**  39:11
40:2 44:11
54:1 61:21

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Kevin Greene on 12/17/2024**

Index: agreed..bit

66:7,9 67:2
69:18 70:15
75:7,11

**agreed** 44:1

**ahead** 73:3
87:19

**AI** 23:15

**allegation**
25:10

**allegations**
14:5

**alleged** 5:14

**altered** 21:2,
7,18,24
22:10 23:4,
10 75:18,22

**ambiguous**
62:16

**amount** 24:16
79:9,14

**analysis** 64:21

**anybody's**
15:21

**Anytime** 71:5

**apologize**
32:18 63:5

**appearance**
74:19

**Apple** 16:23

**approximate**
57:2

**apps** 27:15

**area** 34:3

**arguably** 37:8

**argued** 35:21

**arguing** 32:22
35:18,20

**arrest** 16:14
19:17 30:1
47:14 48:20
71:11,17
72:3,6

**arrested** 42:20
64:15 70:7

**arresting**
79:20

**arrests** 79:3,
7,9,14

**art** 56:22

**articles** 71:24

**artificial**
21:9 23:7

**assist** 24:1
79:12

**assistance**
11:24 48:19

**assistant** 4:20
31:7 35:15
42:7,16 43:3
49:14

**assume** 90:7

**attempted** 69:5

**attempting**
70:8

**Attorney** 31:7,
22 35:15
42:7,16 43:3
49:14 50:20,
21 76:24
77:11

**attorneys**
80:14

**aware** 23:20
24:24 42:10
60:18 68:22
69:4 72:5
74:9,15,18
89:11

---

**B**

---

**B-1** 54:14

**B-2** 54:14

**back** 12:25
17:25 18:5
25:14 27:19
29:9 44:5
52:6,8 61:2
62:14 83:19

**background**
11:6

**bad** 39:23,24
40:11,23,25
41:3 49:7

**baited** 69:20,
22

**ballgame** 85:21

**base** 58:12

**based** 76:3
79:3,9,14
87:16 88:5

**basically**
82:14

**basis** 56:9
60:19 74:10,
22

**bathroom** 62:7

**bear** 45:14

**began** 42:17

**beginning**
46:24,25
56:24

**believes** 61:19
69:6

**believing**
69:21

**bellybutton**
35:24 82:3,7

**belong** 84:12,
17

**beneficial**
86:16

**birds** 77:14

**birth** 89:18

**bit** 9:16 12:3
14:11,16
16:13 42:18
52:1 75:16
76:14 77:17
78:22

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: Bittorrent..children

**Bittorrent**
27:16,17,18,
24

**body** 33:2,4,5

**book** 52:14

**bottom** 32:23
33:2

**break** 62:6,7
63:3,4 80:7

**breast** 57:5
86:20

**breasts** 43:22

**bring** 25:14
30:1 85:9,12

**bringing** 18:6

**brought** 11:19
23:22,24
24:2,25 85:5

**bunch** 70:23
82:20

---

C

**call** 15:5
57:9 72:24

**called** 4:3
9:11 56:22
71:17,20,23
72:2,5 76:5

**calls** 66:14

**camera** 18:3
55:17

**car** 30:9

**career** 71:12
74:1

**careful** 16:1

**Carson** 13:4,8,
11 14:7
34:24 39:6,
16 43:9
44:17 45:7,
16 62:20
64:18 65:2,
17,25 66:16
68:8,12
69:15 70:2
87:13,16,19
89:3,22,24,
25 90:5,10,
15,21,24
91:7,10

**case** 6:16
10:10 11:15
12:7,14,16
15:6 16:6
18:21,24
19:11 20:2
22:9,17
23:2,15,18
24:7 26:20
27:5 30:7,
10,18 43:16,
21,25 46:20
48:24 49:5,
12 52:4
53:10 56:13
57:25 58:5,
25 60:25
63:3 70:22
71:25 76:1,

9,11 77:1,6,
11,13 87:3,
4,24 89:7

**cases** 12:10
14:19 16:8
37:22 72:17
86:17

**categorization**
57:8,10,23

**categorizations**
57:14

**categorize**
27:6,11
28:18

**categorizes**
54:11

**category** 55:3

**cellphones**
7:6,8

**Center** 7:24
8:3 9:6

**certification**
6:4,5

**chain** 8:16

**chance** 26:2

**charge** 46:3
61:5

**chargeable**
60:14,20

**charged** 10:9
20:2,20
32:21 33:9,
22 34:14

**36**:13,15,16
37:4,14 41:8
46:5 51:11,
20 73:10

**charges** 73:12
85:1,6,9,12

**charging** 26:18

**chat** 29:5
62:22

**chatting** 61:13

**check** 58:4

**chest** 43:18
55:18

**child** 5:15
17:10 19:19
20:11 25:10
27:12 36:17
37:18,23
38:13,22
39:5 43:20,
24 44:2 46:6
57:3,10,12,
17,23 58:1,
7,10,12,15,
18,19,22
59:1,6
60:14,21
72:17 73:10
76:21 77:2,5
79:4,7 85:6
88:7,10

**children** 5:7,
12 7:25 8:3,
9 9:7 62:3
73:11 86:22

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                    Index: choice..correctly

choice 67:7

chose 41:9

chronological 73:20 77:21 78:13,17

circumstances 46:18,20,22

cited 42:7

claiming 69:1

claims 88:24

clarify 26:25 85:4

class 69:13

clear 15:12 83:9

clearinghouse 8:5,6

click 82:14

clicked 82:17

client 40:17 90:13

clip 37:2

cloud 18:11 56:4

coffee 62:9

colleague 30:25

Comcast 8:14

comfortable 88:6

comment 16:18

53:22 56:21 72:22

committed 39:12 43:7 45:15

commonly 85:25 86:5

communicating 58:16

community 79:20 80:5

company 50:19

compare 51:18 89:18

completely 77:6

complying 35:9

computer 30:13,14 33:14 38:17, 20

computers 19:4

concern 15:13

concerns 49:11 50:6

concluded 91:17

conduct 15:1 38:22

confirm 7:19 20:20 51:9 58:19,20,21, 23 59:1

confirmed 58:12,18

constant 56:8

constitute 20:10 60:20

constituted 19:18

consulted 86:7

contact 72:12

contacted 50:17,18

contained 26:13 54:2, 11

content 17:8 32:22 53:17 54:11

context 46:4 50:25 86:9

control 38:18 91:6

conversation 51:1

conversations 49:4

convinced 69:24

copy 90:22,24 91:11,13

corporal 4:14 13:5 89:24

correct 6:17,

21,24 9:3 16:24 17:4, 11 19:14,23 20:4,5 26:11,15 27:13 28:6 32:11 33:20, 24 34:12,15, 19,22,23 35:3,4,10 36:18,19,21 37:11,23 38:3 40:6,9 41:19 42:4 43:8 47:6,7, 8,10,14,18 48:5,11,16, 20 51:12,21 52:24 54:8, 20 55:9,12, 15,21,22,24 56:18 57:21 59:2,9,21 62:3 64:3 66:9,14,21 67:7,8,17 68:2 71:9 73:11,14 74:2,7,24 75:24 77:19 83:1,2,5,6, 9,10 84:14, 20,21 85:3 86:9 88:3 89:1,9,10, 19,20

correctly 8:23 17:6,15

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: country..detectives

18:13 20:16
25:2 26:5,8
29:10 35:11
38:13,23
55:6 72:25

country  83:25

county  4:12
5:1,20 9:13
14:4 18:8
20:25 21:21
22:7 31:7
58:16 59:4
60:1 69:5,24
70:7 71:16,
20 76:25
77:12 79:2

County's  13:2

couple  24:6
30:12 36:10
37:19 47:25
80:17 87:14

court  7:23
8:25 11:3,11
35:2 57:16
62:15,21
63:14,19,21
90:20 91:2,
8,11

coworkers  22:3

Crawford
12:12,13
31:22 42:15
49:20

crazy  60:10

credibility

59:15,20

credible
52:19,23,24

credibly  69:6

crime  26:19
37:14 38:2
39:13 43:7
45:4,15

crimes  5:7

criminal  12:7

cropped  82:6,
10

CROSS-
EXAMINATION
80:22

CSAM  57:12,
15,16,17

custodian
42:12 66:25
88:25 89:8,
13

cyber  7:22
8:15,19 9:12
59:25 60:15,
24

———————

**D**

———————

daily  60:2

damage  18:4

dark  28:8,16,
17

data  24:16
25:23 30:5

38:20 48:19
58:12 64:11

date  89:18,19

dated  54:20

dates  89:12,
13

day  32:10
34:7 35:21
83:4

days  24:6
36:10 54:23

dealing  14:19
24:15,16
43:13 85:22

deals  28:25

dealt  24:17
77:10

decision  16:14
29:25 47:14
48:20 67:4
73:12 85:1,
12,15

decisions  46:9

defendant
90:16

department
5:23

depend  22:15,
16

depends  21:3

depicted  27:4
51:11 61:20,
23 63:18

65:11 70:17

depicting
64:22

depiction
38:20

depictions
20:21

deposed  12:17

deposition
7:2,3 9:17
10:6 12:4,6
32:14 54:24
91:16

designed
77:21,24

desire  15:19

detect  25:24

detective
4:14,19 5:5,
19 8:4 9:3,
22 18:24
19:22 20:7,
13,24 22:6,
25 23:1
26:24 30:5
31:25 47:11
48:18 49:10
50:22 53:13
61:19,21
68:19 69:25
70:8 71:9
80:10,18
89:25

detectives

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                    Index: determination..efforts

26:21 77:8

**determination**
26:12,18
58:11

**determinations**
20:1,9

**determine**
21:1,23 22:9
59:6

**determining**
23:6

**develop** 43:22
44:2

**developing**
56:25 57:4

**development**
43:12,23
57:5 77:24
86:21

**device** 16:23
17:10,13
18:12 25:13,
20 28:14

**devices** 25:18
28:5,14 30:5
67:13

**difference**
66:8

**differently**
13:2 14:5
79:24 80:3

**difficult**
48:16 57:19
66:7 67:4,7

75:21

**dig** 29:19

**digging** 40:16,
21

**digital** 4:19,
20 73:21
74:18 77:9,
12 79:13
81:11

**digitally**
21:2,18,24
22:10 23:4,
10

**DIRECT** 4:7

**disagree** 31:14

**disagreed**
72:24

**disclaimed**
65:22

**disclaimer**
35:9,13 41:1
82:22

**disclaimers**
88:14

**discrepancies**
54:2

**discuss** 11:24
63:3

**discussed** 86:8

**discussion**
85:23

**disgraceful**
79:23

**displaying**
88:7

**doctor** 43:25
44:1 73:1,2
76:18,20
77:16,17,20
78:4,12
85:16 86:6

**doctors** 86:1

**document** 9:21,
25

**documents**
12:22 14:2

**door** 63:6

**dot** 41:15,18
82:21

**doubts** 43:6

**download** 7:19,
21 9:18
11:25 17:15
19:11,14
20:15 24:2,5
25:16,21
26:3,14
48:10

**downloaded**
16:19 19:5
24:17

**downloads** 7:6
18:25 32:11
56:12 81:10

**drive** 15:25
33:14

**drop** 57:7

**drug** 16:2

**Duckduckgo**
82:21

**dug** 29:17

**Dully** 72:14,
16,25 73:19
76:15 87:3,6

**Dully's** 75:25

**duly** 4:4

**dysplasia** 57:5

---

**E**

**e-mail** 62:20,
22 89:4

**e-mailed** 89:8

**e-mailing**
88:25

**earlier** 67:9
72:22 75:16
78:21 82:2
88:2

**easiest** 8:8

**easily** 47:17
60:7

**easy** 16:7,8

**edited** 21:1

**effectuate**
30:1

**effort** 61:21

**efforts** 63:17

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                              Index: electronic..find

electronic
   8:13

employed   4:11

employee   90:8

employees
   90:12

end   24:22
   39:21 40:19,
   22 41:14
   47:12

ended   41:18

enforcement
   6:13 8:15
   11:13 15:22
   66:13 79:20,
   21,24 86:13

enticement
   5:11

entire   33:4
   46:22 54:5

equate   84:19

equipment
   79:12,15

erotic   81:17

erotica   57:12

essentially
   82:23

establish
   44:19 86:21

established
   44:16

esthetic   74:19

estimate   60:2,
   3 77:21
   78:13

estimation
   78:17

evaluate   23:3

events   18:16

eventually
   8:17

everybody's
   62:10

evidence   16:6
   28:12 45:2
   49:12 50:7
   64:9 67:12
   75:3,23

evidentiary
   7:15

EXAMINATION
   4:7 87:20

excuses   48:7

exhibit   38:11,
   25 62:17,24

exhibition
   38:19

exhibition,--
   55:11

existed   43:6

experience
   21:20,22
   27:11 33:7

expert   21:16,
   19 45:12,13

expertise
   72:19

explain   8:8
   77:20 78:16

explained
   76:13

exploitation
   62:3 79:4,8

exploited   7:24
   8:3,10,11
   9:7

express   49:11

extra   16:1

_____

**F**
_____

face   36:5,6,
   11,13,20,22
   43:19,23
   51:14,18,19,
   20,23 83:23

facilitator
   19:22

facing   55:17

fact   50:8
   59:11 69:18
   81:20 83:3
   84:16 86:6,
   20 89:6

facts   16:17

factual   54:2

fair   23:18
   24:8 50:6
   70:14

fairly   60:18

false   54:2
   83:3

familiar   37:13
   41:23 54:10
   57:22 76:7
   80:25 81:4,
   5,17,20 84:5
   85:24

federal   6:11
   35:10 41:2,
   23 42:8
   65:14,15,19

female   43:16,
   21 69:19
   74:9,10 75:8

female's   33:2

females   37:2
   57:5 85:18

field   21:9

figured   77:15

file   27:24
   28:10 73:12
   85:1

file-sharing
   27:15

files   26:6,7,
   9,13 28:1,3
   55:2

filters   21:12

find   17:8
   26:19 28:4,
   12 33:4 91:6

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024

finding 49:16

firearms 14:22
15:23 16:1

fish 72:13

Florida 38:11
45:5 76:21

flush 16:9

follow-up
87:14

fooled 69:20,
23

force 6:8,10

forensic 17:14
19:11 20:24
21:7 23:8
26:14 32:11
47:24

forensics
4:19,20 6:19
7:7 22:2
75:17 77:10,
12 79:13
81:11

form 13:4,12,
14 14:7
34:24 39:6,
16 43:9
45:7,16,23
60:22 64:18
65:2,17,25
66:16 68:8,
12 69:15
70:2 73:22
74:13 75:4

78:2 83:21
89:2

formalities
91:17

forum 29:8

forum-based
28:11,18
29:3

forward 85:12

found 50:8

full 35:22
46:3 49:16
82:6,15,19

Full-time 5:2

fumbling 38:9

function 6:19

funding 6:11,
12 78:22
79:1,3,7,12

FWC 72:2,5,12

― G ―

Gainesville
76:18

gangster 15:25

gave 19:5,6
63:8 77:17

generally
18:18

generated 6:23
22:13 23:7

generation
23:15

gentleman
80:13

girl 51:6,8,
16 55:16
83:16,18,22

girl's 37:4
83:15

girls 37:5,7
81:21 84:17,
20

give 6:9 63:6
80:6 87:13

good 21:14
63:24 89:22,
23

Google 8:13
52:15 53:13

Googled 53:9

Googling 81:25

government
6:11 65:14
66:20 84:5,8

grade 69:12

grants 78:22
79:6,11

great 62:7

Green 8:4

Greene 4:3,10
8:3 9:3 13:5
63:2 80:10
87:22 89:24

grooming
74:10,16

guess 6:13
11:18 24:5
37:3 38:11
49:25 50:10,
17 73:25

guessing 76:4

guesstimation
60:5

guilty 38:1

gun 15:18

guys 25:24
34:6 61:12

― H ―

hair 43:17,22
55:18 57:4,6
74:11,20
75:3,8,14,23
86:21

hall 11:22
47:25 48:1

hallway 48:4

handful 60:11

happen 50:15

happened 13:2
24:2 31:13
42:20 46:24
47:9 50:2
89:7

hard 21:15
55:12 57:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                         Index: hash..images

**hash** 58:8,13, 20

**hate** 91:7

**he'll** 90:3,16

**head** 60:4 83:21

**heard** 28:8 81:2

**helped** 19:13

**helpful** 66:13

**helping** 77:13

**helps** 56:14

**Hey** 22:18 24:10 69:12

**highly** 70:15

**Hindsight's** 15:10

**hip** 43:22 57:5

**hips** 33:3,8 34:3

**history** 67:25 68:2 88:7

**hit** 21:13

**hole** 39:22 40:20,22

**home** 25:1,5, 6,8,13

**honestly** 11:15 14:10 41:25 47:20 70:10 71:23 90:6

**hotlines** 8:18

**hour** 62:6

**hours** 11:18

**house** 17:19, 24 18:3 72:10

**human** 56:25

**hundred** 18:14 28:2 60:7 86:23

**hurt** 39:22

**hypothetical** 44:13 45:1 67:19 70:23

**hypothetically** 44:12 61:19

────────────

**I**

────────────

**I-C-A-C** 5:8

**I.D.** 51:10

**ICAC** 5:5,16, 19,24 6:1,3 8:21 11:22 20:7 24:13 26:20,21 52:7 53:4 56:12,17 58:17 62:2 69:8 72:9,16 75:1 77:8,9 78:23 81:10 86:17,25

**ICAT** 41:22

42:2

**ID** 83:14,16, 19,21

**ID's** 51:13 64:3,22 66:21 89:9

**idea** 15:8 52:19 59:22 76:3

**identification** 39:1 62:25 83:24 84:11

**identifications** 84:17

**identified** 17:25 49:3 85:20

**identify** 17:19 30:10 61:22 63:17

**IDS** 66:13 83:8 84:6,8, 12

**illegal** 28:19, 23 29:19 53:17 68:2

**image** 19:18 21:1,11,17, 23 23:7 25:21 27:3 30:12 33:4, 5,7,9,10 34:1,2,18 35:22 36:1,4

38:3,20 43:13,14,15 54:7,12 55:14,23 60:19 61:18, 23 75:18,22 82:3,6,9,15, 19 83:11,14

**image-related** 61:14

**imaged** 28:5 30:4

**images** 10:1,3, 4,5,9,12 17:3 19:16, 22 20:1,20 21:10 22:8 23:2,14 25:24 26:9 27:4 32:20, 23,25 33:19, 21,22 34:14, 17 36:9,12, 17 40:3 44:20 45:4 46:3,14,15 47:4,11,13, 16 48:11,24 50:12 51:11, 17 56:13 58:23 60:13 64:12,16 65:9,24 68:3,6 69:25 70:1 73:9 74:1,4,18 82:11,14

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                     Index: IMEI..Join

84:19 85:5,6

**IMEI** 17:25

**improve** 74:19

**inappropriate**
63:10

**include** 38:22
46:14

**included** 47:2

**indicators**
86:20

**individual**
27:2 40:9
45:14 57:20
59:12 61:22
69:25 70:17
73:20 78:13
82:4

**individual's**
77:24

**individuals**
14:20 26:10
68:4

**infant** 57:3

**inform** 19:16

**information**
8:7,9,12,14,
18 18:23
24:16 28:24
33:18,19
41:6 44:10
55:2 83:4

**Initially**
17:18

**insight** 77:18

**instructing**
35:16

**intelligence**
21:9 23:7

**intentionally**
30:20 38:18

**interest** 17:9
26:4,6,7,23
27:1

**internet** 5:7
8:10,11
47:7,18,23
48:2,19
49:4,16
52:11,12
69:7 83:4,23

**interpret**
68:10

**interview**
11:19 15:1
17:18 23:22,
24

**investigate**
8:17 41:9

**investigated**
8:20 11:16
64:14 88:24

**investigating**
5:11 37:22
77:1,4,7

**investigation**
5:14 6:16,20
11:1 13:1

14:5 16:12
19:23 22:23
23:20 25:9
42:19 43:5
46:11,14
49:11 56:12,
15 59:5
70:25 72:6,
16 80:24
81:3,7

**investigations**
8:21 24:18
26:20 52:7,
10 62:2
68:25 79:7

**investigative**
89:7

**investigator**
5:19 20:8,24
37:11 41:8,
22 42:2 45:2
46:3 56:17
58:17 59:14,
16,18,19
65:8 67:3
69:9 72:16
73:5 75:2
88:24

**investigators**
5:16 43:24
65:15

**involved** 5:14
6:16 29:25
47:9

**involvement**
19:11 23:18

30:6,9 32:7
87:24

**involving**
80:24 81:7

**IPAC** 37:11

**issue** 14:24
15:1 43:13

**issued** 66:21
84:6,8

**issues** 14:22

**items** 26:3

---

**J**

**January** 54:20

**jerk** 11:8

**job** 4:17 20:9
21:14 26:17,
22 68:21

**Johns** 4:12
5:1,19 9:13
13:2 14:4
18:8 20:25
21:21 22:7
31:6 58:16
59:4 60:1
69:5,24 70:7
71:16,20
79:2 90:8

**Join** 13:6
14:8 34:25
39:7,17
43:10 44:17
45:8 64:19
65:3,18

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024          Index: judgment..Madam

66:1,17
68:13 89:3

**judgment**   27:3

---

**K**

---

**Kaitlyan**  31:22

**Kevin**   4:3,10

**keys**   63:6

**kid**   61:13

**kill**   77:14

**killed**   15:14

**kind**   4:19
  6:14 7:19
  9:9 15:5,17
  16:18 19:9
  21:11,13
  23:17 24:18
  33:15 40:18
  42:19 56:14
  57:9,18 71:2
  72:12 76:11
  77:6,17
  78:21 79:17
  82:10 85:16
  86:11 90:7
  91:4

**kinds**   86:13

**Knee**   55:18

**knees**   55:18

**knew**   17:16
  18:11 47:19
  48:6 81:12

**knowing**   38:2

82:25 88:13

**knowingly**
  38:4,18
  39:23

**knowledge**
  21:22 86:4
  87:23 88:6

---

**L**

---

**lab**   4:21,22
  18:5 47:24
  48:2

**lady**  80:13

**laptop**   17:6

**laptops**   19:3

**large**   24:16
  82:13

**lascivious**
  55:11

**late**   5:6
  31:13

**law**   6:13 8:15
  11:13 15:22
  38:1 39:4
  41:2 42:11
  45:5 66:11,
  13 79:20,21,
  24 86:12

**laws**   35:10
  42:3

**Lawshe**   9:13
  10:9 11:2
  12:23 14:6

15:13 16:14
18:6 23:22
30:1 32:20
34:14 36:16
37:14 41:7
42:20 43:7
45:3,14 46:6
47:14 48:20
50:7 51:11
66:6 67:13,
22 71:8
80:25 81:7
87:24

**Lawshe's**   6:16
  17:24 22:9
  23:2,15 25:1
  28:5 48:24
  52:4 89:7

**lawyer**   10:21

**lead**   68:1

**learn**   11:13

**learned**   15:14
  86:25

**legal**   18:20
  40:2 41:4,5
  74:4

**level**   6:9
  57:8

**lieutenant**
  4:24

**lighting**   21:12

**limit**   86:4

**limitations**
  78:17

**lines**   29:14

**locate**   34:1,11
  47:4

**located**   17:24
  25:13

**lock**   63:5

**long**   4:25
  11:15 33:12
  34:1 37:15,
  24

**longer**   14:13
  57:2 77:9

**looked**   22:19,
  20 36:14
  44:1 56:18
  61:3 65:8
  80:4 83:23

**lot**   12:10
  14:19 16:8
  17:22 19:3
  21:7 24:12,
  21 25:5
  27:5,7 28:24
  29:17,20
  30:16,19
  35:21 41:13
  50:2 60:12
  74:1

**lucky**   73:8
  85:5

---

**M**

---

**M-E-T**   81:14

**Madam**   7:23

63:14,19

**made**  16:17
23:20 24:24
27:14 46:5,8
53:22 56:21
67:9 70:19
71:17 72:22
73:12 84:25
85:11

**maintain**  66:12

**make**  17:2
19:9,10,16
20:9 26:12,
17 35:1
38:10 58:10
61:21 62:16
63:17 66:14
67:4,7 85:15

**makes**  64:9

**makeup**  51:6

**making**  16:13
19:25 27:3
47:13 48:7,
19 56:4

**male**  43:17

**males**  57:6

**manipulatable**
70:16

**manipulation**
21:10 71:2

**manipulations**
21:13

**marked**  38:25
62:24

**match**  58:9

**material**  12:3
19:19 37:18
57:11,17
60:21 88:8,
10

**Matt**  13:22
87:11 89:24
90:6 91:3

**matter**  43:7

**matters**  48:16

**maturity**  76:6

**means**  40:5
42:4 54:17
56:24 57:18

**meant**  26:8
32:8

**measure**  77:24

**media**  71:17,
21,22

**meet**  30:19
32:10 70:8
76:10

**meeting**  31:8,
12,18,21
32:19 49:2,
12,19 50:18

**member**  76:17,
20

**members**  80:5

**membership**  6:4

**Messenger**  29:6

**met**  30:17,21
31:5 81:15
87:5

**meta**  64:11

**metart**  81:21
87:23 88:3

**metart.com**
51:25 53:9,
13,16 66:19
81:1,18
82:23 88:7

**metart.com.**
50:19

**mid-2017**  5:7

**mind**  59:20
64:14

**minor**  20:22
33:9,10 40:8
55:8 61:20
63:17 68:20

**minors**  26:13
39:14 68:4,
7,11,17

**minutes**  30:12
34:4,5 71:1

**Missing**  7:24
8:3 9:7

**model**  34:17,
18 35:6,23
36:21,23,24
55:14 61:22
75:3,8

**models**  34:11,
21 35:4

**39**:13 41:2,7
44:12,20
47:5,18 49:3
50:12 51:9,
10 52:8
64:2,6,25
65:10 66:21
69:10 74:9,
10 75:13
81:21 82:24
83:9,12
84:13 88:15

**models'**  83:8

**moment**  72:14

**month**  5:3
60:6,7 61:8

**monthly**  60:3

**months**  48:1
60:9

**morally**  40:12

**morning**  53:11
81:24

**motion**  38:19

**moved**  47:24

**movie**  27:22

**multiple**  28:1
34:7,8 74:15

**muscles**  43:18
57:6

---

**N**

---

**N-C-M-E-C**  9:1

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                                    Index: named..passports

named  30:25

Napster  27:19

narrow  56:14

national  6:9
  7:24 8:2 9:6

NCMEC  7:22
  8:22 9:5,12,
  23 18:20
  53:24 54:3,
  5,7,11,19
  56:6 57:22
  58:1,6,7,10,
  15,16 59:4,
  7,23,25
  60:19 61:3
  62:17

necessarily
  15:22 28:19
  84:19

need-to-know
  56:9

needed  30:10

nefarious
  29:24

nervous  41:14

news  71:24

nice  63:8
  91:3

nominally
  41:23

nonchargeable
  57:13

north  61:13

notation  27:14

note  26:22

notes  13:13
  80:8,20
  84:22

notified  72:6

nude  17:2
  26:9 27:2
  29:16

nudes  29:15

nudity  25:24
  27:7

number  17:25
  55:1 79:3

numbers  82:21

――――――――――――
            O
――――――――――――

oath  88:6

object  13:4,
  12,23 14:7
  34:24 39:6,
  16 43:9
  45:7,16
  64:18 65:2,
  17,25 66:16
  68:12 70:2

objection
  13:14 44:16
  90:18

obvious  26:15
  27:11,12
  57:2 85:6

occasion  85:9,

13 87:2

occasions
  85:18

October  31:13
  47:12 49:13,
  20,21

office  4:12
  5:20 11:22,
  23 14:4 22:8
  25:14 58:17
  59:5 60:1
  63:8 70:7
  71:17,20
  72:8,9 79:2
  90:12,16

officer  11:13
  14:24 15:18,
  22 63:16
  79:21

officers  25:4,
  5

older  40:6
  43:16,17
  88:15

one's  51:14

online  5:11
  8:12

open-ended
  59:23

opened  47:25

operation  69:2

opine  86:1

opinion  16:15,

17 19:17
  20:21 43:4,5
  45:13 65:8

opportunity
  15:4

opposed  15:2
  33:6

order  38:1
  39:11,12
  40:8 90:21,
  23

organizations
  79:6

original  13:20
  29:9,12
  51:19 64:12

overly  26:15

oversees  4:24

owns  15:18

――――――――――――
            P
――――――――――――

part  6:2,3,10
  27:7 38:21
  47:2 69:2,8
  81:15

parts  68:25

pass  50:16
  69:6

passed  8:16,19

passport  51:16
  83:12,16,19

passports

Case 3:24-cv-00137-MMH-LLL    Document 98-13    Filed 12/15/25    Page 39 of 46 PageID
2178
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Kevin Greene on 12/17/2024                                    Index: past..portion

44:20 50:13
83:8,24
84:5,9,12,16

past   5:18
20:8

patience   84:23

paygrade   79:11

Payne   31:22
32:22

PDF   90:25
91:14

PDFS   91:5

pectoral   43:18
57:6

pediatrician
72:20 76:10,
13

peer-to-peer
27:18

people   4:22
8:19 14:21
17:22 24:21
27:21,25
28:2 29:4,9,
15 30:19
32:10,13
40:21 41:13,
16 60:11
68:17 72:24
77:7 85:11
86:1,16

percent   18:14
86:23

Perfect   90:18

performance
38:13

performed   6:19

person   8:10,11
24:19 27:4
38:17 39:12
40:18 56:25
65:9,12
69:25 73:13
85:1,10

personal   7:14
71:14

personally
79:22

perspective
13:3

phone   7:14
11:25 16:10,
20,23 17:3,
24 18:4
19:13 25:21
30:4 72:10

phones   7:13

photo   51:13
64:6 82:5,20
89:9,19

photograph
38:19 78:14

photographs
51:10 64:22
65:11 69:1
70:15 74:23
84:14 86:2

89:12,13

photos   51:6,17

phrased   26:4
84:25

physically
57:1

physician
45:13

pick   17:19
72:10

picture   27:1
35:23 37:5
38:19 49:16
51:4,19 58:9
73:21

pictures   18:1,
3 25:13
29:11,16
50:12,20
66:23 69:16
76:12 81:8,
11 83:17

Pierce   12:12,
13 31:6,20,
23 32:21,24
35:12 42:6
43:3 49:13,
20 50:17

pit   40:22

place   14:25
24:14 81:13
86:17

places   28:16

Plaintiff   4:4

plaintiff's
38:25 62:24

platform   27:25
28:14

play   21:11

point   7:15
18:9 20:8
39:21 47:22
49:6 50:7,11
53:14 62:2

pointed   59:10

policy   72:24

porn   58:22

pornographic
17:2 26:9
27:3 28:20
33:10 40:3
67:25 74:1

pornography
5:15 17:10
20:11 25:10,
25 27:12
29:1 36:17
37:23 39:5
46:6 57:23
58:1,7,10,
12,15,18,20
59:1,6,7
60:15,21
72:17 73:10
74:5 77:2,5
79:4 85:6

portion   33:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: position..question

63:22

position   64:25
  65:4

positive   56:6

possess   38:18
  40:2 45:4

possession
  5:15 10:9
  17:5,9,13
  19:18 20:11
  25:10 33:9
  36:17 37:17,
  23 38:2,4
  39:4,24 46:6
  47:13 60:20
  64:15 72:17
  77:2,4

possibility
  48:9

post   29:8,9,
  11,12,15,16

posted   65:23

posts   29:14

potential   15:4
  43:15

potentially
  27:2

practice   74:10
  85:25

preparation
  7:3 9:17
  10:6,17,18
  54:23

prepubescent
  55:8,15,21
  59:12 75:3,
  9,14

present   10:4
  31:6,7,17
  55:19

presentation
  38:21

prestige   79:19

Preston   9:22
  18:24 19:22
  20:14 22:7
  23:1 30:6
  31:25 47:11
  48:18 49:10
  50:22 53:13
  68:19 70:1,8
  71:9 89:25

pretended   70:9

pretending
  68:7,10,17

pretends   68:19

previously
  12:7

print   35:12,
  16

printer   11:5

prior   18:6
  19:17 47:13
  48:19 52:4
  72:6 80:24
  81:6

probable   19:18
  20:1,9,10
  43:6,12
  44:2,3

problems   18:24

PROCEEDINGS
  4:1

process   10:23
  15:3 18:5,20

product   23:15

programs   25:24

property   54:3

protect   62:3

Protection
  76:21

provide   6:7,12

provided   10:1
  66:24 89:14,
  17

providers   8:13

puberty   57:1,4
  77:25

pubic   43:17,
  22 55:18
  57:4,6 74:11
  75:3,8,13,23
  86:21

public   28:25
  41:1 55:24
  56:2,3

publicly   56:4

published

61:20 83:4

publishers
  66:12

publishing
  53:17

purport   66:20
  84:17

purported
  84:12

purposes   57:10

purview   5:16

put   27:25
  62:22 63:5
  81:25

Putnam   76:25

putting   68:25

───────────

Q

quarter   59:25

question
  13:13,15,17,
  20,23 15:16
  22:6 23:11
  34:22 49:7
  52:3 59:19,
  23 61:17
  63:19 64:3,
  14 66:21
  68:3 71:6
  73:18 75:10,
  19 84:14,24
  85:2,8 88:5,
  20

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                     Index: questions..report

| | | | |
|---|---|---|---|
| questions | 56:10 | record  4:9 | relation  81:18 |
| 10:22 37:19 | realize  11:12 | 13:13 30:17 | 85:8 |
| 80:11,14,17 | 24:7 | 34:13 62:13, | relevant  17:9 |
| 87:12 88:13, | | 14 63:23 | rely  59:7 |
| 16 89:21 | reason  16:22 | 66:25 89:8 | remember |
| 90:1 | 31:14 45:3 | 91:15 | 12:11,12,16, |
| quick  80:7 | 56:10 72:23 | records  42:11 | 19 17:21 |
| quicker  28:3 | reasonable | 88:25 89:12 | 18:2,14 23:5 |
| 56:16 | 46:13 65:9, | Reddit  29:8 | 27:19 29:10 |
| quickly  54:25 | 12 | redirect | 31:19,20 |
| quota  79:16, | recall  12:8,9 | 87:16,20 | 32:4,5,13 |
| 18 | 18:15 20:23 | reference | 34:4 35:11, |
| quote  67:23 | 22:11 23:13 | 33:23 67:9 | 14,15,17 |
| | 25:6 26:5 | referenced | 36:6,7,14 |
| ――――――― | 31:10,17 | 46:15 72:15 | 37:20 49:15, |
| R | 32:15,19 | referred  8:22 | 17 50:4,5, |
| | 35:19 36:1,4 | 18:7 76:24 | 10,25 51:2, |
| rabbit  39:22 | 41:20 42:9 | referring  7:22 | 14,23 52:13 |
| raise  59:19 | 52:17,21 | 8:6 9:6,12, | 53:21 54:4 |
| 64:13 | 53:15 54:6, | 25 | 67:11 76:19 |
| raised  43:5 | 16 67:1 | refers  81:21 | 82:10,19 |
| ran  25:23 | 75:5,19 | refresh  39:3,9 | 83:13,20,22 |
| range  86:22 | 78:25 81:13 | regard  54:4 | 84:3,4 85:2 |
| ranges  86:1 | 83:14,15 | regular  60:19 | remembered |
| rating  76:6 | 85:15 87:24 | 74:10,22 | 53:3 |
| read  7:19 | 88:1,2,16,19 | regularly | remote  91:16 |
| 37:15 38:13, | receive  60:2 | 48:13,18 | remove  75:23 |
| 16,22 52:5, | 79:3,7 | 56:18 | repeat  13:16 |
| 6,11,12 | received  9:13 | related  8:9 | report  6:23 |
| 55:2,6 56:8 | recently  76:10 | 22:8 23:2,14 | 7:6,20,22 |
| 63:23 90:3, | 86:8 90:15 | 26:20 28:19 | 9:11 22:13 |
| 17 | recess  80:9 | 33:19 60:25 | 26:3,5 53:24 |
| readily  41:8 | recollection | 78:23 | 54:5,7,11, |
| realistically | 12:18 20:14 | | 19,22 57:25 |
| | 22:25 33:16 | | 58:1,11,15 |
| | 39:3,9 | | |

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                Index: reporter..section

59:4,8,11
60:19 61:3
62:17

**reporter** 7:23
9:1 11:4,11
35:2 57:16
62:15,21
63:14,19,21
90:20 91:2,
8,11

**reporting**
58:5,6,8

**reports** 7:7,9,
10,11,13
56:8,11
59:23,25
60:1 75:25

**represent** 35:3
89:25

**representation**
38:20

**representations**
46:4

**represented**
34:21 35:5
41:7 90:7

**reputation**
71:14

**requested** 9:23
63:22

**requesting**
18:22

**required** 66:12

**requirements**
41:24

**requires** 38:1
42:11

**respond** 29:9

**response** 29:12
53:9

**responsible**
19:25

**result** 6:23
22:17

**return** 9:19,22
10:2 18:8,12
19:1,14
20:15,18
48:11

**returned** 89:8

**revealed** 26:3

**review** 7:2,5,
17 10:1,12
12:4 18:23
19:6 22:8
52:16 56:11

**reviewed** 7:12
9:10,14,16,
18,20,21
10:19 12:2,3
14:2,3 19:16
36:9 53:24
54:6,22

**reviewing** 7:16
12:22 32:20

**rid** 16:7

**Roberts** 4:8
7:23 8:1,25
9:2 13:18,22
14:1,14
35:1,7 39:2,
8 40:1 44:5,
8,18 45:9,17
46:1 61:1
62:5,9,14,22
63:1,14,24
64:1,20
65:6,21
66:3,18
68:9,15
69:17 70:5
73:24 74:14
75:6 78:3
80:10,13
82:2,22
84:24 87:11,
14,18,21
89:5,21
90:2,4,6,14,
18,20,23
91:3

**room** 23:22,24
47:3

**RU** 41:15

**ruined** 71:12,
14

**rules** 63:11

**run** 49:25

**running** 19:2

**rush** 15:19

**rushed** 14:11

15:2

___

**S**

**safely** 15:1

**safety** 14:22,
24 15:19,21

**Samsung** 16:19
17:12 18:12
25:20

**Santiago** 30:25
31:2

**satisfied**
64:5,12

**scale** 76:4,6,
8 78:18
85:24 86:8,
14,20

**scanned** 7:18

**scope** 56:14

**screenshot**
51:22 82:8,
20

**search** 9:19
18:22 19:1
20:17,18
30:9,11
67:12,18,25
68:1 91:4

**searching**
67:10,23

**second-guess**
46:12

**section** 37:3,

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                    Index: send..start

17

**send**  26:23
  29:15 90:25

**sending**  16:4
  26:21

**separately**
  30:18

**service**  8:13
  28:11

**seventh**  69:12

**sexual**  19:19
  37:18 38:12,
  22 57:11,17
  62:3 76:6
  79:4,8 88:8,
  10

**share**  8:8,15
  27:22 28:1,
  2,3 38:10

**shared**  62:19

**sharing**  27:19
  28:10,20

**sheriff's**  4:12
  5:20 14:4
  22:7 58:17
  59:5 60:1
  70:7 71:16,
  20 79:2
  90:12,16

**Shevlin**  13:6,
  12 14:8
  34:25 39:7,
  17 43:10
  44:16 45:8,

23 60:22
62:7,11
64:19 65:3,
18 66:1,17
68:13 73:22
74:13 75:4
78:2 80:17,
20,23 87:7,
17,22 88:13
89:2,22,23
90:22 91:12,
13

**shoot**  89:19

**shoots**  64:6

**shot**  15:14

**show**  18:3
  23:9 36:20
  37:1 38:19
  84:18

**showed**  36:13,
  22 37:4
  50:23 82:4

**showing**  54:19

**shown**  28:15

**shows**  33:2,8

**signature**
  91:17

**signs**  75:13

**similar**  23:10
  27:21 29:8,
  13 76:11,12
  87:4

**simple**  50:8

**simplest**  90:25

**simply**  26:8

**sir**  6:18 13:9
  25:3 28:7
  54:21 72:18

**sit**  4:18 64:5

**site**  29:5

**sites**  67:25

**sitting**  49:8

**situations**
  86:13

**sketchy**  41:11

**skin**  74:20

**skip**  78:22

**slowed**  15:6
  16:12

**slowing**  15:3

**small**  19:2
  57:3

**society**  74:23

**solely**  75:2

**sort**  15:18
  19:10,21
  28:13,16
  67:7 76:7

**sounded**  82:3

**sounds**  57:19
  62:7

**source**  52:9
  88:2

**speak**  10:21

87:2

**special**  5:22,
  24 6:2,12

**specialist**
  26:14 75:17

**specialized**
  6:13

**specialty**  6:6

**specific**  14:16
  42:24

**specifically**
  20:19 60:25
  66:6

**spot**  40:25
  41:3 90:11

**spots**  40:23

**squint**  38:16

**St**  4:12 5:1,
  19 9:13 13:2
  14:4 18:8
  20:25 21:21
  22:7 31:6
  58:16 59:4
  60:1 69:5,24
  70:7 71:16,
  20 79:2 90:8

**stages**  77:25
  78:7

**staging**  77:18,
  21

**stands**  55:8
  81:15

**start**  12:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                    Index: started..things

started  12:21
  18:5

starting  43:21
  57:7

state  4:9 6:9
  31:7,22
  35:15 42:7,
  16 43:3
  49:14 50:20,
  21 76:24
  77:10

stated  68:4

statement  83:1

statements
  54:2

States  40:3

stating  88:6

statute  37:13
  38:6,11 42:8
  62:18 65:16,
  20,22

step  73:5

stone  77:15

stood  30:10

strictly  19:21

stuff  23:9
  28:22 33:15
  40:18,23
  41:17 56:15
  57:7 63:8
  67:15 70:23
  77:14,15

subject  35:23

54:7,12

subpoena  10:2
  18:8,12,19,
  22 19:14
  20:15,18
  48:11

Subsection
  37:17 38:12,
  15

success  69:19

successfully
  25:21 69:20

suggest  90:2

suing  71:8

supervisor
  4:20 72:2,7,
  11

supposed  43:24

surprise  81:23

suspects  15:4

SVU  5:23 20:7

SWAT  16:4

sworn  4:4

Synchronoss
  18:9,21 19:1
  24:1,4 58:6

system  56:4

―――――――――
          T
―――――――――

taking  64:24
  65:4 77:13

talk  9:15
  16:19 17:12
  29:4 63:11

talked  61:15
  72:14 75:16
  78:21 87:5

talking  9:21
  15:20 25:20
  29:1 32:8
  34:2 36:1,7
  49:8 62:15
  66:5 72:9
  82:5 86:2,7

tangent  9:10

Tanner  76:4,6,
  7 77:18,20
  78:7,18
  85:24 86:8,
  14,19

task  6:8,10

taught  86:25

team  16:4
  20:4 76:21
  89:8

tech  19:21

technical
  24:10 48:19

technically
  39:23 44:3

teenage  43:16

teenagers
  86:22

teens  39:20

67:12,19,23
  81:18,21

telling  44:10
  53:21

ten  52:17

tend  15:2

term  27:12
  28:8 56:22
  81:17

terms  67:11,
  13 69:22
  70:16

test  77:23

testicles  57:6

testified  4:4
  17:1 24:25
  25:12 48:13
  88:1

testimony
  67:10

themself
  40:19,21

theoretically
  40:17

thighs  33:3
  82:4,7

thing  15:24
  19:10 29:13
  42:17,19
  76:7

things  14:12,
  23,24 15:2,
  5,10 24:22

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024        Index: thinking..understanding

25:25 27:16
28:9,16
35:19 42:21,
23 62:19
73:17 74:19
79:13

**thinking**  31:21

**thought**  32:8
61:16

**throw**  16:8

**thumbnail**
82:13

**tickets**  79:16

**time**  6:1
10:21 13:11
14:10,12,17
16:13 17:14
19:2 23:19,
21,25 25:8
31:5 37:15,
24 40:20
42:18 47:9
48:3 52:22
53:14 54:23
62:10 64:6
65:10 70:13
83:5 86:17
87:8

**timeframe**
31:15 59:24

**timeline**  18:16

**times**  30:20
41:13 61:2

**tinker**  21:11

**tinkered**  22:22

**tinkering**
21:16

**tiny**  76:14

**tip**  7:22 8:19
9:12,23
18:19 59:15,
20,25

**tips**  8:15
60:15,24

**tissue**  43:18

**title**  4:17

**today**  4:17
5:13 10:13,
16,17,23
22:25 64:5
86:3

**today's**  7:3
9:17 10:6
12:4 54:23

**toddler**  26:16
57:3

**toilet**  16:8

**told**  49:15
50:9 78:10

**tool**  21:4
67:3

**tools**  21:6,8
23:8 65:15

**top**  33:3 60:4
83:20

**totally**  32:16

**touched**  74:19,
23 75:18

**track**  70:12

**trained**  37:22
41:22

**training**  6:7,
12,13 38:1
39:4,15
86:12

**treat**  79:24,
25 80:2,3,4

**trick**  37:21

**trouble**  19:3

**true**  59:13
83:1 88:19,
22

**turn**  14:23

**turned**  30:5

**TV**  71:24

**Twenty**  34:4

**type**  21:4
26:19 27:18
33:23 42:15,
16 74:11
82:9 83:13
86:12

**types**  74:15

**typing**  33:15

_____

**U**

_____

**UC**  69:2

**UF**  76:21

**Uh-huh**  11:17
31:11 35:25
37:12 38:14
44:22 61:24
80:19 85:7
87:25 88:21

**Ukraine**  52:8
84:1,6,9

**Ukrainian**
51:16

**unconfirmed**
57:23 58:1,
8,15 59:4

**undercover**
48:2 69:2

**understand**
4:11 5:4
6:15,20 8:23
13:23 17:6,
15 18:13
19:10 20:16
25:2,9 26:8
30:21 31:4
32:15 33:13
34:6,13
37:25 40:5,8
42:1,3 43:4
44:13 58:14
59:3 71:8,
11,19 72:25
89:6

**understanding**
18:7 39:14
66:19 72:19

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Kevin Greene on 12/17/2024                                    Index: unit..young

86:19

unit   5:22  6:2
  8:21  15:7
  24:13  69:5
  77:8,9

United   40:3

unlawful   38:17

unusual   33:7,
  11

upload   27:24

uploaded   55:2

———————————

            V

———————————

vagina   33:6,8
  35:24  37:4
  82:4  83:15

vaginal   34:3

values   58:9,
  13,20

verbatim   13:24

verification
  35:10  41:24
  65:16,19
  82:24  85:17
  88:16

verified   41:2

verify   83:20
  88:19

verifying
  84:13

Verizon   7:18,
  21  9:11,18,

23  18:9

victims   5:22,
  24  6:2
  85:19,20

videos   21:10
  29:12  56:13
  58:24  81:12

view   38:18
  64:2  83:11

viewed   42:6
  49:3  65:23
  83:25  88:15

viewing   43:2
  59:14

viruses   41:16

visible   75:13

visited   53:8

visiting   46:14

———————————

            W

———————————

waived   91:18

walked   48:4

wanted   32:24

wanting   79:15
  82:14

warrant   9:19
  16:2  18:22
  19:1  20:17,
  18

watermark
  32:23

ways   21:5,11

web   28:8,16,
  17  82:8

website   28:25
  29:17  33:19,
  23  34:2
  41:1,5  42:11
  46:4,5  51:22
  61:16  80:25
  82:12,18
  87:23  88:25

websites   28:18
  32:24,25
  33:15  34:7,
  10,11,20,21
  35:3,6,8,9
  41:10,18
  42:6  43:2
  44:10  46:15
  48:23  65:23
  88:14

weekly   60:3

weird   61:12
  90:11

Weiss   30:22
  31:5,23

wet   16:10

wildlife   72:13

word   55:12
  57:15  82:9,
  10  91:4

work   5:5,23
  6:14,24  7:14
  16:23  17:6

18:19  22:13
  26:13  30:13
  42:15  79:18

worked   77:11

working   81:10

worry   14:20,
  22  41:16

worse   80:4

Wow   22:21

write   11:11
  26:6  79:6,
  10,11,16

wrong   40:12

———————————

            Y

———————————

y'all   86:14

Yahoo   29:6

year   40:12
  49:23,25
  52:7  66:8
  69:6,7,19
  70:1,9,19,20

years   5:2,3
  40:6  44:12
  49:25  52:8,
  17  56:19
  68:23

young   39:20
  67:12,19,23
  73:11