```
 1              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                JACKSONVILLE DIVISION

 3
                       CASE NO.:  3:24-cv-00044-MMH-MCR
 4

 5    WILLIAM LEE LAWSHE,
      an individual,
 6
          Plaintiff,
 7
      vs.
 8
      MIKAYLA PRESTON,
 9    in her individual capacity
      as a Detective for St. Johns
10    County Sheriff's office
      and KATHLEEN DULLY, in her
11    individual capacity as
      medical director of the UF
12    Child Protection Team,

13        Defendants.
                              /
14

15
      ZOOM VIDEOTAPED DEPOSITION OF:  KATHLEEN DULLY,
16                                    M.D.

17    DATE:          April 28, 2025

18    TIME:          10:00 a.m. - 12:26 p.m.

19    LOCATION:   Via Zoom

20    REPORTED BY:  LISA K. PENKACIK, RMR

21

22

23

24

25
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 2

```
1  A P P E A R A N C E S :
2
3       MICHAEL K. ROBERTS, ESQUIRE
        Law Offices of Nooney, Roberts
        Hewett and Nowicki
4       1680 Emerson Street
        Jacksonville, Fl  32207
5       mroberts@nrhnlaw.com
           On behalf of the Plaintiff.
6
7       AMY SHEVLIN, ESQUIRE
8       Buchanan & Buchanan, P.A.
        1900 SE 18th Avenue
9       Suite 300
        Ocala, FL 34471-8237
10      ashevlin@rbtrial.com
           On behalf of the Defendant Kathleen Dully,
11      M.D.
12
        MATTHEW CARSON, ESQUIRE
13      Sniffen & Spellman, P.A.
        123 N Monroe Street
14      Tallahassee, FL 32301-1509
        mcarson@sniffenlaw.com
15
           On behalf of Defendant Mikayla Preston.
16
17   ALSO PRESENT:  Danny Holguin, videographer
                    Shayne A. Thomas, Esquire
18                  (University of Florida)
                    Autumn Zepf, paralegal
19
20
21
22
23
24
25
```

Page 3

```
1                    I N D E X
2
     TESTIMONY OF:  KATHLEEN DULLY, M.D.
3
     DIRECT EXAMINATION by Mr. Roberts . . . . . . 4
4
     CERTIFICATE OF OATH . . . . . . . . . . . . 87
5    CERTIFICATE OF REPORTER . . . . . . . . . . 88
6    ERRATA SHEET. . . . . . . . . . . . . . . . 89
     PLAINTIFF'S EXHIBITS:
8    1 (Articles). . . . . . . . . . . . . . . . 85
     2 (Dr. Krugman's report). . . . . . . . . . 85
9    3 (Demonstrative image) . . . . . . . . . . 85
     4 (Dr. Dully's letters) . . . . . . . . . . 85
10
11
12
13
14
15          S T I P U L A T I O N S
16       It is hereby stipulated and agreed by and
17   between counsel for the respective parties and the
18   deponent that the reading and signing of the
19   deposition be reserved.
20
21
22
23
24
25
```

Page 4

```
1                  P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Good morning, this is
3    the beginning of media one in the deposition of
4    Dr. Kathleen Dully in the matter of William Lee
5    Lawshe versus Mikayla Preston, case number
6    3:24-cv-00044-MMH.  Today's date is April 28,
7    2025 and the time is 10:01 a.m.  My name is Danny
8    Holguin.  I am the videographer.  The court
9    reporter is Lisa Penkacik.  We are here with
10   Huseby Global Litigation.
11       Counsel please introduce yourselves after
12   which the court reporter will swear in the
13   witness.  Thank you.
14       MR. ROBERTS:  Michael Roberts for the
15   plaintiff, Mr. Lawshe.
16       MS. SHEVLIN:  Amy Shevlin on behalf of Dr.
17   Dully.
18       MR. CARSON:  Matt Carson representing
19   Detective Preston.
20            KATHLEEN DULLY, M.D.,
21   having been first duly sworn by the reporter,
22   thereupon testified upon her oath as follows:
23       THE WITNESS:  I do.
24            DIRECT EXAMINATION
25   BY MR. ROBERTS:
```

Page 5

```
1        Q.  Okay.  Dr. Dully, I introduced myself a
2    little bit earlier, my name is Michael Roberts, I'm
3    here to ask some questions today.  I assume -- you've
4    had your deposition taken before?
5        A.  Yes, but never as a defendant, but, yes.
6        Q.  Okay.  You've had it taken as an expert
7    witness?
8        A.  Yes.
9        Q.  Well, a deposition is a deposition, same
10   ground rules apply, you're under oath, and I'll be
11   asking you questions.  At any time if you don't
12   understand a question that I've asked you, please let
13   me know and I'll try to rephrase it.  I don't have a
14   script that I'm going from, so it's probable that I
15   will ask a bad question, so don't hesitate to
16   question me if you don't understand.  Also, there is
17   a court reporter who is trying to take down
18   everything that we say, question and answer, so we'll
19   just try to be mindful of the job that she's trying
20   to do and not speak over one another; sometimes
21   that's difficult for me and sometimes it's difficult
22   for witnesses.  So we'll do the best we can.  But the
23   last thing that I'll say is, a lot of times we'll
24   speak colloquially, we'll say uh-huh or uh-huh or
25   they'll be a nod of the head, I'll ask for a verbal
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 6

1  response, if I catch it, just because the court
2  reporter will not be able to describe un-huh, uh-huh,
3  I'll know what you mean by a nod of the head, but she
4  can't write that down so...
5      A.    Thanks.
6      Q.    With that, can you just state your full
7  name for the record?
8      A.    Kathleen Mary Dully, D-u-l-l-y.
9      Q.    And where are you currently employed?
10     A.    The University of Florida College of
11 Medicine in Jacksonville.
12     Q.    And I understand you work for the Child
13 Protection Team?
14     A.    Yes, I'm the medical director of the Child
15 Protection Team for the University of Florida.
16     Q.    And what does that mean; what is a medical
17 director of the Child Protection Team?
18     A.    I supervise the medical care that we
19 deliver on a case by case basis and solve problems
20 and help hire people, essentially.
21     Q.    And just for those who may not know, what
22 is the Child Protection Team?
23     A.    The Child Protection Team is the body of
24 experts that consults for DCF usually and sometimes
25 law enforcement as well on suspected or advertised

Page 7

1  child maltreatment cases.  And offers them
2  determinations on the likelihood of abuse or that it
3  is not abuse.  We cover the eight counties -- this
4  Child Protection Team covers the eight northeast
5  counties of Florida.
6      Q.    What is -- well, what is your training and
7  background?
8      A.    So in 1981 I graduated from Cornell
9  University College of Arts and Sciences, in Ithaca,
10 New York with a Bachelor of Arts and I graduated with
11 distinction in all subjects and Cum Laude.  In 1986,
12 I graduated from the F. Edward Hebert, H-e-b-e-r-t
13 School of Medicine in Bethesda, Maryland, which is
14 Fed Med or the military medical school.
15         And from there I went to pediatric
16 internship followed by residency training at Naval
17 Hospital Oakland, California from 1986 through 1989.
18 In 1989, I was transferred to my first duty station
19 as a pediatrician, and that was here at Naval Air
20 Station Jacksonville, Florida where I served for two
21 years.  I was assigned to be the Chair of the Child
22 Abuse Case Review Committee here at this military
23 region Navy Marine Corps while I was there.
24         At the time the only training that was
25 available was in the conference format, so although I

Page 8

1  had seen and cared for children of possible child
2  maltreatment before, I had only learned about it as a
3  resident and on the job training is what that is and
4  by reading and studying the cases in the medical
5  literature.
6          Then in 1990 the Navy sent me to my first
7  child abuse conference in January in San Diego,
8  California, which was the child maltreatment
9  conference that is offered by what is called now Navy
10 Children's Hospital in San Diego and the American
11 Academy of Pediatrics and the American Professional
12 Society of Abusive Children.  The conference format
13 for many years was all that was available in terms of
14 getting additional medical training and consultation
15 and so I continued to pursue that all the time every
16 year, and then in 1980 -- sorry, during Desert
17 Shield.  1991, the Navy moved me to Naval Medical
18 Center San Diego.
19          In San Diego they made me in charge because
20 I had the training, child abuse case review,
21 subcommittees for physical abuse, sexual abuse and
22 something they called the multi-problem family unit.
23 And those I was the Chair, but actually functioned as
24 the medical consultant to a team of people doing case
25 reviews for military commanders.

Page 9

1          In 1993, there was some ability to propose
2  to the military that specialized fellowships could be
3  developed, and were slowly becoming available, and in
4  1994 the Navy sent me to the Chadwick Center for
5  Children & Families, which was Rady Children's
6  Hospital for a year of fellowship.  And there I was
7  able to see cases under supervision of people who had
8  been working in the field for 30 and more years, and
9  do the medical assessments on suspected child
10 maltreatment cases, as well as that which is not.  So
11 that was a specialized opportunity.
12          When I finished that in 1994, the Navy
13 moved me to the Naval Hospital Camp Pendleton,
14 California, and there I was again the medical
15 consultant for the child abuse case review committee
16 for Marine Corps Commanders and then I was also the
17 domestic violence consultant for their domestic
18 violence case review committees.
19          In all of this time I had served as faculty
20 and am a teacher for medical residents and positions
21 in training at all levels in child maltreatment, be
22 it radiology or orthopedics, or OB/GYN or pediatrics,
23 of course, and emergency medicine.
24          And after 1994 when I finished the
25 fellowship, my additional training went back to

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 10

1 conferences and continuing medical education and then
2 I was able -- though I had passed the general
3 pediatric specialty boards in 1989, the first child
4 abuse specialty board became available in 2009 and I
5 was grandmothered into the field with about 200
6 others, and I was able to sit for and pass that
7 EXAMINATION in 2009 to be a board certified
8 specialist in child abuse pediatrics.
9      Q.   Very good.  Thank you for that.
10          So currently at the Child Protection Team,
11 do you -- do you see -- do you have patients; do you
12 form a patient -- a doctor/patient relationship with
13 the people that you examine?
14      A.   On a case by case basis, yes.
15      Q.   And tell me, what do you mean by that?
16      A.   So I am consultant.  I don't become the
17 child's pediatrician, but I consult for DCF and law
18 enforcement and the hospitals and so I have a time of
19 a doctor/patient relationship, but the relationship
20 goes back to the primary care pediatrician.
21      Q.   In the time that you consult, do you -- do
22 you agree that you have to practice within the
23 standard of applicable care, medical care?
24      A.   Yes.
25          MS. SHEVLIN:  Form.

Page 11

1      Q.   And so this child abuse board
2 certification, is that a medical/legal certification?
3          MS. SHEVLIN:  Form.
4      A.   It's a medical from -- administered by the
5 American Board of Pediatrics.
6      Q.   Is there a legal component to it?
7          MS. SHEVLIN:  Form.
8      A.   No.
9      Q.   Okay.  All right.  Is part of that
10 curriculum designed to help you interface with law
11 enforcement or DCF?
12          MS. SHEVLIN:  Form.
13      A.   Not in any direct way, no.  Of course you
14 have to be able to do that.
15      Q.   Do you understand that the child abuse --
16 that the purpose of the child abuse certification is
17 to aid DCF and law enforcement in investigations?
18          MS. SHEVLIN:  Form.
19      A.   That is not the purpose, that is one of the
20 practice points, I would say yes, but it is to take
21 care of kids and try to stop whatever is going on,
22 if, in fact, something is going on.
23      Q.   Okay.  Well, what do you mean by "trying to
24 stop something that's going on"?
25      A.   If there is child maltreatment going on,

Page 12

1 sometimes it can be stopped and then the child can
2 have a more normal life.
3      Q.   Do doctors stop that?
4          MS. SHEVLIN:  Form, speculation.
5      Q.   Well, let me ask you a better way.
6          As a doctor, are you trained in your -- in
7 your child abuse specialty, are you trained to stop
8 child abuse in a home setting?
9          MS. SHEVLIN:  Form.
10          You can answer, Dr. Dully.  I'm laying a
11 record.  Unless I tell you not to answer a
12 question, just go ahead and answer to the best of
13 your ability if you understand the question, I'm
14 just making some objections for the record.
15      A.   I was missing those completely.  I'm sorry,
16 I didn't understand.
17          MS. SHEVLIN:  That's okay.  I just objected
18 to form.  If you understood the question and you
19 can answer, you can go ahead and answer.
20      A.   I have no ability to stop it, but by
21 helping to assess the evidence that is present that
22 may contribute to stopping it.
23      Q.   Okay.  So who -- who stops it?  As a
24 medical doctor, what are you talking about?
25          MS. SHEVLIN:  Form.

Page 13

1      A.   The community, which involves responsible
2 investigators and agencies.
3      Q.   So is it not a fair statement to say that
4 the child abuse board -- like that training exist to
5 provide expertise to determine what is and what is
6 not child abuse?
7          MS. SHEVLIN:  Form.
8      A.   There is various levels of certainty, but
9 at one end of the spectrum, it may not be child abuse
10 and at the other end of the spectrum, it may only be
11 child abuse.
12      Q.   Right.  But to treat the condition or the
13 injury, you were qualified to treat injuries or
14 illnesses as a pediatrician without the child abuse
15 specialty; do I understand that correctly?
16          MS. SHEVLIN:  Form.
17      A.   I think I do, as a general pediatrician, I
18 take care of kids.
19      Q.   Right.  So the only -- what I'm trying to
20 get at, the child abuse specialty is really solely
21 aimed at the distinction or you making a distinction
22 between what may or may not constitute abuse,
23 correct?
24          MS. SHEVLIN:  Form, mischaracterization of
25 her prior testimony.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 14

1    A.   There are things that look like child abuse
2 that are not and I'm consulted in those and there are
3 things where we can't say for sure, and there are
4 things that are child abuse and not something else.
5 And that is part of the determination and diagnostic
6 process.
7    Q.   And that, grappling with those decisions,
8 that is the job of a child abuse specialist, correct?
9         MS. SHEVLIN:  Form.
10    A.   That is what we do in the medical case,
11 yes.
12    Q.   And that's what I'm getting at, right.  I
13 understand that you're a pediatrician, but the board
14 certification specifically regarding child abuse,
15 that is what gives you the purported expertise of
16 making a determination or an opinion about whether
17 something is or is not child abuse; is that a fair
18 characterization of what that specialty is?
19         MS. SHEVLIN:  Form.
20    A.   The board certification is a board
21 certification and I passed it because of a lot of
22 other things, and so there's training, experience,
23 literature and the years that go by and the things
24 that children and parents have taught me.  So it
25 doesn't distill down to an exam or a -- yes or no

Page 15

1 determination.
2    Q.   And I am sorry if you took that question as
3 being like what the test entails.  What I'm trying to
4 understand, and I'll just ask you the question.
5         What does it mean to be a child abuse -- do
6 you consider you to be an expert on child abuse
7 medicine?
8         MS. SHEVLIN:  Form.
9    A.   -- abuse pediatrics.
10    Q.   What does that mean?
11    A.   That is what the board -- American Board of
12 Pediatrics decided to call it, and it is a specialty
13 where we can see the children and put the time in,
14 and whatever else is required to help determine how
15 correct that concern may be or not.
16    Q.   And when you say concern, you're talking
17 about abuse?
18    A.   Yes.
19    Q.   Concern for abuse, correct?
20    A.   So people report things and then I am in a
21 position if there are medical concerns to bring those
22 to bear on what they reported to help decide if they
23 could be right or not right or we cannot say for
24 sure.
25    Q.   And so how long have you been with the

Page 16

1 University of Florida?
2    A.   10 and a half years now.
3    Q.   And other than the Navy is the University
4 of Florida the only other employer that you had in
5 your career?
6    A.   No.  I also did the same work as a child
7 abuse pediatrician and sex assault examiner for the
8 Rady Children's Hospital before I came here.  There I
9 was not medical director, and there, technically, I
10 worked for their specialty group, not necessary --
11 not for the center -- not for the hospital.  Although
12 those are the patients that I saw.
13    Q.   Do you -- and I'm going to use the term
14 "moonlight"; do you know what that means?
15    A.   Yes.
16    Q.   Have you moonlighted anywhere else as a
17 pediatrician or anything like that?
18         MS. SHEVLIN:  Form.
19    A.   When I was active duty military, my work
20 for Rady Children's, Chadwick Center for Children &
21 Families as a child abuse pediatrician and sex
22 assault examiner, that was considered moonlighting
23 through 2006 and I retired upon my return from Iraq.
24 The moonlighting after that, I did not do or need to
25 do because I was able to work continuously in my

Page 17

1 specialty.
2    Q.   So how many physicians currently work for
3 your department that you're a medical director of?
4    A.   In the division, there are three of us and
5 all three of us participate on the team.
6    Q.   And are you responsible for setting
7 policies and procedures?
8         MS. SHEVLIN:  Form.
9    A.   I contribute to them.  I make
10 recommendations about them, I may be the person who
11 writes and signs them, but these other two
12 pediatricians are also board certified child abuse
13 pediatricians with many years experience and I
14 consult with them before putting things in writing in
15 general.
16    Q.   Okay.  So we're here today about a case
17 that you consulted on -- do you understand that
18 correctly; did you consult on the case against Mr.
19 Lawshe?
20         MS. SHEVLIN:  Form.
21    A.   I did not know that person's name at the
22 time.  I consulted for a detective at the St. Johns
23 Sheriff's office.
24    Q.   Subsequently have you learned that Mr.
25 Lawshe was the subject of that investigation?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 18

1    A.    Yes.

2    Q.    I have three letters; one is dated February
3  22nd; one is April 5th and the other is April 5th; do
4  you have access to those as we sit here today?

5    A.    I do not have the February 22 letter.  I
6  can't find it.

7    Q.    I'll share it with you when we get to that.
8  I want to ask you just to start off, some
9  general -- some general questions.

10          So what is sexual maturity rating?

11    A.    Sexual maturity rating is a way of stating
12  how close to puberty or in the middle of puberty or
13  completed puberty may be progressing.

14    Q.    I've also seen it referred to as Tanner
15  staging; is Tanner staging and SMR or sexual
16  maturity, is that the same thing; are those two terms
17  synonymous?

18          MS. SHEVLIN:  Form.

19    A.    In the 1980s and 1990s early, it was called
20  Tanner staging.  In about 1998 it changed because
21  there had been so many other studies both before and
22  after Tanner and Marshall and it was changed to
23  sexual maturity rating.  As the years go by, there's
24  more data than just Dr. Tanner's data.

25    Q.    All right.  And so when did you first

Page 19

1  learn -- when you first learned about it, it was
2  called Tanner staging?

3          MS. SHEVLIN:  Form.

4    A.    Well, it didn't have a formal name and I
5  actually don't remember what the other pediatricians
6  were calling it in fellowship.

7    Q.    Okay.  And do you know what the -- the test
8  was designed to do?

9          MS. SHEVLIN:  Form.

10    A.    In the clinical setting?

11    Q.    In the clinical setting, yes.

12    A.    Yes.

13    Q.    First of all, was it designed as a clinical
14  test?

15          MS. SHEVLIN:  Form, speculation.

16    A.    It was -- sexual maturity rating was
17  designed to be able to monitor progress through
18  puberty or a completion thereof or delay thereof, as
19  well as early puberty.

20    Q.    So a pediatrician would be able to assess
21  whether or not there were any delays or abnormal
22  start to puberty in their patients; that was sort of
23  the reason -- that was the function of Tanner staging
24  or sexual maturity rating as you understand it?

25          MS. SHEVLIN:  Form, prior

Page 20

1  mischaracterization of prior testimony.

2    A.    For most pediatricians that is its
3  function.

4    Q.    Okay.  And what do you mean by that "for
5  most pediatricians that's its function"?

6    A.    Well, even newborns aren't Tanner two or
7  SMR two, so it is normal to have some variability in
8  the development of puberty.  Sometimes it's actually
9  the sign of a tumor, so we want to have some idea of
10  what's normal, so that we can identify deviations
11  from normal.  For instance, a three year old who
12  already has Tanner three or SMR three breast buds,
13  plus pubic hair, that would not be normal.  So we use
14  it on the very little kids as well as those who are
15  approaching puberty and in reference to the concerns
16  from the parents or the child, sometimes a teen-age
17  child is worried that they're not normal.

18    Q.    But that is not the way in which you employ
19  sexual maturity rating in this case, is it?

20    A.    In this case, the opportunity to assess the
21  patient never occurred.

22    Q.    But you did use the sexual maturity rating
23  in forming your opinions in this case?

24    A.    Yes.

25    Q.    All right, okay.  So let me -- let's just

Page 21

1  go back.

2          How long have you been using sexual
3  maturity rating to -- let me ask you this.  Looking
4  for predicate for this.

5          Do you use sexual maturity rating to
6  chronologically estimate the age of individuals in
7  digital pornographic photographs?

8          MS. SHEVLIN:  Form.

9    A.    It is not to estimate the age, it's to
10  estimate the appearance of the age, yes.

11    Q.    What does that mean?

12    A.    The appearance of the age is not the same
13  thing as knowing the chronological age.

14    Q.    What's the difference?

15    A.    One is in terms of years of age and has
16  documents to go with it.  And the other is based on
17  appearance and in this case, in photographs.

18    Q.    So I'm struggling with that distinction.
19  So you -- so you're -- you're not attempting to state
20  or estimate how old the individual depicted in the
21  photograph is, you are trying to estimate how old
22  they appear to be?

23    A.    Yes.

24    Q.    So any type of -- you're aware that
25  photographs can be digitally edited?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 22

1      MS. SHEVLIN:  Form.
2      A.  Yes.
3      Q.  You're aware that models can remove pubic
4 hair through multiple different modalities, correct?
5      MS. SHEVLIN:  Form.
6      A.  Yes.
7      Q.  Any digital altering of a photograph would
8 render your opinion say -- would not make it a
9 reliable opinion, correct?
10      MS. SHEVLIN:  Form.
11      MR. CARSON:  Join.
12      A.  That's not true, it will be a reliable
13 opinion about the appearance of the image.
14      Q.  But it would not be a reliable opinion
15 about the actual age of the individual that is
16 depicted?
17      A.  It may not be.
18      Q.  And that's true as well as grooming.  If
19 somebody had been groomed, it may not be -- it may be
20 an -- you may be given an accurate depiction or
21 opinion about the appearance, but if there were
22 grooming that was undetectable to you, it would not
23 be an accurate opinion or reliable opinion about the
24 actual age of the individual?
25      MS. SHEVLIN:  Form.

Page 23

1      A.  The chronological age is a different
2 question.  This is just the appearance of the image.
3      Q.  Okay.  So from a scientific -- you
4 understand that -- let me just ask you.
5          Would you agree with me that that is a -- a
6 limitation on what your opinion could be accurately
7 understood to be?
8      A.  Yes.
9      MS. SHEVLIN:  Form.
10      Q.  Can you describe that limitation for me?
11      A.  It is not an opinion about chronological
12 age, it is an opinion about the apparent appearance
13 of the image and what its age may be.  It's not the
14 same thing.
15      Q.  How long have you interacted with law
16 enforcement -- let me ask you this question.
17          How long do you think you have been using
18 SMR in this way, to look at a pornographic image and
19 estimate the appearance of chronological age?
20      MS. SHEVLIN:  Form.
21      A.  Since shortly after 1994.
22      Q.  And is that sort of like the burst of the
23 internet or like widely used internet, what was 1994?
24      MS. SHEVLIN:  Form.
25      A.  It was just my fellowship.

Page 24

1      Q.  Okay.  What was special about that
2 fellowship that that's what made you start doing
3 that?
4      MS. SHEVLIN:  Form.
5      A.  Law enforcement was bringing cases for
6 evaluation to Rady Children's and my colleague
7 pediatricians were also doing these evaluations.  I
8 had not been aware of it before 1994.
9      Q.  And when is the last time you did an
10 evaluation like this?
11      A.  2024.  Maybe Nassau County Sheriff.  I know
12 I did at least one from them in 2024.
13      Q.  You don't think you've done any this year?
14      A.  I have not.
15      Q.  Has there been any change in your practice
16 or policies since 2023 in regards to evaluation of
17 these types of images?
18      MS. SHEVLIN:  Wait, Dr. Dully, hang on a
19 second.  Michael, we're getting into subsequent
20 remedial measures, there's case law on this.  I'm
21 not going to let her answer this question.
22      MR. ROBERTS:  I won't direct her not to
23 answer questions, whether it's relevant or not is
24 not a reason for you to instruct her not to
25 answer.

Page 25

1      MS. SHEVLIN:  It's not relevant.  It's
2 subsequent remedial measures.  There's case law
3 on it.
4      MR. ROBERTS:  That's not -- that's not the
5 law.  And you cannot -- and you can't -- you can,
6 but there's two reasons why you can instruct the
7 witness not to answer and they both deal with
8 privilege.
9      MS. SHEVLIN:  You're asking her for
10 subsequent remedial measures.
11      MR. ROBERTS:  And that is perfectly
12 discoverable.  That is perfectly discoverable.
13      MS. SHEVLIN:  If you want to provide me
14 case law on your position, I'm happy to look at
15 it.
16      MR. ROBERTS:  Are you instructing her --
17 are you instructing her not to answer that
18 question?
19      MS. SHEVLIN:  At this time I'm instructing
20 her not to answer that question.  If there is
21 case law, tell me that I'm wrong, I'm happy to
22 look at it.
23      MR. ROBERTS:  I haven't briefed the issue,
24 I've only done this for 21 years but --
25      Q.  Have you -- have you read my -- or Mr.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 26

1  Lawshe's expert report in this case?
2  A.  I saw it on Friday, yes.
3  Q.  Okay.  What was your impression of that?
4  MS. SHEVLIN:  Form.
5  A.  I don't agree with it.
6  Q.  Have you read the article The Difficult
7  Issue of Age Assessment on pedo-pornographic
8  material?
9  A.  Not to my knowledge, no.
10  Q.  The last time you attempted to do any
11  research on the reliability of applying sexual
12  maturity rating to online pornographic images?
13  MS. SHEVLIN:  Form.
14  A.  I was reviewing what I already have last
15  night.
16  Q.  What is it that you already have?
17  A.  I have the original Tanner and Marshall
18  articles from 1959 and '70, the Noshney (ph)
19  publication that came a decade or so later.  It's
20  sort of an update on sexual maturity ratings.  The
21  Herman and Giddens work that came about 10 years
22  after that in the 1990s on sexual maturity in
23  American girls.  I do have some other population
24  evaluation articles such as from Switzerland or from
25  Hong Kong or Asia, but those don't really apply in

Page 27

1  this case to my knowledge, and I did not review them
2  much at all.  And what else?  I did look at an
3  American Academy of Pediatrics publication that
4  summarizes all of the pubertal stage photographs
5  from, I think it's from 1996 and then also the -- was
6  there anything else good?  There is another article
7  that I reviewed.  Let me see.  I don't know if I have
8  -- well, and of course, the standard textbook that I
9  use which is the 15th Edition of Nelson's textbook of
10  pediatrics.
11  Q.  So those sound like journals that are
12  pediatric journals about Tanners staging or sexual
13  maturity rating in the clinical setting?
14  A.  They -- they are and also a -- a
15  publication, I think it's a desktop publication from
16  the military from the Armed Forces Center for Child
17  Protection in 1998, I think it was.  I looked at it,
18  that was -- I was actually asked to help get these
19  images taken care of by the Armed Forces Center for
20  Child Protection about that time when I was active
21  duty.
22  Q.  And just so -- anyway, clinical setting by
23  clinical setting, I mean and I want to make sure
24  we're on the same page, a pediatrician who is
25  treating a patient in the clinical or office setting;

Page 28

1  is that -- is that a fair way to use clinical?
2  A.  Yes.  Except that all the work was done
3  from photographs -- where most of the work was done
4  from photographs as a study modality.  So it is a
5  clinical tool, and if you ever get access to the
6  child, then you can use it that way.  But sometimes
7  in child abuse pediatrics, you do or do not have
8  access to the child; you do have access to the images
9  and are consulted to estimate the appearance of their
10  sexual maturity based on photographs.
11  Q.  Okay.  So I want to share the screen here.
12  This is an article that we disclosed to you a month
13  ago, a couple months ago.  Can you see this on your
14  screen?
15  A.  Okay.  Yeah, that's a lot of fine print.
16  Q.  Let me -- Forensic Science international;
17  have you heard of that journal?
18  A.  Well, it's not a medical journal, but I
19  have heard of it.
20  Q.  I just want to go down here to the
21  conclusion.  I'm going to read some of these -- well,
22  let me just read this.  We'll start with this.  Much
23  pornographic, pedo-pornographic material depicts
24  women who seem sexually mature and who may be late
25  teenagers or women over the 18 years of age.  Our

Page 29

1  study, in fact, proves that it is nearly impossible
2  to say that adults who look like sub adults are
3  indeed adults, which obviously may apply to all those
4  sub adults who seem sexually mature.  Did I read that
5  correctly?
6  A.  You read it out loud, yes.
7  Q.  And it says, forensic and medical experts
8  should avoid using such unscientific behavior which
9  may have drastic consequences in a Court of law; did
10  I read that correctly?
11  A.  Yes.
12  Q.  Now, you're unfamiliar with this, but I'd
13  ask you to get familiar with it.  This study shows
14  that pediatricians who attempt to age pornographic
15  images of women are wrong between 95 and 73 percent
16  of the time when they do that; does that surprise
17  you?
18  A.  Well, they're against it, so it doesn't
19  surprise me.  I think that's what they wanted to
20  find.
21  Q.  This study was funded by the E.U. Project
22  to help develop ways of detecting child ponography
23  online; why do you see that this is what they wanted?
24  MS. SHEVLIN:  Form, she has not had an
25  opportunity to read the entire article.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 30

```
1              MR. ROBERTS:  Stop, stop, I don't want a
2     speaking objection.  She said this article was
3     published by people who wanted to find that.
4        Q.  Dr. Dully, why do you think the people who
5  wrote this article wanted to find that?
6              MS. SHEVLIN:  Form.
7        A.  Because their conclusion and their tables
8  say that in what you have shown me.  It needs to be
9  read critically with a jaundiced eye because it
10 appears on the surface that that is their aim.  It's
11 also a legal journal, not a medical journal.  It
12 would be read with a jaundiced eye.
13       Q.  So you're discounting an article that
14 you've never seen or read?
15             MS. SHEVLIN:  Form.
16       A.  I am discounting a journal that is not a
17 medical journal and I would read it critically if you
18 give me the chance.
19       Q.  Well, you had a chance and you haven't done
20 it, have you?
21             MS. SHEVLIN:  Form.
22       A.  I haven't seen this before.
23       Q.  Well, you -- you -- you had access to the
24 article last week.
25             MS. SHEVLIN:  Form.
```

Page 31

```
1        A.  I have never seen this before.
2        Q.  Because you chose not to look at it.
3              MS. SHEVLIN:  Form, mischaracterization of
4     her prior testimony.
5        A.  I have never seen this before.
6        Q.  Why have you not seen it before?
7        A.  It was not provided to me.  I have never
8  seen it before.
9        Q.  It was in the expert's report that you said
10 you read last week?
11       A.  It's certainly not in there.
12       Q.  Okay.  I'm going to share what we'll mark
13 as Exhibit 2.  That will be Exhibit 1.
14           This is the report of Scott Krugman; does
15 this look familiar to you?
16       A.  Yes.
17       Q.  See three here, The Difficult Issue of Age
18 Assessment on Pedo Pornographic Material?
19       A.  It is a reference, yes.
20       Q.  You agree it was -- the name of the
21 article, the journal and the citation was provided in
22 his report?
23             MS. SHEVLIN:  Form, mischaracterization of
24     her prior testimony.
25       A.  The citation is there.
```

Page 32

```
1        Q.  So why -- why didn't you look at it?
2              MS. SHEVLIN:  Form.
3        A.  Because I know it's a difficult assessment.
4  I know that it's difficult.
5        Q.  Why do you say that it's difficult?
6        A.  Because it is an appearance, it is not a
7  chronicle age.  Chronological age, sorry, not enough
8  syllables.
9        Q.  So let me ask you this.  So if I was a
10 person who had to make a legal determination about
11 whether or not someone was, in fact, or -- let me
12 re-ask the question.  If I was someone who was being
13 asked to make a factual determination about whether
14 or not a model depicted in a pornographic image on
15 the internet was a minor; in fact, a minor, would
16 your opinion about the appearance be a reliable
17 opinion for me to base that decision on?
18             MS. SHEVLIN:  Form.
19       A.  No, that's what the investigation is for.
20       Q.  That seems like a major limitation in your
21 opinion about age; would you agree with that?
22             MS. SHEVLIN:  Form.
23       Q.  I'm sorry, almost all of your answers are
24 being interrupted by Amy's objection.  Was that a
25 yes?
```

Page 33

```
1        A.  It was a correct.
2              MS. SHEVLIN:  Give us just like one second
3     so I can make an objection and then we won't
4     talk over other.
5        A.  Sorry, sorry.
6        Q.  And maybe I'm -- do you tell law
7  enforcement officers about the limitations in your
8  opinions before you give them to them?
9              MS. SHEVLIN:  Form.
10       A.  Yes.
11       Q.  It happened again.  It happened again.  So
12 you said yes to that question, correct?
13       A.  Yes.
14       Q.  Can you tell me what you explain to law
15 enforcement officers when you give them your opinion?
16       A.  That this is the appearance of the person
17 in the image, and that is, if I can see the image;
18 sometimes the images are too blurry or just not good
19 enough to even see.  So they know quality of the
20 image and they know that it is only an image and that
21 the appearance depicts something that is based on
22 sexual maturity rating that may or may not prove to
23 be a minor.  They don't bring the little kids, they
24 bring these borderline kids to be looked at or images
25 and they investigate after that.  Because I can only
```

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 34

1  give them appearance.
2      Q.   So you're aware that a lot -- I mean, do
3  you have any impression of how much or how many
4  images that are published on the internet have been
5  digitally altered in some way?
6          MS. SHEVLIN:  Form.
7      A.   I'm sure it's an astrological number.  I
8  don't know the number.
9      Q.   As we sit here, I mean, you're -- I mean,
10 you believe -- let me just -- you think that most
11 images have some sort of digital altering on them for
12 aesthetic purposes?
13         MS. SHEVLIN:  Form, mischaracterization of
14     prior testimony.
15     A.   No.  A lot of images have -- may have
16 alterations and a lot of images may not have
17 alterations, I don't know what those numbers might
18 be.
19     Q.   And that is a fair answer.  If you don't
20 know the answer, just say I don't know.
21         But whether or not there were alterations
22 would have a significant impact on the accuracy or
23 the reliability of your opinion as to the actual age
24 of the model?
25         MS. SHEVLIN:  Form, speculation.

Page 35

1      A.   What I see on the image does not
2  necessarily give an indication of the actual
3  chronological age that may be discovered during
4  investigations.
5      Q.   So what is -- what do you see -- what is
6  the value -- I mean, your -- your job is to consult
7  with law enforcement in these cases, correct?
8      A.   Yes.
9      Q.   What do you see the value of your opinions
10 being?
11         MS. SHEVLIN:  Form.
12     A.   There are times when it leads to a real
13 child or a trafficked child and it may be local; it
14 may not have any bearing at all because it may turn
15 out to be modified images that were made to look like
16 an adolescent.  So I don't know what direction it
17 will go after I tell them, yes, they have an
18 appearance of an adolescent going through puberty and
19 that is its only value.
20     Q.   So, okay.  I'm going to put a pin in that
21 statement.  I want to go to actually sexual maturity
22 rating.  In terms -- and let's just have this and
23 just talk about females.  All of the images you
24 reviewed in this case were females, correct?
25     A.   Yes.

Page 36

1      Q.   So and let's just start with a genital or
2  vaginal appearance in females.  Can you describe what
3  the grades of sexual maturity -- first of all, what
4  are the grades of sexual maturity rating?
5      A.   I, II, III, IV, V and for pubic hair there
6  may be a VI.
7      Q.   Okay.  So can you just give me the pubic
8  hair -- first of all, in the genital region is there
9  any other factor other than pubic hair development in
10 sexual maturity rating?
11     A.   There is another factor but we usually
12 can't see it and that is the appearance of the hymen
13 itself.
14     Q.   And that's an internal anatomical body
15 part?
16     A.   It's a little bit internal; it's not --
17 it's still considered external, but it's not readily
18 visible.
19     Q.   Did that have any bearing on your opinions
20 in this case, the hymen?
21     A.   No, I could not see that structure.
22     Q.   So, the only, I guess anatomical appearance
23 would be the appearance of pubic hair in terms of
24 genital development?
25     A.   Generally speaking, yes.  I don't have the

Page 37

1  images, so I haven't seen them in two years, so...
2      Q.   Well, we'll talk about that because, Amy, I
3  thought that's what we were doing, is you were going
4  to give her the images.
5          MS. SHEVLIN:  I meant to talk to you about
6      that on Friday.  When we take a break, I'll call
7      you.
8          MR. ROBERTS:  Okay.  All right.
9      Q.   So, grade- -- what's grade I?  I'm sorry,
10 we're just talking about genitals or pubertal hair --
11     A.   For the female child, that's the little
12 girl, so she will have fully developed labia majora
13 if she's a term infant and that appearance will
14 continue until she becomes -- developed some pubic
15 hair.  So once she starts developing some pubic hair
16 that is not vellus hair, different from the hair on
17 her abdomen, she could be called SMR II.
18     Q.   Okay.  And grade -- what is grade III?
19     A.   Grade III is a little bit more pubic hair
20 on the labia and also where the labia come together
21 up front that will no longer be clearly or plainly
22 visible because there is pubic hair at the top of
23 that, the labia majora where they come together, the
24 interior commissure, and part of the mons pubis is
25 covered with pubic hair that is not the same as

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 38

1 vellus hairs on the abdomen.
2     Q.    And grade IV.
3     A.    Grade IV fills out the entire triangle
4 shape of the labia majora, the anterior commissure
5 and the mons pubis over to, but not involving where
6 the thighs join at the pelvis.
7     Q.    What do you mean by triangle?
8     A.    That is the shape when the legs are
9 together the hair bearing parts over the mons
10 pubis in front of the anterior commissure and on
11 either side it's wider and between the legs, it will
12 come to appointment so it may look like an inverted
13 triangle.
14    Q.    And grade IV?
15    A.    Grade IV will involve the inner thighs as
16 well.  And also hair will be thicker or more
17 abundant.
18    Q.    So, I mean, human beings are all different;
19 the thickness is a very subjective evaluation, I
20 would imagine?
21          MS. SHEVLIN:  Form.
22    A.    Is that a clinical question or --
23    Q.    Yeah, it is.  Between making the
24 distinction between IV and V, I mean, how -- what is
25 the thickness of a V versus the thickness of a IV?

Page 39

1     A.    I would look at the inner thighs to tell
2 the difference.  And most -- most of the children are
3 shaved, so we don't get to assess thickness, there
4 isn't anything to see, there are whiskers there.
5     Q.    Because most -- most people at that age do
6 groom themselves at least at the thigh level?
7          MS. SHEVLIN:  Form, speculation.
8     Q.    Well, I think that was just your testimony,
9 wasn't it?
10    A.    No, that wasn't my testimony, but --
11    Q.    What did you say?  I'm sorry, can you just
12 say it again, you don't get to see at the thigh, you
13 said something about shaving?
14    A.    There are whiskers.  We cannot judge the
15 thickness of the pubic hair, we can only look at the
16 location of the hair bearing parts by looking for the
17 whiskers, the obvious shaving.
18    Q.    So, really, the difference between four and
19 five is whether or not you see over the inguinal
20 notch, that crease between our thighs and the pubic
21 level, the pubic area?
22    A.    Practically speaking, it is the inner
23 thighs.
24    Q.    Yep, okay.  And if there were waxing or
25 grooming such that you couldn't see whiskers or

Page 40

1 something, but it was obviously being groomed, you
2 would not be able to distinguish between IV and V?
3     A.    So I can see whiskers on the inner thighs,
4 that distinguishes V from IV.
5     Q.    But if you can't, because of the method of
6 grooming or the digital altering, you would not be
7 able to tell the difference between a IV and a V?
8          MS. SHEVLIN:  Form.
9     A.    I'm talking about an actual patient.
10 You're talking about images?
11    Q.    Oh, is there a difference?
12          MS. SHEVLIN:  Form.
13    A.    An actual patient, I can see the difference
14 because I can see the hair follicles.
15    Q.    So what's the difference when you're
16 evaluating an image?
17    A.    There isn't as much fine focus or close
18 view to necessarily be able to see and blond
19 individuals may be less obvious as well.
20    Q.    So it's much more difficult or it's more
21 difficult for you to make the distinction between a
22 IV and a V on -- on a digital image?
23          MS. SHEVLIN:  Form.
24    A.    On any image, yes.
25    Q.    Okay, okay.  All right.

Page 41

1          So this triangle of pubic hair, what --
2 what's the significance of that?  Why do you say a
3 triangle?
4     A.    Because I'm trying to be descriptive.
5     Q.    No, but I mean, is that the way that pubic
6 hair grows in on females is in a triangle -- is that
7 the way it's supposed to grow in?
8     A.    At a certain maturity, it will look like a
9 triangle.  Early on it does not look like a triangle.
10    Q.    But at the IV to V stage, an ungroomed
11 female model should have a triangle shape to her
12 pubic hair?
13          MS. SHEVLIN:  Form.
14    A.    Roughly, except for what's out on the inner
15 thigh they're going more posterior.  Some people have
16 it going up to their belly button as well, that's
17 called a six.
18    Q.    Okay.  Pubic hair that goes up to your
19 belly button would be a VI?  Grade VI; is that
20 correct?
21    A.    In a straight line up the midline lafay
22 (ph), there can be a VI, and it may go posterior
23 around the anus, too.
24    Q.    How long can people appear to be -- well,
25 before I ask that question.  Give me the same rundown

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 42

1  with breasts.  Grades IV through V in breasts, just
2  describe what those are.
3       A.  Grade IV, just grade IV and V?
4       Q.  No, I'm sorry, grade I through V.  I'm
5  sorry if I asked that question wrong.
6       A.  Okay.  So most newborns are II, maybe III
7  in their sexual maturity rating, they've been exposed
8  to estrogen in utero.  Even the male infant has
9  breast buds, so the newborn is, by definition, a
10  sexual maturity rating of II and sometimes III.  As
11  the estrogen effect from being a fetus goes down in
12  their bloodstream in little girls that takes two to
13  four years.  The breast buds become small and flat
14  and no longer palpable.  So there will be a flat
15  little pale nipple and if they're cold, they may have
16  a papilla protruding in the middle.  As the -- that
17  is an SMR I, which is sometime after birth until
18  estrogen effects starts being produced by their own
19  body.  The breast buds will then redevelop and when
20  it's confined to just under the nipple and its
21  areola, then that is an SMR II.
22           When there is a little bit more enlargement
23  of a mound outside the area of the pink areola, then
24  that's a III.  When the breast tissue is beginning to
25  meet at the sternum and the midline, then it is a IV

Page 43

1  when looking at it an anterior/posterior way, so
2  we're looking directly at the person's chest.  If we
3  look from the side, you -- or have a side view, you
4  can see that a IV has two mounds; one mound for the
5  breast tissue and a separate mound on top of it for
6  the nipple for areola and papilla.  So IV, sexual
7  maturity rating is two mounds instead of one.  V has
8  become a single globular shape, and so it has a
9  papilla at the top of the nipple, but there is one
10  mound that is under the pink of the areola and the
11  breast tissue all the way to the chest wall.
12       Q.  Okay.  So how long in chronological age can
13  a female present as a grade IV on clinical exam?
14           MS. SHEVLIN:  Form.
15       A.  About 20 percent of women who are not
16  pregnant revert to a IV.  And will be that way
17  through parts of their adulthood.
18       Q.  So a female being a grade IV is not
19  inconsistent with them being over the age of 18?
20       A.  Correct.
21           MS. SHEVLIN:  Form.
22       Q.  And when you meet with detectives, do you
23  give them some explanation of what the -- the sexual
24  maturity rating is; do you give them like a little
25  primer course if you've never met them before?

Page 44

1           MR. STEWART:  Form.
2       A.  In general, I don't -- I'm not the first
3  pediatrician that they have met with, but I will ask
4  them if they have any questions and show them what I
5  use, my reference.
6       Q.  You show them a reference book or something
7  like that?
8       A.  The pediatric, Nelson's Textbook of
9  Pediatrics, yes.
10       Q.  Okay.  Actually, and I'm just going to show
11  you this.  It's just -- and you can tell me if it's
12  helpful or not helpful.  I guess that means it's a
13  demonstrative aid, it just has -- it's like a
14  textbook, I don't know if it's from your textbook or
15  not, and you can tell me if it's not helpful.  Do you
16  see this?
17       A.  I can see it.
18       Q.  Is that a visual depiction of what you just
19  testified to, that image there?  What's that?
20       A.  Yes, they are trying to depict that here.
21       Q.  And I understand it's like -- it's a
22  drawing, it's probably just a pen drawing, but this
23  -- this is kind of -- I see a triangle at IV and I
24  see a larger triangle at V; is this generally what
25  you were testifying to earlier?

Page 45

1       A.  Yes, roughly.
2           MS. SHEVLIN:  Are you making that as an
3       exhibit?
4           MR. ROBERTS:  We can mark that as 3.  1 was
5       the article.  2 was the expert report and 3 was
6       that demonstrative image.
7       Q.  I want to go back to Exhibit 2, which is
8  Dr. Krugman's report and you said you disagreed with
9  the report, but I just want to maybe dial in on that.
10           For example, I just want to go to the --
11  the letter E here, Dr. Dully.  It's well-known and
12  documented that adult females can exhibit and appear
13  to be SMR IV; you would agree with Dr. Krugman on
14  that point?
15       A.  Yes.
16       Q.  Do you know Dr. Krugman?
17       A.  I know Dick Krugman, I don't think I know
18  Scott Krugman.
19       Q.  Okay.  In this he says that you're a member
20  of a list serves that he's a member of and this issue
21  about the concerns and limitations of using SMR in
22  CSAM investigations has been raised in that -- in
23  that e-mail list serve; is that true?
24       A.  It's been discussed off and on for at least
25  a decade, yes.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 46

1    Q.   I mean, has anyone suggested on there that
2  it is not scientific to be applying SMR ratings to
3  the pornographic images on the internet to determine
4  chronological age?
5         MS. SHEVLIN:  Form.
6    A.   I don't remember anybody saying that it was
7  unscientific, but we all agree that there are
8  limitations to stating what the appearance may be
9  versus what the age of the patient may actually be.
10   Q.   Let me ask a question in a different way,
11 because we may be just ships passing in the nights
12 here.
13        Do you agree that it is not scientifically
14 reliable to use SMR ratings to determine the actual
15 chronological age of a model depicted in a
16 pornographic image on the internet?
17        MS. SHEVLIN:  Form.
18   A.   Yes.
19   Q.   Yes.  Sorry.
20        So you agree that that's not scientific to
21 say the actual age of the model?
22   A.   I agree.
23   Q.   What you are saying is, is that you can
24 apply SMR and say what it appears to be, irrespective
25 of the possibility of grooming or digital

Page 47

1  manipulation?
2         MS. SHEVLIN:  Form.
3         MR. CARSON:  Join.
4    Q.   I didn't even -- I don't even know I know
5  what your answer is there, so can you restate your
6  answer?
7    A.   I said correct.
8    Q.   Correct, okay.
9         Do you think that you communicate that idea
10 to law enforcement when they come to you?
11   A.   Yes.
12   Q.   So when Detective Preston came to you with
13 these images and she left, you would have told her
14 that you cannot give her any reliable information
15 about the actual age of this individual depicted in
16 this image?
17   A.   Yes.
18   Q.   All right.  So, in some ways, I think maybe
19 you agree with Dr. Krugman if he is talking about
20 actual age; is that fair enough -- is that a fair
21 statement?
22        MS. SHEVLIN:  Form, mischaracterization of
23        prior testimony.
24   Q.   Do you understand my question, Dr. Dully?
25   A.   I'm -- I'm not sure how your question is

Page 48

1  different from all the others.  I guess I'm not sure.
2  I must be missing the nuance.
3    Q.   Well, you said originally that you
4  disagreed with his opinions; do you remember that
5  testimony?
6    A.   I disagreed with his opinion about my
7  opinion.
8    Q.   If he thought that your opinion was stating
9  the actual age of the individual, rather than just
10 the appearance, would that be an explanation for the
11 disagreement between Dr. Krugman and yourself?
12        MS. SHEVLIN:  Form, speculation.
13   A.   Yes.
14   Q.   Okay.  So did you understand that your
15 opinions were going to be used in a probable cause
16 affidavit to seek a search warrant?
17        MS. SHEVLIN:  Form.
18   A.   No.
19   Q.   What did you think that they were going to
20 be used for?
21   A.   That there were probably other files to be
22 looked at or other circumstances and there would be
23 some determination on whether they would move forward
24 or not.
25   Q.   Do you think -- I'm sorry, I didn't mean to

Page 49

1  cut you off.  Were you finished?  I'm sorry.
2    A.   I think I was finished.
3    Q.   Okay.  Sometimes on Zoom it's a little hard
4  to know when people are finished or not, but...
5         Would you be comfortable with your opinions
6  being used in a probable cause affidavit without the
7  caveat --
8         MS. SHEVLIN:  Form.
9    Q.   -- that you've just given us here about the
10 limitations of your opinion?
11   A.   I don't think my comfort matters.  I'm just
12 making a statement about the appearance.  And then
13 there's decisions on whether to move forward with
14 that or not.  Sometimes they do and sometimes they
15 don't, and I don't know that one image is going very
16 far ever; I don't know that.
17   Q.   Well, no, that's not my -- so it's, you
18 know, as a child abuse expert that your opinion
19 sometimes have serious legal consequences, correct?
20   A.   Yes.
21        MS. SHEVLIN:  Form.
22   Q.   Parents lose their children sometimes
23 because of your opinions.
24   A.   Yes.
25   Q.   In this case someone went to jail, in part,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 50

1 because of your opinion; were you aware of that?
2        MR. STEWART:  Form.
3        A.   I was informed after it was published in a
4 newspaper.  A colleague informed me that that had
5 been in the newspaper, but I did not know that.
6        Q.   Did you suspect that your opinions might be
7 used in front of a judge?
8        MS. SHEVLIN:  Form.
9        A.   Sometimes they go before a judge, sometimes
10 they go before a jury; that's not my determination.
11        Q.   But that's not my question.
12        My question was, when you gave this -- when
13 you wrote these letters, did you expect that the law
14 enforcement officer, Detective Preston, was -- was
15 going to quote them in a probable cause affidavit for
16 a judge?
17        A.   I know that she was going to investigate
18 further, but I did not know what the next step might
19 be.
20        Q.   All right.  So I'm going to just pull up
21 and share the -- you don't have the February 22nd
22 report; did I understand that correctly?
23        A.   I did not.
24        Q.   So -- and we'll mark this as Plaintiff's
25 Exhibit 4.  And it will be a composite exhibit

Page 51

1 because I have them in a PDF that has all three of
2 your letters.  I'll represent to you that this letter
3 is almost verbatim copy and pasted from your -- in
4 your April 5th, so the words are going to probably
5 look very similar, but just take a second and look at
6 it.  Just tell me when you're done.
7        A.   Okay.
8        Q.   So my first question is, why did you not
9 include in your letter any commentary on the
10 limitations of your opinion in regards to the actual
11 age of the model or the ima- -- the person depicted
12 in the photograph?
13        A.   I think the limitations are obvious, and I
14 say what appears to be.  And that is the appearance,
15 the developmental genital appearance and she does not
16 appear to be shaved; the whole thing is about
17 appearance.  I think that's pretty apparent.
18        Q.   Well, you told -- you've already testified
19 that you would have told Detective Preston explicitly
20 that I am not talking about the actual age of the
21 individual, I'm only talking about the appearance?
22        A.   I'm only talking about the appearance
23 that's --
24        Q.   And you would have communicated that to
25 Detective Preston?

Page 52

1        A.   And it's in writing, yes.
2        Q.   And when you say it's in writing, you're
3 talking about your use of the word "appears," you use
4 the word appears over and over again?
5        A.   Yes.
6        Q.   Okay.  So I understand you don't have the
7 images in front of you and we're going to take a
8 break here in just a minute and I can talk to Amy
9 about that, but I just want -- I want to go through
10 this real quick, okay.
11        You, in this depict -- you describe the
12 image that you're looking at, correct?
13        A.   Yes.
14        Q.   And can you describe for the record -- do
15 you -- first of all, do you remember meeting for the
16 first time Detective Preston?
17        A.   I remember that I met her, yes.
18        Q.   Do you remember -- you had that meeting in
19 general, maybe not word for word, but in general do
20 you remember that meeting?
21        A.   Only vaguely.
22        Q.   So she showed you an image on her laptop is
23 what's related in this letter.  Can you describe what
24 that image looked like?
25        A.   I can only read to you what I typed.

Page 53

1        Q.   Please do.
2        A.   The image depicts what appears to be a
3 naked pubertal female child wearing pink earrings and
4 white lace socks on her feet.  She is on a wood floor
5 in a knees to chest position with her lower legs and
6 ankles parted to expose her genitalia for the camera.
7        Q.   So she was in a knees to chest position; is
8 that correct?
9        A.   Yes.
10        Q.   Now, you were of the opinion -- Oh, I'm
11 sorry, I didn't mean to stop sharing there, I'm
12 sorry.
13        Your opinion was that she appeared to be
14 SMR IV; is that correct?
15        A.   Just of her genitals, yes.
16        Q.   Because you -- you couldn't evaluate her
17 breasts?
18        A.   I don't think I was able to see them or I
19 would have put them in there.
20        Q.   Well, knees to chest, in theory, she would
21 be covering her breasts with her knees or her legs,
22 correct?
23        MR. KASS:  Form.
24        A.   That sounds right.
25        Q.   Yeah.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 54

1           You put that she would have achieved this
2  developmental genital appearance of SMR IV at 12 to
3  15 years of age.  Why didn't you put that she could
4  -- but she could be 18 or 19 or 20 with an SMR IV?
5           MS. SHEVLIN:  Form.
6      A.   Well, that would depend on the
7  modifications and grooming, as you're calling it,
8  that she would undertake, and I'm not assessing
9  grooming, I'm assessing appearance of the photograph,
10 which is what pornography is all about.
11     Q.   Well, you testified earlier and you agreed
12 with Dr. Krugman that women can present as SMR IV for
13 their entire life?
14     A.   For their breast development, yes.
15     Q.   And genital pubic hair?
16     A.   That depends on shaving and heritage or
17 depilatories or waxing or other things.
18     Q.   You say that she (sic) did not assess her
19 grooming, but you did in the next sentence assess the
20 grooming?
21     A.   She did not appear to be shaved; that,
22 again, is an appearance.
23     Q.   How -- what scientific basis do you have to
24 make that determination?
25           MS. SHEVLIN:  Form.

Page 55

1      A.   I don't see any hair there and so she does
2  not appear, you know, to be shaved.  I mean, there is
3  or there isn't hair, right, why say that there is
4  anterior pubic hair present.
5      Q.   But that's just a lay opinion, right,
6  that's not a scientific opinion, you're just saying I
7  don't see any hair?
8      A.   No, I think you mischaracterize it big
9  time, clinically.
10     Q.   Tell me, I asked the question and you
11 didn't answer it.
12           What is the scientific basis for your
13 opinion that she does not appear to be shaved,
14 medical, scientific basis for your opinion?
15     A.   The hair is still there.
16     Q.   I don't understand, you said the hair is
17 still hair?
18     A.   Shaving removes hair, but the hair is still
19 there; it's present or absent in the image.
20     Q.   Is that a medical opinion?
21     A.   That's a clinical medical assessment what
22 the image looks like.
23     Q.   What about waxing or electrolysis or
24 chemical hair removal?
25           MS. SHEVLIN:  Form, speculation.

Page 56

1      A.   What about it?  The hair --
2      Q.   Do those leave visible signs of hair?
3           MS. SHEVLIN:  Same objections.
4      Q.   Well, hold on.  You're saying as a medical
5  expert, you can determine whether someone is groomed
6  or not groomed, correct?
7           MS. SHEVLIN:  Form, mischaracterization of
8  her prior testimony.
9      A.   I know what shaving looks like because I
10 see it all the time and it has been that way since
11 the 90's so --
12     Q.   Yeah, and I'm asking about go waxing or
13 electrolysis; you're familiar that there are other
14 types of grooming other than shaving, correct?
15     A.   There are, yes.
16     Q.   And they leave a different -- they look
17 different; the results is different than shaving,
18 correct?
19           MS. SHEVLIN:  Objection, speculation.
20     A.   They're designed to be the same or they can
21 be designed to be different.
22     Q.   Right.
23           So, how can you look at a pornographic
24 image and determine whether or not they have been
25 waxed or electrolysis hair removal, some other form

Page 57

1  of hair removal?
2      A.   I'm not assessing the hair removal, I am
3  saying the pubic hair is present.
4      Q.   But if she is groomed that would destroy
5  any validity to your SMR rating as -- as regards to
6  pubic hair, correct?
7           MS. SHEVLIN:  Form.
8      A.   The hair is still present.  It can be
9  assessed for its appearance.
10     Q.   We're going to follow back up with that.
11 But before we take a break, I'm going to ask you this
12 quick and I'm going to go back to this image.
13           Okay.  This is the general image and we
14 talked were the triangle.  Dr. Dully, you've
15 described this model in the February 22nd, 2023 as
16 sitting towards the camera, knees to chest, correct?
17     A.   Yes.
18     Q.   It would have been impossible for you to
19 determine whether this model had a triangle or not
20 based on the way that she was sitting, correct?
21     A.   I do not know; I do not know what the image
22 looks like.
23     Q.   You've described the image as knees to
24 chest, sitting on the floor, that would obscure the
25 inguinal notch or the inner thigh from your view,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 58

1  correct?

2        MS. SHEVLIN:  Form.

3    A.   No, that depends on the image.

4    Q.   Well, if the image, because I've seen it,
5  if the image obscured the inguinal notch, it would be
6  impossible for you to determine whether or not the
7  model had a triangle or the hair crossed the inguinal
8  notch to the thigh, correct?

9        MS. SHEVLIN:  Form.

10    A.   Well, there is not -- there is no inguinal
11  notch, I don't know what you're talking about, and I
12  can see -- I state that I can see, but I don't have
13  the image, you have an advantage over me, you're not
14  seeing it, correctly.

15    Q.   Okay.  The thigh -- you testified -- tell
16  me what was the difference between, again, IV and V?

17    A.   Can I see the image?

18    Q.   I am not actually comfortable because the
19  image is still on a Nick Nick database because no one
20  is doing their job, and I'm afraid that if we
21  transmit it, we're all going to get investigated for
22  child pornography even though it's an adult, so I'm
23  just going to ask you questions right now based on
24  the hypothetical and I will show you the image, but
25  can you, once again, tell me what is the difference

Page 59

1  between a IV and a grade V pubic hair?

2    A.   The presence of hair or the shaved area of
3  hair on the inner thighs, on either side of the fully
4  developed roughly triangle shape of hair.

5    Q.   So if you could not see the inner thigh,
6  you could not distinguish -- it would be impossible
7  for you to even say what appears to be a grade IV
8  versus a grade V?

9        MS. SHEVLIN:  Form.

10    A.   I cannot see the image.  I can't comment
11  one way or the other.

12    Q.   You have to answer my questions unless you
13  don't understand them.

14    A.   I can't see the image.  You're asking me --

15    Q.   I'm asking you a hypothetical question, Dr.
16  Dully.

17    A.   Okay.  A hypothetical, not about this case,
18  about something else, okay, try that.

19    Q.   Hypothetically, if the image did not show
20  the inner thigh or the inner section of the inner
21  thigh and the pubic region, you could not distinguish
22  between a grade IV and a grade V in terms of sexual
23  maturity rating appearance?

24        MS. SHEVLIN:  Form.

25    A.   I would need to see the image, but I would

Page 60

1  consider that as facts, yes.

2    Q.   Evaluating whether or not pubic hair has
3  crossed the line onto the thigh is the distinguishing
4  factor between a grade IV and grade V, pubic hair
5  distribution for sexual maturity rating, correct?

6    A.   It is the most helpful distinction, yes.

7    Q.   Okay.  All right.  Why don't we take a
8  break, we've been going for an hour and a half.

9        Amy, do you want to call me?

10        MS. SHEVLIN:  Yeah, I'll you on your cell.

11        THE VIDEOGRAPHER:  Going off the record the
12  time is 11:29 a.m.

13        (Whereupon a break was taken.)

14        THE VIDEOGRAPHER:  We're on the record, the
15  time is 11:47 a.m.

16    Q.   Okay.  So we had an off record discussion
17  and through no fault of Dr. Dully, there's just a
18  logistical issue with Miss Shevlin's office and the
19  photographs did not get sent to her.  So we are going
20  to ask a few more questions, but then continue the
21  deposition to a later time in which she will have
22  access to those photographs and we will reschedule
23  it, Matt raised the concern about him asking
24  questions and that certainly will be accommodated
25  when we reschedule the deposition.  He also has the

Page 61

1  ability to reset a deposition as well.  Is that a
2  fair summary, Matt and Amy?

3        MS. SHEVLIN:  I think that's a fair
4  summary.

5        MR. CARSON:  Agreed.

6        MS. SHEVLIN:  And I do also want to add
7  just one thing.  The questions that you'll be
8  asking her are largely going to be hypothetical
9  if we're talking about the images from this point
10  forward and then when we have an opportunity for
11  her to look at the images, they'll be specific to
12  those images, correct?

13        MR. ROBERTS:  Some of them may be
14  hypothetical.  I don't intend to go through every
15  image in a hypothetical way, but I am going to
16  ask about some general principles, you know, that
17  maybe we don't even need the images for, but
18  yeah, some may be hypothetical, but I don't
19  intend to go through everything like that.

20    Q.   All right, Dr. Dully, I want to ask you --
21  and this is not a hypothetical, when you were making
22  these assessments at the request of law enforcement,
23  do you use any other set of scientific principles or
24  methods in rendering the opinion on the appearance of
25  the model, other than sexual maturity rating?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 62

1    A.   Yes, sometimes I do.  It depends on the
2  image.  So sometimes I --
3    Q.   What would those be?
4    A.   So sometimes I can see the teeth, and I can
5  tell if they're baby teeth or mixed dentition, which
6  is adult teeth in some stage of eruption, sometimes
7  with missing teeth as well.  And then sometimes if
8  they're very young, I can look at it by proportion,
9  if they're very young, images of the very young, I
10 can look at body proportion which is head size to
11 body size.  And most of the size or height is not
12 visible in most images; sometimes they're standing
13 next to an adult and I can look at approximate
14 height, but most of these images are not that, and so
15 occasionally, you know, there's more information or
16 appearance information on the images and sometimes,
17 there is not.
18   Q.   If you relied on any other data such as
19 proportion, height, teeth, would that be information
20 that would be included in your report?
21   A.   Yes.
22   Q.   So if it's not included in your report, I
23 can take from that that you did not consider other
24 data in forming that opinion?
25   A.   Not other image data.  Sometimes I look at

Page 63

1  the bio main or something that's printed on it, or
2  for sexual content, but that's often not helpful
3  either.  It's just all letters and numbers and
4  asterisks, that doesn't help.
5    Q.   Yeah, I understand.  If -- if there was
6  something, though, you would put that in your report?
7    A.   I would.
8    Q.   All right.  So I think when we left off,
9  there was this hypothetical and I don't -- and I
10 apologize, and I'm going to ask this hypothetical
11 again, and I use inguinal notch, but I think it's
12 inguinal -- what is it that --
13       MS. SHEVLIN:  Form.
14   A.   I don't know.
15   Q.   It's -- I'm sorry, do you know the
16 anatomical term that I'm talking about?
17       MR. CARSON:  Groove.
18   Q.   Inguinal groove?
19   A.   Yeah, I don't know what you're referring
20 to.
21   Q.   It's just an anatomy term.  It's the --
22 it's the -- it's the line between the abdominal wall
23 and your hip, that groove, that crease.
24   A.   Oh, that would be -- you could call that an
25 inguinal fold.

Page 64

1    Q.   Inguinal fold, yeah, I've seen notch, I've
2  seen fold, I've seen groove, I've seen -- but that's
3  the line that you're talking about in the distinction
4  of -- between IV and V, correct?
5    A.   No, that is very anterior.  I'm talking
6  about medial thighs, which is the inner surface of
7  the upper thighs.
8    Q.   But if a picture did not -- if an image did
9  not depict the upper thigh or the abdominal wall
10 where it meets the thigh, it would be impossible for
11 you to distinguish between a grade IV and a grade V
12 pubic hair presentation, correct?
13       MS. SHEVLIN:  Form.
14   A.   No, that's not the location.  The location
15 isn't abdominal wall and it's not in the inguinal
16 fold.  It is between where the thighs come together
17 in the middle, so it's anterior and medial, the inner
18 thigh.
19   Q.   Okay.  So if you cannot see in a digital
20 image, the interior thigh, it would be impossible for
21 you to distinguish between a grade IV and a grade V?
22       MS. SHEVLIN:  Form.
23   A.   No, it's the anterior, a-n-t-e-r-i-o-r and
24 medial thigh, m-e-d-i-a-l, which is where the legs
25 come together between the upper thighs and on the

Page 65

1  front of the medial surface of the thighs.
2    Q.   If you cannot see that area, it would be
3  impossible for you to distinguish between a grade IV
4  or a grade V presentation, correct?
5    A.   MS. SHEVLIN:  Form.
6    A.   Probably, but grade IV and grade V are also
7  a subjective determination of quantity amount of
8  pubic hair.
9    Q.   You would not be able to, scientifically,
10 with any degree of reliability distinguish between a
11 grade IV and grade V if you had not seen the area
12 that you have just described?
13       MS. SHEVLIN:  Form.
14   A.   At a hundred percent level of certainty,
15 probably not.
16   Q.   No, you can't ever say with 100 degree --
17 100, you know, that's not -- that's not what I'm
18 talking about.  And I want to -- I'm going to spend
19 as much time on this as we need to.  What I'm going
20 to do, is I'm going to pull back up our demonstrative
21 aid.
22       Mr. Videographer, do you have this
23 demonstrative aid?
24       THE VIDEOGRAPHER:  Yes, sir, if I see it?
25       MR. ROBERTS:  Yeah, can you do like a split

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 66

1 screen, the ability to do a split screen with
2 the witness in this?
3         THE VIDEOGRAPHER:  I see it now.  She's on
4 the -- do you guys see it?  She's on the side
5 right now.
6         MR. ROBERTS:  That's fine, yeah, that's
7 fine.
8         THE VIDEOGRAPHER:  Okay.
9     Q.    So we have a -- can you see cursor, Dr.
10 Dully?
11    A.    Yes.
12    Q.    So on grade IV, grade V; is my cursor, the
13 area where my cursor on both the IV and the V, is
14 that the area that you're talking about?
15    A.    Yes.  Also between the thighs.
16    Q.    Also between the thighs.
17    A.    To each other.
18    Q.    If you cannot see this area that I am
19 running my cursor on, you cannot do a SMR rating to
20 distinguish between a IV and a V on a pornographic
21 image off the internet, can you?
22         MS. SHEVLIN:  Form.
23    A.    There can be a difference in quality, as
24 you can see, and then also there's medial thighs
25 which you can't see on these diagrams, so if I can

Page 67

1 see better than just this, maybe.
2     Q.    At what point would you say to -- first of
3 all, have you ever told a law enforcement officer,
4 you know, there's just not enough here for me to
5 reliably give you an opinion about the sexual
6 maturity rating.
7     A.    Yes.
8     Q.    And what would be the criteria for that?
9     A.    Sometimes the image is too pixilated or
10 blurry or the clothes are covering the vital
11 structures.
12    Q.    What are the vital structures?
13    A.    The breast area from more than one view,
14 and the pubic area as well.
15    Q.    Okay.  So if the breast area is obscured
16 and the pubic area is obscured, those are
17 circumstances in which you believe you have
18 communicated to a law enforcement officer that this
19 just isn't enough for me to reliably opine on the
20 sexual maturity rating as it appears in the
21 photograph?
22         MS. SHEVLIN:  Form.
23    A.    Correct.  Maybe I can see the teeth, maybe
24 it's an image that belongs to a bigger file that
25 shows more information, but based on that one image

Page 68

1 alone, I can't do the sexual maturity rating.
2     Q.    So you do have -- first of all, do you
3 recall, I think you met with Detective Preston twice;
4 is that what your rec- -- records indicate?
5     A.    Yes.
6     Q.    February 22nd and April 5th.  Do you have
7 any calendars or anything in your possession that
8 document those meetings?
9     A.    I have a date and a time on my Outlook
10 calendar.
11    Q.    Have you gone back and checked that Outlook
12 calendar and -- and found an April 5th and a
13 February 22nd?
14    A.    I did not remember the February visit, so
15 when I went back, I did find the February visit on my
16 calendar.
17    Q.    Have you met with her any other times other
18 than April 5th or April (sic) 22nd?
19    A.    Not met with her.  I may have seen her in
20 the hallway, potentially, but, no, I didn't share any
21 cases with her to my knowledge.
22    Q.    Okay.  Did you check for that?
23    A.    No.
24    Q.    So you just don't recall having any other
25 cases that you consulted with her about?

Page 69

1     A.    I don't know that they were with her;
2 sometimes it's a team.  I have seen other St. John's
3 County cases at the hospital --
4     Q.    Right.
5     A.    -- but I don't remember her being a
6 prominent figure in any of the others.
7     Q.    Okay.  So do you recall -- so you don't
8 recall her -- meeting her in February with a single
9 image as we sit here today?
10    A.    I do not.
11    Q.    Do you recall meeting her in April with
12 multiple images?
13    A.    Yes, because we scheduled that.  And she
14 had images, more than one, yes.
15    Q.    And we've talked a little bit about that
16 meeting.  Do you recall the discussions that you had
17 with her during that meeting?
18    A.    In any vivid way, no.
19    Q.    You testified earlier that you would have
20 counseled her on the limitations of your opinions
21 regarding appearance versus actual age; is that
22 correct?
23    A.    In a simple way, yes, that's all I would
24 have said.
25    Q.    In any way you wouldn't be misleading

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 70

1  anybody in what your opinions are, correct?
2         MS. SHEVLIN:  Form.
3         MR. CARSON:  Join.
4     A.   Correct, the investigation needs to occur.
5     Q.   What do you mean by that, the investigation
6  need to occur?
7     A.   I have no access to actual -- any
8  additional information at all about the case, the
9  person depicted, other computer's images, I don't
10  have any of that information, so if there is an
11  investigation that's occurring, that I am not part
12  of.
13     Q.   Do you mean that, in part, that your
14  opinions are not enough to establish the actual age
15  of the individuals depicted from a medical
16  standpoint?
17     A.   Right.
18         MR. CARSON:  Object to form.
19         MS. SHEVLIN:  Join.
20     Q.   So, it's okay.  I got your answer that
21  time.
22         MR. CARSON:  If you don't mind, I didn't
23    hear her.  I think I might have spoken over the
24    witness.
25     Q.   I think you gave me another "correct"?

Page 71

1     A.   I think I did, yes.
2         MR. CARSON:  I apologize, Doctor.
3     A.   I'm sorry, I'm sorry.
4     Q.   I'll re-ask it.
5         You have not -- in these -- in these three
6  reports that I have that you produced in this case,
7  you have not rendered a reliable medical opinion on
8  the actual age of the individuals depicted in this --
9  in these images, correct?
10     A.   Correct.
11     Q.   So let me ask you this and these are kind
12  of hypothetical questions, but they are about the
13  images, so does that mean when you're presented an
14  image and, for example, the model appears, for
15  whatever reason, to have no pubic hair, that in
16  regards to sexual maturity rating is going to be --
17  that that is a sexual maturity rating of one?
18     A.   Probably, but I'll look to see if I can see
19  the other areas, too, and countenance of the person.
20     Q.   Right.  But I mean, you're not, if you're
21  not -- if you can't look at the breast and you don't
22  have a picture of her face or anything like that and
23  you just see a genital area and there's no pubic hair
24  that is visible to you, that's a sexual maturity
25  rating of what?

Page 72

1     A.   That would be the appearance -- if the
2  person is blonde, I will explain that I might not be
3  able to see blonde pubic hair even if it's there, so
4  I don't know the image, so I don't know if it was a
5  blonde or not.
6     Q.   Well, I guess for whatever reason, right,
7  I'm just asking, brunette red head or whatever, if
8  you look at an image and you do not see any pubic
9  hair, that would result in a sexual maturity rating
10  of one in terms of appearance?
11     A.   Yes.
12     Q.   And do you make any effort to determine
13  whether or not the image has been manipulated,
14  touched up, edited in any way?
15     A.   No, I have no expertise in that.
16     Q.   Talk about shaving, do you have any
17  expertise in the appearance of electrolysis, hair
18  removal?
19     A.   Not to my knowledge, no.
20     Q.   Do you have any expertise in what an
21  individual who has received electrolysis looks like
22  when you take a picture of them -- of their pubic
23  hair?
24     A.   No.
25     Q.   Same question with waxing; do you -- are --

Page 73

1  do you have any expertise in determining whether or
2  not from looking at a picture someone has been waxed?
3     A.   If there's folliculitis where the hairs are
4  starting to grow back, maybe, otherwise, no.
5     Q.   Because your understanding is waxing pulls
6  the hair follicles out of the skin in that process,
7  correct?
8     A.   Yes.  And there would be a period of time
9  where the follicles look healed over.
10     Q.   And that would be the appearance of no
11  growth of pubic hair?
12     A.   Yes.
13     Q.   Is there a reason why you only say in -- in
14  these opio- -- in these letters that the model or she
15  does not appear to be shaved rather than waxed?
16     A.   No, I just used shaved as the customary
17  term.
18     Q.   So by shaved, you mean grooming of any
19  type?
20         MS. SHEVLIN:  Form.
21     A.   The after care is still present, not shaved
22  in a general sense, not absent.
23     Q.   Hold on, I'm not understanding you.  Let's
24  not even look at the first letter, let's just look at
25  April 5th, okay?  You've got an April 5th.  I can

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 74

1  pull it up.
2           MS. SHEVLIN:  Could you pull it up, I want
3      to make sure it's the correct one for all of us
4      to pull up at the same time.
5           MR. ROBERTS:  There's two April 5ths.
6      Q.   So I'm going to share your report again.
7  I'm going to scroll down to the second -- so, I just
8  want to go over here on the second paragraph, can you
9  see this, the second image is imprinted with white
10 script.  That's the way it begins.  You say she does
11 not appeared to be shaved.  What do you mean by that
12 statement?
13     A.   That there's no shaving bumps or
14 folliculitis that we might see, and I don't see --
15 you can see that I say she appears to have no pubic
16 hair development.
17     Q.   So I guess what I'm saying, what I'm
18 getting at is what if she was waxed?
19          MS. SHEVLIN:  Form, speculation.
20     A.   I could have said she does not appear to be
21 waxed, I would be saying the same thing.
22     Q.   Bill, but -- do you get bumps from waxing?
23          MS. SHEVLIN:  Form, speculation.
24     A.   You can.
25     Q.   But I think we just established that there

Page 75

1  is a period after waxing where it appears that you
2  have no pubic hair growth, correct?
3      A.   It may appear you have no hair growth
4  wherever was waxed, I don't know how long that
5  lasted.
6      Q.   So how could you rule out in giving your
7  opinion here that she hadn't been waxed?
8           MS. SHEVLIN:  Form.
9      A.   I'm not making any statement about waxing
10 at all.
11     Q.   And that's my question, why not?  Why not?
12     A.   Because the presence of pubic hair is the
13 presence of pubic hair; what cosmetic procedure is
14 not part of the question.
15     Q.   She doesn't have any presence of pubic
16 hair, so isn't it part of the question, why does she
17 not have pubic hair; your answer is that she's
18 prepubescent, there are other explanations, correct?
19          MS. SHEVLIN:  Form.
20     A.   Correct, she has appearance of prepubescent
21 or -- yes.
22     Q.   Or she has the appearance of one is who is
23 just been waxed?
24          MS. SHEVLIN:  Form, speculation.
25     A.   I can't see the image, but hypothetically,

Page 76

1  that is one explanation.
2      Q.   Why is that explanation less likely than
3  your given explanation that she's prepubescent?
4           MS. SHEVLIN:  Form.
5      Q.   Which explanation?
6      Q.   That she's just been waxed?
7           MS. SHEVLIN:  Form, mischaracterization of
8      prior testimony.
9      A.   I was a military doctor and all the young
10 women are shaved, they're not waxed.  Waxing and
11 electrolysis and laser hair treatments are expensive,
12 and so in general, they're shaved.  So for me as a
13 military physician, shaved is a general term.
14     Q.   Whatever happens in the military happens in
15 the military.  I'm not asking about the military;
16 you've been a U.F. physician for 10 years, correct?
17     A.   And a military physician since 1982.
18     Q.   And you had no reason to believe that this
19 model was in the military, correct?
20          MS. SHEVLIN:  Form, speculation.
21     A.   Correct, but my customary vocabulary is
22 definitely effected,
23     Q.   No, and I'm not talking semantics, Dr.
24 Dully, and I -- I apologize if you think I am talking
25 semantics, I am not.  You just testified that one

Page 77

1  possible explanation for her not having the
2  appearance of hair, is that she was waxed?
3      A.   Okay.
4      Q.   That's correct, right?
5      A.   Or shaved or something else, yes.
6      Q.   Or electrolysis, correct?
7      A.   Maybe.
8      Q.   Now, my question to you is, you offered the
9  opinion that the reason why she does not have pubic
10 hair is because she is less than nine to 13 years
11 old, correct?
12          MS. SHEVLIN:  Form, mischaracterization of
13     prior testimony.
14     A.   Based on the appearance.
15     Q.   But the appearance is also consistent with
16 someone who's been waxed, correct?
17          MS. SHEVLIN:  Same objections.
18     A.   Correct, but I'm not seeing the image, so
19 hypothetically, it could be.
20     Q.   Right, so here's my question.  What makes
21 it more likely that your opinion, that it is her
22 pubertal development that explains her lack of pubic
23 hair, rather than waxing or electrolysis?
24          MS. SHEVLIN:  Form.
25     A.   The investigation will verify or refute.  I

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 78

1 have no ability to do that.
2    Q.   Well, I'm just asking you from a medical
3 perspective, okay.  You get an image, right, from the
4 internet, you knew this was an image from the
5 internet, correct?
6    A.   No, I know it was a Nick Nick tip based on
7 what I was told, I don't actually know.
8    Q.   Actually, and you may not know this, this
9 was not a Nick Nick tip, this picture, you describe
10 it, it had a file name, it's a screen shot and then
11 there is Duck Duck Go dot -- did you not know that
12 that was a screen shot from the internet?
13         MS. SHEVLIN:  Form.
14    A.   No, I didn't know where it came from.
15    Q.   Well, you'll look at it when you look at
16 the image, you'll agree it is from the internet; it
17 has the website.
18         MS. SHEVLIN:  Form.
19    Q.   Well, let's not get into that, we'll ask
20 that later.
21         You're being asked a medical opinion by the
22 detective, correct?
23         MS. SHEVLIN:  Form.
24    A.   Yes.
25    Q.   Now, you know, as a medical doctor that

Page 79

1 there can be multiple explanations for a model in an
2 image not having the appearance of pubic hair,
3 correct?
4    A.   There can be, yes.
5    Q.   Right.
6         One of those is that the image has just
7 been digitally altered to remove evidence of pubic
8 hair, correct?
9    A.   Yes.
10         MS. SHEVLIN:  Form.
11    Q.   One of those would be waxing or
12 electrolysis or some form of hair removal that did
13 not leave any visible evidence of hair, correct?
14         MS. SHEVLIN:  Form.
15    A.   Yes.
16    Q.   All right.  One of the explanations would
17 be that the model has not reached a certain level of
18 puberty, correct?
19    A.   Yes.
20    Q.   So as a medical doctor, this would be what
21 we call kind of a differential diagnosis, correct?
22 You got -- you got three different things that could
23 explain what you are observing; is that a fair
24 characterization?
25         MS. SHEVLIN:  Form.

Page 80

1    A.   Potentially, yes.
2    Q.   What makes you think that pubertal
3 development would be more likely than digitally
4 altering the image or some sort form of hair removal
5 that you couldn't see on the picture?
6         MS. SHEVLIN:  Speculation.
7    A.   I am not saying how likely or unlikely it
8 is, I'm only saying what the appearance is.
9    Q.   So when you're entering these opinions,
10 you're not saying with any degree of reliability that
11 they're correct?
12         MS. SHEVLIN:  Form, mischaracterization of
13    prior testimony.
14    A.   It's not chronological age, their
15 appearance.
16    Q.   Well, why didn't you -- I guess my question
17 here is and I don't think you need to look at the
18 image for this, you acknowledge that waxing can
19 produce the same effect of no visual evidence of
20 pubic hair; why would you as a doctor say that she is
21 an SMR I rather than she just had a really good wax
22 job?
23         MS. SHEVLIN:  Form, speculation.
24    A.   Again, I need to see the patient, which is
25 the image.

Page 81

1    Q.   Okay.  Well, we'll certainly do that when
2 we get the images and I guess we can answer those
3 questions then.
4         In this same -- and this perhaps highlights
5 what we've been going around today more than anything
6 else.  In the first paragraph here you review another
7 image, and this is -- let's just call it by its file
8 name: YCBLVVFQ underscore O.JPG.  This is an image
9 that you evaluated and I'm just going to read your
10 opinion.  Her breasts are partially visible and could
11 be SMR IV to V.  However, her genitals -- genitals
12 are plainly visible and her thighs spread widely
13 apart and showing she is SMR I with respect to pubic
14 hair.  Then you say this developmental appearance is
15 less than nine to 13 years of age.
16         So my first question is, what developmental
17 appearance is less than nine to 13 and a half years
18 of age with this model?
19         MS. SHEVLIN:  Form.
20    A.   Absence of hair bearing parts.
21    Q.   Okay.  But what about her breasts?
22    A.   Well, I did not have a good view of her
23 breasts, so that was the best that I could do was IV
24 to V.
25    Q.   Yeah, but what's the developmental

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 82

1  appearance of a V breast; what's the age ra- -- age
2  range of that?
3      A.   Post pubertal or beyond.
4      Q.   Greater than 18 years old, correct?
5      A.   Well, no, not necessarily, because part of
6  the sexual maturity rating is looking for disorders
7  that involve estrogen exposure at any age, and the
8  five can -- breast development sometimes starts first
9  and finishes first and so you can have a V during
10 puberty, so it's good to be able to see both areas if
11 possible.
12     Q.   What kind of disorder would that be called,
13 someone who has an SMR rating of V breasts, but no
14 pubertal hair development?
15     A.   Well, it can be normal, and it can be
16 normal based on the limitations of the photographs,
17 and there are cases of precocious thelarche it's
18 called where breast development happens without
19 actual pubertal development.
20     Q.   Your testimony here today is that it is
21 normal for a female to have grade IV to V breasts,
22 but no pubic -- pubertal hair development in a
23 clinical setting?
24     A.   It is possible, yes.
25     Q.   And if that is possible, you would look at

Page 83

1  it and say -- you would run some diagnostic tests to
2  try to explain why that was happening, correct?
3      A.   No, not necessarily.  It depends on the
4  whole picture.
5      Q.   How many pictures have you seen -- have you
6  ever treated that had grade V breasts, but no
7  pubertal development; is that someone that you've
8  treated before?
9          MS. SHEVLIN:  Form.
10     A.   Yes.  I have seen one in the military and
11 she had a sexual development disorder.
12     Q.   Okay.  So something that was not normal?
13     A.   It turned out that it was not normal, but
14 when we started, that was not necessarily so.
15     Q.   How old was she when you stopped treating
16 her?
17     A.   17.
18     Q.   So at 17 she had no pubertal hair
19 development?
20     A.   That was why I was seeing her, yes.
21     Q.   Did she have pubertal development when she
22 was 18?
23     A.   I didn't see her past 17, I don't know.
24     Q.   So it's possible for someone to present
25 with an SMR IV -- IV or V breast, no pubertal hair

Page 84

1  development and be 18 years-old?
2          MS. SHEVLIN:  Form, mischaracterization of
3      prior testimony.
4      A.   Well, it's -- it's possible; it would
5  depend on the underlying causes.
6      Q.   You would have to be in a clinical setting
7  to diagnose and figure that out, right?
8          MS. SHEVLIN:  Form.
9      A.   Yeah.
10     Q.   Why did you -- why in this one, though,
11 would you have -- would you have relied on the pubic
12 hair SMR rating, but not the breast development SMR
13 rating?
14     A.   Because I can see the pubic hair
15 development.
16     Q.   But there was enough for you to say SMR IV
17 to V?
18     A.   I erred on the old side since I could not
19 really see, so the breast development was potentially
20 that mature.
21         MR. ROBERTS:  Give me one second, okay.  I
22     think it's probably a good point to just continue
23     the deposition, go through the photographs and
24     all that stuff, I'm sure there will be a lot more
25     questions.  Does that sound good to everybody?

Page 85

1          MS. SHEVLIN:  Fine with me.
2          THE VIDEOGRAPHER:  Sorry, Mr. Roberts, no
3  video orders right now?
4          MR. ROBERTS:  Yeah, no video orders.  I
5  will actually order a copy of the transcript.
6          MS. SHEVLIN:  We'll take a copy as well,
7  just E-Tran.
8          THE COURT REPORTER:  Mr. Carson, do you
9  need a copy?
10         MR. CARSON:  I'm good for now.
11         THE COURT REPORTER:  Read or waive?
12         MR. ROBERTS:  You know, I don't even know
13 if we're continuing it, if it's an official
14 transcript.  It's up to you, Doctor, you can read
15 it if you want.
16         MS. SHEVLIN:  I'm going to have her read,
17 but given the circumstances, we'll make sure it
18 gets to her as soon as possible as soon as we get
19 it.
20         THE VIDEOGRAPHER:  The video recorded
21 deposition of Dr. Kathleen Duffy, going off the
22 record, the time is 12:26 p.m.  Thank you.
23         (Plaintiff's Exhibit Nos. 1 through 4 were
24 marked by the reporter subsequent to the
25 deposition.)

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

| Page 86 |
| --- |

1      (Whereupon the deposition terminated at
2   12:26 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 87 |
| --- |

1                  CERTIFICATE OF OATH
2
3   STATE OF FLORIDA  )
4   COUNTY OF ORANGE  )
5
6        I, the undersigned authority, certify that
7   KATHLEEN DULLY, M.D. personally appeared before me
8   and was duly sworn.
9        WITNESS my hand and official seal this 10th
10  day of May 2025.
11
12
13
14
15
16
17             LISA K. PENKACIK, RMR
               Notary Public - State Of Florida
18             My Commission expires 9/7/2026
               Commission No.:  HH 289853
19
20
21
22
23
24
25

| Page 88 |
| --- |

1                CERTIFICATE OF REPORTER
2
    STATE OF FLORIDA  )
3
    COUNTY OF ORANGE  )
4
5        I, LISA K. PENKACIK, Registered Merit
6   Reporter, certify that I was authorized to and did
7   stenographically report the deposition of
8   KATHLEEN DULLY, M.D.; that a review of the
9   transcript was requested; and that the transcript
10  is a true and complete record of my stenographic
11  notes.
12       I, further certify that I am not a relative,
13  employee, attorney or counsel of any of the
14  parties, nor am I a relative or employee of any of
15  the parties' attorney or counsel connected with the
16  action, nor am I financially interested in this
17  action.
18       Dated this 10th day of May, 2025.
19
20
               LISA K. PENKACIK, RMR
21
22
23
24
25

| Page 89 |
| --- |

1                   ERRATA SHEET
2   PAGE:    LINE:       CORRECTION:       REASON:
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   _____
     DATE
24   _____
25   KATHLEEN DULLY, M.D.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025

Index: 1..abuse

**Exhibits**

**Plt Exhibit 1**
 3:8  31:13

**Plt Exhibit 2**
 3:8  31:13
 45:7

**Plt Exhibit 3**
 3:9

**Plt Exhibit 4**
 3:9  50:25

**1**

**1**  31:13  45:4
 85:23

**10**  16:2  26:21
 76:16

**100**  65:16,17

**10:01**  4:7

**11:29**  60:12

**11:47**  60:15

**12**  54:2

**12:26**  85:22
 86:2

**13**  77:10
 81:15,17

**15**  54:3

**15th**  27:9

**17**  83:17,18,
 23

**18**  28:25

 43:19  54:4
 82:4  83:22
 84:1

**19**  54:4

**1959**  26:18

**1980**  8:16

**1980s**  18:19

**1981**  7:8

**1982**  76:17

**1986**  7:11,17

**1989**  7:17,18
 10:3

**1990**  8:6

**1990s**  18:19
 26:22

**1991**  8:17

**1993**  9:1

**1994**  9:4,12,
 24  23:21,23
 24:8

**1996**  27:5

**1998**  18:20
 27:17

**2**

**2**  31:13  45:5,
 7

**20**  43:15  54:4

**200**  10:5

**2006**  16:23

**2009**  10:4,7

**2023**  24:16
 57:15

**2024**  24:11,12

**2025**  4:7

**21**  25:24

**22**  18:5

**22nd**  18:3
 50:21  57:15
 68:6,13,18

**28**  4:6

**3**

**3**  45:4,5

**30**  9:8

**3:24-cv-00044-
mmh**  4:6

**4**

**4**  50:25  85:23

**5**

**5th**  18:3  51:4
 68:6,12,18
 73:25

**5ths**  74:5

**7**

**70**  26:18

**73**  29:15

**9**

**90's**  56:11

**95**  29:15

**A**

**a-n-t-e-r-i-o-r**
 64:23

**a.m.**  4:7
 60:12,15

**abdomen**  37:17
 38:1

**abdominal**
 63:22  64:9,
 15

**ability**  9:1
 12:13,20
 61:1  66:1
 78:1

**abnormal**  19:21

**Absence**  81:20

**absent**  55:19
 73:22

**abundant**  38:17

**abuse**  7:2,3,
 22  8:7,20,21
 9:15  10:4,8
 11:1,15,16
 12:7,8  13:4,
 6,9,11,14,
 20,22  14:1,
 4,8,14,17
 15:5,6,9,17,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: Abusive..appearance

19 16:7,21
17:12 28:7
49:18

Abusive   8:12

Academy   8:11
  27:3

access   18:4
  28:5,8 30:23
  60:22 70:7

accommodated
  60:24

accuracy   34:22

accurate
  22:20,23

accurately
  23:6

achieved   54:1

acknowledge
  80:18

active   16:19
  27:20

actual   22:15,
  24 34:23
  35:2 40:9,13
  46:14,21
  47:15,20
  48:9 51:10,
  20 69:21
  70:7,14 71:8
  82:19

add   61:6

additional
  8:14 9:25

70:8

administered
  11:4

adolescent
  35:16,18

adult   45:12
  58:22 62:6,
  13

adulthood
  43:17

adults   29:2,3,
  4

advantage
  58:13

advertised
  6:25

aesthetic
  34:12

affidavit
  48:16 49:6
  50:15

afraid   58:20

age   21:6,9,
  10,12,13,15
  22:15,24
  23:1,12,13,
  19 26:7
  28:25 29:14
  31:17 32:7,
  21 34:23
  35:3 39:5
  43:12,19
  46:4,9,15,21
  47:15,20

48:9 51:11,
  20 54:3
  69:21 70:14
  71:8 80:14
  81:15,18
  82:1,7

agencies   13:2

agree   10:22
  23:5 26:5
  31:20 32:21
  45:13 46:7,
  13,20,22
  47:19 78:16

agreed   54:11
  61:5

ahead   12:12,
  19

aid   11:17
  44:13 65:21,
  23

aim   30:10

aimed   13:21

Air   7:19

alterations
  34:16,17,21

altered   34:5
  79:7

altering   22:7
  34:11 40:6
  80:4

American   8:10,
  11 11:5
  15:11 26:23
  27:3

amount   65:7

Amy   4:16 37:2
  52:8 60:9
  61:2

Amy's   32:24

anatomical
  36:14,22
  63:16

anatomy   63:21

ankles   53:6

answers   32:23

anterior   38:4,
  10 55:4
  64:5,17,23

anterior/
posterior   43:1

anus   41:23

apologize
  63:10 71:2
  76:24

apparent   23:12
  51:17

appearance
  21:10,12,17
  22:13,21
  23:2,12,19
  28:9 32:6,16
  33:16,21
  34:1 35:18
  36:2,12,22,
  23 37:13
  46:8 48:10
  49:12 51:14,
  15,17,21,22

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**

Kathleen Dully, M.D. on 04/28/2025                    Index: appeared..blonde

54:2,9,22
57:9 59:23
61:24 62:16
69:21 72:1,
10,17 73:10
75:20,22
77:2,14,15
79:2 80:8,15
81:14,17
82:1

**appeared** 53:13
74:11

**appears** 30:10
46:24 51:14
52:3,4 53:2
59:7 67:20
71:14 74:15
75:1

**applicable**
10:23

**apply** 5:10
26:25 29:3
46:24

**applying** 26:11
46:2

**appointment**
38:12

**approaching**
20:15

**approximate**
62:13

**April** 4:6
18:3 51:4
68:6,12,18
69:11 73:25

74:5

**area** 39:21
42:23 59:2
65:2,11
66:13,14,18
67:13,14,15,
16 71:23

**areas** 71:19
82:10

**areola** 42:21,
23 43:6,10

**Armed** 27:16,
19

**article** 26:6
27:6 28:12
29:25 30:2,
5,13,24
31:21 45:5

**articles**
26:18,24

**Arts** 7:9,10

**Asia** 26:25

**assault** 16:7,
22

**assess** 12:21
19:20 20:20
39:3 54:18,
19

**assessed** 57:9

**assessing**
54:8,9 57:2

**assessment**
26:7 31:18

32:3 55:21

**assessments**
9:9 61:22

**assigned** 7:21

**assume** 5:3

**asterisks** 63:4

**astrological**
34:7

**attempt** 29:14

**attempted**
26:10

**attempting**
21:19

**avoid** 29:8

**aware** 21:24
22:3 24:8
34:2 50:1

---

**B**

**baby** 62:5

**Bachelor** 7:10

**back** 9:25
10:20 21:1
45:7 57:10,
12 65:20
68:11,15
73:4

**background** 7:7

**bad** 5:15

**base** 32:17

**based** 21:16

28:10 33:21
57:20 58:23
67:25 77:14
78:6 82:16

**basis** 6:19
10:14 54:23
55:12,14

**bear** 15:22

**bearing** 35:14
36:19 38:9
39:16 81:20

**beginning** 4:3
42:24

**begins** 74:10

**behalf** 4:16

**behavior** 29:8

**beings** 38:18

**belly** 41:16,
19

**belongs** 67:24

**Bethesda** 7:13

**big** 55:8

**bigger** 67:24

**Bill** 74:22

**bio** 63:1

**birth** 42:17

**bit** 5:2 36:16
37:19 42:22
69:15

**blond** 40:18

**blonde** 72:2,3,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

5

**bloodstream** 42:12

**blurry** 33:18 67:10

**board** 10:4,7 11:1,5 13:4 14:13,20 15:11 17:12

**boards** 10:3

**body** 6:23 36:14 42:19 62:10,11

**book** 44:6

**borderline** 33:24

**break** 37:6 52:8 57:11 60:8,13

**breast** 20:12 42:9,13,19, 24 43:5,11 54:14 67:13, 15 71:21 82:1,8,18 83:25 84:12, 19

**breasts** 42:1 53:17,21 81:10,21,23 82:13,21 83:6

**briefed** 25:23

**bring** 15:21 33:23,24

**bringing** 24:5

**brunette** 72:7

**buds** 20:12 42:9,13,19

**bumps** 74:13, 22

**burst** 23:22

**button** 41:16, 19

--------

C

--------

**calendar** 68:10,12,16

**calendars** 68:7

**California** 7:17 8:8 9:14

**call** 15:12 37:6 60:9 63:24 79:21 81:7

**called** 8:9,22 18:19 19:2 37:17 41:17 82:12,18

**calling** 19:6 54:7

**camera** 53:6 57:16

**Camp** 9:13

**care** 6:18 10:20,23 11:21 13:18 27:19 73:21

**cared** 8:1

**career** 16:5

**Carson** 4:18 22:11 47:3 61:5 63:17 70:3,18,22 71:2 85:8,10

**case** 4:5 6:19 7:22 8:20,24 9:15,18 10:14 14:10 17:16,18 20:19,20,23 21:17 24:20 25:2,14,21 26:1 27:1 35:24 36:20 49:25 59:17 70:8 71:6

**cases** 7:1 8:4 9:7,10 24:5 35:7 68:21, 25 69:3 82:17

**catch** 6:1

**caveat** 49:7

**cell** 60:10

**center** 8:18 9:4 16:11,20 27:16,19

**certainty** 13:8 65:14

**certification** 11:2,16 14:14,20,21

**certified** 10:7 17:12

**Chadwick** 9:4 16:20

**Chair** 7:21 8:23

**chance** 30:18, 19

**change** 24:15

**changed** 18:20, 22

**characterization** 14:18 79:24

**charge** 8:19

**check** 68:22

**checked** 68:11

**chemical** 55:24

**chest** 43:2,11 53:5,7,20 57:16,24

**child** 6:12, 14,17,22,23 7:1,4,21 8:1,7,8,20 9:9,15,21 10:3,8,10 11:1,15,16, 25 12:1,7,8

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**

Kathleen Dully, M.D. on 04/28/2025                    Index: child's..copy

13:4,6,9,11,
14,20  14:1,
4,8,14,17
15:5,6  16:6,
21  17:12
20:16,17
27:16,20
28:6,7,8
29:22  35:13
37:11  49:18
53:3  58:22

**child's**  10:17

**children**  8:1,
12  9:5  14:24
15:13  16:20
39:2  49:22

**Children's**
8:10  9:5
16:8,20  24:6

**chose**  31:2

**chronicle**  32:7

**chronological**
21:13  23:1,
11,19  32:7
35:3  43:12
46:4,15
80:14

**chronologically**
21:6

**circumstances**
48:22  67:17
85:17

**citation**
31:21,25

**clinical**
19:10,11,13
27:13,22,23,
25  28:1,5
38:22  43:13
55:21  82:23
84:6

**clinically**
55:9

**close**  18:12
40:17

**clothes**  67:10

**cold**  42:15

**colleague**  24:6
50:4

**College**  6:10
7:9

**colloquially**
5:24

**comfort**  49:11

**comfortable**
49:5  58:18

**commanders**
8:25  9:16

**comment**  59:10

**commentary**
51:9

**commissure**
37:24  38:4,
10

**committee**  7:22
9:15

**committees**
9:18

**communicate**
47:9

**communicated**
51:24  67:18

**community**  13:1

**completed**
18:13

**completely**
12:15

**completion**
19:18

**component**  11:6

**composite**
50:25

**computer's**
70:9

**concern**  15:15,
16,19  60:23

**concerns**  15:21
20:15  45:21

**conclusion**
28:21  30:7

**condition**
13:12

**conference**
7:25  8:7,9,
12

**conferences**
10:1

**confined**  42:20

**consequences**
29:9  49:19

**considered**
16:22  36:17

**consistent**
77:15

**constitute**
13:22

**consult**  10:17,
21  17:14,18
35:6

**consultant**
8:24  9:15,17
10:16

**consultation**
8:14

**consulted**  14:2
17:17,22
28:9  68:25

**consults**  6:24

**content**  63:2

**continue**  37:14
60:20  84:22

**continued**  8:15

**continuing**
10:1  85:13

**continuously**
16:25

**contribute**
12:22  17:9

**copy**  51:3
85:5,6,9

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**

Kathleen Dully, M.D. on 04/28/2025

Cornell   7:8

Corps   7:23
 9:16

correct   13:23
 14:8 15:15,
 19 22:4,9
 33:1,12
 35:7,24
 41:20 43:20
 47:7,8 49:19
 52:12 53:8,
 14,22 56:6,
 14,18 57:6,
 16,20 58:1,8
 60:5 61:12
 64:4,12 65:4
 67:23 69:22
 70:1,4,25
 71:9,10 73:7
 74:3 75:2,
 18,20 76:16,
 19,21 77:4,
 6,11,16,18
 78:5,22
 79:3,8,13,
 18,21 80:11
 82:4 83:2

correctly
 13:15 17:18
 29:5,10
 50:22 58:14

cosmetic   75:13

Counsel   4:11

counseled
 69:20

countenance
 71:19

counties   7:3,5

County   24:11
 69:3

couple   28:13

court   4:8,12
 5:17 6:1
 29:9 85:8,11

cover   7:3

covered   37:25

covering   53:21
 67:10

covers   7:4

crease   39:20
 63:23

criteria   67:8

critically
 30:9,17

crossed   58:7
 60:3

CSAM   45:22

Cum   7:11

curriculum
 11:10

cursor   66:9,
 12,13,19

customary
 73:16 76:21

cut   49:1

---
**D**
---

D-U-L-L-Y   6:8

Danny   4:7

data   18:24
 62:18,24,25

database   58:19

date   4:6 68:9

dated   18:2

DCF   6:24
 10:17 11:11,
 17

deal   25:7

decade   26:19
 45:25

decide   15:22

decided   15:12

decision   32:17

decisions   14:7
 49:13

defendant   5:5

definition
 42:9

degree   65:10,
 16 80:10

delay   19:18

delays   19:21

deliver   6:19

demonstrative
 44:13 45:6
 65:20,23

dentition   62:5

department
 17:3

depend   54:6
 84:5

depends   54:16
 58:3 62:1
 83:3

depict   44:20
 52:11 64:9

depicted   21:20
 22:16 32:14
 46:15 47:15
 51:11 70:9,
 15 71:8

depiction
 22:20 44:18

depicts   28:23
 33:21 53:2

depilatories
 54:17

deposition   4:3
 5:4,9 60:21,
 25 61:1
 84:23 85:21,
 25 86:1

describe   6:2
 23:10 36:2
 42:2 52:11,
 14,23 78:9

descriptive
 41:4

Desert   8:16

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025                    Index: designed..documents

designed   11:10
   19:8,13,17
   56:20,21

desktop   27:15

destroy   57:4

detecting
   29:22

detective   4:19
   17:22 47:12
   50:14 51:19,
   25 52:16
   68:3 78:22

detectives
   43:22

determination
   14:5,16 15:1
   32:10,13
   48:23 50:10
   54:24 65:7

determinations
   7:2

determine   13:5
   15:14 46:3,
   14 56:5,24
   57:19 58:6
   72:12

determining
   73:1

develop   29:22

developed   9:3
   37:12,14
   59:4

developing
   37:15

development
   20:8 36:9,24
   54:14 74:16
   77:22 80:3
   82:8,14,18,
   19,22 83:7,
   11,19,21
   84:1,12,15,
   19

developmental
   51:15 54:2
   81:14,16,25

deviations
   20:10

diagnose   84:7

diagnosis
   79:21

diagnostic
   14:5 83:1

diagrams   66:25

dial   45:9

Dick   45:17

Diego   8:7,10,
   18,19

difference
   21:14 39:2,
   18 40:7,11,
   13,15 58:16,
   25 66:23

differential
   79:21

difficult   5:21
   26:6 31:17
   32:3,4,5

40:20,21

digital   21:7
   22:7 34:11
   40:6,22
   46:25 64:19

digitally
   21:25 34:5
   79:7 80:3

direct   4:24
   11:13 24:22

direction
   35:16

directly   43:2

director   6:14,
   17 16:9 17:3

disagreed   45:8
   48:4,6

disagreement
   48:11

disclosed
   28:12

discounting
   30:13,16

discoverable
   25:12

discovered
   35:3

discussed
   45:24

discussion
   60:16

discussions
   69:16

disorder   82:12
   83:11

disorders   82:6

distill   14:25

distinction
   7:11 13:21
   21:18 38:24
   40:21 60:6
   64:3

distinguish
   40:2 59:6,21
   64:11,21
   65:3,10
   66:20

distinguishes
   40:4

distinguishing
   60:3

distribution
   60:5

division   17:4

doctor   12:6,24
   71:2 76:9
   78:25 79:20
   80:20 85:14

doctor/patient
   10:12,19

doctors   12:3

document   68:8

documented
   45:12

documents
   21:16

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: domestic..expose

domestic  9:17

dot  78:11

drastic  29:9

drawing  44:22

Duck  78:11

Duffy  85:21

Dully  4:4,17,
  20 5:1 6:8
  12:10 24:18
  30:4 45:11
  47:24 57:14
  59:16 60:17
  61:20 66:10
  76:24

duly  4:21

duty  7:18
  16:19 27:21

———————————
E
———————————

e-mail  45:23

E-TRAN  85:7

E.U.  29:21

earlier  5:2
  44:25 54:11
  69:19

early  18:19
  19:19 41:9

earrings  53:3

edited  21:25
  72:14

Edition  27:9

education  10:1

Edward  7:12

effect  42:11
  80:19

effected  76:22

effects  42:18

effort  72:12

electrolysis
  55:23 56:13,
  25 72:17,21
  76:11 77:6,
  23 79:12

emergency  9:23

employ  20:18

employed  6:9

employer  16:4

end  13:9,10

enforcement
  6:25 10:18
  11:11,17
  23:16 24:5
  33:7,15 35:7
  47:10 50:14
  61:22 67:3,
  18

enlargement
  42:22

entails  15:3

entering  80:9

entire  29:25
  38:3 54:13

erred  84:18

eruption  62:6

essentially
  6:20

establish
  70:14

established
  74:25

estimate  21:6,
  9,10,20,21
  23:19 28:9

estrogen  42:8,
  11,18 82:7

evaluate  53:16

evaluated  81:9

evaluating
  40:16 60:2

evaluation
  24:6,10,16
  26:24 38:19

evaluations
  24:7

evidence  12:21
  79:7,13
  80:19

exam  14:25
  43:13

EXAMINATION
  4:24 10:7

examine  10:13

examiner  16:7,
  22

exhibit  31:13

45:3,7,12
  50:25 85:23

exist  13:4

expect  50:13

expensive
  76:11

experience
  14:22 17:13

expert  5:6
  15:6 26:1
  45:5 49:18
  56:5

expert's  31:9

expertise  13:5
  14:15 72:15,
  17,20 73:1

experts  6:24
  29:7

explain  33:14
  72:2 79:23
  83:2

explains  77:22

explanation
  43:23 48:10
  76:1,2,3,5
  77:1

explanations
  75:18 79:1,
  16

explicitly
  51:19

expose  53:6

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025                                        Index: exposed..Friday

exposed    42:7

exposure   82:7

external   36:17

eye   30:9,12

---

### F

face   71:22

fact   11:22
  29:1 32:11,
  15

factor   36:9,11
  60:4

facts   60:1

factual   32:13

faculty   9:19

fair   13:3
  14:17 28:1
  34:19 47:20
  61:2,3 79:23

familiar   29:13
  31:15 56:13

Families   9:5
  16:21

family   8:22

fault   60:17

February   18:2,
  5 50:21
  57:15 68:6,
  13,14,15
  69:8

Fed   7:14

feet   53:4

fellowship
  9:6,25 19:6
  23:25 24:2

fellowships
  9:2

female   37:11
  41:11 43:13,
  18 53:3
  82:21

females   35:23,
  24 36:2 41:6
  45:12

fetus   42:11

field   9:8
  10:5

figure   69:6
  84:7

file   67:24
  78:10 81:7

files   48:21

fills   38:3

find   18:6
  29:20 30:3,5
  68:15

fine   28:15
  40:17 66:6,7
  85:1

finished   9:12,
  24 49:1,2,4

finishes   82:9

flat   42:13,14

floor   53:4
  57:24

Florida   6:10,
  15 7:5,20
  16:1,4

focus   40:17

fold   63:25
  64:1,2,16

follicles
  40:14 73:6,9

folliculitis
  73:3 74:14

follow   57:10

Forces   27:16,
  19

forensic   28:16
  29:7

form   10:12,25
  11:3,7,12,18
  12:4,9,18,25
  13:7,16,24
  14:9,19 15:8
  16:18 17:8,
  20 18:18
  19:3,9,15,25
  21:8 22:1,5,
  10,25 23:9,
  20,24 24:4
  26:4,13
  29:24 30:6,
  15,21,25
  31:3,23
  32:2,18,22
  33:9 34:6,
  13,25 35:11

38:21 39:7
40:8,12,23
41:13 43:14,
21 44:1
46:5,17
47:2,22
48:12,17
49:8,21
50:2,8 53:23
54:5,25
55:25 56:7,
25 57:7
58:2,9 59:9,
24 63:13
64:13,22
65:5,13
66:22 67:22
70:2,18
73:20 74:19,
23 75:8,19,
24 76:4,7,20
77:12,24
78:13,18,23
79:10,12,14,
25 80:4,12,
23 81:19
83:9 84:2,8

formal   19:4

format   7:25
  8:12

forming   20:23
  62:24

forward   48:23
  49:13 61:10

found   68:12

Friday   26:2

37:6

**front** 37:21
38:10 50:7
52:7 65:1

**full** 6:6

**fully** 37:12
59:3

**function** 19:23
20:3,5

**functioned**
8:23

**funded** 29:21

---

G

---

**gave** 50:12
70:25

**general** 10:2
13:17 17:15
18:9 44:2
52:19 57:13
61:16 73:22
76:12,13

**generally**
36:25 44:24

**genital** 36:1,
8,24 51:15
54:2,15
71:23

**genitalia** 53:6

**genitals** 37:10
53:15 81:11

**Giddens** 26:21

**girl** 37:12

**girls** 26:23
42:12

**give** 30:18
33:2,8,15
34:1 35:2
36:7 37:4
41:25 43:23,
24 47:14
67:5 84:21

**giving** 75:6

**Global** 4:10

**globular** 43:8

**good** 4:2 10:9
27:6 33:18
80:21 81:22
82:10 84:22,
25 85:10

**grade** 37:9,
18,19 38:2,
3,14,15
41:19 42:3,4
43:13,18
59:1,7,8,22
60:4 64:11,
21 65:3,4,6,
11 66:12
82:21 83:6

**grade-** 37:9

**grades** 36:3,4
42:1

**graduated** 7:8,
10,12

**grandmothered**

10:5

**grappling** 14:7

**Greater** 82:4

**groom** 39:6

**groomed** 22:19
40:1 56:5,6
57:4

**grooming**
22:18,22
39:25 40:6
46:25 54:7,
9,19,20
56:14 73:18

**groove** 63:17,
18,23 64:2

**ground** 5:10

**group** 16:10

**grow** 41:7
73:4

**grows** 41:6

**growth** 73:11
75:2,3

**guess** 36:22
44:12 48:1
72:6 74:17
80:16 81:2

**guys** 66:4

---

H

---

H-E-B-E-R-T
7:12

**hair** 20:13

22:4 36:5,8,
9,23 37:10,
15,16,19,22,
25 38:9,16
39:15,16
40:14 41:1,
6,12,18
54:15 55:1,
3,4,7,15,16,
17,18,24
56:1,2,25
57:1,2,3,6,8
58:7 59:1,2,
3,4 60:2,4
64:12 65:8
71:15,23
72:3,9,17,23
73:6,11
74:16 75:2,
3,12,13,16,
17 76:11
77:2,10,23
79:2,8,12,13
80:4,20
81:14,20
82:14,22
83:18,25
84:12,14

**hairs** 38:1
73:3

**half** 16:2
60:8 81:17

**hallway** 68:20

**hang** 24:18

**happened** 33:11

**happening** 83:2

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                Index: happy..informed

| | | | |
|---|---|---|---|
| happy 25:14, 21 | hospitals 10:18 | 32:14 33:17, 20 35:1 | imagine 38:20 |
| hard 49:3 | hour 60:8 | 40:16,22,24 44:19 45:6 | impact 34:22 |
| head 5:25 6:3 62:10 72:7 | human 38:18 | 46:16 47:16 49:15 52:12, | impossible 29:1 57:18 58:6 59:6 64:10,20 65:3 |
| healed 73:9 | hundred 65:14 | 22,24 53:2 | |
| hear 70:23 | Huseby 4:10 | 55:19,22 56:24 57:12, | |
| heard 28:17, 19 | hymen 36:12, 20 | 13,21,23 58:3,4,5,13, | impression 26:3 34:3 |
| Hebert 7:12 | hypothetical 58:24 59:15, | 17,19,24 59:10,14,19, | imprinted 74:9 |
| height 62:11, 14,19 | 17 61:8,14, 15,18,21 | 25 61:15 62:2,25 | include 51:9 |
| helpful 44:12, 15 60:6 63:2 | 63:9,10 71:12 | 64:8,20 66:21 67:9, | included 62:20,22 |
| helping 12:21 | hypothetically 59:19 75:25 | 24,25 69:9 71:14 72:4, | inconsistent 43:19 |
| heritage 54:16 | 77:19 | 8,13 74:9 | indication 35:2 |
| Herman 26:21 | ─────── | 75:25 77:18 78:3,4,16 | individual 21:20 22:15, |
| hesitate 5:15 | I | 79:2,6 80:4, 18,25 81:7,8 | 24 47:15 48:9 51:21 |
| highlights 81:4 | idea 20:9 47:9 | images 24:17 26:12 27:19 | 72:21 |
| hip 63:23 | identify 20:10 | 28:8 29:15 33:18,24 | individuals 21:6 40:19 70:15 71:8 |
| hire 6:20 | II 36:5 37:17 42:6,10,21 | 34:4,11,15, 16 35:15,23 | infant 37:13 42:8 |
| hold 56:4 73:23 | III 36:5 37:18,19 | 37:1,4 40:10 46:3 47:13 | information 47:14 62:15, |
| Holguin 4:8 | 42:6,10,24 | 52:7 61:9, 11,12,17 | 16,19 67:25 70:8,10 |
| home 12:8 | illnesses 13:14 | 62:9,12,14, 16 69:12,14 | informed 50:3, 4 |
| Hong 26:25 | ima- 51:11 | 70:9 71:9,13 81:2 | |
| hospital 7:17 8:10 9:6,13 16:8,11 69:3 | image 22:13 23:2,13,18 | | |

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: inguinal..lack

inguinal  39:19
  57:25 58:5,
  7,10 63:11,
  12,18,25
  64:1,15

injuries  13:13

injury  13:13

instance  20:11

instruct  24:24
  25:6

instructing
  25:16,17,19

intend  61:14,
  19

interacted
  23:15

interface
  11:10

interior  37:24
  64:20

internal
  36:14,16

international
  28:16

internet  23:23
  32:15 34:4
  46:3,16
  66:21 78:4,
  5,12,16

internship
  7:16

interrupted
  32:24

introduce  4:11

introduced  5:1

inverted  38:12

investigate
  33:25 50:17

investigated
  58:21

investigation
  17:25 32:19
  70:4,5,11
  77:25

investigations
  11:17 35:4
  45:22

investigators
  13:2

involve  38:15
  82:7

involves  13:1

involving  38:5

Iraq  16:23

irrespective
  46:24

issue  25:23
  26:7 31:17
  45:20 60:18

Ithaca  7:9

IV  36:5 38:2,
  3,14,15,24,
  25 40:2,4,7,
  22 41:10
  42:1,3,25
  43:4,6,13,

16,18 44:23
  45:13 53:14
  54:2,4,12
  58:16 59:1,
  7,22 60:4
  64:4,11,21
  65:3,6,11
  66:12,13,20
  81:11,23
  82:21 83:25
  84:16

**J**

Jacksonville
  6:11 7:20

jail  49:25

January  8:7

jaundiced
  30:9,12

job  5:19 8:3
  14:8 35:6
  58:20 80:22

John's  69:2

Johns  17:22

join  22:11
  38:6 47:3
  70:3,19

journal  28:17,
  18 30:11,16,
  17 31:21

journals
  27:11,12

judge  39:14
  50:7,9,16

jury  50:10

**K**

KASS  53:23

Kathleen  4:4,
  20 6:8 85:21

kids  11:21
  13:18 20:14
  33:23,24

kind  44:23
  71:11 79:21
  82:12

knees  53:5,7,
  20,21 57:16,
  23

knew  78:4

knowing  21:13

knowledge  26:9
  27:1 68:21
  72:19

Kong  26:25

Krugman  31:14
  45:13,16,17,
  18 47:19
  48:11 54:12

Krugman's  45:8

**L**

labia  37:12,
  20,23 38:4

lace  53:4

lack  77:22

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: lafay..material

lafay  41:21

laptop  52:22

largely  61:8

larger  44:24

laser  76:11

lasted  75:5

late  28:24

Laude  7:11

law  6:25
  10:17 11:10,
  17 23:15
  24:5,20
  25:2,5,14,21
  29:9 33:6,14
  35:7 47:10
  50:13 61:22
  67:3,18

Lawshe  4:5,15
  17:19,25

Lawshe's  26:1

lay  55:5

laying  12:10

leads  35:12

learn  19:1

learned  8:2
  17:24 19:1

leave  56:2,16
  79:13

Lee  4:4

left  47:13
  63:8

legal  11:6
  30:11 32:10
  49:19

legs  38:8,11
  53:5,21
  64:24

letter  18:5
  45:11 51:2,9
  52:23 73:24

letters  18:2
  50:13 51:2
  63:3 73:14

level  39:6,21
  65:14 79:17

levels  9:21
  13:8

life  12:2
  54:13

likelihood  7:2

limitation
  23:6,10
  32:20

limitations
  33:7 45:21
  46:8 49:10
  51:10,13
  69:20 82:16

Lisa  4:9

list  45:20,23

literature  8:5
  14:23

Litigation
  4:10

local  35:13

location  39:16
  64:14

logistical
  60:18

long  15:25
  21:2 23:15,
  17 41:24
  43:12 75:4

longer  37:21
  42:14

looked  27:17
  33:24 48:22
  52:24

lose  49:22

lot  5:23
  14:21 28:15
  34:2,15,16
  84:24

loud  29:6

lower  53:5

_____

**M**

_____

m-e-d-i-a-l
  64:24

M.D.  4:20

made  8:19
  24:2 35:15

main  63:1

major  32:20

majora  37:12,
  23 38:4

make  17:9
  22:8 27:23
  32:10,13
  33:3 40:21
  54:24 72:12
  74:3 85:17

makes  77:20
  80:2

making  12:14
  13:21 14:16
  38:23 45:2
  49:12 61:21
  75:9

male  42:8

maltreatment
  7:1 8:2,8
  9:10,21
  11:25

manipulated
  72:13

manipulation
  47:1

Marine  7:23
  9:16

mark  31:12
  45:4 50:24

marked  85:24

Marshall  18:22
  26:17

Mary  6:8

Maryland  7:13

material  26:8
  28:23 31:18

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025

Matt 4:18
  60:23 61:2

matter 4:4

matters 49:11

mature 28:24
  29:4 84:20

maturity
  18:10,11,16,
  23 19:16,24
  20:19,22
  21:3,5
  26:12,20,22
  27:13 28:10
  33:22 35:21
  36:3,4,10
  41:8 42:7,10
  43:7,24
  59:23 60:5
  61:25 67:6,
  20 68:1
  71:16,17,24
  72:9 82:6

means 16:14
  44:12

meant 37:5

measures 24:20
  25:2,10

Med 7:14

media 4:3

medial 64:6,
  17,24 65:1
  66:24

medical 6:14,
  16,18 7:14

8:4,14,17,24
9:9,14,20
10:1,23 11:4
12:24 14:10
15:21 16:9
17:3 28:18
29:7 30:11,
17 55:14,20,
21 56:4
70:15 71:7
78:2,21,25
79:20

medical/legal
  11:2

medicine 6:11
  7:13 9:23
  15:7

meet 42:25
  43:22

meeting 52:15,
  18,20 69:8,
  11,16,17

meetings 68:8

meets 64:10

member 45:19,
  20

met 43:25
  44:3 52:17
  68:3,17,19

method 40:5

methods 61:24

Michael 4:14
  5:2 24:19

middle 18:12
  42:16 64:17

midline 41:21
  42:25

Mikayla 4:5

military 7:14,
  22 8:25 9:2
  16:19 27:16
  76:9,13,14,
  15,17,19
  83:10

mind 70:22

mindful 5:19

minor 32:15
  33:23

minute 52:8

mischaracterizat
ion 13:24
  20:1 31:3,23
  34:13 47:22
  56:7 76:7
  77:12 80:12
  84:2

mischaracterize
  55:8

misleading
  69:25

missing 12:15
  48:2 62:7

mixed 62:5

modalities
  22:4

modality 28:4

model 32:14
  34:24 41:11
  46:15,21
  51:11 57:15,
  19 58:7
  61:25 71:14
  73:14 76:19
  79:1,17
  81:18

models 22:3

modifications
  54:7

modified 35:15

monitor 19:17

mons 37:24
  38:5,9

month 28:12

months 28:13

moonlight
  16:14

moonlighted
  16:16

moonlighting
  16:22,24

morning 4:2

mound 42:23
  43:4,5,10

mounds 43:4,7

move 48:23
  49:13

moved 8:17
  9:13

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025     Index: multi-problem..palpable

multi-problem
  8:22

multiple   22:4
  69:12 79:1

————————————
              N
————————————

naked   53:3

Nassau   24:11

Naval   7:16,19
  8:17 9:13

Navy   7:23
  8:6,9,17
  9:4,12 16:3

necessarily
  35:2 40:18
  82:5 83:3,14

Nelson's   27:9
  44:8

newborn   42:9

newborns   20:6
  42:6

newspaper
  50:4,5

Nick   58:19
  78:6,9

night   26:15

nights   46:11

nipple   42:15,
  20 43:6,9

nod   5:25 6:3

normal   12:2
  20:7,10,11,

13,17 82:15,
16,21 83:12,
13

northeast   7:4

Nos   85:23

Noshney   26:18

notch   39:20
  57:25 58:5,
  8,11 63:11
  64:1

nuance   48:2

number   4:5
  34:7,8

numbers   34:17
  63:3

————————————
              O
————————————

O.JPG.   81:8

Oakland   7:17

oath   4:22
  5:10

OB/GYN   9:22

Object   70:18

objected   12:17

objection   30:2
  32:24 33:3
  56:19

objections
  12:14 56:3
  77:17

obscure   57:24

obscured   58:5
  67:15,16

observing
  79:23

obvious   39:17
  40:19 51:13

occasionally
  62:15

occur   70:4,6

occurred   20:21

occurring
  70:11

offered   8:9
  77:8

offers   7:1

office   17:23
  27:25 60:18

officer   50:14
  67:3,18

officers   33:7,
  15

official   85:13

online   26:12
  29:23

opine   67:19

opinion   14:16
  22:8,9,13,
  14,21,23
  23:6,11,12
  32:16,17,21
  33:15 34:23
  48:6,7,8
  49:10,18

50:1 51:10
53:10,13
55:5,6,13,
14,20 61:24
62:24 67:5
71:7 75:7
77:9,21
78:21 81:10

opinions   20:23
  33:8 35:9
  36:19 48:4,
  15 49:5,23
  50:6 69:20
  70:1,14 80:9

opio-   73:14

opportunity
  9:11 20:20
  29:25 61:10

order   85:5

orders   85:3,4

original   26:17

originally
  48:3

orthopedics
  9:22

Outlook   68:9,
  11

————————————
              P
————————————

p.m.   85:22
  86:2

pale   42:15

palpable   42:14

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025

papilla   42:16
   43:6,9

paragraph   74:8
   81:6

parents   14:24
   20:16 49:22

part   11:9
   14:5 36:15
   37:24 49:25
   70:11,13
   75:14,16
   82:5

parted   53:6

partially
   81:10

participate
   17:5

parts   38:9
   39:16 43:17
   81:20

pass   10:6

passed   10:2
   14:21

passing   46:11

past   83:23

pasted   51:3

patient   10:12
   20:21 27:25
   40:9,13 46:9
   80:24

patients   10:11
   16:12 19:22

PDF   51:1

pediatric   7:15
   10:3 27:12
   44:8

pediatrician
   7:19 10:17,
   20 13:14,17
   14:13 16:7,
   17,21 19:20
   27:24 44:3

pediatricians
   17:12,13
   19:5 20:2,5
   24:7 29:14

pediatrics
   8:11 9:22
   10:8 11:5
   15:9,12
   27:3,10 28:7
   44:9

Pedo   31:18

pedo-
pornographic
   26:7 28:23

pelvis   38:6

pen   44:22

Pendleton   9:13

Penkacik   4:9

people   6:20
   8:24 9:7
   10:13 15:20
   30:3,4 39:5
   41:15,24
   49:4

percent   29:15
   43:15 65:14

perfectly
   25:11,12

period   73:8
   75:1

person   17:10
   32:10 33:16
   51:11 70:9
   71:19 72:2

person's   17:21
   43:2

perspective
   78:3

ph   26:18
   41:22

photograph
   21:21 22:7
   51:12 54:9
   67:21

photographs
   21:7,17,25
   27:4 28:3,4,
   10 60:19,22
   82:16 84:23

physical   8:21

physician
   76:13,16,17

physicians
   17:2

picture   64:8
   71:22 72:22
   73:2 78:9
   80:5 83:4

pictures   83:5

pin   35:20

pink   42:23
   43:10 53:3

pixilated   67:9

plainly   37:21
   81:12

plaintiff   4:15

plaintiff's
   50:24 85:23

point   45:14
   61:9 67:2
   84:22

points   11:20

policies   17:7
   24:16

ponography
   29:22

population
   26:23

pornographic
   21:7 23:18
   26:12 28:23
   29:14 31:18
   32:14 46:3,
   16 56:23
   66:20

pornography
   54:10 58:22

position   15:21
   25:14 53:5,7

positions   9:20

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025

Index: possession..purpose

possession
68:7

possibility
46:25

Post    82:3

posterior
41:15,22

potentially
68:20   80:1
84:19

Practically
39:22

practice   10:22
11:20   24:15

precocious
82:17

predicate   21:4

pregnant   43:16

prepubescent
75:18,20
76:3

presence   59:2
75:12,13,15

present   12:21
43:13   54:12
55:4,19
57:3,8   73:21
83:24

presentation
64:12   65:4

presented
71:13

Preston   4:5,19
47:12   50:14
51:19,25
52:16   68:3

pretty   51:17

primary   10:20

primer   43:25

principles
61:16,23

print   28:15

printed   63:1

prior   13:25
19:25   20:1
31:4,24
34:14   47:23
56:8   76:8
77:13   80:13
84:3

privilege   25:8

probable   5:14
48:15   49:6
50:15

problems   6:19

procedure
75:13

procedures
17:7

process   14:6
73:6

produce   80:19

produced   42:18
71:6

Professional
8:11

progress   19:17

progressing
18:13

Project   29:21

prominent   69:6

proportion
62:8,10,19

propose   9:1

Protection
6:13,15,17,
22,23   7:4
10:10   27:17,
20

protruding
42:16

prove   33:22

proves   29:1

provide   13:5
25:13

provided   31:7,
21

pubertal   27:4
37:10   53:3
77:22   80:2
82:3,14,19,
22   83:7,18,
21,25

puberty   18:12,
13   19:18,19,
22   20:8,15
35:18   79:18

82:10

pubic   20:13
22:3   36:5,7,
9,23   37:14,
15,19,22,25
39:15,20,21
41:1,5,12,18
54:15   55:4
57:3,6   59:1,
21   60:2,4
64:12   65:8
67:14,16
71:15,23
72:3,8,22
73:11   74:15
75:2,12,13,
15,17   77:9,
22   79:2,7
80:20   81:13
82:22   84:11,
14

pubis   37:24
38:5,10

publication
26:19   27:3,
15

published   30:3
34:4   50:3

pull   50:20
65:20   74:1,
2,4

pulls   73:5

purported
14:15

purpose   11:16,

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025                 Index: purposes..removal

19

**purposes**  34:12

**pursue**  8:15

**put**  15:13
  35:20 53:19
  54:1,3 63:6

**putting**  17:14

_____

Q

**qualified**
  13:13

**quality**  33:19
  66:23

**quantity**  65:7

**question**  5:12,
  15,16,18
  12:12,13,18
  15:2,4 23:2,
  16 24:21
  25:18,20
  32:12 33:12
  38:22 41:25
  42:5 46:10
  47:24,25
  50:11,12
  51:8 55:10
  59:15 72:25
  75:11,14,16
  77:8,20
  80:16 81:16

**questions**  5:3,
  11 18:9
  24:23 44:4
  58:23 59:12

60:20,24
61:7 71:12
81:3 84:25

**quick**  52:10
  57:12

**quote**  50:15

_____

R

**ra-**  82:1

**radiology**  9:22

**Rady**  9:5
  16:8,20 24:6

**raised**  45:22
  60:23

**range**  82:2

**rating**  18:10,
  11,23 19:16,
  24 20:19,22
  21:3,5 26:12
  27:13 33:22
  35:22 36:4,
  10 42:7,10
  43:7,24 57:5
  59:23 60:5
  61:25 66:19
  67:6,20 68:1
  71:16,17,25
  72:9 82:6,13
  84:12,13

**ratings**  26:20
  46:2,14

**re-ask**  32:12
  71:4

**reached**  79:17

**read**  25:25
  26:6 28:21,
  22 29:4,6,
  10,25 30:9,
  12,14,17
  31:10 52:25
  81:9 85:11,
  14,16

**readily**  36:17

**reading**  8:4

**real**  35:12
  52:10

**reason**  19:23
  24:24 71:15
  72:6 73:13
  76:18 77:9

**reasons**  25:6

**rec-**  68:4

**recall**  68:3,24
  69:7,8,11,16

**received**  72:21

**recommendations**
  17:10

**record**  6:7
  12:11,14
  52:14 60:11,
  14,16 85:22

**recorded**  85:20

**records**  68:4

**red**  72:7

**redevelop**
  42:19

**reference**
  20:15 31:19
  44:5,6

**referred**  18:14

**referring**
  63:19

**refute**  77:25

**region**  7:23
  36:8 59:21

**related**  52:23

**relationship**
  10:12,19

**relevant**  24:23
  25:1

**reliability**
  26:11 34:23
  65:10 80:10

**reliable**  22:9,
  12,14,23
  32:16 46:14
  47:14 71:7

**reliably**  67:5,
  19

**relied**  62:18
  84:11

**remedial**  24:20
  25:2,10

**remember**  19:5
  46:6 48:4
  52:15,17,18,
  20 68:14
  69:5

**removal**  55:24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025

56:25 57:1,2
72:18 79:12
80:4

**remove** 22:3
79:7

**removes** 55:18

**render** 22:8

**rendered** 71:7

**rendering**
61:24

**rephrase** 5:13

**report** 15:20
26:1 31:9,
14,22 45:5,
8,9 50:22
62:20,22
63:6 74:6

**reported** 15:22

**reporter** 4:9,
12,21 5:17
6:2 85:8,11,
24

**reports** 71:6

**represent** 51:2

**representing**
4:18

**request** 61:22

**required** 15:14

**reschedule**
60:22,25

**research** 26:11

**reset** 61:1

**residency** 7:16

**resident** 8:3

**residents** 9:20

**respect** 81:13

**response** 6:1

**responsible**
13:1 17:6

**restate** 47:5

**result** 72:9

**results** 56:17

**retired** 16:23

**return** 16:23

**revert** 43:16

**review** 7:22
8:20 9:15,18
27:1 81:6

**reviewed** 27:7
35:24

**reviewing**
26:14

**reviews** 8:25

**Roberts** 4:14,
25 5:2 24:22
25:4,11,16,
23 30:1 37:8
45:4 61:13
65:25 66:6
74:5 84:21
85:2,4,12

**roughly** 41:14
45:1 59:4

**rule** 75:6

**rules** 5:10

**run** 83:1

**rundown** 41:25

**running** 66:19

———————————

**S**

———————————

**San** 8:7,10,
18,19

**scheduled**
69:13

**school** 7:13,14

**Science** 28:16

**Sciences** 7:9

**scientific**
23:3 46:2,20
54:23 55:6,
12,14 61:23

**scientifically**
46:13 65:9

**Scott** 31:14
45:18

**screen** 28:11,
14 66:1
78:10,12

**script** 5:14
74:10

**scroll** 74:7

**search** 48:16

**section** 59:20

**seek** 48:16

**semantics**
76:23,25

**sense** 73:22

**sentence** 54:19

**separate** 43:5

**serve** 45:23

**served** 7:20
9:19

**serves** 45:20

**set** 61:23

**setting** 12:8
17:6 19:10,
11 27:13,22,
23,25 82:23
84:6

**sex** 16:7,21

**sexual** 8:21
18:10,11,15,
23 19:16,24
20:19,22
21:2,5
26:11,20,22
27:12 28:10
33:22 35:21
36:3,4,10
42:7,10
43:6,23
59:22 60:5
61:25 63:2
67:5,20 68:1
71:16,17,24
72:9 82:6
83:11

**sexually** 28:24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: shape..speaking

29:4

**shape** 38:4,8
41:11 43:8
59:4

**share** 18:7
28:11 31:12
50:21 68:20
74:6

**sharing** 53:11

**shaved** 39:3
51:16 54:21
55:2,13 59:2
73:15,16,18,
21 74:11
76:10,12,13
77:5

**shaving** 39:13,
17 54:16
55:18 56:9,
14,17 72:16
74:13

**Sheriff** 24:11

**Sheriff's**
17:23

**Shevlin** 4:16
10:25 11:3,
7,12,18
12:4,9,17,25
13:7,16,24
14:9,19 15:8
16:18 17:8,
20 18:18
19:3,9,15,25
21:8 22:1,5,
10,25 23:9,

20,24 24:4,
18 25:1,9,
13,19 26:4,
13 29:24
30:6,15,21,
25 31:3,23
32:2,18,22
33:2,9 34:6,
13,25 35:11
37:5 38:21
39:7 40:8,
12,23 41:13
43:14,21
45:2 46:5,17
47:2,22
48:12,17
49:8,21 50:8
54:5,25
55:25 56:3,
7,19 57:7
58:2,9 59:9,
24 60:10
61:3,6 63:13
64:13,22
65:5,13
66:22 67:22
70:2,19
73:20 74:2,
19,23 75:8,
19,24 76:4,
7,20 77:12,
17,24 78:13,
18,23 79:10,
14,25 80:6,
12,23 81:19
83:9 84:2,8
85:1,6,16

**Shevlin's**
60:18

**Shield** 8:17

**ships** 46:11

**shortly** 23:21

**shot** 78:10,12

**show** 44:4,6,
10 58:24
59:19

**showed** 52:22

**showing** 81:13

**shown** 30:8

**shows** 29:13
67:25

**sic** 54:18
68:18

**side** 38:11
43:3 59:3
66:4 84:18

**sign** 20:9

**significance**
41:2

**significant**
34:22

**signs** 17:11
56:2

**similar** 51:5

**simple** 69:23

**single** 43:8
69:8

**sir** 65:24

**sit** 10:6 18:4
34:9 69:9

**sitting** 57:16,
20,24

**size** 62:10,11

**skin** 73:6

**slowly** 9:3

**small** 42:13

**SMR** 18:15
20:7,12
23:18 37:17
42:17,21
45:13,21
46:2,14,24
53:14 54:2,
4,12 57:5
66:19 80:21
81:11,13
82:13 83:25
84:12,16

**Society** 8:12

**socks** 53:4

**solely** 13:20

**solve** 6:19

**sort** 19:22
23:22 26:20
34:11 80:4

**sound** 27:11
84:25

**sounds** 53:24

**speak** 5:20,24

**speaking** 30:2
36:25 39:22

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: special..talking

special   24:1

specialist
  10:8 14:8

specialized
  9:2,11

specialty
  10:3,4 12:7
  13:15,20
  14:18 15:12
  16:10 17:1

specific   61:11

specifically
  14:14

spectrum   13:9,
  10

speculation
  12:4 19:15
  34:25 39:7
  48:12 55:25
  56:19 74:19,
  23 75:24
  76:20 80:6,
  23

spend   65:18

split   65:25
  66:1

spoken   70:23

spread   81:12

St   17:22 69:2

stage   27:4
  41:10 62:6

staging   18:15,
  20 19:2,23

27:12

standard   10:23
  27:8

standing   62:12

standpoint
  70:16

start   18:8
  19:22 24:2
  28:22 36:1

started   83:14

starting   73:4

starts   37:15
  42:18 82:8

state   6:6
  21:19 58:12

statement   13:3
  35:21 47:21
  49:12 74:12
  75:9

stating   18:11
  46:8 48:8

station   7:18,
  20

step   50:18

sternum   42:25

STEWART   44:1
  50:2

stop   11:21,24
  12:3,7,20
  30:1 53:11

stopped   12:1
  83:15

stopping   12:22

stops   12:23

straight   41:21

structure
  36:21

structures
  67:11,12

struggling
  21:18

studies   18:21

study   28:4
  29:1,13,21

studying   8:4

stuff   84:24

subcommittees
  8:21

subject   17:25

subjective
  38:19 65:7

subjects   7:11

subsequent
  24:19 25:2,
  10 85:24

Subsequently
  17:24

suggested   46:1

summarizes
  27:4

summary   61:2,4

supervise   6:18

supervision

9:7

supposed   41:7

surface   30:10
  64:6 65:1

surprise
  29:16,19

suspect   50:6

suspected   6:25
  9:9

swear   4:12

Switzerland
  26:24

sworn   4:21

syllables   32:8

synonymous
  18:17


                    T

tables   30:7

takes   42:12

talk   33:4
  35:23 37:2,5
  52:8 72:16

talked   57:14
  69:15

talking   12:24
  15:16 37:10
  40:9,10
  47:19 51:20,
  21,22 52:3
  58:11 61:9
  63:16 64:3,5

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: Tanner..triangle

65:18 66:14
76:23,24

Tanner  18:14,
15,20,22
19:2,23
20:6,12
26:17

Tanner's  18:24

Tanners  27:12

taught  14:24

teacher  9:20

team  6:13,15,
17,22,23 7:4
8:24 10:10
17:5 69:2

technically
16:9

teen-age  20:16

teenagers
28:25

teeth  62:4,5,
6,7,19 67:23

term  16:13
37:13 63:16,
21 73:17
76:13

terminated
86:1

terms  8:13
18:16 21:15
35:22 36:23
59:22 72:10

test  15:3

19:7,14

testified  4:22
44:19 51:18
54:11 58:15
69:19 76:25

testifying
44:25

testimony
13:25 20:1
31:4,24
34:14 39:8,
10 47:23
48:5 56:8
76:8 77:13
80:13 82:20
84:3

tests  83:1

textbook  27:8,
9 44:8,14

thelarche
82:17

theory  53:20

thereof  19:18

thicker  38:16

thickness
38:19,25
39:3,15

thigh  39:6,12
41:15 57:25
58:8,15
59:5,20,21
60:3 64:9,
10,18,20,24

thighs  38:6,15
39:1,20,23
40:3 59:3
64:6,7,16,25
65:1 66:15,
16,24 81:12

thing  5:23
18:16 21:13
23:14 51:16
61:7 74:21

things  14:1,3,
4,22,23
15:20 17:14
54:17 79:22

thought  37:3
48:8

time  4:7 5:11
7:24 8:15
9:19 10:18,
21 15:13
17:22 24:9
25:19 26:10
27:20 29:16
52:16 55:9
56:10 60:12,
15,21 65:19
68:9 70:21
73:8 74:4
85:22

times  5:23
35:12 68:17

tip  78:6,9

tissue  42:24
43:5,11

today  5:3

17:16 18:4
69:9 81:5
82:20

Today's  4:6

told  47:13
51:18,19
67:3 78:7

tool  28:5

top  37:22
43:5,9

touched  72:14

trafficked
35:13

trained  12:6,7

training  7:6,
16,24 8:3,
14,20 9:21,
25 13:4
14:22

transcript
85:5,14

transferred
7:18

transmit  58:21

treat  13:12,
13

treated  83:6,8

treating  27:25
83:15

treatments
76:11

triangle  38:3,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: true..whiskers

7,13 41:1,3,
6,9,11
44:23,24
57:14,19
58:7 59:4

true  22:12,18
45:23

tumor  20:9

turn  35:14

turned  83:13

type  21:24
73:19

typed  52:25

types  24:17
56:14

**U**

U.F.  76:16

uh-huh  5:24
6:2

un-huh  6:2

underlying
84:5

underscore
81:8

understand
5:12,16 6:12
11:15 12:13,
16 13:15
14:13 15:4
17:17 19:24
23:4 44:21
47:24 48:14

50:22 52:6
55:16 59:13
63:5

understanding
73:5,23

understood
12:18 23:7

undertake  54:8

undetectable
22:22

unfamiliar
29:12

ungroomed
41:10

unit  8:22

University
6:10,15 7:9
16:1,3

unscientific
29:8 46:7

update  26:20

upper  64:7,9,
25

utero  42:8

**V**

vaginal  36:2

vaguely  52:21

validity  57:5

variability
20:7

vellus  37:16
38:1

verbal  5:25

verbatim  51:3

verify  77:25

versus  4:5
38:25 46:9
59:8 69:21

VI  36:6
41:19,22

video  85:3,4,
20

view  40:18
43:3 57:25
67:13 81:22

violence  9:17,
18

visible  36:18
37:22 56:2
62:12 71:24
79:13 81:10,
12

visit  68:14,
15

visual  44:18
80:19

vital  67:10,
12

vivid  69:18

vocabulary
76:21

**W**

Wait  24:18

waive  85:11

wall  43:11
63:22 64:9,
15

wanted  29:19,
23 30:3,5

warrant  48:16

wax  80:21

waxed  56:25
73:2,15
74:18,21
75:4,7,23
76:6,10
77:2,16

waxing  39:24
54:17 55:23
56:12 72:25
73:5 74:22
75:1,9 76:10
77:23 79:11
80:18

ways  29:22
47:18

wearing  53:3

website  78:17

week  30:24
31:10

well-known
45:11

whiskers  39:4,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: white..Zoom

14,17,25
40:3

**white**  53:4
74:9

**widely**  23:23
81:12

**wider**  38:11

**William**  4:4

**witnesses**  5:22

**women**  28:24,
25 29:15
43:15 54:12
76:10

**wood**  53:4

**word**  52:3,4,
19

**words**  51:4

**work**  6:12
16:6,19,25
17:2 26:21
28:2,3

**worked**  16:10

**working**  9:8

**worried**  20:17

**write**  6:4

**writes**  17:11

**writing**  17:14
52:1,2

**wrong**  25:21
29:15 42:5

**wrote**  30:5
50:13

---
**Y**
---

**YCBLVVFQ**  81:8

**year**  8:16 9:6
20:11 24:13

**years**  7:21
8:13 9:8
14:23 16:2
17:13 18:23
21:15 25:24
26:21 28:25
37:1 42:13
54:3 76:16
77:10 81:15,
17 82:4

**years-old**  84:1

**York**  7:10

**young**  62:8,9
76:9

---
**Z**
---

**Zoom**  49:3