## Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO.: 3:24-cv-00137-MMH-LLL

WILLIAM LEE LAWSHE,

an individual,

      Plaintiff,

-vs-

VERIZON COMMUNICATIONS, INC.,

a Delaware Corporation, and

SYNCHRONOSS TECHNOLOGIES, INC.,

a Delaware Corporation

      Defendants.

_____

REMOTE VIDEOTAPED DEPOSITION OF DAVID RUNYON

IN HIS CAPACITY AS CORPORATE REPRESENTATIVE

VIA ZOOM PLATFORM

Thursday, October 22, 2025

1:07 - 6:23 p.m.

Reported By:

Wendy Beath Anderson, RDR, CRR, CRC

Notary Public, State of Florida

Esquire Deposition Services

West Palm Beach Office    Job #J13610228

## Page 2

```
1   APPEARANCES:
2   On behalf of the Plaintiff:
3       MICHAEL K. ROBERTS, ESQUIRE
        JEFFERY S. NOONEY JR., ESQUIRE
4       LAW OFFICES OF NOONEY, ROBERTS,
        HEWETT, AND NOWICKI
5       1680 Emerson Street
        Jacksonville, Florida 32207
6
7   On behalf of Verizon Communications, Inc.:
8       NURY SIEKKINEN, ESQUIRE
        SUDHIR RAO, ESQUIRE
9       ZWILLGEN PLLC
        1900 M Street NW, Suite 250
10      Washington, DC 20036
11
12
13  On behalf of Synchronoss Technologies, Inc:
14      ANDREW H. REISS, ESQUIRE
        BOND, SCHOENECK & KING, PLLC
15      4001 Tamiami Trail North, Suite 105
        Naples, Florida 34103
16
17
18  ALSO PRESENT:
19      PATRICIA SUNAR, ESQUIRE
        ASSOCIATE GENERAL COUNSEL, VERIZON
20
21      MICHAEL ACKER, REMOTE VIDEOGRAPHER
22
23
24
25
```

## Page 3

```
1            - - -
2        I N D E X
3            - - -
4
5   WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS
6
    DAVID RUNYON
7
    BY MR. ROBERTS:    6
8   BY MS. SIEKKINEN:         158
    BY MR. ROBERTS:                   162
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1                - - -
2          E X H I B I T S
3                - - -
4   PLAINTIFF'S    DESCRIPTION               PAGE
5   EXHIBIT 1      VERIZON'S MOTION TO        35
                   DISMISS PLAINTIFF'S
6                  AMENDMENT COMPLAINT
7   EXHIBIT 2      DOCUMENT ENTITLED          43
                   "VERIZON'S EFFORTS TO
8                  COMBAT ONLINE CHILD
                   EXPLOITATION FREQUENTLY
9                  ASKED QUESTIONS"
10  EXHIBIT 3      NON-PROFIT HASH SHARING    53
                   DATABASE AGREEMENT
11
    EXHIBIT 4      CHANGE REQUEST TO SCOPE OF 61
12                 WORK NO. 1 DATED JANUARY
                   27, 2022
13
    EXHIBIT 5      SCOPE OF WORK FOR          86
14                 WEBPURIFY
15  EXHIBIT 6      ANSWERS TO INTERROGATORIES 104
16  EXHIBIT 7      TRAINING MATERIAL          112
17  EXHIBIT 8      CYBERTIP REPORT            126
18  EXHIBIT 9      DEPOSITION TRANSCRIPT OF   173
                   CARA BLASZKA
19
20  ** ALL EXHIBITS RETAINED BY PLAINTIFF'S COUNSEL AND MAY
    BE SUPPLIED AT A LATER DATE
21
22
23
24
25
```



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
5–8

Page 5

```
1            P R O C E E D I N G S
2                  - - -
3        Remote deposition taken before Wendy Beath
4   Anderson, Registered Diplomate Reporter, Certified
5   Realtime Reporter and Notary Public in and for the State
6   of Florida at Large, in the above cause.
7                  - - -
8        THE VIDEOGRAPHER:  We are now on the record.
9   The time is 1:07 p.m. eastern standard on
10  October 22, 2025.  This begins the videoconference
11  deposition of David Runyon taken in the matter of
12  William Lee Lawshe, an individual, vs. Verizon
13  Communications, Incorporated, a Delaware
14  corporation, et al. filed in the United States
15  District Court, Middle District of Florida,
16  Jacksonville Division.  Case number is
17  24-CV-00137-MMH-LLL.
18       My name is Michael Acker.  I am your remote
19  videographer for today.  The court reporter is
20  Wendy Anderson.  We are represent Esquire
21  Deposition Solutions.
22       As a courtesy, will everyone who is not
23  speaking, please mute your audio and please
24  remember to unmute your audio when you are ready to
25  speak.
```

Page 6

```
1        Will everyone present please identify
2   themselves and state whom you represent, after
3   which the witness will be sworn in.
4        MR. ROBERTS:  Michael Roberts and I represent
5   Mr. Lawshe.
6        MS. SIEKKINEN:  I'm Nury Siekkinen.  I
7   represent Verizon Communications, Inc.
8        MR. RAO:  Good afternoon.  Sudhir Rao.  I also
9   represent defendant Verizon Communications, Inc.
10       MR. REISS:  Andrews Reiss.  I represent
11  Synchronoss.
12       MS. SUNAR:  Patricia Sunar, Verizon.
13  Thereupon,
14              (DAVID RUNYON)
15  having been first duly sworn or affirmed, was examined
16  and testified as follows:
17       THE WITNESS:  I do.
18            DIRECT EXAMINATION
19  BY MR. ROBERTS:
20       Q.  Good afternoon, Mr. Runyon.  Could you just
21  state your name for the record, please.
22       A.  Yes, David Runyon.
23       Q.  Mr. Runyon, I think I introduced myself a
24  little bit earlier.  My name's Michael Roberts.  I'm an
25  attorney and I represent a gentleman named William Lee
```

Page 7

```
1   Lawshe in a case that he's brought against Verizon.  I'm
2   here to take a deposition today of Verizon's corporate
3   representative with the most knowledge of policies,
4   procedures and practices regarding the scanning and
5   reporting of child sexual abuse material.
6        Are you that corporate representative?
7        A.  I am.
8        Q.  All right.  Well, tell me a little bit about
9   yourself when you're not being a corporate
10  representative.  What do you do?
11       A.  I -- sorry.
12       Q.  Bless you.
13       A.  That may happen quite often, so I apologize up
14  front.
15       I deal with our hacking, phishing, spam,
16  harassment and child sexual abuse material that is
17  reported on the Verizon consumer IP space.
18       Q.  Okay.  What's your job title?
19       A.  Network securities specialist.
20       Q.  And you are a W-2 employee of Verizon?
21       A.  Yes.
22       Q.  And how long have you been doing that?
23       A.  I've been doing this exact work since August
24  of 2008.
25       Q.  I hear you're in New Jersey today; is that
```

Page 8

```
1   correct?
2        A.  Correct.
3        Q.  I noticed your driver's license was a Texas
4   driver's license.  Did I see that correctly?
5        A.  Yes.
6        Q.  Do you live in Texas?
7        A.  I do.
8        Q.  And do you work at a Verizon facility there or
9   do you work remotely?
10       A.  I work at our Hidden Ridge facility.
11       Q.  All right.  And where is that?  Is that close
12  to a major metropolitan area?
13       A.  It's Las Colinas, technically.  Las Colinas or
14  Irving, Texas.
15       Q.  That outside of Dallas?
16       A.  Right up against it.
17       Q.  Yeah, okay.  So tell me in your Dade job, not
18  related to being a corporate representative, how is it
19  that you deal with child sexual abuse material for
20  Verizon?
21       A.  Sure.  We receive notifications from third
22  parties or sometimes from NCMEC or even law enforcement
23  regarding images that may potentially be on our network.
24  We also take in reports of child predation issues that
25  may occur and reported by third parties involving our
```

Page 9

1 customers.
2     Q.  You said child -- didn't understand that word
3 predation?
4     A.  Right, yes.
5     Q.  What does that mean?
6     A.  Basically --
7     Q.  I just don't know what that word means, I'm
8 sorry.
9     A.  Child predation is somebody trying to take
10 advantage of a child.
11     Q.  Okay.  All right.  Now, you said Verizon
12 receives notification.  These are from third parties?
13     A.  They can be from third parties or they can be
14 from law enforcement.  They can be from NCMEC directly.
15     Q.  Okay.  So tell me, we're today, we're going to
16 talk about it all a little bit, but have you
17 familiarized yourself with the facts of this case or the
18 allegations of Mr. Lawshe's case?
19     A.  I'm aware of the case.
20     Q.  Yeah.  He was reported to NCMEC by an entity
21 called Synchronoss after scanning a hash database,
22 generally.
23        Do you understand that to be the case?
24        MS. SIEKKINEN:  Objection to the extent it's
25     inconsistent with the allegations in the case here.

Page 10

1 Go ahead.
2        THE WITNESS:  The process is that --
3 BY MR. ROBERTS:
4     Q.  I'm not asking you about the process.  I'm
5 just trying to -- I'm honestly not.  I'm just trying to
6 establish, do you work in any way with the scanning of
7 images against a hash database?
8     A.  No, I do not directly work with that.
9     Q.  Okay.  All right.  I'm trying to understand
10 the universe of CSAM detection and reporting at Verizon.
11 And so one of those methods is scanning of hash values
12 against -- and we'll talk about this -- against a
13 database.
14        You work in a different department, correct?
15     A.  Correct.
16     Q.  Okay.  Tell me, you know, like -- let's just
17 start with, what did you do today -- or not today, but
18 leading up to today, to prepare for this deposition?
19     A.  Reviewed some documentation and went over some
20 information that our legal team wanted me to know, to be
21 aware of.
22     Q.  Okay.
23     A.  So...
24     Q.  All right.  So you reviewed some documents.
25        Do I understand that correctly?

Page 11

1     A.  Yes.
2     Q.  All right.  Did you -- in trying to prepare or
3 to be Verizon's corporate representative, did you
4 interview anyone or talk to any other Verizon employees
5 about policies and procedures and practice of the
6 detection and reporting of child sexual abuse material?
7     A.  Outside of our legal department, no.
8     Q.  When you say your legal department, are you
9 talking about the internal legal department at Verizon?
10     A.  Yes.
11     Q.  Let me ask you more specific.  There's a
12 gentleman named Ethan Arenson.  Did you speak with him?
13     A.  Yes.
14        MS. SIEKKINEN:  Objection.  Only to the extent
15     you're going to start -- you're looking for
16     privileged information.  He can speak about --
17        MR. ROBERTS:  I'm not asking --
18        MS. SIEKKINEN:  Okay, go ahead.  I'm just
19     laying that out there.
20 BY MR. ROBERTS:
21     Q.  I'm not asking the contents of any
22 conversation.  I'm just asking did you speak with him?
23        MS. SIEKKINEN:  Thanks for the clarification,
24     yes.
25        THE WITNESS:  Yes.  He's the head of our

Page 12

1 digital safety programs; yes.
2 BY MR. ROBERTS:
3     Q.  What is his title?
4     A.  Truthfully, I don't know exactly what his
5 specific title is.
6     Q.  Okay.  You said he's the head of the digital
7 safety program.
8        Did I understand that correctly?
9     A.  Correct.
10     Q.  I've seen something like trust and safety.  Is
11 that -- does that phrase sound familiar to you?
12     A.  I've heard it, yes.
13     Q.  I mean, is that the name of his org?
14        MS. SIEKKINEN:  Objection.  Asked and
15     answered.  He said he didn't know.
16 BY MR. ROBERTS:
17     Q.  Okay.  All right.  So you -- okay.  You're
18 Verizon's corporate representative today.  Do you not
19 know the organization's name within Verizon that which
20 you work for?
21        MS. SIEKKINEN:  Objection.  That's not what he
22     testified.  Misstates his testimony.
23        MR. ROBERTS:  Okay.  Nury, Nury --
24        MS. SIEKKINEN:  You did --
25        MR. ROBERTS:  -- you can object to the form of



Page 13

1  the question.  Please, please refrain from the
2  speaking objections, okay?
3      MS. SIEKKINEN:  It's not speaking.
4      MR. ROBERTS:  You can say --
5      MS. SIEKKINEN:  Michael, I'm giving you an
6  opportunity to cure, that's all.
7      MR. ROBERTS:  Okay.
8  BY MR. ROBERTS:
9      Q.  I'm just asking for the name of the
10  organization within Verizon that you work for.  Do you
11  know the name of the organization that you work for
12  within Verizon?
13      A.  Yes, I do.
14      Q.  Okay.  What is the name of the organization
15  that you work for within Verizon?
16      A.  Network security.
17      Q.  Okay.  Who is the head of network security?
18      A.  That would be Marc Krause.
19      Q.  And who is Marc?  Crawlsee?  Can you spell
20  that last name?
21      A.  Krause, K-R-A-U-S-E.
22      Q.  Okay.  And who is Mr. Krause?
23      A.  He's the vice president of network security.
24      Q.  Okay.  And we had talked about Ethan Arenson.
25  Does Ethan Arenson -- does he report to Marc Krause?

Page 14

1      A.  No.
2      Q.  Okay.  Does -- I'm trying to understand the
3  organizational structure, okay, of the organization you
4  work for.  You had said earlier that Ethan Arenson is
5  the head of something.  Can you just give me the
6  organizational structure, like who do you report to, who
7  do they report to all the way up to who is ultimately in
8  charge of network security?
9      A.  Yes, I could give you that.
10      Q.  Please do.
11      A.  Okay.  My direct manager is Marty McGhee and
12  Marty reports up to Ryan Stonehausen and Ryan reports up
13  to Marc Krause.
14      Q.  Where does Ethan Arenson fit into the
15  organizational structure?
16      A.  He represents -- he's the legal person that's
17  responsible for the digital safety program for which we
18  operate under.
19      Q.  Okay.  Who is the person who is ultimately
20  responsible for establishing the policies, procedures
21  and practices for child sexual abuse material detection
22  and reporting?
23      A.  The process is outlined from Ethan's efforts.
24      Q.  Okay.  Does Ethan -- is Ethan the individual
25  that makes the ultimate decisions on what Verizon's

Page 15

1  policies or procedure are?
2      A.  As far as I know, yes.
3      Q.  Well, and I mean, I'm not trying to put you on
4  the spot, but you --
5      A.  No, the answer's yes.
6      Q.  Yeah.  And I'm asking, you are not -- and just
7  so we understand, this is sometimes a little bit of an
8  awkward situation.  I'm not asking you personally this
9  question, right?  This is -- you are Verizon's corporate
10  representative of policies and procedures.
11      A.  Right.
12      Q.  And I'm just asking from Verizon's
13  perspective, who is the person responsible for
14  establishing the policies and procedures of reporting
15  and scanning or detecting child sexual abuse material?
16      MS. SIEKKINEN:  Objection.  That's outside the
17  scope of the notice, but you can go ahead and
18  answer.
19      THE WITNESS:  That would be Ethan.
20  BY MR. ROBERTS:
21      Q.  Okay.  All right.  Now, you indicated that you
22  reviewed some documentation.  What documents did you
23  review?
24      A.  I reviewed the statements of work that we have
25  for our vendors and I also --

Page 16

1      Q.  What --
2      A.  Sorry.  Go ahead.
3      Q.  What else?
4      A.  Just went over our digital safety program
5  information that we have that's posted online and
6  what -- I think that's what I can recall at the moment.
7      Q.  Okay.  So the first thing that you indicated
8  was statement of work from your vendors.  What vendors
9  are you referring to?
10      A.  That would be Synchronoss and WebPurify.
11      Q.  Okay.  So you reviewed those statement of work
12  documents; is that correct?
13      A.  Correct.
14      Q.  All right.  Digital program and safety
15  information, I think you referred to as online.  Did I
16  understand that correctly?
17      A.  I'm sorry, could you rephrase that or repeat
18  that?
19      Q.  Yeah, what was the other -- I'm just asking
20  you directly, I mean, can you give me a little more
21  information about what the other -- you said some
22  digital program safety information online, and I'm
23  trying to get a little bit more information about what
24  document or documents you're referring to?
25      A.  Oh, well, our FAQ that's posted on the Verizon



Page 17

1  web, on Verizon.com.
2      Q.  Yeah, I think I have that document.  I can
3  pull it up for you in a little bit when we talk about
4  it, okay?
5          Did you review anything else you can recall as
6  we sit here today in preparation for today's deposition?
7      A.  I think I did actually take a look at
8  something regarding the National Center for Missing and
9  Exploited Children as well, some of the statements that
10  we have or work with that, yeah, that process.
11     Q.  Can you be a little bit more specific?  Is it
12  material that was provided by NCMEC to Verizon?
13     A.  No.  I just think it was -- I think we have --
14  I don't know exactly what that document was.  I just
15  remember going over it.
16     Q.  Okay.  What types of information did it have
17  on it?
18     A.  Oh, it had information related to the
19  processes, some of the, I think -- I would have to look
20  at it again.  I apologize, I don't remember verbatim.
21     Q.  I have some documents from NCMEC we may look
22  at in a little bit.  It may refresh your recollection.
23         Did you review any documents from Synchronoss?
24  Meaning --
25     A.  Yes.

Page 18

1      Q.  I'm sorry?
2      A.  Sorry.
3      Q.  The scope of work you reviewed that, correct?
4      A.  Correct.
5      Q.  Okay.  There's been a document that is
6  entitled "Legal Service of Process" or "Process of
7  Service."
8          Did you review that document?
9      A.  I don't recall.
10     Q.  All right.  So as I indicated earlier, I'm
11  here to ask you questions about, you know, Verizon's
12  policies, procedures and practices regarding child
13  sexual abuse material.  So have you identified the --
14  documents that you reviewed, are those all of the
15  documents that memorialize Verizon's policies or
16  procedures regarding the detection and reporting of
17  child sexual abuse material?
18     A.  Can you rephrase it?  I'm not exactly sure
19  what you mean by "memorialize."
20     Q.  Yeah.  So by memorialize I mean to reduce to
21  writing.  And so are those documents that you reviewed,
22  the statements of work and the digital program safety
23  information, the frequently asked questions, are those
24  the only documents within Verizon that reduced to
25  writing Verizon's policies, practices and procedures

Page 19

1  regarding the detection and reporting of child sexual
2  abuse material?
3      A.  As far as I know that would be the case.
4      Q.  One of the purposes of a corporate
5  representative deposition is for me to ensure that I'm
6  not missing something.  And so what I -- I'm going to
7  ask it in a different way, is as far as Verizon is
8  concerned, these documents that you've identified are
9  the only documents that have reduced to writing
10  Verizon's policies and procedures regarding the
11  detection and reporting of child sexual abuse material?
12         MS. SIEKKINEN:  Objection to the extent that
13     he said that he didn't recall something.  Just
14     misstates his testimony a little bit.  Go ahead.
15         THE WITNESS:  Yeah, again, so far as I know,
16     that's what I've seen.
17  BY MR. ROBERTS:
18     Q.  Okay.  All right.  So what steps does Verizon
19  take to detect child sexual abuse material on its
20  network?
21         MS. SIEKKINEN:  Objection.  Calls for a
22     narrative, but you can go.
23         THE WITNESS:  On our network?
24  BY MR. ROBERTS:
25     Q.  Yeah.  I'm asking for the entirety of

Page 20

1  Verizon's universe.  What steps does Verizon take to
2  detect child sexual abuse material?
3      A.  Well, there's -- forgive me, but there's
4  multiple parts of our network.  So sorry, trying to get
5  some clarification as to what specific segment are we
6  talking about.
7      Q.  I'm asking -- so you're Verizon's corporate
8  representative for policies, procedures and practices
9  regarding the detection of child sexual abuse material.
10  I'm asking you what steps, what programs does Verizon
11  have to detect child sexual abuse material?
12     A.  Okay.  Well, for our -- for the cloud storage,
13  we have two vendors that assist us that basically take
14  the images and they scan them and then when they flag an
15  apparent image that could potentially be CSAM.  They
16  then -- Synchronoss basically does that scanning.  They
17  then market.
18         They then have WebPurify or in conjunction
19  with investors, they have WebPurify go through -- has a
20  human that goes through and inspects it, and if they
21  watch -- they believe that it also is a candidate or
22  basically has an apparent -- is apparently CSAM, then
23  that gets reported back to Synchronoss and Synchronoss
24  then reports that to the National Center for Missing and
25  Exploited Children.



Page 21

1    Q.   Okay.  I'm going to get into much more detail
2    about that in a minute.  But -- so there's the scanning
3    of the cloud storage.  What else?
4          MS. SIEKKINEN:  Objection.  Detection was not
5    part of the 30(b)(6) notice.  Go ahead.
6          MR. ROBERTS:  Can you read what the notice
7    was?
8          MS. SIEKKINEN:  Just one moment.
9          MR. ROBERTS:  I don't have it in front of me.
10         MS. SIEKKINEN:  Yeah, I do, though.  The most
11   knowledge of policies, procedure and practices of
12   scanning and reporting CSAM.
13   BY MR. ROBERTS:
14         Q.   So reporting, is there other practices that
15   you report -- policies and practices in which you report
16   CSAM other than the scanning process that you've just
17   described?
18         A.   Yes, we do -- for our consumer IP space,
19   whenever there's a report of child sexual abuse material
20   that could potentially be on one of our customers' or
21   networks, we report that as well.
22         Q.   What's consumer IP space?  What does that
23   mean?
24         A.   That is the IP space that our customers lease
25   from Verizon to have internet service at their homes or

Page 22

1    businesses.
2          Q.   So that reporting on the consumer IP space, is
3    that based on scanning or just third-party reporting?
4          A.   It's third-party reporting.
5          Q.   Why doesn't Verizon scan its consumer IP space
6    in the same way it does cloud storage?
7          A.   That would be -- sorry.
8          Q.   Bless you, sorry.
9          A.   Yeah, sorry.  Like I said, that may happen
10   again.
11         No, our online environment, that's our
12   customers' networks.  We don't scan our customers'
13   networks.
14         Q.   Why not?
15         MS. SIEKKINEN:  Objection.  Outside the scope.
16   BY MR. ROBERTS:
17         Q.   You still have to answer, but why does Verizon
18   scan cloud storage but not the consumer -- your
19   customer's IP space?
20         A.   Because cloud storage is something that the
21   end user is putting on to our network.
22         Q.   I mean, so are you -- okay.  I understand that
23   the end user is your customer, though, correct, that
24   you're referring to?
25         A.   Yes.

Page 23

1    Q.   And when you say your network, you're talking
2    about the cloud storage, correct?
3          A.   Correct.
4          Q.   All right.  But your consumers could use the
5    IP space that they're leasing or using to transmit and
6    distribute child sexual abuse material, correct?
7          A.   I'm sorry, could you rephrase that or repeat
8    that?
9          Q.   Your customer, Verizon's customers, could use
10   the IP space that you provide to transmit or distribute
11   child sexual abuse material, correct?
12         MS. SIEKKINEN:  Objection.  Calls for
13   speculation and outside the scope.
14   BY MR. ROBERTS:
15         Q.   You can answer.
16         A.   No.  We don't manage their networks.
17         Q.   Okay.  But you -- if there's a third party
18   complaint of child sexual abuse material in the consumer
19   IP space, you would report that, correct?
20         A.   Yes.  If we received a report, we would pass
21   that on to the National Center for Missing and Exploited
22   Children for their review.
23         Q.   Okay.  Explain to me that process.
24         A.   Okay.  If someone has happened to be at
25   somebody's house and saw something on their computer

Page 24

1    that they didn't feel comfortable with and they reported
2    that to Verizon, we are obligated to report that to the
3    National Center for Missing and Exploited Children as a
4    potential CSAM.
5          Q.   Okay.  So I want to bear in a little bit on
6    that.  You said somebody -- if somebody sees something
7    that they're uncomfortable with, Verizon would report
8    that to NCMEC and that's the National Center for Missing
9    and Exploited Children?
10         A.   Correct.
11         Q.   Well, I'm -- what's Verizon's policy?  Does it
12   have to be -- it has to be something more than they're
13   just uncomfortable with it, right?
14         A.   No, if it's apparent or a report to us, we
15   call through and report that to the National Center for
16   Missing and Exploited Children.
17         Q.   So if an individual was to, let's say, just
18   see something and just said, hey, I think this is child
19   sexual abuse material, Verizon doesn't do any sort of --
20   they don't review that?  They don't do anything about
21   like the veracity of that?  They just immediately pass
22   it on to the National Center for Missing and Exploited
23   Children?
24         MS. SIEKKINEN:  Objection.  Outside the scope
25   and calls for speculation.



Page 25

1     THE WITNESS:  I report -- if we receive a
2     report --
3   BY MR. ROBERTS:
4     Q.  Right.
5     A.  -- it is our responsibility to forward that to
6   the National Center for Missing and Exploited Children.
7   We don't analyze it.  We just pass it along.
8     Q.  Okay.  So it doesn't have to be apparent child
9   sexual abuse material?  It's just -- if it's a report,
10  you pass it along?
11    A.  For -- yes, for our -- on that --
12    Q.  The consumer IP space?
13    A.  For internet services, yes.
14    Q.  All right.  How often does that occur?
15    A.  Very infrequent.
16    Q.  Right.
17    A.  We might see -- in a given year, we might see
18  eight reports.
19    Q.  I was looking at some of the published numbers
20  that NCMEC and Verizon have published in the past, and
21  it's funny you say that, because I think I saw in 2023
22  there were 30-something-thousand reports from
23  Synchronoss and maybe only like -- literally maybe seven
24  or eight or nine reports from Verizon.
25        Do I take it from my understanding, that's

Page 26

1   what you're talking about, those handful of reports that
2   I see on NCMEC's reported list, published list, those
3   five or six or nine, that's what you're talking about is
4   the consumer IP space reports?
5         MS. SIEKKINEN:  Objection.  Foundation.
6     Counsel's kind of testifying here for him.
7   BY MR. ROBERTS:
8     Q.  Let me re-ask that question.  Are you
9   familiar, have you ever looked at any of the published
10  numbers by NCMEC on how many reports Verizon makes
11  annually?
12    A.  I think I did look at that a little bit, yes,
13  I have.
14    Q.  Yeah.  And so I think what you're testifying
15  to, this is really all I'm asking, you're confirming
16  that if I see Verizon has reported five or six or ten or
17  eight or whatever reports outside of Synchronoss,
18  outside of Synchronoss, that is the consumer IP space
19  reports?
20        MS. SIEKKINEN:  Objection.
21        THE WITNESS:  Correct.
22        MS. SIEKKINEN:  Outside the scope.  Go ahead.
23  BY MR. ROBERTS:
24    Q.  Correct, okay.  Is there any other reporting
25  that Verizon does of child sexual abuse material other

Page 27

1   than what you've described with the consumer IP space
2   and the cloud storage?
3     A.  Not that I'm aware of.
4     Q.  Okay.  And I'm just going to ask this just to
5   make sure.  You are not aware of why Verizon does not
6   scan the consumer IP space?
7         MS. SIEKKINEN:  Asked and answered.
8     Objection.
9   BY MR. ROBERTS:
10    Q.  I'll ask it again.  You can answer it.
11    A.  Okay.  It's just not a practical -- you
12  just -- it's too intrusive.
13    Q.  How is it too intrusive?
14    A.  Well, it's a violation of -- I mean, you can't
15  just go in there and start scanning customer networks.
16    Q.  I mean, you scan customers' photographs.  Why
17  can't you scan customers' networks?
18    A.  It's their private network.  We don't manage
19  it.  Whereas the cloud is something that the customers
20  are openly putting onto our network and our
21  interpretation of service addresses that if they're
22  going to put that on our network, that Verizon will scan
23  the content and that's in our terms of service.
24    Q.  Couldn't Verizon put in its terms of service
25  that you can't use our consumer IP space to transmit

Page 28

1   child sexual abuse material?
2         MS. SIEKKINEN:  Objection.  Way outside the
3     scope here.
4   BY MR. ROBERTS:
5     Q.  You have to answer the question.
6     A.  Can you repeat that, please?
7     Q.  Yeah, I mean, couldn't Verizon just put in its
8   terms of service that you -- that you're going to scan
9   for child sexual abuse material if you use Verizon's
10  consumer IP space?
11        MS. SIEKKINEN:  Objection.  Same objection.
12    Go ahead.
13        THE WITNESS:  We have many different things
14    that are in place in our terms of service and
15    acceptable-use policy, but I don't know.  I don't
16    know how to answer that.
17  BY MR. ROBERTS:
18    Q.  Okay.  All right.  So does Verizon itself
19  employ any content moderators to review potential images
20  of child sexual abuse material?
21        MS. SIEKKINEN:  Objection.  Outside the scope.
22    Go ahead.
23        THE WITNESS:  We have our two vendors.
24  BY MR. ROBERTS:
25    Q.  I'm saying outside the vendors.  So I'm



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
29—32

Page 29

1  talking about now in your world, in the consumer IP
2  space, do you have anyone on your team or in your
3  organization that has the ability to do content
4  moderation?
5      A.  No, we do not do that.
6      Q.  Okay.  So just while we're on that topic, if
7  WebPurify escalates content to Verizon, how do they
8  resolve the escalation with WebPurify?
9          MS. SIEKKINEN:  Objection.  Lack of
10     foundation.
11  BY MR. ROBERTS:
12     Q.  Do you understand my question?
13     A.  I don't, actually.
14     Q.  Okay.  Well, we'll get there in a minute.
15         All right.  So you -- when we were talking
16  about -- let's move back to the cloud storage scanning.
17  You -- does Verizon agree that the scanning that they do
18  on their customers' cloud storage is entirely voluntary?
19     A.  I'm sorry, could you repeat that, please?
20     Q.  Does Verizon agree that the scanning that
21  you've briefly described performed on customers' cloud
22  storage is entirely voluntary?
23     A.  I'd have to defer to legal on that.  I
24  don't -- I guess I don't totally understand how that,
25  how that question's phrased, so I apologize.

Page 30

1      Q.  Okay.  Do you understand -- do you believe
2  that Verizon is required to scan their customers'
3  private photographs?
4      A.  We do it to be good corporate citizens and
5  protect children.
6      Q.  Okay.  You're not aware of any law that
7  requires you to do that?
8      A.  If we are made aware of CSAM or apparent CSAM,
9  we do have to report that by law.
10     Q.  And my question is, are you aware of any law
11  that requires you to scan your customers' photographs?
12     A.  I would have to defer that to legal because
13  I'm not a lawyer.  I don't know.
14     Q.  Okay.  In any event, Verizon has chosen to
15  scan its customers' private photographs, correct?
16         MS. SIEKKINEN:  Objection to the
17     characterization.  Go ahead.
18         THE WITNESS:  We do scan, yes.
19  BY MR. ROBERTS:
20     Q.  Okay.  All right.  Tell me, when was this
21  process of scanning, when was that begun?
22     A.  Do you know what?  I don't remember when the
23  actual date is, when that began.
24     Q.  Who does the scanning for Verizon?
25     A.  Synchronoss does.

Page 31

1      Q.  All right.  Verizon understands that
2  Synchronoss is acting as its agent to perform the
3  scanning task?
4          MS. SIEKKINEN:  Objection.  Calls for a legal
5      conclusion.  Go ahead.
6  BY MR. ROBERTS:
7      Q.  Well, let me ask you this.  Does Verizon set
8  all the policies and procedures that Synchronoss is
9  required to follow when scanning Verizon customers'
10  cloud service?
11     A.  It -- whatever's in the statement of work is
12  what they're supposed to be doing.  That's what I know.
13     Q.  And does Verizon control that?  Does Verizon
14  control what is in the statement of work?
15         MS. SIEKKINEN:  Objection.
16         THE COURT REPORTER:  I'm sorry, Nury.  Can you
17     please repeat that objection?
18         MS. SIEKKINEN:  Objection.  The contract
19     speaks for itself, but go ahead.
20         THE WITNESS:  I was just saying that that's an
21     agreement between Verizon and Synchronoss.  I
22     didn't write it, so I don't know.  You would have
23     to ask legal on that.
24  BY MR. ROBERTS:
25     Q.  Well, I'm sorry, but you're Verizon's

Page 32

1  corporate representative about policies and procedures,
2  okay?  So I'm going to ask you, does Verizon have the
3  right to tell Synchronoss how to scan, what to scan,
4  what procedures to do to scan?
5          MS. SIEKKINEN:  Objection.  Outside the scope.
6      Go ahead.
7          THE WITNESS:  I believe if -- yes.
8  BY MR. ROBERTS:
9      Q.  Okay.
10     A.  Sorry, Michael, could we take a break for a
11  second?
12         MR. ROBERTS:  Sure.  Yeah, let's take a quick
13     break.
14         THE WITNESS:  I appreciate it.
15         MR. ROBERTS:  Yeah.
16         THE VIDEOGRAPHER:  This marks the end of media
17     number one.  The time is 1:46 p.m.  We are now off
18     the record.
19         (Off the record.)
20         THE VIDEOGRAPHER:  This marks the beginning of
21     media number two.  The time is 1:59 p.m.  We are
22     now on the record.
23  BY MR. ROBERTS:
24     Q.  Okay.  We took a quick break, and so we're
25  back here.  We were talking about -- we're going to



Page 33

1  start talking about Verizon's relationship with
2  Synchronoss, and I understand, Mr. Runyon, that at some
3  point Verizon decided that they would ask Synchronoss to
4  scan Verizon's customers' cloud storage; is that
5  correct?
6      A.  Yes.
7      Q.  All right.  And you've reviewed the scope of
8  work in which Verizon engaged Synchronoss to do that
9  service, correct?
10         MS. SIEKKINEN:  Objection.  Vague on scope
11     of -- sorry.
12 BY MR. ROBERTS:
13     Q.  So let me just re-ask it.  You testified
14 earlier that you had reviewed a scope of work between
15 Verizon and Synchronoss, correct?
16     A.  Correct.
17     Q.  Was that scope of work related to scanning
18 Verizon cloud content or Verizon customers' cloud
19 content for child sexual abuse material?
20     A.  That is inclusive of it, yes.
21     Q.  All right.  All right.  So tell me, what --
22 what is Verizon's policy regarding reporting child
23 sexual abuse material through their scanning process?
24         MS. SIEKKINEN:  Objection.  Vague.  Go ahead.
25         THE WITNESS:  Sorry, the process is that

Page 34

1     Synchronoss scans and marks anything that appears
2     to be apparent CSAM.
3  BY MR. ROBERTS:
4      Q.  Okay.  How do they determine what -- first of
5  all, what is apparent CSAM?
6      A.  I believe the definition is in the statement
7  of work or in one of the documents, I think, somewhere.
8      Q.  Well, I'm asking you.  If you need to refer to
9  something, tell me.  What is Verizon's definition of
10 apparent child sexual abuse material?
11     A.  And I think that's in the -- in one of the
12 documents that defines that.
13     Q.  Do you know what Verizon's definition of
14 apparent child sexual abuse material is?
15         MS. SIEKKINEN:  Objection.  Asked and
16     answered.
17         THE WITNESS:  I'll refer to the document.
18 BY MR. ROBERTS:
19     Q.  Where in the document does it define child
20 sexual abuse material?
21     A.  I'll have to look at that.
22     Q.  I don't see a definition section.  I could be
23 missing it, but I'm here to ask you questions.  You're
24 the corporate representative with the most knowledge and
25 I'm not really asking what's in that agreement.  I'm

Page 35

1  asking what is Verizon's policy regarding the definition
2  of apparent child sexual abuse material?
3      A.  I would have to defer that to legal.
4      Q.  Okay.  Hold on one second.  I'm going to
5  share -- I'm not just staring at you, Mr. Runyon.  I was
6  looking for a document on my computer.  I'm going to
7  share what we'll mark as Plaintiff's Exhibit 1.
8         (Plaintiff's Exhibit No. 1 was marked for ID.)
9  BY MR. ROBERTS:
10     Q.  This is Verizon's motion to dismiss
11     plaintiff's amended complaint, page 12.  I'm going to
12     read you the sentence, okay, Mr. Runyon?  It says --
13         MS. SIEKKINEN:  Objection.  He's not had a
14         chance to review the document.  You've just flashed
15         a page of it.
16         MR. ROBERTS:  I'm not asking him to review it.
17         MS. SIEKKINEN:  He has time to review a
18         document.  Thank you.
19         MR. ROBERTS:  Please stop, Nury.  You can
20         object once I've asked the question, okay?
21 BY MR. ROBERTS:
22     Q.  I'm going to read a sentence to you,
23     Mr. Runyon, okay?  And I'm going to ask you about
24     Verizon's policy.  The sentence says, "An image may
25     appear to be CSAM, child sexual abuse material, but not

Page 36

1  actually be CSAM in fact, such as when the image
2  involves an 18-year-old who may appear to be 17 years
3  old or younger."
4         Is that Verizon's policy regarding -- does
5  that reflect Verizon's policy regarding what apparent
6  child sexual abuse material is?
7         MS. SIEKKINEN:  Objection.  You flashed one
8         page of a document on the screen.  You've not given
9         him a chance --
10         MR. ROBERTS:  Okay, Nury, I mean, I'm serious.
11         I'm serious, okay?  The speaking objections have to
12         stop, have to stop, okay?  You can object to my
13         questions.  I have no problem with you objecting to
14         my questions, but the speaking objections have to
15         top.  They're inappropriate.
16         MS. SIEKKINEN:  Michael, it's customary to
17         give your opposing counsel an opportunity to cure.
18         MR. ROBERTS:  I will ask -- I will ask you for
19         clarification of your objection if I choose to,
20         okay?  I will, I promise, okay?
21 BY MR. ROBERTS:
22     Q.  So Mr. Runyon, I've read the sentence -- have
23     you had an opportunity to read the sentence I've
24     highlighted?
25     A.  I am reading it, yes.



Page 37

1    MS. SIEKKINEN: Objection.
2    THE WITNESS: Sorry.
3    MS. SIEKKINEN: Again, he's not had a chance
4    to review the whole document, which is customary.
5  BY MR. ROBERTS:
6    Q.  Before you read it, Mr. Runyon, you knew --
7  when did you find out that you were going to be produced
8  as Verizon's corporate representative in this case?
9    MS. SIEKKINEN: Objection. Outside the scope.
10  BY MR. ROBERTS:
11    Q.  Well, let me ask you a different way. You
12  were disclosed as a corporate representative for Verizon
13  when they answered their interrogatories back in, I
14  think June of this year; is that correct?
15    MS. SIEKKINEN: Objection. Lack of
16    foundation. Go ahead.
17  BY MR. ROBERTS:
18    Q.  Do you recall signing interrogatory answers,
19  Mr. Runyon, back in June? Yes?
20    A.  Yes, I did.
21    Q.  And were you identified as at least a
22  corporate representative regarding those answers back
23  then?
24    A.  Yes.
25    Q.  Yes. And do you feel like you had an ample

Page 38

1  opportunity to prepare for today's deposition?
2    MS. SIEKKINEN: Objection. Outside the scope.
3    Go ahead.
4    THE WITNESS: Yes.
5  BY MR. ROBERTS:
6    Q.  Okay. I'm not going to show you the entire
7  document. You had the opportunity to read whatever
8  documents you wanted to in preparation for today,
9  correct?
10    MS. SIEKKINEN: Objection. You've marked it
11    as an exhibit. The whole document can be reviewed.
12    MR. ROBERTS: Okay. Please --
13  BY MR. ROBERTS:
14    Q.  All right. So I'm going to ask you a question
15  and we're going to try to get an answer. We're going to
16  try to get through this. "An image may -- an image may
17  appear to be child sexual abuse material but not
18  actually be CSAM in fact, such as when the image
19  involves an 18-year-old who may appear to be 17 years
20  old or younger."
21    My question is, is it Verizon's policy to
22  report images that involve 18-year-olds that may appear
23  to be seven-year-olds -- 17-year-olds?
24    MS. SIEKKINEN: Objection. Lack of
25    completeness. The footnote isn't shown on the

Page 39

1  screen. There's -- it's very easy to cure.
2  BY MR. ROBERTS:
3    Q.  Do you want to read the footnote before
4  answering that, Mr. Runyon?
5    A.  Verizon's -- gosh, sorry, guys. This is going
6  to keep happening.
7    Verizon's policy is to report apparent CSAM.
8  We do not make the final determination as to whether or
9  not it is. We report it and that is the process.
10    Q.  And I'm asking you what is Verizon's
11  definition of apparent CSAM?
12    A.  I would have to defer to legal on that.
13    Q.  Okay. You can't defer to legal on that. You
14  are the corporate representative for their policies and
15  procedures, okay?
16    Do you agree that what is apparent -- what
17  constitutes apparent child pornography is an important
18  part of the policies and procedures regarding reporting
19  child sexual abuse material?
20    MS. SIEKKINEN: Objection to harassing the
21    witness. Go ahead.
22    THE WITNESS: Again, our policy is to report
23    apparent. We don't make the final determination.
24  BY MR. ROBERTS:
25    Q.  But as we sit here today, you cannot define

Page 40

1  what apparent child pornography is, according to
2  Verizon's policies and procedures?
3    A.  I am referring this to our legal department.
4    Q.  Well, does the legal department make the
5  decision about what to report or not report in a
6  particular case?
7    MS. SIEKKINEN: Objection. Outside the scope
8    and lack of foundation there. Go ahead.
9    THE WITNESS: The process that we have in
10    place is we scan for apparent -- Synchronoss scans
11    for apparent CSAM. It is then -- then goes to
12    WebPurify where a human who is trained to look at
13    this, looks at it and if they agree it meets the
14    condition of the apparent, it is then sent back to
15    Synchronoss and Synchronoss sends that notice --
16    sends it off to the National Center for Missing and
17    Exploited Children, who then reports that to law
18    enforcement, and law enforcement makes a final
19    determination as to whether or not it actually is
20    or isn't CSAM.
21  BY MR. ROBERTS:
22    Q.  But as we sit here today, you cannot give me a
23  definition of what apparent CSAM means?
24    MS. SIEKKINEN: Objection. Asked and
25    answered.



Page 41

1  BY MR. ROBERTS:
2     Q.  You can answer it.  If you want to refer me to
3  legal again, that's okay.  I'm just -- I'm trying to
4  make sure that you do not have an answer to that
5  question.
6     A.  Michael, I'm going to refer that to legal,
7  yes.
8     Q.  Okay.  All right.  Do you believe that this
9  statement is consistent with Verizon's policy, that an
10  image of an 18-year-old that may appear to be 17 years
11  old is apparent child pornography?
12     A.  If it has the appearance of it, it gets
13  reported through the process.
14     Q.  Does Verizon -- is it Verizon's position that
15  an individual can look at a digital photograph and
16  determine by solely looking at the photograph whether an
17  individual is 18 or 17?
18        MS. SIEKKINEN:  Objection.  Lack of
19  foundation.  Assumes facts not in evidence.  Go
20  ahead.
21        THE WITNESS:  Again, the way the process is,
22  is it is scanned by Synchronoss.  If it has the
23  appearance, it is then passed on to WebPurify.
24  WebPurify then has a human using their training and
25  best judgment to -- life experiences, they

Page 42

1  pass -- they will then say yes, this meets the
2  criteria of apparent CSAM.  They then take that,
3  report it by Synchronoss.  Synchronoss reports it
4  to law enforcement -- or to NCMEC and NCMEC refers
5  that to law enforcement.  It is then at that point
6  in the hands of law enforcement to make the final
7  determination.
8  BY MR. ROBERTS:
9     Q.  So I guess we're not going to define apparent
10  today, but is it Verizon's policy that they report
11  apparent child sexual abuse material to NCMEC?
12     A.  Synchronoss does on the -- in this particular
13  instance, if the Synchronoss marks it as apparent and it
14  is confirmed by a person with WebPurify that it meets
15  the criteria of apparent, it will then be referred to
16  the National Center for Missing and Exploited Children
17  who then refers it to law enforcement.  That's our
18  process and our policies.
19     Q.  Okay.  The policy is to report apparent child
20  sexual abuse material?
21        MS. SIEKKINEN:  Objection.  Asked and
22  answered.
23  BY MR. ROBERTS:
24     Q.  You can answer again.
25     A.  Yes.

Page 43

1     Q.  All right.  I'm going to share what's
2  Exhibit 2.
3        (Plaintiff's Exhibit No. 2 was marked for ID.)
4  BY MR. ROBERTS:
5     Q.  I believe that this is a document that you
6  have already reviewed.  This is Verizon's Efforts to
7  Combat Online Child Exploitation Frequently Asked
8  Questions.
9        Was this the document that you were referring
10  to that you had reviewed?
11        MS. SIEKKINEN:  Objection.  You need a moment
12  to review to make sure it's complete.
13        THE WITNESS:  Yes, that does appear to be so.
14  BY MR. ROBERTS:
15     Q.  Okay.  So this document is available on
16  Verizon's public-facing website?
17     A.  Yes, it should be.
18     Q.  So if a customer had questions, frequently
19  asked questions, about what Verizon does to detect or
20  combat online child exploitation, this is Verizon's
21  statement to customers regarding their efforts, correct?
22        MS. SIEKKINEN:  Objection.  Lack of
23  foundation.  Go ahead.
24  BY MR. ROBERTS:
25     Q.  Well, hold on.  You had time to review this

Page 44

1  document in preparation for today's deposition, correct?
2        MS. SIEKKINEN:  Objection.  It's not clear
3  that it's the same document.  There's no Bates
4  stamp there.  I'm helping you, Michael.
5        MR. ROBERTS:  No, you're not, Nury.  I thought
6  that Mr. Runyon just testified that this appears to
7  be the same document that he reviewed.
8  BY MR. ROBERTS:
9     Q.  Is this the document that you reviewed or not?
10     A.  It appears to be, but I don't -- I don't know
11  it verbatim to the point I could match every word to it.
12     Q.  Okay.  Well, let's read it.  "Verizon uses
13  PhotoDNA technology, which is capable of matching the
14  digital signature of an uploaded image to large
15  databases of known CSAM maintained by the National
16  Center for Missing and Exploited Children."
17        Did I read that correctly?
18     A.  Yes.
19     Q.  All right.  It says, "We also make extensive
20  use of human reviewers, who evaluate the images detected
21  through automated scanning and ensure that all confirmed
22  CSAM is reported to NCMEC."
23        Did I read that correctly?
24     A.  Yes.
25     Q.  Does that refresh your recollection?  Is that



DAVID RUNYON                                          October 22, 2025
LAWSHE vs VERIZON COMMUNICATIONS                     45–48

Page 45

1  the language that you reviewed on the document that you
2  reviewed in preparation for today's deposition?
3      A.  It may be, but as I stated, I don't remember
4  word-for-word what the document had in it.
5      Q.  Okay.  This document does not -- the word
6  "apparent" does not appear in the two sentences that we
7  just read, does it?
8          MS. SIEKKINEN:  Objection.  Outside the scope.
9  Go ahead.
10         THE WITNESS:  I'm sorry, was that a question?
11  I didn't --
12  BY MR. ROBERTS:
13     Q.  Yeah.  The word "apparent" does not appear in
14  this statement, does it?
15     A.  Not in this statement, no.
16     Q.  Right.  Does this reflect Verizon's policy --
17  is this Verizon's policy of scanning and reporting child
18  sexual abuse material?
19         MS. SIEKKINEN:  Objection.  Compound.
20  BY MR. ROBERTS:
21     Q.  Okay.  Let's just break it down.  The first
22  sentence, "Verizon uses PhotoDNA technology, which is
23  capable of matching the digital signature of an uploaded
24  image to large databases of known CSAM maintained by the
25  National Center for Missing and Exploited Children," is

Page 46

1  that an accurate statement of Verizon's policy regarding
2  the scanning for child sexual abuse material?
3      A.  Yes.
4      Q.  Okay.  "We also make extensive use of human
5  reviewers who evaluate the images detected through
6  automated scanning and ensure that all confirmed CSAM is
7  reported to NCMEC," is that an accurate statement of
8  Verizon's policies regarding reporting of child sexual
9  abuse material?
10     A.  Yes.
11     Q.  Okay.  All right.  Why does Verizon believe --
12  first of all, can you tell me the name of the databases
13  that Verizon was using to scan for the detection of
14  child sexual abuse material?
15         MS. SIEKKINEN:  Object to the form.
16         THE WITNESS:  I'm sorry, could you repeat
17  that, the name of the databases?
18  BY MR. ROBERTS:
19     Q.  Yeah, yeah.  This says it uses PhotoDNA
20  technology, which is capable of matching the digital
21  signature of an uploaded image to large databases of
22  known CSAM maintained by the National Center for Missing
23  and Exploited Children.
24         Can you tell me in the fall of 2022 and the
25  winter of 2023, what databases was Verizon utilizing to

Page 47

1  scan for child sexual abuse material?
2          MS. SIEKKINEN:  Object to the form.
3          THE WITNESS:  I believe the primary was the
4  National Center for Missing and Exploited
5  Children's hash database.
6  BY MR. ROBERTS:
7      Q.  Can you be more specific than that?
8      A.  What do you -- like what type of -- what's the
9  actual physical name of the database?
10     Q.  There are multiple -- there are multiple
11  databases, I can represent to you, that are, I guess,
12  supported by the National Center for Missing and
13  Exploited Children.  I'm asking you which database was
14  Verizon utilizing?
15         MS. SIEKKINEN:  Objection.  Lack of
16  foundation.
17         THE WITNESS:  Well, okay.  You mean other than
18  the National Center for Missing and Exploited
19  Children?
20  BY MR. ROBERTS:
21     Q.  Were they using a database -- what do you mean
22  by the National Center for Missing and Exploited
23  Children database?  I can represent to you that that
24  doesn't exist.  So what are you referring to?  Yeah,
25  what are you referring to?

Page 48

1          MS. SIEKKINEN:  Objection.  Lack of
2  foundation.
3          THE WITNESS:  Well, I'm referring to the hash,
4  if that's what you're referring to.
5  BY MR. ROBERTS:
6      Q.  Has Verizon ever actually is -- you've never
7  reviewed the agreement, the access agreement for the
8  hash database that Verizon was using to scan for child
9  sexual abuse material?
10         MS. SIEKKINEN:  Objection.  Assumes facts not
11  in evidence.
12  BY MR. ROBERTS:
13     Q.  Have you ever reviewed the agreement that was
14  being used -- the agreement to gain access to the
15  database which was being used to scan Verizon's
16  customers' cloud storage for child sexual abuse
17  material?
18         MS. SIEKKINEN:  Objection.  Vague.
19         THE WITNESS:  I'm sorry, my voice is starting
20  to cut out too.
21  BY MR. ROBERTS:
22     Q.  It's okay.
23     A.  Yeah.  Believe me, it's not fun right now.
24     Q.  It's really a yes or no question.  Have you
25  reviewed an access agreement to any hashtag database?



Page 49

1    MS. SIEKKINEN:  Objection.  You're referring
2  to a document.  Can we show it?
3    MR. ROBERTS:  No.  I'm asking what he has done
4  to prepare for today.
5    MS. SIEKKINEN:  No, you're asking specifics
6  about.
7    MR. ROBERTS:  Nury, please stop arguing with
8  me.  I will stop this deposition.
9    MS. SIEKKINEN:  This is easy to cure.
10    MR. ROBERTS:  Please do not make me be this
11  way.  You can object to my questions.  I have no
12  problem with that, okay?  Please stop talking and
13  arguing.
14  BY MR. ROBERTS:
15    Q.  Mr. Runyon, have you reviewed any access
16  agreement to a database of hashes or hash database for
17  child sexual abuse material in preparation for today?
18    A.  Okay.  That -- yes.
19    Q.  Does that refresh your recollection?  I asked
20  you earlier about the documents that you reviewed.
21    A.  Yes.  It was the phrasing, sorry.
22    Q.  Okay.  Tell me, what have you reviewed.
23    MS. SIEKKINEN:  Objection.  Asked and
24    answered.
25

Page 50

1  BY MR. ROBERTS:
2    Q.  Well, obviously, this has refreshed your
3  recollection.  So tell me what additional document other
4  than you -- previously did you review to prepare for
5  today?
6    A.  There was an agreement between NCMEC and
7  Verizon, I believe, or NCMEC and Synchronoss.  I'm not
8  sure which.
9    Q.  Okay.  And what was that agreement about?
10    A.  I believe access to the hash, to the NCMEC
11  hash.
12    Q.  Was that the non-profit hash database?  Is
13  that the document that you're referring to?
14    A.  Yes.
15    Q.  All right.  Was Verizon in possession of that
16  document prior to the bringing of this lawsuit?
17    MS. SIEKKINEN:  Objection.  Outside the scope.
18    THE WITNESS:  I don't -- I don't know when we
19    had possession of it.  You would have to ask legal
20    about that.  That's --
21  BY MR. ROBERTS:
22    Q.  Okay.  All right.  So in Verizon's policy,
23  they indicate that this large database and it says,
24  quote, Of known CSAM.
25    What makes Verizon believe that that database

Page 51

1  is only composed of known child sexual abuse material?
2    MS. SIEKKINEN:  Objection.  Vague.
3    THE WITNESS:  We put trust in NCMEC and that
4    they've gone through and vetted the information
5    that's in there.
6  BY MR. ROBERTS:
7    Q.  Verizon believes that NCMEC has vetted the
8  information in the non-profit CSAM hash database?
9    MS. SIEKKINEN:  Objection.  Asked and
10    answered.
11    THE WITNESS:  Yes.
12  BY MR. ROBERTS:
13    Q.  Why do you think that they have vetted the
14  information in the non-profit CSAM database?
15    MS. SIEKKINEN:  Objection.  Outside the scope.
16    THE WITNESS:  They're considered to be a
17    leading industry resource for that.
18  BY MR. ROBERTS:
19    Q.  Okay.  Do you recall there being any
20  disclaimers of no warranty about the accuracy of the
21  information contained in the non-profit database in the
22  agreement that you reviewed?
23    MS. SIEKKINEN:  Objection.  This document
24    speaks for itself.  Go ahead.
25    THE WITNESS:  There may have been.  I don't --

Page 52

1    I don't know that I looked at it that closely.  It
2    could have existed.
3  BY MR. ROBERTS:
4    Q.  At the time that this statement that we're
5  looking at was written, did Verizon believe that that
6  database was composed of known and only known child
7  sexual abuse material?
8    MS. SIEKKINEN:  Objection.  Outside the scope.
9    THE WITNESS:  Could you rephrase that or --
10    I'm sorry.
11  BY MR. ROBERTS:
12    Q.  At the time that Verizon composed this policy
13  that we've been looking at, did they believe that the
14  database that they were using was only composed of known
15  child sexual abuse material?
16    MS. SIEKKINEN:  Object to the form.  Misstates
17    the facts.
18    THE WITNESS:  I would have to defer that to
19    legal.  I don't know when this -- what we're
20    looking at right now, when that was actually
21    created versus -- and I really am not sure when the
22    NCMEC agreement was put in place.  So I'm not
23    familiar with either one of those timings.
24  BY MR. ROBERTS:
25    Q.  I'll show you what we have marked -- I think



DAVID RUNYON                                          October 22, 2025
LAWSHE vs VERIZON COMMUNICATIONS                      53–56

Page 53

1 we'll mark it as Plaintiff's Exhibit 3.
2      MR. ROBERTS:  Madam Court Reporter, are we at
3 Exhibit No. 3?
4      THE COURT REPORTER:  Yes, sir.
5      (Plaintiff's Exhibit No. 3 was marked for ID.)
6 BY MR. ROBERTS:
7    Q.  This is the non-profit hash-sharing database
8 agreement.
9      Does this appear to be at least the front page
10 of the document that you reviewed?
11   A.  I believe so, yes.
12   Q.  Okay.  I know I'm scrolling pretty quickly
13 here, but does this appear to be the document that you
14 looked at, that you reviewed?
15   A.  It looks -- it very well could be.
16   Q.  It says it was signed in 2018?
17   A.  Okay.
18   Q.  This here at the end, "The registrant," which
19 would be Synchronoss, "on behalf of Verizon accepts all
20 information contained in the non-profit database
21 including but not limited to PhotoDNA signatures, hashes
22 and categorizations as-is without warranty of any kind
23 and assumes all risk and liability associated with using
24 the information contained in the non-profit database."
25      Did I read that first sentence correctly?

Page 54

1      MS. SIEKKINEN:  Objection.  The document
2 speaks for itself.  Go ahead.
3 BY MR. ROBERTS:
4    Q.  Okay.  "If the registrant has questions or
5 concerns regarding information contained in the
6 non-profit database, it shall address those issues with
7 the participating non-profit identified as having
8 submitted the information to the non-profit database,
9 including but not limited to circumstances in which the
10 participating non-profit is informed that the
11 information they have submitted may be corrupt,
12 incorrectly categorized or otherwise mistakenly
13 submitted."
14      So my first question is, why would Verizon
15 characterize to its customers that this database only
16 contained known child sexual abuse material, given this
17 clause in the agreement?
18      MS. SIEKKINEN:  Objection.  Misstates the
19      record and assumes facts not in evidence and
20      outside the scope.
21 BY MR. ROBERTS:
22   Q.  You can answer the question.
23   A.  I'd have to defer you to legal on that.
24   Q.  Okay.  Have you reviewed the deposition of
25 Fallon McNulty, the corporate representative for NCMEC?

Page 55

1      MS. SIEKKINEN:  Objection.  Outside the scope.
2 Go ahead.
3      THE WITNESS:  I'm not sure if I have or
4      haven't.
5 BY MR. ROBERTS:
6    Q.  Okay.  She testifies that in, I think, the
7 non-profit -- well, let me just ask you this.  You'll
8 agree you've reviewed the non-profit organization
9 hash-database sharing agreement.  That is a database
10 that is composed of multiple lists from multiple
11 non-profit entities, correct?
12      MS. SIEKKINEN:  Objection.  Misstates the
13      document.  Go ahead.
14      THE WITNESS:  I don't remember what -- if it
15      said it was coming from multiple sources or not.
16 BY MR. ROBERTS:
17   Q.  Okay.  In fact, is Verizon aware that NCMEC
18 has no control over the submissions of other
19 organizations to the non-profit organization
20 hash-sharing list?
21      MS. SIEKKINEN:  Objection.  Assumes facts.
22 BY MR. ROBERTS:
23   Q.  Well, were you aware of that?
24      MS. SIEKKINEN:  Objection.  Assumes facts not
25      in evidence.

Page 56

1 BY MR. ROBERTS:
2    Q.  You can answer.
3    A.  I would have to defer that to legal.  I don't
4 know what the -- what that states.
5    Q.  And you didn't realize that NCMEC has no
6 control over the submissions to the non-profit database
7 that are made by other international organizations?  You
8 didn't know that?
9      MS. SIEKKINEN:  Objection.  Misstates.
10      THE WITNESS:  I would have to defer that to
11      legal.  I don't really -- yeah, I don't have an
12      answer for you on that.
13 BY MR. ROBERTS:
14   Q.  Okay.  Well, do you believe that Verizon
15 knew -- well, first of all, let's back up.
16      The individual hashes that are involved in
17 this case, do you believe that they came from NCMEC's
18 external hash-sharing list?
19      MS. SIEKKINEN:  Objection.  Outside the scope.
20      THE WITNESS:  Can you please --
21 BY MR. ROBERTS:
22   Q.  Yeah.
23   A.  Sorry.
24   Q.  Yeah, yeah, it's hard.  It sounds like you
25 have no clue like about this, and you correct me if I'm



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
57–60

Page 57

1  wrong.
2      Do you understand that the NCMEC -- that the
3  NPO hash-sharing list is a conglomeration of multiple
4  lists from multiple different organizations, not just
5  NCMEC?
6      Did you understand that?
7      MS. SIEKKINEN: Objection. That was not in
8  evidence. Misstates, and argumentative with the
9  witness.
10 BY MR. ROBERTS:
11     Q. Did you understand that, Mr. Runyon?
12     A. I don't know what the list totally comprises.
13     Q. Okay. You don't know what criteria were used
14 by other organizations to make submissions to the NPO
15 hash list?
16     MS. SIEKKINEN: Objection. Outside the scope.
17     THE WITNESS: I'm not privy to what NCMEC does
18     with that hash list or how they create it.
19 BY MR. ROBERTS:
20     Q. Okay. NCMEC doesn't actually control anything
21 that other organizations put on that list. Did you know
22 that?
23     MS. SIEKKINEN: Objection. Outside the scope.
24     THE WITNESS: I don't have any awareness of
25     how they create that list.

Page 58

1  BY MR. ROBERTS:
2      Q. Okay. But you testified earlier that Verizon
3  relies on that list because you trust NCMEC.
4      Did I understand that correctly?
5      MS. SIEKKINEN: Objection. Misstates. Go
6      ahead.
7      THE WITNESS: Sorry. Yes, that is what I
8      stated, that they are considered to be an industry
9      expert resource.
10 BY MR. ROBERTS:
11     Q. But if they don't control the information on
12 that list, why would Verizon trust the information on
13 that list?
14     MS. SIEKKINEN: Objection. Outside the scope.
15     THE WITNESS: They're considered an industry
16     expert and that's -- we have to rely on them to do
17     their job.
18     Can we take another break? I apologize. I've
19     got to get something in my throat. My throat's
20     just going nuts.
21     MR. ROBERTS: Okay. All right. That's fine.
22     THE VIDEOGRAPHER: This marks the end of media
23     number two. The time is 2:36 p.m. We are now off
24     the record.
25     (Off the record.)

Page 59

1      THE VIDEOGRAPHER: This marks the beginning of
2      media number three. The time is 2:49 p.m. We are
3      now on the record.
4  BY MR. ROBERTS:
5      Q. All right, Mr. Runyon, I still have Exhibit 3
6  up here and I just -- this is the first page of the
7  non-profit hash-sharing database access agreement and
8  the third paragraph down says, "Various non-profit
9  organizations worldwide provide services to help prevent
10 child sexual exploitation and assist child victims of
11 all exploitation. As part of these efforts, these
12 non-profits may possess PhotoDNA signatures and/or
13 hashes of images that they believe constitute apparent
14 child pornography or their jurisdiction's equivalent
15 legal definition for child pornography."
16     My question for you is, are you aware as we
17 sit here today who these various non-profit
18 organizations are?
19     A. I know of a few.
20     Q. Okay. Who?
21     A. Well, aside from National -- the National
22 Center for Missing and Exploited Children, there's also
23 the Internet Watch Foundation and there's also
24 CyberTip.CA, I think.
25     Q. Okay. And when did Verizon discover that

Page 60

1  those organizations were contributing to the non-profit
2  hash-sharing database?
3      MS. SIEKKINEN: Objection. Lack of
4      foundation.
5      THE WITNESS: I don't know when that date was.
6  BY MR. ROBERTS:
7      Q. Okay. Do you know any of the other
8  organizations that are -- or have contributed to the
9  non-profit hash-sharing database?
10     MS. SIEKKINEN: Objection. Lack of
11     foundation.
12     THE WITNESS: No, I'm not aware of any.
13 BY MR. ROBERTS:
14     Q. Okay. Where did you get that information that
15 IWF and CyberTip Canada -- who told you that they were
16 contributors, or what document did you review that told
17 you that?
18     A. Well, you asked me the question if I was aware
19 of any. I've run into those two different companies
20 through my work receiving child sexual abuse material
21 reports for our consumer IP space, but --
22     Q. Right.
23     A. Yeah, but as far as --
24     Q. But I'm asking you.
25     A. Right.



DAVID RUNYON                                          October 22, 2025
LAWSHE vs VERIZON COMMUNICATIONS                     61—64

Page 61

1    Q.  But I'm asking you why do you think they were
2  part of the non-profit hash-sharing database?
3    A.  Oh, I believe there was a document that stated
4  that Synchronoss was only going to continue to use just
5  the NCMEC base report, I think, or something like that.
6    Q.  Can you tell me, what did that document look
7  like?  What document are you referring to?
8    A.  I just remember coming across it.  I don't
9  remember what it actually looked like.
10   Q.  Was it an e-mail?
11   A.  It may have been.
12   Q.  Do you know who the author of the e-mail was?
13   A.  No, I do not.
14   Q.  All right.  So I think you indicated that you
15  had reviewed some scope of work documents.  One of those
16  was between Synchronoss and Verizon, correct?
17   A.  Yes.
18   Q.  Let me show you what we'll mark as 4.
19      (Plaintiff's Exhibit No. 4 was marked for ID.)
20  BY MR. ROBERTS:
21   Q.  This document, it's a change request to scope
22  of work No. 1 and this is dated January 27th of 2022.
23  Is this one of the scope-of-work documents that you were
24  referring to?
25   A.  It may have been.

Page 62

1    Q.  Okay.  Is this the scope of work that was in
2  place at the time of the events which are the subject of
3  this lawsuit?
4      MS. SIEKKINEN:  Objection.  To the extent he
5    hasn't had time to look at that.
6  BY MR. ROBERTS:
7    Q.  Okay.  Have you had time to look at this?
8    A.  I'm looking at it, but the -- I don't know
9  exactly when this was in place, and I'm not familiar
10  exactly when --
11   Q.  So --
12   A.  Yeah.
13   Q.  Okay.  So October of 2022 and January of 2023.
14   A.  Okay.
15   Q.  I'm showing you a document that was signed --
16  a scope of work that was signed January 27th of 2022.
17  This is between Synchronoss and Verizon and it has a
18  scope of work regarding illicit content screening.
19      So my question is, is this the document that
20  set the policies and procedures between Verizon and
21  Synchronoss that was in place in 2022 and 2023, the time
22  of this subject incident?
23   A.  It appears to be.
24   Q.  Okay.  All right.  So here it says on -- under
25  Subsection B, and I guess we can identify this by

Page 63

1  Synchronoss and there's a Bates Stamp 826, "Illicit
2  Content Screening."
3      Do you see that?
4    A.  Yes.
5    Q.  All right.  It says, "Screening content of
6  supported data classes by platform using a commercially
7  available database or bases supported by supplier, such
8  as AOL databases of MD5 child pornography hash
9  signatures."
10      What is the AOL database?
11      MS. SIEKKINEN:  Objection.  Outside of the
12    scope.
13      THE WITNESS:  I don't know what that is.
14  BY MR. ROBERTS:
15   Q.  Well, this is the -- you tell me if I'm wrong,
16  but this was the scope of work that was signed January
17  of 2022 between Verizon and Synchronoss.  You don't know
18  what the AOL database is?
19      MS. SIEKKINEN:  Objection.  Outside the scope.
20      THE WITNESS:  No, I personally don't have any
21    familiarity with what that is.
22  BY MR. ROBERTS:
23   Q.  Okay.  Do you know why Verizon included it in
24  their policies and procedures regarding scanning of
25  CSAM?

Page 64

1      MS. SIEKKINEN:  Outside the scope.  Objection.
2      THE WITNESS:  I do not.
3  BY MR. ROBERTS:
4    Q.  You are -- you are being produced as the
5  corporate representative or Verizon on scanning child
6  sexual abuse material, correct?
7    A.  Yes.
8    Q.  All right.  These are the policies regarding
9  scanning of child sexual abuse material, correct?
10      MS. SIEKKINEN:  Objection.  Misstates the
11    evidence.
12  BY MR. ROBERTS:
13   Q.  I'm asking you a question.  Is this the
14  policy -- is this a policy relevant to the scanning of
15  child sexual abuse material between Verizon and
16  Synchronoss?
17      MS. SIEKKINEN:  Objection.  Vague what you're
18    referring to.
19  BY MR. ROBERTS:
20   Q.  I'm sorry, I didn't get your answer,
21  Mr. Runyon.
22   A.  It appears to be.
23   Q.  Okay.  So this is the policy.  You're the
24  corporate representative.  You don't know what the AOL
25  database is?



Page 65

1  MS. SIEKKINEN:  Objection.  Outside the scope.
2      MR. ROBERTS:  Okay.  I'm going to indulge you,
3  Nury.  How is that question outside the scope of
4  his corporate representative status?
5      MS. SIEKKINEN:  I've lodged my objection for
6  the record.  This is not -- that's outside the
7  scope of what you put forth in your 30(b)(6)
8  notice, which is --
9      MR. ROBERTS:  And I'm asking you how asking
10  him a question directly quoted from the policies,
11  how is that outside of the scope, or are you just
12  being obstructive at this point?
13      MS. SIEKKINEN:  No, no, I'm certainly not
14  being obstructionist.  I mean, it's very clear --
15      MR. ROBERTS:  Okay.  Can you explain how that
16  is the outside the scope of this deposition to ask
17  him what a particular term in the policy means?
18      MS. SIEKKINEN:  First of all, that's not a
19  policy.  This is an agreement and this is a change
20  order.  So that's no longer part of the agreement.
21  It's being replaced with another part of the
22  agreement.  That's why it's outside the scope.
23  It's not part of the policies, practices and
24  procedures for scanning and reporting CSAM.
25      MR. ROBERTS:  Okay.

Page 66

1  BY MR. ROBERTS:
2      Q.  So you don't know what the AOL database is?
3      MS. SIEKKINEN:  Objection.  Outside the scope.
4  Go ahead.
5      THE WITNESS:  I am -- no, I do not.
6  BY MR. ROBERTS:
7      Q.  Okay.  So we go to the integration of PhotoDNA
8  signature screening content.  What does the NCMEC
9  database hashes, what does that refer to?
10      A.  The list of known CSAM that they provide.
11      Q.  Who's "they"?
12      A.  NCMEC.
13      Q.  Okay.  So NCMEC provides or makes -- grants
14  access to multiple lists.  Which one does this refer to?
15      A.  Let's see.  I don't know.  I don't think it --
16  yeah, I don't know.
17      Q.  Okay.  Okay.  I want to go to this false
18  positive support.  What is a false positive?
19      A.  What is a false positive for a report of CSAM?
20      Q.  What is a false positive as it means here in
21  this agreement?
22      A.  Let me see.  I can only make a -- honestly, I
23  don't know how to explain that.
24      Q.  Okay.  It says, "Where a given NCMEC database
25  hash generates more than any threshold amount Verizon

Page 67

1  deems appropriate of false positive identifications with
2  zero true matches to known CSAM, upon written request
3  from Verizon, supplier shall remove such hash from its
4  hash database such that scans do not match against such
5  hash, such functionality, quote, the hash supression
6  functionality."
7      Okay.  So you don't know what false positive
8  is.  What is the threshold amount?  What does that mean?
9      A.  That would be something I would have to defer
10  to legal on.  I don't know the answer to that.
11      Q.  Okay.  What is the hash suppression
12  functionality?
13      A.  That I do not know.
14      Q.  All right.  This says, "Supplier shall remove
15  such hash from its hash database."
16      Does Synchronoss maintain a hash database?
17      MS. SIEKKINEN:  Objection.  Vague.
18  BY MR. ROBERTS:
19      Q.  Well, let me ask it a different way.  What
20  does its hash database refer to in this agreement?
21      A.  I believe it's referring to the database
22  that's provided from -- or from the National Center for
23  Missing and Exploited Children.
24      Q.  You believe that the supplier has the ability
25  to remove hashes from the database?

Page 68

1      MS. SIEKKINEN:  Objection.
2  BY MR. ROBERTS:
3      Q.  Like Synchronoss has ability to remove
4  dashes -- remove hashes from the database?
5      MS. SIEKKINEN:  Objection.  Misstates --
6  BY MR. ROBERTS:
7      Q.  From the NPO database.
8      MS. SIEKKINEN:  Objection.  Misstates
9  evidence.
10      THE WITNESS:  I'm sorry, could you --
11  BY MR. ROBERTS:
12      Q.  Yeah.  So this says supplier and I think you
13  said -- you understand the supplier is Synchronoss,
14  correct?
15      A.  Yes.
16      Q.  All right.  "Shall remove such hash from its
17  hash database."
18      My question is, does Verizon believe that
19  Synchronoss has the ability to remove hashes from the
20  NPO database?
21      A.  I don't know.
22      MS. SIEKKINEN:  Objection.  Misstates.  Go
23  ahead.  Yeah, he answered.
24  BY MR. ROBERTS:
25      Q.  Do you know what its hash database refers to?



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
69–72

Page 69

1  A. I'm making -- I don't know.

2  Q. Okay. And that's okay. If you don't know,
3  just say you don't know.

4  At least as evidenced by this agreement,
5  Verizon anticipated some level of false positives,
6  whatever that meant, when they entered into this
7  agreement; is that true?

8  MS. SIEKKINEN: Objection. Calls for
9  speculation.

10  THE WITNESS: There is a portion in that
11  contract there or in that document that says so, I
12  believe, yes.

13  BY MR. ROBERTS:

14  Q. Now, does Verizon have any idea what the false
15  positive rate is? In other words, how often does false
16  positives occur?

17  MS. SIEKKINEN: Objection. Vague. Unclear.

18  BY MR. ROBERTS:

19  Q. Well, I guess you don't know what a false
20  positive is, do you?

21  A. I can speculate what I think it is, but that's
22  not what --

23  Q. I don't want you to speculate. You're
24  actually speaking on behalf of Verizon, which is a very
25  large corporation. I'm sure --

Page 70

1  A. Right.

2  Q. -- they wouldn't want you to speculate. I
3  guess what I'm asking you is, you really don't know what
4  false positive means in this context?

5  MS. SIEKKINEN: Objection. Asked and
6  answered.

7  MR. ROBERTS: That's correct. We can move on.
8  You don't have to answer that.

9  BY MR. ROBERTS:

10  Q. Do you have any familiarity with reported
11  false positives by either Synchronoss or WebPurify?

12  MS. SIEKKINEN: Objection. Outside the scope.
13  Go ahead.

14  THE WITNESS: Can you -- when you say
15  "familiarity," can you --

16  BY MR. ROBERTS:

17  Q. I guess -- I guess -- I mean, I guess I can't
18  really ask any -- if you don't know what false positive
19  means, I guess -- I mean, it's probably a bad question.

20  So this is in a section under "Human Review of
21  Suspected CSAM." And it says, "Verizon shall engage the
22  services of a third party to conduct human review of the
23  content that has been flagged as a match or near-match
24  to a NCMEC database hash using the PhotoDNA solution."

25  First question, what is a near match?

Page 71

1  A. It contains components that would be -- that
2  match with what's in known CSAM.

3  Q. And when you say "known CSAM," what are you
4  referring to?

5  A. The NCMEC list.

6  Q. And again, why do you think the NCMEC list
7  only contains known CSAM?

8  MS. SIEKKINEN: Objection. Asked and
9  answered.

10  THE WITNESS: They are considered to be an
11  industry expert.

12  BY MR. ROBERTS:

13  Q. Okay. You mean NCMEC an industry expert?

14  A. Correct.

15  Q. Okay. "Human reviews subcontractors shall
16  manually review each such flagged image to determine if
17  such image reasonably qualifies as child pornography
18  under the applicable federal law and any other CSAM
19  definitions/guidelines that may be provided by Verizon
20  to such human review subcontractor. Within 48 hours of
21  identifying content as a match or near-match to a NCMEC
22  database hash, supplier shall provide the human review
23  subcontractor with secure access to the content through
24  a review tool that is mutually agreed upon by the
25  parties, provided supplier shall be responsible for

Page 72

1  ensuring the human review subcontractor shall not have
2  access to any subscriber data in a form enabling it or
3  containing subscriber identification or the ability
4  to download the content from the solution. Supplier
5  shall reasonably assist Verizon as necessary for
6  purposes of performing a quality control audit of such
7  human review subcontractor and agrees to provide Verizon
8  with reporting and analysis on a weekly basis and
9  allocated by data centers regarding the total number of
10  images scanned that were identified as a hash match or
11  near match to a NCMEC database hash through the PhotoDNA
12  solution and verified as a true positive or false
13  positive by the human review subcontractor."

14  Did you understand what I just read?

15  A. Yes.

16  Q. Okay. Does Verizon have possession of weekly
17  reporting from Synchronoss on the number of matches, the
18  number of true positives and the number of false
19  positives?

20  MS. SIEKKINEN: Objection. Outside the scope.
21  Go ahead.

22  THE WITNESS: You would have to defer that to
23  legal.

24  BY MR. ROBERTS:

25  Q. Okay. To your knowledge, has Verizon ever



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
73–76

Page 73

1  conducted a quality control audit of the human review
2  subcontractor?
3      A.  Yes.
4      Q.  Okay.  When?
5      A.  I'll have to defer that to legal.  It's not
6  something I know.
7      Q.  Well, you say you know that they have.  So
8  tell me about what knowledge you have.
9      A.  I'm aware that there's a process in place and
10  I understand that they're -- that that's underneath
11  legal review.  I believe that's their process.
12      Q.  I mean, I know that there is a process.  We
13  see the process here and it's described elsewhere.  But
14  my question to you is, are you aware of it having been
15  done?
16      MS. SIEKKINEN:  Objection.
17  BY MR. ROBERTS:
18      Q.  An audit being done?
19      MS. SIEKKINEN:  Asked and answered.
20  BY MR. ROBERTS:
21      Q.  You can answer it.  I didn't understand your
22  answer.
23      A.  Yes, I've been advised that it's been done.
24      Q.  Okay.  Who -- when?  I mean, who told you that
25  it's been done?

Page 74

1      A.  Our legal -- my legal department.
2      Q.  Like as a result of this case it's been done,
3  or like in the past on a regular basis?  What?
4      A.  I don't have knowledge of that, so I don't
5  know.
6      Q.  Are there weekly meetings with Synchronoss or
7  WebPurify regarding quality control?
8      MS. SIEKKINEN:  Objection.
9      THE WITNESS:  I don't know.
10      MS. SIEKKINEN:  Outside the scope.  Go ahead.
11  Go ahead.
12      THE WITNESS:  I don't know.
13  BY MR. ROBERTS:
14      Q.  You don't know.  Well, tell me about this.
15  Like what kind of quality control audits have been done?
16      A.  I don't manage that, so I don't know.
17      Q.  I'm asking you as the corporate
18  representative, not your personal knowledge and what you
19  do in your job.  And you can tell me you're not prepared
20  to answer that question if that's the truth.  Are you
21  not prepared to answer that question?
22      MS. SIEKKINEN:  Objection.  Outside the scope
23  and argumentative to the witness.  Go ahead.
24      THE WITNESS:  Well, as I stated, I don't know
25  the information.

Page 75

1  BY MR. ROBERTS:
2      Q.  Okay.  This was a document that you reviewed
3  in preparation for today's deposition, correct?
4      A.  It appears to be.
5      Q.  Did you not anticipate that I might ask you
6  questions about quality control or false positives?
7      MS. SIEKKINEN:  Objection.  Outside the scope.
8      THE WITNESS:  Sure, it's possible.
9  BY MR. ROBERTS:
10      Q.  Okay.  Do you know if any of the procedures
11  for quality control or audit have been done as a result
12  of these two CyberTip reports?
13      MS. SIEKKINEN:  Objection to the extent it
14      calls for privileged information.  Go ahead.  Not
15      things that are privileged, but you may answer.
16      THE WITNESS:  I don't know.
17  BY MR. ROBERTS:
18      Q.  I understand that you're not clear on what
19  false positive is, but let me just ask you this.  Do you
20  believe that Verizon considers either the October
21  CyberTip report or the January CyberTip report to be a
22  false positive under the policies and procedures of
23  Verizon?
24      MS. SIEKKINEN:  Objection.  Outside the scope.
25      But you can answer.

Page 76

1      THE WITNESS:  Sorry, could you repeat that
2      again?
3  BY MR. ROBERTS:
4      Q.  Yeah.  I understand that you're not clear on
5  what false positive means specifically in this
6  agreement, but I am asking you do you know -- is
7  Verizon's position that either the October CyberTip
8  report that's the subject of this case or the January
9  CyberTip report, which is the subject of this case, are
10  false positives under their policies and procedures?
11      MS. SIEKKINEN:  Objection.  Outside the scope.
12      Go ahead.
13      THE WITNESS:  I'm struggling with the
14      answer -- not the answer, but the question and the
15      interpretation of it.  I apologize.  I just...
16  BY MR. ROBERTS:
17      Q.  Okay.  You don't understand -- if you don't
18  understand my question, that's okay.  I can re-ask it a
19  different way.
20      A.  Yeah, please, if you don't mind.
21      Q.  Yeah, so without getting into what false
22  positive means, okay, I'm just asking you, has Verizon
23  treated the October CyberTip report like a false
24  positive?
25      MS. SIEKKINEN:  Objection.  Outside the scope.



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
77–80

Page 77

1    Go ahead.
2        THE WITNESS: I don't know.
3    BY MR. ROBERTS:
4        Q.  Okay.  The same question as to the January
5    CyberTip report.  Under Verizon's policies and
6    procedures, have they treated that as a false positive?
7        MS. SIEKKINEN: Objection.  Outside the scope.
8    Go ahead.
9        THE WITNESS: I don't know.
10   BY MR. ROBERTS:
11       Q.  So again, and this is just, you don't know,
12   like, currently if one or both of these images were
13   flagged by Verizon again, you don't know whether or not
14   they would be reported to NCMEC again in the future --
15       MS. SIEKKINEN: Objection.
16   BY MR. ROBERTS:
17       Q.  -- under Verizon's policies and procedures and
18   practices?
19       MS. SIEKKINEN: Objection.  Outside the scope.
20   Go ahead.  And calls for speculation.  Go ahead.
21       THE WITNESS: Yes, our process is if it shows
22   to be apparent CSAM, it would get reported again.
23   BY MR. ROBERTS:
24       Q.  It is -- is it Verizon's position that under
25   its policies and procedures that the October image is

Page 78

1    apparent child sexual abuse material?
2        A.  If it shows to be apparent through the
3    process, it will get referred to National Center for
4    Missing and Exploited Children.  It will then go to law
5    enforcement and law enforcement makes a determination
6    whether or not it is or isn't.
7        Q.  Right.  But my question is, under Verizon's
8    policies and procedures, do they consider the October
9    image, the image that was attached to the October
10   CyberTip report to be apparent child pornography, under
11   their policies?
12       MS. SIEKKINEN: Objection.  Outside the scope.
13       THE WITNESS: I feel like I've addressed this,
14   but I'm not quite sure what you're looking -- what
15   answer you're looking for from me.
16   BY MR. ROBERTS:
17       Q.  Well, let me explain.  Does Verizon care about
18   the safety and well-being of its customers?
19       MS. SIEKKINEN: Objection.  Outside the scope.
20   BY MR. ROBERTS:
21       Q.  Well, you're the corporate representative here
22   to testify about the policies and procedures of the
23   scanning and reporting child sexual abuse material,
24   correct?
25       A.  Yes.

Page 79

1        Q.  And you understand that reporting a customer
2    for possession or manufacture or distribution of child
3    sexual material may have a negative impact on that
4    customer's life, correct?
5        MS. SIEKKINEN: Objection.  Compound and
6    outside the scope.
7        THE WITNESS: We follow the --
8    BY MR. ROBERTS:
9        Q.  You understand that, right?
10       A.  We follow the process of reporting.
11       Q.  And that's not my question.  But for example,
12   I mean, you understand that you're disclosing
13   potentially private information of a customer when you
14   disclose it to NCMEC, correct?
15       MS. SIEKKINEN: Objection.  Outside the scope.
16   Go ahead.
17       THE WITNESS: If it is apparent CSAM, we
18   report it to NCMEC.
19   BY MR. ROBERTS:
20       Q.  Right.  So let me get back to -- because you
21   asked what answer I want.  What I want to hear is that
22   Verizon cares about the accuracy of their reports.  And
23   apparently, you're saying they don't really care about
24   the accuracy of their reports.
25       Is that true?

Page 80

1        MS. SIEKKINEN: Objection.  Misstates the
2    testimony and is argumentative and harassing.
3        THE WITNESS: No, it's not true.
4    BY MR. ROBERTS:
5        Q.  So Verizon does care about whether or not
6    their reports to NCMEC are accurate, correct?
7        MS. SIEKKINEN: Objection.  Outside the scope.
8    But go ahead.
9        THE WITNESS: Our reporting process reports
10       apparent CSAM.  We don't make the determination.
11   BY MR. ROBERTS:
12       Q.  Right.
13       A.  We don't make the determination.
14       Q.  Right, but --
15       A.  The final --
16       Q.  But now, but Mr. Runyon, now --
17       MS. SIEKKINEN: Objection.  You're
18       interrupting his response.
19       MR. ROBERTS: Yeah, yeah.
20   BY MR. ROBERTS:
21       Q.  Mr. Runyon, now Verizon knows that the October
22   image does not display a child, okay?  What I'm asking
23   you is, don't they care about not reporting that again
24   in the future?
25       MS. SIEKKINEN: Objection.  Lack of



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
81–84

Page 81

1  foundation.  Assumes facts not in evidence.
2  Outside the scope.
3  BY MR. ROBERTS:
4    Q.  You can answer the question.
5    A.  We follow our process.  That's --
6    Q.  Right, but your process has, in writing
7  anyway, some mechanism for correcting errors, correct?
8    A.  I believe there's some language in that; yes.
9    Q.  Yeah.  And I'm asking you, has Verizon done
10  that in this case?  Have they taken any mitigating or
11  corrective errors to address the content that was
12  reported in this case either in the October or the
13  January image?
14    MS. SIEKKINEN:  Objection.  Vague, ambiguous
15    and outside the scope.
16    THE WITNESS:  I think I would have to defer
17    that to legal in that regard.
18  BY MR. ROBERTS:
19    Q.  Well, as their corporate representative, do
20  you believe if Verizon is given information that one of
21  their reports was false, do you believe that Verizon
22  should investigate that and make some independent
23  determination about whether or not that was a correct --
24  or I think this thing says a false positive?
25    MS. SIEKKINEN:  Objection.  Assumes facts not

Page 82

1  in evidence and calls for speculation
2  hypothetically.
3    THE WITNESS:  If that falls within the
4    process.
5  BY MR. ROBERTS:
6    Q.  But does it fall within the process?
7    MS. SIEKKINEN:  Objection.  Same objection as
8    before.
9  BY MR. ROBERTS:
10    Q.  If Verizon is made aware that they have
11  potentially reported an image as child pornography and,
12  in fact, it's not child pornography, do you believe that
13  Verizon's processes and policies are designed to address
14  and correct that issue?
15    MS. SIEKKINEN:  Objection.  Outside the scope.
16    Go ahead.
17    THE WITNESS:  I believe, yes.
18  BY MR. ROBERTS:
19    Q.  Has any of those policies or processes
20  occurred in this case with the images that Mr. Lawshe
21  was reported for?
22    MS. SIEKKINEN:  Objection.  Outside the scope.
23    THE WITNESS:  That I don't know.
24  BY MR. ROBERTS:
25    Q.  As Verizon's corporate representative, you are

Page 83

1  unaware of any effort to determine as we sit here today
2  whether or not the October or the January images were
3  false positives that should be subject to Verizon's
4  policies and procedures in that regard?
5    MS. SIEKKINEN:  Objection.  Outside the scope.
6    THE WITNESS:  Sorry, could you repeat that
7    again?
8  BY MR. ROBERTS:
9    Q.  Yeah.  As Verizon's corporate representative,
10  as we sit here today, you are unaware that there has
11  been any action taken by Verizon on the October or
12  January images in this case to implement the policies
13  and procedures regarding false positives?
14    MS. SIEKKINEN:  Objection.  Outside the scope.
15    THE WITNESS:  I don't know.
16  BY MR. ROBERTS:
17    Q.  Okay.  So I want to go back to Exhibit 2,
18  which was the frequently asked questions.  We've been
19  talking about the database and the scanning.  I want to
20  move to extensive use of human reviewers that we talked
21  about earlier.
22    This policy states that "The human reviewers
23  evaluate the images and" -- and this is a quote --
24  "ensure that all confirmed CSAM is reported to NCMEC."
25    Tell me, what does Verizon mean by "confirmed

Page 84

1  CSAM"?
2    MS. SIEKKINEN:  Objection.
3    Mischaracterization.
4  BY MR. ROBERTS:
5    Q.  Am I mischaracterizing that that says "ensure
6  that all confirmed CSAM is reported to NCMEC"?  Is that
7  a mischaracterization, Mr. Runyon?
8    MS. SIEKKINEN:  Objection.  Mischaracterizing
9    the document.  It's not a policy.  Go ahead.
10  BY MR. ROBERTS:
11    Q.  Okay.  Hold on.  Your attorney, Mr. Runyon,
12  has just said that this is not -- does not reflect the
13  policy of Verizon.  Earlier you testified --
14    MS. SIEKKINEN:  Michael, that's not what I
15    said.  That's not at all what I said.  The record
16    will reflect what my objection was.  That's the
17    mischaracterization.  Enough.
18  BY MR. ROBERTS:
19    Q.  Okay.  Is -- Mr. Runyon, is this frequently
20  asked questions, is this an accurate representation of
21  Verizon's policies and procedures regarding their
22  efforts to combat child sexual abuse material?
23    MS. SIEKKINEN:  Objection.  Outside the scope.
24    Go ahead.
25    THE WITNESS:  It is apparent -- sorry.  Yeah,



Page 85

1    it's a document that's what I think at one
2    point in time, or still is, on our website.  I'm
3    not sure.
4    BY MR. ROBERTS:
5        Q.  Okay.  And it says that "The human reviewers
6    ensure that all confirmed CSAM is reported to NCMEC."
7        Is that a misrepresentation of what it says?
8        A.  No.
9        Q.  All right.  What does "confirmed CSAM" mean?
10   What does Verizon mean by confirmed CSAM?
11       MS. SIEKKINEN:  Objection.  Outside the scope.
12       THE WITNESS:  I would take that to be that
13   it's -- I'm not sure how we're defining confirmed
14   there.
15   BY MR. ROBERTS:
16       Q.  Okay.  But it doesn't say, you'll agree,
17   ensure that all apparent CSAM or images that appear to
18   be CSAM are reported to NCMEC?  It does not say that,
19   does it?
20       A.  The word "apparent" is not in that sentence,
21   no.
22       Q.  Yeah, okay.
23       THE WITNESS:  Can we take another break?  I
24   apologize.
25       MR. ROBERTS:  Sure.

Page 86

1        THE WITNESS:  I've got to go do something
2    about this.
3        MR. ROBERTS:  All right.
4        THE COURT REPORTER:  Michael, can you take us
5    off the record, Mr. Acker?
6        THE VIDEOGRAPHER:  I'm so sorry.  This marks
7    the end of media number three.  The time is
8    3:28 p.m.  We are now off the record.
9        (Off the record.)
10       THE VIDEOGRAPHER:  This marks the beginning of
11   media number four.  The time is 3:44 p.m.  We are
12   now on the record.
13   BY MR. ROBERTS:
14       Q.  Okay.  Mr. Runyon, we just took a break.  I'm
15   going to show you what we'll mark as Exhibit 5.
16       (Plaintiff's Exhibit No. 5 was marked for ID.)
17   BY MR. ROBERTS:
18       Q.  It's the -- I think it's the scope of work for
19   WebPurify.
20       Okay.  I'm going to show you this document
21   here.  It says, "Scope, Responsibilities and Pricing.
22   Human-based review of suspected CSAM in Verizon cloud
23   project."
24       Is this the document, or does this appear to
25   be the document that you reviewed?  And this is a

Page 87

1    document -- I'll say Verizon produced this document.
2    The Bates stamp begins at -- the scope of work is at 33.
3        Does this appear to be the document that you
4    reviewed?
5        A.  It does.
6        Q.  Okay.  All right.  So in the scope here,
7    again, there's a couple of terms that I want to ask you
8    about.  The name of this is human-based review of
9    suspected CSAM in Verizon cloud.
10       What does Verizon mean when they say
11   "suspected CSAM"?
12       A.  Oh, sorry, I'm looking crosswise.
13       Q.  Do you see it right here?  Is it highlighted
14   if I do that?  Can you see that?
15       A.  No, I'm sorry, I was looking down below that,
16   I apologize.
17       Q.  Correct.
18       A.  So you're --
19       Q.  So my question is, what does Verizon mean when
20   they say "suspected child sexual abuse material"?
21       A.  It's apparent, appears to be.
22       Q.  Okay.  Later under the scope it goes into a
23   little bit more detail.  It says, "A third party
24   designated by Verizon provides Verizon with the
25   technical solution for the Verizon cloud personal

Page 88

1    storage services and uses software to screen images
2    stored in Verizon cloud for matches against databases of
3    known CSAM hashes."  I'm going to stop there.
4        Known CSAM hashes seems to different than
5    suspected CSAM hashes.  Does Verizon mean that to be
6    something different than suspected CSAM hashes?
7        MS. SIEKKINEN:  Objection.  Calls for a legal
8    conclusion.  Go ahead.
9        THE WITNESS:  I don't know.  I would have to
10   defer that to legal.
11   BY MR. ROBERTS:
12       Q.  Well, to me -- and this is just not a legal
13   question.  It's just -- known sounds like well, if I
14   know something, it is what it purports to be versus if I
15   suspect something, it may or may not be that thing.  Is
16   that the way that you normally use those two terms in
17   your everyday life?
18       MS. SIEKKINEN:  Objection.  Outside the scope.
19   Go ahead.
20       THE WITNESS:  It could be.
21   BY MR. ROBERTS:
22       Q.  Right.  I mean, if I say I know something,
23   that suggests that I have actual knowledge and that is a
24   fact, correct?
25       A.  That's one interpretation.  A lot of people



Page 89

1  say they know something when they don't.
2      Q.  We could all be wrong.  That's certainly true.
3  But why did Verizon ask WebPurify to do human review of
4  images that Verizon knew -- already knew were child
5  sexual abuse material?
6          MS. SIEKKINEN:  Objection.  Mischaracterizes
7      the text.
8          THE WITNESS:  I'm sorry, could you repeat the
9      question?
10 BY MR. ROBERTS:
11     Q.  Well, let me ask -- let me -- she objected.
12 Let me re-ask.
13         If a match to a known child sexual abuse image
14 is detected, such human image is flagged for human
15 review and verification prior to reporting it to NCMEC.
16 And so my question is, if it's known child sexual abuse
17 material, why would you have someone review it?
18         MS. SIEKKINEN:  Objection.  Outside the scope.
19     Go ahead.
20         THE WITNESS:  It would still need to be
21     reported.  So you would still go through the same
22     process regardless.
23 BY MR. ROBERTS:
24     Q.  Well, what I'm saying is, why have the process
25 at all if it's known child sexual abuse material?  Is

Page 90

1  there any scenario where Verizon is going to
2  intentionally not report known child sexual abuse
3  material?
4      A.  Not that I'm aware.
5      Q.  Right.  So Verizon, their policy, if they have
6  knowledge of a match with known child sexual abuse
7  material, human review or not, their policy is going to
8  be to report that to NCMEC, correct?
9          MS. SIEKKINEN:  Objection.
10     Mischaracterization of previous testimony.  Go
11     ahead.
12         THE WITNESS:  Sorry, could you repeat the
13     question?
14 BY MR. ROBERTS:
15     Q.  Yeah.  It's a question.  I'm not telling you
16 anything.  I'm not telling you anything.  I'm asking you
17 a question.
18     A.  That's what I asked --
19     Q.  Isn't it true, isn't it true that Verizon,
20 their policy, if they know that an image is a match to
21 known child sexual abuse material, their policy is
22 always going to be report that, whether there's human
23 review or not, correct?
24         MS. SIEKKINEN:  Objection.  Assumes facts not
25     in evidence.  Go ahead.

Page 91

1          THE WITNESS:  We follow the same process that
2      we utilize.  It's -- basically it goes --
3      Synchronoss marks it as CSAM and then it goes
4      underneath human review, and then if it's
5      considered still to be CSAM upon the human review,
6      it goes back to Synchronoss to be reported to
7      NCMEC.
8  BY MR. ROBERTS:
9      Q.  Right, but what I'm -- I think maybe we're
10 ships passing in the night.  If Verizon already knows
11 that it's child sexual abuse material, why do they have
12 anybody look at it?
13         MS. SIEKKINEN:  Objection.  Assumes facts not
14     in evidence.
15         THE WITNESS:  We follow the process regardless
16     of that.  So it just continues -- the same process
17     should be in place regardless.
18 BY MR. ROBERTS:
19     Q.  And so you're the corporate representative for
20 the policies and procedures.  I'm asking you why
21 Verizon's policy is to have a known image of child
22 sexual abuse material reviewed by a human --
23         MS. SIEKKINEN:  Objection.
24 BY MR. ROBERTS:
25     Q.  -- if you know that it's child sexual abuse

Page 92

1  material?
2          MS. SIEKKINEN:  Objection.  Assumes facts not
3      in evidence.
4          THE WITNESS:  It's still part of the process.
5  BY MR. ROBERTS:
6      Q.  Right.  Isn't it true, though, that they're
7  not known images of child sexual abuse material?  It's
8  really what you said earlier, it's suspected child
9  sexual abuse material?
10         MS. SIEKKINEN:  Objection.
11     Mischaracterization.  Go ahead.
12         THE WITNESS:  Right.  We don't make the
13     determination whether that's actually CSAM.  Law
14     enforcement does.
15 BY MR. ROBERTS:
16     Q.  Right, but I guess my question, again,
17 following up on this, why are you telling WebPurify in
18 this agreement that it's a known child sexual abuse
19 material?  Why do you tell them before they review it
20 that it's known to be child sexual abuse material?
21         MS. SIEKKINEN:  Objection.  Outside the scope
22     and mischaracterizes.
23         THE WITNESS:  I would have to refer that
24     language to legal, then.  I don't know how to
25     address that.



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
93—96

Page 93

1  BY MR. ROBERTS:
2      Q.  Let me put it from WebPurify's perspective.
3  If I'm the vendor and I read this agreement and Verizon
4  has told me that a particular image is a match to a
5  known image of child sexual abuse material, do you
6  believe that that might affect their willingness to
7  report or not report an image?
8      MS. SIEKKINEN:  Objection.  Outside the scope
9      and calls for a hypothetical.
10      THE WITNESS:  They should be following the
11      process just as we do.
12  BY MR. ROBERTS:
13      Q.  Yeah, and I -- yeah, but this is the process,
14  right?  I mean, you're telling them part of the process
15  is Verizon has told WebPurify that the images that they
16  are reviewing have matched known child sexual abuse
17  material.  That's the policy, correct?
18      MS. SIEKKINEN:  Objection.  Outside the scope
19      and assumes facts not in evidence.  Go ahead.
20      THE WITNESS:  Could you rephrase that?
21  BY MR. ROBERTS:
22      Q.  Yeah.  And I'm literally -- and you correct me
23  if I'm wrong.  I'm reading from -- this is -- is the
24  policies and procedures for human review of child sexual
25  abuse material at Verizon, correct?  That's what we're

Page 94

1  looking at?
2      A.  Correct.
3      Q.  You are the corporate representative that's
4  been produced with the most knowledge of those policies
5  and procedures, correct?
6      A.  Correct.
7      Q.  Okay.  This paragraph of scope, this is part
8  of Verizon's policies and procedures, correct?
9      A.  Correct.
10      Q.  All right.  Is it not true that Verizon has
11  communicated in this document to WebPurify that it is
12  sending images which have matched to known CSAM images?
13      A.  That we're sending them?
14      Q.  Correct?
15      A.  I mean, the language reads that that
16  statement's in there.
17      Q.  Right.  So that is part of the policy?  I
18  mean, part of the policy is Verizon is telling WebPurify
19  that the images that they are reviewing have matched to
20  known child sexual abuse images, correct?
21      MS. SIEKKINEN:  Objection.
22      Mischaracterization.  Go ahead.
23      THE WITNESS:  What the language states.
24  BY MR. ROBERTS:
25      Q.  Right.  Isn't it true, though, that that might

Page 95

1  bias WebPurify in their evaluation of an image if
2  they've already been told that it's a match to known
3  child sexual abuse material?
4      MS. SIEKKINEN:  Objection.  Outside the scope
5      and calls for speculation.
6      THE WITNESS:  I don't know that.
7  BY MR. ROBERTS:
8      Q.  Do you agree that that's a possibility?
9      A.  I don't know that either.
10      Q.  Okay.  This says, "Child sexual abuse material
11  means child sexual abuse material which means any image
12  that reasonably qualifies as child pornography under
13  applicable U.S. federal law and any other child sexual
14  abuse material definitions and guidelines that may be
15  provided by Verizon."
16      Did I read that correctly?
17      A.  Yes.
18      Q.  Okay.  This doesn't have the word apparent in
19  either the definition for child sexual abuse material or
20  the scope of work, does it?
21      A.  It does not.
22      Q.  Okay.  What is Montage?
23      A.  My belief is that is a proprietary software.
24      Q.  And Verizon required WebPurify to utilize that
25  in the review of documents?

Page 96

1      MS. SIEKKINEN:  Objection.  Assumes facts not
2      in evidence.
3      MR. ROBERTS:  Well, Nury, he is the evidence.
4      He's the corporate rep.  I'm asking him a question.
5  BY MR. ROBERTS:
6      Q.  Is that the policy?  Is it the policy of
7  Verizon that they required WebPurify to use Montage?
8      A.  I would have to defer that to legal.
9      Q.  Okay.  Do you understand that Montage blurs an
10  image?
11      A.  I've never actually seen that product, or that
12  software, so I can't speak to that.
13      Q.  So you don't know what Montage really is other
14  than it's a proprietary tool?
15      A.  Correct.
16      MS. SIEKKINEN:  Mr. Runyon is having
17      difficulty with coughing right now.
18      THE WITNESS:  Sorry.
19      MS. SIEKKINEN:  It's okay.  It's okay, David.
20  BY MR. ROBERTS:
21      Q.  Does -- other than -- you've identified the
22  process of reporting child sexual abuse material.  One
23  is a match to a database of purported or suspected,
24  however you want to call it, images of -- or hash values
25  of child sexual abuse material, and the second is human

Page 97

1  review.
2       Are there any other processes involved in the
3  reporting of child sexual abuse material?
4       A.  I don't believe so.
5       Q.  Is there any mechanism where there's an image
6  that is age-difficult or age-indeterminate?  Do you know
7  what that means?  Do you know what that term means?
8       A.  Somewhat.
9       Q.  Yeah, you look at an image and the person
10  could be 17 or they could be 19.  They could be 16 or
11  they could be 20.  Do you understand that's what
12  age-difficult or age-indeterminate means?
13      A.  Okay.
14      Q.  Do you understand that that's what it means?
15  I don't want to tell you something.  I want you to
16  testify.
17      A.  Yes.
18          MS. SIEKKINEN:  Objection.  You are telling
19  him.
20          MR. ROBERTS:  I'm asking him to confirm that's
21  his understanding of the words age-difficult or
22  age-indeterminate.
23  BY MR. ROBERTS:
24      Q.  So what is Verizon's policy on reporting
25  age-difficult or age-indeterminate images?

Page 98

1          MS. SIEKKINEN:  Objection.  Outside the scope.
2  BY MR. ROBERTS:
3       Q.  Okay.  Let me lay the predicate.  You are the
4  corporate representative for policy, procedures and
5  practices regarding the reporting of apparent CSAM to
6  NCMEC, correct?
7       A.  Correct.
8       Q.  And do you agree that that involves the
9  reporting, at least potentially, of images which are
10  age-difficult or age-indeterminate?
11      A.  Yes.
12      Q.  What is the policy regarding the reporting of
13  images which are age-difficult or age-indeterminate?
14      A.  I'm sorry, you kind of broke up.
15      Q.  Yeah, let me ask it again.  Does Verizon -- or
16  what is Verizon's policy regarding the reporting of
17  age-indeterminate or age-difficult images?
18          MS. SIEKKINEN:  Objection.  Outside the scope.
19  Go ahead.
20          THE WITNESS:  If it is apparent CSAM, it is
21  marked by Synchronoss.  Synchronoss then refers
22  that to WebPurify to be -- manual verification
23  or to look at it, review.  And if they determine
24  that it meets the qualification of apparent CSAM,
25  then that is sent back to Synchronoss and

Page 99

1  Synchronoss files a report to NCMEC and that's the
2  process we have.
3  BY MR. ROBERTS:
4       Q.  Right.  So my question is, you've already
5  testified that you don't know what apparent child sexual
6  abuse material is.  What I'm asking is, what is web --
7  what is Verizon's policy regarding reporting images that
8  could be interpreted to be 18 or 17, or 19 or 16?
9  What's their policy?  Do they report those types of
10  images as child sexual abuse material --
11          MS. SIEKKINEN:  Objection.
12  BY MR. ROBERTS:
13      Q.  -- as apparent?
14          MS. SIEKKINEN:  Objection.  Misstates
15  testimony.  But go ahead, answer that.
16          THE WITNESS:  Yeah, if it's apparent, it gets
17  reported through the same process that we've spoken
18  before, and that is it goes to -- Synchronoss marks
19  it.  It is then reviewed manually by WebPurify.
20  WebPurify validates that it meets the criteria of
21  apparent and sends it back to Synchronoss.
22  Synchronoss then sends a notification -- or the
23  report over to the National Center for Missing and
24  Exploited Children, and they then forward it on to
25  law enforcement who makes the final determination.

Page 100

1  BY MR. ROBERTS:
2       Q.  So, but my question is, if there's an image
3  that's been flagged in human review and the human
4  reviewer looks it and says this person, they could be 18
5  or they could be 16, is that apparent child pornography
6  or reportable under Verizon policies and procedures?
7          MS. SIEKKINEN:  Objection.  Compound.  Go
8  ahead.
9          THE WITNESS:  Yes, it would get reported.
10  BY MR. ROBERTS:
11      Q.  Okay.  So Verizon includes in apparent child
12  pornography images that they know could be adult images,
13  correct?
14          MS. SIEKKINEN:  Objection.  Mischaracterizes.
15  Go ahead.
16          THE WITNESS:  Well, that's the whole point.
17  We don't know.  That's why we report it.
18  BY MR. ROBERTS:
19      Q.  You don't know because they could be adults or
20  they could be minors, correct?
21      A.  It gets -- we don't make that determination.
22      Q.  Is that correct, you report it if they could
23  be a minor, even though they could be an adult?
24          MS. SIEKKINEN:  Objection.  Asked and
25  answered.



Page 101

1    THE WITNESS: If it meets the condition of
2    apparent, then yes.
3  BY MR. ROBERTS:
4    Q.  And does that meet the condition of apparent?
5      MS. SIEKKINEN: Objection.
6  BY MR. ROBERTS:
7    Q.  Someone that could be 18 but they could be 16?
8    A.  Yes, it would get reported.
9    Q.  Okay.  So when Verizon reports an image to the
10  National Center for Missing and Exploited Children as
11  apparent child pornography, they are not actually saying
12  that it is a minor; is that correct?
13    A.  Right.  We're not making -- yes.
14    Q.  It could be an adult or it could be a minor,
15  correct?
16      MS. SIEKKINEN: Objection. Mischaracterizes.
17    Go ahead.
18      THE WITNESS: Yes.
19  BY MR. ROBERTS:
20    Q.  Okay.  Why wouldn't Verizon, when faced with
21  this type of it could be an adult or it could be a
22  minor, why wouldn't they do some level of investigation
23  into the image and the circumstances of the download and
24  try to make some determination about whether or not it
25  really is a minor rather than somebody that just might

Page 102

1  be a minor?
2      MS. SIEKKINEN: Objection. Compound and
3    outside the scope. Go ahead.
4      THE WITNESS: We don't make that
5    determination. We follow our process.
6  BY MR. ROBERTS:
7    Q.  But I'm asking, why doesn't your process
8  include some level of investigation beyond just looking
9  at the image?
10      MS. SIEKKINEN: Objection. Outside the scope.
11      THE WITNESS: The volume of notices would be
12    prohibitive of that.
13  BY MR. ROBERTS:
14    Q.  Okay.  Why do you say that it would be
15  prohibitive?
16      MS. SIEKKINEN: Bless you.
17      THE WITNESS: Sorry. Thank you. Could you
18    repeat the question? I'm sorry.
19  BY MR. ROBERTS:
20    Q.  Yeah, why would it be prohibitive? You mean
21  cost-prohibitive?
22    A.  That could factor in. I don't know.
23    Q.  Okay.  Well, you said it would be prohibitive.
24  I'm just asking you, why would it be prohibitive to
25  include some sort of investigation into these images

Page 103

1  that are age-indeterminate?
2      MS. SIEKKINEN: Objection. Outside the scope.
3    Go ahead.
4      THE WITNESS: Well, that -- again, that would
5    actually go down to law enforcement at that point.
6    I mean, they would do that final determination.
7    We -- again, we're not making the determination.
8    We are just producing this as apparent CSAM report.
9    They do that type of work.
10  BY MR. ROBERTS:
11    Q.  And other than it being prohibitive, do you
12  have any explanation as to why Verizon doesn't do some
13  level of investigation other than eyeballing the image
14  prior to reporting your customer to the National Center
15  for Missing and Exploited Children?
16      MS. SIEKKINEN: Objection. Asked and
17    answered.
18      THE WITNESS: We have multi steps that we go
19    through. We have two different vendors that are
20    doing that work.
21  BY MR. ROBERTS:
22    Q.  So this contract, this scope of work -- and
23  actually, you answered some interrogatories. I'm going
24  to stop. I'm going to show you --
25      MR. ROBERTS: I guess are we at 6, Madam Court

Page 104

1  Reporter?
2      THE COURT REPORTER: Yes, we are.
3      (Plaintiff's Exhibit No. 6 was marked for ID.)
4  BY MR. ROBERTS:
5    Q.  These are answers to interrogatories. I'll
6  show you -- we'll mark this as 6 -- June 2025. I'm
7  scrolling down for your verification. This is your
8  electronic signature June 6th, 2025.
9      Do you recall verifying answers to
10  interrogatories or two forms, something like that?
11    A.  Yes.
12    Q.  You recall that, okay. You state here to the
13  Question No. 2, to this particular CyberTip, was it
14  reviewed by a human and your answer was yes. In your
15  answer you say that "Verizon states that the image
16  described in the CyberTip report," this number, "was
17  reviewed by a human being before it was reported to
18  NCMEC. The individual was employed by WebPurify, a
19  company contracted by Verizon. The review occurred on
20  or about August -- October 29th, 2022. Verizon's
21  investigation is in progress and does not yet have
22  direct knowledge of the name or location of the
23  individual who reviewed this image at this time."
24      Do you understand that WebPurify has destroyed
25  the information that would tell us the name of the



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
105–108

Page 105

1  individual that you were referring to?
2       MS. SIEKKINEN: Objection. Mischaracterizes.
3  Go ahead.
4       THE WITNESS: No, I don't have any knowledge
5  of that.
6  BY MR. ROBERTS:
7       Q.  Okay.  Why do you say that this image was
8  reviewed by a human?
9       A.  Because that's the process that's outlined in
10  the statement of work, and we have to trust our vendors
11  to do their job.
12       Q.  So you're trusting -- you're basically saying
13  that's the process, that's why you answered it that way?
14       A.  We have to have a good-faith belief that our
15  vendors are doing the work that they're employed to do.
16       Q.  You agree with me, though, sometimes people
17  don't do the work that they're supposed to do?
18       MS. SIEKKINEN: Objection. Outside the scope.
19       THE WITNESS: I don't know that.
20  BY MR. ROBERTS:
21       Q.  And how long have you had a job?
22       A.  Since I was 16.
23       Q.  And in that time, nobody has ever not done
24  something that they were supposed to do?
25       MS. SIEKKINEN: Objection. Outside the scope.

Page 106

1       THE WITNESS: Of course they have.
2  BY MR. ROBERTS:
3       Q.  It's a ridiculous question, isn't it?  Of
4  course people sometimes don't do the things that they're
5  supposed to do.  And I'm not asking you to comment on
6  what WebPurify, an unknown person at WebPurify did or
7  didn't do.  I'm just trying to verify that the only
8  reason that you have said that a human being actually
9  looked at this image is because of the process and
10  procedures outlined in the scope of work?
11       MS. SIEKKINEN: Objection.
12  BY MR. ROBERTS:
13       Q.  Do I understand that correctly?
14       MS. SIEKKINEN: Mischaracterizes his
15       testimony.  Go ahead.
16       THE WITNESS: In order for them to be able to
17       submit that back to Synchronoss, they have to check
18       off that they manually reviewed it.  So somebody
19       has to acknowledge that that's the steps they took.
20  BY MR. ROBERTS:
21       Q.  Okay.  Other than that, do you have any
22  information that they actually looked at the image?
23       A.  I do not.
24       Q.  Okay.  Why do you not know where it occurred?
25       A.  Sorry?

Page 107

1       Q.  Yeah, part of the question was tell me the
2  location.  You see this, where did this review occur.
3  And you answered, verified answer, that you do not have
4  direct knowledge of the location of the individual who
5  reviewed this image.
6       Why do you not know that?
7       A.  My understanding, that's not been provided by
8  WebPurify.
9       Q.  The same contract that you've relied on to
10  testify under oath that this image was looked at says
11  that it has to be done in Hyderabad, India, doesn't it?
12       MS. SIEKKINEN: Objection. You've taken the
13       document away.  He can't see what it says.
14  BY MR. ROBERTS:
15       Q.  You've reviewed the document, correct?
16       A.  Yes.
17       Q.  Mr. Runyon, you've reviewed it.  You
18  understand that Web -- it's actually -- this person was
19  not employed by WebPurify, Inc., were they?  It was
20  WebFurther India Ltd.  Does that name sound familiar,
21  WebFurther India?
22       MS. SIEKKINEN: Objection.  If you're going to
23       ask about the terms of the contract, please put it
24       back up.  You know, that's normal.
25

Page 108

1  BY MR. ROBERTS:
2       Q.  You're the corporate representative,
3  Mr. Runyon.  You didn't understand that this human
4  review was occurring in Hyderabad, India?
5       A.  Yes.
6       MS. SIEKKINEN: Objection.
7       THE WITNESS: I'm aware.
8       MS. SIEKKINEN: Go ahead.
9  BY MR. ROBERTS:
10       Q.  You're aware that the review is occurring in
11  Hyderabad, India, correct?
12       A.  Yes.
13       Q.  All right.  Why did you not answer this and
14  say that it was done in Hyderabad?
15       MS. SIEKKINEN: Objection. Outside the scope.
16       THE WITNESS: I don't know.  I'll have to
17       defer that to legal.  I don't know.
18  BY MR. ROBERTS:
19       Q.  Well, are these your answers or are these
20  legal's answers?
21       A.  They're mine.
22       Q.  Right.  So you relied on the contract to say
23  that it was reviewed, but you wouldn't rely on the
24  contract to say that it was done in Hyderabad, India?
25       Do I understand that correctly?



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
109–112

Page 109

1   MS. SIEKKINEN: Objection. Mischaracterizes
2   his testimony. Go ahead.
3       THE WITNESS: Can you rephrase that or ask
4   that again? I'm sorry.
5   BY MR. ROBERTS:
6   Q. Yeah. Why didn't you say that the review
7   occurred in Hyderabad, India?
8   A. I don't know.
9   Q. Why does Verizon hire people in Hyderabad,
10  India to do the content review for them?
11      MS. SIEKKINEN: Objection. Outside the scope.
12  Go ahead.
13      THE WITNESS: I have to defer that to legal.
14  BY MR. ROBERTS:
15  Q. Is it because it's cheaper?
16  A. Oh, I don't know.
17      MS. SIEKKINEN: Objection. Speculation. Go
18  ahead.
19      THE WITNESS: I don't know.
20  BY MR. ROBERTS:
21  Q. How much -- what are the speculation? You
22  reviewed the exhibit, I think -- let me see, five, the
23  scope of work. What are these unredacted numbers? How
24  much does this cost per month?
25      MS. SIEKKINEN: Objection. Outside the scope.

Page 110

1       THE WITNESS: I don't know.
2   BY MR. ROBERTS:
3   Q. How much is it an image that WebPurify gets
4   paid?
5       MS. SIEKKINEN: Objection. Outside the scope.
6       THE WITNESS: I don't know.
7   BY MR. ROBERTS:
8   Q. Did you not see an unredacted copy of this
9   agreement?
10      MS. SIEKKINEN: Objection. Outside the scope.
11  Go ahead.
12      THE WITNESS: I don't recall.
13  BY MR. ROBERTS:
14  Q. You don't recall whether or not you saw an
15  unredacted copy of this scope of work for WebPurify?
16  A. Correct. I don't recall if I did or did not.
17  Q. Okay. I didn't mean to -- this scope of work
18  references Ethan Arenson. I think you've already
19  identified him. It says, under responsibilities, "Key
20  Responsibilities: Conducts weekly meetings with
21  supplier for quality assurance and other topics related
22  to services covered under this SOW."
23      Did Ethan Arenson conduct weekly quality
24  assurance meetings with WebPurify from the date this
25  contract was signed until present?

Page 111

1   A. Don't know.
2   Q. Okay. This contract speaks about escalations.
3   Do you recall seeing that?
4   A. I may have glanced over it. I don't remember
5   if I actually read into that to that level, but...
6   Q. To your knowledge, has WebPurify ever had to
7   escalate content to Verizon under the terms of this
8   policy and procedure to help them evaluate a particular
9   image?
10  A. I don't know.
11  Q. If they did have to escalate content to
12  Verizon, isn't it true that Verizon wouldn't have any
13  content moderators that would be qualified to help them?
14      MS. SIEKKINEN: Objection. Vague.
15      THE WITNESS: I don't know that.
16  BY MR. ROBERTS:
17  Q. You testified earlier that Verizon doesn't
18  employ any content moderators, trained content
19  moderators in-house. Was that true?
20  A. To the best of my knowledge, yes.
21  Q. Yeah. So I mean, if WebPurify had to escalate
22  content to Verizon, who at Verizon would help them make
23  a determination?
24  A. I believe that would be legal and most likely
25  Ethan.

Page 112

1   Q. Okay. Do you think Ethan has training in
2   identifying child sexual abuse material?
3       MS. SIEKKINEN: Objection. Outside the scope.
4   Go ahead.
5       THE WITNESS: I don't know.
6   BY MR. ROBERTS:
7   Q. Okay. What were the consequences for this
8   supplier, here WebPurify, if they failed to provide
9   moderation within the 24 hours of receipt?
10  A. I believe it's in the document there
11  somewhere, but I'm not sure what that is.
12  Q. Okay. I was provided with some training
13  material. I guess we'll mark the training material as
14  7.
15      (Plaintiff's Exhibit No. 7 was marked for ID.)
16  BY MR. ROBERTS:
17  Q. Have you reviewed this document?
18  A. I believe I have.
19  Q. This was a document produced by Verizon. It
20  starts at Bates Stamp 51. I want to -- "Which image and
21  videos are reportable CSAM? Verizon must report to the
22  National Center for Missing and Exploited Children
23  whenever it encounters child pornography, a term defined
24  in U.S. law to mean an individual under the age of 18
25  engaged in sexually explicit conduct."



Page 113

1         Did I read that correctly?
2    A.   Yes.
3    Q.   That definition doesn't have anything -- does
4    not refer to the word apparent, does it?
5    A.   That word is not in the sentence, no.
6    Q.   Okay.  Do you know what the Dost factors are?
7    A.   Not verbatim.  I've read a little bit of it,
8    but that's about it.  I don't really.
9    Q.   Okay.  There's a section here saying, "Making
10   age determinations."  It says, "Determining the age of
11   an individual who appears in a photo or video can be
12   difficult and is not an exact science."
13        Do you agree with that statement?
14   A.   That's what the -- that's what that line says,
15   yes.
16   Q.   Well, I'm not asking you if that's -- I'm
17   sorry.  As Verizon's corporate representative on
18   policies and procedures, do you agree that that is a
19   true statement, that it is difficult to determine the
20   age and it is not an exact science?
21   A.   Yes.
22   Q.   Okay.  Tell me, as Verizon's corporate
23   representative, what is the Tanner Scale?
24   A.   I believe it's a guideline.
25   Q.   Okay.  Do you believe as Verizon's corporate

Page 114

1    representative that application of the Tanner Scale is a
2    reliable scientific way of determining whether someone
3    is above or below the age of 18?
4        MS. SIEKKINEN:  Objection.  Outside the scope.
5    Go ahead.
6        THE WITNESS:  I don't know that.
7    BY MR. ROBERTS:
8    Q.   All right.  As Verizon's corporate
9    representative, though, you are aware that that is what
10   information was provided by Verizon to WebPurify to make
11   that determination, correct?
12       MS. SIEKKINEN:  Objection.  Mischaracterizes
13   the document.  Go ahead.
14       THE WITNESS:  Yes.
15   BY MR. ROBERTS:
16   Q.   Yeah, and they -- just so we're not
17   misrepresenting, it says, "Moderators should use their
18   best judgment with assistance from the Tanner Scale
19   discussed in the next two slides."
20       Is that what it says?
21   A.   That is what that line states.
22   Q.   Yeah.  There's no other methodology in this
23   document to help a moderator make that decision,
24   correct?
25       MS. SIEKKINEN:  Objection.  Mischaracterizes.

Page 115

1    Go ahead.
2    BY MR. ROBERTS:
3    Q.   Is there another methodology in this document
4    which would help a moderator to determine whether or not
5    the individual is 18 or not 18 or below 18?
6    A.   Not that I see at the present.
7    Q.   Okay.  And you reviewed it.  Do you recall
8    anything from your review?
9    A.   I do not.
10   Q.   Okay.  Do you believe, as Verizon's corporate
11   representative, that this is an accurate representation
12   of the Tanner Scale?
13       MS. SIEKKINEN:  Objection.  Lack of
14   foundation.  Go ahead.
15       THE WITNESS:  Best I know, yes.
16   BY MR. ROBERTS:
17   Q.   What do you -- well, I mean, this is
18   Verizon -- it's not your personal knowledge I'm asking
19   you, but what I'm asking you as Verizon's corporate
20   representative, Verizon believes this is an accurate
21   representation of the Tanner Scale?
22       MS. SIEKKINEN:  Objection.  Outside the scope.
23   Go ahead.
24       THE WITNESS:  Yes.
25

Page 116

1    BY MR. ROBERTS:
2    Q.   Okay.  As the corporate representative of
3    Verizon, you understand Verizon has the resources to
4    hire medical professionals and experts to help them
5    understand the Tanner Scale and limitations of the
6    Tanner Scale?
7        MS. SIEKKINEN:  Objection.  Assumes a lot of
8    facts not in evidence.
9        THE WITNESS:  I don't know that.
10   BY MR. ROBERTS:
11   Q.   Okay.  So do you have any idea as Verizon's
12   corporate representative what a Stage 5, let's say, on
13   the Tanner Scale means?
14   A.   Other than what's being shown right there.
15   Q.   Other than what's being shown right here,
16   you'd have no idea?
17   A.   No.
18   Q.   Right.  So according to this, a Tanner
19   Scale 5, okay, is the age range of 12 and a half to 16
20   and a half.
21   A.   Okay.  Yes, I see that.
22   Q.   Yes, that's what this scale states, right?
23   A.   I see that, yes.
24   Q.   You're Verizon's corporate representative.
25   This is the document that you gave to WebPurify to help



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
117–120

Page 117

1  them determine the age of individuals, correct?

2      A.  Yes.

3      Q.  Okay.  I'm going to represent to you that

4  Tanner Scale Stage 5 is fully sexually mature.  There is

5  no rating beyond that, okay?  Your mother, if she's

6  still alive, is a Tanner Stage 5.

7      Did you know that?

8      MS. SIEKKINEN:  Objection.  Way outside the

9    scope.  Go ahead.

10      THE WITNESS:  Yes.  I mean, that would make

11    sense.

12  BY MR. ROBERTS:

13      Q.  Right.  So you know just as a human being that

14  Tanner Stage 5, fully sexually mature does not represent

15  an age range of 12 and a half to 16, correct?

16      A.  I don't know that.

17      Q.  Okay.  Does that seem like a reasonable thing

18  to you, if someone is fully sexually mature from the

19  pubic hair standpoint that you could estimate their age

20  range to be between 12 and a half and 16 and a half

21  years old?

22      MS. SIEKKINEN:  Objection.  Outside the scope.

23      THE WITNESS:  Well, this is a guideline and

24    it's not scientific.

25

Page 118

1  BY MR. ROBERTS:

2      Q.  Yeah, it is not scientific, is it?  No.  This

3  isn't accurate, though, right?  That's not accurate?

4      A.  I don't know that.

5      Q.  Okay.  Down here it says age and it goes up to

6  15.  What does this mean down here, these ages down here

7  at the bottom, infantile to 15?

8      A.  You mean other than what it represents as an

9  age scale?

10      Q.  Right.  You agree that that age scale doesn't

11  go above the age of 15?

12      A.  On this chart.

13      Q.  On this document, yeah.  No?

14      A.  Yes.

15      Q.  Do you agree that there is no diagram -- on

16  this diagram, there is no image with an age range that

17  does not include a minor?

18      MS. SIEKKINEN:  Objection.  Outside the scope.

19    Go ahead.

20      THE WITNESS:  Based upon the document, yes.

21  BY MR. ROBERTS:

22      Q.  So if I were to use this purported version of

23  the Tanner Scale, every image in this, I would have to

24  conclude that their age range includes being a minor,

25  correct?

Page 119

1      MS. SIEKKINEN:  Objection.  Outside the scope

2    and misrepresents the document.  Go ahead.

3      THE WITNESS:  I don't know that.

4  BY MR. ROBERTS:

5      Q.  Okay.  Well, this age range is eight to

6  thirteen.  That includes being a minor, correct?

7      A.  Yes, sorry.

8      MS. SIEKKINEN:  Sorry.

9  BY MR. ROBERTS:

10      Q.  Twelve and a half to 18 and a half, that

11  includes being a minor, correct?  Twelve and a half to

12  18 and a half years old, that age range includes minors,

13  correct?

14      A.  Yes.

15      Q.  Okay.  Eighteen (sic) to fourteen years old,

16  that includes minors, correct?

17      A.  Yes.

18      Q.  Twelve and a half to 16 and a half years old,

19  that includes minors, correct?

20      A.  Yes.

21      Q.  There's no age range on this Tanner Scale that

22  would allow me to conclude someone is not a minor,

23  correct?

24      MS. SIEKKINEN:  Objection.  Outside the scope.

25    Go ahead.

Page 120

1      THE WITNESS:  Yes.

2  BY MR. ROBERTS:

3      Q.  All right.  But Verizon's policy is let's use

4  this age range of 12 and a half to 18 and a half.  If a

5  moderator thought this individual could be from 12 and a

6  half to 18 and a half years old, that would qualify

7  under Verizon's policy as being reportable child sexual

8  abuse material?

9      MS. SIEKKINEN:  Objection.  Compound and

10    vague.  Go ahead.

11      THE WITNESS:  I'm sorry, could you repeat

12    that?

13  BY MR. ROBERTS:

14      Q.  Yeah.  If there was a pornographic image of an

15  individual, a female individual and the moderator

16  determined that she fit within this 12 and a half to 18

17  and a half age range, under Verizon' policies and

18  procedures that would be reportable child sexual abuse

19  material?

20      MS. SIEKKINEN:  Objection.  Hypothetical.

21      THE WITNESS:  It could potentially.

22  BY MR. ROBERTS:

23      Q.  Okay.  What would it depend on?

24      MS. SIEKKINEN:  Objection.  Hypothetical.

25    Same objection.



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
121–124

Page 121

1    THE WITNESS:  Well, they're using their best
2    judgment.  Again, it's not scientific.
3  BY MR. ROBERTS:
4    Q.  Okay.  "Under these policies and procedures
5  Tanner Stage 2 marks the beginning of physical signs of
6  puberty and the dividing line between pre- and
7  postpubescent."
8       Did I read that correctly?
9    A.  Yes.
10    Q.  And that is Verizon's policy?
11    MS. SIEKKINEN:  Objection.  Mischaracterizes.
12    Go ahead -- object to the form.  Go ahead.
13  BY MR. ROBERTS:
14    Q.  Is that Verizon's policy?
15    A.  That's what's written on this paper.
16    Q.  Yeah, I'm not asking what's written on the
17  paper.  I'm asking you as corporate representative, is
18  that Verizon's policy when they're training the content
19  moderators?  Is that their policy?
20    MS. SIEKKINEN:  Object to the form.  Go ahead.
21    THE WITNESS:  It's a guideline.
22  BY MR. ROBERTS:
23    Q.  Under Verizon's guidelines if a model has
24  pubic hair, are they prepubescent or postpubescent or
25  pubescent?

Page 122

1    MS. SIEKKINEN:  Object to the form.  Compound.
2    Go ahead.
3  BY MR. ROBERTS:
4    Q.  Let me ask it again, because I think I changed
5  it near the end.
6       If a female model has visible signs of pubic
7  hair, under Verizon's policies, is that individual
8  prepubescent or pubescent?
9    MS. SIEKKINEN:  Object to the form.  Go ahead.
10    Hypothetical.
11    THE WITNESS:  Now, we're actually -- I'm
12    sorry, we're --
13  BY MR. ROBERTS:
14    Q.  I know you're looking at this right now.  Are
15  you trying to figure out the answer by looking at
16  this --
17    A.  Yes.
18    Q.  -- document?
19       Okay.  I'm asking as Verizon's -- I'm not
20  asking you right now to interpret this, okay?  I'm
21  asking you as the corporate representative what their
22  policies and procedures are, okay?
23       Is it Verizon's policy that if an individual
24  has visible signs of pubic hair, that they would be
25  defined as pubescent as opposed to prepubescent?

Page 123

1    MS. SIEKKINEN:  Objection.  Calls for
2    speculation and hypothetical.  Go ahead.
3    THE WITNESS:  They could be.
4  BY MR. ROBERTS:
5    Q.  Could be what?
6    A.  It could be reported.
7    Q.  As -- no, no, no.  No, no, no.
8    A.  I'm sorry.
9    Q.  I'm asking you would it be reported as
10  prepubescent or pubescent?
11    A.  We don't --
12    MS. SIEKKINEN:  Objection.  Same objection.
13    Go ahead.
14    THE WITNESS:  Again, we don't make the age
15    determination.
16  BY MR. ROBERTS:
17    Q.  Okay.  Actually, do you -- you're aware -- are
18  you not aware that Verizon does -- their policy is to
19  ask WebPurify to make the determination of prepubescent
20  versus pubescent?  Are you aware of that?
21    A.  No, I'm not.
22    Q.  Okay.
23    MS. SIEKKINEN:  Can we have -- can we take a
24    break?  It's been a little bit and I know David's
25    had some issues with his allergies.

Page 124

1    MR. ROBERTS:  Yeah, yeah, and we'll try to
2    finish it up here.  Can we make it like a
3    five-minute break?
4    MS. SIEKKINEN:  Yeah, we'll do it as quick as
5    we can.
6    THE VIDEOGRAPHER:  This marks the end of media
7    number four.  The time is 4:38 p.m.  We are now off
8    the record.
9    (Off the record.)
10    THE VIDEOGRAPHER:  This marks the beginning of
11    media number five.  The time is 4:47 p.m.  We are
12    now on the record.
13  BY MR. ROBERTS:
14    Q.  Okay.  I am -- have you ever spoken with
15  anybody from WebPurify about the services or procedures
16  that they do in preparation for being a corporate
17  representative for Verizon?
18    A.  I have not.
19    Q.  Okay.  Do you have any insight into their data
20  retention policies?
21    A.  I do not.
22    Q.  All right.  Do you -- as corporate
23  representative for Verizon, do you know why -- you did
24  not know that they had permanently deleted information
25  from their computers regarding the human review of this

Page 125

1  incident?
2       MS. SIEKKINEN:  Objection.  Vague.
3       THE WITNESS:  I'm unaware of that.
4  BY MR. ROBERTS:
5       Q.  Okay.  When you were answering
6  interrogatories, did you speak with anybody from
7  WebPurify to help get information for those
8  interrogatory answers?
9       A.  No.
10      Q.  All right.  Did you know why you could not
11 identify the name of the person who allegedly looked at
12 the image in question?
13      MS. SIEKKINEN:  Objection.  Outside the scope.
14  Go ahead.
15      THE WITNESS:  I do not.
16 BY MR. ROBERTS:
17      Q.  All right.  So let's -- have you ever seen the
18 CyberTip reports in this case?
19      A.  Yes, I have.
20      Q.  Are you familiar with -- what's that?
21      A.  You're fine.
22      Q.  Sorry.  Are you familiar with CyberTip
23 reports?
24      A.  I am.
25      Q.  Okay.  Do you view them as a part of your

Page 126

1  daily responsibilities or your job responsibilities,
2  whether it's daily or not?
3       A.  Daily, no.  Definitely not daily.  But yes,
4  whenever we file one, we do get a confirmation report
5  back.
6       Q.  So how do you -- when you're filing a -- and
7  what I'm showing --
8       MR. ROBERTS:  Madam Court Reporter, is that 7?
9       THE COURT REPORTER:  No, you are up to 8 now.
10      MR. ROBERTS:  Okay, 8.
11      (Plaintiff's Exhibit No. 8 was marked for ID.)
12 BY MR. ROBERTS:
13      Q.  How do you send a CyberTip report?  Have you
14 ever sent a CyberTip report?
15      A.  Yes.
16      Q.  How do you do that?
17      A.  Go to web interface with the National Center
18 for Missing and Exploited Children, log into the secure
19 database, sort of a secure web page and send the
20 information and file the report there.
21      Q.  And are there like questions and you fill out
22 the answers or you submit different information in
23 there?
24      A.  Yes, yeah.  There's a certain amount that are
25 required, but yes.

Page 127

1       Q.  Do you attach the content that is the subject
2  of that CyberTip to that?
3       A.  We put -- if we have an image, but we don't --
4  in my case I've never had one that I had to attach, but
5  that would be -- if there was one that was provided,
6  that would have to be done.
7       Q.  Okay.  So you never had to report child sexual
8  abuse material, or you reported something else?
9       A.  I have had to report child sexual abuse
10 material.
11      Q.  And how did you identify that material without
12 the image itself?
13      MS. SIEKKINEN:  Objection.  Outside the scope.
14  Go ahead.
15      THE WITNESS:  Our process is designed that we
16  don't actually view the image for my side of the
17  business for what I deal with.  So we validate that
18  the URL exists, that it's the reported material,
19  and then we let NCMEC file that to law enforcement.
20 BY MR. ROBERTS:
21      Q.  What is a URL?
22      A.  Universal request locator.
23      Q.  Is it like a website or a web page?
24      A.  That would be correct.
25      Q.  And how would you get that type of

Page 128

1  information?
2       A.  It would either be reported to us by a third
3  party, law enforcement or by the National Center for
4  Missing and Exploited Children itself.
5       Q.  Okay.  And do you -- it's just like a random
6  person?  If someone called up and said, hey, David
7  Runyon's got child pornography on his website, would you
8  just report that to NCMEC without looking at it or doing
9  anything?
10      MS. SIEKKINEN:  Objection.  Hypothetical.
11      THE WITNESS:  In that instance, if all they
12  did was just say that there was something there but
13  they didn't provide us with any material evidence,
14  and what I mean by that is they didn't give us the
15  URL for that particular image or for that --
16 BY MR. ROBERTS:
17      Q.  Right.
18      A.  -- then we would basically at that point
19 inform them that they would have to give us more
20 information, or they themselves can report it to NCMEC
21 or law enforcement.
22      Q.  But if they gave you a URL, like, wouldn't
23 somebody have to, like, follow that to be, like, oh,
24 okay, this is real, it's not just like a fake thing?
25      A.  Right.  We validate that the URL exists, but



Page 129

1  we don't go to actually view the image.  We're not
2  designed to do that.
3      Q.  Okay.  So do you know how many -- how many --
4  at WebPurify, how many content moderators are dedicated
5  to the Synchronoss/Verizon project?
6      A.  I don't know.
7      Q.  How often do they get the training that we
8  were talking about, that we just showed?
9      A.  I don't know that.  I don't know the answer to
10  that.
11      Q.  Okay.  Who administered that training?  Is it
12  a Verizon person or is it a WebPurify person?
13      A.  I believe that's in the contract or in the
14  statement of work somewhere would outline that.
15      Q.  Okay.  But you don't know as we sit here
16  without going through the contract who does that?
17      A.  No, I do not.
18      Q.  So can you see this?  I'm going to make it a
19  little bit bigger for us.  I had a milestone in my life
20  the other day.  I got bifocals.  So that was a big step
21  for me.  But my contacts are still just normal.  So
22  we'll blow this up.
23      A.  Yeah, same thing, so I understand.
24      Q.  All right.  So incident type, this
25  information, are you familiar enough with a CyberTip

Page 130

1  report that the information provided in Section A is
2  information that's provided by Synchronoss on behalf of
3  Verizon?
4      A.  Yes, in this instance, yes.
5      Q.  Yes, okay.  Incident type:  Child pornography,
6  possession, manufacture and distribution, let me ask you
7  that.  Did Verizon -- and this is you as corporate
8  representative of Verizon.
9          Did Verizon have any evidence or facts or
10  circumstances that Mr. Lawshe was manufacturing child
11  pornography?
12      MS. SIEKKINEN:  Objection.  Outside the scope.
13      Go ahead.
14      THE WITNESS:  I don't know that.
15  BY MR. ROBERTS:
16      Q.  Same question.  Did Verizon have any
17  information that Mr. Lawshe was distributing child
18  pornography?
19      MS. SIEKKINEN:  Objection.  Outside the scope.
20      THE WITNESS:  I don't know that.
21  BY MR. ROBERTS:
22      Q.  Let me ask you this.  Does every single
23  CyberTip report produced by Synchronoss on behalf of
24  Verizon have the same incident type?
25      MS. SIEKKINEN:  Objection.  Outside the scope.

Page 131

1      Go ahead.
2      THE WITNESS:  I can't speak to the reports
3  that Synchronoss says, but I can tell you that
4  NCMEC, from our standpoint, when we manually enter
5  this into the systems from my side, that's the
6  whole choice we're provided, is one line.  It says
7  possession, manufacture, distribution is all
8  together.
9  BY MR. ROBERTS:
10      Q.  Okay.
11      A.  They don't deviate.
12      Q.  Incident time, what does this mean, the
13  incident time?
14      MS. SIEKKINEN:  Objection.  Outside the scope.
15      Go ahead.
16      THE WITNESS:  I don't know how it relates
17  to -- how Synchronoss submissions go.
18  BY MR. ROBERTS:
19      Q.  Okay.  But Verizon is submitting these reports
20  on behalf -- I'm sorry, Synchronoss is submitting these
21  reports on behalf of Verizon, correct?
22      A.  Yes.
23      Q.  Okay.  They are acting at the direction of
24  Verizon when they scan and report child sexual abuse
25  material, correct?

Page 132

1      A.  Yes.
2      Q.  All right.  I can tell you that this incident
3  time at 1:25:23, this number here, is the same as the
4  report time.  It's the exact same time as the report
5  time.  Do you know why?
6      MS. SIEKKINEN:  Objection.  Outside the scope.
7      Go ahead.
8      THE WITNESS:  Sorry, I do not.
9  BY MR. ROBERTS:
10      Q.  Well, does Verizon have a policy of reporting
11  the incident report time in place of the actual incident
12  time?
13      A.  I don't know that.
14      Q.  Is Verizon aware that these incident times are
15  not reflective of the actual time of upload?
16      MS. SIEKKINEN:  Objection.  Assumes facts not
17  in evidence.  Mischaracterizes.  Go ahead.
18      THE WITNESS:  I don't know.
19  BY MR. ROBERTS:
20      Q.  Well, let me back up.  Let me ask you this.
21  As Verizon's corporate representative on policies and
22  procedures of reporting child sexual abuse material, do
23  you know what this incident time represents?
24      MS. SIEKKINEN:  Objection.  Outside the scope.
25      Go ahead.



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
133–136

Page 133

1    THE WITNESS: I do not.
2  BY MR. ROBERTS:
3    Q.  So Verizon -- does Verizon know anything about
4  why the incident time is what it is?
5    MS. SIEKKINEN: Objection. Outside the scope.
6    Go ahead.
7    THE WITNESS: I'm sorry, could you repeat the
8    question?
9  BY MR. ROBERTS:
10    Q.  Yeah.  This is -- this is Verizon's, right?
11  Let's go up here.  It says, "Synchronoss Technologies is
12  the cloud-based storage provider for content stored on
13  the Verizon cloud"; is that correct?
14    A.  Correct.
15    Q.  Right.  This is a report of your customer,
16  Verizon's customer, to the National Center for Missing
17  and Exploited Children, correct?
18    MS. SIEKKINEN: Objection. Mischaracterizes.
19    Go ahead.
20    THE WITNESS: It appears to be, yes.
21  BY MR. ROBERTS:
22    Q.  Well, I mean, Mr. Lawshe was not a customer of
23  Synchronoss, was he?
24    MS. SIEKKINEN: Objection. Outside the scope.
25    Go ahead.

Page 134

1    THE WITNESS: He's a Verizon customer, as I
2    understand it.
3  BY MR. ROBERTS:
4    Q.  Correct.  Does Verizon have a policy of
5  reporting the report time in place of the incident time?
6    MS. SIEKKINEN: Objection. Outside the scope.
7    Go ahead.
8    THE WITNESS: I don't know.
9  BY MR. ROBERTS:
10    Q.  Do you know why this isn't the incident time?
11    MS. SIEKKINEN: Objection. Assumes facts not
12    in evidence and outside the scope.
13    THE WITNESS: No, I do not.
14  BY MR. ROBERTS:
15    Q.  Do you believe -- as Verizon's corporate
16  representative, do you believe that is the time of the
17  upload?
18    MS. SIEKKINEN: Objection. Outside the scope.
19    THE WITNESS: I don't know that.
20  BY MR. ROBERTS:
21    Q.  Okay.  "Were the entire contents of the
22  uploaded file publicly available?  No."
23    Why did -- does Verizon always say no on these
24  reports?
25    A.  I don't know.

Page 135

1    Q.  Do you know why this says no?  I can represent
2  to you that this image was downloaded from a public
3  www.com website.  Do you know why it says that it was
4  not available publicly?
5    MS. SIEKKINEN: Objection. Outside the scope.
6    Go ahead.
7    THE WITNESS: I don't know.
8  BY MR. ROBERTS:
9    Q.  Okay.  Do you believe that Verizon should know
10  why its suppliers are answering questions a certain way
11  on a NCMEC CyberTip report?
12    MS. SIEKKINEN: Objection. Outside the scope.
13    THE WITNESS: Could you rephrase that or
14    repeat it, please?
15  BY MR. ROBERTS:
16    Q.  Yeah.  I mean, do you believe that Verizon
17  should know why its suppliers are answering questions a
18  certain way on a NCMEC CyberTip report?
19    MS. SIEKKINEN: Same objection.
20    THE WITNESS: No.
21  BY MR. ROBERTS:
22    Q.  Do you believe that Verizon should -- if they
23  hire people to make CyberTip reports, do you believe
24  those CyberTip reports should be accurate?
25    MS. SIEKKINEN: Objection. Outside the scope.

Page 136

1    Go ahead, and calls for hypothetical.
2    THE WITNESS: Yes.
3  BY MR. ROBERTS:
4    Q.  Okay.  To the extent -- do you know if this is
5  an accurate answer?  Were the entire contents of the
6  uploaded file publicly available?  Do you know if that's
7  accurate or not?
8    MS. SIEKKINEN: Objection. Outside the scope.
9    THE WITNESS: I do not.
10  BY MR. ROBERTS:
11    Q.  Does Verizon -- is that an ambiguous question
12  to you as Verizon's corporate representative?
13    MS. SIEKKINEN: Objection. Outside the scope.
14    Go ahead.
15    THE WITNESS: I'm not exactly sure what
16    ambiguous fully means.
17  BY MR. ROBERTS:
18    Q.  Okay.  Let me say.  So the question is, "Were
19  entire contents of uploaded file publicly available?"
20    Did I read that correctly?
21    A.  Okay, yes.
22    Q.  Would you agree that if this file, if the
23  contents of this file were downloaded from a public
24  website, that the answer to that question should be yes?
25    MS. SIEKKINEN: Objection. Outside the scope.



Page 137

1    THE WITNESS: I don't know that.
2  BY MR. ROBERTS:
3    Q.  Well, why not?
4    MS. SIEKKINEN: Objection. Same objection.
5    THE WITNESS: I don't know.
6  BY MR. ROBERTS:
7    Q.  Well, I mean, just as a human being, you work
8  in the security, you know, division there at Verizon.
9  If I ask you the question were entire contents of the
10 uploaded file publicly available, and you knew that the
11 contents of file had been downloaded from a public
12 website, would you say they are publicly available or
13 would you say they're not publicly available?
14   MS. SIEKKINEN: Objection. Calls for
15   speculation, outside the scope and vague.
16   THE WITNESS: Underneath that circumstance,
17   yes.
18 BY MR. ROBERTS:
19   Q.  Yeah, they would be publicly available, right?
20 I mean, if you do just download them from a public
21 website, they would be publicly available, correct?
22   MS. SIEKKINEN: Objection. Outside the scope.
23   THE WITNESS: If that's where I downloaded
24   them from, yes.
25

Page 138

1  BY MR. ROBERTS:
2    Q.  Okay.  As Verizon's corporate representative,
3  you don't have any other way of interpreting that
4  question that I'm unaware of, do you?
5    MS. SIEKKINEN: Objection. Outside the scope.
6    Go ahead.
7    THE WITNESS: No.
8  BY MR. ROBERTS:
9    Q.  Okay.  "Did reviewing ESP view entire contents
10 of uploaded file?"  This says yes.  Do you know why this
11 report would say yes?
12   MS. SIEKKINEN: Objection. Outside the scope.
13   THE WITNESS: I do not.
14 BY MR. ROBERTS:
15   Q.  Okay.  Do you believe that WebPurify -- that
16 it's the policy of Verizon that WebPurify viewed the
17 entire contents of the uploaded file?
18   MS. SIEKKINEN: Objection. Vague. Go ahead.
19   They should be viewing it, yes.
20 BY MR. ROBERTS:
21   Q.  The entire contents of the uploaded file?
22   A.  That I don't know.
23   MS. SIEKKINEN: Same objection.
24 BY MR. ROBERTS:
25   Q.  Okay.  You don't know if they view the entire

Page 139

1  contents of the uploaded file, but they should be
2  looking at it to a certain degree; is that your
3  testimony?
4    MS. SIEKKINEN: Objection. Mischaracterizes.
5    Go ahead.
6    THE WITNESS: Sorry, could you rephrase that?
7  BY MR. ROBERTS:
8    Q.  Yeah.  I asked you if you knew -- first of
9  all, let me ask you this way.  The reporting electronic
10 service provider, I mean, I guess that's Synchronoss.
11 Let's just say Synchronoss did not view the entire
12 contents of the uploaded file pursuant to Verizon's
13 policies, did they?
14   MS. SIEKKINEN: Objection. Outside the scope.
15   Go ahead.
16   THE WITNESS: I don't know that.
17 BY MR. ROBERTS:
18   Q.  You don't know if Synchronoss looks at the
19 images or not in Verizon's policy?
20   A.  I'm aware that they use the PhotoDNA analysis
21 process.
22   Q.  Okay.  I know, but I mean, like, did they view
23 the entire contents of the file?  Do you know if
24 Synchronoss looks at the images at all?
25   A.  I don't.

Page 140

1    Q.  Okay.  You know that no one from Verizon
2  looked at the image, correct?
3    MS. SIEKKINEN: Objection. Outside the scope.
4    Go ahead.
5    THE WITNESS: Don't know.
6  BY MR. ROBERTS:
7    Q.  You don't know?  I mean, hold on now.  As the
8  corporate representative, you testified about the
9  policies.  There's nobody at Verizon, you've testified,
10 that does content moderation.  So nobody at Verizon
11 would have monitored this content, like looked at this
12 picture prior to it being reported, would they?
13   MS. SIEKKINEN: Objection. Outside the scope.
14   Go ahead.  And hypothetical.
15   THE WITNESS: No.
16 BY MR. ROBERTS:
17   Q.  Yeah, so I think -- I thought that what you
18 were saying was that Verizon has hired a third party to
19 visually do the content moderation.
20   Did I understand that correctly?
21   A.  Right.  We have Synchronoss that scans for it.
22 They mark it as a candidate.  It then goes to WebPurify,
23 who has a human review process.
24   Q.  Right.
25   A.  A person looks at it, yes.



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
141–144

Page 141

1    Q.  Right.  And when I ask you that question --
2   where we got off on this tangent was I asked you did
3   they view the entire contents of the uploaded file, and
4   I think you said you're not sure about that?
5       MS. SIEKKINEN:  Objection.
6   BY MR. ROBERTS:
7    Q.  What I was trying to clarify is you know they
8   look at it to a certain extent, but are you sure that
9   they viewed the entire contents of the file?
10      MS. SIEKKINEN:  Objection.  Vague.  Go ahead
11      and outside the scope.
12      THE WITNESS:  I don't know.
13  BY MR. ROBERTS:
14   Q.  Right.  And I don't know if they use this tool
15  called Montage, which potentially can alter the
16  appearance of the image if and when they look at the
17  image, correct?
18      MS. SIEKKINEN:  Objection.  Outside the scope
19      and assumes facts not in evidence.
20      THE WITNESS:  I don't have firsthand knowledge
21      of that, no.
22  BY MR. ROBERTS:
23   Q.  Well, and as Verizon's corporate
24  representative you don't have any knowledge of what the
25  Montage program does?

Page 142

1       MS. SIEKKINEN:  Objection.  Same objection as
2       before.
3       THE WITNESS:  It's -- I'll just state that
4       it's proprietary software, so that's...
5   BY MR. ROBERTS:
6    Q.  But you're not refusing to answer my question
7   because of proprietary software, are you?
8    A.  No.  I thought I was just elaborating on it.
9    Q.  Yeah, no.  I'm just asking you a very
10  practical question.  As Verizon's corporate
11  representative, you don't understand what the Montage
12  program physically does to an image?
13   A.  Correct.
14   Q.  That's all I'm trying to understand.
15   A.  Okay.
16   Q.  Yeah.  In your filling out of reports for
17  NCMEC, you are aware that there is a -- the ability to
18  make notes, like physical notes, on a CyberTip report,
19  correct?
20   A.  Yes.
21   Q.  Additional comments that can provide context
22  and additional information that could be helpful for
23  NCMEC?
24   A.  On the ones that I submit, yes.
25   Q.  Right.  Do you know why there's no additional

Page 143

1   information provided on Synchronoss reports?
2    A.  I do not.
3    Q.  All right.  There's also the ability to
4   clarify incident time.  You know, what do you mean by
5   the incident -- let me ask you this.  When you fill out
6   a report for, you know, your job, do you attempt to put
7   an accurate incident time into that report?
8    A.  Yes.
9    Q.  All right.  And by incident time, do you mean
10  like trying to give them the -- NCMEC, the best
11  information you have available to you about when the
12  specific event which is the subject of the report
13  occurred?
14   A.  No.  And actually, we report when we received
15  it.
16   Q.  Okay.  Well, and in those situations -- go
17  ahead.  In those situations you may not know when the
18  incident occurred?
19      MS. SIEKKINEN:  Objection.
20      THE WITNESS:  Correct.
21      MS. SIEKKINEN:  Outside the scope.  Go ahead.
22  BY MR. ROBERTS:
23   Q.  Right.
24   A.  Yes.
25   Q.  Are you aware that there is a space on the

Page 144

1   forms for electronic service providers to clarify what
2   they mean by incident time?
3    A.  No, I'm not.
4    Q.  All right.  Are you aware of feedback that
5   NCMEC has provided to Verizon regarding the accuracy of
6   its reports?
7       MS. SIEKKINEN:  Objection.  Outside the scope.
8       THE WITNESS:  No.
9   BY MR. ROBERTS:
10   Q.  Okay.  You agree with me that the accuracy of
11  cyber -- NCMEC/CyberTip reports falls within the
12  policies, practices and procedures of detecting and
13  reporting child sexual abuse material, correct?
14      MS. SIEKKINEN:  Objection.  Vague.
15      THE WITNESS:  Sorry, could you rephrase that?
16  BY MR. ROBERTS:
17   Q.  Yeah.  So I asked for you to be produced as a
18  corporate representative on partly reporting of child
19  sexual abuse material.
20      Do you understand that?
21   A.  Partly reporting?
22   Q.  No.
23   A.  Sorry.
24   Q.  Yeah.  Part of the reason -- part of the
25  subject matter of which I have asked for a corporate



DAVID RUNYON                                    October 22, 2025
LAWSHE vs VERIZON COMMUNICATIONS                145–148

Page 145

1  representative to be designated is the reporting of
2  child sexual abuse material.
3     A.  Okay.
4     Q.  Did you understand that?
5     A.  Yes.
6     Q.  All right.  Will you agree with me that the
7  CyberTip report is the main, if not the exclusive way,
8  in which Verizon reports child sexual abuse material?
9        MS. SIEKKINEN:  Objection.  Outside the scope.
10       THE WITNESS:  Yes.  That is the reporting
11    mechanism that we employ.
12  BY MR. ROBERTS:
13    Q.  Okay.  And so when Miz -- when your counsel
14  objects to the scope of my question, I just want to make
15  sure you and I understand, you believe that questions
16  about a CyberTip report are included within the scope of
17  reporting child sexual abuse material?
18       MS. SIEKKINEN:  Objection.  Outside the scope.
19  BY MR. ROBERTS:
20    Q.  Correct?
21       MS. SIEKKINEN:  The scope is Verizon's
22    policies.
23  BY MR. ROBERTS:
24    Q.  Well, listen, Verizon doesn't set the policies
25  of how Synchronoss reports this stuff?

Page 146

1        MS. SIEKKINEN:  Objection.  Outside the scope.
2    Go ahead.  Go ahead.
3        THE WITNESS:  I was just going to say, it's --
4    the statement of work specifies that, how the
5    information should be exchanged.
6  BY MR. ROBERTS:
7    Q.  Yeah, but you agree -- I mean, you agree with
8  me as Verizon's corporate representative that it's
9  Verizon's responsibility of how sexual abuse material is
10  reported on its customers, correct?
11    A.  Could you -- I'm sorry, can you --
12    Q.  Yeah, I mean, you're not suggesting here today
13  that it's not your responsibility how Synchronoss does
14  it because Synchronoss is their own company and that
15  doesn't have anything to do with Verizon, are you?
16       MS. SIEKKINEN:  Objection.  Compound.  Go
17    ahead.
18       THE WITNESS:  No, I'm not saying that.
19  BY MR. ROBERTS:
20    Q.  Right.  Synchronoss is reporting -- they're
21  doing Verizon's work in submitting these CyberTip
22  reports, correct?
23       MS. SIEKKINEN:  Objection.  Vague.
24       THE WITNESS:  They are who we are contracted
25    for this work, yes.

Page 147

1  BY MR. ROBERTS:
2    Q.  Your -- Verizon is paying them to scan and
3  report child sexual abuse material, correct?
4        MS. SIEKKINEN:  Objection.  Asked and
5    answered.
6        THE WITNESS:  Yes.
7  BY MR. ROBERTS:
8    Q.  Okay.  What I'm saying, though, what I'm
9  hearing is that Verizon has abdicated the responsibility
10  to Synchronoss to make the CyberTip reports in whatever
11  way they feel is reasonable.
12       MS. SIEKKINEN:  Objection.  Mischaracterizes
13    his testimony and argumentative.
14       THE WITNESS:  I don't know that.
15  BY MR. ROBERTS:
16    Q.  Okay.  Well, I'm just trying to figure out,
17  right -- okay.  So we've talked about the incident time
18  and what you've told me is Verizon -- as corporate
19  representative, I don't know why the incident time is
20  the way it is, okay?
21       So I'm trying to figure out who's responsible
22  for making sure that that incident time is accurate.
23  That's my question to you.  Who's responsible for making
24  sure that the information in the CyberTip report is
25  accurate?

Page 148

1        MS. SIEKKINEN:  Objection.  Outside the scope.
2        THE WITNESS:  I don't know.
3  BY MR. ROBERTS:
4    Q.  Okay.  Do you know anything about the content
5  that was the subject of these reports?
6        MS. SIEKKINEN:  Objection.  Outside the scope.
7    Go ahead.
8        THE WITNESS:  No.
9  BY MR. ROBERTS:
10    Q.  Have you viewed the images?
11       MS. SIEKKINEN:  Objection.  Outside the scope.
12       THE WITNESS:  I have not.  Sorry, I have not.
13  BY MR. ROBERTS:
14    Q.  All right.  Okay.  Going back to the
15  frequently asked questions and the statements of Verizon
16  on this, would you agree with me that the human
17  reviewers at WebPurify are not confirming that the
18  information -- that the images that they are reporting
19  are child sexual abuse material?
20       MS. SIEKKINEN:  Objection.  Vague.  Go ahead.
21       THE WITNESS:  I'm sorry, could you rephrase it
22    or repeat it?  I'm sorry.
23  BY MR. ROBERTS:
24    Q.  Yeah.  You stated previously that it was law
25  enforcement's job to figure out whether or not the



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
149–152

Page 149

1  assertion that this was child sexual abuse material or
2  not -- let me ask that question again.  Sorry.
3        Earlier you testified that it was law
4  enforcement's job to determine whether or not the
5  assertion that this particular image, any particular
6  image, was child sexual abuse material or not was law
7  enforcement's responsibility.
8        Did I understand that correctly?
9  A.  Yes.
10  Q.  All right.  And so your testimony is that it's
11  law enforcement's job to confirm whether or not it's
12  child sexual abuse material or there's been a crime, et
13  cetera, correct?
14  A.  Yes.
15  Q.  All right.  WebPurify is not confirming that
16  material is child sexual abuse material before they
17  report it to law enforcement, are they?
18  A.  They are confirming that it's apparent CSAM.
19  Q.  Yeah, okay.  And that's different than
20  confirming that it is child sexual abuse material,
21  correct?
22  A.  Yes.
23  Q.  You don't -- you're not here -- you're not
24  prepared to testify on behalf of Verizon as to what
25  Verizon means by "apparent," correct?

Page 150

1        MS. SIEKKINEN:  Objection.  Outside the scope.
2    Go ahead.
3        THE WITNESS:  I would leave that definition to
4    our legal department.
5  BY MR. ROBERTS:
6  Q.  If you can't -- as Verizon's corporate
7  representative, if you can't answer the question of what
8  apparent child pornography means, how could WebPurify
9  know what Verizon means by apparent child sexual abuse
10  material?
11        MS. SIEKKINEN:  Objection.  Argumentative with
12    the witness and outside the scope.
13        THE WITNESS:  Again, it's all a process.  It
14    goes from the scanner to Synchronoss.  It then gets
15    human-reviewed through WebPurify, and these are all
16    just suspected apparent CSAM.  It's -- no one in
17    that process makes the final -- makes that
18    determination that is actually truly is until it
19    gets down to law enforcement.
20  BY MR. ROBERTS:
21  Q.  Okay.  And although you can't give me a
22  definition of what apparent is on behalf of Verizon, I
23  think you did indicate that that definition does include
24  images that appear to be adults?
25        MS. SIEKKINEN:  Objection.  Mischaracterizes

Page 151

1    his testimony and outside the scope.
2        THE WITNESS:  No.
3  BY MR. ROBERTS:
4  Q.  No?
5  A.  No.
6  Q.  Okay.  I thought earlier you testified that if
7  you looked at an image that was age-difficult or
8  age-indeterminate and that model could appear to be 18
9  or 19, but could also appear to be 17 or 16, that that
10  would fall under the definition of reportable, whatever
11  that is, reportable child sexual abuse material?
12        MS. SIEKKINEN:  Objection.  Misstates the
13    testimony.  Go ahead.
14        THE WITNESS:  Yes, I did state that.  I did
15    say that it -- again, it goes down to apparent.
16  BY MR. ROBERTS:
17  Q.  Yeah.  So if I looked at an image on -- and
18  this is a hypothetical.  If I looked at an image on a
19  public website, if I was a Verizon customer and I
20  downloaded an image of a young female adult that was 19
21  years old and someone in Hyderabad thought that they
22  looked 17, Verizon would report me to the National
23  Center for Missing and Exploited Children for possession
24  of child pornography?
25        MS. SIEKKINEN:  Objection.

Page 152

1  BY MR. ROBERTS:
2  Q.  Is that accurate?
3        MS. SIEKKINEN:  Outside the scope.  Outside
4    the scope.  Mischaracterizes testimony and
5    hypothetical by your own admission.
6        THE WITNESS:  Again, as I've stated, the
7    process would be that if it was flagged to be in
8    review and it was determined that it was apparent,
9    then that would move on to the next step of
10    going -- being reported to the National Center for
11    Missing and Exploited Children and then on to law
12    enforcement if -- for their --
13  BY MR. ROBERTS:
14  Q.  I guess the problem is we just don't know what
15  apparent is, though, right?
16        MS. SIEKKINEN:  Objection.  Outside the scope.
17        MR. ROBERTS:  Nury, are you saying that the
18    definition of what apparent child pornography is,
19    is outside of the scope of a corporate
20    representative?
21        MS. SIEKKINEN:  No.  Your continued going at
22    him in his testimony is outside the scope,
23    harassing the witness.  Enough.  It's asked and
24    answered.
25        MR. ROBERTS:  Okay.



Case 3:24-cv-00137-MMH-LLL    Document 100-4    Filed 12/18/25    Page 39 of 46 PageID
2371

DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
153–156

Page 153

1    THE WITNESS:  Sorry, not that it's relevant,
2  but this is working.
3    MR. ROBERTS:  Oh, good.  It is relevant.
4    MS. SIEKKINEN:  That was your Flonase that you
5  held up that has helped you a little bit?
6    THE WITNESS:  Yes, it has definitely made a
7  difference.
8    MS. SIEKKINEN:  I know you were having some
9  trouble with the coughing and stuff earlier.
10    THE WITNESS:  Yeah.
11  BY MR. ROBERTS:
12    Q.  Let me ask you, and this can be -- you know,
13  I'll talk about the deposition in a second, but does
14  Verizon, in the context of their policies and procedures
15  regarding child sexual abuse -- you understand that as a
16  result of a CyberTip report, one of the foreseeable
17  consequences of that is legal process, a search warrant
18  or subpoena being served on Verizon?
19    MS. SIEKKINEN:  Objection.  Outside the scope,
20  but go ahead.
21    THE WITNESS:  Ultimately, that's law
22  enforcement's decision to pursue.
23  BY MR. ROBERTS:
24    Q.  No, I understand that.  I'm just saying
25  Verizon foresees -- let me ask you this.  Do you have

Page 154

1  employees who are dedicated to dealing with search
2  warrants?
3    MS. SIEKKINEN:  Objection.  Outside the scope.
4  Go ahead.
5    THE WITNESS:  There is a legal team that deals
6  with -- that takes, you know, law enforcement
7  requests, yes.
8  BY MR. ROBERTS:
9    Q.  And those law enforcement requests often
10  originate from the reporting of child sexual abuse
11  material, correct?
12    MS. SIEKKINEN:  Objection.  Outside the scope.
13  Go ahead.
14    THE WITNESS:  It may.
15  BY MR. ROBERTS:
16    Q.  Sure.  Does Verizon have any policies or
17  procedure regarding child sexual abuse reports, about
18  the retention of evidence?
19    MS. SIEKKINEN:  Objection.  That's outside the
20  scope.
21    THE WITNESS:  I'd have to refer to legal about
22  that.
23  BY MR. ROBERTS:
24    Q.  Okay.  Real quickly back to the CyberTip
25  report, and I'm fixing, I promise, I'm fixing to finish

Page 155

1  up here.
2    A.  Maybe I spoke too soon.  I just started
3  coughing again.
4    Q.  Okay.  Do you know whether or not these
5  answers -- "Were the entire contents of the uploaded
6  file publicly available?"  It says no.  Do you know if
7  that is a hard-coded answer, that it's always that way?
8    A.  I do not know.
9    Q.  All right.  Do you know if the reporting --
10  this question here, "Did the reporting ESP view the
11  entire contents of the uploaded file," do you know if
12  that's hard-coded in these reports?
13    A.  I do not.
14    Q.  And by hard-coded I mean, do you understand
15  that this report is electronically generated?
16    A.  Yes.
17    Q.  Yeah.  And that's different when you do your
18  CyberTip report.  You physically go in and you answer
19  the questions, correct?
20    A.  Correct.
21    Q.  In the scanning process it's different.  This
22  is a computer-generated.  No human being types in this
23  information, correct?
24    MS. SIEKKINEN:  Objection.  Assumes facts not
25  in evidence.  Go ahead.

Page 156

1    THE WITNESS:  I don't know.
2  BY MR. ROBERTS:
3    Q.  Oh, okay.  All right.  You don't know if this
4  is a computer-generated report?
5    A.  Correct.
6    MR. ROBERTS:  Okay.  Okay.  Just give me five
7  minutes, okay?  Take a break and I think we might
8  be wrapped up.
9    MS. SIEKKINEN:  Okay.
10    THE VIDEOGRAPHER:  This marks the end of media
11  number five.  The time is 5:29 p.m.  We are now off
12  the record.
13    (Off the record.)
14    THE VIDEOGRAPHER:  This marks the beginning of
15  media number six.  The time is 5:38 p.m.  We are
16  now on the record.
17    MR. ROBERTS:  Okay.  Mr. Runyon, I don't have
18  any more questions for you right now, but I am
19  going to continue this deposition and I'm going to
20  continue it for two reasons.  One is, I'm not sure
21  that I've been given all of the documents that were
22  responsive to a request to produce.  And the other
23  reason is that my impression -- and this is not a
24  personal criticism of you -- was that you were not
25  prepared to answer relevant questions regarding



Page 157

1  policies and procedures of the detection and
2  reporting of child sexual abuse material.
3      And so I'm going to reserve my right to come
4  back and ask you further questions.  That doesn't
5  mean that I'm going to do that, but I am continuing
6  the deposition and I'm reserving the right to do
7  that.
8      MS. SIEKKINEN:  That's not a question, but for
9  the record, we're objecting to the continuance.
10  You know, to this -- and to all your
11  characterizations, but it's not fruitful to do it
12  here on the record.  We will continue our
13  conversation off line, okay, Michael?
14      MR. ROBERTS:  Absolutely.  Okay.  With that --
15      MS. SIEKKINEN:  I'm sorry, can we -- we're
16  going to take a break and have a -- have redirect
17  because you're concluding your questions for the
18  day.
19      MR. ROBERTS:  Correct, but I'm continuing the
20  deposition.  So if you want to ask redirect of your
21  own witness, that's fine.
22      MS. SIEKKINEN:  Yeah, you just said that you
23  were going to be -- maybe not even ask him back, so
24  we wanted to do the redirect now.  We'll take a
25  break and we'll come back and do redirect.

Page 158

1      MR. ROBERTS:  Okay.
2      MS. SIEKKINEN:  Thank you, everyone.  We'll
3  take a break.
4      THE VIDEOGRAPHER:  This marks the end of media
5  number six.  The time is 5:40 p.m.  We are now off
6  the record.
7      (A break was had.)
8      THE VIDEOGRAPHER:  This marks the beginning of
9  media number seven.  The time is 5:55 p.m.  We are
10  now on the record.
11          CROSS EXAMINATION
12  BY MS. SIEKKINEN:
13      Q.  Hi, David.  Near the -- close to the beginning
14  of this whole start time, you were asked about the term
15  apparent CSAM, and in your answer you referenced a
16  definition that was in a document.
17      Do you recall that?
18      A.  Yes.
19      MS. SIEKKINEN:  Okay.  Sudhir, would you mind
20  putting up -- I forget -- I forgot Mr. Roberts'
21  numbering.  Yeah, go up to the very top.  We'll
22  show what that is, yeah.  This is a document that
23  Mr. Roberts did put up, but didn't scroll through
24  the full document, didn't show the full document.
25  So scroll down to the bottom of this page.  There

Page 159

1  we go.
2  BY MS. SIEKKINEN:
3      Q.  I'll just draw your attention to 1A.  Does
4  that refresh your recollection on a document that had a
5  definition of a child CSAM or a child -- or sorry,
6  apparent child pornography?
7      A.  Yes.
8      Q.  Okay.  Can you tell me what apparent CSAM --
9  apparent child pornography means?
10      A.  That it has the appearance of being something
11  that qualifies as child sexual abuse material.
12      Q.  Would you mind reading 1A of this document,
13  please?
14      A.  Sure, yeah.  "Apparent child pornography means
15  images of suspected child sexual exploitation which
16  using good-faith judgment appear to meet the federal
17  definition of child pornography pursuant to 18 U.S. Code
18  2556(8)."
19      Q.  Okay.  Thank you.  That's enough for that
20  document.
21      David, I know we referred to it a couple of
22  times, but mostly off the record, but the record might
23  reflect some coughs and sneezes here and there.  Can you
24  tell us what's -- you know, why -- what's causing that?
25      A.  Yeah, fall.  A lot of allergies.

Page 160

1      Q.  You suffer from seasonal allergies?
2      A.  Every spring and fall.
3      Q.  And you just arrived in New Jersey within the
4  last day or so; is that right?
5      A.  Yeah, yes.
6      Q.  Okay.  And you -- you told us earlier you
7  reside in Texas?
8      A.  Yeah.  I have --
9      Q.  Yeah.
10      A.  This type of fall hasn't hit there yet, so I
11  haven't had the displeasure of dealing with it.
12      Q.  And at a certain point you referenced
13  something -- a medication that you had taken.  Can you
14  say what that was?
15      A.  Yes, Flonase.
16      Q.  You take that in an effort to clear up your
17  allergies for this testimony?
18      A.  Yes.
19      Q.  Thanks.  Okay.  Just a clarifying question.
20  Who can access images on a Verizon customer's cloud?
21      A.  Just the customer.
22      Q.  Just the customer.  So can the general public
23  access a particular image on a Verizon customer's cloud?
24      A.  No.
25      Q.  Like a regular internet user can't navigate to



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
161–164

Page 161

1 a site that has this like -- that's the Verizon
2 customer's cloud account?
3    A.  No.
4    Q.  Okay.
5    MS. SIEKKINEN:  Sudhir, would you mind putting
6    up the training materials, please?  Great.
7 BY MS. SIEKKINEN:
8    Q.  This is a document that Mr. Roberts spent some
9 time with you on earlier; isn't that right?
10    A.  Yes.
11    Q.  Okay.  We can scroll down to -- I'll tell you
12 where.  Right -- we've spent a fair bit of time on this
13 page, right?
14    A.  Yes.
15    Q.  I'd like you to take a second to look at that
16 first bullet point under "Making Age Determinations."
17 I'll give you a minute.
18    A.  Okay.
19    Q.  Verizon is asking moderators to use what to
20 make determinations?
21    A.  To use their best judgment with the assistance
22 from the Tanner Scale.
23    Q.  Right.  So you're -- they're not confined to
24 the Tanner Scale?
25    A.  No.  It's just a guide.

Page 162

1    MS. SIEKKINEN:  All right.  Thank you.  That
2 is all.
3    MR. ROBERTS:  Andrew, do you have questions?
4    MR. REISS:  I do not.
5    MR. ROBERTS:  I have a couple of follow-up
6    there just right on point with that on the
7    redirect.
8       REDIRECT EXAMINATION
9 BY MR. ROBERTS:
10    Q.  Mr. Runyon, you were asked some questions
11 about a definition of apparent child pornography.  Do
12 you recall your attorney asking you that question?
13    A.  Yes.
14    Q.  Do you know when Verizon obtained that
15 document?
16    MS. SIEKKINEN:  Objection.  Outside the scope.
17    Go ahead.
18    THE WITNESS:  I'm not aware.
19 BY MR. ROBERTS:
20    Q.  You're not sure that they actually had that
21 document prior to the litigation in this case, are you?
22    MS. SIEKKINEN:  Same objection.
23    THE WITNESS:  I am not.
24 BY MR. ROBERTS:
25    Q.  Okay.  I asked you what Verizon's definition

Page 163

1 of apparent child pornography was.  That document was a
2 contract between Synchronoss and NCMEC, correct?
3    A.  Yes.
4    MS. SIEKKINEN:  Objection.  Compound.  Sorry,
5    there were two questions, sorry.
6 BY MR. ROBERTS:
7    Q.  So the document that you looked at, that --
8 Verizon was not a party to, that document that your
9 counsel asked you questions about in regards to apparent
10 child pornography, correct?
11    A.  I don't know.
12    Q.  Okay.  In any of the documents that you
13 reviewed that Verizon produced, did you see any
14 definitions of apparent child pornography?
15    A.  I don't know.
16    Q.  I asked you early on were there any other
17 documents other than the ones that you had reviewed that
18 memorialized or reduced to writing Verizon's policies
19 and procedures regarding the scanning and reporting of
20 child sexual abuse material.
21    Do you recall me asking you that question?
22    A.  I do.
23    Q.  And I think you testified that you did not
24 know of any other documents other than the ones you
25 reviewed that memorialized those policies and

Page 164

1 procedures; is that true and accurate?
2    A.  Yes, that is what I stated.
3    Q.  Okay.  And so the scope of work between
4 Verizon and WebPurify would be the only documentary
5 evidence of policies and procedures as it pertains to
6 the relationship between Verizon and WebPurify; is that
7 correct?
8    MS. SIEKKINEN:  Objection.  Outside the scope.
9    THE WITNESS:  I don't know that.
10 BY MR. ROBERTS:
11    Q.  Do you know of any other document that would
12 establish the policies and procedures regarding content
13 moderation between Verizon and WebPurify other than the
14 scope of work that we went over in your direct
15 testimony?
16    MS. SIEKKINEN:  Objection.  Outside the scope
17    and mischaracterizes.  Go ahead.
18    THE WITNESS:  No, I am not.
19 BY MR. ROBERTS:
20    Q.  Yeah, and just for the record, I'm not
21 characterizing your testimony.  I'm asking you, am I
22 correct?
23    A.  Correct.
24    Q.  Right.  Okay.  So when we look at this
25 document, which was marked as an exhibit -- I wrote them



DAVID RUNYON                                              October 22, 2025
LAWSHE vs VERIZON COMMUNICATIONS                          165–168

Page 165

1  down, but maybe it was five, but it is the scope of
2  work.
3        THE COURT REPORTER:  You're correct.
4  BY MR. ROBERTS:
5        Q.  In fact, it is not the policy of Verizon that
6  only apparent child pornography is reported to NCMEC,
7  correct?
8        MS. SIEKKINEN:  Objection.  Misstates
9     testimony and documents.  Go ahead.
10       THE WITNESS:  I'm sorry, could you repeat
11    that?
12 BY MR. ROBERTS:
13       Q.  Yeah.  Did someone tell you that it was
14 Verizon's policy to report apparent child sexual abuse
15 material?
16       MS. SIEKKINEN:  Object to the form.  And
17    objection, it's outside of the scope.
18       THE WITNESS:  As part of my training for
19    what -- the job I do.
20 BY MR. ROBERTS:
21       Q.  Who told you that in regards to the scanning
22 and reporting of child sexual abuse material that
23 Verizon's policy and procedure was to report apparent
24 child pornography?
25       MS. SIEKKINEN:  Objection to the scope and --

Page 166

1  yeah, object to the form.
2        THE WITNESS:  It's something --
3  BY MR. ROBERTS:
4        Q.  Who told you that?
5        A.  Well, I had forgotten that it was actually in
6  the one document that we looked at, but that's been...
7        Q.  Yeah, but in the document -- and we'll go back
8  to you -- that document doesn't have anything to do with
9  Verizon's policies and procedures regarding reporting
10 CSAM, does it?
11       MS. SIEKKINEN:  Objection.  Mischaracterizes
12    testimony.
13 BY MR. ROBERTS:
14       Q.  We'll go back to it in a minute and we'll
15 figure out what that document actually does, but I'll
16 represent to you that does not set Verizon's policy on
17 what they report or don't report.
18       My question to you is, who told you that
19 Verizon's policy is to report apparent child pornography
20 in regards to scanning of child sexual abuse material?
21       MS. SIEKKINEN:  Objection.  Asked and answered
22    and object to the form.
23 BY MR. ROBERTS:
24       Q.  You can answer.
25       A.  I mean, it's been --

Page 167

1        MS. SIEKKINEN:  Objection.  To the extent it
2     calls for privileged material, I'm objecting on
3     that basis.
4  BY MR. ROBERTS:
5        Q.  Well, I'll state here, if it was an attorney
6  that told you that it is not privileged because you're
7  corporate representative and you're speaking on behalf
8  of the corporation.  But did anybody tell you -- here's
9  what I'm getting at, Mr. Runyon.  Nowhere in the
10 documents that I have reviewed or you've reviewed does
11 it say that Verizon's policy is to report apparent child
12 pornography or child sexual abuse material.  It doesn't
13 say that in any of the documents.
14       So I'm asking you, who's told you that?
15       MS. SIEKKINEN:  Objection.  Mischaracterizes
16    the documents and mischaracterizes the evidence.
17    Go ahead.
18 BY MR. ROBERTS:
19       Q.  Go ahead and answer for me, Mr. Runyon.
20       MS. SIEKKINEN:  But I'm raising my same
21    objection as before.  Go ahead.
22       THE WITNESS:  I don't remember exactly where I
23    learned that, at what point.  It's something that
24    has been verbalized or, you know, that I've been
25    aware of for a long time.

Page 168

1  BY MR. ROBERTS:
2        Q.  I mean, why wasn't WebPurify made aware of
3  that?
4        MS. SIEKKINEN:  Objection.  Outside the scope.
5        THE WITNESS:  I don't know.
6  BY MR. ROBERTS:
7        Q.  Right, because this just says that the purpose
8  of determining whether the content is child sexual abuse
9  material, correct?  That's what this document says?
10       MS. SIEKKINEN:  Objection.  Mischaracterizes.
11 BY MR. ROBERTS:
12       Q.  Okay.  I'm going to read it to you,
13 Mr. Runyon, just so nobody thinks I'm mischaracterizing
14 anything.  It says, "Supplier shall provide personnel to
15 do the human review for the purpose of determining
16 whether the content is child sexual abuse material and
17 therefore should be reported to NCMEC."
18       Did I misrepresent what the words are on the
19 page?
20       A.  No.
21       Q.  Okay.  Do you agree that that does not tell,
22 or reflect, Verizon a policy that's only apparent or
23 apparent CSAM is what is being either determined or
24 reported?
25       MS. SIEKKINEN:  Objection.  Incomplete.  Go



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
169–172

Page 169

1   ahead.
2       THE WITNESS:  Yes, I agree that that word
3   "apparent" is not in there.
4   BY MR. ROBERTS:
5       Q.   Right.  So what I'm asking you -- because I'm
6   trying to determine where this policy comes from that
7   Verizon reports apparent child sexual abuse material.
8   Because on our website frequently asked questions, it
9   says that confirmed CSAM is reported.  In this document,
10  it says determining whether the content, quote, is CSAM
11  and therefore should be reported.  I am looking for
12  something that would direct me to understand how or
13  where this policy comes from.
14      So my question to you is, what document -- is
15  there a document that memorializes the policy that
16  you've articulated that apparent CSAM is what is
17  reported to NCMEC?
18      MS. SIEKKINEN:  Objection.  Asked and
19  answered.
20      THE WITNESS:  I don't know.
21  BY MR. ROBERTS:
22      Q.   And you can't remember any person that told
23  you that that was the policy?
24      MS. SIEKKINEN:  Objection.  Asked and
25  answered.

Page 170

1       THE WITNESS:  No, I can't.
2   BY MR. ROBERTS:
3       Q.   This is the document that you were shown, the
4   hash-sharing -- the NPO, the non-profit hash-sharing
5   database agreement.  And this has a definition of
6   apparent child pornography, correct?
7       A.   Yes.
8       Q.   But this document -- and if you need to take
9   your time and read it, this document does not lay out
10  what Verizon's policies or procedure are for reporting
11  CSAM to NCMEC, does it?
12      MS. SIEKKINEN:  Objection.  Vague.  But go
13  ahead.
14      THE WITNESS:  I'm sorry, could you repeat the
15  question?
16  BY MR. ROBERTS:
17      Q.   Yeah.  This document does not describe what
18  Verizon's policies are regarding reporting child sexual
19  abuse material to NCMEC, does it?
20      MS. SIEKKINEN:  Object to the form.
21      THE WITNESS:  No.
22  BY MR. ROBERTS:
23      Q.   Right.  You were asked some questions about
24  whether or not the public had access to customers'
25  images that were stored on the cloud.

Page 171

1       Do you recall that?
2       A.   Yes.
3       Q.   Tell me, what is your understanding about what
4   happens to an image that's uploaded and is flagged by
5   Synchronoss using this PhotoDNA or hash-matching
6   technology?
7       MS. SIEKKINEN:  Objection.  Compound.  Go
8   ahead.
9       THE WITNESS:  It is analyzed using PhotoDNA,
10  as I understand it, and it looks for exact and near
11  matches.  And it takes those as -- it takes those
12  images and forwards them to WebPurify for them to
13  be visually looked at and to see if they confirm
14  that they do meet the standards for apparent CSAM.
15  And from there, it is forwarded back to
16  Synchronoss.  Synchronoss then files the report
17  with National Center for Missing and Exploited
18  Children and they pass it on to law enforcement.
19  BY MR. ROBERTS:
20      Q.   So particularly, though, you were asked
21  questions about do the public have access to images in
22  the cloud.  What's your understanding about what happens
23  when an image is flagged?  Does it go to the cloud?
24      MS. SIEKKINEN:  Objection.  Outside the scope.
25      Go ahead.

Page 172

1       MR. ROBERTS:  No, hold on.
2       MS. SIEKKINEN:  I'm sorry.
3       MR. ROBERTS:  No, no, sorry.
4   BY MR. ROBERTS:
5       Q.   Your counsel asked you questions about public
6   access to the cloud, correct?
7       A.   Yes.
8       Q.   On redirect, you recall her asking you
9   questions on that topic --
10      A.   Yes.
11      Q.   -- correct?  All right.  I'm going to follow
12  up on one of the questions that she asked, okay?
13      Is it your understanding that when an image is
14  flagged using PhotoDNA, MD5 hashing, by Synchronoss, it
15  never makes it to the cloud?  Do you understand that?
16      A.   I understand the question.
17      Q.   Do you understand the answer?
18      MS. SIEKKINEN:  Objection to the form and
19  argumentative.
20      MR. ROBERTS:  I'm not arguing with you,
21  Mr. Runyon.
22  BY MR. ROBERTS:
23      Q.   I'm not arguing.  I'm just telling you, I'm
24  asking you a question.  What does the cloud have to do
25  with anything on these images and it being publicly



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
173–176

Page 173

1  available?
2      A.  Files where the image is stored.
3      Q.  No, incorrect.  Incorrect.  You don't
4  understand this basic, basic stuff here, okay?  You're
5  the corporate representative for Verizon.  Have you not
6  reviewed Synchronoss' attorney's deposition of Cara
7  Blaszka in this case?
8      MS. SIEKKINEN:  Objection.  Argumentative and
9      harassing of the witness.
10 BY MR. ROBERTS:
11     Q.  Have you reviewed --
12     MS. SIEKKINEN:  Ask your questions and be
13     done.
14 BY MR. ROBERTS:
15     Q.  Have you reviewed that deposition?
16     A.  I don't know.
17     Q.  Okay.  Your attorneys actually filed this
18 portion of the deposition in court records.  We'll call
19 this maybe 9.
20     (Plaintiff's Exhibit No. 9 was marked for ID.)
21 BY MR. ROBERTS:
22     Q.  This is the deposition of Cara Blaszka.  This
23 page was actually singled out and filed and they've
24 highlighted it, not me.  It says, "So if there is a
25 direct match, an exact match or a near match, the image

Page 174

1  itself gets put into a quarantine server.  It never
2  makes it to the subscriber's account."
3      Did you not know that?
4      A.  No, I didn't.
5      Q.  Okay.  So assuming that she's telling the
6  truth, these images are not stored in the cloud,
7  correct?
8      MS. SIEKKINEN:  Objection.  Mischaracterizes,
9      but go ahead.
10     THE WITNESS:  Based upon that document, that
11     would be fair to say.
12 BY MR. ROBERTS:
13     Q.  Do you have any reason to disagree with the
14 testimony of Cara Blaszka?
15     A.  No, I do not.
16     MS. SIEKKINEN:  Objection.  Outside the scope.
17     But go ahead.
18     THE WITNESS:  I do not.
19 BY MR. ROBERTS:
20     Q.  Okay.  Let me ask you this.  Are you aware
21 that Verizon tracks and records all website activity of
22 their customers?
23     MS. SIEKKINEN:  Objection.  Outside the scope.
24     THE WITNESS:  I am not.
25

Page 175

1  BY MR. ROBERTS:
2      Q.  Okay.  For marketing purposes, you've never
3  heard -- I mean, you never heard of a program called
4  Custom Experience at Verizon?
5      MS. SIEKKINEN:  Objection.  We're outside the
6      scope both of the 30(b)(6) and of recross.
7      THE WITNESS:  No, that's not something I'm
8      familiar with.
9  BY MR. ROBERTS:
10     Q.  Okay.  All right.  So in any of the policies
11 or processes that we have discussed, is searching a
12 client's web history in any way part of the policies and
13 procedures to make a determination about whether or not
14 a particular content should be reported?
15     MS. SIEKKINEN:  Objection.  Outside the scope
16     of the 30(b)(6) and of recross.
17 BY MR. ROBERTS:
18     Q.  I just asked you a question.  I just want to
19 make sure you understand it.  Do the policies and
20 procedures of Verizon and the detection of reporting of
21 child sexual abuse material include searching the web
22 history or search history of the customer?
23     A.  I don't know.
24     MR. ROBERTS:  All right.  I don't have any
25     other questions.  Okay.  So I think, if we're

Page 176

1  done -- any more questions from anybody?  Going
2  once.
3      MR. REISS:  No.
4      MR. ROBERTS:  Going twice.
5      MS. SIEKKINEN:  We're done.
6      THE VIDEOGRAPHER:  Counsel, before we go off
7  the record, I would just like to confirm any video
8  and transcript orders, starting with Mr. Roberts.
9      MR. ROBERTS:  Yes, please.  We'll have a
10 transcript.  We don't -- we'll take a video.
11 That's fine, yeah.
12     THE VIDEOGRAPHER:  Would you like the video
13 synced with the transcript?
14     MR. ROBERTS:  I don't know if we're that
15 fancy.  I don't know if we need that yet.  But is
16 that something I can order later if I need it?
17     THE VIDEOGRAPHER:  Yes.
18     MR. ROBERTS:  Okay.  Thank you.
19     MS. SIEKKINEN:  We're also ordering the
20 transcript and video, please.
21     THE VIDEOGRAPHER:  And would you like that
22 synced?
23     MS. SIEKKINEN:  Yes, please.
24     MR. REISS:  And we just need the transcript.
25     MR. ROBERTS:  And just for the record -- and I



DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
177—180

Page 177

1  know that opposing counsel is objecting.  But I
2  just want to restate that we're continuing the
3  deposition for previous-stated reasons.  And I'm
4  assuming that you'll continue to object to that for
5  the stated reasons, and we can have that
6  conversation off line.
7      MS. SIEKKINEN:  Yeah, I agree with that, that
8  we're going to be continuing to object and then
9  we'll continue the meeting to confer off line.
10     MR. ROBERTS:  Sure.  All right.  Thanks guys.
11  David, I hope you feel better.
12     THE WITNESS:  I'm getting there.
13     MR. ROBERTS:  Sorry you got the short straw to
14  be the corporate rep, you know, but I appreciate
15  your time.  Thank you.
16     THE VIDEOGRAPHER:  One moment, Mr. Roberts.  I
17  still need to take us off the record.
18     MR. ROBERTS:  Oh, okay.  Sorry.
19     THE VIDEOGRAPHER:  All right.  We are off the
20  record at 6:23 p.m.  This concludes today's
21  testimony given by David Runyon.  The total number
22  of media used was seven and will be retained by
23  Esquire Deposition Solutions.  Thank you all.
24     (Witness excused.)
25     (Deposition was adjourned at 6:23 p.m.)

Page 178

1              CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF PALM BEACH
4
5
6          I, the undersigned authority, certify that
7  DAVID RUNYON personally appeared before me and was duly
8  sworn on the 22nd day of October, 2025.
9
10         Witness my hand and official seal this 24th
11  day of October, 2025.
12
13
14
15  _____
16
17  Wendy Beath Anderson, RDR, CRR, CRC
   Notary Public State of Florida
   My Commission Expires:  9/23/2029
18  My Commission No.:  HH-687547
19  Job #J13610228
20
21
22
23
24
25

Page 179

1              C E R T I F I C A T E
2  STATE OF FLORIDA
3  COUNTY OF PALM BEACH
4
5      I, Wendy Beath Anderson, Certified Realtime
   Reporter and Notary Public in and for the State of
6  Florida at Large, do hereby certify that I was
   authorized to and did stenographically report said
7  remote deposition of DAVID RUNYON; that a review of the
   transcript was not requested; and that the foregoing
   transcript is a true record of my stenographic notes.
9      I FURTHER CERTIFY that I am not a relative,
   employee, or attorney, or counsel of any of the parties,
10  nor am I a relative or employee of any of the parties'
   attorney or counsel connected with the action, nor am I
11  financially interested in the action.
12      The foregoing certification of this transcript
   does not apply to any reproduction of the same by any
13  means unless under the direct control and/or  direction
   of the certifying reporter.
14
15
16     Dated this 24th day of October, 2025.
17
18  _____
19  Wendy Beath Anderson, RDR, CRR, CRC
20  Job #J13610228
21
22
23
24
25

Page 180

1  Reference No.: 13610228
2
3  Case:  LAWSHE vs VERIZON COMMUNICATIONS
4
       DECLARATION UNDER PENALTY OF PERJURY
5
       I declare under penalty of perjury that
6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the
7  same has been read to me, and the same is
   true and accurate, save and except for
8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
9  hereof, with the understanding that I offer
   these changes as if still under oath.
10
11  _____
12     David Runyon
13
14     NOTARIZATION OF CHANGES
15        (If Required)
16
17  Subscribed and sworn to on the _____ day of
18
19  _____, 20____ before me,
20
21  (Notary Sign)_____
22
23  (Print Name)                Notary Public,
24
25  in and for the State of _____

DAVID RUNYON
LAWSHE vs VERIZON COMMUNICATIONS

October 22, 2025
181–182

Page 181

```
1   Reference No.: 13610228
    Case:  LAWSHE vs VERIZON COMMUNICATIONS
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
    SIGNATURE:_____DATE:_____
25  David Runyon
```

Page 182

```
1   Reference No.: 13610228
    Case:  LAWSHE vs VERIZON COMMUNICATIONS
2
3   Page No._____Line No._____Change to:_____
4   _____
5   Reason for change:_____
6   Page No._____Line No._____Change to:_____
7   _____
8   Reason for change:_____
9   Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
    SIGNATURE:_____DATE:_____
25  David Runyon
```

